SEP 2 1 2007

U.S.D.C. S.D.N.Y
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

METRO FUEL LLC,

'07 CIV 8244

                                        Plaintiff,

            – against –                                    **COMPLAINT AND
                                                           DEMAND FOR JURY TRIAL**

CITY OF NEW YORK,

                                        Defendant.

-------------------------------------------------------------------x

Plaintiff Metro Fuel LLC, by and through its attorneys, Emery Celli Brinckerhoff & Abady LLP, for its Complaint alleges as follows:

## NATURE OF THE CASE

1.      This First Amendment challenge to New York City's scheme for regulating advertising signs is about stark government hypocrisy.

2.      Plaintiff Metro Fuel LLC ("Fuel") is engaged in the business of outdoor advertising in New York City (as well as in several other major metropolitan areas). Fuel is involved in a number of different outdoor advertising businesses in New York City, including the billboard, wallscape, and panel sign businesses. This case is only about Fuel's New York City panel sign business.

3.      Panel signs are internally illuminated poster advertisements that have a surface area of approximately 24 square feet (69 inches high by 48 inches wide). Fuel operates 360 panel signs in New York City. These signs are situated in one of three ways: (1) they are placed on a lot that has not been built on, such as a parking lot; (2) they are affixed to the front or

side of a building, usually at or near the ground level; or (3) they are placed on the inside of a parking garage near the door to the garage. Fuel typically rents space from the landlord in exchange for the right to place a panel sign on or inside of the property. Most of Fuel's panel signs do not project from the building line onto the adjacent sidewalk, and the few that do project do so only by a few inches.

4.    New York City's Zoning Resolution places severe restrictions on Fuel's ability to operate panel signs in New York City. Panel signs are not allowed in residential or manufacturing districts at all, and are only allowed in a small minority of commercial districts. Were the Zoning Resolution enforced as written, *ninety percent* (approximately 324 out of 360) of Fuel's panel signs would have to come down.

5.    Fuel anticipates that the City will likely claim that the Zoning Resolution regulations at issue are necessary to preserve and protect "traffic safety" and "aesthetics" (as the City has repeatedly claimed in past litigation, even though the Zoning Resolution makes no reference to either of these supposed justifications). The evidence confirms unmistakably, however, that the true motivation behind the City's regulations is bare-knuckle economic greed: the City's desire to stifle competition in those segments of the outdoor advertising industry in which *the City itself* is the most significant player.

6.    Tellingly, the City is not applying its zoning regulations to vast numbers of *the City's own* advertising signs – ones that are virtually the same size as Fuel's panel signs; that often are located in close proximity to Fuel's panel signs; that plainly are far more dangerous and unsightly than Fuel's signs allegedly are; but that, unlike Fuel's signs, generate hundreds of millions of dollars in revenue for the City.

7.    The most glaring example of this phenomenon is the City's recent and very high-profile contract with Cemusa, Inc. ("Cemusa"), an outdoor advertising company that has been awarded the exclusive right to install thousands of pieces of "street furniture" (including bus shelters, newsstands, and public pay toilets) throughout the City. Cemusa has been afforded the right to place advertising on each and every piece of street furniture – notwithstanding that virtually all such advertising violates the Zoning Resolution provisions that are challenged in this action – because Cemusa agreed to give the City *half of the gross revenues generated by each ad.* Indeed, Cemusa expressly guaranteed that the City will receive *at least $1 billion* in revenue over the 20-year life of the contract.

8.    It cannot seriously be disputed that the Cemusa ads that will be blanketing the City are far more dangerous and unsightly than Fuel's panel signs allegedly are. The Cemusa ads are at least as big as Fuel's ads. The Cemusa ads are located much closer to the curb line, and thus are far more visible and distracting to motorists and pedestrians. Indeed, many of the Cemusa ads will be equipped with dynamic scroller technology (*i.e.*, ads that move) and even Bluetooth wireless technology (*i.e.*, ads that literally send text messages to passing motorists and pedestrians). These larger, closer to the curb, high-tech ads plainly are more noticeable and distracting to passing motorists and pedestrians than Fuel's static ads allegedly are. And yet the City is not applying its Zoning Resolution provisions to Cemusa's signs. The reason for this is as obvious as it is cynical: Cemusa's ads make money for the City, and Fuel's ads do not.

