UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

METRO FUEL LLC,

            Plaintiff,

   vs.

CITY OF NEW YORK,

            Defendant.

Case No. 07 Civ 8244 (PAC)

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT OR A PRELIMINARY INJUNCTION**

Emery Celli Brinckerhoff & Abady LLP
75 Rockefeller Plaza, 20th Floor
New York, NY 10019
(212) 763-5000

Attorneys for Plaintiff Metro Fuel LLC

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii-iv

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.    Plaintiff's Outdoor Advertising Business . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    B.    The City's Regulatory Scheme . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    C.    The City's Street Furniture Advertising Signs . . . . . . . . . . . . . . . . . . . . . . . . 6

        1.    The Street Furniture Franchise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

            (a)    Bus Shelters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

            (b)    Newsstands . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        2.    Public Pay Telephones . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        3.    Lamppost Banners . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        4.    Taxi Cabs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        5.    Urban Panels . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    D.    The City's Primary Goal In Saturating Its Streetscape With Street Furniture
        Advertising Signs Is to Generate Revenue . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        1.    The City's Share of Street Furniture Advertising Revenue . . . . . . . . . . 15

        2.    New York City Marketing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    E.    The City Awarded the Street Furniture Franchise to Cemusa Even Though
        Cemusa's Proposal Received the Lowest Design Scores of Any Bidder . . . . . . 19

    F.    The City Exempts Its Street Furniture From the Advertising Sign
        Restrictions Set Forth In the Zoning Resolution . . . . . . . . . . . . . . . . . . . . . . 21

    G.    The City's Purported "Traffic Safety" Concerns . . . . . . . . . . . . . . . . . . . . . . . 22

    H.    The City's Purported "Aesthetics" and "Neighborhood Character" Concerns . . 23

I.    Other Examples of the City's Hypocrisy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

    1.    Advertising Signs on City Property . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

    2.    City Advertising on Privately Owned Signs . . . . . . . . . . . . . . . . . . . . . 27

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

I.    THE CITY'S SCHEME FOR REGULATING PANEL SIGNS VIOLATES THE FIRST AMENDMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

    A.    Commercial Advertising Signs Enjoy Robust First Amendment Protection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

    B.    The Underinclusiveness Case Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

    C.    The City's Scheme Fails the Third and Fourth Prongs of *Central Hudson* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

        1.    Third Prong . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

        2.    Fourth Prong . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

    D.    Courts Must Be Particularly Skeptical of Regulatory Schemes Through Which the Government Discriminates In Favor of Its Own Speech . . . . 40

# TABLE OF AUTHORITIES

**PAGE NO(s)**:

**FEDERAL CASES**:

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Ballen v. City of Redmond*,
    466 F.3d 736 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 37

*Central Hudson Gas & Elec. Corp. v. Public Serv. Comm. of New York*,
    447 U.S. 557 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*City of Cincinnati v. Discovery Network, Inc.*,
    507 U.S. 410 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*City of Ladue v. Gilleo*,
    512 U.S. 43 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Edenfield v. Fane*,
    507 U.S. 761 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 33

*Elrod v. Burns*,
    427 U.S. 347 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Energy Reserves Group, Inc. v. Kansas Power & Light*,
    459 U.S. 400 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Florida Star v. B.J. F.*,
    491 U.S. 524 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Greater New Orleans Broadcasting Assn., Inc. v. United States*,
    527 U.S. 173 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Horizon Outdoor, LLC v. City of Industry*,
    228 F. Supp. 2d 1113 (C.D. Cal. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 33

*Metro Lights, LLC v. City of Los Angeles*,
    488 F. Supp. 2d 927 (C.D. Cal. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Metromedia, Inc. v. City of San Diego*,
    453 U.S. 490 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 34, 36, 39

*Nichols Media Group v. Town of Babylon,*
365 F. Supp. 2d 295 (E.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Polymer Technology Corp. v. Mimran,*
37 F.3d 74 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Rubin v. Coors Brewing Co.,*
514 U.S. 476 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 30, 31

*U.S. Trust Co. of New York v. New Jersey,*
431 U.S. 1 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*U.S. v. Winstar Corp.,*
518 U.S. 839 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,*
425 U.S. 748 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*World Wide Rush, LLC v. City of Los Angeles,*
__ F. Supp. 2d __, 2008 WL 2477440 (C.D. Cal. Jun. 9, 2008) . . . . . . . . . . . . . 1, 32, 39

*Zelnick v. Fashion Institute of Technology,*
464 F.3d 217 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

## PRELIMINARY STATEMENT

This motion turns on a straightforward legal question: whether a municipality relinquishes its otherwise broad authority to severely restrict advertising signage on private property when, in order to generate revenue, the municipality itself has purposefully blanketed its streetscape with thousands of its own, essentially identical advertising signs.

Two federal District Courts have addressed this question, both of which held that the First Amendment prohibits a municipality from having it both ways. *See Metro Lights, LLC v. City of Los Angele*s, 488 F. Supp. 2d 927 (C.D. Cal. 2006); *World Wide Rush, LLC v. City of Los Angeles*, __ F. Supp. 2d __, 2008 WL 2477440 (C.D. Cal. Jun. 9. 2008).

The *Metro Lights* and *World Wide Rush* decisions, which are directly on point, apply an unbroken line of Supreme Court cases confirming that a regulatory scheme restricting commercial speech cannot stand if it is pierced by exceptions that substantially undermine its purported rationale. *See*, *e.g.*, *Greater New Orleans Broadcasting Assn., Inc. v. United States*, 527 U.S. 173 (1999); *Rubin v. Coors Brewing Co*., 514 U.S. 476 (1995); *see also Florida Star v. B.J. F*., 491 U.S. 524, 541-542 (1989) (Scalia, J., concurring) ("[A] law cannot be regarded as protecting an interest of the highest order, and thus as justifying a restriction upon truthful speech, when it leaves appreciable damage to that supposedly vital interest unprohibited") (internal quotation marks and citation omitted); *City of Ladue v. Gilleo*, 512 U.S. 43, 52-53 (1994) (noting that underinclusiveness "diminish[es] the credibility of the government's rationale for restricting speech").

In this case, the City's purported justifications for restricting advertising signs on private property – its supposed concerns for "traffic safety," "aesthetics," and "neighborhood character" – are belied by the gaping exemptions the City has bestowed upon its street furniture franchisee. The City's ubiquitous bus shelter, newsstand, public pay telephone, urban panels,

and lamppost banner advertising signs are similar in size to, if not substantially bigger than Fuel's signs. They invariably are located significantly closer to the curb line and thus are considerably more visible to passing motorists and pedestrians. And, unlike Fuel's signs, the City's street furniture advertising signs employ a variety of electronic media that display highly distracting moving images and text. It therefore is plain that the City's signs undermine its supposed concerns far more than Fuel's signs allegedly do.

Because the City chooses not to follow its own rules – the vast majority of its street furniture signs violate the very advertising sign restrictions that the City is so anxious to enforce against Fuel – its purported justifications for suppressing Fuel's protected speech fall of their own weight.

Contrary to the City's strained claim that its main goal in saturating its sidewalks with street furniture advertising was to enhance the aesthetics of its streetscape, the record in this case confirms clearly and unequivocally that the City actually was motivated primarily by its desire to raise massive amounts of revenue. The City is guaranteed to receive *well over $1 billion* in cash over the next 20 years (and perhaps much more, depending upon actual advertising revenue) from its bus shelter, newsstand, and pay telephone advertising contracts – many times the cost of building and maintaining those street furniture structures. Indeed, the City's purported aesthetic motivation is flatly belied by the undisputed fact that the City officials who evaluated the various street furniture franchise proposals gave Cemusa, the winning franchisee, the lowest design scores of any of the bidders. Cemusa, however, guaranteed the most revenue.

To be sure, there is nothing wrong with the City capitalizing on its assets to raise revenue and alleviate the financial burden borne by its taxpayers. But that desire is not a legitimate reason for suppressing protected speech. *See Greater New Orleans*, 527 U.S. at 191 (rejecting

the argument that exceptions to speech restrictions were necessary to generate revenue for the government).

Importantly, the fatal underinclusiveness of the City's scheme for regulating Fuel's panel signs easily could be avoided. As the *Metro Lights* court made clear, municipalities wishing to regulate private signage while simultaneously deriving revenue from street furniture advertising have "many alternatives" at their disposal that would pass constitutional muster, including, "[m]ost obviously," "impos[ing] the same requirements" on their street furniture franchisees that they impose on other advertising companies. 488 F. Supp. 2d at 950. For example, if the City would compel Cemusa to remove the hundreds of advertising signs that it has placed on street furniture in residential districts, then the City could similarly enforce its zoning restrictions against advertising signs on private property in residential districts. Because the City admittedly has never even *considered* adopting an evenhanded approach to regulating advertising signs on both public and private property, its discriminatory scheme must be struck down.

## FACTS

### A.    Plaintiff's Outdoor Advertising Business

Fuel operates approximately 440 panel signs in New York City. Fuel's panel signs measure approximately 69 inches tall by approximately 48 inches wide. They are internally illuminated, meaning that they contain posters that are lit by fluorescent bulbs placed behind the posters. Freedman Decl. ¶ 2.

Fuel's panel signs generally are situated in one of several ways: the vast majority of them (76.7%) are placed in, on, or near parking garages, either inside the door to the garage, cantilevered above or near the garage door, or affixed to the exterior of the garage. 14.4% of them are affixed to the exteriors of other mixed use commercial properties. The remaining 8.8% are located in parking lots, either affixed to an adjacent building or mounted on a pole. Fuel

typically rents space from the landlord in exchange for the right to place a panel sign on or inside of the property. *Id.* ¶ 3.

