UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

METRO FUEL LLC,                                                    No. 07-VC-8244 (PAC)

       Plaintiff,

    vs.

CITY OF NEW YORK.

       Defendant.

------------------------------------------------------------------------x

## DECLARATION OF ERIC HECKER, ESQ.

      ERIC HECKER, ESQ. declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

    1.     I am a partner at Emery Celli Brinckerhoff & Abady LLP, counsel for Plaintiff Metro Fuel LLC ("Fuel"). I submit this declaration in support of Plaintiff's Motion for Summary Judgment or, in the alternative, for a Preliminary Injunction.

    2.     The New York City Zoning Resolution contains a variety of stringent restrictions on the placement of advertising signs in New York City (the "City"). Generally speaking, and as discussed more fully below and in Plaintiff's accompanying Memorandum of Law, all advertising signs are forbidden in residential zoning districts; all advertising signs are forbidden in most types of commercial zoning districts; and although non-illuminated and indirectly illuminated advertising signs are permitted in manufacturing zoning districts, directly illuminated signs such as the internally illuminated panel signs at issue in this case are forbidden even in manufacturing zoning districts. *See generally* Z.R. §§ 32-63, 32-645, 42-52, 42-533.

3.      The City, however, has chosen to ignore all of these rules when it comes to the thousands of non-compliant advertising signs it has placed on street furniture throughout the City.  As demonstrated below, the record developed in this case confirms beyond dispute that the City has no actual, sincere interest in protecting "traffic safety," "aesthetics," or "neighborhood character" – its ostensible basis for enacting the regulations Plaintiff challenges.  The reality is that the City has never given meaningful consideration to those purported concerns, and that it did not hesitate to sell them on the open market to the highest bidder in order to generate revenue.

4.      Attached hereto as Exhibit 1 are various factual stipulations (abbreviated herein as "Stips.") to which the parties have agreed in this case.

5.      Throughout this Declaration, I will be referring to the deposition testimony of various witnesses, the relevant excerpts of which are attached hereto as follows:  the March 19, 2008 deposition of Kerry Gould-Schmit is attached hereto as Exhibit 2; the June 10, 2008 follow-up deposition of Kerry Gould-Schmit is attached hereto as Exhibit 3; the February 14, 2008 deposition of Stanley Shor is attached hereto as Exhibit 4; the June 18, 2008 deposition of Iris Weinshal is attached hereto as Exhibit 5; the May 15, 2008 deposition of Edward Fortier is attached hereto as Exhibit 6; the May 14, 2008 deposition of Jeffrey Sugarman is attached hereto as Exhibit 7; the May 9, 2008 deposition of Thomas Wargo is attached hereto as Exhibit 8; the January 22, 2008 deposition of Jospeh Perello is attached hereto as Exhibit 9; and the March 11, 2008 deposition of Daniel Doctoroff is attached hereto as Exhibit 10.

A.      **Fuel's Advertising Sign Business**

6.      As explained in the accompanying Declaration of Michael A. Freedman, Fuel operates approximately 440 panel signs in New York City.  Fuel's panel signs measure

approximately 69 inches tall by approximately 48 inches wide.  They are internally illuminated, meaning that they contain posters that are lit by fluorescent bulbs placed behind the posters. Freedman Decl. ¶ 2.

7.      Fuel's panel signs generally are situated in one of several ways:  the vast majority of them (approximately 76.7%) are placed in, on, or near parking garages, either inside the door to the garage, cantilevered above or near the garage door, or affixed to the exterior of the garage. Approximately 14.4% of them are affixed to the exteriors of other mixed use commercial properties.  The remaining approximately 8.8% are located in parking lots, either affixed to an adjacent building or mounted on a pole.  Fuel typically rents space from the landlord in exchange for the right to place a panel sign on or inside of the property.  Freedman Decl. ¶ 3.

8.      Fuel's panel signs are made available to national and local advertisers on an "all comers" basis in a fashion similar to newspaper, magazine, and broadcast advertising.  Fuel's panel signs may be used to display a variety of commercial and noncommercial messages, including political, religious, charitable, and public service messages.  Freedman Decl. ¶ 4.

9.      Fuel markets its panel signs to prospective advertisers on a "reach and frequency" basis based on the demographics of the location area.  Fuel does not specifically market its panel signs as visible to motorists.  Freedman Decl. ¶ 5.

10.     Fuel's panel signs compete directly with the street furniture advertising signs – primarily bus shelters, newsstands, and public pay telephones – with which the City has blanketed its sidewalks in recent years.  Fuel sells advertising space on its panel signs to many of the very same advertisers that are contracting with the City's franchisees to place the very same advertising copy on the City's street furniture.  Indeed, with thousands of street furniture signs in

play, the City of New York is not just Fuel's regulator.  It is, through its franchisees, by far

Fuel's biggest competitor in the marketplace.  Freedman Decl. ¶ 6.

11.    The vast majority (approximately 93%) of Fuel's panel signs are located in zoning

districts in which, according to the regulations being challenged in this case, internally

illuminated advertising signs purportedly are prohibited.  Freedman Decl. ¶ 7.

**B.    The City's Regulatory Scheme**

12.    The New York City Zoning Resolution defines a "sign" to include any writing,

pictorial representation, emblem, or flag that is attached to, painted on, or in any other manner

represented on a building or other structure, and that is used to announce, direct attention to, or

advertise, and that is visible from outside of a building."  Z.R. § 12-10 (definition of "sign").

13.    The Zoning Resolution distinguishes between "accessory use" signs and

"advertising" signs.  An "accessory use sign" is one that directs attention to a business or

profession that is conducted on the premises where the sign is located.  Z.R. § 12-10 (definition

of "accessory use").  Accessory signs are also referred to as "on-premises signs" or "business

signs."

14.    An "advertising sign" is a sign that directs attention to a business, profession,

commodity, service or entertainment conducted, sold or offered elsewhere than upon the

premises where the sign is located.  Z.R. § 12-10 (definition of "advertising sign").  A sign is, by

definition, not an "advertising sign" if it is "accessory to a use located on the zoning lot"

containing the sign.  *Id.*

15.    The Zoning Resolution liberally permits accessory signs to be placed and

maintained anywhere in commercial and manufacturing districts, subject only to size, height,

illumination, and projection limitations.  Z.R. §§ 32-62 to 32-661; *id.* §§ 42-52 to 42-543.

16.     Contrary to its treatment of accessory signs, the Zoning Resolution places severe restrictions on the placement of advertising signs in commercial and manufacturing districts. Whereas accessory signs may be located in any type of district, the Zoning Resolution provides that advertising signs are permitted only in C6-5, C6-7, and C7 districts and, subject to illumination restrictions, in C8, M1, M2, and M3 districts.  Z.R. §§ 32-63, 42-52.  Advertising signs are not permitted in residential districts at all.  Z.R. § 22-32.

17.     Although some advertising signs are allowed in C8, M1, M2, and M3 districts, advertising signs in those districts may only be non-illuminated or indirectly illuminated.  Z.R. §§ 32-645, 42-533.

