# EXHIBIT 2

1

1

2    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
3    Civi Action No. 06 Civ. 8193(PAC)(DF)
     ----------------------------------x
4    CLEAR CHANNEL OUTDOOR, INC.,

                    Plaintiff,
5         - against -

     THE CITY OF NEW YORK and PATRICIA J.
6    LANCASTER, in her official capacity as
     Commissioner of the New York City
7    Department of Buildings,

                              Defendants.
8    ------------------------------------x
     Civil Action No. 06 Civ. 8219(PAC)(DF)
9    ------------------------------------x
     ATLANTIC OUTDOOR ADVERTISING, INC., SCENIC
10   OUTDOOR, INC., TROYSTAR CORPORATION and
     WILLOW MEDIA, L.L.C,
11                                 Plaintiffs,
                    -against-
12   CITY OF NEW YORK, PATRICIA J. LANCASTER,
     and EDWARD FORTIER,
13                              Defendants.
     ----------------------------------x
14                  March 19, 2008
                    10:10 a.m.
15

16             Deposition of KERRY
17   GOULD-SCHMIT, pursuant to Notice, held at
18   the offices of Davis Wright Tremaine LLP,
19   1633 Broadway, New York, New York, before
20   Jineen Pavesi, a Registered Professional
21   Reporter, Registered Merit Reporter,
22   Certified Realtime Reporter and Notary
23   Public of the State of New York.
24

25

1                    GOULD-SCHMIT

2    day-to-day work of updating the RFP and

3    things like that, they really weren't so

4    involved because they can't be.

5                    You know, they are an oversight

6    agency, they really can't sit on a

7    committee or anything like that.

8                    So at that point their

9    involvement became a lot less, during the

10   competitive bid process and during the

11   contract negotiations.

12                   New York City Marketing, on the

13   other hand, was quite involved, they were

14   involved when we drafted the RFP with the

15   idea of keeping the 22-1/2 percent, they

16   were involved also on the selection

17   committee because we really felt they had

18   expertise in figuring out the

19   compensation, advertising markets, things

20   like that, so they were technical advisers

21   to the selection committee on the RFP.

22                   They were also involved in the

23   contract negotiations, Joe Perello was

24   actively involved in negotiating those

25   pieces of the contract that described the

1                    GOULD-SCHMIT

2    relationship with CEMUSA, how they can use

3    their advertising, so they were involved

4    in that.

5                    And really every day they are

6    heavily involved in how that 22-1/2

7    percent gets used as well as planning all

8    of the international advertising received.

9                    Because on top of the 22-1/2

10   percent, we also receive $400 million in

11   advertising campaigns over the 20 years,

12   so it starts at 15 million and goes up

13   from there annually.

14                   They program all of that

15   international advertising, so they have

16   people on staff, this is their job.

17        Q.        You mentioned --

18        A.        I would just say, too, at the

19   end, in the contract negotiation,

20   obviously the deputy mayor, when we were

21   going to the FCRC, we would like to know,

22   but their involvement was pretty early on.

23        Q.        You mentioned during the

24   Giuliani administration there had been a

25   prior RFP in and around 1997; what

4e0885a4-a2e8-45ec-ac69-b50995803476

1                    GOULD-SCHMIT

2    within that.

3                    We didn't reassess that and say

4    could we go with less advertising; it

5    existed, we were moving forward under that

6    ULURP and those parameters and it is what

7    it is and that's the size of the

8    advertisement.

9        Q.        You proposed a new law to the

10   City Council to permit advertising on the

11   shelters, correct?

12       A.        Correct.

13       Q.        To the newsstands, I'm sorry.

14                  Were there hearings on this

15   topic?

16       A.        Yes.

17       Q.        Who testified?

18       A.        There were many hearings, I

19   think you would have to get the list of

20   who testified from the council because

21   many people testified.

22                  I believe there were upwards of

23   six hearings about the newsstand law.

24       Q.        What were with the primary

25   objections voiced to changing the

GOULD-SCHMIT

1

2     Q.       To your knowledge, they have

3     not looked at whether the ads are going up

4     on the arterial highways?

5     A.       To my knowledge, no.

6     Q.       We started out this deposition

7     and you listed for me the numerous bodies

8     that had reviewed the street furniture

9     franchise and we also discussed that in

10    1996 and 1997 the city had also gone

11    through several reviews.

