# EXHIBIT 3

# In The Matter Of:

## *METRO FUEL, LLC v.*
## *CITY OF NEW YORK*

---

## *KERRY GOULD-SCHMIT*
### *June 10, 2008*

---

## *RAYVID REPORTING SERVICE, INC.*
### *25 West 45th Street - Suite 900*
### *New York, NY 10036*
*PH: 212-267-3877 / FAX: 212-692-9171*

**GOULD-SCHMIT, KERRY - Vol. 1**

1             KERRY GOULD-SCHMIT

2        A    Well, we allowed ten, and we asked

3   for commercial districts, and it was just a year

4   run pilot.

5        Q    Your understanding is that pursuant

6   to Section 4.4.2, that limited ten sign pilot has

7   to comply with the electronic media restrictions

8   contained in the Zoning Resolution?

9        A    If it became a permanent program.

10       Q    So, your understanding is that

11  Section 4.4.2 does not apply to pilots?

12       A    That is my understanding.

13       Q    Just to be clear, it doesn't say

14  that, does it?

15       A    No, it doesn't say that.

16       Q    You would agree with me, wouldn't

17  you, that Section 4.4.2 also says that although

18  Cemusa's street furniture is subject to the Zoning

19  Resolution's electronic media restrictions, the

20  street furniture is not subject to the Zoning

21  Resolution's restrictions on backlighting?

22       A    I didn't understand the question.  I

23  got lost somewhere in there.

24       Q    Sure.  Let me rephrase it, it was a

25  bit awkward.

1                    KERRY GOULD-SCHMIT

2          Q        Did the City ever consider doing

3    what you just suggested, namely foregoing its

4    share of the revenue generated by advertising

5    signs in exchange for requiring a franchisee to

6    have less advertising?

7          A        I do not believe that was thought of

8    as a business model.  There were other business

9    people thinking about this though, but...

10         Q        Who were the other people thinking

11   about it?

12         A        I mean Joe Perillo.

13         Q        Is it fair to say, generally, that

14   Joe Perillo was focused on the revenue side of the

15   street furniture franchise more than he was

16   focused on the design/attractiveness side?

17         A        Yes, I would say Joe has a different

18   take from what his job was with the City.  We are

19   an operating agency, we had a very different take

20   as to what we wanted to achieve with the program.

21         Q        Given the role that Joe played, it

22   doesn't seem particularly likely that Joe would

23   have been thinking about advocating having the

24   City take less revenue in order to reduce the

25   amount of advertising?

1                  KERRY GOULD-SCHMIT

2             MS. NEUFELD:  Objection.

3      A      Yes, and I have no idea what Joe

4  thought or wanted to achieve.

5             Can I just add, I don't think that

6  was physically possible to eliminate the

7  advertising, in thinking about this whole program.

8  I mean, it is $100 million.  It is free

9  replacement whenever we needed it for twenty

10  years, ongoing maintenance.  I mean, it's a big

11  financial commitment for a company to do this.

12      Q      I totally understand why it would

13  not have made sense for the City to think that it

14  could get somebody to build out a $100 million

15  worth of street furniture and maintenance without

16  allowing advertising.

17             I'm just wondering about the amount

18  of advertising and I just want to make sure I

19  understand you correctly, that in going forward

20  with the street furniture franchise in 2004, give

21  or take, nobody at the City, to your knowledge,

22  considered the possibility of scaling back on the

23  amount of permissible advertising, and foregoing

24  some of the revenue or all of the revenue

25  generated by the City in order to achieve that

1           KERRY GOULD-SCHMIT

2    goal?

3        A       I would say, yes, that's my

4    understanding.  We did not consider reducing the

5    advertising.

6                MR. HECKER:  Let me mark this as

7        Exhibit 31.

8                (The above described document was

9        marked Plaintiff's Exhibit 31 for

10       identification, as of this date.)

11   REDACTED PURSUANT TO THE COURT'S JULY 15, 2008 ORDER AND THE PARTIES' MARCH 27, 2008 PROTECTIVE ORDER

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    KERRY GOULD-SCHMIT

2    REDACTED PURSUANT TO THE COURT'S JULY 15, 2008 ORDER AND THE PARTIES' MARCH 27, 2008 PROTECTIVE ORDER

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

22e6bb3e-b260-49b3-b25b-0ee235128af2

KERRY GOULD-SCHMIT

REDACTED PURSUANT TO THE COURT'S JULY 15, 2008 ORDER AND THE PARTIES' MARCH 27, 2008 PROTECTIVE ORDER

1           KERRY GOULD-SCHMIT

2       A       Yes.

3       Q       And that's how Cemusa came back and

4   beat NBC Decaux by, approximately, 20 points?

