# EXHIBIT 4

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
Civil Action No. 06 Civ. 8193(PAC)(DF)
------------------------------------------x
CLEAR CHANNEL OUTDOOR, INC.,
          Plaintiff,
    - against -
THE CITY OF NEW YORK and PATRICIA J.
LANCASTER, in her official capacity as
Commissioner of the New York City
Department of Buildings,
          Defendants.
------------------------------------------x
Civil Action No. 06 Civ. 8219(PAC)(DF)
------------------------------------------x
ATLANTIC OUTDOOR ADVERTISING, INC., SCENIC
OUTDOOR, INC., TROYSTAR CORPORATION and
WILLOW MEDIA, L.L.C,
          Plaintiffs,
            -against-
CITY OF NEW YORK, PATRICIA J. LANCASTER,
and EDWARD FORTIER,
          Defendants.
------------------------------------------x
                    February 14, 2008
                    9:45 a.m.
```

Deposition of STANLEY SHOR, pursuant to Notice, held at the offices of Davis Wright Tremaine LLP, 1633 Broadway, New York, New York, before Jineen Pavesi, a Registered Professional Reporter, Registered Merit Reporter, Certified Realtime Reporter and Notary Public of the State of New York.

1                    SHOR
2    phones.
3        Q.      Why is that?
4        A.      The proliferation of cell
5    phones has made the pay phone much less
6    useful to most people; therefore, the
7    other aspects of the pay phone that people
8    don't like seem to outweigh the former
9    desire to have pay phones.
10              MS. SCHNEIER:  Can I have the
11    answer read back.
12              (Record read.)
13       Q.     What are the aspects of pay
14    phones that people don't like?
15       A.     People don't like that the pay
16    phones are dirty, covered with graffiti,
17    often they don't work when people have
18    tried to use them because they are subject
19    to constant vandalism.
20              Property owners don't like
21    having them adjacent to their properties.
22              At one time the building line
23    phones generated a payment to the adjacent
24    stores; the reduction in usage has led the
25    companies to stop paying the adjacent

1                    SHOR
2  respond to certain when receiving
3  violations on certain locations and not on
4  others.
5        Q.       How many PPTs currently have
6  advertising on them?
7        A.       I don't have a number for that.
8        Q.       Do you have a general idea?
9        A.       We have approximately 21,000
10 pay phones in total; of that total, 58
11 percent are at the curb and 42 percent are
12 at the building line and this continuously
13 changes over time.
14               There is a significant number
15 of phones removed every year, there is
16 also some phones that are new that come
17 into the system.
18               Of that 58 percent, there is a
19 percentage that have advertising on them,
20 but it is not 100 percent.
21               As far as the actual number of
22 ad panels, we do have records at the
23 office for what the companies provide to
24 us, the locations of the ad panels that
25 they put up, but I don't have an actual

1                    SHOR
2  you will take a minute and look at that
3  section.
4            (Witness perusing document.)
5       Q.    My question here is can you
6  explain what LED advertising is?
7       A.    It says right here, light
8  emitting diode, it is an electronic form
9  of lighting that's used to -- usually
10 used to spell out words or numbers and it
11 is extremely bright, it is currently being
12 used in the walk/don't walk signs.
13            It apparently uses less
14 electricity, so it is being looked on a
15 lot more favorably lately for
16 environmental reasons.
17      Q.    How does that contrast, for
18 those not as immersed in this, to just
19 backlighting?
20      A.    Backlighting, you're looking at
21 a poster with light coming through it;
22 with LED, you're looking at the light
23 fixture itself, so it is much brighter
24 than the back-lit posters.
25      Q.    Other than being much brighter,

1                    SHOR

2     telephone.

3          Q.     Do you know if there is any

4     agency that keeps those records?

5          A.     We keep records on where the

6     pay phones are, we have a database of

7     where they are, but it is not indexed by

8     entrance to bridge or arterial highway.

