# EXHIBIT 6

```
 1   UNITED STATES DISTRICT COURT
 2   SOUTHERN DISTRICT OF NEW YORK
 3   ------------------------------------x
 4   METRO FUEL, LLC,
                                              Case No.
 5                     Plaintiff,             07-CV-8244
 6        - against -
 7   CITY OF NEW YORK,
 8                     Defendant.
 9   ------------------------------------x
10
                         May 15, 2008
11                       10:22 a.m.

12                       75 Rockefeller Plaza
                         New York, New York 10019
13

14        DEPOSITION of EDWARD FORTIER, testifying
15   on behalf of THE CITY OF NEW YORK, the Defendant
16   in the above entitled matter, taken pursuant to
17   Consent, before a Notary Public of the State of
18   New York.
19
20
21
22
23
24
25   RAYVID REPORTING SERVICE, INC.     (212) 599-3642
```

1          EDWARD FORTIER
2   saying that there is a common sense sentiment
3   shared by City officials that advertising signs,
4   obviously, have an aesthetic impact on the
5   landscape and that there hasn't been any
6   assessment of that impact, other than the common
7   sense conclusion?
8        A      I believe the aesthetic goes to the
9   quantity of signage in that, again, accessory
10  signage serves a better public purpose in
11  directing people to businesses and the aesthetics
12  are not related to the particular sign, but rather
13  the quantity of signage that might result.
14              So, keeping the signage -- reducing
15  the amount of signage is beneficial to the
16  aesthetic.
17       Q      I hear you and I think I understand
18  what you're saying.
19              I'm just trying to focus more on the
20  City's process for evaluating the pros and cons of
21  signage rather than it's justification for
22  treating different kinds of signage differently.
23              Let me ask you, to your knowledge,
24  has the City ever engaged in any kind of study of
25  the impact of advertising signs on aesthetic?

1                  EDWARD FORTIER
2        A    Not to my knowledge.
3        Q    To your knowledge, has the City ever
4   engaged in any kind of study with respect to the
5   impact of any urban element on aesthetic?
6             MS. NEUFELD:  Objection.
7        A    No.
8        Q    Mr. Fortier, I want to ask you a few
9   questions about traffic safety.  I appreciate that
10  at your prior deposition you testified that you're
11  not a traffic safety expert and that you're
12  generally uncomfortable speaking about traffic
13  safety issues, and I certainly don't want you to
14  go beyond your personal knowledge in answering my
15  questions; but I want to press you just a little
16  bit further to see if you do have an opinion in
17  the area of traffic safety that might be relevant
18  to this case.
19            I would preface my questions by
20  observing once again that I believe you've
21  testified that you have some general understanding
22  about the City's traffic safety concerns that
23  animate its advertising sign restrictions?
24       A    Very -- on a very limited basis,
25  yes.

1                    EDWARD FORTIER
2    them to street furniture?
3         A     Yes.
4         Q     My question is, do you believe it
5    was prudent for the City to do what it did in
6    Section 4.4.2; namely, to apply all of the Zoning
7    Resolution's restrictions on electronic media to
8    Cemusa's street furniture signs without accounting
9    for any of the differences to which you testified
10   before?
11              MS. NEUFELD:  Objection.
12        A     Yes.
13        Q     The restrictions on electronic media
14   and flashing signs contained in the Zoning
15   Resolution are equally applicable to street
16   furniture as they are to advertising signs on
17   zoning lots, right?
18        A     Correct.
19        Q     You'll see in 4.4.2, for whatever
20   reason the City chose not to impose the Zoning
21   Resolution's restrictions on backlighting, to
22   street furniture.
23              Can you think of any reason why it
24   would be appropriate for the City to impose the
25   Zoning Resolution's restrictions on electronic

