# EXHIBIT 7

JEFFREY SUGARMAN

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

---------------------------------------x

METRO FUEL, LLC,

               Plaintiff,      Case No.
                                07-CV-8244

   - against -

CITY OF NEW YORK,

              Defendant.

---------------------------------------x

               May 14, 2008
               10:01 a.m.

               75 Rockefeller Plaza
               New York, New York 10019

    DEPOSITION of JEFFREY SUGARMAN, testifying on behalf of THE CITY OF NEW YORK, the Defendant in the above entitled matter, taken pursuant to Notice, before a Notary Public of the State of New York.

RAYVID REPORTING SERVICE, INC.    (212) 599-3642

1           JEFFREY SUGARMAN
2      that if Ms. Neufeld discovers there was
3      another EAS prepared subsequently, I would
4      ask that that be produced promptly.
5           Q    Mr. Sugarman, I gather you would
6  agree that neighborhood character assessments are
7  an important aspect of evaluating whether any
8  given land use change that is contemplated would
9  be appropriate?
10          A    Yes.
11          Q    I gather you would agree with me
12 that it would be imprudent for the City to proceed
13 with a project with a significant citywide land
14 use impact without first engaging in a thorough
15 neighborhood character assessment?
16          A    Yes.
17          Q    And you would also agree with me,
18 wouldn't you, that it would have been imprudent
19 for the City to proceed with the coordinated
20 street furniture franchise, in particular, without
21 first engaging in a thorough neighborhood
22 character assessment?
23          A    Yes, at some time.  I mean, I just
24 want to be clear, to my knowledge, as Ms. Neufeld
25 said, the EAS was done in 1996, and the assessment

1                JEFFREY SUGARMAN
2   was done at that time.
3             Subsequent assessment was based on a
4   review of the previous proposal at hand and the
5   decisions made by the Commissioner and Council at
6   that time.
7        Q    I understand that.  I'm just trying
8   to clarify that you agree with me that it would be
9   important to insure that the underlying
10  neighborhood character assessment that had been
11  performed previously was done thoroughly and
12  properly before the City embarked on a project of
13  the scope of the coordinated street furniture
14  franchise?
15       A    Yes.
16       Q    In contemplating the possibility of
17  allowing advertising signs to be placed on the
18  street furniture, on a citywide basis, what would
19  an appropriately thorough neighborhood character
20  assessment entail?
21       A    It would entail first the analysis
22  of the general locations proposed for the street
23  furniture, which is on the streets of New York and
24  their relationship to the adjoining land uses and
25  also in relationship to the specific functions of

                    JEFFREY SUGARMAN

                I mean, we regulate signs through
zoning and I have no doubt that we develop things
with those specific regulations, which I've not
been involved with. There were discussions, but
I'm not aware of it.

        Q    To make sure the record is clear, to
your knowledge, the City has never engaged in a
comprehensive study with respect to the impact of
advertising signs on aesthetic?

        A    I will emphasize, only to my
knowledge, it has not. I will not say it has not.
I am not aware of that. That's all I will say.

        Q    Fair enough.

                Let's talk a little bit about
traffic safety. What are the City's traffic
safety concerns with respect to advertising signs?

        A    That they don't distract, first and
foremost, visually. One, they don't literally
distract, so that you would take your attention
off of the road or the sidewalk.

                Two, that they don't overwhelm the
necessary information needed to provide safe use
of the streets and sidewalks, parking regulations,
traffic signals and other signage, way finding

JEFFREY SUGARMAN

Page 63

1              JEFFREY SUGARMAN
2   order to achieve its aesthetic neighborhood
3   character and safety goals, right?
4        A    Yes, it's important.  I will take
5   generally some objection to the -- the adverbial
6   emphasis you put on the statements.  I will not
7   characterize things as being very important or not
8   in such general terms.  It is important.
9        Q    And wouldn't you agree with me that
10  although your belief is that the considerations
11  that apply on private property are different than
12  the considerations that apply to the sidewalks, it
13  is as important that the City carefully and
14  thoughtfully regulate advertising signage on the
15  street furniture as it is that the City carefully
16  and thoughtfully regulate advertising signage on
17  private property?
18       A    Yes.  They are different places, and
19  they have different functions.  You have to
20  evaluate those things according to those
21  functions, and they all contribute or distract.
22  I think we need to carefully consider the amount
23  of signage on streets.
24       Q    Part of that careful consideration
25  includes an assessment whether and the degree to

