# EXHIBIT 8

# In The Matter Of:

*METRO FUEL, LLC, v.*
*CITY OF NEW YORK,*

---

*THOMAS WARGO*
*May 9, 2008*

---

*RAYVID REPORTING SERVICE, INC.*
*25 West 45th Street - Suite 900*
*New York, NY 10036*
*PH: 212-267-3877 / FAX: 212-692-9171*

WARGO, THOMAS - Vol. 1

1           THOMAS WARGO
2  understanding of how a proposed action might
3  affect the neighborhood character.
4        Q    Depending on the results of the
5  neighborhood character assessment, the lead agency
6  might conclude that it would be appropriate to
7  modify or perhaps even abandon the proposed
8  action?
9        A    Yes.
10       Q    Would you agree it would be
11 imprudent for the City to go forward with a
12 project with significant Citywide land use impact
13 without first engaging in a thorough neighborhood
14 character assessment?
15       A    Yes.
16       Q    I asked you before if you had a view
17 about whether a neighborhood character assessment
18 of the coordinated street furniture franchise was
19 required under C.E.Q.R., and I understand that
20 you're not an attorney, and I understand this is
21 not your primary area of responsibility, and that
22 you are therefore uncomfortable speaking to
23 whether it was legally required; but I want to ask
24 you that in your more than two decades of
25 experience engaged in land use issues as an

1        THOMAS WARGO
2   study of the impact of advertising signs on the
3   aesthetics of the City on a citywide basis?
4        A    No.
5        Q    Would you agree with me that
6   neighborhood character assessments and aesthetic
7   assessments are necessarily neighborhood specific?
8        A    Yes.
9        Q    In other words, in engaging in an
10  aesthetic analysis or a neighborhood character
11  analysis of a particular proposed land use, it's
12  important that the aesthetic or neighborhood
13  character analysis be done on a
14  neighborhood-by-neighborhood basis?
15       A    We usually do it based on districts,
16  since the districts tend to encompass
17  neighborhoods that are similar.
18       Q    Fair enough. You would agree with
19  me, in engaging an aesthetic or neighborhood
20  character assessment, it's important to do so on a
21  district-by-district basis?
22       A    Yes.
23       Q    That's because the City's aesthetic
24  and neighborhood character concerns vary depending
25  upon the type of district that's at issue?

1                    THOMAS WARGO
2            I'm not a finance expert; so, I
3   don't know what -- if the advertisements on the
4   newsstand is going to generate revenue that's
5   going to be directly linked to the upkeep of the
6   Transportation System or not.
7            To the extent that it's going into
8   the general fund, I guess it is, in theory, I
9   would be more comfortable in knowing that it was
10  dedicated to that, but that's my personal opinion.
11       Q    Do you think raising revenue is a
12  good reason for compromising on neighborhood
13  character or aesthetic concerns?
14       A    It's not a good reason to
15  compromise.
16           MR. HECKER:  Mark this as
17       Plaintiff's Exhibit 7.
18           (The above described document was
19       marked Plaintiff's Exhibit 7 for
20       identification, as of this date.)
21       Q    Mr. Wargo, Exhibit 7 is a Bates
22  stamped document beginning 5743 and ends at 5779.
23  I believe this is the Department of Transportation
24  submission to the Mayor's Office of Environmental
25  Coordination containing the Environmental

THOMAS WARGO

Page 162

1        THOMAS WARGO
2   within.
3        Q    Both of the examples I'm positing
4   are lit from within.
5             One example is an ad that's
6   identical to a bus shelter ad, except that it's on
7   a parking lot, on a zoning lot; and the other is
8   an identically sized video ad with a high
9   definition moving video image; and I'm asking you
10  whether the video ad, my example, would present
11  greater aesthetic and neighborhood character
12  concerns than the --
13       A    In my opinion, yes.
14       Q    Would you similarly have greater
15  concerns about a high definition moving video
16  image on a bus shelter ad that's actually in a bus
17  shelter than you would of a static ad?
18       A    I would have concerns that there
19  would be different regulations, yes.
20       Q    What do you mean by that?
21       A    I mean that I could see where the
22  moving ads are allowed with less frequency than
23  the non moving ads.
24       Q    Did anybody at DCP ever explore
25  whether the kinds of restrictions on advertising

