# EXHIBIT 9

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
Civil Action No. 06 Civ. 8193(PAC)(DF)
-----------------------------------x
CLEAR CHANNEL OUTDOOR, INC.,
                    Plaintiff,
    - against -
THE CITY OF NEW YORK and PATRICIA J.
LANCASTER, in her official capacity as
Commissioner of the New York City
Department of Buildings,
                    Defendants.
-----------------------------------x
Civil Action No. 06 Civ. 8219(PAC)(DF)
-----------------------------------x
ATLANTIC OUTDOOR ADVERTISING, INC., SCENIC
OUTDOOR, INC., TROYSTAR CORPORATION, and
WILLOW MEDIA, L.L.C.,
                    Plaintiffs,
         -against-
CITY OF NEW YORK, PATRICIA J. LANCASTER,
and EDWARD FORTIER,
                    Defendants.
-----------------------------------x
          January 22, 2008
          10:00 a.m.


          Deposition of JOSEPH PERELLO,
pursuant to Notice, held at the offices of
Davis Wright Tremaine LLP, 1633 Broadway,
New York, New York, before Jineen Pavesi,
a Registered Professional Reporter,
Registered Merit Reporter, Certified
Realtime Reporter and Notary Public of the
State of New York.
```

```
1                    PERELLO
2       A.      Yes, I am going to try to
3  recall their names.
4               I know Jonathan Mintz, but I am
5  not sure if he was on the design committee
6  or the finance committee, because we met
7  collectively often.
8               Someone from EDC was on the
9  finance committee.
10      Q.      Where was Mintz from?
11      A.      Consumer Affairs.
12              Well, you will get a better
13 source than me who was on there.
14      Q.      The next carryover sentence
15 onto page 11 lists a number of agencies on
16 an evaluation commission; is that the
17 committee to which you're referring?
18      A.      Yes.
19      Q.      So it was the evaluation
20 commission that you worked with these
21 people, is that correct?
22      A.      Correct.
23      Q.      The first full paragraph on
24 page 11 lists the companies that were the
25 bidders for this contract, is that
```

1                    PERELLO
2   correct?
3        A.      Right, looks to be accurate.
4                I am not sure it is
5   comprehensive, though.
6        Q.      You had one of them, Viacom
7   Outdoor, which is described here as an
8   incumbent, that meant it had the existing
9   bus shelter contract?
10       A.      Yes.
11       Q.      And you participated in
12  extending that contract for a limited
13  period while this evaluation commission
14  did its work, am I correct?
15       A.      Yes.
16       Q.      With whom did you work in your
17  negotiations with Viacom Outdoor for the
18  extension of the contract?
19       A.      Larry Levine.
20       Q.      Who is Larry Levine?
21       A.      He was a senior person at
22  Viacom Outdoor.
23       Q.      You and he negotiated that
24  extension?
25       A.      Yes, in coordination with DOT.

1                        PERELLO
2  clearly, past precedent.
3               I would say those are the
4  three.
5       Q.      In striking the balance, did
6  you do any safety studies in terms of
7  placing ads on city-owned property?
8       A.      I don't believe we did, I am
9  not sure though.
10      Q.      Did you do any --
11      A.      I don't remember.
12      Q.       -- any study on aesthetics in
13 terms of where you would place these
14 city-ads on city-owned properties?
15      A.      I don't believe we did, I don't
16 remember any.
17      Q.      So that when you made these
18 judgments as to where you would and where
19 you wouldn't seek to expand advertising,
20 you made sort of your own common sense
21 judgments?
22      A.      No, we sought the counsel of
23 others, the law, interpretation of the
24 law.
25              We didn't seek to expand

1                    PERELLO
2  advertising essentially, we only sought to
3  use the advertising that we had the best
4  way we knew how for the city.
5       Q.    A little earlier in this report
6  you took credit for increasing the
7  advertising space to the city in extending
8  the Viacom.
9       A.    Yes.
10      Q.    And didn't the CEMUSA deal,
11 which you helped negotiate, provide for a
12 somewhat broader number of shelters which
13 would contain advertising?
14      A.    That's a good question.
15            We sought to --  we did not
16 seek to increase advertising panels for
17 the sake of increasing advertising panels.
18            The DOT wanted more bus
19 shelters, so we did not say build more bus
20 stop shelters because it will be more
21 advertising panels.
22            We sought to maximize
23 advertising where advertising existed, so
24 it is accurate to say that we increased
25 advertising space on the existing

