# EXHIBIT 10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
Civil Action No. 06 Civ. 8193(PAC)(DF)
-----------------------------------x
CLEAR CHANNEL OUTDOOR, INC.,
                Plaintiff,
   - against -
THE CITY OF NEW YORK and PATRICIA J.
LANCASTER, in her official capacity as
Commissioner of the New York City
Department of Buildings,
                  Defendants.
----------------------------------------x
Civil Action No. 06 Civ. 8219(PAC)(DF)
----------------------------------------x
ATLANTIC OUTDOOR ADVERTISING, INC., SCENIC
OUTDOOR, INC., TROYSTAR CORPORATION and
WILLOW MEDIA, L.L.C,
                Plaintiffs,
        -against-
CITY OF NEW YORK, PATRICIA J. LANCASTER,
and EDWARD FORTIER,
                Defendants.
-----------------------------------x
           March 11, 2008
           1:50 p.m.

        Deposition of DANIEL DOCTOROFF,
pursuant to Notice, held at the offices of

Davis Wright Tremaine LLP, 1633 Broadway,

New York, New York, before Jineen Pavesi,

a Registered Professional Reporter,

Registered Merit Reporter, Certified

Realtime Reporter and Notary Public of the

State of New York.

VERITEXT NEW YORK REPORTING COMPANY
212-267-6868    www.veritext.com    516-608-2400
365fe738-e84a-41ed-ab10-7da579cc27d5

```
1              DOCTOROFF
2      Q.    On the assumption I am accurate
3  in saying there were a number of signs
4  under different agencies along arterials,
5  you wouldn't doubt that that would be
6  violative of the city's laws?
7      A.    I have no idea, because I can't
8  tell you what the city's laws say, whether
9  the city's laws only apply to private
10 property as opposed to private and public
11 property.
12     Q.    Are you aware as to the general
13 thrust of this litigation?
14     A.    Not really.
15     Q.    Clear Channel and other
16 plaintiffs are challenging the city's ban
17 on arterial signs in commercial and
18 manufacturing areas only.
19           They are not challenging the
20 outright ban in residential zones or in
21 park zones.
22           Do you feel the same way in
23 terms of what you like as to arterial
24 signs about signs in commercial and
25 manufacturing areas as you do in
```

```
1              DOCTOROFF
2  residential and park areas?
3      A.    I don't like them anywhere,
4  that's just a matter of personal
5  preference, that is not a statement of
6  opinion about the law, I just don't like
7  them.
8      Q.    And they are, I guess among
9  other things, aesthetically displeasing to
10 you?
11     A.    I believe they clutter of the
12 landscape, yes.
13     Q.    Is the clutter factor as
14 troublesome to you in manufacturing
15 districts, for example, as opposed to park
16 districts or are they equally troubling to
17 you?
18     A.    I would say they are more
19 troubling in park districts than in
20 manufacturing districts, but generally
21 troubling -- we're talking highway signs
22 -- under all circumstances.
23     Q.    But you are aware, are you not,
24 that the term arterial highways under the
25 city zoning code applies to more than what
```

```
1              DOCTOROFF
2  the layperson would describe as highway?
3      A.    Yes.
4            I, for example, in the
5  commercial districts in the core of
6  Manhattan was strongly opposed to the
7  signs on sidewalk sheds, the signs that
8  are hung from the sides of buildings.
9            So overall I have serious
10 reservations about large signs, other than
11 in specifically designated areas like
12 Times Square.
13     Q.    Do you have the same feeling
14 about advertising signs on bus shelters?
15     A.    No.
16     Q.    And on phone kiosks?
17     A.    I think there are too many
18 signs on phone kiosks and in fact shortly
19 before I left I encouraged the Buildings
20 Department and the Law Department and
21 DOITT, because they were responsible for
22 the phone kiosks, to review the city's
23 policy, particularly as it pertains to
24 what would happen upon the termination of
25 those contracts, which was largely going
```

```
1              DOCTOROFF
2  to be in 2010, with the idea of severely
3  limiting the number of phone kiosks,
4  despite the fact the city generates
5  substantial revenue from them.
6      Q.    Is there something about the
7  signs on the phone kiosks that are more
8  troubling to you?
9      A.    There are simply too many of
10 them; literally in many places in
11 Manhattan there are two or three on a
12 block and they were put there without any
13 real consideration for the need for the
14 phones or the appearance that would result
15 from their placement.
16     Q.    Let me finish the earlier
17 question and let me ask you to let me
18 finish the question.
19           Was there anything particular
20 on ad panels in phone kiosks that were
21 more troublesome to you than ad panels on
22 bus shelters?
23     A.    I simply felt there were too
24 many phone kiosks.
25     Q.    It is a volume issue only?
```

