# EXHIBIT 13

# FRANCHISE AGREEMENT

between

## THE CITY OF NEW YORK

and

## CEMUSA, INC.

### Coordinated Street Furniture Franchise

Dated: 05/19/06



2006 - 001096

NYC007667

NYC007667

# TABLE OF CONTENTS

Page #

SECTION 1        DEFINED TERMS ................................................................................2

SECTION 2        GRANT OF AUTHORITY .....................................................................8
2.1.        Term. ........................................................................................................ 8
2.2.        Submissions By Company. ....................................................................... 8
2.3.        Certain Actions by the Company after the Effective Date. .................... 9
2.4.        Nature of Franchise; Effect of Termination. .......................................... 9
            2.4.1.    Nature of Franchise. ................................................................. 9
            2.4.2.    Ownership. ............................................................................... 9
            2.4.3.    Warranties of Title. ................................................................ 12
            2.4.4.    Permits, Authorizations, Approvals, Consents and Licenses. ... 12
            2.4.5.    Design of Coordinated Franchise Structures. ........................ 12
            2.4.6.    Build out and Costs. ............................................................... 14
            2.4.7.    Effect of Expiration or Termination. ..................................... 18
2.5.        Conditions and Limitations on Franchise. .............................................. 18
            2.5.1.    Not Exclusive. ....................................................................... 18
            2.5.2.    Sidewalk and Historic Pavement. .......................................... 19
            2.5.3.    Location of Coordinated Franchise Structures. ...................... 19
            2.5.4.    Removal, Replacement, Relocation, Reinstallation............... 20
            2.5.5.    No Waiver. .............................................................................. 21
            2.5.6.    No Release. ............................................................................. 21
2.6.        Other Structures. ..................................................................................... 21

SECTION 3        SERVICE..............................................................................................23
3.1.        Operations. .............................................................................................. 23
            3.1.1.    Bus Shelters. ........................................................................... 23
            3.1.2.    APTs. ...................................................................................... 23
            3.1.3.    PSSs. ....................................................................................... 24
            3.1.4.    Newsstands. ............................................................................ 24
            3.1.5.    Other. ...................................................................................... 25
3.2.        Automatic Vehicle Location and Control System. ................................. 26
3.3.        Electronic Inventory and Management Information System and
            Recordkeeping. ....................................................................................... 27
3.4.        Performance Standards and Corrective Actions. .................................... 28
3.5.        Complaint Handling Procedures. ............................................................ 29
3.6.        Complaint Record Keeping. .................................................................... 30
3.7.        Americans with Disabilities Act. ............................................................ 30
3.8.        No Discrimination. .................................................................................. 30
3.9.        Continuity of Service. ............................................................................. 30

SECTION 4        ADVERTISING.....................................................................................30
4.1.        Introduction. ............................................................................................ 30
4.2.        Defined Terms. ........................................................................................ 31
4.3.        Advertising Specifications. ..................................................................... 32
            4.3.1.    Generally. ............................................................................... 32
            4.3.2.    Dimensions/Specifications. .................................................... 32

NYC007668

NYC007668

|   | | | Page # |
|---|---|---|---|
| | 4.4. | Restrictions. | 32 |
| | 4.4.1. | Prohibitions. | 32 |
| | 4.4.2. | Other Media. | 32 |
| | 4.4.3. | Viacom Outdoor Agreement. | 32 |
| | 4.4.4. | Public Service Advertising. | 33 |
| | 4.4.5. | NYCMDC Advertising. | 33 |
| | 4.4.6. | New Structures, Return, Other. | 33 |
| | 4.4.7. | Alternative Compensation. | 33 |
| | 4.4.8. | Olympics. | 35 |
| | 4.4.9. | Removal. | 35 |
| | 4.5. | Maintenance of Advertising. | 35 |
| | 4.6. | Future Compliance. | 35 |
| | 4.7. | Change in Local Law. | 36 |
| SECTION 5 | | CONSTRUCTION AND TECHNICAL REQUIREMENTS | 37 |
| | 5.1. | General Requirements. | 37 |
| | 5.2. | Identification of Coordinated Franchise Structure. | 37 |
| | 5.3. | Quality. | 37 |
| | 5.4. | Structures. | 37 |
| | 5.5. | No Obstruction. | 37 |
| | 5.6. | Safety Precautions. | 38 |
| | 5.7. | Power Outages. | 38 |
| SECTION 6 | | SECURITY FUND | 38 |
| | 6.1. | General Requirement. | 38 |
| | 6.2. | Scope of Security Fund. | 38 |
| | 6.3. | Security Fund Purposes. | 39 |
| | 6.4. | Withdrawals From or Claims Under the Security Fund. | 39 |
| | 6.5. | Use. | 39 |
| | 6.6. | Notice of Withdrawals. | 39 |
| | 6.7. | Replenishment. | 39 |
| | 6.8. | Not a Limit on Liability. | 40 |
| SECTION 7 | | PERFORMANCE BOND AND LETTER OF CREDIT. | 40 |
| | 7.1. | General Requirement. | 40 |
| | 7.2. | Form. | 40 |
| | 7.3. | Scope. | 41 |
| | 7.4. | Letter of Credit Reduction. | 42 |
| | 7.5. | Drawdown Against the Letter of Credit. | 42 |
| | 7.6. | Use. | 42 |
| | 7.7. | Notice of Drawdown. | 43 |
| | 7.8. | Replenishment. | 43 |
| | 7.9. | Not a Limit on Liability. | 43 |
| | 7.10. | Cancellation Upon Replacement. | 44 |
| SECTION 8 | | EMPLOYMENT AND PURCHASING. | 44 |
| | 8.1. | Right to Bargain Collectively. | 44 |

- ii -

NYC007669
NYC007669

|  |  | Page # |
|---|---|---|
| 8.2. | Local Opportunities. | 45 |
| 8.3. | Obligation to Use Domestic and Local Contractors and Subcontractors | 45 |
| 8.4. | No Discrimination | 45 |
| SECTION 9 | COMPENSATION AND OTHER PAYMENTS | 45 |
| 9.1. | Defined Terms. | 45 |
| 9.2. | Compensation. | 45 |
| 9.3. | Advance Payment. | 47 |
| 9.4. | Alternative Compensation Planning. | 47 |
| 9.4.1. | Valuation of Alternative Compensation. | 48 |
| 9.4.2. | Exchanging Markets; Less Than 100% Penetration. | 49 |
| 9.4.3. | Alternative Compensation Content. | 50 |
| 9.4.4. | No Carryover; No Cash Conversion. | 50 |
| 9.4.5. | Adjustments to Alternative Compensation Under Section 9.2. | 51 |
| 9.5. | Payments. | 51 |
| 9.6. | Revisions to Franchise Fee. | 51 |
| 9.6.1. | PSS. | 53 |
| 9.6.2. | NYCMDC Advertising/Public Service Advertising. | 53 |
| 9.6.3. | Scrollers. | 53 |
| 9.6.4. | Olympics. | 53 |
| 9.7. | Credits. | 53 |
| 9.7.1. | Bus Shelters. | 53 |
| 9.7.2. | New Bus Shelters. | 53 |
| 9.7.3. | Newsstands. | 54 |
| 9.7.4. | Cash Option. | 54 |
| 9.7.5. | Cash or Alternative Compensation Set-Off. | 54 |
| 9.7.6. | Inability to Mutually Designate Coordinated Franchise Structures For Reversion. | 55 |
| 9.7.7. | Absence of Identified Locations. | 55 |
| 9.7.8. | No Default. | 55 |
| 9.7.9. | Performance at the Cost of the City. | 55 |
| 9.8. | Reports and Records. | 55 |
| 9.8.1. | Monthly. | 56 |
| 9.8.2. | Quarterly. | 56 |
| 9.8.3. | Yearly. | 56 |
| 9.8.4. | Third Party Agreements. | 56 |
| 9.8.5. | Access to Third Party Agreements. | 56 |
| 9.9. | Reservation of Rights. | 56 |
| 9.10. | Other Payments. | 56 |
| 9.10.1. | City Incurred Cost. | 56 |
| 9.10.2. | Future Costs. | 56 |
| 9.11. | Limitations on Credits or Deductions. | 57 |
| 9.12. | Interest on Late Payments. | 57 |
| 9.13. | Method of Payment. | 58 |
| 9.14. | Report Certification. | 58 |
| 9.15. | Continuing Obligation and Holdover. | 58 |

