to install bus shelters until DOT has issued to the Company 3500 permits for the installation of New Bus Shelters and (ii) DOT shall not grant to any other Person a franchise to install newsstands until DOT has issued to the Company 330 permits for the installation of Replacement and/or New Newsstands, provided, however, that should the City at any time issue a request for proposals for the installation, operation and/or maintenance of bus shelters and/or newsstands then DOT's agreement not to grant franchises as described in this sentence shall be conditional on the Company's prompt delivery to DOT of all materials required from the Company that would be necessary for DOT to process and issue the necessary permits for the installation of the number of New Bus Shelters and/or Newsstands necessary to reach the 3500 and 330 figures described above, as the case may be. If the Company fails to promptly deliver the materials necessary for DOT to process and issue the necessary permits, the City may grant any Person a franchise notwithstanding the requisite number of permits, as provided in this Section 2.5.1, have not been issued; provided however that any such failure by the Company shall not constitute a breach or default under this Agreement. This Section 2.5.1 is not intended to affect the Company's right to install 3500 New Bus Shelters and 330 Replacement and/or New Newsstands and to place advertising thereon as set forth in this Agreement or any of the Company's other rights or obligations as set forth in this Agreement. Nothing in this Agreement shall affect the ability of the Company and the City to consider potential additional revenue generating opportunities that may be proposed by either party in the future with respect to the Coordinated Franchise Structures.

    2.5.2.  <u>Sidewalk and Historic Pavement</u>.  No Coordinated Franchise Structure shall be designed so that it would result in the unrepaired destruction or damage of any part of a sidewalk or historic pavement. Neither the installation, operation, maintenance nor removal of Bus Shelters, APTs, and PSSs nor the installation, maintenance and removal of Newsstands shall result in the unrepaired destruction or damage of any part of a sidewalk or historic pavement. Nothing herein shall preclude the Company from installing a Coordinated Franchise Structure, including appurtenant utility connections, on a sidewalk or historic pavement by any means necessary. Prior to any such installation, the Company shall make a good faith effort to procure sufficient quantities of those materials of which the sidewalk or historic pavement is comprised to repair, replace, or restore it to its condition existing immediately prior to the date of the installation of the subject Coordinated Franchise Structure and in compliance with the New York City Administrative Code. If the City is the sole source of those materials of which the sidewalk or historic pavement is comprised, then it shall provide the Company, at the Company's expense, any such materials stored by the City. In the event that the installation, operation, maintenance or removal of any Bus Shelter, APT, or PSS or the installation, maintenance and removal of Newsstands results in damage to sidewalk or historic pavement, such sidewalk or historic pavement shall be restored to its condition existing immediately prior to the date of the installation of the subject Coordinated Franchise Structure in accordance with the timeframes set forth in Appendix C and in compliance with the New York City Administrative Code at the sole cost and expense of the Company, using in-kind materials. The Company may request an extension of time to the timeframes referred to in the preceding sentence which may be granted by DOT in its sole discretion.

    2.5.3.  <u>Location of Coordinated Franchise Structures</u>. The Coordinated Franchise Structures shall be installed, removed and replaced by the Company in such locations and in such priority as directed by DOT in accordance with this Agreement, or, if not otherwise specifically

-19-

NYC007692
NYC007692

set forth in this Agreement, in DOT's sole discretion, provided, however, that APTs shall be installed by the Company in such locations as directed by the City in its sole discretion. When practicable, DOT shall provide Company with an opportunity to comment on DOT's location decisions regarding Coordinated Franchise Structures in light of the Company's concerns regarding the revenue generating potential of locations. Nothing contained in this paragraph shall be construed to prevent DOT from changing a location set forth in Schedules A or B if the City would otherwise have the right to order the relocation of the structure in accordance with Section 2.5.4.1 or 2.5.4.2 herein.

2.5.4.   Removal, Replacement, Relocation, Reinstallation.

2.5.4.1.  Public Utilities, Other.  The Company shall remove, replace, relocate or reinstall at its sole cost and expense, at the request of the City, Coordinated Franchise Structures which interfere with the construction, maintenance or repairs of public utilities, public works or public improvements. The Company shall not be responsible for the costs and expenses of any removal, replacement, relocation and/or reinstallation requested by the City except as set forth in the preceding sentence or as expressly required elsewhere in this Agreement, including, but not limited to, Section 2.5.4.2 hereof. Nothing in this Agreement shall abrogate the right of the City to change the grades or lines of any Inalienable Property of the City, or perform any public works or public improvements, or any street widening project, or any other capital project of any description. In the event that the Company refuses or neglects to so remove, replace, relocate or reinstall such Coordinated Franchise Structures as directed by the City, the City shall have the right to remove, replace, relocate or reinstall such Coordinated Franchise Structures without any liability to the Company, and the Company shall pay to the City the costs incurred in connection with such removal, replacement, relocation or reinstallation and for any other costs or damages incurred by the City including, but not limited to repair and restoration costs, arising out of the performance of such work.

2.5.4.2.  Public Use, Other.  The City shall have the right at any time to inspect the Coordinated Franchise Structures and order the removal, replacement, relocation or reinstallation of any of the Coordinated Franchise Structures at the sole cost and expense of the Company upon a determination in the City's sole discretion that any of the Coordinated Franchise Structures, unreasonably interferes or will unreasonably interfere with the use of a street by the public, constitutes a public nuisance, creates a security concern, or is, or has otherwise become inappropriate at a particular location, or that such removal, replacement, relocation or reinstallation is necessary to address changing conditions. In the event that the Company fails to so remove, replace, relocate or reinstall any of the Coordinated Franchise Structures as directed by the City, the City shall have the right to remove, replace, relocate or reinstall such Coordinated Franchise Structures without any liability to the Company, and the Company shall pay to the City the costs incurred in connection with such removal, replacement, relocation or reinstallation and for any other costs or damages incurred by the City, including but not limited to repair and restoration costs. If a Coordinated Franchise Structure is required to be removed and/or relocated because the City mistakenly identified a location listed on Schedule A or Schedule B as Inalienable Property of the City, the City shall require the Company to remove and/or relocate such Coordinated Franchise Structure and shall pay to the Company the costs incurred in connection with such removal and/or relocation and for any other costs or damages incurred by the Company, including but not limited to repair and restoration costs.

NYC007693
NYC007693

2.5.4.3.  Notification. In the event the Commissioner determines that all or any of the Coordinated Franchise Structures should be removed, replaced, relocated or reinstalled pursuant to this Section 2.5, the Company shall perform such work in accordance with the timeframes set forth in Appendix G attached hereto.

2.5.4.4.  Emergency. Notwithstanding the foregoing, if the Commissioner determines that an imminent threat to life or property exists, the Commissioner may, at the sole cost and expense of the Company, with such notice, if any, as is practicable to the Company given the nature of the emergency, take such action as the Commissioner deems necessary to alleviate the emergency, including but not limited to removing, replacing, relocating or reinstalling all or any portion of the System and have repair and restoration work performed. The Commissioner may, if he or she determines that the System or any portion of the System can be safely reinstalled and maintained, require the Company to do so at its sole cost and expense.

2.5.5.  No Waiver. Nothing in this Agreement shall be construed as a waiver of any local law, rule or regulation of the City or of the City's right to require the Company to secure the appropriate permits or authorizations for Coordinated Franchise Structure installation.

2.5.6.  No Release. Nothing in this Agreement shall be construed as a waiver or release of the rights of the City in and to the Inalienable Property of the City. In the event that all or part of the Inalienable Property of the City is eliminated, discontinued, closed or demapped, all rights and privileges granted pursuant to this Agreement with respect to said Inalienable Property of the City, or any part thereof so eliminated, discontinued, closed or demapped, shall cease upon the effective date of such elimination, discontinuance, closing or demapping. If said elimination, discontinuance, closing or demapping is undertaken for the benefit of any private Person, the City shall make reasonable efforts to condition its consent to said elimination, discontinuance, closing or demapping on the agreement of said private Person to: (i) grant the Company the right to continue to occupy and use said Inalienable Property of the City; or (ii) reimburse the Company for the reasonable costs of relocating the affected part of the Coordinated Franchise Structures.

