drawdown against the Letter of Credit, recourse to the Performance Bond or the Guaranty, withdrawal from the Security Fund or otherwise through payment or reimbursement by the Company.

(b) In addition to its right to drawdown on the Letter of Credit for any of the reasons set forth in Section 6.3 hereof, DOT may drawdown in full on the Letter of Credit at any time such Letter of Credit has less than thirty (30) days to run before it is scheduled to expire and no replacement or renewal Letter of Credit has been given in its place. In the event of a drawdown for such reason, DOT will hold the proceeds as cash security (paying to itself any interest earned) in lieu of a Letter of Credit (with DOT having the right to make withdrawals for the same purposes as drawdowns are permitted on the Letter of Credit) until a replacement Letter of Credit is put in place, at which time such drawdown proceeds will be returned to the Company less any proper withdrawals and any reasonable transaction expenses. All amounts so held in cash will be subject to annual reduction in accordance with Section 7.4, and the excess cash held by the City following such annually scheduled reduction shall promptly be returned to the Company. In the event of the drawdown contemplated in this Section 7.5(b), no breach or default shall exist under this Agreement by virtue of the Company having failed to maintain the Letter of Credit in accordance with the terms of this Agreement. In the event of a drawdown on the Letter of Credit as contemplated by this Section 7.5(b), and until such time as a replacement Letter of Credit is obtained in accordance with this Section 7.5(b), the replenishment obligations of the Company with respect to the moneys held by the City following such drawdown as cash security shall correspond to the replenishment obligations (and rights, including the Company's right to contest any withdrawals therefrom) of the Company applicable to the Security Fund under Section 6.7.

7.6. Use. In performing any of the Company's obligations under this Agreement using the Letter of Credit the City shall obtain competition, if applicable, to the maximum extent practicable under the circumstances.

7.7. Notice of Drawdown. Within 48 hours after any drawdown against the Letter of Credit or any claim with respect to the Performance Bond, DOT shall notify the Company of the date and amount thereof, provided, however, that DOT shall not make any drawdowns or claims by reason of any breach for which the Company has not been given notice and an opportunity to cure in accordance with this Agreement. The drawdown against the Letter of Credit or a satisfied claim with respect to the Performance Bond shall constitute a credit against the amount of the applicable liability of the Company.

7.8. Replenishment. Until the expiration of one year after the Term, during any holdover period, and subject to the provisions of Sections 13.5(b) and 13.7.1(c), within 30 days after receipt of notice (the "L/C Replenishment Period") from DOT that at least $500,000 (cumulatively or in a single instance) has been drawn down against the Letter of Credit, the Company shall obtain a replacement or additional letter of credit such that the total amount available under the letter(s) of credit obtained shall be restored to the amount required in this Section 7, provided that the Company is not contesting, in good faith, the drawdown, or any portion thereof (provided that the Company shall replenish any uncontested portions if greater than $500,000). Nothing herein shall prohibit the Company from contesting any drawdown, including any drawdown less than $500,000. The amount referenced in the immediately

- 43 -

preceding sentence shall be reduced proportionately in accordance with the Letter of Credit reductions contemplated by Section 7.4, to a minimum of $100,000. If the Company fails to obtain a replacement or additional letter of credit in the appropriate amount within the L/C Replenishment Period and does not contest the drawdown before a court of competent jurisdiction, then the Company shall pay interest accruing on that amount at the rate specified in Section 9.12 hereof from the completion of the L/C Replenishment Period until such replacement or additional letter of credit is obtained. If the drawdown is contested, then upon the entry of a final non-appealable court order or judgment determining the propriety of the drawdown, DOT, or the Company as applicable, shall refund or replenish the appropriate amount, or obtain a replacement or additional letter of credit, as appropriate. If either DOT or the Company has not refunded or made the required replenishment, or obtained a replacement or additional letter of credit, as appropriate, within 30 days of the entry of a final non-appealable court order or judgment, interest on the appropriate amount shall be payable by either DOT or the Company, as applicable, at the rate specified in Section 9.12 hereof from the end of the L/C Replenishment Period to the date the applicable amounts are actually refunded or replenished, or an additional or replacement letter of credit is obtained, as appropriate. Such interest shall be payable to the party entitled thereto.

  7.9.  <u>Not a Limit on Liability</u>.  The obligation to perform and the liability of the Company pursuant to this Agreement shall not be limited in nature or amount by the acceptance of the Performance Bond or the Letter of Credit required by this Section 7 subject to the limitations set forth in the last sentence of Section 7.5(a) and Section 13.5(b).

  7.10.  <u>Cancellation Upon Replacement</u>.  In the event the Company provides a replacement or substitute Letter of Credit or a replacement Performance Bond pursuant to the provisions of this Section 7, the City shall, as soon as practicable and in no event later than 30 days after such replacement or substitute Letter of Credit or replacement Performance Bond is delivered to the City or to a third party for the benefit of the City, return to the issuing bank such Letter of Credit and/or to the Company or surety such Performance Bond that was replaced or substituted, and shall notify, in writing, the Company and/or the surety of such return. Additionally, the City hereby agrees that upon delivery of the replacement or substitute Letter of Credit or replacement Performance Bond to the City, the City shall have no further rights (including, without limitation, the right to make claims or demands) against any Letter of Credit and/or Performance Bond that has been replaced or substituted as described above.

## SECTION 8

## EMPLOYMENT AND PURCHASING

  8.1.  <u>Right to Bargain Collectively</u>.  The Company agrees to recognize the right of its employees to bargain collectively through representatives of their own choosing in accordance with applicable law. The Company shall recognize and deal with the representatives duly designated or selected by the majority of its employees for the purpose of collective bargaining with respect to rates of pay, wages, hours of employment or any other terms, conditions or privileges of employment. The Company shall not dominate, interfere with, participate in the management or control of, or give financial support to any union or association of its employees.

-44-

8.2.  <u>Local Opportunities</u>. The Company, shall use commercially reasonable efforts, at its own cost and expense, to recruit, educate, train and employ residents of the City, for the opportunities to be created by the construction, installation, operation, management, administration, marketing and maintenance of the System. Such recruitment activities shall include provisions for the posting of employment and training opportunities at appropriate City agencies responsible for encouraging employment of City residents. The Company shall ensure the promotion of equal employment opportunity for all qualified Persons employed by, or seeking employment with, the Company.

8.3.  <u>Obligation to Use Domestic and Local Contractors and Subcontractors</u>. The Company certifies that at least eighty percent of the overall costs incurred by the Company for the labor and materials involved in the manufacture, including without limitation, assembly, of the Coordinated Franchise Structures shall be within the United States and that at least fifty percent of the overall costs incurred by the Company for the labor and materials involved in the manufacture, including without limitation, assembly of the Coordinated Franchise Structures shall be within the City of New York.

8.4.  <u>No Discrimination</u>. The Company shall not: (i) refuse to hire, train, or employ; (ii) bar or discharge from employment; or (iii) discriminate against any individual in compensation, hours of employment, or any other term, condition, or privilege of employment, including, without limitation, promotion, upgrading, demotion, downgrading, transfer, layoff, and termination, on the basis of race, creed, color, national origin, sex, age, handicap, marital status, affectional preference or sexual orientation in accordance with applicable law. The Company agrees to comply in all respects with all applicable federal, state and local employment discrimination laws and requirements during the Term.

