# EXHIBIT 15



**New York City**
**Department of Transportation**

40 Worth Street
New York, New York 10013
Tel: 212/676-0868
Fax: 212/442-7007

Iris Weinshall, Commissioner

## Request for Proposals for a
## Coordinated Street Furniture Franchise

PIN Number: #84104MBAD689
Date of Issue: March 26, 2004

### Technical Inquiries II
June 11, 2004

The New York City Department of Transportation received inquiries for information during and after the Pre-proposal Conference held on Tuesday, April 27, 2004, which may be of interest to all potential proposers. The following answers are for clarification purposes only and in no way modify, change or correct the RFP document as issued by the department. Such modifications to the RFP can only be made by written amendment to the RFP issued by the department as it deems necessary.

Questions asked at the Pre-Proposal Conference are numbered 1 through 19. A corresponding page number where the question can be found in the Pre-Proposal transcript is included in parentheses following each inquiry. Questions numbered 20 through 55 were received by the Department in writing.

**Inquiry 1:** Will the audited financial statements have to be certified and rendered pursuant to the Generally Accepted Accounting Principles as promulgated by the American Institute of Certified Public Accounts? Will there be any reference to the Generally Accepted Auditing Principles? (p.8)

*Response:* *1) Yes.*
*2) No.*

**Inquiry 2:** Can advertising be placed on the sides and/or fronts of newsstands, or is advertising limited to rear of the structure? (p.16)

*Response:* *Advertising on newsstands is limited to 82.5 square feet with a maximum height of 9 feet. The placement of advertisements on newsstands is not limited to the rear of the structure.*

**Inquiry 3:** Did the RFP go through ULURP? (p. 16)

*Response:* *An RFP for a coordinated street furniture franchise issued in 1997 was approved through ULURP. The Department of City Planning confirmed, after reviewing the current RFP immediately prior to its release, that the new Coordinated Street Furniture Franchise would not present any new land use impacts or implications which would require review pursuant to the Uniform Land Use Procedure.*

NYCDOT Coordinated Street Furniture Franchise RFP  
Technical Inquiries II

June 11, 2004  
For Informational Purposes Only

**Inquiry 4:** During the Phase Four rating process, will the alternative compensation be treated equally as cash in the grading system? (p. 20)

*Response:* Yes.

**Inquiry 5:** Has the Agency received any feedback from the Council regarding whether alternative compensation will be viewed as an amount of payment under the Council's resolutions? (p. 20)

*Response:* No.

**Inquiry 6:** How many of the three hundred and thirty newsstands will no longer enjoy the benefit of grandfathering and will have to be relocated? (p.23)

*Response: We cannot determine how many stands will need to relocate at this time.*

**Inquiry 7:** Are there different clearance requirements for existing newsstands that require relocation, that new locations – different than the new locations that have been required in the past? (p. 25)

*Response: All applicable siting and relocation criteria for newsstands can be found in Section 20-231 of the Administrative Code. This Section of the Administrative Code was not included in the Coordinated Street Furniture RFP Appendix.*

**Inquiry 8:** On the Marketing Partnership Agreement, could you just clarify? Is the City reserving the right for the New York Marketing Development Corporation to sell their twenty percent? And, are they intending to post commercial advertising, as opposed to public-style messages responsive? It's conceivable that they would actually sell it, in competition with the franchisee. (p. 31)

*Response: The following statement was provided by NYC Marketing:*

*NYC Marketing, led by the City's Chief Marketing Officer, is charged with centralizing the City's intellectual properties and physical marketing assets and to manage these assets in ways to better the City. Outdoor media is an example of a physical marketing asset that the city owns or controls. NYC Marketing is the City's central office for licensing, sponsorship, media management, brand management, marketing and advertising. Consistent with best practices by other cities as well as the MTA and Port Authority, the City is reserving space for itself to achieve several communication objectives.*

*One core of mission of NYC Marketing is to identify and develop marketing partnerships with corporations that achieve the following broad goals for the City. They are:*
*a)     Generate revenue without raising taxes*
*b)     Support city agencies or important city initiatives*

NYCDOT Coordinated Street Furniture Franchise RFP           June 11, 2004
Technical Inquiries II                                       For Informational Purposes Only

    c)    *Promote the authentic NYC around the world for the growth of jobs and tourism*

*Each marketing partner will achieve all or some of these goals in ways that best suit the partner and the City.*

