# EXHIBIT 23

**DEPARTMENT OF INFORMATION TECHNOLOGY AND TELECOMMUNICATIONS**

# REPORT ON AMENDMENTS TO DEPARTMENT RULES, TITLE 67 OF THE RULES OF THE CITY OF NEW YORK, SECTION 6-06, SECTION 6-32 AND SECTION 6-38

**OCTOBER 5, 2004**

AR00262

NYC005378

# TABLE OF CONTENTS

|  |  | ¶ Numbers |
|---|---|---|
| I. | General Introduction | 1-3 |
| II. | Consistency of Proposed Rule Changes with Contract and Law | 4-15 |
|  | A. Introduction | 4 |
|  | B. Relevant Contract Provisions | 5 |
|  | C. Public Comments | 6-7 |
|  | D. Discussion | 8-24 |
|  | i. Contractual Authority | 9-11 |
|  | ii. Legislative Authority | 12-24 |
|  | a. Local Law 68 | 13-15 |
|  | b. Clause 8 | 16-24 |
|  | E. Conclusion | 25 |
| III. | Policy Basis of Rules Changes | 26-48 |
|  | A. Section 6-06(c) | 26-44 |
|  | i. Introduction | 26-27 |
|  | ii. Policy Analysis Supporting Section 6-06(c) | 28-37 |
|  | a. The Desirability of Limiting Visual Clutter | 28-29 |
|  | b. The City's Interest in Limiting Visual Clutter | 30-33 |
|  | c. The Concentration of Visual Clutter from PPT Advertising in Certain Areas | 34-37 |
|  | iii. Public Comments on Policy Issues in Section 6-06(c) | 38-43 |
|  | iv. Conclusion and Summary of Analysis of Section 6-06(c) | 44 |
|  | B. Permit Application Fee | 45-49 |
|  | i. Introduction | 45 |
|  | ii. Comments and Conclusion | 46-49 |
| ATTACHMENT A | List of Written Comments Received |  |

AR00263

NYC005379

I.    **General Introduction**

1.    In 1959, the New York City Council ("the City Council") adopted a local law (Local Law 78 of 1959) making it illegal to install or maintain public pay telephone installations ("PPTs") on street property owned and operated by the City of New York ("the City") without a license issued by the City's Commissioner of Traffic, in his or her discretion, and describing certain procedures for the issuance of such licenses. New York Telephone Company, then a part of the AT&T Bell System and for many years the only significant provider of telephone service in New York City, received a number of such licenses pursuant to this 1959 local law. After the Bell System was broken up into several constituent parts in 1984, a number of companies began to install PPTs on City-owned street property, although they did not receive the required licenses.

2.    In 1995, the City Council adopted Local Law 68 of 1995 ("Local Law 68"), which provided an amnesty opportunity to legalize previously unlicensed, then-existing PPT installations, provided certain specified conditions (including, but not limited to, obtaining a franchise from the City) were met, and which also provided a generally applicable system of franchising and administration for managing PPT installations on City-owned street property. The City Council in 1995 also adopted (in accordance with subsections a. and b. of Section 363 of the New York City Charter ("the City Charter")) the first of a series of authorizing resolutions[1] which authorize the City's Department of Information Technology and Telecommunications ("DoITT") to grant franchises for the installation and operation of PPTs on City-owned street property. In 1996, DoITT first adopted (pursuant to rulemaking authority granted to DoITT by the provision of Local Law 68 codified at subsection b. of Section 23-403 of the City's Administrative Code[2]) a set of rules regarding installation and operation of PPTs on City-owned street property, which rules have been amended from time to time since their original adoption (as thus amended, "the PPT Rules", which are codified at Chapter 6 of Title 67 of the Rules of

---

[1] Resolution Numbers 439-A of 1995, 2248 of 1997 and 1043 of 2003 (referred to hereinafter respectively as the "1995 Resolution", the "1997 Resolution" and the "2003 Resolution", and collectively as the "Authorizing Resolutions")

[2] Local Law 68 provisions will be cited hereinafter by reference to the Administrative Code section at which they are codified.

AR00264

NYC005380

the City of New York). DoITT thereafter took a series of steps toward the grant of franchises for PPTs on City-owned street property, and in 1999 more than eighty companies were approved by the City's Franchise and Concession Review Committee ("FCRC") and the City's Mayor for such franchises, and franchise contracts were signed by the City and the respective franchisees (said franchise contracts are referred to hereinafter as "the PPT Franchise Contracts").

3.    On January 27, 2004, DoITT published a notice of a proposal to make a few additional changes to the PPT Rules (the "Proposed Rule Changes") and invited written comments regarding, and scheduled a public hearing on, said Proposed Rule Changes. Written comments have been received from the commenters listed in Attachment A to this document and additional comments were made orally at the public hearing held on February 26, 2004. A transcript of the proceedings of the public hearing (the "Transcript") is available for inspection, by appointment, at DoITT's offices at 75 Park Place, 9th Floor, New York, New York. Alternatively, copies of the Transcript may be purchased from the Tankoos Reporting Company, 142 Willis Ave, P.O. Box 347, Mineola, New York 11501. Copies of the written comments received by DoITT are also available for inspection, by appointment, at DoITT's office.

## II.    Consistency of Proposed Rule Changes with Contract and Law.

### A.    Introduction

4.    A number of commenters on the Proposed Rule Changes argue that new Section 6-06(c) (hereinafter referred to as "Section 6-06(c)") is inconsistent with either law or existing contracts or both. The following analysis in this Section II. considers these arguments. Section II.B. below reviews the relevant contractual provisions. Section II.C. describes the public comments received that discuss the legal authority of Section 6-06(c). Section II.D. discusses and analyzes the legal authority arguments raised in the comments on Section 6-06(c). Section II.E. summarizes DoITT's conclusions regarding the Section 6-06(c) legal authority matters.

### B.    Relevant Contract Provisions

4

AR00265

NYC005381

5.     The PPT Franchise Contracts provide at Section 4.1(a) that[3] "The City hereby grants the Company, *subject to and consistent with the terms and conditions of this Agreement, Local Law 68 for the Year 1995, and the PPT Rules,* the right and consent to place advertising, through a Media Representative as described below, on the exterior rear and side panels of its Curb Line PPTs in commercial and/or manufacturing zoning districts and any other zoning districts where commercial and/or manufacturing uses are permitted as of right."[4]  The term "PPT Rules" is defined in Section 1.25 of the PPT Franchise Contracts as "Chapter 6 of Title 67 of the Rules of the City of New York *as such rules may be amended from time to time.*"  The PPT Franchise Contracts further provide at Section 4.4.3 that *"The City retains the right, in the future, to impose additional restrictions on advertising* after giving the Company reasonable notice and a reasonable period to comply with such restrictions."

### C.     Public Comments

6.     Several commenters argue that part of the Proposed Rule Changes would if adopted be illegal as *ultra vires* because, these commenters argue, Section 6-06(c) would be inconsistent with or outside the scope of DoITT's legislative authority.  Commenters cite two possible sources for this *ultra vires* argument:

(i)     Local Law 68, codified at Chapter 4 of Title 23 of the City's Administrative Code.

(ii)     Numbered paragraph (8) of the list of franchise terms and conditions in the successive City Council Authorizing Resolutions.  The provision of the Authorizing Resolutions cited by these commenters provides in its preamble that "Any franchise granted pursuant to this resolution shall be by written agreement and shall include, but not be limited to, the following terms and conditions...."  The provision then goes on to list a series of categories of terms to be included in any franchise granted pursuant to the Authorizing Resolutions, including the following eighth category in the list: "(8) there

---

[3] Italics have been added for emphasis in the quotations in this paragraph.

[4] For purposes of this discussion, the proviso, contained in Section 4.1(a) of the PPT Franchise Contracts, which makes the right to place advertising on PPTs subject to DoITT's rules as they are amended from time to time, is referred to hereinafter as the "Rules Proviso".

