# EXHIBIT 35



# H A R V A R D | B U S I N E S S | S C H O O L

9-506-022

REV: AUGUST 23, 2007

V. KASTURI RANGAN

ANITA ELBERSE

MARIE BELL

# Marketing New York City

On November 8, 2005, Michael Bloomberg was reelected mayor of New York City (NYC) by the second-largest percentage margin of victory of any mayoral candidate in NYC history. This endorsement was particularly heartening, as Bloomberg had begun his first term in January 2002—mere months after the 9/11 terrorist attacks leveled the World Trade Center towers. At that time, many had wondered if Bloomberg would be able to live up to the expectations set by outgoing Mayor Rudolph Giuliani, whose actions on September 11 and in its aftermath had been widely applauded. Bloomberg had also faced an estimated $4.8 billion budget deficit.[1]

Mayor Bloomberg proved a key factor in NYC's resurgence. Bringing a level of agility and accountability honed by his two decades of leadership in the private sector, Bloomberg applied a results-based approach to almost every area of city government and recruited key personnel from the private sector. By the end of his first term, Bloomberg's critics gave him credit for "using a by-the-numbers approach to nurse the city back to health from the devastation of the 9/11 attacks, while risking his own popularity in the process."[2]

One of Bloomberg's key private-sector recruits was Daniel Doctoroff, who was appointed deputy mayor for Economic Development and Rebuilding in January 2002. Doctoroff, a former managing partner in a private equity investment firm who had conceived and driven the city's 2012 Olympic bid (which NYC eventually lost out to London), believed that NYC required continued innovation to maintain and enhance its position relative to other global cities. In addition to focusing on infrastructure projects intended to make the city more livable, more business friendly, and more economically diverse, he wanted to revitalize the global perception of NYC. As the mayor had stated in his state of the city address in January 2003, "To oversee our promotion and marketing efforts, we'll establish a chief marketing officer for the city. . . . NYC is the best-known city on the planet. . . . Yet, as a city, we've never taken direct, coordinated custody of our image. By changing that, we can realize additional city revenues immediately."

The chief marketing officer (CMO) would be a new position within a new organization, New York City Marketing (NYCM). Doctoroff explained:

---

[1] "New York Mayor Bloomberg's Budget Seeks Broad Cuts Across City Agencies," *The Wall Street Journal*, February 14, 2002.

[2] "While Aides Get Free Hand, Bloomberg Measures Results," *The New York Times*, October 18, 2005.

Professors V. Kasturi Rangan and Anita Elberse and Research Associate Marie Bell prepared this case. HBS cases are developed solely as the basis for class discussion. Cases are not intended to serve as endorsements, sources of primary data, or illustrations of effective or ineffective management.

Copyright © 2006, 2007 President and Fellows of Harvard College. To order copies or request permission to reproduce materials, call 1-800-545-7685, write Harvard Business School Publishing, Boston, MA 02163, or go to http://www.hbsp.harvard.edu. No part of this publication may be reproduced, stored in a retrieval system, used in a spreadsheet, or transmitted in any form or by any means—electronic, mechanical, photocopying, recording, or otherwise—without the permission of Harvard Business School.



Clear Channel

EXHIBIT NO. 3

JINEEN PAVESI

CERTIFIED REALTIME SPECIALIST

We realized that NYC had a marketing problem that needed to be addressed. Even though NYC is the safest big city in the U.S., many people have incorrect or outdated perceptions of it—they think that crime is as abundant as seen on television, and they think the cost of doing business is high. We need to point to the positives—for example, that crime is at the lowest levels in years and that, although costs may be higher, the productivity of employees here in NYC is also higher.

Doctoroff formulated the vision for NYCM with two other prominent private-sector recruits: Michael Cardozo, the city's corporation counsel; and Andrew Alper, president of the New York City Economic Development Corporation (EDC). Together, they crystallized the idea of "a marketing department and a CMO that could help NYC capitalize on its unique assets but be mindful that it is a city, not a consumer product," as Doctoroff put it. To address this need, Doctoroff, Cardozo, and Alper determined that NYCM would centralize marketing, media, and licensing services for NYC. Joe Perello was appointed as the city's first CMO and president of NYCM.

In its first two years, NYCM forged corporate partnerships, including a marketing/vending contract with Snapple, a multiplatform deal with The History Channel, and the funding of a major event, the Country Music Association Awards, held in Madison Square Garden. NYCM was a party to negotiating advertising and promotion space on the city's street furniture, primarily its bus shelters. NYCM had also surveyed all of the city's brands, secured copyrights, and was negotiating licensing royalties and selecting vendors. Yet, for all of its successes, much work remained to be done. Perello remarked:

NYCM is a breakthrough concept for municipal marketing. Our challenge is to create a self-funded marketing and promotional engine for the city—one that recognizes the city's assets, translates them into revenue opportunities, and returns value to the city in terms of revenue and jobs. We are constantly pursuing opportunities that help us promote NYC and push the boundaries of traditional destination marketing.

There was no doubt that Mayor Bloomberg was keen to back NYCM in his second term as well. In his January 2006 state of the city address, Bloomberg noted that his administration had created new partners, NYC Marketing and NYC Big Events, for NYC & Company, the city's convention and visitors bureau. He remarked, "Now they'll work more closely together to create the best marketing and promotion effort serving any city in the world. And to support this, we're going to commit an additional $15 million annually—nearly tripling the city's investment."

## New York and NYC Marketing

With over 8 million inhabitants in 2005, NYC was the largest and most densely populated city in the U.S. It comprised five boroughs: Brooklyn, the Bronx, Manhattan, Queens, and Staten Island, each of which could be major cities in their own right.[3] (See Exhibit 1 for a map of NYC.) The New York metropolitan area was one of the world's largest urban conglomerations, with a population of over 22 million people. Also known as the "Big Apple," the city included large populations of immigrants and was home to more Fortune 500 companies than any other city in the U.S. It boasted an extensive collection of museums, galleries, performance venues, media outlets, international corporations, stock exchanges, and international embassies.

---

[3] The population of Brooklyn was 2.5 million, the Bronx 1.3 million, Manhattan 1.5 million, Queens 2.3 million, and Staten Island 0.4 million. The New York metropolitan area included NYC, much of northern New Jersey, eight counties in New York State, southwestern Connecticut, and a small portion of Pennsylvania.

