# EXHIBIT 36

EXECUTION COPY

Agreement (this "Agreement") dated as of December 7, 2004 between the New York City Marketing Development Corporation, a local development corporation organized pursuant to Section 1411 of the Not-for-Profit Corporation Law of the State of New York and having an address at One Liberty Plaza, New York, N.Y. 10007 ("NYC Marketing") and The History Channel, a division of A&E Television Networks, a New York general partnership having an address at 235 E 45th St., New York, NY 10017-3305 ("THC") with respect to a marketing relationship promoting history, heritage and tourism in New York City.

**Recitals**

Whereas, NYC Marketing was formed by the City of New York (the "City") in order to design and implement comprehensive marketing, licensing, and corporate partnership initiatives on behalf of the City, in order to generate revenues for the City and resources to promote New York City around the world for the growth of jobs and tourism in New York City; and

Whereas a Letter of Intent was executed by the parties dated August 26, 2004 (the "Letter of Intent") and this Agreement is the Agreement contemplated by Section 8 of the Letter of Intent; and

Whereas this Agreement supersedes the Letter of Intent in its entirety; and

Whereas, each of the parties believes that the transactions contemplated herein will promote history, heritage and tourism in New York City; and

Whereas, NYC Marketing determined that this agreement is in the City's best interest and does not preclude the City from engaging in other partnerships or obtaining other valuable City opportunities; and

Whereas THC desires to sponsor the history, heritage and tourism initiative of the City on terms mutually agreeable to the parties; and

Whereas, NYC Marketing and THC wish to proceed to collaborate to jointly develop the marketing initiative promoting history, heritage and tourism in New York City described in this Agreement; and

**Agreement**

**NOW, THEREFORE,** in consideration of the mutual promises herein set forth, the parties hereto do hereby agree as follows:

1. **TERM, ETC.**

45188v12

Clear Channel
EXHIBIT NO. 7
JINEEN PAVESI
CERTIFIED REALTIME SPECIALIST

NYC010938

1.1 **Term.** The term of this Agreement shall be a period commencing August 26, 2004 and shall expire on June 30, 2008 (the "Term"), unless extended pursuant to Section 1.2 or Section 3 hereof or terminated earlier as provided herein.

1.2 **Negotiation to Extend.** No sooner than June 30, 2007, and no later than December 30, 2007, NYC Marketing shall negotiate exclusively and in good faith for a period of no more than sixty days with THC regarding an extension, unless THC advises NYC Marketing that it does not wish to extend the Agreement. NYC Marketing or the City shall then follow the applicable guidelines and law in effect at that time to determine what, if any, sponsorship is in the best interests of the City.

1.3 **Removal of THC Materials Following Termination.** Upon the expiration or termination of the Term for any reason (except as otherwise specifically provided in Section 3 with respect to the NYCOHC, as therein defined), THC shall promptly remove its property or equipment (the "THC Materials") from any premises owned or operated by the City wherever located and repair any damages to the premises occupied by the THC Materials and caused by THC's installation, operation, or removal of the THC Materials, reasonable wear and tear excepted.

1.4 **Survival of Certain Provisions.** The parties acknowledge that the following provisions shall survive the expiration or earlier termination of this Agreement for any reason:

1.4.1 The obligation of THC to maintain and retain books and records pursuant to Section 2.2;

1.4.2. The obligations of the parties pursuant to Sections 11, 13, 14.6 and 15;

1.4.3 Any other provision of this Agreement that, by its terms, extends beyond the Agreement's expiration or termination.

2. **<u>PAYMENTS; BOOKS AND RECORDS.</u>**

2.1 **Payments.** THC shall be obligated to make payments as follows:

$400,000 upon execution of the Letter of Intent, which the parties acknowledge has been paid;
$600,000 promptly following the execution of this Agreement
$100,000 on March 31, 2005
$100,000 on the date of the launch of the NYCOHC referred to in Section 3;
$200,000 on June 30, 2005;
$200,000 on September 30, 2005;
$200,000 on December 31, 2005.
$200,000 on March 31, 2006;
$200,000 on June 30, 2006;

$200,000 on September 30, 2006;
$200,000 on December 31, 2006.
$200,000 on March 31, 2007;
$200,000 on June 30, 2007;
$200,000 on September 30, 2007;
$300,000 on January 1, 2008.

**2.2 Books and Records.** THC shall maintain proper, orderly and adequate books and records at THC's headquarters or another THC office located within fifty (50) miles of the City of New York. THC shall retain such books and records for a period of at least six years after the expiration of the periods to which the books and records relate. The parties acknowledge that no provision of this Agreement can diminish, compromise or abridge in any way the powers, duties, and obligations of the Comptroller of the City of New York pursuant to the provisions of the New York City Charter.

**3. <u>NEW YORK CITY'S OFFICIAL HISTORY CENTER</u>:** The City shall replace the existing City Hall Park Visitor Center and designate it as New York City's Official History Center (the "NYCOHC"), as provided in Section 3.2. The NYCOHC shall serve as the central location in New York City for visitors to find information on tours, activities, events and other information related to history and heritage in the City. THC shall become the sponsor of the NYCOHC, as provided in Section 3.1. For the avoidance of doubt, the parties acknowledge that "sponsorship" as used in this Agreement shall not mean payment for advertising. THC's and NYC Marketing's rights and obligations regarding the NYCOHC and related elements set forth in this Section 3 shall remain in effect for a period of thirty-six months from the date of first use or until June 30, 2008, whichever is later, unless the Term is terminated by either party prior to expiration, in which case, such rights and obligations shall terminate immediately. For the avoidance of doubt, the NYCOHC shall remain the property of the City and shall be operated and staffed by the City.

**3.1. THC Obligations Related to the NYCOHC:** The obligations of THC related to the NYCOHC shall include the following:

3.1.1 THC shall provide equipment for the newly replaced NYCOHC and up to three mutually agreed potential additional visitor sites. Such equipment (per visitor site) shall be mutually agreed upon and may include, but not be limited to: no more than three plasma screens, no more than two DVD players, audio equipment, and no more than two computers. The parties acknowledge that once installed, such equipment shall become the sole property of the City or its designee.

3.1.2 THC shall create, promote and furnish the prizes for a THC tourism contest, which shall highlight New York City as a premier destination for tourists. NYC Marketing shall secure from third parties value-added incentives as provided in Section 3.2.11. THC may elicit third-party donations of prizes in exchange for promotional mention. All such value-added incentives and third party donations shall be mutually agreed.

3.1.3 THC shall participate in the development of New York City's Official History Tours including, but not limited to: reviewing the plans for, and once approved by THC, providing THC's imprimatur for, and promoting bus tours conducted by one or more qualified, licensed New York City tour guides, whose tours shall include attractions primarily related to New York City history. In addition, walking and audio tours will be arranged. Such elements shall be mutually agreeable by the parties. For the avoidance of doubt, the parties acknowledge that use of the name, "New York City's Official History Tours," is subject to approval under all applicable laws.

