without additional compensation any and all assistance which MDC and/or the City may reasonably require of Snapple. In the event any claim is made or any action is brought against Snapple in any way relating to the Agreement herein on the basis of MDC's or the City's actions and in each case by a third party, MDC shall diligently render to Snapple without additional compensation any and all assistance which Snapple may reasonably require of MDC or the City. Notwithstanding the foregoing, if Snapple, on the one hand, or MDC, on the other, is required to assist the other party pursuant to this Paragraph, such assisting party shall be reimbursed for its actual, reasonable costs and expenses.

D. Either party shall report to the other party in writing within ten (10) working days of the date such party becomes aware of the initiation by or against it of any legal action or proceeding in connection with or relating to this Agreement.

E. No claim whatsoever shall be made by Snapple against any officer, agent, or employee of MDC or the City for, or on account of, anything done or omitted in connection with this Agreement. No claim whatsoever shall be made by MDC or the City against any officer, agent or employee of Snapple or an Affiliate for, or on account of, anything done or omitted in connection with this Agreement.

22. <u>Governing Law.</u> This Agreement shall be governed by and construed in accordance with the laws of the State of New York, notwithstanding conflicts of laws principles. It is the intent and understanding of the parties to this Agreement that each and every provision of federal, state and local law, and rule or regulation thereunder required to be inserted in this Agreement shall be and is inserted herein. Furthermore, it is hereby stipulated that every such provision is to be deemed to be inserted herein, and if, through mistake or otherwise, any such provision is not inserted, or is not inserted in correct form, then this Agreement shall forthwith upon the application of either party be amended by such insertion so as to comply strictly with the law and without prejudice to the rights of either party hereunder. Any claim or cause of action hereunder which is not specifically provided to be arbitrated shall be brought only in Supreme Court, New York County, or if a federal question be presented, then in the United States District Court for the Southern District of New York located in New York County. If an action shall be commenced in any other court, the parties expressly agree to a change of venue to one of the courts prescribed above.

23. <u>No Waivers.</u> Waiver by either Snapple or MDC of a breach of any provision of this Agreement shall not be deemed to be a waiver of any other or subsequent breach and shall not be construed to be a modification of the terms of the Agreement unless and until the same shall be agreed to in writing by MDC or Snapple, as the case may be.

24. <u>Invalidity.</u> If any provision of this Agreement shall, to any extent, be invalid or unenforceable, then the remainder of this Agreement shall not be affected thereby, and each provision of this Agreement shall be valid and be enforceable to the fullest extent permitted by law.

NYC011126

**25.** Modification. No modification, amendment, waiver or release of any provision of this Agreement or of any right, obligation, claim or cause of action arising hereunder shall be valid or binding for any purpose unless in writing and duly executed by the party against whom same is asserted.

**26.** Merger. This Agreement and the Permits represent the entire agreement of the parties with regard to the subject matter hereof and contain all the terms and conditions agreed upon by the parties hereto, and no other agreement, oral or otherwise, regarding the subject matter of this Agreement shall be deemed to exist or to bind any of the parties hereto, or to vary any of the terms contained herein, and all prior or contemporaneous agreements, whether oral or written, shall be deemed merged herein. All obligations of Snapple and its Affiliates, financial or otherwise, are contained in this Agreement or the Permit attached hereto as Exhibit A.

**27.** Investigations. A. The parties to this Agreement agree to cooperate fully and faithfully with any investigation, audit or inquiry conducted by a State of New York or City governmental agency or authority that is empowered directly or by designation to compel the attendance of witnesses and to examine witnesses under oath, or conducted by the Inspector General of a governmental agency that is a party in interest to the transaction, submitted bid, submitted proposal, contract, lease, permit, or license that is the subject of the investigation, audit or inquiry.

B. (i) If any person who has been advised that his or her statement, and any information from such statement, will not be used against him or her in any subsequent criminal proceeding refuses to testify before a grand jury or other governmental agency or authority empowered directly or by designation to compel the attendance of witnesses and to examine witnesses under oath concerning the award of or performance under any transaction, agreement, lease, permit, contract, or license entered into with the City, the State, or any political subdivision or public authority thereof, or the Port Authority of New York and New Jersey, or any local development corporation within the City, or any public benefit corporation organized under the laws of the State of New York, or;

(ii) If any person refuses to testify for a reason other than the assertion of his or her privilege against self-incrimination in an investigation, audit or inquiry conducted by a City or State governmental agency or authority empowered directly or by designation to compel the attendance of witnesses and to take testimony under oath, or by the Inspector General of the governmental agency that is a party in interest in, and is seeking testimony concerning the award of, or performance under, any transaction, agreement, lease, permit, contract, or license entered into with the City, the State, or any political subdivision thereof or any local development corporation within the City, then;

C. (i) The commission or agency head whose agency is a party in interest to the transaction, submitted bid, submitted proposal, contract, lease, permit, or license shall convene a hearing, upon not less than five (5) days written notice to the parties involved to determine if any penalties should attach for the failure of a person to testify.

