# EXHIBIT 40

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------------x

In the Matter of the Application of

CLEAR CHANNEL ADSHEL, INC.,

                       Petitioner,

For a Judgment Pursuant to Article 78 of the CPLR

           - against -

FRANCHISE AND CONCESSION REVIEW
COMMITTEE OF THE CITY OF NEW YORK,
MICHAEL R. BLOOMBERG, as Mayor and Chair
of the Franchise and Concession Review
Committee, WILLIAM C. THOMPSON, JR., as
Comptroller of The City of New York, NEW YORK CITY
DEPARTMENT OF TRANSPORTATION, NEW YORK
CITY ECONOMIC DEVELOPMENT CORPORATION,
NEW YORK CITY MARKETING DEVELOPMENT
CORPORATION, NEW YORK CITY DEPARTMENT
OF CITY PLANNING, THE CITY OF NEW YORK, and
CEMUSA, INC.,

                   Respondents.

-------------------------------------------------------------------x

**Index No. 108831/2006**

**IA PART 23**

**Hon. Richard F. Braun**

**VERIFIED AMENDED ANSWER**

       The FRANCHISE AND CONCESSION REVIEW COMMITTEE OF THE CITY

OF NEW YORK ("FCRC"), MICHAEL R. BLOOMBERG, as Mayor and Chair of the FCRC,

Committee, WILLIAM C. THOMPSON, JR., as Comptroller of The City of New York, the

NEW YORK CITY DEPARTMENT OF TRANSPORTATION ("DOT"), the NEW YORK

CITY ECONOMIC DEVELOPMENT CORPORATION, the NEW YORK CITY

MARKETING DEVELOPMENT CORPORATION, the NEW YORK CITY DEPARTMENT

OF CITY PLANNING and THE CITY OF NEW YORK (the "City"), (collectively, the

"Municipal Respondents), by their attorney, MICHAEL A. CARDOZO, Corporation Counsel of

the City of New York, for their Verified Answer to the Amended Verified Petition (the



"Petition") of Clear Channel Adshel, Inc. ("Clear Channel" or "Petitioner") respectfully allege as follows:

    1.    Admit so much of Paragraphs 1 and 4 of the Petition as alleges that Petitioner seeks certain relief under Article 78 of the CPLR and deny the remainder thereof.

    2.    Deny the allegations set forth in Paragraph 2 of the Petition and affirmatively aver that Clear Channel, the fourth-rated of five proposers for the franchise in suit, was not granted an opportunity to submit a best and final offer ("BAFO") because its proposal was judged significantly inferior to those of three other proposers, whose proposals were deemed far more advantageous to the City and from whom BAFOs were sought, and that limiting the number of BAFOs requested was a lawful, reasonable and appropriate exercise of discretion expressly granted under the Request for Proposals ("RFP") issued for the subject franchise.

    3.    Deny the allegations set forth in Paragraphs 3, 36, 47, 49, 51, 93-98, 100, 103, 112, 120, 121-126, 128-130, 134-143, 145-150, 152, 154-156 and 158-161 of the Petition.

    4.    Deny having knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 5 of the Petition, except admit that Clear Channel pays sales and income taxes to the City and the State of New York.

    5.    Deny the allegations of paragraph 6 of the Petition and respectfully refer the Court to Section 373 of the New York City Charter (the "Charter") for a complete and accurate statement of the FCRC's membership; and affirmatively aver that the Borough President of Manhattan served on the FCRC with respect to the subject franchise, along with a designee of the Mayor, an appointee of the Mayor, and designees of the Comptroller, the Corporation Counsel and the Director of Management and Budget in accordance with said Charter provision.

6.    Deny the allegations in Paragraph 9 of the Petition and affirmatively aver that DOT is an agency of the City organized and acting pursuant to Section 71 of the Charter

7.    Deny the allegations set forth in Paragraph 10 of the Petition and affirmatively aver that EDC, is a not-for-profit corporation whose purpose is to protect and enhance the City's job and revenue base through the provision of comprehensive economic development services, including commercial and industrial real estate development, financial services, the development and management of commercial transport systems, management of the City's wholesale and public food markets, and the planning, development and management of waterfront properties. Its objectives include relieving and reducing unemployment, aiding the City by attracting new industry to it, or by encouraging the development of, and retention of, industry in the City; studying and promoting and promoting the City's economic growth and business prosperity and preserving and augmenting the City's tax base.

8.    Deny the allegations set forth in Paragraph 13 of the Petition and affirmatively aver that MDC is a local development corporation organized and existing for the purpose of centralizing and managing the City's marketing assets; MDC's mission is to generate new revenues and develop new resources to promote the City at home and around the world so as to increase jobs and tourism in the City; MDC was intended to serve as a centralized marketing office that would, *inter alia*, develop, protect and use the New York City "brand name," which is recognized as one of the most highly regarded brands in the world, to generate new revenues for the City from non-traditional sources including the development of marketing partnerships with private sector entities.

9.    Deny so much of Paragraph 17 of the Petition as alleges that the City Council is required to draft the authorizing resolution it adopts.

10.     Admit so much of Paragraph 19 of the Petition as alleges that the FCRC must determine whether a proposed franchise agreement is consistent with the RFP therefor; deny having knowledge or information sufficient to form a belief as to the truth of the remainder thereof; and respectfully refer the Court to Charter §§ 363, 371, 372 and 373 for the true scope and nature of the duties of the FCRC and its members regarding franchises.

11.     Deny having knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraphs 22, 23, 24, 26, 39, 40, 41 and 44 of the Petition.

12.     Deny so much of Paragraph 25 of the Petition as alleges that there have been "significant changes" in the City's streetscape since the environmental review completed in 1997 in anticipation of a substantially similar street furniture franchise which was not then awarded.

13.     Affirmatively aver in response to Paragraph 28 of the Petition that the authorizing resolution (Sixth "Resolved" Clause) states that the RFP evaluation criteria shall include:

> The adequacy of the proposed compensation to be paid to the City; provided, however, that a preference shall be granted to the proposals that provide a greater compensation to the City in the initial period of the agreement **provided the total proposed compensation over the term of the franchise is determined to be in the best financial interest of the City;**

and aver that to the extent said Paragraph omits the highlighted language, or any indication that such language has been omitted, it is misleading and therefore denied. The Court is respectfully referred to the entire authorizing resolution for its true and complete terms.

14.     Deny so much of Paragraph 32 of the Petition as alleges that the Phase II scoring criteria set forth in the RFP were modified by addendum so that the City could "steer" the contract to "smaller, less qualified companies" and affirmatively aver that the modification,

done at the request of Van Wagner Communications, L.L.C. ("Van Wagner"), was done with the intention of expanding the competitive pool of potential proposers.

