Decaux and Van Wagner, the "feedback" concerned their compensation proposals. For Cemusa, the "feedback" concerned certain aspects of its technical proposal. The letters also informed the recipients that their BAFO material had to be submitted by June 27, 2005. Before that date, DOT responded to various questions raised by the BAFO participants. Copies of those responses are collectively designated Exhibit "P" hereto.

        83.    BAFO material was submitted by the participants on or before the specified date. The Best and Final Offers submitted by the participants reflected attention paid, particularly by Cemusa and Decaux, to the feedback offered by the Evaluation Committee. Cemusa's BAFO is annexed hereto as Exhibit "Q". The Cemusa BAFO indicated a guaranteed cash proposal of $923,945,000 and alternatives to cash in the sum of $398,400,000, plus "contingent compensation" of $91,532,000 based upon the City's willingness to accept 200 additional "scrollers", or multi-face scrolling advertising panels as part of Cemusa's proposal. After DOT inquired of Cemusa by e-mail on July 7, 2005 (Exhibit "R" hereto), whether these additional scroller revenues could be considered guaranteed, rather than contingent, if the City were willing to accept such panels, by letter dated July 7, 2005 (copy submitted as Exhibit "S"), Cemusa indicated that 95% of such additional compensation, starting with the sixth year of the contract, could be considered as guaranteed rather than conditional. This additional scroller revenue brought Cemusa's guaranteed cash proposal to $998,954,150. Together with non-cash compensation calculated by the Selection Committee for bid purposes at $249,738,538, the Cemusa compensation proposal totaled $1,248,692,688 for bid purposes.[16]

---

[16] The actual value of Cemusa's proposal was $1,397,354,150 ($998,954,150 guaranteed cash plus $398,400,000 AFC). However for evaluation purposes, the AFC offered by Cemusa was reduced to approximately $249,738,538 in accordance with the 80% cash/20% non-cash evaluation method described earlier that had been established pursuant to the RFP. Accordingly,

84.    The evaluation procedures and point allocations outlined in the RFP and used for the initial proposals remained the same for the BAFO.  Upon completion of the evaluation process, Cemusa once again received the highest score, followed by Decaux and Van Wagner.  The following chart shows the final scores achieved by each participant on their BAFOs:[17]

| Company | Phase II | BAFO Phase III | BAFO Phase IV | Preference points | BAFO Overall |
|---|---|---|---|---|---|
| Cemusa | 154.25 | 336.5 | 384 | 35 | 909.75 |
| NBCDecaux | 168 | 384 | 303.5 | 35 | 890.5 |
| Van Wagner | 129 | 379 | 259.5 | 28 | 795.5 |

85.    In the ultimate judgment of the Evaluation Committee, the compensation promised to the City in its proposal put Cemusa ahead of the other proposers.  Cemusa's winning phase IV score reflects a compensation proposal that included a total GMAC substantially higher in amount than the GMAC proposed by Decaux, the BAFO proposer with the next highest score. Cemusa proposed a total GMAC of nearly $1.25 billion, whereas Decaux proposed a total GMAC in the approximate amount of only $1 billion.  Thus, not only did the Cemusa have a proposed guaranteed cash component ($999 million) essentially equal to the $1 billion cash offer

---

Cemusa's compensation proposal was evaluated on the basis of a total GMAC of approximately $1.25 billion.

[17] As explained in the Request for Award submitted to the FCRC prior to the public hearing and vote (Exhibit "T" hereto), the Evaluation Committee had initially evaluated the guaranteed compensation to the City from scroller revenues at 95% of $91,532,000, overlooking the fact that the City would not be entitled to receive such moneys until the sixth year of the Franchise Agreement.  This error reduced the guaranteed cash component of Cemusa's proposal from $1,010,900,000 to $998,954,150 ($923,945,000 + $75,009,150).  This reduction in the value of the offer by Cemusa did not affect the Evaluation Committee's recommendation, although, as explained in the Request for Award, it did have a minimal and non-material (one point) effect on the recommended point allotment for both NBCDecaux and Van Wagner since each of their respective percentages of Cemusa's offer increased slightly.

of the second-rated proposer, Decaux, but in addition, the Cemusa proposal was also beneficial to the City by its devotion of substantial resources to promote the City worldwide as an attractive place to live, visit and transact business. In contrast, Decaux proposed to provide additional advertising resources by *deducting* their value from the guaranteed payments due the City.

86.    By letters dated September 21, 2005, DOT on the one hand, informed Cemusa that it had been selected to enter into negotiations with the City toward entering into the Street Furniture Franchise Agreement and on the other hand, informed both Decaux and Van Wagner that they had not been selected. A copy of the letter to Cemusa is annexed hereto and is designated Exhibit "U". Copies of the letters addressed to Decaux and Van Wagner are annexed hereto and are collectively designated Exhibit "V".

87.    On May 15, 2006, after a public hearing on May 11, 2006, the FCRC unanimously voted to grant Cemusa and DOT approval to execute the non-exclusive Franchise Agreement negotiated between the parties since the fall of 2005. Transcripts of the May 11, 2006 public hearing and the May 15, 2006 FCRC proceedings and vote are submitted herewith as Exhibits "W" and "X", respectively.

**The June 14, 2005 Unsolicited Clear Channel BAFO**

88.    As previously noted, by letter dated June 6, 2005 (Exhibit "O"), Clear Channel was advised that based upon the proposal it had submitted, the Selection Committee had determined not to proceed to the BAFO stage with Clear Channel. Thereafter by letter dated June 14, 2005 (Exhibit "Y" hereto), Clear Channel, professing surprise at not being asked to submit a BAFO and claiming a belief that all proposers would be entitled to submit a BAFO (fueled, it said, by the April 4, 2005 invitation to improve its offer), submitted an unsolicited

"enhanced financial offer".  That proposal called for $800,000,000 in guaranteed cash and $500,000,000 in AFC.

89.    The enhanced offer recites non-cash/in-kind compensation of "[o]ver $1.4 billion, of which $500 million are in Media Services through Clear Channel's Outdoor, Radio and Entertainment Divisions."  This is misleading.  The only salient number is the $500 million for media services, as the balance was for the cost of providing, installing, and maintaining the Street Furniture, something each proposer was obligated to do independent of the compensation proposal it made and which monetary value was not considered for evaluation purposes. Contrary to Clear Channel's assertion in its verified petition that this would have resulted in its compensation proposal being greater than Cemusa's, of the $500 million offered for media services, only $200,000,000 could have been counted in keeping with the 80%-20% ratio required by the RFP.  Thus, Cemusa's compensation proposal would still have been greater than Clear Channel's by approximately $250,000,000.

90.    By letter dated July 11, 2005 (Exhibit "Z" hereto), DOT responded to Clear Channel's June 14, 2005 letter.  DOT reiterated the determination of the Evaluation Committee not to seek a BAFO from Clear Channel and pointed out that there was no basis to be found in DOT's April 4, 2005 communication upon which Clear Channel could believe that it would be entitled to submit a BAFO unless invited to do so by DOT, as such purported belief is contrary to the express terms of the RFP.[18]  DOT also pointed out that Clear Channel's

---

[18] Section 4(M) of the RFP (Exhibit "C") provided as follows:

1.    The Department reserves the right to award a Franchise Contract on the basis of initial offers received, without negotiation.  Therefore, each initial offer should contain the Proposer's best terms from a programmatic and cost standpoint.

interpretation was also contrary to the express terms of the April 4, 2005 e-mail (Exhibit "H") which states that "this is not a request for a best and final offer."

