# EXHIBIT 52

CITY PLANNING COMMISSION

October  9, 1996/Calendar No 34.                          C960543(A)GFY

IN THE MATTER OF a modified application submitted by the Department of Transportation pursuant to Sections 197-a and 363e(2) of the New York City Charter for a franchise for installing, operating and maintaining bus stop shelters, automatic public toilets, newsstands and public service structures to be located in all five boroughs, and proposed for modification on August 19, 1996 pursuant to Section 7.030 of the Uniform Land Use Review Procedure.

The application (C960543 GFY) for approval of an RFP for a franchise for the installation, maintenance and operation of bus stop shelters, self-cleaning automatic public toilets and public service structures and the installation and maintenance of newsstands in all five boroughs of the city (the Coordinated Street Furniture Franchise) was filed by the Department of Transportation on May 1, 1996.   On August 19, 1996, The Department of Transportation recommended, and the City Planning Commission proposed, pursuant to Section 7.030 of the Uniform Land Use Review Procedure (ULURP), a modification (C960543 (A) GFY) to the original application.  The modified application revised the original RFP to indicate the location and nature of business terms to be included in the final RFP and added text relating to the protection of distinctive sidewalks or historic pavements and requiring the Franchisee to cooperate with DOT in responding to complaints and is the subject of this report.

BACKGROUND

The concept of providing major elements of street furniture under a coordinated franchise arrangement is new for the City of New York. To date, the regulation, construction, installation and maintenance of various types of street furniture has occurred in differing ways with greater or lesser degrees of coordination and consistency.

The bus stop shelters currently in use throughout the city have their genesis in two February 14, 1978 reports of the City Planning Commission, (N770135MFY and N770642MFY), which set out locations and size and clearance standards for shelters citywide. All current shelters are provided by a private entity which utilizes two standard designs throughout the City dating from the early 1980's. The company operates under a City franchise which permits advertising on the shelters and which is administered by the Department of Transportation. On April 25, 1995, the Franchise and Concession Review Committee approved the extension of the franchise contract to December 31, 1997.

The inventory of newsstands which currently exist on City streets has accrued over a period of many years on an ad hoc basis. Individual operators have constructed and installed newsstands pursuant to licenses issued by the Department of Consumer Affairs. On January 18, 1992, the City promulgated revised "Newsstand Guidelines" pursuant to the New York City Administrative Code.

2

C960543(A)  GFY

These guidelines establish size limitations for newsstand structures and siting and clearance criteria and specify review and approval procedures involving several City entities. Newsstands in existence prior to August 1991 were allowed to remain in place, subject to less stringent standards than those constructed after this date.

Efforts to bring automatic public toilets to city streets began in the summer of 1992 with a pilot program under which toilets were installed temporarily at three locations in Manhattan. On March 16, 1994 an application by DOT (C940054 (A) GFY) for a Request for Proposals for a franchise involving the construction, operation and maintenance of automatic public toilets and public service kiosks was approved by the City Council (Res. #214). The RFP called for a maximum inventory of 200 toilets and 400 kiosks and included dimensional, siting and clearance criteria comparable to those in the "Newsstand Guidelines". The franchisee would be permitted to place advertising on both the toilets and the kiosks. As required by the Council's resolution, on May 26, 1994, the Department of Transportation issued a Request for Qualifications for participation in a one-year pilot program for Automatic Self-cleaning Public Toilets. A lack of meaningful response to the RFQ resulted in a decision not to proceed with the Request for Proposals.

At present there are a small number of City-owned pedestrian

information kiosks located on city streets solely within Manhattan. They are free-standing structures containing posters and maps.

The proposal currently being advanced seeks to replace and coordinate all of the items of street furniture discussed above under a unified program. On March 6, 1996 the City Council adopted Resolution Number 1548 authorizing the Department of Transportation to grant franchises for bus stop shelters, newsstands, automatic public toilets and public service structures. The Request for Proposals which is the subject of this report is the mechanism by which a franchisee will be selected to implement the coordinated street furniture program.

THE PROPOSAL

The land use aspects of the proposed RFP were certified by the Planning Commission for referral to Community Boards on May 20, 1996. The proposed Request for Proposals is for a non-exclusive 20-year franchise to install, maintain and operate bus stop shelters (BSSs), self-cleaning automatic public toilets (APTs) and public service structures (PSSs) and to install and maintain newsstands in the five boroughs of the City. The RFP calls for proposals to construct, maintain and operate such facilities, collectively referred to as "Franchise Structures", that are clean, safe and attractive, in convenient locations to serve the needs of residents and visitors. As permitted by the Authorizing

4

C960543(A)  GFY

Resolution, the RFP also allows for the placement of advertising on Franchise Structures, subject to specific criteria and limitations as more fully described below.

The proposed RFP requires that proposals provide for the following:

o    The installation and maintenance of a minimum of 3,300 and a maximum of 3,500 bus stop shelters, with amenities for the public in the form of street identification signage, seating (where directed by the Department of Transportation) and public service information;

o    The installation, operation and maintenance of a minimum of 30 and a maximum of 100 self-cleaning APTs, for the use of which the franchisee will be permitted to collect a minimal fee from the public; and

o    The installation and maintenance of a minimum of 430 and a maximum of 500 newsstands.  The Franchisee will not operate the newsstands, but will be responsible for their maintenance and repair.

In addition, proposers are encouraged to provide for the installation, operation and maintenance of public service structures, incorporating such elements as newspaper and periodical dispensers, recycling or litter bins, computer terminals that

---

5                                                    C960543(A)  GFY

provide access to government or commercial activity, bicycle racks and public pay telephones.

Most of the Franchise Structures will replace and improve on existing or previously proposed sidewalk structures. At a minimum, the present bus stop shelter inventory will be maintained and enhanced through the addition of newly designed shelters. The proposed RFP expresses a preference for the replacement of the existing shelter inventory with the new designs. Existing sidewalk newsstands will be replaced at their current locations if such locations comply with the Siting Criteria. Complying locations will be found for other newsstands.

