# EXHIBIT 54

# City Environmental Quality Review

# C.E.Q.R.
## Technical Manual





Michael R. Bloomberg, Mayor
The City of New York

EXHIBIT
Plf's 3
3/9/08 JD

# CHAPTER 1

# PROCEDURES AND DOCUMENTATION

City Environmental Quality Review, or "CEQR," is a process by which agencies of the City of New York review proposed discretionary actions for the purpose of identifying the effects those actions may have on the environment. This part of the CEQR Technical Manual outlines the legal framework of the CEQR process.

This chapter addresses the types of actions subject to CEQR, the selection of the agency primarily responsible for the environmental review of the action, the involvement of other agencies and the public in the review, the determinations and findings that are prerequisites for agency action, and the process for identifying technical areas to be reviewed. It also discusses CEQR's relationship with other approval procedures, such as the Uniform Land Use Procedure, and introduces the documentation used in CEQR, including the Environmental Assessment Statement (EAS) and the Environmental Impact Statement (EIS).

This chapter is not a definitive discussion of the legal issues that may be encountered in the CEQR process. The review of a specific project or action by an agency may in many instances require additional research and interpretation. In these cases, it may be useful to consult with legal counsel.

## A. Overview of Legislative History

### 100. NEPA

The concept of an interdisciplinary, comprehensive environmental impact assessment was first introduced when the Congress of the United States of America included it in Section 102(2)(C) of the National Environmental Policy Act of 1969, known as "NEPA." NEPA regulations require all Federal agencies to evaluate the environmental consequences of proposed actions and to consider alternatives.

### 200. SEQRA

In 1975, New York State's legislature enacted the State Environmental Quality Review Act, known as "SEQRA." This Act requires that all State and local governmental agencies assess environmental effects of discretionary actions, unless such actions fall within certain statutory or regulatory exemptions from the requirements for review, before undertaking, funding or approving the action.

The provisions of SEQRA may be found in Article 8 of the State Environmental Conservation Law (ECL § 8-0101 et seq.). The State Department of Environmental Conservation (DEC) has promulgated extensive regulations that guide the process of review. These regulations, last revised in 1995 and taking effect in 1996, are published in Part 617 of Title 6 New York Codes, Rules and Regulations (6 NYCRR), and are included in the Appendix to this Manual. These regulations are available on DEC's Web site at http://www.dec.state.ny.us/. They permit a local government to promulgate its own rules provided they are no less protective of the environment than the State rules. The City of New York has exercised this prerogative by promulgating its own procedures, known as CEQR.

### 300. CEQR

In 1973, before SEQRA was enacted, the New York City Mayor's Executive Order No. 87, titled "Environmental Review of Major Projects," adapted NEPA to meet the needs of the City. After SEQRA was enacted, New York City revised its procedures in the Mayor's Executive Order No. 91 of 1977, which established CEQR by name. This order centralized most CEQR review functions in the Departments of City Planning and Environmental Protection (DCP and DEP), which served as the City's "co-lead agencies."

In 1989, amendments to the New York City Charter, adopted by referendum, established the Office of Environmental Coordination and authorized the City Planning Commission to establish procedures for the conduct of environmental review by City agencies where review is required by law. The Charter directs that such procedures include (1) the selection of the City agency or agencies that are to be responsible for determining whether an Environmental Impact Statement is required (i.e., the "lead" agency), (2) the participation by the City in reviews involving agencies other than City agencies, and (3) coordination of environmental review procedures with the Uniform Land Use Review Procedure.

On October 1, 1991, additional rules of the City Planning Commission were superimposed on Executive Order No. 91, fundamentally reforming the City's process. The additional rules, titled Rules of Procedure, are published in the Rules of the City of New York (RCNY), Title 62, Chapter 5 (62 RCNY, Chapter 5). The provisions of Executive Order No. 91 are published as an Appendix to Chapter 5 of the RCNY and also in Title 43 of the Rules of the City of New York. Both the additional rules and the Executive Order are included in the Appendix to this Manual.

Instead of centralizing lead agency responsibilities in two agencies, as was the case under Executive Order No. 91, the additional rules contain a series of provisions by which the agency responsible for the conduct of environmental review of a given action is to be selected.

The additional rules also set forth a public scoping procedure to be followed by the City lead agencies responsible for an action's environmental review, and define in greater detail the responsibilities of the Mayor's Office of Environmental Coordination (OEC). One of the responsibilities of OEC is to assist City lead agencies in fulfilling their environmental responsibilities. Thus, CEQR is New York City's process for implementing SEQRA, while at the same time adapting and refining the State rules to take into account the special circumstances of New York City.

CEQR requirements in general and also for specific actions are often defined through decisions of the State courts. This court review is provided for in Article 78 of the New York State Civil Practice Law and Rules. If an agency fails to comply with CEQR in directly undertaking, funding or approving an action, a court may invalidate that decision. Decisions on Article 78 petitions have established a substantial body of judicial guidance on the scope and requirements of environmental review. For this reason, it is often helpful to consult with legal counsel when making decisions related to environmental review responsibilities.

## B. CEQR Procedures

The CEQR process requires City agencies to assess, disclose, and mitigate the environmental consequences of their decisions to fund, directly undertake, or approve an action.

Based on an initial evaluation, an agency determines whether an action is subject to environmental review or belongs to a category of actions that are not subject to review. If the action is subject to environmental review, an initial assessment considers a series of technical areas, such as air quality, traffic, and neighborhood character, to determine whether the action may have a significant adverse impact on the environment. If the action under consideration may have a significant adverse environmental impact, then the lead agency must investigate and further consider the potential of the project or action to generate significant adverse environmental impacts; the lead agency must consider alternatives that would avoid or minimize such impacts and measures that would mitigate them.

CEQR includes certain requirements as to how the work of the lead agency in studying effects on the environment is to be documented. Under certain circumstances, CEQR also gives the public a role in the review of the study of environmental effects. The level of detail appropriate for the study of environmental effects, the kind of documentation, and the extent of public involvement will vary depending on the action to be studied and its context. This section describes the procedural steps through which an environmental assessment progresses.

### 100. Applicability

Actions that are subject to CEQR include proposed actions that are (1) directly undertaken by a City agency, (2) for which the agency provides financial assistance, or (3) for which the agency issues permits or approvals at its discretion. Such actions must involve the exercise of discretion by the agency and may include approvals of construction projects, such as building a bridge, or adoption of regulations, such as a decision to rezone an area. They may be actions initiated by

the City or actions proposed by private applicants for approval by City agencies.

