siting of a facility in an area where similar facilities are located may avoid a neighborhood character impact for CEQR purposes but raise issues as to fair distribution under the Criteria for the Location of City Facilities. Where an action requires both an environmental assessment and a "Fair Share" analysis, an applicant or lead agency may find it helpful or efficient, with respect to the required analyses and procedural steps, to incorporate the "Fair Share" analysis in the CEQR analysis, but this approach is not a requirement of either CEQR or the Criteria for the Location of City Facilities.

## 200. CEQR-SEQRA Coordination

All State agencies taking actions in New York City must follow SEQRA. When a State agency is an involved agency, SEQRA rules apply to its determinations.

## 300. CEQR-NEPA Coordination

Federal agencies undertaking actions in New York City must comply with NEPA. The New York SEQRA regulations in Section 617.15 provide for coordination of environmental assessment provisions in New York with those required under NEPA for Federal agencies. The City and Federal decisions on the same project are independent of each other. Thus, a Federal decision not to undertake environmental review or to prepare an EIS does not automatically support or require a similar decision by the City.

NEPA's regulations provide for a process to coordinate the Federal and State and/or City procedures to achieve savings of time and money and to avoid duplicative procedures. These are published as Section 1506.2 of Title 40 of the Code of Federal Regulations. Federal agencies must cooperate with City agencies "to the fullest extent possible to reduce duplication between NEPA and State and local requirements," by such means as (1) joint planning processes, (2) joint environmental research and studies, (3) joint public hearings, and (4) joint environmental assessments. Typically, the City agency enters into a written Memorandum of Understanding with the relevant Federal agency to establish the terms of this collaboration. Joint studies, however, cannot oblige each agency to make the same decision. Each must meet its separate CEQR or NEPA and other statutory obligations.

# CHAPTER 2

# ESTABLISHING THE ANALYSIS FRAMEWORK

## A. Defining the Action for the Environmental Analysis

### 100. Categories of Actions

CEQR requires all City agencies to determine whether discretionary actions they directly approve, fund, or undertake may significantly affect the environment. There are two broad categories of actions—localized actions, which include site-specific actions and changes in regulatory control for small areas, and generic actions.

### 110. LOCALIZED ACTIONS

*111. Site-Specific Actions*

Site-specific actions are those proposed for a specific location; approvals are generally being sought to allow a particular project to proceed. Often, the project is narrowly defined, such as a proposed building that requires height and setback waivers, or a change to the City map for a specific location (e.g., the mapping of a street), or a special permit for a public parking garage, or the granting of a particular franchise. Therefore, the physical characteristics of site-specific actions are usually well-defined. In some cases, however, the physical development or uses permitted by the action may not be synonymous with the proposed project. In these instances, the environmental analysis will identify a reasonable development scenario. This is discussed in 2A, Section 210, below.

*112. Changes in Regulatory Controls for Small Areas*

Particular projects whose form and shape are controlled by a rezoning or other change in City controls are not considered site-specific, but when the area in question is small, the environmental analysis can be specific and is thus similar to that of a site-specific proposal. A change in regulatory controls for a site or small group of specific sites allows a range of development scenarios to occur. Examples of such changes include:

- Rezoning of a block or several blocks.
- Designation of an urban renewal area, or approval, alteration, or amendment of an urban renewal plan.
- Zoning text amendment(s) or changes to Special Districts affecting a limited number of geographic areas.

This kind of action is proposed most often in two circumstances: (1) as part of the continuing planning process undertaken by a City agency; and (2) as the regulatory framework that allows a particular project to proceed. Even if a particular project is proposed, this type of action usually affects an area larger than that project site. In either case, the action has different environmental implications from site-specific actions: it changes the development potential of a site or sites. If approved, the change in regulations would allow development of a new type, use, form, or density that may not be subject to its own site-specific environmental review.

### 120. GENERIC ACTIONS

"Generic" actions are programs and plans that have wide application or affect the range of future alternative policies. Usually these actions affect the entire City or an area so large that site-specific description of analysis is not appropriate. Examples of generic actions undertaken in the City include:

- Citywide rezonings.
- Zoning change in many neighborhoods, such as Quality Housing.
- Citywide programs or master plans, such as the Department of Sanitation's master plan for solid waste management, the Department of Environmental Protection's land-based sludge management plan, or the Mayor's Office's plan for transitional housing.
- Text changes to the Zoning Resolution that may affect a wide area.
- 197-a plans.
- Regulatory changes, local legislation, and changes to the City Code.

Some generic actions, such as rezonings, alter the scope of future ministerial actions. Once the

generic action is approved, then actions that occur as a consequence of the decision may be as-of-right and would not require further CEQR review. Other generic actions, such as public construction or land acquisition programs, may contemplate future specific actions that are discretionary and do require further CEQR review. In both cases, the generic environmental assessment may be an important planning tool. It allows the agency to identify the range of impacts that could occur and to *build into the plan or program* the appropriate mitigation, thus ensuring that future actions arising from the plan or program do not have the potential for significant impact, whether or not they are subject to further CEQR review. (For more information on generic assessments, see Chapter 1B Section 410.)

## 200. Identifying the Project Characteristics for Analysis

Whatever the proposed action, the first step in its environmental assessment is to define the case to be examined. Without some definition, no predictions can be made as to the action's results. The amount of detail needed to make that prediction depends on the type of action and its expected impacts. The definition also serves to inform all interested and involved persons and agencies about the proposal.

### 210. LOCALIZED ACTIONS

#### 211. Site-Specific Actions

Because these are generally actions proposed to facilitate particular projects, site-specific actions are usually simplest to define. When the physical development or uses permitted by the action are synonymous with the project, the first step is to present the location and physical dimensions of the project. Generally, the action should be described in some detail, including proposed uses, site plan, design approach, and appearance of the proposed buildings, as appropriate. Depending on the nature of the impacts expected, more detail may be required about certain aspects of the project. For example, projects in historic districts or involving changes to historic buildings would require a more detailed explanation of the proposed architectural features, since an important aspect of the analysis would be any changes to the existing architectural context. Timing and schedule of the project, including construction and operation phases, should also be described.

In some cases, however, the physical development or use permitted by the action differs somewhat from the project. In these instances, a likely, reasonable scenario is chosen for analysis. From the range of possible scenarios that are reasonable and likely on the site, the one with the worst environmental consequences should be chosen for analysis. More information on choosing such a scenario is provided below in 2A, Section 212.

