UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

METRO FUEL LLC,

           Plaintiff,

   vs.

CITY OF NEW YORK,

           Defendant.

Case No. 07 Civ 8244 (PAC)

**PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS**
**PURSUANT TO LOCAL CIVIL RULE 56.1**

Pursuant to Rule 56.1 of the Civil Rules of the Southern District of New York, Plaintiff Metro Fuel LLC ("Fuel") hereby submits the following statement of material facts about which it contends there are no genuine issue to be tried:

## A.    Fuel's Advertising Sign Business

1.    Fuel operates approximately 440 panel signs in New York City.  Freedman Decl. ¶ 2.

2.    Fuel's panel signs measure approximately 69 inches tall by approximately 48 inches wide.  Freedman Decl. ¶ 2.

3.    They are internally illuminated, meaning that they contain posters that are lit by fluorescent bulbs placed behind the posters.   Freedman Decl. ¶ 2.

4.    Fuel's panel signs generally are situated in one of several ways:  the vast majority of them (approximately 76.7%) are placed in, on, or near parking garages, either inside the door to the garage, cantilevered above or near the garage door, or affixed to the exterior of the garage. Approximately 14.4% of them are affixed to the exteriors of other mixed use commercial properties.  The remaining approximately 8.8% are located in parking lots, either affixed to an adjacent building or mounted on a pole.  Fuel typically rents space from the landlord in exchange for the right to place a panel sign on or inside of the property.  Freedman Decl. ¶ 3.

5.    Fuel's panel signs are made available to national and local advertisers on an "all comers" basis in a fashion similar to newspaper, magazine, and broadcast advertising.  Fuel's panel signs may be used to display a variety of commercial and noncommercial messages, including political, religious, charitable, and public service messages.  Freedman Decl. ¶ 4.

6.     Fuel markets its panel signs to prospective advertisers on a "reach and frequency" basis based on the demographics of the location area.  Fuel does not specifically market its panel signs as visible to motorists.  Freedman Decl. ¶ 5.

7.     Fuel's panel signs compete directly with the street furniture advertising signs – primarily bus shelters, newsstands, and public pay telephones – with which the City has blanketed its sidewalks in recent years.  Fuel sells advertising space on its panel signs to many of the very same advertisers that are contracting with the City's franchisees to place the very same advertising copy on the City's street furniture.  Indeed, with thousands of street furniture signs in play, the City of New York is not just Fuel's regulator.  It is, through its franchisees, by far Fuel's biggest competitor in the marketplace.  Freedman Decl. ¶ 6.

8.     The vast majority (approximately 93%) of Fuel's panel signs are located in zoning districts in which, according to the regulations being challenged in this case, internally illuminated advertising signs purportedly are prohibited.  Freedman Decl. ¶ 7.

**B.     The City's Regulatory Scheme**

9.     The Zoning Resolution liberally permits accessory signs to be placed and maintained anywhere in commercial and manufacturing districts, subject only to size, height, illumination, and projection limitations.  Z.R. §§ 32-62 to 32-661; *id*. §§ 42-52 to 42-543.

10.     Contrary to its treatment of accessory signs, the Zoning Resolution places severe restrictions on the placement of advertising signs in commercial and manufacturing districts.  Whereas accessory signs may be located in any type of district, the Zoning Resolution provides that advertising signs are permitted only in C6-5, C6-7, and C7 districts and, subject to illumination restrictions, in C8, M1, M2, and M3 districts.  Z.R. §§ 32-63, 42-52.

11.     Advertising signs are not permitted in residential districts at all.  Z.R. § 22-32.

12.     Although some advertising signs are allowed in C8, M1, M2, and M3 districts, advertising signs in those districts may only be non-illuminated or indirectly illuminated.  Z.R. §§ 32-645, 42-533.  Fuel's internally illuminated panel signs are not permitted in C8, M1, M2, or M3 districts because the City considers internally illuminated signs to be directly illuminated (as opposed to indirectly illuminated).

13.     Under the Zoning Resolution, an indirectly illuminated sign is one "whose illumination is derived entirely from an external artificial source and is so arranged that no direct rays of light are projected from such artificial source into residences or streets."  Z.R. § 12-10 (definition of "sign with indirect illumination").

14.     According to the Department of Buildings (the agency with primary enforcement jurisdiction over the City's advertising sign restrictions), a large-format billboard that is lit by numerous external high-wattage external floodlights is considered indirectly illuminated, but a panel sign consisting of a poster lit by a fluorescent bulb placed behind it is considered directly illuminated.  Fortier Dep. at 119-20, 127-29.

15.     Accordingly, Fuel's internally (*i.e.*, directly) illuminated panel signs are only allowed in C6-5, C6-7, and C-7 districts.  Fuel's panel signs are not allowed in any residential districts, nor in any manufacturing districts, nor in any commercial districts other than C6-5, C6-7, and C-7 districts.

