UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------- x
METRO FUEL, LLC,

                                                  Plaintiff,

                                      -against-

CITY OF NEW YORK                                       07-CV-8244

                                                  Defendant.
------------------------------------------------------------------- x

### DEFENDANT'S STATEMENT PURSUANT TO LOCAL CIVIL RULE 56.1

Pursuant to Rule 56.1 of the Civil Rules of the Southern District of New York, defendant submits the following statement of material facts as to which it contends there is no genuine issue to be tried:

**The Regulation of Outdoor Signs on Zoning Lots Through the Zoning Resolution**

        1. The New York City Zoning Resolution ("Zoning Resolution" or "Z.R.") regulates the size and placement of signs, including advertising signs, on zoning lots throughout the City. See, e.g., Z.R. §§ 32-64, 32-65, 42-531, 42-532, 42-533, 42-543.

        2. Zoning lots are tracts of land separate and apart from other tracts of land such as streets and waterfront area. Z.R. § 12-10.

        3. As defined in Z.R. § 12-10 an "Advertising Sign" is "a sign that directs attention to a business, profession, commodity, service or entertainment conducted, sold or

offered elsewhere than upon the same zoning lot and is not accessory to a use located on the zoning lot." Stipulations of Fact, ¶ 2.[1]

4.  An "Accessory Sign" (formerly known as a "Business Sign") is a sign on a zoning lot that directs attention to a business or profession conducted on the same zoning lot. Stipulations of Fact, ¶ 5.

5.  As with all structures located on zoning lots, before a sign may be erected or maintained, a permit must be issued by DOB. Administrative Code § 28-105.1 (effective as of July 1, 2008 - formerly Administrative Code § 27-147).

**History of the City's Zoning Regulations**

6.  In 1916, the City of New York became the first municipality in the country to undertake comprehensive zoning. In 1940, the newly constituted New York City Planning Commission ("CPC") proposed a series of amendments, including a proposal to regulate outdoor signs. Neufeld Dec., ¶ 2; Exhibit E (Major Report of City Planning Commission, 1940).

7.  The 1940 CPC determined that it was necessary to regulate outdoor signs because "[b]illboards and signs not only dominate our business streets . . . but they take advantage of every opportunity to crowd in upon public places, established and maintained by public funds, including civic centers, parks, and especially express highways and bridge approaches." Neufeld Dec., ¶ 3; Exhibit E at 90.

---

[1] The Parties' Stipulations of Fact are Exhibit 1 to the July 28, 2008 Declaration of Eric Hecker. ("Hecker Dec."). Unless otherwise specified, all other references herein to exhibits are to those provided with the August 25, 2008 Declaration of Sheryl R. Neufeld ("Neufeld Dec.").

8. The 1940 CPC also determined that "the outdoor sign or billboard is to be differentiated from any other use controlled by zoning in that it derives its value not from the use of the property on which it is located, as do other uses, but from its exploitation of the view from other more or less distant properties. For this reason signs located in business areas often exert a deteriorating influence over very extensive residential areas." Id.

9. The 1940 zoning amendments introduced the prohibition against placement of advertising signs in districts zoned for residence use and in business, retail, restricted retail and local retail districts. Neufeld Dec., ¶ 5; Exhibit E at 90-1; and Article II, Section 3, Subsection 9 on NYC006141 and Article II, Section 4, Subsection 49 on NYC006142.

10. Like today, the 1940 zoning amendments did not prohibit business signs, which were accessory to and drew attention to a business conducted on the same zoning lot, from being placed in areas where advertising signs are prohibited. In distinguishing between accessory/business and advertising signs, the 1940 CPC recognized that business signs serve an essential economic purpose, i.e., advising customers and suppliers of the location of a particular establishment, whereas advertising signs bear no relationship to the use of the property on which they sit. Neufeld Dec., ¶¶ 4-5; Exhibit E at 90-91.

11. When the City adopted a comprehensive new Zoning Resolution in 1961, it did not significantly change the framework for regulating outdoor advertising signs. Neufeld Dec., ¶¶ 6-7; Exhibits F and G (sections of the 1961 Z.R. and Voorhees Walker Report).