9.    The same is true for the over 13,000 public pay telephones that are ubiquitous in New York City. Virtually all of these pay telephones bear advertising. Indeed, it is common knowledge that the advertising revenue generated by public pay telephones *dwarfs* the

revenue that is generated by the calls that are placed on them. Like Cemusa's street furniture signs, these lucrative pay telephone ads tend to be located near curblines, where they are maximally visible to passing motorists and pedestrians. Like the street furniture signs, these pay telephone ads blatantly violate the very Zoning Resolution regulations that purportedly apply to Fuel's panel signs. Like the street furniture signs, however, the City is not applying its Zoning Resolution provisions to pay telephone ads because the City gets a substantial fraction of every dollar of advertising that is placed – 26% of the gross revenues, which generated $13.7 million for the City last year alone.

10.    These are but a few examples of the many ways in which the City encourages outdoor advertising when doing so suits it. The City is virtually *saturated* with advertising that is not just condoned but embraced by the City. Subway entrances have surface-level advertising (including video advertising) that is visible to passing motorists and pedestrians. Banners bearing corporate logos hang from the City's lampposts. All of the City's buses and most of its taxis are covered in advertising. Any suggestion that these dominant species of streetscape advertising are acceptable, but that Fuel's substantially less visible panel signs somehow are offensive, is wholly irrational.

11.    Fuel does not dispute the City's authority to make reasonable determinations about what is in the public's interest, and to enact and enforce regulations that are narrowly tailored to serving and protecting the public interest. But it is axiomatic that the City cannot infringe on core First Amendment rights when its reasons for doing so are blatantly pretextual – especially where, as here, the City's true motivation is to destroy competition and reserve for itself a monopoly in the outdoor advertising business.

12.     For all of these reasons, the Zoning Resolution provisions at issue should be declared unconstitutional, and Fuel should be allowed to continue to operate its panel signs unless and until the City devises a neutral set of rules that apply evenhandedly to *all* advertising signs, including the ones that directly enrich the City.

## THE PARTIES

13.     Plaintiff Metro Fuel LLC ("Fuel") is a Delaware limited liability company located at 149 Fifth Avenue, New York, New York.  Fuel is engaged in the business of outdoor advertising in New York City (as well as in several other major metropolitan areas).

14.     Defendant City of New York ("the City"or "New York City" ) is a municipality organized and existing under the laws of the State of New York.  At all times relevant hereto, the City was and is responsible for the establishment and enforcement of outdoor advertising regulations within New York City.

## JURISDICTION AND VENUE

15.     This action arises under 42 U.S.C. § 1983, 28 U.S.C. §§ 2201 and 2202, and the First and Fourteenth Amendments to the United States Constitution.

16.     The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1343, and 28 U.S.C. § 1367(a).

17.     The acts complained of occurred in the Southern District of New York and venue is lodged in this Court pursuant to 28 U.S.C. § 1391(b).

## JURY DEMAND

18.     Plaintiff demands trial by jury in this action.

# FACTUAL ALLEGATIONS

**A.     Fuel's Panel Signs**

19.     For purposes of this Complaint, a "panel sign" is an internally illuminated advertising sign measuring 69 inches high by 48 inches wide (*i.e.*, with a total surface area of under 24 square feet).

20.     Fuel operates 360 panel signs in New York City.  The vast majority of Fuel's panel signs are located in commercial and manufacturing districts.

21.     Many of Fuel's signs are operated with the cooperation of parking lot and parking garage operators.  Fuel pays parking lot and parking garage operators a monthly fee in exchange for the right to place panel signs on their lots, on their buildings, or inside of their buildings near the garage doors.

22.     In the case of parking lots, Fuel's panel signs are either free-standing or are affixed to buildings located on the lots.  In the case of parking garages, Fuel's panel signs are affixed either to an exterior building wall, in which case they are always visible from the street, or to an interior building wall just inside of the garage door, in which case they are visible from the street only when such doors are open.

23.     Fuel's panel signs are made available to national and local advertisers on an "all comers" basis in a fashion similar to newspaper, magazine, and broadcast advertising. Fuel's panel signs are used to display a variety of commercial and noncommercial messages, including political, religious, charitable, and public service messages.  Fuel's panel signs are a forum for the communication and expression of ideas and messages – both commercial and

noncommercial messages – that are protected by the First Amendment to the United States Constitution.

**B.      The City's Stringent Regulation of Panel Signs**

24.      The New York City Zoning Resolution defines a "sign" to include any writing, pictorial representation, emblem, or flag that is attached to, painted on, or in any other manner represented on a building or other structure, and that is used to announce, direct attention to, or advertise, and that is visible from outside of a building.  Z.R. § 12-10 (definition of "sign").[1]

25.      The Zoning Resolution distinguishes among three types of "signs": "advertising" signs, "accessory signs," and "non-commercial" signs.