Fuel's panel signs are made available to national and local advertisers on an "all comers" basis in a fashion similar to newspaper, magazine, and broadcast advertising. Fuel's panel signs may be used to display a variety of commercial and noncommercial messages, including political, religious, charitable, and public service messages. *Id.* ¶ 4. Fuel markets its panel signs to prospective advertisers on a "reach and frequency" basis based on the demographics of the location area. Fuel does not specifically market its panel signs as visible to motorists. *Id.* ¶ 5.

The vast majority of Fuel's panel signs (93%) are located in zoning districts in which, according to the regulations being challenged in this case, internally illuminated advertising signs purportedly are prohibited. *Id.* ¶ 7.

Fuel's panel signs compete directly with the street furniture advertising signs – primarily bus shelters, newsstands, and public pay telephones – with which the City has blanketed its sidewalks in recent years. Fuel sells advertising space on its panel signs to many of the very same advertisers that are contracting with the City's franchisees to place the very same advertising copy on the City's street furniture. Indeed, with thousands of street furniture signs in play, the City of New York is not just Fuel's regulator. It is, through its revenue-sharing scheme with its franchisees, by far Fuel's biggest competitor in the marketplace. *Id.* ¶ 6.

**B.    The City's Regulatory Scheme**

The New York City Zoning Resolution defines a "sign" to include "any writing, pictorial representation, emblem, or flag that is attached to, painted on, or in any other manner represented on a building or other structure, and that is used to announce, direct attention to, or advertise, and that is visible from outside of a building." Z.R. § 12-10 (definition of "sign").

The Zoning Resolution distinguishes between "accessory use" signs and "advertising" signs. An "accessory use sign" is one that directs attention to a business or profession that is conducted on the premises where the sign is located. Z.R. § 12-10 (definition of "accessory use"). An "advertising sign" is a sign that directs attention to a business, profession, commodity, service or entertainment conducted, sold or offered elsewhere than upon the premises where the sign is located. Z.R. § 12-10 (definition of "advertising sign"). A sign is, by definition, not an "advertising sign" if it is "accessory to a use located on the zoning lot" containing the sign. *Id.*

The Zoning Resolution liberally permits accessory signs to be placed and maintained anywhere in commercial and manufacturing districts, subject only to size, height, illumination, and projection limitations. Z.R. §§ 32-62 to 32-661; *id.* §§ 42-52 to 42-543.

Contrary to its treatment of accessory signs, the Zoning Resolution places severe restrictions on the placement of advertising signs in commercial and manufacturing districts. Whereas accessory signs may be located in any type of district, the Zoning Resolution provides that advertising signs are permitted only in C6-5, C6-7, and C7 districts (which mostly are entertainment districts) and, subject to illumination restrictions, in C8, M1, M2, and M3 districts (which mostly are manufacturing and quasi-manufacturing districts). Z.R. §§ 32-63, 42-52. Advertising signs are not permitted in residential districts at all. *Id.* § 22-32.

Although some advertising signs are allowed in C8, M1, M2, and M3 districts, advertising signs in those districts may only be non-illuminated or indirectly illuminated. Z.R. §§ 32-645, 42-533. Directly illuminated signs – such as Fuel's internally illuminated panel signs and the City's internally illuminated street furniture advertising signs – are not permitted in those districts.[1]

---

[1] The City's treatment of "direct" versus "indirect" illumination makes no sense. An indirectly illuminated sign is one "whose illumination is derived entirely from an external artificial source and is so arranged that no direct rays of light are projected from such artificial

Accordingly, Fuel's internally (*i.e.*, directly) illuminated panel signs are only allowed in C6-5, C6-7, and C-7 districts.  Fuel's panel signs are not allowed in any residential districts, nor in any manufacturing districts, nor in any commercial districts other than C6-5, C6-7, and C-7 districts.  Hecker Decl. ¶¶ 16-19.

Of the approximately 440 panel signs that Fuel currently operates in New York City, approximately 7% are located in C6-5, C6-7, or C-7 districts.  The remaining 93% of its panel signs are located in districts where panel signs purportedly are not allowed.  Freedman Decl. ¶ 7.

**C.    The City's Street Furniture Advertising Signs**

The City operates and controls, through its various franchisees, a variety of street furniture structures bearing advertising signs:  bus shelters and newsstands (which are part of the 2006 Street Furniture Franchise), as well as public pay telephones ("PPTs") (which are part of separate franchise agreements).  The City also permits advertising signs to be placed on lamppost banners hanging directly over the streets, and on urban panels placed on above-ground subway entrance railings affixed to sidewalks.

**1.    The Street Furniture Franchise**

In 2004, the New York City Department of Transportation ("DOT") issued a Request for Proposal ("RFP") for the installation, operation, and maintenance of bus shelters, newsstands, and automatic public toilets throughout the City.  Hecker Decl. Exh. 12.  On May 19, 2006 the City entered into a 20-year franchise agreement (the "Franchise Agreement") with Cemusa, Inc.,

---

source into residences or streets."  Z.R. § 12-10 (definition of "sign with indirect illumination").  The Department of Buildings ("DOB") interprets the "external artificial source" and "direct . . . project[ion]" language to mean that a large-format billboard that is lit by numerous high-wattage external floodlights is indirectly illuminated (and thus permitted in manufacturing districts), but a small poster that is lit by a fluorescent bulb placed behind it (*i.e.*, internally illuminated) is considered directly illuminated (and thus forbidden even in manufacturing districts).  Fortier Dep. at 119-20, 127-29.  The City's scheme makes no sense because the former plainly is less innocuous than the latter.

permitting Cemusa to place advertising signs on all of these street furniture structures.  Hecker Decl. Exh. 13.

       (a)     **Bus Shelters**

Prior to 2006, the City had entered into franchise agreements with various outdoor advertising companies to install and maintain bus shelters.  Those prior franchise agreements permitted the outdoor advertising companies to sell advertising space on the bus shelters.  Stips. ¶ 60.[2]

Under the 2006 Franchise Agreement, Cemusa is obligated to replace all of the approximately 3,100 existing bus shelters in New York City.  In addition, Cemusa is permitted to install up to 400 additional bus shelters that did not exist prior to the 2006 Franchise Agreement. Stips. ¶ 63.

The new bus shelters contain two advertising panels that are placed on the end of the shelter positioned perpendicular to the street.  Each of these advertising panels is permitted to contain up to 27.5 square feet of advertising copy – even larger than Fuel's panel signs – for a total of 55 square feet per shelter.  Stips. ¶ 64.  The new Cemusa bus shelter advertising panels are considerably larger than those that were on the old shelters.  The old shelters were only permitted to display 47 square feet of advertising copy.  Stips. ¶ 64.

The bus shelter advertising signs may be internally illuminated, and there is no limit on the degree to which they may be illuminated.   Stips. ¶ 66.  The bus shelter signs are illuminated in a manner that is very similar to Fuel's panel signs (posters placed in front of fluorescent bulbs), except that the bus shelter signs – indeed, all of the City's street furniture advertising signs – tend to be brighter than Fuel's panel signs.  Wachtel Decl. ¶ 56.

---

[2]  The parties' factual stipulations (abbreviated herein as "Stips.") are appended to the Hecker Declaration as Exhibit 1.

The more than 6,000 bus shelter advertising signs that the City has placed throughout the City are located in every type of zoning district, including residential districts. Hecker Decl. Exh. 15. Virtually every single one of them violates the very advertising sign restrictions that purportedly apply to Fuel's panel signs. Bass Decl. ¶¶ 5-6.

The City's bus shelter signs are placed considerably closer to the curb line than Fuel's signs, and thus are far more visible to passing motorists. Wachtel Decl. ¶ 49; Hecker Decl. Exh. 17. Indeed, unlike Fuel's signs, the City's signs are specifically marketed to prospective advertisers as visible to both pedestrians and motorists. Askew Decl. ¶ 3 (appended to Hecker Decl. as Exh. 16).

Unlike Fuel's inventory of panel signs, which only display static copy, a substantial percentage of the City's street furniture advertising signs display moving images, which the City considers the "wave of the future." Gould-Schmit (Mar. 19) Dep. at 177[3]; Hecker Decl. Exh. 19.

First, Cemusa is expressly authorized to install 250 so-called "scroller" advertising signs – dynamic signs that change the advertising copy being displayed every few seconds. Stips. ¶ 68; Wachtel Decl. ¶ 28. At least 80 of these scrollers have already been installed. Stips. ¶ 68.

In addition to these 250 scrollers, the Franchise Agreement authorizes DOT to approve Cemusa's use of other forms of "electronic media" on "a case by case basis." Hecker Decl. Exh. 13, ¶ 4.4.2. The City has already approved the use of several types of electronic media – including high-definition video screens, electronic stock tickers, and Bluetooth wireless transmissions – and believes that "the wider use of electronic media is likely." Hecker Decl. Exh. 19.

---

[3] The various deposition transcripts cited herein are appended to the Hecker Declaration as Exhibits 2-10.

In March 2007, the City gave Cemusa permission to equip ten bus shelters with high-definition liquid crystal display ("LCD") screens displaying video advertising. Stips. ¶¶ 70-71. The City permitted Cemusa to place these LCD video advertising signs in areas with high pedestrian and vehicular traffic and on two-way streets where they are visible to oncoming traffic. Stips. ¶ 72. Indeed, the City rejected the advice of Stanley Shor, the Assistant Commissioner of the Department of Information Technology and Telecommunications ("DOITT") (which administers the public pay telephone franchises), who, because of his concern for traffic safety, advised DOT to require Cemusa, for traffic safety reasons, to place the LCD screens only on one-way streets facing away from vehicular traffic. Hecker Decl. Exh. 18.