18.     Fuel's internally illuminated panel signs are not permitted in C8, M1, M2, or M3 districts because the City considers internally illuminated signs to be directly illuminated (as opposed to indirectly illuminated).  Under the Zoning Resolution, an indirectly illuminated sign is one "whose illumination is derived entirely from an external artificial source and is so arranged that no direct rays of light are projected from such artificial source into residences or streets."  Z.R. § 12-10 (definition of "sign with indirect illumination").  According to the Department of Buildings (the agency with primary enforcement jurisdiction over the City's advertising sign restrictions), a large-format billboard that is lit by numerous external high-wattage external floodlights is considered indirectly illuminated, but a panel sign consisting of a poster lit by a fluorescent bulb placed behind it is considered directly illuminated.  Fortier Dep. at 119-20, 127-29.

19.     Accordingly, Fuel's internally (*i.e.*, directly) illuminated panel signs are only allowed in C6-5, C6-7, and C-7 districts.  Fuel's panel signs are not allowed in any residential

districts, nor in any manufacturing districts, nor in any commercial districts other than C6-5, C6-7, and C-7 districts.

20.    Of the approximately 440 panel signs that Fuel currently operates in New York City, approximately 7%  are located in C6-5, C6-7, or C-7 districts.  The remaining 93% of Fuel's panel signs are located in districts in which panel signs purportedly are not allowed. Freedman Decl. ¶ 7.

**C.    The City's Street Furniture Advertising Signs**

21.    The City operates and controls, through its various franchisees, a variety of street furniture structures bearing advertising signs:  bus shelters and newsstands (which are part of the 2006 Street Furniture Franchise), as well as public pay telephones ("PPTs") (which are part of separate franchise agreements).  The City also permits advertising signs to be placed on lamppost banners hanging directly over the streets, and on urban panels placed on above-ground subway entrance railings affixed to sidewalks.

**1.    The Street Furniture Franchise**

22.    On May 19, 2006 the City entered into a 20-year franchise agreement (the "Franchise Agreement") with Cemusa, Inc. for the installation, operation, and maintenance of bus shelters, newsstands, and automatic public toilets.  Stips. ¶ 62.  The City's Council's authorizing resolution for the Street Furniture Franchise is attached hereto as Exhibit 11.  The City's Request for Proposal, with excerpts of the appendices thereto, is attached hereto as Exhibit 12.  The City's Franchise Agreement with Cemusa is attached hereto as Exhibit 13.

(a)    **Bus Shelters**

23.    Prior to 2006, the City had entered into franchise agreements with various outdoor advertising companies to install and maintain bus shelters. Those prior franchise agreements permitted the outdoor advertising companies to sell advertising space on the bus shelters. Stips. ¶ 60.

24.    At the conclusion of the prior franchise agreements, the City owned all of the then-existing bus shelter structures. Exh. 14 at NYC011780-81.

25.    Under the 2006 Franchise Agreement, Cemusa is obligated to replace all of the approximately 3,100 existing bus shelters in New York City. In addition, Cemusa is permitted to install up to 400 additional bus shelters that did not exist prior to the 2006 Franchise Agreement. Stips. ¶ 63.

26.    The new bus shelters each contain two advertising panels that are placed on the end of the shelter positioned perpendicular to the street. Each of these advertising panels is permitted to contain up to 27.5 square feet of advertising copy, for a total of 55 square feet per shelter. Stips. ¶ 64.[1]

27.    The new Cemusa bus shelter advertising panels are considerably larger than those that were on the old shelters. The old shelters were only permitted to display 47 square feet of advertising copy. Stips. ¶ 64.

28.    Like the old bus shelters, the advertisements in the new bus shelters may be internally illuminated, and the vast majority of these shelters are in fact internally illuminated.

---

[1]    Up to 10% of the new bus shelters may contain additional advertising signs if the shelter is greater than 25 feet in length. Such shelters may have an additional 55 square feet of advertising space if the advertising panels are end panels or an additional 27.5 square feet of advertising space if the advertising panels are not end panels. Stips. ¶ 65.

The advertising posters are visible day and night. There is no limit to the level of illumination on the new bus shelters. Stips. ¶ 66.

29.    The City's illuminated street furniture advertising signs tend to be brighter than Fuel's signs. Wachtel Decl. ¶ 56.

30.    The City's bus shelter signs are placed approximately 3 feet from the curb line, whereas Fuel's panel signs generally are placed between 8 to 18 feet from the curb line. Wachtel Decl. ¶ 49.

31.    There is no restriction on the placement of the City's bus shelter (and newsstand) advertising signs in residential zoning districts. Exh. 15 at NYC015410.

32.    David Askew, Cemusa's Vice President for Sales and Marketing, submitted a declaration in this case (which is attached hereto as Exhibit 16) in which he testified that Cemusa markets its bus shelter advertising signs to prospective advertisers as visible to both pedestrians and motorists. Askew Decl. ¶ 3.

33.    As detailed in the accompanying Declaration of Richard Bass, of the thousands of advertising signs that the City has placed on its bus shelters, virtually *none* of them complies with the zoning restrictions that apply in the districts in which the shelters are located.

34.    Attached hereto as Exhibit 17 are photographs depicting typical Cemusa bus shelters in New York City.

35.    Under the Franchise Agreement, Cemusa is authorized to install 250 so-called "scroller" advertising signs – dynamic signs that change the advertising copy being displayed every few seconds. Stips. ¶ 68; Wachtel Decl. ¶ 28. At least 80 of these scrollers have already been installed. Stips. ¶ 68.

36.     In addition to these 250 scrollers, the Franchise Agreement contemplates that various forms of "[e]lectronic media" will be permitted in connection with advertising signage "on a case by case basis."  Exh. 13, Franchise Agr. ¶ 4.4.2.

37.     As described below, the City has approved Cemusa's use of electronic media in three ways:  high-definition video screens, electronic stock tickers, and Bluetooth wireless transmissions.

38.      In March 2007, the City gave permission to Cemusa to equip ten bus shelters with high-definition liquid crystal display ("LCD") screens displaying video advertising.  Stips. ¶¶ 70-71.

39.     The City permitted Cemusa to place these LCD video advertising signs on shelters in areas with high pedestrian and vehicular traffic.  Stips. ¶ 70.

40.     The City permitted Cemusa to place these LCD video advertising signs on two-way streets where they would be visible to oncoming traffic.  Stips. ¶ 72.  The City rejected the advice of Stanley Shor, the Assistant Commissioner of the Department of Information Technology and Telecommunications ("DOITT") in charge of the public pay telephone franchises, who advised the Department of Transportation ("DOT") to require Cemusa, for traffic safety reasons, to place the LCD screens only on one-way streets facing away from vehicular traffic.  Exh. 18 at NYC015498.

41.     The City has also permitted Cemusa to equip 20 bus shelters with smaller LCD "tickers" that dynamically display stock quotes, the time, and the temperature.  Stips. ¶ 79.

42.     In addition to full-size video advertisements and smaller tickers, the City also has permitted Cemusa to equip many of its bus shelters with "Bluetooth" technology.

43.     Bluetooth is a wireless communication system that transmits a signal containing

data to certain kinds of handheld devices, including mobile telephones.  Exh. 16, Askew Decl. ¶ 4.  Bluetooth can be used to beam images, wallpaper, coupons, video files (such as television or movie trailers), audio files (such as ringtones), games, and software applications to those passing through its transmission radius.  Stips. ¶77.