12             Was there ever any

13    comprehensive review of outdoor

14    advertising by the city with the aim of

15    coordinating its regulation of signs on

16    private property and New York City's role

17    as an advertiser?

18    A.       Not to my knowledge.

19    Q.       Were you ever present or aware

20    of any discussions about the need to have

21    a unified cohesive approach for all

22    signage in New York City, whether on

23    private property or on government

24    property?

25    A.       I was never involved in any

GOULD-SCHMIT

1
2    discussions of that matter.

3         Q.      And you're not aware of any

4    discussions of that nature?

5         A.      No.

6         Q.      Are you aware of or were you

7    ever present at any discussions about the

8    need to have a unified cohesive approach

9    for all signage on city or MTA property

10   are, including the subway entrances for

11   street furniture?

12        A.      No, I was never involved in any

13   of those.

14               I don't even know if those

15   conversations happened.

16        Q.      So you're not aware of any such

17   discussions?

18        A.      Correct.

19        Q.      What efforts, if any, were

20   there to coordinate all advertising on any

21   city structures to prevent the

22   overabundance of advertising on the

23   streets?

24        A.      From DOT's perspective, we were

25   not involved in any discussions like that.

GOULD-SCHMIT

1

2    Q.      In connection with issuing new

3    street furniture franchise, nobody looked

4    at whether there had been increase in

5    subway entrance panels?

6    A.      Correct.

7    Q.      Did you investigate whether the

8    MTA was going to or had already put up

9    digital ads on subway entrances?

10   A.      No, no contact with MTA about

11   their digital ads.

12   Q.      Did the DOT, in issuing the new

13   franchise, do anything to go out and look

14   at the city blocks to see whether there

15   was an oversaturation of ads on the city

16   streets?

17   A.      No; again, as I said, the ULURP

18   happened, it was approved in '97, we were

19   sticking within the same parameters and so

20   when it came time to reissue the

21   franchise, it was viewed as being, like I

22   said, a smaller program that was

23   contemplated in 1997, which went through

24   all the regulatory proceedings and so we

25   moved forward.

1                    GOULD-SCHMIT

2      later than this, but this is the meat of

3      the ULURP from 1996.

4           Q.        What do you think is missing?

5                MS. NEUFELD:  Off the record.

6                (Discussion off the record.)

7           Q.        Would you turn to page 16; in

8      1996, the Manhattan borough president and

9      Manhattan borough board recommended

10     disapproval of the street furniture RFP in

11     part because of their concerns about too

12     much clutter and ad copy on the sidewalk,

13     isn't that correct?

14               (Witness perusing document.)

15          A.        I do see, according to this

16     document, that the borough president

17     recommended disapproval.

18          Q.        On page 17 it indicates that

19     the Manhattan borough board also voted to

20     disapprove the application, correct, on

21     the bottom?

22          A.        Yes, correct.

23          Q.        Would you also turn to page 13

24     of Exhibit 153, it states, "Four community

25     boards voted in favor of the proposal.  17

GOULD-SCHMIT

1
2  boards voted in favor of the proposal with
3  modifications.  19 voted against the
4  proposal.  One board voted no
5  recommendation."
6          Do you see that?
7      A.     Yes, I see that.
8      Q.     So 21 community boards were in
9  favor of the proposal with some
10  modifications or as is and 19 community
11  boards were against the proposal and one
12  abstained, correct?
13      A.     According to this, correct.
14      Q.     Would you agree with me that
15  was a very, very close vote?
16      A.     Yes, I would agree that's a
17  close vote.
18      Q.     About as close as it could
19  possibly get?
20      A.     It was a close vote.
21      Q.     So there was significant
22  opposition to the 1996 street furniture
23  proposal from the various community
24  boards?
25      A.     From the community boards there

1                GOULD-SCHMIT

2    is obviously opposition.

3        Q.        Let's go back to the problems

4    identified by the Manhattan borough

5    president on page 16.

6                Would it be fair to say that if

7    he was concerned with the proliferation of

8    ads on the streets in 1996, that there

9    were far more ads on the streets by 2004

10   in Manhattan?