5       A       Yes.

6       Q       20 points out of 900 isn't exactly a

7   huge margin of victory, is it?

8       A       No.

9       Q       It was a fairly close competition?

10      A       Yes, it was.

11      Q       NBC almost won?

12      A       It was close.

13      Q       And the reason why Cemusa beat NBC

14  Decaux is because of the strength of its

15  compensation proposal?

16      A       Yes.

17      Q       Even though its design was inferior?

18      A       Yes.

19      Q       And if the design was inferior, even

20  in the BAFO phase, after it had gotten feedback

21  from the committee?

22      A       Yes.

23              MR. HECKER:  Mark this as 37.

24              (The above described document was

25      marked Plaintiff's Exhibit 37 for

1                    KERRY GOULD-SCHMIT

2     forth page is Clear Channel's scoring and the

3     fifth page is Viacom's scoring, right?

4              A      Yes.

5              Q      Exhibit 39 does the same thing for

6     the post BAFO round of scoring that was tabulated

7     in, approximately, July of 2005, right?

8              A      Yes.

9              Q      And this is only a three-page

10    document because there were only three BAFO

11    finalists, right?

12             A      Yes.

13             Q      The first page is Cemusa's post BAFO

14    scoring and the second page is NBC's post BAFO

15    scoring and the third page is Van Wagner's post

16    BAFO scoring, right?

17             A      Yes.

18                    MR. HECKER:  Let me mark yet another

19            document.

20                    (The above described document was

21            marked Plaintiff's Exhibit 40 for

22            identification, as of this date.)

23             Q      Kerry, Exhibit 40 is another chart

24    that I have prepared that you've never seen

25    before.

22e6bb3e-b260-49b3-b25b-0ee235128af2

1          KERRY GOULD-SCHMIT

2          Again, I want to be very clear, I'm

3     not asking you to agree with or confirm my math.

4     I'm asking you to accept that the math that's here

5     is correct and accurate.

6          I want to take a minute to explain

7     to you what I've done here with this chart.

8     Again, the top half of Exhibit 40 relates to the

9     initial round and the bottom half of Exhibit 40

10    relates to the post BAFO round.

11          Are you with me so far?

12    A     Yes.

13    Q     I've focused only on each of the six

14    categories within 3D, I, E, the categories that

15    are most expressly about design, leaving aside my

16    understanding that you also think that the

17    maintenance categories have something to do with

18    aesthetics.  I'm focused on the specific design

19    categories here.

20          Do you see that?

21    A     Yes.

22    Q     Next to each row, D1 through D6 I

23    put the total number of points that each company

24    could have gotten for each category in

25    parentheses.

1          KERRY GOULD-SCHMIT

2               Do you see that?

3     A      Yes.

4     Q      And what I've done in each cell of

5  this chart, I've put down the average score that

6  each company got for each category averaging the

7  seven scores of the individual Selection Committee

8  members together.

9               Does that make sense?

10    A      Yes.

11    Q      And again, I'm not asking you to

12  verify the math.  I'm quite sure that Sheryl

13  and/or Christina will let me know at the

14  appropriate juncture if I have erred.

15               I want to understand if you

16  understand conceptually what this chart purports

17  to show.

18    A      Yes, I do.

19    Q      You'll see, according to this chart,

20  Cemusa received a 2.1 out of 6 in category D1.

21               Do you see that?

22    A      Yes.

23    Q      This is the category that relates to

24  citywide design scheme/aesthetics, right?  You can

25  look back to Exhibit 37.

1          KERRY GOULD-SCHMIT

2     A     Right.

3     Q     You would agree with me from a

4  design perspective, that's a very important

5  category?

6          MS. NEUFELD:  Objection.

7     Q     You agree with that, don't you?

8          MS. NEUFELD:  Objection.

9     A     Yes, one of many.

10    Q     There are only six, right?

11    A     Yeah, I think -- I mean, there are

12 six, obviously the most important of the group

13 are, I would say, the ones worth three are less

14 important.

15    Q     D1 goes to the overall aesthetic

16 appeal of the design proposal on a citywide basis?