9          Q.     It is just by location?

10         A.     Correct.

11         Q.     Do you know if DOITT tracks

12    whether any of the PPTs are in underserved

13    areas as defined here?

14         A.     There are no longer any areas

15    of the city that are underserved as

16    defined here.

17                This is based upon the census

18    of 1990; what was considered a low

19    penetration area for household telephones.

20                We then -- after the data for

21    the 2000 census was available, we reviewed

22    it and determined that the percentage of

23    households was no longer that high that

24    had no telephone service, so we eliminated

25    any community district from being

```
 1                    SHOR
 2   those pay phones.
 3              MS. SCHNEIER:  Off the record.
 4              (Discussion off the record.).
 5        Q.    Obviously DOITT has the ability
 6   to track and provide information about
 7   revenues on all PPTs with advertising
 8   panels, correct?
 9        A.    Correct.
10        Q.    Looking at this, do these
11   numbers look familiar to you?
12        A.    That's at the very end of this
13   response here?
14        Q.    Yes.
15              (Witness perusing document.)
16        A.    Looks about right.
17        Q.    Do you now have the revenue
18   numbers for 2007 available?
19        A.    For fiscal year 20007, we
20   should have that available.
21        Q.    Do you know if the advertising
22   revenue from PPTs with advertising panels
23   went up from 2006?
24        A.    I believe it did.
25        Q.    Do you know if the number of
```

1  SHOR
2  PPTs declined from 2006 to 2007?
3      A.    The number of PPTs overall
4  definitely did decline.
5      Q.    Do you know by what percentage?
6      A.    No, I believe that e-mail that
7  was Exhibit 90 states there was an average
8  decline of 1,700 phones per year during
9  the last five years.
10          MS. SCHNEIER:  I would like to
11 mark as Exhibit 92 a document that has
12 been Bates stamped NYC 9580 through 9581.
13          (Clear Channel Exhibit 92,
14 Bates stamped NYC 9580 through 9581, was
15 marked for identification, as of this
16 date.)
17     Q.    You might notice, if you look
18 at the second page, that the grand total
19 advertising revenue number of 14 million
20 and then some actually matches up with
21 what we saw in the prior answer.
22          Do you recognize the form of
23 this document, Mr. Shor?
24          (Witness perusing document.)
25     A.    It looks like a document that

1         SHOR
2  community board that there was some
3  specific traffic safety issue at a
4  location, we would review it, but I don't
5  recall there being any specific traffic
6  safety issues involved with any individual
7  application.
8      Q.    But no one, DOITT or any other
9  agency, said there were over 8,000
10 advertising panels and these eight
11 community districts, hey, there might be
12 some traffic safety issues with having
13 such proliferation of advertising panels
14 on the phone kiosks?
15     A.    Not to my knowledge.
16     Q.    Did anyone do any, in terms of
17 community districts 1 through 8, did
18 anyone do any sort of aesthetic study as
19 to the impact of having these many PPTs
20 with advertising panels in this area?
21     A.    I am not aware of any study
22 that was related directly to community
23 districts 1 through 8.
24           I know at one point the Art
25 Commission commented on existing rules

1           SHOR
2  that we had, but that was citywide, saying
3  that they should be further spaced apart
4  than what we had.
5       Q.      The existing rules that the Art
6  Commission commented on, what rules are
7  you referring to?
8       A.      Rules regarding the siting of
9  pay phone, that they be no closer than 50
10 feet apart, that kind of thing.
11              The Art Commission just decided
12 to send us that, that was not during a
13 process, so it didn't really have an
14 impact on a specific process at the time,
15 although it was kept in mind when we later
16 did this rule, that there was issues as
17 far as having things close together.
18      Q.      In coming up with the rule to
19 ban any further advertising panels on PPTs
20 in community districts 1 through 8, is one
21 of the things that was considered whether
22 there was any offsetting reason that would
23 justify the further visual clutter or
24 aesthetic concerns from having more
25 advertising panels?