1  EDWARD FORTIER
2  media to street furniture but not to impose the
3  Zoning Resolution's restrictions on backlighting
4  on the street furniture?
5      A   No.
6      Q   I have a question that I think I
7  know the answer to, and if I'm right, it will save
8  us some time.
9          Do you know what Blue Tooth
10 technology is?
11     A   Yes.
12     Q   Are you aware of the existence or
13 extent of Cemusa's use of Blue Tooth technology in
14 connection with its street furniture advertising?
15     A   No.
16     Q   Let me ask you a couple of brief
17 questions nonetheless.
18         Mr. Fortier, do you believe it
19 should be permissible for my client to use Blue
20 Tooth transmitters to beam advertisements to
21 passing pedestrians in the vicinity of its
22 advertising signs?
23     A   I have never considered that, as
24 there is no -- if there was no visual
25 representation in place, no structure in place,

1                    EDWARD FORTIER
2    you're aware of, looked into this question?
3              MS. NEUFELD:  Objection.
4         A    As it relates to particularly signs
5    on subway stairs, no, I'm not aware.
6         Q    Is there any other way in which you
7    think this might have been looked into?
8         A    We have more recently with the Law
9    Department in conjunction with counsel --
10             MS. NEUFELD:  Are you aware of
11        privilege when you're answering the
12        question?
13             THE WITNESS:  Yeah.
14        A    We have considered the issue of MTA
15   signage as it relates to arterial signs.
16        Q    To your knowledge, nobody at the
17   City has considered the issue relating to the
18   MTA's urban panels?
19        A    No.
20             MR. HECKER:  Let's mark it as 19.
21             (The above described document was
22        marked Plaintiff's Exhibit 19 for
23        identification, as of this date.)
24        A    Mr. Fortier, Exhibit 19 is a
25   two-page document that's not Bates stamped.  At

1           EDWARD FORTIER
2    office for the Department of Buildings.
3           Q    To your knowledge, has anybody at
4    the City ever conducted or engaged anybody to
5    conduct a study of the best practices in the area
6    of sign regulation in other jurisdictions?
7           A    Not that I'm aware of.
8           Q    To your knowledge, has the City ever
9    considered adopting a single set of rules that
10   would apply equally to signage on private property
11   as well as signage on the streets and sidewalks?
12          A    No.
13          Q    Have you ever heard of someone named
14   Douglas Woodward?
15          A    Yes.
16          Q    Who is Douglas Woodward?
17          A    I worked with Douglas at the
18   Department of City Planning.  I'm not certain as
19   to his title at that time, but he was involved as
20   a Planning -- sort of capacity with the
21   department.
22          Q    Approximately, just to give me a
23   very general idea, when was the last time you
24   talked to him, recently or years ago?
25          A    About a year, year and a half ago.

1              EDWARD FORTIER
2         A      I would say that -- yes, if the --
3   if the base of the sign is within the zoning lot,
4   yes.  Their projection, whether it's a few inches
5   or a few feet, would fall under the jurisdiction
6   of the Department of Buildings.
7         Q      Even if the advertising sign itself
8   is all the way by the curb line, the jurisdiction
9   would be with DOB and not DOT, right?
10        A      I have not encountered that
11  situation, but it sounds correct to me, that we
12  would.  I would have to verify with counsel of DOT
13  as to jurisdiction.  I've not seen a case like
14  that.
15               Projections are not allowed to that
16  extent.  There may be conforming situations where
17  it may have occurred, but I would need to confirm.
18        Q      If the City did conclude that it was
19  appropriate to subject street furniture
20  advertising to the restrictions of the Zoning
21  Resolution, and if the City further concluded to
22  vest DOB as opposed to DOT with enforcement
23  authority over such street furniture advertising,
24  there isn't any reason why that wouldn't make
25  sense, is there?

Page 114

1         EDWARD FORTIER
2         MS. NEUFELD:  Objection.
3      A     I think we have the ability to
4 evaluate the signage as to complying with the
5 Zoning Resolution.  I don't see why we wouldn't,
6 aside from the very broad issue of our
7 jurisdiction of the sidewalks generally.  That's
8 the major hurdle, but I think we have the ability
9 to evaluate whether or not existing signage meets
10 regulations, complies with regulations.
11      Q     To your knowledge, there aren't any
12 specifically dedicated sign enforcement staff at
13 DOT, are there?
14      A     I really have no idea.
15         MR. HECKER:  I think I'm done.
16         Well, one more series of questions
17 and we'll call it a day.
18      Q     I want to turn back to indirectly
19 illuminated advertisements in manufacturing
20 districts.
21         Subject to certain limitations,
22 signs with indirect illumination that bear
23 advertising in manufacturing districts can be
24 permissible?
25      A     Yes.