Rayvid Reporting Service
(212) 267-3877

1            JEFFREY SUGARMAN
2   which advertising signs are appropriate on the
3   street furniture in different types of
4   neighborhoods?
5        A    Yes, generally speaking.
6        Q    Another important component of this
7   analysis is the overall amount of signages in
8   terms of the number of signs?
9        A    Number and size.
10       Q    And also illumination?
11       A    Yes.
12       Q    You wouldn't want to allow a street
13  furniture to contain advertising signs without
14  carefully assessing the extent to which the City's
15  neighborhood character aesthetic and traffic
16  safety goals would be further or hindered by the
17  number, the size and the illumination levels of
18  advertising signs.
19            MR. HECKER:  I''ll withdraw that
20       question.
21       Q    I don't want to beat this to death,
22  but I'm not totally understanding your testimony
23  and I would like to understand it as best as I
24  can.
25            Could you, as succinctly and clearly

1   JEFFREY SUGARMAN
2   of the recent versus the far past. We have
3   landmarks regulation that deal with the importance
4   of establishing and maintaining a certain sense of
5   the deep history of our City.
6           It's a different thing from whether
7   or not the expectations in 1999 should consider
8   street furniture in 1899 in New York, in which
9   case I would say no, none at all. People lived
10  differently.
11          Q    Were you aware that New York City
12  has allowed its street furniture franchisee to
13  place certain so-called electronic media, such as
14  LCD screens, on some of its street furniture
15  structures on a limited basis?
16          A    That the City has? No, I am not
17  aware of that fact.
18          I know there is that kind of lit
19  animated signage on the subways, which we do not
20  control and which we do not like, but...
21          Q    Why don't you like the LCD screens
22  that the MTA has placed on some of its subway
23  entrances?
24          A    Because they are really visually
25  intrusive. That's why we have limited, in our

1                    JEFFREY SUGARMAN
2   belief, the degree to which signage on the street
3   furniture could be animated or lit.  It's simply
4   backlighting.  Which, you know, if the signage
5   wasn't there, it would be necessary to provide the
6   light to provide for safe use of those structures.
7           Q      I gather from your previous
8   testimony that you agree that street furniture
9   advertising signs can potentially impact traffic
10  safety?
11          A      Yes.
12          Q      And you agree that street furniture
13  advertising signs can potentially impact
14  neighborhood character?
15          A      Yes.
16          Q      And street furniture advertising
17  signs can potentially implicate aesthetic concern?
18          A      Yes.
19                 MR. HECKER:  Let's mark Exhibit 11.
20             (The above described document was
21          marked Plaintiff's Exhibit 11 for
22          identification, as of this date.)
23          Q      Mr. Sugarman, I've marked for
24  identification as Exhibit 11, a document that's
25  quite a long document, that begins with Bates

JEFFREY SUGARMAN

Page 100

1          JEFFREY SUGARMAN
2   whether one franchise consideration was different
3   than another or any other legal question.
4            What I asked you about when I ask
5   you about sufficiency, I'm asking your opinion of
6   what is an appropriate assessment in light of the
7   land use that's being contemplated and the
8   potential adverse effects of that land use based
9   on your experience in this area, alright.
10           Subject to that, my question is, you
11  would agree with me that in reviewing the EAS and
12  related land use assessments that were performed
13  in 1996 in connection with the prior street
14  furniture franchise proposal, you assumed that
15  those evaluations had been performed sufficiently,
16  but did not yourself undertake your own efforts to
17  insure that they had been performed sufficiently?
18       A    I did not make separate efforts,
19  other than to understand the determinations made
20  and the processes described, particularly in the
21  CPC Report, as to whether or not the valuations
22  addressed the significant issues.  That was done
23  very much as just reading the work and being
24  professional in considering --
25       Q    When you read the CPC Report and