Rayvid Reporting Service
(212) 267-3877

1        THOMAS WARGO
2   signs contained in the Zoning Resolution ought to
3   be imported into the street furniture franchise
4   contract?
5        A    Not to my knowledge.
6        Q    Do you have any understanding of why
7   no thought was ever given to that?
8        A    I was not involved in the study.
9        Q    Do you think that should have been
10  thought of?
11       A    I can't say.  I wasn't there at the
12  time.
13       Q    I know you weren't there at the
14  time, but you're one of the most senior zoning
15  officials of the City of New York, charged with
16  understanding and implementing the concerns
17  reflected in the Zoning Resolution, right?
18       A    Yes.
19       Q    And I think it's fair to ask if you
20  think it was prudent for the City to proceed with
21  a street furniture franchise contract without
22  considering whether it made sense to impose upon
23  the franchisee, as a matter of contract, some or
24  all of the restrictions on advertisement signs
25  contained in the Zoning Resolution.

THOMAS WARGO

Page 187

1            THOMAS WARGO
2       Q       Mr. Wargo, a few minutes ago you
3  testified about a sign guy down at DCP who is
4  retired now.
5       A       Yes.
6       Q       What's his name?
7       A       Ken Bergin, B-E-R-G-I-N.
8       Q       Do you know what he's doing now?
9       A       He is retired.  He splits his time
10 between New York and Florida.
11      Q       Take a look at Exhibit 9, a two-page
12 exhibit Bates stamped 16102 and 16103.
13              Take as much time as you need to
14 read the whole thing, but I'm only going to ask
15 you a quick question about the piece written by
16 David Karnovsky towards the top of the first page,
17 towards the middle of the first page.  Take as
18 much time as you need to read it.
19              Were you aware that at some point in
20 2005, the Department of City Planning was
21 considering hiring a consultant to study best
22 practices in the area of sign regulation and other
23 jurisdictions?
24      A       No.
25      Q       To your knowledge, has that been

THOMAS WARGO

Page 188

1                    THOMAS WARGO
2    done?
3         A    No.
4         Q    Do you think that would be a good
5    idea?
6         A    At the present time, no.
7         Q    Why not?
8         A    Because I think that the regulations
9    that we have on the books are appropriate.
10        Q    There is nothing about the City's
11   billion dollar franchise with the street furniture
12   franchisee that makes you question whether
13   retaining such a consultant would be appropriate?
14        A    No.
15        Q    Who is Douglas Woodward?
16        A    He is an urban designer.
17        Q    How do you know him?
18        A    I used to work with him at City
19   Planning.
20        Q    When did he leave City Planning?
21        A    Many years ago.  I don't know the
22   exact date.
23        Q    Do you know what his role was when
24   he was at City Planning?
25        A    He worked in our Urban Design

1                    THOMAS WARGO
2    to create neighborhood character or aesthetics
3    concerns?
4            A      They could.
5            Q      Under what circumstance could they?
6            A      If there were an extreme number of
7    them in close proximity to one another, if the
8    size of the advertisements that were on them -- I
9    mean, all these things could contribute to
10   concern.
11           Q      How would you go about assessing
12   whether the number of them were extreme enough to
13   cause neighborhood character or aesthetics
14   concerns?
15           A      I would do a study.
16           Q      To your knowledge, has DCP or any
17   other City agency done such a study?
18           A      To my knowledge, no, but I presume
19   that the franchise project involved a study.
20           Q      If it didn't, do you think that
21   would have been imprudent?
22           A      If it didn't assess those concerns,
23   I would think that would be imprudent.
24           Q      I gather you are aware that there
25   are fundamentally two kinds of pay phones in

THOMAS WARGO

Page 209

1                THOMAS WARGO
2    the entire City.
3         Q    What if I told you that the dramatic
4    explosion in public pay telephone advertising that
5    occurred in the last ten years have been
6    concentrated overwhelmingly in midtown Manhattan?
7         A    I would have no comment on that.
8         Q    What do you mean, you'd have no
9    comment?
10             Do you mean you would have no
11   opinion whether that would be relevant to your
12   view of whether pay phone advertising presents a
13   character or aesthetics concerns?
14        A    That should have been looked at in
15   the awarding of the franchising of those phones.
16        Q    Do you think the fact that it wasn't
17   looked into, assuming it wasn't, undercuts the
18   City's justifications for regulating advertising
19   signs on the private property?
20        A    I would say so.
21             MR. HECKER:  I think I have nothing
22        further.
23             MS. NEUFELD:  That's it.
24
25