```
1                    PERELLO
2   advertising panels.
3              So with respect to the 17-1/2
4   percent, we were able to use space on
5   existing advertising panels, this did not
6   require Viacom to build new bus stop
7   shelters.
8              However, the city needs more
9   bus stop shelters, the DOT wants more bus
10  stop shelters because they are useful, but
11  that did not play in our evaluation; if
12  DOT wanted to build less bus stop
13  shelters, that's their business, not ours.
14     Q.      So on whatever number of
15  shelters, though, you did seek to increase
16  the amount of advertising space the city
17  could control?
18     A.      Whatever --  only --  we did
19  not seek to damage what worked.
20             So the bus stop shelter model
21  worked, we did not seek to say give us
22  more.
23             We only sought a number that
24  was fair and that everyone could operate
25  as they would.
```

1        PERELLO
2    A.    Yes.
3    Q.    And that was owned by the City
4 of New York, wasn't that?
5    A.    Yes.
6    Q.    This refers to a marketing plan
7 set forth in Exhibit 1, which was not
8 produced.
9        MR. KOVNER:  I do ask for it
10 and it is possible we didn't ask for it,
11 but I think we did.
12   Q.    Do you recall what you had
13 promised to History Channel in connection
14 with the marketing, advertising and
15 publicity efforts?
16   A.    Yes.
17   Q.    Could you describe that?
18   A.    Sure.
19        The spirit of the agreement was
20 in part to create more awareness around
21 New York City's rich history for a few
22 purposes; one was to attract a certain
23 type of what we called cultural tourist,
24 which had proven to spend more than the
25 average tourist when they went on trips.

1                    PERELLO

2              It was designed to highlight

3    New York City's rich history so that those

4    tourists would be attracted to come here

5    for different reasons other than typical.

6              And the Official History Center

7    was one of the anchors of that partnership

8    and part of our obligation was to make it

9    aware among New Yorkers that it existed,

10   we ran historical tours out of that

11   visitors center through a partnership with

12   Gray Line that the History Channel created

13   and I believe we used part of our media to

14   promote the Official History Center.

15        Q.   In paragraph 2.1 on page 2

16   going over to the top of page 3, it looks

17   like the History Channel is paying between

18   $3 and $4 million.

19        A.   Seems right.

20        Q.   For various things the city

21   would provide under this.

22        A.   Yes.

23        Q.   And if you go to 10.2 on page

24   11, "New York City Marketing agrees to

25   provide 6.8 million in city-owned outdoor

1                    PERELLO
2    media as provided in Exhibit 3," and I ask
3    counsel, when she has a chance, to give us
4    Exhibit 3.
5              What kind of media were you
6    going to provide to meet this obligation?
7         A.   I believe we were providing
8    mostly outdoor media and it was --  it was
9    mostly outdoor.
10        Q.   Is that the kind of media that
11   we just looked on the prior Exhibit 6, if
12   you could bring that before you.
13        A.   It is a combination of bus stop
14   shelters, phone booths, street pole
15   banners; probably limited to that, if I
16   recall.
17        Q.   And that media could be used by
18   the History Channel to promote its
19   programs, could it not?
20        A.   Some of it.
21        Q.   Were there restrictions in this
22   agreement that you recall on how much
23   could be used for that purpose?
24        A.   I believe there were, I am not
25   sure how many, but I think it refers to

1                    PERELLO
2  signed it?
3       A.      I did.
4       Q.      Go if you will to the first
5  page, 2.1, sponsorship fee.
6               Do you see that Universal
7  agreed to pay to New York City Marketing
8  $3 million?
9       A.      I do.
10      Q.       We will come back to this.
11              Let's go to Snapple.
12              MR. KOVNER: Exhibit 10 is a
13 copy of an agreement between New York City
14 Marketing and Snapple Beverage Corp..
15              (Clear Channel Exhibit 10,
16 agreement between New York City Marketing
17 and Snapple Beverage Corp.. , was marked
18 for identification, as of this date.)
19              (Witness perusing document.)
20      Q.      Do you recall that agreement?
21      A.      Yes.
22      Q.      Who negotiated for the city,
23 who negotiated this agreement for the
24 city?
25      A.      Myself with a lot of help.

1                    PERELLO
2       Q.      With help from whom?
3       A.      My staff, Law Department.
4       Q.      But it was New York City
Marketing Corporation as advised by the
Law Department?
7       A.      Yes.
8       Q.      Did you sign it?
9       A.      Yes.
10      Q.      And that's your signature on
page 28?
12      A.      I believe it is.
13              (Witness perusing document.)
14      A.      Yes, it is.
15      Q.      Turn if you would to page 4,
paragraph 4, little I, including little I,
and take a moment to read the provisions
of 4, little 1, little 2, but don't go
over to A through C.
20              (Witness perusing document.)
21      A.      Yes.
22      Q.      In little 1, the city is
obligated to provide 4.5 million in year
1, 6 million in year 2 and 7.5 million in
year 3 of city-owned and controlled

1                    PERELLO
2    physical media, including bus stop
3    shelters, street furniture, street
4    banners, signage on city-owned or
5    controlled real estate or personal
6    property.
7               Do you recall that clause.
8        A.     Yes.
9        Q.     Was the principal manner in
10   which the city began to meet and met its
11   obligations to Snapple under this
12   agreement through the provision of public
13   service announcements or similar
14   announcements on advertising space on bus
15   stop shelters and phone kiosks, et cetera?
16       A.     Yes.
17       Q.     Did that include street banners
18   as well?
19       A.     Yes.
20       Q.     This clause references signage
21   on city-owned or controlled real and
22   personal property as distinguished, do you
23   see that at the beginning of little 1,
24   from bus stop shelters, street furniture
25   and street banners.