VERITEXT NEW YORK REPORTING COMPANY
212-267-6868       www.veritext.com       516-608-2400

365fe738-e84a-41ed-ab10-7da579cc27d5

Page 74

```
 1            DOCTOROFF
 2      A.   I don't think it was called
 3 that then; as you walk into the mayor's
 4 side of City Hall, it is directly at the
 5 end of the haul.
 6      Q.   Was Mr. Ricks there?
 7      A.   I don't remember.
 8      Q.   Mr. Perello was there?
 9      A.   Yes.
10      Q.   Mr. Schaps?
11      A.   Yes.
12      Q.   Do you know Mona Sehgal?
13      A.   No.
14      Q.   Do you know Edward Fortier?
15      A.   I do.
16      Q.   Was he there?
17      A.   I don't remember.
18      Q.   Did you take notes at the
19 meeting?
20      A.   No.
21      Q.   Did anyone?
22      A.   I don't know.
23      Q.   Who made the presentation, to
24 the best of your recollection?
25      A.   I think it was Richard Schaps.
```

Page 75

```
 1            DOCTOROFF
 2      Q.   What did he talk about?
 3      A.   I don't remember.
 4      Q.   Did he talk about billboards?
 5      A.   I don't remember.
 6      Q.   Did he talk about street
 7 furnishings?
 8      A.   I don't remember.
 9           It probably would have been one
10 of 60 meetings I would have had that week.
11      Q.   I would like to show you a
12 document previously marked as Clear
13 Channel Exhibit 30.
14           (Witness perusing document.)
15      Q.   I know many of those pictures
16 are not very legible, but does this appear
17 to be the presentation and PowerPoint that
18 was presented and distributed at the
19 meeting?
20      A.   I don't recall, other than the
21 fact on appendix D it says PowerPoint
22 presentation made by Van Wagner
23 communications to Deputy Mayor Doctoroff
24 and staff.
25           I don't remember the
```

Page 76

```
 1            DOCTOROFF
 2 presentation, but I assume this was the
 3 presentation given the label.
 4      Q.   Was the PowerPoint projected on
 5 a screen?
 6      A.   Yes.
 7      Q.   Let's go to page Bates numbered
 8 1501, which reads, "The problem; New
 9 York's arterial highways and streets are
10 cluttered with illegal advertising
11 signage."
12           Does that heading refresh your
13 recollection as to whether that was one of
14 the subjects of the presentation discussed
15 at the meeting?
16      A.   It does not refresh my
17 recollection as much as the e-mail that
18 you showed me before which said that was
19 one of the topics that was going to be
20 discussed.
21      Q.   In the first paragraph, the
22 final two sentences read, "More than $50
23 million was spent on the legal New York
24 City outdoor media in 2005.  If New York
25 City laws had been enforced, a significant
```

Page 77

```
 1            DOCTOROFF
 2 portion of that money could have been
 3 spent on forms of outdoor advertising that
 4 provide revenue for the city such as the
 5 street furniture program."
 6           Do you see that?
 7      A.   I do.
 8      Q.   Do you recall that point being
 9 made?
10      A.   I do recall the point being
11 made and I also recall that to me that
12 point was irrelevant, that I was never
13 motivated at any time in my thinking about
14 billboards and policies related to illegal
15 billboards or arterial highway signs by
16 considerations of money, it was only by
17 considerations of aesthetics.
18           There was never a confluence --
19 there never was expressed, certainly not
20 in my presence, a connection between
21 reducing any form of signage in order to
22 increase the value of the street furniture
23 franchise.
24      Q.   When that point was made, did
25 you disabuse Mr. Schaps or the other Van
```

20 (Pages 74 to 77)

Page 78

DOCTOROFF
1
2 Wagner representatives of their thinking?
3     A.    I don't think so, but that
4 wouldn't be unusual, they were in to make
5 a point and I felt little need I'm sure to
6 rebut it.
7     Q.    Assuming that your testimony is
8 accurate, and I don't begin to suggest the
9 contrary, that it was simply not a factor
10 in your thinking or the city's policies,
11 namely the increase of revenue, was it
12 nonetheless accurate to say that if
13 hundreds of outdoor billboards came down
14 it would somewhat increase the value of
15 other advertising?
16     A.    I don't believe that is the
17 case for the reasons that I expressed
18 earlier.
19         I have always viewed the
20 billboard market and the street furniture
21 market for advertisers, whether it is
22 right or wrong I don't know, but to be
23 different markets, one for motorists and
24 their passengers and one for pedestrians.
25         So I don't ever even remember