- iii -

NYC007670

NYC007670

|  |  | Page # |
|---|---|---|
| 9.16. | Energy Costs. | 59 |
| 9.17. | Amenities. | 59 |
| SECTION 10 | OVERSIGHT AND REGULATION | 59 |
| 10.1. | Confidentiality. | 59 |
| 10.2. | Oversight. | 59 |
| 10.3. | State-of-the-Art. | 60 |
| 10.4. | Regulation by City. | 60 |
| 10.5. | Office in New York City. | 60 |
| 10.6. | Reports. | 60 |
| 10.6.1. | Financial Reports. | 60 |
| 10.6.2. | Other Reports. | 60 |
| 10.6.3. | Guarantor Financials Statements. | 61 |
| 10.7. | Books and Reports/Audits. | 61 |
| 10.7.1. | Books and Records. | 61 |
| 10.7.2. | Right of Inspection. | 61 |
| 10.8. | Compliance with "Investigations Clause". | 61 |
| SECTION 11 | RESTRICTION AGAINST ASSIGNMENT AND OTHER TRANSFERS | 62 |
| 11.1. | Transfer of Interest. | 62 |
| 11.2. | Transfer of Control or Ownership. | 62 |
| 11.3. | Petition. | 62 |
| 11.4. | Consideration of the Petition. | 63 |
| 11.5. | Permitted Encumbrances. | 63 |
| 11.6. | Subcontracts. | 63 |
| 11.7. | Consent Not a Waiver. | 64 |
| SECTION 12 | LIABILITY AND INSURANCE | 64 |
| 12.1. | Liability and Indemnity. | 64 |
| 12.1.1. | Company. | 64 |
| 12.1.2. | City. | 64 |
| 12.1.3. | No Liability for Public Work, Etc. | 64 |
| 12.1.4. | No Liability for Damages. | 65 |
| 12.1.5. | Defense of Claim, Etc. | 65 |
| 12.1.6. | Intellectual Property Indemnification. | 65 |
| 12.1.7. | No Claims Against Officers, Employees, or Agents. | 66 |
| 12.2. | Insurance. | 66 |
| 12.2.1. | Types of Insurance. | 66 |
| 12.2.2. | General Requirements for Insurance Policies. | 68 |
| 12.2.3. | Proof of Insurance. | 69 |
| 12.2.4. | Operations of the Company. | 69 |
| 12.2.5. | Subcontractor Insurance. | 70 |
| 12.2.6. | Insurance Notices, Filings, Submissions. | 70 |
| 12.2.7. | Disposal. | 70 |
| 12.2.8. | Adjusted Insurance Coverage. | 71 |
| 12.2.9. | Other Remedies. | 71 |

NYC007671

NYC007671

Page #

SECTION 13    DEFAULTS AND REMEDIES; TERMINATION...................................71
    13.1.    Defaults.........................................................................................71
    13.2.    Termination Defaults. .................................................................73
        13.2.1.   Definition of Termination Default. .........................73
    13.3.    Expiration and Termination for Reasons Other Than Termination
        Default...........................................................................................76
    13.4.    Disposition of System. ................................................................77
        13.4.1.   Expiration. .................................................................77
        13.4.2.   After Termination Upon Termination Default............77
        13.4.3.   After Termination For Reason Other Than A Termination
            Default. .......................................................................77
    13.5.    Effect of Expiration or Termination. ..........................................77
    13.6.    Procedures for Transfer After Expiration or Termination. ..........78
    13.7.    Removal Upon Expiration or Termination. .................................78
        13.7.1.   Removal Procedures. .................................................78
        13.7.2.   Failure to Commence or Complete Removal. .............79
        13.7.3.   No Condemnation. .....................................................79
        13.7.4.   Other Provisions........................................................79

SECTION 14    MISCELLANEOUS ...................................................................79
    14.1.    Appendices, Exhibits, Schedules. ...............................................79
    14.2.    Order of Governance....................................................................80
    14.3.    Coordination. ..............................................................................80
    14.4.    Publicity. .....................................................................................80
    14.5.    Notices. .......................................................................................80
    14.6.    General Representations, Warranties and Covenants of the Company. ... 81
        14.6.1.   Organization, Standing and Power. ..........................81
        14.6.2.   Authorization: Non-Contravention. ..........................81
        14.6.3.   Fees. ...........................................................................82
        14.6.4.   Criminal Acts Representation. ...................................82
        14.6.5.   Criminal Acts Covenant. ...........................................82
        14.6.6.   Relationship with the City. ........................................83
        14.6.7.   Misrepresentation.......................................................83
    14.7.    Binding Effect..............................................................................83
    14.8.    Comptroller Rights.......................................................................83
    14.9.    Remedies......................................................................................83
    14.10.   No Waiver: Cumulative Remedies. .............................................83
    14.11.   Partial Invalidity..........................................................................84
    14.12.   Survival.......................................................................................84
    14.13.   Headings and Construction..........................................................84
    14.14.   No Subsidy...................................................................................85
    14.15.   No Agency....................................................................................85
    14.16.   Governing Law.............................................................................85
    14.17.   Survival of Representations and Warranties.................................85
    14.18.   Claims Under Agreement. ...........................................................85
    14.19.   Modification.................................................................................86
    14.20.   Service of Process. ......................................................................86

NYC007672
NYC007672

                                                                    Page #

14.21.        Compliance With Certain City Requirements. ...................................... 86
14.22.        Compliance With Law, Licenses. .......................................................... 86
14.23.        Mitigation. .............................................................................................. 86
14.24.        Force Majeure and Other Excused Failure to Perform. ..................... 86
14.25.        Counterparts. .......................................................................................... 87

APPENDIX A       LIQUIDATED DAMAGES
APPENDIX B       NEW NEWSSTAND COSTS
APPENDIX C       MAINTENANCE, INSPECTION AND REPAIR SCHEDULE
APPENDIX D       ADVERTISING DIMENSIONS/SPECIFICATIONS
APPENDIX E       CERTAIN COMPANY INFORMATION
APPENDIX F       MACBRIDE PRINCIPLES
APPENDIX G       INSTALLATION, REPLACEMENT AND REMOVAL

EXHIBIT A        CITY COUNCIL AUTHORIZING RESOLUTION NP.1004
EXHIBIT B        RFP
EXHIBIT C        PROPOSAL
EXHIBIT D        BAFO
EXHIBIT E        16-123 NYC ADMINISTRATIVE CODE
EXHIBIT F        PERFORMANCE BOND FORM
EXHIBIT G        INVESTIGATIONS CLAUSE
EXHIBIT H        PUBLIC SERVICE ADVERTISING/NYCMDC ADVERTISING
EXHIBIT IA       PRE-BUILDOUT LETTER OF CREDIT
EXHIBIT IB       POST-BUILDOUT LETTER OF CREDIT
EXHIBIT J        GRIMSHAW AGREEMENT
EXHIBIT K        THE SIROKY GROUP INC LICENSE
EXHIBIT L        ESCROW AGREEMENT

SCHEDULE A       EXISTING BUS SHELTERS
SCHEDULE B       EXISTING NEWSSTANDS
SCHEDULE C       GUARANTEED MINIMUM; ALTERNATIVE COMPENSATION
SCHEDULE D       FRANCHISE FEE REVISIONS
SCHEDULE E       INSURANCE
SCHEDULE F       EXCEPTIONS SCHEDULE
SCHEDULE 4.7     CHANGE IN LOCAL LAW
SCHEDULE 7.4     LETTER OF CREDIT REDUCTION
SCHEDULE 9.2     COMPENSATION

NYC007673
NYC007673

## AGREEMENT

THIS AGREEMENT, executed as of the _19ᵗʰ_ day of _May_, 2006 by and between **THE CITY OF NEW YORK** (as defined in Section 1 hereof, the "City") acting by and through its **DEPARTMENT OF TRANSPORTATION** (as defined in Section 1 hereof, "DOT"), having an address at 40 Worth Street, New York, New York 10013, and **CEMUSA, INC.**, having a place of business at 420 Lexington Avenue, Suite 2533, New York, New York 10170 (as defined in Section 1 hereof, the "Company").