2.6.  Other Structures.

(a)  The Company, on its own behalf and on behalf of its applicable licensors (each of whom has authorized in writing the following grant), will grant to the City such rights as may be necessary for the purposes of constructing, installing, operating, and maintaining street furniture and structures other than the Coordinated Franchise Structures as described in and subject to the provisions of Sections 2.6 (b) and 2.6(c) below. Such grants shall be made and take effect at the earliest time necessary to effectuate the purposes of this Section 2.6.

(b)  If, during the Term, the City desires to create or design street furniture (other than the Coordinated Franchise Structures) with designs that are substantially similar to those created by the Company and/or Grimshaw for the Coordinated Franchise Structures, and if such street furniture is to bear advertising in any form (all such street furniture referred to as "Ad-Bearing Street Furniture"), the City shall (i) retain the services of Grimshaw and the Company to perform such creation and/or design of the Ad-Bearing Street Furniture and (ii) pay to the Company 5% of any advertising revenue (calculated in the same manner as Gross

-21-

NYC007694

NYC007694

Revenues are calculated under this Agreement) that the City actually receives from the sale of advertising on such Ad-Bearing Street Furniture during such time as advertising is displayed on the Ad-Bearing Street Furniture (for the remainder of the Term of this Agreement or for 7 years, whichever is longer). In such event, the Company will be solely responsible for standard per-diem and expense reimbursement payments to Grimshaw. Payments due the Company pursuant to this paragraph shall be made reasonably promptly after the City's receipt of the advertising revenue. Pursuant to a separate agreement between Grimshaw and the Company, which is attached hereto as Exhibit J (the "Grimshaw Agreement"), Grimshaw has agreed to accept a royalty of 4% of the actual manufacturing costs of such Ad-Bearing Street Furniture for its design services to be paid by the City (or a third party designated by the City; provided that the City shall be obligated to make all such payments in the event the third party fails to do so). In the event that Grimshaw-designed Ad Bearing Street Furniture is not actually installed, then in lieu of 4% of the actual manufacturing costs, Grimshaw has agreed to accept its standard per-diem and expense reimbursement arrangements charged to its best customers to be paid by the City (or a third party designated by the City; provided that the City shall be obligated to make all such payments in the event the third party fails to do so), or, if previously paid by the Company, reimbursed to the Company by the City.

(c)     If, during the Term, the City desires to create or design street furniture (other than the Coordinated Franchise Structures) with designs that are substantially similar to those created by Company and/or Grimshaw for the Coordinated Franchise Structures, but such street furniture does not bear advertising in any form ("Non-Ad-Bearing Street Furniture"), then the City shall retain the services of Grimshaw to perform such creation and/or design of the Non-Ad-Bearing Street Furniture to perform creation and/or design services in connection therewith. Pursuant to the Grimshaw Agreement, Grimshaw has agreed to accept a royalty of 4% of the actual manufacturing costs of such Non-Ad-Bearing Street Furniture for such design services, plus Grimshaw's standard per-diem and expense reimbursement, to be paid by the City (or a third party designated by the City; provided that the City shall be obligated to make all such payments in the event the third party fails to do so). In the event that Grimshaw-designed Non-Ad Bearing Street Furniture is not actually installed, then in lieu of 4% of the actual manufacturing costs, Grimshaw has agreed to accept its standard per-diem and expense reimbursement arrangements charged to its best customers to be paid by the City (or a third party designated by the City; provided that the City shall be obligated to make all such payments in the event the third party fails to do so). In the event any Non-Ad-Bearing Street Furniture designed pursuant to this Section 2.6(c) subsequently becomes Ad-Bearing Street Furniture (during the Term of this Agreement), the City shall be obligated to pay to the Company the payments contemplated in Section 2.6(b)(ii) for the term specified therein. In the event Non-Ad-Bearing Street Furniture designed pursuant to this Section 2.6(c) subsequently becomes Ad-Bearing Street Furniture within the seven-year period immediately following the Term of this Agreement, the City shall be obligated to pay to the Company the payments contemplated in Section 2.6(b)(ii) from the time of such conversion through the remainder of that seven-year period.

(d)     No street furniture created pursuant to the provisions of this Section 2.6 may be installed anywhere other than New York City without the express written permission of the Company and Grimshaw.

NYC007695
NYC007695

(e)    The Company shall not have any obligations under Section 12.1.1, or Section 12.1.6 except as expressly set forth therein, to any Indemnitee for any Damages relating to the matters contemplated pursuant to this Section 2.6.

(f)    The Company agrees that it will not agree to any amendment to Sections 4.2, 4.4, 5.1, 5.2, 7.4, the last two sentences of Section 10.1, and 12.13 of the Grimshaw Agreement, or to the defined terms used in those sections, that adversely affects the City's rights under any of those sections without the City's prior written consent.

SECTION 3

SERVICE

3.1.    Operations.

3.1.1.    Bus Shelters.  As more fully set forth in the RFP, Proposal, BAFO, and Appendix C attached hereto, commencing on the Effective Date and thereafter throughout the Term the Company shall be responsible for the following cleaning and maintenance requirements:

(a)    All maintenance of the Bus Shelters, including, but not limited to, preventative maintenance, cleaning and removing graffiti, dirt, stickers and refuse from the Bus Shelters, must occur on at least two nonconsecutive days each week; promptly clearing and removing debris, snow and ice from the ground in and around the Bus Shelters up to three feet on each side of the Bus Shelter and to the Curb on the Curb-side of the Bus Shelter (including clearing a three-foot access path for wheelchairs in the case of snow and ice and spreading salt or ice remover).  The Company shall comply with the regulations for snow removal set forth in section 16-123 of the New York City Administrative Code as may be amended or modified from time to time.  A copy of section 16-123 is attached hereto as Exhibit E.

(b)    Inspections on at least two nonconsecutive days each week for damage, debris and unsafe conditions.

(c)    Inspections of electrical wiring and connections including service and post connections and testing for stray voltage (such inspections and testing may be part of regularly scheduled general inspections or otherwise) shall take place at least once each year during the Term.  The Company shall record in EIMIS the date(s) of such inspections and testing.

3.1.2.    APTs.  As more fully set forth in the RFP, Proposal, BAFO, and Appendix C attached hereto, commencing on the installation of an APT and thereafter throughout the Term the Company shall make the APTs available for use to the public at a nominal amount of $0.25 per use between the hours of eight a.m. to eight p.m. daily, unless longer hours are otherwise directed by DOT in its reasonable discretion.  Additionally, every APT must provide an emergency alarm system that allows for two-way communication for activation by the user and transmission to an operations center and the police and fire department.  A smoke and fire alarm system with an automatic door opening device must be provided.  An emergency access portal, in addition to the user door, must be provided to allow access to the interior by police or other

-23-

NYC007696
NYC007696

emergency services. All APTs must contain a self-activating system that communicates contemporaneously all significant maintenance and operations problems to an operations center. The Company shall be responsible for the following cleaning and maintenance requirements:

(a)    All maintenance of the APTs including, but not limited to, preventative maintenance, cleaning, removing graffiti, dirt, stickers and refuse, and restocking dispensers on a daily basis, promptly clearing and removing debris, snow and ice from the ground in and around the APTs up to three feet on each side of the APT and to the Curb on the Curb-side of the APT (including clearing a three-foot access path for wheelchairs in the case of snow and ice and spreading salt or ice remover), prompt response to self activating maintenance and operating warning systems, and ensuring comfortable interior temperature, ventilation and illumination between the hours of eight a.m. and eight p.m. daily unless longer hours are otherwise directed by DOT in its reasonable discretion. The Company shall comply with the regulations for snow removal set forth in section 16-123 of the New York City Administrative Code as may be amended or modified from time to time.

(b)    Daily inspections of the APTs for damage, debris, and unsafe conditions.

(c)    Inspections of electrical wiring and connections including service and post connections and testing for stray voltage (such inspections and testing may be part of regularly scheduled general inspections or otherwise) shall take place at least once each year during the Term. The Company shall record in EIMIS the date(s) of such inspections and testing.