SECTION 9

<u>COMPENSATION AND OTHER PAYMENTS</u>

9.1.  <u>Defined Terms</u>. For the purposes of this Agreement, the following terms, phrases and words shall have the meaning set forth in this Section 9.1, unless the context clearly indicates that another meaning is intended. When not inconsistent with the context, words used in the present tense include the future tense, words used in the plural number include the singular number, and words used in the singular number include the plural number. All capitalized terms used in the definition of any other term shall have their meaning as otherwise defined in Sections 1 or 4 herein. References in this Section 9 to "commercial advertising" provided to NYCMDC as compensation to the City shall be understood to refer to space for advertising to be provided to NYCMDC (including New York City Promotional Advertising) for use consistent with its corporate purpose in accordance with this Section 9.

(a)  "Alternative Compensation" means one of the two compensation components of the Guaranteed Minimum. Alternative Compensation for each year of the Term shall have a market value as set forth in Column B of Schedule C attached hereto (subject to adjustment as contemplated by this Section 9), and shall consist of commercial advertising provided to NYCMDC on the inventory described below, which shall be used by NYCMDC consistent with NYCMDC's corporate purpose (but not for "spot market advertising"); provided,

-45-

however, that $2,500,000 of Alternative Compensation listed in Column B of Schedule C for the first year of the Term shall consist of the amenities contemplated by Section 9.17 and not commercial advertising. The inventory referred to in the immediately preceding sentence shall consist of out-of-home advertising media (e.g. billboards, stadium signage, transit terminals, street furniture and advertising time on any form of electronic media) outside of New York City then owned or controlled by the Company or any other entity which is more than 50% owned by Cemusa-Corporacion Europea de Mobiliario Urbano, S.A. (the "Parent"), or a successor in interest to the Parent, and over which the Parent or such successor in interest exercises operational control (the "Cemusa In-Kind Markets"). Alternative Compensation shall be valued at the prevailing market rates actually charged to commercial customers buying comparable amounts of the Company's advertising space in the applicable Cemusa In-Kind Market in accordance with the valuation methodology described in Section 9.4.1. Commercial advertising provided as Alternative Compensation shall be implemented pursuant to Sections 4.4.6(d) and 9.4 herein unless otherwise noted herein.

(b)    "Cash Component" means one of the two compensation components of the Guaranteed Minimum, consists of cash, and is as set forth in Column A of Schedule C attached hereto.

(c)    "Gross Revenues" means all revenues (from whatever source derived, and without any deduction whatsoever for commissions, fees, brokerage, labor charges or other expenses or costs), as determined in accordance with generally accepted accounting principles, on an accrual basis, paid or obligated to be paid, directly or indirectly, to the Company, its subsidiaries, affiliates, or any third parties directly or indirectly retained by the Company to generate revenue (not including amounts paid or obligated to be paid to such third parties by or on behalf of the Company or any subsidiary or affiliate of the Company), as a result of the installation of the Coordinated Franchise Structures and, including without limitation, the display of advertising thereon. In addition to any revenues generated in the form of monetary receipts, Gross Revenues shall be deemed to include the fair market value of any non-monetary consideration in the form of materials, services or other benefits, tangible or intangible, or in the nature of barter the Company may receive. In the event that the Company provides any advertising space pursuant to any transaction which is not an arm's-length transaction (because, for example the transacting Persons share some common ownership, or one party is controlled by the other party or the transaction involves the Company's including or grouping advertising on the Coordinated Franchise Structures with other assets in the Company's inventory or otherwise), the amount to be included in Gross Revenues with respect to such transaction will be the fair market value of the advertising space as if such advertising space were provided pursuant to an arm's-length transaction. Notwithstanding anything to the contrary in this definition, Gross Revenues shall not include any sales taxes or other taxes imposed by law which the Company is obligated to collect, or any Public Service Advertising, NYCMDC Advertising or Alternative Compensation. Gross Revenues shall not include Scroller Gross Revenues in years 1 through 5 of the Term and PSS Gross Revenues during the Term. The Company will not divert or recharacterize revenue that would otherwise have been considered Gross Revenues for purposes of this Agreement.

NYC007719
NYC007719

(d) "Guaranteed Minimum" for any given year of the Term shall consist of the Cash Component set forth in Schedule C and the Alternative Compensation set forth in Schedule C, subject to adjustment as expressly set forth in Section 9.

(e) "New York City Promotional Advertising" means advertising which in at least substantial portion on its face promotes New York City, including by promoting, for example: travel to New York City; doing business in New York City; arts, entertainment and cultural institutions located in New York City; or life in or living in New York City.

(f) "PSS Gross Revenues" shall mean revenue generated by PSSs calculated in the same manner as Gross Revenues. PSS Gross Revenues shall be paid in accordance with Schedule D.

(g) "Scroller Gross Revenues" shall mean revenue generated by Scrollers calculated in the same manner as Gross Revenues.

9.2. <u>Compensation</u>. As compensation for the franchise, commencing on the Effective Date and as set forth in this Section 9, the Company shall pay and/or provide (as the case may be) to the City with respect to each year of the Term (subject to the remaining provisions of this Section 9):

the greater of:

(i) 50% of Gross Revenues for such year of the Term; or

(ii) the Cash Component for such year of the Term;

plus

the Alternative Compensation for such year of the Term

as the Franchise Fee; provided however that, in any year of the Term in which 50% of Gross Revenues is greater than the Cash Component, the Cash Component will be increased and the Alternative Compensation will be reduced by the actual amount of the positive difference obtained by subtracting the amount of the Cash Component (as set forth in Schedule C for such year, i.e., prior to any adjustment) from 50% of Gross Revenues for such year; provided further however that the Alternative Compensation shall not be reduced by, nor the Cash Component increased by, an amount which would reduce Alternative Compensation below the amount set forth in Column C of Schedule C for such year. The adjustments to the Alternative Compensation contemplated in this Section 9.2 shall be made in the year of the Term following the year of the Term to which they apply, due to the inability to adjust Alternative Compensation retroactively.

For the avoidance of doubt, several examples of the calculation of the Franchise Fee in a variety of circumstances are set forth on Schedule 9.2 to this Agreement.

9.3. <u>Advance Payment</u>. Within five business days of the Effective Date, the Company shall pay to the City $50,000,000 in cash as the first installment of the advance payment of the

NYC007720
NYC007720

Cash Component for the first four years of the Term. Within five business days of receipt by the Company from DOT of the necessary permits for installation by the Company of the 200th Coordinated Franchise Structure (not including PSSs), the Company shall pay to the City $68,460,000 in cash as the second and last installment of the advance payment of the Cash Component for the first four years of the Term. Should 50% of the Gross Revenues for any of the first four years of the Term be more than the Cash Component for that year, the Company shall make payment of the excess amount in cash within 45 days of the end of that year of the Term. The Alternative Compensation shall be paid to the City in accordance with the terms of this Section 9.