*Each partnership will celebrate a certain type of relationship with the City. For example, a retailer in New York City is best positioned to recruit mentors for the City and, as a part of their partnership with the City, may be provided with space on bus shelters and newsstands to promote their relationship with the City, specifically how they help recruit mentors. A call to action may be included in the message.*

*The City also anticipates using this space to post public service announcements, advertise City initiatives and to enhance City marketing and sponsorship relationships as well as to celebrate special events in the City. While it does not intend to sell the space individually to any advertiser, it may be used for commercial purposes so long as they have a clear benefit to the City. (See Answer to Inquiry #11)*

**Inquiry 9:**    Is the two foot overhang part of the full width of the newsstand. This is the one on the side versus the three-foot overhang on the front. It's for the whole width of the newsstand, including the three foot overhang on the front? (p.32)

Response:    *The two foot overhang is not included when calculating the width of the newsstand.*

**Inquiry 10:**    Will the prevailing wages of the building trades be the wage that's required? (p. 32)

Response:    *This is not a public works contract as defined by NYS Labor Law. However, franchisee will be required to obtain and comply with all applicable permits for performing any excavation work in City streets or sidewalks, including the requirements set forth in NYC Administrative Code Section 19-142.*

**Inquiry 11:**    There is a tremendous amount of confusion in the room about exactly how this twenty percent mechanism is going to work...is it going to be space that the City is using for its own promotional purposes? Is it space that it's negotiating with respondents to ---in sponsorship deals? Is it part of a trade, et cetera, et cetera? (p.35)

Response:    *Statement provided by NYC Marketing:*
*See answer to Inquiry #8. Additionally, this space my be used in conjunction with larger sponsorship deals with the City but the space itself will be used primarily to celebrate the partnership, specifically how the partner is helping make life better in New York City. The City may also trade some of its allotted media with other Cities to promote tourism from those cities.*

NYCDOT Coordinated Street Furniture Franchise RFP  June 11, 2004
Technical Inquiries II  For Informational Purposes Only

**Inquiry 12:** With respect to Item 26 in the supplement, you said that you do have your own internal ratios. Would that be true for Phase 3 and Phase 4? (p. 38)

*Response:* *Phase 3 and Phase 4 have specific evaluation criteria, which are outlined on pp. 25 and 26 in the RFP. The point values for individual criteria are not considered public information.*

**Inquiry 13:** Is there some statute that permits franchise structures with advertising to be placed in residential zones? (Paraphrased, p. 40)

*Response:* *The sign regulations of the New York City Zoning Resolution do not apply to publicly-owned sidewalks and there is therefore no zoning restriction on placing franchise structures with advertising on sidewalks in areas zoned as Residential Districts. However, the RFP states that "electronic media (such as 'zippers') will be permitted only on a case-by-case basis and, except for backlighting of printed posters, will be subject to the applicable zoning regulations for property adjacent to the site." Since there is no provision for use of electronic media such as 'zippers' in Residential Zoning Districts, franchise structures on sidewalks within such Districts cannot include electronic media other than backlighting of printed posters.*

**Inquiry 14:** Is there a way to get a list of everybody who has asked for and received the RFP? (p. 55)

*Response:* *The list of RFP recipients can not be distributed at this time. The list can be released once the RFP process is completed. Attached please find the security desk sign in sheet from the pre-proposal conference and an additional voluntary sign in sheet that was available at the conference.*

**Inquiry 15:** Will the franchisee be required to use Union labor or organized labor for the assemblage, construction, posting and cleaning of the structures? (p.74)

*Response:* *There is no requirement in the RFP to use Union labor.*

**Inquiry 16:** Will the franchisee be required by the Department to comply with the living wage law in the City? (p. 75)

*Response:* *New York City Administrative Code Section 6-109 (the "Living Wage Law") pertains to contracts to provide homecare, building, day care, head start services, services to persons with cerebral palsy, food services or temporary services and is not applicable to this Franchise.*

NYCDOT Coordinated Street Furniture Franchise RFP        June 11, 2004
Technical Inquiries II        For Informational Purposes Only

**Inquiry 17:** ADA diagram question. What is the square footage that's necessary for the wheelchairs themselves? (p. 79)

*Response:* *Proposers are responsible for ensuring that their proposals are compliant with the ADA. The diagrams attached to the first addendum were for informational purposes only to illustrate possible approaches to ADA compliance for newsstand interiors.*

**Inquiry 18:** Will you define financial fitness, so that the criteria or definition that the committee will use in examining – what financial fitness means? (p. 88)