5

AR00266

NYC005382

shall be provisions to allow franchisees to sell or lease advertising space on its public pay telephones which are located in commercial and/or manufacturing zoning districts and zoning districts where commercial and/or manufacturing uses are permitted. To the maximum extent feasible, the Department shall ensure that such provisions for the sale or lease of advertising space on public pay telephones be consistent with the provisions of the franchise agreement entered into between the City of New York and New York Telephone on July 1, 1993...." This clause, which appears in each of the Authorizing Resolutions, is referred to hereinafter as "Clause 8".

7.     Comments received also suggest that Section 6-06(c) would be inconsistent with the City's rights under the PPT Franchise Contracts themselves. See page 2 of the written comments submitted by Telebeam Telecommunications Corporation ("Telebeam"), arguing that its PPT Franchise Contract was a "contract of adhesion" and that "it was not the intention of the franchisees when executing the franchise agreement...to grant DoITT the authority to modify unilaterally a material economic term of that agreement....So, in enacting this rule, DoITT commits...a breach of contract...."

D.     **Discussion**

8.     This discussion will review first the argument that Section 6-06(c) would be inconsistent with the City's contractual authority under the PPT Franchise Contracts, and will then review the claim that Section 6-06(c) is *ultra vires* based on prior City Council actions.

i.     **Contractual Authority**

9.     The plain language of the PPT Franchise Contracts unambiguously authorizes, as a contractual matter, both under the Rules Proviso of Section 4.1(a) and under Section 4.4.3, the adoption by the City of restrictions on PPT advertising such as those included in Section 6-06(c). The assertion in the Telebeam comments that Section 6-06(c) would "modify unilaterally a material economic term" of the PPT Franchise Contracts requires that the "material economic term" be characterized without reference to the very language that creates it. The plain language of the PPT Franchise Contracts clearly contemplates that the advertising authority granted by the contracts is inherently and in its very essence subject to subsequent limitation by the City under

6

AR00267

NYC005383

the procedures described in the Rules Proviso and in Section 4.4.3; the right to advertise cannot be construed separately from those inherent limitations. Neither the Rules Proviso of Section 4.1(a) nor 4.4.3 are buried in small-type, boilerplate language at the back of the PPT Franchise Contracts; both provisions are part and parcel of the expressly limited advertising authority granted by Section 4 of the PPT Franchise Contracts.

10.    It might be argued that the PPT Franchise Contracts cannot be fairly read in accordance with their plain meaning to grant the City the authority to restrict advertising on PPTs generally (Section 4.4.3) or specifically by rulemaking (the Rules Proviso) because, such an argument would presumably run, the City's supposedly unlimited discretion to subsequently restrict the placement of advertising would render the apparent grant of an opportunity to place advertising on PPTs essentially meaningless or illusory. Such an argument would presumably rely on standard principles of contract interpretation that suggest against contract interpretations which render a contract provision meaningless. But the limitations on advertising placement set forth in the Rules Proviso and Section 4.4.3 do not empty of substance or meaning the contractually granted advertising right as expressed in Section 4, because the City's authority to restrict advertising pursuant to the Rules Proviso and/or Section 4.4.3 is necessarily limited by the standard limitations on the City's authority to engage in rule-making or similar types of final action – that is, the City must act on a rational and non-arbitrary policy basis[5]. To the extent Section 6-06(c) is adopted and the City can articulate a rational, non-arbitrary policy basis for

_____

[5] It may be that if a private party rather than the City were the franchisor under the PPT Franchise Contracts then the reserved rights to limit advertising established by the Rules Proviso and Section 4.4.3 might be construed as rendering the franchisee's authority to place advertising as described in Article 4 virtually worthless, because a private franchisor would not be subject to standard restraints on final action to which the City is subject. But the franchisor under the PPT Franchise Contracts, that is, the City, is not a private party and is, in its rulemakings and other final actions, subject to the constraints to which municipal governments in New York State are subject in general, and the scope of the Rules Proviso and Section 4.4.3 must be understood as implying such constraints. The grounds on which Section 6-06(c) would if adopted meet such constraints -- that is, the substantive rational, non-arbitrary policy grounds upon which Section 6-06(c) relies -- will be discussed below; the point of raising this issue in this context is simply to observe that the Rules Proviso and Section 4.4.3 cannot be read to render nugatory or meaningless a franchisee's expressly limited authority, as described in Section 4 of the PPT Franchise Contracts, to place advertising on PPTs.

AR00268

NYC005384

Section 6-06(c)[6], then it meets the test of the Rules Proviso and Section 4.4.3, provided of course that franchisees are given the reasonable periods for notice and compliance established in Section 4.4.3 (the City Charter's requirement at Section 1043.e. (c) that at least thirty days elapse after publication of a finalized rule before such rule becomes effective would be sufficient for Section 6-06(c) to meet the notice requirement of Section 4.4.3, while the compliance requirement of Section 4.4.3 would be met because the effect of the proposed change would only affect future installations, not current installations, so that the opportunity to comply will always be available as such future installations are constructed[7]).

    11.    It should also be noted that the characterization (see ¶7 above), in Telebeam's comments, of the PPT Franchise Contracts as "a contract of adhesion" (implying presumably that the City should not be permitted to act despite the clear language of the Rules Proviso and Section 4.4.3) is historically inaccurate. Drafts of proposed franchise contracts were offered by the City for comment by potential franchisees several times before it was presented to the FCRC for approval, and many changes were made, including changes to key economic terms, in response to the concerns and comments of potential franchisees (a number of competent attorneys represented the interests of potential franchisees, including attorneys representing a trade group that included many potential franchisees as well as a number of attorneys representing individual potential franchisees). Indeed, potential franchisees had sufficient negotiating leverage that, for example, when potential franchisees were dissatisfied with the length of the franchise term being offered by DoITT, the City Council was persuaded to amend the relevant authorizing resolution to prohibit DoITT from adopting franchises of a term length less than that acceptable to potential franchisees.

---

[6] The rational, non-arbitrary policy basis for Section 6-06(c) will be discussed below in Section III. of this Report.

[7] The provision in Section 4.4.3 requiring a minimum time for franchisees to comply with newly adopted advertising restrictions clearly suggests that additional restrictions might *not* be limited (as in Section 6-06(c)) to subsequently installed advertising installations but might affect even *existing* advertising installations, which Section 6-06(c) would not affect at all. Thus, far from being more *restrictive* than the PPT Franchise Contracts contemplate, Section 6-06(c) is in this respect more *protective* of franchisee authority to install advertising than the full scope of restriction Section 4.4.3 contemplates might be imposed by the City.

8

AR00269

NYC005385

ii.     **Legislative Authority**

12.     The following discussion will review in turn each of the two citations suggested by commenters as a "statutory" basis for the claim that Section 6-06(c) is *ultra vires*: (a) Local Law 68, and (b) Clause 8 of the Authorizing Resolutions.

a.     **Local Law 68**

13.     There are two provisions of Local Law 68 that are relevant to DoITT's rulemaking authority and to PPT advertising. These two relevant provisions are codified at

--subsection 3.b. of Administrative Code Section 23-403, which subsection empowers, indeed mandates, the Commissioner of DoITT to promulgate rules with respect to PPTs, and

-- Administrative Code Section 23-405, which, far from granting any right or entitlement to advertising, makes expressly clear that no right to advertise is being granted under Chapter 4.

14.     Subsection 3.b. of Section 23-403 states that "The commissioner shall promulgate rules to implement the provisions of this chapter. Such rules shall include, without limitation... standards and procedures regarding the installation, removal, operation, cleaning and maintenance of public pay telephones...." Section 23-401 of the Administrative Code defines "public pay telephone" as a "telephone and associated equipment from which calls can be paid for at any time by coin, credit card [etc....] The term 'public pay telephone' shall include any pedestal or telephone bank supporting one or more such telephones, associated enclosures, signage and other associated equipment." By empowering the Commissioner of DoITT to promulgate rules regarding the installation and operation of public pay telephones, including by definition the associated enclosures and signage, the Council unambiguously authorized the Commissioner to adopt rules regarding advertising signs on PPT enclosures, including a rule such as Section 6-06(c).