## NYC Marketing

The creation of an innovating marketing organization was part of Mayor Bloomberg's strategic plan. Together, Doctoroff, Cardozo, and Alper established NYCM and served as its board members. Cardozo, a former partner and cochairman of the sports division at a leading law firm and a pioneer in the field of sports law, explained the Board's perspective:

> After 9/11, merchandise supporting the fire and police departments was flying off the shelves, but the city wasn't seeing as much of that revenue as it could have. As a city, we were organized to serve citizens but not to do business. We brainstormed how a sports model could be an analogy to city government. American sports leagues do not own the franchises, yet by demonstrating that the collection is far more valuable than its individual parts, they are able to motivate the owners of the franchises to seek collective governance to everyone's benefit. We believed that a similar model would work for the city. In some ways it is easier because the city owns all the assets, but in other ways more difficult because we are dealing with public property.

In 2002, Alper, a former COO of the Investment Banking Division at Goldman, Sachs & Co., began promoting NYC to business and influential decision makers around the world. Recalling his experience, Alper remarked, "Running a city is a highly competitive business. When we began to think of NYC as a product, as an extremely powerful brand with unique attributes, we noticed we were missing significant opportunities to protect or capitalize on the value it represented."

In March 2003, Perello, founder of a marketing agency serving sports and entertainment businesses, received a call from a client explaining that the city wanted to create a new office responsible for marketing NYC. He had begun his career in MBNA's credit card division, building one of the largest affinity credit card portfolios with the National Football League, and then was the vice president of business development for the New York Yankees. Perello recalled his initial reaction: "I knew that the idea of NYC was powerful. The city's size and preeminent positioning provided tangible physical assets that could be used in partnership with a business to meet commercial goals and provide revenues and solve problems for NYC." But at the same time, Perello was skeptical that it could be accomplished within what he perceived as the complex and bureaucratic structure of city government. After interviewing with Doctoroff, however, Perello became keenly interested in the job. He recalled: "I realized that the Bloomberg administration was serious and that he and the mayor were keen to get something like this done, especially in NYC."

In April 2003, Perello became CMO and set out to explore the full potential of NYC's powerful brand. While Perello reported directly to Doctoroff, each of NYCM's founders contributed to the organization's initial development. In July 2003, NYCM was established as a local development corporation and the city's centralized marketing authority. Over the next two years, Perello built a talented team initially drawn primarily from the private sector but soon supplemented with talent from inside the administration that could advise the group in navigating and operating as part of city government. (See Exhibit 6 for NYCM's organization chart.)

## City Government

NYC's operating budget of over $50 billion was far and away the largest municipal budget in the U.S. and larger than every state budget with the exception of the states of New York and California.[4]

---

[4] Much of the discussion in this section has been drawn from briefs and materials prepared by Desiree Peterkin, senior director of government relations at NYCM.

(Exhibit 2 summarizes the city budget.) The mayor and the city council[5] governed NYC based on the city charter, which defined the responsibilities and balance of power between the executive and legislative branches as well as elected officials and agencies. City council members and the mayor served for a maximum of two consecutive four-year terms. By law, the city was required to balance its budget annually.

The mayor acted as the city's equivalent of a CEO. He defined policy through the annual budget submitted to the city council, the appointment of commissioners to city agencies, and the direct exercise of his authority. As of 2006, the city had 60 mayoral agencies and dozens of offices and commissions, such as the fire department and the police department, all headed by direct appointees. Analogous to a CFO was the city's comptroller, William Thompson, who monitored every aspect of the city's finances and issued its annual financial statements. At one time considered a potential Democratic challenger to Mayor Bloomberg for the 2005 election, Thompson was also the city's chief auditor.[6] Reporting to the mayor were seven deputy mayors including Deputy Mayor Doctoroff. (Exhibit 3 provides an organization chart for NYC government.)

NYCM was a not-for-profit local development corporation rather than an NYC agency. NYCM's status meant it was free of many governmental procedures and could move more quickly, though it was bound by the city's policies and procedures when NYCM's actions involved the use of city assets. Jessica Eliasi, vice president of strategic marketing at NYCM, noted, "Marketing a city requires an understanding of many different audiences and an ability to match the demands of the private sector with the needs of the municipality. To create a 'win-win' for everyone, we need to know who to approach, when to approach them, and how to explain to them why our project is important to them and the city.

NYCM's activities were closely related to three other city-affiliated entities that also reported to Doctoroff: the EDC was responsible for fostering investment and employment opportunities to create economic growth for the city; NYC Big Events was responsible for attracting high-profile events and celebrations; and NYC&Co was responsible for promoting NYC and attracting major conventions, trade shows, and other events to NYC. NYCM also followed the procedures of the mayor's Office of Contracts Services (MOCS)[7] and the Franchise and Concession Review Committee (FCRC).[8]

## Marketing New York City

Ultimately, by generating revenues and promoting NYC around the world, NYCM aimed to promote tourism and grow jobs. Perello remarked:

NYC attracts 40 million visitors every year—we can increase that number significantly. In addition to visitors, we are targeting business leaders, talent, and "dreamers." We really want

---

[5] The 51-member council represented every community district in NYC, oversaw the growth and workings of city agencies, approved the annual budget, and had decision-making power over zoning and land-use issues. The council's authority was limited, as it shared power with the mayor (who prepared the budget, had veto power, and negotiated union contracts); it could not pass local laws that imposed taxes unless authorized by state legislation because state laws superseded local ones.

[6] There were several other significant and influential government and quasi-government organizations including borough governments, NYC community boards, and business improvement districts (BIDs).

[7] The MOCS oversaw the city's procurement of $7 billion annually of goods, services, construction, and construction-related services for all mayoral agencies.

[8] NYC defined the private use of public property for compensation as a concession. Major concessions, as defined by the city Planning Commission, required review and approval by the Uniform Land Use Review Procedure. Other concessions went through a more streamlined process via a public hearing at the FCRC, which included the mayor, the director of the Office of Management and Budget, the corporation counsel, the comptroller, the affected borough president, and an additional appointee of the mayor. Government agencies could award franchises to companies to occupy or use city property to provide a public service.

to promote NYC as a destination for a number of different groups and generate activity in the city. The direct effect may be tens of millions of dollars in licensing, sponsorship, and advertising, but if we work on our ultimate goals—driving tourism and growing jobs—we have the potential to generate billions of dollars.