3.1.4 THC shall approve one or more licensed bus tour operators to furnish one or more New York City history-themed bus tours as contemplated in Section 3.1.3. THC shall enter into an agreement with one or more licensed bus tour operator(s) (the "Bus Tour Operator") for such tour(s), including: (i) THC-branded signage on the operator's points of pick up, and (ii) THC branding of two (2) trolley type buses. The parties acknowledge that the Bus Tour Operator will determine all operational aspects of the Tours, including the number, pick up points, and other matters, although THC will request that one trolley bus to pick up passengers from a Times Square location, preferably 42nd Street, and a second trolley bus to pick up passengers from the NYCOHC site. It is intended that the cost of such tours shall be borne by consumers, and that the consumer cost shall not be materially different than other similar tours; the parties acknowledge that the consumer costs will be determined by the Bus Tour Operator. For the avoidance of doubt, THC acknowledges that all NYC Official History Tours, given by bus shall be conducted by licensed New York City tour operators.

3.1.5 As between NYC Marketing and THC, THC shall pay for all THC-branding and promotional materials on the pick-up points and trolley buses. Promotional materials on the buses shall promote historic tours and the NYCOHC, if operationally feasible.

3.1.6 THC shall provide creative input on marketing materials to be created by NYC Marketing and produced by a NYC & Company third-party custom publisher, such as maps, passports, brochures and itineraries (but not itineraries for the bus tour, which will be prepared by the Bus Tour Operator), to support NYC's Official History Tours and the NYCOHC.

3.1.7 THC shall bear all costs related to the NYC & Company annual concierge breakfast, as contemplated in Section 3.2.12, costs to be mutually agreed.

**3.2 NYC Marketing Obligations Related To The NYCOHC:** The obligations of NYC Marketing shall include the following:

3.2.1 NYC Marketing shall cause the existing City Hall Park Visitor Center location to be replaced and designated New York City's Official History Center.

(i) The completion date of the NYCOHC is intended to be May 6, 2005. NYC Marketing will work diligently, devoting all resources at its disposal, to meet that date. However, if NYC Marketing has fulfilled its obligations in the previous sentence, but is nevertheless unable to meet the May 6, 2005 completion date, then NYC Marketing shall have 30 days grace, *i.e.*, until June 6, 2005, in which to so complete the replacement.

(ii) The NYCOHC design and plans shall be submitted to THC for its review and approval, as well as NYC Marketing, NYC & Co. and all relevant City agencies. Such replacement shall include mutually-agreed, appropriate corporate sponsorship recognition (as defined in Section 14.6) of THC for its sponsorship on the outside and inside of the NYCOHC. No additional sponsor shall be a competitor of, nor pose a conflict for, THC or its advertisers, or otherwise be inconsistent with or diminish the brand of THC; accordingly, the approval (not to be unreasonably withheld) of THC for any additional sponsors of the NYCOHC shall be required. NYC Marketing advises that such recognition (which is distinct from advertising) is permissible under applicable laws and regulations, and has been conceptually approved by each of the entities that must approve, but the specific recognition, when mutually agreed, must be approved by City Hall, the Art Commission, NYC & Company, the Department of Parks and Recreation, Landmarks Preservation Commission and (to confirm compliance with law and regulations) the City Law Department.

3.2.3 NYC Marketing shall provide a presence in Federal Hall, which is currently being refurbished by the National Parks Service (subject to the City's final agreement with the National Parks Service) for tourists to obtain information on history and heritage in New York City and to promote the NYCOHC, with appropriate corporate sponsorship recognition for THC. Should the City's agreement with the National Parks Service not be completed by February 1, 2005, the parties shall negotiate in good faith on a mutually agreeable substitute.

3.2.4 NYC Marketing shall provide a featured presence at NYC & Company's midtown visitor center location as an additional opportunity to promote the NYCOHC and for tourists to obtain information on history and heritage in New York City, with appropriate corporate sponsorship recognition for THC.

3.2.5 NYC Marketing shall use best efforts to create an additional NYCOHC in a prominent midtown location, preferably on 42nd Street in Times Square (subject to mutual approval) as an opportunity to provide tourists with information on historical and heritage sites in New York City. As with the original NYCOHC, the location, plans, design and appropriate corporate sponsorship recognition of THC shall be mutually agreed by the parties.

3.2.6 NYC Marketing shall pay for and cause the NYCOHC at City Hall Park to be staffed by two (2) visitor counselors (THC shall be consulted as to the identity

and training of staff) available during operating hours (currently 9 AM – 6 PM weekdays and 10 AM – 6 PM weekends). If a second NYCOHC is created in a prominent midtown location, that second NYCOHC shall be staffed in a similar ratio of staff to square footage as the NYCOHC at City Hall Park.

3.2.7 NYC Marketing shall organize and conduct a Mayoral launch of the NYCOHC at Gracie Mansion and a ribbon-cutting reception at the NYCOHC site, event details to be mutually agreed.

3.2.8 NYC Marketing shall invite and encourage the Mayor and prominent City Officials to attend all additional major launches and other major initiatives in connection with the Agreement;

3.2.9 NYC Marketing shall create marketing materials to be produced by a NYC & Company third-party custom publisher including, but not limited to: maps, passports, brochures and itineraries for walking and audio tours, but not itineraries for the bus tour, which will be prepared by the Bus Tour Operator, to support NYC's Official History Tours and the NYCOHC (such materials shall include appropriate corporate sponsorship recognition of THC and shall not include advertising).

3.2.10 NYC Marketing shall promote the NYCOHC through the NYC & Company marketing, advertising and publicity efforts set forth in Exhibit 1, as well as a communications plan created cooperatively with THC and NYC Marketing.

3.2.11 In connection with the tourism contest contemplated in Section 3.1.2, NYC Marketing shall secure from third parties value-added incentives (e.g., discounts to: (i) Broadway Shows, (ii) hotel rooms and/or (iii) restaurants) for visitors. NYC Marketing shall secure from third parties value-added incentives for visitors who use NYCOHC passport at New York City cultural institutions and other tourist attractions (subject to THC approval). Such incentives shall be promoted by THC and the City. All such value-added incentives and third party donations shall be mutually agreed.

3.2.12 NYC Marketing shall plan and make all arrangements for an annual travel and tourism industry trade breakfast in conjunction with NYC & Company to introduce Hotel Concierges to, and to promote, NYCOHC and NYC's Official History Tours.

3.2.13 NYC Marketing shall use best efforts to facilitate the display of THC introductory heritage tour video at no fewer than two (2) third-party historic sites, not owned or controlled by the City and other tourist attractions (subject to THC approval).

3.2.14 NYC Marketing shall advise THC of all significant New York City historical initiatives of NYC Marketing and the City as they arise.

3.2.15 NYC Marketing shall secure a mutually-agreed City-owned or controlled venue for a THC event without charge to THC once during each 12 months of the Term (subject to all City regulations, approvals and processes). NYC Marketing shall incur the venue charge, if any, as well as any permit fees. THC shall incur all event-related expenses including, but not limited to catering and staffing, and shall enter into the venue agreement providing for insurance, indemnities and the like; if the venue agreement does not contain such points, the provisions of this Agreement shall govern.