NYC011127

(ii) If any non-governmental party to the hearing requests an adjournment, the commissioner or agency head who convened the hearing may, upon granting the adjournment, suspend any contract, lease, permit, or license pending the final determination pursuant to paragraph E below without the City incurring any penalty or damages for delay or otherwise.

D. The penalties which may attach after a final determination by the commissioner or agency head may include but shall not exceed:

(i) The disqualification for a period not to exceed five (5) years from the date of an adverse determination for any person, or any entity of which such person was a member at the time the testimony was sought, from submitting bids for, or transacting business with, or entering into or obtaining any contract, lease, permit or license with or from the City; and/or

(ii) The cancellation or termination of any and all such existing City contracts, leases, permits or licenses that the refusal to testify concerns and that have not been assigned as permitted under this Agreement, nor the proceeds of which pledged, to an unaffiliated and unrelated institutional lender for fair value prior to the issuance of the notice scheduling the hearing, without the City incurring any penalty or damages on account of such cancellation or termination; monies lawfully due for goods delivered, work done, rentals, or fees accrued prior to the cancellation or termination shall be paid by the City.

E. The commissioner or agency head shall consider and address in reaching his or her determination and in assessing an appropriate penalty the factors in paragraphs (i) and (ii) below. He or she may also consider, if relevant and appropriate, the criteria established in paragraphs (iii) and (iv) below in addition to any other information which may be relevant and appropriate:

(i) The party's good faith endeavors or lack thereof to cooperate fully and faithfully with any governmental investigation or audit, including but not limited to the discipline, discharge, or disassociation of any person failing to testify, the production of accurate and complete books and records, and the forthcoming testimony of all other members, agents, assignees or fiduciaries whose testimony is sought.

(ii) The relationship of the person who refused to testify to any entity that is a party to the hearing, including, but not limited to, whether the person whose testimony is sought has an ownership interest in the entity and/or the degree of authority and responsibility the person has within the entity.

(iii) The nexus of the testimony sought to the subject entity and its contracts, leases, permits or licenses with the City.

(iv) The effect a penalty may have on an unaffiliated and unrelated party or entity that has a significant interest in an entity subject to penalties under D above, provided

NYC011128

that the party or entity has given actual notice to the commissioner or agency head upon the acquisition of the interest, or at the hearing called for in C(i) above gives notice and proves that such interest was previously acquired. Under either circumstance the party or entity must present evidence at the hearing demonstrating the potential adverse impact a penalty will have on such person or entity.

F. (i) The term "license" or "permit" as used herein shall be defined as a license, permit, franchise or concession not granted as a matter of right.

(ii) The term "person" as used herein shall be defined as any natural person doing business alone or associated with another person or entity as a partner, director, officer, principal or employee.

(iii) The term "entity" as used herein shall be defined as any firm, partnership, corporation, association, or person that receives monies, benefits, licenses, leases, or permits from or through the City, or otherwise transacts business with the City.

(iv) The term "member" as used herein shall be defined as any person associated with another person or entity as a partner, director, officer, principal or employee.

G. In addition to and notwithstanding any other provision of this Agreement the Commissioner or agency head may in his or her sole discretion terminate this Agreement upon not less that three (3) days' written notice in the event the contractor fails to promptly report in writing to the Commissioner of Investigation of the City of New York any solicitation of money, goods, requests for future employment or other benefit or thing of value, by or on behalf of any employee of the City or other person, firm, corporation or entity for any purpose which may be related to the procurement or obtaining of this Agreement by the contractor, or affecting the performance of this contract.

28. Other Instruments. Each of the parties hereto shall use all reasonable efforts to take, or cause to be taken, all appropriate action, do or cause to be done all things necessary, proper or advisable under applicable law, and to execute and deliver such documents and other papers, as may be required to carry out the provisions of this Agreement and consummate and make effective the transactions contemplated by this Agreement.