15.    Deny so much of Paragraph 34 and 105 of the Petition as alleges that the RFP was in any manner inconsistent with the authorizing resolution and affirmatively aver that (a) the authorizing resolution provided for "compensation" to the City without specification as to its form and that the inclusion in the RFP of reference to "an alternative form of compensation" ("AFC") was fully consistent therewith; (b) as required by the authorizing resolution, a copy of the RFP was filed with the City Council within 15 days of its publication, without negative comment; and (c) Petitioner, both by failing to make negative comment regarding the RFP's inclusion of AFC as a permitted form of compensation and by submitting a proposal which included AFC, has waived any objection to this aspect of the RFP.

16.    Deny so much of Paragraph 37 of the Petition as alleges that preference points for greater compensation to the City in the initial period was  reduced from five points to one point via addendum to the RFP and affirmatively aver that (like Petition Paragraph 28), this allegation again distorts the terms of the authorizing resolution, which established preferences not only for up-front money, but also for proposers manufacturing and assembling franchise structures within the City and within the United States; the RFP delineated five preference points available to proposers in total and the addendum simply allocated them among these various items of preference, with one point for high initial payments and two for each of the others; the Municipal Respondents further deny that the allocation of preference points was in any manner intended to favor Cemusa, but instead represented the fair intendment in regard to preferences of the authorizing resolution.

17.     Deny the allegations set forth in Paragraph 38 of the Petition, except admit that proposals for the franchise were received from each of the companies indicated therein.

18.     Deny having knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 42 of the Petition, except affirmatively aver that Cemusa was evaluated as a fiscally responsible and experienced proposer by the City; that the Evaluation Committee necessarily considered the financial strengths and weaknesses of all proposers through application of the evaluation criteria; and that Cemusa has furnished the City with $50 million to date plus multiple forms of security to ensure fulfillment of its obligations, including a $96 million letter of credit, a $5 million replenishing security fund, a $5 million performance bond, liability insurance in the amount of $10 million, escrow provisions providing additional assurance of compliance with franchise obligations and a parent-company guaranty of Cemusa's obligations.

19.     Deny having knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 43, except deny that a lobbyist "delivered" the contract for Cemusa, and affirmatively aver that each proposer expressly agreed in writing, as required by the RFP, that other than through contacting DOT's chief contracting officer, proposers and their representatives – including lobbyists -- would not initiate any contact with any of the evaluators or other City officials regarding the solicitation, and that such promises were required to be made for the purpose of avoiding undue, outside influences upon City officials evaluating proposals.

20.     Deny the allegations set forth in of Paragraph 48 of the Petition, except admit that the City sought and obtained a guarantee of Cemusa's obligations from FCC Versia, S.A., and that FCC Versia, S.A. owns 99% of Corporacion Europea de Mobilario Urbano, S.A.,

which owns 100% of Cemusa, Inc.; deny having knowledge or information sufficient to form a belief as to the truth of the allegations concerning the financial status of FCC Versia, S.A.

21.    Deny the allegations set forth in Paragraph 50 of the Petition and affirmatively aver that Joseph Perello, President of the City's Marketing Development Corporation ("MDC"), served as a technical advisor to proposal evaluators as to compensation matters, and that the RFP contained a requirement (at p. 16) that, should the City be able to secure the 2012 Olympic Games, franchisees might be required to give up their franchised advertising space during the Olympic period which forbearance the RFP required to be addressed in the proposals; and aver that Clear Channel aggressively proposed that it would give up all revenue for the Olympic period in return for a twenty-five year franchise, despite the fact that the authorizing resolution (at Paragraph ELEVENTH) and the RFP (at p. 1) limited the franchise to twenty years.

22.    Deny the allegations set forth in Paragraph 52 of the Petition and affirmatively aver that throughout the evaluation process the City reasonably was concerned with "rate integrity" – *i.e.*, ensuring that companies selling advertising space in other media would not "package" street furniture space with such media [*e.g.*, rent this billboard or place a television or radio ad at top dollar and get reduced cost bus shelter ads] so as to reduce street furniture revenue to the detriment of the City, which is entitled under the franchise to guaranteed compensation in a given year or a percentage of gross revenues for that year, whichever is higher; indeed, rather than this being a matter of "bizarre speculation" as outlandishly posited in the Petition, the Comptroller had found in an audit dated June 28, 2004 [available at http://www.comptroller.nyc.gov/BUREAUS/AUDIT/PDF_FILES/FM03_139A.pdf], at p. 5, that the then-current street furniture vendor Viacom had provided free bus shelter advertising to a

number of vendors who had purchased billboard space for which the City receives no compensation and Clear Channel's representatives, in meetings with the City, expressly recognized this issue, addressed by Mr. Perello of MDC at those meetings, as being a legitimate concern of the City.

23.    Admit the allegations set forth in Paragraph 53 of the Petition, except affirmatively aver (a) that the RFP (at p. 20) provides as follows with respect to the "guaranteed minimum annual amount" of compensation ("GMAC") "and "alternative forms of compensation" ("AFC") offered by a proposer:

> 5.    **Compensation Proposal**    The compensation to be paid to the City each year for the rights granted under the Franchise Contract . . . shall be a guaranteed minimum annual amount, or a percentage of any gross revenues derived by the Franchisee . . . .
>
> *** 
>
> The guaranteed minimum annual amount offered by a proposer may be in the form of all cash or a proposer may offer compensation in the form of approximately eighty percent (80%) cash plus an alternative form of compensation with a value equal to approximately twenty percent (20%) of such guaranteed minimum annual amount.
>
> The preferred alternative form of compensation the City would consider includes, but is not limited to, commercial media outlets such as out-of-home signage (e.g., billboards, stadium signage, transit terminals, street furniture), promotional time on television, promotional time on radio, and web-based advertising.    If proposing alternative compensation to cash, the proposal must include the percentage of the compensation, the effective cash value of the alternative(s) offered and an analysis of the valuation in sufficient detail for the committee to determine the value.
>
> The alternative form of compensation offered must have at least the same dollar value at the end of the contract as at the beginning of the contract or the Franchisee will be responsible to make up any shortfall[;]

(b) that the compensation schedule furnished to proposers for submission on April 11, 2005 differed somewhat in nomenclature from the RFP in its treatment of GMAC, referring in said schedule to the cash portion of GMAC as "Guaranteed Annual Minimum Compensation with Inflation" and to the AFC portion of GMAC as "Other Additional Compensation Above GMAC (Include Value of Non-Cash with Inflation)"; and (c) that Clear Channel and the other proposers understood that they were to list AFC in the column entitled "Other Additional Compensation Above GMAC (Include Value of Non-Cash with Inflation)," as Petitioner did in offering $500 million of such in-kind AFC in its April 11, 2005 schedule in said column.