**The May 11, 2006 Public Hearing**

91.    A well-attended public hearing of the FCRC was held in the Spector Hall public hearing room in Manhattan on May 11, 2006. Testimony was given by 14 persons and a number of City officials involved in the RFP process also spoke.

92.    **DOT Commissioner Iris Weinshall** observed that the Street Furniture Franchise marked the "fruition of a process that has been in the planning for the last 20 years." Exhibit "W", at 7. She observed that the amenities to be provided under the Franchise Agreement "at no cost to the City . . . [n]ot only will . . . provide necessary public services to all New Yorkers . . . [but also they] . . .

> will have a remarkable effect on the City streetscapes. The new coordinated designs will enliven our sidewalks, and with ongoing maintenance, add to the beauty of our streets. This is truly a program that will impact New Yorkers every day as they walk down the street, and it will be achieved through a private investment -- unquestionably, an excellent example of public-private partnership.

*Id.*

93.    Commissioner Weinshall observed that "[t]he City stands to gain nearly $1.4 billion in total compensation from this franchise, including approximately $1 billion in cash revenue and $400 million worth of advertising campaigns outside of New York City. The City

---

2.    The Department reserves the right to enter into negotiations with one or more Proposers and subsequently to request the submission of Best and Final Offers from those Proposers who, after the conclusion of such negotiations, are still under consideration for award. No Proposer shall have any rights against the Department arising from an invitation to enter into negotiations or to submit a Best and Final Offer.

will also benefit from $100 million in capital investments in our streetscape, ongoing maintenance of the street furniture worth approximately $200 million, and control of 22.5% of advertising space on the street furniture within the City over the next 20 years." Exhibit "W", at 8. Commissioner Weinshall also commended Cemusa's commitment to using local New York City companies to manufacture and install much of the coordinated street furniture. *Id.*, at 8-9. Noting as well the comprehensiveness of the RFP, the thoroughness of the competitive process, and the broad experience and expertise of the Evaluation Committee and its advisors, Commissioner Weinshall urged the FCRC to grant their approval of the Franchise Agreement. *Id.*, at 7-8.

94.    **Toulla Constantinou,** the Chief Executive Officer of Cemusa North America, also spoke about Cemusa's excitement "to be working hand in hand with the City of New York to bring a coordinated street furniture franchise to the City." Exhibit "W", at 9. She observed that "[t]he varied and vibrant streetscapes of the five boroughs are ideal settings for street furniture elements that blend seamlessly into the surroundings." *Id.* Ms. Constantinou expressed confidence that the Street Furniture Franchise agreed upon between Cemusa and the City "will add even more vitality to the streets and transit system of an already bustling world capital." *Id.* She also noted that Cemusa has pledged to fabricate more than half of the Street Furniture in New York City; that it was working with the non-profit New York Industrial Retention Network to identify manufacturing, engineering, design and construction companies within the five boroughs; and that Cemusa had moved its North American headquarters from Chicago to downtown Manhattan. *Id.*, at 10.

95.    **Laura Gallo,** Vice President of the New York Building Congress, a coalition of the design, construction and real estate industry, offered testimony expressing the

Building Congress's support of the Franchise Agreement. Exhibit "W", at 21-23. She commented with approval on DOT's intensive evaluation and negotiations, observed that FCRC approval would "promote economic development in New York City while improving the City's streetscapes and public services"; and noted that Cemusa's commitment to partner with local businesses "will create at least 100 jobs citywide and will stimulate local industry." *Id.*, at 22.

96.    **Rick Bell**, Executive Director of the American Institute of Architects ("AIA"), New York Chapter, supported the Franchise Agreement on behalf of the New York Chapter's over 4,100 architect and affiliate members. Exhibit "W", at 42-44. Mr. Bell expressed the satisfaction that "at long last" the Franchise Agreement will bring "well-designed and copious streetscape amenities to the sidewalks of New York." *Id.*, at 42. He praised the "elegant and functional street furniture by Grimshaw Architects" as being "of the highest design quality" and commended the designs as "contemporary but not themed to a specifically referential aesthetic, allowing these long-overdue urban necessities to remain fresh and contextually relevant for many years to come." *Id.*, at 43.

97.    Mr. Bell lauded the designs for bringing "a coordinated approach to what has been a visually blaring cacophony of randomly configured newsstands and bus shelters in the diverse neighborhoods of our five boroughs." *Id.* Mr. Bell also paid tribute to the functionality of the designs as follows:

> Functionality is as important as aesthetics, and the design prototypes show an equivalent level of concern and sophisticated resolution for such basic requirements as storage in the newsstands, seating in the bus shelters, and cleanliness in the public toilets. Lighting, material use and solidity in these street furniture prototypes speak to a grounded concern with the special needs of New York City's grit and grime, while putting an optimistic and progressive face on streets that will become less mean by their presence

*Id.*, at 43-44.

98.     **Donna Keren**, Vice President for Policy and Research at NYC & Company, a not-for–profit corporation dedicated to building New York City's economy through tourism and convention development, and major events and marketing the City on a worldwide basis, also spoke in favor of the Franchise Agreement. Exhibit "W", at 44-47. She observed that "the shelters, newsstands and facilities provided by this contract will improve the street scene for visitors and residents alike by bringing world class design to our street furniture." *Id.*, at 45. Ms. Keren also noted that the long-awaited access to public toilets will improve the environment for tourists, noting that "[m]any international travelers are accustomed to these kinds of facilities in the cities they visit around the globe and will welcome New York City's entry into this enlightened approach to serving visitors." *Id.*, at 46. Finally, she observed that in the world of tourism marketing the maxim "out of sight, out of mind . . . is painfully true." *Id.* She hailed Cemusa's agreement to promote New York City in other cities served by Cemusa in its other client cities as one that "will keep New York City where we need to be, right in front of the potential visitor, encouraging them to visit." *Id.*, at 47.

99.     **Marysol Rodriguez**, Vice President of Government Affairs for the Partnership for New York City, an organization of business leaders representing the City's largest private sector employers, whose primary mission is to promote economic growth in the five boroughs, offered that the organization "strongly" supported approval of the Street Furniture Franchise which it believes "will contribute in important ways to the economic development in the City." Exhibit "W", at 53. In addition to testifying, as did others before her, as to the benefits for the City's business environment, improved streetscapes and benefits to the tourism industry, Ms. Rodriguez stressed the benefits to the public transit system by increasing the comfort and

safety of riders, making bus route and schedule information more accessible, and by providing better illumination at night. *Id.*, at 53-54. She predicted that these benefits will increase bus ridership which will reduce congestion on streets and sidewalks. *Id.*, at 54.

100. **Matthew Bauer**, the Chair of the New York City Business Improvement District ("BID") Manager's Association, which represents the directors of all 53 of the City's BID'S, recalled that in 2003 the Association had testified before the City Council in support of the street furniture initiative ultimately leading to the present Franchise Agreement and stated that the BIDs are "very pleased . the program is coming to fruition.". Exhibit "W", at 54. In urging approval of the Franchise Agreement, he observed that the Franchise Structures will greatly enhance the pedestrian's experience while raising necessary revenues and praised the design quality and the design process for permitting the BID and other civic organizations to become involved. *Id.*, at 55.