The goal of this proposal is to provide well-maintained attractive street furniture that offers increased public amenities and to reduce clutter on City sidewalks. The proposed RFP seeks designs for the different types of structures which will be aesthetically pleasing, will be unified in a city-wide coordinated design scheme and will take into account compatibility with special contexts, such as historic districts, through both the basic designs and the incorporation of site-specific design components.

The design and placement of the Franchise Structures will be subject to the review and approval of the Landmarks Preservation Commission and the Art Commission. The Franchisee will be required to comply with the Americans with Disabilities Act and any federal,

state and local laws relating to accessibility for people with disabilities.

The maximum permissible dimensions for each of the Franchise Structures are as follows:

|                  | Area        | Height | Width    | Length    |
|------------------|-------------|--------|----------|-----------|
| Bus Stop Shelter | 150 sq. ft. | 9 ft.  | 5 ft.    | 30 ft.    |
| Newsstand        | 72 sq. ft.  | 9 ft.  | 6.5 ft.  | 14 ft.    |
| APT              | 78 sq. ft.  | 12 ft. | 8 ft.    | 12.5 ft.  |
| PSS              | 36 sq. ft.  | 9 ft.  | 6 ft.    | 6 ft.     |

Proposers will also have the option to propose cylindrical, pillar-type structures for newsstands, APTs and PSSs. Such structures, which occupy less sidewalk area than permitted in the table above, will have a maximum height of 16 feet, but will not be permitted to exceed the maximum widths stated above.

Sites for street furniture constructed under the Franchise will be selected by the Department of Transportation in accordance with comprehensive Siting Criteria. These criteria generally mirror the existing or approved criteria for Bus Stop Shelters, Newsstands and APTs. Minor adjustments have been made to provide greater consistency and coordination, but the criteria continue to recognize the unique nature of each type of structure.

7                                                        C960543(A)  GFY

The Siting Criteria require that all Franchise Structures be located so that a completely unobstructed clear path parallel to the curb is maintained at the following minimum widths:

|  | Clear Path |
|---|---|
| Bus Stop Shelter | 7 ft. |
| APT | 8 ft. |
| Newsstand | 9.5 ft. |
| PSS | 9.5 ft. |

For Bus Stop Shelters only, on narrow sidewalks the Department of Transportation may permit a narrower clear path, but not less than 5 feet. An additional requirement that all Franchise Structures be located in proximity to either the curb line or the building line guarantees that on wide sidewalks the clear path will exceed the above minimums.

The Siting Criteria specify minimum clearances between a Franchise Structure and other elements or objects on or in the surface of the sidewalk. A Franchise Structure may not be located in front of a building entrance unless the owner so permits. For a specified list of building types, APTs, Newsstands and PSSs must be located at least 15 feet from entrances.

The Siting Criteria further restrict the location of APTs, most notably to wide streets, as defined in the Zoning Resolution, in

8

C960543(A) GFY

commercial, manufacturing or mixed-use districts.

The proposed RFP specifies in the following language a procedure for locating the Franchise Structures under which the Department of Transportation will engage in an extensive consultative process with Community Boards, elected officials and others:

> The Department will adhere to the following consultative process in designating new sites:
>
> 1. The Department will request recommendations for new sites from Council Members, Borough Presidents, Community Boards, Business Improvement Districts (BIDs), the New York City Transit Authority (for bus stop shelters only), and newspaper publishers and licensed newsstand operators (for newsstands only).
>
> 2. The Department will review these recommendations and any other suggested sites for compliance with the siting criteria (Appendix 3) and additionally consider the following factors:
>
>    Bus Stop Shelters: Ridership figures, transfer points, location of existing shelters, geographic distribution, sidewalk activity, presence of other Franchise Structures on the sidewalk
>
>    Newsstands: Economic viability, replacement of existing structures, geographic distribution, sidewalk activity, presence of other Franchise Structures on the sidewalk
>
>    APTs: Availability of water and sewer service, public convenience, enhancement of commercial and tourist areas, sites recommended by the Department of Parks and Recreation, geographic distribution, sidewalk activity, presence of other Franchise Structures on the sidewalk
>
>    Public Service Structures: Sidewalk activity, geographic distribution, presence of other Franchise Structures on the sidewalk.
>
> 3. The Department will distribute lists of proposed sites determined by the Department to be desirable for a 60-day comment period to Council Members, Borough Presidents,

C960543(A)  GFY

Community Boards, other appropriate City agencies, BIDs, the New York City Transit Authority (for bus stop shelters only), newspaper publishers (for newsstands only), adjacent property owners (for newsstands and APTs only) and any other interested party, including Proposers, if they so request.

4.    After consideration of the comments and selection of a Franchisee the Department will choose final sites and notify Council Members, Borough Presidents, Community Boards, other appropriate City agencies, the Franchisee, and any other person who commented on the proposed sites.

At least once each year, the Department will request from all Community Boards, BIDs, Council Members, Borough Presidents, the Franchisee and (for purposes of siting newsstand structures) publishers of major daily New York City newspapers a prioritized list of locations for the placement or removal of Franchise Structures.

The Department may direct the Franchisee to replace bus stop shelters, newsstands and PSSs at existing sites, independent of the above consultative process.

The Franchisee will be required, at a minimum, to adhere to the following build-out schedule:

|  | BSSs | APTs | Newsstands |
|---|---|---|---|
| Year 1 | 550 | 15 | 144 |
| Year 2 | 550 | 15 | 143 |
| Year 3 | 550 | *** | 143 |
| Year 4 | 550 | *** | *** |
| Year 5 | 550 | *** | *** |
| Year 6 | 550 | *** | *** |
| Years 7-20 | *** | *** | *** |

*** Additional structures as directed by DOT

10                                                                      C960543(A) GFY

The proposed RFP permits a maximum of 2 advertising panels on any Franchise Structure. The maximum permissible amounts of advertising are as follows:

|  | Area | Height |
|---|---|---|
| Bus Stop Shelter | 70 sq. ft. | 7 ft. |
| Newsstand | 108 sq. ft. | 9 ft. |
| APT | 108 sq. ft. | 9 ft. |
| PSS | 42 sq.ft. | 7 ft. |

The maximum permitted height of advertising on pillar structures is 14 feet.