Within this group of discretionary actions, some categories of actions may be subject to environmental review and others are not. Thus, the first step in the process of environmental review is to determine whether the action is subject to review. For CEQR purposes, actions are broadly divided into three types, as defined by State law and regulations and listed in the two sections below.

### 110. ACTIONS NOT SUBJECT TO ENVIRONMENTAL REVIEW

#### 111. Type II Actions

DEC has included in its regulations a list of actions that it has determined will not have a significant impact on the environment. See 6 NYCRR 617.5. Such actions do not require preparation of an Environmental Impact Statement or an EAS. The State rules permit local agencies to promulgate their own Type II lists. Because the City has no list, the State list should be consulted. DEC's Type II list is included in the 6 NYCRR Part 617 rules that are provided in the Appendix. See 6 NYCRR Part 617.5. Many governmental decisions will fall within the exemption for "routine or continuing agency administration and management, not including new programs or major reordering of priorities that may affect the environment". 6 NYCRR 617.5(c) (20). Another widely applicable Type II category includes the one for official acts of a ministerial nature involving no exercise of discretion. This category includes building permits and historic preservation permits where issuance is predicated solely on the applicant's compliance or non-compliance with the relevant local building or preservation code(s), 6 NYCRR 617.5(c)(19). The pivotal inquiry in such matters is whether the information that would be considered in an environmental review may form the basis for a decision whether or not to undertake or approve the action under consideration. If an agency has some discretion, but that discretion is circumscribed by a narrow set of criteria that do not bear any relationship to the environmental concerns that may be raised in an environmental review, the agency's decisions will not be considered "actions" for purposes of SEQRA and CEQR. The Type II categories for maintenance and repair involving no substantial changes in an existing structure or facility 6 NYCRR 617.5 (c) (1) and for replacement, rehabilitation or reconstruction of a structure or facility in kind on the same site 6 NYCRR 617.5 (c) (2) may also apply to many governmental activities. Emergency actions that are immediately necessary on a limited and temporary basis for the protection or preservation of life, health, property or natural resources are Type II actions, as well. 6 NYCRR 617.5 (c)(33). The parameters of these and other Type II categories require careful consideration and, in many instances, some knowledge of judicial decisions on the subject.

### 120. ACTIONS SUBJECT TO ENVIRONMENTAL REVIEW

#### 121. Type I Actions

Type I actions are defined in the State regulations as "those actions and projects that are more likely to require the preparation of an EIS than unlisted actions" (see below). A Type I action "carries with it a presumption that it is likely [to] have a significant effect on the environment and may require an EIS." Before taking a Type I action, an agency is required to prepare an EAS. Although it is possible to conclude on the basis of an EAS that a Type I action would have no significant impact on the environment, such a determination is less likely than it is for an unlisted action. A list of Type I actions appears in DEC's regulations See 6 NYCRR 617.4. The City has a supplementary list, which appears at § 6-15 of Executive Order No. 91. Both are in the Appendix.

#### 122. Unlisted Actions

Unlisted actions are all actions that are not listed as Type I or Type II. For any unlisted action, an Environmental Assessment Statement (EAS) must be prepared.

### 130. ISSUES OF SEGMENTATION

Defining the scope of the action that is to be the subject of environmental review is one of the preliminary steps in the CEQR process. A project may, for example, involve approvals by more than one agency and funding by yet another agency. If these separate actions were reviewed independently, the combined effects of the total project might be inadequately addressed. SEQRA defines such segmentation as "the division of the environmental review of an action such that various activities or stages are addressed ... as though they were independent, unrelated activities, needing individual determinations of significance."

Although segmentation is permissible in some instances, an agency must avoid improper segmentation. This may require expert guidance, particularly for the purpose of understanding judicial decisions that address this issue. One reference for guidance on this issue is the SEQR Handbook, published by DEC, which offers eight criteria that may be considered in determining whether individual agency actions should be considered together:

1. Is there a common purpose or goal for each action?
2. Is there a common reason for each action being completed at about the same time?
3. Is there a common geographic location involved?
4. Do any of the activities being considered contribute toward significant cumulative or synergistic impacts?
5. Are the different actions under the same ownership or control?
6. Is a given action a component of an identifiable overall plan?
7. Can the interrelated phases of various projects not be considered "functionally independent?"
8. Does the approval of one phase or action commit the agency to continuing with other phases?

The DEC SEQRA Handbook, however, is currently out of print. For further information on the DEC SEQRA Handbook, please refer to DEC's website at http://www.dec.state.ny.us/ .

An example of an action raising segmentation issues is the construction of a highway in phases or sections, where some of the sections would serve no independent purpose until and unless they are joined together with others. Similarly, reconstruction of an existing highway interchange and additional widening of the highway can be so interrelated that the two actions must be examined together.

As mentioned above, segmented review may be permissible in limited instances if the lead agency believes it is warranted under the circumstances, the reasons for proceeding in a segmented manner are clearly stated, a demonstration is made that the segmented review is no less protective of the environment than an unsegmented review and the related actions are identified and discussed fully. In addition, each of the segments must have independent utility and not commit the agency to continuing with the remaining segments. Before making the decision to segment review of related actions, expert guidance should be obtained.

## 200. CEQR Rules

### 210. ESTABLISHING A LEAD AGENCY

As early as possible in an agency's formulation of an action it proposes to undertake, or as soon as an agency receives an application for a funding or approval action, it must determine whether the action is subject to CEQR. If the action is subject to CEQR, a "lead agency" must be determined. State regulations define the "lead agency" as the agency "principally responsible" for carrying out, funding, or approving an action. Under the Rules of Procedure for CEQR, only the lead agency is responsible for determining whether an action, considered in its entirety, requires environmental review. (62 RCNY § 5-05(a)) The other agencies that have jurisdiction to fund, approve, or undertake an action are known as "involved agencies."

The Rules of Procedure for CEQR (62 RCNY § 5-03) provide that where only one City agency is involved in a proposed action, that agency shall be the lead agency for environmental review under CEQR. Where more than one agency is involved, a single lead agency must be selected. An exception is for legislative actions, for which the City Council and the Mayor act as co-lead agencies. The Rules address in detail lead agency selection for a number of City processes, including the enactment of local laws, actions involving franchises and applications for special permits from the Board of Standards and Appeals, among others. The Rules also designate the lead agency for specific actions for which approval by the City Planning Commission is required under the New York City Charter.