#### 212. Changes in Regulatory Control for Small Areas

Unlike site-specific projects, changes to regulations allow subsequent future projects as yet undefined that may not require a site-specific CEQR review. The environmental assessment must consider the change in development potential for the site(s). Thus, although the physical form of the project is unknown, its potential characteristics must be identified for the analysis. This is done by predicting likely, reasonable scenarios that could result if the approval is granted. From this range of realistic, reasonable scenarios, the one with the worst environmental consequences should be chosen for analysis. This will be referred to as the "reasonable worst-case scenario" throughout this Manual. This way, regardless of which scenario actually occurs, its impacts would be no worse than those considered in its environmental review. It is possible that the worst case could be two different scenarios for two different technical areas: for example, for a commercial zoning proposal, commercial/office use would generate the highest number of trips; residential use would generate demands on local schools and publicly accessible open spaces. In this case, if both scenarios are reasonable, two analysis scenarios should be examined.

When a specific project is part of the proposal, this project should be delineated, but it will not necessarily constitute the worst case for CEQR purposes. Generally, a specific project that requires rezoning can stand as the worst case for environmental assessment under the following circumstances:

- *It is itself the worst case of the range of development scenarios.* As an example, if an applicant seeks a special permit that would allow 50 parking spaces on a site because he/she plans to construct a 50-space parking lot, the action and the reasonable worst case would be the same.

- *Other, more environmentally damaging cases would be permitted under the zoning, but can be shown to be unlikely or infeasible in the circumstances.* Some factors or circumstances that could make a development scenario unlikely or infeasible include site conditions—constraints created by the configuration of the parcel, location of streets, or subsurface or topographical conditions; market conditions; adjacent uses and conditions, which could affect market perception and demand, particularly if they are incompatible with the proposal; and what type or density of development or activity is typical in the particular area and borough. Take as an example an application in Manhattan for a rezoning from M1-6 to C4-7. Both districts permit office development at an FAR of 10, but the M1-6 district provides for an as-of-right plaza bonus to an FAR of 12, which is not available in the C4-7 designation. In fact, the applicant requires the rezoning to develop a proposed mixed-use, primarily residential building (residential use is not permitted in the M1-6 district). For issues of traffic and air quality, an office building permitted under C4-7 would be the "worst case." However, it is clear that since the office option is now available to the property owner under the current M1-6 zoning (and with 20 percent more floor area), but has not led to such development, full office development under the new zoning is not a *reasonable* scenario. The proposed zoning change would produce new development, but it would have to contain a substantial proportion of residential use to be reasonable in the circumstances. Thus, the other, more environmentally damaging case permitted under the proposed zoning is unlikely by the year the action would be completed in the circumstances and the specific project proposed can stand as the worst case for the environmental assessment.

- *Additional actions or controls would restrict development to the specific project.* These actions might include restrictive declarations, certain special permits, leases or other agreements between the project sponsor and the City, and design and use restrictions under urban renewal plans. For example, if an applicant seeks a large-scale permit that would use less than the maximum floor area permitted by the underlying zoning, but in a different building envelope than the zoning allowed, the large-scale permit would specify the use, floor area, building footprint, bulk, height, and setbacks for each planned building, as well as the location and amount of open space and parking. In this case, the action and the reasonable worst case are the same.

Although the reasonable worst-case scenario is often hypothetical, it must have enough detail to allow analysis, like the site-specific proposals. It must discuss the buildings that could be built on the site in terms of their square footage, use, height, and bulk, and, as above, provide more information if needed for any one technical area. Where specifics are needed for a particular analysis and the reasonable worst-case is hypothetical, determining these specifics should be subject to the same approach as described above. As an example, on a proposal where residential use has been determined to be the reasonable worst case, it may be necessary to estimate the number of apartments. For trip generation in the transportation analysis, since trips are estimated on a per-unit basis, the number of units assumed should be the greatest that could conceivably fit in the hypothetical building and conform to zoning regulations; i.e., many small units would be assumed for the analysis. However, if it is clear that very small units are not the norm in the neighborhood and not likely to be marketable, fewer, larger units can be assumed. For this same project, however, the analysis of impacts on schools would be most conservative if larger apartments were assumed. Two different apartment counts and types that represent points in a reasonable range of scenarios can be assumed for the two different analyses.

## 220. GENERIC ACTIONS

For generic actions, specific details about the kind of development that might reasonably be expected are often not available, or considering each particular site that could be affected would be redundant or impossible because of the scale of the project. The description of the proposed action focuses on the approval or proposed program that triggers CEQR and its logic and rationale. The description can also include, as appropriate:

- "Typical" cases, i.e., several descriptions similar to those in a localized action for cases that can reasonably typify the conditions and impacts of the entire proposal.

- A discussion of the range of conditions under which the action(s) may take place, so that the full range of impacts can be identified.

## B. Identifying Project Purpose and Need

All proposed actions originate in a planning process of some sort and are intended to fulfill certain goals, objectives, or mandates. Often, proposals are designed to meet public policies. Both the EAS and EIS require a statement of the project's purpose and need—the planning impetus behind the proposal. Knowledge of the project's objectives also allows definition of appropriate alternatives to the action.

### 100. Purpose and Need for Publicly and Privately Sponsored Actions

The purpose, or objectives, of and need for the project should be explained clearly at the beginning of the EAS or EIS. Knowledge of the need for a project, and the goals it is intended to achieve, assists decision-makers in determining whether the project should be approved. This statement of objectives or purpose should be framed in terms of how the action meets public needs and responds to public policies.

Proposals by private applicants can also be framed in terms of how they meet public policies or needs. This approach is particularly appropriate if a site is underused in terms of the public policy that applies to it, and the applicant can demonstrate that the proposal would make the best use of the site while meeting the policies.

### 200. Project Objectives and Their Role in Defining Alternatives

Defining the project's objectives is also important because it can help define the range of alternatives analyzed in the EIS. The lead agency must consider whether any feasible alternatives to the project, considering the project's goals, can reduce impacts. To warrant consideration, alternatives must be "reasonable," achieve the same or similar objectives of the project sponsor, have relatively the same or reduced impacts, and be implementable in a similar timeframe to that of the project. "Reasonable" alternatives are those that are feasible, regardless of whether the applicant intends to pursue them. (Choosing reasonable alternatives is discussed in Chapter 3U, below.)