16.     Of the approximately 440 panel signs that Fuel currently operates in New York City, approximately 7% are located in C6-5, C6-7, or C-7 districts.  The remaining 93% of Fuel's panel signs are located in districts in which panel signs purportedly are not allowed.  Freedman Decl. ¶ 7.

**C.    The City's Street Furniture Advertising Signs**

**1.    The Street Furniture Franchise**

17.    On May 19, 2006 the City entered into a 20-year franchise agreement (the "Franchise Agreement") with Cemusa, Inc. for the installation, operation, and maintenance of bus shelters, newsstands, and automatic public toilets.  Stips. ¶ 62.

**(a)    Bus Shelters**

18.    Prior to 2006, the City had entered into franchise agreements with various outdoor advertising companies to install and maintain bus shelters.  Those prior franchise agreements permitted the outdoor advertising companies to sell advertising space on the bus shelters.  Stips. ¶ 60.

19.    At the conclusion of the prior franchise agreements, the City owned all of the then-existing bus shelter structures.  Hecker Decl. Exh. 14 at NYC011780-81.

20.    Under the 2006 Franchise Agreement, Cemusa is obligated to replace all of the approximately 3,100 existing bus shelters in New York City.  In addition, Cemusa is permitted to install up to 400 additional bus shelters that did not exist prior to the 2006 Franchise Agreement.  Stips. ¶ 63.

21.    The new bus shelters each contain two advertising panels that are placed on the end of the shelter positioned perpendicular to the street.  Each of these advertising panels is permitted to contain up to 27.5 square feet of advertising copy, for a total of 55 square feet per shelter.  Stips. ¶ 64.

22.    Up to 10% of the new bus shelters may contain additional advertising signs if the shelter is greater than 25 feet in length.  Such shelters may have an additional 55 square feet of

advertising space if the advertising panels are end panels or an additional 27.5 square feet of advertising space if the advertising panels are not end panels.  Stips. ¶ 65.

23.    The new Cemusa bus shelter advertising panels are considerably larger than those that were on the old shelters.  The old shelters were only permitted to display 47 square feet of advertising copy.  Stips. ¶ 64.

24.    Like the old bus shelters, the advertisements in the new bus shelters may be internally illuminated, and the vast majority of these shelters are in fact internally illuminated.  The advertising posters are visible day and night.  There is no limit to the level of illumination on the new bus shelters.  Stips. ¶ 66.

25.    The City's illuminated street furniture advertising signs tend to be brighter than Fuel's signs.  Wachtel Decl. ¶ 56.

26.    The City's bus shelter signs are placed approximately 3 feet from the curb line, whereas Fuel's panel signs generally are placed between 8 to 18 feet from the curb line.  Wachtel Decl. ¶ 49.

27.    There is no restriction on the placement of the City's bus shelter (and newsstand) advertising signs in residential zoning districts.  Hecker Decl. Exh. 15 at NYC015410.

28.    Cemusa markets its bus shelter advertising signs to prospective advertisers as visible to both pedestrians and motorists.  Askew Decl. ¶ 3.

29.    Virtually none of the City's bus shelter advertising signs complies with the zoning restrictions that apply in the districts in which the shelters are located.  Bass Decl.

30.    Under the Franchise Agreement, Cemusa is authorized to install 250 so-called "scroller" advertising signs – dynamic signs that change the advertising copy being displayed every few seconds.  Stips. ¶ 68; Wachtel Decl. ¶ 28.

31.    At least 80 of these scrollers have already been installed.  Stips. ¶ 68.

32.    In addition to these 250 scrollers, the Franchise Agreement contemplates that various forms of "[e]lectronic media" will be permitted in connection with advertising signage "on a case by case basis."  Hecker Decl. Exh. 13, Franchise Agr. ¶ 4.4.2.

33.    In March 2007, the City gave permission to Cemusa to equip ten bus shelters with high-definition liquid crystal display ("LCD") screens displaying video advertising.  Stips. ¶¶ 70-71.

34.    The City permitted Cemusa to place these LCD video advertising signs on shelters in areas with high pedestrian and vehicular traffic.  Stips. ¶ 70.

35.    The City permitted Cemusa to place these LCD video advertising signs on two-way streets where they would be visible to oncoming traffic.  Stips. ¶ 72.

36.    The City rejected the advice of Stanley Shor, the Assistant Commissioner of the Department of Information Technology and Telecommunications ("DOITT") in charge of the public pay telephone franchises, who advised the Department of Transportation ("DOT") to require Cemusa, for traffic safety reasons, to place the LCD screens only on one-way streets facing away from vehicular traffic.  Hecker Decl. Exh. 18 at NYC015498.

37.    The City has also permitted Cemusa to equip 20 bus shelters with smaller LCD "tickers" that dynamically display stock quotes, the time, and the temperature.  Stips. ¶ 79.

38.    Bluetooth is a wireless communication system that transmits a signal containing data to certain kinds of handheld devices, including mobile telephones.  Askew Decl. ¶ 4.