12. In 1998, following a decision in <u>City of New York v. Allied Outdoor Advertising</u>, 172 Misc.2d 707 (Sup. Ct. Kings Co. 1997), the City amended the Zoning Resolution to clarify that non-commercial signs are permitted wherever any "signs" are permitted. Neufeld Dec., ¶ 8; Exhibit I (<u>Report of the City Planning Commission</u>, dated February 18, 1998).

13. In 2000 the Department of City Planning decided that further revision to the Zoning Resolution's signage provisions was necessary. The amendments proposed by DCP (and subsequently adopted by the CPC) continued to restrict the placement of advertising signs to high-density commercial and manufacturing zoning districts and, among other things, established size, height and projection requirements for all signs in Manufacturing zoning districts. Neufeld Dec., ¶ 9; Exhibits J and K (2000 CPC Report and City Council Resolution Number 1772).

14. Specifically, advertising signs are 1) prohibited in residential districts and low-density commercial districts and; 2) generally permitted in C6-5, C6-7, C7 and C8 commercial districts and M1, M2 and M3 manufacturing districts, subject to certain size, height, projection and illumination requirements. Neufeld Dec., ¶ 7; Exhibit H (sections of the current Zoning Resolution).

15. With respect to illumination, the Zoning Resolution permits signs with indirect illumination (i.e. illumination derived from an external artificial source, such as the external spotlights that shine onto highway billboards) in all areas where advertising signs are allowed, but limits advertising signs with direct illumination (i.e. illumination designed to give forth artificial light, such as the back lit panel signs operated by Fuel) to C6-5, C6-7 and C7 commercial zoning districts. Z.R. §§ 12-10 (definitions of "sign, illuminated" and "sign with indirect illumination"); 32-63, 32-644, 32-645, 42-533; May 15, 2008 Deposition Transcript of Edward Fortier, Director of the Department of Buildings' Sign and Padlock Enforcement Unit ("Fortier Dep. Tr.") [Exhibit OO] at p. 45, lns. 2- 19, p. 48, lns. 10-24.

16. Internally illuminated advertising signs are permitted in C6-5, C6-7 and C7 districts, but not in other areas of the City because those districts are mapped in limited areas of the City where directly (internally) illuminated signage supports a distinctive neighborhood

4

character (such as Times Square and Coney Island). City Response to Interrogatory No. 17, Eric Hecker Dec., Exhibit 26; May 9, 2008 Deposition Transcript of Tom Wargo, head of the Department of City Planning's Zoning Division ("Wargo Dep. Tr.") [Exhibit PP] at p. 116, ln. 16 – p. 119, ln. 11, p. 119, ln. 24- p. 120, ln. 24, p. 126, ln. 21- p. 127, ln. 5; p. 132, ln. 5 – p. 136, ln. 17; Fortier Dep. Tr. [Exhibit OO] at p. 49, ln. 11 – p. 55, ln. 15.

17. Directly illuminated advertising signs are not permitted in C8, M1, M2 and M3 districts because, in contrast to C6-5, C6-7 and C7 districts, these districts are located in areas throughout the City, often in close proximity to residential districts. In addition, directly illuminated signs may have negative effects on nearby commercial/manufacturing uses within these districts. Id.

**Plaintiff's Outdoor Advertising Signs**

18. Fuel entered the outdoor advertising market in New York City in 2006. Exhibit L, ¶ 1.

19. Fuel operates many different types of outdoor advertising signs in the City of New York, however, Fuel's challenge in this lawsuit centers around what it describes as its "panel sign business." Complaint, ¶ 2.

20. Panel signs, as defined by Fuel, are internally-illuminated light boxes measuring approximately 24 square feet. July 28, 2008 Declaration of Michael A. Freedman ("Freedman Dec."), ¶ 2.

21. At the time it filed its Complaint in September 2007, Fuel stated that it operated approximately 360 panel signs in New York City. Complaint, ¶ 3.