26.      An "advertising sign" is a sign that directs attention to a business, profession, commodity, service or entertainment conducted, sold or offered *elsewhere than upon* the premises where the sign is located.  Z.R. § 12-10 (definition of "advertising sign").  A sign is, by definition, not an "advertising sign" if it is "accessory to a use located on the zoning lot" containing the sign.  *Id.*

---

[1] Fuel believes that the City will take the position that all of its panel signs meet the Zoning Resolution's definition of a "Sign," including the panel signs that are located *inside* of a parking garage visible only through the garage door (when the door is open).  Fuel disagrees with this assessment and asserts that panel signs that are located inside of a parking garage and are visible only through a door are not "Signs" subject to regulation under the Zoning Resolution. However, Fuel will assume for purposes of this Complaint that such panel signs are subject to regulation under the Zoning Resolution.  The purpose of this Complaint is to establish that any regulation purporting to apply to such signs, assuming *arguendo* that it exists, runs afoul of the First Amendment and therefore is unenforceable in any event.

27.     An "accessory sign" is a sign that directs attention to a business or profession that is conducted *on the premises* where the sign is located. Z.R. § 12-10 (definition of "accessory use"). Accessory signs are also referred to as "on-premises signs" or "business signs."

28.     The Zoning Resolution liberally permits accessory signs to be placed and maintained anywhere in commercial and manufacturing districts, subject only to size, height, illumination, and projection limitations. Z.R. §§ 32-62 to 32-661; *id.* §§ 42-52 to 42-543.

29.     Contrary to its treatment of accessory signs, the Zoning Resolution places substantial restrictions on where advertising signs may be located in commercial and manufacturing districts.

30.     Whereas accessory signs may be located in any type of district, the Zoning Resolution provides that advertising signs are allowed only in C6-5, C6-7, C7, and C8 commercial districts and in M1, M2, and M3 manufacturing districts. Z.R. §§ 32-63, 42-52. Advertising signs are not allowed in residential districts at all.

31.     However, Fuel's panel signs are not allowed in C8, M1, M2, or M3 districts because, in such districts, the only advertising signs that are allowed are non-illuminated or indirectly illuminated advertising signs. Z.R. §§ 32-645, 42-533.

32.     Accordingly, Fuel's panel signs are only allowed in C6-5, C6-7, and C-7 districts. Fuel's panel signs are not allowed in any residential districts, nor in any manufacturing districts, nor in any commercial districts other than C6-5, C6-7, and C-7 districts.

33.    Of the 360 panel signs that Fuel currently operates in New York City, approximately 36 such signs are located in C6-5, C6-7, or C-7 districts.  The remaining 324 panel signs are located in districts in which panel signs purportedly are not allowed.

34.    In other words, ninety percent of Fuel's panel signs are located in districts in which panel signs purportedly are not allowed.

35.    Moreover, the Zoning Resolution contains no exception for panel signs displaying non-commercial messages.  Fuel's panel signs are prohibited in all districts other than C6-5, C6-7, or C-7 districts, even if they are displaying political, cultural, or other public service messages.

**C.    The City's Scheme For Regulating Fuel's Panel Signs Does Not Directly or Materially Advance Any Purported Interest in Promoting Traffic Safety and Aesthetics**

36.    As stated above, Fuel anticipates that the City likely will claim that its scheme for regulating panel signs is permissible because it has a substantial interest in promoting "traffic safety" and "aesthetics."

37.    However, no scientific study has ever demonstrated that there is any connection between panel signs and traffic safety or that panel signs compromise traffic safety in any way.

38.    Indeed, the City has never studied whether there is any connection whatsoever between panel signs and traffic safety or whether panel signs compromise traffic safety in any way.

39.    There is, in fact, no connection between panel signs and traffic safety. Fuel's panel signs do not affect or compromise traffic safety in any way.

40.    Even assuming there were some connection between panel signs and traffic safety – which there is not – it would make no sense, and would be entirely irrational, to allow such supposedly dangerous panel signs in C6-5, C6-7, and C-7 districts, but to prohibit them in all other districts.

41.    Nor does the City's scheme directly or materially advance its purported interest in promoting aesthetics. The City has not conducted any studies concluding or demonstrating that panel signs substantially compromise or adversely affect the attractiveness of the urban landscape.

42.    The City has not engaged in any comprehensive or coordinated effort to study or address aesthetic issues in residential, commercial, or manufacturing districts.