The City has also permitted Cemusa to equip 20 bus shelters with smaller LCD "tickers" that dynamically display stock quotes, the time, and the temperature. Stips. ¶ 79.

In addition to full-size video advertisements and smaller tickers, the City also has permitted Cemusa to equip many of its bus shelters with "Bluetooth" technology. Bluetooth is a wireless communication system that transmits a signal containing data to certain kinds of handheld devices, including mobile telephones. Askew Decl. ¶ 4 (Hecker Decl. Exh. 16). Bluetooth can be used to beam images, wallpaper, coupons, video files (such as television or movie trailers), audio files (such as ringtones), games, and software applications to those passing through its transmission radius. Stips. ¶77. Pedestrians and motorists with Bluetooth-enabled handheld devices who pass within the transmission radius of a Bluetooth-equipped bus shelter can receive an audible ping or vibration alerting them that they have received an advertising message sent to their device. Stips. ¶ 76.

Notably, the City made no meaningful effort to ensure that passing motorists would not be pinged or buzzed by distracting wireless advertisements. Cemusa told the City that its Bluetooth transmissions would be confined to a radius of fifteen feet – itself enough to reach

passing motorists in many areas – but the City took no steps to confirm that Cemusa ever adhered to these limits.  In fact, Cemusa always believed that its Bluetooth transmissions could travel farther than fifteen feet and, because it never bothered to perform any tests, has no idea how far its transmissions actually traveled.  Stips. ¶ 75; Askew Decl. ¶¶ 8-9.

Although the Bluetooth program was supposed to be limited to ten bus shelters, Cemusa actually installed Bluetooth technology on well over 100 different bus shelters throughout the City.  Stips. ¶ 73; Askew Decl. ¶ 5.  Prior to March 2008, the City never asked Cemusa how many bus shelters actually had been equipped with Bluetooth technology – because the City "does not monitor the content of advertising" on its shelters – and did not learn about the extent of Cemusa's Bluetooth program until it was revealed through discovery in this litigation.  Stips. ¶ 74; Askew Decl. ¶ 6.

As discussed more fully below, the record in this case confirms that the City permitted Cemusa to use these various forms of electronic media in order to increase advertising revenue.

### (b)    Newsstands

Under the Franchise Agreement, Cemusa is also obligated to replace each of the 284 existing newsstands in New York City, and is permitted to install up to 330 new newsstands.  Stips. ¶ 83.  Prior to 2006, newsstands were not permitted to display advertising signs.  However, the City amended its Administrative Code, in response to DOT's request, in order to permit Cemusa to display advertising signs on newsstands for the first time.  Stips. ¶ 84; Gould (Mar. 19) Dep. at 54.

Each new Cemusa newsstand is permitted to display up to 82.5 square feet of advertising copy.  The newsstands have advertising panels of varying sizes depending on the dimensions of the newsstand.  There usually is one advertising panel similar to Fuel's panel signs on the side of the newsstand, and one considerably larger advertising panel on the rear of the newsstand facing

the street.  Stips. ¶ 83.

As with its bus shelters, the City's newsstand advertising signs are placed considerably closer to the curb line than Fuel's signs, and thus are far more visible to passing motorists. Wachtel Decl. ¶ 49.  Indeed, the panels placed on the rear of the newsstands facing the street – which are far larger than Fuel's panel signs, and which are not even visible to pedestrians on the same side of the street – could only have been designed to be seen by passing motorists.  Hecker Decl. Exh. 20; Askew Decl. ¶ 3 (Hecker Decl. Exh. 16).

### 2.    Public Pay Telephones

In 1999, the City entered into a number of franchise agreements with different franchisees to install and operate PPTs throughout the City.  These franchises have a term of 11 years with a 4-year renewal option.  Stips. ¶ 95.  There currently are approximately 21,000 public pay telephones in New York City, approximately 12,000 of which bear advertising signs, the vast majority of which are illuminated.  Hecker Decl. ¶ 60; Shor Dep. at 65.

The PPT franchise agreements permit the placement of advertising panels on the exterior rear and side panels of PPT enclosures in any zoning districts in which commercial or manufacturing uses are permitted as of right.  Stips. ¶ 96.  Unlike bus shelter and newsstand advertising signs, which are expressly permitted in residential zoning districts, PPT advertising signs are not permitted in residential districts.  *Id.*

Advertising on side display panels is permitted to be 27" x 57".  Advertising on rear display panels is permitted to be up to  54" x 57" for double-pedestal structures and up to 36" x 81" for triple-pedestal structures.  Stips. ¶ 98; Hecker Decl. Exh. 21, ¶ 4.4.1(c).  The City's PPT

advertising signs are placed considerably closer to the curb line than Fuel's panel signs.  Wachtel Decl. ¶ 49.[4]

From 1999 to 2004, there was explosive growth in the number of PPTs with advertising panels in central Manhattan, the most lucrative advertising market.  Hecker Decl. ¶ 65.  After receiving widespread community complaints, DOITT issued a report finding that the "visual disturbance and distraction resulting from PPT advertising" had "grown substantially" and had become "profound."  Hecker Decl. Exh. 23.  As the City acknowledged, the massive proliferation of PPT advertising signs during those five years was entirely unnecessary given the exponential increase in the use of cell phones and resulting decrease in the need for PPTs. Hecker Decl. ¶¶ 66-69; Shor Dep. at 44, 82.  Former Deputy Mayor Daniel Doctoroff put it this way:

> I think there are too many signs on phone kiosks….
>
> There are simply too many of them; literally in many places in Manhattan there are two or three on a block and they were put there without any real consideration for the need for the phones or the appearance that would result from their placement.

Doctoroff Dep. at 40-41.

### 3.    Lamppost Banners

DOT permits the display of advertising banners on the City's lampposts.  34 RCNY § 2-14(b).  Lamppost advertising banners are permitted to be 3 feet wide and 8 feet tall, the same square footage as Fuel's panel signs.  *Id*. § (b)(2)(iv).  Unlike Fuel's signs, which are placed a considerable distance from the curb lines, the City's lamppost advertising banners hang directly

---

[4]  The City has approved the use of light-emitting diode ("LED") technology for displaying electronic copy on PPT advertisements for the New York Lotto.  Stips. ¶ 102.  These LED ads are "much brighter" than typical backlit panel signs.  Shor Dep. at 75.

over active roadways. Stips. ¶ 113. The City has issued thousands of permits for companies to hang such banners throughout the City. Stips. ¶¶ 114, 116.

Although lamppost banners theoretically are supposed to promote cultural or community events, DOT permits up to 10% of the banners to advertise corporate sponsorship. 34 RCNY § 2-14(b)(2)(v). Many of these ubiquitous banners are nothing more than pure commercial advertisements, as demonstrated by the photographs that are attached to the Hecker Declaration as Exhibit 24. The *Cosmopolitan* banners boasting that New York is the "beauty capital of the world" are barely disguised advertisements for the magazine. So too with the banners advertising the CBRE real estate firm and the television program *The Family Guy*.

### 4.    Taxi Cabs

The New York City Taxi and Limousine Commission ("TLC") has issued over 7,300 permits for advertising on the rooftops of taxicabs. Many of these rooftop advertising boxes are permitted to include dynamic digital advertisements. Stips. ¶¶ 109-110.

### 5.    Urban Panels

The Metropolitan Transportation Authority ("MTA") has placed advertising signs known as "urban panels" on the street-level staircase railings of approximately 905 subway entrances around New York City. All but 92 of these urban panel structures are double-faced, resulting in a total of 1718 advertising faces, each measuring approximately 28 inches by 58 inches. The vast majority of these urban panels are internally illuminated. Stips. ¶ 36 & App. B.

Of the 1718 advertising sign faces on urban panels throughout the City, 80 of them display high-definition video advertisements. Stips. ¶ 38. Jeffrey Sugarman, an urban designer with the Department of City Planning, testified that these video advertisements are "really visually intrusive." Sugarman Dep. at 82-83.

The City has asserted that although it generally has the legal authority to enforce its advertising sign restrictions against the MTA, it does not have the authority to do so with respect to advertising signs located on the property of New York City Transit (a subsidiary of the MTA) because of subsection 13-a of section 1204 of the Public Authorities Law.[5]  Exh. 26 at 15-16 (Response to Interrogatory No. 22).  It is not at all clear, however, that subsection 13-a gives the MTA the unqualified right to attach large electronic advertising signs to subway entrance railings that are affixed to City sidewalks.  As one senior City official advised DOT, it "may exceed the authority" that MTA has under subsection 13-a to "extend an appurtenance into the City's air space for the sole purpose of generating revenue from advertising."  Hecker Decl. Exh. 27.  Despite the fact that this question was raised, the City never bothered to explore whether the MTA's urban panels in fact are exempt.  Shor Dep. at 226-27; Fortier Dep. at 102.

In any event, the City cannot credibly rely on subsection 13-a because the City played a direct role in its enactment.  As the legislative history reveals, then-Governor Nelson A. Rockefeller, before deciding whether to sign the bill, requested the recommendation of New York City Mayor Robert F. Wagner.  Mayor Wagner strongly endorsed the bill because advertising revenues would help keep fares down, which the City recognized would benefit its residents:

> This bill was sponsored on the recommendation of the New York City Transit Authority.  The Authority advises me that the revenue to be realized by it for advertising as authorized by the proposed law would be approximately $1,000,000 a year.