44.     Pedestrians and motorists with Bluetooth-enabled handheld devices who pass within the transmission radius of a Bluetooth-equipped bus shelter can receive an audible ping or vibration alerting them that they have received an advertising message sent to their device. Stips. ¶ 76.

45.     Pursuant to the agreement between the City and Cemusa, the Bluetooth transmission radius is only permitted to be fifteen feet.   However, Cemusa believed that the technology it installed had the capacity to transmit content considerably farther, and Cemusa never tested its technology and therefore does not know exactly how far its Bluetooth transmissions traveled.  Stips. ¶ 75; Exh. 16, Askew Decl. ¶ 8.

46.     The City never asked Cemusa to explain how its Bluetooth transmissions would be confined to a 15-foot radius, nor did the City ever ask Cemusa to represent or certify that its Bluetooth transmissions were in fact confined to any particular radius.  Askew Decl. ¶ 9.

47.     Although the Bluetooth program was supposed to be limited to ten bus shelters, Cemusa actually installed Bluetooth technology on well over 100 different bus shelters throughout the City.  Stips. ¶ 73; Exh. 16, Askew Decl. ¶ 5.

48.     Prior to March 2008, the City did not audit the Bluetooth program or ask Cemusa to report on how many bus shelters had been equipped with Bluetooth technology because the City "does not monitor the content of advertising" on its bus shelters.  The City did not learn about the extent of Cemusa's Bluetooth program until it was revealed through discovery in this

litigation.  Stips. ¶ 74; Exh. 16, Askew Decl. ¶ 6.

49.     The City has referred to electronic media as the "wave of the future" and noted that "the wider use of electronic media is likely."  Gould-Schmit (Mar. 19) Dep. at 177; Exh. 19.

### (b)     Newsstands

50.     Under the Franchise Agreement, Cemusa also is obligated to replace each of the 284 existing newsstands in New York City, and is permitted to install up to 330 new newsstands. Stips. ¶ 83.

51.     Prior to 2006, newsstands were not permitted to display advertising signs. However, the City amended its Administrative Code, at DOT's request, in order to permit Cemusa to display advertising signs on newsstands for the first time.  Stips. ¶ 84; Gould (Mar. 19) Dep. at 54.

52.     Each new Cemusa newsstand is permitted to display up to 82.5 square feet of advertising copy.  The newsstands have advertising panels of varying sizes depending on the dimensions of the newsstand.  There usually is one smaller advertising panel on the side of the newsstand and one larger advertising panel on the back of the newsstand facing the street.  Stips. ¶ 83.

53.     The City's newsstands are placed approximately 3 feet from the curb line. Wachtel Decl. ¶ 49.

54.     As detailed in the accompanying Declaration of Richard Bass, of the dozens of newsstands bearing advertising signs that the City has already installed (with hundreds more scheduled to be build in the next couple of years), almost all of them violate the zoning restrictions that apply in the districts in which the newsstands are located.

55.    Attached hereto as Exhibit 20 are photographs depicting typical Cemusa newsstands in New York City.

56.    Cemusa markets its newsstand advertising signs to prospective advertisers as visible to both pedestrians and motorists.  Exh. 16, Askew Decl. ¶ 3.

### 2.    Public Pay Telepones

57.    In 1999, the City entered into a number of franchise agreements with different franchisees to install and operate PPTs throughout the City.  These franchises have a term of 11 years with a 4-year renewal option.  Stips. ¶ 95.

58.    The PPT franchise agreements permit the placement of advertising panels on the exterior rear and side panels of PPT enclosures in any zoning districts in which commercial or manufacturing uses are permitted as of right.  Stips. ¶ 96.

59.    Advertising on side display panels is permitted to be 27" x 57".  Advertising on rear display panels is permitted to be up to  54" x 57" for double-pedestal structures and up to 36" x 81" for triple-pedestal structures.  Stips. ¶ 98; Exh. 21 at ¶ 4.4.1(c) (excerpts of PPT franchise agreement).

60.    There currently are approximately 21,000 public pay telephones in New York City, approximately 12,000 of which bear advertising signs.  Shor Dep. at 65.

61.    These PPT advertising signs are placed approximately 3 feet from the curb line.  Wachtel Decl. ¶ 49.

62.    The franchise agreements allow PPT advertising signs to be illuminated (except in designated historic districts).  Stips. ¶ 99.

63.    Attached hereto as Exhibit 22 are photographs depicting typical PPTs bearing advertising signs in New York City.

64.    The City has approved the use of light-emitting diode ("LED") technology for displaying electronic copy on PPT advertisements for the New York Lotto.  Stips. ¶ 102.  These LED ads are "much brighter" than typical backlit PPT signs.  Shor Dep. at 75.

65.    From 1999 to 2004, there was explosive growth in the number of PPTs with advertising panels in central Manhattan, the most lucrative advertising market.  DOITT later made the following findings after receiving widespread community complaints:

> [T]here has accumulated a very high number of advertising panels on PPTs installed on the City's streets in CDs [Community Districts] 1-8, resulting in an aggravation of visual clutter in those areas.  According to figures collected by DoITT, there are 8,160 advertising panels located on PPTs in City streets just within the eight community districts that comprise CDs 1-8 in Manhattan.  The 8,160 advertising panels on PPTs in these eight community districts represent over 72% of all the advertising panels on PPTs on City streets throughout the 59 community districts of the City.  And the problem has grown substantially in the last five years . . . .  With the significant accumulation of PPT advertising panels installed in CDs 1-8, and the significant increase in such panels in these districts over the last five years, the cumulative effect of visual disturbance and distraction resulting from PPT advertising in CDs 1-8 has become a significant issue.
>
> [T]he weight of such burden is even more profound given that this visual clutter has been concentrated within a much smaller physical area than it would in other community districts.  Although the eight community districts that comprise CDs 1-8 represent 8/59, or about 14%, of the total number of 59 community districts in the City, these eight districts actually represent only about 4% of the geographic area of the City.

Exh. 23, at 22-23; Stips. ¶ 100.

66.    DOITT found that the PPTs were placed on City streets without regard for whether the locations actually needed greater phone service.  Stips. ¶ 100.

67.    Even worse, the City authorized and profited from the vast increases in PPTs at the same time that cell phones made PPTs increasingly more irrelevant.  As Stanley Shor

acknowledged, "[t]he proliferation of cell phones has made the pay phone much less useful to most people."  Shor Dep. at 44, 82.

68.     The DOITT report on the growth of the central Manhattan PPTs conceded:

> It is true that the enormous growth in the use of wireless phones and the apparently related decline in use of payphones … reduces the impact of one argument that might theoretically be made to support advertising on PPTs (i.e., the argument that PPTs are so important that advertising on them should be permitted so as to encourage the installation of PPTs even if such PPTs are not self-supporting based solely on revenue from phone usage).  To the extent that wireless phones now offer an alternative to PPTs for many people, if permission to advertise had originally been intended to encourage the installation of PPTs sufficient to serve a certain number of anticipated users of PPTs then as the number of anticipated users has declined the relevance of such an intention would also decline.