11       A.        It is a different borough

12   president obviously from this point to who

13   we dealt with.

14               And, yes, from --  I don't know

15   that quantitatively, actually, if there

16   are more advertisements on the streets

17   since 1996.

18               My assumption would be --  I

19   actually don't know on the pay phones if

20   there was a franchise prior to that, I am

21   not that familiar with DOITT's program, so

22   I can't say all of the pay phone ads have

23   come out since 1996, I don't know the

24   history of that.

25               So quantitatively, I don't know

1                    GOULD-SCHMIT

2    if there is more advertising on the

3    sidewalk today or in 2001 versus 1996.

4         Q.        Did you make any effort to

5    review the documentation in connection

6    with the 2004 amendments to the DOITT

7    rules which focused on the number of ads

8    on phones and the growth in that market?

9         A.        By 2004 we had already gone

10   through, we had an authorizing resolution,

11   we changed the newsstand law and I don't

12   recall what point they changed or amended

13   their rules, but we issued the RFP in

14   March of 2004.

15        Q.        But you had not entered into

16   the contract at that time?

17        A.        No, but we had set out business

18   terms to base proposals on.

19        Q.        Let's look at some of the

20   issues identified by the Manhattan borough

21   president.

22             Page 16 of Exhibit 153 says,

23   "The borough president proposes that site

24   selection for franchise structures be

25   preceded by extensive surveys of existing

1                   GOULD-SCHMIT

2      street furniture so that community

3      districts which have too many or too few

4      of these structures can be better served

5      in the future."

6                   Did the city undertake any

7      surveys of existing street furniture in

8      connection with the 2004 street furniture

9      RFP?

10         A.         No, to my knowledge, we did

11     not; we had the list of existing shelters

12     and list of existing licensed newsstands

13     and we limited the number of toilets to 20

14     and that is it.

15         Q.         Did the city conduct any

16     surveys of all advertisements on

17     government property, including the urban

18     panels on the subway entrances, in

19     connection with the 2004 street furniture

20     RFP?

21         A.         No, we did not.

22         Q.         Back to page 16 of Exhibit 153,

23     Manhattan borough president said,

24     "Comprehensive borough-wide street

25     furniture master plan should be completed

1                    GOULD-SCHMIT

2    with the intent to set limits on the

3    number of franchise structures per block

4    phase and per intersection."

5            Did the city ever complete such

6    a master plan prior to entering into the

7    CEMUSA agreement?

8        A.       Not to my knowledge.

9        Q.       Why not?

10       A.       Because we went through a

11   regulatory process and during that process

12   I am sure there were objection voiced by

13   lots of people, but in the end it was an

14   approved process and the parameters were

15   set and the numbers of structures were set

16   and we were given the proper regulatory

17   approval to move forward.

18       Q.       And that process was in 1997?

19       A.       It was in 1997, it is part of

20   this right here, this is part of that

21   process.

22            So certainly I think we would

23   all be naive to assume that during

24   regulatory processes that there are no

25   objections, there are objections,

```
1              GOULD-SCHMIT
2    Exhibit Clear Channel 155 a document Bates
3    stamped New York City 15406 through 15424,
4    which is a second technical inquiries
5    issued by the DOT, this time dated June
6    11, 2004.
7              (Clear Channel Exhibit 155,
8    Bates stamped New York City 15406 through
9    15424, was marked for identification, as
10   of this date.)
11             (Witness perusing document.)
12        Q.    Do you recognize this document?
13        A.    Yes, I do.
14        Q.    What is it?
15        A.    Again, a second set of
16   technical inquiries to the RFP, questions
17   get submitted during RFP and these are
18   nonbinding responses to the questions.
19        Q.    Did you help write both the
20   first and second technical inquiries?
21        A.    I did help write them.
22        Q.    Can you turn to the page Bates
23   stamped 15411 and if you you could just
24   skim Inquiry No. 21 and the response to
25   it.
```