17    A     Yes, I think that's important.

18    Q     That's what it does and it's

19 important, right?

20    A     Correct.

21    Q     And they got a 2.14 out of 6 in that

22 category, right?

23    A     Prior to BAFO, yes.

24    Q     Cemusa and Van Wagner were both in

25 the five and a half range, right?

1                     KERRY GOULD-SCHMIT

2           A       Yes.

3           Q       I would go through each of these one

4    by one, but wouldn't you agree with me that, again

5    assuming my math is correct, this chart reflects

6    and confirms your memory that NBC Decaux and Van

7    Wagner scored much better than Cemusa did in all

8    of the design categories?

9           A       In the D section of the design

10   categories, yes.  If you run this, I think, also

11   for E, you might see Cemusa gaining points there,

12   because I do believe -- the maintenance and all of

13   that.

14          Q       You're focusing on D right now?

15          A       I view D and E as the design

16   categories.  As far as D, these specific sets,

17   absolutely, Decaux and Van Wagner perform the

18   best.

19          Q       And Cemusa performed the worst out

20   of all five?

21          A       Prior to the BAFO, yes.

22          Q       Cemusa performed the worst among the

23   three BAFO finalists, right?

24          A       In the D categories, yes, they are

25   down by 6 points -- 7 points.

1              KERRY GOULD-SCHMIT

2              MS. NEUFELD:  Objection.

3       Q       Cemusa had the lowest D scores?

4       A       Yes, the spread was not as large in

5  the BAFO, but, yes.

6       Q       You would agree with me that even

7  though the spread wasn't as large in the BAFO, the

8  spread was, nonetheless, still significant,

9  correct?

10             MS. NEUFELD:  Objection.

11      A       I wouldn't say significant, no, 7

12  points is what I'm seeing.

13      Q       Out of 30.  The D category is worth

14  a total of 30 points, right?

15      A       Is that the D or the phase --

16      Q       There are six categories within D,

17  D1 through 6, right?

18      A       Yes, well -- sure, it's significant.

19  7 points is significant.

20      Q       You can put that aside.  I do plan

21  to come back to the E category later.

22             When I pointed you earlier this

23  afternoon to the last paragraph of your

24  Declaration and the language contained therein,

25  I'm going to paraphrase what I believe you said.

1          KERRY GOULD-SCHMIT

2    that award about?

3          A       Each year the City, the Art

4    Commissions gives awards for public projects, for

5    design excellence.  Street furniture got one in

6    '05.

7          Q       I believe, and I know you will

8    correct me if I'm wrong, that you used the number

9    $100 million earlier in describing vaguely and

10   approximately how much this franchise was going to

11   cost, right?

12         A       Yes.

13         Q       Am I correct that that $100 million

14   number, which I know, obviously, is not an

15   accurate figure, is your approximation on an order

16   of magnitude basis of how much it would cost both

17   to build out the street furniture and to maintain

18   it?

19         A       No, that is the designing cost,

20   construction cost, installation cost.

21         Q       $100 million?

22         A       Yeah.

23         Q       I thought I had seen some reference

24   in documents to the number of $55 million.

25               Does that ring a bell for you?

1                    KERRY GOULD-SCHMIT

2      disagree.

3                    The amount of money that Cemusa

4      thinks it's going to make on this contract is way,

5      way more than it's going to cost them to build out

6      the newsstands and maintain them for twenty years.

7                    Would you agree with that?

8                    MS. NEUFELD:   Objection.

9      A        Yes.

10     Q        The difference between being able to

11     place advertising signs on the newsstands and not

12     being able to place advertising signs on the

13     newsstands is not the difference between this deal

14     being profitable for Cemusa or not profitable for

15     Cemusa, right?

16                   MS. NEUFELD:   Objection.

17     A        Could you just repeat that?

18                   MR. HECKER:   Read it back.

19                   (The question requested was read

20         back by the reporter.)

21     A        I agree, the deal would be

22     profitable for Cemusa, less profitable, but still

23     profitable.

24     Q        I know we don't have a crystal ball,

25     but based on your practical experience, would this

157

1      KERRY GOULD-SCHMIT

2      the bidders to placing advertising on the bus

3      shelters which had already been there, but not let

4      them put advertising on newsstands which had never

5      been there?

6          A      I don't recall.  I really don't

7      recall, that was a long time ago.  There was a lot

8      of discussion about the newsstands, so...