SHOR

A. It is not clear.

Q. Let me try to rephrase that awkwardly phrased question.

Are you aware that in connection with the street furniture franchise, one of the things that was considered was whether the aesthetic issues with having advertising on the bus shelters would be offset by the fact the franchisee would be receiving revenues from those bus shelters, bus shelter advertisements; were you aware that was one of the things that was considered?

A. I wasn't part of those discussions.

Q. In deciding to ban further advertising on PPTs in community districts 1 through 8, do you know if that same sort of analysis, weighing the economic benefits from having advertising against the aesthetic concerns, was similarly weighed?

A. What I can say is that when we looked at making a rule regarding

1                         SHOR
2       advertising and we looked at the number of
3       advertising panels and economics, to some
4       degree we looked at our experience over
5       the years and what revenues came in and
6       the number of panels and we found that
7       there was a great deal of elasticity in
8       the market.
9                   So that if more phones with
10      more advertising panels went up, that
11      didn't necessarily result in additional
12      advertising and in certain years they
13      actually went down.
14                  So our opinion regarding the
15      economic impact was that limiting the
16      number of additional panels was not going
17      to have a significant impact for either
18      the city or the existing companies.
19                  But as you had asked before,
20      did we consider removing -- forcing
21      companies to remove panels, as I said, we
22      felt that that was a bigger issue
23      contractually, but that certainly would
24      have had some impact on their revenue and
25      our revenue.

1                    SHOR
2        Q.      Our revenue being DOITT's
3   revenues?
4        A.      Sure; if we had all of the
5   panels removed within the districts as
6   opposed to just enforcing against the
7   phones that were cited illegally,
8   certainly that would have had a
9   significant impact.
10       Q.      Isn't one of the things that
11  DOITT concluded that it was not
12  unreasonable to assume that any further
13  increase in advertising from community
14  districts 1 through 8 was marginal given
15  the saturation of that area with
16  advertising panels already?
17       A.      You could say it that way.
18       Q.      In fact if there was over
19  competition for revenue dollars in that
20  area, what would happen is the revenue
21  dollars from existing advertising panels
22  would likely decrease somewhat?
23       A.      Well, we saw that the average
24  panel revenue did go down during a period
25  of time when --  during that five-year

```
1                    SHOR
2    came back to us and said we really want to
3    do this, what do we have to do, and I
4    said, well, you're going to have to come
5    up with an improved design and take it to
6    the Art Commission.
7              They hired Jim Garretson, who
8    has done business at the Art Commission
9    before, he is an architect, he designed an
10   improved version for them, he actually
11   designed several alternatives, the Art
12   Commission liked his most streamlined
13   version and approved it.
14             So that's the wrap.
15      Q.    The second paragraph talks
16   about the MTA signs which you had
17   previously mentioned was raised as posting
18   several objections.
19      A.    Yes.
20      Q.    Now I would like you to look at
21   what has been marked as Exhibit 112 which
22   has your question, do you see your
23   question?
24             (Witness perusing document.)
25      A.    Yes.
```

1                    SHOR
2       Q.      What was the answer that you
3   received?
4       A.      I never received an answer on
5   this.
6               I don't know if the
7   commissioner took this any further.
8       Q.      Do you know how many such
9   advertisements the MTA has over transit
10  facilities?
11      A.      No.
12              MS. SCHNEIER:  I will just mark
13  one more document, Exhibit 113, and then
14  if I can take a five-minute break to
15  confer, I think I will wrap it up.
16              This is a document Bates
17  stamped NYC 10702 through 10710.
18              (Clear Channel Exhibit 113,
19  Bates stamped NYC 10702 through 10710, was
20  marked for identification, as of this
21  date.)
22              (Witness perusing document.)
23      Q.      Earlier in the deposition,
24  Mr. Shor, I believe you testified that
25  DOITT does not track whether any of the