1          EDWARD FORTIER
2  those light rays must have reflected from the wall
3  to the viewer's eye, right?
4      A    Yes.
5      Q    Any time that there is a sign with
6  indirect illumination that's visible by a human
7  being from a street, by definition, light rays
8  must have reflected off of the sign onto the
9  street, right?
10     A    Yes.
11     Q    And the City's concern is with
12 direct light rays, as opposed to indirect light
13 rays?
14     A    Yes.
15     Q    And the City hasn't made any effort
16 to control the degree to which light rays come to
17 the street, indirectly?
18     A    The limitation within the Zoning
19 speaks to no direct rays coming to the street or
20 residences.
21          When you say we made no efforts to
22 control, I'm not sure I understand the question.
23 Are you asking --
24     Q    Under the City's scheme, it is worse
25 to have an internally illuminated panel sign that

1                    EDWARD FORTIER
2    is illuminated by a single 400 watt bulb than it
3    is to have an indirectly illuminated sign that is
4    lit with many, many bulbs that far exceed that
5    wattage and that in combination result in more
6    light reaching the street, albeit indirectly?
7         A    I couldn't speak to the amount of
8    light that actually reaches the street.
9         Q    And you couldn't speak to it because
10   it's not controlled by the City's regulations.
11             There are no limits imposed thereon?
12        A    We have no illumination limits
13   within Zoning.
14             MR. HECKER: Thank you, that's it.
15   EXAMINATION BY MS. NEUFELD:
16
17        Q    Mr. Fortier, picking up the area we
18   were just talking about, illuminated signs.
19             I believe there's a discussion
20   earlier where Mr. Hecker was asking you some
21   questions about his client signs and whether they
22   were directly illuminated.
23             Do you remember that discussion?
24        A    Yes.
25        Q    I believe that you testified that as

1          EDWARD FORTIER
2  light are emanated to the viewer and the light is
3  only projected onto the painting?
4          A    Yes.
5          Q    Let's refer to that type of lighting
6  as art museum lighting, for the sake of shorthand,
7  okay?
8          A    Yes.
9          Q    If I'm understanding your testimony,
10 consistent with clarifications made in response to
11 Ms. Neufeld's followup, what you're saying is that
12 if my clients took the light bulbs in their panel
13 signs from behind the posters and placed them in
14 what I'm calling for shorthand, art museum light
15 fixtures, then they would be indirectly
16 illuminated?
17         A    Yes.
18         Q    As long as the light rays only reach
19 the street indirectly by way of reflecting off of
20 the sign and not directly to the street?
21         A    Yes.
22         Q    And I will represent to you that my
23 client's panel signs contain fluorescent bulbs
24 that project 6,350 luminance, okay?
25         A    Yes.

```
 1                    EDWARD FORTIER
 2        Q      Your testimony is that my client
 3   could remove those bulbs and install what we're
 4   loosely calling art museum style light fixtures on
 5   their signs and project light onto their signs,
 6   such that a light meter on the street would
 7   register 6,350 luminance, correct?
 8        A      Yes.
 9        Q      In fact, my client could install
10   these so-called art museum style light fixtures on
11   their panel signs and project so much light onto
12   their signs that a light meter on the street would
13   register a million luminance, because there is no
14   limit under the Zoning Resolution to how much
15   illumination can reach the street as a result of
16   indirectly illuminated advertising signs?
17              MS. NEUFELD:  Objection.
18        A      We have no limitations right now as
19   to the amount of illumination.
20
21
22              (Continued on following page.)
23
24
25
```

1          EDWARD FORTIER
2     Q    So, in my question, a million luminance would be okay, as long as my client's signs otherwise complied with the other restrictions of the Zoning Resolution?
6     A    Yes.
7          MR. HECKER:  I don't have anything else.

                                    _____
                                    EDWARD FORTIER


Subscribed and sworn before me
this_____ day of_____, 2008.


_____
     NOTARY PUBLIC