Rayvid Reporting Service
(212) 267-3877

55c72cbe-628e-40f3-8695-f642864b8fe0

1           JEFFREY SUGARMAN
2  we're referring now to the CPC Report with respect
3  to the 1996 RFP, right?
4       A     Yes.
5       Q     When you read that CPC Report, you
6  saw that that report drew certain conclusions
7  about the land use impact of the then proposed
8  RFP, right?
9       A     Yes, I did.
10      Q     And you assumed that those
11 conclusions were valid and did not, yourself,
12 undertake a separate analysis about whether you
13 agreed with those conclusions?
14          MS. NEUFELD:  Objection.
15      Q     Is that fair?
16      A     Only to the extent that there were
17 any proposed new changes, or any changes to what
18 was going to be in the RFP.
19      Q     Fair enough.  Let me make sure I'm
20 understanding then.
21          With respect to the analysis that
22 was done in the 1996 CPC Report, those aspects of
23 the 1996 street furniture RFP that were the same
24 as what was proposed in 2003 to 2006, you assume
25 that the analysis in the 1996 CPC Report was valid

1              JEFFREY SUGARMAN
2    and you did not yourself undertake any independent
3    analysis to determine whether you agreed with the
4    1996 analysis?
5         A    That's accurate.
6         Q    Are you aware of any efforts by
7    anybody else at CPC, other than yourself, to
8    engage in any independent analysis to determine
9    whether the conclusions drawn in the 1996 report
10   with respect to those aspects of the 1996
11   franchise that are the same as the 2003 franchise
12   were valid?
13        A    I'm not aware.
14        Q    Same question with respect to the
15   Department of Transportation.
16             Are you aware of anybody at the
17   Department of Transportation, Kerry Gould-Schmidt,
18   the Commissioner, or anybody else who engaged in
19   any type of independent analysis of the 1996
20   report?
21        A    Not with sufficient specificity to
22   say yes or no.  I know that studies were done.
23        Q    What kind of studies do you believe
24   were done at DOT?
25        A    I know that they reviewed the RFP

1           JEFFREY SUGARMAN
2   carefully and considered its appropriateness. The
3   criteria they used for its appropriateness, I'm
4   not aware of. It's probably not useful in terms
5   of responding to the question.
6           Q    Fair enough.
7                I believe you testified, correct me
8   if I'm wrong, that you did review the 1996 CPC
9   Report, but you did not review the EAS that the
10  DOT had prepared in 1996?
11          A    That's accurate.
12          Q    Other than the 1996 CPC Report, did
13  you review any other documents or do anything else
14  by way of familiarizing yourself with the type of
15  analysis with respect to land use impact that had
16  been performed in 1996?
17          A    No.
18               MR. HECKER: We should take a lunch
19          break.
20               (Whereupon, at this point in the
21          proceedings there was a luncheon recess,
22          after which the deposition continued as
23          follows:)
24               MR. HECKER: Mark this as 13.
25               (The above described document was

1          JEFFREY SUGARMAN
2     A      I have not reviewed this prior
3  exhibit -- I don't recall the exact degree of
4  dissent, but there was certainly testimony by the
5  public in opposition to certain aspects.
6     Q      And you do recall generally that
7  there was significant opposition by certain
8  aspects of the public to the type and quantum
9  advertising signs that were contemplated in
10 connection with the 1996 street furniture
11 franchise?
12    A      Yes.
13           MS. NEUFELD: Objection.
14    Q      Am I correct that, to your
15 knowledge, nobody at the Department of City
16 Planning or the Department of Transportation
17 reconsidered, in the 2003 or 2006 period, whether
18 the quantum and type of street furniture
19 advertising that had been proposed in 1996 should
20 be reconsidered in light of that criticism?
21           MS. NEUFELD: Objection.
22    A      Yeah, I can't answer that question.
23 I don't know.
24    Q      It's true, isn't it, that you didn't
25 reconsider in the 2003 to 2006 period whether the

1          JEFFREY SUGARMAN
2  quantum and type of street furniture advertising
3  that had been proposed in 1996 should be
4  reconsidered, in light of the criticism that was
5  mounted at that time?
6              MS. NEUFELD:  Objection.
7       A     I didn't.
8       Q     What was your answer?
9       A     I did not.
10             MS. NEUFELD:  Can we have him step
11      out, because I need to clarify something
12      with you.
13             MR. HECKER:  We'll step out.
14             (Whereupon, at this point in the
15      proceedings there was a recess, after which
16      the deposition continued as follows:)
17      Q     Mr. Sugarman, in light of an off the
18 record conversation I just had with Ms. Neufeld,
19 let me ask you a general question that I think
20 you've already spoken to, but I want to make sure
21 I'm understanding you correctly.
22             Based on your review of Exhibit 13,
23 you concluded in or around 2003 that the City
24 Planning Commission engaged in a sufficient
25 analysis of the land use impact of the street