Page 79

DOCTOROFF
1
2 thinking about the connection between the
3 two.
4     Q.    But you do remember that he
5 made the point?
6     A.    Yes.
7     Q.    You also -- perhaps I am
8 wrong, I don't want to mischaracterize
9 your testimony -- I thought you did
10 testify that as you looked at outdoor
11 advertising generally, that you would
12 agree that there were many advertisers
13 that chose to advertise both on billboards
14 and on shelters --
15     A.    But that's not relevant in my
16 view.
17         The fact that an advertiser
18 might choose to advertise on a billboard
19 and on street furniture doesn't mean that
20 if you didn't advertise on one you would
21 spend more on another because you're
22 trying to reach different people with
23 different media.
24         Just like you would say, well,
25 you know, if I don't advertise on TV I'm

Page 80

DOCTOROFF
1
2 going to spend more.
3         They serve very different
4 purposes in my mind, so I don't
5 acknowledge that he even for companies
6 that would advertise on both, that a
7 decline in one would result in an increase
8 in another.
9     Q.    Let's take some sample
10 advertisers, for example.
11         Soon-to-be-released motion
12 pictures, automobiles, beer --
13     A.    No, I acknowledge that there
14 are some advertisers that would advertise
15 on both, that also advertise on TV and
16 advertise on the radio and advertise in
17 magazines and newspapers and on the
18 Internet.
19         What I don't acknowledge is
20 that a reduction in spending on one leads
21 to an increase in spending on the rest for
22 any specific form of advertising.
23     Q.    Let's change increase in
24 spending in your sentence to increase in
25 demand.

Page 81

DOCTOROFF
1
2     A.    I don't think that's the case,
3 because they serve different purposes.
4     Q.    What are the differences in
5 those purposes?
6     A.    Different sets of people,
7 different targets, different demographics,
8 different experiences.
9         The experience of walking by
10 something is a very different experience
11 than what you experience driving by
12 something and I just don't believe they
13 think of them as substitutable.
14     Q.    But for the advertiser who
15 wants to promote the motion picture or the
16 beer or the new automobile, what's the
17 different purpose that is achieved --
18     A.    It is not the different
19 purpose, it is the different audience and
20 different experience of seeing the
21 advertisement.
22     Q.    Did you understand that Van
23 Wagner's billboards were largely legal tap
24 meeting?
25     A.    As I reflect on the meeting, I

21 (Pages 78 to 81)

VERITEXT NEW YORK REPORTING COMPANY
212-267-6868    www.veritext.com    516-608-2400
365fe738-e84a-41ed-ab10-7da579cc27d5

Page 86

```
           DOCTOROFF
1
2    the second page he sent ccs of this letter
3    to the Commissioner of Buildings and two
4    of its senior employees responsible for
5    sign enforcement, Mona Sehgal and Edward
6    Fortier, did you not?
7        A.     I just noticed that.
8        Q.     Having granted a meeting to
9    him where he made his presentation with
10   which you disagreed in part and then he
11   follows with a letter to you --
12       A.     When you say I disagree, let me
13   just interrupt.
14       I am not saying I disagreed in
15   the meeting, I didn't say I disagreed with
16   the intent.
17       He and I may have had different
18   motives, I do disagree with some of the
19   assertions that he made about my motives,
20   but not necessarily about my intent.
21       Q.     Let's go back just to clarify
22   that, go back to Exhibit 30 and if you
23   would go to page 11501.
24       (Witness complying.)
25       Q.     The last sentence of the first
```

Page 87

```
           DOCTOROFF
1
2    paragraph, "If New York City laws had been
3    enforced, a significant portion of that
4    money could have been spent on forms of
5    outdoor advertising that provide revenue
6    for the city such as the street furniture
7    program."
8        Is it your testimony that that
9    statement is accurate but did not reflect
10   your view?
11       A.     No, I hadn't even conceded that
12   it is accurate.
13       What I think I have tried to
14   say a couple of times is that I believe
15   outdoor advertising, billboards, and
16   street furniture and other related city
17   assets are not related, that revenues from
18   one, shifting of revenues from one, does
19   not -- decrease in revenues from one does
20   not translate an increase in revenues from
21   the other.
22       Q.     So it is true you disagree at
23   least in part with statements that he made
24   during his presentation?
25       A.     No, I didn't say -- I didn't
```

Page 88

```
           DOCTOROFF
1
2    say anything at the meeting.
3        Q.     I am not saying you said
4    anything, but I thought you testified you
5    listened and disagreed, albeit privately,
6    with this point?
7        A.     I don't know if I did or
8    didn't, but I never believed there was a
9    connection between the two.
10       So I never conceded that as a
11   matter of fact an elimination of
12   advertising on illegal outdoor signs would
13   result in an increase in advertising
14   revenue from the street furniture program.
15       Q.     To that extent at least you
16   disagreed with Mr. Schaps' presentation?
17       A.     I do disagree; I can't tell you
18   I disagreed to him.
19       Q.     I am not saying that you said
20   it, but you disagreed at the time you
21   heard it?
22       A.     I would have disagreed at that
23   time.
24       But I will also say that it was
25   never a consideration in our development
```