## WITNESSETH:

WHEREAS, pursuant to City Council Authorizing Resolution No. 1004 (passed by the New York City Council on August 19, 2003), attached as Exhibit A hereto, the DOT, on behalf of the City, has the authority to grant non-exclusive franchises for the occupation or use of the Inalienable Property of the City (as defined in Section 1 hereof, the "Inalienable Property of the City") for the installation, operation, and maintenance of Bus Shelters, APTs, and PSSs (as each is hereinafter defined) and for the installation and maintenance of Newsstands (as hereinafter defined) (Bus Shelters, APTs, PSSs and Newsstands are collectively referred to herein as "Coordinated Franchise Structures"), including renewals thereof; and

WHEREAS, DOT issued a Request for Proposals dated March 26, 2004, as modified by Addendum I, dated June 11, 2004, Addendum II, dated July 15, 2004, and Addendum III, dated August 18, 2004, (as defined in Section 1 hereof, the "RFP") inviting qualified entities to submit proposals for the design, construction, installation, operation and maintenance of Coordinated Franchise Structures on City streets to serve with a coordinated design the needs of residents of, and visitors to, the City; and

WHEREAS, the Company submitted to DOT its Proposal in response to the RFP; and

WHEREAS, DOT recommended the Company's Proposal based on its assessment that it was the most beneficial proposal in the interest of the City; and

WHEREAS, on May 11, 2006 the New York City Franchise and Concession Review Committee (as defined in Section 1 hereof, the "FCRC") held a public hearing on the proposed grant of a franchise to the Company for the installation, operation, and maintenance of Bus Shelters, APTs, and PSSs and for the installation and maintenance of Newsstands, and associated equipment on, over, and under the Inalienable Property of the City, which was a full public proceeding affording due process in compliance with the requirements of Chapter, 14 of the New York City Charter (the "Charter"); and

WHEREAS, the FCRC, at its duly constituted meeting held on May 15, 2006, and acting in accordance with its customary procedures, voted on and approved the grant to the Company of a franchise as contemplated by the RFP; and

WHEREAS, the potential environmental impacts of the action to be taken hereunder have been considered by the City and have been determined by the City to be fully consistent with those resulting from the Council's approval of the authorization of DOT to grant a nonexclusive

1444359-5/5/06

NYC007674
NYC007674

franchise for the installation, operation and maintenance of coordinated franchise structures, which include bus stop shelters, automatic public toilets, newsstands and other public service structures and Local Law 64 of 2003 (the newsstand legislation) which were reviewed and for which a negative declaration was issued finding that such actions will not result in any significant adverse environmental impacts, all in accordance with the New York State Environmental Quality Review Act ("SEQRA"), the regulations set forth in Title 6 of the New York Code of Rules and Regulations, Section 617 *et seq.*, the Rules of Procedure for City Environmental Quality Review ("CEQR") (Chapter 5 of Title 62 and Chapter 6 of Title 43 of the Rules of The City of New York).

NOW, THEREFORE, in consideration of the foregoing clauses, which clauses are hereby made a part of this Agreement, the mutual covenants and agreements herein contained, and other good and valuable consideration, the parties hereby covenant and agree as follows:

## SECTION 1

## DEFINED TERMS

For purposes of this Agreement, the following terms, phrases, words, and their derivatives shall have the meanings set forth in this Section, unless the context clearly indicates that another meaning is intended. In addition, all references to "install, operate and maintain," "installation, operation and maintenance," "install and maintain," "installation and maintenance," or any other variance therein, shall be deemed to include any construction, installation, operation, maintenance, repair, upgrading, renovation, removal, relocation, alteration, replacement or deactivation as appropriate, except that with respect to Newsstands, it shall not include operation.

1.1     "ADA" shall have the meaning given in Section 3.7 hereof.

1.2     "Affiliate" or "Affiliated Person" means each Person who falls into one or more of the following categories: (i) each Person having, directly or indirectly, a Controlling Interest in the Company; (ii) each Person in which the Company has directly or indirectly, a Controlling Interest; (iii) each executive officer, director or general partner or limited partner holding an interest of 10% or more in the Company; and (iv) each Person directly or indirectly, controlling, controlled by or under common Control with the Company; provided that "Affiliate" or "Affiliated Person" shall in no event mean the City, any limited partner holding an interest of less than 10% of the Company or any creditor of the Company solely by virtue of its status as a creditor and which is not otherwise an Affiliate or Affiliated Person.

1.3     "Agreement" means this agreement, together with the Appendices, Exhibits and Schedules attached hereto and all amendments or modifications thereof.

1.4     "APT(s)" means automatic public toilets installed or to be installed by the Company pursuant to this Agreement.

1.5     "Arbitrated Value" shall have the meaning given in Section 9.4.1(d) hereof.

NYC007675
NYC007675

1.6    "Art Commission" means the Art Commission of the City of New York, or any successor thereto.

1.7    "AVLC(s)" means automatic vehicle location and control systems.

1.8    "Bus Shelter(s)" means structures intended as bus stop shelters (including seating, if installed) which provide meaningful protection from precipitation, wind, and sun, consisting of New Bus Shelters and Existing Bus Shelters.

1.9    "BAFO" means the Company's Best and Final Offer dated June 27, 2005.

1.10    "Baseline In-Kind Value" shall have the meaning given in Section 9.4.1 hereof.

1.11    "Build Start Date" shall have the meaning given in Section 2.4.6 hereof.

1.12    "Cemusa In-Kind Market(s)" shall have the meaning given in Section 9.1(a) hereof.

1.13    "City" means the City of New York or, as appropriate in the case of specific provisions of this Agreement, any board, bureau, authority, agency, commission, department or any other entity of the City of New York, or any authorized officer, official, employee or agency thereof, or any successor thereto.

1.14    Intentionally Deleted.

1.15    "Commissioner" means the Commissioner of DOT, or his or her designee, or any successor in function to the Commissioner.

1.16    "Company" means CEMUSA, Inc., a Delaware corporation, whose principal place of business is located at 645 North Michigan Avenue, Suite 800, Chicago, Illinois 60611.

1.17    "Comptroller" means the Comptroller of the City, the Comptroller's designee, or any successor in function to the Comptroller.

1.18    "Control" or "Controlling Interest" in a Person, in the assets comprising the System, in the Company or in the franchise granted herein means working control in whatever manner exercised, including without limitation, working control through ownership, management, or negative control (provided, however that negative control shall not be interpreted to include negative covenants that may be set forth in financing documentation or similar provisions that may be set forth in financing documentation), as the case may be, of such Person, the assets comprising the System, the Company or the franchise granted herein. A rebuttable presumption of the existence of Control or a Controlling Interest in a Person, in the assets comprising the System, in the Company or in the franchise granted herein shall arise from the beneficial ownership, directly or indirectly, by any Person, or group of Persons acting in concert (other than underwriters during the period in which they are offering securities to the public), of 10% or more of such Person, the assets comprising the System, the Company or the franchise granted herein. "Control" or "Controlling Interest" as used herein may be held simultaneously by more than one Person or group of Persons.

NYC007676

NYC007676

1.19    "Coordinated Franchise Structure(s)" means Bus Shelters, APTs, PSSs and Newsstands and any associated equipment, wiring, and/or cables that are attached to such Coordinated Franchise Structures (other than any such associated equipment, wiring, and/or cables that are owned by third parties) and the advertising panels, installed on, over and under the Inalienable Property of the City.

1.20    "Curb" means a raised stone or concrete edging along the side of a roadway (or, where no such raised edging exists, the similar line of separation between those portions of the Inalienable Property of the City used primarily for pedestrian and sidewalk uses and those portions used primarily for vehicular and roadway use).