3.1.3.    PSSs. As more fully set forth in the RFP, Proposal, BAFO, and Appendix C attached hereto, commencing on the installation of a PSS and thereafter throughout the Term the Company shall be responsible for:

(a)    All maintenance of the PSSs, including, but not limited to, preventative maintenance, cleaning, and removing graffiti, dirt, stickers and refuse (provided, however, that the Company shall not be responsible for the removal of refuse from free standing trash receptacles) on at least two nonconsecutive days of the week. Company shall remove snow as necessary to ensure continued access to the PSSs.

(b)    Two inspections weekly on non-consecutive days of the PSSs for damage, debris, and unsafe conditions and for information kiosks, proper functioning of the information systems including any hardware and software.

(c)    Inspections of electrical wiring and connections including service and post connections and testing for stray voltage (such inspections and testing may be part of regularly scheduled general inspections or otherwise) shall take place at least once each year during the Term. The Company shall record in EIMIS the date(s) of such inspections and testing.

3.1.4.    Newsstands. As more fully set forth in the RFP, Proposal, BAFO, and Appendix C attached hereto, commencing on the installation of a Newsstand and thereafter throughout the Term:

- 24 -

NYC007697
NYC007697

(a) the Company shall be responsible for all maintenance of the exterior of the Replacement and New Newsstands, in cooperation with the Newsstand Operators including, but not limited to, preventative maintenance, cleaning and removing graffiti, dirt, stickers and refuse on the exterior of the Newsstand on at least two nonconsecutive days each week, promptly clearing and removing debris, snow and ice from the ground in and around the Newsstands up to three feet on each side of the Newsstand and to the Curb on the Curb-side of the Newsstand (including clearing a three-foot access path for wheelchairs in the case of snow and ice and spreading salt or ice remover) and daily inspections of the Newsstands for damage, debris, and unsafe conditions. The Company shall comply with the regulations for snow removal set forth in section 16-123 of the New York City Administrative Code as may be amended or modified from time to time. The Company shall also be responsible for inspections of electrical wiring and connections including service and post connections and testing for stray voltage (such inspections and testing may be part of regularly scheduled general inspections or otherwise) at least once each year during the Term. The Company shall record in EIMIS the date(s) of such inspections and testing; provided, however,

(b) the Company shall not be responsible for (i) operating the Newsstand as a newsstand, (ii) cleaning Newsstand interiors, (iii) any condition on the exterior of the Newsstand that can be reasonably demonstrated to the satisfaction of DOT by the Company to have been caused solely by the Newsstand Operator provided, however, the City may require the Company to address any such condition at the City's sole cost and expense; (iv) the cost of any telephone, other communication, or electricity usage by a Newsstand Operator; or (v) any other utility cost that is not necessary to the franchise; and

(c) The Company is prohibited from deriving revenue from the operation of the Newsstand as a newsstand.

3.1.5. Other. The Company shall

(a) promptly and diligently, and in all cases within the minimum standards and timeframes set forth on Appendix C attached hereto, maintain, replace or repair any parts or components of the Coordinated Franchise Structures which are broken, deteriorated or damaged, regardless of the nature, cause or frequency of such conditions using materials and methods for such maintenance, repair and replacement that comply with all applicable federal, state and local laws, rules and regulations; and

(b) collect refuse or recyclables from any trash receptacles incorporated within or on Coordinated Franchise Structures, provided, however, that the Company shall not be responsible for the collection of refuse or recyclables from free standing trash receptacles installed as PSSs; and

(c) maintain and repair the sidewalk immediately under and three feet on each side of the Coordinated Franchise Structure in its proper condition, or, if necessary restored thereto at the Company's sole cost and expense. On the side of the Coordinated Franchise Structure nearest the Curb, Company's responsibility of maintenance and repair shall extend to, and include, the Curb. Notwithstanding the foregoing, the Company shall not be

NYC007698

NYC007698

responsible for the creation of new pedestrian curbs within the area for which it is responsible for maintenance and repair; and

(d)      provide and maintain adequate illumination for all Coordinated Franchise Structures, except trash receptacles and multi-rack newsracks, between dusk and daylight, or whenever artificial lighting is required for the protection, safety and welfare of the public (provided that where there is no existing electrical connection to a Bus Shelter location and where adding an electrical connection would be impractical because the necessary utility connections are unusually inaccessible, then the phrase "adequate illumination" shall mean courtesy lighting powered by solar panel); and

(e)      remove broken glass, such that the structure is made safe, within 24 hours after the Company becomes aware of the problem, (the glass shall be replaced when practicable within 24 hours of the Company becoming aware of the problem but in no event later than 48 hours after becoming aware of the problem); and

(f)      (i)      complete repairs, replacement of parts, or removal of the structure or components thereof as necessary to ensure public safety of the Coordinated Franchise Structure, within 24 hours (subject to the time frames for the replacement of glass set forth in Section 3.1.5(e)) of the time the Company becomes aware of the problem, including without limitation by oral or written notice from DOT that repair, replacement or removal is necessary to ensure public safety. Should a permit be required, the period for completion of such repair, replacement or removal shall be extended to within 24 hours of receipt of permit, provided that the Company submits a complete application for such permit without delay. The Company shall make the structure safe while permits are pending; and

(ii)      complete repairs, replacement of parts or removals not covered by the preceding clause (i), within 5 days of the time the Company becomes aware of the problem, unless a permit is required. Should a permit be required, the period for completion of such repair, replacement or removal shall be extended to within 5 days of receipt of permit, provided that the Company submits a complete application for such permit without delay; and

(g)      If the Company removes a Coordinated Franchise Structure pursuant to Section 3.1.5 (f) and such Coordinated Franchise Structure is to be replaced at the same location, such replacement will take place within the time frames set forth in Appendix G. If a permit is required, the time period shall be measured from the date of receipt of permit, provided that the Company submits a complete application for such permit without delay.

(h)      If the Company fails to make replacement, complete repairs, or effectuate removals, as required herein, then DOT may, in addition to any other rights and remedies set forth in this Agreement, and without any further notice, make replacement and repairs, or effectuate removals, at the sole cost and expense of the Company.

3.2.      <u>Automatic Vehicle Location and Control System.</u> The Company shall cooperate with DOT, MTA New York City Transit, or any other agencies to make the Bus Shelters available for the installation of wiring and equipment and the ongoing maintenance of AVLC's as such systems are developed. The Company is not responsible for the acquisition, installation,

- 26 -

NYC007699
NYC007699



or maintenance of AVLC equipment or for associated costs and will have no ownership interest in, or responsibility for, the AVLC. However, the Company shall cooperate in its design, installation and maintenance and shall provide access to the Bus Stop Shelters to permit AVLC installation and maintenance, and ensuring (assuming adequate instruction from all applicable governmental and quasi-governmental entities) that routine maintenance of the Bus Stop Shelters does not interfere with the AVLC.

3.3.   Electronic Inventory and Management Information System and Recordkeeping.

(a)   Within 20 days of the Effective Date and thereafter throughout the Term, the Company shall at its sole cost and expense, and as more fully set forth in the RFP and Proposal, install and maintain an Electronic Inventory and Management Information System for the Coordinated Franchise Structures incorporating state-of-the-art technology. If at any time during the Term DOT determines in its reasonable discretion that EIMIS is failing to meet the requirements of the preceding sentence or is inadequate for its purposes then DOT may direct the Company to make such necessary modifications to EIMIS as it deems necessary, and such modifications shall be promptly implemented by the Company at its sole cost and expense.

(i)   to the extent necessary the EIMIS, any part thereof, or any software necessary for its operation shall be installed and maintained by the Company on DOT provided personal computers providing for access by authorized DOT users. DOT shall make appropriate information technology personnel available to coordinate the installation of the EIMIS on its equipment and/or network as appropriate.

(ii)   the EIMIS shall not run primarily on the DOT's equipment or network and DOT shall not be responsible for management, maintenance or assuring access to the system. All such requirements shall be the responsibility of the Company.

(iii)   within 20 days of the Effective Date, the Company shall provide full access to the EIMIS (and training thereon reasonably satisfactory to DOT) to no less than ten authorized personnel of the City through the Internet using any standard Internet browser providing access to the World Wide Web pursuant to the license agreement between the Company and The Siroky Group Inc. attached hereto as Exhibit K. Such access shall be provided through standard Internet security protocols through a secure server. In addition, the City shall have access, through the same means, for a reasonable number of additional users to allow read-only access to conduct searches of the EIMIS and to allow 311 operators (or operators under a successor system) to enter and review the status of complaints received.