9.4.  Alternative Compensation Planning.

(a) The Company and NYCMDC shall consider two four-week advertising campaigns, with 100% penetration, in each of the Cemusa In-Kind Markets then available as the baseline media plan for Alternative Compensation for each year of the Term. The parties shall meet annually at least 180 days prior to the end of each year of the Term to mutually agree in good faith on a media plan (which may be the baseline media plan referred to above or a modified version thereof in accordance with the remaining provisions of this Section 9.4) for the advertising campaigns to be made available to NYCMDC by the Company (including the particular Cemusa In-Kind Markets to be included, the specific campaign in each such market, the intended value assigned to each campaign, and the schedule for placement) which is to constitute the Alternative Compensation due to the City on Schedule C for the next succeeding year (provided, however, nothing herein shall limit the ability of NYCMDC and the Company to plan campaigns through mutual agreement beyond the next succeeding year to the extent such planning is commercially reasonable) of the Term (the "Media Plan"). If the parties are unable to agree, then NYCMDC shall propose a placement program which shall be subject to the approval of the Company, not to be unreasonably withheld, and in the event of reasonable objections by the Company (such as the Company being obligated to provide the requested space to a third party for the applicable year of the Term), NYCMDC shall make reasonable adjustments to its proposal to meet the Company's objections. Once NYCMDC makes such adjustment, the Media Plan shall be final, subject to further adjustment pursuant to Section 9. The parties acknowledge that NYCMDC may not be able to determine valuation to its satisfaction prior to the time set forth in Section 9.4.1.

Notwithstanding the foregoing, thereafter the Company and NYCMDC may mutually agree to revise the agreed Media Plan at any time, except that such revisions to placement in any given market shall be on a space available basis. For the first year of the Term, the parties shall agree on a Media Plan prior to the Effective Date to the extent possible, or as soon as possible thereafter.

(b) At the time the Media Plan is agreed to with respect to any year of the Term, NYCMDC shall designate specific markets (or parts thereof) that may be relinquished in the event the amount of Alternative Compensation set forth on Schedule C is required to be adjusted in accordance with Section 9.2 with respect to such year of the Term. Such adjustment will be made to the agreed upon Media Plan.

NYC007721
NYC007721

9.4.1. <u>Valuation of Alternative Compensation</u>. No later than 90 days prior to the end of each year of the Term, NYCMDC shall notify the Company if NYCMDC believes that the value of the Media Plan for the following year of the Term is less than the amount set forth on Schedule C for such year. In such event, NYCMDC may retain an international media agency reasonably acceptable to the Company (provided that WPP, Interpublic, Dentsu, Publicis, and Omnicom shall be acceptable) with expertise in media buying and planning in each of the Cemusa In-Kind Markets to determine the value of the Media Plan created pursuant to Section 9.4. The value determined by the media agency (the "Estimated In-Kind Value") in any given year shall be compared against the Alternative Compensation amount as set forth in Schedule C attached hereto for that same year (Such amount set forth on Schedule C, after any adjustment required pursuant to Section 9.2, the "Baseline In-Kind Value"). If the adjustment to the Alternative Compensation required by Section 9.2 is not determinable at the time the valuation contemplated by this Section 9.4.1 is finalized, then such valuation and resulting adjustment to the Media Plan, if any, shall be recalculated when the adjustment to the Alternative Compensation becomes known.

(a) To the extent the Estimated In-Kind Value is less than 85% of the Baseline In-Kind Value for such year, the Company and NYCMDC will mutually agree in good faith on additional advertising campaigns to be provided by the Company to NYCMDC in Cemusa In-Kind Markets (but, unless such denomination is impossible, such additional campaigns must consist of four-week advertising campaigns, with 100% penetration), such that the Estimated In-Kind Value plus the value of these additional campaigns equals the Baseline In-Kind Value for such year; provided that in no event will the Company be obligated to provide more than three four-week advertising campaigns with 100% penetration in any Cemusa In-Kind Market unless it is necessary to exceed this limitation in order for the Company to deliver the full Baseline In-Kind Value.

(b) To the extent the Estimated In-Kind Value is more than 115% of the Baseline In-Kind Value for such year, the Company and NYCMDC will mutually agree in good faith on advertising campaigns to be relinquished by NYCMDC in Cemusa In-Kind Markets (but, unless such denomination is impossible, such reduction must consist of four-week advertising campaigns, with 100% penetration), such that the Estimated In-Kind Value minus the value of the campaigns to be relinquished equals the Baseline In-Kind Value for such year.

(c) To the extent the Estimated In-Kind Value is less than or equal to 115% of the Baseline In-Kind Value for such year but more than or equal to 85% of the Baseline In-Kind Value for such year, there shall be no change to the Media Plan for that year resulting from the performance of the valuation contemplated by this Section 9.4.1.

(d) However, to the extent the Estimated In-Kind Value is less than 85% of the Baseline In-Kind Value for such year, the Company may, within 20 days notice of the Estimated In-Kind Value, choose to dispute the Estimated In-Kind Value. If the parties are not able to successfully resolve their differences within 10 business days after the Company gives notice to the City that it is disputing the Estimated In-Kind Value, then the parties shall immediately thereupon submit their dispute with respect to the value of the Media Plan to arbitration pursuant to the Commercial Arbitration Rules of the American Arbitration Association (the "<u>AAA</u>") or any successor organization thereto. The determination of the AAA

NYC007722
NYC007722

arbitrator shall be limited to determining the value the Media Plan and shall be final and binding upon the parties. The AAA shall select one arbitrator who shall be an individual with at least twenty years' experience in the field of commercial marketing and advertising. Because of the time-sensitive nature of the required calculation, the arbitrator shall, to the extent reasonably possible, hold a hearing to consider the submissions of the parties within one week of the arbitrator's appointment and to render the decision within 10 business days of the close of the arbitration hearing and final submission of all materials in support of the positions of the parties. In rendering the decision, the arbitrator shall consider the criteria set forth in Section 9.1(a). The parties agree that in the event that arbitration is invoked, both parties shall proceed as expeditiously as possible under the circumstances to conclude the arbitration, including the timely submission of any supporting materials and appearance at arbitration hearings. Each party shall bear its own legal fees and expenses, but the cost of the arbitration shall be borne equally by the parties. The arbitrator shall have no power to vary or modify the provisions of this Agreement and the arbitrator's jurisdiction is limited accordingly. The arbitration contemplated hereby shall be conducted in New York, New York. Following the arbitrator's determination, the parties will increase or decrease the number of two four-week advertising campaigns with 100% penetration in mutually agreed Cemusa In-Kind Markets in the same manner as contemplated in Sections 9.4.1(a) and (b) based upon the arbitrator's determination as to the value of the Media Plan (such determination, the "Arbitrated Value").

9.4.2. Exchanging Markets; Less Than 100% Penetration.

(a) As part of the process contemplated in Section 9.4(a), and subject to the Company's reasonable approval based on availability, NYCMDC may exchange four week advertising campaigns with 100% penetration in one Cemusa In-Kind Market for four week advertising campaigns with 100% penetration of equivalent value in a different Cemusa In-Kind Market; provided that in any given Cemusa In-Kind Market in any given year of the Term NYCMDC may not run more than three four-week advertising campaigns with 100% penetration. Solely for purposes of this Section 9.4.2, "equivalent value" shall be determined by reference to the Company's rate cards in the applicable markets. References to "100% penetration" in this Agreement mean 100% penetration as such term is generally understood in the out-of-home advertising industry.