*Response:* *Proposers will be evaluated with respect to whether they possess the necessary financial resources to carry out the work and to comply with the required delivery and performance schedules of the RFP.*

**Inquiry 19:** There shall be provisions contained in the agreements required pursuant to Paragraph 6, subdivision H, Section 362, regarding collective bargaining and other matters. (p. 104)

*Response:* *As stated in the Authorizing Resolution the City will comply with Section 363(h)(6) of the City Charter which requires franchisees to "recognize the right of its employees to bargain collectively..." and to deal with representatives chosen by the employees and not to interfere with union activity.*

**Inquiry 20:** The dates when each of the newsstands listed in the file "Newsstand locations.pdf" were installed on the sidewalks.

*Response:* *This question is not relevant to the Coordinated Street Furniture RFP.*

**Inquiry 21:** At the preproposal conference, DOT stated that the reason why there had been no ULURP review of the current street furniture RFP was that it was not significantly different from the 1997 RFP which had undergone ULURP review. In its answers to inquiries about the 1997 RFP, DOT indicated that the City would coordinate advertising between pay phones and the franchise structures through: (1) DOITT's prohibition against pay phone advertising in Manhattan on the same side of any avenue block with a bus stop shelter, newsstand, automatic pay toilet or computer information terminal and (2) on all other city streets within 150 feet of these structures. DOITT is not currently adhering to these policies which means that the impact of the current RFP on the city streets will be significantly different than what it would have been under the 1997 RFP. For example, (a) DOITT refuses to enforce the advertising prohibition contained in clause (1) above on Broadway in Manhattan, claiming that Broadway is not an avenue. The consequence of DOITT's unexpected policy (Broadway is generally considered an Avenue as reflected in the street finder in Verizon's manhattan phone book) significantly increases the number of pay phones with advertising on Broadway from what could have been anticipated in 1997.

(b) Even when DOITT acknowledges that pay phone advertising violates the prohibition in clause (1), DOITT refuses to remove the advertising. It simply issues a notice of

Case 1:07-cv-08244-PAC    Document 16-23    Filed 07/28/2008    Page 7 of 14
NYC015412
Case 1:07-cv-08244-PAC    Document 16-23    Filed 07/28/2008    Page 7 of 14
NYC015412

NYCDOT Coordinated Street Furniture Franchise RFP     June 11, 2004
Technical Inquiries II                                 For Informational Purposes Only

violation and closes the complaint, leaving the pay phone advertising on the street. This results in significantly more pay phones with advertising on the city streets than could have been foreseen in 1997.

(c) DOITT has been allowing the installation of pay phones with advertising in violation of the prohibition in clause (1). This results in significantly more pay phones with advertising on the city streets than could have been foreseen in 1997.

(d) When a pay phone with advertising is identified to DOITT as being within the distance from a newsstand prohibited under the DOITT Rules, DOITT's stated position is to refuse to determine the actual date on which the newsstand was installed on the street. Instead, DOITT automatically assumes that the pay phone was installed first, thereby negating the newsstand proximity restriction referred to in clause (2). This results in significantly more pay phones with advertising on the city streets than could have been foreseen in 1997.

(e) DOITT appears to have exempted from its siting requirements pay phones with advertising installed at sites on which pay phone franchisees claim to have had pay phones (with or without advertising) on or prior to June 30, 2000. This results in significantly more pay phones with advertising on the city streets than could have been foreseen in 1997.

(f) DOITT does not apply proximity restrictions to a pay phone with advertising if the pay phone was installed prior to the installation of the object to which it is in proximity. Therefore, the proximity restrictions referred to in (2) will not be applied to pay phones in proximity to new franchise structures installed under the street furniture franchise. Because of the large number of pay phones installed since 1997, this will result in significantly more pay phones with advertising on the city streets in proximity to franchise structures than could have been foreseen in 1997.

In light of the foregoing, will a ULURP review be conducted of the current RFP?