15.     Section 23-405 of the Administrative Code reads as follows: "**Advertising.** A permit issued under this chapter shall not constitute an authorization to place advertising upon a

9

AR00270

NYC005386

public pay telephone." The plain import of this provision is that the mere grant of a permit to install a PPT is not to be treated as also granting a right to install advertising on such PPT. Any advertising right for a PPT owner would require some separate and additional action or actions by the City. As discussed in detail below, that action cannot have been the mere adoption by the Council of an authorizing resolution, because an authorizing resolution by its nature can do nothing more than authorize a City agency to grant franchises of a certain type. The separate and additional action creating the right to place advertising on PPT enclosures is only found in the PPT Franchise Contracts, which contracts by their own terms reserve the City's authority to add new restrictions to the right to advertise by rulemaking or otherwise. Section 23-405, which expressly and unambiguously denies any legislatively based right to advertise on PPTs, cannot plausibly be turned on its head to represent a legislative mandate requiring unrestricted advertising on PPTs.[8]

      b.    **Clause 8**

16.    The Independent Payphone Association of New York ("IPANY") and other commenters citing Clause 8 argue that Section 6-06(c) is inconsistent with Clause 8, either because Section 6-06(c) would place limits on the authority of franchisees to place advertising on PPTs in commercial and/or manufacturing zones or because such limits are said to be inconsistent with the 1993 New York Telephone franchise cited in Clause 8[9]. These commenters then argue that therefore Section 6-06(c) would upon adoption be *ultra vires*. Chris Collins, commenting on behalf of City Council Speaker Gifford Miller, did not expressly argue that Section 6-06(c) if adopted would be *ultra vires* but did comment that "the proper way" to impose

---

[8] Commenter Robert Brill argues that Section 23-405 "made it clear that the right to advertise sprang from the Payphone Authorizing Resolution" (see comments of Robert Brill, pp. 5-6). But as discussed below, such a private right cannot spring from an authorizing resolution, rather, any such right would spring from the PPT Franchise Contracts, where such rights are expressly limited by the Rules Proviso and Section 4.4.3.

[9] See Comments of Robert Brill, Telebeam Telecommunications Corporation, John Sweeney on behalf of Coastal Communications Service, and Lawrence Warden, former member of the city Council (oral testimony, see Transcript at pages 8-12).

AR00271

NYC005387

restrictions on advertising on PPTs would be "within the Authorizing Resolution process at the City Council".[10]

17.    The Authorizing Resolutions cited by these commenters are specific purpose resolutions adopted pursuant to the franchise provisions of the City Charter (Chapter 14), and are not local laws of general effect adopted pursuant to Chapter 2 of the City Charter. The City Charter's procedures for adoption of franchise authorizing resolutions differ substantially from the City Charter's procedures for adoption of local laws (compare Charter Sections 32, 33, 36 and 37, which describe procedures specific to adoption of local laws only, with Section 373, which describes a different set of procedures for adoption of franchise authorizing resolutions[11]), and thus cannot have the effect of local laws. A franchise authorizing resolution is limited in its effect to establishing the parameters of franchises which City agencies are authorized to grant. Those commenters who have cast their criticism of Section 6-06(c) as a claim that Section 6-06(c) is "inconsistent with the Authorizing Resolutions" have articulated a claim which is by its nature inappropriately expressed, because it requires reliance on an incorrect legal assumption, *viz.,* that City Council authorizing resolutions constrain agency rulemaking authority (rulemaking authority granted to the agency by local law), not merely the adoption of franchise contract terms.[12]

---

[10] Transcript, p.4

[11] For example, a local law is not effective without either the signature of the Mayor or a veto override (see City Charter Section 37.b.); authorizing resolutions, by contrast, are not signed by the Mayor. Also, a local law may not be adopted without a fiscal impact statement (Section 33.a.), no such prerequisite exists for a franchise authorizing resolution.

[12] This error appears, for example, at page 6 of the comments submitted by Robert Brill: "It is submitted that the proposed prohibition on advertising in the Payphone Core on permits issued by the Commissioner is without any grant of authority from the Council through its pertinent statute --- the Payphone Authorizing Resolution." This quote clearly seems to be misconstruing a franchise authorizing resolution as the statutory source of agency rulemaking authority. In fact, a franchise authorizing resolution is not a source of agency rulemaking authority and is not in the normal sense of the term a "statute". A similar error seems to arise in the comments of Chris Collins (see p. 4 of the Transcript), where Mr. Collins argues that "the proper way to impose further restrictions [on advertising], assuming that they are necessary, is within the Authorizing Resolution process at the City Council....We expect that the Council will be undertaking a review of the Authorizing Resolutions in the next couple of months, and we would be happy to discuss this topic with the administration in that context...." No change in an authorizing Continued...

11

AR00272

NYC005388

18.    The language of the Authorizing Resolutions themselves recognizes this fundamental limitation on the nature and scope of authorizing resolutions.  For example, the 1997 Authorizing Resolution[13] language that introduces the list of types of provisions that must be included in a PPT franchise contract issued thereunder, the list of which Clause 8 is a part, reads "Any franchise granted pursuant to this resolution shall be by written agreement and shall include, but not be limited to, the following terms and conditions".  This language does not purport to cast Clause 8, or any of the other clauses it introduces, as local law binding on, or granting rights to, private entities or to limit the ongoing rulemaking or administrative authority of any agency; it purports only to remain within the bounds of what an authorizing resolution can be – an authorization to a City agency to grant a type of franchise, with such authorization being conditional on the inclusion in the franchise contract of certain type of provisions, such as insurance requirements, security requirements, inspection and record keeping requirements, etc..  The City Council itself, in the Authorizing Resolutions themselves, thus expressed the appropriately limited scope of the Authorizing Resolutions, and did not purport to limit or create agency rulemaking authority or limit or create rights or obligations of private entities.

19.    In short, neither the nature nor the language of the Authorizing Resolutions allows Clause 8 to be applied as if it were a constraint on agency rulemaking or agency administrative activity after franchises are issued.  The effect of an authorizing resolution ends with the

---

resolution subsequent to the grant of a franchise pursuant to that authorizing resolution can have any effect whatsoever on operations or activities pursuant to such previously granted franchise.  A change in an authorizing resolution can only effect the question of whether terms of franchises which may be proposed for grant *after* such authorizing resolution amendment are consistent with the terms of the authorizing resolution as thus amended.  Similarly at page 2 of the written comments of Telebeam Communications Corporation, the argument that "The proposed rules would abrogate significantly the rights granted in the Authorizing Resolution" incorrectly assumes that a franchise authorizing resolution grants "rights" to private parties.

[13] Although the comments received are not all precise in specifying which of the Authorizing Resolutions a particular citation is referring to, it can be assumed that all discussions of the question of whether a particular provision or application of the PPT Franchise Contracts is or would be authorized by an Authorizing Resolution must be referring to the 1997 Authorizing Resolution, which is the Authorizing Resolution that was in effect at the time of the adoption of the PPT Franchise Contracts; the 1995 and 2002 Authorizing Resolutions were respectively too early and too late to have any legal effect with respect to matters regarding the current PPT Franchise Contracts, which were approved in 1999, during the applicability of only the 1997 Authorizing Resolution.

AR00273

NYC005389

determination that a proposed franchise agreement is compliant with the resolution. Thereafter, the activities of the agency administering the franchise are constrained only by the franchise agreement itself and the agency's authority under local law, state law and federal law, without reference back to the original authorizing resolution. However, *even if* Clause 8 of the Authorizing Resolutions somehow had some on-going effect on the rights of franchisees, or on DoITT's rulemaking or administrative authority, it would still be true that the Rules Proviso and Section 4.4.3 generally, and Section 6-06(c) specifically, would still be entirely consistent with the language of Clause 8.