**Tourism**   In his 2006 state of the city address, Mayor Bloomberg set a new goal for tourism, called "50 by 15," to have 50 million visitors to NYC by 2015. The goal reaffirmed the importance of tourism to Mayor Bloomberg's strategy of diversifying NYC's economy. Tourism was a proven economic driver for the city: in 2005 it represented a $24 billion industry that generated more than $5 billion in city, state, and federal tax revenues supporting nearly 329,000 jobs. Of the more than 41 million visitors to NYC in 2005, 34.7 million were domestic and 6.7 million were international.[9] It was estimated that the international visitor market generated 40% of all visitor spending. Overnight visitors were primarily served by the city's hotel industry. Hotel occupancy in Manhattan in 2004 was about 83%, with an average daily rate of $202—an 11% increase over 2003's.

The EDC commissioned a market research study to determine the potential economic benefit from an increased emphasis on tourism. The study extensively surveyed 1,350 domestic respondents and 47 departing international tourists. It identified a pool of approximately 90 million domestic actual and potential visitors to the city and suggested that a $55 million marketing investment ($35 million directly by the city and $20 million by industry contributions to a marketing budget) could contribute $1.1 billion in direct visitor spending along with the creation of about 12,000 new jobs, all within the bounds of NYC's existing infrastructure.

The study identified seven visitor segments: the "culture buff," "extended New Yorker," "indulgers," "guided tourist," "explorer," "homebodies," and "not for me." (Exhibit 4 lists features of the segments.) While each segment had its own characteristic wants and needs, several findings were common across all visitors. The first was that few cities could compete with NYC's market position. Despite its unique position, however, it was important to have changing attractions to draw repeat visitors. One concern across segments was affordability: NYC was perceived as expensive, and the perception of high prices kept some visitors away. A second concern was crime: perceptions of crime kept some visitors away and limited visitor movement within the city.[10] The common needs across all segments were better information, preferably personalized information, and assistance in physically navigating the city.

Actively managing the NYC brand was seen as crucial to NYCM's efforts to capitalize on the city's assets and grow tourism. "We are one of the most compelling brands in the world," said Perello. A 2004 Young & Rubicam study ranked NYC as the 13th most powerful global brand of 2,400 brands analyzed. It also indicated most American cities in brand strength and stature. Key brand attributes for NYC were "unique," "authentic," and "dynamic." (See Exhibit 5 for details.)

NYC&Co, the city's primary tourism marketing organization, also played a key role in branding efforts. A private nonprofit organization with a membership of 1,800 businesses and an annual budget of about $16 million (40% of which was contributed by the city), NYC&Co worked to enhance the city's image through conventions, major events, and the worldwide promotion of NYC.

---

[9] In 2004, the major international tourist groups were British (870,000 visitors), Canadian (690,000 visitors), Japanese (292,000 visitors), German (232,000 visitors), and French (218,000 visitors). In 2005, markets that showed significant growth were Mexico (+10%), China (+25%), India (+11%), Russia (+12%), and Brazil (+25%).

[10] In 2005 NYC had been ranked by the FBI Uniform Crime Report as the safest of the 25 largest cities in the U.S., with crime dropping 14% from 2001 to 2004 and a further 3.4% in 2005.

**Jobs**    The overall responsibility for enhancing the long-term growth and vitality of NYC fell to the EDC. The EDC worked with the private and public sectors on initiatives to revitalize businesses, create jobs, and generate revenues for the city. The EDC also leased and sold various parcels of city-owned property to promote development. As Alper noted, "NYC is a huge market. We have the seventh-largest economy in the world, and 40% of our citizens are foreign born. I am convinced that if we target the right industries, we can grow [the manufacturing, tourism, and biomedical job sectors]."[11] (The EDC had made headway in several areas including the development of a privately financed $700 million life-sciences park on the East River, Morgan Stanley's decision to bring an additional 2,300 employees into lower Manhattan, and American Airlines' construction of a new $1.1 billion terminal at JFK Airport. Because affordable housing was also seen as an important element in attracting and growing jobs in NYC, Mayor Bloomberg had funded the construction and rehabilitation of over 50,000 affordable houses across the city's boroughs in his first term and planned to fund $7.5 billion to build and preserve 165,000 units of housing by 2013.)

The EDC and NYCM saw each other as complementary organizations. Alper noted, "NYC needs to have a point of differentiation. Every city that wants to create business development can offer tax breaks and financial incentives, but what seals the deal are the qualities that make your city different—its unique attributes. That is where we see NYCM coming into play."

## NYCM Initiatives

NYCM's activities drove four primary benefits for NYC: they created a way to generate direct revenues for the city, helped to promote NYC around the world, provided access to advertising vehicles, and supported city agencies and initiatives. Direct revenue was not NYCM's only focus—NYCM also hoped to accomplish multiple benefits in each of its deals—but the goal was to run NYCM as a self-funded initiative. "We want to enhance life in NYC at no expense to the public," remarked Perello. "If we help agencies maximize their opportunities, we increase efficiency in government and provide additional revenue for essential services."

### Corporate Partnerships

NYCM sought partnerships that supported NYC's brand-building and marketing goals. Partnership opportunities were built on three guiding principles: *"Do well"* for partners by helping them achieve marketing goals through the appropriate use of the city's assets; *"Do good"* for New Yorkers through support for city initiatives that aligned with the partner's brand; and *"Do more"* for the city and the partner by activating its association with NYC in a way that reflected accurately and positively on both brands.

**Snapple**    NYCM's first deal was a five-year $166 million partnership with Snapple, a company that began in 1972 when three childhood friends began selling pure fruit drinks to health food stores in Greenwich Village. Even though through subsequent acquisitions Snapple ended up in 2003 a division of Cadbury Schweppes American Beverages, it remained true to its NYC roots. In 2003, Snapple entered into a vending agreement with the Department of Education (DOE). NYCM subsequently negotiated an opportunity that expanded beyond schools to broader opportunities with the city.

---

[11] "EDC Boss Shares City's Good News," *Real Estate Weekly*, January 21, 2004.

- **Schools:** The first component of the deal envisaged a minimum of $40 million over five years to the DOE in cash through a sponsorship commitment for sports and physical education programs and commissions (30%)[12] on every case of Snapple beverages sold. It included expansion of the Public School Athletic League (PSAL), with 120 new middle-school teams joining the league in September 2004, spread across 17 different sports and 76 public schools.[13] Snapple's estimated investment in the program was over $5 million in the first year of the agreement. In return, Snapple became the exclusive provider via vending machines in NYC's 1,200 schools. Under the deal, carbonated beverages were replaced with Snapple products: water (Snap2-0) and a special line of Snapple 100% Juiced that met the DOE's nutritional guidelines. Snapple did not stock any other products (including its best-selling iced tea). The products were initially priced at $1.00—about 18% less than the average retail price in NYC. Snapple was responsible for the installation, operation, maintenance, and fulfillment of all the vending machines.