4. **<u>SAVE OUR HISTORY IN NEW YORK CITY</u>:** *Save Our History* in New York City is to be a part of THC's national *Save Our History* initiative. This initiative shall focus on the preservation of New York City's historical sites, monuments and historic houses and shall further history education, preservation, and awareness of New York City's history. The Payments are partially for the sponsorship of restoration work to the historical sites, monuments and historic houses specified in Exhibit 2 (the "Sites"). Accordingly, THC shall receive appropriate corporate sponsorship recognition at the Sites.

**4.1 The Obligations of THC Regarding *Save Our History*:** The obligations of THC shall include the following:

4.1.1 THC shall provide, over the course of the Term, a minimum of three DVDs on historical/heritage topics to each of the City's public school libraries up to 1000 libraries.

4.1.2 THC shall create, subject to the approval of NYC Marketing and the NYC Department of Education, a *Save Our History* in the Schools curriculum regarding the Sites for use by NYC public school students.

4.1.3 THC shall create annual *Save Our History* in New York City History Teachers of the Year Award for each year of the Term ("Awards"). Such Awards shall reward multiple teachers, not a single teacher, the exact number to be agreed by the parties. Selection of such teachers, as well as elements of the Awards, shall be subject to approval of the Department of Education; such selection shall be made by mutually-agreed third parties. How the recipients of the awards are publicized, etc. shall be mutually agreed and may include a press announcement, and materials for classrooms. THC shall also recognize the teachers on the *Save Our History* website.

4.1.4 If adequate space, facilities and utilities exist for the City to exhibit videos at the three historic houses included in the Sites, THC shall produce introductory videos about the history of, and preservation efforts regarding, these historic houses. THC shall donate copies of these videos (but not ownership of the copyright therein) to the City Department of Parks and Recreation.

**4.2 The Obligations Of NYC Marketing Regarding Save Our History:** The obligations of New York City Marketing shall include the following:

4.2.1 NYC Marketing shall cause the restoration of the Sites and acknowledge THC as the restoration partner for the Sites with appropriate corporate sponsorship recognition at such locations. The method of distribution of the DVDs shall be mutually agreed by the parties.

4.2.2 NYC Marketing shall organize and conduct mutually agreed events to showcase the restoration and community preservation activities of the Sites.

4.2.3 NYC Marketing shall advocate to the Department of Education that the THC's *Save Our History* in the Schools curriculum be made available for use in grades 4, 5, 7, 8, and 10, and, subject to Department of Education's approval of the curriculum and the Awards, cause the Department of Education to endorse and distribute the curriculum to its principals, and to make it available for use in grades 4, 5, 7, 8, and 10 of all City schools. If requested, THC will work with the Department of Education to make reasonable modifications to the curriculum. THC acknowledges that THC shall not make any reference to the Department of Education's endorsement of the curriculum for commercial purposes, but may make reference to development and use of the curriculum in connection with other *Save Our History* efforts, with the further agreement that any mention of the City Department of Education will require the approval of the City Department of Education.

4.2.4 NYC Marketing shall use best efforts to coordinate with NYC Department of Education to identify local NYC public schools participate in an "Adopt a Monument/Site Program."

4.2.5 NYC Marketing shall create historical walking tours (to be free of charge), subject to THC's approval, which shall not be unreasonably withheld, of City Hall and other potential Civic Center buildings for use by and for the sole benefit of the City, primarily for school children in connection with THC's *Save Our History* program, with materials for these tours to provide appropriate corporate sponsorship recognition for *Save Our History* and THC.

4.2.6 NYC Marketing shall coordinate press events around celebrations of historic New York City anniversaries and seek to have appropriate THC involvement in such events.

5. <u>NYC HISTORY DAY AT THE REPUBLICAN NATIONAL CONVENTION</u>: The parties acknowledge that, as contemplated by the Letter of Intent, THC was the title and presenting sponsor of New York City History Day at the Republican National Convention ("RNC") on September 2, 2004 ("History Day"). In connection with History Day, THC produced a video montage celebrating the history of NYC, which was exhibited at the RNC on Monday, August 30, 2004. The parties acknowledge that such video montage is owned by the THC. THC hereby grants to NYC

Marketing a royalty-free license to use the video, as edited by THC for this purpose, for non-public exhibitions for the purpose of supporting the City's efforts to cause third parties to stage large events and conventions or to locate businesses in New York City; NYC Marketing acknowledges that NYC Marketing may not, and may not permit others to, edit the video montage or use it for other purposes without the consent of THC.

6. **AIRTIME, ETC.**:

6.1 **Airtime.** THC shall provide NYC Marketing with $15,000,000 worth of on-air time to market the NYCOHC and New York City over the Term to be aired on The History Channel networks, which currently include The History Channel, History International, the Biography Channel and The History Channel en español. The parties shall meet to discuss the scheduling of the airtime, but NYC Marketing acknowledges that THC shall have the final say over such scheduling, and that planned time may, under unusual circumstances, be preempted. (Any preempted spots will be rescheduled by THC following consultation with NYC Marketing). Such airtime shall be comprised of 30-second advertising spots to be used for the following purposes:

6.1.1. 50% shall be aired on The History Channel networks in the United States to be used to promote tourism to the City.

6.1.2 THC shall use best efforts to air 20% on The History Channel branded or affiliated networks outside the United States to be used to promote tourism to New York City. NYC Marketing will cooperate with THC in seeking third parties to provide value-added incentives and promotional items to tourists, such as airline tickets and hotel accommodations, to encourage interest in tourism from outside the United States. Any amount not realized by NYC Marketing under this subsection, shall be equally allocated to Sections 6.1.1 and 6.1.3, unless mutually agreed otherwise by the parties.

6.1.3 30% shall be advertising spots produced by THC, at its cost, and aired on The History Channel networks in the United States and/or The History Channel branded or affiliated networks outside the United States to promote New York City heritage tourism, including New York City's Official History Tours (which shall contain the logo of the Bus Tour Operator) and the NYCOHC;

6.2 **Content and Approval of Commercials.** The content of all commercial advertising spots, including those produced by THC, shall be mutually agreed upon by the parties, which approval shall not be unreasonably withheld or delayed. All such commercial advertising spots must comply with THC then-current standards for advertising, and the advertising spots must promote New York City tourism. For the avoidance of doubt, the parties acknowledge that advertising spots that promote significant New York City events, so long as they do not (a) contain reference to third-party sponsorship, or (b) refer to events to be televised during the Term by a network not owned by A&E Television Networks, shall be considered as promoting tourism in New York City. Except for the advertising spots mentioned in Section 6.1.3, THC shall allow NYC Marketing to air advertising spots produced independently which promote tourism

in New York City. Each of the parties acknowledges that any new advertising spot prepared by it must be delivered to and approved by the other party at least 15 days prior to the intended air-date.