29. E.O. 50—Equal Employment Opportunity

This contract is subject to the requirements of Executive Order No. 50 (1980) as revised ("E.O. 50") and the Rules and Regulations promulgated thereunder. No contract will be awarded unless and until these requirements have been complied with in their entirety. By signing this contract, the contractor agrees that it:

(1)     will not engage in any unlawful discrimination against any employee or applicant for employment because of race, creed, color, national origin, sex, age, disability, marital status or sexual orientation with respect to all employment decisions including, but not limited to, recruitment, hiring, upgrading, demotion, downgrading,

NYDOCS02/670047.2

25

NYC011129

transfer, training, rates of pay or other forms of compensation, layoff, termination, and all other terms and conditions of employment;

(2)     the contractor agrees that when it subcontracts it will not engage in any unlawful discrimination in the selection of subcontractors on the basis of the owner's race, color, creed, national origin, sex, age, disability, marital status or sexual orientation;

(3)     will state in all solicitations or advertisements for employees placed by or on behalf of the contractor that all qualified applicants will receive consideration for employment without unlawful discrimination based on race, creed, color, national origin, sex, age, disability, marital status or sexual orientation, or that it is an equal employment opportunity employer;

(4)     will send to each labor organization or representative of workers with which it has a collective bargaining agreement or other contract or memorandum of understanding, written notification of its equal employment opportunity commitments under E.O. 50 and the rules and regulations promulgated thereunder; and

(5)     will furnish all information and reports including an Employment Report before the award of the contract which are required by E.O. 50, the rules and regulations promulgated thereunder, and orders of the Director of the Bureau of Labor Services ("Bureau"), and will permit access to its books, records and accounts by the Bureau for the purposes of investigation to ascertain compliance with such rules, regulations, and orders.

The contractor understands that in the event of its noncompliance with nondiscrimination clauses of this contract or with any of such rules, regulations, or orders, such noncompliance shall constitute a material breach of the contract and noncompliance with the E.O. 50 and the rules and regulations promulgated thereunder. After a hearing held pursuant to the rules of the Bureau, the Director may direct the imposition by the contracting agency of any or all of the following sanctions:

(i)     disapproval of the contractor;

(ii)     suspension or termination of the contract;

(iii)     declaring the contractor in default; or

(iv)     in lieu of any of the foregoing sanctions, the Director may impose an employment program.

The Director of the Bureau may recommend to the contracting agency head that a Board of Responsibility be convened for purposes of declaring a contractor who has repeatedly failed to comply with E.O. 50 and the rules and regulations promulgated thereunder to be nonresponsible.

The contractor agrees to include the provisions of the foregoing paragraphs in every subcontract or purchase order in excess of $50,000 to which it becomes a party

NYC011130

pursuant to or related to this Agreement unless exempted by E.O. 50 and the rules and regulations promulgated thereunder, so that such provisions will be binding upon each subcontractor or vendor. The contractor will take such action with respect to any subcontract or purchase order as may be directed by the Director of the Bureau of Labor Services as a means of enforcing such provisions including sanctions for noncompliance.

The contractor further agrees that it will refrain from entering into any contract or contract modification subject to E.O. 50 and the rules and regulations promulgated thereunder with a subcontractor who is not in compliance with the requirements of E.O. 50 and the rules and regulations promulgated thereunder.

NYC011131

Wherefore, the parties have hereunto set their hands this ~~19th~~ *Feb* day of ~~January~~, 2004.

New York City Marketing Development Corporation

By _____
   Joseph M. Perello, President

*Sworn to before me this 30th day of February, 2004*

*[signature]*

LAURA FERNANDEZ
Notary Public - State of New York
NO. 01FE6086886
Qualified in Bronx County
My Commission Expires 2/3/2007

Snapple Beverage Corp.

By _____
   John L. Belsito, Senior Vice President

*Sworn to before me this 19th day
of February 2004.*

Approved as to form:

_____
Acting Corporation Counsel

*Janet L. Barrett,
notary public, State of TX*

JANET L. BARRETT
Notary Public, State of Texas
My Commission Expires 09-03-05

NYDOCS01/676043.2

28

EXHIBIT A

Permit

NYC011133

EXHIBIT B

SNAPPLE BRANDS

Yoo-Hoo

Orangina

Mistic

Mott's

Clamato

Hawaiian Punch

Mauna Lai

Nantucket Nectars

Snapple

Snap20

Snapple 100% Juiced!