24.    Deny so much of Paragraph 54 of the Petition as alleges or even suggests that that Petitioner had any basis to believe that a request for a BAFO automatically "would follow" the provision of additional information requested by DOT on April 4, 2005.

25.    Deny the allegations in Paragraphs 55, 56, 58, 64-66, 106-108 of the Petition and respectfully refer the Court to Paragraphs 66-69, 71-76, 83 & n. 16, 116-120, 124 and 125 of the Municipal Respondents' Affirmative Statement of the Material Facts for a true and complete rendition of the facts relating to Cemusa's offer of in-kind (AFC) compensation.

26.    Deny the allegations set forth in Paragraph 57 of the Petition, except admit that Cemusa first informed the City on April 18, 2005 that Italy, Spain and Portugal would be among the locations in which the AFC that Cemusa had indicated in its September 14, 2004 proposal and its April 11, 2005 compensation schedule would be available for the City's benefit.

27.    Deny the allegations in Paragraphs 59 to 62 and 113 to 115 of the Petition and respectfully refer the Court to Paragraphs 83, 136-140, 150, 151 & n. 24 of the Municipal Respondents' Affirmative Statement of the Material Facts for a true and complete rendition of the facts relating to consideration of scroller revenues by the City for the purposes of evaluating

proposals; and affirmatively aver that other proposals, including those of Clear Channel and NBCDecaux, were contingent upon the City's acceptance of far more scrollers than was that of Cemusa, so that correspondence between the City and Cemusa relating to scroller revenues was for the sole and express purpose of normalizing assumptions as to scrollers for bid evaluation purposes and thereby permitting evaluation of Cemusa's proposal on an "apples to apples" basis with other proposals.

28.    Deny the allegations in Paragraphs 67 to 86 of the Petition and respectfully refer the Court to Paragraphs 77-81, 88-90, 119, 120, 126, 138-140 and 149 of the Municipal Respondents' Affirmative Statement of the Material Facts for a true and complete rendition of the facts relating to the decision to proceed to a BAFO with Cemusa, Van Wagner and Decaux, the top three proposers, while not seeking or accepting a BAFO from Petitioner, whose proposal was rated fourth.

29.    Deny the allegations set forth in Paragraph 87 of the Petition and affirmatively aver that the provision in Section 2(6)(b) of the Franchise Agreement between Cemusa and the City regarding compensation to Cemusa in the event that the City wishes in the future to use Cemusa's designs for structures *other than those included in the franchise* is nothing more than fair reimbursement to Cemusa in the event its designs and structures are utilized for the City's benefit more broadly than presently contemplated by the parties and, as such, any dispute as to the future arrangements for such structures is wholly speculative and contingent, including upon the grant of a future franchise for such structures following all requisite procedures under Chapter 14 of the Charter.    Moreover, discussions for such compensation were initiated by the City during the negotiation of the contract, and were not part of the RFP or the evaluation criteria leading to an award of contract.    Thus, they are not relevant

to this dispute.  In addition, the FCRC approved the franchise agreement containing such provision notwithstanding having been presented with the same complaint Petitioner raises herein in a May 15, 2006 memorandum from counsel for Decaux, at p. 2.  Finally, the franchise agreement contains a severability clause such that, however speculative and unripe the argument, it should not be disruptive of the award or performance of the franchise.

30.    Deny the allegations set forth in Paragraph 88 of the Petition, except admit that the proposed franchise agreement was reviewed and approved by the FCRC as required by the Charter.

31.    Deny the allegations set forth in Paragraphs 89-92 of the Petition and affirmatively aver that on May 11 2006, at a public hearing of the FCRC, Petitioner appeared through counsel and argued why it, rather than Cemusa, should have received the franchise and counsel for another disappointed proposer, Decaux, did the same.  After hearing their arguments and considering written submissions to the FCRC made by each, the FCRC unanimously approved the award of the subject franchise agreement to Cemusa.

32.    Deny the allegations set forth in Paragraph 104 of the Petition, except admit that Cemusa was the fourth ranked pre-BAFO proposer on Phases II and III of the evaluations; and affirmatively aver that pursuant to Charter § 363(b), DOT, as the responsible agency for the franchise, prepared an authorizing resolution which set forth the nature of the franchise to be granted, the public service to be provided, the terms and conditions of the franchise, the method by which proposals would be solicited and the criteria to be used in evaluating the proposals submitted in response to such a solicitation.  The authorizing resolution was thereafter adopted.  The Second "Resolved" Clause of the authorizing resolution provided that an RFP or other solicitation would be issued.  The RFP sets out in detail the process to be

followed, including the establishment of the Evaluation Committee. Since the authorizing resolution required proposals to be evaluated according to the criteria set forth in the RFP, it follows that an evaluation committee would be convened to accomplish this mandate. That the evaluation committee brought together the insights and experience of various City agencies and entities – one representative from each of the Department of Parks and Recreation, the Department of Design and Construction, the Department of City Planning, the Department of Consumer Affairs and the Economic Development Corp., and two representatives from DOT – each of whom reviewed the responses to the RFP, was expressly contemplated by the RFP and permitted under the authorizing resolution the Sixth "Resolved" Clause of which provides that "in reviewing and evaluating responses to any such RFP or other solicitation, DOT shall apply the evaluation criteria listed below uniformly to all such responses and shall review and evaluate all such responses within the same time period." It then goes on to specify certain criteria that the RFP or other solicitation must contain but allows for other criteria to be set forth by saying that the criteria " shall include, but not be limited to, the following . . . ."

33. Deny the allegations set forth in Paragraphs 109-111 of the Petition and affirmatively aver that the franchise agreement requires Cemusa to provide advertising to the City in each of its other markets in the base minimum amount of $15.5 million annually as adjusted upward for inflation at a rate of 2.5% per annum under a detailed protocol set forth therein. This protocol includes third-party verification of value, and recognizes that the value of the City's annual campaign may be difficult to quantify and thus may fluctuate within an agreed range of between 85% of such base minimum amount and *115%* thereof (such latter figure having been ignored in the Petition). Further, the base minimum is subject to augmentation for the City's benefit if Cemusa adds additional markets, as Cemusa's obligation is to provide in

such markets two four-week campaigns providing 100% market penetration. We respectfully refer the Court to Section 9.4 of the Franchise Agreement for the full and complete protocol under which the City will receive a minimum of $395.9 million of non-cash compensation over the term of the franchise and aver that the FCRC approved the franchise agreement containing such provision, notwithstanding having been presented with the same complaint Petitioner raises herein in a May 12, 2006 letter from its counsel.