101. **Adam Friedman**, Executive Director of the New York Industrial Retention Network, a citywide economic development organization that seeks to strengthen the manufacturing sector, to save and create blue-collar jobs in New York City urged approval of the Franchise Agreement based on Cemusa's commitment to manufacture in New York City at least 50 percent of the street furniture, a commitment he viewed as "tremendously important." Exhibit "W", at 56.

102. **Rich Loconte**, Deputy Director of the Association for a Better New York "ABNY"), a 350-member business group, offered testimony that the Street Furniture Franchise "will re-define and revitalize New York City from the silent function that it will bring to the City streets, to public service needs that it will meet, to the jobs that it will provide to the City's economy." Exhibit "W", at 58-59. After noting the importance of "a newly created guaranteed

stream of income over a 20-year period to bolster municipal coffers", he also stressed the "improved quality of life that" much needed and long awaited public lavatories will bring. *Id.*, at 59. Finally, he noted that Cemusa will provide direct economic benefits to the City by hiring more than 100 employees itself and creating an additional 100 new jobs in the City through its subcontracts with local manufacturers, designers, suppliers and construction companies. *Id.*

103.    **Bomi Kim**, Director of Brooklyn Connects, a program of the Brooklyn Chamber of Commerce designed to help Brooklyn's minority and woman-owned businesses find and secure business opportunities with both private and [of] public sectors, also endorsed ratification of the Franchise Agreement. Exhibit "W", at 60-62. In addition to noting the $1 billion in income to the City and the approximately 220 additional local jobs the Franchise Agreement will create, Ms. Kim related that Cemusa was the only company to reach out during the early stages of the RFP to engage the City's local manufacturers as partners in the proposal process and that these "efforts showed Cemusa understands the value of public/private partnerships and the importance of inclusion to ensure healthy long-term economic development." *Id.*, at 60-61.

**Decaux's Opposition**

104.    A number of individuals, most prominently disappointed proposers who had competed unsuccessfully for the Franchise Agreement, urged FCRC members to cast their vote against the proposed Franchise Agreement. **Edward Wallace**, an attorney representing Decaux, testified at the hearing (Exhibit "W", at 23-35) and presented two written statements (they are submitted together as Exhibit "AA" hereto) elaborating upon his testimony.[19] Decaux's position before the FCRC was that Decaux's cash proposal ($1 billion) was higher than

---

[19] Mr. Wallace also submitted a compilation of portions of the RFP, which is available to the Court on request.

Cemusa's (said by Mr. Wallace to be $924 million) and that the in-kind AFC portion of Cemusa's offer was essentially valueless unsold advertising space that, he claimed, Decaux routinely gives away to cities . *Id.*, at 25-28. He was also critical of the RFP for not containing a provision making AFC convertible to cash at the City's option. *Id.*, at 30-31.

105. In addition, Mr. Wallace argued that the RFP was ambiguous because it indicated that AFC was to have an "effective cash value", which, he claimed, Decaux construed as requiring it be convertible to cash and precluding an offer of "remnant" space as, Decaux argued, was the basis of Cemusa's in-kind offer. *Id.*, at 28. Finally, Decaux argued in its written statement (Exhibit "AA") that the Cemusa proposal was defective and should not have been considered because it designated its AFC proposal as being "above GMAC", whereas the RFP contemplated AFC to be part of GMAC.

106. On behalf of Decaux, Mr. Wallace asked the FCRC to postpone the vote while the City hires an independent evaluator to review Cemusa's AFC offer or, alternatively, that all proposers be given a new opportunity to submit BAFOs containing three different categories of compensation: guaranteed cash; advertising space convertible to cash; and advertising space not convertible to cash. Exhibit "W", at 29-30.

## Clear Channel's Opposition

107. **Anthony Mahajan,** a lawyer for Clear Channel, urged the FCRC to direct that the RFP process begin anew. Exhibit "W", at 48-49. He adopted by reference all of Decaux's statements "as if fully set forth herein." Id., at 48. He criticized DOT for rejecting what he said was a better offer from Clear Channel, which he characterized as a better capitalized and more experienced entity than Cemusa. *Id.*, at 50. Mr. Mahajan objected to DOT's decision not to seek a BAFO from Clear Channel. *Id.*, at 49-50. He further argued that

the Evaluation Committee's consideration of Cemusa's in-kind contribution and the scroller revenue component of its offer were contrary to Authorizing Resolution No. 1004 and the RFP. *Id.*, at 50.

108.     Finally, citing various factors, **Robert Bookman,** an attorney for a trade group representing newsstand operators within the City, argued for a delay in the process. Exhibit "W", at 62-66. He claimed that the City would be better served by restarting the process; having each proposer tender mock-ups of their proposed structures; and having "the public" decide which to choose. *Id.*, at 63-64. This approach, contended Mr. Bookman, will in some way generate higher cash offers to the City than had the RFP process. *Id.*, at 63. Mr. Bookman testified that Cemusa's Newsstand design is "quite beautiful"; that Cemusa had very courteously listened to the operators' concerns regarding Newsstand design; and that DOT had kept the operators appropriately informed at all of the franchise proceedings. *Id.*, at 62-64. Nonetheless, he expressed opposition to the Franchise Agreement because Cemusa had not as yet committed to designing the Newsstands as the operators have demanded – most notably with respect to display space. *Id.*, at 64-65. Finally, Mr. Bookman cited to his appeal of an adverse ruling against his clients in their litigation challenging Local Law 64 of 2004 [*see Uhlfelder v. Weinshall*, 10 Misc. 3d 151, 810 N.Y.S.2d 275 (Sup. Ct. N.Y. Co.2005)], a law which, among other things, establishes siting requirements for newsstands, and provides for their relocation if they impede pedestrian traffic. *Id.*, at 65-66. He requested that the Franchise Agreement be delayed until all appellate proceedings are resolved, notwithstanding that the Court hearing the

matter has ruled that the Newsstand improvements contemplated by Authorizing Resolution No. 1004 and Local Law 64 should not be enjoined. *Id.*, at 66.[20]

### Clear Channel's May 12, 2006 Letter

109.    Another lawyer from Mr. Mahajan's firm, **Randy Mastro**, followed up with a May 12, 2006 letter to the FCRC and others within City government asserting that DOT was *required* by the terms of the RFP to consider the unsolicited "improved offer" submitted by Clear Channel on June 14, 2005. A copy of the May 12th letter is submitted as Exhibit "BB" hereto. Mr. Mastro contended that it was not rational for DOT to request BAFOs from fewer than all proposers. Mr. Mastro also argued that Cemusa was permitted to "improve" its offer via the April 18, 2005 Letter after submitting an April 11, 2005 tabular breakdown of compensation proposal which, he claimed, did not show in-kind compensation, and that Clear Channel therefore should have been permitted to "improve" its offer at any time, including after rejection.