For no more than 10% of the total number of Franchise Structures citywide and for no more than 20% of the total number of Franchise Structures in any one community district, the RFP allows increases in the maximum advertising areas and numbers of panels of up to 35 square feet and 1 additional panel.

The placement of advertising panels shall not obstruct the visibility of adjacent buildings or the interior of a Bus Stop Shelter, nor may it interfere with pedestrian or motorist sight-lines necessary for traffic safety. Advertising on PSSs may not physically or visually obscure the public service they provide.

Backlit printed media are allowed in all locations. The intent of

11                                                          C960543(A)  GFY

the proposed RFP is to ensure that electrically animated media (such as "zipper" signs) are permitted only on a case by case basis and only in zoning districts where the Zoning Resolution allows them.  Audio advertising will not be permitted.  Advertising of tobacco products is prohibited.

ENVIRONMENTAL REVIEW

The original application (C960543GFY) was reviewed pursuant to the New York State Environmental Quality Review Act (SEQRA), and the SEQR regulations set forth in Volume 6 of the New York Code of Rules and Regulations, Section 617.00 et seq., and the New York City Environmental Quality Review (CEQR) procedures set forth in Executive Order 91 of 1977.  The designated CEQR number is 96DOT010Y.  The Lead Agency is the Department of Transportation.

After a study of the potential environmental impacts of the proposed action, a Negative Declaration was issued on May 3, 1996.

After review of the modified application (C960543(A)GFY), it was determined that the modifications constitute a minor modification of the proposed RFP and that the Negative Declaration issued on May 3, 1996 remains valid.

UNIFORM LAND USE REVIEW

The original application (C960543GFY) was certified as complete by the Department of City Planning on May 20, 1991, and was duly

referred to the community boards, the Borough Boards and the Borough Presidents in accordance with Article 3 of the Uniform Land Use Review Procedure (ULURP) rules.  The modified application (C960543(A)GFY) was referred to the community boards, Borough Boards and Borough Presidents on August 19, 1996, pursuant to Section 7.030 of the ULURP Rules.

**Community Board Review**

The Commission received recommendations from the following 41 community boards.  A copy of each board's full recommendation is attached to this report.

| | |
|---|---|
| The Bronx Community Boards: | 2, 3, 4, 7, 9, 10, 11, 12 |
| Brooklyn Community Boards: | 1, 2, 5, 6, 7, 9, 10, 12, 13, 15, 18 |
| Manhattan Community Boards: | 1, 2, 3, 4, 5, 6, 7, 8, 9 |
| Queens Community Boards: | 1, 3, 4, 6, 7, 8, 9, 10, 11, 12 |
| Staten Island Community Boards: 1, 2, 3 | |

Four community boards voted in favor of the proposal; seventeen boards voted in favor of the proposal with modifications; nineteen voted against the proposal and one board voted no recommendation.

Many resolutions, including several of the disapprovals, supported the general concept of a comprehensive, coordinated, city-wide approach to the provision of major elements of street furniture. A range of issues, concerns and proposed modifications relating to

13                                                    C960543(A) GFY

specific aspects of the RFP were raised.  Those most frequently
cited in the Community Board resolutions were as follows.

Many resolutions call for a greater role for Community Boards,
Business Improvement Districts and/or elected officials in the
siting process, such as final siting approval or the ability to
appeal DOT's decisions.  Some request a limit on the number of
structures in some Community Districts and a guaranteed minimum
number in others.  Some concerns are also expressed about the
minimum clear paths contained in the siting criteria.

Many resolutions express concern about the amount of advertising
and call for the maximum permitted size or number of panels to be
reduced.  Several resolutions seek a higher percentage of the total
amount of advertising for public service information.  Control over
the content of advertising is also sought.

Several resolutions suggest a shorter franchise term, possibly with
a renewal provision subject to performance review.

A number of resolutions express concern about contextual "fit" and
seek to have the design of structures subject to the review or
approval of the affected Community Board, BID, council member
and/or Borough President.

There is concern over the City's ability to ensure adequate

C960543(A)  GFY

franchisee performance in terms of maintenance and removal of damaged structures.  Several resolutions suggest defined monetary penalties or contract revocation for failure to perform and specific timetables for these actions.

Objections to the 16 foot maximum height for pillar structures are raised in several resolutions.

Two Manhattan Community Boards seek greater number of APTs and longer required operating hours for them.

**Borough President Review**

The President of the Borough of Brooklyn, on July 29, 1996 recommended approval of the application with modifications, as follows:

> The siting of street furniture shall be in consultation with, and the approval of, the affected community board, City Council member and borough president, and such requirement shall be included in the franchise agreement;
>
> The affected community board, City Council member and borough president shall be consulted with regard to the design and composition of the street furniture and they shall approve which deign and composition will be placed at a particular site, and such requirements shall be included in the franchise agreement;
>
> The height of pillar-type newsstands, PSSs and APTs shall be kept as low as possible and that pillar-type street furniture shall not be sired in low-rise building areas; and
>
> The advertising of alcoholic beverages and offensive materials shall be prohibited; and

C960543(A) GFY

The design of the street furniture to be sited in downtown Brooklyn, to the extent possible, shall conform to the "Downtown Brooklyn Streetscape Design Guidelines".

The President of the Borough of Manhattan, on August 23, 1996, recommended disapproval of the application.  She raised the following issues:

The Borough President proposes that site selection for Franchise Structures be preceded by extensive surveys of existing street furniture so that Community Districts which have too many or too few of these structures can be better served in the future, and poorly sited structures can be relocated.  A comprehensive boroughwide street furniture masterplan should be completed with the intent to set limits on the number of Franchise Structures per block face and per intersection.  Additionally, the DOT proposal should outline a specific plan to ensure wide geographical distribution of Franchise Structures.  To ensure equitable distribution throughout Manhattan, a specific strategy should be devised that will guarantee each Community District a minimum number of each type of Franchise Structure.  Districts in Northern Manhattan will receive a fair share of all types of Franchise Structures.  One concrete provision to ensure geographic distribution of bus stop shelters, especially in Northern Manhattan, would be to site the first year build-out of 550 bus stop shelters in new locations, rather than replacing existing structures.