Where the Rules of Procedure do not identify a single agency as the lead, the Rules provide criteria by which the involved agencies may choose the most appropriate agency to act as lead for the action. The City's rules also establish a procedure by which the lead agency may be changed; the rules authorize a lead agency to transfer lead agency status to an involved agency, which then becomes the lead agency.

The City's rules governing lead agency selection among City agencies are detailed and cannot be summarized without omitting important provisions. They are best examined in their published form.

If State agencies are involved, the OEC should be consulted for the purpose of deciding whether a City or a State agency should act as lead under the State's regulations. SEQRA rules allow for selection of a City agency as lead when the primary location of the action is local and/or the impacts are primarily of local significance. SEQRA rules also impose a 30-day time limit on lead agency selection when a State agency is involved. If disputes occur among City and State agencies, one of the involved agencies or the applicant (if there is one) may request the Commissioner of DEC to select an agency. After allowing a brief period for involved agency comment on the request, the Commissioner is required to select a lead agency within 20 calendar days of the date the request was received by the DEC Commissioner.

If Federal agencies are involved, the OEC should also be contacted so that the Federal review may be coordinated.

The lead agency is responsible for sending notice of its lead agency status and preparing (see below) and distributing the EAS to all other involved agencies. If the lead agency determines on the basis of the EAS that the proposed action may have a significant adverse effect on the environment, the lead agency is also responsible for circulating the scoping documents, draft Environmental Impact Statements (DEISs), Final Environmental Impact Statements (FEISs), and Notices of Determination, Notices of Completion, and Notices of Public Hearings (all of which are discussed below) to the other involved agencies. The lead agency is to make every effort to keep the other involved and interested agencies informed of the progress of the CEQR process for actions within their jurisdiction. Keeping involved agencies informed is important because each involved agency must prepare its own written findings after the FEIS has been completed and before it takes its action. If the involved agency has chosen not to participate in the process, it still must consider the DEIS and FEIS as the basis for its written CEQR findings (see Section 270, below).

Agencies without jurisdiction to fund, approve, or undertake an action, but that wish to participate in the review process because of their specific expertise or concern about the proposed action, are known as "interested agencies." Interested agencies do not prepare written findings based on the EIS.

## 220. DETERMINATION OF SIGNIFICANCE

### 221. Preparation of Environmental Assessment Statement

If there is no private applicant, an agency that has determined that it is the appropriate lead begins its assessment of whether the proposed action may have a significant effect on the environment by preparing an Environmental Assessment Statement (EAS). Instructions for completing the EAS appear in the form itself. If there is a private applicant, the applicant prepares Parts I and II of the EAS and submits them to the lead agency for review. The lead agency then reviews Parts I and II and completes Part III and the certification. The EAS and this Technical Manual are intended to assist lead agencies and private applicants in identifying the potential effects an action may have on the environment and assessing whether such effects may be significant and adverse.

Apart from serving as a guide to the process of making an initial assessment, the EAS documents an agency's compliance with the initial steps in the CEQR process. It is important that the EAS contain enough information to support the agency's conclusions regarding the potential for significant adverse impacts.

### 222. Criteria for Significance

If the proposed action may reasonably be expected to have any of the following consequences, which appear in Part 617.7 of 6 NYCRR, the action may have a significant effect on the environment:

1. A substantial adverse change in existing air quality, ground or surface water quality or quantity, traffic or noise levels; a substantial increase in solid waste production; a substantial increase in potential for erosion, flooding, leaching, or drainage problems;

2. The removal or destruction of large quantities of vegetation or fauna; substantial interference with the movement of any resident or migratory fish or wildlife species; impacts on a significant habitat area; substantial adverse effects on a threatened or endangered species of animal or plant, or the habitat of such a species; or other significant adverse effects to natural resources;

3. The impairment of the environmental characteristics of a Critical Environmental Area designated pursuant to 6 NYCRR 617.14 (g). For a discussion of Critical Environmental Areas, see Chapter 3I, Natural Resources;

4. The creation of a material conflict with a community's current plans or goals as officially approved or adopted;

5. The impairment of the character or quality of important historical, archaeological, architectural, or aesthetic resources, or of existing community or neighborhood character;

6. A major change in the use of either the quantity or type of energy;

7. The creation of a hazard to human health;

8. A substantial change in the use, or intensity of use, of land including agricultural, open space, or recreational resources, or in its capacity to support existing uses;

9. The encouraging or attracting of a large number of people to a place or places for more than a few days, compared with the number of people who would come to such a place absent the action;

10. The creation of a material demand for other actions which would result in one of the above consequences;

11. Changes in two or more elements of the environment, no one of which has a significant effect on the environment, but when considered together result in a substantial adverse impact on the environment; or

12. Two or more related actions undertaken, funded, or approved by an agency, none of which has or would have a significant effect on the environment, but when considered cumulatively would meet one or more of the criteria in this section.

In determining whether an action would cause one of the above consequences, the lead agency must consider reasonably related short-term, long-term, and cumulative effects, including simultaneous or subsequent actions that are (a) included in a long-range plan; (b) likely to be undertaken as a result thereof; or (c) dependent thereon.

The significance of any of the above consequences should be assessed in connection with the following: (a) the setting in which the action occurs; (b) the probability that an adverse impact will occur; (c) the duration of the impact; (d) its irreversibility; (e) the geographic scope of the adverse impact; (f) its magnitude; and (g) the number of people affected.

Executive Order 91 contains criteria for determining significance in section 6-06. The City's criteria generally repeat the State's but do not match word-for-word. Differences should not be material, however, because section 5-02(b)(2) of the City's Rules of Procedure provides that the City's Rules and Executive Order 91 shall not be construed to require environmental quality review of an action where such review would not otherwise be required by the State Environmental Quality Review Act and the State's regulations, or to dispense with any such review where it is otherwise required.

### 223. Notice of Determination

Once the EAS has been completed, the lead agency should coordinate with other involved agencies (see Section 210, above) in making its determination of significance. The EAS and supporting documentation provide the written record that the agency must examine to make its determination.

Based on the EAS, the lead agency must make one of three possible determinations:

- If the lead agency determines that the action will not have a significant adverse effect on the environment, it issues a *Negative Declaration*. This statement describes the action and the reasons for the determination that the action will not have a significant adverse effect on the environment. The issuance of a Negative Declaration constitutes the completion of the CEQR process with respect to the proposed action.