## C. Defining Analysis Conditions

Once the action has been defined, its effects on its environmental setting can be considered. Regardless of the documentation required (EIS or EAS), the technical area being assessed, or the complexity of the analysis, it must be conducted in a particular way. For each technical area in which impacts may occur, the assessment includes a description of existing conditions; a prediction of the future, without the action, for the year that the action would be completed; and a prediction of the future for the same year with completion of the action. Comparing the two future scenarios identifies the action's impacts on its environmental setting. For each technical area being assessed, this same framework must be used.

### 100. Choosing the Analysis Years

CEQR requires analysis of the action's effects on its environmental setting. Because the proposed action, if approved, typically would take place in the future, the action's environmental setting is not the current environment, but the environment, as it would exist at project completion, in the future. Therefore, future conditions must be projected. This prediction is made for a particular year, generally known as the "build year." The build year is the year when the action would be substantially operational, since this is when the action's effects would begin to be felt, and when mitigation of project impacts would have to be in place. (On the other hand, certain actions would be implemented very quickly following approval. For such actions, the appropriate environmental setting for this analysis would be the current environment).

It may be that the build year for a given action is uncertain. This could be the case for some generic actions or for small area rezonings, where the build-out depends on market conditions and other variables. In this case it is prudent to select, from the range of reasonable timing scenarios, the one that represents the worst case environmentally. Often, an earlier year is considered most conservative in terms of air quality. As time passes, older vehicles with poorer or no emission controls drop out of the basic mix of vehicles on the road to be replaced by new cars with strong emission control systems. Therefore, analysis in an earlier year would be most likely to yield the most conservative results. In addition, where im-

pacts requiring mitigation are identified, it is important to be sure that the mitigation will be in place when the project impacts are felt—hence, another reason to select an earlier build year. However, in an area that is expected to see substantial development over the near future, it may be most appropriate to choose a later build year from the reasonable range, so that the analysis can address the increases in traffic and other activities resulting from that development in considering project impacts.

For phased projects, in addition to the final build year, when the entire project is completed, interim build years are also assessed—the first full year after each phase is completed. Large-scale projects to be constructed over a long period, with operation or occupancy of the different elements as they are completed, are also assessed with interim build years. Typically, one interim year is chosen, usually based on an estimate of the year when a critical mass of the anticipated development would be complete or when enough development to produce impacts requiring mitigation would have occurred.

## 200. Defining the Study Area

For each technical area in which an impact may occur, whether land use, traffic and transportation, or natural resources, a study area must be defined for analysis. This is the geographic area likely to be affected by the proposed action for a given technical area, or the area in which impacts of that type could occur. Appropriate study areas differ depending on the type of impact being analyzed. For visual character, for example, possible impacts generally do not extend beyond the area in which the project can be seen, while for traffic, worsened traffic conditions can occur at intersections some distance away. Often it is appropriate to use primary and secondary study areas: the primary study area is closest to the project site and therefore most likely to be affected; the secondary study area is farther away and receives less detailed scrutiny. Generally, the primary study area is most likely to be more directly affected by the action, and those effects can be predicted with relative certainty, while the secondary study area may experience indirect effects, such as changes to trends. Discussions of each technical area and the methodology for choosing an appropriate study area are provided in Chapter 3. For a given technical area, the same study area is used for the assessment of existing conditions, the future without the project, and the future with the action in place.

## 300. Existing Conditions

The first step in the analysis of the environmental setting of the project is to describe current conditions. This must be performed for any technical areas (i.e., land use, traffic, noise, etc.) that may be affected by the project. The issues to be discussed are identified initially for an EAS or during the more formal scoping process for an EIS, and differ for different kinds of actions. An analysis does not need to be prepared for technical areas in which the action cannot reasonably be expected to have impacts. For example, for a proposal in central Midtown Manhattan, discussion of coastal policies would not be needed. More information on each technical area and when it must be analyzed is provided in the discussions of technical areas below in Chapter 3.

The assessment of existing conditions establishes a baseline, not against which the project is measured, but from which future conditions can be projected. The prediction of future conditions begins with an assessment of existing conditions because these can be measured, observed, and otherwise tested in the field.

In addition to observations, assessment of existing conditions requires data from other sources (such as the census, for example), and, for some technical areas, use of mathematical computation or modeling. Timeliness of data is also important. Ordinarily, this is not a problem, but can be if the review process becomes elongated because of changes in the proposal or other difficulties encountered during the approval process.

When performing studies of existing conditions, the "reasonable worst-case" conditions are generally selected for examination. For example, for traffic, the periods when the greatest number of new vehicular, pedestrian, and transit trips to and from the site would occur are predicted. This could be on weekdays, 8 to 9 AM and 5 to 6 PM, as at a typical office building; or on a weekend, Saturday 1 to 2 PM, as at a shopping complex. Then, the project impacts are assessed for those peak times, to determine what might be the worst possible effects of the project that might reasonably occur. Sometimes it is appropriate to consider the action's peak periods in combination with the peak background period—for example, if an action's greatest number of trips to and from the site would occur between 8 and 9 AM, and the "rush hour" in the area is from 7 to 8 AM, the action's peak could be considered as if it occurred

simultaneously with the area rush hour. In other cases, combining these peaks is *too* conservative and therefore is not reasonable—such as if the action's greatest number of trips would occur between 1 and 2 PM, but the area rush hour occurs from 7 to 8 AM. In that case, the peak hour would be selected based on the most conservative conditions anticipated with the project: if the peak baseline period (7 to 8 AM) is extremely sensitive to even slight changes in traffic, then it would be considered in the analysis; if the peak period for the project (1 to 2 PM) is great enough that a traffic (or air or noise) impact could be reasonably expected, then this period would serve as the peak period for analysis. It is not uncommon in this situation to select *both* periods for analysis, if the specific situation warrants it.

## 400. Future Without the Proposed Action (No Action Condition): Baseline Condition(s) for Impact Analysis

The existing environmental setting is used to project future conditions without the proposed action. This prediction is made for the year the action would be completed (the "build" year, discussed above under 2C, Section 100, "Choosing the Analysis Years"), using the data about existing conditions together with information about expected future growth and developments. The scenario of the future without the proposed action, often referred to as the "no action" or "no build" condition, provides a baseline condition against which the incremental changes generated by the project can be evaluated. This sets the context in which to assess impacts. For a phased project, the no action conditions are assessed so that the accumulating increment of the project phases can be disclosed. This means that the no action case does not contain any part of the project. For example, a two-phased project is proposed with build years 5 and 10 years hence. The future without the project/no action condition would present conditions 5 and 10 years in the future always without the project. The no action condition for the second phase would *not* contain the project's first phase.