39.    Bluetooth can be used to beam images, wallpaper, coupons, video files (such as television or movie trailers), audio files (such as ringtones), games, and software applications to those passing through its transmission radius.  Stips. ¶77.

40.     Pedestrians and motorists with Bluetooth-enabled handheld devices who pass within the transmission radius of a Bluetooth-equipped bus shelter can receive an audible ping or vibration alerting them that they have received an advertising message sent to their device. Stips. ¶ 76.

41.     Pursuant to the agreement between the City and Cemusa, the Bluetooth transmission radius is only permitted to be fifteen feet.   However, Cemusa believed that the technology it installed had the capacity to transmit content considerably farther, and Cemusa never tested its technology and therefore does not know exactly how far its Bluetooth transmissions traveled.  Stips. ¶ 75; Askew Decl. ¶ 8.

42.     The City never asked Cemusa to explain how its Bluetooth transmissions would be confined to a 15-foot radius, nor did the City ever ask Cemusa to represent or certify that its Bluetooth transmissions were in fact confined to any particular radius.  Askew Decl. ¶ 9.

43.     Although the Bluetooth program was supposed to be limited to ten bus shelters, Cemusa actually installed Bluetooth technology on well over 100 different bus shelters throughout the City.  Stips. ¶ 73; Askew Decl. ¶ 5.

44.     Prior to March 2008, the City did not audit the Bluetooth program or ask Cemusa to report on how many bus shelters had been equipped with Bluetooth technology because the City "does not monitor the content of advertising" on its bus shelters.  The City did not learn about the extent of Cemusa's Bluetooth program until it was revealed through discovery in this litigation.  Stips. ¶ 74; Askew Decl. ¶ 6.

45.      The City has referred to electronic media as the "wave of the future" and noted that "the wider use of electronic media is likely."  Gould-Schmit (Mar. 19) Dep. at 177; Hecker Decl. Exh. 19.

**(b)    Newsstands**

46.    Under the Franchise Agreement, Cemusa also is obligated to replace each of the 284 existing newsstands in New York City, and is permitted to install up to 330 new newsstands. Stips. ¶ 83.

47.    Prior to 2006, newsstands were not permitted to display advertising signs. However, the City amended its Administrative Code, at DOT's request, in order to permit Cemusa to display advertising signs on newsstands for the first time.  Stips. ¶ 84; Gould (Mar. 19) Dep. at 54.

48.    Each new Cemusa newsstand is permitted to display up to 82.5 square feet of advertising copy.  The newsstands have advertising panels of varying sizes depending on the dimensions of the newsstand.  There usually is one smaller advertising panel on the side of the newsstand and one larger advertising panel on the back of the newsstand facing the street.  Stips. ¶ 83.

49.    The City's newsstands are placed approximately 3 feet from the curb line. Wachtel Decl. ¶ 49.

50.    As detailed in the accompanying Declaration of Richard Bass, of the dozens of newsstands bearing advertising signs that the City has already installed (with hundreds more scheduled to be build in the next couple of years), almost all of them violate the zoning restrictions that apply in the districts in which the newsstands are located.

51.    Cemusa markets its newsstand advertising signs to prospective advertisers as visible to both pedestrians and motorists.  Askew Decl. ¶ 3.

2.    **Public Pay Telepones**

52.    In 1999, the City entered into a number of franchise agreements with different franchisees to install and operate PPTs throughout the City.  These franchises have a term of 11 years with a 4-year renewal option.  Stips. ¶ 95.

53.    The PPT franchise agreements permit the placement of advertising panels on the exterior rear and side panels of PPT enclosures in any zoning districts in which commercial or manufacturing uses are permitted as of right.  Stips. ¶ 96.

54.    Advertising on side display panels is permitted to be 27" x 57".  Advertising on rear display panels is permitted to be up to 54" x 57" for double-pedestal structures and up to 36" x 81" for triple-pedestal structures.  Stips. ¶ 98; Hecker Decl. Exh. 21 at ¶ 4.4.1(c).

55.    There currently are approximately 21,000 public pay telephones in New York City, approximately 12,000 of which bear advertising signs.  Shor Dep. at 65.

56.    These PPT advertising signs are placed approximately 3 feet from the curb line. Wachtel Decl. ¶ 49.

57.    The franchise agreements allow PPT advertising signs to be illuminated (except in designated historic districts).  Stips. ¶ 99.

58.    The City has approved the use of light-emitting diode ("LED") technology for displaying electronic copy on PPT advertisements for the New York Lotto.  Stips. ¶ 102.

59.    These LED ads are "much brighter" than typical backlit PPT signs.  Shor Dep. at 75.

60.    From 1999 to 2004, there was explosive growth in the number of PPTs with advertising panels in central Manhattan, the most lucrative advertising market.  Hecker Decl. Exh. 23, at 22-23.

61.    DOITT later found that the PPTs were placed on City streets without regard for whether the locations actually needed greater phone service.  Stips. ¶ 100.