22. Fuel presently operates approximately 440 panel signs in the City of New York. Freedman Dec., ¶ 2.

5

23. Panel signs are displayed in a variety of ways, including affixed to the facades of buildings and on free-standing poles. Freedman Dec., ¶ 3.

24. The panel signs in Fuel's control as of June 2008 were located at 227 different facilities. Exhibit L, ¶ 2.

25. Of those, 178 facilities (78.5%) had one or two panels, and 49 facilities (21.5%) had more than two panels. Id.

26. Most of Fuel's panel signs display advertising copy. Exhibit L, ¶ 3.

27. Most of Fuel's panel signs do not have permits from the New York City Department of Buildings for the display of advertising copy, as is required by Administrative Code § 28-105.1. Exhibit L, ¶ 4.

28. Fuel claims that 7% of its current panel signs are situated in zoning districts where internally illuminated advertising signs are allowed (i.e., C6-5, C6-7 and C7 zoning districts). Freedman Dec., ¶ 7.

29. If Fuel changed the lighting of its panel signs to indirect lighting its panel signs would be allowed in C8, M1, M2 and M3 districts. Fortier Dep. Tr. [Exhibit OO] at p. 47-48, 55-56.

30. Documents produced in January 2008 by Fuel in response to the City's discovery requests indicate that, at that time, Fuel operated approximately 419 panel signs, of which, approximately 118 were located in manufacturing zoning districts. Exhibit PP.

31. Fuel's website encourages its clients to "saturate a neighborhood with [their] message or 'road block' key areas to reach commuters twice daily." Exhibit MM.

**Regulation of the Use Advertising on the City's Streets and Sidewalks**

32. The provisions of the Zoning Resolution do not generally regulate the use and development of the City's streets and sidewalks. August 25, 2008 Declaration of Douglas Woodward ("Woodward Dec."), ¶ 3; Z.R. § 11-01.

33. The street is a distinct planning environment separate and apart from adjoining private property and may be used and regulated differently from the adjoining private property. Woodward Dec., ¶¶ 25-39, 43-49.

34. Public amenities on the City's streets such as bus shelters, newsstands and public pay telephones (and any advertising on those structures) are regulated pursuant to the terms of Franchise Agreements entered into by the Department of Transportation ("DOT") and the Department of Information, Technology and Telecommunications ("DoITT") pursuant to Authorizing Resolutions adopted by the City Council in accordance with City Charter § 363. Exhibit B (May 12, 2008 Declaration of Kerry Gould-Schmit), ¶ 24 (Coordinated Street Furniture Franchise ("CSFF")) and Exhibit D [May 9, 2008 Declaration of Stanley Shor], ¶ 15 (Public Pay Telephone ("PPT") Franchise).

35. Public announcements on street pole banners on the City's sidewalks are regulated pursuant to rules established by DOT. 34 RCNY § 2-14(b).

36. Advertising on taxicabs is regulated pursuant to controls established by the Taxi and Limousine Commission ("TLC"). Pursuant to those controls advertising is prohibited on all TLC-licensed vehicles, except on displays on the top of the rooftops of taxicabs that have been approved by TLC. Administrative Code § 19-525; Stipulations of Fact , ¶ 109.

37. Subway entrances fall under the jurisdiction of the New York City Transit Authority. Pursuant to New York State Public Authorities Law § 1204(13-a), "[n]otwithstanding the provisions of section fourteen hundred twenty-three of the penal law or the provisions of any

general, special or local law, code, ordinance, rule or regulation to the contrary the authority may erect signs or other printed, painted or advertising matter on any property, including elevated structures, leased or operated by it or otherwise under its jurisdiction and control and may rent, lease or otherwise sell the right to do so to any person, private or public."

38.     Advertising signs are appropriate to public structures in the public street by nature, and do not have the same effects on neighborhood character and aesthetics as advertising on property adjoining the public streets and sidewalks. Woodward Dec., ¶¶ 40-49.

**The Coordinated Street Furniture Franchise**

39.     Since the 1970s, the placement of bus shelters on the City's streets has been governed pursuant to standards established by the City Planning Commission. Exhibit A (May 12, 2008 Declaration of Christina L. Hoggan), ¶ 5; Exhibit M (CPC Report, dated February 4, 1978).