43.    Plaintiff's panel signs do not affect or compromise the aesthetics of the urban landscape in New York City.

**D.    The City's Scheme For Regulating Fuel's Panel Signs Is Not Narrowly Drawn to Its Purported Interest in Promoting Traffic Safety and Aesthetics**

44.    To say that the City's scheme is not narrowly drawn to its purported interest in promoting "traffic safety" and "aesthetics" would be a considerable understatement. Far from regulating outdoor advertising in a consistent and evenhanded manner, the City itself has directly sponsored – and profited handsomely from – the widespread proliferation of advertising signs on the City's sidewalks and streets that, if the City's anticipated position regarding "traffic safety" and "aesthetics" is accepted, are far more dangerous and unattractive than Fuel's panel signs allegedly are.

### 1.    The City's Street Furniture Franchise

45.    Despite its purported interest in limiting the placement of advertising signs in order to promote traffic safety and aesthetics, the City itself is affirmatively placing thousands of its own advertising signs on so-called "street furniture" – including bus shelters, newsstands, and pay toilets – along the City's sidewalks.

46.    The City has done so unabashedly in order to generate revenue, notwithstanding the fact that the City's street furniture advertising is, if anything, more dangerous and more aesthetically objectionable than Plaintiff's panel signs allegedly are.

47.    In May 2006, the City approved a twenty-year, multi-billion-dollar agreement with Cemusa, a Spanish outdoor advertising company.  Known as the Coordinated Street Furniture Franchise ("CSFF"), this agreement calls for Cemusa to construct and manage more than 3,300 bus shelters, 330 new newsstands, dozens of automated public toilets (as well as other forms of street furniture, such as trash receptacles) on the City's sidewalks.

48.    While the ostensible reason for the CSFF is to "coordinate" the design and appearance of street furniture across the city, the true and primary purpose of the new structures is to generate advertising revenues in which the City will share.  Cemusa will place advertising on each and every new structure, and the City will receive a whopping 50% of the gross revenues.

49.    In addition to its 50% cut of the gross revenues, the City will also receive as much as 22.5% of advertising space on the new street furniture, free of charge, for the City's own public service announcements and for use by the City's marketing partners.

50.     Over the twenty-year life of the CSFF, the City and Cemusa are *each* expected to rake in over $1 billion in advertising revenues (although the City, unlike Cemusa, will have few if any offsetting costs).

51.     Any purported gains in the area of "traffic safety" and "aesthetics" attributable to the City's regulation of panel signs is more than offset – indeed, dramatically so – by the City's encouragement of the widespread proliferation of advertising signs under the Cemusa contract.

**(a)     Bus Shelters**

52.     One of the most significant aspects of the CSFF is the replacement of the approximately 3,300 bus shelters that currently exist on the City's sidewalks. Cemusa is under contract to replace all of these shelters with new structures – and to build as many as 200 new shelters as well – throughout the City's residential, commercial, and manufacturing districts.

53.     Every single one of these new bus shelters will display advertising. Each of them will contain two internally illuminated advertising panels totaling up to 55 square feet of advertising space. In other words, the new Cemusa panels will be even *larger* than Fuel's similar panel signs (which are only 24 square feet each).

54.     Cemusa's new bus shelters are specifically designed to maximize their visual impact on drivers. The advertising panels are oriented perpendicular to the street, such that they are visible to motorists approaching the shelter from both directions. Indeed, the bus shelters are located near the curb lines, and the advertising panels are placed as close to the curb lines as possible, to ensure maximum visibility by passing motorists.

55.    In this way, Fuel's panel signs stand in stark contrast to the bus shelter signs that the City is permitting Cemusa to roll out across the five boroughs. Fuel's panel signs invariably are located in parking lots, inside parking garages, or, at most, affixed to buildings. Fuel's signs generally do not project from a building line out over a sidewalk – and those that do project do so only by a matter of inches – much less do they ever come anywhere close to a curb line. Because Cemusa's bus shelter signs invariably are located immediately adjacent to curb lines – and thus are much more visible than Fuel's panel signs, both to passing motorists and pedestrians – Cemusa's signs plainly are far more dangerous and far less attractive than Fuel's panel signs allegedly are.

56.    These bus shelter signs blatantly violate the very Zoning Resolution provisions that Fuel's panel signs allegedly violate. But the City is not applying these provisions to these bus shelter signs simply because they generate money for the City.

57.    Attached hereto as Exhibit A are photographs depicting some of Fuel's panel signs located in close proximity to some of the City's bus shelter signs. These photographs vividly demonstrate the common-sense point that the City's bus shelter signs are far more dangerous and unsightly than Fuel's panel signs allegedly are.