---

[5]  Subsection 13-a provides that:  "Notwithstanding . . . the provisions of any general, special or local law, code, ordinance, rule or regulation to the contrary, the [transit] authority may erect signs . . . or advertising matter on any property . . . leased or operated by it or otherwise under its jurisdiction or otherwise sell the right to do so to any person . . . ."  N.Y. Pub. Auth. L. § 1204(a)(13-a).

> Any additional revenues received by the Authority would be helpful in preserving the present fare structure of the New York City transit facilities. This I am most anxious to do.
>
> Accordingly, I recommend that you approve the bill.

Hecker Decl. Exh. 28.

Moreover, even if subsection 13a did pose a legal hurdle to enforcement action by the City against the MTA, the City still could exert its considerable influence over the MTA to seek the MTA's voluntary compliance with the City's restrictions on advertising signs. The City controls 4 members of the MTA's Board, owns most of the MTA's facilities, and provides the MTA with between $280 million and $290 million per year in operating subsidies and hundreds of millions of dollars more per year in capital subsidies. Stips. ¶¶ 39-43.

Despite its considerable influence, the City has never bothered to ask the MTA to voluntarily remove even its most eye-catching high-definition video panels. Former DOT Commissioner Iris Weinshal – whose agency has primary jurisdiction over the City's sidewalks – testified that she had significant traffic safety concerns about the MTA's high-definition video panels, but that she accepted the advice of her chief of staff to "leave it alone" – *i.e.*, "don't get into it with them" – for fear of squandering the political capital she needed with the MTA on other issues. Because of the "scope of things [she] had to deal with [the MTA] on," it would not have been prudent to "take them on," and she therefore "just sort of dropped it." Weinshal Dep. at 80-83.

## D.    The City's Primary Goal In Saturating Its Streetscape With Street Furniture Advertising Signs Is to Generate Revenue

### 1.    The City's Share of Street Furniture Advertising Revenue

The City will profit handsomely from its Franchise Agreement with Cemusa. In addition to financing 100% of the cost of building and maintaining all of the new newsstands, bus

shelters, and automated public toilets, Cemusa is obligated to pay the City at least 50% of the gross advertising revenue derived from the Coordinated Street Furniture Franchise. Stips. ¶ 85. Moreover, Cemusa has guaranteed the City *a minimum of $1 billion in cash* over the twenty-year contract term, and perhaps a great deal more depending on advertising revenue. Stips. ¶ 86; Hecker Decl. Exh. 29.

In addition to this guaranteed revenue, Cemusa must provide the City with 20% of all of the street furniture advertising space for use by the City's commercial "marketing partners" and for advertisements promoting New York City. Stips. ¶ 89. Cemusa is also required to post advertisements for the City on Cemusa advertising signs in other cities throughout the world. The value of such "in-kind" advertising over the course of the Coordinated Street Furniture Franchise is an additional $398,400,000, bringing the total value of the Cemusa contract to $1.4 billion. Stips. ¶ 90.

A significant percentage of that revenue flows directly from the City's conscious decision to allow Cemusa to display dynamic (scrolling or electronic) advertising messages. For example, the City conditioned its approval of Cemusa's use of scroller ads on the payment of tens of millions of additional guaranteed dollars. Cemusa had originally proposed $924 million in guaranteed payments to the City, with an additional $91.5 million in "contingent" compensation – contingent, that is, upon the City's willingness to permit Cemusa to place scrollers "in the most favorable advertising locations." Hecker Decl. Exh. 30. The City agreed to allow such scrollers, but only after Cemusa agreed to guarantee the City an additional $75 million in cash compensation (thus bringing the total guarantee up to $999 million). Hecker Decl. Exh. 31. Former DOT Commissioner Iris Weinshal testified that "[t]here was just one

upside" to allowing Cemusa to install scrollers: "generating more revenue." Weinshal Dep. at 77-78; *see also* Gould-Schmit (June 10) Dep. at 183-84.[6]

The City also has profited from its PPT franchises. The City collects 26% of net advertising revenues generated by ads placed on PPTs, which resulted in payments to the City of over $10 million in 2004, over $12 million in 2005, and over $14 million in 2006 and 2007. Stips. ¶¶ 103-104. The City makes more than three times as much money from advertisements on pay phones than it does from all other sources of pay phone income combined – including charges for telephone calls. Stips. ¶ 105. Indeed, the revenue derived during this period steadily increased (because of increasing advertising revenue) even though the number of PPTs declined by an average of 1,700 phones per year (because of the increasing prevalence of cell phones). Shor Dep. at 96-97; *id*. at 44, 82; Hecker Decl. Exh. 32.

## 2.    New York City Marketing

That the City has profited and will continue to profit to this degree from its street furniture advertising programs is no accident. To the contrary, the financial success of the street furniture advertising program resulted from a carefully planned and coordinated effort by the City to leverage its street furniture assets to generate maximum revenue.

In 2003, the City established New York City Marketing ("NYCM") – a new organization designed to generate revenue and promotional exposure for the City – and appointed Joseph Perello as its first Chief Marketing Officer. Hecker Decl. Exhs. 33, 34. As the Harvard Business School reported after its extensive study of the City's novel marketing efforts, "NYCM set out to centralize and manage the city's collective media assets. The idea was to use the assets to

---

[6] The City's decision to permit Cemusa to install high-definition LCD video screens and Bluetooth transmitters on bus shelters caused advertising revenues on those shelters to increase by over 50%. Stips. ¶ 78.

generate value to the city, by using them either to support corporate partners and city agencies or to promote NYC in other ways. NYCM believed that media opportunities were important not only to tap into advertising vehicles but also to shape the messaging in those vehicles." Hecker Decl. Exh. 35, at 10. Perello quickly recognized that street furniture advertising represented "one of the most significant opportunities" for NYCM. *Id*. at 10-11.

Perello helped DOT negotiate a one-year extension of the City's then-existing bus shelter franchise agreement that increased the City's share of advertising revenue by $13.5 million. *Id*. at 11; Perello Dep. at 46-47, 58-60. He subsequently helped spearhead and negotiate the new street furniture Franchise Agreement with Cemusa. Gould-Schmit (Mar. 19) Dep. at 21-22.

Thanks to Perello's efforts, the City has also capitalized on the lucrative opportunities presented by the advertising sign space that the City reserved for itself under the Franchise Agreement. The City has entered into a variety of "marketing partnership agreements," including:

- The History Channel: The City agreed to provide the History Channel with "$6.8 million in city-owned outdoor media" to promote its programs in exchange for $19.5 million, including $3.5 million in cash, and $16.5 million worth of media and programming. Hecker Decl. Exh. 36, ¶¶ 2.1, 10.2; Perello Dep. at 83-85.

- Snapple: The City agreed to award Snapple an exclusive contract to provide water and juice vending machines in the City's 1,200 schools and to give Snapple almost $20 million of advertising space on the City's street furniture in exchange for $106 million in cash and $60 million in marketing and promotional value. Hecker Decl. Exh. 37; Perello Dep. at 110-12.

Notably, the City has linked its efforts to enforce its restrictions on private property advertising signs with its knowledge that doing so will increase the value of its own street furniture advertising assets. In July 2006, Van Wagner, an outdoor advertising company, met with then-Deputy Mayor for Economic Development Daniel Doctoroff and other City officials. Wan Wagner made a presentation encouraging the City to devote more resources to enforcing its advertising sign restrictions. Van Wagner distributed materials to the attendants that explained

the financial benefits to the City of an enforcement regime:  "If New York City laws had been

enforced, a significant portion of that money [spent by advertisers on the signs that do not

comply with City law] could have been spent on forms of outdoor advertising that provide

revenue for the City, such as the street furniture program."  Hecker Decl. Exh. 38 at

NYC011501.  Later that day, Van Wagner sent a follow-up letter to Doctoroff, writing:

> Dan, I know that you have always appreciate how valuable a
> resource street furniture, telephone kiosks and other outdoor
> advertising assets can be to New York City.  We firmly believe
> that by ensuring that outdoor advertising companies comply with
> applicable regulations, not only will you help clean up New York
> City but you will be able to generate greater revenue for the City
> from its outdoor advertising assets.

Hecker Decl. Exh. 39.  Neither Doctoroff nor any of the high-ranking City officials who were

copied on the letter (including then-DOB Commissioner Patricia Lancaster) ever indicated to

Van Wagner or anyone else that they disagreed with this point.  Doctoroff Dep. at 89-90.[7]

**E.      The City Awarded the Street Furniture Franchise to Cemusa Even Though
         Cemusa's Proposal Received the Lowest Design Scores of Any Bidder**

The City's suggestion that its goal in pursuing the Street Furniture Franchise was to

enhance the appearance of the streetscape, rather than to generate maximum revenue, is belied by

a mountain of contradictory record evidence.  For example, the City stated unequivocally in its

Verified Answer to an Article 78 petition filed by a rejected bidder that it was "the compensation

promised to the City in its proposal [that] put Cemusa ahead of the other proposers."  Hecker

Decl. Exh. 40, ¶ 85.

Tellingly, not only did the City select Cemusa because of the money it promised, but the

City did so even though Cemusa received abysmal design scores.  ████████████████████

---

[7]  Kerry Gould-Schmit testified that when the City considered the possibility of allowing
advertising signs to be placed on sidewalk sheds, it was concerned that doing so would adversely
impact the revenues generated by its street furniture and PPT franchises.  Gould-Schmit (Mar.
19) Dep. at 254-55.