Exh. 23, at 28 n.32.

69.     As a result of the significant community complaints over the increase in PPTs bearing advertising signs in central Manhattan, the City was eventually forced to amend 67 RCNY ¶ 6-06(c) to prohibit the placement of new advertising signs on new PPTs installed pursuant to approvals issued after December 4, 2004 in Manhattan Community Districts 1-8. Stips. ¶ 101.  This was done only after DOITT concluded that "any marginal increase in revenue to the City from any further additional advertising installations" in this area was "small or nonexistent."  Exh. 23, at 27 n.30; Shor Dep. at 139-41.  The City did nothing to reduce the 8000 advertising panels on PTTs in central Manhattan that had been erected up until that date.

70.     Deputy Mayor Doctoroff testified as follows:

> I think there are too many signs on phone kiosks….
>
> There are simply too many of them; literally in many places in Manhattan there are two or three on a block and they were put there without any real consideration for the need for the phones or the appearance that would result from their placement.

Doctoroff Dep. at 40-41.

71.    The City has allowed its PPT franchisees to place thousands of PPTs bearing advertising signs in zoning districts in which the Zoning Resolution does not allow advertising signs to be placed on private property.

### 3.    Lamppost Banners

72.    The New York City Department of Transportation ("DOT") permits the display of advertising banners on the City's lampposts.  34 RCNY § 2-14(b).

73.    Lamppost advertising banners are permitted to be 24 square feet – 3 feet wide and 8 feet tall.  *Id.* § (b)(2)(iv).

74.    These advertising banners are cantilevered from lampposts such that they hang directly over active roadways.  Stips. ¶ 113.

75.    Although lamppost banners are theoretically supposed to promote cultural or community events, DOT permits up to 10% of the banners to advertise corporate sponsorship. 34 RCNY § 2-14(b)(2)(v).

76.    Attached hereto as Exhibit 24 are photographs depicting typical lamppost banners in New York City.

77.    As these photographs demonstrate, lamppost banners, which have become ubiquitous throughout midtown Manhattan, often are nothing more than pure commercial advertisements.  For example, the banner advertising New York as the "beauty capital of the world" is a barely disguised advertisement for *Cosmopolitan* magazine.  So too with the banner advertisements for the CBRE real estate firm and the television program *The Family Guy*.

78.    The City has issued thousands of permits for companies to hang banners on lampposts around the City.  These banners are permitted to hang directly over the street.  The

City has never studied any impact that they might have on traffic safety or aesthetics.  Stips. ¶¶ 113, 114, 116.

### 4. Taxi Cabs

79.     The New York City Taxi and Limousine Commission ("TLC") issues permits for advertising on the rooftops of taxi cabs.  There are over 13,000 licensed medallion taxicabs in the City of New York.  TLC has issued approximately 7,300 permits for advertising on the rooftops of taxicabs.  Many of these rooftop taxi cab advertising boxes are permitted to include dynamic digital advertisements.  Stips. ¶¶ 109-110.

### 5. Urban Panels

80.     The Metropolitan Transportation Authority ("MTA") has placed advertising signs known as "urban panels" on the street-level staircase railings of approximately 905 subway entrances around New York City.  All but 92 of these urban panel structures are double-faced, resulting in a total of 1718 advertising faces, each measuring approximately 28 inches by 58 inches.  The vast majority of these urban panels are internally illuminated.  Stips. ¶ 36, & App. B.

81.     Of the 1718 advertising sign faces on urban panels throughout the City, 80 of them display high-definition video advertisements.  Stips. ¶ 38.  Jeffrey Sugarman, an urban designer with the Department of City Planning, testified that these video advertisements are "really visually intrusive."  Sugarman Dep. at 82-83.

82.     Attached hereto as Exhibit 25 is a photograph depicting various typical urban panels, including those displaying high-definition video advertisements.

83.     The City has asserted that although it generally has the legal authority to enforce its advertising sign restrictions against the MTA, it does not have the authority to do so with respect to advertising signs located on the property of New York City Transit (a subsidiary of the MTA) because of subsection 13a of section 1204 of the Public Authorities Law, which provides that:  "Notwithstanding . . . the provisions of any general, special or local law, code, ordinance, rule or regulation to the contrary, the [transit] authority may erect signs . . . or advertising matter on any property . . . leased or operated by it or otherwise under its jurisdiction or otherwise sell the right to do so to any person . . . ."  Exh. 26 at 15-16 (Response to Interrogatory No. 22).

84.     It is not at all clear, however, that subsection 13a gives the MTA the unqualified right to attach large electronic advertising signs to subway entrance railings that are affixed to City sidewalks.  One senior City official advised DOT that it "may exceed the authority" that MTA has under subsection 13a to "extend an appurtenance into the City's air space for the sole purpose of generating revenue from advertising."  Exh. 27 at NYC014313.  Despite the fact that this question was raised, the City never bothered to explore whether the MTA's urban panels in fact are exempt.  Shor Dep. at 226-27; Fortier Dep. at 102.

85.     In any event, the City cannot credibly rely on subsection 13a because the City played a direct role in its enactment.  As the legislative history reveals, then-Governor Nelson A. Rockefeller, before deciding whether to sign the bill, requested the recommendation of New York City Mayor Robert F. Wagner.  Mayor Wagner strongly endorsed the bill because advertising revenues would help keep fares down, which would benefit New York City residents:

> This bill was sponsored on the recommendation of the New York City Transit Authority.  The Authority advises me that the revenue to be realized by it for advertising as authorized by the proposed law would be approximately $1,000,000 a year.

Any additional revenues received by the Authority would be helpful in preserving the present fare structure of the New York City transit facilities. This I am most anxious to do.

Accordingly, I recommend that you approve the bill.

Exh. 28.

86.     Moreover, even if subsection 13a did pose a legal hurdle to enforcement action by the City against the MTA, the City still could exert its considerable influence over the MTA to seek the MTA's voluntary compliance with the City's restrictions on advertising signs. The City controls 4 members of the MTA's Board. Stips. ¶ 39. The City owns most of the MTA's facilities, and the MTA relies on the City's continuing willingness to lease those facilities to it. Stips. ¶¶ 40, 42-43. And the City provides the MTA with between $280 million and $290 million per year in operating subsidies and hundreds of millions of dollars more per year in capital subsidies. Stips. ¶ 41.

87.     Despite its considerable influence, the City has never bothered to ask the MTA to consider voluntarily removing even its most offensive high-definition video panels. Former DOT Commissioner Iris Weinshal – whose agency has primary jurisdiction over the City's sidewalks – testified that she had significant traffic safety concerns about the MTA's high-definition video panels, but that she accepted the advice of her chief of staff to "leave it alone" – *i.e.*, "don't get into it with them" – for fear of squandering the political capital she needed with the MTA on other issues. Because of the "scope of things [she] had to deal with [the MTA] on," it would not have been prudent to "take them on," and she therefore "just sort of dropped it." Weinshal Dep. at 80-83.