143

```
 1              GOULD-SCHMIT
 2              (Witness perusing document.)
 3      A.      Again, I think it is a question
 4   about DOITT's franchise and why we didn't
 5   have to go through another ULURP
 6   proceeding.
 7              As I stated earlier, the
 8   program was smaller than what was put
 9   forth in 1997, the franchise program that
10   we as DOITT was doing; it was deemed by
11   City Planning we did not have to go
12   through another ULURP proceeding.
13              Again, DOITT has a separate
14   franchise authorized by different
15   legislation, it is a different contract,
16   it is not DOT's contract to monitor or
17   enforce and so I think these questions are
18   really better answered by DOITT.
19      Q.      Do you know who submitted this
20   inquiry?
21      A.      No, off the top of my head I
22   don't know.
23      Q.      Let's take a closer look at it.
24              In the second sentence the
25   inquirer said, "In its answers to
```

1              GOULD-SCHMIT

2     inquiries about the 1997 RFP, DOT

3     indicated that the city would coordinate

4     advertising between pay phones and the

5     franchise structures through, 1, DOITT's

6     prohibition against pay phone advertising

7     in Manhattan on the same side of any

8     avenue block with a bus stop shelter,

9     newsstand, automatic pay toilet or

10    computer informational terminal and, 2, on

11    all other city streets within 150 feet of

12    these structures."

13              Was that an accurate

14    characterization of the city's answers to

15    inquiries about the 1997 RFP?

16       A.     I don't recall; again, I wasn't

17    there in 1997, it would have to be looked

18    up in documentation.

19       Q.     Look at the next sentence.

20              "DOITT is not currently

21    adhering to these policies, which means

22    that the impact of the current RFP on the

23    city streets will be significantly

24    different than what it would have been

25    under the 1997 RFP."

GOULD-SCHMIT

1
2    When DOT got this inquiry, did

3    it do anything to confirm whether this was

4    accurate or inaccurate, that DOITT is not

5    currently adhering to these policies and

6    that therefore the impact of the current

7    RFP on the city streets will be

8    significantly different than it would have

9    been under the 1997 RFP?

10    A.    No, I am sure I called Stanley

11    Shor to let him know that we were getting

12    a complaint that they weren't enforcing,

13    but, again, it wasn't DOT's place to

14    enforce the pay phone franchise, it is

15    DOITT's contract.

16    I recall calling Stanley to say

17    we got a complaint, but, again, it didn't

18    have any impact as to what was included in

19    the RFP.

20    Q.    And when you called Stanley

21    Shor, other than informing him about the

22    complaint, did you review with him whether

23    this was accurate or not?

24    A.    Accurate in what sense?

25    Q.    Did you review with Stanley

```
 1                GOULD-SCHMIT

 2   Shor whether it was true that DOITT was

 3   not currently adhering to these policies?

 4        A.       No, I would have just let

 5   Stanley know that this was going on.

 6                 Again, it is their contract to

 7   enforce.

 8        Q.       It says, "DOITT refuses to

 9   enforce the advertising prohibition

10   contained in clause 1 above on Broadway in

11   Manhattan, claiming that Broadway is not

12   an avenue."

13                 Did you discuss that with

14   Stanley Shor?

15        A.       I don't recall specifics.

16                 I don't recall if it was a

17   phone call or e-mail, but as to what DOITT

18   did with it, again, it is really not my

19   place to comment on how DOITT was

20   enforcing the contract.

21        Q.       If you look at the beginning of

22   little B on the bottom of page 15411, it

23   says, "The inquirer says that even when

24   DOITT acknowledges that pay phone

25   advertising violates the prohibition,
```

GOULD-SCHMIT

1

2     DOITT refuses to remove the advertising,

3     it simply issues a notice of violation and

4     encloses the complaint.  This results in

5     significantly more pay phones with

6     advertising on the city streets than could

7     have been foreseen in 1997."

8               Did you investigate with

9     Stanley Shor whether this was accurate?

10        A.     Did not.

11        Q.     New York City 15412, it

12    continues, subparagraph C, it says, "DOITT

13    has been allowing the installation of pay

14    phones with advertising in violation of

15    the prohibition in clause 1.  This results

16    in significantly more pay phones with

17    advertising on the city streets than could

18    have been foreseen in 1997."

19              When you spoke with Stanley

20    Shor, did you investigate whether this

21    allegation was accurate?