9          Q      Can you take a look at Paragraph 35

10     of your Declaration.  It says here that during the

11     evaluation process, of which you were an integral

12     part, the City carefully considered the aesthetics

13     and functionality and adaptability of the proposed

14     street furniture to various environments of the

15     City of New York, right?

16         A      Yes.

17         Q      The City did not similarly consider

18     the aesthetic impact of advertising signs on

19     various environments in the City of New York,

20     right?

21         A      We did not.

22         Q      And the result of the careful

23     consideration that you gave to the aesthetics,

24     functionality and adaptability of the proposed

25     street furniture to various environments of the

1          KERRY GOULD-SCHMIT

2               MR. HECKER:  Why don't we take a

3     five minute break.

4               (Whereupon, at this point in the

5     proceedings there was a recess, after which

6     the deposition continued as follows:)

7               MR. HECKER:  Back on the record.

8          Q     Kerry, I just want to talk a little

9     more about a subject that we already talked about

10    a little earlier in the afternoon, namely what

11    you, meaning the City, relied on in going forward

12    with the 2004 round, in terms of what had happened

13    in 1996.

14         A     Okay.

15         Q     We talked about some of the

16    documents that you've relied on.  You relied on

17    Exhibit 7, which is the Environmental Assessment

18    Statement, right?

19         A     Yes.

20         Q     You relied on Exhibit 13, which is

21    the City Planning Commission Report, right?

22         A     Yes.

23         Q     You relied especially on Plaintiff's

24    29, which is this subsequent document that was

25    generated that reflects some of the changes that

1                    KERRY GOULD-SCHMIT

2    happened during the process, right?

3         A       Yes.

4         Q       I can't ask you to testify under

5    oath those are all the documents that you've seen,

6    but is it fair to say that those are the main

7    documents that you recall relying on in

8    determining what had been decided in 1996 and why?

9         A       Yes.

10        Q       Can you think of other significant

11   documents, as you sit here today, that you recall

12   relying on to the extent that you relied on these

13   documents?

14        A       Yes.  The RFP itself, as well as

15   it's amendments.

16        Q       Fair enough.  So those three

17   documents, Exhibit 7, 13 and 29, plus the 1997 RFP

18   and its exhibits.

19                Can you recall any other significant

20   paperwork that the City relied on in determining

21   what had been decided in 1996 and why?

22        A       No.

23        Q       You testified about some of the

24   people that various folks at the City talked to

25   about what had happened in 1996.  One of the

1                     KERRY GOULD-SCHMIT

2    better for neighborhood character or better for

3    traffic safety or better for the built

4    environment, but rather that it was better for the

5    City financially?

6           A       It was better -- we didn't see -- we

7    didn't see it any differently -- yes, we were

8    putting the back lit panels out there and they

9    weren't having a negative impact on all of those

10   things, we viewed this as that.

11          Q       I don't think you're being at all

12   evasive.  I think your answers are not clear.

13                  I'm looking at what the court

14   reporter is writing, and I'm trying to get a clean

15   answer to my question, if I can.  I think you can

16   answer this yes or no, and if you can't, try to

17   explain to me why you can't.

18                  Isn't it fair to say that the City

19   decided to allow Cemusa to place scroller

20   advertising on the street furniture solely because

21   the City wanted to make money doing so, and not

22   because of any aesthetic, neighborhood character

23   or built environment considerations?

24                  MS. NEUFELD:  Objection.

25          A       I still -- okay, I think it's not a

Rayvid Reporting Service
(212) 267-3877

Page 184

KERRY GOULD-SCHMIT

yes or no, because we made a decision that was
partially based on money, but we didn't think we
were having a negative impact any further than
with -- with an electronic media it would be --

Q    I understand you didn't think you
were doing any harm to the environment.

One reason you did it was for the
money, right?

A    Yes.

Q    What other reasons did you do it?

A    I don't have another reason.

Q    You would agree that the only reason
the City allowed Cemusa to put scrollers on its
street furniture advertising is because the City
wanted to make money doing so?

A    Sure, yes.  I want to add, all the
three proposals had scrollers in their BAFOs.  It
wasn't an exclusive Cemusa thing.

Q    If the City had decided to go with
one of the other franchisees, it would have let
them have scrollers too?

A    Yes.

Q    And it would have done so for one
reason and one reason only, to make money, right?

22e6bb3e-b260-49b3-b25b-0ee235128af2