JEFFREY SUGARMAN

Page 113

1      JEFFREY SUGARMAN
2           MS. NEUFELD: Objection.
3      A      I would have to read it again
4  specifically to see whether or not there was a
5  statement that there were impacts.
6           I believe that it recognized that
7  the street furniture had a presence on the street,
8  and that to the extent that certain reductions
9  were made in the amount of advertising, and the
10 size -- the number of some of the structures, that
11 it was an acceptable degree of impact on the
12 streets in terms of balancing that I mentioned
13 before, in terms of the public benefit and the
14 impact.
15     Q      So, in other words, the City
16 Planning Commission concluded in 1996, based on
17 analysis reflected in Exhibit 13, that the street
18 furniture franchise advertising signs that were
19 then contemplated were appropriate, right?
20     A      Yes.
21     Q      You didn't engage in any independent
22 analysis yourself from 2003 to 2006 about whether
23 you agreed with the conclusions that had been
24 drawn in 1996, right?
25     A      I did not.

Rayvid Reporting Service
(212) 267-3877

55c72cbe-628e-40f3-8695-f642864b8fe0

JEFFREY SUGARMAN

Page 155

1          JEFFREY SUGARMAN
2    right?
3          A      Yes.
4          Q      And you know for certain that it
5    costs less than a billion dollars over twenty
6    years to build and maintain these structures,
7    right?
8          A      Yes.
9          Q      So, you know for certain, sitting
10   here today, that the City is guaranteed to receive
11   significantly more revenue from street furniture
12   advertising than it cost to build and maintain the
13   street furniture structures, right?
14              MS. NEUFELD:   Objection.
15         A      It receives revenue in excess -- oh,
16   God.  It's really frustrating.
17         Q      I'm not trying to give you a hard
18   time, Mr. Sugarman.  You would agree with me that
19   the differential is significant.  I'm not asking
20   you about massive.
21              Wouldn't you agree with me that the
22   City is deriving significantly more revenue from
23   street furniture advertising than it cost to build
24   or maintain the street furniture structures?
25         A      In all likelihood, yes.

Rayvid Reporting Service
(212) 267-3877

JEFFREY SUGARMAN

1  JEFFREY SUGARMAN
2  assessment of the potential impact and did not do
3  any further assessment.
4      Q    You didn't look beyond the City
5  Planning Commission Report that we discussed this
6  morning in determining whether fifty-five square
7  feet was, indeed, the appropriate number to
8  proceed with?
9      A    No, I did not.  In terms of the
10 other materials that have been generated in the
11 earlier franchise agreement -- I didn't.  I didn't
12 have that information at my disposal,
13 unfortunately.
14     Q    Do you know why the City didn't
15 reduce the allowable advertising square footage,
16 even further below fifty-five square feet in 1996?
17     A    I only know that it was a
18 determination based -- a determination that that
19 was a reasonable amount and a lesser amount was
20 not -- reducing it to a lesser amount wouldn't
21 substantially change -- it would not affect the
22 degree of impact.
23     Q    And you don't have any basis for
24 answering my previous question, other than what
25 you've read in the City Planning Commission

JEFFREY SUGARMAN

Page 177

1          JEFFREY SUGARMAN
2   and 2003, especially in the midtown Manhattan
3   area?
4         A     You're talking about the Times
5   Square special district?
6         Q     I'm talking more about the pay
7   phones.
8               You're aware, aren't you, that there
9   had been a very dramatic increase in the number of
10  pay phone advertisements, especially in midtown
11  Manhattan, between 1996 and 2003?
12        A     I'm not actually aware of the
13  numbers.
14        Q     If there were a dramatic increase in
15  the number of pay phone advertisements in midtown
16  Manhattan between 1996 and 2003, is that something
17  that would affect your view about whether it would
18  be prudent, putting aside legal or illegal,
19  prudent to engage in a new assessment of the
20  impact of street furniture advertising on the City
21  scape?
22              MS. NEUFELD: Objection.
23        A     It should have been taken into
24  consideration. I believe that we actually did
25  discuss the presence of telephones, but the street