Page 89

```
           DOCTOROFF
1
2    of a policy with respect to outdoor
3    advertising.
4        Q.     Now let me go back to Exhibit
5    31, which is now a couple of days later
6    when you receive it following the meeting.
7        Isn't he making the same point
8    in the last sentence with which you
9    disagreed at the time?
10       A.     Yes, but I just said I probably
11   didn't say anything about it at the
12   meeting.
13       Q.     I understand that.
14       My question is, now you
15   learned, did you not, that he was sending
16   a copy of this letter confirming his
17   understanding, as he saw it, to your
18   senior officials responsible in this area.
19       A.     He probably would have said the
20   same thing in the same meeting assuming
21   they were there, so it certainly couldn't
22   have been any surprise to them.
23       Q.     Did you express your
24   disagreement on this subject to either
25   Commissioner Lancaster, Mona Sehgal,
```

23  (Pages 86 to 89)

Page 90

```
 1           DOCTOROFF
 2  Edward Fortier, or anyone else at the
 3  Buildings Department?
 4      A.   I don't believe I did.
 5      Q.   To anyone else in the city
 6  government?
 7      A.   I don't recall.
 8      Q.   I would like to show the
 9  witness Exhibit 32 previously marked.
10           (Witness perusing document.)
11      Q.   This is two e-mails in later
12  July and neither of which are to you.
13      A.   Yes.
14      Q.   The lower and earlier one is
15  from Mr. Schaps to Commissioner Lancaster;
16  can you read that lower one.
17      A.   Yes.
18           (Witness perusing document.)
19      Q.   Is it true that Edward Fortier
20  or Mona Sehgal, or responsible officials
21  at the Buildings Department, were present
22  at the meeting at your invitation?
23      A.   I don't know.
24      Q.   In the top e-mail, at the top
25  of the page, Mona Sehgal says to
```

Page 91

```
 1           DOCTOROFF
 2  Commissioner Lancaster, "Ed," meaning
 3  Fortier and "Phyllis," meaning Arnold,
 4  "have had numerous discussions and
 5  meetings with Van Wagner since 2001."
 6           Did you know that in 2006?
 7      A.   I don't know.
 8      Q.   I would like to show the
 9  witness Exhibit No. 15 previously marked.
10           This is a letter from
11  Mr. Pretsfelder, counsel to Van Wagner, to
12  Mr. Fortier dated July 27, 2006, showing
13  you as a copy.
14           Have you seen Exhibit 15
15  before?
16           (Witness perusing document.)
17      A.   Yes.
18      Q.   Did you review it at the time
19  you received it?
20      A.   I skimmed it.
21      Q.   In the third paragraph
22  Mr. Pretsfelder says to Mr. Fortier, "To
23  help you in this process and pursuant to
24  your request, we have enclosed a list of
25  the top media-buying agencies and contacts
```

Page 92

```
 1           DOCTOROFF
 2  at those agencies to whom we think the
 3  city's initial educational efforts should
 4  be directed."
 5           Were you aware that Mr. Fortier
 6  had requested of Van Wagner a list of the
 7  media-buying agencies with a view to
 8  having the city contact them?
 9      A.   No, but if I had been, I would
10  have applauded it.
11      Q.   You would have applauded it?
12      A.   Sure, we were very interested
13  in insuring that we eliminate the illegal
14  signs.
15           And, as I said before, the mere
16  fact that we and Van Wagner saw the
17  purpose of enforcement to be different
18  doesn't mean that we were not in agreement
19  with the goal of eliminating illegal signs
20  and were prepared to look at ways of doing
21  that.
22      Q.   And so their proposal that the
23  city write directly to the media ad
24  agencies had your approval?
25      A.   I can't say it had my approval,
```

Page 93

```
 1           DOCTOROFF
 2  I don't remember weighing in specifically,
 3  I would have left that to Buildings to
 4  determine whether it was appropriate,
 5  legal, or whatever.
 6           But if they determined that it
 7  was going to be effective in achieving our
 8  objective, then I would have generally
 9  applauded it.
10      Q.   Did you read the draft letter
11  to ad agencies that was attached to this
12  letter?
13      A.   No.
14      Q.   I would like the witness to
15  have an opportunity to review Exhibit 140.
16           (Witness perusing document.)
17      Q.   This is an e-mail in October
18  '06 relating to a meeting with Mike
19  McKeehan and Van Wagner and it says that
20  "the required attendees are Elizabeth
21  Weinstein and Edward Fortier."
22           Who was Elizabeth Weinstein?
23      A.   She was a senior policy advisor
24  who worked for me in the Mayor's Office of
25  Operations and was responsible for me for
```

24 (Pages 90 to 93)