1.21    "Damages" shall have the meaning given in Section 12.1 hereof.

1.22    "DOT" or the "Department" means the Department of Transportation of the City, its designee, or any successor thereto.

1.23    "Effective Date" means the later of the date on which this Agreement has been registered with the Comptroller as provided in Sections 375 and 93.p. of the City Charter or the expiration of the 30-day notice period provided under the Viacom Outdoor Agreement to the current party thereto; provided, that the City agrees to give such notice under the Viacom Outdoor Agreement no later than the date this Agreement is registered with the Comptroller.

1.24    "Electronic Inventory and Management Information System" or "EIMIS" means the software which constitutes a computerized inventory system for the Coordinated Franchise Structures and sites as further set forth in the RFP and the Proposal that includes, but is not limited to (a) database, mapping, and graphic capabilities for recording the location (by borough and community district), type, design and features of all installed Coordinated Franchise Structures and the location, features, and status of proposed sites for Coordinated Franchise Structures including sites that have been rejected and (b) capacity for contemporaneous two-way information sharing between DOT and the Company regarding the design, construction, installation, operation, and maintenance of the Coordinated Franchise Structures.

1.25    "Estimated In-Kind Value" shall have the meaning given in Section 9.4.1 hereof.

1.26    "Escrow Agent" shall have the meaning given in Section 9.5 hereof.

1.27    "Event of Force Majeure" means a delay due to strike; war or act of war (whether an actual declaration of war is made or not); terrorism; insurrection; riot; injunction; fire, flood or similar act of providence; or other similar causes or events to the extent that such causes or events are beyond the control of the party claiming an Event of Force Majeure, provided in each case that such party has taken and continues to take all reasonable actions to avoid or mitigate such delay and provided that such party notifies the other party to this Agreement in writing of the occurrence of such delay within five (5) business days, or if not reasonably practicable, as soon thereafter as reasonably practicable, of the date upon which the party claiming an Event of Force Majeure learns or should have learned of its occurrence. A delay in a decision by a government entity, the approval of which is a condition to an occurrence, shall not constitute an "Event of Force Majeure" unless such delay is beyond the normal period in which such entity generally acts with respect to the type of decision being sought and only if the party claiming

NYC007677
NYC007677

Event of Force Majeure has taken and continues to take all reasonable steps to pursue such decision. In no event will a government entity's final decision relating to the Company, this Agreement or the System, whether positive or negative, once made constitute an Event of Force Majeure (the term "final decision" in this sentence shall refer to a decision with respect to which all available appeals have been exhausted or the time period for filing such appeals has expired). The financial incapacity of the Company shall not constitute an Event of Force Majeure.

1.28  "Existing Bus Shelters" means the existing Bus Shelters as currently set forth on Schedule A attached hereto, which schedule for purposes of this Agreement shall be updated and finalized on or about the Effective Date by DOT in order to reflect relocation and similar activity since the date of this Agreement.

1.29  "Existing Bus Shelter Replacement Schedule" shall have the meaning given in Section 2.4.6 hereof.

1.30  "Existing Newsstands" means the existing newsstands as currently set forth on Schedule B attached hereto, which schedule for purposes of this Agreement shall be updated and finalized on or about the Effective Date by the New York City Department of Consumer Affairs.

1.31  "FCRC" means the Franchise and Concession Review Committee of the City, or any successor thereto.

1.32  "Franchise Fees" means the fees paid by the Company to the City as set forth in Section 9 hereof.

1.33  "Guarantor" shall mean FCC Versia, S.A.

1.34  "Guaranty" shall have the meaning given in Section 2.2 hereof.

1.35  "Historic Districts" means those districts so designated by Landmarks.

1.36  "Inalienable Property of the City" means the property designated in Section 383 of the Charter of The City of New York.

1.37  "Indemnitees" shall have the meaning given in Section 12.1.1 hereof.

1.38  "Installation Date" shall have the meaning given in Sections 2.4.6 (e) and (f) hereof.

1.39  "Landmarks" shall mean the Landmarks Preservation Commission of the City of New York, or any successor thereto.

1.40  "L/C Replenishment Period" shall have the meaning given in Section 7.8 hereof.

1.41  "Letter of Credit" shall have the meaning given in Section 7.1 hereof.

1.42  "Mayor" means the chief executive officer of the City or any designee thereof.

1.43  "Media Plan" shall have the meaning given in Section 9.4(a) hereof.

-5-

NYC007678
NYC007678

1.44 "New Bus Shelter(s)" means bus shelters installed or to be installed by the Company in conformity with the Plans and Specifications, which replace Existing Bus Shelters or are placed at DOT's request at other locations, as contemplated in this Agreement.

1.45 "New Newsstand" means a Newsstand which is not a Replacement Newsstand as defined in Local Law 64 for the year 2003.

1.46 "New Newsstand Operator" means an individual who holds a valid newsstand license from The New York City Department of Consumer Affairs and operates or will operate a New Newsstand in the City.

1.47 "Newsstand(s)" means structures intended for selling and displaying newspapers, periodicals and convenience items installed or to be installed by the Company pursuant to this Agreement.

1.48 "Newsstand Operator(s)" means an individual who holds a valid newsstand license from The New York City Department of Consumer Affairs and operates a Newsstand in the City.

1.49 "NYCMDC" means the New York City Marketing Development Corporation, or successor thereto, acting as agent for the City. If there is no successor to NYCMDC, then DOT shall be deemed the successor thereto for purposes of this Agreement. As agent for the City all obligations of NYCMDC under this Agreement shall be binding on and enforceable against the City, and all benefits to NYCMDC under this Agreement shall accrue to, and be enforceable by, the City.

1.50 "Other Affected Property" shall have meaning given in Section 13.6.1 hereof.

1.51 "Performance Bond" shall have the meaning given in Section 7.1 hereof.

1.52 "Person" means any natural person or any association, firm; partnership, joint venture, corporation, or other legally recognized entity, whether for profit or not for profit, but shall not mean the City.

1.53 "Plans and Specifications" shall mean the plans, specifications, and designs for the Coordinated Franchise Structures (other than the Existing Bus Shelters) to be installed by the Company pursuant to this Agreement, as approved by the Art Commission and Landmarks to the extent required by law and accepted by DOT, as may be modified from time to time pursuant to this Agreement, and all rights of copyright, patent, trademark, service mark, trade dress, and all other intellectual property rights of any kind arising out of, relating to, or embodied or incorporated in the Coordinated Franchise Structures; any reports, documents, data, drawings, sketches, mockups, models, photographs, images, and/or other materials of any kind and in any medium produced pursuant to this Agreement related to the design, structure and physical appearance of the Coordinated Franchise Structures, and any and all drafts and/or other preliminary materials in any format or medium related to such items. Nothing contained herein shall be construed as entitling the City to assert ownership rights or the licensed rights set forth in Sections 2.4.2 or 2.6 in any word marks or logos of the Company or its licensors.

NYC007679
NYC007679

1.54  "Post Term System" shall have the meaning given in Section 13.6 hereof.

1.55  "PSS(s)" means public service structures such as trash receptacles, multi-rack news racks and information/computer kiosks that provide access to government or commercial activity (provided, however, that no internet connectivity shall be permitted) to be installed by the Company pursuant to this Agreement.

1.56  "Preliminary Plans and Specifications" means the plans and specifications and designs for the "New York City Line" of the Coordinated Franchise Structures, presented in the BAFO as the "Grimshaw 5" line, and shall include all modifications, improvements and further developments as may be required for presentation to the Art Commission and Landmarks.

1.57  "Privileged Information" shall mean attorney-client communications or attorney work product entitled to privilege under New York State law.

1.58  "Proposal" means the proposal dated September 14, 2004, the Response to Follow-Up Questions dated April 11, 2005, the Company's letter dated April 18, 2005, the Best and Final Offer dated June 27, 2005 and the Company's letter dated July 7, 2005, each submitted by the Company in response to the RFP.