(iv)   the EIMIS shall provide at minimum: two-way information sharing between the City and the Company for the recording and processing of complaints from the public and the City, plotting street furniture structures on city maps, graphic navigation, color coding of structures, incident recording and reports, financial information regarding costs, revenues, advertising value by location and structure type, advertising panels displaying Public Service Advertising and NYCMDC Advertising, back-up maintenance and data protection protocols, and a help-menu function for assisting with system operation. The City shall make appropriate 311 personnel available to coordinate the creation of an interface between EIMIS and the 311 system.

NYC007700
NYC007700

(v)     the EIMIS shall be available to authorized users 24 hours per day, seven days a week. In the event of lost access, it shall be restored within six hours of notification by the City.

(b)     Commencing on the Effective Date and thereafter throughout the Term, the Company shall maintain records, in a form satisfactory to the Commissioner and which shall be in a format which is downloadable to commercially available software, demonstrating compliance with the maintenance and operating requirements set forth in Section 3.1 herein, Appendix C attached hereto and the RFP, Proposal and BAFO. Such records shall be available for inspection by the City at all times upon reasonable written advance notice and copies thereof, whether in paper, electronic or other form, shall be provided to DOT promptly upon request. Not later than 30 calendar days after the Effective Date, the Company shall submit to DOT a detailed description of all proposed recordkeeping procedures that will document compliance with the minimum service operating procedures set forth in Section 3.1 herein and Appendix C attached hereto. If DOT determines in its reasonable discretion that such proposed recordkeeping procedures are insufficiently detailed or otherwise unlikely to adequately document compliance with the minimum service operating procedures set forth in Section 3.1 herein and Appendix C attached hereto, DOT may direct the Company to adopt such modifications to the proposed recordkeeping procedures as it deems reasonably necessary, and such modifications shall be promptly implemented by the Company at its sole cost and expense.

(c)     The Company shall be permitted, at any time during the Term, to replace the software and related components then constituting the EIMIS with alternative software and related components (which may be proprietary to the Company or an Affiliate of the Company), at its sole cost and expense, provided that the features of the replacement EIMIS are substantially equivalent or superior to the EIMIS being replaced. In such event, the Company shall grant to the City all necessary licenses and sublicenses as contemplated by Section 2.4.2(b), and shall escrow or cause to be escrowed the source code as required by Section 2.4.2(e). In addition, if such software is proprietary to the Company or an Affiliate of the Company, the Company shall grant to the City all necessary licenses to operate the EIMIS as contemplated by this Agreement following the Term, on a perpetual, royalty-free basis. Furthermore, all right, title, and interest in all data collected by the EIMIS and all other information necessary for the City to maintain and operate the Coordinated Franchise Structures will become the sole and exclusive property of the City without any compensation to the Company after the termination or expiration of this Agreement and the Company and its software vendor shall return any and all such data to the City in a format accessible and usable by the City without the use of the Company's and/or software vendor's software; provided, however, that the Company may retain and use for its own business purposes a copy of such data, and the City shall grant to the Company any necessary license in this regard.

3.4.     <u>Performance Standards and Corrective Actions.</u>

(a)     If the Company has failed to comply with the maintenance and operating requirements set forth in Section 3.1 herein and Appendix C attached hereto, then the Company shall pay liquidated damages as set forth on Appendix A attached hereto.

NYC007701
NYC007701

(b)    If notwithstanding compliance with the maintenance and operating requirements set forth in Section 3.1 herein and Appendix C attached hereto, complaints that the Coordinated Franchise Structures are unsafe or unclean or in disrepair increase by 20% or more during any six month period as compared to the previous six month period, the Commissioner may require the Company, at its sole cost and expense, to adopt and implement such modifications to its inspection, maintenance, repair or cleaning procedures as he or she deems appropriate to ensure that the Coordinated Franchise Structures are maintained in a clean and safe condition and in good repair.

(c)    In addition to any other term, condition or requirement of this Agreement, except and to the extent caused by relocation requirements imposed by the City, the Company shall not have more than ten percent of any type of its Coordinated Franchise Structures out of service at any given time; provided that the foregoing requirement with respect to APTs shall be twenty percent and shall not be in effect until at least five APTs have been installed by the Company. Failure to comply with this Section 3.4(c) shall result in the assessment of liquidated damages as set forth in Appendix A attached hereto.

3.5.    Complaint Handling Procedures.

(a)    Within 30 days after the Effective Date of this Agreement, subject to the reasonable approval of DOT, the Company shall establish and maintain prompt and efficient complaint handling procedures for handling complaints received directly from the public and for handling complaints forwarded to the Company by the City, which procedures shall be consistent with all applicable laws, rules and regulations and the provisions of this Section 3.5. Such procedures shall be set forth in writing and copies thereof shall be maintained at the Company's office and shall be available to the public and the Commissioner upon request.

(b)    All Coordinated Franchise Structures shall have on them a conspicuously posted notice advising the public that they may direct complaints and comments to 311.

(c)    The Company shall have a telephone line for receiving complaints forwarded from DOT, the 311 system or other designated City agencies. The line shall be answered in person from 9:00 a.m. to 5:00 p.m. Monday through Friday, and at other times shall be answered via recorded message. Notwithstanding the above, the Company shall have a contact person available to DOT by phone 24 hours a day, seven days a week.

(d)    The Company shall record all complaints received on the telephone line, through EIMIS, or from any other source in the manner set forth in Section 3.6 hereof and shall diligently and promptly investigate each complaint. If such complaint is reasonably determined to be accurate, the condition shall be cured within the timeframes set forth in Appendix C attached hereto.

(e)    The Company shall provide to DOT a reasonable and adequate explanation describing corrective steps taken by the Company in response to any complaint or reasons why no corrective steps were taken.

(f)    In the event that a complaint has not been diligently and promptly investigated and/or the underlying problem has not been cured by the Company to the

-29-

NYC007702
NYC007702

satisfaction of the Commissioner within the periods set forth above, the Commissioner may (i) order the Company in writing to take appropriate action to investigate such complaint and/or cure the problem, as the case may be and (ii) if the Company fails to take appropriate action accordingly, investigate and cure the underlying problem at the Company's sole cost and expense.

3.6.    <u>Complaint Record Keeping</u>.  The Company shall maintain written, accurate and complete records of all complaints that shall be available to DOT through EIMIS or, at DOT's reasonable advance request, in written form.  Such records shall indicate: (i) the specific Coordinated Franchise Structure, including its identifying number and its exact location, for which the complaint was made; (ii) the type of complaint; (iii) the date and time of complaint; (iv) if the complaint is in written form, the name, address, and telephone number of the Person filing the complaint; (v) the Company's action to address the complaint; and (vi) to the extent applicable the date of resolution of the complaint.  All such records shall be retained by the Company throughout the Term.  The EIMIS shall provide DOT a means by which it can search for complaints by location and/or time period, and shall produce statistical reports, at DOT's request, by type of complaint, location of complaint, type of structure, and time period.

3.7.    <u>Americans with Disabilities Act</u>.  In connection with its obligations under this Agreement the Company, at its sole cost and expense, agrees to comply with the applicable provisions of the Americans With Disabilities Act of 1990, 42 U.S.C. 12132 ("ADA"), the Architectural and Transportation Barriers Compliance Board Guidelines, and any additional applicable federal, state and local laws relating to accessibility for persons with disabilities and any rules or regulations promulgated thereunder, as such laws, rules or regulations may from time to time be amended.

3.8.    <u>No Discrimination</u>.  The Company shall not discriminate in the provision of Services on the basis of race, creed, color, national origin, sex, age, handicap, marital status, or real or perceived sexual orientation.

3.9.    <u>Continuity of Service</u>.  In the event the Company, with the consent of the City as required and in accordance with the provisions of Section 11 hereof, sells or otherwise transfers the System, or any part thereof, or Control thereof to any Person, or to the City or the City's assignee, or in the event the franchise terminates, the Company shall transfer the System, or such relevant part, in an orderly manner in order to maintain continuity of Service.