(b) NYCMDC shall not be entitled to run advertising campaigns of less than four weeks duration or less than 100% penetration unless such is necessary to achieve in a practical manner the full market value of Alternative Compensation (as determined in accordance with Section 9.4.1) the Company is obligated to provide under this Agreement in a particular year of the Term (i.e., if there is an amount of Alternative Compensation left over that is too small to equal in value a four week marketing campaign of 100% penetration in any of the Cemusa In-Kind Markets).

9.4.3. Alternative Compensation Content. NYCMDC shall program the Alternative Compensation on behalf of the City. No more than 50% of the Alternative Compensation to be programmed by NYCMDC pursuant to this Section 9.4 shall consist of advertising that is not New York City Promotional Advertising. Furthermore, in any given Cemusa In-Kind Market, NYCMDC may program panels for an existing advertiser-client of the Company in that Cemusa In-Kind Market only if such advertising is New York City Promotional

-50-

Advertising. NYCMDC shall at all times during the Term give the Company 10 business days notice prior to entering into agreements with marketing partners for campaigns involving use of Alternative Compensation panels. The notice shall contain information as to the identity of the marketing partner, length of time, the geographic reach and the number of panels involved in the proposed campaign. In addition, the content and creative for such marketing partnerships shall be provided to the Company within a reasonable time after receipt of that information by NYCMDC. NYCMDC and the Company shall cooperate in good faith to address any potential issues that may arise out of the execution of such advertising campaigns.

9.4.4. <u>No Carryover; No Cash Conversion</u>. Alternative Compensation shall not be convertible into cash under any circumstances; except, however, that if the Alternative Compensation is not provided by the Company in accordance with this Agreement, nothing herein shall prevent the City from pursuing all remedies available to it at law, equity or in this Agreement. Additionally, Alternative Compensation to be provided in a particular year of the Term must be used in such year and may not be carried over into any subsequent year of the Term.

9.4.5. <u>Adjustments to Alternative Compensation Under Section 9.2</u>. In the event the amount of the Alternative Compensation set forth on Schedule C is required to be adjusted in accordance with Section 9.2 with respect to any year of the Term, such adjustment will be implemented by reducing the Media Plan. The value of the campaigns to be relinquished by NYCMDC shall be established by reference to (a) the Arbitrated Value for such year, (b) the Estimated In-Kind Value for such year if there is no Arbitrated Value, or (c) the valuations assigned to each Cemusa In-Kind Market in the Media Plan for such year, if there is no Estimated In-Kind Value.

9.5. <u>Payments</u>.

(a) Beginning with the fifth year of the Term (it being understood and agreed that the cash portion of the Franchise Fee payable with respect to the first four years of the Term shall be paid in accordance with Section 9.3 herein), within 30 days after the end of each of the first three quarters of each year of the Term, the Company shall pay to the City in cash the greater of (i) one fourth of the Cash Component for such year or (ii) 50% of Gross Revenues for that quarter. Beginning with the fifth year of the Term, within 30 days after the end of the fourth quarter of each year of the Term, the Company shall pay the excess, if any, of the full cash payment due to the City under Section 9.2 for such year of the Term (after all applicable adjustments contemplated by Section 9 and Section 4.7) over the amounts already paid by the Company on a quarterly basis with respect to such year under the preceding sentence. If the sum of the payments made by the Company in accordance with this Section 9.5(a) with respect to any year of the Term exceeds the cash portion of the Franchise Fee due to the City under Section 9.2 for such year (after all applicable adjustments contemplated by Section 9 and Section 4.7), the Company shall be entitled to take the excess as a credit against the next cash payment or payments due to the City under this Section 9, unless there is no such next payment scheduled (i.e., the Term has expired or terminated), in which case such excess shall be payable by the City to the Company within 30 days (if the amount is less than $100,000) or 90 days (if the amount is equal to or greater than $100,000) of invoice therefor.

NYC007724
NYC007724

(b) Within 30 days after any termination of this Agreement, the Company shall pay to the City in cash the appropriate pro rata amount (based on the number of days in the partial year and using 365 days in a full year) of the cash portion of the Franchise Fee for the elapsed portion of such year which has not previously been paid pursuant to Sections 9.3 or 9.5(a) and any other amounts owed to the City pursuant to this Agreement. Additionally, the Company shall deliver the pro rata amount of any Alternative Compensation agreed to pursuant to Section 9.4 herein for such year and not previously delivered.

(c) Beginning with the fifth year of the Term, and for each year of the Term thereafter, no later than 45 days from the anniversary of the Effective Date, the Company shall deposit with the escrow agent (the "Escrow Agent") under an escrow agreement to be entered into among the Company, such Escrow Agent and the City (the "Escrow Agreement"), which Escrow Agreement shall be substantially in the form attached hereto as Exhibit L, the greater of (i) the Cash Component for that year of the Term or (ii) the cash portion of the Franchise Fee paid by the Company for the immediately preceding year of the Term, minus, in each case, any amounts deposited in escrow the prior year pursuant to this Section 9.5(c) and then remaining in escrow (the amount deposited in escrow in accordance with this Section 9.5(c), the "Escrow Fund"). Each payment required to be made pursuant to Sections 9.5(a) and 9.5(b) shall be made from the Escrow Fund provided that if the Escrow Fund is at any time insufficient to make such payments, the Company shall make such payments directly.

(d) In addition, no later than the first day of the fourth year of the Term, the Company shall cause the establishment with the Escrow Agent of an additional, separate escrow account (the "Supplemental Escrow Account"), pursuant to the Escrow Agreement. The Supplemental Escrow Account shall be unfunded until required to be funded in accordance with the terms of this Section 9.5(d). Funds on deposit in the Supplemental Escrow Account from time to time as required herein are referred to as the "Supplemental Escrow Fund." During the Term, the Supplemental Escrow Fund shall be increased (by deposit of additional funds by or at the direction of the Company) or decreased (by payment to or at the direction of the Company by the Escrow Agent), within 10 business days, as follows:

(i) At any time after the third year of the Term when the Net Worth (hereinafter defined) of the Guarantor is less than 125 million Euros the Supplemental Escrow Fund shall constitute the greater of (x) the Cash Component for the then current year of the Term and the following year of the Term or (y) two times the cash portion of the Franchise Fee actually paid by the Company for the immediately preceding year of the Term.

(ii) At any time after the fourth year of the Term when the Net Worth of the Guarantor is between 125 million Euros and 150 million Euros, the Supplemental Escrow Fund shall constitute the greater of (x) the Cash Component for the then current year of the Term or (y) the cash portion of the Franchise Fee actually paid by the Company for the immediately preceding year of the Term.

(iii) At any time when the Net Worth of the Guarantor is 150 million Euros or greater, or after the 19th year of the Term, the Supplemental Escrow Fund shall be 0.