Response:    *The Department of City Planning confirmed, after reviewing the current RFP immediately prior to its release, that the new Coordinated Street Furniture Franchise would not present any new land use impacts or implications which would require review pursuant to the Uniform Land Use Procedure. Any issues regarding DoITT's oversight of PPT franchisees should be referred to DoITT.*

Inquiry 22:   At the preproposal conference, DOT indicated that the reason why there had been no ULURP review of the current street furniture RFP was that it was not significantly different from the 1997 RFP which had undergone ULURP review. The 1997 RFP indicated that the City might require the franchisee to give the City's marketing partners priority in ad placement but that this would be done in a manner consistent with the franchisee's obligations to their advertisers and at market rate. Under the current RFP, the City reserves 20% of the advertising space on all of the franchisee's Franchise Structures for use by the City and its marketing partners. Unlike the 1997 RFP, there is to be no compensation to the franchisee for this space and no obligation that the 20% would be used in a manner consistent with the franchisee's obligations to its advertisers. This is a substantial change between the 1997 and current RFPs which

NYCDOT Coordinated Street Furniture Franchise RFP                                June 11, 2004
Technical Inquiries II                                                           For Informational Purposes Only

> could significantly affect the number of franchise structures and/or ad panels installed by a franchisee. In light of the foregoing, will a ULURP review be conducted of the current RFP?

Response: *Please see Answer #21.*

Inquiry 23: Could the City offer any proposers under the current RFP the opportunity to become a city marketing partner?

Response: *Answer provided by NYC marketing: This RFP does not contemplate proposers becoming marketing partners of the City. At the moment the City does not anticipate engaging in marketing partnerships with proposers. Regardless, it will not consider these options while this RFP is under review.*

Inquiry 24: If the City plans to offer any proposer the opportunity to become a city marketing partner, at what phase of the proposal evaluation process will this opportunity be offered?

Response: *Please see Answer # 23.*

Inquiry 25: Could the city offer the selected proposer the opportunity to become a city marketing partner as part of the franchise contract negotiation?

Response: *Please see Answer # 23*

Inquiry 26: What procedures does the City have in place to prevent unfairness, favoritism or conflict of interest in the event a proposer is considered by the City as a marketing partner?

Response: *Please see Answer # 23*

Inquiry 27: What steps will the City take to make sure that the franchisee does not restrict or give preferential treatment in franchise structure advertising on the basis of political content or the political affiliation or views of a proposed advertiser?

Response: *The City does not intend to regulate advertising content placed by the Franchisee on franchise structures except as provided in the RFP on pp. 14 -15.*

Inquiry 28: How are BIDs relating to this franchise? Are their current advertising and sponsor-supported programs allowed to continue?

Response: *Currently there is no intent in the RFP to affect the relationship between any BID and its sponsors or advertisers.*

NYCDOT Coordinated Street Furniture Franchise RFP                            June 11, 2004
Technical Inquiries II                                                  For Informational Purposes Only

**Inquiry 29:** Can they (BIDS) design new objects, say a bike rack that is adorned with a commercial for their local bike shop as long as they do not conflict with the information terminal, bus shelter, newsstand, trash barrel configurations?

*Response:* *This question is not relevant to the CSFF RFP.*

**Inquiry 30:** As I understand the RFP, the revenue which the Franchisee may derive from selling sponsorships of waste baskets and information/computer kiosks will not affect the compensation due the City. There will be a fixed additional amount added to the guaranteed annual minimum amount for each kiosk and waste basket regardless of where the structure is located or the amount paid for the sponsorship. Actual revenue derived from these structures will be excluded from the gross revenue amount that is compared to the guaranteed minimum for purposes of determining annual compensation. Is this correct?

*Response:* *DOT expects that any revenue proposers expect to derive from the Public Service Structures, including sponsorships, will be reflected in their proposals for how the installation of these structures will affect the annual compensation. A specific, fixed amount or unit cost will be added or subtracted from the total annual compensation (either the guaranteed minimum annual amount or a percentage of gross revenues) for each public service structure installed at DOT's direction. Revenue from public service structures will not be included in the gross revenues for the purpose of calculating the percentage payment.*

**Inquiry 31:** The RFP states that "in the event that the City directs the Franchisee to install PSSs, the compensation shall be increased or reduced by a fixed amount for each PSS installed." When would the compensation be reduced?

*Response:* *Proposers may propose to reduce the amount of compensation for a particular type of Public Service Structure if they feel that installation of that type of structure will result in a net cost rather than income to them.*

**Inquiry 32:** Would the information/computer kiosks provide internet access?

*Response:* *Answered in the transcript on page 29.*

**Inquiry 33:** The RFP says that information/computer kiosks will provide access to "commercial activity". The RFP allows sponsor logos and names on kiosks but otherwise prohibits advertising on them. Could you please elaborate and give examples to show what type of "commercial activity" would be permissible on kiosks and what would not be permissible.