20.     Certainly there seems nothing in the initial language of Clause 8, which merely provides that PPT franchises are to include provisions allowing PPT advertising, that would prohibit general restrictions, such as the Rules Proviso and Section 4.4.3, or specific restrictions, such as those proposed in Section 6-06(c), from being included as part of such provisions. This initial language of Clause 8 merely requires franchises to include language permitting advertising, it does not constrain or prohibit language that would condition or limit the scope of such permission. Similarly, for example, the Authorizing Resolutions provide that franchise agreements require franchisees to provide a security fund ensuring performance of the franchisee's obligations[14], but such Authorizing Resolution language is obviously not to be read as requiring that franchise contracts demand security that is unlimited in scope or amount. Throughout the Authorizing Resolutions, provisions mandating the inclusion in franchise contracts of forms or types of contract provisions cannot be read to require that such provisions must be unlimited or unconditional. Indeed, as discussed below, the PPT Franchise Contracts from their initial approval almost five years ago have included restrictions on PPT advertising, in some ways more restrictive than the proposed restrictions in Section 6-06(c).

21.     If the question is whether the inclusion of the Rules Proviso in the PPT Franchise Contracts (which now provides one, though not necessarily the only, contractual basis of authority for applying Section 6-06(c)) in the PPT Franchise Contracts was authorized by the applicable Authorizing Resolution, the Authorizing Resolutions all make it fully clear that the

---

[14] See clause (4) in the list of required franchise provisions in the Authorizing Resolutions.

AR00274

NYC005390

City Council did not intend to allow Clause 8 to trump DoITT's on-going rulemaking and administrative authority. The Authorizing Resolutions, in addition to Clause 8, also include a provision, at numbered clause (13) thereof, that expressly requires that any PPT franchise granted by DoITT include "provisions requiring all franchisees to comply with all applicable City, state and federal laws, regulations and policies"[15]. Thus the retention of authority in the Rules Proviso was not merely permitted by the Authorizing Resolutions, it was mandated by the Authorizing Resolutions. That the inclusion of the Rules Proviso in the PPT Franchise Contracts was not challenged at the time of the adoption of the PPT Franchise Contracts as inconsistent with the applicable Authorizing Resolution, nor has it been thus challenged since then, reinforces the conclusion that the Rules Proviso is a valid, validly adopted and enforceable provision of the PPT Franchise Contracts.

22.      That specific restrictions such as Section 6-06(c) are fully consistent with Clause 8, and would have been so even if included expressly in the PPT Franchise Contracts, is made particularly clear by the observation that the PPT Franchise Contracts in fact included a far more restrictive, but similarly specific, limitation on the provision of PPT advertising. Section 6-06(c) would restrict advertising on PPTs in only eight of the City's 59 community districts, and would leave unaffected by the proposed rule advertising on all existing installations even in those few affected districts. Advertising on both future and current installations in 51 of the 59 community districts in the City would be wholly unaffected. Section 4.1(a) of the PPT Franchise Contracts, representing an even more limiting restriction, permitted PPT advertising only on PPTs that are installed on the curb side of the sidewalk ("curb line PPTs"), while not permitting advertising on the larger number of PPTs that are installed on the building side of the sidewalk "building line PPTs"). Clause 8 nowhere refers to a restriction on advertising on building line PPTs, yet in the nearly five years since the PPT Franchise Contracts, including the restriction to curb line PPTs only, were presented to the FCRC for its approval, no one has come forward to argue that such a

---

[15] See clause (13) in the list of required franchise provisions in the Authorizing Resolutions (some commenters might be understood to be arguing that this clause (13) would, to the extent it were applied to franchises for the provision of telecommunications services, be preempted by federal law, but because Section 6-06(c) would if adopted apply only to placement of advertising on PPTs and would place no restriction on any telecommunications activity, such a preemption argument is irrelevant in this context).

14

AR00275

NYC005391

significant restriction was inconsistent with Clause 8. Such an absence of objection suggests that there has been a widespread understanding that Clause 8 is entirely compatible with limitations and restrictions on the placement of advertisements on PPTs, including the outright ban on such placement on some PPTs, so long as such restrictions have a rational, non-arbitrary policy basis and are, to the extent the Rules Proviso is the relevant contractual provision, adopted pursuant to the City's rulemaking procedure.[16]

23.    It appears to be suggested in some of the comments that Section 6-06(c) is inconsistent with the part of Clause 8 that refers to a 1993 advertising franchise contract with New York Telephone Company (the "1993 Advertising Contract").[17]    Even if the 1997 Authorizing Resolution could somehow render a subsequent agency rule *ultra vires*, Section 6-06(c) would in any event be entirely consistent with the 1993 Advertising Contract.    The franchisee under the 1993 Advertising Contract received an authority to advertise PPTs that was fundamentally limited by the absence of any on-going right to maintain PPTs.    The 1993 Advertising Contract (at Section 3.2) expressly recited that the franchise granted no right or authority to install or maintain PPTs on the City's streets and reserved all the City's then-existing legal authority to limit or revoke PPT installation or maintenance authority.    Under applicable law at the time (Local Law 78 of 1959), licenses for the installation and maintenance of any and all PPTs were expressly revocable at any time, at the discretion of the City agency commissioner with jurisdiction, and thus offered no on-going right or entitlement with respect to any existing or potential PPT installations.    The PPT Franchise Contracts adopted in 1999, by contrast, grant franchisees a contractually assured term of years for PPT permits, eleven to fifteen years in length, that can only be revoked for a limited set of reasons.    The Rules Proviso and Section

---

[16] Indeed, it would seem particularly inappropriate for those companies whose revenues are primarily based on curb line PPTs that include advertising to now argue that the Rules Proviso or Section 6-06(c) are inconsistent with Clause 8.    These companies have presumably enjoyed the benefit, over the past approximately five years, of generating advertising revenue from their curb line PPT installations without competition from advertising on building line PPTs, specifically because the PPT Franchise Contracts included a substantial restriction on PPT advertising.    For a franchisee that has enjoyed the benefits of a substantial restriction on PPT advertising to now more than three years later claim that restrictions on PPT advertising are *ultra vires* seems particularly inappropriate.

[17] See, for example, comments of Telebeam Telecommunications Corporation, which include as an attached exhibit certain materials related to the 1993 Advertising Contract.

AR00276

NYC005392

4.4.3 were necessary inclusions in the PPT Franchise Contracts to give the City a level of authority to protect the public interest comparable to that which was reserved in the 1993 Advertising Contract. The Rules Proviso and Section 4.4.3 (and the specific application of those provisions proposed under Section 6-06(c)) give the City an ability comparable to that reserved in the 1993 Advertising Contract to protect the public interest in a streetscape free of excessive physical and visual clutter and appropriately available for alternative non-PPT street uses. It would have been fully within the power of the City under the 1993 Advertising Contract to implement the policy articulated in Section 6-06(c) by withholding the grant of (or revoking) licenses for PPTs in Manhattan community districts 1-8, or alternatively by withholding the grant of (or revoking) licenses for PPTs of a size compatible with advertising panels in Manhattan community districts 1-8, or alternatively by withholding the grant of (or revoking) licenses unless advertising was not installed (or withdrawn) in locations where the City found public interest needs incompatible with additional advertising on PPTs. The contractually recognized powers the City holds under the Rules Provision and Section 4.4.3 of the PPT Franchise Contracts, as exercised by Section 6-06(c), are fully consistent with those the City held under the 1993 Advertising Contract.

24. In summary, there appears to be no basis for concluding that that the Rules Proviso or Section 4.3.3 generally, or Section 6-06(c) specifically, would be *ultra vires* as inconsistent with Clause 8 of the 1997 Authorizing Resolution.

**E.    Conclusion**

25. The preceding discussion has analyzed various arguments that Section 6-06(c) would if adopted be *ultra vires*, either as inconsistent with existing contracts, local law or the Authorizing Resolutions, and has found that none of these arguments is persuasive. DoITT thus concludes that if a rational, non-arbitrary policy basis for adoption of Section 6-06(c) exists, that it would be legally permissible for DoITT to adopt Section 6-06(c). The rational, non-arbitrary policy reasons for adoption of Section 6-06(c) will be analyzed in the next section of this Report.