- **City:** The second part of the Snapple partnership was a citywide marketing, vending, and concession partnership.  Under the agreement, effective April 2004, Snapple gained the exclusive right to sell iced teas (e.g., Lemon Iced Tea), water (Snap2-0), and chocolate drinks (Yoo-Hoo) in city-controlled properties.  Over a period of five years, NYC was expected to receive $66 million in cash comprising commissions on every case sold at city buildings, facilities, parks, and other locations, as well as marketing payments for initiatives that included the use of city-owned media, city-run promotions, and the sponsorship of events and concerts (such as a summer concert series and a beach volleyball tournament).  The deal further covered in-kind activities valued at approximately $60 million over the five years of the partnership. Snapple used its own marketing resources to promote the city.  For example, under the deal, Snapple produced and aired a national commercial featuring NYC and funded a website (www.snappleandnyc.com) that promoted NYC.

The deal was initially heralded as a new type of mutually beneficial public-private partnership. However, in less than a week after the announcement, the city's comptroller joined Snapple's competitors in the beverage industry to warn of a "back-room" deal. Although the comptroller did not have oversight of the DOE, he mounted a well-publicized audit of the Snapple partnership, suggesting that the DOE selection process did not follow the city's traditional procurement process.

The comptroller questioned whether agencies reporting to the mayor could pursue marketing deals like the Snapple partnership without formal city review and approval.  In March 2004 he announced a lawsuit to stop the implementation of the citywide partnership with Snapple.  The lawsuit claimed that the comptroller should have authority over the review of marketing agreements because the city charter did not distinguish between real and intellectual property.  Although an appellate court upheld the Snapple deal in June 2005, the court's decision did require that future contracts that used the city's intellectual property be approved by the city's FCRC.  The comptroller's lawsuit resulted in an investigation by the city council in which Doctoroff, Perello, and the DOE were asked to testify and to defend the Snapple partnership.  As Perello noted, "Despite a strong launch and an excellent understanding between Snapple and NYCM, the skeptical media environment and the legal resources dedicated to fighting the lawsuit made it difficult for NYCM to pursue new partnerships, setting our operations back by close to 15 months." Additionally, vending results for

---

[12] "City fends off questions on Snapple deal," *Associated Press Newswires*, October 23, 2003.

[13] The Snapple sponsorship also resulted in the Snapple MVP Awards (with checks to first-, second- and third-place teams); the inaugural Snapple track and field and wrestling tournament; an after-school fitness program, called CHAMPS, offered at 40 middle schools; extension of the Big Apple summer program by one week; expansion of summer sports clinics, and so on.

the city deal fell short of initial goals, and adjustments had to be made to both components of the city agreement.

The Snapple deal provided a challenge for public schools, which had previously individually negotiated their own vending deals. While the DOE committed that every school would receive at least as much revenue under the Snapple agreement as it had on its own, it took some time to achieve this. In some cases, schools that previously received about $5,000 monthly had seen their income reduced to only a third of that for each of the first four months under the new arrangement.[14] Other schools reported they lost out on other forms of support from their former vendors, for example, "free" products at school functions and ads placed in school programs.[15] These problems were quickly resolved. By August 2005, sales were climbing, and the $11.7 million in funds flowing to schools was close to the projected $13.6 million.[16] Indeed, estimates were that, in the first year, Snapple sales made up 83% of the previous year's total school-based vending (which covered all beverages and snacks).

The city component of the Snapple deal encountered implementation obstacles. Installation of the vending machines on city-controlled sites sometimes proved difficult, for example, because sites lacked adequate electrical outlets or had existing vending contracts. As Parks Commissioner Adrian Benepe noted:

> Every concessionaire, down to the hot dog seller, has a contract with Parks and his own deal with his own suppliers. A directive to make Snapple the exclusive supplier couldn't be enforced until our contracts expired and we could specify the sale of Snapple products in the defined product categories. Successful vending machine sites have available electricity, high foot traffic, and secure locations free of vandalism. It wasn't a turf war; we just couldn't physically deliver the number of locations as quickly as NYCM had forecasted.

As a result, while city commissions from vending sales through April 2005 had been projected at $5.4 million, actual sales commissions were $405,000.[17] At that point, only 830 of the planned 3,500 vending machines had been installed.[18] In August 2005, NYCM announced that it would renegotiate the city vending component of the Snapple partnership. Snapple and NYCM mutually agreed to readjust their partnership focus. NYCM would receive 30% of city-vending Snapple sales and $15.3 million over a five-year period to provide marketing initiatives to Snapple, while keeping the sponsorship and promotional side of the agreement intact. Perello noted:

> We quickly realized we were too ambitious in trying to apply the DOE vending model to the city. The marketing value of the city partnership, however, was compelling and successful. We presented a new deal to Snapple which positioned the agreement as a marketing partnership with a vending component rather than a vending agreement with a marketing component. Snapple recognized the value and agreed to this new structure.

Despite these problems, Snapple remained enthusiastic about the overall deal. Snapple's CEO, Jack Belsito, said:

---

[14] "Snapple Checks Leave Some Schools Short," *The New York Times*, January 31, 2004.

[15] Ibid.

[16] "Juice Deal's Feeble Fruits; Big Snapple Pact falls $hort," *New York Post*, August 7, 2005.

[17] Ibid.

[18] "Snapple Cash Still a Slow Drip," *New York Daily News*, November 30, 2004.

Snapple is extraordinarily proud of our relationship with NYC. It is not just about selling—it is about being a valued contributor to our community. Our partnership with NYC schools represents less than 3% of the cases we sell in NYC and its suburbs. What is important to us is that Snapple has been able to positively impact thousands of NYC schoolchildren, helping them to become more active with hundreds of new sports teams and physical education programs, while also providing them more nutritious beverage options every day.

He continued, "The process was a learning experience for us. NYCM was in its formative stages and was itself learning about the challenges of centralizing assets. We became somewhat caught up in that." Since Snapple had struck its deal with NYC, its brand had gained considerable market share and created opportunities to forge similar agreements with other municipalities around the U.S.