6.3 **Valuation of Airtime; Reports.** Airtime shall be valued at THC's 2004/5 rate card, a copy of which has been delivered to NYC Marketing. No less frequently than every six months of the Term, THC shall provide to NYC Marketing a report detailing the on-air times for the spots covered by Section 6.1 that have run, including the network, date, time and dollar value for each spot.

7. **PROGRAMMING TO AIR ON THE HISTORY CHANNEL:**

7.1 **Definition of Years 1, 2 and 3:** For the purposes of this Agreement, "Year 1," and "Year 2" shall mean the 12-month periods ending on the first and second anniversaries (respectively) of the date hereof, and "Year 3" shall mean the period commencing immediately after Year 2 and through June 30, 2008, in each case unless the Term is earlier terminated.

7.2 **Programming in Year 1.** In Year 1, unless otherwise mutually agreed, THC shall air on The History Channel a minimum of five hours of television segments with start times from and after 7 PM and to and including 11 PM Eastern Time, which celebrate and showcase history in the City (herein defined as "NYC Week.")

7.3 **Programming in Years 2 and 3.** In Years 2 and 3, unless otherwise mutually agreed, THC shall air on The History Channel a minimum of three hours in the aggregate of programming with start times from and after 7 PM and to and including 11 PM Eastern Time that celebrates and showcases the history of New York City.

8. **LICENSE OF TELEVISION PROGRAMMING TO NYC TV:** THC shall license to NYC Marketing, $1,000,000 in television programming (valued at THC's cost for such programming) which programming shall celebrate history in the City (the "Licensed Programs") without the payment of any fees. The Licensed Programs shall be for exhibition on the City's cable television station NYC TV 74 and the City's broadcast television channel, WNYE 25, neither of which is advertiser-supported, and both of which are sponsorship supported and are available only in the New York City DMA. The Licensed Programs shall not be exhibited on any network the City does not wholly-own and operate, or which is advertiser supported, or which is available outside of the New York City DMA. (If any of the foregoing conditions is violated, the license for the station that violates the conditions shall forthwith terminate. If the City acquires a new entity to replace one that it has sold, so long as the new entity is wholly-owned by the City, remains sponsorship-supported, rather than advertiser-supported, and is available only in the New York City DMA, THC will transfer the program license to the new station.) THC shall be named a sponsor of such programming, with the sponsorship message and its position to be mutually agreed, as provided in this Section 8, and as further provided in a License Agreement containing the terms in this Section 8 and other customary terms contained in THC's license agreements to third parties.

8.1 **License Period.** The Licensed Programs may be aired during the Term (unless THC has advised NYC Marketing that its rights in a particular program will expire earlier and NYC Marketing elects to license the program nonetheless, in which event the right to air that Licensed Program will terminate when THC's rights in it expire).

8.2 **Programming To Be Agreed.** The Licensed Programs shall be mutually agreed.

9. **PARADE FLOAT:** In connection with NYC Marketing's efforts to promote historical tourism, the NYCOHC and history and heritage tours in the City, THC will seek to include as a parade float in the 2005 and 2006 Macy's Thanksgiving Day Parade a trolley similar to that contemplated in Section 3.1.4, with presentation (including additional creative elements) and signage reasonably acceptable to THC, to be designated "New York City's Official History Trolley" (the "Parade Presence"). THC will set forth the presentation and signage that is reasonably acceptable to THC in a letter to NYC Marketing to be delivered no later than May 30, 2005. THC shall incur all expenses related to the parade and shall also provide costumes, likenesses of historical figures and characters to participate in such Parade Presence. For the avoidance of doubt, the parties acknowledge that use of the name, "New York City's Official History Trolley," is subject to approval under all applicable laws. NYC Marketing must approve the use of the intellectual property of the City on the Parade Presence. With regard to such approval of the use of intellectual property of the City, once any necessary legal approvals have been obtained, if NYC Marketing fails to respond to a request for approval within 10 days from mailing, the approval shall be deemed to have been given. NYC Marketing will work with THC toward achieving this goal (with the expectation that substantive discussions will be well underway no later than June 30, 2005), and the parties will keep each other informed.

10. **NYC MARKETING'S OTHER COMMITMENTS TO THC:**

10.1 **Account Manager.** In addition to providing general support, NYC Marketing shall dedicate one (1) account manager acceptable to THC, who shall be responsible for the execution of the elements herein. NYC Marketing shall bear all costs related to the account manager.

10.2 **Media.** NYC Marketing shall provide $6,818,028 (subject to the next sentence of this Section 10.2) in City-owned outdoor media as provided in Exhibit 3; provided that THC shall have the right to change the times specified in Exhibit 3 for each of the three categories, subject to availability; but the amounts shall not be changed among the categories, unless mutually agreed. The parties will meet to discuss planned use of the City-owned outdoor media no less frequently than each six months. If the Parade Presence is included in the Macy's Thanksgiving Day Parade as provided in Section 9 for either or both of the two parades, then the amount of the media provided by NYC Marketing in this Section 10 shall be reduced by $300,000 for each such year in which it the Trolley is included as provided above. The reduction shall be allocated among the three categories of media, pro rata to the dollar values in the three categories

in Exhibit 3. For the avoidance of doubt, the parties acknowledge that the bus stop shelters shall be (i) in Manhattan, (ii) south of 96th Street, and (iii) if NYC Marketing has bus stop shelters meeting this criteria that have not, as of the date requested, been committed to a third party, north of Houston Street. NYC Marketing has advised THC that bus stop shelters are permitted to be used for tune-in advertising, but that, at least currently, street banners and telephone kiosks are not. THC acknowledges that it will use the bottom 10% of bus stop shelter media for recognition or promotion of one or more elements contemplated by this Agreement. Production and installation costs shall be borne by THC. All media shall be subject to all then-current restrictions contained in applicable rules, regulations and City Franchise agreements; NYC Marketing has furnished a summary of the current restrictions, attached hereto as Exhibit 4, and will advise THC of changes in such restrictions in a timely manner.

**10.3 Documents.** NYC Marketing shall provide assistance to THC and persons producing THC content in accessing publicly-available historical content in the City's possession, including, but not limited to, material in the possession of the Department of Records, Landmarks Preservation Commission, NYC TV archives and other relevant NYC historic content.

**10.4 Permits.** NYC Marketing shall provide assistance in obtaining all permits and approvals for matters contemplated herein.

**10.5 Exhibit 1.** Throughout the Term, NYC Marketing shall provide the publicity, collateral publications, etc. described in Exhibit 1 attached hereto.

**11. <u>INDEMNIFICATION:</u>**

**11.1 Obligation to Indemnify.**

11.1.1 <u>Certain Definitions</u>. As used herein:

(i) "<u>Exposures</u>" shall mean losses, costs and expenses (including reasonable attorneys' fees) arising from third-party claims, third-party demands and third-party causes of action. The parties acknowledge that "Exposures" does not include their own lost profits, special, punitive, incidental, indirect or consequential damages arising from third-party claims, third-party demands or third-party causes of action, but that if an Indemnified Party shall be required to pay or have paid on its behalf to a third party that third party's lost profits, special, punitive, incidental, indirect or consequential damages, the losses, costs and expenses relating thereto are included in the definition of "Exposures").