Snapple a Day

Elements

NYC011134

EXHIBIT C

MINIMUM PRICES

Snapple 11.5 oz Cans  $1.00
Snapple 100% Juiced! 11.5 oz Cans - $1.00
Mott's 11.5 Cans     - $1.00
Yoo-hoo 11 oz Cans   - $1.00
Snap20 16.9 oz PET   - $1.00
Snapple 16 oz Glass - $1.25
Snap20  25 oz PET    - $1.25
Snapple 20 oz PET    - $1.50

At the end of 2 years, Snapple shall have the option to raise each of these minimums,
individually or in aggregate, by  a maximum of $0.25 per unit. To the extent that Snapple
does not exercise this option on any one individual item, or increases the minimum by
less than $0.25 per unit, in each subsequent year Snapple shall have the option to increase
the minimum on that item to $0.25 per unit above the level specified in the table.

NYC011135

EXHIBIT D

SNAPPLE MARKS

[Subject to completion by Snapple]

Made from the best stuff on Earth

Best Stuff is in Here

Snapple-a-Day

Snap 2-0

Snapple 100% Juiced!

NYC011136

EXHIBIT E

CITY MARKS

[Subject to completion by MDC]

NYC011137

AMENDMENT TO AGREEMENT DATED FEBRUARY 19, 2004
BETWEEN NEW YORK CITY MARKETING DEVELOPMENT CORPORATION AND
SNAPPLE BEVERAGE CORP.

Amendment, dated as of this _____ day of December 2005 (this "Amendment"), to that certain Agreement dated as of February 19, 2004 (the "Agreement") between the New York City Marketing Development Corporation ("MDC") and Snapple Beverage Corp. ("Snapple").

Whereas, pursuant to Article 25 of the Agreement, MDC and Snapple now wish to amend certain terms set forth in the Agreement;

Whereas, the New York City Department of Small Business Services, with its principal place of business located at 110 Williams Street, 2nd Floor, New York, NY 10038, is the City agency that will submit this matter to the Franchise and Concession Review Committee for approval;

**NOW, THEREFORE,** the parties hereto hereby agree as follows:

1.    This Amendment, and the changes to the Agreement enumerated herein, are subject to, and may take effect only upon, the obtaining of all necessary approvals, including the approval of the Franchise and Concession Review Committee, of all, and not less than all, of the provisions of this Amendment (except that the acknowledgement of the Commencement Date in Paragraph 2 below and the changes to the notice provisions of the Agreement enumerated in Paragraph 18 below shall be effective immediately and without any such approvals).

2.    The parties agree that the Commencement Date, as defined in Article 1 of the Agreement, is April 22, 2004.

3.    Article 1 of the Agreement is hereby amended (a) by deleting the word "five" from the first sentence thereof and replacing it with the word "six" and (b) by adding the following language immediately after the words "following Year Four" in the second to last sentence thereof: "and 'Year Six' shall mean the 365-day year following Year Five".

4.    Clause (i) of the introductory paragraph to Article 4 of the Agreement is hereby amended by deleting clauses (B) and (C) thereof and inserting the following new clauses (B), (C), (D) and (E) prior to the parenthetical definition of City Marketing Initiative:

> (B) Six Million Dollars ($6,000,000) for Year Two, (C) Nine Million Dollars ($9,000,000) for each of Years Three and Four, (D) Ten Million Five Hundred Thousand Dollars ($10,500,000) for Year Five and (E) an amount for Year Six that is equal to the sum of (x) the City Make Whole Amount (as defined and calculated pursuant to Article 5(f)) for Year Two and (y) each City Initiative Shortfall (as defined and calculated pursuant to Article 4(i)), if any, in Years

NYC010922

Three, Four or Five which is in excess of the City Initiatives Annual Cap (as defined in Article 4(i)).