34.     Deny the allegations set forth in Paragraphs 116 to 118 of the Petition and aver that Cemusa, which offered $118 million in year one of the franchise agreement ($50 million of which already has been received) and Clear Channel, which offered alternative proposals of either (a) $220 million in year one (not $225 million as alleged) and a total of $25 million in additional cash over the term of the franchise (a guaranteed cash proposal of $245 million) or (b) $50 million in each of the first three years plus a total of $171 million in additional cash over the term of the franchise (a guaranteed cash proposal of $471 million, each received the 1 preference point allotted by the RFP for proposers providing greater compensation to the City in the initial period of the agreement. Cemusa, however, which offered pre-BAFO $831,550,000 cash plus $398,400,000 in AFC over the franchise term was adjudged to have proposed total compensation over the term of the franchise in the best financial interest of the City.

35.     Deny that the allegations set forth in Paragraphs 132 and 133 of the Petition set forth facts to which a responsive pleading is required.

36.     Deny the allegations set forth in Paragraph 153 of the Petition, except admit so much thereof as alleges that the RFP states as quoted therein.

## MUNICIPAL    RESPONDENTS'    AFFIRMATIVE STATEMENT OF THE FACTS

37.     Via the instant Petition, Clear Channel Adshel, Inc. ("Clear Channel"), an unsuccessful proposer, seeks to annul the franchise agreement (the "Street Furniture Franchise" or the "Franchise Agreement") between The City of New York (the "City") and Cemusa, Inc. ("Cemusa"), and to invalidate the unanimous approval of the Franchise Agreement by the City's Franchise and Concession Review Committee ("FCRC") pursuant to Chapter 14 of the New York City Charter (the "Charter").  On May 15, 2006, the FCRC – consisting of the Mayor, his appointee, the Comptroller, the Manhattan Borough President, the Director of the Office of Management and Budget and the Corporation Counsel -- voted to approve the Franchise Agreement following a public FCRC hearing held May 11, 2006.[1]

---

[1] Under the Charter, execution of a franchise requires broad public participation on a number of levels.  First, at the policy-making level, a general authorizing resolution must be enacted by the City Council, following public debate and a vote, thus permitting the City's legislative body to determine whether a particular type of franchise is desirable and under what terms and conditions it should be let.  Charter § 363(c).  A "responsible agency" (here, DOT), designated by the Mayor, then shapes a request for proposals or other solicitations in accordance with the authorizing resolution.  *See id.,* §§ 362(b); 363(e).  Following any necessary land use review under Chapter 8 of the New York City Charter, § 197-c, a franchisee is selected subject to the review and approval of the FCRC, which is comprised of the Mayor, the Director of the Office of Management and Budget, the Corporation Counsel, the Comptroller, and an additional appointee of the Mayor.  *Id.* §§ 363(f); 373(a).  The Borough President for the borough in which the franchise is located is also a member.  *Id.* § 373(a).  If more than one borough is to be covered by a particular franchise, the affected borough presidents must choose one of their number to represent them.  *Id.*  The Charter requires affirmative votes of five members of the FCRC for the approval of a franchise.  *Id.* § 373(c).  Before such vote a public hearing on the proposed franchise agreement must be held.  *Id.* § 371.  Thereafter, the Mayor must separately approve the franchise agreement which is then registered with the Comptroller.  *Id.* §§ 372; 374.

38.    The Franchise Agreement, a copy of which is submitted as Exhibit "A" hereto,[2] will provide attractive, desirable, much needed and long awaited amenities which will enhance the City's streetscape and serve the convenience of the public, while also endowing the City with substantial non-tax revenues.  The Franchise Agreement was unanimously approved by public officials charged by the Charter with responsibility for its review and decision-making authority for its approval after a lengthy and extensive competition managed by the City's Department of Transportation ("DOT").  It is now being challenged in this proceeding, by the fourth-place finisher in that competition, who finished so far behind Cemusa and the other top finishers that it was removed from consideration and advised that it would not be asked to submit a best and final offer in June 2005.

**Introduction**

39.    Pursuant to New York City Council Authorizing Resolution No. 1004 (passed by the City Council on August 19, 2003), Exhibit "B" hereto, DOT, on behalf of the City, was authorized by the Council to grant non-exclusive franchises for the occupation or use of inalienable property of the City for the installation, operation, and maintenance of certain public structures consisting of Bus Shelters, self-cleaning Automatic Public Toilets ("APTs"), "Public Service Structures ("PSSs") consisting of trash receptacles, multi-rack news racks and information/computer kiosks, and the installation and maintenance of Newsstands.  These Bus Shelters, APTs, PSSs and Newsstands are collectively referred to herein as "Franchise Structures" or "Street Furniture."

40.    On September 21, 2005, following a public Request for Proposals ("RFP") process and the solicitation of best and final offers from those proposers whose proposals were

---

[2] The Exhibits and Appendices to the Franchise Agreement, which are voluminous, will be made available to the Court upon request.

deemed most advantageous to the City, DOT announced that it would begin contract negotiations for the Street Furniture Franchise with Cemusa, a multinational outdoor advertising/street furniture company. Under the terms of the Franchise Agreement reached by the parties, Cemusa will be responsible for furnishing, installing, maintaining and operating Bus Shelters, APTs and PSSs and to furnish, install and maintain Newsstands for 20 years.[3] Cemusa will provide a minimum of 3,300 new Bus Shelters,[4] approximately 330 new Newsstands and up to 20 APTs. The Franchise Structures designed by the world renowned architectural firm of Nicholas Grimshaw Partners are all to be made of stainless steel, anodized aluminum, and tempered glass, providing a distinctive, modern, yet neutral effect throughout the City as distinguished from the dissonance and largely uninspired design of existing structures.

41.    Cemusa will pay the City cash and other consideration well in excess of one billion dollars in value over the life of the Franchise Agreement for the right to sell advertising space on the Franchise Structures. In addition to the substantial revenues to be provided by Cemusa, the City, which will pay nothing for construction and maintenance of the Bus Shelters, Newsstands, and APTs, will also receive 22.5 percent of the advertising panels available at any given time to promote the City and for public service messages.

42.    The selection of Cemusa came after an intensive evaluation of the proposals submitted by five interested companies. Each proposal included detailed technical plans, financial information and scale models and drawings. The proposals were evaluated by a

---

[3] Cemusa will be responsible for furnishing, installing and maintaining Newsstands which will be operated by licensed newsstand operators. All existing sidewalk newsstands licensed through the Department of Consumer Affairs ("DCA") will be replaced by the franchisee. As of now that number stands at 307. Cemusa will also be responsible for building additional Newsstands for which licenses are issued by DCA.