### Decaux's May 15, 2006 Memorandum

110.    Prior to the May 15, 2006 vote, Mr. Wallace sent a Memorandum, dated May 15, 2006, to the Members of the FCRC, once again asking for postponement of the vote and this time requesting that the FCRC conduct a further review of the award process and the Franchise Agreement. A copy of the May 15, 2006 Memorandum is submitted as Exhibit "CC" hereto. The May 15, 2006 Memorandum complained that the April 18, 2005 Letter detailing $395,900,000 in AFC value was a late proposal that came after the April 11, 2005 deadline for submission of financial information and that DOT's request to Cemusa to provide this

---

[20] **Amy Berlin**, a lawyer for Viacom (CBS Outdoor), also testified. Although she expressed agreement with concerns raised by others about treatment of in-kind compensation in the RFP process, she did not object to the Franchise Agreement and made it clear that Viacom's primary concern was an orderly close-out of its expired franchise agreement. Exhibit "W", at 68-69.

information should have been made to all proposers as Decaux, he claimed, would have augmented its proposal as well had it received such a request.

111.    The May 15, 2006 Memorandum also noted that the RFP (*see* Section III(A)(5), at p. 20) contemplated a compensation proposal which could include a "guaranteed minimum annual amount" (GMAC) of which an "alternative form of compensation" could, at the proposer's option, be a portion. Mr. Wallace observed that when, on April 4, 2005, DOT sought additional information from each proposer as to its compensation proposal, the financial table that DOT asked them to complete made reference to GMAC plus "Additional Compensation" rather than referring to an "alternative form of compensation." This, according to Decaux, somehow created an ambiguity which had confused Decaux as to the in-kind proposal being sought.

**The FCRC Focuses on Objections to the Proposed Franchise Agreement**

112.    Upon questioning by FCRC members, each of the objections raised before the FCRC, as well as any concerns of the FCRC's members, were fully addressed by officials of DOT, the Office of the Corporation Counsel and the City's Marketing Development Corporation ("MDC") prior to the FCRC's May 15th vote. At the May 11th public hearing, **Manhattan Borough President Scott Stringer** sought assurances that the nearly $400 million in AFC to be provided by Cemusa will represent a real value to the City and questioned whether there is a "mechanism in place to ensure that we're getting the true value for the contract?" Exhibit "W", at 14.

113.    In response, Ms. Constantinou, on behalf of Cemusa, assured the FCRC of Cemusa's intent "to treat New York City the same way as we treat every other one of our advertising customers" with respect to the City's advertising campaigns. *Id.*, at 15.

114.    **Deputy Commissioner Altschuler** then advised the FCRC of the fact that the Franchise Agreement "ensures that the City will always get that full cash value of the advertising" by requiring a "third-party monitor to review the value each year as the City gives Cemusa its marketing plan, and that third-party evaluator will tell us whether or not we are getting the full $15 million worth [as increased annually by 2.5% to account for inflation]."[21] *Id.*, at 15-16; *see* Franchise Agreement §9.4.1.

115.    **Bruce Regal**, a Senior Counsel in the Office of the Corporation Counsel and a principal negotiator of the Franchise Agreement, observed that Cemusa's obligation to provide the in-kind compensation to the City is unconditional, and "if for some reason, completely unexpected, that Cemusa was unable to deliver that commitment using their own resources, they would have to obtain resources from other sources. . . ." *Id.*, at 17.

116.    Further, in response to the claim that the RFP process treated alternative compensation ambiguously so that proposers might have been confused about offering it, **Kerry Gould**, a senior policy advisor with DOT who served on the Evaluation Committee, observed that "we did, in a technical clarification during the RFP process, let everybody know that the alternative compensation would be viewed as a dollar value.[22]  Cemusa gave us a dollar value. They broke that down by year, what they thought that could get us. They outlined that you can get two four-week campaigns in each of our markets around the world, and we believe each year

---

[21] As evidenced by Schedule C to the Franchise Agreement, the Compensation Schedule pursuant to which Cemusa is to furnish the City with cash and AFC over the Agreement's 20-year term, the actual baseline figure for AFC is $15.5 million adjusted annually for inflation at a 2.5% rate throughout the term.  The initial year indicates $18 million, reflecting $2.5 million in additional amenities promised by Cemusa to the City.  A copy of Schedule C is included as Exhibit "DD" hereto.

[22] *See* Exhibit "E", June 11, 2004 Response to Technical Inquiries II, in which bidders were told that "alternate compensation [is to be treated] equally as cash in the grading system."

it's valued at this much." Exhibit "W", at 18. Moreover, Ms. Gould noted, each of the proposers was advised in the technical clarification and during negotiations that they will be subject to audit with respect to the value of AFC they provided. *Id.*, at 18-19. Accordingly, she stated: "We feel very comfortable that we will get our $15 million growing at two-and-a-half percent inflation rate each year for 20 years of the contract, that we will get that cash value at market rate in advertising." *Id.*, at 19.

117.    Also in regard to the supposed confusion generated by the request for alternative compensation, in response to questioning by the Office of the Mayor's FCRC representative, Deputy Commissioner Altschuler noted that other companies besides Cemusa had put in alternative compensation proposals, including, most notably, Decaux. He advised the FCRC that whereas Cemusa had offered the City $999 million cash over twenty years and Decaux had offered either $960 million or $1 billion cash depending on the type of APT to be furnished under an alternate proposal, the principal difference between their offers was that whereas Cemusa has offered the AFC *in addition* to its guaranteed cash offer, Decaux had structured its proposal so that the value of any in-kind media services requested by the City would be *deducted* from the guaranteed cash offer. Exhibit "W", at 35-36. Finally, as to Decaux's claim that the AFC component of the RFP was somehow ambiguous, Deputy Commissioner Altschuler observed that each of the proposers was advised in the RFP that they would have opportunities to ask DOT questions about any aspect of the solicitation they found unclear, and many did so. *Id.*, at 37.

118.    Deputy Commissioner Altschuler also stressed that a significant focus of the Selection Committee during contract negotiations was that Cemusa's offer of a $15.5 million annual advertising campaign, adjusted for inflation, "was the item that needed to be protected. . .

. The intent was, and as the contract provides, that there would be a way to ensure that we get that full value each year." *Id.*, at 20-21. In that regard, responding to Mr. Wallace's request for an independent evaluation of the value of Cemusa's in-kind proposal, he noted that the Franchise Agreement does exactly that on an annual basis to protect the City's right to receive fair market value from Cemusa's in-kind compensation. *Id.*, at 37; *see* Franchise Agreement § 9.4.1.

119.    Deputy Commissioner Altschuler further explained to the FCRC how the fact that Cemusa's offer of AFC exceeded 20% of GMAC was treated by the Evaluation Committee. Although Cemusa had offered AFC of nearly $400 million, for bid purposes the offer was evaluated on approximately $248 million. The proposed Franchise Agreement, however, obligates Cemusa to provide the full $395.9 million in AFC offered in its BAFO. Exhibit "W", at 38-39; *See also* Schedule C to the Franchise Agreement (Exhibit "DD" hereto).

120.    Ms. Gould and Deputy Commissioner Altschuler also noted that DOT's having agreed to accept the additional scrollers proposed by Cemusa made the Cemusa guaranteed cash offer worth $999 million over the franchise term not $924 million as Decaux had represented. Exhibit "X", at 41-42.

121.    Finally, responding to the Newsstand Operators, Ms. Gould noted that DOT would continue to work with the operators to assure that – in conformance with local law – new, ADA compliant Newsstands would be provided by Cemusa with a minimum of disruption to their current businesses. Exhibit "W", at 67.