The design of street furniture should contribute to the reduction of street clutter.  In order to achieve this goal, new designs for all Franchise Structures should be combined with public service structures, such as litter and recycling bins, newspaper dispensers and public pay telephones.  The Borough President strongly agrees with the Borough Board that it is absolutely essential to include ample provisions for newsbox dispensers in DOT's final RFP.

It is important to regulate the amount of advertising permitted within any given area.  This is necessary both to prevent visual inundation by too many advertisements, which has been found to reduce visual impact if too closely sited, and to protect the economic viability of the advertisements.  One possible way to achieve this would be to specify a minimum allowable distance between structures containing advertise-ments, or set a maximum square footage of advertising per block face.  The most objectionable aspects of the proposed advertising are described below:

C960543(A) GFY

o   The additional third advertising panel proposed for 10
    percent of bus stop shelters and newsstands (bus shelters
    currently have 1 or 2 panels).  The proposed advertising
    footage, without the addition of a 35 foot square panel,
    is already excessive, and elevates the target of
    potential revenues above the quality, design and
    maintenance of the City's public space.

o   The proposed 16-foot high pillar style structures.  The
    negative land use impacts from locating 16-foot high
    pillars to be used for newsstands, public toilets and
    public service structures outweigh any potential benefit
    related to a decreased sidewalk footprint.

o   The low amount (minimum of 2.5 percent) of public service
    advertising.  The amount of public service information
    and advertising should be increased to a minimum of 25
    percent of all available advertising space to be
    distributed equally among each community district.  The
    surface space likely to be available on APTs should be
    used for public information such as maps and guides.

The Borough President concurs with the Borough Board that the
long length of the twenty-year contract term dictates that
five or ten-year contract renewal periods should be set based
on stringent performance reviews.  Performance evaluations
should include comments from all interested elected officials
and community members who are involved in the siting process.
Penalties and liquidated damages should be incurred by the
franchisee for non-compliance with maintenance and contract
requirements.  A complaint system should be set up so that
problems can be resolved quickly.


The President of the Borough of Staten Island, on August 6, 1996,

recommended approval of the application.


A copy of each Borough President recommendation is attached.


**Borough Board Review**

The Manhattan Borough Board, on August 15, 1996, voted to

disapprove the application.  The Board's resolution raised a series

C960543(A) GFY

of issues, many of which parallel those of the Manhattan Borough President. Additional concerns were cited as follows:

In regards to siting restrictions:
o   Clear paths should be widened using accepted methods of calculated pedestrian levels of service.
o   More specific rules and mechanisms should be developed for improperly sited Franchise Structures which require removal.
o   Business Improvement Districts' streetscape plans should meet the same siting and design requirements as the Coordinated Street Furniture Franchise.

In regards to the franchise contract:
o   A performance bond should be posted.
o   An initial trial period should be established for each type of Franchise Structure prior to establishing the final design.
o   Telephone and identification numbers should be placed on each Franchise Structure for maintenance purposes.

In regards to bus stop shelters:
o   Unbreakable material should be mandated as the appropriate material for the walls of all bus stop shelters.
o   Only one wall panel, with advertising on both sides, should be allowed on each bus stop shelter.

In regards to newsstands:
o   Special controls should be set to limit the number of newsstands at each intersection and per block face.
o   Adequate clear paths should be maintained based on pedestrian levels of service, and improperly sited newsstands should be removed in a timely fashion.
o   Circular footprints should be avoided for all newsstands.

The Borough Board strongly recommends that the following be included in the final Request For Proposals:
o   The siting criteria be further modified to prohibit the replacing of existing structures, especially newsstands, at sites that cannot accommodate the structure due to heavy pedestrian traffic or existing conflict with a transit stop.

Additionally, the Borough Board recommends that each Community Board should approve any Franchise Structure within its boundaries in order to ensure that the above concerns are satisfactorily addressed.

The Manhattan Borough Board recommendation is attached.

## City Planning Commission Public Hearing

On August 21, 1996 (Calendar Nos. 13 & 14) the City Planning Commission scheduled September 11, 1996 for a public hearing on the original application (C960543GFY) and the modified application (C960543(A)GFY). The hearing was duly held on September 11, 1996 (Calendar Nos. 30 and 31).

Ten speakers testified, six in favor and 4 opposed to the application. Written testimony in favor of the application and correspondence in opposition to it were also submitted.

Those speaking in favor of the proposal were the Deputy Mayor for Economic Development and Planning, the Executive Director of the Division of Franchises, Concessions and Consents at the Department of Transportation, the General Counsel of the Alliance for Downtown New York, a representative of the Grand Central and Thirty-Fourth Street Partnerships, the President of the Municipal Art Society and a representative of a company which installs and operates transit shelters.

Written testimony in support was received from the Time Square Business Improvement District.

Those speaking in opposition were a representative of the Manhattan Borough President, a representative of Local/Expression and two individuals.

Written correspondence in opposition was received from Community Board 10 in Manhattan.

Several speakers supporting the application and two opponents acknowledged the importance of improving the quality of the city's streets and applauded the concept of a coordinated street furniture initiative. The Deputy Mayor stated: "Our streetscape is the first, last, and constant impression made on anyone living, working, or visiting New York. Our streetscape is a very real statement of who we are and how we are perceived. It is no longer enough to focus simply upon what goes on beyond the property line". The Manhattan Borough President's representative said: "the Borough President commends the Department of Transportation's efforts to improve the visual appearance of city streets." All of those speaking in favor concurred that the proposed RFP does constitute a unified, coordinated and comprehensive proposal, although some saw aspects which could be enhanced or were of concern. The Deputy Mayor and the general counsel of the Alliance for Downtown New York asserted that the proposal will reduce sidewalk clutter. The Deputy Mayor and the representative of the Grand Central and Thirty Fourth Street Partnerships also noted that the street furniture program will provide new public amenities such

C960543(A)  GFY

as automatic toilets.