- If the lead agency determines that the action may have a significant effect on the environment but that all such effects can be eliminated or avoided by specific changes in the action or mitigation that can be easily implemented, then the lead agency issues a *Conditional Negative Declaration* (often referred to as a CND). Pursuant to State regulations, CNDs are not permitted for Type I actions or for actions where there is no applicant distinct from the lead agency.

Conditions that require implementation by another agency must be approved by the lead agency in advance of issuing the CND. As a matter of practice, a letter of understanding with the implementing agency usually should be obtained. (A discussion of mitigation is provided in Section 262, below.)

- If the lead agency determines that the action may have one or more significant adverse impacts, the agency issues a *Positive Declaration*. This notice states that the lead agency has determined that the proposed action may have a significant adverse effect on the environment, and that a Draft Environmental Impact Statement (DEIS) will be prepared. It describes the action and the reasons supporting this determination. The issuance of a Positive Declaration commits the lead agency to preparing a Draft Environmental Impact Statement before it approves, undertakes, or funds its action.

The State rules require the lead agency to give public notice of a CND or a Negative Declaration for a Type I action by publication in the *Environmental Notice Bulletin* published by DEC. The rules provide for a 30-day public comment period. The lead agency is also responsible for submitting these notices for publication in the *City Record*. A Positive Declaration and an intent to prepare an EIS must be published following procedures similar to those for the CND, but no 30-day comment period is required.

Section III of the EAS provides full information on notices of determination; Executive Order No. 91 also provides such guidance. Copies of notices of determination (positive declarations, conditional negative declarations, and negative declarations for Type I actions) are submitted to the *Environmental Notice Bulletin* by e-mailing the notice to enb@gw.dec.state.ny.us. DEC has provided an *Environmental Notice Bulletin* SEQRA Notice Publication Form on its website for this purpose. Alternatively, notices may be mailed to: ENB, NYS Department of Environmental Conservation (DEC), 625 Broadway, 4th Floor, Albany, NY 12233-1750. The ENB can be called at 518-402-9165 with any questions. The DEC publishes the notices in the *Environmental Notice Bulletin*, as required by State law. Copies of the notices also must be filed with the OEC, at 100 Gold Street, 2d Floor, New York, New York 10038; the applicant, if any; the appropriate Community Board(s); the regional director of DEC; and all other involved agencies and interested agencies. OEC is required to publish a list of notices in the *City Record*. These include a quarterly listing of determinations of significance, draft and final scopes and draft environmental impact statements.

After CEQR review for the proposed action is complete, the lead agency may institute a monitoring and review process to ensure that any mitigation included as part of a Conditional Negative Declaration is implemented. Examples include making building permits or temporary certificates of occupancy contingent on completion of the mitigation.

### 230. SCOPING

The City's Rules of Procedure require in section 5-07 that the lead agency conduct a public scoping process for any action for which it has issued a Positive Declaration. Within 15 days after issuing a Positive Declaration, the lead agency must issue a draft scope of work.

The scope of work is a document that identifies in detail all topics to be addressed in the EIS, including the proposed methods for study, possible alternatives to the proposed action, and mitigation measures. The scope describes the proposed action in sufficient detail to allow the public and interested and involved agencies to understand it. It identifies the preferred methods for the analysis.

As appropriate, based on the assessment provided in the EAS, the lead agency may find it useful to target the scoping document to those issues that are likely to or may have the potential for significant adverse impacts. A rationale may be provided for those issues that are excluded because they are not likely to result in significant adverse impacts. By appropriately reducing the scope of the EIS and providing a focused assessment on the issues of concern, this will give the decision-makers and the public a more useful document.

Chapter 3 of this Manual discusses methodologies that may be used to analyze specific impact categories. They have been developed by the expert staffs of various City agencies, working with consultants, and should serve as useful guides to the application of the criteria for determining significance. The lead agency may, however, use other methodologies, but if different methodologies are contemplated, it may be advisable to consult with the OEC.

The list of technical areas for which methodologies are provided in this Manual may

serve as a checklist for the initial identification of the issues to be addressed in the EIS. It may be that a project will not require analysis in all of the technical areas. Conversely, the unique character of a given proposed action may require analysis in an area not included in this Manual. The technical areas and issues that are typically to be considered as appropriate in the scoping process include the following:

- Land use, zoning, and public policy
- Socioeconomic conditions
- Community facilities and services
- Open space
- Shadows
- Historic resources
- Urban design/visual resources
- Neighborhood character
- Natural resources
- Hazardous materials
- Waterfront revitalization program
- Infrastructure
- Solid waste and sanitation services
- Energy
- Traffic and parking
- Transit and pedestrians
- Air quality
- Noise
- Construction impacts
- Public health

For each of these topics, the scope indicates whether study is appropriate, and, if it is, the scope defines the study areas and analysis methodologies to be used. DEC also provides a scoping checklist, which is published as an Appendix to its SEQRA rules.

After the draft scope is completed, a public scoping meeting must be held. The lead agency must publish notice of the public scoping meeting in the *City Record* and notify other involved agencies of the scoping meeting following the timetable described in Section 290. The notice must indicate that a Draft Environmental Impact Statement will be prepared, request public comment with respect to issues to be addressed in the DEIS, and state that members of the public may inspect copies of the EAS and draft scope from the lead agency or OEC. The notice also must identify the date, time, and place of the scoping meeting; indicate that written comments will be accepted by the lead agency through the 10th day following the meeting; and provide written guidelines for public participation at the scoping meeting.

All involved and interested City agencies, the OEC, the appropriate borough board, community boards that would be affected by the action, any private applicant, and any interested civic or neighborhood groups or individuals may attend the scoping meeting and give comments on the draft scope of work. The lead agency must consider these comments before issuing a final scope of work which should incorporate, as appropriate, the comments received.

When a lead agency receives substantial new information after issuance of the final scope, it may amend the final scope to reflect such information. The lead agency should notify all those who received copies of the final scope, including OEC and the other involved agencies, of this change.