The future without the project in a generic analysis would be constructed similarly to that of a site-specific project, although it may not be possible to present specific or quantified estimates of changes over wide areas. Emphasis would be on trends and policy. However, the rationale that applies to the concept of the impact analysis—comparing the *future* without the project with the future with it—applies equally to site specific or generic assessments.

For environmental impact statements, the no action condition also appears in the examination of alternatives, since a "no build" or "no action" option must always be available to the decision-maker. The no action alternative compares the significant adverse impacts and benefits of the project to future conditions without the project.

Using existing conditions as a baseline allows the prediction of the future to a certain level of accuracy. All together, the no action analysis takes the existing observed condition and adds to it known or expected changes to arrive at a reasonable estimate of the future. The kind of information that may be factored into a no action scenario includes:

- *Expected development.* For many technical areas, it is important that the no action analysis accurately incorporate known development projects that are likely to be built by the completion date of the proposed action. This includes developments that are under construction, planned, and proposed, collectively termed "no build projects." Sometimes, projections of development on "soft sites" are also appropriate—soft sites are sites where development is not proposed or planned, but can reasonably be expected to occur within the proposal's time frame. Examples of soft sites are properties that are underbuilt with respect to their zoning in areas where development demand is high. Some general indicators of soft sites are sites that are developed to less than 50 percent of their permitted floor area, houses of worship, vacant land, parking lots, gas stations, and one- and two-story freestanding retail. However, each context is different and these general indicators may be less applicable in some areas than others. The no action analysis is *not* equivalent to the maximum development capacity, but to the future development that can reasonably be expected to occur within the proposal's timeframe, given market conditions, development trends in the area, etc.

- *Growth factors.* In addition, no action analyses of some technical areas, such as traffic, can employ a background growth factor to account for a general increase expected in the future. Such growth factors

may also be used in the absence of known development proposals. More information on no action analyses for each technical area is found in the technical sections of this Manual.

- *Other expected changes.* No action analyses also must consider any other future changes that will affect the environmental setting, such as changes in technology. For example, an increase in the proportion of vehicles with pollution controls affects carbon monoxide concentrations, and this is accounted for in the air quality analyses. Other examples of changes to be considered include roadway improvements, implementation of recycling, and changes to such City policies as zoning regulations.

Because of the difficulty in precisely predicting the future, the no action assessment can present a range of possibilities and describe the likelihood of their occurrence.

## 500. Future with the Proposed Action (Build Condition): Probable Impacts Analysis

Finally, the future with the proposed action, also known as the "build" or "action" condition, is assessed and compared with the no action scenario. This assessment is performed for the same technical areas, using the same study areas, as the existing and no action assessments.

### 510. PREDICTING PROJECT INCREMENTS

For most technical areas, the projection of the build condition involves predicting the numeric increment that the project would add to the no action condition—the number of new residents, new vehicle trips, new students in the school system, or additional wastewater flows to a water pollution control plant, for example. For other areas, where quantitative predictions are inappropriate—such as land use or neighborhood character—more qualitative assessments of the action's effects are made by comparing conditions if the action is implemented with the no action condition. Methodologies for predicting this information are set forth in Chapter 3.

### 520. DETERMINING IMPACT SIGNIFICANCE

The next step is to assess whether those changes caused by the project would constitute significant impacts. Significant impacts are substantial changes in environmental conditions. The impacts discussion can focus on the beneficial as well as adverse impacts of the action; in either case, it uses the no action condition as a basis for comparison.

Many technical areas provide thresholds for what constitutes a significant impact; others require a more judgmental and qualitative assessment. Both qualitative and quantitative information is used, where possible, to determine the likelihood that the impact would occur, the timeframe in which it would occur, and its significance. Where no quantitative thresholds exist, a determination of significance must consider magnitude, duration, geographic scope, number of people affected, and irreversibility.

CEQR requires that each probable impact area be given a "hard look"—that is, the environmental review cannot simply acknowledge that there might be an impact; it must consider the likelihood and significance of that impact. Similarly, the environmental review cannot simply dismiss the likelihood of expected impacts occurring without providing reasoning. On the other hand, the analysis should examine only those impacts deemed likely to occur or reasonably anticipated, rather than assess a checklist of every conceivable impact.

The impacts analysis must consider both direct and indirect environmental effects of an action. (These are sometimes called "primary" and "secondary" effects.) Direct impacts are those that occur as a direct result of a proposed action—for example, demolition of a historic building on the site or increased carbon monoxide levels because of project-generated traffic. Indirect impacts are generally wider-range consequences and include such effects as changes in land use patterns that may result from a new development. The analysis must also consider short- and long-term impacts of the action. Short-term impacts are those that happen immediately as a result of the action; long-term impacts are similar to indirect impacts—effects on the character of the community over the long-run, for example. This discussion is related to that of cumulative impacts, described below.

### 530. CUMULATIVE IMPACTS

In addition to the two future scenarios—no action and action—that address conditions in the action's build year, the assessment must also consider cumulative impacts, where appropriate. Cumulative impacts are two or more individual

effects on the environment that, when taken together, are significant or that compound or increase other environmental effects. Generally, they are the long-term impacts (as described above), of either an individual action or a group of actions.

When cumulative impacts are the result of long-range, generic, or programmatic plans, such as changes to zoning regulations, they are best addressed in generic environmental assessments. These assessments can be used for a number of actions in a given area that may have minor effects if considered singly, but when considered together might have significant effects.

## D. Impact Analyses— Methodologies and Documentation

### 100. Overview and Approach to Impact Analyses

The guidance provided in Chapter 3 sets forth for each technical area specific methods for assessing impacts of a proposed action. Unless it is known from the start that a detailed analysis will be required in a given technical area, the guidance leads the analyst through a series of steps with ascending level of detail, aimed at permitting the lead agency to determine whether the potential for significant impact can be ruled out or confirmed. If at any point, this determination can be made, then the analysis is sufficient. The steps of all CEQR technical analyses apply the same approach, as follows:

- The first step is a simple screen or series of questions aimed at determining whether a given technical area assessment is appropriate for a given proposed action.