62.    Stanley Shor acknowledged that "[t]he proliferation of cell phones has made the pay phone much less useful to most people."  Shor Dep. at 44, 82.

63.    Former Deputy Mayor Doctoroff believes that there are too many PPTs bearing advertising signs in Manhattan.  Doctoroff Dep. at 40-41.

**3.    Lamppost Banners**

64.    The New York City Department of Transportation ("DOT") permits the display of advertising banners on the City's lampposts.  34 RCNY § 2-14(b).

65.    Lamppost advertising banners are permitted to be 24 square feet – 3 feet wide and 8 feet tall.  *Id*. § (b)(2)(iv).

66.    These advertising banners are cantilevered from lampposts such that they hang directly over active roadways.  Stips. ¶ 113.

67.    Although lamppost banners are theoretically supposed to promote cultural or community events, DOT permits up to 10% of the banners to advertise corporate sponsorship. 34 RCNY § 2-14(b)(2)(v).

68.    Many lamppost banners are predominantly commercial.  For example, the banner advertising New York as the "beauty capital of the world" is a barely disguised advertisement for *Cosmopolitan* magazine.  So too with the banner advertisements for the CBRE real estate firm and the television program *The Family Guy*.  Hecker Decl. Exh. 24.

69.    The City has issued thousands of permits for companies to hang banners on lampposts around the City.  These banners are permitted to hang directly over the street.  The

City has never studied any impact that they might have on traffic safety or aesthetics.  Stips. ¶¶ 113, 114, 116.

### 4.    Taxi Cabs

70.    The New York City Taxi and Limousine Commission ("TLC") issues permits for advertising on the rooftops of taxi cabs.  There are over 13,000 licensed medallion taxicabs in the City of New York.  TLC has issued approximately 7,300 permits for advertising on the rooftops of taxicabs.  Many of these rooftop taxi cab advertising boxes are permitted to include dynamic digital advertisements.  Stips. ¶¶ 109-110.

### 5.    Urban Panels

71.    The Metropolitan Transportation Authority ("MTA") has placed advertising signs known as "urban panels" on the street-level staircase railings of approximately 905 subway entrances around New York City.  All but 92 of these urban panel structures are double-faced, resulting in a total of 1718 advertising faces, each measuring approximately 28 inches by 58 inches.  The vast majority of these urban panels are internally illuminated.  Stips. ¶ 36, & App. B.

72.    Of the 1718 advertising sign faces on urban panels throughout the City, 80 of them display high-definition video advertisements.  Stips. ¶ 38.

73.    Jeffrey Sugarman, an urban designer with the Department of City Planning, testified that these video advertisements are "really visually intrusive."  Sugarman Dep. at 82-83.

74.    The City has asserted that although it generally has the legal authority to enforce its advertising sign restrictions against the MTA, it does not have the authority to do so with respect to advertising signs located on the property of New York City Transit (a subsidiary of the

MTA) because of subsection 13a of section 1204 of the Public Authorities Law.  Hecker Decl. Exh. 26 at 15-16 (Response to Interrogatory No. 22).

75.     One senior City official advised DOT that it "may exceed the authority" that MTA has under subsection 13a to "extend an appurtenance into the City's air space for the sole purpose of generating revenue from advertising."  Hecker Decl. Exh. 27 at NYC014313.

76.     Despite the fact that this question was raised, the City never bothered to explore whether the MTA's urban panels in fact are exempt.  Shor Dep. at 226-27; Fortier Dep. at 102.

77.     New York City Mayor Robert F. Wagner strongly endorsed the enactment of section 13-a because advertising revenues would help keep fares down, which would benefit New York City residents.  Hecker Decl. Exh. 28.

78.     The City controls 4 members of the MTA's Board.  Stips. ¶ 39.

79.     The City owns most of the MTA's facilities, and the MTA relies on the City's continuing willingness to lease those facilities to it.  Stips. ¶¶ 40, 42-43.

80.     The City provides the MTA with between $280 million and $290 million per year in operating subsidies and hundreds of millions of dollars more per year in capital subsidies.  Stips. ¶ 41.

81.     The City has never asked the MTA to consider voluntarily removing any of its urban panels.  Weinshal Dep. at 80-83.

**D.     The City's Primary Goal In Saturating Its Streetscape With Street Furniture Advertising Signs Was to Generate Revenue**

**1.     The City's Share of Street Furniture Advertising Revenue**

82.     In addition to financing 100% of the cost of building and maintaining all of the new newsstands, bus shelters, and automated public toilets, Cemusa is obligated to pay the City

at least 50% of the gross advertising revenue derived from the Coordinated Street Furniture Franchise.  Stips. ¶ 85.

83.    Pursuant to the Franchise Agreement, the City is entitled to receive a Guaranteed Minimum Annual Compensation ("GMAC") totaling approximately $999 million over the twenty-year contract term.  Stips. ¶ 86; Hecker Decl. Exh. 29.