40.     Bus stop shelters were first introduced as a public amenity on the streets of the City of New York in the early 1970s. The first shelters were installed by the City, and subsequently deteriorated due to poor maintenance. Exhibit A, ¶ 2; Exhibit M.

41.     In the mid-late 1970s private companies applied for franchises to operate the City's bus stop shelters. Exhibit A, ¶¶ 3-4; Exhibit M. The City Planning Commission adopted standards that, among other things, governed the placement of bus stop shelters on the City's streets and the size and placement of advertising on the structures. Exhibit A, ¶¶ 5-6; Exhibit M.

42.     Over time, various other types of street furniture have appeared on New York City sidewalks. Exhibit B (May 12, 2008 Declaration of Kerry Gould-Schmit), ¶ 10; Exhibit S (CPC Report, dated October 6, 1996). Newsstands, for example, were constructed and

installed over many years on an ad hoc basis by various operators, and were not coordinated or consistent with each other. Exhibit B, ¶ 11; Exhibit S.

43. In 1996, the City Planning Commission and City Council approved, through the Uniform Land Use Review Procedure ("ULURP") [ULURP procedures are codified in New York City Charter § 197-c], DOT's application for the approval of a Request For Proposals ("RFP") for a franchise for the installation, maintenance and operation of bus stop shelters, automatic pay toilets ("APTs"), newsstands, and public service structures, after evaluating the land-use impacts of the proposal. Exhibit B, ¶ 14; Exhibit S; Exhibit T (City Council Resolution No. 2096).

44. In order to generate the necessary funding for the CSFF, the City Council authorized DOT to allow the franchisee to sell limited advertising on certain street furniture structures in exchange for designing, constructing, installing, operating and maintaining the street furniture structures. Exhibit C (July 28, 2008 Reply Declaration of Kerry Gould-Schmit), ¶ 7.

45. The benefits of a coordinated street furniture franchise, including improving the aesthetics and usability of the City's streets and providing well-maintained and attractive street furniture, were outlined in the CPC's October 6, 1996 Report. Exhibit B, ¶ 15; Exhibit S at 6, 24.

46. DOT issued its CSFF RFP in 1997. The 1997 RFP included extensive criteria governing, among other things, the placement of bus stop shelters on the City's streets and the size and placement of advertising on the structures. Exhibit B, ¶¶ 16, 18-20; Exhibit S; Exhibit O (1997 CSFF RFP). The CSFF was not awarded in 1997. Exhibit B, ¶ 21.

47. In 2003, DOT, still interested in improving the aesthetics of the City's streetscape, elected to revive the CSFF proposal. Exhibit B, ¶ 22. DOT issued its RFP in March,

9

2004. The 2004 CSFF RFP was substantially similar to the 1997 CSFF RFP. Exhibit B, ¶¶ 28-34.

48. Five companies bid on the 2004 RFP. Stipulations of Fact, ¶ 62. The RFP set forth explicit instructions as to the form, organization and content of the proposal to be submitted in response to the RFP. Exhibit C, ¶¶ 8-9.

49. After carefully considering all the proposals, in September 2005, the City invited Cemusa to negotiate a franchise agreement. Exhibit B, ¶¶ 35-36. Cemusa was awarded the CSFF based on the strength of its proposal as a whole – not just its compensation package. Exhibit C, ¶¶ 12-17.

50. On or about May 19, 2006, the City entered into a 20-year contract with Cemusa by which it is the franchisee for the CSFF ("Franchise Agreement" or "Agreement"). Under the Agreement, Cemusa has undertaken the design, construction, installation, and maintenance of street furniture, including newsstands, bus stop shelters, self-cleaning APTs, and other public service structures. The Agreement incorporated the terms set forth in the 2004 RFP, including the siting criteria and limitations on advertising. Exhibit B, ¶¶ 37-46.