58.    In addition to allowing traditional posters, the City is also permitting Cemusa to use a more dynamic form of advertising – so-called "scroller" advertising – which allows a single illuminated advertising panel to serve as a platform for a scrolling series of posters which replace one another at short intervals. Scroller advertising permits a single platform to be used on a rotating basis by more than one advertiser, and seeks to capture the attention of viewers by virtue of its kinetic nature. Whereas there used to be no scroller

advertising on street furniture in New York City, the CSFF allows Cemusa to place up to 200 scrollers – each holding multiple different, rotating advertisements – at bus stop locations of Cemusa's choosing. Naturally, Cemusa will maximize revenues by locating these 200 scrolling panels, to the greatest degree possible, at the locations with the greatest number of "eyeballs" (vehicular and pedestrian traffic). This provides yet another reason why Cemusa's bus shelter signs are even more dangerous and unattractive than Fuel's panel signs allegedly are.

59.    Moreover, some of the Cemusa bus shelter signs are equipped with "Bluetooth" technology that actually enables these signs to detect passing cellular telephones and to send advertisements directly to these passing phones in the form of text messages. On information and belief, the range for this technology is up to 300 feet, meaning that the Cemusa signs will be able to locate and send text messages not only to passing pedestrians, but to passing motorists as well. Needless to say, the fact that unsuspecting motorists may be bombarded with text message advertisements emanating from nearby bus shelters provides yet another reason why Cemusa's bus shelter signs are, if anything, significantly more dangerous and unattractive than Fuel's panel signs allegedly are.

**(b)    Newsstands**

60.    In addition to the 3,300-3,500 bus shelters, the CSFF also allows Cemusa to take over and place advertising on each of the City's approximately 330 newsstands, all of which are located on congested streets in the urban center. Prior to the CSFF, advertising on newsstands was forbidden. Under the CSFF, Cemusa will construct new newsstands up to nine feet in height and six and a half feet in width. These new newsstands will bear as much as 82.5 square feet of illuminated advertising – on both the side and the rear of the structures – that will

be, by design, as visible to passing motorists as possible.  City rules allow advertising panels of up to seven feet in height and permit the siting of the newsstand as little as 18 inches from the curbline.  The effect of these rules is to allow obtrusive advertising signs to be placed immediately adjacent to the nearest lane of traffic.  These newsstand advertising panels will be far more dangerous and unattractive than Fuel's panel signs allegedly are.

61.    These newsstand signs blatantly violate the very Zoning Resolution provisions that Fuel's panel signs allegedly violate.  But the City is not applying these provisions to these newsstand signs simply because they generate money for the City.

(c)    **Public Pay Toilets**

62.    Advertising placed pursuant to the CSFF will also appear on a third category of street furniture:  automated public toilets ("APTs").  The CSFF calls for the construction of 20 curbside APTs around the City, each to provide maximum advertising space (in the form of illuminated panels) in the amount of 82.5 square feet.  The signage may be as large as nine feet in height.  While the absolute number of APTs in the City will be rather small, most of these structures will appear in the most congested parts of the City (principally in Manhattan) and, as curbside advertising platforms, will be oriented to present advertising both to pedestrians and to drivers.  Once again, the advertising panels on these APTs will be far more dangerous and unattractive than Fuel's panel signs allegedly are.

2.    **Pay Telephones**

63.    In addition to the three categories of advertising-bearing street furniture mandated by the CSFF (bus shelters, newsstands, and automated public toilets), the City's

sidewalks have been virtually blanketed by advertisements placed on public pay telephones.

64.     The City currently has upwards of 13,000 public pay telephones located on its sidewalks.  Typically, these structures each have three advertising panels:  one perpendicular to the street and facing oncoming traffic in the near lane; one comprising the rear of the structure that is parallel to the lane of traffic (but head-on from the perspective of motorists and pedestrians on the side streets); and one on the far side of the structure, visible, in the case of streets running in two directions, from the lanes of traffic on the far side.

65.     Not surprisingly, the City shares in the very substantial revenue generated by the advertisements on these pay telephones, which generally dwarfs the revenue generated by the calls that are placed on them.  The City receives 26% of the gross revenue generated by each advertisement.  Last year alone, the City's take from pay telephone advertisements was $13.7 million.

66.     Pay telephone advertisements are even more dangerous and unattractive than Fuel's panel signs allegedly are because the pay telephones are located near curb lines where they are far more visible to passing motorists and pedestrians.