REDACTED PURSUANT TO THE COURT'S JULY 15, 2008 ORDER AND THE PARTIES' MARCH 27, 2008 PROTECTIVE ORDER

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███████

The City's street furniture Evaluation Committee – whose seven members subjected each proposal to an elaborate scoring process – agreed with the Design Advisory Committee's assessment. Out of a total of 30 possible design points, the Evaluation Committee gave NBC/Decaux and Van Wagner average scores of 26.71 and 25.71, respectively. Hecker Decl. ¶¶ 117-119 & Exhs. 43-45. Cemusa, on the other hand, received an average design score of 12.29 – by far the lowest of any of the five bidders. *Id*.

However, Cemusa also received by far the highest scores for its compensation proposal. When all of the categories were combined (after three finalists were invited to submit their best and final offers), Cemusa nosed NBC/Decaux by a razor-thin margin of 909.75 to 890.5 total points – *i.e.*, average scores by each of the seven members of the Evaluation Committee of 129.96 (out of 145) for Cemusa and 127.21 for NBC/Decaux. Hecker Decl. ¶¶ 120-23 & Exhs. 46-48.

At her deposition, Kerry Gould-Schmit, DOT's representative on the Evaluation Committee, put it this way:

Q.    20 points out of 900 isn't exactly a huge margin of victory, is it?

A.    No.

Q.    It was a fairly close competition?

A.    Yes, it was.

Q.    NBC almost won?

A.    It was close.

Q.    And the reason why Cemusa beat NBC Decaux is because of the strength of its compensation proposal?

A.    Yes.

Q.    Even though its design was inferior?

A.    Yes.

Gould-Schmit (June 10) Dep. at 94.

## F.    The City Exempts Its Street Furniture From the Advertising Sign Restrictions Set Forth In the Zoning Resolution

The City's position in this litigation is that its street furniture advertising signs are exempt from all of the restrictions set forth in the Zoning Resolution because the Zoning Resolution "regulates the use and development of zoning lots" but "does not govern the use or development of the City's streets and sidewalks."  Hecker Decl. Exh. 26 at 18-19 (Response to Interrogatory No. 26).  Notably, the City has not credibly explained *why* it chooses not to subject its street furniture advertising signs to the restrictions set forth in the Zoning Resolution.

There is no question that the City could apply the Zoning Resolution to its street furniture advertising signs if it chose to.  For example, section 4.4.2 of the Franchise Agreement requires Cemusa to comply with the Zoning Resolution's electronic media restrictions governing immediately adjacent property.  Hecker Decl. Exh. 13.  In other words, Cemusa is only allowed to place an electronic advertising sign on a street furniture structure if the Zoning Resolution

would allow such a sign to be placed on the property immediately adjacent to that street furniture structure.  There plainly is no reason why the City could not, if it wished to, require Cemusa to comply with all of the zoning restrictions on advertising signs that apply to immediately adjacent zoning lots.  Fortier Dep. at 96-97, 113-14.  Tellingly, however, the City has never even considered doing that.  Gould-Schmit (Mar. 19) Dep. at 99-100; Wargo Dep. at 162-63.[8]

The consequence of the City's decision to exempt its street furniture advertising signs from the restrictions set forth in the Zoning Resolution are severe.  As detailed in the accompanying Declaration of Richard Bass, of the more than six thousand advertising signs that the City has placed on its bus shelters, virtually *none* of them complies with the Zoning Resolution restrictions that apply in the districts in which the shelters are located.  Bass Decl. ¶¶ 5, 7-10.  Indeed, the City has placed hundreds of bus shelters bearing advertising signs in residential districts, where urban planners agree advertising signage is least appropriate.  *Id*. ¶¶ 5, 8-9.

## G.    The City's Purported "Traffic Safety" Concerns

Strangely, although the City contends that the restrictions on advertising signs that apply to Fuel's panel signs are designed to address "traffic safety" concerns, the City also expressly concedes that Fuel's panel signs *do not in fact implicate* traffic safety concerns.  Hecker Decl. Exh. 26, at 11-12 (Response to Interrogatory Nos. 15-16).

Of course, the City has no real basis to make any judgments in this area because it has never conducted or consulted any studies regarding whether panel signs (be they Fuel's panel signs or the City's own street furniture signs) affect traffic safety.  Stips. ¶ 93; Gould-Schmit

---

[8]  Although the Franchise Agreement states that Cemusa must comply with the restrictions on electronic advertising signs set forth in the Zoning Resolution, the City has not actually required Cemusa to do so on the theory that its high-definition video ads and stock tickers are only "pilots."  Gould-Schmit (June 10) Dep. at 11.

(Mar. 19) Dep. at 152; Shor Dep. at 137-38. This is so despite the City's express recognition of the importance of conducting such a study. In 2005, David Karnovsky, the General Counsel of the Department of City Planning, suggested to Melinda Katz, the Chair of the City Council's Land Use Committee, that the City Council should provide funding to "hir[e] a consultant to study best practices in the area of sign regulation in other jurisdictions." Hecker Decl. Exh. 49. However, no such study was ever performed. Fortier Dep. at 111; Wargo Dep. at 187-88.

The final nail in the City's traffic safety coffin is the testimony of Plaintiff's traffic safety expert, Jerry Wachtel, who conducted a thorough field study of Fuel's panel signs and the City's street furniture signs. Mr. Wachtel concluded that the City's signs have a greater potential to distract drivers than Fuel's panel signs do. Wachtel Decl. ¶¶ 6, 22, 27, 36, 40, 47- 49, 66. This is so because the City's street furniture signs are at least as large, if not larger than Fuel's signs, are located substantially closer to the curb lines, and thus are far more likely to enter a driver's so-called "cone of vision." *Id*. ¶¶ 47-49. Not surprisingly, Mr. Wachtel concluded that the City's scroller and electronic advertising signs (of which Fuel has none) are the most likely of all to distract drivers. *Id*. ¶¶ 12, 28-30, 34.[9]

## H.    The City's Purported "Aesthetics" and "Neighborhood Character" Concerns

The City also contends that it restricts Fuel's panel signs in order to protect "aesthetics" and "neighborhood character." Hecker Decl. Exh. 26, at 11-12 (Response to Interrogatory Nos. 15-16). Again, however, the City has never conducted or consulted any studies, and is not aware

---

[9] The City has developed a set of "siting criteria" governing the placement of street furniture, which it claims ensures that street furniture will not "interfere with pedestrian or motorist sight lines necessary for traffic safety." Hecker Decl. Exh. 50, at NYC005969. However, as Mr. Wachtel confirms, nothing in the siting criteria even remotely addresses whether the *advertising signs* on the City's street furniture implicate traffic safety issues. Wachtel Decl. ¶¶ 52-53.

of any studies, regarding the impact of panel signs on aesthetics or neighborhood character. Stips. ¶ 93; Fortier Dep. at 30-31; Sugarman Dep. at 53; Wargo Dep. at 70.

Nor has the City meaningfully considered the extent to which the thousands of its own street furniture advertising signs that dominate the streetscape impact aesthetics or neighborhood character. Instead, in implementing the Street Furniture Franchise beginning in 2004, the City relied exclusively on an analysis of a similar street furniture franchise proposal that had been considered in 1996 (but ultimately abandoned). Stips. ¶ 92. In determining what steps had been taken and what conclusions had been drawn during the 1996 review process, the City relied primarily on its review of DOT's 1996 application pursuant to the City Environmental Quality Review process and a report issued later in 1996 by the City Planning Commission. Hecker Decl. Exhs. 51-53; Gould-Schmit (June 10) Dep. at 162-63; Sugarman Dep. at 103. Beyond reading this application and report, the City took no other steps between 2004 and 2006 to revisit or reconsider any of the assumptions that were made or the conclusions that were drawn during the 1996 review process. Sugarman Dep. at 100-02, 113, 173.

Notably, neither the CEQR application nor the City Planning Commission report meaningfully addressed whether or the extent to which the contemplated street furniture advertising program implicated aesthetic or neighborhood character concerns. The brief section in the CEQR application addressing neighborhood character stated that the City's goal was to "provide well-maintained attractive street furniture" that would "enhance the overall appearance of the streetscape," but nothing in the CEQR application addressed whether the widespread proliferation of street furniture *advertising signs* would impact neighborhood character. Hecker Decl. Exh. 51, at NYC005773. Similarly, the City Planning Commission report stated generally that the City's goal was to build street furniture "structures which will be aesthetically pleasing," but the report did not discuss the Commission's view on whether or the extent to which the

*advertising signs* would affect aesthetics or neighborhood character.  Hecker Decl. Exh. 52, at 6, 24.  Indeed, in response to the suggestion that the number of advertising signs under consideration should be reduced, the Commission merely stated, without analysis, that "[i]t does not believe that it [would be] prudent to make further reductions in the amount of revenue-generating advertising."  *Id*. at 36.

One reason why the Commission may have been reticent to discuss the aesthetic impact of the contemplated advertising sign program is that the City had neglected to perform a Neighborhood Character Assessment as required by City law.  Under CEQR, an Environmental Assessment Statement must be prepared for every proposed action subject to environmental review – which the City agrees the Street Furniture Franchise was – and "neighborhood character" is one of the criteria that the City is required to assess.  43 RCNY § 6-06(a)(5).  As the City's CEQR Technical Manual makes clear, there are a variety of specific requirements for Neighborhood Character Assessments when certain "preliminary thresholds" are triggered. Hecker Decl. Exh. 54, at 3H-1 to 3H-5.  Notwithstanding the fact that the Street Furniture Franchise plainly triggered these thresholds, no formal Neighborhood Character Assessment was ever performed.  Not surprisingly, City officials concede that this was "imprudent."  Sugarman Dep. at 37-38, 63-64, 173; Wargo Dep. at 39, 201.