**D.    The City's Primary Goal In Saturating Its Streetscape With Street Furniture Advertising Signs Was to Generate Revenue**

**1.    The City's Share of Street Furniture Advertising Revenue**

88.    The City will profit tremendously from its Franchise Agreement with Cemusa.  In addition to financing 100% of the cost of building and maintaining all of the new newsstands, bus shelters, and automated public toilets, Cemusa is obligated to pay the City at least 50% of the gross advertising revenue derived from the Coordinated Street Furniture Franchise.  Stips. ¶ 85.

89.    Pursuant to the Franchise Agreement, the City is entitled to receive a Guaranteed Minimum Annual Compensation ("GMAC") totaling approximately $999 million over the twenty-year contract term.  Stips. ¶ 86; Exh. 29.

90.    In addition to this GMAC, Cemusa must provide the City with 20% of all of the street furniture advertising space for use by the City's commercial marketing partners and for advertisements promoting New York City.  Stips. ¶ 89.

91.    Cemusa also must also provide the City with "in-kind" payments by posting advertisements for the City on Cemusa-owned out-of-home advertising media in other cities throughout the world.  The value of such in-kind advertising over the course of the Coordinated Street Furniture Franchise is $398,400,000.  Stips. ¶ 90.

92.    Although Cemusa expects to generate total revenues in the range of $2 billion through street furniture advertising, it will cost at most $100 million to construct and install all of the new street furniture structures.  Exh. 14 at NYC011779; Gould-Schmit (June 10) Dep. at 139.

93.    Notably, the City approved the use of various forms of electronic media on its street furniture advertising signs for the express purpose of generating significant additional revenue.

94.     For example, the City conditioned its approval of Cemusa's use of "scroller" ads on the payment of millions of additional dollars.  Cemusa had originally proposed a GMAC of $924 million, with an additional $91.5 million in "Contingent Compensation Above GMAC" – dependent upon the City permitting Cemusa to place 200 scrollers "in the most favorable advertising locations."  Exh. 30.  The City then inquired whether Cemusa would guarantee that additional $91.5 million if the City would agree to allow the scrollers.  Cemusa agreed that it would guarantee 95% of the contingent compensation beginning in the sixth year of the Franchise Agreement, meaning that Cemusa guaranteed an additional $75 million on top of the $924 million it had initially bid, raising the total GMAC to $999 million.  Exh. 31.

95.     Former DOT Commissioner Iris Weinshal testified that "[t]here was just one upside [to allowing Cemusa to install scrollers:] generating more revenue."  Weinshal Dep. at 77-78; *see also* Gould-Schmit (June 10) Dep. at 183-84.

96.     The City also has profited substantially from its decision to permit Cemusa to install high-definition LCD video screens and Bluetooth transmitters on bus shelters.  Those programs increased advertising revenue on the equipped shelters by over 50%.  Stips. ¶ 78.

97.     Because the street furniture structures the City claims to have desired cost a tiny fraction of the $2 billion in advertising revenue Cemusa expects to generate, the City could have scaled back its street furniture advertising program dramatically and still induced a bidder to build and maintain the very same structures at no cost to the City – provided, of course, that the City were willing to prioritize aesthetics and neighborhood character over generating revenue. Gould-Schmit (June 10) Dep. at 151; Sugarman Dep. at 155.  Tellingly, however, the City never considered this an option.  Gould-Schmit (June 10) Dep. at 43-45.

98.    The City also has profited handsomely from its PPT franchises.  The City collects 26% of net advertising revenues generated by ads placed on PPTs.  The City was paid the following amounts under its PPT franchise agreements in recent years:  $10,728,963.52 in 2004, $12,459,593.70 in 2005, $14,103,080.14 in 2006, and $14,017,347.61 in 2007.  Stips. ¶¶ 103-104.

99.    The revenue derived during this period steadily increased even though the number of PPTs declined by an average of 1,700 phones per year (because of the increasing prevalence of cell phones).  Shor Dep. at 96-97; *id*. at 44, 82; Exh. 32.

100.    The City makes more than three times as much money from advertisements on pay phones than it does from all other sources of pay phone income combined – including charges for telephone calls.  Stips. ¶ 105.

### 2.    New York City Marketing

101.    That the City has profited and will continue to profit handsomely from its street furniture advertising programs is no accident.  Rather, the City has engaged in a carefully planned effort to leverage its street furniture assets to generate maximum revenue.

102.    In 2003, the City established New York City Marketing ("NYCM") – a new organization designed to generate revenue and promotional exposure for the City – and appointed Joseph Perello as its first Chief Marketing Officer.  Exhs. 33 and 34.

103.    "NYCM set out to centralize and manage the city's collective media assets.  The idea was to use the assets to generate value to the city, by using them either to support corporate partners and city agencies or to promote NYC in other ways.  NYCM believed that media opportunities were important not only to tap into advertising vehicles but also to shape the messaging in those vehicles."  Exh. 35 at 10.

104.    Perello quickly recognized that street furniture advertising represented "one of the most significant opportunities" for NYCM, and that Manhattan, in particular, was a key and lucrative market for outdoor advertisers.  *Id*. at 10-11.

105.    Indeed, Perello helped DOT negotiate a one-year extension of the City's then-existing bus shelter franchise agreement that increased the City's share of advertising revenue by $13.5 million.  Perello Dep. at 46-47, 58-60; Exh. 35 at 11.  Perello subsequently helped spearhead and negotiate the new street furniture Franchise Agreement with Cemusa.  Gould-Schmit (Mar. 19) Dep. at 21-22.

106.    Thanks to Perello's efforts, the City has also capitalized on the lucrative opportunities presented by the advertising sign space that the City had reserved for itself under the Franchise Agreement.  The City entered into a variety of "marketing partnership agreements," including:

- The History Channel:  The City agreed to provide the History Channel with "$6.8 million in city-owned outdoor media" to promote its programs in exchange for $19.5 million agreement, including $3.5 million in cash, and $16.5 million worth of media and programming.  Exh. 36 ¶¶ 2.1, 10.2; Perello Dep. at 83-85.

- Snapple:  The City agreed to award Snapple an exclusive contract to provide water and juice vending machines in the City's 1,200 schools and to give Snapple almost $20 million of advertising space on the City's street furniture in exchange for $106 million in cash and $60 million in marketing and promotional value.  Exh. 37; Perello Dep. at 111-13.

107.    In July 2006, then Deputy Mayor for Economic Development Daniel Doctoroff met with Van Wagner, an outdoor advertising company.  Van Wagner made a presentation to Doctoroff and others encouraging the City to devote more resources to enforcing its advertising sign restrictions.  Van Wagner distributed materials to the attendants that explained the financial benefits to the City of an enforcement regime:  "If New York City laws had been enforced, a significant portion of that money [spent by advertisers on the signs that do not comply with City

law] could have been spent on forms of outdoor advertising that provide revenue for the City, such as the street furniture program."  Exh. 38 at NYC011501.  The president of Van Wagner made this point at the meeting with Doctoroff, and Doctoroff did not voice any disagreement. Doctoroff Dep. at 77-78.

108.     Later that same day, Van Wagner sent a follow-up letter to Doctoroff, writing:

> Dan, I know that you have always appreciate how valuable a resource street furniture, telephone kiosks and other outdoor advertising assets can be to New York City.  We firmly believe that by ensuring that outdoor advertising companies comply with applicable regulations, not only will you help clean up New York City but you will be able to generate greater revenue for the City from its outdoor advertising assets.