22        A.     No, again, it wasn't my place

23    to enforce their contract and it also

24    isn't my place --  City Planning's place

25    to determine if additional regulatory

                    GOULD-SCHMIT

 1
 2    review is needed.
 3        Q.      Did you raise these issues with
 4    City Planning?
 5        A.      Some of these questions were
 6    sent to City Planning, I don't recall if
 7    this was or not.
 8               Again, this comes after the
 9    release of the RFP, so we're beyond the
10    point of City Planning looking to see if
11    we needed to amend the ULURP, go through
12    that process; that all happened prior to
13    this.
14               This is an RFP that has been
15    released, reviewed and okayed from a
16    regulatory standpoint and is out there for
17    companies to bid on, it is all out there,
18    it has all been approved, so this comes
19    after the fact.
20        Q.      In your mind is it therefore a
21    fait accompli even if you had learned at
22    this point that there were going to be
23    significant issues of clutter on the
24    sidewalks, would you have proceeded?
25        A.      I think City Planning, when

GOULD-SCHMIT

1

2    they looked at the program before they

3    gave us the go-ahead, I am sure they

4    contemplated these things and it is their

5    role in city government to do that and

6    they informed us that we were okay to move

7    forward with the program and so we did.

8        Q.    Do you know for a fact whether

9    City Planning looked at the increase of

10   advertising on the streets, whether on the

11   phone kiosks or on the MTA subway panels,

12   do you know for a fact that City Planning

13   looked at the increase of ads on the

14   streets when they made the decision that

15   they didn't need another ULURP review?

16       A.    I do not know that for a fact.

17       Q.    Let's go back to New York City

18   15412.

19            In subparagraph D the

20   individual making this complaint says, in

21   essence, that DOITT automatically assumes

22   that the pay phone was installed first and

23   therefore that the pay phone can remain.

24            Did you discuss the accuracy of

25   that assertion in your conversation with

GOULD-SCHMIT

1       GOULD-SCHMIT

2  Stanley Shor, did you try to see whether

3  that was accurate?

4       A.      No and that's really a

5  discussion that should happen between

6  DOITT and Department of Consumer Affairs,

7  they licensed the newsstands, so it

8  becomes a question of licensing.

9              So, yes, there are two agencies

10  with responsibilities that were not under

11  my control.

12      Q.      Looking at E and F in this

13  Inquiry No. 21.

14              Is it also fair to say you

15  didn't ask Stanley Shor the accuracy of

16  the allegations in these paragraphs

17  either?

18      A.      I don't recall; as I said, I

19  don't really recall the back and forth.

20              I do know that Stanley was

21  contacted that there were complaints.

22      Q.      That was so that he could --

23      A.      Act on it as they saw

24  appropriate.

25      Q.      Did you have any conversations

```
 1              GOULD-SCHMIT
 2    with the City Planning about these
 3    complaints voiced in Inquiry No. 21?
 4         A.     No, I don't believe there would
 5    have been any reason why I would have had
 6    discussion with City Planning about them.
 7              Again, this all came in after
 8    City Planning's review.
 9         Q.     Do you know whether anyone else
10    at DOT spoke to City Planning about the
11    subject of the increased ads on the
12    telephone kiosks since 1997?
13         A.     I couldn't confirm that, I have
14    no idea.
15         Q.     To your knowledge, did the city
16    do any studies of the impact of the ads on
17    the new CEMUSA shelters on aesthetics in
18    the city?
19         A.     No, I don't believe --  can you
20    rephrase that.
21         Q.     Did the city do any studies on
22    whether the ads on the new bus shelter
23    franchises would detract from the
24    cityscape?
25         A.     No, there were no studies done
```

1                GOULD-SCHMIT

2    on the impact of the ads on the aesthetics

3    of the streetscape.

4                There was a fairly involved

5    design review process to talk about the

6    aesthetics of the structure itself.

7        Q.        Did the city do any reviews of

8    whether the ads on the new CEMUSA bus

9    shelters would have any impact on traffic

10   safety in the city?

11       A.        No; again, the shelters have

12   been out there with ads since the

13   mid-Eighties, so we did not conduct any

14   further studies than what went through the

15   regulatory process with ULURP.

16       Q.        As you say, the shelters have

17   been out there since the 1980s with ads.

18                Has the DOT found that the ads

19   on the bus shelters have materially

20   contributed to any traffic safety

21   problems?

22       A.        That I couldn't speak to, that

23   predates me.