1.59  "quarter" as used in Sections 4 and 9 of this Agreement shall mean three-month periods beginning on the Effective Date. For avoidance of doubt, if the Effective Date is May 25, the quarters of the Term would end on August 24, November 24, February 24 and May 24.

1.60  "Replacement Newsstand" means a Newsstand as defined in Local Law 64 for the year 2003.

1.61  "Replacement Newsstand Schedule" shall have the meaning given in Section 2.4.6 hereof.

1.62  "Replenishment Period" shall have the meaning given in Section 6.7.

1.63  "RFP" means the Request for Proposals dated March 26, 2004, as modified by Addendum I, dated June 11, 2004, Addendum II, dated July 15, 2004, and Addendum III, dated August 18, 2004.

1.64  "Scroller(s)" shall mean a two-sided advertising display that contains a minimum of three posters per side, each containing an individual graphic, and that can display multiple campaigns on both sides by providing an opportunity to change an advertising poster at pre-determined time intervals by gradually moving another poster containing an individual graphic in place of the first, allowing for multiple advertisers to post advertising posters in one location (or allowing an advertiser the opportunity to post multiple creative executions in a series as part of one ad campaign) during the same posting period. For the purposes of Section 4 hereof, a Scroller shall not be counted as one panel but rather by the number of posters with individual graphics contained therein.

1.65  "Security Fund" shall have the meaning given in Section 6.1 hereof.

-7-

NYC007680
NYC007680

1.66 "Service(s)" means the installation, operation and maintenance of Coordinated Franchise Structures, provided, however, that with respect to Newsstands, Services shall mean installation and maintenance and shall not include operation.

1.67 "Software" shall have the meaning given in Section 2.4.2 hereof.

1.68 "Software Escrow Agent" shall have the meaning given in Section 2.4.2 hereof.

1.69 "System" means all of the Coordinated Franchise Structures which are to be installed, operated and/or maintained by the Company pursuant to this Agreement and the EIMIS (together with associated data).

1.70 "Term" means the term of the Agreement as described in Section 2.1 hereof.

1.71 "Termination Default" shall have the meaning given in Section 13.2.1 hereof.

1.72 "Vendex" means the City's Vendor Information Exchange System, or any successor system established pursuant to law, rule or regulation.

1.73 "Viacom Outdoor Agreement" means the contract dated March 20, 1985 by and between the City of New York and Miller Signs Associates, as last amended on January 25, 2005.

1.74 "year" shall mean a period of 365 days, as distinguished from a calendar year.

## SECTION 2

## GRANT OF AUTHORITY

2.1. **Term.** This Agreement, and the franchise granted hereunder, shall commence upon the Effective Date, and shall continue for a term of 20 years from the Effective Date, unless this Agreement is earlier terminated as provided in this Agreement.

2.2. **Submissions By Company.** The City acknowledges receipt from the Company of the following items and documents and hereby agrees that as of the date hereof each such item or document delivered by the Company is on its face in compliance with the terms and conditions of this Agreement and that the Company has fulfilled its contractual obligations thereto, provided, however, that this acknowledgement and agreement in no way releases any of the Company's ongoing obligations as to such items under this Agreement: (i) evidence as described in Section 12 hereof of the Company's insurance coverage, (ii) an opinion of the Company's counsel dated as of the date this Agreement is executed by the Company, in a form reasonably satisfactory to the City, that this Agreement has been duly authorized, executed and delivered by the Company and is a binding obligation of the Company, (iii) an IRS W-9 form certifying the Company's tax identification number, (iv) a letter from the Company to the Department of Consumer Affairs certifying to the projected costs of the construction and installation of the New Newsstands, as described in Section 2.4.6(d)(iii) hereof, (v) organizational and authorizing documents as described in Sections 14.6.1 and 14.6.2 hereof, (vi) evidence that the Security Fund required pursuant to Section 6 hereof has been created, (vii)

-8-

NYC007681

NYC007681

evidence that the Performance Bond required pursuant to Section 7 hereof has been created consisting of an original executed performance bond in the required amount and approved form, (viii) evidence that the Letter of Credit required pursuant to Section 7 hereof has been delivered, (ix) a guaranty from the Guarantor ("Guaranty"), and (x) fully completed and up-to-date questionnaires in connection with Vendex which have received a favorable review by the City.

2.3.    Certain Actions by the Company after the Effective Date.  Within five business days of receipt by the Company of an invoice, the Company shall reimburse to the City all costs incurred by the City in publishing legally required notices with respect to the franchise granted by this Agreement.

2.4.    Nature of Franchise; Effect of Termination.

2.4.1.    Nature of Franchise.  The City hereby grants the Company, in accordance with the terms and conditions of this Agreement, the RFP, the Proposal and the BAFO (the RFP, Proposal and BAFO are attached hereto and made a part hereof as Exhibits B, C, and D respectively), a non-exclusive franchise providing the right and consent to install, operate and maintain Bus Shelters, APTs, and PSSs and to install and maintain Newsstands on, over and under the Inalienable Property of the City.  The exercise of such franchise is subject to all applicable laws, rules and regulations of the City, including with respect to the Newsstands, Local Law 64 for the year 2003 and with respect to multi-rack news racks, 19-128.1 of the Administrative Code.  The Inalienable Property of the City does not include premises controlled by such entities as, including, but not limited to, the New York City Department of Education, the New York City Health and Hospitals Corporation, the Metropolitan Transportation Authority, the New York City Housing Authority, the New York City Off Track Betting Corporation, or the interior of any buildings owned, leased, or operated by the City, or any other City property not expressly included in Section 1.36 herein.

2.4.2.    Ownership.

(a)    All Coordinated Franchise Structures are at all times during the Term of this Agreement, except as otherwise stated in this Agreement, the property of the Company, and the Company has responsibility therefore in accordance with the terms of this Agreement.  The Company shall take ownership and be responsible for the operation and maintenance as described herein of the Existing Bus Shelters as of the Effective Date of this Agreement.  No representations are or have been made by the City, or by any of its officers, agents, employees or representatives, as to the present physical condition, structural integrity, cost of operation or otherwise of the Existing Bus Shelters, and the Company acknowledges that it has inspected the same, is familiar with the "as is" condition thereof, and will hold the City harmless in connection therewith pursuant to Section 12.1.1 hereof, provided, however, the Company shall have no liability for Damages relating to any event that occurred prior to the Effective Date.  Except as otherwise stated in this Agreement, during the Term hereof, the City has no ownership interest, or any obligations with respect to, the Coordinated Franchise Structures.

(b)    The Company has purchased sufficient licenses for all off-the-shelf software and hardware components reasonably necessary for the creation, maintenance, and

-9-

NYC007682
NYC007682

operation of EIMIS and has secured for the City valid, non-exclusive, royalty-free, paid-up sublicenses, or equivalent rights to use, consistent with the terms and conditions of this Agreement for any proprietary software used by the Company and reasonably necessary for operation and (to the extent applicable) maintenance of EIMIS, and to the extent independent licenses are required, software pertaining to the operation and maintenance of APTs and PSSs (all such software referred to in this sentence, collectively referred to hereinafter as the "Software," which for purposes of this Agreement will mean programs in object code format only together with any manuals and documentation). The licenses and sublicenses in the Software to be granted to the Company and/or the City in accordance with this Section 2.4.2(b) or Section 3.3(c) will be sufficient to allow the Company and/or City to (i) access, operate, and maintain the EIMIS, and all APTs and PSSs for the purposes contemplated by this Agreement during the Term and (ii) address changing conditions as they apply to EIMIS, including without limitation, by requiring the applicable software vendors to create derivative works of the Software in customizing, adapting, configuring, optimizing and refining EIMIS consistent with the purposes of this Agreement.