SECTION 4

<u>ADVERTISING</u>

4.1.    <u>Introduction</u>.

(a)    In consideration of the Company's performance of the Services,  and payment by the Company of the Franchise Fees, the City hereby grants to the Company the exclusive right throughout the Term to sell and place advertising on the Coordinated Franchise Structures that are the subject of this Agreement and subject to the specifications, terms,

- 30 -

NYC007703
NYC007703

reservations and restrictions of this Agreement, and to collect revenues generated by such advertising.

(b)    The Company expressly acknowledges that it is receiving a non-exclusive franchise and that the City, either itself or through third parties, may design, construct, install, operate and maintain street furniture, including, but not limited to, bus stop shelters, automatic public toilets, trash receptacles, multi-rack news racks, information/computer kiosks, and newsstands, that contain advertising on them from which the Company would not be entitled to collect revenue.

4.2.    Defined Terms. For the purposes of this Section 4, the following terms, phrases, words and their derivations shall have the meaning set forth herein, unless the context clearly indicates that another meaning is intended. When not inconsistent with the context, words used in the present tense include the future tense, words used in the plural number include the singular number, and words used in the singular number include the plural number. All capitalized terms used in the definition of any other term shall have their meaning as otherwise defined in Section 1.

(a)    "advertising" shall mean any printed matter including, but not limited to, words, pictures, photographs, symbols, graphics or visual images of any kind, or any combination thereof, promoting or soliciting the sale or the use of a product or service or providing other forms of textual or visual message or information, but in no event shall include the textual information that is required to be posted on a Coordinated Franchise Structure by federal, state and local law, rule or regulation, or this Agreement.

(b)    "alcohol advertising" shall mean advertising, the purpose or effect of which is to identify a brand of an alcohol product, a trademark of an alcohol product or a trade name associated exclusively with an alcohol product, or to promote the use or sale of an alcohol product.

(c)    "NYCMDC Advertising" shall mean advertising reasonably determined by NYCMDC to be within its corporate purpose including, but not limited to, commercial advertisements, advertising promoting New York City, and public service advertisements, but NYCMDC Advertising shall not include "spot market advertising".

(d)    "tobacco advertising" shall mean advertising, which bears a health warning required by federal statute, the purpose or effect of which is to identify a brand of a tobacco product (any substance which contains tobacco, including, but not limited to, cigarettes; cigars, pipe tobacco and chewing tobacco), a trademark of a tobacco product or a trade name associated exclusively with a tobacco product, or to promote the use or sale of a tobacco product.

(e)    "Olympic Period" shall mean the period starting four weeks prior to the commencement of the Olympics and ending two weeks after the end of the Olympics.

(f)    "prohibited advertising" shall mean advertising that is false and/or misleading, which promotes unlawful conduct or illegal goods, services or activities, or that is otherwise unlawful or obscene as determined by DOT, including but not limited to advertising that constitutes public display of offensive sexual material in violation of Penal Law 245.11.

-31-

NYC007704

NYC007704

(g)     "Public Service Advertising" shall mean advertising the purpose or effect of which is to communicate information pertaining to the public health, safety, and welfare of the citizens of the City, as determined by DOT in its sole discretion.

(h)     "spot market advertising" shall mean advertising sold by NYCMDC to commercial advertisers (whether for cash, trade or barter) in a manner unrelated to any broader sponsorship or partnership arrangement between such advertiser and NYCMDC or the City and unrelated to any event, sponsorship or support efforts, or intergovernmental agreements of NYCMDC or the City. For the purposes of this definition of "spot market advertising", intergovernmental agreements shall mean agreements between the City and/or NYCMDC and other governmental or quasi-governmental entities.

4.3.     Advertising Specifications.

4.3.1.     Generally.     Advertising shall be permitted on the Coordinated Franchise Structures except that advertising shall not be permitted on the interior of Newsstands or APTs, or as otherwise prohibited herein. Advertising is not permitted on PSSs except that the name or logo of a sponsoring entity shall be permitted on the exterior of trash receptacles and information/computer kiosks. No advertising shall be permitted on APTs in parks, except that advertising shall be permitted on APTs located on sidewalks adjacent to parks. The design, dimensions, and location of advertising on all Coordinated Franchise Structures shall be in accordance with the terms of this Agreement including Appendix D. The Company shall be entitled to utilize the full amount of advertising space set forth on Appendix D (notwithstanding that the dimension specifications on Appendix D are expressed as "maximum advertising").

4.3.2.     Dimensions/Specifications.     All advertising, or the name or logo of a sponsoring entity, shall contain the features and conform to the basic dimensions set forth in Appendix D attached hereto, and made part hereof, provided, however, that modifications to advertising dimensions may be necessitated by location specific modifications to individual Coordinated Franchise Structures as set forth in Section 2.4.5 herein. Notwithstanding any provision of this Agreement to the contrary, except for the modifications at individual locations contemplated in the proviso to the immediately preceding sentence, the Company shall not be required to modify the basic dimensions set forth on Appendix D attached hereto.

4.4.     Restrictions.

4.4.1.     Prohibitions.     Tobacco advertising and prohibited advertising is not permitted. Alcohol advertising within 250 feet of any school, day care center, or house of worship is not permitted.

4.4.2.     Other Media.     Electronic media will be permitted on a case by case basis; and, except for backlighting of printed posters (the Company shall be permitted to use backlighting of advertising on Coordinated Franchise Structures except where prohibited by rules or regulations of Landmarks), will be subject (except as may otherwise be permitted by the City) to the applicable zoning regulations for property adjacent to the site, and shall be subject to all applicable approvals by City agencies. Audio advertising will not be permitted, provided, however, an audio component used in connection with an information/computer kiosk may be

-32-

NYC007705
NYC007705

permitted in the sole discretion of DOT. The Company shall be permitted to install 250 Scrollers on Coordinated Franchise Structures when and where the Company deems most advantageous in its sole discretion. Any other multimedia, or other non traditional form or type of advertising, including additional Scrollers, shall be permitted only on a case by case basis, as determined by the Commissioner and shall be subject to any applicable approvals by City agencies.

4.4.3.  Viacom Outdoor Agreement.  The Company acknowledges receipt from the City of the Viacom Outdoor Agreement and agrees that it shall take such actions as are reasonably necessary to comply with the revenue sharing obligations set forth in Section 4.10 therein.

4.4.4.  Public Service Advertising.  In each year of the Term, the Company shall provide 2.5% of the total number of panels then available to the Company, to be evenly distributed among the various Coordinated Franchise Structures and evenly distributed throughout the City, at no cost to the City or NYCMDC for Public Service Advertising. The first panel locations for Public Service Advertising shall be as set forth in Exhibit H attached hereto which Exhibit shall be amended as necessary to reflect changes and additional panel locations to be provided for Public Service Advertising during the Term in accordance with this Section 4.4. The Company shall assist DOT and/or NYCMDC in its efforts to inform City agencies of the availability of such Public Service Advertising and in the coordination of requests by such agencies for the use of such space. NYCMDC will coordinate with City agencies for use of the Public Service Advertising panels. The City agrees to consider, in good faith, any proposal made by the Company to postpone the use of the Public Service Advertising space provided for in this Section, or to return that space to the Company, during times of full occupancy for other advertising campaigns in order to maximize revenue generation opportunities; provided that nothing in this sentence shall be interpreted to require the City to forego its rights to receive the Public Service Advertising space that it is entitled to pursuant to this Section.

4.4.5.  NYCMDC Advertising.  In each year of the Term, in addition to the advertising inventory provided for Public Service Advertising pursuant to Section 4.4.4 herein, the Company shall provide advertising space to NYCMDC for NYCMDC Advertising at no cost to the City or NYCMDC consisting of 20% of the total number of panels then available to the Company under this Agreement. Such space shall be distributed fairly throughout the City and shall represent a corresponding percentage of the value of the advertising space available to the Company under this Agreement as set forth in Exhibit H attached hereto, which Exhibit shall be amended as necessary to reflect changes and additional panel locations to be provided to NYCMDC during the Term in accordance with this Section 4.4.