-52-

NYC007725
NYC007725

Solely for purposes of this Section 9.5(d), "Net Worth" shall mean total assets of the Guarantor, minus total liabilities of the Guarantor, calculated in accordance with generally accepted accounting principles, as reflected in the most recent audited annual financial statements of the Guarantor required to be delivered to the City pursuant to Section 10.6.3.

(e) All interest earned on the Escrow Fund and Supplemental Escrow Fund shall accrue to the Company or the Guarantor, as applicable, and be payable to or at the direction of the Company at the end of each quarter of the Term.

9.6. <u>Revisions to Franchise Fee</u>. The Franchise Fee may be revised as follows:

9.6.1. <u>PSS</u>. Should DOT exercise its option to require the Company to install, maintain and operate PSSs as set forth in Section 2.4.6(c) herein, the cash portion of the Franchise Fee shall be adjusted as set forth on Schedule D attached hereto.

9.6.2. <u>NYCMDC Advertising/Public Service Advertising</u>. Should the City exercise its yearly option to return to the Company advertising space reserved for NYCMDC Advertising or Public Service Advertising as set forth in Section 4.4.6(f) herein, the cash portion of the Franchise Fee shall be adjusted as set forth on Schedule D attached hereto.

9.6.3. <u>Scrollers</u>. Should the Company install any Scroller before year six of the Term, the cash portion of the Franchise Fee prior to year six of the Term shall be increased by an amount equal to 50% of Scroller Gross Revenues.

9.6.4. <u>Olympics</u>. Should the City exercise its option to require the Company to cease to sell and place advertising on all or some of the Coordinated Franchise Structures during the Olympic Period as set forth in Section 4.4.8 herein, the Company shall deduct from the cash portion of the Franchise Fee to be paid for the quarter immediately following the Olympic Period the following amount:

> the average Gross Revenue, for the same eight weeks as the Olympic Period, of the three years preceding the Olympics, multiplied by 1.2.

9.7. <u>Credits</u>. The parties acknowledge that the cash portion of the Franchise Fee payable by the Company each year has been determined by the Company based on certain assumptions of the Company regarding revenue generation from advertising as permitted under this Agreement. Accordingly:

9.7.1. <u>Bus Shelters</u>. If at any time the number of Bus Shelters is reduced to fewer than 3300 Bus Shelters through no fault of the Company, then NYCMDC and the Company shall promptly mutually designate Bus Shelters in the same geographic area to the extent possible, which are allocated to NYCMDC Advertising as set forth on Exhibit H attached hereto, to revert back to the Company for advertising thereon, such that the Company will control the advertising on 2557 Bus Shelters. To the extent that the Company is thereafter able to install additional Bus Shelters, the Bus Shelters shall be re-allocated as set forth in Exhibit H attached hereto by the next advertising cycle, so that the Company shall at all times control the advertising on 2557 Bus Shelters.

NYC007726
NYC007726

9.7.2. <u>New Bus Shelters</u>. If by the fifth anniversary of the Build Start Date the Company is unable to install at least 3300 New Bus Shelters within the time frames for such installation provided for in this Agreement due to the fault of the City, then NYCMDC and the Company shall promptly mutually designate New Bus Shelters in the same geographic area to the extent possible, which were allocated to NYCMDC Advertising as set forth on Exhibit H attached hereto, to revert back to the Company for advertising thereon, such that the Company will control the advertising on 2557 New Bus Shelters (provided that, in the Company's discretion, it may select geographically closer Existing Bus Shelters allocated to NYCMDC for reversion, on a one-for-one basis, in lieu of New Bus Shelters). To the extent that the Company thereafter is able to install additional New Bus Shelters, the New Bus Shelters (or Existing Bus Shelters, as the case may be) shall be re-allocated as set forth in Exhibit H attached hereto by the next advertising cycle, so that the Company shall at all times control the advertising on 2557 New Bus Shelters.

9.7.3. <u>Newsstands</u>. If, through no fault of the Company, (a) at any time after the end of the first year of the Term the number of Newsstands is reduced to fewer than 110 New or Replacement Newsstands, (b) at any time after the end of the second year of the Term the number of Newsstands is reduced to fewer than 220 New or Replacement Newsstands, or (c) at any time after the end of the third year of the Term the number of Newsstands is reduced to fewer than 330 New or Replacement Newsstands, then NYCMDC and the Company shall promptly mutually designate Replacement Newsstands and/or New Newsstands and/or Bus Shelters in the same geographic area to the extent possible, which were allocated to NYCMDC Advertising as set forth on Exhibit H attached hereto, to revert back to the Company for advertising thereon (which may be on Replacement Newsstands and/or New Newsstands and/or Bus Shelters but excluding Bus Shelters which the Company controls the advertising on pursuant to Sections 9.7.1 and 9.7.2 herein) such that the Company controls the advertising on the equivalent of 85 Newsstands in the second year of the Term, the equivalent of 171 Newsstands in the third year of the Term and the equivalent of 256 Newsstands starting in the fourth year of the Term for the remainder of the Term, provided, that for purposes of the foregoing reversion, (i) Replacement Newsstands and New Newsstands shall be the first to revert on a one to one basis, (ii) if NYCMDC has no remaining Newsstands available to it, then New Bus Shelters shall revert (provided that, in the Company's discretion, it may select geographically closer Existing Bus Shelters allocated to NYCMDC in lieu of New Bus Shelters) and (iii) if NYCMDC has no remaining New Bus Shelters, then Existing Bus Shelters shall revert. In designating Bus Shelters for reversion in accordance with this Section 9.7.3, the parties shall make such reversion on the basis of 1.5 Bus Shelters reverting for every 1 Newsstand. To the extent that the Company is thereafter able to install additional Newsstands, the Existing Bus Shelters, New Bus Shelters and Newsstands shall be re-allocated as set forth in Exhibit H attached hereto, in the reverse order that they reverted to the Company in accordance with this Section 9.7.3, by the next advertising cycle, so that the Company shall at all times control the advertising on the equivalent of 85 Newsstands in the second year of the Term, the equivalent of 171 Newsstands in the third year of the Term and the equivalent of 256 Newsstands starting in the fourth year of the Term for the remainder of the Term.

9.7.4. <u>Cash Option</u>. At the City's option, in lieu of part or all of the reversion of Bus Shelters, Replacement Newsstands and/or New Newsstands contemplated by Sections 9.7.1, 9.7.2, and 9.7.3 herein, the City may choose to have the Company deduct from the cash portion

NYC007727
NYC007727

of the Franchise Fee the product of (a) the revenue value associated with the applicable Coordinated Franchise Structure(s), as set forth in Table A of Appendix 5 of the Proposal (increasing annually to adjust for inflation at the higher of (i) 2.5% per year or (ii) the rate of inflation reflected in the Consumer Price Index for All Urban Consumers (CPI-U), subject to a cap of 3% per year), (b) the number of Coordinated Franchise Structures that would be required to compensate the Company in accordance with Sections 9.7.1, 9.7.2, and 9.7.3 herein, and (c) the number of advertising panels on the applicable Coordinated Franchise Structure set forth in such Appendix 5, Table C.