*Response:* *The Department will make that determination once proposals are submitted and different concepts are reviewed.*

NYCDOT Coordinated Street Furniture Franchise RFP                                June 11, 2004
Technical Inquiries II                                                   For Informational Purposes Only

**Inquiry 34:** Would revenue resulting from allowable "commercial activity" affect the fixed amount used to calculate the guaranteed annual minimum or be included in the gross revenue amount that is compared to the guaranteed minimum for purposes of determining annual compensation?

*Response:* *If the Franchisee derives revenue from allowable "commercial activity" on PSSs that revenue should be reflected in the fixed amount or unit cost of the PSS.*

**Inquiry 35:** Would the Franchisee be permitted to enter into other revenue producing arrangements involving the information/computer kiosks eg, charge premiums for including information on kiosks located in specific geographic regions of the City; charge for internet access; charge for providing entertainment - eg games, tickets, reservations, music; sell its own product and services or those of third parties through kiosks? Would such revenue affect the fixed amount used to calculate the guaranteed annual minimum or be included in the gross revenue amount that is compared to the guaranteed minimum for purposes of determining annual compensation?

*Response:* *Proposers can submit other revenue generating alternatives for computer information kiosks. If any of the options are agreed to by the City in the final contract, revenue derived by the Franchisee from such activity would be reflected in the unit cost proposed for the information/computer information kiosk. (See #34)*

**Inquiry 36:** In addition to the RFP provisions relating to the Olympics, to what extent will the City attempt to influence the nature of advertising on bus stop shelters, automatic pay toilets and newsstands or the parties who may advertise?

*Response:* *Please see Answer #27*

**Inquiry 37:** To what extent would an information/computer kiosk sponsor be permitted to influence the nature of information provided at its sponsored kiosk or the parties who could provide it?

*Response:* *This will be determined after we have reviewed proposals.*

**Inquiry 38:** Can internet phones be incorporated into franchise structures?

*Response:* *Incorporating a public pay telephone (internet or otherwise) into a structure is strictly optional. If a Franchise Structure incorporates a public pay telephone, the telephone service must be provided by a company that has a franchise from DoITT.*

**Inquiry 39:** The Department of Information Technology and Telecommunications does not currently have published regulations addressing issues specific to internet phones. If internet phones are permitted to be incorporated into franchise structures, how will they be regulated?

*Response:* *Please see answer to #38.*

NYCDOT Coordinated Street Furniture Franchise RFP                                June 11, 2004
Technical Inquiries II                                                  For Informational Purposes Only

**Inquiry 40:** If a public pay telephone is incorporated into a franchise structure, will this affect the guaranteed minimum annual compensation amount due under the street furniture franchise and if so, how?

*Response:* No

**Inquiry 41:** If a public pay telephone is incorporated into a franchise structure, will this affect the gross revenue amount that is compared to the guaranteed minimum for purposes of determining annual compensation under the street furniture franchise and if so, how?

*Response:* *Current payphone franchises provide for a City share of revenue from curbside payphones in two forms: a share of revenues generated from the use of the phone itself and a share of the revenue from advertising placed on the phone enclosure. If a coordinated street furniture franchisee arranges with a payphone franchisee to provide payphone service from a coordinated street furniture facility, the revenue generated from payphone customers using the payphone would be treated for franchise purposes as revenue to the payphone franchisee under the payphone franchise, and not revenue to the coordinated street furniture franchisee. However, if the payphone franchisee were to pay the coordinated street furniture franchisee a fee for placing the phone on the coordinated street furniture facility, the full amount of such fee (whether such fee is in the form of a fixed rent or a portion of revenues or some combination) payable to the coordinated the street furniture franchisee would be included as revenue to the coordinated street furniture franchisee under the coordinated street furniture franchise. Because a payphone placed on a coordinated street furniture franchise facility would have no separate enclosure on which to place advertising, any advertising on such facility would not be treated, for franchise purposes, as payphone advertising, but would be treated solely as advertising authorized under the coordinated street furniture franchise, and revenue from advertising on such coordinated street furniture facility would be treated (whether or not a payphone is incorporated in the facility) as revenue generated under the coordinated street furniture franchise.*

**Inquiry 42:** If a public pay telephone is incorporated into a franchise structure, will this affect the compensation due the city in any other way?

*Response:* *Please see answer to #41.*

**Inquiry 43:** How will the public pay telephone aspect of the proposals for the street furniture franchise be evaluated? Will this be handled as part of the evaluation procedures set forth in the RFP? Will it be handled separately by DOITT?