AR00277

NYC005393

III.  **Policy Basis of Rule Changes**

A.    **Section 6-06(c)**

    i.    **Introduction**

26.    Section 6–06(c) (defined above at Section II.A.) as included in the Proposed Rule Changes proposed to restrict advertising on PPT installations installed in Manhattan community districts 1, 2, 3, 4, 5, 6, 7, and 8 ("CDs 1 – 8") to those installations that have been installed pursuant to "notices to proceed"[18] issued not later than the effective date of the new section. Pursuant to a notice published in the City Record on the date of this Report, DoITT has adopted Section 6-06(c), with changes from the Proposed Rule Changes as discussed below.

27.    In addition to the comments regarding DoITT's legal authority to adopt Section 6–06(c), which comments are discussed in Section II. above, DoITT also received comments treating the proposed rule from a policy perspective. The following discussion of the substantive (as opposed to legal authority) aspects of Section 6–06(c) will first review the policy goals underlying Section 6–06(c) and will then discuss the comments received regarding the substantive aspects of Section 6–06(c) as proposed and, where changes have been made, in response to such comments, to Section 6-06(c) since it was proposed, the reason for such changes.

    ii.    **Policy Analysis of Section 6-06(c)**

        a.    **The Desirability of Limiting Visual Clutter**

---

[18] A "notice to proceed" is the document which DoITT issues to notify an applicant that its application to install a PPT has been approved and that the applicant may install and activate (that is, cause dial tone service to commence from) such PPT, conditional on completion of such installation and activation within a period of time set forth in the notice to proceed. The formal permit or license authorizing on-going occupation of the sidewalk by the PPT, on the terms described in the permit, is delivered upon the actual installation and activation of the PPT in accordance with the provisions of the notice to proceed.

17

AR00278

NYC005394

28.     Outdoor commercial advertising is treated by many communities in the United States as a burden on the public, to be restricted or prohibited.[19]  The effect of outdoor advertising can be esthetically unpleasant.  Members of the public using outdoor public space can find classic esthetic values such as balance, consistency and orderliness disturbed by outdoor advertising, and may be increasingly disturbed by increasing amounts of such advertising.[20]  Outdoor advertising at a certain level of intensity may contribute to a sense of chaos and disorderliness, and a loss of esthetic enjoyment of natural or architectural beauty, neighborhood and community uniqueness, and even privacy (in the sense of the ability to maintain one's private thoughts without being affected by unbidden visual intrusion).

29.     The U.S. Supreme Court has recognized that there is a significant and legitimate government interest in limiting the visual clutter that results from the placement of advertisements on public streets.  See Members of the City Council of Los Angeles v. Taxpayers for Vincent 466 U.S. 789 (1984) (hereinafter, "Vincent"): "The problem addressed by this ordinance -- the visual assault on the citizens of Los Angeles presented by an accumulation of signs posted on public property -- constitutes a significant substantive evil within the City's power to prohibit." Vincent 466 US at 807. The Supreme Court also recognized in Vincent that such interest is rational even if the relevant ordinance only reduces and does not eliminate the visual clutter effect of outdoor advertising: "... the city could reasonably conclude that the esthetic interest was outweighed by the countervailing interest in one kind of advertising even though it was not outweighed by the other .... Even if some visual blight remains, a partial, content-neutral ban may nevertheless enhance the City's appearance." Vincent 446 US at 811.

---

[19] See, for example, 81 A.L.R. 3d  486, 81 A.L.R.3d 564  and 80 A.L.R. 3d 687 for numerous examples of federal, state and local rules, ordinances and statues restricting or prohibiting various forms of outdoor advertising, including among others the Federal Highway Beautification Act, codified at 23 USC §131.

[20] See ¶ 31 below.

AR00279

NYC005395

**b.**     The City's Interest in Limiting Visual Clutter

30.     The City of New York has taken a number of steps expressing its determination that limiting the visual clutter of outdoor advertising, and the resulting impingement by such clutter on the esthetics of the streetscape, is an important value to the City. Section 10-119 of the City Administrative Code expressly prohibits the posting or affixing of advertisements, notices and other similar material on various types of facilities that occupy City streets (including public pay telephones located on such streets) except as the City may expressly permit such posting or affixing. This provision of the Administrative Code has been stiffened as recently as 2003, when amendments adding additional facilities to the list of prohibited sites, increasing penalties for violation, and expanding enforcement provisions were adopted by Local Law 2 of 2003. Section 10-119 was upheld in Herschaft v. City of New York 2002 U.S.Dist. LEXIS 9561 (E.D.N.Y. May 24, 2002) aff'd, 70 Fed. Appx. 26 (2d Cir. 2003), which recognized that the "the City does have a significant governmental interest" in "preserving esthetics". 2002 U.S.Dist. LEXIS 9561 at 3. Another indication of the significant interest the City places on limiting the visual clutter that results from outdoor advertising is found in the City's zoning laws covering private property. The City exercises its zoning authority in a variety of ways to limit and control outdoor advertising and signage located on private property (see sections 22-30 through 22-35, 32-60 through 32-69 and 42-50 through 42-58 of the New York City Zoning Resolution).

31.     DoITT also received a number of comments, in response to the Proposed Rule Changes, confirming the importance of limiting visual clutter on City streets. Comments from the Madison Avenue Business Improvement District, the Society for the Architecture of the City, the Municipal Arts Society, the Downtown Alliance and the Historic Districts Council, as well as from a number of Community Boards[21] and others, reference as an important City goal the limiting of visual clutter on public property so as to preserve and protect the esthetic quality of

---

[21] Each Community Board is created pursuant to Section 2800 of the City Charter, and is mandated to, among other things "consider the needs of the district which it serves" (City Charter Section 2800 d.(1)) and "consult, assist and advise" City agencies "with respect to any matter relating to the welfare of the district and its residents" (City Charter Section 2800 d.(2))

19

AR00280

NYC005396

the streets. Several Community Boards have also adopted resolutions expressing their view that the limitation of visual clutter resulting from outdoor advertising is an important priority for the City to consider in its management of the City's streets.[22]

32.    Based on the information described above, and based on its experience in implementing its power and duties under Chapter 48 of the City Charter, DoITT finds that it is an important government goal in managing the public rights-of-way to minimize the visual clutter that is created by advertising material placed on public pay telephone installations located, pursuant to City-granted franchises, on City sidewalks.[23]

33.    Over the past several years, the City has undertaken a variety of initiatives to minimize visual clutter and better control the esthetics of installations on or affecting City streets, indicating a growing public concern over visual clutter, esthetic disturbances in the streetscape and unsolicited demands on public attention. See, for example, Local Law 23 of 2002 which adopted new requirements regarding the installation and appearance of newsracks on City streets (as the Council noted in its declarations of findings and intent therefor, "the

---

[22] For example, Resolution of Manhattan Community Board 5 of February 17, 2004 ("Whereas, the board is also concerned with the proliferation of visual clutter on our streets and feels that additional advertising enclosures for phones would add to this condition; therefore be it RESOLVED, that Community Board Five supports the proposed amendments of the rules regarding public pay telephones that would prohibit the installation of new advertising enclosures....").

[23] An argument might be made that some examples of posted advertising could represent an esthetic improvement, or at least no greater an esthetic imposition, than the unadorned, blank walls or panels that may be found on public pay telephone enclosures absent advertising panels, but DoITT finds that except in unusual circumstances the variable visual distraction and disturbance of outdoor advertising creates in general a greater sense of visual clutter than a blank surface. The changing aspect of commercial outdoor advertising on PPTs, as compared to less variable forms of visual impact, is a legitimate basis for prohibition of the former. See Metromedia v. City of San Diego 453 U.S. 490 at 511: "...the city may believe that offsite advertising, *with its periodically changing content*, presents a more acute problem than does onsite advertising." [emphasis added] Posted advertising is by its nature intended to be more visually intrusive than a blank surface — posted advertising, after all, gains its value from acquiring public attention, from being "eye-catching". Such advertising is thus likely to contribute more to visual clutter than blank surfaces alone. Also, a restriction on advertising on PPTs may incentivize PPT owners to keep the applicable enclosures themselves as small and unobtrusive as practicable given that an owner's goal of minimizing the burden of maintaining a larger facility may no longer be outweighed by the owner's goal of maximizing advertising space.