**The History Channel**   In December 2004, NYCM announced a $19.5 million deal with The History Channel. The goal of the partnership was to boost tourism and preserve and promote the city's history and heritage. For NYC, the 3.5-year deal resulted in an influx of $3.5 million in cash, $15 million in media contribution, and $1 million in programming.

- The $3.5 million cash payment was used to establish an NYC Heritage Tourism Center, restore three historic houses (part of the Parks Department's portfolio), and provide comprehensive media support to the partnership primarily through NYC's advertising space in bus shelters. The Heritage Tourism Center (see Exhibit 7), owned by the city and sponsored by The History Channel, was a focal point of the agreement. Opened in July 2005 in lower Manhattan, it replaced the tourism kiosk established in June 2002 in response to a growing number of visitors after 9/11.

- The $15 million in media included a combination of prime-time and mixed-use spots. NYCM was responsible for developing the creative content for 70% of the spots, with the other 30% of the spots designated to support the joint NYC/The History Channel Landmark Tourism initiative. Beginning in August 2005, the network aired three promotional spots to its viewer base of 88 million households.

- The $1 million in programming consisted of five shows of "A-level" programming with NYC content that would appear on the city-owned cable channel. The History Channel would have an annual NYC week. Beginning in August 2005, the network's most popular program, "Modern Marvels," featured NYC landmarks such as subways, bridges, and other architectures. The episodes were introduced by former city mayors Dinkins and Koch. The History Channel would also be able to distribute its programs to public school students in grades 4, 5, 7, 8, and 10.

Negotiations took nine months from the time Perello contacted Michael Mohamad, the network's senior vice president of marketing. Perello noted, "We had conceived of an integrated partnership that included 14 city entities. Coordinating with them took time, but in the end the results made it worthwhile." In fact, for the city agencies associated with the deal, the negotiations were highly productive. "In this deal, NYCM came to us with a real partner and tangible benefits. We were able to articulate what we needed and the level of support we could provide," commented the parks commissioner. "The restoration of historic houses and monuments was a real need for us and one that is difficult for us to fund."

**Country Music Association (CMA) Awards**   The CMA Awards were broadcast live from Madison Square Garden on November 15, 2005. Bringing the award show to NYC was a major coup for the city's Big Events group and President Maureen Reidy, another private-sector recruit. It marked the first time the awards were held outside Nashville, Tennessee. NYC was hardly

considered to be a focal point for country music—the city did not even have a country music radio station. According to EDC estimates, the awards would bring an additional $30 million to the city from increased tourism and exposure of a new audience to NYC.

NYCM's role in the CMA awards was the creation of sponsorship opportunities that would underwrite the estimated $2.5 million needed to offset the incremental costs of hosting the awards in NYC. NYCM secured $3 million in net revenue from 14 corporate sponsors, seven of which were first-time supporters of the CMA. The sponsors helped promote NYC and the event nationally. A key sponsor was Chevrolet, a division of General Motors, which paid a multimillion-dollar fee. Chevrolet sponsored a three-day event in Union Square Park that provided free performances and showcased vehicles. It highlighted safety initiatives in cooperation with the city's Safety City program.

## Media

NYCM set out to centralize and manage the city's collective media assets. The idea was to use the assets to generate value to the city, by using them either to support corporate partners and city agencies or to promote NYC in other ways. NYCM believed that media opportunities were important not only to tap into advertising vehicles but also to shape the messaging in those vehicles.

**Street furniture** Street furniture was a collective term for objects and pieces of equipment installed on streets and roads for various purposes, including bus stops, newsstands, phone kiosks, street banners, and benches. NYC, like other municipalities around the world, entered into long-term franchise agreements with providers to build these structures. In turn, the provider retained the rights to sell advertising on the units.

Street furniture advertising represented one of the most significant opportunities for NYCM. While outdoor advertising represented only 2.4% of advertising in the U.S., it was growing at 5.5% annually—a faster rate than advertising in newspapers or on network television and radio. Outdoor advertisers considered NYC, with its population density and income levels, a key market. The city had an estimated 3,000 bus shelters with two advertising panels per shelter, 7,000 banners on street poles, and another 1,000 telephone kiosks.[19] Advertising on street furniture was valuable: published advertising rates for a four-week run were as high as $4,500 per bus shelter panel in Manhattan, $825 per panel in other city boroughs, and $440 per banner on street poles. While the percentage of utilized space varied from month to month and borough to borough, it was estimated to range from a low of 66% in off-peak periods in some boroughs to over 90% in peak periods in Manhattan.

In 2002, with the existing 20-year contract for the city's bus shelters coming up for renewal, Mayor Bloomberg proposed that a new contract incorporate the design, installation, and maintenance of bus shelters, newsstands, and pay toilets. In 2003, the city council passed a bill that led to the issuance of a request for proposals (RFP), with bids due in August 2004. Bids were reviewed by an advisory committee that in turn made recommendations to the Department of Transportation (DOT) evaluation commission (the DOT was responsible for operational management of the street furniture). This commission included representatives from the Departments of Design and

---

[19] There were almost 900 bus shelters in Queens, 725 each in Manhattan and Brooklyn, 500 in the Bronx, and about 150 on Staten Island. The city buses and the subway were outside the purview of the city's street furniture. These assets were owned by the Metropolitan Transportation Authority (MTA). The MTA transported an estimated 7.7 million people per week via rail, subway, and buses. About 4,400 public buses served over 666 million people per year.

Construction, City Planning, Parks and Recreation, and Consumer Affairs, as well as from the EDC and NYCM.[20]

Among others vying for the lucrative contract, incumbent (and a major Manhattan employer) Viacom Outdoor, Clear Channel Communications of Texas, and the market leader, JC Decaux from France, were bidders of note.[21] In September 2005, the DOT announced the selection of the Spanish firm Cemusa, a division of an $8 billion construction and municipal services company. Although many had regarded Cemusa as a dark horse, its ability to deliver on the complete package of advertising and facilities was important.[22] It had earned a good reputation for its design and maintenance of "street furniture" in other cities around the world. The company was expected to invest over $100 million in NYC on street furniture construction. Financial considerations were also important. As one observer noted:

> [Cemusa] will pay $1 billion for the rights to sell advertising as well as design, install, and maintain 3,300 new bus stop shelters, 330 new newsstands, and 20 public toilets. The city will receive a share of the ad revenues—as it does under its current street furniture contract with Viacom—as well as 20% of the ad space for its own agencies and for corporate partnership deals. . . . Cemusa will [also] pony up out-of-home inventory in European and Latin American markets.[23]

From its outset, NYCM was aware that NYC's street furniture assets could be significant to the city's marketing strategy and to potential corporate partners. In 2003, under the last year of the city's 20-year contract with Viacom Outdoor, the city received $12.5 million in guaranteed commissions from advertising sales and 2% of the advertising space for public service announcements.