(ii) "<u>Indemnified Party</u>" shall mean, as to each party, each of the other party and the other party's affiliates under 100% common ownership, and their respective officers, directors, employees, representatives and agents (including, in the case of NYC Marketing, the City).

11.1.2 Obligation to Indemnify. Each party to this Agreement (the "Indemnifying Party") shall defend, indemnify and hold harmless the Indemnified Parties from and against any and all Exposures and claims therefor arising out of or resulting from (a) the negligent acts or omissions of the Indemnifying Party or its officers, directors, employees, representatives or agents (including in the case of NYC Marketing, employees of the City) in connection with this Agreement, or (b) any breach of the representations, warranties or obligations under this Agreement by the Indemnifying Party or its officers, directors, employees, representatives or agents (including in the case of NYC Marketing, employees of the City). For the avoidance of doubt, each party shall indemnify and hold harmless the Indemnified Parties from and against all Exposures arising out of or resulting from any claim that any intellectual property furnished by it and contemplated to be used hereunder, including that furnished by it as the Causing Party (as defined in Section13.3), infringes or violates the intellectual property or other rights of a third party.

11.1.3 Agreement with Bus Tour Operator. THC shall ensure that the agreement between THC and the Bus Tour Operator relating to the tour contemplated by Section 3.1.4 provides that (and whether or not in a separate agreement, that the agreement between THC and the Bus Tour Operator or other entity providing the parade float as contemplated by Section 9 (the "Parade Float Operator", also provides):

(i) the Bus Tour Operator, as to the tours, and Parade Float Operator, as to the parade float shall indemnify NYC Marketing and its Indemnified Parties from and against any third party Exposures and claims therefor arising out of or resulting from the Bus Tour Operator's operations of the history-themed bus tour or tours contemplated by that Section, or the Parade Float Operator's operations of the parade float contemplated by Section 9, as applicable; and

(ii) each of the Bus Tour Operator and the Parade Float Operator shall (a) be responsible for maintaining insurance coverage at least equal to that set forth in Schedule A, (b) name NYC Marketing and its Indemnified Parties as additional insureds on such insurance policies, and (c) furnish certificates of insurance to NYC Marketing and the City of New York; and

(iii) NYC Marketing and its Indemnified Parties are third party beneficiaries of the sections of the agreement between THC and the Bus Tour Operator and the Parade Float Operator described in clauses (i) and (ii) above.

So long as the agreement or agreements between THC and the licensed Bus Tour Operator and the Parade Float Operator each provides as set forth above, NYC Marketing and its Indemnified Parties shall have no claims for indemnification against THC arising from Exposures and claims therefor arising out of or related to the operations of the history-themed bus tour or tours contemplated by Section

3.1.4 or the parade float contemplated in Section 9, respectively (except insofar as such Exposures and claims therefor relate to breaches by THC of its representations, warranties or obligations hereunder).

**11.2 Procedure:** In the event that an Indemnified Party asserts any claim for indemnification, that Indemnified Party (i) shall give prompt notice thereof to the Indemnifying Party; (ii) shall permit the Indemnifying Party to assume the defense, and if the Indemnifying Party elects so to assume the defense (and provides prompt written notice that it will do so), the Indemnified Party shall have the right to retain its own counsel at its own expense to consult with the Indemnifying Party, and (iii) shall cooperate with the Indemnifying Party. Subject to the foregoing, the Indemnifying Party shall not settle any claim for other than money without prior written consent of the Indemnified Party. The Indemnified Party shall not settle any claim for which it is seeking indemnification without the consent of the Indemnifying Party, unless the Indemnifying Party takes the position that the claim is not subject to indemnification hereunder, in which case the consent of the Indemnifying Party shall not be needed.

**11.3 Responsibility of the City for NYC Marketing:** NYC Marketing hereby represents and warrants that the City is the indemnitor of any and all Exposures to which NYC Marketing may be subject relating to this Agreement, and as a condition precedent to this Agreement, THC acknowledges that the City has shall furnished a letter acknowledging that responsibility and that the City self-insures and that NYC Marketing has the right to enter this Agreement and to agree to all of its terms as the City's Agent, including Section 11.1.3.

**12. <u>INSURANCE</u>.** THC shall maintain in full force and effect without interruption during the Term general liability and media liability insurance policies, which either are "pay on behalf of" policies or which name NYC Marketing and the City as additional insureds. The total limits of the primary liability policies and excess coverage covering each category of risk shall be Fifteen Million Dollars ($15,000,000) per occurrence and Fifteen Million Dollars ($15,000,000) per policy period. The policies shall be written by carriers admitted to write insurance in New York State having a Best's rating of A or better. THC represents and warrants that on the date hereof the required policies are in full force and effect, and the parties acknowledge delivery by THC to NYC Marketing of certificates of insurance showing the coverages required hereunder. THC shall deliver or cause to be delivered to NYC Marketing certificates of insurance showing the insurance required hereunder to be in full force and effect upon request of NYC Marketing, and, in any event, as soon as practicable prior to the renewal date or dates of the policies in effect on the date hereof. THC represents that all such insurance policies currently do provide, and policies in the future shall provide, that they may not be cancelled with less than thirty (30) days' notice and that such notice shall be provided to NYC Marketing. THC shall immediately notify NYC Marketing of any notices of cancellation or termination of such policies for any reason. THC represents that such policies are, and shall continue to be, on an occurrence, not on a "claims made" basis.

13. **<u>REPRESENTATIONS AND WARRANTIES</u>.** In addition to the other representations and warranties contained in this Agreement, each of THC and NYC Marketing represents and warrants to the other as follows:

13.1 **Power and Authority, etc.** It has the right, power and legal authority to enter into and fully perform its obligations under this Agreement, and has taken all action necessary to be authorized to enter into this Agreement. It has procured all approvals and authorizations necessary to enter into and to perform this Agreement (including, in the case of NYC Marketing, all necessary approvals and authorizations of the City and its various agencies). It is free to enter into this Agreement, and the execution and performance of this Agreement does not violate, nor is such execution and performance otherwise prohibited by, any law, regulation, court order, or administrative order applicable to said party. The execution and performance of this Agreement does not and will not conflict with, nor be prohibited by, any covenant, agreement, contract, or any charter provision of said party.

13.2 **Person Executing.** The person executing this Agreement on its behalf has the authority to do so and to bind, in the case of THC, THC, and in the case of NYC Marketing, NYC Marketing on its own behalf.

13.3 **Rights to Trademarks, Etc.** It owns or has licensed or otherwise has the right to use any intellectual property furnished by it and contemplated to be used hereunder (e.g., logos on the NYCOHC, visitors centers, and any programming supplied by it hereunder), so long as such intellectual property is used as contemplated hereby, free from third party claims; it being understood that if either party (the "Causing Party") gives permission to a third party to include its logo or other intellectual property on or in connection with any of the matters contemplated hereby then, as between the Causing Party and the other party, the Causing Party shall be deemed to have made the foregoing representation and warranty for such intellectual property as though it were the Causing Party's own intellectual property. (For example, if NYC Marketing causes an additional sponsor to place its logo on the NYCOHC, then as between THC and NYC Marketing, NYC Marketing shall be deemed to have made the foregoing representation and warranty with respect to such third party logo.)