5.      Clause (i) of the introductory paragraph to Article 4 of the Agreement is hereby further amended by adding the following clause after the parenthetical definition of City Marketing Initiative and immediately prior to the semi-colon:

, and in each of Years Three through Six, the City Marketing Initiative shall include national media having a value of at least One Million Dollars ($1,000,000), provided that MDC holds such national media in its portfolio and such media was obtained through activities consistent with MDC's corporate purposes and not through direct purchase. To the extent MDC does not hold media meeting such conditions in its portfolio, MDC agrees to use reasonable best efforts to deliver such media to Snapple in a manner consistent with MDC's corporate purpose and not through direct purchase, however should MDC be unable to so provide such national media, MDC shall not be required to supply national media and instead shall supply the same value in local City owned and controlled physical media. Notwithstanding anything else contained in this agreement, the parties agree that, unless otherwise mutually agreed, the components of the City Marketing Initiative for each of Years Three, Four, Five and Six shall be comprised of at least thirty-five percent (35%) in marketing, sponsorship and events (advertising and promotions sponsored by the City at City-controlled locations and events as well as other marketing and communication vehicles owned by or sponsored by the City) and the balance in media (e.g., bus stop shelters, street furniture, street banners, signage on City-owned or controlled real and personal property, etc.).

6.      Article 4(b) of the Agreement is hereby deleted in its entirety and replaced with the following new Article 4(b):

(b)      In subsequent Years, the parties shall agree in writing to the specific elements that will comprise the City Marketing Initiative and the Snapple Marketing Initiatives, including without limitation the value of each element, prior to the beginning of each Year. Snapple shall deliver to MDC no later than September 1 of the prior Year for the next succeeding Year (i) a written proposal for the Snapple Marketing Initiatives and (ii) Snapple's request for the various media elements of the City Marketing Initiative. The value of each proposed element as agreed shall be binding on the parties, except to the extent of a dispute involving the delivery of such elements as set forth below. Not later than thirty (30) days after its receipt of Snapple's proposal and request, MDC shall respond in writing as to (i) whether Snapple's proposal for Snapple Marketing Initiatives is acceptable, (ii) whether MDC shall be able to provide the City Marketing Initiative media elements requested by Snapple, and (iii) MDC reasonable good faith value for each element thereof. To the extent MDC believes that any element of the Snapple Marketing Initiative is not acceptable, or that MDC shall be unable to deliver any element of the City Marketing Initiative requested by

NYC010923

Snapple, or Snapple disagrees with MDC's stated value for marketing, sponsorship or event elements that comprise the proposed City Marketing Initiative, the parties shall proceed in good faith to resolve any differences as expeditiously as possible. The parties agree to value the marketing and communications activities fairly and equitably no later than February 28 of each year, taking into account the criteria and all other matters hereinafter set forth in Paragraphs (c), (d) and (e) below, and agree not to frustrate the terms of this Agreement by unreasonably or in bad faith disputing the value of such activities or services. The agreed City Marketing Initiatives shall include detail setting forth all elements of each City Marketing Initiative and the specific value attributed to each element. The provisions of Article 4(a) above shall apply with respect to resolving disputes over the Snapple Marketing Initiative and shall also apply with respect to resolving disputes over the value of the proposed City Marketing Initiatives. The provisions of Articles 4(f), (g), (h) and (i) below, and the procedural provisions set forth in this paragraph, shall apply with respect to providing an accounting for the City Marketing Initiative and for resolving disputes over whether the City Marketing Initiative agreed to by the parties was actually delivered or was delivered at the value agreed. If the parties are unable to resolve their differences with respect to a Snapple Marketing Initiative or a City Marketing Initiative (including without limitation in the event that the parties do not agree in writing to the value of the City Marketing Initiative for an upcoming Year prior to the beginning of such Year), either party may deliver to the other a formal notice of dispute. If the parties are unable to resolve such dispute within ten (10) business days of delivery of a notice of dispute, all remaining items in dispute shall: (a) for disputes over Snapple Marketing Initiatives or the value of a proposed City Marketing Initiative, be governed by the provisions of Article 4(a); and (b) for disputes over whether any element of the agreed upon City Marketing Initiative has been delivered or was delivered at the value agreed be promptly referred to a mutually agreed upon third party who shall be an expert with respect to the commercial marketing and advertising media elements contained in the City Marketing Initiative (and the value thereof to the extent value has not been previously agreed). Such expert shall be required to hold a mediation session within one week of the retention of such expert. The expert shall take into account the criteria and other matters set forth in this Paragraph 4(b), as well as Paragraphs 4(c), (d) and (e) in considering whether a media element of the City Marketing Initiative has been provided by MDC or has been provided at the value agreed. Notwithstanding anything else contained in this Agreement, Snapple and MDC agree not to dispute the value of the Marketing Initiatives provided to each other during Year One and Year Two. Should the parties agree to add an element to the City Marketing Initiative subsequent to the beginning of any Year and should the parties be unable to reach agreement with respect to the value of such element, the parties agree to submit to the procedures above with respect to both the value and delivery of such element. For the avoidance of doubt, the phrase "delivered at the value agreed" or "provided at the value agreed" shall not provide Snapple with the opportunity to challenge the initially agreed upon valuation.