[4] At DOT's option, Cemusa is required to provide an additional 200 Bus Shelters, for a total of up to 3,500.

selection committee made up of seven City officials of diverse backgrounds and substantial experience. The evaluation period lasted ten months and included extensive interviews with each proposer.

**The RFP**

43.    On March 26, 2004, DOT issued an RFP inviting the submission of proposals for a twenty-year non-exclusive franchise contract for the installation, operation and maintenance by and at the expense of the franchisee, of Bus Shelters and APTs and the installation and maintenance of Newsstands and the display of advertising on the Franchise Structures. The primary goals of this important City initiative are to increase and improve the appearance of Street Furniture within the City and to raise non-tax revenue available for municipal services. A copy of the RFP and its three addenda are submitted as Exhibit "C" hereto.

44.    In summary, the RFP called for the submission of proposals that included the following:

- The installation and maintenance of a minimum of 3,300 bus stop shelters, that are to be newly designed and that shall replace existing bus shelters and include amenities for the public in the form of street identification signage, seating and public service information.
- The installation, operation and maintenance of a maximum of 20 APTs.
- The installation and maintenance of a minimum of 330 Newsstands.
- The installation, operation and maintenance of PSSs – trash receptacles, multi-rack newsracks and information/computer kiosks providing access to government, community or commercial services and activities -- with the numbers of each type of PSS to be determined by the City after the award of the franchise.

45.    While the Franchise Structures are to remain the property of the franchisee during the term of the Franchise Agreement, once the Street Furniture Franchise expires (or is otherwise terminated pursuant to the Franchise Agreement), the Franchise Structures will become the City's property (without compensation to the franchisee) or alternatively, the City may elect to have the franchisee remove any or all of the Street Furniture, solely at the franchisee's expense.

46.    From a proposer's perspective, the main incentive for seeking the Street Furniture Franchise is the substantial revenue the franchisee will earn through the display of advertising on the Franchise Structures.    For this privilege, each proposer was required to indicate the amount it would pay the City stated in the form of a proposed percentage of gross revenues derived by the franchisee from such advertising displays or a proposed guaranteed minimum annual amount, whichever is greater.[5]

47.    The RFP, at pages 18 through 23, set forth explicit instructions as to the form, organization and content of a "proposal package" that is responsive to the RFP.    The proposal package, in addition to business entity and principal (VENDEX) questionnaires and other required documents annexed as addenda to the RFP, had several parts.    One part of the package consisted of a statement of the proposer's qualifications including a narrative of relevant experience, references from clients, an organization chart of the members of the project "team" and the proposer's audited financial statements.    Another part of the proposal package consisted of a "technical proposal" describing the design, manufacture, maintenance and operation of each item of Street Furniture and included drawings of the basic designs as well as scale models.

---

[5] For purposes of evaluating compensation proposals of the various proposers, given the speculative nature of relying upon projected gross advertising revenues, the evaluators elected to base their evaluations upon the proposed guaranteed minimum annual amount (cash and in-kind value) offered by each proposer.

Proposal packages also were required to contain a cash flow analysis itemizing the revenues and expenses anticipated over the term of the franchise.

48.    A significant part of the proposal package consisted of the "compensation proposal." Proposers were required to propose all of the following:

(a)    A guaranteed minimum annual amount of compensation (suggested to be at least $15 million/year) that may be in the form of all cash or in the form of approximately 80% cash plus an alternative form of compensation (preferably commercial media outlets) with a value equal to approximately 20% of such guaranteed minimum annual amount. A compensation proposal that includes alternative compensation must include the percentage of the compensation, the effective cash value of the alternative offered and an analysis of the valuation in sufficient detail for the evaluation committee to determine the value.

(b)    A percentage of gross revenues (as defined in the RFP at pages 20-21) to be paid each contract year during the term of the franchise should the percentage amount exceed the guaranteed minimum annual amount. Gross revenues shall be calculated on the basis of total amounts contracted for by advertisers, telephone service providers, and the like and shall include any amounts received in the form of materials, services or other benefits or in the nature of barter; and such gross revenues shall not be subject to deduction for commissions or other expenses.

(c)    An amount by which the annual compensation will be increased or reduced for each of the three types of PSSs (trash receptacle, multi-rack news rack, or information/computer kiosk) per unit installed.

49.    The RFP stated at page 21 that "a preference shall be granted to the proposals that provide a greater compensation to the City in the initial period of the agreement provided the total proposed compensation over the term of the franchise is determined to be in the best financial interest of the City."

50.    The RFP also detailed the procedures to be followed and the criteria to be applied in evaluating proposals. In general terms, proposals were to be evaluated by a committee comprised of a minimum of three (3) persons qualified to evaluate the components of this

solicitation to be drawn from agencies such as the Departments of Transportation, Design and Construction, and City Planning.

51. The RFP also envisioned the participation of technical advisors from other public entities such as the Art Commission, the Mayor's Office for People with Disabilities, the Landmarks Preservation Commission, the Department of Parks and Recreation, the Department of Environmental Protection, the Department of Buildings, the Department of Information Technology and Telecommunications, the Department of Homeless Services, the Police Department, the Fire Department, the MTA's New York City Transit Authority, the Community Assistance Unit and the Office of Management and Budget.

52. In addition, the RFP contemplated that the City would present some or all of the design proposals received pursuant to the RFP to a Design Advisory Committee that could include representatives of civic organizations with expertise in architecture and urban design, the real estate industry, the Newsstand industry, and the City's various Business Improvement Districts. Any recommendations made by this Design Advisory Committee were to be reviewed and could be considered by members of the evaluation committee.

53. The RFP further provided that responsive proposals were to be reviewed and evaluated in phases on a point scale on the basis of which the evaluation committee was to recommend one or more of the proposers to be invited to enter into negotiations with the City for Best and Final Offers ("BAFO") for the Franchise. However, the RFP cautioned at page 30 that since DOT reserved the right to award a Franchise Contract on the basis of initial offers received without negotiation, "each initial offer should contain the Proposer's best terms from a programmatic and cost standpoint."

54.     Following issuance of the RFP, DOT made reasonable efforts to respond to questions raised by interested parties concerning the requirements of the RFP.  To that end, on April 27, 2004, DOT conducted a pre-proposal conference at its offices to provide an opportunity for interested parties to ask questions regarding the RFP.   The conference was chaired by Howard Altschuler, DOT's Deputy Commissioner in Charge of Procurement, Technology and Passenger Transport who, along with other City officials, entertained and responded to numerous questions previously submitted in writing and otherwise posed by the attendees.[6]  DOT also issued a detailed written response, dated April 27, 2004, to technical inquiries, a copy of which is submitted as Exhibit "D" hereto.[7]  DOT continued to respond to informational inquiries from interested parties almost up to the submission date of the proposal packages.  Copies of such additional responses dated June 11, 2004, August 9, 2004 and August 18, 2004 are submitted as Exhibit "E" hereto.