**May 15, 2006 FCRC Proceedings and Vote**

122.    Prior to the May 15th vote, the Comptroller's FCRC representative, **Valerie Budzik, Esq.,** making reference to the issues raised in Decaux's memorandum of that date, asked DOT to "describe the process that it used to score the compensation aspects of the

proposal" and to describe the "additional clarifications that you asked for on some of the bids…" Exhibit "X", at 5.

123.    Kerry Gould of the Evaluation Committee provided a detailed response. Exhibit "X", at 5-10. She observed that Cemusa initially submitted an alternative compensation proposal that was qualitative in nature, without a dollar amount attached, in September 2004. *Id.*, at 6. Thereafter, it was determined that each of the five proposers had sufficient resources and experience to be considered for the franchise, so that in February and March 2005, the Evaluation Committee conducted two-day interviews of each proposer. *Id.*, at 7. Ms. Gould explained that the interviews were divided into four sections: one on the technical proposal, one on the compensation proposal, one section on design, "and then basically a general follow-up for them to ask questions of us and us to answer questions for them. All of the proposers went through that process." *Id.*

124.    Ms. Gould went on to explain to the FCRC that on March 23, 2005, each proposer was sent a letter specific to its proposal. Exhibit "X", at 7. Some proposers were asked for clarification on their in-kind AFC offer if the Evaluation Committee didn't feel it had enough detail. *Id.* However, as to Cemusa, DOT inadvertently had failed to include a request that the proposer elucidate on its alternative compensation proposal. *Id.* She stated: "When we got all the responses back on April 11th, we were looking through and realized we neglected to ask [Cemusa] a question. We had asked it of others and not of them." *Id.* Ms. Gould explained to the FCRC that DOT then requested Cemusa to clarify its AFC proposal "which we felt is within the parameters of the RFP. . . . They responded to us the next day with the April 18, 2005 letter which everybody has seen regarding their in-kind." *Id.*, at 8.

125.    Ms. Gould also observed that Cemusa was not the only proposer from which DOT sought additional information after April 11, 2005.  She explained that DOT "had another clarification . . . from Van Wagner, because in their proposal they had some things that were predicated on the passing of a Local Law. When that Local Law passed, we also, in early May, wrote to them and asked them if they, based on what happened, would revise or give us a clarification on their proposal. They did that." Exhibit "X", at 8.  She once again emphasized: "We believe all those communications are within our right in the RFP." *Id.*[23]

126.    Ms. Gould went on to describe the process by which the Selection Committee winnowed the top proposals from the others.  The scoring, done at the end of May, produced three ranked proposers with

> a significant gap between them and the next two. We decided -- as it is also stated in the RFP, we could have gone to negotiations without even going through a best and final offer -- It's written in the RFP that way -- We did decide to do best and final offer with three of the proposers.  We sent them a written letter outlining things we thought were maybe deficient or they should look at in their offer to us.  They were given an opportunity to write questions to us.  We sent back a question and answer to those proposers.  And basically that was it.  We looked again at the proposals, reevaluated them, and ranked them, and Cemusa was the number one ranked proposer, such as we made the recommendation that we should move into contract negotiations with Cemusa.

Exhibit "X", at 9-10.

127.    As the Manhattan Borough President had done previously,  the Comptroller also sought reassurance that the City would receive full value for the promised

---

[23]  On May 12, 2005, Deputy Commissioner Altschuler e-mailed Van Wagner asking for clarification as to the effect that Intro 423-A, a recently enacted local law directed at eliminating illegal billboards would have on its bid.  Van Wagner wrote back the next day to indicate that certain monies in its proposal could therefore be categorized as within its GMAC. Copies of the May 12, 2005 e-mail and Van Wagner's response are submitted herewith as Exhibits "EE" and "FF", respectively.

AFC. Ms. Budzik asked that DOT address the Comptroller's "concern that we do see the provisions in the agreement to protect the City's interest to be sure that it's actually getting that advertising value" with a focus on "what is in the agreement to protect the City's interest to be sure that it is actually getting the $398 million, and then also why we are unable to have at least some of that converted to cash in the event that the City doesn't pursue marketing in any given year?" Exhibit "X", at 12-13.

128.    Senior Counsel Bruce Regal of the Office of the Corporation Counsel addressed both issues:

> With respect to your first question, that is, how is the City protected in the contract that is proposed today to make sure that we do, in fact, get the dollar value that was offered in the proposal. The answer is that each year a certain amount of advertising in each of Cemusa's non-New York City markets is, in effect, the baseline proposal to the City of what will be available to the City for advertising. The City then has the right to obtain a third-party evaluation of what that baseline is worth on the open market, that is, what a commercial buyer looking to buy advertising as if it were for a movie advertisement or a car advertisement, what that commercial advertiser would pay in an arm's length transaction for advertising. And that's the standard that gets applied to what we are getting. Now, if the baseline amount of advertising that has been offered falls short of the dollar value that we have been promised, the amount of advertising has to be increased. Cemusa owes the City more advertising than it initially proposes in order to make that dollar number. And it goes up until you get to the dollar number we have been offered. Conversely, obviously if it turns out that the advertising market has increased so much that that baseline is worth more than we were promised, then we will get a little bit less, so it goes down to the actual value we were offered. But in any event, we always have the ability to have a third party evaluate what we are being offered and that's tested against the real market value.
>
> Now, your second question had to do with why the contract does not have a City right to convert that advertising into an actual cash payment. The answer to that is, that's part of a much larger business deal between the two parties that reflects the proposal

that [was] offered by Cemusa and that was negotiated as part of this contract. It includes a billion dollars in cash payments to the City over 20 years, and to the extent that that business deal were changed in one particular way, that is, something which is advertising based would be convertible to cash at the City's option, that option is of a value and would have to be reflected presumably in some other arrangement under the contract. That is, all these pieces fit together into a contract that was offered and negotiated, and it's the proposal that the City accepted and the proposal that the City has negotiated and formed into a contract, and if it were to change in one piece, it would to have to change in others. So, in summary, I don't think the Department of Transportation is recommending that we reopen the contract at this point and start negotiating different pieces.

Exhibit "X", at 13-15.

129.    Manhattan Borough President Stringer then once again raised the issue of "how the City will able to get the true value of the in-kind advertising compensation," questioning how can the City be assured of getting "preferred campaigns before another Cemusa client buys them out" rather than merely "advertising for the sake of advertising." Exhibit "X", at 18. He also asked how the City would plan to engage in long-range media planning with Cemusa given the expiration of a number of its contracts within five years. *Id.*

130.    **Bryan Grimaldi**, MDC's General Counsel, addressed both of these concerns. As to the latter, he noted that Cemusa is a rapidly growing company with "five very desirable markets now where the City could target a media advertising campaign." Exhibit "X", at 19. Mr. Grimaldi noted that as to Cemusa's having expiring contracts, "Cemusa is no different than any other bidder. All of those companies experience the same market fluctuations . . . .They all bid for different contracts that expire over different terms. And we are confident that Cemusa, a well-run company will be able to fulfill the contract." Exhibit "X", at 20.