The Deputy Mayor and the general counsel for the Downtown Alliance noted that the proposal ensures community input into the siting of the street furniture items within its scope. The Deputy Mayor pointed out that "particularly when it comes to newsstands, the City will, for the first time, have the ability to use discretion and say "no" to locations which meet placement guidelines but are otherwise deemed inappropriate". The Times Square Business Improvement District's written testimony calls for "substantive consultations, with community planning boards, business organizations, newsstand operators and publishers" on siting issues.

Two speakers supporting the proposal called for flexibility in the design of structures to ensure variety and a good contextual fit. The Deputy Mayor stated that designs will be diverse and will complement the character of the neighborhood in which they are sited. The Manhattan Borough President's representative called for the participation of Community Boards, civic groups and elected officials in the design selection process. The President of the Municipal Art Society sought an assurance that the proposed designs would be submitted to the Art Commission and Landmarks Preservation Commission "for their consideration".

On the matter of advertising, the Deputy Mayor stated that this was

C960543(A)  GFY

necessary in order for the franchisee to recoup his capital investment and cover on-going operational costs. The President of the Municipal Art Society and a speaker in opposition argued that the proposal allows too much advertising, with both larger and more numerous panels than currently exist on city sidewalks. The MAS President also claimed that allowing advertising on Public Service Structures would result in their proliferation, rather than consolidation. Two speakers opposing the proposal expressed concern about potential advertising for alcohol products.

Two speakers in opposition argued that the proposed 20 year length of the franchise was too long. In response to a related Commissioner's question, the Deputy Mayor said that 20 years was necessary because of the substantial capital investment required of the Franchisee.

Two supporters of the proposal raised questions about the management of newsstands and the relationship between the franchisee and individual operators. They were concerned that the performance of individual operators would not be properly monitored or held to adequate standards. The Times Square BID sought to have the number of newsstands in Midtown capped at current levels.

The President of the Municipal Art Society objected to the lack of a cap on the number of Public Service structures. In her testimony and in response to Commissioner's questions, the Deputy Mayor

C960543 (A) GFY

stated that the Administration had already decided that this type of street furniture would now be limited to computer information terminals and litter and recycling bins.

The representative of Local/Expression argued that the proposal was "not fully thought out" and that the City should take more time to explore other approaches. He suggested that Bus Stop Shelters be combined with Newsstands so that they are manned and that small businesses be financially compensated by the City for making their toilets available to the public.

Another speaker in opposition said that he thought there may be legal problems associated with having a single franchise and that the RFP and franchise processes should include a role for the Commission and the City Council. He argued that the manufacture of street furniture items should be done in New York City. In response to questions from the Commission, the Deputy Mayor stated that financial issues made a single franchisee necessary. This approach ensured economies of scale and allowed costs and revenues to be spread city-wide. Asked about the possibility of the franchisee sub-contracting work under the street furniture program to local businesses, the Department of Transportation's representative said that DOT was already "actively meeting with many different sized companies who are interested in all aspects of this proposal".

C960543(A) GFY

In addition to the issues cited above, the Manhattan Borough President's representative repeated many of her concerns described earlier in this report.

There were no other speakers and the hearing was closed.

## CONSIDERATION

The Commission believes that the Department of Transportation's proposed RFP for a coordinated street furniture franchise is appropriate as modified below. With the inclusion of its changes, the Commission believes that implementation of the program will result in a significant improvement in the appearance and useability of the City's streets and will enhance the range and quality of public facilities thereon. The functional efficiency and appearance of existing street furniture items will improve as the current aging stock is replaced. The introduction of new amenities, most notably automatic public toilets, will bring to New Yorkers and visitors alike a much needed augmentation of the range of public amenities available to them. Grouping several major types of street furniture together in one program with a single franchisee under the direction of a single City agency offers the potential for a more coordinated and rational distribution of these facilities, both across the City as a whole and within a district or neighborhood.

C960543(A) GFY

## Modifications

While the Commission agrees that the Coordinated Street Furniture Franchise will significantly enhance the City's streets, it believes that a number of changes can be made which will result in the program's goals being more fully realized. The Commission has carefully considered the proposed RFP and evaluated the considerable body of recommendations and testimony it has received during the public review process. Based on this review, the Commission believes that the proposal's objectives of providing a more aesthetically pleasing and functional streetscape will be better achieved with the following modifications.

## A.   Design

The Commission shares the concern expressed in many of the submissions it received that there must be sufficient flexibility in the designs of the various types of Franchise Structures to allow a good contextual "fit" in the diversity of districts and neighborhoods in which the structures will be located. The Commission also acknowledges that increasing the number of alternative designs increases the cost of the program and that increasing the range of designs must be considered in relation to other objectives such as limiting the amount of advertising on the structures.

A feasible and balanced approach to this problem is to require, for each type of structure, two fundamentally different designs and to

25

further require that each of these basic designs be capable of variation. The Commission also agrees that high quality in the design of the structures is essential to the success of the program. Accordingly, the Commission believes that the first paragraph of Section II A 1. of the RFP should be replaced with the following new language:

> The Coordinated Street Furniture Franchise is an important new initiative for the City of New York. Its primary goals are to augment and significantly improve the appearance and quality of the largest items of furniture in our streets.
>
> Designs must achieve aesthetic excellence. They must be compatible with a wide variety of built contexts and must conform to a citywide coordinated design scheme. Designs for the different types of Franchise Structures must be coordinated so that within any one area there is a harmonious relationship between the various items of street furniture.
>
> Designs will be evaluated on the basis of functional efficiency, aesthetics, security, durability, adaptability for various built environments around the City and accommodation of people with disabilities. All designs are subject to the approval of the Department.
>
> For each type of standard Franchise Structure (Bus Stop Shelter, Newsstand, Automatic Public Toilet and Public Service Structure meeting non-pillar dimensional criteria), Proposers must submit two basic designs. The **first design** shall be suitable for deployment, in the case of Bus Stop Shelters, throughout the City and, in the case of other Franchise Structures, in medium and high density mixed-use environments. Proposers are required to show how each of these basic designs can be varied to suit specific contexts. This might be achieved, for example, through alternative shapes or forms for component parts, alternate materials and/or varying the color of applied finishes. The **second design** for each type of standard Franchise Structure shall be appropriate for use within districts or in front of individual buildings which are designated New York City Landmarks. These designs may also be deployed on a limited basis in other locations. Some degree of variation in these basic designs is also required. Any designs for pillar structures shall be additional to the basic designs specified above.