### 240. PREPARATION AND PUBLICATION OF THE DRAFT ENVIRONMENTAL IMPACT STATEMENT

### 241. Preparation of the DEIS

The next step is the preparation of the Draft Environmental Impact Statement (DEIS). The content and format of an Environmental Impact Statement depend on the nature of the action and the sorts of impacts, alternatives, and mitigation measures that are reasonable in the circumstances. The EIS is intended to enable a decision-maker to understand environmental impacts, and is analytic, not encyclopedic. It is not a repository for all knowledge about a given technical area. Rather, the EIS should cover specific significant environmental impacts that can be reasonably anticipated or have been identified in the scoping process, and explain these in no more detail than is appropriate considering the nature and magnitude of the proposed action and the significance of the potential impacts. Therefore, the level of detail is determined by a rule of reason: how much detail is reasonable to enable the lead and other involved agencies to make informed decisions about the significant adverse environmental impacts of a proposed action and how to avoid or mitigate those impacts to the maximum extent practicable in the circumstances.

Section 6-09 of Executive Order No. 91 prescribes the following contents of an EIS:

1. A description of the proposed action and its environmental setting.
2. A statement of the environmental impacts of the proposed action, including short-term and

long-term effects and typical associated environmental effects.
3. An identification of any adverse environmental effects that cannot be avoided should the proposal be implemented.
4. A discussion of the social and economic impacts of the proposed action.
5. A discussion of alternatives to the proposed action and the comparable impacts and effects of such alternatives.
6. An identification of any irreversible and irretrievable commitments of resources that would be involved in the proposed action should it be implemented.
7. A description of mitigation measures proposed to minimize significant adverse environmental impacts.
8. A description of the growth-inducing aspects of the proposed action, where applicable and significant.
9. A discussion of the effects of the proposed action on the use and conservation of energy resources, where applicable and significant.
10. A list of underlying studies, reports or other information obtained and considered in preparing the statement.
11. Such other information as is consistent with the purposes of SEQRA as described in the CEQR Executive Order and the SEQRA Regulations.

Furthermore, SEQRA requires that EISs contain certain information regarding reasonably foreseeable catastrophic impacts and State agency actions in the City's waterfront revitalization program boundaries.

If information about reasonably foreseeable catastrophic impacts is unavailable or uncertain, and such information is essential to an agency's CEQR/SEQRA findings, the EIS would:

- Identify the nature and relevance of unavailable or uncertain information;
- Provide a summary of existing credible scientific evidence, if available;
- Assess the likelihood of occurrence, even if the probability of occurrence is low, and the consequences of the potential impact, using theoretical approaches or research methods generally accepted in the scientific community.

The analysis would likely be necessary in the review of such actions as the siting of a hazardous waste treatment facility or liquid natural gas facility. According to the SEQRA rules, it does not apply in the review of such actions as the siting of shopping malls, residential subdivisions, or office facilities.

### 241.1. Cover Page

The draft EIS must have a cover page, setting forth the following provisions:

1. A statement that it is a Draft EIS.
2. The name or descriptive title of the action.
3. The location and street address, if applicable, of the action.
4. The name and address of the agency that required its preparation, and the name, telephone number, fax number and e-mail address of a person at the agency who can provide further information.
5. The names of individuals or organizations that prepared any portion of the EIS.
6. The date (day, month, year) of its acceptance by the agency responsible for its preparation.
7. If the EIS is longer than 10 pages, a table of contents must be provided following the cover sheet.

### 241.2. Executive Summary

Following the cover page, the EIS must provide a precise summary that adequately and accurately summarizes the EIS. 6 NYCRR 617.9(b)(4). The summary briefly describes the action, its significant adverse environmental impacts, a list of mitigation measures to avoid or reduce significant adverse impacts, alternatives considered, and a listing of matters to be decided (including a listing of each permit or approval).

### 241.3. Project Description

The draft EIS must fully describe the action and its background, purpose, public need and benefits, including social and economic considerations, the approvals required, and the role of the EIS in the approval process. This section is intended to give the reader and the decision-maker enough information to understand the action in its full context. Enough information should be provided to allow assessment of the project's impacts in later sections of the EIS. Typically, a project description includes text, graphics, a statement of the project's location, and tables, and defines the project, its plan and form, and its size. If the action involves changes in regulatory controls that affect one or more sites not associated with specific known development (known as "soft sites"), it may be necessary to

describe one or more development scenarios to establish what may reasonably be expected to occur.

### 241.4. Technical Analyses

Each technical analysis of the EIS must assess existing conditions, the future absent the proposed action (sometimes referred to as the "no action" or "no build" condition), and the future if the action is implemented. Comparison of the future without and with the action allows the action's increment and impacts to be evaluated. CEQR requires analysis of both the primary and the secondary impacts of an action. Similarly, cumulative impacts, must be identified.

Chapter 3 of this Manual provides assistance in performing these technical analyses, including some possible methodologies. These methodologies are considered appropriate for analysis of CEQR actions, but are not required by CEQR. Other methodologies also exist and may be used if appropriate.

### 241.5. Mitigation

CEQR requires that any significant adverse impacts identified in the EIS be minimized or avoided to the fullest extent practicable, given costs and other factors. Such mitigation measures must be identified in the EIS. In the DEIS, options for mitigation must be recommended and assessed. A range of mitigation can be presented for public review and discussion, without the lead agency having selected one for implementation. Where no mitigation is available, the EIS must disclose the potential for unmitigatable significant adverse impacts.

### 241.6. Alternatives

The State SEQRA rules require that "a description and evaluation of the range of reasonable alternatives to the action" be included in an EIS at a level of detail sufficient to permit a comparative assessment of the alternative discussed. The regulations specify that such alternatives include "the range of reasonable alternatives to the action which are feasible, considering the objectives and capabilities of the project sponsor." 6 NYCRR 617.9(b)(5)(v). If the environmental assessment and consideration of alternatives identify a feasible alternative that eliminates or minimizes adverse impacts, the lead agency may want to consider the alternative as the proposed action. SEQRA also requires that the range of reasonable alternatives include the "no-action" alternative. 6 NYCRR 617.9(b)(5)(v) specifically provides that the no-action alternative discussion should evaluate the adverse or beneficial site changes that are likely to occur in the foreseeable future, in the absence of the proposed action. 6 NYCRR 617.9(b)(5)(v). More guidance on alternatives that reduce or eliminate impacts in the various technical areas is found in Section 600 of each technical analysis area (Chapter 3), and a general discussion of alternatives is provided in Chapter 3U.