- The next step is usually a qualitative or semi-quantitative analysis again aimed at determining whether an impact in the given technical area can be ruled out. These analyses are necessarily conservative—the rationale being that if the proposed action shows no significant adverse impact using simplified but conservative assumptions, a detailed analysis would only confirm this conclusion.

- If a proposed action appears to have some potential for significant adverse impact based on the first two steps, then a more detailed analysis is undertaken. The purpose of this analysis is to be as realistic as possible in making assumptions, so that an impact is neither over- nor underpredicted, and so that, should mitigation be warranted, appropriate, feasible, and workable measures can be developed. At this analysis level it is always appropriate to gather as much project-specific data as possible; where such data are unavailable (or the effort to gather the information appears unwarranted), reasonable, but conservative, assumptions should be made.

- When the analysis identifies that the action would cause a change in conditions, the next step is to determine whether that change would be (a) adverse and (b) significant. In most technical areas, the beneficial and adverse effects are clear. However, in some, more subjective areas, such as neighborhood character or visual quality, a change can be identified, but its quality—negative or positive—is more difficult to determine. For these cases, the lead agency may carefully consider public policy and public comments in addition to the technical studies in determining whether an impact can be considered beneficial or adverse.

- Determining the significance of an impact can also be very difficult. In technical areas where measures and thresholds can be set, either through analysis or practice (air quality, noise, and traffic are good examples), a significant impact can be identified with relative ease. In many other technical areas, significance is more a question of relativity. For these determinations a series of questions that, if answered in the affirmative signal significance, can be used. The lead agency may consider public policy and public comments in determining the significance of an impact.

- Once it is determined that an impact is adverse and significant, mitigation to reduce or eliminate the impact must be considered. The technical analysis of mitigation must be sufficient to allow the lead agency to understand how effective it will be, what effort will be involved in implementing it, and whether it will produce any new significant impacts of its own. Usually, the level of technical analysis

required to identify the impact will suffice for the development and assessment of mitigation. Various options for mitigation of a given impact can be presented in the DEIS; in the FEIS, the lead agency must choose from these options the mitigation measures that reduce the impact to the greatest extent practicable. It is CEQR practice that where mitigation is not available, not practical, not implementable on schedule with the proposed action, requires further discretionary actions, or otherwise cannot be guaranteed, then the lead agency must disclose that the significant adverse impact would be unmitigated.

- Where a potential significant adverse impact has been identified, alternatives to the proposed action to reduce or eliminate that impact should also be considered. (As noted in Chapter 1, above, CEQR alternatives are selected from those that meet project objectives.) The analysis of alternatives in the technical area where a significant adverse impact has been identified should contain enough detail to clearly reveal the reduction in impact and reduction in the need for mitigation.

## 200. Deciding on the Level of Appropriate Documentation

The descriptions of the technical methodologies below do not address the issue of documentation, i.e., whether an analysis is appropriate for inclusion in an EAS or requires an EIS. A very detailed level of analysis may yield the answer that no potential for a significant adverse impact would arise from a proposed action; in this case, the appropriate documentation would be an EAS with a detailed supplemental analysis. On the other hand, a very simple screen may lead to the same conclusion of no significant impact potential for a particular technical area, while in another technical area a significant adverse impact has been identified, requiring all technical analyses to be documented in an EIS. Given the many technical areas to be considered and the difficulty in determining impact significance, the decision on how to document the analyses and how to proceed in CEQR can be complex. The following offers technical guidance to the lead agency in making its determination of significance and deciding on the form and documentation of CEQR review.

## 210. ACTIONS FOR WHICH AN EAS ALONE IS APPROPRIATE

For many actions, it will be immediately clear that no significant impacts would occur in any of the technical areas. These are actions whose characteristics fall below the initial thresholds for determining whether more detailed technical analyses are required. The lead agency can rely on the EAS and issue a Negative Declaration.

More detailed analyses can also be prepared to supplement an EAS, without a subsequent EIS. No EIS would be needed if, for each technical area, screening or detailed analyses show that no significant impact would occur, or that any significant impacts could be easily and fully mitigated. In the latter case, if there is an applicant distinct from the lead agency and the action is an unlisted one, the lead agency could issue a Conditional Negative Declaration (CND), as described in Chapter 1, above. For a CND to be appropriate, the EAS must provide enough information about the potential significant impact that the mitigation can be readily determined. Further, the mitigation measures must be easily implemented, practical, and assured. For example, a CND would be appropriate where a significant traffic impact is identified if the impact could be mitigated by a simple retiming of traffic lights or lane restriping, provided that this mitigation is fully defined in the EAS and supporting documentation and the CND and that the agency responsible for implementing the mitigation, in this case the New York City Department of Transportation, has agreed in concept to the mitigation measures; written commitment in principle is often appropriate.

It is also possible to issue a CND in instances where more information is needed to fully define the significant impact and precise mitigation, but where the potential impact is well understood, fully disclosed, and easily mitigated. Examples of these circumstances would include actions requiring the excavation of soils near underground gasoline storage tanks or areas with some potential for archaeological resources. In both cases, the full extent of the impact cannot be known without some site excavation. But also in both cases, the range of possibilities (from no impact to gasoline-contaminated soils or the presence of an archaeological resource) are well known, and the potential significant impact and appropriate mitigation measures can be presented to the decision-maker. If, after removing the tanks on site and testing the soils, gasoline contamina-

tion is found, the soils are aired, if possible, to allow the gasoline to evaporate, and retested, or removed from the site and disposed of at a landfill certified to receive such materials. For archaeology, a testing program is developed and approved by the New York City Landmarks Preservation Commission; this program is usually implemented by the applicant before the start of construction, during site excavation, and it contains agreements on the length of time for testing and, if resources are found, control of the construction work and the recording, handling, processing, and disposition of artifacts. (More information on these specific examples is provided in Chapters 3F and 3J.)

### 220. ACTIONS FOR WHICH AN EIS IS CLEARLY APPROPRIATE

For actions that may result in significant adverse impacts, a Positive Declaration and EIS would typically be most appropriate, except in those cases where the application of a Conditional Negative Declaration is appropriate (see 210, above). For actions that would result in significant adverse impacts that would require substantial effort to mitigate, it is CEQR practice to disclose the impacts and mitigation measures in an EIS.