84.    In addition to this GMAC, Cemusa must provide the City with 20% of all of the street furniture advertising space for use by the City's commercial marketing partners and for advertisements promoting New York City.  Stips. ¶ 89.

85.    Cemusa also must also provide the City with "in-kind" payments by posting advertisements for the City on Cemusa-owned out-of-home advertising media in other cities throughout the world.  The value of such in-kind advertising over the course of the Coordinated Street Furniture Franchise is $398,400,000.  Stips. ¶ 90.

86.    Although Cemusa expects to generate total revenues in the range of $2 billion through street furniture advertising, it will cost at most $100 million to construct and install all of the new street furniture structures.  Hecker Decl. Exh. 14 at NYC011779; Gould-Schmit (June 10) Dep. at 139.

87.    The City conditioned its approval of Cemusa's use of "scroller" ads on the payment of millions of additional dollars.  Cemusa had originally proposed a GMAC of $924 million, with an additional $91.5 million in "Contingent Compensation Above GMAC" – dependent upon the City permitting Cemusa to place 200 scrollers "in the most favorable advertising locations."  Hecker Decl. Exh. 30.

88.    The City then inquired whether Cemusa would guarantee that additional $91.5 million if the City would agree to allow the scrollers.  Cemusa agreed that it would guarantee

95% of the contingent compensation beginning in the sixth year of the Franchise Agreement, meaning that Cemusa guaranteed an additional $75 million on top of the $924 million it had initially bid, raising the total GMAC to $999 million.  Hecker Decl. Exh. 31.

89.    Former DOT Commissioner Iris Weinshal testified that "[t]here was just one upside [to allowing Cemusa to install scrollers:] generating more revenue."  Weinshal Dep. at 77-78; *see also* Gould-Schmit (June 10) Dep. at 183-84.

90.    Cemusa's use of high-definition LCD video screens and Bluetooth transmitters on bus shelters caused advertising revenue on the equipped shelters to increase by over 50%.  Stips. ¶ 78.

91.    Because the street furniture structures the City claims to have desired cost a fraction of the $2 billion in advertising revenue Cemusa expects to generate, the City could have scaled back its street furniture advertising program and still induced a bidder to build and maintain the very same structures at no cost to the City if the City were willing to forego receiving any revenue.  Gould-Schmit (June 10) Dep. at 151; Sugarman Dep. at 155.

92.    The City never considered this option.  Gould-Schmit (June 10) Dep. at 43-45.

93.    The City collects 26% of net advertising revenues generated by ads placed on PPTs.  The City was paid the following amounts under its PPT franchise agreements in recent years:  $10,728,963.52 in 2004, $12,459,593.70 in 2005, $14,103,080.14 in 2006, and $14,017,347.61 in 2007.  Stips. ¶¶ 103-104.

94.    The revenue derived during this period steadily increased even though the number of PPTs declined by an average of 1,700 phones per year (because of the increasing prevalence of cell phones).  Shor Dep. at 96-97; *id*. at 44, 82; Hecker Decl. Exh. 32.

95.    The City makes more than three times as much money from advertisements on pay phones than it does from all other sources of pay phone income combined – including charges for telephone calls.  Stips. ¶ 105.

## 2.    New York City Marketing

96.    In 2003, the City established New York City Marketing ("NYCM") – a new organization designed to generate revenue and promotional exposure for the City – and appointed Joseph Perello as its first Chief Marketing Officer.  Exhs. 33 and 34.

97.    "NYCM set out to centralize and manage the city's collective media assets.  The idea was to use the assets to generate value to the city, by using them either to support corporate partners and city agencies or to promote NYC in other ways.  NYCM believed that media opportunities were important not only to tap into advertising vehicles but also to shape the messaging in those vehicles."  Hecker Decl. Exh. 35 at 10.

98.    Perello quickly recognized that street furniture advertising represented "one of the most significant opportunities" for NYCM, and that Manhattan, in particular, was a key and lucrative market for outdoor advertisers.  *Id*. at 10-11.

99.    Perello helped DOT negotiate a one-year extension of the City's then-existing bus shelter franchise agreement that increased the City's share of advertising revenue by $13.5 million.  Perello Dep. at 46-47, 58-60; Hecker Decl. Exh. 35 at 11.

100.    Perello subsequently helped spearhead and negotiate the new street furniture Franchise Agreement with Cemusa.  Gould-Schmit (Mar. 19) Dep. at 21-22.

101.    Thanks to Perello's efforts, the City entered into a variety of "marketing partnership agreements," including:

- •     <u>The History Channel</u>: The City agreed to provide the History Channel with "$6.8 million in city-owned outdoor media" to promote its programs in exchange for $19.5 million agreement, including $3.5 million in cash, and $16.5 million worth of media and programming. Hecker Decl. Exh. 36 ¶¶ 2.1, 10.2; Perello Dep. at 83-85.

- •     <u>Snapple</u>: The City agreed to award Snapple an exclusive contract to provide water and juice vending machines in the City's 1,200 schools and to give Snapple almost $20 million of advertising space on the City's street furniture in exchange for $106 million in cash and $60 million in marketing and promotional value. Hecker Decl. Exh. 37; Perello Dep. at 111-13.