51. Pursuant to the Agreement, advertising on bus stop shelters is limited to the two end panels, and to the exterior of newsstands and public toilets. The advertisements are further limited by area and height. The maximum advertising area is limited to: 55 square feet on bus stop shelters; 82.5 square feet on newsstands and APTs. The maximum height for advertising is: 7 feet on bus stop shelters; 9 feet on newsstands, and 9 feet on APTs. Exhibit B, ¶ 44; Exhibit Q (Excerpts from Cemusa Agreement) at 4.3.1.

52. By the end of the Franchise Agreement, Cemusa will have built between 3,100 and 3,500 new bus shelters, the majority of which replace existing bus shelters, and up to 400 of which may be in new locations. In addition, Cemusa will have replaced 280 existing

newsstands (and if DCA applications for newsstand licenses are applied for and granted, possibly constructed approximately 50 more), as well as constructed 20 APTs. Stipulations of Fact, ¶¶ 63, 84; Exhibit B, ¶¶ 28, 38-9; Exhibit Q.

53.  In 2007, the Art Commission awarded Cemusa's architects an Excellence in Design Award for the design of the CSFF structures. Exhibit C, ¶ 24.

54.  The benefits to the City under the CSFF are numerous: (1) the City will benefit from extensive private investment to upgrade the existing street furniture inventory, which presently consists of approximately 3,400 structures; (2) City residents and visitors will enjoy enhanced and distinctive structures including new amenities such as APTs; and (3) the street furniture structures are cleaned and maintained by Cemusa at its expense for the life of the Agreement. In addition, while it was not the goal of initiating the CSFF, the City will receive guaranteed revenue as a result of the CSFF, and significant opportunities to advertise and promote the City and its interests in New York and around the world. Exhibit B, ¶ 52.

**Public Pay Telephone Franchises**

55.  Franchises to place Public Pay Telephones on the City's streets are currently administered by DoITT. Exhibit D (May 9, 2008 Declaration of Stanley Shor), ¶ 4. Since the inception of advertisements on PPT enclosures, DoITT, and its predecessors, have addressed the aesthetic and traffic safety concerns associated with PPT advertisements by regulating, among other things, the siting of PPTs. Id., ¶¶ 5, 10-21.

56.  For example, in the mid-1980's, New York Telephone Company ("NYT") began placing advertisements on its PPT enclosures. The City, recognizing the need for PPTs, but concerned with the potential affects of such advertisements if unregulated, permitted NYT to place advertisements pursuant to an Advertising Panel Franchise Agreement. Exhibit D, ¶ 9; Exhibit GG (Advertising Panel Franchise Agreement, dated March 3, 1988). The Agreement,

dated March 3, 1988, provided size and siting criteria for PPT advertisements. Exhibit D, ¶ 10; Exhibit SS. Additionally, under the Agreement, NYT was obligated to effectuate a program for the installation of additional PPTs in the City with an emphasis on "economically deprived areas." Exhibit D, ¶ 11; Exhibit SS.

57. During the course of the NYT agreement, a number of companies began installing Customer-Owned Coin Operated Telephones ("COCOTs") in the City without obtaining licenses. Many of the COCOTs were "poorly maintained, unsafe, unclean, and covered with graffiti." Exhibit D, ¶ 8.

58. As a result, on August 17, 1995, based on the need for reliable and accessible PPT service on the streets for the City, the City Council adopted Resolution No. 439-A authorizing DoITT to solicit proposals for PPT franchises. As part of the RFP process, DoITT was required to adopt siting and clearance criteria to be utilized by DoITT in approving the placement of PPTs. Exhibit D, ¶ 13; Exhibit II (Resolution No. 439-A).

59. Concurrently, the City Council adopted Local Law 68 of 1995 ("Local Law 68"), which provided COCOT operators an opportunity to legalize COCOTs so as to ensure reliable and accessible telephone service to City residents while "address[ing] the issues of public health and safety, street congestion, unsightly and illegal advertising, graffiti, and public nuisance issued surrounding COCOTs." Exhibit D, ¶ 14; Exhibit FF (excerpts environmental review), Exhibit II; Exhibit KK (Local Law 68 of 1995). Local Law 68 authorized DoITT to manage PPTs and related enclosures that were installed, operated or maintained on City Streets, in the best interests of the City, by requiring a permit, and a franchise with the City that met certain conditions. Exhibit D, ¶ 15; Exhibit KK.