67.     These pay telephone advertisements blatantly violate the very Zoning Resolution provisions that Fuel's panel signs allegedly violate.  But the City is not applying these provisions to these pay telephone ads simply because they generate money for the City

68.     Attached hereto as Exhibit B are photographs depicting some of Fuel's panel signs located in close proximity to some of the City's pay telephone advertisements.  These photographs vividly demonstrate the common-sense point that the City's pay telephone advertisements are far more dangerous and unsightly than Fuel's panel signs allegedly are.

### 3.    Banners

69.    In addition to advertisements on bus shelters, newsstands, pay toilets, and pay telephones, the City allows advertising banners to be placed on New York City Department of Transportation property such as lamp posts.

70.    In theory, these banners are supposed to promote public events or cultural exhibits. However, up to 10% of the banners may be used to advertise commercial sponsorship of the event or exhibit. In practice, therefore, the banners are used substantially for commercial advertising.

71.    Notably, these banners are allowed to be up to 24 square feet – exactly the same size as Fuel's panel signs. However, these banners are far more dangerous and unattractive than Fuel's panel signs allegedly are, because the banners are almost always located beyond the curb line, literally dangling directly over the City's streets.

72.    Attached hereto as Exhibit C are photographs depicting some of Fuel's panel signs located in close proximity to some of the City's banner ads. These photographs vividly demonstrate the common-sense point that the City's banner ads are far more dangerous and unsightly than Fuel's panel signs allegedly are.

### 4.    Taxi Cabs

73.    In recent years, the City's Taxi and Limousine Commission has begun to allow advertisements to be placed on the roofs of the City's many thousands of taxi cabs.

74.    On information and belief, the City has issued over 5,000 rooftop advertising permits to taxi operators. Moreover, many of these rooftop ads contain dynamic

digital copy – such as flashing news or sports scores – that is specifically designed to attract the attention of motorists and pedestrians to the maximum degree possible.

75.     Because many of these rooftop taxi advertisements contain digital copy, and because their very purpose is to attract the attention of adjacent motorists, these advertisements are far more dangerous and unattractive than Fuel's panel signs allegedly are.

**5.     Subway Entrances and Buses**

76.     The City also tolerates a plethora of advertising located on property owned or controlled by the Metropolitan Transportation Authority (the "MTA") that is far more dangerous and unattractive than Fuel's panel signs allegedly are.

77.     First, the MTA places advertisements on most of its subway entrances located on City sidewalks.  The advertisements are approximately the same size as Fuel's panel signs, but the MTA subway entrance signs are located much closer to the curb lines than Fuel's panel signs are.  Moreover, unlike Fuel's panel signs, many of the MTA's subway entrance advertising signs contain scrolling, dynamic digital, and even video advertising.  For these reasons, the MTA subway entrance signs are far more dangerous and unattractive than Fuel's panel signs allegedly are.

78.     Attached hereto as Exhibit D are photographs depicting some of Fuel's panel signs located in close proximity to some of the MTA's subway entrance ads.  These photographs vividly demonstrate the common-sense point that the subway entrance ads are far more dangerous and unsightly than Fuel's panel signs allegedly are.

79.     The MTA also places advertisements on all of its buses running throughout New York City.  The typical bus advertisement is larger than Fuel's panel signs.

Indeed, many of the MTA's buses contain so-called "blanket" advertisements that literally cover the entire bus. Like the taxi rooftop advertisements, these bus advertisements are designed to, and do, attract the attention of New York City motorists to the maximum possible degree because the advertisements are physically located directly on the City's roadways.

80.    The City has the legal authority to regulate advertisements placed on property owned or controlled by the MTA. At a bare minimum, the City exerts substantial influence over the MTA by virtue of the fact that the Mayor controls several of the MTA's board members. Tellingly, however, the City has made no effort whatsoever to curb the proliferation of advertising signs on MTA property, including subway entrance advertisements and bus advertisements.

## AS AND FOR A FIRST CLAIM FOR RELIEF
(42 U.S.C. § 1983 – First Amendment)

81.    Plaintiff repeats and realleges each of the foregoing paragraphs as if they were fully set forth at length herein.

82.    The messages contained on Plaintiff's panel signs constitute speech that is entitled to full First Amendment protection.

83.    The messages contained on Plaintiff's panel signs are not misleading and do not relate to unlawful activity.

84.    The City has no substantial, much less compelling, interest that justifies the suppression of Plaintiff's protected commercial speech.

85.    The City's scheme for regulating outdoor advertising does not directly advance its purported interest in promoting traffic safety and aesthetics.

86.    The City's scheme for regulating outdoor advertising is not narrowly drawn to its purported interest in promoting traffic safety and aesthetics.