Worse still, the City chose to proceed with the Street Furniture Franchise in 2004 even though there had been significant and vocal opposition to the 1996 proposal, which had been approved by a razor-thin margin:  a vote of 21-19 by the City's community boards, over the strong opposition of the Manhattan Borough President.  Hecker Decl. Exh. 52, at 12-19; Stips. ¶ 92; Gould-Schmit (Mar. 19) Dep. at 114-16.  Moreover, the City chose to rely exclusively on the review that had been performed in the previous decade despite the fact that, as described previously, the enormous growth of PPTs bearing advertising signs and the presence of urban

panels on subway entrances had dramatically increased the amount of "visual clutter" on the City's sidewalks.  Hecker Decl. ¶¶ 65-69.

## I.     Other Examples of the City's Hypocrisy

There are a myriad of other examples of the City's blatant hypocrisy when it comes to regulating advertising signs, including the fact that the City has purposefully derived substantial revenue from large-format billboards located on its own property, and that the City routinely places its own advertising messages on signs located on private property.

### 1.     Advertising Signs on City Property

The City has stipulated that there are at least 11 billboards located on City property that fail to comply with the Zoning Resolution's restriction of the placement of advertising signs near arterial highways.  Stips. ¶¶ 13-31.  The Yankee Stadium billboard is particularly notable.  With two faces measuring 26 feet by 48 feet (1248 square feet), it flashes continually changing electronic messages – including commercial advertisements – directly onto the Major Deegan Expressway.  This electronic billboard is located on property under the jurisdiction of the Parks Department and is licensed to Central Parking Systems, in exchange for which Central Parking Systems pays fees to the City.  Stips. ¶¶ 24-25.

These illegal billboards – which are many times larger than Fuel's panel signs – have brought the City significant revenues, including $343,865 from February 2005 through September 2008 for the two signs on the West Side Highway, and approximately $600,000 from January 2002 through March 2008 for the billboard along the Major Deegan Expressway.  Stips. ¶¶ 16, 30.

### 2.      City Advertising on Privately Owned Signs

Finally, numerous City agencies have engaged in extensive outdoor advertising campaigns on billboards and street furniture throughout the City, including the NYPD, the Department of Corrections, and the Parks Department.  Stips. ¶ 119-122.[10]

## ARGUMENT

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. *Zelnick v. Fashion Institute of Technology*, 464 F.3d 217, 224 (2d Cir. 2006).  A material fact is one that would "affect the outcome of the suit under the governing law," and a dispute about a genuine issue of material fact occurs if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party."  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

For the reasons set forth below, it is respectfully submitted that Plaintiff is entitled to summary judgment on its First Amendment claim.[11]

---

[10]   As discussed previously, NYC Marketing regularly uses its 20% allotment to place advertisements for private companies doing business with the City on bus stop shelters throughout New York City.  Stips. ¶ 123.

[11]   In the alternative, Plaintiff seeks a preliminary injunction barring the City from enforcing its advertising sign restrictions against Plaintiff's panel signs.  To obtain a preliminary injunction, Plaintiff must show "irreparable harm and either (1) a likelihood of success on the merits of [its] case or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor." *Polymer Technology Corp. v. Mimran*, 37 F.3d 74, 77-78 (2d Cir. 1994) (citation omitted).  The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

I.    **THE CITY'S SCHEME FOR REGULATING PANEL SIGNS VIOLATES THE FIRST AMENDMENT**

A.    **Commercial Advertising Signs Enjoy Robust First Amendment Protection**

The First Amendment "protects commercial speech from unwarranted government regulation." *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm. of New York*, 447 U.S. 557, 561 (1980). The Supreme Court has repeatedly held that "speech does not lose its First Amendment protection because money is spent to protect it, as in a paid advertisement of one form or another." *E.g.*, *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 420 (1993) (quoting *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976)). To the contrary, it is firmly established that speech is protected by the First Amendment "even though it is carried in a form that is 'sold' for a profit." *Id.* This is so because commercial speech serves important societal interests that transcend the commercial interest of the speaker: "Commercial expression not only serves the economic interest of the speaker, but also assists consumers and furthers the societal interest in the fullest possible dissemination of information." *Central Hudson*, 447 U.S. at 561-62.

The Supreme Court has emphasized that outdoor advertising signs such as those at issue in this case are entitled to robust First Amendment protection. "Billboards are a well-established medium of communication, used to convey a broad range of different kinds of messages." *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 501 (1981) (plurality opinion); *see also id.* at 524 (Brennan, J., concurring) (observing that "[m]any businesses and politicians and other persons rely upon outdoor advertising because other forms of advertising are insufficient, inappropriate and prohibitively expensive"). As the Court has recognized, "[t]he outdoor sign or symbol is a venerable medium for expressing political, social and commercial ideas," and "outdoor signs have played a prominent role throughout American history, rallying support for political and social causes." *Metromedia*, 453 U.S. at 501 (plurality opinion) (quotation omitted).

Against this backdrop, the Supreme Court has developed a four-prong test for determining whether restrictions on commercial speech withstand constitutional scrutiny: (1) whether the advertising is neither unlawful nor misleading, and therefore entitled to First

Amendment protection; (2) whether the regulation seeks to further a substantial governmental interest; (3) whether the regulation directly and materially advances that interest; and (4) whether the ordinance reaches no further than necessary to accomplish its stated goals. *See Central Hudson*, 447 U.S. at 563-66; *Greater New Orleans Broadcasting Assn., Inc. v. United States*, 527 U.S. 173, 183 (1999).

The burden of establishing all four prongs under the *Central Hudson* test lies squarely with the City. *See, e.g.*, *Greater New Orleans*, 527 U.S. at 183; *Discovery Network*, 507 U.S. at 416; *Horizon Outdoor, LLC v. City of Industry*, 228 F. Supp. 2d 1113, 1126 (C.D. Cal. 2002). The City's burden "is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Edenfield v. Fane*, 507 U.S. 761, 770-771 (1993).

The first two prongs of the *Central Hudson* test are not disputed in this case. The City does not and cannot contend that the advertisements on Plaintiff's panel signs concern unlawful activities or are misleading, and Plaintiff accepts that the City's purported goals of promoting traffic safety, aesthetics, and neighborhood character are, in theory, substantial governmental interests. However, as will be demonstrated below, the City cannot meet its formidable burden with respect to the third or fourth prongs of the *Central Hudson* test: establishing that the regulations at issue directly advance the City's stated interests and are narrowly tailored to serve those interests.

### B.    The Underinclusiveness Case Law

The Supreme Court has long made clear that where a scheme restricting commercial speech is pierced with exceptions that substantially undermine the government's stated objectives, such underinclusiveness is fatal under the third and fourth prongs of the *Central Hudson* test. The leading case is *Greater New Orleans*.

In *Greater New Orleans*, the Court struck down a federal ban on radio and television advertisements for privately operated commercial casino gambling. The "fundamental" flaw in the regulatory scheme was that it was "so pierced by exemptions and inconsistencies that the Government [could not] hope to exonerate it." 527 U.S. at 190. Whereas broadcasters were barred from carrying any advertising for privately operated casino gambling, advertisements for tribal casino gambling sanctioned by federal law were exempted from the ban, as were various other government-operated commercial casinos. *Id*. The Court emphasized the blatant hypocrisy of the government's patchwork scheme, refusing to "ignore Congress's simultaneous encouragement of tribal casino gambling," which was "growing at a rate exceeding any increase in gambling . . . that private casino advertising could produce." *Id*. at 189. The regulations failed the *Central Hudson* test because they "distinguishe[d] among the indistinct, permitting a variety of speech that pose[d] the same risks the Government purports to fear, while banning messages unlikely to cause any harm at all." *Id*. at 195. Notably, the Court also rejected the argument that the exceptions were necessary to generate revenue for the government. *Id*. at 191.

Similarly, in *Rubin v. Coors Brewing Co*., 514 U.S. 476 (1995), the Supreme Court struck down a federal law prohibiting beer labels from displaying alcohol content, which the government contended was necessary to curtail so-called "strength wars." Applying *Central Hudson*, the Court concluded that the scheme did not directly or materially advance the government's asserted interest because beer manufacturers were permitted to advertise the alcohol content of their beer – just not on the labels themselves – and because the labeling restriction applied only to beer but not to wine or spirits. *Id*. at 488. The Court observed that "[t]he failure to prohibit the disclosure of alcohol content in advertising, which would seem to constitute a more influential weapon in any strength war than labels, makes no rational sense if the Government's true aim is to suppress strength wars," and that "[i]f combating strength wars

were the goal, we would assume that Congress would regulate alcohol content for the strongest beverages as well as for the weakest ones." *Id*. These "exceptions and inconsistencies" were constitutionally fatal because they "undermine[d] and counteract[ed]" the government's proffered justification for regulating. *Id*. at 489.