Exh. 39.  The letter was copied to DOB Commissioner Patricia Lancaster, Doctoroff's Chief of Staff Marc Ricks, Mona Sehgal of the DOB, and Edward Fortier of the DOB.  Doctoroff did not follow up with any of these individuals to indicate that he disagreed with Van Wagner's point. Doctoroff Dep. at 89-90.[2]

**E.     The City Awarded the Street Furniture Franchise to Cemusa Even Though Cemusa's Proposal Received the Lowest Design Scores of Any Bidder**

109.     The City's suggestion that its goal in pursuing the Street Furniture Franchise was to enhance the appearance of the streetscape – rather than to generate maximum revenue – is belied by the City's unqualified admission in its Verified Answer to an Article 78 petition filed by a rejected bidder that it was "the compensation promised to the City in its proposal [that] put Cemusa ahead of the other proposers."  Exh. 40, ¶ 85.

---

[2]   Kerry Gould-Schmit testified that when the City considered the possibility of allowing advertising signs to be placed on sidewalk sheds, it was concerned that doing so would adversely impact the revenues generated by its street furniture and PPT franchises.  Gould-Schmit (Mar. 19) Dep. at 254-55

110.    Indeed, not only did the City select Cemusa because of the money it offered, but the City did so even though Cemusa received among the lowest design scores of any of the bidders.

111.    The Street Furniture Franchise RFP spelled out a specific, detailed, and strict procedure through which the various street furniture bids would be evaluated and a winning franchisee would be selected.  Each bid would be evaluated by a special inter-agency "Evaluation Committee" and awarded up to 145 points:  up to 25 points for ability to provide required services, 60 points for technical merit, 55 points for compensation package, and up to 5 special preference points.  Each of these basic categories was further broken down into various subcategories, each of which was allocated maximum point scores.  Exh. 12 at 23-26; Exh. 43.

112.    Given the point totals assigned to each category, 38% of each bidder's total score was derived from an assessment of that bidder's proposed compensation package.  Stips. ¶ 91.

113.    In order to evaluate the design aspects of the various street furniture proposals, the Evaluation Committee relied on the assistance of the Design Advisory Committee, a group comprised of representatives of City agencies and civic organizations with experience in architecture and urban design, which evaluated the design aspects of each proposal and submitted non-binding recommendations to the Evaluation Committee.  Exh. 40, ¶ 52.

114.    REDACTED PURSUANT TO THE COURT'S JULY 15, 2008 ORDER AND THE PARTIES' MARCH 27, 2008 PROTECTIVE ORDER

115.  REDACTED PURSUANT TO THE COURT'S JULY 15, 2008 ORDER AND THE PARTIES' MARCH 27, 2008 PROTECTIVE ORDER

116.  REDACTED PURSUANT TO THE COURT'S JULY 15, 2008 ORDER AND THE PARTIES' MARCH 27, 2008 PROTECTIVE ORDER

117.  REDACTED PURSUANT TO THE COURT'S JULY 15, 2008 ORDER AND THE PARTIES' MARCH 27, 2008 PROTECTIVE ORDER

Exhibit 43 explains how the Evaluation Committee scored each bidder's design.  The fifth page of this document explains that "Phase Three" of the scoring pertained to "technical merit," and that subsection D of Phase Three pertained specifically to the bidder's design.  Each bidder could receive up to 30 design points.

118.    Exhibit 44 sets forth the actual design scores that were awarded to each bidder by each member of the Evaluation Committee (whose names have been redacted and replaced with capital letters).  The column on the far left side of the table reflects the scoring category that is being reported.  The six rows labeled "D1" through "D6" reflect the design scoring categories. The first page of the document reflects Cemusa's design scores, followed by NBC/Decaux, Van Wagner, Clear Channel, and Viacom.

119.    Exhibit 45 is a chart summarizing the design scores awarded to each bidder. Whereas NBC/Decaux and Van Wagner received average design scores of 26.71 and 25.71, respectively (out of 30 possible points), Cemusa received an average design score of 12.29 – by far the lowest of any of the five bidders.  Gould-Schmit (June 10) Dep. at 105-09.

120.    After the initial scores were tallied, three of the five bidders were invited to revise their proposals and to submit best and final offers (the "BAFO" round).  Cemusa received one of the three highest overall point totals in the initial round – despite its abysmal design scores – because it scored by far the highest of any bidder in the compensation package category.

121.    Exhibit 46 explains the overall scoring process and confirms that Cemusa's "Phase IV" scoring – *i.e.*, its compensation package – was far superior to any of the other bidders in both the initial and BAFO rounds.  Exhibit 47 is a chart summarizing each bidder's scores broken down by category.  The third line of this chart ("Subtotal:  II + III") demonstrates that in the initial round, Cemusa was in fourth place when all of the scoring other than its compensation package had been tallied, and the fifth and sixth lines ("Initial Phase IV" and "Initial Total") demonstrate that Cemusa vaulted into first place when its compensation package scores were added.  Cemusa therefore was invited to submit a final BAFO proposal along with NBC/Decaux and Van Wagner, which had received the highest design scores.

122.    The results of the BAFO round were similar.  The Evaluation Committee reviewed the revised proposals submitted by each of the three finalists, and Cemusa once again received by far the lowest design scores.  Exhibit 48 contains the design scores for the final round, which are summarized on the bottom half of Exhibit 45.  Cemusa's design scores were still "significant[ly]" lower than the other two finalists.  Gould-Schmit (June 10) Dep. at 111.

123.    However, Cemusa also received by far the highest scores for its compensation proposal in the BAFO round.  When all of the categories were combined, Cemusa nosed NBC/Decaux by a razor-thin margin:  909.75 to 890.5 total points – *i.e.*, average scores by each of the seven members of the Evaluation Committee of 129.96 (out of 145) for Cemusa and 127.21 for NBC/Decaux.  Exh. 46 (last page); Exh. 47.

124.    At her deposition, Kerry Gould-Schmit, DOT's representative on the Evaluation Committee, put it this way:

> Q.    20 points out of 900 isn't exactly a huge margin of victory, is it?
>
> A.    No.
>
> Q.    It was a fairly close competition?
>
> A.    Yes, it was.
>
> Q.    NBC almost won?
>
> A.    It was close.
>
> Q.    And the reason why Cemusa beat NBC Decaux is because of the strength of its compensation proposal?
>
> A.    Yes.
>
> Q.    Even though its design was inferior?
>
> A.    Yes.

Gould-Schmit (June 10) Dep. at 94.

125.    Thomas Wargo, the Director of the Zoning Division of the Department of City Planning, testified that raising revenue is not a good reason for compromising aesthetic or neighborhood character concerns.  Wargo Dep. at 156.

**F.    The City Exempts Its Street Furniture From the Advertising Sign Restrictions Set Forth In the Zoning Resolution**

126.    According to the City, its street furniture advertising signs are exempt from all of the restrictions set forth in the Zoning Resolution because the Zoning Resolution "regulates the use or development of zoning lots" but "does not govern the use of development of the City's streets and sidewalks."  Exh. 26 at 18-19 (Response to Interrogatory No. 26).