24                I am not sure.

25       Q.        For the period of time that

1           GOULD-SCHMIT

2    that's really viable, see if we got

3    complaints about it, this is ugly, I don't

4    like it.

5           Just to do a little test, just

6    to measure the waters, get the feel.

7      Q.     You thought this was a

8    potentially attractive form of advertising

9    and it would make the city competitive if

10   they allowed this type of advertising, is

11   that fair?

12     A.     I believe that's fair, it could

13   be attractive and, yes, I do think we

14   think it is the wave of the future, it is

15   just how do you do it in a meaningful and

16   educated way.

17           We thought this was one small

18   little test that we can start our

19   education on, this electronic media.

20     Q.     Is it also fair to say that

21   electronic media would also increase the

22   revenues to the city?

23     A.     Yes, that is fair to say.

24     Q.     What were the major

25   considerations in devising a pilot?

4e0885a4-a2e8-45ec-ac69-b50995803476

1                  GOULD-SCHMIT

2                  Were any studies done before

3        the pilot went into effect about the

4        either visual or traffic safety impact of

5        electronic ads on any street furniture

6        structures?

7           A.        Not under the franchise's

8        control, not that I know of at DOT.

9                  This was the test.

10          Q.        Did you research whether any

11       other cities had experimented with

12       electronic media on street furniture

13       structures?

14          A.        We know the MTA, we --  the

15       reason we know they do it is because some

16       people are unhappy, like the Municipal

17       Arts Society.

18                 We know out there there are

19       pros and cons for this.

20                 Do we have any reference to a

21       study, no, I think they are very hard to

22       find, we don't have any that I know of.

23          Q.        Did you talk to anyone at the

24       MTA about the pros and cons that they had

25       found in the use of electronic media on

1          GOULD-SCHMIT

2    the subway panels?

3         A.        Did not.

4         Q.        What was your understanding of

5    the pros and cons of electronic media?

6         A.        I don't have any preconceived

7    notions as to what the pros and cons are,

8    I really left that to the professionals,

9    which would be the people that do this

10   type of analysis.

11              I don't really know, I don't

12   know that it has any impact or a

13   tremendous amount of impact.

14        Q.        Other than deciding that you

15   would have the customer surveys and you

16   would have the before and after traffic

17   accident data, did you have any other

18   discussions prior to the pilot going into

19   effect about the traffic safety

20   implications of the pilot?

21        A.        No, not that I recall.

22              We did inform City Planning

23   that we were doing it, but, no, I think we

24   felt this is our time to do this.

25        Q.        Did City Planning have any

GOULD-SCHMIT

1

2    advertising on them, they would be

3    generating revenue and some of that

4    revenue should go back to making it a more

5    pleasant environment, because it is fairly

6    unpleasant underneath the sidewalk sheds.

7         So we did discuss in London the

8    construction and sidewalk sheds are nicer,

9    we were just talking anecdotally about

10   what we experienced.

11        It certainly came up about its

12   impact, that we had the street furniture

13   franchise on the street and it was moving

14   forward and would this even be attractive

15   to people, because there is just more and

16   more advertising out there and at some

17   point does it lose its value, so we sort

18   of talked about that at a very high level

19   of detail, no great analysis, just sort of

20   what our feelings were about that.

21        That's what I remember most

22   about it.

23        Q.    Was there discussion that this

24   could bring in revenue for the city?

25        A.    Sure.

GOULD-SCHMIT

1

2    Q.      Was there discussion about how

3    much revenue it could bring in?

4    A.      No; the bigger concern was are

5    we hurting ourselves by having too much

6    advertising.

7          It wasn't an analysis of I

8    think it is worth this much; maybe that

9    type of analysis has gone on, but I was

10   not involved in that.

11   Q.      So there was concern that there

12   would be an oversaturation of the market

13   and you might decrease the value of the

14   ads on the street furniture structures if

15   you also had ads on the sidewalk sheds?

16   A.      Sure, street furniture, phones,

17   whatever is out there, yes; the idea was

18   could you have too much out there.

19         And also, you need to attract

20   people to come in and do it.

21         There was just a conversation

22   about, well, maybe the industry wouldn't

23   even be interested in this because there

24   is so much out there.

25   Q.      Was there an attempt to