        (c)    The Plans and Specifications and the Preliminary Plans and Specifications are the property of the Company or its licensors, as applicable. The Company, on its own behalf and on behalf of its applicable licensors (each of whom has authorized in writing the following grant) hereby grants to the City, effective as of the date of the first to occur of the termination or expiration of this Agreement in accordance with its terms or the transfer of ownership of the Coordinated Franchise Structures to the City, an exclusive, irrevocable, royalty-free to the City, fully paid-up license (i) to use the Plans and Specifications, and the Preliminary Plans and Specifications to the extent incorporated in the Plans and Specifications, for the purpose of installing, maintaining and operating in the City the Coordinated Franchise Structures (and additional items of street furniture identical to the Coordinated Franchise Structures) and (ii) to display, perform publicly, and reproduce the Plans and Specifications for purposes of installing, operating, and maintaining in the City the Coordinated Franchise Structures (and additional items of street furniture identical to the Coordinated Franchise Structures). For avoidance of doubt, the license grant set forth in the immediately preceding sentence of this Section 2.4.2(c) shall immediately take effect in accordance with its terms whether or not the Company challenges such termination; provided, however, that nothing herein shall be interpreted as an admission by the Company that any such termination is appropriate. Furthermore, for all copyright and patent rights in the grants above, the terms of these licenses will be the longest term currently recognized for copyrights and patents, respectively, under United States law. For all other rights licensed in this Section, the term of the license is perpetual. Notwithstanding the foregoing, as of the Effective Date, nothing herein shall be construed as restricting the City's ability to work during the Term with the Company and the Company's licensor Grimshaw Industrial Design, LLC. ("Grimshaw") in furtherance of the purposes of this Agreement to coordinate the creation, installation, and maintenance of the Coordinated Franchise Structures. Further, as of the Effective Date, the Company, on its own behalf and on behalf of its applicable licensors (each of whom has authorized in writing the following grant) hereby grants to the City a non-exclusive, royalty-free license to display, reproduce, and perform publicly images of the Coordinated Franchise Structures in any medium for the term of copyright.

NYC007683

NYC007683

(d)    The Company agrees that the Coordinated Franchise Structures installed by the Company in accordance with this Agreement shall be unique to the City, and the Company shall not, without the prior written permission of the City, install or cause or facilitate the installation of any such Coordinated Franchise Structures for any other client or other third party anywhere in the world. Additionally, the Company shall cause third parties that expressly licensed the Plans and Specifications, in whole or in part, to the Company, or third parties that otherwise participated in the creation of the Plans and Specifications  to execute documents to this effect.

(e)    To the extent that this Agreement includes software licensed to the Company and/or the City (excluding "off-the-shelf" software) in connection with the creation, operation or maintenance of EIMIS, the Company agrees that (i) it shall cause its software vendor to enter into, and maintain in full force and effect a source code escrow agreement with an escrow agent (the "Software Escrow Agent"), which escrow agreement shall provide materially the same terms and conditions as follows, and (ii) all source code and related documentation for the licensed software shall be under escrow deposit pursuant to said escrow agreement. The Company shall cause its software vendor to provide 30 days prior written notice of a change of the Software Escrow Agent. The escrow agreement contemplated hereby must be in effect within 30 days of the Effective Date. Additionally,

(i)    source code must be held by the Software Escrow Agent in trust for the City;

(ii)    all major updates (e.g., new versions and critical patches and fixes) must be escrowed as they are issued; minor updates may be escrowed in batches no less frequently than monthly;

(iii)    the Software Escrow Agent shall verify deposit of the source code and all updates and so notify the City;

(iv)    the City shall be permitted periodic testing of all source code held in escrow; and

(v)    if the Company's software vendor, any assignee or successor (x) becomes insolvent or ceases to exist as a business entity or (y) fails to perform its obligations under its agreement with the Company such that the Company fails to comply with its obligations with respect to EIMIS contained in this Agreement, the City shall have the right to so certify to the Software Escrow Agent and to direct the Software Escrow Agent to provide the City with a copy of the source code and commentary for the installed release level of the product utilized by the City. All source code materials granted under this clause shall be maintained subject to the confidentiality provisions of this Agreement and shall be used solely for the internal business purposes of the City. Title to any source code released to the City remains the property of the Company's software vendor.

It is agreed that the Company shall provide to the City all information necessary for the City to comply with registration requirements, if any, of the Software Escrow Agent. The Company agrees to adhere to the obligations set forth in any agreement with the

NYC007684
NYC007684

software vendor or the Software Escrow Agent as they relate to the deposit of Software in escrow. The agreement with the Software Escrow Agent shall provide that the City shall have the opportunity to cure any default of the Company, at the sole cost and expense of the Company, that jeopardizes the ability of the City to access the escrowed source code as provided for under this Agreement.

The escrow agreement provisions set forth in this Section 2.4.2(e) shall apply with equal force to any software licensed to the City (excluding "off-the-shelf" software) by a subcontractor of the Company.

2.4.3.  Warranties of Title.  The Company represents and warrants that the Plans and Specifications and Software: (a) are original to the Company or validly licensed or sublicensed to the Company; (b) to the knowledge of the Company after reasonable inquiry, do not infringe, dilute, misappropriate, or improperly disclose any intellectual property or proprietary rights of any third party, or otherwise violate any law, rule, or regulation; and (c) do not constitute defamation or invasion of the right of privacy. The Company further represents and warrants that it has not granted any license(s), permit(s), interest(s), or right(s), exclusive or nonexclusive, to any party other than the City with respect to the Plans and Specifications and will not grant any such licenses unless such grants are necessary to perform the Company's obligations under this Agreement.

2.4.4.  Permits, Authorizations, Approvals, Consents and Licenses.

(a)    Before installing any Coordinated Franchise Structure, the Company shall obtain at its sole cost and expense, any necessary permits, authorizations, approvals, consents, licenses, and certifications required for each Coordinated Franchise Structure, including, but not limited to: (i) pursuant to all City laws, rules and codes related to materials and construction and all applicable sections of the building, plumbing and electrical codes of the City; (ii) all permits, authorizations, approvals, consents, licenses and certifications required by DOT, Landmarks and the Art Commission, and any other agency of the City with jurisdiction over the property on which the Coordinated Franchise Structure is to be located; (iii) any necessary permits, authorizations, approvals, consents, licenses, and certifications required pursuant to any applicable state and federal laws, rules, regulations and policies, writs, decrees and judgments; and (iv) any necessary permits, authorizations, approvals, consents, licenses and certifications from Persons to use a building or other private property, easements, poles, and conduits.

(b)    The Company agrees that fees paid to obtain any permits, consents, licenses, or any other forms of approval or authorization shall not be considered in any manner to be in the nature of a tax, or to be compensation for this franchise in lieu of the compensation described in Section 9 hereof.

2.4.5.  Design of Coordinated Franchise Structures.  The design of all Coordinated Franchise Structures installed pursuant to this Agreement (other than Existing Bus Shelters) shall be in compliance with all applicable laws, rules and regulations of the City and shall be subject to approval of the Art Commission and, to the extent required by law, Landmarks. Company shall make good faith efforts to obtain approval of the Art Commission

-12-

NYC007685
NYC007685

and to the extent required by law, Landmarks. The Company shall submit an application signed by DOT (which application DOT agrees to sign in a form reasonably acceptable to DOT), to the Art Commission and, to the extent required by law, Landmarks, for review and approval of the Preliminary Plans and Specifications. In the event that changes to the Preliminary Plans and Specifications are required by the Art Commission or Landmarks for their approvals, the Company at its sole cost and expense shall make such changes as are required to obtain such approval. Following such approval, the Preliminary Plans and Specifications as approved shall be the Plans and Specifications referred to in this Agreement and shall be the Plans and Specifications used to manufacture the Coordinated Franchise Structures. It is anticipated that street or sidewalk conditions at certain locations will require modifications of the size of individual Coordinated Franchise Structures (as distinct from modifications to the design of the Coordinated Franchise Structures overall). Such modifications to individual Coordinated Franchise Structures shall be made at the Company's sole cost and expense upon a determination by the City that such modifications are necessary or appropriate based on street or sidewalk conditions at such specified locations. Additionally,

(a)    The Company shall design PSSs such that the public service provided is immediately apparent and shall not be obscured physically or visually by advertising;