4.4.6.  New Structures, Return, Other.

(a)  No later than 90 days prior to the expiration of each year of the Term, additional panels that have become available to the Company in the preceding 12 months shall be allocated by mutual agreement between the Company and NYCMDC as follows for the following year of the Term:

NYC007706
NYC007706

(i)    2.5% of such new panels shall be allocated to Public Service Advertising to be evenly distributed as to value and geography among the newly available panels; and

(ii)    20% of such new panels shall be allocated to NYCMDC Advertising to be evenly distributed as to value and geography among the newly available panels.

(b)    If the City opts with respect to any year to return some but not all of the Public Service Advertising or the NYCMDC Advertising pursuant to Section 4.4.6(f) hereof, the specific locations of the panels shall reflect an even geographical distribution throughout the City unless otherwise agreed between the Company and NYCMDC.

(c)    The Company agrees to consider, in good faith, any proposal made by DOT or NYCMDC to exchange locations of the NYCMDC Advertising inventory previously agreed upon. Notwithstanding the preceding, the City shall have a yearly option, to be exercised on or before the 90th day prior to the expiration of each year of the Term (subject to the Company's reasonable approval as to locations, based on availability), to exchange with the Company no more than 5% of the locations (provided that no more than 1% may be exchanged per borough in any given year and all such exchanges shall be within the same borough) of the NYCMDC Advertising inventory previously agreed upon on a comparable value basis, effective the following year of the Term.

(d)    The administration of NYCMDC Advertising and Public Service Advertising, including but not limited to posting, planning, installation, maintenance, removal and reporting shall be performed by the Company at no cost to the City or NYCMDC (except that the advertising posters shall be provided to or at the direction of the Company at no expense to the Company), shall be implemented in accordance with the same standards and best practices and utilization of the same materials and methods as used by the Company for displays of its paying commercial clients, which shall include, at a minimum: sufficient lead time for planning, a copy change every four weeks, location lists with spotted maps provided to NYCMDC and DOT two weeks prior to the posting date of any campaign, a completion report including at least six quality photographs of distinct panels for every campaign and an affidavit certifying the date that materials were received and posted provided to NYCMDC and DOT within 6 weeks of the posting completion.    In programming the NYCMDC Advertising and Public Service Advertising, NYCMDC shall provide the Company with a monthly inventory of the NYCMDC Advertising and Public Service Advertising locations and the advertising campaign requested at each location.

(e)    For the purposes of this Section 4.4.6 an exclusive advertising campaign shall be any campaign whereby the Company agrees to limit its rights to enter into advertising agreements with entities that compete with a particular advertiser. If the Company wishes to enter into an exclusive advertising campaign that would limit not just the Company's rights but also NYCMDC's rights under this Agreement to use panels for NYCMDC Advertising, then provided the Company has given NYCMDC the notice described below in this paragraph NYCMDC agrees to cooperate in good faith to address any potential issues that may arise out of an accommodation by NYCMDC of such exclusivity arrangement, including, for

-34-

NYC007707
NYC007707

example, consideration of an in-kind exchange of panel locations on a one for one basis to accommodate a specified geographic exclusivity. NYCMDC has no obligation beyond such good faith cooperation to accommodate any such exclusivity commitment sought by the Company. The notice to NYCMDC described in this paragraph shall contain information as to the schedule, duration, geographic reach and number of panels involved in the proposed exclusive advertising campaign.

(f)    Additionally, the City shall have a yearly option, to be exercised no later than the 90th day prior to the expiration of each year of the Term, to return to the Company any or all of the advertising space reserved for Public Service Advertising and NYCMDC Advertising effective the following year of the Term. DOT will be compensated for this returned advertising space in accordance with Section 9.6.2 hereof.

4.4.7.  Alternative Compensation.  In addition to the advertising panels provided for Public Service Advertising and NYCMDC Advertising, the Company shall be required to provide to NYCMDC certain advertising space pursuant to Section 9.4 hereof.

4.4.8.  Olympics.  Should any Olympics be awarded to the City during the Term:

(a)    the City, at its sole discretion, may require the Company to cease to sell and place advertising on all or some of the Coordinated Franchise Structures during the Olympic Period;

(b)    the City, at its sole discretion, may impose restrictions on the parties who may advertise on the Coordinated Franchise Structures and/or the nature of the advertising during the Olympic Period;

(c)    the City or its designated representative may assume control of advertising sales and placement during the Olympic Period;

(d)    the Company shall continue to comply with all other terms of this Agreement, except as expressly set forth herein.

4.4.9.  Removal.  Any material displayed or placed in violation of Section 4 shall be removed by the Company within 48 hours of notice from DOT and any material displayed or placed in violation of Section 4.4.1 shall be removed by the Company within 24 hours of notice from DOT. If the Company fails to do so, the City shall have the right to remove such material without any liability to the Company and the Company shall pay to the City the costs incurred in connection with such removal and for any other costs or damages incurred by the City in connection with such removal including, but not limited to repair and restoration costs, arising out of the performance of such work.

4.5.  Maintenance of Advertising.

(a)    The Company shall maintain the advertising on Coordinated Franchise Structures in a clean and attractive condition at all times and be responsible for the cost of any power consumption used, electrical or otherwise, including the cost of any power consumption used in connection with NYCMDC Advertising and Public Service Advertising.

-35-

NYC007708
NYC007708

(b)     All advertising display panels must be safe, secure and sturdy, and shall be maintained as such throughout the Term. In the event the Commissioner deems a display panel or any part thereof to be unsafe, insecure or not sturdy, or to otherwise pose a threat to public safety, the Company shall remove such panel without delay upon receipt of notice from DOT. If the Company fails to do so, the City shall have the right to remove such panel without any liability to the Company and the Company shall pay to the City the costs incurred in connection with such removal and for any other costs or damages incurred by the City in connection with such removal including, but not limited to repair and restoration costs, arising out of the performance of such work. In the event any panel is removed in accordance with this Section 4.5, the Company shall take all steps necessary to maintain the full function of the structure. A replacement panel may be installed, at the Company's sole cost and expense, only with the express, prior written approval of the Commissioner, which approval shall not be unreasonably withheld, conditioned or delayed.

    4.6.     Future Compliance. The Company shall comply with all applicable laws, rules and regulations in force as of the Effective Date and which may hereafter be adopted with respect to advertising.

    4.7.     Change in Local Law. If there is a change in local New York City law, rule or regulation restricting alcohol advertising (a "Local Alcohol Advertising Restriction") such that the Company can demonstrate to the City a loss in revenue, then:

    (a)     If the Company can show that its Gross Revenues have declined in any or all of the eight quarters beginning in the quarter in which the restriction imposed by the Local Alcohol Advertising Restriction took effect (the "Restriction Effective Date") (as compared with the Company's Gross Revenues during the corresponding quarter of the 12 month period prior to the Restriction Effective Date), then the Cash Component applicable to any such quarters shall be reduced by the product of (i) .5 and (ii) the decline in the Company's Gross Revenues attributable to the Local Alcohol Advertising Restriction during such applicable quarter. If the reduction contemplated by the preceding sentence is greater than the Cash Component applicable to such quarter pursuant to Section 9.5 hereof (after all other adjustments pursuant to Section 9 hereof), then all subsequent payments of the cash portion of the Franchise Fee shall be reduced until the full amount of the adjustment calculated in accordance with this Section 4.7(a) has been deducted, provided, however, that in no event shall any reductions be rolled over for more than seven quarters.

    (b)     The adjustments set forth in Section 4.7(a) shall be in the nature of a deferral, not an offset. Accordingly, the Company shall repay to the City all amounts (without interest) deducted in accordance with Section 4.7(a) in 12 equal quarterly payments beginning on the date of the first regularly scheduled payment under Section 9.5 occurring after the last deferral allowed in Section 4.7(a) hereof.

    (c)     Notwithstanding the foregoing, this Section 4.7 shall have no force or effect if there is a Local Alcohol Advertising Restriction after the 17th year of the Term. If any of the payments to be made to the City pursuant to Section 4.7(b) above would, by its terms, be payable after the expiration of this Agreement, then the balance of such amount deferred shall be paid no later than 30 days after start of the last quarter of the last year of the Term. In the event

NYC007709
NYC007709

that this Agreement is terminated in accordance with its terms, Company shall pay back any amounts deferred within 30 days of such termination.