9.7.5. <u>Cash or Alternative Compensation Set-Off</u>. In the event that there are insufficient Coordinated Franchise Structures allocated to NYCMDC at any time to effectuate the reversions as contemplated by Sections 9.7.1, 9.7.2 and 9.7.3, then any such shortfalls shall be made up by a deduction by the Company from the cash portion of the Franchise Fee of the amount in cash calculated in accordance with Section 9.7.4, or, in the Company's sole discretion, by a reduction in an equivalent amount of Alternative Compensation.

9.7.6. <u>Inability to Mutually Designate Coordinated Franchise Structures For Reversion</u>. If the Company and NYCMDC are unable to mutually designate, in good faith, the appropriate Coordinated Franchise Structures for reversion to the Company under the circumstances described in Sections 9.7.1, 9.7.2 or 9.7.3, the reversion of Coordinated Franchise Structures to the Company contemplated in such Sections shall occur automatically, with the Coordinated Franchise Structures allocated to NYCMDC that are located nearest to the applicable unavailable Coordinated Franchise Structures reverting to the Company and with respect to Sections 9.7.2 and 9.7.3 in accordance with the priorities and ratios for such reversion set forth in Sections 9.7.2 and 9.7.3.

9.7.7. <u>Absence of Identified Locations</u>. In the event that the reversion of Coordinated Franchise Structures allocated to NYCMDC contemplated by Sections 9.7.1, 9.7.2 or 9.7.3 is to take place with respect to New Bus Shelters or Newsstands as to which no specific location for installation had been previously agreed to between the Company and the City, such reversion shall take place in proportion to the overall geographic distribution of the then installed Bus Shelters or Newsstands, as applicable (other than those allocated to NYCMDC Advertising).

9.7.8. <u>No Default</u>. No failure by the Company to install Coordinated Franchise Structures that gives rise to a right of the Company to reversion of Coordinated Franchise Structures from NYCMDC pursuant to Sections 9.7.1, 9.7.2 or 9.7.3 shall constitute a breach or default under this Agreement or give rise to the obligation to pay liquidated damages.

9.7.9. <u>Performance at the Cost of the City</u>. In the event the Company is required to perform an obligation under this Agreement which is to be performed at the City's cost or expense, as specifically set forth in this Agreement, the Company shall be permitted to delay such performance until it receives written authorization from DOT. All reasonable costs and expenses expended by the Company in performance of such obligation shall be reimbursed to the Company by the City reasonably promptly after submission of invoices therefor.

NYC007728
NYC007728

9.8. **Reports and Records.**

9.8.1. **Monthly.** The Company shall submit to DOT reports of Gross Revenues, (and PSS Gross Revenues, and Scroller Gross Revenues, as applicable), and any other information reasonably requested by DOT, in a form acceptable to DOT, within 10 business days of the end of each calendar month during the Term.

9.8.2. **Quarterly.** The Company shall submit to DOT reports of Gross Revenues, (and PSS Gross Revenues and Scroller Gross Revenues, as applicable), and any other information reasonably requested by DOT, in a form acceptable to DOT, within 20 business days of the end of each quarter of the Term.

9.8.3. **Yearly.** The Company shall submit to DOT a detailed income and expense statement, reports of Gross Revenues, (and PSS Gross Revenues and Scroller Gross Revenues, as applicable), and any other information reasonably requested by DOT, in a form acceptable to DOT, within 20 business days of the end of each year of the Term.

9.8.4. **Third Party Agreements.** All agreements entered into by the Company in connection with the Coordinated Franchise Structures shall provide that such agreements and all records and documents related thereto shall be made available to the City upon request. Additionally, all agreements entered into by the Company in connection with advertising on the Coordinated Franchise Structures shall include a provision requiring that upon expiration or sooner termination of this Agreement, the City shall have the option of assuming all the Company's rights and obligations under such agreement.

9.8.5. **Access to Third Party Agreements.** The Company shall make available to the City, at its office located in the City, all third party agreements entered into by the Company in connection with the Coordinated Franchise Structures and comprehensive itemized records of all revenues received in a format reasonably acceptable to DOT and in sufficient detail to enable the City to determine whether all compensation owed to the City pursuant to this Section 9 is being paid to the City upon request, during regular business hours and upon reasonable prior notice to the Company. Notwithstanding the foregoing, the parties acknowledge and agree that the powers, duties, and obligations of the Comptroller pursuant to the provisions of the New York City Charter shall not be diminished, compromised, or abridged in any way.

9.9. **Reservation of Rights.** No acceptance of any compensation by the City shall be construed as an accord and satisfaction that the amount paid is in fact the correct amount, nor shall such acceptance of any payment be construed as a release of any claim that the City may have for further or additional sums payable under the provisions of this Agreement, subject to Section 13.5(b). All amounts paid shall be subject to audit and recomputation by the City.

9.10. **Other Payments.**

9.10.1. **City Incurred Cost.** If the City incurs any costs or expenses pursuant to this Agreement for (a) work that should have been performed by the Company, or (b) work performed by the City which the Company could not perform, but the costs and expenses for which the Company is liable, the Company shall, within 30 days of receipt of an invoice from the City, pay to the City the amount so incurred.

NYC007729
NYC007729

9.10.2. <u>Future Costs</u>. In the event of a Default by the Company under this Agreement, the Company shall pay to the City or to third parties, at the direction of the Commissioner, an amount equal to the reasonable costs and expenses which the City incurs for the services of third parties (including, but not limited to, attorneys and other consultants) in connection with any enforcement of remedies including termination for a Termination Default. Before any reimbursable work is performed, the City will advise the Company that the City will be incurring the services of third parties pursuant to the preceding sentence. However, in the event the City terminates this Agreement or brings an action for other enforcement of this Agreement against the Company, or the Company brings an action against the City, and the Company finally prevails, then the Company shall have no obligation to reimburse the City or pay any sums directly to third parties, at the direction of the City, pursuant to this Section with respect to such termination or enforcement. In the event the Company contests the charges, it shall pay any uncontested amounts. The Commissioner shall review the contested charges and the services rendered and shall reasonably determine whether such charges are reasonable for the services rendered. In addition to the foregoing, the Company shall pay to the City or to third parties, at the direction of the Commissioner, an amount equal to the reasonable costs and expenses which the City incurs for the services of third parties (including, but not limited to, attorneys and other consultants) in connection with any renewal or transfer, amendment or other modification of this Agreement or the franchise to be made at the request of the Company. Before any reimbursable work is performed, the City will advise the Company that the City will be incurring the services of third parties pursuant to the preceding sentence. The Company expressly agrees that the payments made pursuant to this Section 9.10.2 are in addition to and not in lieu of, and shall not be offset against, the compensation to be paid to the City by the Company pursuant to any other provision of this Section 9.

9.11. <u>Limitations on Credits or Deductions</u>.