*Response:* *The incorporation of a public pay telephone into a franchise structure will be handled as part of the RFP technical design review.*

NYCDOT Coordinated Street Furniture Franchise RFP  June 11, 2004
Technical Inquiries II  For Informational Purposes Only

**Inquiry 44:** Inquiry 22 and its response in the April 27, 2004 Technical Inquiries states that "scrolling advertising panels" are permitted "subject to the approval of the Department" except that if accompanied by "other electronic features" they will only be permitted on a "case-by-case basis" What is the difference between the type of Department approval contemplated when these ads have electronic features and when they don't? How is "subject to the approval of the Department" different than "permitted on a case-by-case basis"?

*Response:* *Any advertising medium on a Franchise structure beyond a print back lit panel will be reviewed and approved by the Department on a case by case basis. The criteria for review will include the applicable zoning regulations for property adjacent to the site.*

**Inquiry 45:** If scrolling ads are backlit printed posters, what kind of approvals will be required?

*Response:* *Please see Answer #44.*

**Inquiry 46:** Will the franchisee be permitted to charge entities with whom it is affiliated lower advertising rates for the sale of advertising space on franchise structures than what it would charge an unrelated third party for the same space?

*Response:* *The Franchisee is expected to sell the advertising space on franchise structures for the rate the market will bear.*

**Inquiry 47:** Will the franchisee be permitted to give preference to entities with whom it is affiliated over unrelated third parties in the sale of advertising space on franchise structures?

*Response:* *Please see Answer #27.*

**Inquiry 48:** Will the franchisee be permitted to charge its affiliates rates for the sale of advertising space on franchise structures which are lower than market rates?

*Response:* *Please see Answer #46*

**Inquiry 49:** What are the instructions for delivery of scale models?

*Response:* *Please see Addendum I, #4.*

**Inquiry 50:** Do you have a summary of the prepoposal meeting that we could read?

*Response:* *A transcript of the prepoposal conference is included on the enclosed CD Rom.*

NYCDOT Coordinated Street Furniture Franchise RFP                June 11, 2004
Technical Inquiries II                                            For Informational Purposes Only

**Inquiry 51:** When does the awarded franchisee begin the contract?

*Response:* *When the contract is approved by the Franchise and Concessions Review Committee, registered with the Comptroller and a Notice to Proceed is issued.*

**Inquiry 52:** Can the RFP response pages be printed front and back in the interest of minimizing the total number of pages in the Proposal Package?

*Response:* *Yes, proposals can be printed on front and back.*

**Inquiry 53:** Is there a required or preferred proposal/page size?

*Response:* *No, there is not a required or preferred proposal page size.*

**Inquiry 54:** Can the required RFP forms (Cash Flow Analysis, Acknowledgment of Addenda) and/or "Required City Documents" (VENDEX, Affirmation, MacBride, Affidavit), collectively Appendices #s 4, 5, 6, 7, 9, 11, be reformatted in the RFP submission (submitted in a format other that the hardcopies provided in the RFP)? If yes, can these documents be provided to me in digital format? If yes, what application are they saved in?

*Response:* *No, the forms cannot be reformatted and must be submitted as shown in the RFP; however, to assist in your preparations we are providing a Microsoft Word template for Appendix 5: Cash Flow Analysis. Appendices 4, 6, 7, 9 and 11 are provided as PDF files. All files can be found on the enclosed CD Rom.*

**Inquiry 55:** Regarding the one (1) original and two (2) copies of the "Required City Documents" requested for the RFP submission, the assumption is the original set will be bound with the one (1) signed, original Proposal Package. Shall the two sets of copies of the "Required City Documents" be bound into the first two (of 20 total) copies of the Proposal Package and labeled as such? Please advise.

*Response:* *See Addendum I, #5*


**From Technical Inquiries I, issued April 27, 2004**

Inquiry 11: How will a preference be granted for a proposal with greater compensation in the initial period? By additional points? If so, how many?

*Response:* *Please see Addendum I, #7.*

NYCDOT Coordinated Street Furniture Franchise RFP                     June 11, 2004
Technical Inquiries II                                    For Informational Purposes Only

**Inquiry 18:** Please provide more information about the Security Fund (p. 7) – will it bear interest, will a letter of credit suffice, must it always be replenished after a drawdown?

*Response:* *The form of the Security Fund will be the subject of negotiations between the selected vendor and NYCDOT and it must be in a form acceptable to the Comptroller. (Also See Addendum I, #2)*