20

AR00281

NYC005397

proliferation of unregulated newsracks has a deleterious impact on the appearance of such sidewalks and the city in general"). See also City Council Resolution 1004 of 2003, which required that all franchises granted thereunder "reflect a citywide coordinated design scheme", and the RFP issued pursuant to that Resolution earlier this year by the City's Department of Transportation (see quotations therefrom and discussion thereof at ¶ 37 below). The scope of zoning and land use restrictions on outdoor signage visible from the streets has also expanded in recent years: see, for example, Local Law 14 of 2001, codified at Section 26-127.3 and Subchapter 4 of Title 26 of the New York City Administrative Code. Efforts such as Local Law 14 of 2001 may also be seen to some extent as part of a overall response to a general sense that an increasing level of unsolicited intrusion on the public's attention requires increased scrutiny of unsolicited intrusions on public attention generally. See, for example, recent federal regulatory action to create a national "do-not-call" list (In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Report and Order adopted June 26, 2003, 18 FCC Rcd 14014) and federal legislation to restrict unsolicited e-mail (Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003, Pub. L. No. 108-187, 117 Stat. 2699 (2003)). The intensity of interest over the last few years in minimizing visual and other forms of unsolicited clutter is confirmed, in the specific context of PPT advertising in City streets, by various resolutions and comments of local Manhattan Community Boards in the last few years expressing concern over, and opposition to, additional clutter on the streets from additional PPT installations and advertising thereon.[24]

c.     **The Concentration of Visual Clutter from PPT Advertising in Certain Areas**

---

[24] See for example, Community Board 6 Resolution of April, 2004; Letter of Community Board 7 dated March 4, 2004; Community Board 4 Resolution of March 3, 2004; Community Board 5 Resolution of February 17, 2004; Community Board 8 Resolution of February 18, 2004; Letter of Community Board 6 dated October 21, 2002; Community Board 2 Resolution of November 26, 2001; Response to Questionnaire received by DoITT from Community Board 1, July 18, 2001; Community Board 2 Resolution of January 12, 2001; Letter of Community Board 3, December 30, 2000. See also, testimony from representatives of Community Boards 4, 5 and 7 as set forth in the Transcript, pages 12-13 and 35-38.

21

AR00282

NYC005398

34.    In spite of these varied indications of greater public interest in minimizing visual clutter on the streets and indeed in minimizing unsolicited intrusions on public attention generally, there has accumulated a very high number of advertising panels on PPTs installed on the City's streets in CDs 1-8, resulting in an aggravation of visual clutter in those areas. According to figures collected by DoITT, there are 8,160 advertising panels located on PPTs in City streets just within the eight community districts that comprise CDs 1-8 in Manhattan[25]. The 8,160 advertising panels on PPTs in these eight community districts represent over 72% of all the advertising panels on PPTs on City streets throughout the 59 community districts of the City. And the problem has grown substantially in the last five years.  DoITT's records show that at least 4,170 PPT advertising panels in CDs 1-8 have been added in just the past five years – over half of the 8,160 total current PPT advertising panels in these districts.  Also, the eight community districts comprised by CDs 1-8 represent, out of the 59 community districts in the City, the eight community districts with the most PPT advertising panels in the district as well as the only eight community districts in the City that have more than 500 PPT advertising panels in the district[26].  With the significant accumulation of PPT advertising panels installed in CDs 1-8, and the significant increase in such panels in these districts over the last five years, the cumulative effect of visual disturbance and distraction resulting from PPT advertising in CDs 1-8 has become a significant issue.

35.    A heavy burden of additional visual clutter from PPT advertising has fallen on CDs 1-8, both in terms of total numbers and in terms of new installations since 1999, but the weight of such burden is even more profound given that this visual clutter has been concentrated within a much smaller physical area than it would in other community districts.  Although the eight community districts that comprise CDs 1-8 represent 8/59, or about 14%, of the total number of 59 community districts in the City, these eight districts actually represent only about

---

[25] Figures regarding the number of advertising panels on PPTs in this paragraph are based on notices required to be provided to DoITT pursuant to Section 4.3.1 of the PPT Franchise Contracts. Maintenance of an advertising panel on a PPT located on a City street without a notice provided to DoITT thereof under said Section 4.3.1 would be a default under the applicable franchisee's PPT Franchise Contract.

[26] Indeed, other than CDs 1-8, no community district in the City has even 400 PPT advertising panels, and 39 of the community districts in the City have less than 100 PPT advertising panels within the district.

AR00283

NYC005399

4% of the geographic area of the City.    According to statistics produced by the City's Department of City Planning ("DCP"), CDs 1-8 comprise in total about 14.3 square miles of land area out of 321 square miles in the City, or about 4.45% of the City's land area.  DCP also calculates "lot area" of the City to calculate the size of areas of the City available for land use. Under this calculation, DCP calculates the lot area of CDs 1-8 as totaling 265.4 million square feet  compared to about 6,696.7 million square feet of lot area in the City as a whole, which means that about  3.96% of the City's lot area falls within  CDs 1-8.

36.    Comparing the figures from ¶34 above to the figures from ¶35 above makes clear the objective conditions of increasing and disproportionate visual clutter from advertising on PPTs that have provoked significant concern about advertising on PPTs in CDs 1-8. About 72% of the PPT advertising panels on the City's streets have been squeezed into about 4% of the City's area. As part of the City's general efforts to limit visual clutter and protect the appearance of the City's streetscape, and reflecting both the expressed concerns of community members and representatives as well as the sheer numbers of PPT advertising facilities that have been installed in CDs 1-8, the adoption of Section 6-06(c) is not merely rational but a significant step in the protection of an important public interest.

37.    There may be, in individual situations, good and valid esthetic reasons for the City to tolerate the burden of some amount of additional clutter from advertising on street furniture if such advertising is tied to a program of esthetic upgrades such that the overall result is a net improvement in the esthetic quality of the streetscape. For example, the City is currently (as of the date of this Report) reviewing responses to an RFP issued by the City's Department of Transportation ("DOT") for franchises, which RFP is sometimes known as, and is referred to herein as, the "Coordinated Street Furniture RFP"[27].  The purposes of a franchise granted pursuant to the Coordinated Street Furniture RFP, as described therein, would be as follows:

---

[27] "Request For Proposals For A Franchise To Install, Operate And Maintain Bus Stop Shelters, Self-Cleaning Automatic Public Toilets And Public Service Structures And To Install And Maintain Newsstands In The Boroughs Of The Bronx, Brooklyn, Manhattan, Queens And Staten Island" released March 26, 2004.

AR00284

NYC005400

> The Coordinated Street Furniture Franchise is an important new initiative for the City of New York. Its primary goals are to augment and significantly improve the appearance and quality of the largest items of furniture in our streets.
>
> Designs must achieve aesthetic excellence. They must be compatible with a wide variety of built contexts and must conform to a citywide coordinated design scheme. Designs for the different types of Franchise Structures must be coordinated so that within any one area there is a harmonious relationship between the various items of street furniture.[28]

Under a franchise granted pursuant to the Coordinated Street Furniture RFP, a franchisee would be required to undertake, at its own expense, a re-design of thousands of pieces of existing City street furniture such as bus shelters and newsstands, with the goal being a significant upgrade in the esthetic quality and consistency of the City's streetscape. In order to provide a franchisee with revenue to support such a cost-intensive esthetic upgrade, the franchisee would be permitted to include advertising panels on some of the new street furniture. Many of such advertising panels would simply replace existing advertising panels on current street furniture installations, but there may be some additional advertising locations as well. The goal of the Coordinated Street Furniture RFP, however, is to grant a franchise under which the improvements in esthetics resulting from a contractually required street furniture design upgrade will outweigh the additional visual clutter arising from such additional advertising locations, resulting in a net improvement in the esthetics of the streetscape. The PPT Franchise Contracts, in contrast, provide no offsetting obligatory esthetic improvements to balance the negative effect of visual clutter from advertising panels on PPTs. In CDs 1-8, the visual clutter from advertising panels on PPTs has become a serious enough issue that the adoption of Section 6-06(c) to protect the City's streetscape going forward is a rational and, indeed, important step for the protection of the esthetic value of the public rights-of-way in the affected communities.

    iii.    <u>**Public Comments on Policy Issues in Section 6-06(c)**</u>

---

[28] Coordinated Street Furniture Franchise, Section II.A.1., page 3.