Working with the DOT, Perello focused on increasing the value of the deal: maximizing the cash, increasing the city's share of advertising space, and taking advantage of the freedom to place commercial advertising along with public service announcements. The following year, upon expiration of the Viacom Outdoor contract, Perello helped the DOT negotiate a one-year extension with greater benefits, including an increased payment of $13.5 million and a greater allocation of advertising space to 17.5% for the city to use not only for public service announcements but also in support of NYCM's corporate partners. Additionally, the new extension called for Viacom to provide $1.5 million in advertising space in other Viacom Outdoor national markets.

NYCM oversaw the use of the city-allocated media space and received the revenues associated with it, with the DOT receiving annual payments from the vendor with the advertising rights. (Exhibit 8 summarizes media value by street furniture type. Exhibit 9 outlines media utilization. Exhibit 10 provides some examples for Snapple.)

Compared with those for bus shelters, street banner media on street poles had stricter guidelines. The DOT only permitted the use of street banners for the purpose of promoting cultural, public, or

---

[20] The contract review process was extended by several factors including a lawsuit by the New York City Newsstand Operators Association that claimed that newsstands should not be included in the new contract. Existing newsstands were approved by the city but built and maintained by the individual newsstand owners, who received all advertising revenues associated with their stands.

[21] Several articles noted these firms as bidders including "Advertising: Companies Bid to Bid for Bus-Stop Ads," *The Wall Street Journal*, April 7, 2004; "NYC to Start Talks with Cemusa for $1bn Contract," *Reuters News*, September 21, 2005; and "The Insider," *Crain's New York Business*, July 11, 2005.

[22] "What's a Cemusa? New Outdoor Giant; Spanish Firm Lands $1 bill NYC Contract," *Advertising Age*, September 26, 2005.

[23] Ibid.

historical events that benefited tourism or enhanced the image of the city. DOT Commissioner Iris Weinshall, who approved all banners,[24] expressed her department's stewardship role: "We have a heavy volume of vehicular traffic commingling with heavy pedestrian traffic. We simply cannot commercialize our streets at the cost of safety. We have to balance the potential commercial value with aesthetics and safety. We have turned down very lucrative offers for street advertising."

Perello and his team understood that the city's new street furniture agreement represented a lucrative opportunity but also agreed there was a need for balance, noting:

> We could wrap advertising around every building and shelter we own, but people in the city would be visually assaulted everywhere they turned. We would prefer to get a good deal for our space, but without so much ambient advertising, or for that matter, illegal advertising.

**Universal Studios/*King Kong***    In November 2005, NYCM signed a partnership letter of intent with Universal Studios regarding the premiere of the feature film *King Kong* one month later.[25] Under the terms of the $3 million deal, Universal Studios gained access to the city for the launch of its much anticipated film. The agreement covered Military Island (which was used for a media event and the display of a 20-foot sculpture of King Kong), Times Square (simultaneous on 20 screens, a three-minute video montage was shown), and 42nd Street (for red-carpet access to theaters). The city also facilitated a citywide outdoor media campaign for Universal and its promotional partners. In return, in addition to receiving the sponsorship fee, the city retained the right to incorporate a one-minute feature on NYC on 14 million domestic and international *King Kong* DVDs and insert a tourism message in the DVD box. Eliasi noted, "Identifying new and breakthrough ways to build on NYC's brand is at the core of our model. With Universal Studios, we were able to host a perception-changing event with media value and positive exposure that increased consumer touchpoints for NYC and promoted an authentic and exciting image of NYC."

### Licensing

In 2003, much of NYC's intellectual property had not been registered, there was no comprehensive enforcement program, and because each agency was managing its own mark, a uniform set of standard policies, practices, and quality-control guidelines had not been established. Perello turned to Jeff Sofka, formerly the licensing chief at the NFL, who played an integral role in establishing NYC's licensing practice. Perello and Sofka believed that assembling a single collection of brands and trademarks would make sponsorship and licensing pacts significantly more attractive. One of Perello's first initiatives was to centralize authority over NYC's trademarks so that licensing deals involving any city department would be handled by his office. NYCM initially focused on the marks of seven agencies—the Fire Department (FDNY), Police Department (NYPD), Department of Parks & Recreation, Taxi & Limousine Commission, Department of Sanitation, Department of Transportation, and the Mayor's Office of Film, Theater and Broadcasting.

"Getting agreement was challenging," acknowledged Perello. For example, although the city had not relinquished its ownership of the mark, the Fire and the Police Departments had received permission in the mid-1990s to start their own small licensing programs, which benefited the Fire Safety Education Fund and the New York Police Foundation, respectively. As a result, Perello noted,

---

[24] This covers the content, location, and number of banners. For example, any sponsorship name was required to be placed on the bottom of the banner and not be larger than 10% of the banner. Banners associated with an event needed to be sited within a predetermined radius of the event.

[25] The original 1933 movie was considered a classic. Like its predecessor, the 2005 version of *King Kong* was set in NYC and featured many familiar landmarks including the Empire State Building.

"Individual agencies viewed licensing revenues as their money, and it took some work to convince the individual agencies that total licensing proceeds would increase with a more professional, centralized licensing operation, modeled after those in professional sports or media."

With support from Doctoroff and Cardozo, NYCM had centralized the rights to 21 trademarks across the seven agencies by February 2005 (see Exhibit 11 for the marks).[26] An RFP was then issued to offer product licensing rights for a range of products including apparel, souvenirs, replicas, and home furnishings. The terms of the licensing agreement called for royalty rates ranging from 8% to 15%.

Once the agreement was established, NYCM's focus shifted to trademark enforcement. "Every licensor has to battle trademark infringement, but no one has the problem that we do. Vendors on our own sidewalks are selling, 'I Love NY' and generic NYC apparel. And everyone can freely use the NYC skyline, or even the Statue of Liberty, in all kinds of products," noted NYCM's vice president of licensing. NYCM worked on the development of new logos that were "legally enforceable," as NYCM put it, devised "rules of engagement with potential licensees," and invested in quality-control systems such as the use of special "hang tags" with holographs that indicated a T-shirt's or baseball cap's authenticity. NYCM also worked with the midtown enforcement group to pursue infringement.