14. **<u>MISCELLANEOUS.</u>**

14.1 **Definition of "Appropriate Corporate Sponsorship Recognition."** The term "appropriate corporate sponsorship recognition" shall mean prominent, dignified acknowledgement of sponsorship (as distinguished from advertising). NYC Marketing shall ensure that all such recognition shall be consistent with all rules and regulations and shall not give rise to a franchise or concession.

14.2 **Breach, Cure; No Consequential Damages.**

14.2.1 Default by either party of its respective material obligations (including the obligation to indemnify, the confidentiality obligations herein, and the obligation of THC to remit payments when due) or breach of its material

representations hereunder, which default is not disputed and thus has not become the subject of arbitration pursuant to Section 14.3, and which has not been cured within 30 days after receipt of a written notice of default specifying the default, shall permit the non-defaulting party to terminate this Agreement forthwith upon notice, in addition to whatever remedies it may be entitled to hereunder and under law. The parties acknowledge that neither of them shall be entitled to lost profits, special, punitive, incidental, indirect or consequential damages, except to the extent included in the definition of "Exposures" in Section 11.1.1(i), with respect to the obligation to indemnify against third-party Exposures.

14.2.2 Any illegal activity by the either party, or any or immoral or other activity by either party that a reasonable person would conclude is inconsistent with or damaging to the name, brand or reputation of NYC Marketing and/or the City (on the one hand), or of THC (on the other), as the case may be shall permit the other party to terminate this Agreement immediately. Termination of this Agreement in accordance with this Section 14.2.2 shall not give rise to liability by the parties arising solely from termination pursuant to this Section 14.2.2. Following termination in accordance with this Section 14.2.2, THC shall not be responsible for any payments due hereunder after the date of such termination.

14.2.3 To the extent allowed by law, the filing by either party of a voluntary petition in bankruptcy or the filing against the either party of an involuntary petition in bankruptcy and the failure of either party to cause said petition to be withdrawn or vacated within sixty (60) days of the filing of said petition or the voluntary dissolution of either party or either party having been found to be unable to pay its debts in due course or a trustee having been appointed to manage its business shall permit the other party to terminate this Agreement forthwith upon notice in addition to whatever remedies it may be entitled to hereunder and under law..

**14.3 Arbitration.** If the parties have a dispute regarding this Agreement (including a dispute as to whether a party has defaulted its material obligations or breached its material representations hereunder), and, having attempted to resolve the dispute by negotiation for 10 business days following receipt of written notice from either party to the other specifying the dispute, the parties are not able to resolve successfully the dispute, then the parties shall immediately thereupon submit their dispute to arbitration pursuant to the Commercial Arbitration Rules of the American Arbitration Association (the "AAA"). The determination of the AAA arbitrators shall be final and binding upon the parties. The AAA shall select three arbitrators, and all such arbitrators shall be individuals with at least twenty years' experience in the field of the substance of the dispute (e.g., programming, commercial marketing and advertising). Because of the time-sensitive nature of certain marketing initiatives, the arbitrators shall be required to hold a hearing to consider the submissions of the parties within one week of the invocation of arbitration by either of the parties and to render their decision within 15 days of the close of the arbitration hearing and final submission of all materials in support of the position of the parties. The arbitrators shall provide a reasoned written opinion. The parties agree that in the event either party invokes arbitration, both parties shall

proceed as expeditiously as possible in the circumstances to conclude the arbitration, including the timely submission of any supporting materials and appearance at arbitration hearings. Each party shall bear its own legal fees and expenses, and the cost of the arbitration shall be borne equally by the parties, unless the arbitrators elect to otherwise apportion the costs of the arbitration.

**14.4 Notices.** Any notice required to be given in connection with this Agreement shall be in writing and delivered by overnight or same day courier service with confirmation and addressed to the following parties, or to such other address as the parties may designate in accordance with this Section 14.3:

To THC:

The History Channel
Attn. Sr. Vice President, Marketing
235 East 45th Street
New York, NY 10017

With a copy to:
General Counsel
A&E Television Networks
235 East 45th Street
New York, NY 10017

To NYC Marketing:

NYC Marketing
One Liberty Plaza, 34th Floor
New York, NY 10006
Attention: President

With a copy to:

General Counsel
NYC Marketing
One Liberty Plaza, 34th Floor
New York, NY 10006

With a copy (which shall not be deemed to be notice) to:

New York City Law Department
100 Church Street
New York, New York 10007
Attn: Chief, Economic Development Division
Telephone: (212) 788-1333
Fax: (212) 227-5648

**14.5 No Agency, Joint Venture, Etc.** This Agreement shall not create a joint venture, partnership, franchise, principal-agent or similar relationship between THC and NYC Marketing. Neither NYC Marketing nor THC nor any of their respective affiliates, employees, agents or subcontractors is or shall be an agent, servant or employee of the other by virtue of this Agreement or by virtue of any approval, permit, license, grant, right or other authorization given by NYC Marketing or the City or any of their officers, agents or employees, nor shall this Agreement be deemed to constitute either party with general authority or power to act on behalf of the other party. Neither party shall enter any agreements which purport to be binding upon the other party.

**14.6 Confidentiality.**

14.6.1 As used herein, "Confidential Information" shall mean, except as provided in the next sentence, information with respect to a party's affiliates, advertising agencies, business associates, industry contacts, prices for the sale of advertising, programming costs, business structure, operations, accounts, customers, clients, finances, strategies and personnel, and any other information which a party designates as Confidential Information. "Confidential Information" shall not include (i) information which is already known prior to disclosure, (ii) becomes publicly known without breach of this Agreement, or (iii) is received from a third party without similar restrictions.

14.6.2 Except as specifically provided herein, each party shall, and shall cause its affiliates under 100% common ownership (and in the case of NYC Marketing, the City), and their respective agents, representatives, accountants, employees, officers and directors to maintain and protect the confidentiality of all Confidential Information , and not to disclose or provide access to any Confidential Information to any individual or organization without the prior written approval of the other party. The following shall not constitute a violation of this Section 14.5.2:

(i) Disclosure by NYC Marketing to officials of the City, or by THC to officers, directors and employees of its owners, so long as the obligations to keep the Confidential Information confidential as provided in Section 14.5.2 is acknowledged (written acknowledgement is not required) by the party receiving it.

(ii) Disclosure by either party to its attorneys, auditors or agents to the extent necessary, so long as such person(s) are instructed to maintain the confidentiality required by this Section 14.5.2.