NYC010924

7.    Article 4(d) of the Agreement is hereby amended by deleting the fourth sentence thereof and replacing it with the following sentence:

Advertising Material disseminated to the public pursuant to the City Marketing Initiative shall utilize such names and logos of Snapple and its Affiliates (but for purposes of this Article 4, "Affiliates" shall be any entity controlled by or under control with Snapple Beverage Corp., and expressly not limited to those Affiliates selling brands listed on Exhibit B hereto) as shall be required by Snapple, provided that no reference shall be made to the City, MDC or the matters contemplated herein in any Advertising Materials that contain the names and logos of Snapple Affiliates other than those listed on Exhibit B hereto.

8.    Article 4 is hereby amended by adding the following new paragraphs (f), (g), (h) and (i) thereto:

(f)    Within forty-five (45) days after the end of each quarter of the Year, MDC shall provide Snapple with a written report setting forth all media elements contained in the City Marketing Initiative provided by MDC during the immediately preceding quarter and year to date and the value agreed by the parties.

(g)    At any time within ninety (90) days after the end of a Year, and in the event that Snapple believes in good faith that one or more particular agreed elements of the City Marketing Initiative shall not have been delivered or not have been delivered at the value agreed and/or that the value ascribed by MDC to any marketing, sponsorship or event element added to the City Marketing Initiative subsequent to the beginning of any Year shall be incorrect (taking into account the provisions of Paragraphs (b), (c), (d) and (e) above), Snapple shall be entitled to provide a written notice to MDC setting forth in reasonable detail any disagreement with MDC as to whether a particular media element has been provided by MDC or has been provided at the value agreed and/or whether the value ascribed by MDC to any marketing, sponsorship or event element added to the City Marketing Initiative subsequent to the beginning of any Year shall be correct (taking into account the provisions of Paragraphs (b), (c), (d) and (e) above).  If the parties cannot resolve a disagreement set forth in such written notice within ten (10) business days (or such longer period as may be agreed in writing by the parties), then the provisions of Paragraph 4(b) shall apply. Notwithstanding the foregoing, Snapple shall not be entitled to submit a notice of dispute with regard to any quarter that has previously been reported to Snapple for which Snapple has not raised a dispute pursuant to Article 4(b) hereof within ninety (90) days after Snapple shall have received such quarterly report.

(h)    The parties agree that the value of any media delivered to Snapple by MDC pursuant to this Agreement shall be the published rate card for the franchisee of the media in the Year delivered.  The parties further agree that for events, sponsorships, and other elements that are elements of the City Marketing

NYC010925

Initiative the value of such elements delivered shall be agreed by the parties in accordance with the provisions in Article 4(b), notwithstanding values that the parties agreed to in Years One and Two. The value agreed to by the parties with regard to the City Marketing Initiative for Year One and Year Two is attached hereto as Exhibit F.

(i)    If, in any Year, MDC shall fail to provide the full City Marketing Initiative as provided in Article 4 for such Year, MDC shall make up the difference to Snapple of the actual amount of City Marketing Initiatives provided to Snapple for such Year and the required amount of City Marketing Initiatives for such Year (the "City Initiative Shortfall") as follows:

> Snapple shall have a right, in addition to any credits and reductions in Sales Commissions provided by Article 5(f)(ii), to (x) take a full credit against each City Marketing Initiative Payment (as defined below) next due in an amount equal to the City Initiative Shortfall and (y) if such credit shall be insufficient to cover the City Initiative Shortfall, to reduce Sales Commissions I (as defined below) to zero. When the dollar value of (x) and (y) aggregates an amount equal to the City Initiative Shortfall, then Snapple shall resume its obligation to make Sales Commission I and City Marketing Initiative Payments at the full value prescribed in Article 5(a) and (b), subject to Article 5(f)(ii). Notwithstanding the foregoing, in any one Year the maximum value of the credits and reduced Sales Commissions I Snapple shall be entitled to take and make pursuant to this paragraph shall be Three Million Dollars ($3,000,000) (the "City Initiatives Annual Cap"), and any City Initiative Shortfall in excess of the City Initiatives Annual Cap shall be included in the City Marketing Initiatives for Year Six pursuant to the provisions of Article 4 above.