**The Proposal Evaluation Criteria and Process**

55.     Pursuant to the RFP, as amended by RFP Addendum II dated July 15, 2004, proposal packages were required to be submitted by 2:00 p.m. on September 14, 2004. DOT received proposal packages from five proposers:  Cemusa, Clear Channel, Van Wagner Communications, L.L.C. ("Van Wagner"), NBCDecaux, L.L.C. ("Decaux") (a company owned 70% by JC Decaux North America and 30% by NBC Universal) and Viacom Outdoor ("Viacom").

---

[6] For the sake of brevity, the extensive pre-proposal conference transcript has not been annexed to these papers but is available to the Court on request.

[7] The April 27, 2004 technical clarification submitted herewith is a different version than that filed with the Court on June 28, 2006 as an exhibit to an affidavit that was not accepted for filing.  The current version was provided to proposers.  DOT cannot confirm whether the previously filed document was provided to proposers.

56.    The committee formed to evaluate proposals submitted in response to the

RFP (the "Evaluation Committee")[8] consisted of seven members from the following City

agencies and entities:  Two from DOT, including Deputy Commissioner Altschuler, who chaired

the Committee, and one each from the Departments of Consumer Affairs, City Planning, Design

and Construction, Parks and Recreation and the New York City Economic Development

Corporation. In accordance with the provisions of the RFP, DOT submitted all of the proposals

to the Evaluation Committee for assessment.

57.    As previously noted, proposals received in response to the RFP were to be

reviewed and evaluated in four phases, three phases being on a point scale providing for a

maximum point total of 145, with points assigned as follows:

| Phase I – Responsiveness Determination | Pass/Fail |
|---|---|
| Phase II – Assessment of Proposer's Ability to Provide Required Services | 25 |
| Phase III – Assessment of Technical Proposals | 60 |
| Phase IV – Assessment of the Compensation Package | 55 |
| Preference Points | 5 |

58.    The evaluation process proceeded in the manner set forth in the RFP.  In

Phase I, the determination as to whether or not a proposal package was responsive to the

requirements of the RFP was made by DOT's Auditor General (RFP, at 24).  Proposals passing

the Phase I evaluation were then presented to and evaluated by the Evaluation Committee on a

---

[8] The "Evaluation Committee" is denominated as such in the RFP.  It was also referred to during
the evaluation process as the "Selection Committee", as it is on occasion herein.

phase-by-phase basis through Phase IV and were awarded numerical scores for each phase. The members of the Evaluation Committee individually scored each proposal. The proposals were ranked on the basis of the combined scores each proposal received. All five proposals in this instance passed the Phase I evaluation and proceeded to Phase II.[9]

59.    For the purpose of highlighting each element of the relevant evaluation criteria, Phases II and III were broken down into categories and sub-categories to which numerical values were assigned. Those numerical values add up to the total number of points available for the particular phase.[10]  The proposal evaluation procedures and criteria are discussed in the RFP at pages 23-26 and are set forth in detail in the "Coordinated Street Furniture Franchise RFP – Scoring Tally Sheet" used by each member of the Committee, a form of which is submitted as Exhibit "F" hereto.

**Phase II – Ability to Provide Required Services (25 Points)**

60.    In this phase, Evaluation Committee members evaluated each responsive proposer's business organization, financial fitness, and past experience with street furniture in urban environments. Pursuant to the RFP, each proposal receiving a score of 15 or better[11] was permitted to advance to the next phase of evaluation. The RFP further provided that in the event

---

[9] Each proposal consists of a voluminous, multi-volume package that addresses each of the subjects specified in the RFP discussed earlier in this affidavit. Because of their bulk, copies of such proposals are not appended but shall be made available to the Court on request, for an *in camera* review in light of confidentiality concerns raised by some of the proposers.

[10] The above chart shows the maximum number of points available for award by each of the seven Committee members. The scores awarded to each proposal represent the sum of the points awarded by each Committee member out of a potential total of 1015 points.

[11] The RFP originally set a higher threshold to meet for a proposer to move to the next phase. After receiving a letter from Van Wagner that protested the strict requirement as being unfair to smaller companies DOT issued an addendum which eased the threshold thus ensuring maximum competition.

that the total number of proposals achieving a score of 15 was less than three, the next highest

proposals would be added in rank order to achieve a minimum pool of three proposals advancing

to the next phase. Categories A and B below comprise Phase II review.

Category A:  Business Organization & Financial Fitness (13 points)

A1.    Adequate Access to Capital and Operating Funds by Franchisee
       (and Subcontractors, if applicable) (**8**)

A2.    Ability of Franchisee to Maintain Books & Records (and Subcontractors,
       if applicable) (**2**)

A3.    Staff Resumes & Corporate Organization of Franchisee (and
       Subcontractors, if applicable) (**3**)

Category B:  Past Performance & Experience with Street Furniture in Urban
Environments (12 points)

B1.    Bus Stop Shelters (design, installation, operation, and maintenance) (**3**)

B2.    Automatic Public Toilets (design, installation, operation, and
       maintenance) (**2**)

B3.    Newsstands (design, installation, operation, and maintenance) (**3**)

B4.    Advertising Record (The proposer's experience in the sale and
       maintenance of outdoor advertisements in an urban environment)
       (**4**)

All five proposals received a Phase II score of 15 or better entitling them to proceed to Phase III.

**Phase III – Technical Merit (60 Points) (Plus four Preference Points)**

61.    In this Phase, the Evaluation Committee examined and evaluated the

technical proposals of each of the proposers selected in accordance with Phase II of the RFP's

Evaluation Procedures.   The factors considered by the Evaluation Committee in Phase III

included, on a non-exclusive basis: the proposer's plans to fulfill and, if applicable, exceed the

terms and conditions of the Franchise as described in Section II of the RFP; any commitments to

improve design, technology and/or services during the term of the Franchise Agreement; the

proposer's plans pertaining to design, manufacture, installation, maintenance and operation of each of the types of Franchise Structures, including the proposer's plan for the replacement of existing Newsstands; the proposer's plans for administering the Franchise, including the proposer's computerized inventory and information sharing system; and the proposer's plans for marketing the Franchise Structures and the advertising thereon.