131.    Both **Marc Ricks**, the Mayor's representative on the FCRC and Ms. Budzik made inquiry as to the City's rights and remedies in the event that Cemusa failed to

provide all or a portion of the stipulated AFC called for by the Franchise Agreement.  Exhibit

"X", at 20-21.  Mr. Regal discussed the City's rights in such event:

> Cemusa is obligated to provide the amount of advertising at the
> dollar value which is committed to in the contract.  That's a
> contract obligation.  If they fail to provide that either because
> they don't have it to give us or because they don't want to or
> whatever, they are in default under the agreement.  If there is a
> default under the contract, we have a number of different
> remedies.  We have security funds we are holding.  We have a
> letter of credit that we are holding.  We have a guarantee from
> their parent company, and, ultimately, we have the right to
> litigate, we have the right to cancel the contract and keep $100
> million worth of street furniture that they have installed.  So we
> have a lot remedies in the event that Cemusa fails to perform
> under the contract.
>
> MS. BUDZIK:  So the security fund would be available to
> compensate the City in the event they didn't deliver?
>
> MR. REGAL:  For any default of the contract, the security fund
> is available, yes.

Exhibit "X", at 21.

132.    Mr. Ricks then asked the members of the Evaluation Committee to

address the issues raised in Mr. Mastro's May 12, 2006 letter.  Exhibit "X", at 24.  In regard to

why Clear Channel was not permitted to submit a BAFO, Deputy Commissioner Altschuler

explained that because of the substantial gap between the three highest proposers and the two

bottom ranked proposers when the initial responses to the RFP were evaluated and scored, the

Committee decided to invite the three highest ranked proposers to submit a BAFO, but not the

lowest two proposers.  *Id.*, at 24-25.  Clear Channel was a distant fourth behind the top three.

133.    Before the vote Deputy Commissioner Altschuler also addressed Mr.

Mastro's claim that the Evaluation Committee was required to consider the unsolicited BAFO

submitted by Clear Channel after it was told that DOT did not request a BAFO from Clear

Channel. Exhibit "X", at 25-26. He stated that under the RFP, "once we request a best and final offer, if you are not requested, you are out of the competition. And to accept it at that point, would certainly not [be] fair to anyone else who was not invited." *Id.*, at 26.

134.    In his May 12, 2006 letter, Mr. Mastro claimed that Section 4(G) of the RFP required DOT to consider BAFOs from all proposers whether or not they were requested to provide one. That is inaccurate. Section 4(G) of the RFP states:

> 1. A proposer may submit a modified Proposal to replace all or any portion of a previously submitted Proposal until the Proposal Due Date and Time and, *if applicable*, until the due date and time set for the submission of Best and Final Offers, *if Best and Final Offers are required by the Department.*
>
> 2. The Evaluation Committee shall consider only the *latest timely version* of the Proposal.

135.    Under this provision, for several reasons the Evaluation Committee could not consider Clear Channel's modified proposal of June 14, 2005, made after it was advised on June 6, 2005 that it had not been selected by DOT to proceed to the BAFO stage. First, the modified proposal came after DOT had advised Clear Channel that it did not wish to receive a BAFO from the proposer, so that that the modified offer was not within those "required by the Department". Moreover, because DOT had advised Clear Channel that it was not to submit a BAFO, the provision permitting additional submissions where a BAFO was required was not "applicable" to Clear Channel's additional submission. Clear Channel's modified offer of June 14, 2005 was not the latest "timely version" of its proposal, coming, as it did, after all the proposals had been submitted and evaluated and after Clear Channel had been informed that it was not to submit a BAFO. Finally, as set forth above (at Paragraph 90 & n. 18), it is important to note that the RFP expressly provides that only those proposers which are "still under consideration for award" may be asked to submit BAFOs.

136.     Deputy Commissioner Altschuler described this provision of the RFP and the rationale behind DOT's determination not to review Clear Channel's June 14, 2006 unsolicited BAFO as follows:

> MR. RICKS: And so, is the Department, pursuant to the rules of the RFP, permitted to consider the bid details . . . of the June 14th letter?
>
> MR. ALTSCHULER:   No, the RFP . . . does allow for a proposer to make changes up to the time that they submit a proposal up until the time we request a best and final offer . . . . [I]f you are not requested, you are out of the competition. And to accept it at that point, would certainly not [be] fair to anyone else who was not invited. . . . .Clear Channel was not invited to submit a best and final offer.

Exhibit "X", at 25-26.

137.     Ms. Gould similarly advised the FCRC that the June 14, 2006 unsolicited Clear Channel was not considered "[b]ecause they were not invited in to offer a best and final [offer]." Exhibit "X", at 27.  She went on to point out that even if it had been considered, it would not change the outcome of the competition.  She advised the FCRC:

> Just so we can compare  what was offered, Clear Channel, the highest bid we received on the April 11th date, the cash was $471 million compared to $830 million offered by Cemusa. They did offer in-kind media.  We capped that at the 20 percent. So their in-kind services, we gave them $117 million, compared to Cemusa, which at that point was at least $200 million in the in-kind portion of their proposal.  So it was really not in competition with the highest ranked proposer, we felt, on the compensation front, or to be matter of fact, on the technical proposal.
>
>                                 ***
>
> [T]here was a letter sent back to us which supposedly would have been a best and final offer from Clear Channel, which, again, was $800 million in cash and 500 million in in-kind advertising.  It still would not have put them in the range of a billion dollars in cash and $400 million in advertising.

Exhibit "X", at 26-27.

138.    **Howard Friedman**, who represents the Corporation Counsel on the FCRC and is the Deputy Chief of Contracts and Real Estate in that office, also spoke about the procedures utilized by the Evaluation Committee to reduce the field of competitors after evaluation of the initial proposals. Mr. Friedman stated:

> The process that is set forth in this RFP and that DOT followed, is absolutely common for City RFPs, whether they are in the world of franchises or concessions or government procurements. It is absolutely typical to say that an award may be based just on the initial proposals. Absolutely typical to say, however, there might be, in effect, finalists from whom we would ask best and final offers. Absolutely typical and appropriate to figure out who should be invited to submit BAFOs based on how initial scorings come out to see if there is a natural break between the people who are asked to submit BAFOs and the people who aren't. There is nothing different in this proposal that hasn't been done a thousand times before with the City[,][i]ncluding, by the way, the requests for clarification. RFPs and their responses can be very complicated and the request for clarification for things that have been said is also absolutely typical.

Exhibit "X", at 28.

139.    Ms. Budzik then asked for further clarification regarding an issue "raised in the various letters that have been submitted to the Committee", how the scroller revenues offered by Cemusa came to be guaranteed, rather than contingent. Exhibit "X", at 28-29.  Ms. Gould explained:

> In their BAFO offer there was a table and on the bottom of that table was a note that explained Column I, which was contingent compensation.  And it  said they had originally proposed 50 scroller[s], it said if 200 more additional scrollers were approved, they would generate that much more  revenue in that contingent column. We have already confirmed for people, other BAFOs have far more scrollers in them.  We basically reached out to Cemusa to confirm for them, yes, we are allowing that many scrollers, so how will that contingent compensation be treated?  Will it be guaranteed?  Because we are confirming for

you that number of scrollers is allowed. We just felt that it was a clarification on something we already told bidders, it was addressed in other proposals. We just simply wanted clarification on the note.

*** 

As I said, there were other proposals with far greater number of scrollers than Cemusa offered, so we felt, just in clarifying for them, we were allowing that many. They confirmed for us that if we are allowing it, that money would be moved to the guarantee column.

Exhibit "X", at 29-31.