C960543(A) GFY

> Bus Stop Shelters and Newsstands must be available in several
> sizes and configurations to meet the constraints imposed by
> various street conditions and users' needs as specified below.
> The maximum dimensions of each of the Franchise Structures is
> described below and summarized in Appendix 2.

The Commission believes that this change will have the added benefits of giving respondents to the RFP a clearer sense of what is expected in terms of design and ensuring greater comparability between submissions.

Several recommendations have been made to the Commission concerning the integration of smaller items such as pay telephones, newsboxes and litter bins into the larger Franchise Structures. The Commission notes that the RFP already requires respondents to allow for the inclusion of public pay telephones in or on larger structures. Although the concept of integrating smaller items into the larger structures appears beneficial in principle, after examining the issue the Commission believes that in practice there would be adverse consequences which would outweigh potential benefits. Items such as newsboxes or litter bins on a bus stop shelter, for example, would either reduce the adjacent clear path or restrict access into the shelter and would compromise its transparency. The Commission therefore believes that the sentence in Section 1 of the RFP encouraging proposers to incorporate smaller items (referred to as "PSSs") within or on Franchise Structures should be deleted.

C960543(A) GFY

B.    Advertising

Considerable concern was expressed during the public review process that the RFP allows too much advertising on Franchise Structures. The Commission shares this concern. Based on advice from the Department of City Planning about the likely configuration of Franchise Structures and appropriate locations for advertising panels thereon, the Commission believes the maximum amount of advertising permitted on a Bus Stop Shelter should be reduced from 70 square feet to 55 square feet, on a Newsstand from 108 square feet to 70 square feet and on an Automatic Public Toilet from 108 square feet to 70 square feet.  Consistent with the Deputy Mayor's commitment in her testimony before it, the Commission believes that it is appropriate to limit advertising on Public Service Structures to litter or recycling bins only and sets the maximum permitted amount at 8 square feet for each bin and the maximum permitted height at 3 feet above sidewalk level.

The Commission has also examined the question of the number and location of advertising panels permitted on Franchise Structures. Most new Bus Stop Shelters will be about the size of the current standard unit.   The Commission believes that its basic configuration, an opaque end panel and a transparent long panel parallel to the curb, is optimal because it maximizes visibility into and through the shelter and minimizes the visual impact of the shelter on adjacent ground floor uses and building facades. Accordingly, the Commission proposes to modify the RFP to permit

the basic allowance of two panels and a maximum of 55 square feet of advertising to be located only on shelter end panels (i.e. panels which are aligned perpendicularly to the curb). For Newsstands and Automatic Public Toilets, the Commission sees no reason to limit the number of advertising panels, given the total maximum area limit per structure. Indeed, it believes this limitation unnecessarily constrains design flexibility. It therefore believes the RFP should be modified to remove the restriction of two panels per Newsstand or Automatic Public Toilet.

The Commission heard concerns about the allowance in the RFP of a third advertising panel of up to 35 square feet in area on any Franchise Structure, limited to a maximum of 10% of the total number of structures city-wide and 20% in any one Community District. It believes that additional advertising should only be permitted on large Bus Stop Shelters.

To preserve design flexibility, the location of one additional advertising panel should remain unrestricted. Two additional panels would be acceptable if their location is limited to shelter end panels. The Commission therefore proposes to modify the RFP to permit, on bus stop shelters greater than 25 feet in length only, two additional advertising panels each up to 27.5 square feet in area if both are located on shelter end panels; or one additional advertising panel of up to 27.5 square feet in area.

C960543(A) GFY

The Commission is concerned about the potential visual impact, particularly at night, of advertising affixed to litter or recycling bins. Accordingly it proposes to prohibit backlit advertising on litter or recycling bins.

C. Public Service Structures

In her testimony before the Commission, the Deputy Mayor stated that in response to concerns about the possible proliferation of Public Service Structures, the Administration proposed to limit the scope of these Structures to computer information terminals and litter and recycling bins. The Commission agrees with this limitation and believes the RFP should be modified to reflect it.

With this tighter definition of Public Service Structure types, the Commission also believes it is appropriate to reduce the maximum allowable sizes of these Structures to the following dimensional limits:

|  | Area | Length | Width | Height |
|---|---|---|---|---|
| Computer Terminals | 16 s.f. | 4' | 4' | 9' |
| Litter/Recycling bins | 6.25 s.f. | 2'6" | 2'6" | 4' |

A roof overhang of up to 2 feet should be permitted on one side of a computer terminal if a clear height of 7 and 1/2 feet is maintained beneath it.

C960543(A) GFY

D.   Pillar-Type Structures

A number of Community Board and Borough President recommendations and speakers at the public hearing stated that the maximum height limit of 16 feet for pillar-type structures was excessive.

The Commission notes that this height limit is intended to allow for conical or tapered roof configurations and that pillar-type structures of this kind have been successfully installed in many cities and could provide a positive addition to certain New York City streetscapes.  It agrees, however, that some decrease in the overall height limit is approporiate.  A corresponding reduction in the height limit for advertising should also be made.  The Commission therefore proposes to reduce the maximum permitted height of pillar structures to 14 feet and the maximum permitted height of advertising thereon to 12 feet.

The Commission notes that submission of pillar-type designs is optional, not required, and that the new language relating to design which it is adding to the RFP clearly places emphasis on non-pillar designs.  It is also assured that the installation of pillar-type structures will be at the City's discretion and in consultation with Community Boards and other interested parties.

The Commission does believe, however, that some additional restrictions on pillar-type Structures are required.    In particular, the Commission proposes to modify the RFP to eliminate

31                                              C960543(A)  GFY

pillar-type Public Service Structures. These are now more limited in scope and have a reduced footprint. The Commission also proposes to modify the RFP to prohibit pillar-type newsstands in districts which are zoned for residential use. (The RFP already excludes Automatic Public Toilets from residential districts).