### 241.7. Completion of the DEIS

For actions proposed by private applicants, a Preliminary Draft Environmental Impact Statement (PDEIS) is prepared by the applicant and submitted to the lead agency. The lead agency then reviews the PDEIS for adequacy, accuracy, and completeness with respect to the scope of work. If necessary, the lead agency comments on issues that were not adequately addressed in the PDEIS. The applicant can then revise the document accordingly. This review continues until the lead agency determines that the PDEIS is complete and ready for public circulation and comment as a DEIS.

### 242. Notice of Completion

When the lead agency deems the DEIS to be complete, it prepares a *Notice of Completion* in accordance with section 6-10(a) of Executive Order No. 91. This Notice describes the action, its potential impacts and effects and specifies the period of public review and comment. This notice, and the draft EIS, should be filed with or distributed to the following:

- Mayor's Office of Environmental Coordination (OEC).

- The New York State Department of Environmental Conservation, Division of Regulatory Services, 625 Broadway, 4th Floor, Albany, NY 12233-1750.

- The Notice of Completion is filed for publication in the *Environmental Notice Bulletin* by mailing it to The New York State Department of Environmental Conservation, Division of Regulatory Services, 625 Broadway, 4th Floor, Albany, NY 12233-1750.

- Region II Office of the New York State Department of Environmental Conservation at Long

Island City, Queens, NY.

- Borough President(s), as applicable.

- Applicant, if any.

- All involved agencies.

- All persons who have requested the Notice or Draft EIS. In the case of the Draft EIS, the agency may charge a fee to cover copying costs.

- Appropriate community boards and borough boards.

- In the case of actions in the Coastal Zone, the New York State Secretary of State (162 Washington Avenue, Albany, NY 12231).

The Notice of Completion of the DEIS is available for inspection at the lead agency's office and the Mayor's Office of Environmental Coordination. In addition, a copy is often placed in a local library for public reference.

### 250. PUBLIC REVIEW

Publication of the DEIS and issuance of the Notice of Completion signal the start of the public review period. During this time the public may review and comment on the DEIS either in writing or at the public hearing, which must be convened for the purpose of receiving such comments. The comment period must extend for a minimum of 30 days.

The lead agency must hold the CEQR public hearing no less than 15 days or more than 60 days after the completion and filing of the DEIS, except when a different hearing date is required as appropriate under another law or regulation. For example, for actions pursuant to the City's Uniform Land Use Review Procedure (ULURP), section 6-10 (c)(4) of CEQR provides that the public hearing conducted by the appropriate community or borough board and/or the City Planning Commission on the ULURP application shall satisfy the hearing requirement under CEQR for the Draft EIS. However, the lead agency under CEQR must conduct the CEQR hearing, even if this hearing is held simultaneously with a ULURP hearing. The lead agency must also publish all required notices for the hearing (discussed below). Similarly, the CEQR hearing on an application for an approval from the Board of Standards and Appeals (BSA) may be conducted simultaneously with the hearing on other issues even though the hearing may occur more than 60 days after the filing of the DEIS.

The Notice of Public Hearing may be contained in the Notice of Completion, or the lead agency may publish it as a separate document. In either case, the lead agency must publish a notice of the public hearing in the *City Record*, in the *Environmental Notice Bulletin* published by the New York State Department of Environmental Conservation, and in a general circulation newspaper at least 14 calendar days before the scheduled hearing. If published as a separate document from the Notice of Completion, the Notice of Public Hearing should also be distributed to the same parties who received the Notice of Completion of the DEIS (see Section 242, above).

The public is invited to send written comments to the lead agency, with a minimum of 30 calendar days to comment on issues related to the environmental review. Written comments are accepted for a minimum of 10 calendar days after the hearing. See 6 NYCRR 617.9(a)(4)(iii). All substantive comments received at the hearing become part of the CEQR record and are typically summarized and responded to in the FEIS.

### 260. PREPARATION AND PUBLICATION OF FINAL ENVIRONMENTAL IMPACT STATEMENT (FEIS)

#### 261. Preparation of the FEIS

After the close of the public comment period for the DEIS, the lead agency prepares, or causes to be prepared, a Final EIS (FEIS). This document consists of the DEIS, copies or a summary of the substantive comments received at the hearing or in writing during the comment period, and the lead agency's responses. Any revisions, including further studies, made in response to comments are set forth. Revisions of the DEIS are typically indicated by marking the revised text in the FEIS. Where differences of expert opinion over the choice of data or methodology arise, the lead agency may provide a reasoned elaboration of why it selects one approach over another. The responses should be sufficient to show that the lead agency took a hard look at the environmental issues raised. The cover page of the FEIS must indicate that it is the Final EIS.

#### 262. Mitigation

Measures that minimize significant adverse impacts to the maximum extent practicable must be

identified in the FEIS. If a range of possible mitigation measures for a given significant impact was presented in the DEIS, the mitigation to be used must be selected and disclosed in the FEIS, and its method of implementation described. Certain mitigation measures that require implementation by or approval from City agencies (such as changes to traffic signal timing, which would be implemented by the New York City Department of Transportation) should be agreed to in writing by that agency before inclusion in the FEIS or findings. In the absence of commitment to mitigation or when no feasible mitigation measures can be identified, the potential for unmitigated or unmitigatible significant adverse impacts must be disclosed.

### 263. Notice of Completion

Once the lead agency determines that the FEIS is complete, it issues a *Notice of Completion*, describing the FEIS, the action, and how to obtain copies of the FEIS. This notice and a copy of the FEIS are then filed with the same persons who received copies of the Notice of Completion for the DEIS, as well as any new interested agencies that may have participated. In the case of actions in the Coastal Zone, the New York State Secretary of State must also receive a copy of the FEIS.

### 270. AGENCY FINDINGS

Before the lead agency makes a decision on an action that has been analyzed in an FEIS, it must allow at least 10 calendar days for consideration of the FEIS, pursuant to SEQRA. Then, to demonstrate that the responsible City decision-maker has taken a hard look at the impacts and alternatives or mitigation measures, the lead agency adopts a formal set of written *findings* in the form of a "Statement of Findings", drawing its conclusions about the significant adverse environmental impacts of the proposed action and how to avoid or mitigate them. Written, formal findings must be adopted by the responsible decision-makers of the lead agency before the agency may fund, approve, or undertake its action. The findings conclude the CEQR process. This Statement of Findings must set forth the following points:

1. The agency has considered the FEIS.
2. All CEQR/SEQRA requirements have been met.
3. Consistent with social, economic, and other essential considerations of State and City policy, from among the reasonable alternatives, the proposed action is one that minimizes or avoids significant adverse environmental effects to the maximum extent practicable, including the effects disclosed in the relevant Environmental Impact Statement.
4. Consistent with social, economic, and other essential considerations, to the maximum extent practicable, adverse environmental effects revealed in the FEIS will be minimized or avoided by incorporating as conditions to the decision those mitigative measures that are identified as practicable.
5. The facts and conclusions in the FEIS relied upon to support the agency's decision and the social, economic, and other factors and standards that formed the basis of its decision.