### 230. ACTIONS WHERE AN EIS MAY BE MORE APPROPRIATE THAN AN EAS ALONE

In some cases, the decision whether to move ahead with an EIS is not straightforward and is based on considerable judgment. Some examples are as follows:

- As noted above, there may be times when public review and comment present additional information that affects the lead agency's final determination of whether an impact is adverse or significant. Although, in the end, the lead agency may find that the impact is not significant, an EIS procedure may be most appropriate. After public review, however, the lead agency may issue a Negative Declaration if on the basis of the DEIS and comments made thereon, it determines that the action would not have a significant effect on the environment; no FEIS need be prepared.

- Some proposed actions may require many detailed analyses to determine whether potentially significant adverse impacts might occur. An example of such a case might be a waterfront project with underground gasoline tanks, potential traffic and parking effects, potential school shortages, and a potential contextual effect on a nearby historic resource. Although several of these potential impacts can be found through detailed analysis to be less than significant and the others can be mitigated successfully, the lead agency may find that in combination the issues should be disclosed through an EIS. In this type of situation, it might be appropriate and most efficient to decide on an EIS right from the start.

### 300. When a Document is Complete

The documents for which the lead agency must determine completeness include the EAS, the scoping document, the DEIS, and the FEIS. In all cases, the document is complete when it contains enough information for the lead agency to proceed to the next step in the CEQR process, as follows:

- *EAS.* The lead agency must make a determination of significance based on the contents of the EAS and supplemental analyses, if necessary. If it is readily apparent that an EIS will be required and a Positive Declaration issued, the lead agency can find the EAS to be complete if it contains a project description; identification of the potential environmental issues arising from the proposed action; documentation, as appropriate, of those areas where a potentially significant adverse impact is *not* anticipated (if appropriate); and a draft scoping document for the EIS.

  To issue a Negative Declaration or a CND, the technical analyses that support the conclusion must also be complete. These analyses must have been undertaken to a level of detail adequate to determine whether a potential for significant impact does or does not exist. Where a CND is to be issued, the analyses must be appropriate to support the recommendation of mitigation and the assurance that such mitigation will be effective and will be implemented.

- *Scoping Document.* The scoping document is first issued as a draft and undergoes review by involved and interested agencies and the public (see Chapter 1). In general, the scoping document should contain a very clear description of the proposed action(s), with enough detail about the proposal and

its surroundings to understand the environmental issues. It should set forth in as much detail as possible appropriate study areas and specific methodologies proposed for analysis in each relevant technical area. To the extent that they are known, alternatives to the proposed action should be identified.

The scoping document is considered complete when the lead agency is satisfied that the description of the proposed action and relevant methodologies are adequate, and comments from the public and other agencies have been addressed as appropriate (either incorporated into the final scoping document or answered in a back-up memo).

- *DEIS.* The DEIS is called a "draft," but it is really a very comprehensive document. The lead agency finds the DEIS to be complete and issues a Notice of Completion when it meets the following criteria:

1. The document contains a project description that provides enough information so that the reader can understand the basis for technical analyses that follow.
2. Project objectives and actions required to implement the project are explained clearly.
3. For each technical area, an analysis of existing conditions, the future without the project, and project impacts has been undertaken to a level of detail adequate to disclose potential impacts for public discussion. For the DEIS, some specific information required to pinpoint mitigation can be left out if the document presents the range of possible impacts and mitigation for public review. An example of this situation would be when enough is known about a site to estimate a worst-case range of hazardous materials that may be present and the impacts associated with different contaminants, and to describe appropriate mitigation for the possibilities, but physical sampling is not yet complete.
4. Options for mitigation have been presented and assessed. For the DEIS, a range of mitigations can be presented for public review and discussion, without the lead agency having selected one for implementation.
5. The no action alternative and alternatives that meet project objectives but reduce impacts have been included and assessed to a level of detail so that they can be appropriately compared to the proposed action.

- *FEIS.* The FEIS is considered complete, and the lead agency issues a Notice of Completion when it meets the following criteria:

1. The FEIS should contain a summary of all reasonable comments on the DEIS, including a list of the commenters and responses to those comments. Usually this is included as a separate chapter.
2. The text, figures, and tables of the FEIS should reflect changes made in response to the public review. Usually, the text, figures, and tables are those of the DEIS, with changed passages marked by marginal lines or symbols, so that the reader can readily see where changes have been made. It is also useful to provide a foreword to the document summarizing the changes made as a result of public review.
3. Mitigation issues should be resolved to the extent possible. If a range of mitigations has been presented in the DEIS, the mitigation selected by the lead agency should be disclosed in the FEIS and its method of implementation described. Where more information is necessary to determine and assure specific mitigation (as in the hazardous materials example, above), it should be provided. If the additional information cannot be provided (for instance, if access to the site is not available for hazardous materials sampling), then the discussions of the DEIS can stand, but the FEIS must be clear as to any possibilities that mitigation could be impractical or unavailable, so that a potential for an unmitigated impact can be disclosed.

## H. Neighborhood Character

### 100. Definition

Neighborhood character is an amalgam of the various elements that give neighborhoods their distinct "personality". These can include land use, urban design, visual resources, historic resources, socioeconomics, traffic, and noise. These technical areas, and whether an action would affect them, are often considered in CEQR, and they are defined and described individually in other chapters of the Technical Manual. For neighborhood character, CEQR considers how those elements combine to create the context and feeling of a neighborhood, and how an action would affect that context. Thus, to determine an action's effects on neighborhood character, these contributing elements are considered together.

### 200. Determining Whether a Neighborhood Character Assessment is Appropriate

An assessment of neighborhood character is generally needed when the action would exceed the preliminary thresholds for neighborhood character, presented below, or when it appears that the action would have moderate effects on several of the elements that contribute to neighborhood character that in combination could have an effect on neighborhood character.

#### 210. PRELIMINARY THRESHOLDS

When the proposed action would result in any of the following conditions, an assessment of neighborhood character is generally appropriate.

- *Land use.* When development resulting from the proposed action would conflict with surrounding uses; conflict with land use policy or other public plans for the area; change land use character; or result in a significant land use impact, as determined in that technical analysis.

- *Urban design.* When the proposed action would result in substantially different building bulk, form, size, scale, or arrangement; block form, street pattern, or street hierarchy; streetscape elements, such as streetwall, landscaping, curbcuts, loading docks, and pedestrian activity and circulation; changes to natural features; or when a significant urban design impact is identified in that technical analysis.