102.     When the City considered the possibility of allowing advertising signs to be placed on sidewalk sheds, it was concerned that doing so would adversely impact the revenues generated by its street furniture and PPT franchises. Gould-Schmit (Mar. 19) Dep. at 254-55.

## E.     The City Awarded the Street Furniture Franchise to Cemusa Even Though Cemusa's Proposal Received the Lowest Design Scores of Any Bidder

103.     It was "the compensation promised to the City in its proposal [that] put Cemusa ahead of the other proposers." Hecker Decl. Exh. 40, ¶ 85.

104.     The Street Furniture Franchise RFP spelled out a specific, detailed, and strict procedure through which the various street furniture bids would be evaluated and a winning franchisee would be selected. Each bid would be evaluated by a special inter-agency "Evaluation Committee" and awarded up to 145 points: up to 25 points for ability to provide required services, 60 points for technical merit, 55 points for compensation package, and up to 5 special preference points. Each of these basic categories was further broken down into various subcategories, each of which was allocated maximum point scores. Hecker Decl. Exh. 12 at 23-26; Exh. 43.

105.     Given the point totals assigned to each category, 38% of each bidder's total score was derived from an assessment of that bidder's proposed compensation package. Stips. ¶ 91.

106.    In order to evaluate the design aspects of the various street furniture proposals, the Evaluation Committee relied on the assistance of the Design Advisory Committee, a group comprised of representatives of City agencies and civic organizations with experience in architecture and urban design, which evaluated the design aspects of each proposal and submitted non-binding recommendations to the Evaluation Committee.  Hecker Decl. Exh. 40, ¶ 52.

107.    

108.    

109.    

110.    Whereas NBC/Decaux and Van Wagner received average design scores of 26.71 and 25.71, respectively (out of 30 possible points), Cemusa received an average design score of 12.29 – by far the lowest of any of the five bidders.  Gould-Schmit (June 10) Dep. at 105-09.

111.    After the initial scores were tallied, three of the five bidders were invited to revise their proposals and to submit best and final offers (the "BAFO" round).  Cemusa received one of

the three highest overall point totals in the initial round because it scored by far the highest of any bidder in the compensation package category.  Hecker Decl. Exh. 46.

112.    In the BAFO round , the Evaluation Committee reviewed the revised proposals submitted by each of the three finalists, and Cemusa once again received by far the lowest design scores.  Hecker Decl. Exhs. Exhibit 45, 48; Gould-Schmit (June 10) Dep. at 111.

113.    However, Cemusa also received by far the highest scores for its compensation proposal in the BAFO round.  Hecker Decl. Exh. 46.

114.    When all of the categories were combined, Cemusa nosed NBC/Decaux by a razor-thin margin:  909.75 to 890.5 total points – *i.e.*, average scores by each of the seven members of the Evaluation Committee of 129.96 (out of 145) for Cemusa and 127.21 for NBC/Decaux.  Hecker Decl. Exh. 46 (last page); Hecker Decl. Exh. 47.

115.    Raising revenue is not a good reason for compromising aesthetic or neighborhood character concerns.  Wargo Dep. at 156.

## F.    The City Exempts Its Street Furniture From the Advertising Sign Restrictions Set Forth In the Zoning Resolution

116.    According to the City, its street furniture advertising signs are exempt from all of the restrictions set forth in the Zoning Resolution because the Zoning Resolution "regulates the use or development of zoning lots" but "does not govern the use of development of the City's streets and sidewalks."  Hecker Decl. Exh. 26 at 18-19 (Response to Interrogatory No. 26).

117.    Thus, "[t]he only activities taking place on the City's streets and sidewalks that are regulated by the Zoning Resolution are those that are directly related to the use and development of the adjoining lot."  *Id.*

118.    If the City chose to, it could subject its street furniture advertising signs to some or all of the restrictions set forth in the Zoning Resolution.  Fortier Dep. at 96-97, 113-14.

119.    The City never considered doing that.  Gould-Schmit (Mar. 19) Dep. at 99-100; Wargo Dep. at 162-63.[1]

120.    Although the Franchise Agreement states that Cemusa must comply with the restrictions on electronic advertising signs set forth in the Zoning Resolution, the City has not required Cemusa to do so on the theory that its high-definition video ads are only a "pilot."  Gould-Schmit (June 10) Dep. at 11.

## G.    The City's Purported "Traffic Safety" Concerns

121.    The City contends that the restrictions on advertising signs are designed to address "traffic safety concerns" (as well as to address aesthetic and neighborhood character concerns).  Hecker Decl. Exh. 26 at 11-12 (Response to Interrogatory No. 15).

122.    The City expressly concedes, however, that Fuel's panel signs do *not* implicate traffic safety concerns.  *Id*. at 12 (Response to Interrogatory No. 16) (stating that the City restricts panel signs in order to address aesthetic and neighborhood character concerns, but not traffic safety concerns).