60. To this end, in early 1996, DoITT promulgated rules to administer and regulate PPT franchises, existing PPTs, and applications for new PPT locations. Exhibit D, ¶ 16.

The requirements regarding siting and clearance requirements were set forth at 67 RCNY § 6-41. Id., ¶¶ 17-19.

61.   Since the promulgation of its initial rules in March 1996, DoITT has amended its rules several times based on its evolving knowledge and experience regulating the PPT industry. Exhibit D, ¶¶ 31-31 . For example, in 1998, due to, among other things, DoITT's ongoing concern regarding the saturation of PPTs, DoITT amended 67 RCNY § 6-41(j)(2), effective September 16, 1998, so as to reduce the number of PPTs located on a sidewalk based on the length of the street. Exhibit D, ¶ 32; Title 67 RCNY § 6-41(j)(2). During the same period, additional regulations regarding the location of PPTs in relation to street furniture or street conditions were added. Exhibit D, ¶ 33; 67 RCNY § 6-41(h).

62.   In addition, after completing the RFP process, in 1999, the City offered franchises to install, operate and maintain public pay telephones ("PPTs") on, over and under the City's streets in order to provide public pay telephone services. Exhibit D, ¶¶ 22-30; Exhibit JJ (City Council Resolution 2248); Stipulations of Fact, ¶ 95.

63.   The PPT franchise agreement limits the placement of advertising panels on PPT kiosks to the exterior rear and side panels of the enclosure for curb-line PPTs in commercial and/or manufacturing zoning districts and any other zoning districts where commercial and/or manufacturing uses are permitted as of right. Exhibit D, ¶¶ 23, 26; Stipulations of Fact, ¶ 96.

64.   The Agreement also limits the size of the PPT advertisements. Pursuant to the Agreement, advertising side panels cannot be larger than 27" x 57" (i.e., approximately 10 ½ square feet). Advertising on rear panels can not be larger than 27" x 57" in vertical format for a single PPT pedestal, 57" x 27" in horizontal format for two PPT pedestals, 54" x 57"(i.e. approximately 21 square feet) in vertical format for two PPT pedestals, or 36" x 81" (i.e.

approximately 17 ½ square feet) in horizontal format on a two or three PPT pedestal. Exhibit D, ¶ 27; Exhibit LL (Sample PPT Franchise Agreement).

65. On October 5, 2004, due to a concern that a high concentration of advertising panels were being placed on PPT enclosures in Manhattan, DoITT adopted 67 RCNY §6-06(c). Title 67 RCNY §6-06(c) prohibits the placement of advertisements on new PPT enclosures in Manhattan Community Districts 1 through 8. Exhibit D, ¶ 34; Exhibit EE (DoITT Report on Amendments to Department Rules, Title 67 of the Rules of the City of New York, Section 6-06, Section 6-32 and Section 6-38, dated October 5, 2004); Stipulations of Fact, ¶ 101.

66. The PPT franchise agreement requires franchisees to use qualified media representatives to represent, organize and manage the advertising space on public pay telephones. Stipulations of Fact, ¶ 97. Presently, DoITT is accepting submissions from outdoor advertising companies seeking to become new media representatives. Exhibit D, ¶ 29.

67. Since the inception of DoITTs codification of PPT regulations in 1996, the number of PPTs on City sidewalks has decreased by 40%. Specifically, the number of PPTs on City sidewalks has decreased from approximately 35,000 PPTs in 1996 to approximately 21,000 PPTs on City sidewalks today. In 2004, there were approximately 29,000 PPTs. Exhibit D, ¶ 38.

Dated:   New York, New York
         August 25, 2008

                                    MICHAEL A. CARDOZO
                                    Corporation Counsel of the City of New York
                                    Attorney for Defendants
                                    100 Church Street, Room 5-188
                                    New York, New York 10007
                                    (212) 788-0818

                                    By: /s/ Sheryl R. Neufeld
                                         Sheryl R. Neufeld (SK 2728)