87.    The City did not carefully calculate the costs and benefits of its scheme for regulating outdoor advertising.

88.    The City's scheme for regulating outdoor advertising violates the First and Fourteenth Amendments to the United States Constitution.

89.    The violation of Plaintiff's rights has been caused by an official policy and custom of the City of New York.

90.    Absent relief, Plaintiff has suffered and will continue to suffer irreparable harm.

## AS AND FOR A SECOND CLAIM FOR RELIEF
(New York State Constitution)

91.    Plaintiff repeats and realleges each of the foregoing paragraphs as if they were fully set forth at length herein.

92.    By virtue of the foregoing, the City's scheme for regulating outdoor advertising violates the New York State Constitution, including but not limited to Article I, § 8.

93.    Absent relied, Plaintiff has suffered and will continue to suffer irreparable harm.

WHEREFORE, Plaintiff respectfully requests judgment against Defendant as follows:

1.      an order declaring that the New York City Zoning Resolution violates the United States and New York Constitutions on its face and as applied to Plaintiff;

2.      an order enjoining Defendant from enforcing the Zoning Resolution against or otherwise regulating Plaintiff's panel signs;

3.      an order awarding reasonable attorneys' fees and costs; and

4.      an order directing such other and further relief as the Court may deem just and proper.

Dated: September 20, 2007
      New York, New York

Respectfully submitted,

EMERY CELLI BRINCKERHOFF
& ABADY LLP

By: _____
     Richard D. Emery (RE 5181)
     Eric Hecker (EH 0989)

75 Rockefeller Plaza, 20th Floor
New York, N.Y. 10019
(212) 763-5000

Attorneys for Plaintiff

JS 44C/SDNY
REV. 12/2005

CIVIL COVER SHEET

**'07 CIV 8244**

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for use of the Clerk of Court for the purpose of initiating the civil docket sheet.

PLAINTIFFS    METRO FUEL LLC

DEFENDANTS    CITY OF NEW YORK

ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER
Emery Celli Brinckerhoff & Abady LLP – (212) 763-5000
75 Rockefeller Plaza, 20th Fl., NY NY 10019

ATTORNEYS (IF KNOWN)
Richard D. Emery
Eric Hecker

SEP 21 2007
U.S.D.C. S.D.N.Y.
CASHIERS

CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE)
First Amendment challenge under 42 U.S.C. s 1983 to various municipal zoning regulations pertaining to advertising signs.

Has this or a similar case been previously filed in SDNY at any time? No[x] Yes? ☐    Judge Previously Assigned _____

If yes, was this case Vol.☐ Invol. ☐  Dismissed. No☐ Yes ☐  If yes, give date _____ & Case No. _____

(PLACE AN [x] IN ONE BOX ONLY)

## NATURE OF SUIT

**ACTIONS UNDER STATUTES**

**TORTS**

**CONTRACT**
[ ] 110 INSURANCE
[ ] 120 MARINE
[ ] 130 MILLER ACT
[ ] 140 NEGOTIABLE INSTRUMENT
[ ] 150 RECOVERY OF OVERPAYMENT & ENFORCEMENT OF JUDGMENT
[ ] 151 MEDICARE ACT
[ ] 152 RECOVERY OF DEFAULTED STUDENT LOANS (EXCL VETERANS)
[ ] 153 RECOVERY OF OVERPAYMENT OF VETERANS BENEFITS
[ ] 160 STOCKHOLDERS SUITS
[ ] 190 OTHER CONTRACT
[ ] 195 CONTRACT PRODUCT LIABILITY
[ ] 196 FRANCHISE

**PERSONAL INJURY**
[ ] 310 AIRPLANE
[ ] 315 AIRPLANE PRODUCT LIABILITY
[ ] 320 ASSAULT, LIBEL & SLANDER
[ ] 330 FEDERAL EMPLOYERS' LIABILITY
[ ] 340 MARINE
[ ] 345 MARINE PRODUCT LIABILITY
[ ] 350 MOTOR VEHICLE
[ ] 355 MOTOR VEHICLE PRODUCT LIABILITY
[ ] 360 OTHER PERSONAL INJURY

**PERSONAL INJURY**
[ ] 362 PERSONAL INJURY - MED MALPRACTICE
[ ] 365 PERSONAL INJURY PRODUCT LIABILITY
[ ] 368 ASBESTOS PERSONAL INJURY PRODUCT LIABILITY

**PERSONAL PROPERTY**
[ ] 370 OTHER FRAUD
[ ] 371 TRUTH IN LENDING
[ ] 380 OTHER PERSONAL PROPERTY DAMAGE
[ ] 385 PROPERTY DAMAGE PRODUCT LIABILITY