Applying *Greater New Orleans* and *Rubin* to a factual scenario virtually identical to the one presented here, the United States District Court for the Central District of California struck down Los Angeles's prospective ban on off-site advertising signs in *Metro Lights, LLC v. City of Los Angele*s, 488 F. Supp. 2d 927 (C.D. Cal. 2006). In *Metro Lights*, Los Angeles, like the City in this case, had contracted with a franchisee to place thousands of off-site advertising signs on street furniture in exchange for millions of dollars in revenue sharing, and had exempted all such street furniture advertising from the otherwise total ban on all new advertising signs. The District Court struck down this scheme because the total ban and the enormous street furniture exception "operate[d] at cross purposes." *Id*. at 945. The Court explained:

> At the same time that the City, through its Sign Ordinance, bans the erection of all new off-site signs, the City's Street Furniture Program gives the City's contractor an exclusive right to place thousands of off-site signs next to traffic lanes in every area of the City where a traffic shelter, kiosk or "amenity" is located. This dichotomy undermines the Sign Ordinance's stated interests [in protecting traffic safety and aesthetics] since many of the Street Furniture advertisements, which are placed at street level, are designed precisely to attract the attention of all who pass by . . . .

*Id*. at 943; *see also id*. at 948 ("Again, as in *Greater New Orleans*, the City cannot persuasively argue that its Ordinance complies with *Central Hudson* by directly advancing a substantial government interest while the City promulgates other policies that undermine the stated interest."). The *Metro Lights* Court did not view that case as a close one, observing that "the inconsistency and the reasons for its existence are *less subtle* than those discussed in *Greater New Orleans*." *Id*. at 949 (emphasis added).

In this case, the City's scheme for regulating panel signs is even more problematic than Los Angeles's scheme was in *Metro Lights*. In *Metro Lights*, the ban at issue was only prospective, grandfathering thousands of signs that were allowed to remain in place in perpetuity. Here, in contrast, there is no such grandfathering. Under the City's scheme, *no* signs that violate the rules at issue may remain in place (except the City's own street furniture signs, that is). And while the City's scheme technically is not a complete ban – panel signs are permitted in a small fraction of the City's commercial districts – the restrictions at issue are so severe that they are amount to a virtually complete ban.

More recently, the correctness of the analysis in *Metro Lights* was reaffirmed in *World Wide Rush, LLC v. City of Los Angeles*, __ F. Supp. 2d __, 2008 WL 2477440 (C.D. Cal. Jun. 9, 2008), in which the District Court preliminarily enjoined one of the zoning restrictions (the prohibition of advertising signs located within 2,000 feet of a freeway) underlying Los Angeles's prospective total ban of all advertising signs. Relying on *Greater New Orleans* and *Metro Lights*, the *World Wide Rush* Court concluded that the fact that the City had granted exceptions approving five highway advertising billboards fatally undermined its stated goals of preserving traffic safety and aesthetics:

> Plaintiffs here have persuasively demonstrated that, despite the City's interests in safety and aesthetics that support its ban on signs within 2,000 feet of a freeway, the City has permitted giant commercial billboards in these areas that directly undermine those interests.

*Id*. at *15.

**C.    The City's Scheme Fails the Third and Fourth Prongs of *Central Hudson***

Based on the case law discussed above, it is clear that the advertising sign regulatory scheme at issue in this case fails both the third and fourth prongs of *Central Hudson*.

1. <u>Third Prong</u>

As discussed above, the City has not performed any studies – formal or informal, scientific or anecdotal – regarding whether advertising signs truly pose a threat to traffic safety or meaningfully affect the aesthetics or neighborhood character of the streetscape. Hecker Decl. ¶¶ 132-33, 137, 141; Stips. ¶¶ 93, 114, 116. This omission is itself fatal to the City's regulatory scheme, for the Supreme Court has repeatedly held that a regulation restricting commercial speech will be struck down where the government "has not 'carefully calculated' the costs and benefits associated with the burden on speech imposed by its prohibition." *Discovery Network*, 527 U.S. at 417; *see also Central Hudson*, 447 U.S. at 564 (holding that a "regulation may not be sustained if it provides only ineffective or remote support for the government's [stated] purpose").

As the Court has explained, the requirement that the government support its purported regulatory interest with specific, credible evidence of a demonstrated need to act – rather than "mere speculation or conjecture," *Edenfield*, 507 U.S. at 770 – is "critical" because it serves to prevent the government from doing precisely what the City has done here: manufacturing a pretextual regulatory justification (promoting "safety and aesthetics") to mask its actual, impermissible purpose (maximizing revenue at the expense of protected speech). *See Rubin*, 514 U.S. at 487 (holding that it is "critical" that the government support its position with specific, credible evidence of a need to act because "otherwise, 'a State could with ease restrict commercial speech in the service of other objectives that could not themselves justify a burden on commercial expression'") (quoting *Edenfield*, 507 U.S. at 771); *see also Horizon Outdoor, LLC v. City of Industry*, 228 F. Supp. 2d 1113, 1126-27 (C.D. Cal. 2002) (rejecting city's putative justifications of promoting "safety" and preventing "visual blight" because the city proffered no evidence that it had considered "any reports or studies or other evidence indicating

that the ban actually serves those interests").

In this case, the City's purported concern for "traffic safety" is curious given its express concession that Fuel's panel signs *do not actually implicate* traffic safety concerns. Hecker Decl. ¶¶ 130-31. The City appears to be carving the nuanced position that the challenged regulations generally further traffic safety goals, but that those goals will be achieved regardless of whether the regulations reach Fuel's panel signs. This concession that the regulations ban considerably more speech than is necessary is constitutionally fatal, whether it is considered under the third prong of the *Central Hudson* test (because applying the regulations to Fuel's panel signs does not directly or material advance the City's traffic safety goal) or the fourth prong (because the overinclusive regulations are not narrowly tailored and sweep into their vortex channels of communication that do not implicate the City's traffic safety concern).[12]

The City's reliance on its supposed "aesthetic" and "neighborhood character" concerns is similarly unavailing. As Justice Brennan observed in *Metromedia*, the government cannot justify substantial restrictions on commercial speech based on general "aesthetic" concerns unless its decision to regulate advertising signs stems from a detailed and comprehensive analysis of the attractiveness of the municipal environment as a whole:

> [B]efore deferring to a city's judgment [with respect to aesthetic concerns], a court must be convinced that the city is seriously and comprehensively addressing aesthetic concerns with respect to its environment. Here, San Diego has failed to demonstrate a comprehensive and coordinated effort in its commercial and industrial areas to address

---

[12] Courts have recognized that the third and fourth prongs of the *Central Hudson* test are, in essence, flip sides of the same coin. *E.g.*, *Greater New Orleans*, 527 U.S. at 188 (observing that "[t]he fourth part of the test compliments the direct-advancement inquiry of the third); *Metro Lights*, 488 F. Supp. 2d at 942 (same). The underinclusiveness of the City's scheme discussed in the next section therefore is relevant and fatal under the third *Central Hudson* prong as well: because the City has blanketed its streetscape with thousands of street furniture general advertising signs that are at least as problematic as Fuel's panel signs allegedly are, the City is not directly or materially advancing its traffic safety or aesthetic goals.

other obvious contributors to an unattractive environment.  In this sense the ordinance is [fatally] underinclusive.

453 U.S. at 531.

In this case, the City cannot credibly claim that it has engaged in any meaningful analysis of the impact of advertising signs on the urban landscape, much less that it has done so "seriously and comprehensively."  Indeed, it is undisputed that the City engaged in no aesthetic or neighborhood character analysis *at all* when it proceeded with the Street Furniture Franchise in 2004.  Hecker Decl. ¶ 141; Stips. ¶ 93; Fortier Dep. at 30-31; Sugarman Dep. at 53; Wargo Dep. at 70.  Instead, the City merely reviewed a few documents that were generated back in 1996, none of which reflect any serious consideration of the impact of a City-wide street furniture advertising program on aesthetics or neighborhood character, and all of which predate the subsequent explosion in PPT and urban panel advertising signs that dramatically altered the City's streetscape.  Hecker Decl. ¶¶ 142-52.

Because the City has not adduced any evidence that Fuel's panel signs actually compromise traffic safety or meaningfully threaten the urban landscape, the City's scheme does not "directly and materially" advance any government interest under the third prong of *Central Hudson*.

2.  <u>Fourth Prong</u>

Ultimately, this Court need not identify the precise quantum of evidence that is required for the City to prove that its scheme is directly and materially advancing its purported interests because the City's scheme has, as the Supreme Court put it in *Greater New Orleans*, a "more fundamental" flaw that is fatal under the fourth prong of *Central Hudson*:  its "regulatory regime is so pierced by exemptions and inconsistencies that the Government cannot hope to exonerate it."  527 U.S. at 190.

To satisfy the fourth *Central Hudson* prong, there must be "a reasonable fit between the restriction and the goal," and "the challenged regulation [must] include a means narrowly tailored to achieve the desired objective."  *Ballen v. City of Redmond*, 466 F.3d 736, 742 (9th Cir.

2006) (citations and quotation omitted). "A regulation need not be absolutely the least severe that will achieve the desired end, but if there are numerous and obvious less-burdensome alternatives to the restriction on commercial speech, that is certainly a relevant consideration in determining whether the fit between ends and means is reasonable." *Id*. (quoting *Discovery Network*, 507 U.S. at 417 n.13).

Even assuming the City's concession that Fuel's signs do not affect traffic safety is not, in itself, fatal, the fact that the City has exempted from its rules thousands of its own street furniture advertising signs certainly is. Fuel has adduced unrebutted expert testimony confirming that the City's street furniture signs are, if anything, significantly more likely to distract drivers than Fuel's signs are. Wachtel Decl. ¶¶ 6, 22, 27, 36, 40, 47-49, 66 (discussing, among other things, the "cone of vision" issue). The Wachtel Declaration confirms scientifically what common sense makes obvious: because the City's street furniture signs are considerably more visible to passing motorists than Fuel's signs, the City's decision to categorically exempt its signs is fatal to any claim that its scheme is narrowly tailored. *See Metro Lights*, 488 F. Supp. 2d at 944 (crediting similar expert testimony, but noting that "this evidence is not necessary to the Court's ruling since the study tends to confirm that which common sense suggests").