127.    Thus, "[t]he only activities taking place on the City's streets and sidewalks that are regulated by the Zoning Resolution are those that are directly related to the use and development of the adjoining lot." *Id.*

128.    If the City chose to, it certainly could subject its street furniture advertising signs to some or all of the restrictions set forth in the Zoning Resolution.  For example, section 4.4.2 of the Franchise Agreement requires Cemusa to comply with the Zoning Resolution's electronic media restrictions governing immediately adjacent property.  Exh. 13.  In other words, Cemusa is only allowed to place an electronic advertising sign on a street furniture structure if the Zoning Resolution would allow such a sign to be placed on property immediately adjacent to that street furniture structure.  There is no reason why the City could not, if it wished to, require Cemusa to comply with all of the zoning restrictions on advertising signs that apply to immediately adjacent zoning lots.  Fortier Dep. at 96-97, 113-14.  But the City never even considered doing that. Gould-Schmit (Mar. 19) Dep. at 99-100; Wargo Dep. at 162-63.[3]

129.    The consequence of the City's decision to exempt its street furniture advertising signs from the restrictions set forth in the Zoning Resolution are severe.  As detailed in the accompanying Declaration of Richard Bass, of the thousands of advertising signs that the City has placed on its bus shelters and newsstands, virtually *none* of them complies with the zoning restrictions that apply in the districts in which the shelters and newsstands are located.

---

[3]   Although the Franchise Agreement states that Cemusa must comply with the restrictions on electronic advertising signs set forth in the Zoning Resolution, the City has not required Cemusa to do so on the theory that its high-definition video ads are only a "pilot."  Gould-Schmit (June 10) Dep. at 11.

**G.      The City's Purported "Traffic Safety" Concerns**

130.    The City contends that the restrictions on advertising signs are designed to address "traffic safety concerns" (as well as to address aesthetic and neighborhood character concerns). Exh. 26 at 11-12 (Response to Interrogatory No. 15).

131.    The City expressly concedes, however, that Fuel's panel signs do *not* implicate traffic safety concerns. *Id*. at 12 (Response to Interrogatory No. 16) (stating that the City restricts panel signs in order to address aesthetic and neighborhood character concerns, but not traffic safety concerns).

132.    The City has not conducted or consulted any studies regarding whether panel signs – be they Fuel's panel signs or the City's own street furniture signs – implicate traffic safety concerns. Stips. ¶ 93; Gould-Schmit (Mar. 19) Dep. at 152; Shor Dep. at 137-38.

133.    In 2005, David Karnovsky, the General Counsel of the Department of City Planning, suggested to Melinda Katz, the Chair of the City Council's Land Use Committee, that the City Council should provide funding to "hir[e] a consultant to study best practices in the area of sign regulation in other jurisdictions." Exh. 49. However, no such study was ever performed. Fortier Dep. at 111; Wargo Dep. at 187-88.

134.    Plaintiff's traffic safety expert, Jerry Wachtel, conducted a through study of Fuel's panel signs and the City's street furniture signs and concluded that the City's signs have a greater potential to distract drivers than Fuel's panel signs do. Wachtel Decl. ¶¶ 6, 22, 27, 36, 40, 47, 49, 66.

135.    This is so because the City's street furniture signs are at least as large, if not larger than Fuel's signs, are located substantially closer to the curb lines, and thus are far more likely to enter a driver's so-called "cone of vision." Wachtel Decl. ¶¶ 47-49.

136.    Mr. Wachtel concluded that the City's scroller and electronic advertising signs (of which Fuel has none) are the most likely of all to distract drivers.  Wachtel Decl. ¶¶ 12, 28-30, 34.

137.    The City approved Cemusa's use of electronic media – including high-definition video screens – without conducting or consulting any studies about the traffic safety or aesthetic impact of electronic advertising signs.  Gould-Schmit (Mar. 19) Dep at 191.  Indeed, the City knew that the MTA had experimented with similar technology, but did not bother to consult with the MTA about its experience.  *Id*. at 191-92.

138.    The City Council Authorizing Resolution that authorized the 2004 RFP expressly required DOT to develop street furniture siting criteria that "address . . . visual impact on vehicular traffic."  Exh. 11 at NYC007654-55.

139.    Purportedly implementing this express directive, the siting criteria that DOT developed contain a single, passing statement that "[t]he placement of the Franchise Structures shall not interfere with pedestrian or motorist sight lines necessary for traffic safety."  Exh. 50 at NYC005969.  However, the actual siting rules plainly are geared towards pedestrian flow issues, not traffic safety issues, and DOT has not taken any steps to ensure that street furniture advertising signs are not placed where they are unduly capable of distracting passing motorists.  As Mr. Wachtel concluded, the "siting criteria do nothing to address the critical issues of driver distraction and inattention from advertising signs, nor do they attempt to do so.  As far as I know, the City has developed no such criteria, and traffic safety is therefore unaddressed in the City's process for approval of advertising signs on structures located on city property."  Wachtel Decl. ¶¶ 52-53.

**H.    The City's Purported "Aesthetics" and "Neighborhood Character" Concerns**

140.    The City contends that it restricts Fuel's panel signs in order to protect "aesthetics" and "neighborhood character."  Exh. 26 at 11-12 (Response to Interrogatory Nos. 15-16).

141.    However, the City never conducted or consulted any studies, and is not aware of any studies, regarding the impact of panel signs or street furniture advertising signs on aesthetics or neighborhood character.  Stips. ¶ 93; Fortier Dep. at 30-31; Sugarman Dep. at 53; Wargo Dep. at 70.

142.    Instead, in implementing the Street Furniture Franchise beginning in 2004, the City relied exclusively on an analysis of a similar street furniture franchise proposal that had been considered in 1996 (but ultimately abandoned).  Stips ¶ 92.

143.    In determining what steps had been taken and what conclusions had been drawn during the 1996 review process, the City relied primarily on three written documents:  the City Environmental Quality Review ("CEQR") application that DOT submitted in April 1996 (Exh. 51); the City Planning Commission report that was issued in October 1996 (Exh. 52); and the City Council authorizing resolution that was enacted in December 1996 (Exh. 53).  Gould-Schmit (June 10) Dep. at 162-63; Sugarman Dep. at 103.

144.    When implementing the Street Furniture Franchise beginning in 2004, the City took no steps to revisit or reconsider any of the assumption that were made or the conclusions that were drawn during the 1996 review process.  The City simply assumed that the 1996 review process had been appropriately thorough.  Sugarman Dep. at 100-02, 113, 173.

145.    DOT's April 1996 CEQR application contained a very brief section addressing neighborhood character issues.  Exh. 51 at NYC005773.  It stated that the City's goal was to

"provide well-maintained attractive street furniture" with structures that will be "aesthetically pleasing" and that improved maintenance of the structures would "enhance the overall appearance of the streetscape." *Id.* However, nothing in DOT's CEQR application even remotely addressed whether the widespread proliferation of street furniture advertising signs would have a significant adverse impact on aesthetics or neighborhood character. *Id.*; Gould-Schmit (June 10) Dep. at 157 (City never considered "the aesthetic impact of advertising signs on various environments in New York City").