(b)    In consultation with DOT the Company shall prepare as part of the Plans and Specifications size variations of the Newsstands which all meet the dimensional requirements set forth in the RFP and shall comply with the Americans with Disability Act as further set forth in Section 3.7 hereof. Such variations must be approved by DOT in its reasonable discretion and must meet the following specifications: there must be Newsstand lengths of 8', 10' and 12' which must be able to be used interchangeably with Newsstand widths of 4', 5' and 6'. All Newsstands must be a standard height of 9'. Additionally, the Company shall make reasonable efforts to customize the interior of the Newsstand by permitting all Newsstand Operators to select customization options from a standardized group of customization alternatives offered by the Company;

(c)    The Company shall design New Bus Shelters in a variety of sizes such that every Existing Bus Shelter may be replaced in accordance with the terms of this Agreement. New Bus Shelter designs shall provide for bus route maps, street maps, bus stop name identification, Guide-a-Ride canisters and other information. The New Bus Shelter designs shall also contemplate some form of passenger seating, such as a bench, that may or may not be required to be installed in every New Bus Shelter. Once during the Term at any time during such Term, the City may require the Company, and the Company shall at its sole cost and expense, install or remove such seating from each New Bus Shelter (this provision is not intended to limit the Company's obligation to maintain, including replacement where and when necessary, seating that has been installed and has become worn or damaged, in accordance with the maintenance obligations imposed upon the Company by this Agreement);

(d)    As the City has determined that only one configuration (in lieu of standard and landmark) is appropriate, the Company shall only be required to design and install one configuration of New Bus Shelters, APTs and Newsstands during the Term, subject to the requirements on size variations set forth in this Agreement;

NYC007686
NYC007686

(e)    Company shall at its sole cost and expense produce and install such signage as is requested from time to time by DOT. The obligation to produce as used in this Section is defined as the printing and reproduction of City-designed signage intended specifically and exclusively for Bus Shelters (not including generic bus or transit route maps of the entire system); and

(f)    The Company shall make appropriate staff available to represent itself and assist DOT during any informal or formal public review processes, including, but not limited to, presentations to a Community Board, review by the Art Commission or Landmarks, or a hearing in front of the FCRC.

2.4.6.  Build out and Costs.  The Company agrees to construct and install Coordinated Franchise Structures conforming to the Plans and Specifications, and in accordance with the timeframes set forth herein and in Appendix G annexed hereto, at its sole cost and expense, such cost and expense including, but not limited to, the costs of utility connections and infrastructure related thereto, and utilities consumed during the build-out. The Company's construction and installation obligations in this Section 2.4.6 shall be measured from the 60th day after the date of final approval by the Art Commission as set forth in Section 2.4.5 herein (such date shall be referred to as the "Build Start Date"). If the final Art Commission approval contemplated in this paragraph is received on different dates with respect to the New Bus Shelters, Newsstands or APTs, the term "Build Start Date" shall refer to the date of final approval of the Art Commission as it relates to the relevant Coordinated Franchise Structure. Prior to the installation of any Coordinated Franchise Structure, the Company shall provide to DOT for its approval photographs of the site and a site plan conforming to the siting criteria contained in the RFP. All site plans shall be prepared to scale, shall include all elements and dimensions relevant to the siting criteria, and shall be certified by a professional engineer or licensed architect.

(a)    The Company shall remove Existing Bus Shelters and shall install New Bus Shelters in accordance with the following:

(i)    The Company shall construct and install in locations as set forth in Schedule A attached hereto, and in such other locations as may be directed by DOT, at least 3300 New Bus Shelters by the fifth anniversary of the Build Start Date, with at least 650 New Bus Shelters in total having been installed by the first anniversary of the Build Start Date, at least 1350 New Bus Shelters in total having been installed by the second anniversary of the Build Start Date, at least 2000 New Bus Shelters in total having been installed by the third anniversary of the Build Start Date, at least 2650 New Bus Shelters in total having been installed by the fourth anniversary of the Build Start Date and at least 3300 New Bus Shelters having been installed by the fifth anniversary of the Build Start Date. The Company may, but shall not be required to, exceed the foregoing minimum number of installations during the time periods referred to in the preceding sentence with the consent of DOT. In addition, the Company shall construct and install at the option of DOT in its sole discretion a maximum of 200 additional New Bus Shelters, where and when directed by DOT, provided, however, that (x) such option must be exercised in the first eighteen years of the Term, and (y) the total number of New Bus Shelters to be installed by the Company shall not exceed 3500 without the mutual consent of the Company and the City. The replacement of Existing Bus Shelters at the locations set forth in

- 14 -

NYC007687

NYC007687

Schedule A shall take place in accordance with a schedule to be proposed by the Company and approved by DOT (the "Existing Bus Shelter Replacement Schedule") which shall be consistent with the overall construction and installation schedule contemplated by this Agreement and shall provide that each year 20% of replacements take place at locations allocated to NYCMDC as set forth in Exhibit H attached hereto. The Existing Bus Shelter Replacement Schedule shall include at a minimum, for each month of the build-out years, the location of each Existing Bus Shelter scheduled to be replaced, the projected date for submission of a site plan and photographs, and the projected date for installation. On notification from DOT that a site plan and photographs are required for a location other than as specified in the Existing Bus Shelter Replacement Schedule, the Company shall have 30 days to produce the site plan and photographs and submit them to DOT and to install the New Bus Shelter provided however that the clock shall stop during the time that DOT is reviewing the site plan. DOT shall notify Company when the site plan is approved, or whether changes are required. Company may request an extension of such time which may be granted by DOT in writing in its reasonable discretion; provided that if changes are required by DOT an extension shall be granted for a reasonable period of time commensurate with the nature of the required changes.

(ii)    The Company shall dismantle, remove, and if necessary, dispose of Existing Bus Shelters, at its sole cost and expense, provided that no Existing Bus Shelter shall be removed unless and until DOT has either approved a site plan for a New Bus Shelter to replace it or determined that it will be removed but not replaced. A New Bus Shelter shall be installed in accordance with paragraph (i) of this subsection within five days of the removal of each Existing Bus Shelter, except where DOT has determined that the Existing Bus Shelter will not be replaced. All Existing Bus Shelters shall have been removed and replaced as required by the fifth anniversary of the Build Start Date. Should DOT require the removal of any Bus Shelter other than as specified in the Existing Bus Shelter Replacement Schedule, the Company shall have five days from receipt of notice from DOT to effect the removal. Any site where a Bus Shelter is removed but not replaced shall be promptly restored to its condition existing immediately prior to the date of the removal of the subject Bus Shelter and in compliance with the New York City Administrative Code at the sole cost and expense of the Company.

(b)    Unless the City requires fewer APTs to be installed, the Company shall construct and install in locations as directed by the City, and in accordance with the time frames set forth in Appendix G annexed hereto, at least 10 APTs in total by the first anniversary of the Build Start Date and 20 APTs in total by the second anniversary of the Build Start Date, provided that the Company's obligations set forth in this sentence shall be tolled during any time that access to the site selected by the City is blocked due to circumstances beyond the Company's control. The Company may, but shall not be required to, exceed the foregoing minimum number of installations during the time periods referred to in the preceding sentence with the consent of the City. To the extent that the City has not directed the Company to install all 20 APTs by the second anniversary of the Build Start Date, in any year of the Term the City may direct the Company to install a maximum of 10 APTs with no more than 20 APTs installed during the Term.

(c)    The Company shall construct and install, when and as directed by DOT in locations selected by DOT, PSSs consisting of trash receptacles, multi-rack newsracks,

- 15 -

NYC007688
NYC007688

and information/computer kiosks in accordance with the time frames set forth in Appendix G annexed hereto, provided that the number of PSSs the Company shall be required to install in any given time period shall be reasonable under the circumstances existing at the time, including when considered in light of any concurrent obligations of the Company to install, maintain and, if applicable, relocate, other Coordinated Franchise Structures under this Agreement.