For the avoidance of doubt, an example of the calculation of the adjustments to the Franchise Fee contemplated by this Section 4.7 is set forth on Schedule 4.7 to this Agreement.

(d)    Any adjustment to the Cash Component made pursuant to this Section 4.7 shall not be taken into consideration for purposes of comparing the Cash Component to 50% of Gross Revenues in accordance with Sections 9.2, 9.3 and 9.5.

## SECTION 5

## CONSTRUCTION AND TECHNICAL REQUIREMENTS

5.1.    <u>General Requirements</u>.    The Company agrees to construct and install the Coordinated Franchise Structures in accordance with the Plans and Specifications and each of the terms set forth in this Agreement governing construction and installation of the Coordinated Franchise Structures, the siting criteria in the RFP, the Proposal and BAFO.

5.2.    <u>Identification of Coordinated Franchise Structure</u>.    The Company shall have displayed on each Coordinated Franchise Structure a unique identifying number (which shall be tracked via EIMIS) and a visible sign that shall comply with Section 3.5 (b) herein.

5.3.    <u>Quality</u>.    The Company agrees to comply with all applicable sections of the building, plumbing and electrical codes of the City and the National Electrical Safety Code and where the nature of any work to be done in connection with the installation, operation and maintenance or deactivation of the System requires that such work be done by an electrician and/or plumber, the Company agrees to employ and utilize only licensed electricians and plumbers.    All such work shall be performed using quality workmanship and construction methods in a safe, thorough and reliable manner using state of the art building materials of good and durable quality and all such work shall be done in accordance with all applicable law, rules and regulations.    If, at any time, it is determined by the City or any other agency or authority of competent jurisdiction that any part of the System, is harmful to the public health or safety, then the Company shall, at its sole cost and expense, promptly correct all such conditions, provided, however, that to the extent the harmful condition was caused by the City's gross negligence or intentional misconduct, the Company shall correct such harmful condition at the City's sole cost and expense.

5.4.    <u>Structures</u>.    In connection with the installation, operation, and maintenance of any and all Coordinated Franchise Structures, the Company shall, at its own cost and expense, take commercially reasonable measures to protect any and all structures belonging to the City and all designated landmarks, and all other structures within any Historic District from damage that may be caused to such structures and landmarks as a result of the installation, operation or maintenance performed thereon by, or on behalf of the Company.    The Company agrees that it shall be liable, at its own cost and expense, to replace or repair and restore to its prior condition in a manner as may be reasonably specified by the City, any municipal structure, designated

- 37 -

NYC007710
NYC007710

landmarks, structures in an Historic District or any part of the Inalienable Property of the City that may become disturbed or damaged as a result of any work thereon by or on behalf of the Company pursuant to this Agreement.

5.5.    No Obstruction.  In connection with the installation, operation, and maintenance of the Coordinated Franchise Structures, the Company shall use commercially reasonable efforts to minimize the extent to which the use of the streets or other Inalienable Property of the City is disrupted, and shall use commercially reasonable efforts not to obstruct the use of such streets and/or Inalienable Property of the City, including, but not limited to, pedestrian travel. Sidewalk clearance must be maintained at all times so as to insure a free pedestrian passage in accordance with Appendix 3 of the RFP and any applicable laws, rules and regulations unless prior consent has been obtained from the Commissioner in his/her sole discretion.

5.6.    Safety Precautions.  The Company shall, at its own cost and expense, undertake appropriate efforts and any other actions as otherwise directed by DOT to prevent accidents at its work sites, including the placing and maintenance of proper guards, fences, barricades, security personnel and bollards at the Curb, and suitable and sufficient lighting.

5.7.    Power Outages.  In the event that any type of power outage occurs, to the extent the source of such outage is under the direct and exclusive control of the Company, the Company shall restore service within 24 hours at all Coordinated Franchise Structure locations so affected. If the source of a power outage is not under the direct and exclusive control of the Company, the Company shall undertake commercially reasonable efforts to restore service at all affected Coordinated Franchise Structure locations and shall notify the responsible party and the Commissioner within 24 hours.

## SECTION 6

## SECURITY FUND

6.1.    General Requirement.  The Company shall, in accordance with Section 2.2 herein, deposit with DOT a security deposit (the "Security Fund") in the amount of $5,000,000.00, which may consist of a certified check, bank check or wire transfer payable to the "City of New York," or other cash equivalent acceptable to DOT.  Interest shall accrue in an interest bearing bank account for the benefit of the Company and shall be paid annually to the Company on each anniversary of the Effective Date.

DOT shall be entitled, as authorized by law, to charge and collect from the Company for any reasonable administrative expenses, custodial charges, or other similar expenses, as may result from the operation of this Security Fund.

The Company shall maintain $5,000,000 in the Security Fund at all times during the Term plus one year after the end of the Term (provided that such one year period shall not start until the end of any holdover period), unless within such one year period DOT notifies the Company that the Security Fund shall remain in full force and effect during the pendency of any litigation or the assertion of any claim which has not been settled or brought to final judgment and for which the Security Fund provides security; provided that only such portion of the

NYC007711
NYC007711



Security Fund as shall represent the amount actually subject to such outstanding litigation or other claim shall be retained and only until such time as the litigation or other claim is resolved. Any amounts remaining in the Security Fund that are not being retained in accordance with this paragraph shall be promptly returned to the Company.

6.2. <u>Scope of Security Fund</u>. The Security Fund shall secure the City up to the full face amount of such Security Fund for any purpose set forth in Section 6.3 hereof.

6.3. <u>Security Fund Purposes</u>. The Security Fund shall serve as security for the faithful performance by the Company of all terms, conditions and obligations of this Agreement, including, but not limited to:

(a)    any loss or damage to any municipal structure or Inalienable Property of the City, for which the Company would be responsible under this Agreement, during the course of any installation, operation, and maintenance of the System;

(b)    any costs, loss or damage incurred by the City as a result of the Company's failure to perform its obligations pursuant to this Agreement;

(c)    the removal of all or any part of the System, for which the Company would be responsible under this Agreement, from the Inalienable Property of the City, pursuant to this Agreement;

(d)    any expenditure, damage, or loss incurred by the City resulting from the Company's failure to comply with any rules, regulations, orders, permits and other directives of the City and the Commissioner issued pursuant to this Agreement; and

(e)    the payment of any other amounts which become due to the City from the Company pursuant to this Agreement, including, but not limited to payment of compensation set forth in Section 9 hereof and liquidated damages.

6.4. <u>Withdrawals From or Claims Under the Security Fund</u>. In accordance with Section 6.3 herein, this Section 6.4, and Section 13 hereof, DOT may make withdrawals from the Security Fund of such amounts as are necessary to satisfy (to the degree possible) the Company's obligations under this Agreement that are not otherwise satisfied and to reimburse the City for costs, losses or damages incurred as the result of the Company's failure(s) to satisfy its obligations. DOT may not seek recourse against the Security Fund for any costs, losses or damages for which DOT has previously been compensated through a withdrawal from the Security Fund, recourse to the Performance Bond or the Guaranty, draw down against the Letter of Credit, or otherwise through payment or reimbursement by the Company.

6.5. <u>Use</u>. In performing any of the Company's obligations under this Agreement using the Security Fund the City, if applicable, shall obtain competition to the maximum extent practicable under the circumstances.

6.6. <u>Notice of Withdrawals</u>. Within 48 hours after any withdrawals from the Security Fund, DOT shall notify the Company of the date and amount thereof, provided, however, that DOT shall not make any withdrawals by reason of any breach for which the Company has not

NYC007712
NYC007712


been given notice and an opportunity to cure in accordance with this Agreement. The withdrawal of the amounts from the Security Fund shall constitute a credit against the amount of the applicable liability of the Company.