(a) The Company expressly acknowledges and agrees that:

(i) The compensation and other payments to be made or Services to be provided pursuant to this Section 9 shall not be deemed to be in the nature of a tax, and shall be in addition to any and all taxes or other fees or charges which the Company or any Affiliated Person shall be required to pay to the City or to any state or federal agency or authority, all of which shall be separate and distinct obligations of the Company;

(ii) Except as may be expressly permitted under this Agreement, the Company shall not, and shall not cooperate with, encourage or otherwise support any attempt by an Affiliated Person to make any claim for any deduction or other credit of all or any part of the amount of the compensation or other payments to be made or Services to be provided pursuant to this Agreement from or against any City or other governmental taxes of general applicability (other than income taxes) or other fees or charges which the Company or any Affiliated Person is required to pay to the City or other governmental agency;

(iii) Except as expressly permitted under this Agreement, the Company shall not, and shall not cooperate with, encourage or otherwise support any attempt by an Affiliated Person to apply or seek to apply all or any part of the amount of compensation or other payments to be made or Services to be provided pursuant to this Agreement as a deduction or

-57-

NYC007730
NYC007730

other credit from or against any City or other government taxes of general applicability (other than income taxes) or other fees or charges, each of which shall be deemed to be separate and distinct obligations of the Company and the Affiliated Persons; and

   (iv)   Except as may be expressly permitted by this Agreement, the Company shall not, and shall not cooperate with, encourage or otherwise support any attempt by an Affiliated Person to apply all or any part of the amount of any City or other governmental taxes or other fees or charges of general applicability as a deduction or other credit from or against any of the compensation or other payments to be made or Services to be provided pursuant to this Agreement, each of which shall be deemed to be separate and distinct obligations of the Company and the Affiliated Persons.

   (b)   Nothing contained in this Section 9.11 or elsewhere in this Agreement is intended to prevent the Company from treating the compensation and other payments that it may pay pursuant to this Agreement or costs that it may incur in connection therewith as an ordinary expense of doing business and accordingly, from deducting said payments from gross income in any City, state or federal tax return.

   9.12.   Interest on Late Payments.  In the event that any payment required by this Agreement is not actually received by the City on or before the applicable date fixed in this Agreement, interest thereon shall accrue from such date until received at a rate per year equal to the greater of the then applicable Prime Rate plus 2% or 7%.

   9.13.   Method of Payment.  Except as provided elsewhere in this Agreement, all payments made by the Company to the City pursuant to this Agreement shall be made to the New York City Department of Transportation, Director of Accounts Payable, 40 Worth Street, 9th Floor, New York, New York 10013 or as otherwise directed by DOT.

   9.14.   Report Certification.  All compensation reports furnished by the Company pursuant to Section 9.8 herein shall be certified by the chief financial officer of the Company to be correct and in accordance with the books of account and records of the Company.

   9.15.   Continuing Obligation and Holdover.  In the event the Company continues to operate all or any part of the System, including the placement of advertising, and the collection of revenue related thereto, after the expiration or termination of this Agreement, then the Company shall continue to comply with all provisions of this Agreement as if the Agreement was still in force and effect, including, without limitation, all compensation and other payment provisions of this Agreement as well as the maintenance of the Security Fund, the Letter of Credit, the Performance Bond, and the Guaranty throughout the period of such continued operation, provided that any such continued operation and compliance with this Agreement shall in no way be construed, as a renewal or other extension of this Agreement or the franchise granted pursuant to this Agreement, nor as a limitation on the remedies available to the City as a result of such continued operation after the term of this Agreement, including, but not limited to, damages and restitution and injunctive relief. If the Company fails to make such payments, DOT may withdraw such amounts from the Security Fund or the Letter of Credit.

NYC007731
NYC007731

9.16. <u>Energy Costs.</u> The Company shall be responsible for any and all electrical costs, or other costs for energy or power, used for, by or in connection with any and all of the Coordinated Franchise Structures, except as otherwise provided in Sections 2.4.6 and 3.1.4(b) herein.

9.17. <u>Amenities.</u> DOT at its option may require during the first five years of the Term that the Company provide certain amenities to the Coordinated Franchise Structures, the value of which shall not exceed $2,500,000 in the aggregate. Such amenities may include, but are not limited to solar panels, battery recycling containers, installation of water fountains in APTs and support of the integration of new technology.

## SECTION 10

## <u>OVERSIGHT AND REGULATION</u>

10.1. <u>Confidentiality.</u> To the extent permissible under applicable law, the City shall protect from disclosure any trade secret materials or otherwise confidential information submitted to or made available by the Company to the City under this Agreement provided that the Company timely notifies the City of, and clearly labels, the information which the Company deems to be trade secret materials or otherwise confidential information as such. Such notification and labeling shall be the sole responsibility of the Company.

In the event that the City becomes legally compelled to disclose the trade secret materials or otherwise confidential information of the Company, it shall provide the Company with prompt written notice of such requirement so that the Company may seek a protective order or other remedy. In the event that such protective order or other remedy is not obtained, the City agrees to furnish only that portion of such information which is legally required to be provided and exercise its reasonable best efforts to obtain assurances that confidential treatment will be accorded such information.

Notwithstanding the foregoing, this Section 10.1 shall not apply to any information that, at the time of disclosure, (i) was available publicly and not disclosed in breach of this Agreement, or (ii) was available publicly without a breach of an obligation of confidentiality by a third party, or (iii) was learned from a third party who was not under an obligation of confidentiality.

The Company expressly acknowledges and agrees that neither DOT nor the City of New York will have any obligation or liability to the Company in the event of disclosure of materials, including materials labeled by the Company as trade secret materials, or otherwise confidential information.

10.2. <u>Oversight.</u> DOT shall have the right at all times to oversee, regulate and inspect periodically the installation, operation, and maintenance of the System, and any part thereof, in accordance with the provisions of this Agreement and applicable law. The Company shall establish and maintain managerial and operational records, standards, procedures and controls to enable the Company to demonstrate, in reasonable detail, to the reasonable satisfaction of the City at all times throughout the Term, that the Company is in compliance with this Agreement.

NYC007732
NYC007732

10.6.3. **Guarantor Financials Statements.** The Company shall cause Guarantor to yearly submit to DOT a complete set of the latest general purpose financial statements for the prior fiscal period prepared in accordance with generally accepted accounting principles, accompanied by a report from the independent Certified Public Accountant ("CPA") who performed a review of the statements in accordance with the American Institute of Certified Public Accountants' ("AICPA") Professional Standards, not later than 20 business days from the date such financial statements become available to the Guarantor from its CPA. All such financial statements shall be accurate and complete in all material respects.

10.7. **Books and Reports/Audits.**

10.7.1. **Books and Records.** Throughout the Term the Company shall maintain complete and accurate books of account and records of the business, ownership, and operations of the Company with respect to the System in a manner that allows the City to determine whether the Company is in compliance with the Agreement. Should the City reasonably determine that the records are not being maintained in such a manner, the Company shall alter the manner in which the books and/or records are maintained so that the Company comes into compliance with this Section. All financial books and records which are maintained in accordance with generally accepted accounting principles shall be deemed to be acceptable under this Section. The Company shall also maintain and provide such additional books and records as the Comptroller or the Commissioner deem reasonably necessary to ensure proper accounting of all payments due the City.