24

AR00285

NYC005401

38. Public comments that DoITT received regarding Section 6-06(c) in response to the applicable notice of proposed rulemaking fell generally into four categories: comments supporting the adoption of Section 6-06(c), comments supporting the concept of the section but suggesting that the section does not go far enough in limiting advertising or PPT installations generally, comments from PPT owners and their representatives opposing adoption, and comments from representatives of the City Council, past and present, arguing that Section 6-06(c) is beyond the scope of DoITT's authority. In addition, several commenters identified ambiguities in the second sentence of Section 6-06(c) as it was proposed (see ¶ 43 below).

39. Opposition comments were predominantly focused on the legal issues discussed at length in ¶¶ 4 through 25 of this report; these need not be covered again here. Opposition comments did not present any facts or reasoning inconsistent with the fundamental policy bases for adoption of Section 6-06(c), that is, no comments were submitted arguing that the avoidance of visual clutter is not an important public policy, or that advertising on PPTs does not add unpleasant visual clutter to the streetscape, or that such PPT advertising is not concentrated in the districts that are the subject of Section 6-06(c).

40. A few comments from PPT owners or their representative did raise related policy issues. The policy comments of Verizon and of Telebeam Telecommunications Corporation regarding Section 6-06(c) argue that advertising should be permitted on new installations to support the installation or use of new technology in PPT facilities. But existing PPT franchises already have a mechanism, unrelated to advertising revenue, for supporting desirable new technology investments through directed credits against franchise compensation.[29] Even more important though, is that there is no reason to believe that revenue from additional advertising will be dedicated to new technology investment. If new technology investment will generate self-supporting levels of new revenue then there is no need for advertising revenue to support it. If such technology will not generate self-supporting new revenue then PPT operators will have no incentive to take revenue from advertising and use it to invest in such new technology. The

---

[29] See Appendix F, Section 5, titled "Technologically Enhanced Public Interest PPTs", of the PPT Franchise Contracts with the City.

AR00286

NYC005402

comments of Dennis Novick dealt with the technology investment issue in a more nuanced matter, by suggesting that Section 6-06(c) be amended to allow tailored waivers by DoITT that could be granted conditional on specific commitments by operators to reinvest advertising revenue in new technologies found to be in the public interest. This is a proposed mechanism similar to the mechanism established in existing franchise agreements for credits against franchise compensation for new technology investment. However, DoITT finds that, if the anticipated returns of a proposed new technology are so limited, in comparison to the investment required, that the existing franchise credit mechanism would be inadequate to support it, there is insufficient justification to add to such existing available credits an additional layer of support that would require increasing visual clutter on the street in community districts where clutter from PPT advertising has become a significant problem and where opposition to such clutter has been clearly articulated.

41.    Several industry commenters (including J&N Communications and Donna Torres) argue that because the PPT industry's revenues have declined therefore the industry should have the benefit of revenue that additional advertising in the affected community districts would add. But without a specific public (as opposed to private) benefit identified, it is not clear what the justification would be for permitting the additional public burden of adding new instances of visual clutter.  DoITT notes that Section 6-06(c) does not eliminate any existing stream of revenue for any provider. Section 6-06(c) is prospective only, in the sense that if a provider has previously incurred the expense of installing a validly authorized, installed and maintained PPT at a location where advertising is currently permitted (i.e., curbside within a commercial or manufacturing zone and not otherwise restricted from advertising by other specific applicable restrictions) advertising will continue to be permitted from that location after Section 6-06(c) becomes effective.[30]

---

[30] Several commenters alluded to compensation received by the City under the PPT Franchise Contracts that is related to revenue received by the franchisees as the result of advertising being placed on the PPT enclosures. See, for example, pages 17 and 41-42 of the Transcript. DoITT's decision to adopt Section 6-06(c) is based on its concerns regarding the high levels of visual clutter from advertising on PPT enclosures in the areas covered by Section 6-06(c) and is unrelated to revenue issues.  However DoITT notes that if someone were to argue that DoITT should not adopt Section 6-06(c) because adoption will cost the City significant revenue, revenue that ostensibly might have been generated by continuing to

Continued...

AR00287

NYC005403

42.     Several commenters who support the basic concept of limiting clutter in the streetscape argue that Section 6-06(c) does not go far enough in accomplishing that goal. Community Board 5, for example, urges DoITT to expand the scope of the rule to all of Manhattan, while Community Board 7 and Susan Rosenfeld suggest that the restriction against advertising be applied to existing locations as well as new locations. It is in CDs 1-8 that DoITT has found the most complete combinations of high concentrations of visual clutter from PPT advertising and articulated concern over visual clutter from such PPT advertising. If comparable facts arise with respect to other community districts in the future, DoITT will consider expanding the geographic scope of Section 6-06(c) at such time. With respect to existing installations, DoITT recognizes that PPT providers have in many cases made an investment in constructing existing facilities at locations that have to date been permitted to include advertising on the enclosures (because all such locations are required to be curb line PPTs, and because curb line PPTs tend in general to be more expensive to install than other PPTs, such investment is likely to be substantial[31]).  DoITT would seek, at the least, even stronger evidence of the harms of PPT

permit advertising on additional PPTs in CDs 1-8, it is by no means clear that the factual assumption underlying such an argument would be valid. In fact, DoITT has seen a substantial decline in revenue to the City from the share of advertising revenue that is paid to the City as part of PPT franchise compensation (the amount of franchise compensation collected by the City attributable to advertising on PPTs declined from $11,298,605 for the City's fiscal year 2001, which ended June 30, 2001, to $9,328,638 for fiscal year 2004, which ended on June 30, 2004, a decline of 17.5% that occurred despite an increase in the number of panels during this period). To some extent it is possible that the decline in such revenue may reflect a temporary or cyclical decline in the advertising market generally, and not necessarily a long-term phenomenon. However, it is also reasonable to theorize that the high revenue period of several years ago was an unusual "bubble" phenomenon, reflecting unusually high capital market valuations (resulting in unusually large amounts of funding available for aggressive advertising campaigns) that are unlikely to recur in the near future. It is also not unreasonable to conjecture that with the substantial increase in recent years in the number of PPT advertising panels in CDs 1-8, any marginal increase in revenue to the City from any further additional advertising installations on PPTs in CDs 1-8 will be comparatively small or nonexistent. As additional PPT advertising installations in these areas become more likely to offer marketing visibility that overlaps with existing PPT advertising panels, it becomes increasingly likely that any new revenue to the City from one PPT advertising panel will be offset, at least in part, by a decline in revenue from another.

[31] The City has a legitimate and rational interest in limiting the effect of a new advertising sign restriction to new installations and thus "grandfathering" existing installations. See, for example, The Door Store v. City of Tacoma 1991 U.S. App. LEXIS 22276 (9th Cir. 1991) finding that a set of sign regulations,

Continued…

AR00288

NYC005404

advertising than presented to date to support a rule that would affect such bona fide investment.[32]

43.     DoITT received several comments (including those of Robert Brill and David Bronston) expressing concern about ambiguities in the second sentence of the proposed version of Section 6-06(c). Reviewing these comments, DoITT recognizes that this second sentence would create confusion and, in any event was intended to have effect, if ever, in only the most remote circumstances. In order to avoid confusion, then, DoITT is deleting this second sentence in the final version of the rule.

---

adopted for esthetic reasons, did not violate an affected party'sequ al protection rights merely because preexisting uses were permitted to continue, as preexisting use provisions represent a rational classification.