"The licensing opportunities are significant and growing," noted Perello. "We estimate that there was tens of millions of dollars in wholesale trade in NYC-related merchandise last year and that the city only saw a very small part of that revenue. We are only limited by our own imagination and creativity. We believe there are opportunities in parks, sanitation, taxis that haven't been tapped yet."

## The Road Ahead

As NYCM prepared for the year ahead, Perello reflected on his group's initiatives to date. He felt a sense of accomplishment that NYCM had been able to achieve so much without cost to the city. NYCM had generated more than $32 million in new revenue and $44 million in new promotional exposure for NYC that would be realized over multiple years (see Exhibit 12 for NYCM's income statement and key statistics). Additionally, since its inception, it had delivered more than $38 million in advertising value to city agencies, nonprofits, and partners. It was self-funding while also supporting city programs as well as media and promotional exposure for the city.

Perello kept his eye on refining NYCM's business model, remembering the inspiring remarks made by Mayor Bloomberg in fall 2005:

> There was a day when everybody said NYC does not need to advertise, it's the Big Apple, everyone is going to come here. . . . Those days are long over. . . . We are in the days of good communications and great transportation and a media that shows people that there are other cities around the world. We are in a very competitive battle. . . . You have to have a coordinated strategy; you can't just say . . . they're going to come to us.

Perello reflected back on the lessons learned as a way of framing the opportunity for new initiatives. "Ultimately, the role of marketing is to create great brand values," he thought. "Everything we do must add depth or dimensionality to the great brand that is NYC."

---

[26] Under the agreement with the Fire and Police Departments, the beneficiary foundations of their licensing programs would receive payments through 2006 that matched what they may have earned through their earlier licensing programs. Thereafter, 70% of licensing revenues would go to the foundations, with the remaining 30% retained by NYCM for administration of the licensing program.

506-022

Exhibit 1    Map of New York City and its Five Boroughs



Source:   NYCM.

Marketing New York City

506-022

Exhibit 2    Fiscal Summary ($ millions)—Year Ended June 30

| | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 Forecast [a] |
|---|---|---|---|---|---|---|
| Revenue | | | | | | |
| Taxes: | | | | | | |
| General Property Tax | 7,850 | 8,246 | 8,648 | 9,942 | 11,582 | 11,501 |
| Other Taxes [b] | 13,993 | 14,564 | 12,585 | 12,847 | 16,007 | 18,180 |
| Tax Audit Revenues | 416 | 401 | 485 | 571 | 576 | 525 |
| Tax Reduction Program | — | — | — | — | — | (23) |
| Miscellaneous Revenues | 4,239 | 4,853 | 5,128 | 4,258 | 4,683 | 6,167 |
| Transitional Finance Authority – 9/11 | — | — | — | 1,500 | — | — |
| Unrestricted Intergovernmental Aid | 631 | 634 | 666 | 1,443 | 963 | 562 |
| Anticipated Federal Actions | — | — | — | — | — | — |
| Less: Intra-City Revenue | (1,150) | (1,330) | (1,390) | (1,110) | (1,213) | (1,289) |
| Disallowances | (5) | (46) | — | (47) | (27) | (15) |
| Subtotal City Funds | 25,974 | 27,422 | 26,123 | 29,404 | 32,471 | 35,608 |
| Other Categorical Grants | 431 | 492 | 615 | 1,006 | 956 | 856 |
| Inter-Fund Revenues | 240 | 284 | 305 | 300 | 328 | 358 |
| Total City & Inter-Fund Revenues | 26,645 | 28,198 | 27,043 | 30,710 | 33,755 | 36,822 |
| Federal Categorical Grants | 4,417 | 4,550 | 6,097 | 5,618 | 5,415 | 6,873 |
| State Categorical Grants | 7,062 | 7,768 | 8,030 | 8,317 | 8,454 | 9,021 |
| Total Revenues | 38,124 | 40,516 | 41,170 | 44,645 | 47,624 | 52,716 |
| | | | | | | |
| Expenditures | | | | | | |
| Personal Service | 19,178 | 21,182 | 22,756 | 23,608 | 24,410 | 26,305 |
| Other than Personal Service | 16,165 | 17,405 | 18,409 | 18,681 | 19,568 | 22,192 |
| Debt Service | 739 | 310 | 704 | 1,819 | 2,429 | 2,129 |
| MAC Debt Service Funding | — | — | 5 | 225 | 502 | 128 |
| | | | | | | |
| Discretional Transfers | | | | | | |
| Debt Service | 2,599 | 2,199 | 667 | 480 | 1,043 | 1,792 |
| MAC Debt Service | 451 | 458 | — | — | — | — |
| Other [b] | 137 | 287 | 14 | 937 | 880 | 1,479 |
| General Reserve | — | — | — | — | — | 40 |
| | 3,187 | 2,944 | 681 | 1,417 | 1,923 | 3,271 |
| | 39,269 | 41,841 | 41,165 | 44,640 | 47,619 | 52,716 |
| Less Intra-City Expenditures | (1,150) | (1,330) | (1,390) | (1,110) | (1,213) | (1,289) |
| | | | | | | |
| Total Expenditures | 38,119 | 40,511 | 41,165 | 44,640 | 47,619 | 52,116 |
| | | | | | | |
| Surplus/(Deficit) GAAP Basis | 5 | 5 | 5 | 5 | 5 | — |

Source:   City of New York executive budget.

[a] Actual figures are reported (excluding subsequent restatements) for 2000–2004; forecasted figures are reported for 2005.

[b] Discretionary transfers in the miscellaneous budget for delayed receipt of revenues from the Transitional Finance Authority include $625 million, $400 million, and $947 million in 2003–2005.

506-022    -16-

Exhibit 3   NYC Government—Organization Chart



Source:  NYCM.