(iii) Disclosure by either party, if required by law, so long as, if the party so required (the "Disclosing Party") provides the other party with prompt written notice of the requirement in order that the other party may seek a protective order or other remedy or waive compliance with this Section 14.5.2. In the event that such protective order or other remedy is not obtained, or compliance with this Section 14.5.2 is not waived, the

Disclosing Party shall furnish only that portion of the Confidential Information which is legally required to be provided and exercise its reasonable best efforts to obtain assurances that confidential treatment will be accorded such information.

14.6.3 The parties acknowledge that remedies at law for any breach of the obligations under this Section 14.6 may be inadequate and that in addition thereto the parties are entitled to seek equitable relief, including injunction and specific performance, in the event of any such breach.

**14.7. Statements.** Any prepared or scheduled written announcements, press release or other media events related to the matters set forth in this Agreement shall be provided to the other party in advance for approval and coordination and the initial announcement or press release shall be made jointly. NYC Marketing shall advise THC of any major City initiative relating to history or heritage in the City of New York.

**14.8 Assignment, Etc.** Neither THC nor NYC Marketing shall assign, transfer, its rights or obligations in whole or in part under this Agreement (except, in the case of NYC Marketing, to the City, and in the case of THC, to a successor to the business of THC), without the prior written consent of the other party, which shall not be unreasonably withheld.

**14.9 Governing Law; Venue.** This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to conflicts of laws principles. Any claim or cause of action not specifically required to be arbitrated shall be brought only in courts located in New York County.

**14.10 No Waiver, Etc.** Waiver by either party of a breach of any provision of this Agreement shall not be deemed to be a waiver of any other or subsequent breach and shall not be construed to be a modification of the terms of the Agreement unless and until the same shall be agreed to in writing by NYC Marketing or THC, as the case may be.

**14.11 Invalidity.** If any provision of this Agreement shall, to any extent, be invalid or unenforceable, then the remainder of this Agreement shall not be affected thereby, and each provision of this Agreement shall be valid and be enforceable to the fullest extent permitted by law.

**14.11 Amendment.** All amendments, modifications, and waivers of this Agreement ion, shall be in writing. No waiver or release of a provision of this Agreement or a claim or cause of action arising hereunder shall be valid or binding for any purpose unless in writing and duly executed by the party against whom same is asserted.

**14.12 Entire Agreement.** This Agreement represents the entire agreement of the parties with regard to the subject matter hereof and contain all the terms and conditions agreed upon by the parties hereto, and no other agreement, oral or otherwise, regarding the subject matter of this Agreement shall be deemed to exist or to bind any of the parties hereto, or to vary any of the terms contained herein, and all prior or contemporaneous agreements, whether oral or written, shall be deemed merged herein. All obligations of THC and its Affiliates, financial or otherwise, are contained in this Agreement.

15. INVESTIGATIONS. The parties to this Agreement shall cooperate fully and faithfully with any investigation, audit or inquiry conducted by a State of New York or City governmental agency or authority that is empowered directly or by designation to compel the attendance of witnesses and to examine witnesses under oath, or conducted by the Inspector General of a governmental agency that is a party in interest to the transaction, submitted bid, submitted proposal, contract, lease, permit, or license that is the subject of the investigation, audit or inquiry, in accordance with the provisions of Schedule B.

## 16. E.O. 50: EQUAL EMPLOYMENT OPPORTUNITY.

**16.1 Agreement is Subject to E.O. 50.** This Agreement is subject to the requirements of Executive Order No. 50 (1980) as revised ("E.O. 50") and the Rules and Regulations promulgated thereunder. No contract will be awarded unless and until these requirements have been complied with in their entirety. By signing this contract, THC agrees that it:

16.1.1 will not engage in any unlawful discrimination against any employee or applicant for employment because of race, creed, color, national origin, sex, age, disability, marital status or sexual orientation with respect to all employment decisions including, but not limited to, recruitment, hiring, upgrading, demotion, downgrading, transfer, training, rates of pay or other forms of compensation, layoff, termination, and all other terms and conditions of employment;

16.1.2 when it subcontracts it will not engage in any unlawful discrimination in the selection of subcontractors on the basis of the owner's race, color, creed, national origin, sex, age, disability, marital status or sexual orientation;

16.1.3 will state in all solicitations or advertisements for employees placed by or on behalf of the contractor that either (i) all qualified applicants will receive consideration for employment without unlawful discrimination based on race, creed, color, national origin, sex, age, disability, marital status or sexual orientation, or (ii) it is an equal employment opportunity employer;

16.1.4 will send to each labor organization or representative of workers with which it has a collective bargaining agreement or other contract or memorandum of understanding (which currently are none), written notification of its equal employment opportunity commitments under E.O. 50 and the rules and regulations promulgated thereunder; and

16.1.6 will furnish all information and reports including an Employment Report before the award of the contract which are required by E.O. 50, the rules and regulations promulgated thereunder, and orders of the Director of the Bureau of Labor Services ("Bureau"), and will permit access to its books, records and accounts by the Bureau for the purposes of investigation to ascertain compliance with such rules, regulations, and orders.

**16.2 Effect of Noncompliance.** The contractor understands that in the event of its noncompliance with nondiscrimination clauses of this contract or with any of such rules, regulations, or orders, such noncompliance shall constitute a material breach of the contract and noncompliance with the E.O. 50 and the rules and regulations promulgated thereunder. After a hearing held pursuant to the rules of the Bureau, the Director may direct the imposition by the contracting agency of any or all of the following sanctions:

(i) disapproval of the contractor;

(ii) suspension or termination of the contract;

(iii) declaring the contractor in default; or

(iv) in lieu of any of the foregoing sanctions, the Director may impose an employment program.

The Director of the Bureau may recommend to the contracting agency head that a Board of Responsibility be convened for purposes of declaring a contractor who has repeatedly failed to comply with E.O. 50 and the rules and regulations promulgated thereunder to be nonresponsible.

**16.3 Inclusion of Terms in Subcontracts.** The contractor agrees to include the provisions of the foregoing paragraphs in every subcontract or purchase order in excess of $50,000 to which it becomes a party pursuant to or related to this Agreement unless exempted by E.O. 50 and the rules and regulations promulgated thereunder, so that such provisions will be binding upon each subcontractor or vendor. The contractor will take such action with respect to any subcontract or purchase order as may be directed by the Director of the Bureau of Labor Services (when acting within the Director's authority to act) as a means of enforcing such provisions including sanctions for noncompliance.

16.4 **Refrain from Contracts With Non-complying Subcontractors.** The contractor further agrees that it will refrain from entering into any contract or contract modification subject to E.O. 50 and the rules and regulations promulgated thereunder with a subcontractor who contractor is aware is not in compliance with the requirements of E.O. 50 and the rules and regulations promulgated thereunder.

Wherefore, the parties have hereunto set their hands and seals this 7th day of December, 2004.

New York City Marketing Development Corporation

By_______________________________

Joseph M. Perello, President

The History Channel, a division of A&E Television Networks

By: _______________________________

Name: Dan Davids

Title: President, The History Channel - USA

and

By: _______________________________

Michael Mohamad

Title: Senior Vice President, Marketing

Approved as to Form, Certified as to Legal Authority:

By: _______________________________

Acting Corporation Counsel

Schedule A

1. Workers' Compensation - Workers' Compensation insurance with coverage and limits complying with the statutory requirements of the jurisdiction in which the services are performed. If a statutory limit does not exist in the state where the work is to be performed, the Workers' Compensation limit shall be $1,000,000 per occurrence with no aggregate.