> Notwithstanding the foregoing, if there is a City Initiative Shortfall for Year Six (or any unpaid City Initiative Shortfall for any prior Year), then, rather than using the credit against the City Marketing Initiative Payment and reduced Sales Commissions I outlined above, the City Initiative Shortfall for such Year (and any unpaid City Initiative Shortfall for any prior Year) shall be paid as follows: (x) first, Snapple shall be entitled to reduce the final payment of Sales Commissions for such Year by an amount equal to the City Initiative Shortfall for such Year (and any unpaid City Initiative Shortfall for any prior Year) and (y) next, if the amount of the City Initiative Shortfall for such Year (and any unpaid City Initiative Shortfall for any prior Year) shall exceed the final payment of Sales Commissions for such Year, then Snapple shall not be required to make such final payment of Sales Commissions and, within ninety (90) calendar days after the expiration of Year Six, MDC shall pay to Snapple an amount, in cash, in immediately available funds, equal to such excess. For the avoidance of doubt, the parties expressly acknowledge and agree that, notwithstanding the City Initiatives Annual Cap specified in the preceding

NYC010926

paragraph, the City Initiatives Annual Cap shall not apply to a City Initiatives Shortfall, if any, in Year Six.

9.     Article 5(b) of the Agreement is hereby amended by deleting clauses (ii) and (iii) thereof and inserting the following new clauses (ii) and (iii) prior to the parenthetical definition of City Marketing Initiative Payment:

> (ii) in Year Two, Six Million Dollars ($6,000,000); and (iii) in Years Three, Four and Five, Three Million Dollars ($3,000,000) per Year

10.     Article 5(c)(ii) of the Agreement is hereby amended (a) by deleting the phrase "Years Two, Three and Four" from clause (B) thereof and replacing it with the phrase "Year Two" and (b) by deleting clause (C) thereof and inserting the following new clause (C):

> (C) for Years Three, Four and Five, on the first business day of the Year, Seven Hundred Fifty Thousand Dollars ($750,000), on the first business day no later than 90 days thereafter, Seven Hundred Fifty Thousand Dollars ($750,000), on the first business day no later than 91 days thereafter, Seven Hundred Fifty Thousand Dollars ($750,000), and on the first business day no later than 92 days thereafter, Seven Hundred Fifty Thousand Dollars ($750,000).

11.     Article 5(f)(ii) of the Agreement is hereby amended (a) by deleting the phrase "Years Two, Three and Four" from clause (b) of the introductory paragraph thereof and replacing it with the phrase "Year Two" and (b) by deleting clause (c) from the introductory paragraph and inserting the following new clause (c) prior to the parenthetical definition of Baseline:

> and (c) during each of Years Three, Four and Five, to sell from all Vending Locations at least such number of Cases as have actually been sold from all Vending Locations during Year Two.

12.     Article 5(f)(ii) of the Agreement is hereby further amended by adding the following sentence to the end of the first set-off paragraph on page 12:

> Notwithstanding the foregoing, the City Make Whole Amount for Year Two, if any, shall be paid by providing City Marketing Initiatives in Year Six as specified in Article 4 rather than by reducing the City Marketing Initiative Payment and Sales Commission I during Year Three as specified above.

13.     Article 5(f)(ii) of the Agreement is hereby further amended by deleting the phrase "the Term" in the penultimate line of the second set-off paragraph on page 12 and replacing it with the phrase "Year Five".

14.     Article 5(f)(ii) of the Agreement is hereby further amended by deleting the third paragraph on Page 12 (commencing with the words "In addition to the foregoing,") in its entirety and inserting the following new paragraph:

NYC010927

In addition to the foregoing, in the event of a Marketing Baseline Shortfall (as defined below) in any Year, the applicable Snapple Marketing Amount in the succeeding Year shall be reduced to an amount equal to the Snapple Marketing Amount for such succeeding Year multiplied by a fraction, the numerator of which shall be equal to the total number of Cases of Snapple products sold through vending machines at Vending Locations during the Year of the Marketing Baseline Shortfall and the denominator of which shall be equal to the applicable Marketing Baseline (as defined below) for the Year of the Marketing Baseline Shortfall. "Marketing Baseline" shall mean (i) during Year One, the sale of at least seven hundred fifty thousand Cases of Snapple product from all Vending Locations and (ii) during each of Years Two, Three and Four, the sale of at least five hundred thousand Cases of Snapple product from all Vending Locations per Year. "Marketing Baseline Shortfall" means the shortfall, if any, between the Marketing Baseline and the actual sales of Cases in any Year. Notwithstanding anything contained in this Agreement, the Snapple Marketing Amount for Year Five shall not be reduced as a result of a Baseline Shortfall in Year Five.