62.    Categories C, D, and E below comprise Phase III review.  <u>Category C – Marketing Plan</u> allocated **5** points, as follows:

C1.    Proposed Plan (The proposer's plan for marketing the franchise structures and the advertising on the structures) **(3)**

C2.    Plan Customized to Meet Neighborhood Needs (The proposer's consideration of borough and neighborhood needs and the consideration of both local and national advertisers) **(2)**

63.    Phase III, <u>Category D – Design Plan</u>, allocated a total of **30** points to six sub-elements (D1-D6) that were assigned values of from 3 to 6 points and covered aspects of the Street Furniture design scheme generally (D1-**6** points, D2 -**3** points) and the designs of each of the items of Street Furniture:  Bus Stop Shelter ("BSS") (**6** points), Newsstand ("NS") (**6** points), Automatic Public Toilet ("APT") (**6** points ) and Public Service Structures ("PSS") (**3** points**)**.

64.    Phase III, <u>Category E – Maintenance and Administrative Plan</u>, allocated a total of 25 points to nine (9) sub-elements (E1-E9) that were assigned values of from 2 to 4 points and covered plans for the manufacture, installation maintenance and operation of BSSs, APTs and NSs (E1-E3, **3 points each**), Administrative Plan (E4, **4** points), proposed build-out schedule (E5, 3 points), ability to maintain the property of the City (E6, 3 points), proposed computer system (E7, **2** points), commitments to improve design (E8, 2 points) and plans for PSS manufacture (E9, **2** points).

65.    In addition, under Phase III, a total of 4 Preference Points were to be awarded to those meeting certain additional criteria pertaining to domestic manufacture and assembly of Street Furniture:  two preference points were to be awarded for proposals under which 80% or more of the money for labor and materials in manufacturing and assembling the Franchise Structures will be spent in the United States.  Two preference points were to be awarded for proposals under which 50% or more of the money for labor and materials in manufacturing and assembling the Franchise Structures will be spent within the City of New York.[12]

**Phase IV – Compensation Plan (55 Points) (Plus 1 Preference Point)**

66.    The Compensation Plan was evaluated on the basis of the adequacy of the proposed compensation to be paid to the City, considering the "guaranteed minimum annual compensation ("GMAC") and "increase or reduction for PSSs" proposed.  Whereas the rating system for Phases II and III tracks the elements detailed in the RFP, the RFP did not provide a similar method for rating the compensation proposals.  In rating the compensation proposals, the Evaluation Committee awarded the highest number of points to the proposer offering the highest GMAC.  The point rankings of the remaining proposals were based, in descending order, upon the percentage that their GMACs bore to the highest GMAC offered.

---

[12] As contemplated by the RFP, the Evaluation Committee was assisted in its review of proposals by various Technical Advisors.  A Design Advisory Committee, as outlined in the RFP, was formed as well as a Compensation Advisory Committee. The Design Advisory Committee was made up of four architects and one landscape architect from outside city service, an industrial designer representing the Business Improvement Districts and representatives from the Art Commission, Landmarks Preservation Commission and Municipal Arts Society, all who have an expertise in urban design issues. The Compensation Advisory Committee consisted of five individuals drawn from the Economic Development Corporation, the NYC Marketing Development Corp. and DOT's auditing staff.

67.    The RFP required the GMAC proposal to be all in cash or in a combination of approximately 80% cash and 20% an "alternative form of compensation" ("AFC") described in the RFP, consistent with the Authorizing Resolution which provided that the compensation be "a percentage of any gross revenues... or a guaranteed minimum annual amount."[13]    *See* Authorizing Resolution (Exhibit "B") (Eleventh "Resolved" Clause). Regardless of the amount of AFC offered, the compensation proposals, all of which consisted of a combination of cash and AFC, were evaluated in a manner that limited the AFC to no more than 20% of the total of the GMAC.

68.    The evaluation criteria include a preference point for proposals that provide a greater compensation to the City in the initial period of the agreement (provided that the total proposed compensation over the term of the franchise is determined to be in the best financial interest of the City).

69.    In furtherance of the evaluation process, the RFP at Section (IV)(L) on page 29 states that DOT may require proposers to submit supplementary or explanatory information and also may require proposers to attend interviews, to give oral or visual presentations in support of their proposals or to exhibit or otherwise demonstrate the information contained therein.

70.    Pursuant to the RFP, DOT did, in fact, schedule interviews and request supplemental information from each of the proposers.  DOT held four interview sessions with each proposer at which the proposers were given an opportunity to participate in a Q&A.  Two interview sessions were held with **Viacom** on February 7, 2005 and two on February 8, 2005. Two interview sessions were held with **Decaux** on February 9, 2005 and two on February 10,

---

[13] The term "amount" can refer to either cash or in-kind value, or both.

2005. Two interview sessions were held with **Cemusa** on February 28, 2005 and two on March 1, 2005. Two interview sessions were held with **Clear Channel** on March 2, 2005 and two on March 3, 2005. Finally, two interview sessions were held with **Van Wagner** on March 8, 2005 and two on March 9, 2005.

71.    Following those interview sessions, by letters dated March 22, 2005, DOT requested supplemental information from each proposer to be submitted by April 11, 2005. Copies of the March 22, 2005 letters sent to Cemusa, Clear Channel, and Decaux are submitted as Exhibit "G" hereto. By a document e-mailed to each proposer on April 4, 2005 (copy submitted as Exhibit "H"), DOT responded to follow-up questions concerning the requests for additional information contained in the March 22, 2005 letters and sent each proposer a table relating to their compensation proposal to be filled out by each of them and returned on or before April 11, 2005. The April 4, 2005 document sent to proposers told them that this request for financial information "is not a request for a best and final offer. However, should you wish to make adjustments to your compensation proposal that improve your offer to the City you may do so." On or about April 11, 2005, each of the proposers responded to DOT's requests for supplemental information.[14]

**The April 18, 2005 Letter**

72.    In its initial September 14, 2004 proposal, submitted in relevant part as Exhibit "I", Cemusa indicated that it would provide at no cost to the City other than for creating posters, free advertising in its markets throughout Latin America. Cemusa's September 14, 2004 proposal provided in relevant part as follows:

**Provision of advertisement in our Latin American Markets**

---

[14] In response to this request, Van Wagner, Clear Channel, Cemusa, and Viacom all improved some aspect of the compensation offered in their proposal.

Cemusa has a large market share in outdoor advertising in Mexico, El Salvador, Costa Rica, Dominican Republic, Brazil, Guatemala and Panama. Cemusa is proposing to help promote New York as the U.S. second home for Latin Media in these countries. We would work with our Latin American sister companies to create effective networks to reach the target audience for New York City.

This program would be at no cost to the Department or the city other than the creation of the creative work and the printing of the posters, which are the same size as the ones we use in the U.S.

73.    Ironically, Clear Channel, in its September 14, 2004 proposal, a copy of which is submitted in relevant part as Exhibit "J", took a similar approach, stating:

Clear Channel Adshel will provide at no cost to the City through our sister companies, ample multi-media advertising and self-promotion opportunities, both domestically and internationally, in outdoor, radio, entertainment, television and the Internet, in specified markets to be negotiated with designated City marketing officials prior to the execution of the Street Furniture Franchise Agreement.