140.    Mr. Regal followed up with the observation that since a number of other proposers had submitted proposals based on the assumption that scrollers would be approved, "to do an apples to apples comparison with those dollar bids, the City necessarily had to treat the Cemusa proposal in a comparable way. That is, had to reach the assumption that it include the dollars associated with those scrollers." Exhibit "X", at 32.

141.    After all of the FCRC's questions relating to the solicitation and the Franchise Agreement were answered, the FCRC voted. Prior to voting to approve the Franchise Agreement, Ms. Budzik put a statement on the record on behalf of the Comptroller in which she noted that the Comptroller "has thoroughly reviewed the issues that were raised with respect to the award process here. While it is not a perfect process, we think that the issues raised, none of them rise to the level of delaying implementation of what we think is an important initiative for the City." Exhibit "X", at 34.

142.    Borough President Stringer, on behalf of the five borough presidents, despite noting "honest disagreements" regarding whether the in-kind compensation was structured in the RFP so as to maximize value to the City (Exhibit "X", at 36), indicated reasons for his affirmative vote:

I recognize that the City has much at stake in this contract. It is worth one billion dollars in cash for over 20 years and provides the City potentially with unprecedented marketing ability, locally and internationally. I also recognize that the City stands to gain $110 million immediately, which we can certainly use.

*** 

The one thing that is clear, though, is we need pay toilets and we need the street furniture, and I never thought it would happen in my lifetime, so I certainly don't want to the obstructionist, but I think it was important that we all be able to have this exchange of ideas and opinions, and I want to thank the Mayor's office for allowing this process to go forward, so I vote yes.

Exhibit "X", at 35-37.

143.    Submitted as Exhibit "GG" is a copy of the Resolution of the FCRC unanimously approving the Street Furniture Franchise.

144.    On May 26, 2006, following execution, the Franchise Agreement was filed in the Office of the Comptroller and on June 12, 2006 the Comptroller registered the Franchise Agreement pursuant to Sections 328 and 375 of the Charter. By letter dated June 13, 2006 DOT informed Viacom that its Contract to maintain and operate the bus shelters was terminated effective within 30 days. By letter agreement dated June 19, 2006 Viacom (Exhibit "HH" hereto), the City and Cemusa agreed that in order to effectuate a smooth transition to Cemusa, Viacom's agreement would terminate as of June 26, 2006, that ownership of the bus shelters would transfer to Cemusa on that date and that the Effective Date under the Cemusa Franchise Agreement would be June 26, 2006. Thus, as of 12:01 a.m. June 26, 2006 Cemusa took ownership of the approximately 3,150 existing bus shelters on the streets of New York City, and the responsibility for operating and maintaining them pursuant to the Franchise Agreement transferred to Cemusa.

145.    As evidenced by the wire transfer confirmation submitted herewith as Exhibit "II", on June 30, 2006, Cemusa paid $50 million to the City pursuant to the terms of the Franchise Agreement.

**The City Properly Considered Cemusa's Pre-BAFO Offer of In-Kind Compensation**

146.    Some basic legal principles, set forth in the Municipal Respondents' accompanying Memorandum of Law are of particular note.  In recognition of the enormous complexity of some public ventures and the occasional fallibility of some public officials, the RFP process is -- mercifully – a flexible one.  And consonant with the primary aim of public contracting -- to secure the best bargain available for the sole benefit of the public, the law also respects the lawful determinations of public officials who have been shown to have acted in accordance with that goal.

147.    It was not especially fair to Cemusa for DOT to send a March 22, 2005 letter to Clear Channel asking about an in-kind contribution Clear Channel had failed to ascribe a value to in its September 14, 2004 proposal, but not to make the same request of Cemusa.  Had DOT done so in its March 22, 2005 letter to Cemusa, much aggravation would have been spared. But the City's having asked on April 18, 2005 instead of March 22, 2005 is not fatal to the City's consideration of Cemusa's in-kind proposal.  Indeed, the April 18th Letter merely placed Cemusa on a level playing field with Clear Channel by giving it the same clarification opportunity Clear Channel had as the result of the March 22, 2005 letter, and Clear Channel was in no sense prejudiced by Cemusa's receipt on April 18, 2005 of an inquiry comparable to that which Clear Channel had received on March 22, 2005.  As Ms. Gould stated before the FCRC, and as the FCRC found, the RFP permitted sufficient flexibility for DOT to make that request and to consider the result.

**Not To Consider Cemusa's pre-BAFO Offer of In-Kind Compensation**
**Would Not Change the Result of the Competition**

148.    To evaluate Cemusa's pre-BAFO proposal at $834,050,000 ($831,500,000

plus $2.5 million in additional AFC denominated in the schedule it submitted on April 11, 2005),

and not to consider the additional in-kind media in its April 18, 2005 submission, would not

affect the results of the competition.   Such a calculation would add 53.2 points to Clear

Channel's evaluated score; 54.6 points to Decaux's evaluated score; 71.4 points to Van

Wagner's evaluated score and 42 points to Viacom's evaluated score.   The results of

recalculating the pre-BAFO scores without considering the Cemusa in-kind media are as follows:

|  | Cemusa | Decaux | Van Wagner | Clear Channel | Viacom |
|---|---|---|---|---|---|
| Original Revenue Proposal | $834,050,000 | $600,611,000 | $778,898,000 | $588,804,000 | $466,059,000 |
| Phase II | 154.25 | 168 | 129 | 162.75 | 156.5 |
| Phase III | 274.50 | 372.5 | 363.50 | 292 | 250 |
| Phase IV | 384 | 277.6 | 359.15 | 275.45 | 221.75 |
| Preference Points | 35 | 35 | 14 | 35 | 28 |
| Total | 847.75 | 853.1 | 865.65 | 765.2 | 656.25 |
| Rank | 3 | 2 | 1 | 4 | 5 |

149.    In DOT's pre-BAFO analysis, there was a gap of 82.25 points between

Clear Channel and the third-place finisher (Van Wagner), and the Evaluation Committee elected

not to seek a proposal from Clear Channel based upon that gap.   If Cemusa's in-kind

compensation had not been considered, Cemusa would fall to third place, but the gap between

Cemusa and Clear Channel (which would still be in fourth place) would be 82.55 points –

equally wide.   Such a ranking would have furnished no basis to seek an additional BAFO from

Clear Channel.   Cemusa, however, would still score high enough to proceed to the BAFO round

where its AFC could, of course, properly be counted. Accordingly, even were the Evaluation Committee constrained not to consider the in-kind media, the outcome would not change.

**The Evaluation Committee's Consideration of the Scroller Revenues Was Appropriate**

150.    Petitioner's treatment of the Evaluation Committee's decision to accept for evaluation purposes approximately $75 million that Cemusa had made contingent on the permitted use of 250 scrolling advertising panels is disingenuous. Clear Channel's April 11, 2005 bid submission (submitted in relevant part as Exhibit "JJ") stated its intent to use *four hundred* scrolling advertising panels in each year of the franchise after the first. For Clear Channel to premise its bid on the use of four hundred scrolling advertising panels while arguing that the City should be foreclosed from considering Cemusa's offer associated with 250 such panels is insincere, at best.