With these changes, the Commission believes that the retention of the pillar option for Newsstands and Toilets is useful. Their smaller footprint takes less sidewalk space than regular structures, which may be beneficial in some situations. Their vertical orientation may be more appropriate for structures located in front of buildings with facades of heroic proportions.

E.    Clarifications

The Department of Transportation wishes to make some minor revisions, deletions and additions to the language of the RFP to clarify certain aspects of it and to ensure that respondents are aware of existing applicable city regulations and policies. In particular DOT proposes to modify the "Special Circumstances" section of the Siting Criteria by adding the following language:

> Notwithstanding anything contained herein, litter bins may be replaced at their existing locations in accordance with the Department of Sanitation's Operation Order for the placement of litter baskets and the Mayor's Clear Corner Policy (Exec. Order No. 22 of 1995).

This will ensure that the receptacles are sited in a manner that is

consistent with DOS policies and operating procedures. The
Commission supports these proposed modifications.


**Additional Comments**

A number of additional issues were raised and modifications to the
RFP suggested in the recommendations and testimony received during
the public review process. These include issues related to siting,
design, advertising, the franchise term, maintenance and aspects of
individual types of structures.


Some recommendations called for a survey of existing street
furniture, particularly in Midtown Manhattan, as a precursor to
this program. The Commission notes that in developing the
Coordinated Street Furniture RFP, the City agencies involved gave
careful consideration to existing patterns of sidewalk use. The
Department of City Planning, as part of another study, has a
detailed inventory in map form showing the location of all of the
street items for much of Midtown and expects to complete this
analysis in the near future. This work will be made available to
the Department of Transportation and its Franchisee for street
furniture siting purposes.


The Commission is satisfied that a wide geographic distribution of
street furniture items will be achieved under this program. The
Deputy Mayor, in response to questions from the Commission, assured
it that the Administration is committed to a city-wide approach to

C960543(A) GFY

the program and pointed out that one of the basic rationales for including all of the major items of street furniture in a single program across all five Boroughs was to spread the costs and revenues city-wide. The Commission believes that this approach should help ensure an equitable distribution of street furniture items. In relation to the suggestion that the number of items be specified by individual Community Districts in the RFP, the Commission believes that the consultative site selection process which will occur after the Franchisee has been selected is the appropriate time for allocation decisions to be made, given the complex variety of issues which must be addressed in arriving at an optimal distribution pattern.

The Manhattan Borough President has suggested that limits be put on the number of street furniture elements per block face and per intersection. The Commission understands the Borough President's concern, but does not believe that such restrictions in the RFP are necessary. The minimum spacing of Bus Stop Shelters is dictated by the intervals between stops and on streets with multiple bus routes shelters are generally shared. The limited number of Automatic Public Toilets included in the RFP will necessitate their dispersion. While most existing Newsstands will be replaced at or in the immediate vicinity of their current locations, the City will for the first time have discretion over the placement of additional Newsstands. In addition, the comprehensive nature of the Siting Criteria will help ensure that excessive concentrations of street

---

C960543(A)  GFY

furniture items will not occur.

Several submissions received by the Commission during the public review process sought to give Community Boards, elected officials and/or Business Improvement Districts final siting approval. The Commission notes that the RFP includes a multi-stage site selection process including extensive community involvement. A similar process currently used for the siting of Bus Stop Shelters has worked well. The Commission believes that coherent coordination of siting is essential to the success of the program, that this requires overall control by a single entity and that the RFP correctly gives this responsibility to the Department of Transportation.

The Commission believes that concerns about the adequacy of clear paths adjoining Franchise Structures are adequately addressed when all of the provisions of the RFP including the Siting Criteria in the Appendix are taken into account. Maximum widths of structures have been kept as small as possible consistent with functional and ADA requirements and structures are required to be located in close proximity to sidewalk edges.

The Commission received several comments proposing that Community Boards, elected officials and/or Business Improvement Districts be involved in the review and/or approval of street furniture designs. It believes that the new language relating to design will result in

35                                          C960543(A)  GFY

sufficient variability in the designs of the structures to ensure an appropriate design response to particular streetscapes.

The Commission shares the concern expressed in some testimony that other elements of street furniture such as honor boxes and company-owned coin-operated telephones, also need to be dealt with if the City's streetscape is to be managed comprehensively. It believes, however, that the street furniture program embodied in this RFP as proposed to be modified herein will result in a significant improvement in the City's streets. It notes that in response to Commissioners' questions at its Public Hearing, the Deputy Mayor stated that the Administration is pursuing related actions in regard to these other elements of street furniture.

In response to calls for an increase in the percentage of advertising space allocated to public service information, the Commission notes that it has significantly reduced the total amount of advertising permitted on Franchise Structures. It does not believe that it is prudent to make a further reduction in the amount of revenue-generating advertising.

In relation to the type of advertising, the Commission notes that the RFP does include provisions dealing with this question, including a prohibition on tobacco advertising.

A number of submissions received during the Public Review process

36

recommended that the 20 year franchise term be reduced or divided into two or more renewal periods. The Commission notes that the City Council resolution authorizing the franchise permits a 20 year term. It also acknowledges the Deputy Mayor's position that the franchise requires a substantial capital investment necessitating a sufficiently long term to ensure an adequate financial return to the Franchisee. This is particularly the case if the franchise is to yield durable street furniture of high design quality. The Commission believes that adequate Franchise performance can best be guaranteed by a well-crafted contract.

The Commission notes that questions concerning the performance of the Franchisee are contractual in nature, generally fall outside of its purview and will come under the scrutiny of the Franchise and Concessions Review Committee.

In relation to concerns about the siting of Newsstands, the Commission references its comments above concerning the avoidance of excessive concentrations of any type of Franchise Structure and also notes the Deputy Mayor's statement cited in the public hearing section of this report. While questions about the performance of individual operators lie outside the scope of the proposed RFP, the Commission believes that bringing the design, installation and maintenance of all newsstands under a single Franchisee will result in a significant improvement in appearance over the current newsstand inventory.