In addition to the lead agency, all involved agencies must adopt CEQR findings before making final decisions regarding their discretionary actions. Each agency is responsible for adoption of its own findings. Such CEQR findings must be filed with all involved agencies, the OEC and the applicant, if any, at the time the findings are adopted.

### 280. ACTION

Once the lead agency gives notice of the adoption of its findings, the CEQR process is concluded and the agency may then take its action, unless additional procedures are required under other laws.

### 290. TIMETABLE

To guide the CEQR process, the CEQR Rules of Procedure provide timetables for completion of the applicable steps.

Review under CEQR should be undertaken as early as possible in the formulation of a proposal for an action. An agency may, however, conduct environmental, engineering, economic, feasibility, and other studies and preliminary planning and budgetary processes necessary to the formulation of an action without first beginning the CEQR process. Such activities are considered Type II actions. 6 NYCRR 617.5(c)(21). Environmental review must begin before these or any other activities commit the City to engage in or approve an action. Typically, review begins at the stage of early design or, in the case of City projects, at the planning stage. Review also generally begins upon receipt of an application for a permit or other discretionary approval. In the case of public agency projects, an environmental assessment is not required until the specifics of the action are formulated and proposed. The CEQR process must

be completed before any action is taken.

Time limits appear in both SEQRA and CEQR. In general, where a time limit establishes a maximum time in which to accomplish a task specified in the rules, such maximum may be extended for the purpose of ensuring a full assessment. See 6 NYCRR 617.3(i). Also, where City procedures (such as ULURP) require a longer timetable, the CEQR timetables may be extended. Where a time limit is specified as a minimum time period that must expire before the succeeding step in the CEQR process may be taken, as for example, where notice to the public must be given before an action may be taken, the lead agency should follow the prescribed procedure. The time limits are as follows:

1. Establish lead agency: CEQR rules do not specify a maximum time period in which the lead agency should be established. Generally, the maximum period provided in the SEQRA rules of 30 days from the agency's notification of its intent to be lead, except if contested, is followed. 6 NYCRR 617.6 (b)(3)(i)
   Notice of change in lead agency must be given by the new lead agency to the applicant and all other involved and interested agencies within 10 days of the transfer. (Rules of Procedure § 5-03(i))
2. Determine significance (Filing of Notice of Determination): If there is a private applicant, maximum of 15 days from notification of completion of the application—EAS and other reasonably necessary information. (Executive Order No. 91, § 6-07(a)) If there is no applicant, as early as possible.
3. Scope: Draft scope to be published within 15 days following determination of significance. (Rules of Procedure § 5-07(a))
4. Other scoping time frames: The lead agency must publish notice not less than 30 nor more than 45 calendar days prior to public scoping meeting that a DEIS will be prepared; the lead agency must circulate the draft scope and EAS as provided in the Rules of Procedure not less than 30 calendar days nor more than 45 calendar days prior to public scoping meeting; written comments on the scope may be received up to 10 calendar days after the scoping session; within 30 calendar days after the public scoping meeting, the lead agency shall issue a final scope. (If there is no private applicant, the time frames may be extended.) (Rules of Procedure § 5-07)
5. Prepare Draft Environmental Impact Statement: As needed for studies. Determine completeness of the DEIS: The City's rules do not specify a maximum period. Generally, the lead agency follows the State SEQRA rules, which allow 45 days to determine completeness and adequacy of DEIS. The lead agency is to use the final written scope, among other things, to determine whether to accept the draft EIS as adequate with respect to scope and content. If the lead agency determines that the draft EIS is inadequate, the lead agency must identify in writing the deficiencies and provide this information to the project sponsor. 6 NYCRR 617.9(a)(2)(i). After receipt of a resubmitted draft EIS, the lead agency may take up to 30 days to determine whether or not to accept the resubmitted draft EIS. 6 NYCRR 617.9(a)(2)(ii).
6. Public comment and hearing: The hearing must be held no less than 15 days and no more than 60 days after the filing of the DEIS. Written comments must be accepted for at least 10 days after the public hearing; the comment period must last at least 30 days. (Executive Order No. 91 § 6-10(c))
7. Prepare Final Environmental Impact Statement, determine completeness, and file Notice of Completion: Maximum of 30 days from the close of the public hearing. (Executive Order No. 91 § 6-11(a)).
8. Consider completed FEIS before making findings and taking action: Minimum of 10 days from filing of Notice of Completion of FEIS. 6 NYCRR 617.11(a).
   Written Findings: The City rules do not specify a maximum period. Generally, for actions involving an applicant the lead agency makes its findings within the maximum of 30 days from Notice of Completion provided in the SEQRA rules. 6 NYCRR 617.11(b).

## 300. Fees

Pursuant to the Rules of the City of New York (Title 62, Chapter 3, Subchapter A), the City lead agency charges a fee to a private applicant to recover the costs incurred in reviewing the EAS, DEIS, and FEIS of an action that an applicant requests from the agency. The fee is payable upon filing Parts I and II of the EAS with the lead agency (or an agency that could be the lead). The CEQR fees are computed in accordance with 62 RCNY § 3-01, and the schedule of fees is listed in the EAS form.

## 400. Specialized Environmental Impact Statements

There are two variants on the general pattern of Environmental Impact Statements: the Programmatic or Generic EIS and the Supplemental EIS. Each of these EISs is subject to the same review procedures as other EISs, including a Positive Declaration, scoping, a Draft EIS and Notice of Completion, public review period, a Final EIS and Notice of Completion, and written findings.