- *Visual resources.* When the proposed action would result in substantial direct changes to a visual feature, such as unique and important public view corridors and vistas, or to public visual access to such a feature.

- *Historic resources.* When the proposed action would result in substantial direct changes to a historic resource or substantial changes to public views of a historic resource; or when a significant impact on historic resources is identified in that technical analysis.

- *Socioeconomic conditions.* When the proposed action would result in substantial direct or indirect displacement or addition of population, employment, or businesses; substantial changes in the character of businesses; substantial differences in population or employment density from the prevailing condition; or a significant socioeconomic conditions impact, as identified in that technical analysis.

- *Traffic.* When an aspect of traffic—such as the amount of traffic or the type of vehicles—contributes to neighborhood character, *and* when the proposed action would result in a change in level of service (LOS) to C or below (see the traffic chapter of this Manual for details on level of service);

  – Change in traffic patterns;
  – Change in roadway classification (from local to collector, etc.);
  – Change in vehicle mix;
  – Substantial increase in traffic volumes on residential streets; or
  – Significant traffic impact, as identified in that technical analysis.

- *Noise.* When a proposed action would result in significant adverse noise impacts *and* would result in a change in acceptability category (see the discussion in the noise chapter of this Manual).

#### 220. COMBINATION OF MODERATE EFFECTS

Even if an action would fall below the preliminary thresholds for neighborhood character (Section 210, above), it is possible that several moderate changes in the elements that

contribute to neighborhood character could lead to a significant impact on neighborhood character. If it appears that this might occur, a neighborhood character analysis may be appropriate. More information on this kind of significant impact is provided in Section 400, below.

## 300. Assessment Methods

### 310. STUDY AREA

The study area for neighborhood character is the area that may have its character affected by the proposed action. Often, it is coterminous with the land use study area. Unless the action covers a substantial physical area or is a generic or programmatic action, the study area should generally include at least the project site and the area within 400 feet of the project site boundaries (see discussion of study areas in the land use chapter in this Manual). These boundaries can be modified, however, as appropriate, to include any additional areas that would be affected by the action, or to exclude areas that would clearly not be affected by the action.

Larger study areas may be appropriate in such circumstances as actions that are large in scale, that are just outside a well-defined neighborhood that they could affect, or those with truck routes or other action-related traffic some distance from the site of the action. An example of an action requiring a larger study area would be an action that would facilitate a new commercial building on the outskirts of a well-defined neighborhood, such as Brooklyn Heights. Even if that neighborhood is outside of the quarter-mile radius generally appropriate as the study area for a new commercial building, including some of Brooklyn Heights in the study area may be warranted if it appears that the new building could affect its character. This could occur, for example, if the new building would be visually inconsistent with and visible from the neighborhood, or if it would generate increased traffic along quiet, residential neighborhood streets.

Smaller study areas may be appropriate when the neighborhood that would be affected would itself be smaller than the typical study area. An example would be a mid-rise (say, 15- to 20-story) building proposed for midblock in a residential part of the Upper West Side in Manhattan, where the midblock portion of the block has a strongly defined low-rise (four- to five-story) residential character that is very different from the ends of the block, where mid-rise buildings with stores on the ground floors front the wide avenues. The proposed building would not affect the character of the end portions of the block, but could affect the mid-block portion. Therefore, the study area would focus on the midblock portion of the block. Considering a study area that is too large would dilute the intensity of the effects — in this case, a larger area could make it appear that the action would have no significant impacts.

For generic or programmatic actions that would affect relatively small areas, the affected areas would serve as the study area. When large areas would be affected, the analysis can consider neighborhoods typical of those that would be affected. For example, in its evaluation of the Quality Housing zoning amendments, the City chose 35 neighborhoods representative of the types of neighborhoods that could be affected and studied the rezoning's potential effects on those neighborhoods.

### 320. ANALYSIS TECHNIQUES

### 321. Determining Characteristics of Neighborhood Character

After the appropriate study area has been established, the determining characteristics of that neighborhood should be identified. The analyst should determine the neighborhood's overall character, as well as the elements that contribute to and define that character. The steps involved in assessing neighborhood character are described in this section.

#### 321.1. Gathering Information

1. *Field visit.* Generally, the first step is a field visit to observe the neighborhood. Field visits are made during typically active periods rather than at odd hours. The analyst observes such features as the major uses, scale and types of buildings, activity patterns and intensities, and the relationship between traffic, noise, and the character of the streets. Any unusual features or combination of features are identified.

2. *Photographs* Photos are effective in illustrating a neighborhood's characteristics.

3. *Other available information.* Data gathered for other technical areas of the environmental assessment (such as land use, visual quality, socioeconomics, etc.) are useful in identifying the neighborhood's characteristics.

4. *Interviews.* Interviewing neighborhood residents and workers to learn about the neighborhood is also useful in some cases, but generally is not necessary.

### 321.2. Describing the Existing Character

Both graphics and text can be used to describe the character of the neighborhood affected by the action. This assessment should be organized to identify those elements that have a major determining role in the character of the neighborhood.

Because a neighborhood's character is the result of the combination of various contributing elements, the description should characterize the salient features of the neighborhood rather than repeating information about each of the contributing technical areas (e.g., land use, socioeconomics, etc.) found elsewhere in the environmental assessment. The discussion should focus on the major characteristics of the neighborhood and how they relate to the area's overall character. The discussion should address all of the various components of neighborhood character, even if changes to only one of these elements have triggered the need for an analysis. Some of these elements will be critical to the character, while others may be only contributing.

For example, the Financial District area of Manhattan is characterized and defined by its tall buildings and narrow, winding streets. The skyscrapers front uniformly onto the street, creating a wall. During much of the day, these streets are crowded with pedestrians. In this neighborhood, the height and form of the buildings, the width of the streets, the block form, and the pedestrian activity are the defining characteristics. Other elements, such as socioeconomic conditions, traffic, and noise, contribute, but are not key features of the Financial District area.

In another area, however, such as suburban Staten Island, the width of the streets and the buildings' positions relative to the street may not be important, but the size and form of its single-family, detached homes, the landscaping, and the quiet and traffic-free streets may be.