123.    The City has not conducted or consulted any studies regarding whether panel signs – be they Fuel's panel signs or the City's own street furniture signs – implicate traffic safety concerns.  Stips. ¶ 93; Gould-Schmit (Mar. 19) Dep. at 152; Shor Dep. at 137-38.

---

[1]   Although the Franchise Agreement states that Cemusa must comply with the restrictions on electronic advertising signs set forth in the Zoning Resolution, the City has not required Cemusa to do so on the theory that its high-definition video ads are only a "pilot."  Gould-Schmit (June 10) Dep. at 11.

124.    In 2005, David Karnovsky, the General Counsel of the Department of City Planning, suggested to Melinda Katz, the Chair of the City Council's Land Use Committee, that the City Council should provide funding to "hir[e] a consultant to study best practices in the area of sign regulation in other jurisdictions."  Hecker Decl. Exh. 49.

125.    However, no such study was ever performed.  Fortier Dep. at 111; Wargo Dep. at 187-88.

126.    City's signs have a greater potential to distract drivers than Fuel's panel signs do. Wachtel Decl. ¶¶ 6, 22, 27, 36, 40, 47, 49, 66.

127.    The City's scroller and electronic advertising signs are more likely to distract drivers than Fuel's signs are.  Wachtel Decl. ¶¶ 12, 28-30, 34.

128.    The City approved Cemusa's use of electronic media – including high-definition video screens – without conducting or consulting any studies about the traffic safety or aesthetic impact of electronic advertising signs.  Gould-Schmit (Mar. 19) Dep at 191.

129.    The City knew that the MTA had experimented with similar technology, but did not bother to consult with the MTA about its experience.  Id. at 191-92.

130.    The City Council Authorizing Resolution that authorized the 2004 RFP expressly required DOT to develop street furniture siting criteria that "address . . . visual impact on vehicular traffic."  Hecker Decl. Exh. 11 at NYC007654-55.

131.    The City's bus shelter siting criteria are geared towards pedestrian flow issues, not traffic safety issues, and DOT has not taken any steps to ensure that street furniture advertising signs are not placed where they are unduly capable of distracting passing motorists. Wachtel Decl. ¶¶ 52-53.

**H.      The City's Purported "Aesthetics" and "Neighborhood Character" Concerns**

132.      The City contends that it restricts Fuel's panel signs in order to protect "aesthetics" and "neighborhood character."  Hecker Decl. Exh. 26 at 11-12 (Response to Interrogatory Nos. 15-16).

133.      However, the City never conducted or consulted any studies, and is not aware of any studies, regarding the impact of panel signs or street furniture advertising signs on aesthetics or neighborhood character.  Stips. ¶ 93; Fortier Dep. at 30-31; Sugarman Dep. at 53; Wargo Dep. at 70.

134.      Instead, in implementing the Street Furniture Franchise beginning in 2004, the City relied exclusively on an analysis of a similar street furniture franchise proposal that had been considered in 1996 (but ultimately abandoned).  Stips ¶ 92.

135.      In determining what steps had been taken and what conclusions had been drawn during the 1996 review process, the City relied primarily on three written documents:  the City Environmental Quality Review ("CEQR") application that DOT submitted in April 1996; the City Planning Commission report that was issued in October 1996; and the City Council authorizing resolution that was enacted in December 1996.  Gould-Schmit (June 10) Dep. at 162-63.

136.      When implementing the Street Furniture Franchise beginning in 2004, the City took no steps to revisit or reconsider any of the assumption that were made or the conclusions that were drawn during the 1996 review process.  The City simply assumed that the 1996 review process had been appropriately thorough.  Sugarman Dep. at 100-02, 113, 173.

137.      DOT's April 1996 CEQR application contained a very brief section addressing neighborhood character issues.  Hecker Decl. Exh. 51 at NYC005773.  It stated that the City's

goal was to "provide well-maintained attractive street furniture" with structures that will be "aesthetically pleasing" and that improved maintenance of the structures would "enhance the overall appearance of the streetscape." *Id.* However, nothing in DOT's CEQR application addressed whether the widespread proliferation of street furniture advertising signs would have a significant adverse impact on aesthetics or neighborhood character. *Id.*

138.    Nor did the City Planning Commission's October 1996 report meaningfully address whether the contemplated street furniture advertising sign program would have a significant adverse impact on aesthetics or neighborhood character. Like DOT's CEQR application, the Commission's report stated generally that the City's goal was to build street furniture "structures which will be aesthetically pleasing" and that coordinating the look of various types of structures would "result in a significant improvement in the appearance . . . of the City's streets," but the report did not discuss the Commission's view on whether or the extent to which the contemplated advertising sign program would affect aesthetics or neighborhood character. Hecker Decl. Exh. 52 at 6, 24.