**FORFEITURE/PENALTY**
[ ] 610 AGRICULTURE
[ ] 620 FOOD & DRUG
[ ] 625 DRUG RELATED SEIZURE OF PROPERTY 21 USC 881
[ ] 630 LIQUOR LAWS
[ ] 640 RR & TRUCK
[ ] 650 AIRLINE REGS
[ ] 660 OCCUPATIONAL SAFETY/HEALTH
[ ] 690 OTHER

**BANKRUPTCY**
[ ] 422 APPEAL 28 USC 158
[ ] 423 WITHDRAWAL 28 USC 157

**PROPERTY RIGHTS**
[ ] 820 COPYRIGHTS
[ ] 830 PATENT
[ ] 840 TRADEMARK

**LABOR**
[ ] 710 FAIR LABOR STANDARDS ACT
[ ] 720 LABOR/MGMT RELATIONS
[ ] 730 LABOR/MGMT REPORTING & DISCLOSURE ACT
[ ] 740 RAILWAY LABOR ACT
[ ] 790 OTHER LABOR LITIGATION
[ ] 791 EMPL RET INC SECURITY ACT

**SOCIAL SECURITY**
[ ] 861 MIA (1395FF)
[ ] 862 BLACK LUNG (923)
[ ] 863 DIWC (405(g))
[ ] 863 DIWW (405(g))
[ ] 864 SSID TITLE XVI
[ ] 865 RSI (405(g))

**FEDERAL TAX SUITS**
[ ] 870 TAXES
[ ] 871 IRS-THIRD PARTY 20 USC 7609

**OTHER STATUTES**
[ ] 400 STATE REAPPORTIONMENT
[ ] 410 ANTITRUST
[ ] 430 BANKS & BANKING
[ ] 450 COMMERCE/ICC RATES/ETC
[ ] 460 DEPORTATION
[ ] 470 RACKETEER INFLUENCED & CORRUPT ORGANIZATION ACT (RICO)
[ ] 480 CONSUMER CREDIT
[ ] 490 CABLE/SATELLITE TV
[ ] 810 SELECTIVE SERVICE
[ ] 850 SECURITIES/ COMMODITIES/ EXCHANGE
[ ] 875 CUSTOMER CHALLENGE 12 USC 3410
[ ] 891 AGRICULTURE ACTS
[ ] 892 ECONOMIC STABILIZATION ACT
[ ] 893 ENVIRONMENTAL MATTERS
[ ] 894 ENERGY ALLOCATION ACT
[ ] 895 FREEDOM OF INFORMATION ACT
[ ] 900 APPEAL OF FEE DETERMINATION UNDER EQUAL ACCESS TO JUSTICE
[ ] 950 CONSTITUTIONALITY OF STATE STATUTES
[ ] 890 OTHER STATUTORY ACTIONS

**REAL PROPERTY**
[ ] 210 LAND CONDEMNATION
[ ] 220 FORECLOSURE
[ ] 230 RENT LEASE & EJECTMENT
[ ] 240 TORTS TO LAND
[ ] 245 TORT PRODUCT LIABILITY
[ ] 290 ALL OTHER REAL PROPERTY

**ACTIONS UNDER STATUTES**

**CIVIL RIGHTS**
[ ] 441 VOTING
[ ] 442 EMPLOYMENT
[ ] 443 HOUSING ACCOMMODATIONS
[ ] 444 WELFARE
[ ] 445 AMERICANS WITH DISABILITIES - EMPLOYMENT
[ ] 446 AMERICANS WITH DISABILITIES -OTHER
[x] 440 OTHER CIVIL RIGHTS

**PRISONER PETITIONS**
[ ] 510 MOTIONS TO VACATE SENTENCE 28 USC 2255
[ ] 530 HABEAS CORPUS
[ ] 535 DEATH PENALTY
[ ] 540 MANDAMUS & OTHER
[ ] 550 CIVIL RIGHTS
[ ] 555 PRISON CONDITION

Check if demanded in complaint:

CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $_____ OTHER _____

Check YES only if demanded in complaint
JURY DEMAND: [X] YES ☐ NO

DO YOU CLAIM THIS CASE IS RELATED TO A CIVIL CASE NOW PENDING IN S.D.N.Y.?
IF SO, STATE:

JUDGE Hon. Paul A. Crotty    DOCKET NUMBER 06 Civ. 8193

NOTE: Please submit at the time of filing an explanation of why cases are deemed related.

(SEE ATTACHED RELATED CASE STATEMENT)

(SEE REVERSE)