The same is true for the City's strained claim that its regulatory scheme, including its massive exemptions for its own signs, is narrowly tailored to its purported "aesthetic" or "neighborhood character" goals.[13] The Court is encouraged to examine the photographs that are appended to the Hecker Declaration as Exhibits 17, 20, 22, 24, and 25, which depict the various

---

[13] As *Metro Lights* observed, "it is unclear whether aesthetics alone is a sufficiently substantial justification for a restriction on commercial speech." 488 F. Supp. 2d at 947 n.10. At the very least, because "esthetic judgments are necessarily subjective, defying objective evaluation," they "must be carefully scrutinized to determine if they are only a public rationalization of an impermissible purpose." *Metromedia*, 453 U.S. at 510 (plurality opinion); *id*. at 530-33 (Brennan, J., concurring).

types of street furniture bearing advertising signs, including bus shelters, newsstands, PPTs, urban panels, and lamppost banners.  The Court is also encouraged to examine the photographs of various Fuel panel signs that are appended to the Freedman Declaration as Exhibit A.  There simply is no way that anyone could rationally conclude that Fuel's panel signs have any greater impact on aesthetics or neighborhood character than the City's exempted signs do.  *See Discovery Network*, 507 U.S. at 425 (striking down selective ban on newsracks because "respondent publishers' newsracks are no greater an eyesore than the newsracks permitted to remain on Cincinnati's sidewalks"); *see also Ballen*, 466 F.3d at 743 (striking down ban on portable advertising signs in part because "[t]he City has failed to show how the exempted signs reduce vehicular and pedestrian safety or besmirch community aesthetics any less than the prohibited signs").[14]

At a minimum, the City's embrace of dynamic electronic advertising signs – scrollers, high-definition LCD video screens, LED displays, and Bluetooth wireless transmissions – belies the suggestion that the City is at all concerned about the possible impact of advertising signage on aesthetics or neighborhood character.  These technologies obviously are more offensive to those purported concerns than Fuel's static panel signs allegedly are.  Sugarman Dep. at 82-83; Wachtel Decl. ¶¶ 12, 28-30, 34.

---

[14]  The City may rely on testimony from its urban design "expert," Douglas Woodward.  Mr. Woodward (who has never taken an academic course in urban design or architecture, let alone received a degree, let alone written in the area) claims that panel signs that supposedly do violence to aesthetics and neighborhood character when placed on private property somehow become entirely cleansed of their alleged offensiveness, and actually become affirmatively attractive, when they are moved just a few feet out onto the sidewalk and placed on street furniture.  Mr. Woodward's urban design theory is entirely novel – no academic has ever claimed that street furniture advertising signs are any less unsightly than identical signs on private property – and he did not concoct it until he was asked by the Department of City Planning, where he worked for many years, to serve as an "expert" witness in this litigation.  If the City proffers testimony from Mr. Woodward, Fuel will respond with rebuttal testimony from Professor Richard Sommer, the Program Director of the Department of Urban Planning and Design at Harvard, who will explain why Mr. Woodward's theory does not hold water.

It bears emphasis that the glaring underinclusiveness of the City's regulatory scheme is avoidable. When the prior bus shelter franchises expired in 2005, the City owned all of the then-existing structures. Hecker Decl. Exh. 14, at NYC011780-81. Accordingly, the City could have simply contracted for the ongoing maintenance of those structures and discontinued the use of advertising signs altogether (or, at least, dramatically scaled back the advertising program by allowing just enough advertising to cover the cost of ongoing maintenance).

Moreover, even assuming the City sincerely saw an urgent need to build new bus shelters, the City plainly could have forgone the opportunity to generate revenue for itself. The City could have asked each bidder to propose the minimum quantum of advertising that, without sharing revenue with the City, would cover the cost of building and maintaining the structures and providing the bidder with a reasonable profit. Because the street furniture structures the City claims to have desired cost a tiny fraction of the $2 billion in advertising revenue Cemusa expects to generate, Hecker Decl. ¶ 92, the City obviously could have scaled back its street furniture advertising program dramatically and still induced a bidder to build and maintain the very same structures at no cost to the City – provided, of course, that the City were willing to prioritize aesthetics and neighborhood character over generating revenue. Hecker Decl. ¶ 97; Gould-Schmit (June 10) Dep. at 151; Sugarman Dep. at 155. Tellingly, however, the City never considered this an option. Gould-Schmit (June 10) Dep. at 43-45.[15]

Finally, as *Metro Lights* made clear, among the "many alternatives" at its disposal that would pass constitutional muster, the "[m]ost obvious[]" option is that the City could "impose the same requirements" on its street furniture franchisees that it purports to impose on other advertising companies. 488 F. Supp. 2d at 950. For example, if the City would compel Cemusa

---

[15]  Thomas Wargo, the Director of the Zoning Division of the Department of City Planning, testified that raising revenue is not a good reason for compromising aesthetic or neighborhood character concerns. Wargo Dep. at 156.

to remove the hundreds of advertising signs that it has placed on street furniture in residential districts, then the City could similarly enforce its rules prohibiting advertising signs on private property in residential districts. The only thing that the City may not do is restrict protected speech with rules that the City does not consider important enough to follow itself.

Tellingly, the City has never even considered adopting the evenhanded approach to regulating advertising signs on both public and private property that was so obvious to the *Metro Lights* court. Gould-Schmit (Mar. 19) Dep. at 99-100; Wargo Dep. at 186.[16]

Plaintiff expects that the City will attempt to rely on *Metromedia v. City of San Diego*, 453 U.S. 490 (1981), but nothing in that case rescues the City's woefully underinclusive scheme at issue here. Although the plurality in *Metromedia* relied on legislative judgments in evaluating whether the challenged ordinance furthered traffic safety and aesthetic goals, it expressly pointed out that there was *no evidence* in that case contradicting those judgments. *Id*. at 509 (plurality opinion) ("There is nothing here to suggest that these judgments are unreasonable."). Because *Metromedia* was not confronted with and did not consider the basic underinclusiveness argument underpinning the theory of this case, *Metromedia* plainly does not control, and *Greater New Orleans*, *Rubin*, *Metro Lights*, and *World Wide Rush* plainly do.[17]

For all of these reasons, the City's scheme fails the fourth prong of *Central Hudson*.

---

[16] The fact that DOITT does not allow PPTs with advertising signs in residential districts disproves any suggestion that DOT could not similarly restrict bus shelter or newsstand advertising signs in residential districts if it cared to.

[17] Notably, the only *holding* in *Metromedia* is that the challenged scheme was unconstitutional. Justice White's four-Justice plurality, while espousing the view that legislative judgments generally deserve deference, agreed with Justices Brennan and Blackmun that the scheme at issue should nonetheless be struck down.

### D.    Courts Must Be Particularly Skeptical of Regulatory Schemes Through Which the Government Discriminates In Favor of Its Own Speech

Even leaving the underinclusiveness cases aside, the law is clear that a regulatory regime that systematically favors government speech over commercial speech violates the First Amendment.  The Supreme Court has long stressed the need for heightened judicial oversight when the government's own "self-interest is at stake."  *U.S. Trust Co. of New York v. New Jersey*, 431 U.S. 1, 26 (1977) (in dispute over whether Contract Clause barred state's modification of its own financial obligations, Court declined to defer to state's own assessment of whether statute was reasonable and necessary); *U.S. v. Winstar Corp.*, 518 U.S. 839, 896-98 (1996) (courts must be "more suspect" of the government's invocation of the Sovereign Acts Doctrine where there is a higher level of government self-interest); *see also Energy Reserves Group, Inc. v. Kansas Power & Light*, 459 U.S. 400, 412-13 & n.14 (1983).

Applying this concept in the commercial speech context, the Court in *Nichols Media Group v. Town of Babylon*, 365 F. Supp. 2d 295 (E.D.N.Y. 2005), struck down a portion of a billboard ordinance that exempted all signs "erected and maintained by or at the direction of any governmental body, organization, agency or corporation."  *Id*. at 301.  The Court found this favoring of the government's speech over private speech unconstitutional.  "By freeing governmental signs from the reach of the Ordinances, the Towns have created an impermissible distinction that favors the Towns' speech over that of other speakers."  *Id*. at 316.  The Court acknowledged that "narrowly tailored exemptions" could be permissible, but a sweeping license to the government to erect the very signs it would prohibit for others – much like the regulatory scheme here – could not pass constitutional muster.  *Id*. at 317.

These cases provide a strong independent basis for striking down the City's scheme, which plainly favors its own speech over Plaintiff's speech.

## CONCLUSION

For the foregoing reasons, it is respectfully submitted that Plaintiff's motion for summary judgment should be granted.

DATED:     July 28, 2008
           New York, New York


                              By:     _____/s/_____
                                      Richard D. Emery (RE 5181)
                                      Eric Hecker (EH 0989)
                                      Debra L. Greenberger (DG 5159)
                                      Emery Celli Brinckerhoff & Abady LLP
                                      75 Rockefeller Plaza, 20th Floor
                                      New York, NY 10019
                                      Telephone: (212) 763-5000
                                      Facsimile:  (212) 763-5001

                                      ATTORNEYS FOR PLAINTIFF
                                      METRO FUEL LLC