146.    Nor did the City Planning Commission's October 1996 report meaningfully address whether the contemplated street furniture advertising sign program would have a significant adverse impact on aesthetics or neighborhood character. Like DOT's CEQR application, the Commission's report stated generally that the City's goal was to build street furniture "structures which will be aesthetically pleasing" and that coordinating the look of various types of structures would "result in a significant improvement in the appearance . . . of the City's streets," but the report did not discuss the Commission's view on whether or the extent to which the contemplated advertising sign program would affect aesthetics or neighborhood character. Exh. 52 at 6, 24. In response to the suggestion that the number of advertising signs under consideration should be reduced, the Commission merely stated, without analysis, that "[i]t does not believe that it [would be] prudent to make further reductions in the amount of revenue-generating advertising." *Id.* at 36.

147.    One reason why the Commission may have been reticent to discuss the aesthetic impact of the contemplated advertising sign program is that the City had neglected to perform a Neighborhood Character Assessment as required by City law. Under CEQR, an Environmental Assessment Statement ("EAS") must be prepared for every proposed action subject to

environmental review – which the City agrees the Street Furniture Franchise was – and "neighborhood character" is one of the criteria that the City is required to assess.  43 RCNY § 6-06(a)(5).

148.    As the City's CEQR Technical Manual makes clear, there are a variety of specific requirements for Neighborhood Character Assessments when certain "preliminary thresholds" are triggered.  Notwithstanding the fact that these preliminary thresholds plainly were triggered by the Street Furniture Franchise, no Neighborhood Character Assessment was ever performed.  Exh. 54 at 3H-1 to 3H-5.

149.    Despite the fact that no Neighborhood Character Assessment was ever performed, the City assumed, in pursuing the Street Furniture Franchise in 2004, that the 1996 review process had adequately assessed whether the contemplated street furniture advertising program would adversely affect neighborhood character.  Sugarman Dep. at 173.  The City concedes that this was "imprudent."  *Id.* at 37-38, 63-64; Wargo Dep. at 39, 201.

150.    Notably, the City chose to proceed with the Street Furniture Franchise in 2004 even though there had been significant and vocal opposition to the 1996 proposal, which was approved by a razor-thin margin:  a vote of 21-19 by the City's community boards.  The 1996 proposal was strongly opposed by the Manhattan Borough President and the Manhattan Borough Board. Exh. 52 at 12-19; Stips. ¶ 92; Gould-Schmit (Mar. 19) Dep. at 114-16.

151.    The Manhattan Borough President voted to disapprove the 1996 street furniture proposal because of her concern that there was too much advertising and clutter on the streets.  She recommended that "site selection for Franchise Structures be preceded by extensive surveys of existing street furniture so that Community Districts which have too many or too few of these structures can be better served in the future, and poorly sited structures can be relocated."  Exh.

52 at 16.  She further recommended a "comprehensive boroughwide street furniture masterplan" to be "completed with the intent to set limits on the number of Franchise Structures per block face" and "a maximum square footage of advertising per block face."  *Id.*

152.    As described previously, that clutter had substantially increased by 2003, given the enormous growth of PPTs bearing advertisements in central Manhattan and the presence of urban panels on subway entrances.  Although these factors could not have been foreseen when the original land use review was conducted in 1996, no effort was made to review these facts in connection with the 2004 RFP or to assess their impact.  Gould-Schmit (Mar. 19) Dep. at 111, 117-19, 142-51; Sugarman Dep. at 109-10; Exh. 15 at NYC015411-12.  Wargo conceded that this omission "undercuts the City's justifications for regulating advertising signs on . . . private property."  Wargo Dep. at 209; *see also* Sugarman Dep. at 177.

I.    **Other Examples of the City's Hypocrisy**

1.    **Advertising Signs on City Property**

153.    The City has stipulated that there are at least 11 billboards located on City property that fail to comply with the requirements of the Zoning Resolution restricting the placement of advertising signs near arterial highways, including two billboards along the Belt Parkway, two billboards at the West Side Highway and 145th Street, three billboards on the High Line along the West Side Highway, one billboard in Staten Island along the West Shore Expressway, two billboards along the Major Deegan Expressway at 149th Street, and a large two-faced digital billboard across from Yankee Stadium along the Deegan Expressway.  Stips. ¶¶ 13-31.  (Notably, these are just the City-owned large-format billboard located along arterial highways, and just the ones that Plaintiff is aware of.)

154.    The Yankee Stadium sign is particularly notable.  It measures 26 feet by 48 feet (1248 square feet), is double-faced, and flashes continually changing electronic messages – including commercial advertisements – directly onto the Major Deegan Expressway.  This billboard is located on property under the jurisdiction of the Parks Department and licensed to Central Parking Systems, in exchange for which Central Parking Systems pays fees to the City.  Stips. ¶¶ 24-25.

155.    In some instances, the DOB wrote an initial letter of complaint years ago but never followed up, as with the Yankee Stadium billboard.  Stips. ¶ 26.  In other instances, such as the High Line billboards, the City negotiated leases for those advertising signs with outdoor advertising companies in 2006 with the full knowledge of the Office of the Deputy Mayor for Economic Development and Rebuilding, the Parks Department, the Law Department, and New York City Marketing.  Stips. ¶¶ 17-18.

156.    These illegal billboards – which are many times larger than Fuel's panel signs – brought the City significant revenues, including $343,865 from February 2005 through September 2008 for the two signs on the West Side Highway, and approximately $600,000 from January 2002 through March 2008 for the billboard along the Major Deegan Expressway.  Stips. ¶¶ 16, 30.

### 2.    City Advertising on Privately Owned Signs

157.    Various City agencies have posted commercial and non-commercial advertisements on privately owned advertising signs throughout the City.  Stips. ¶ 119.

158.    From 2004 through 2006, the NYPD ran nine advertising campaigns (recruitment and other non-commercial campaigns) involving the use of outdoor signage.  Each campaign ran

for stints of approximately two months and utilized approximately 400 312-square-foot signs throughout the City.  Stips. ¶ 120.

159.    From 2005 through 2007, the Department of Corrections ("DOC") ran five recruitment campaigns involving the use of outdoor signage.  Each campaign ran for stints of approximately two months and utilized, respectively, approximately 350, 200, 200, 200 and 100 55-square-foot signs throughout the City.  Stips. ¶ 121.

160.    From 2005 through 2007, the Parks Department ran seven campaigns (such as lifeguard recruitment and the Central Park winter festival) involving the use of outdoor signage. These campaigns typically ran for stints of approximately one month, with one campaign lasting three months and one lasting seven months.  The campaigns typically utilized approximately 80 bus stop shelters, but one campaign used 100 shelters and one used 40 shelters.  Stips. ¶ 122.

161.    NYC Marketing has regularly placed both public service announcements and advertisements for private companies doing business with the City on bus stop shelters throughout New York City.  Stips. ¶ 123.

162.    The FDNY has placed advertisements bus shelters and PPT kiosks throughout New York City.  These campaigns included the use of 45 bus shelters for between four and eight weeks each.  Stips. ¶ 127.

163.    I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: July 28, 2008
New York, New York

_____/s_____
ERIC HECKER, ESQ.