(d)    Additionally, in accordance with the RFP, the Proposal and the BAFO:

(i)    The Company shall be responsible at its sole cost and expense for the prompt dismantling and removal of any and all Existing Newsstands (unless, in each instance, the Newsstand Operator exercises its option under Section 20-241.1b of Title 20 of the City's Administrative Code, or any successor provision thereto, to itself remove the Existing Newsstand) and the installation of Replacement Newsstands in accordance with a schedule to be provided by DOT from time to time (the "Replacement Newsstand Schedule"). The Replacement Newsstand Schedule shall be consistent with the overall installation timetable for Newsstands contemplated by Section 2.4.6(d)(iii). The Replacement Newsstand Schedule shall include the location of each Existing Newsstand scheduled to be replaced, the projected date for submission of a site plan and photographs, and the projected dates for removal of the Existing Newsstand and the installation of the Replacement Newsstand. On the date specified in the Replacement Newsstand Schedule (provided the City has given the relevant Newsstand Operator notice within the time period required by applicable law, if any, of the date for the removal of the Existing Newsstand), or a date mutually agreed to by the Company, and DOT, the Company shall remove the Existing Newsstand (unless the Newsstand Operator has already removed it) and install the Replacement Newsstand. Installation of each Replacement Newsstand must be completed in nine days from removal by the Company of the applicable Existing Newsstand (or from the date of notice to the Company that the Existing Newsstand has been removed by the Newsstand Operator).

(ii)    On notification from DOT that a site plan and photographs are required for a location other than as specified in the Replacement Newsstand Schedule, the Company shall have 30 days to produce the site plan and photographs and submit them to DOT and install the New Newsstand provided however that the clock shall stop during the time that DOT is reviewing the site plan. DOT shall notify Company when the site plan is approved, or whether changes are required. Company may request an extension of such time which may be granted by DOT in writing in its reasonable discretion; provided that if changes are required by DOT an extension shall be granted for a reasonable period of time commensurate with the nature of the required changes. Should DOT require the removal of any Newsstand, other than as specified in the Replacement Newsstand Schedule, the Company shall have five days to effect the removal and restore the sidewalk. Any site where a Newsstand is removed by the Company but not replaced shall be promptly restored to its condition existing immediately prior to the date of the removal of the subject Newsstand and in compliance with the New York City Administrative Code at the sole cost and expense of the Company.

(iii)    The Company shall construct and install in locations as set forth in Schedule B attached hereto, and in such other locations as may be directed by the City, at least 330 Newsstands, which may include Replacement Newsstands and/or New Newsstands

-16-

NYC007689

NYC007689

with at least 110 Newsstands, as selected by the City in its sole discretion, being installed by the first anniversary of the Build Start Date, with at least 220 Newsstands, as selected by the City in its sole discretion, being installed by the second anniversary of the Build Start Date, and at least 330 Newsstands being installed by the third anniversary of the Build Start Date. The Company's obligations set forth in the preceding sentence shall, to the extent that the above time schedule cannot be met because access to any site is blocked due to circumstances outside the Company's control, be tolled during such time access is blocked. The Company may, but shall not be required to, exceed the foregoing minimum number of installations during the time periods referred to in the preceding sentence with the consent of DOT. Additionally, the Company shall construct and install at the option of the City in its sole discretion additional New Newsstands necessary for operation under any new license issued throughout the Term by the Department of Consumer Affairs (or any successor thereto). All Newsstands constructed shall include, at the Company's sole cost and expense, necessary electric and telephone hook-ups and infrastructure required by the appropriate utility to establish a separate account for the Newsstand Operator's usage of electricity in the Newsstand. However, the New Newsstand Operators will be required to reimburse the Company for the costs and expenses of the construction and installation including costs associated with any interior electric and/or telephone hookups to the Newsstand, in accordance with Appendix B attached hereto, provided that the City shall not be responsible for reimbursement to the Company for the New Newsstands in the event that the Company does not receive such compensation from the New Newsstand Operators. Upon payment of the amount required, or the entry into an installment payment plan with the New Newsstand Operator(s) pursuant to Appendix B, Company shall provide the New Newsstand Operator(s) with either proof of payment or a letter stating that the New Newsstand Operator(s) has entered into an installment payment agreement with the Company.

(iv)   Under no circumstances will the Company be responsible or liable for the removal of any Newsstand Operator who does not cooperate in the Newsstand replacement process contemplated by or arising out of this Agreement. Additionally, the Company shall not have any obligations to any Indemnitee under Section 12.1.1 for any Damages relating to any claim against any Indemnitee made by or on behalf of a Newsstand Operator (a) challenging or contesting the right of the City to remove such Newsstand Operator's newsstand or claiming compensation arising from the removal thereof, (b) claiming any ownership rights in any newsstand, (c) alleging any violation of law or other wrongful conduct on the part of the City or its agents or contractors in connection with the removal of such Newsstand Operators' newsstands (other than any such conduct for which the Company is directly responsible and which is not carried out by the Company at the direction of the City), and any similar claim that does not arise directly out of the performance by the Company of, or its failure to perform, its obligations under this Agreement.

(e)   Upon installing any of the Coordinated Franchise Structures the Company shall send to DOT a photograph of the new installation showing the placement in context of such Coordinated Franchise Structure together with a request for DOT acceptance of the specified Coordinated Franchise Structure, which acceptance shall not be unreasonably withheld, conditioned or delayed. Such request shall set forth the date the Coordinated Franchise Structure was installed (such date shall be the "Installation Date" if the installation is accepted by DOT in accordance with Section 2.4.6(f) below).

- 17 -

NYC007690

NYC007690

(f)    DOT shall inspect such new installation within 14 days of receipt of such photograph and request.  Acceptance of the installation shall not constitute an approval of the structural integrity of the Coordinated Franchise Structures or of any utility connections. Should DOT accept the Coordinated Franchise Structure as being installed in accordance with the site plan it shall send the Company an acceptance notice within 14 days from inspection. Should DOT not accept the Coordinated Franchise Structure as being installed in conformity with the site plan it shall send the Company a rejection notice within 14 days from inspection specifying the problems which need correction and the Company shall have five days from receipt of notice from DOT (provided that in the case of APTs and Newsstands the Company's obligations set forth in this sentence shall be tolled during any time that the Company's access to the site is blocked due to circumstances outside its control) to make such corrections, except if local law requires otherwise in the case of Newsstands.  Thereafter, the Company shall follow the procedures set forth in this Section 2.4.6 (the date such corrections are made shall be the Installation Date if such corrections are approved by DOT).  If DOT sends a rejection notice as contemplated herein, the time between the date the Company sent its request for acceptance and the date DOT sent the rejection notice shall not count towards the assessment of liquidated damages.

(g)    The procedure for accepting Newsstands shall be as set forth in this Section 2.4.6 unless superseded by Local Law 64 of the year 2003 or any other section of the New York City Administrative Code or the Rules of the City of New York.

(h)    Except as otherwise set forth in this Agreement, failure to complete the timely construction and installation of any Coordinated Franchise Structure within the time specified shall result in the assessment of liquidated damages as set forth in Appendix A attached hereto, or the exercise of any other remedy available to the City under this Agreement provided, however, that if DOT does not send a notice of acceptance or rejection of the installation of any Coordinated Franchise Structure within the time period set forth above, such delay shall not be counted against the Company for purposes of assessing liquidated damages or the exercise of any other remedy.

2.4.7.  Effect of Expiration or Termination.  Upon expiration or termination of this Agreement (and provided no new franchise of similar effect has been granted to the Company pursuant to the New York City Charter, any authorizing resolution, and any other applicable laws and rules in effect at the time) the franchise shall expire; all rights of the Company in the franchise shall cease with no value allocable to the franchise itself; and the rights of the City and the Company to the System, or any part thereof, shall be determined as provided in Section 13 hereof.

2.5.    Conditions and Limitations on Franchise.

2.5.1.  Not Exclusive.  Nothing in this Agreement shall affect the right of the City to grant to any Person other than the Company a franchise, consent or right to occupy and use the Inalienable Property of the City, or any part thereof, for the installation operation and/or maintenance of street furniture, including, but not limited to, bus shelters, public toilets, trash receptacles, multi-rack news racks, information/computer kiosks or newsstands, with or without advertising.  Notwithstanding the above, (i) DOT shall not grant to any other Person a franchise

-18-

NYC007691
NYC007691