6.7.    Replenishment.    Until the expiration of one year after the end of the Term or during any holdover period, and subject to the provisions of Sections 13.5(b) and 13.7.1(c), within 30 days after receipt of notice (the "Replenishment Period") from DOT that any amount has been withdrawn from the Security Fund as provided in this Section 6, the Company shall restore the Security Fund to the amount specified in Section 6.1 herein, provided that the Company is not contesting, in good faith, the withdrawal. If the Company fails to replenish the appropriate amount within the Replenishment Period and does not contest the withdrawal before a court of competent jurisdiction, then the Company shall pay interest accruing on that amount at the rate specified in Section 9.12 hereof from the completion of the Replenishment Period until such replenishment is made. If the withdrawal is contested, then upon the entry of a final, non-appealable, court order or judgment determining the propriety of the withdrawal, DOT, or the Company as applicable, shall refund or replenish the appropriate amount to the Security Fund. If either DOT or the Company has not refunded or made the required replenishment to the Security Fund within 30 days of the entry of a final non-appealable court order or judgment, interest on the amount not refunded or replenished shall be payable by either DOT or the Company, as applicable, at the rate specified in Section 9.12 hereof from the end of the Replenishment Period to the date the applicable amounts are actually refunded or replenished. Such interest shall be payable to the party entitled thereto.

6.8.    Not a Limit on Liability.    The obligation to perform and the liability of the Company pursuant to this Agreement shall not be limited in nature or amount by the acceptance of the Security Fund required by this Section 6 subject to the limitations set forth in the last sentence of Section 6.4 and in Section 13.5(b).

SECTION 7

PERFORMANCE BOND AND LETTER OF CREDIT

7.1.    General Requirement.

(a)    The Company shall, in accordance with Section 2.2 herein, provide DOT with a surety performance bond (the "Performance Bond") in the amount of $5,000,000 and an unconditional and irrevocable Letter of Credit (the "Letter of Credit") in the amount of $96,000,000 and such Performance Bond and Letter of Credit shall be in place (subject to the reductions in the amount of the Letter of Credit contemplated in Section 7.4 and substitution contemplated in Section 7.1(b) or 7.2(c)) at all times during the Term plus one year after the end of the Term (provided that such one year period shall not start until the end of any holdover period) unless within such one year period DOT notifies the Company that the Performance Bond or Letter of Credit shall remain in full force and effect during the pendency of any litigation or the assertion of any claim which has not been settled or brought to final judgment and for which the Performance Bond or Letter of Credit provides security; provided that only such portion of the Performance Bond or Letter of Credit as shall represent the amount actually subject to such outstanding litigation or other claim shall be retained and only until such time as

-40-

NYC007713
NYC007713

the litigation or other claim is resolved. Within 20 days' notice from the City of the amount subject to such outstanding litigation or claim, the Company shall provide the City with a replacement Performance Bond and/or Letter of Credit in such amount to be retained in accordance with the provisions of this Section 7. To the extent that the claim can be satisfied from the Letter of Credit or the Performance Bond, the City shall elect either the Letter of Credit or the Performance Bond.

(b)     If at any time during the Term the Performance Bond is (i) to be cancelled by the surety company, (ii) expires by its terms and the surety gives notice 90 days prior to such expiration that the Performance Bond will not remain in effect, or (iii) is no longer in effect for any reason, then the Company shall, prior to such cancellation or expiration, or as soon thereafter as reasonably practicable if prior notice by the surety is not given, provide DOT with a replacement performance bond acceptable to DOT (which Performance Bond shall be acceptable if in the form of Exhibit F and the surety is acceptable to DOT). If the Company cannot obtain a replacement because it is not then commercially available, then the Company shall, prior to such cancellation or expiration, or as soon thereafter as reasonably practicable if prior notice by the surety is not given, substitute a Letter of Credit for such Performance Bond for up to three months. If a Performance Bond is still not available 30 days before the end of such 3 month period, the Company shall increase the Security Fund by the full face amount of the Performance Bond before the expiration of the substitute Letter of Credit in lieu of maintaining a Performance Bond in accordance with this Section 7. The circumstances described in this paragraph shall not constitute a breach or default under this Agreement by virtue of the Company having failed to maintain the Performance Bond in accordance with the terms of this Agreement provided that the Company timely complies with the obligations to substitute the Letter of Credit and increase the Security Fund in accordance herewith. The Company shall provide proof that the Performance Bond is in effect for the full face value on or about each anniversary of the Effective Date or upon reasonable demand by DOT.

7.2.     Form.

(a)     The Performance Bond shall be in a form and from an institution reasonably satisfactory to the City provided that a form of Performance Bond that matches the form set forth in Exhibit F shall be deemed satisfactory to the City. The "City of New York acting by and through the Department of Transportation" shall serve as the sole obligee under the Performance Bond. The attorney-in-fact who signs the performance bond must file with the bond a certified copy of his/her power of attorney to sign the bond.

(b)     The Letter of Credit, prior to the reduction to $5 million as contemplated in Section 7.4 below, shall be in a form and issued by a bank reasonably satisfactory to the City provided that a form of Letter of Credit that matches the form set forth in Exhibit IA shall be deemed satisfactory to the City ("Pre-Build Out L/C"). The Letter of Credit, once the amount is reduced to $5 million and thereafter for the remainder of the Term, shall be in a form and issued by a bank reasonably satisfactory to the City provided that a form of Letter of Credit that matches the form set forth in Exhibit IB shall be deemed satisfactory to the City ("Post Build-Out L/C"). The "City of New York acting by and through the Department of Transportation" shall be named as a beneficiary in both the Pre Build-Out L/C and the Post Build-Out L/C. The

- 41 -

NYC007714

NYC007714

original Letter of Credit shall be deposited with DOT and DOT shall serve as the holder of such letter. The Post Build-Out L/C shall contain the following endorsement:

> "It is a condition of this Letter of Credit that it shall be deemed automatically renewed for consecutive additional periods of one year each from the present and each future expiration date hereof unless and until at least ninety (90) days prior to any such date the Bank shall notify the Beneficiary and the Principal in writing of its intention not to renew this Letter of Credit for any such additional period."

    (c)    In the event that the Company intends to change the issuing bank of the Post Build-Out L/C, the Company shall provide written notification to the City of such proposed change, including the name of the proposed new issuing bank. Upon receipt of such notification, and provided that the new issuing bank is reasonably acceptable to the City, the City and the Company shall sign a written communication to the issuing bank of the then existing Post Build-Out L/C instructing such bank not to renew the existing Post Build-Out L/C and allow it to expire in accordance with its terms. In the event that the Company does not provide a replacement Post Build-Out L/C before the existing Post Build-Out L/C has thirty (30) days to run before it is set to expire, the City may draw down on the Post Build-Out L/C in accordance with Section 7.5 (b) of this Agreement.

    7.3.    <u>Scope</u>.

    (a)    The Performance Bond shall serve as security for any loss or damage, in kind replacement, and/or repairs of, Sidewalks and Historic Pavement during the course of any installation, operation, maintenance or removal, of all or any part of the System by the Company.

    (b)    The Letter of Credit shall serve as security for the Company's performance under this Agreement as such performance is described in Section 6.3 herein.

    7.4.    <u>Letter of Credit Reduction</u>. The amount of the Letter of Credit required to be provided by the Company shall be reduced on a yearly basis on or about the 90th day after each anniversary of the Effective Date, by an amount equal to the number of Coordinated Franchise Structures for which the Installation Date has occurred during the preceding year of the Term, multiplied by the dollar amount applicable to each such Coordinated Franchise Structure set forth in Schedule 7.4, provided that in no event shall the amount of the Letter of Credit be reduced below $5,000,000. The Company shall deliver to the City a replacement Letter of Credit on or about each such 90th day following the anniversary of the Effective Date in a face amount calculated in accordance with this Section 7.4.

    7.5.    <u>Drawdown Against the Letter of Credit</u>.

    (a)    In accordance with Section 7.3 herein, this Section 7.5, and Section 13 hereof, DOT may drawdown against the Letter of Credit such amounts as are necessary to satisfy (to the degree possible) the Company's obligations under this Agreement not otherwise met and to reimburse the City for costs, losses or damages incurred as the result of the Company's failure(s) to meet its obligations. DOT may not seek recourse against the Letter of Credit for any costs, losses or damages for which DOT has previously been compensated through a



NYC007715
NYC007715