10.7.2. **Right of Inspection.** The City, the Commissioner and the Comptroller, or their designated representatives, shall have the right upon written demand with reasonable notice to the Company under the circumstances to inspect, examine or audit during normal business hours all documents, records or other information which pertain to the Company or any Affiliated Person related to the Company's obligations under this Agreement. All such documents shall be made available at the Company's New York City office. All such documents shall be retained by the Company for a minimum of six years following expiration or termination of this Agreement. All such documents and information that are identified by the Company as trade secret materials or otherwise confidential information shall be treated as such in accordance with Section 10.1 hereof, and the City shall make reasonable efforts to limit access to the alleged trade secret materials or otherwise confidential information to those individuals who require the information in the exercise of the City's rights under this Agreement. In the event any information the City claims the right to inspect pursuant to this Section 10.7.2 constitutes Privileged Information, then the Company will not be required to disclose such information and the City shall instead have the right to review a reasonably detailed log of the Privileged Information. The City shall not share any information obtained through the City's audit and inspection rights under this Section 10.7.2 or otherwise under this Agreement with any media agency retained pursuant to Section 9.4.1. Notwithstanding the foregoing, the parties acknowledge and agree that the powers, duties, and obligations of the Comptroller pursuant to the provisions of the New York City Charter shall not be diminished, compromised, or abridged in any way.

10.8. **Compliance with "Investigations Clause".** The Company agrees to comply in all respects with the City's "Investigations Clause," a copy of which is attached as Exhibit G hereto.

NYC007733
NYC007733

## SECTION 11

## RESTRICTION AGAINST ASSIGNMENT AND OTHER TRANSFERS

11.1. <u>Transfer of Interest</u>. Except as provided in this Section 11, neither the franchise granted herein nor any rights or obligations of the Company in the System or pursuant to this Agreement shall be encumbered, assigned, sold, transferred, pledged, leased, sublet, or mortgaged in any manner, in whole or in part, to any Person, without the prior written consent of the City, pursuant to Section 11.3 hereof. In the event any transfer of interest which requires consent of the City takes place without such consent, such transfer shall constitute a Termination Default and the City may exercise any rights it may have under this Agreement. Notwithstanding anything contained herein to the contrary, the City hereby consents to the Company's assignment of the Agreement to Cemusa NY, LLC, a wholly owned subsidiary of the Company, provided that Cemusa NY, LLC satisfies the City's VENDEX and other City's responsibility procedures, and further provided that Cemusa NY, LLC agrees in writing to assume all responsibilities and obligations under the Agreement.

11.2. <u>Transfer of Control or Ownership</u>. Notwithstanding any other provision of this Agreement, except as provided in this Section 11, no change in Control of the Company or the franchise granted herein shall occur after the Effective Date, by act of the Company, by act of any Person holding control of the Company or the franchise granted herein, by operation of law, or otherwise, without the prior written consent of the City. The requirements of Section 11.3 hereof shall also apply whenever any change is proposed of 10% or more of the direct ownership of Parent, the Company, Cemusa NY, LLC, or the franchise granted herein (but nothing herein shall be construed as suggesting that a proposed change of less than 10% does not require consent of the City acting pursuant to Section 11.3 hereof if it would in fact result in a change in Control of Parent, the Company, Cemusa NY, LLC, or the franchise granted herein), and any other event which could result in a change in Control of the Company. For the avoidance of doubt, nothing in this Section 11 shall prohibit, restrict or subject to any approval a change in Control of any entity that Controls, directly or indirectly, the Parent, and such change in Control of any entity that Controls, directly or indirectly, the Parent shall not constitute a change in Control of the Parent, the Company, or the franchise granted hereby for purposes of this Section 11.2, or any transfer of any interest to which Section 11.1 applies.

11.3. <u>Petition</u>. The Company shall promptly notify the Commissioner of any proposed action requiring the consent of the City pursuant to Sections 11.1 or 11.2 herein by submitting to the City, pursuant to Section 14.5 hereof, a petition either (a) requesting the approval of the Commissioner and submission by the Commissioner of a petition to the FCRC and approval thereof by the FCRC or (b) requesting a determination that no such submission and approval is required and its argument why such submission and approval is not required. Each such petition shall fully describe the proposed action and shall be accompanied by a justification for the action and, if applicable, the Company's argument as to why such action would not involve a change in Control of the Company, the System or the franchise, or a transfer of interest in the franchise granted herein or any rights or obligations of the Company in the System or pursuant to this Agreement and such additional supporting information as the Commissioner and/or the FCRC may reasonably require in order to review and evaluate the proposed action. The Commissioner shall expeditiously review the petition and shall (a) notify the Company in writing if the

NYC007734
NYC007734

Commissioner determines that the submission by the Commissioner and the approval of the FCRC is not required or (b) if the Commissioner determines that such submission and approval is required, either (i) notify the Company that the Commissioner does not approve the proposed action and therefore will not submit the petition to the FCRC, or (ii) submit the petition to the FCRC for its approval.

11.4. <u>Consideration of the Petition</u>. The Commissioner and the FCRC, as the case may be, may take such actions as it deems appropriate in considering the petition and determining whether consent is needed or should be granted. In considering the petition, the Commissioner and the FCRC, as the case may be, may inquire into: (i) the qualifications of each Person involved in the proposed action; (ii) all matters relevant to whether the relevant Person(s) will adhere to all applicable provisions of this Agreement; (iii) the effect of the proposed action on competition; and (iv) all other matters it deems relevant in evaluating the petition. After receipt of a petition, the FCRC may, as it deems necessary or appropriate, schedule a public hearing on the petition. Further, the Commissioner and the FCRC may review the Company's performance under the terms and conditions of this Agreement. The Company shall provide all requested assistance to the Commissioner and the FCRC in connection with any such inquiry and, as appropriate, shall secure the cooperation and assistance of all Persons involved in said action.

11.5. <u>Permitted Encumbrances</u>. Nothing in this Section shall be deemed to prohibit any mortgage, lien, security interest, or pledge being granted to any banking or lending institution which is a secured creditor of the Company or any of its Affiliates with respect to any stock of the Company or any of its Affiliates, any rights granted pursuant to this Agreement, or any rights of the Company or any of its Affiliates in the System, including the assets of the Company and its Affiliates which comprise the System, provided that any such mortgage, lien, security interest or pledge shall be subject to the interests of the City as franchisor under this Agreement (and, in the case of any newsstand, any rights of the newsstand operator hereunder or under applicable law), including without limitation the City's right of approval with respect to any transfer of the franchise rights hereunder.

11.6. <u>Subcontracts</u>. The Company agrees not to enter into any subcontracts for the performance of its obligations, in whole or in part, under this Agreement without the prior written approval of DOT, provided that if the proposed subcontractor is not required to comply with VENDEX such prior written approval shall not be required. Two copies of each such proposed subcontract requiring approval shall be submitted to DOT with the Company's written request for approval. All such subcontracts shall contain provisions specifying:

    (a)    That the work performed by the subcontractor must be in accordance with the terms of this Agreement;

    (b)    That nothing contained in the subcontract shall impair the rights of DOT or the City;

    (c)    That nothing contained in the subcontract, or under this Agreement, shall create any contractual relation between the subcontractor and DOT or the City.

NYC007735
NYC007735