[32] Some commenters also suggested that Section 6-06(c) should restrict not just advertising on new PPTs but that it should restrict the installation of new PPTs themselves. DoITT recognizes that some of the same analyses discussed in this Report in support of the advertising restrictions in Section 6-06(c) could be applied to arguments for restricting placement of PPTs themselves. DoITT notes, however, that DoITT's rules already include a mechanism for taking into account any legally authorized and appropriate public interest considerations in the decision whether or not to grant PPT permits. See Title 67 of the Rules of the City of New York, Section 6-31(a). The particular rulemaking which is the subject of this Report is not intended to be in any respect a consideration of the appropriate circumstances under which installation of PPTs without advertising should be restricted, but only a consideration of the extent to which advertising on PPTs should be restricted. In a similar vein, some commenters referred to the dramatic decline in payphone usage in recent years as a basis for supporting Section 6-06(c) or even expanding the scope of its restrictions. It is true that the enormous growth in the use of wireless phones and the apparently related decline in use of payphones (comments from both proponents and opponents of Section 6-06(c) linked the growth of mobile phone use to the decline in use of PPTs, and the FCC has made this link as well, see *In the Matter of Request to Update Default Compensation Rate for Dial-Around Calls from Payphones*, Report and Order, FCC Release No. 04-182, Released August 12, 2004, ¶ 15) reduces the impact of one argument that might theoretically be made to support advertising on PPTs (i.e., the argument that PPTs are so important that advertising on them should be permitted so as to encourage the installation of PPTs even if such PPTs are not self-supporting based solely on revenue from phone usage). To the extent that wireless phones now offer an alternative to PPTs for many people, if permission to advertise had originally been intended to encourage the installation of PPTs sufficient to serve a certain number of anticipated users of PPTs then as the number of anticipated users has declined the relevance of such an intention would also decline. It would be beyond the scope of this particular Report, however, to conclude here that such an intention underlay the original PPT Franchise Contract grant of authority to install advertising on PPTs. The scope of this particular Report's discussion of issues related to the policy underlying Section 6-06(c) is the analysis of the problem of visual clutter from advertising on PPT enclosures, and the concentration of that problem in CDs 1-8.

28

AR00289

NYC005405

iv.    <u>Conclusion and Summary of Analysis of Section 6-06(c)</u>

44.    In conclusion and summary, based on the level and concentration of visual clutter from PPT advertising in CDs 1-8 and articulated concerns over such visual clutter from such PPT advertising in CDs 1-8, the adoption of new rules restricting such PPT advertising within such community districts as described in Section 6-06(c) is not merely rational but highly warranted. DoITT therefore is adopting new Section 6-06(c), effective sixty (60) days from the date of publication in the City Record of the final rule.

B.    <u>Permit Application Fee</u>

i.    <u>Introduction</u>

45.    Section 23-406 of the City's Administrative Code ("Section 23-406") directs DoITT to "establish fees for the issuance and renewal of permits… in amounts sufficient to compensate the city for the administrative expense of issuing or renewing a permit and the expense of inspections and other activities related thereto." By rulemaking in 1996, DoITT established PPT permit fees pursuant to this provision equal to $59 per permit application (codified at Section 6-32 of the PPT rules). Over the years since 1996, DoITT has found that said $59 amount per permit application has not continued to represent an amount "sufficient to compensate the city for the administrative expense of issuing or renewing a permit and the expense of inspections and other activities related thereto". DoITT therefore undertook a study, following the City's standard methodology for determining appropriate permit fees sufficient to reimburse applicable agency expenses, to review the $59 amount for possible changes. The result of this study showed that a fee based on reimbursement to DoITT of the applicable expenses contemplated by Section 23-406 could result in a per permit application fee of $560. Said $560 amount was accordingly incorporated in the Proposed Rule Changes in a proposed amendment of Section 6-32 (and related Section 6-48) of the PPT Rules. The Proposed Rule Changes also proposed a $35 fee for applications to extend notices to proceed, in light of the fact that DoITT has found requests for such extensions have become a separately identifiable aspect

29

AR00290

NYC005406

of permitting, creating a separable expense burden on DoITT that is reasonable imposed on those who seek such extensions rather than on all permit applicants generally.

ii. **Comments and Conclusion**

46. The City received a number of comments from PPT owners and their representatives raising concerns regarding the dramatic nature of the permit application fee increase from $59 to the proposed $560. Comments were also received which suggested that DoITT may lack a rational basis for concluding that such an increase meets the reimbursement of expenses standard set forth in 23-406.

47. The proposed $560 per permit application amount was based on application of the standard User Cost Analysis methodology developed by the City's Office of Management and Budget for the calculation of permit fees of comparable types for many different City agencies, and DoITT finds that it would be reasonable and consistent with Section 23-406 to adopt the proposed $560 amount referred to in the Proposed Rule Changes in amendment of Sections 6-32 and 6-48 of the PPT Rules.

48. Nevertheless, although the proposed $560 amount was developed using the City's standard methodology for such calculations, and the final adoption of such amount would be reasonable and supportable, DoITT recognizes that by comparison to the previous $59 amount the degree of change that would result from an increase to $560 is unusual in its scope. DoITT also recognizes that, although the level of such change likely reflects not an unreasonably high new amount but rather that there was a substantial underestimation of what the fee should have been when the fee was originally set at $59, it may still not be advisable to implement the full measure of such an unusual level of change in one step. Because any study of the type applicable to this sort of determination can only be a reasonable estimate of anticipated expenses to be reimbursed, DoITT is prepared to recognize that there are alternative estimates of some figures in the User Cost Analysis study that would also be reasonable and would produce a lower figure than $560. Based on reasonable alternative assumptions, DoITT concludes that $395 per permit application is also a reasonable estimate of a permit fee that would produce "amounts

30

AR00291

NYC005407

sufficient to compensate the city for the administrative expense of issuing or renewing a permit and the expense of inspections and other activities related thereto." DoITT also concludes that by adopting this alternative $395 amount, it reduces the abruptness of a transition from the previous $59 amount. For these reasons, the final version of the amendment of Sections 6-32 and 6-48 adopted today replaces the $560 figure in the Proposed Rule Changes with the $395 figure.

49.    Commenter Robert Brill suggested that the proposed fee for applications for extensions of notices to proceed be waived if the event or condition resulting in the extension request is of certain types beyond the control of the applicant. DoITT notes that the purpose of the fee is to reimburse DoITT for its expenses of handling such extension requests and is unrelated to the nature of the reason for such requests or the responsibility or non-responsibility of the applicant for the event or condition resulting in such requests. References to the $35 fee in the final rules adopted today are therefore unchanged from those proposed in the Proposed Rule Changes.

AR00292

NYC005408

## ATTACHMENT A

## LIST OF WRITTEN COMMENTS RECEIVED

35 East 75th Street Corp.

Adam Emmerich, 171 West 71st Street Corp.

Andrea D'Allesandro, GEF Development Corporation

Anthony Borelli, Manhattan Community Board No. 4

Barbara Nelson, 49 West 72nd Street Cooperative

Davel Communications, Inc.

David Bronston, representing Vector Media Street Furniture LLP

Dennis Novick, Teleplex Coin Communications, Inc.

Digby Management Company

Donna Torres, Urban Telecommunications

Dorothy Ornitz

E. William Judson, Judson Realty LLC

Erisa Katsur, Tokyo Bunka USA, Inc.

Historic Districts Council

Independent Payphone Association of New York, Inc.

Jennifer Hensley, Downtown Alliance

John Sweeney on behalf of Coastal Communication Service Inc.

Joseph Giumarra, J&N Communications, Inc.

Landmark West!

Larry Warden

Madison Avenue Business Improvement District

Manhattan Community Board No. 4

Manhattan Community Board No. 5

Manhattan Community Board No. 7

Manhattan Community Board No. 8

Richard Windram on behalf of Verizon

Robert Brill, Law Offices of Robert M. Brill, LLC

Roberta Zuckerman

Susan Rosenfeld

AR00293

NYC005409

Telebeam Communications Corporation
The Society for the Architecture of the City
Vanessa Gruen, Municipal Art Society of New York

AR00294

NYC005410