504-022   -17-

**Exhibit 4    NYC Visitor Segmentation**

| | Culture Buff | Extended New Yorker | Indulgers | Guided Tourist | Explorer | Homebodies | Not for Me |
|---|---|---|---|---|---|---|---|
| Description: | Love NYC. Highest affinity to NYC's cultural offerings. Most likely to visit galleries and performing arts centers. | Feel at home in NYC. Don't necessarily come for any other reason than to enjoy being in the city. | More interested in shopping. Impulsive and will look for almost any excuse to take a trip. | Enjoy traveling and don't mind being seen as a tourist. No strong affinity to NYC. A place they should see at least once. | Live to travel and find new experiences. Shun being seen as a tourist. Find their own way rather than pay for a tour guide. | Do not like to travel and only travel when they have to. Day-trippers over-represented with homebodies. | Do travel, but NYC isn't the place for them. Rather visit destinations like a beach resort. |
| % of active NYC travelers | 14% | 10% | 16% | 16% | 19% | 17% | 7% |
| % of active and potential visitors | 8% | 8% | 15% | 16% | 15% | 31% | 9% |
| Trips to NYC per year: | | | | | | | |
| Mean | 8.4 | 8.5 | 3.6 | 3.3 | 3.7 | 3.9 | 3.9 |
| Median | 1.0 | 1.3 | 1.0 | 0.7 | 1.0 | 0.7 | 0.7 |
| Visit NYC for: | | | | | | | |
| Overnight leisure | 68% | 60% | 65% | 59% | 71% | 46% | 45% |
| Day leisure | 54% | 65% | 47% | 40% | 36% | 59% | 54% |
| Business | 24% | 38% | 29% | 25% | 37% | 20% | 24% |
| Likelihood to Return | | | | | | | |
| Definitely | 62% | 57% | 47% | 37% | 45% | 18% | 40% |
| Probably | 26% | 29% | 26% | 21% | 23% | 31% | 26% |
| Spend per Trip [a] | | | | | | | |
| Mean | $738 | $915 | $1,971 | $742 | $755 | $563 | $1,509 |
| Median | $621 | $550 | $724 | $538 | $575 | $399 | $509 |
| "Enjoy NYC's energy" | 95% | 95% | 86% | 77% | 86% | 35% | 26% |
| "NYC is difficult" | 10% | 4% | 50% | 26% | 21% | 46% | 26% |
| "Curious about less (toured areas" | 46% | 44% | 52% | 47% | 67% | 22% | 8% |
| "Enjoy culture on vacation" | 53% | 38% | 47% | 63% | 62% | 28% | 14% |
| "Travel is important" | 63% | 58% | 82% | 82% | 90% | 19% | 62% |
| "Like tour guides" | 14% | 0% | 36% | 53% | 4% | 12% | 5% |

Source: Company documents.

[a] Spend levels are consumer reported. Based on research survey; spending may be over-reported by about 50% on aggregate. Over-reporting by each segment and in relation to each category of spending may vary from case to case. Total sample size of 1,350.

S06-022

Marketing New York City

Exhibit 5    NYC Brand Attributes[a]





**Brand Attribute**

Source:   NYCM.

[a]Young & Rubicam's Brand Asset Valuator – Base USA 2004 FY All Adults.  Core rankings of 56 variables, >80% rank attribute scores designate significant brand attributes.

Marketing New York City

506-022

Exhibit 6    NYCM Organization Chart



Source: NYCM.

**Exhibit 7**    The History Channel—NYC Heritage Tourism Center



Source:   NYCM.

**Exhibit 8**    NYCM City-Managed Media—Value of Media Utilization by Street Furniture Type (fiscal year 2005)

| (000s) | Available | Placed | Units | % Units Placed |
|---|---|---|---|---|
| Bus Stop Shelter | $19,575 | $18,638 | 11,558 of 12,760 | 91% |
| Street Pole Banners | 7,440 | 275 | 765 of 19,500 | 4% |
| Phone Kiosks | 2,980 | 1,162 | 1,110 of  2,840 | 39% |
| Total | $29,995 | $20,075 | 13,433 of 35,100 | 38% |

Source:   NYCM.

**Exhibit 9**    NYCM City-Managed Media—Value of Media Utilization by Purpose (calendar year)

| (000s) | 2004 | 2005 | 2006[a] | Total |
|---|---|---|---|---|
| City Agencies and PSAs | $1,354 | $14,576 | $6,627 | $22,557 |
| Partnerships | $4,757 | $6,586 | $7,933 | $19,276 |
| Big Events | $3,857 | $2,477 | $486 | $6,820 |
| Total | $9,967 | $23,638 | $15,047 | $48,652 |

Source:   NYCM.

[a]Planned media as of February 2006 for flights through FYE2006.

Marketing New York City

S06-022

Exhibit 10    Examples of Snapple Creative for Bus Stop Shelters





Source:   NYCM.

S06-022   -22-

## Exhibit 11   NYC Trademarks

## City of New York Trademarks



Mayor's Office of Film, Theater and Broadcasting - "Made in NY"



Prospect Park - sign

New York City Department of Transportation



Fire Department City of New York - Shield

"No People Except in the Company of a Dog" sign

Staten Island Ferry



Fire Department City of New York - Wordmark

New York City Parks Department - Shield

"No Parking, No Kidding" sign





Fire Department City of New York - Maltese Cross

New York City Police Department - Wordmark

"No Parking, Not At All" sign




City of New York Parks & Recreation

New York City Department of Sanitation

"Don't Even Think Of Parking Here" sign



Carousel Park - sign

New York City Taxi and Limousine Commission - Shield

"Times Square" street sign



"City Hall Park" sign

New York City Taxi and Limousine Commission - Medallion

"Don't Block The Box" sign







Source:  NYCM.

Marketing New York City

506-072

Exhibit 12　　NYCM Income Statement and Key Statistics

| | 2004 | 2005 | 2006 (estimated) |
|---|---|---|---|
| Sponsorship revenue | $1,025,000 | $6,575,000 | $9,453,978 |
| Commission revenue | 41,016 | 466,155 | 550,328 |
| Licensing revenue | — | 276,394 | 834,219 |
| Other revenue | 544 | — | — |
| Total Operating Revenue | 1,066,560 | 7,319,549 | 10,838,525 |
| Direct program expenses | 321,944 | 3,271,180 | 6,073,885 |
| Personal services | 1,131,327 | 2,444,334 | 2,389,639 |
| Other operating expenses | 305,904 | 806,226 | 1,060,826 |
| Total Operating Expenses | 1,759,175 | 6,521,740 | 9,524,350 |
| Operating Income (Loss) | $(692,615) | $797,809 | 1,314,175 |
| Non-operating Income | 366 | 4,018 | 30,979 |
| Change in Net Assets (Deficit) | $(692,249) | 801,827 | 1,345,154 |
| | | | |
| Media Managed by NYCM | $11,727,000 | 29,995,000 | 37,413,000 |
| Promotional Value for NYC | — | 8,258,000 | 31,695,000 |
| City Agencies Supported | 2 | 14 | 34 |

Source:　NYCM.