2. Statutory Disability Insurance - when required by law.

3. Employer's Liability Insurance - Employer's Liability with limits of $1,000,000 bodily injury each accident in primary with coverage provided in excess.

4. Comprehensive Automobile Liability –Comprehensive Automobile Liability insurance covering all owned, non-owned and hired vehicles used in the performance of the work with limits of not less than $5,000,000 per occurrence with no aggregate for bodily injury and property damage.

5. General Liability – Occurrence form Comprehensive General Liability insurance, including premises and operations coverage, broad form contractual liability (including coverage, when and to the extent required by written contract, of Gray Line indemnity obligations to THC, NYC Marketing and the City of New York), coverage for independent contractors, bodily injury, property damage, personal injury, advertising injury and completed operations and products coverage with limits of at least $5,000,000 per occurrence and $5,000,000 in the aggregate per annum.

6. Excess Liability Insurance - shall be written on no less than a follow form basis (no more restrictive than the underlying insurance and including coverage, when and to the extent required by written contract, of Gray Line's indemnity obligations to THC, NYC Marketing and the City of New York) with a minimum limit of liability of $100,000,000 per occurrence and in the aggregate per annum, including completed operations and products coverage. This coverage shall sit over all liability policies.

General Requirements

At Gary Line's sole expense, the aforementioned insurance policies must be maintained with insurers having a minimum A.M. Best rating of "A" at all times during the term of the Agreement and as otherwise stated herein. Gray Line's insurance coverage's will be primary. Gray Line shall be responsible for all defense costs and deductibles in the event that the Gray Line policies do not cover same.

Schedule B

PROVISIONS GOVERNING INVESTIGATIONS

A. (i) If any person who has been advised that his or her statement, and any information from such statement, will not be used against him or her in any subsequent criminal proceeding refuses to testify before a grand jury or other governmental agency or authority empowered directly or by designation to compel the attendance of witnesses and to examine witnesses under oath concerning the award of or performance under any transaction, agreement, lease, permit, contract, or license entered into with the City, the State, or any political subdivision or public authority thereof, or the Port Authority of New York and New Jersey, or any local development corporation within the City, or any public benefit corporation organized under the laws of the State of New York, or;

(ii) If any person refuses to testify for a reason other than the assertion of his or her privilege against self-incrimination in an investigation, audit or inquiry conducted by a City or State governmental agency or authority empowered directly or by designation to compel the attendance of witnesses and to take testimony under oath, or by the Inspector General of the governmental agency that is a party in interest in, and is seeking testimony concerning the award of, or performance under, any transaction, agreement, lease, permit, contract, or license entered into with the City, the State, or any political subdivision thereof or any local development corporation within the City, then;

B. (i) The commission or agency head whose agency is a party in interest to the transaction, submitted bid, submitted proposal, contract, lease, permit, or license shall convene a hearing, upon not less than five (5) days written notice to the parties involved to determine if any penalties should attach for the failure of a person to testify.

(ii) If any non-governmental party to the hearing requests an adjournment, the commissioner or agency head who convened the hearing may, upon granting the adjournment, suspend any contract, lease, permit, or license pending the final determination pursuant to paragraph E below without the City incurring any penalty or damages for delay or otherwise.

C. The penalties which may attach after a final determination by the commissioner or agency head may include but shall not exceed:

(i) The disqualification for a period not to exceed five (5) years from the date of an adverse determination for any person, or any entity of which such person was a member at the time the testimony was sought, from submitting bids for, or transacting business with, or entering into or obtaining any contract, lease, permit or license with or from the City; and/or

(ii) The cancellation or termination of any and all such existing City contracts, leases, permits or licenses that the refusal to testify concerns and that have not been assigned as permitted under this Agreement, nor the proceeds of which pledged, to an unaffiliated

and unrelated institutional lender for fair value prior to the issuance of the notice scheduling the hearing, without the City incurring any penalty or damages on account of such cancellation of termination; monies lawfully due for goods delivered, work done, rentals, or fees accrued prior to the cancellation or termination shall be paid by the City.

D. The commissioner or agency head shall consider and address in reaching his or her determination and in assessing an appropriate penalty the factors in paragraphs (i) and (ii) below. He or she may also consider, if relevant and appropriate, the criteria established in paragraphs (iii) and (iv) below in addition to any other information which may be relevant and appropriate:

(i) The party's good faith endeavors or lack thereof to cooperate fully and faithfully with any governmental investigation or audit, including but not limited to the discipline, discharge, or disassociation of any person failing to testify, the production of accurate and complete books and records, and the forthcoming testimony of all other members, agents, assignees or fiduciaries whose testimony is sought.

(ii) The relationship of the person who refused to testify to any entity that is a party to the hearing, including, but not limited to, whether the person whose testimony is sought has an ownership interest in the entity and/or the degree of authority and responsibility the person has within the entity.

(iii) The nexus of the testimony sought to the subject entity and its contracts, leases, permits or licenses with the City.

(iv) The effect a penalty may have on an unaffiliated and unrelated party or entity that has a significant interest in an entity subject to penalties under D above, provided that the party or entity has given actual notice to the commissioner or agency head upon the acquisition of the interest, or at the hearing called for in C(i) above gives notice and proves that such interest was previously acquired. Under either circumstance the party or entity must present evidence at the hearing demonstrating the potential adverse impact a penalty will have on such person or entity.

E. (i) The term "license" or "permit" as used herein shall be defined as a license, permit, franchise or concession not granted as a matter of right.

(ii) The term "person" as used herein shall be defined as any natural person doing business alone or associated with another person or entity as a partner, director, officer, principal or employee.

(iii) The term "entity" as used herein shall be defined as any firm, partnership, corporation, association, or person that receives monies, benefits, licenses, leases, or permits from or through the City, or otherwise transacts business with the City.

(iv) The term "member" as used herein shall be defined as any person associated with another person or entity as a partner, director, officer, principal or employee.

F. In addition to and notwithstanding any other provision of this Agreement the Commissioner or agency head may in his or her sole discretion terminate this Agreement upon not less that three (3) days' written notice in the event the contractor fails to promptly report in writing to the Commissioner of Investigation of the City of New York any solicitation of money, goods, requests for future employment or other benefit or thing of value, by or on behalf of any employee of the City or other person, firm, corporation or entity for any purpose which may be related to the procurement or obtaining of this Agreement by the contractor, or affecting the performance of this contract.

Each of the parties hereto shall use all reasonable efforts to take, or cause to be taken, all appropriate action, do or cause to be done all things necessary, proper or advisable under applicable law, and to execute and deliver such documents and other papers, as may be required to carry out the provisions of this Agreement and consummate and make effective the transactions contemplated by this Agreement.