15.     The last paragraph of Article 5(f)(ii) of the Agreement (commencing with the words "The foregoing shall constitute") is hereby amended (a) by adding the phrase "or Marketing Baseline Shortfall" after the phrase "Baseline Shortfall" each time it appears in such paragraph and (b) by adding the phrase "and Marketing Baseline" after the phrase "Baseline" each time it appears in such paragraph.

16.     Article 5(i) of the Agreement is hereby amended by deleting the phrase "two million" and replacing it with the phrase "five hundred thousand".

17.     Article 6 of the Agreement is hereby amended to read as follows:

No Placement for Year Six.  For the avoidance of doubt, there shall be no placement of any vending machines on City-Owned or City Controlled Property during Year Six, nor shall there be (i) any Baseline for Year Six, (ii) any Marketing Baseline for Year Six, (iii) any City Marketing Initiative Payment by Snapple for Year Six, or (iv) any Snapple Marketing Amount for Year Six. Snapple shall, on or prior to the expiration of Year Five or termination date if earlier, remove all vending machine in accordance with this Agreement and the DCAS Permit. Snapple shall, however, be required to pay any Sales Commissions as provided in Article 5 on account of Snapple products sold from vending machines at Vending Locations during the removal period or on account of Snapple products sold by New Customers on City Controlled Property during Year Six.

18.     The portion of Article 13 of the Agreement setting for the notice address for Snapple and MDC is hereby amended to read as follows:

NYC010928

If to Snapple:

Snapple Beverage Corp.
900 King Street
Rye Brook, NY 10573
Attn:  Vice President, Marketing Resources
Telephone: (914) 612-4000
Fax:  (914) 612-6302

With a copy (which shall not be deemed to be notice ) to:

Cadbury Schweppes Americas Beverages
900 King Street
Rye Brook, NY 10573
Attn:  Assistant General Counsel
Telephone: (914) 612-4387
Fax:  (914) 612-6302

If to MDC:

New York City Marketing Development Corporation
22 Cortlandt Street, 12th Floor
New York, New York 10007
Attn: General Counsel
Telephone:  (646) 587-5600
Fax:  (646) 587-5610

   19.  Exhibit B of the Agreement is hereby deleted in its entirety and replaced with Exhibit B attached to this Amendment.  Exhibit D of the Agreement is hereby deleted in its entirety and replaced with Exhibit D attached to this Amendment.  Exhibit E of the Agreement is hereby deleted in its Entirety and replaced with Exhibit E attached to this Amendment.  A new Exhibit F attached to this Amendment is hereby added to the Agreement.

[Signature Pages Follow]

NYC010929

IN WITNESS WHEREOF, the parties have hereunto set their hands as of the date first written above.

New York City Marketing Development Corporation

By_____
        Joseph M. Perello, President

New York City Department of Small Business Services on behalf of the City of New York

By_____

      _____


Snapple Beverage Corp.

By_____
        John L. Belsito, Senior Vice President


Approved as to form and certified as to legal authority:


_____
Acting Corporation Counsel

NYC010930

NEW EXHIBIT B TO THE AGREEMENT:

SNAPPLE BRANDS

Yoo-Hoo

Mistic

Mott's

Clamato

Hawaiian Punch

Mauna Lai

Nantucket Nectars

Snapple

Snapple-a-Day

Snap 2-0

Snapple 100% Juiced!

Elements

NYC010931

NEW EXHIBIT D TO THE AGREEMENT:

SNAPPLE MARKS

Made from the best stuff on Earth

Best Stuff is in Here

Yoo-Hoo

Snapple

Snapple-a-Day

Snap 2-0

Snapple 100% Juiced!

NYC010932

NEW EXHIBIT E TO THE AGREEMENT:

CITY MARKS

[TO BE COMPLETED BY MDC]

NYC010933

NEW EXHIBIT F TO THE AGREEMENT

SUMMARY OF CITY MARKETING INITIATIVES FOR YEAR ONE

ny-srv01\1144618v0304

NYC010934