74.    Although Clear Channel had not placed any value on its in-kind offer in its proposal, in meetings with the Evaluation Committee, it stated a willingness to offer $500 million of such advertising to the City.

75.    When Cemusa responded on April 11, 2005, the table it provided (copy submitted as Exhibit "K") indicated that additional non-cash compensation to the City from "Latin American campaigns will depend on NYC's level of advertising." This response indicated to DOT that Cemusa was seeking, but had not been provided with, guidance as to the extent of the City's interest in Cemusa's offer of free advertising in Latin American markets as part of its compensation proposal. DOT also realized that in its March 22, 2005 follow-up letters, it had asked other proposers to provide details regarding their non-cash offers (as in the March 22, 2005 letter to Clear Channel), but inadvertently had not done so in Cemusa's case.

76.     By e-mail dated April 18, 2005 (Exhibit "L" hereto), as allowed under Section 4(L) of the RFP ("The Department may require Proposers to submit supplementary or explanatory information regarding their proposals"), DOT requested additional information from Cemusa regarding the non-cash component of its compensation offer. By letter dated April 18, 2005 (the "April 18, 2005 Letter", a copy of which is submitted as Exhibit "M" hereto), Cemusa responded with the details of a $395,900,000 in-kind compensation offer in addition to its cash offer of $831,550,000 over the term of the franchise plus $2,500,000 in other amenities.

77.     Over the ensuing months, the Evaluation Committee painstakingly evaluated the proposals on the basis of the evaluation criteria set forth in the RFP and the Scoring Tally Sheets. Upon completion of their evaluation of each proposal with supplemental information, the Evaluation Committee members proceeded to score each proposal, assigning values to each phase, category and sub-category. Cemusa received the highest score, followed, in descending order by Decaux, Van Wagner, Clear Channel and Viacom.

78.     The compensation proposals account for almost 40% of the total points available. For the Court's information, the Phase IV rankings were based upon GMACs offered by each proposer as follows: Cemusa - $1,039,438,000; Van Wagner - $778,898,000; Decaux – $680,611,000; Clear Channel - $588,804,000; and Viacom - $466,059,000.

79.     Clear Channel's assertion that its initial offer was superior to Cemusa's, and that therefore it should have been invited to submit a BAFO, is dependent upon including $500 million of in-kind compensation in its proposal. However, pursuant to the RFP, in-kind compensation could only be 20% of the total GMAC, so only $117,750,000 of Petitioner's in-

kind offer could actually be evaluated.   Thus, Clear Channel's original bid for evaluation purposes was only $588,804,000 compared to Cemusa's $1,039,438,000.

80.    The following chart summarizes the ratings given to each proposal:

|  | Cemusa | Decaux[15] | Van Wagner | Clear Channel | Viacom |
|---|---|---|---|---|---|
| Phase II | 154.25 | 168 | 129 | 162.75 | 156.5 |
| Phase III | 274.50 | 372.5 | 363.50 | 292 | 250 |
| Phase IV | 384 | 251 | 288 | 222 | 180 |
| Preference Points | 35 | 35 | 14 | 35 | 28 |
| Total | 847.75 | 826.5 | 794.50 | 711.75 | 614.50 |
| Rank | 1 | 2 | 3 | 4 | 5 |

81.    Because there was a "natural break" in scores between the three highest-rated proposals and the next two proposals, such that the bottom two proposers were not in a competitive range with the others, the Evaluation Committee determined only to seek best and final offers from the three highest rated proposers.  Cemusa, Decaux and Van Wagner were informed by letters dated June 6, 2005 that they were being invited to submit a Best and Final Offer ("BAFO") to DOT.  Copies of those letters are collectively designated Exhibit "N" hereto. Letters dated the same date informed Clear Channel and Viacom that the Committee had decided not to request BAFOs from them.  Copies of those letters are collectively designated Exhibit "O" hereto.

**BAFO, EVALUATION AND SELECTION**

82.    In the June 6, 2005 letters, the Committee provided each BAFO invitee with "...specific feedback to your proposal that should be accounted for in your final offer."  For

---

[15] Subsequently, after receiving Decaux's BAFO, an error was discovered in the earlier pre-BAFO scoring.  Decaux mistakenly was credited with having offered the City additional AFC because it was not then apparent to the evaluators that any in-kind media provided by Decaux would have with it a corresponding reduction in Decaux's offer of guaranteed cash.  Once this error was recognized by the Evaluation Committee, Decaux's pre-BAFO Phase IV score was readjusted to 223 and its total was readjusted to 798.5.  The readjustment did not change Decaux's ranking.

Decaux and Van Wagner, the "feedback" concerned their compensation proposals.  For Cemusa, the "feedback" concerned certain aspects of its technical proposal.  The letters also informed the recipients that their BAFO material had to be submitted by June 27, 2005.  Before that date, DOT responded to various questions raised by the BAFO participants.  Copies of those responses are collectively designated Exhibit "P" hereto.

83.    BAFO material was submitted by the participants on or before the specified date.  The Best and Final Offers submitted by the participants reflected attention paid, particularly by Cemusa and Decaux, to the feedback offered by the Evaluation Committee. Cemusa's BAFO is annexed hereto as Exhibit "Q".  The Cemusa BAFO indicated a guaranteed cash proposal of $923,945,000 and alternatives to cash in the sum of $398,400,000, plus "contingent compensation" of $91,532,000 based upon the City's willingness to accept 200 additional "scrollers", or multi-face scrolling advertising panels as part of Cemusa's proposal. After DOT inquired of Cemusa by e-mail on July 7, 2005 (Exhibit "R" hereto), whether these additional scroller revenues could be considered guaranteed, rather than contingent, if the City were willing to accept such panels, by letter dated July 7, 2005 (copy submitted as Exhibit "S"), Cemusa indicated that 95% of such additional compensation, starting with the sixth year of the contract, could be considered as guaranteed rather than conditional.  This additional scroller revenue brought Cemusa's guaranteed cash proposal to $998,954,150.  Together with non-cash compensation calculated by the Selection Committee for bid purposes at $249,738,538, the Cemusa compensation proposal totaled $1,248,692,688 for bid purposes.[16]

---

[16] The actual value of Cemusa's proposal was $1,397,354,150 ($998,954,150 guaranteed cash plus $398,400,000 AFC). However for evaluation purposes, the AFC offered by Cemusa was reduced to approximately $249,738,538 in accordance with the 80% cash/20% non-cash evaluation method described earlier that had been established pursuant to the RFP.  Accordingly,