151.    Decaux's April 11, 2005 bid submission (submitted in relevant part as Exhibit "KK") stated its intent to use scrollers at 340 Bus Shelters and 170 Newsstands. The submission states that Decaux's $100 million up-front payment would be reduced by up to $40 million and its $640 million guaranteed offer would be reduced by up to another $40 million if Decaux's requested scroller usage were denied by the City. In that submission, Decaux urges the City to accept its scroller assumptions to permit "an 'apples to apples' comparison with other proposers." That is exactly how the City evaluated Cemusa's scroller proposal and those of the other proposers.[24]

**Petitioner's Claim that Required Uniform Land Use Review Was Not Performed Is Without Merit**

---

[24] Decaux also stated in its BAFO (submitted in relevant part as Exhibit "LL"), that its bid was based on the "expectation that the use of scrolling will be permitted and that restrictions would be a matter of contract negotiations." By including Cemusa's scrolling "expectation" for bid evaluation purposes, the Evaluation Committee simply evaluated Cemusa's BAFO on the same basis as it did Decaux's.

152.    New York City Charter Section 363(e) provides that pursuant to an Authorizing Resolution adopted by the Council, the responsible agency can issue a Request for Proposals (RFP) for a franchise provided that the Corporation Counsel determines that the RFP is consistent with the provisions of the Authorizing Resolution and the Department of City Planning either determines that the proposed franchise would not have land use impacts or implications or such request has been reviewed and approved pursuant to Section 197(c) and 197(d) of the Charter.

153.    As set forth in the accompanying Affirmation of David Karnovsky, sworn to July 14, 2006, the Department of City Planning determined that the 2004 RFP for Coordinated Street Furniture would not require review pursuant to the Uniform Land Use Review Procedure (ULURP) since it did not present any new land use impacts or implications from those previously considered in the ULURP review in 1997 of a similar Request for Proposals for a Coordinated Street Furniture Franchise.

154.    Deputy Mayor Daniel Doctoroff and his office were not involved in any manner in the evaluation of proposals or the selection of Cemusa.

155.    Joseph Perello was not a member of the Evaluation Committee and did not direct or instruct the Evaluation Committee or its members how to vote.

## FIRST DEFENSE

156.    The Municipal Respondents' actions were rationally based and in all respects lawful, and were not arbitrary, capricious or contrary to law.

### SECOND DEFENSE

157.    The Petition is barred by thee statute of limitations.

### THIRD DEFENSE

158.    Petitioner's causes of action are barred by the doctrine of laches.

### FOURTH DEFENSE

159.    Petitioner's causes of action are barred by the doctrine of waiver.

### FIFTH DEFENSE

160.    A number of contentions in Clear Channel's Petition – including (a) the alleged roles of Deputy Mayor Daniel Doctoroff and former MDC chief Joseph Perello in the evaluation and award of the Franchise Agreement; (b) the effect on the evaluation and award of the Franchise Agreement of Cemusa's alleged retention of a lobbying firm and a former City official; (c) the claim that Cemusa should have been disqualified during an initial phase of the City's evaluation; (d) the City's use of Economic Development Corporation, Marketing Development Corporation and Department of City Planning officials to assist in the evaluation of proposals; and (e) the Franchise Agreement's purported exclusive grant of rights to Cemusa and its architect should future use of their designs extend beyond Street Furniture, were never raised before the FCRC and thus have not been preserved for review.

**WHEREFORE**, it is respectfully requested that petition should be denied in its

entirety with costs and such other and further relief as the Court deems just.

Dated:        New York, New York
              July 24, 2006

                                    MICHAEL A. CARDOZO
                                    Corporation Counsel of the
                                       City of New York
                                    Attorney for Defendant
                                    100 Church Street, Room 3-100
                                    New York, New York 10007
                                    (212) 788-1280

                              BY: _____
                                        Jonathan S. Becker
                                        Assistant Corporation Counsel

VERIFICATION

STATE OF NEW YORK    )
                        SS.:
COUNTY OF NEW YORK  )

HOWARD ALTSCHULER, being duly sworn deposes and says:

I am the Deputy Commissioner in Charge of Procurement, Technology and Passenger Transport for Respondent the Department of Transportation of the City of New York. I have read the foregoing Answer and know the same to be true to my own knowledge, except as to matters therein stated to be upon information and belief, and, as to those matters, I believe them to be true.

HOWARD ALTSCHULER

Sworn to before me this 24th day

of July, 2006

Notary Public

SUSAN ROGERSON *PONDISH*
NOTARY PUBLIC, STATE OF NEW YORK
NO. 02RO6018362 *02RO6100049*
QUALIFIED IN ~~QUEENS COUNTY~~ *RICHMOND COUNTY*
COMMISSION EXPIRES OCTOBER 28, 20~~06~~ *14*

-65-

## AFFIDAVIT OF SERVICE

STATE OF NEW YORK          )

                           )SS.:

COUNTY OF NEW YORK   )


      LINDA SWANSTON, being duly sworn, deposes and says that on July 24, 2006, she served the attached Verified Amended Answer upon Gibson, Dunn & Crutcher LLP, attorneys for Petitioner, by personally delivering a copy to their offices at 200 Park Avenue, New York, New York.

LINDA SWANSTON

Sworn to before me this 24th
Day of July 2006

Notary Public
JOHN J. JOHNSON
Notary Public, State of New York
No. 01JO4861432
Qualified in Kings County
Commission Expires June 2, 2010

AFFIDAVIT OF SERVICE

STATE OF NEW YORK        )

                         )SS.:

COUNTY OF NEW YORK   )

      MICHAEL FISHER, being duly sworn, deposes and says that on July 24, 2006, he served the attached Verified Amended Answer upon DLA Piper Rudnick Gray Cary US LLP, attorneys for Respondent Cemusa, Inc., by personally delivering a copy to their offices at 1251 Avenue of the Americas, New York, New York.

 

_____

MICHAEL FISHER

Sworn to before me this 24th
Day of July 2006

_____
Notary Public

TINA H. ISSELBACHER
Notary Public, State of New York
No. 4805137
Qualified in New York County
Commission Expires April 30, 2010

Index No. 108831/06

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

In the Matter of the Application of

CLEAR CHANNEL ANSHEL, INC.,

    Petitioner,

– against –

For a Judgment Pursuant to Article 78 of the CPLR

FRANCHISE AND CONCESSION REVIEW COMMITTEE
OF THE CITY OF NEW YORK, MICHAEL R.
BLOOMBERG, as Mayor and Chair of the Franchise and
Concession Review Committee, WILLIAM C. THOMPSON,
JR., as Comptroller of The City of New York, NEW YORK
CITY DEPARTMENT OF TRANSPORTATION, NEW
YORK CITY ECONOMIC DEVELOPMENT
CORPORATION, NEW YORK CITY MARKETING
DEVELOPMENT CORPORATION, NEW YORK CITY
DEPARTMENT OF CITY PLANNING, THE CITY OF
NEW YORK, and CEMUSA, INC.,

    Respondents.

---

VERIFIED AMENDED ANSWER

---

*MICHAEL A. CARDOZO*
*Corporation Counsel of the City of New York*
*Attorney for Defendant*
*100 Church Street*
*New York, N.Y. 10007*

*Of Counsel: Jonathan S. Becker*
*Tel. (212) 788-1230*

Certified pursuant to 22 NYCRR §130-1.1a:

Jonathan S. Becker
*Jonathan S. Becker*

RECEIVED

JUL 24 2006

GD&C