C960543(A) GFY

Recommendations received by the Commission from two Manhattan Community Boards sought additional numbers of Automatic Public Toilets and longer operating hours. The Commission notes that the proposed RFP gives the City an option to require additional toilets beyond the minimum specified number and allows it to require the Franchisee to extend the minimum operating hours of 8:00 a.m. to 8:00 p.m. at particular sites.

C960543(A) GFY

RESOLUTION

**RESOLVED,** that the City Planning Commission finds that the action described herein will have no significant impact on the environment; and be it further

**RESOLVED,** by the City Planning Commission, pursuant to section 197-c and 363-e(2) of the City Charter, that based on the environmental determination and the consideration described in this report the application of the Department of Transportation for a franchise for installing, operating and maintaining bus stop shelters, automatic public toilets, newsstands and public service structures to be located in all five boroughs and proposed for modification on August 19, 1996 pursuant to Section 7.030 of the Uniform Land Use Review Procedure is hereby approved with the following modifications:

1.  Replace the first paragraph of Section II A 1. with the following new language:

    The Coordinated Street Furniture Franchise is an important new initiative for the City of New York. Its primary goals are to augment and significantly improve the appearance and quality of the largest items of furniture in our streets.

    Designs must achieve aesthetic excellence. They must be compatible with a wide variety of built contexts and must conform to a citywide coordinated design scheme. Designs for the different types of Franchise Structures must be coordinated so that within any one area there is a harmonious relationship between the various items of street furniture.

    Designs will be evaluated on the basis of functional

C960543(A) GFY

efficiency, aesthetics, security, durability, adaptability for various built environments around the City and accommodation of people with disabilities. All designs are subject to the approval of the Department.

For each type of standard Franchise Structure (Bus Stop Shelter, Newsstand, Automatic Public Toilet and Public Service Structure meeting non-pillar dimensional criteria), Proposers must submit two basic designs. The **first design** shall be suitable for deployment, in the case of Bus Stop Shelters, throughout the City and, in the case of other Franchise Structures, in medium and high density mixed-use environments. Proposers are required to show how each of these basic designs can be varied to suit specific contexts. This might be achieved, for example, through alternative shapes or forms for component parts, alternate materials and/or varying the color of applied finishes. The **second design** for each type of standard Franchise Structure shall be appropriate for use within districts or in front of individual buildings which are designated New York City Landmarks. These designs may also be deployed on a limited basis in other locations. Some degree of variation in these basic designs is also required. Any designs for pillar structures shall be additional to the basic designs specified above.

Bus Stop Shelters and Newsstands must be available in several sizes and configurations to meet the constraints imposed by various street conditions and users' needs as specified below. The maximum dimensions of each of the Franchise Structures is described below and summarized in Appendix 2.

2.   Delete the sentence in Section 1 of the RFP encouraging proposers to incorporate smaller items (referred to as "PSSs") within or on Franchise Structures.

3.   Reduce the maximum amount of advertising permitted on a Bus Stop Shelter from 70 square feet to 55 square feet, on a Newsstand from 108 square feet to 70 square feet and on an Automatic Public Toilet from 108 square feet to 70 feet. Limit advertising on Public Service Structures to litter or

recycling bins only and set the maximum permitted amount at 8 square feet for each bin and the maximum permitted height at 3 feet above sidewalk level.

4.  Permit the basic allowance of two panels and a maximum of 55 square feet of advertising on Bus Stop Shelters to be located only on shelter end panels (i.e. panels which are aligned perpendicular to the curb).

5.  Remove the restriction of two panels per Newsstand or Automatic Public Toilet.

6.  On bus stop shelters greater than 25 feet in length only, permit two additional advertising panels each up to 27.5 square feet in area if both are located on shelter end panels; or one additional advertising panel of up to 27.5 square feet in area.

7.  Prohibit backlit advertising on litter or recycling bins.

8.  Limit Public Service Structures to computer information terminals and litter and recycling bins only.

Reduce the maximum allowable sizes of Public Service Structures to the following dimensional limits:

41                                                          C960543(A) GFY

|                       | Area       | Length | Width | Height |
|-----------------------|------------|--------|-------|--------|
| Computer Terminals    | 16 s.f.    | 4'     | 4'    | 9'     |
| Litter/Recycling bins | 6.25 s.f.  | 2'6"   | 2'6"  | 4'     |

Permit a roof overhang of up to 2 feet on one side of a computer terminal if a clear height of 7 and 1/2 feet is maintained beneath it.

9. Reduce the maximum permitted height of pillar structures to 14 feet and the maximum permitted height of advertising thereon to 12 feet.

10. Eliminate pillar-type Public Service Structures. Prohibit pillar-type newsstands in districts which are zoned for residential use.

11. Add the following language to the "Special Circumstances" section of the Siting Criteria:

    Notwithstanding anything contained herein, litter bins may be replaced at their existing locations in accordance with the Department of Sanitation's Operation Order for the placement of litter baskets and the Mayor's Clear Corner Policy (Exec. Order No. 22 of 1995).

12. Make minor deletions and additions as indicated in the attached modified version of the RFP.

The resolution (C960543(A)GFY), duly adopted by the City Planning

C960543(A)  GFY

Commission on October 9, 1996 (Calendar No. 34) is filed with the Office of the Speaker, City Council and the Borough Presidents, in accordance with the requirements of Section 197-d of the New York City Charter.

JOSEPH B. ROSE, Chairman
VICTOR G. ALICEA, Vice-Chairman
ALBERT ABNEY
ANGELA M. BATTAGLIA
AMANDA M. BURDEN, A.I.C.P.
IRWIN G. CANTOR, P.E.
KATHY HIRATA CHIN, Esq.
ALEXANDER GARVIN
ANTHONY I. GIACOBBE, Esq.
WILLIAM J. GRINKER
BRENDA LEVIN
EDWARD T. ROGOWSKY
JACOB B. WARD, Esq.,   Commissioners

43                                                    C960543(A)  GFY