### 410. GENERIC OR PROGRAMMATIC EIS

Generic or Programmatic Environmental Impact Statements are used for broad actions with diffuse but potential significant environmental effects. These include the following types of actions: (1) a number of separate actions in the same geographic area that, if considered separately would pose insignificant effects, but taken together have a significant impact; (2) a sequence of actions contemplated by a single agency or individual; (3) separate actions that have generic or common impacts; (4) a program or plan having wide application or restricting the range of future alternative policies or projects. 6 NYCRR 617. 10. These sorts of actions can be studied by a Generic Environmental Impact Statement.

The Generic or Programmatic EIS is useful when the details of a specific impact cannot be accurately identified, as no site-specific action has been proposed, but a broad set of further actions is likely to result from the agency's action. The GEIS follows the same format as the EIS for a more specific action, but its content is necessarily broader. Lead agencies should also be aware that further discretionary actions under the program studied in the GEIS will require further review under CEQR. It is possible, however, to tier a subsequent EIS for a site-specific action on the foundation of the Generic or Programmatic EIS. Since the Generic or Programmatic EIS would have established the analysis framework, the subsequent supplemental EIS need only target the specific narrow impacts associated with the subsequent action.

Most comprehensive planning programs, new development programs, promulgation of new regulations, and revisions to such broadly applicable actions, are candidates for a Generic or Programmatic EIS.

### 420. SUPPLEMENTAL EIS

The Supplemental EIS is a flexible tool in the CEQR process. It is used to supplement, update, or amend a previously prepared and circulated DEIS, FEIS, or Generic EIS. It provides decision-makers, interested agencies, and the public with information about impacts not previously studied.

The Supplemental EIS is used when: (1) changes are proposed for the project that may result in a significant adverse environmental effect not anticipated in the original EIS; (2) newly discovered information arises about significant adverse effects that was not previously analyzed; and (3) a change in circumstances arises that may result in a significant adverse environmental effect not anticipated in the original EIS. In considering the need to prepare a Supplemental EIS, the agency should weigh the importance and relevance of the information, its probable accuracy, and the current state of information in the EIS. 6 NYCRR 617.9(a)(7).

The need for a Supplemental EIS may become apparent after the acceptance of the DEIS and up to the time that agency findings are filed, following the completion of the FEIS. Supplemental EISs may also be prepared after findings have been made if changes are proposed for the project, but before the project is implemented. They are never prepared after the project is implemented. Supplemental findings statements may be necessary.

The scope of the Supplemental EIS is quite narrow. It specifically addresses only those issues that the lead agency determines were not adequately covered before. The Supplemental EIS may be used for changes an applicant proposes to a project already approved following an EIS, or for an approved project's future phase that could not have been studied previously for lack of data or other reasons.

## C. CEQR'S Relationship with Other Approval Procedures

### 100. City Procedures

The CEQR review of actions may require coordination with other City procedures. These are briefly described below.

## 110. UNIFORM LAND USE REVIEW PROCEDURE (ULURP)

Applications for City actions that must be reviewed pursuant to ULURP are filed with the Department of City Planning. For private applicants, DCP serves as the lead agency in CEQR for projects under ULURP; the Department of City Planning also serves as lead for some other City actions in ULURP (see Section 5-03 of the CEQR Rules for the exceptions). If DCP is not the lead agency in a ULURP action, the lead agency should forward copies of completed CEQR documents and determinations to DCP's Environmental Assessment and Review Division in advance of the requested certification date. ULURP's timetable for decision-making begins once an application is certified as complete. This ULURP certification must be accompanied by a Negative Declaration, a Conditional Negative Declaration, or a DEIS and Notice of Completion. The New York City Charter establishes time periods for each step in the ULURP process. Sections 197-c and 197-d should be consulted for the purpose of coordinating CEQR with ULURP.

Additionally, City actions being considered in ULURP are also considered relative to the City Planning Commission's "Criteria for the Location of City Facilities" (Fair Share Criteria), and this assessment can be coordinated with the CEQR analyses (see Section 150, below).

## 120. BOARD OF STANDARDS AND APPEALS

Certain special use permits and variance applications are decided by the Board of Standard and Appeals. Where an appeal is from a discretionary City action that has already complied with the CEQR procedures, the Board acts in a quasi-judicial function and is not subject to CEQR. However, when the application is made to the Board initially, then CEQR applies to such actions and the normal CEQR process is required prior to the Board action.

## 130. WATERFRONT REVITALIZATION

New York City has adopted a Waterfront Revitalization Program pursuant to the New York State Waterfront Revitalization of Coastal Areas and Inland Waterways Act (Sections 910-921 of the New York State Executive Law). The City Planning Commission serves as the City's Coastal Commission under the Waterfront Revitalization Program. Actions that are subject to ULURP are reviewed by the City Planning Commission in its capacity as the Coastal Commission for their consistency with the Program's policies. The New York City Council approved a new Waterfront Revitalization Plan in October 1999. The new Plan replaced fifty-six City and state policies with ten policies designed to simplify and clarify the consistency review process. Discretionary actions subject to CEQR and occurring within the Waterfront Revitalization Program boundaries are to be reviewed by the lead agency for consistency with the Program's policies. The ten new policies are to be used to assess the consistency of City actions with the Waterfront Revitalization Program. However, if the action involves federal or state agencies within the Program boundaries, the 56 polices are used to assess the consistency of such actions with the Waterfront Revitalization program. The environmental review of actions involving federal or state agencies within the program provides for coordination initially through the OEC.

## 140. EMINENT DOMAIN (CONDEMNATION)

When New York City condemns private property for a public purpose, the decision by a City agency to act by eminent domain is an action subject to CEQR. The New York State Eminent Domain Procedure Law, adopted one year after SEQRA, overlaps with CEQR in requiring that environmental effects be identified. The CEQR public hearing may serve the same purpose as the hearing required under the Eminent Domain Procedure Law, Section 204(B).

## 150. FAIR SHARE CRITERIA

The City Planning Commission adopted criteria, pursuant to the New York City Charter, to guide the siting of City facilities so as to further the fair distribution of the burdens and benefits associated with such facilities among the communities of the City. The City Planning Commission considers these criteria, referred to as the "Criteria for the Location of City Facilities," in acting on site selection and acquisition proposals subject to ULURP and in the review of City office sites pursuant to section 195 of the Charter. Sponsoring agencies also observe them in actions that do not proceed through ULURP, such as City contracts, facility reductions, and closings. Although the Criteria for the Location of City Facilities and CEQR criteria overlap to some extent and both processes include procedures for the participation of the public, the Criteria for the Location of City Facilities raise different issues and require a different perspective. For example,