Generic or programmatic actions can be assessed similarly. In the evaluation of the Quality Housing zoning amendments described above (Section 310), for each of the 35 representative neighborhoods, the following characteristics were noted: regularity of street grid, building form, site planning, parking, and streetscape. These descriptors were particularly relevant because they were characteristics that could be directly affected by the proposed action. Each neighborhood was also described according to its predominant land use(s): low-rise, residential, medium-density residential, commercial, industrial, or undeveloped.

### 322. Future No Action Condition

Using the information gathered for the other technical areas about expected changes in the future, assess whether and how the character of the neighborhood would change in the future without the proposed action. This analysis focuses on the key elements that contribute to neighborhood character, similar to the analysis of the proposed action, described below in Section 323.

### 323. Future Action Condition

To determine how the proposed action would affect neighborhood character, relative to the no action conditions, the assessment should describe the proposed action in terms of how it would affect the key elements that define the study area's character. For example, if one of the most important aspects of a neighborhood's character is that a street ends in a cul-de-sac, so that the area is very quiet and has very little traffic, note whether the action would change that condition (by continuing the street through, for example). In the example of Manhattan's Financial District, where the height and form of the buildings, narrowness of the streets, and pedestrian activity are the defining characteristics, a tower-on-a plaza design for an office building would change neighborhood character in its vicinity, even if it represented a one-for-one replacement of floor area and use of a more characteristic building. Also, in this case an increase in traffic alone, although it might be a significant traffic impact and require mitigation, would not affect neighborhood character.

Generic or programmatic actions can be assessed in much the same way, with somewhat less detail than site-specific actions' assessments. In some cases, when less detail about the action is available, the assessment will consider the types of circumstances or issues that *could* affect

neighborhood character in the study area.

## 400. Determining Impact Significance

Understanding key elements that define neighborhood character and the relationship among elements forms the basis for determining impact significance. Usually, a significant change to one of the determining elements of neighborhood character will result in a significant impact on neighborhood character. In general, the more uniform and consistent the existing neighborhood context is, the more sensitive it is to change. A neighborhood that has a more varied context can typically tolerate greater changes without experiencing significant impacts. A significant impact identified in one of the technical areas that can contribute to neighborhood character is *not* automatically equivalent to a significant impact on neighborhood character. Rather, it serves as an indication that neighborhood character should be examined. If that examination determines that one of the defining features of the neighborhood's character would be significantly affected, then a significant impact would occur. For example, a significant traffic impact might occur if an action adds vehicles to an intersection, increasing the delay there. This significant impact would not be an impact on neighborhood character, however, if traffic is not an important determining characteristic of that neighborhood. Alternatively, a significant impact on neighborhood character could occur because of an increase in traffic on area roadways, even if that increase did *not* constitute a significant traffic impact.

Significant impacts on neighborhood character can also occur even if the proposed action would not have a significant impact on any one defining feature of the area. In these cases, the action may instead have moderate impacts on a number of defining features that cumulatively may result in a significant impact on the neighborhood character. For example, a small commercial strip in a suburban section of Staten Island might be different in land use and in urban design from the area's detached houses with lawns and landscaping, but not significantly; it might add some traffic to the local residential streets, but not a significant amount; and it might increase area noise levels, but not significantly. Altogether, however, the commercial strip could have a significant impact on the neighborhood's character by changing it from a small-scale, quiet residential area to a busier commercial one.

As in other technical areas, significant impacts on neighborhood character can be beneficial or adverse. Because a neighborhood's character is perceived and contextual, this judgment may be more subjective than in other technical areas. For example, a new and modern apartment building in an older neighborhood may be perceived as an improvement by some, but as out of context and adverse by others. The lead agency must make the final decision as to which significant impacts are adverse and require mitigation and may consider comments made during public review in making such a determination (see Chapter 2).

## 500. Developing Mitigation

Often, the mitigation proposed for significant impacts in the technical areas that contribute to neighborhood character will also mitigate neighborhood character impacts. For example, when a significant traffic impact is predicted and increases in traffic would also significantly affect neighborhood character, measures to mitigate the significant traffic impact may also reduce traffic to levels that are consistent with the neighborhood. Mitigation of urban design impacts will often effectively mitigate related impacts on neighborhood character as well.

Other times, however, mitigation measures may alleviate significant adverse impacts in the other technical areas, but significant impacts on neighborhood character will remain. In the example of significant traffic impacts, above, mitigation measures might reduce the delay at area intersections to acceptable levels, but not the overall effect that increased traffic may have on the character of an area. The number of vehicles might still be high enough to change the character of the streets. Another example is an action that would result in significant adverse socioeconomic impacts related to secondary displacement of neighborhood residents, and a related significant impact on neighborhood character because of the change in the area's population profile. The socioeconomic impacts may be mitigated by finding affordable housing for those residents displaced, but if the residents move outside the neighborhood, the significant impact on the neighborhood's character would still occur.

If the mitigation measures presented for the action's other significant adverse impacts, if any, would not mitigate neighborhood character impacts, other mitigation measures should be

identified where feasible. For example, if a signal timing change addresses a traffic impact, but not a related neighborhood character impact, the solution might be deliberate rerouting of project-related traffic to a more suitable street. This solution might be considered even if the diversion causes a new traffic impact (which can be mitigated) but does not affect neighborhood character.

## 600. Developing Alternatives

Alternatives proposed to avoid impacts in other technical areas of the environmental assessment may also avoid neighborhood character impacts. Similar to mitigation, alternatives proposed in response to impacts in the technical areas of the assessment may not necessarily avoid neighborhood character impacts (see the discussion of mitigation measures in Section 500, above).

Mitigation measures developed specifically to avoid neighborhood character impacts may be incorporated into alternative proposals.

## 700. Regulations and Coordination

### 710. REGULATIONS AND STANDARDS

There are no special statutory regulations or standards that control the study of neighborhood character in particular. Regulations and standards for each of the technical areas that can contribute to neighborhood character are discussed in Section 710 of the appropriate Manual Chapters.

### 720. APPLICABLE COORDINATION

The neighborhood character chapter requires considerable coordination among the different technical areas that make up neighborhood character—land use, urban design, visual resources, historic resources, socioeconomics, traffic, and noise. The lead agency will want to be sure that the analysts addressing individual technical areas are aware of the issue of neighborhood character and that the analyst for neighborhood character coordinates with these other disciplines.

### 730. LOCATION OF INFORMATION

Information related to the elements of neighborhood character is found in the other technical areas of the environmental assessment (see Section 730 of the appropriate technical chapters of this Manual).