139.    Under CEQR, an Environmental Assessment Statement ("EAS") must be prepared for every proposed action subject to environmental review, and "neighborhood character" is one of the criteria that the City is required to assess. 43 RCNY § 6-06(a)(5).

140.    There are a variety of specific requirements for Neighborhood Character Assessments when certain "preliminary thresholds" are triggered. Notwithstanding the fact that these preliminary thresholds plainly were triggered by the Street Furniture Franchise, no Neighborhood Character Assessment was ever performed. Hecker Decl. Exh. 54 at 3H-1 to 3H-5.

141.     The City chose to proceed with the Street Furniture Franchise in 2004 even though there had been significant and vocal opposition to the 1996 proposal, which was approved by a razor-thin margin:  a vote of 21-19 by the City's community boards.  The 1996 proposal was strongly opposed by the Manhattan Borough President and the Manhattan Borough Board.  Hecker Decl. Exh. 52 at 12-19; Stips. ¶ 92; Gould-Schmit (Mar. 19) Dep. at 114-16.

142.     The Manhattan Borough President voted to disapprove the 1996 street furniture proposal because of her concern that there was too much advertising and clutter on the streets. Hecker Decl. Exh. 52 at 16.

I.     **Other Examples of the City's Hypocrisy**

1.     **Advertising Signs on City Property**

143.     The City has stipulated that there are at least 11 billboards located on City property that fail to comply with the requirements of the Zoning Resolution restricting the placement of advertising signs near arterial highways, including two billboards along the Belt Parkway, two billboards at the West Side Highway and 145th Street, three billboards on the High Line along the West Side Highway, one billboard in Staten Island along the West Shore Expressway, two billboards along the Major Deegan Expressway at 149th Street, and a large two-faced digital billboard across from Yankee Stadium along the Deegan Expressway.  Stips. ¶¶ 13-31.

144.     The Yankee Stadium sign measures 26 feet by 48 feet (1248 square feet), is double-faced, and flashes continually changing electronic messages – including commercial advertisements – directly onto the Major Deegan Expressway.  This billboard is located on property under the jurisdiction of the Parks Department and licensed to Central Parking Systems, in exchange for which Central Parking Systems pays fees to the City.  Stips. ¶¶ 24-25.

145.    In some instances, the DOB wrote an initial letter of complaint years ago but never followed up, as with the Yankee Stadium billboard.  Stips. ¶ 26.

146.    In other instances, such as the High Line billboards, the City negotiated leases for those advertising signs with outdoor advertising companies in 2006 with the full knowledge of the Office of the Deputy Mayor for Economic Development and Rebuilding, the Parks Department, the Law Department, and New York City Marketing.  Stips. ¶¶ 17-18.

147.    These illegal billboards – which are many times larger than Fuel's panel signs – brought the City significant revenues, including $343,865 from February 2005 through September 2008 for the two signs on the West Side Highway, and approximately $600,000 from January 2002 through March 2008 for the billboard along the Major Deegan Expressway.  Stips. ¶¶ 16, 30.

### 2.    City Advertising on Privately Owned Signs

148.    Various City agencies have posted commercial and non-commercial advertisements on privately owned advertising signs throughout the City.  Stips. ¶ 119.

149.    From 2004 through 2006, the NYPD ran nine advertising campaigns (recruitment and other non-commercial campaigns) involving the use of outdoor signage.  Each campaign ran for stints of approximately two months and utilized approximately 400 312-square-foot signs throughout the City.  Stips. ¶ 120.

150.    From 2005 through 2007, the Department of Corrections ("DOC") ran five recruitment campaigns involving the use of outdoor signage.  Each campaign ran for stints of approximately two months and utilized, respectively, approximately 350, 200, 200, 200 and 100 55-square-foot signs throughout the City.  Stips. ¶ 121.

151.    From 2005 through 2007, the Parks Department ran seven campaigns (such as lifeguard recruitment and the Central Park winter festival) involving the use of outdoor signage. These campaigns typically ran for stints of approximately one month, with one campaign lasting three months and one lasting seven months.  The campaigns typically utilized approximately 80 bus stop shelters, but one campaign used 100 shelters and one used 40 shelters.  Stips. ¶ 122.

152.    NYC Marketing has regularly placed both public service announcements and advertisements for private companies doing business with the City on bus stop shelters throughout New York City.  Stips. ¶ 123.

153.    The FDNY has placed advertisements bus shelters and PPT kiosks throughout New York City.  These campaigns included the use of 45 bus shelters for between four and eight weeks each.  Stips. ¶ 127.


DATED:        July 28, 2008
                    New York, New York



By:    _____/s/_____
          Richard D. Emery (RE 5181)
          Eric Hecker (EH 0989)
          Debra L. Greenberger (DG 5159)
          Emery Celli Brinckerhoff & Abady LLP
          75 Rockefeller Plaza, 20th Floor
          New York, NY 10019
          Telephone: (212) 763-5000
          Facsimile:  (212) 763-5001

          ATTORNEYS FOR PLAINTIFF
          METRO FUEL LLC