UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------- x

METRO FUEL, LLC,

                                                    Plaintiff,

              -against-

CITY OF NEW YORK                                    07-CV-8244

                                                    Defendant.
------------------------------------------------------------------------- x

## DECLARATION OF DOUGLAS WOODWARD IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

        **DOUGLAS WOODWARD**, declares pursuant to 28 U.S.C. §1746, under penalty of perjury, as follows:

        1.      I submit this declaration in support of defendant's motion for summary judgment, and in opposition to plaintiff's motion for summary judgment in the above-referenced matter.    Specifically, I submit this declaration in order to provide the Court with an understanding of the difference between the public street (which includes the sidewalk) and property adjoining the street (which for the most part is privately owned),[1] and the appropriateness of outdoor commercial advertising signage in each realm from an urban design

---

[1] While there are most certainly private spaces that are open and available to the public (such as, for example, stores, parking garages and privately owned plazas), these are not part of the public street realm.  For ease of reference, I will refer to the property adjoining the public street realm as "private property" even though I recognize that in some instances property adjoining the public street realm is owned by a government entity, and that in others property adjoining the public street realm may be owned by a private entity and open for use by the public.  The important distinction here is between that which it is proper to allow on the sidewalk versus that which it is proper to allow on property adjoining the sidewalk, regardless of by whom that property is owned or to whom it is open.

perspective.[2] As I will fully explain herein, allowing outdoor commercial advertising signage on the public street, while at the same time prohibiting outdoor commercial advertising signage on adjoining private property, does not undermine the City's interest in prohibiting advertising signage on the adjoining private property.

2.    While at first blush it might be hard for a layperson to understand why it is not at all inconsistent to incorporate advertising into street furniture while prohibiting similar advertising on building façades several feet away, given the important distinction between the public-rights-of-way and the adjoining property, from an urban design perspective, such distinction is rational and serves an important purpose.

3.    The use and development of land in the City of New York is regulated in different ways depending on the type of land in question.  The use and development of tracts of land known as zoning lots (e.g., most private property upon which buildings are constructed) is regulated by New York City Zoning Resolution ("Z.R." or "Zoning Resolution") (and other local laws).  The provisions of the Zoning Resolution do not, unless specifically enumerated, govern the use or development of the City's streets and sidewalks.

4.    The Zoning Resolution divides the City into three basic zoning districts: residential, commercial, and manufacturing; and within these broad categories there are numerous subgroups.  The permitted use of a particular zoning lot depends upon the zoning district in which the lot is situated.  As with other aspects of the Zoning Resolution, the signage regulations permit or prohibit particular categories of signs and regulate their size, height,

---

[2] While there is no one specific definition of urban design, generally speaking, urban design can be thought of, as Jonathan Barnett, a well-known urban designer and one of the founding directors of the Urban Design Group in the New York City Department of City Planning, the

projection and illumination, depending on the zoning district in which the sign is to be erected. Advertising signs,[3] for example, are permitted on zoning lots in all manufacturing zoning districts and in certain high-density commercial zoning districts, but are prohibited in all residential and low-density commercial zoning districts. Z.R. §§ 32-63, 42-52. These provisions are generally designed to protect neighborhood character, and to address aesthetic and traffic safety concerns.[4]

        5.     Because the provisions of the Zoning Resolution do not govern the use and development of the City's streets and sidewalks, zoning does not restrict advertising signs from being located on streets and sidewalks in zoning districts where similar advertising is prohibited on private property. As I will explain herein, in contrast to advertising signs on zoning lots, advertising signs on street furniture on sidewalks do not have a negative impact on neighborhood character and aesthetics.

        6.     The conclusions set forth in this declaration are drawn from my experiences at Columbia as both a student and adjunct professor; my over twenty years of experience as a planner and urban designer at the New York City Department of City Planning ("City Planning"); my work as the Deputy Executive Director and Chief Administrative Officer

---

first governmental unit in the country devoted to urban design, explained, as "designing the City without designing the buildings."

[3] As defined in Z.R. § 12-10 an "Advertising Sign" is "a sign that directs attention to a business, profession, commodity, service or entertainment conducted, sold or offered elsewhere than upon the same zoning lot and is not accessory to a use located on the zoning lot." In contrast "accessory" or "business" signs generally announce the use or activity conducted on the zoning lot on which the sign sits (e.g., a sign announcing the presence of a Duane Reade drugstore). Accessory signs are more liberally allowed to be placed on zoning lots throughout the city.

[4] My purpose here is to discuss only the City's neighborhood character and aesthetic concerns.

of the Lincoln Center Development project; and my current experience as a principal of 3Square, LLC, a real estate advisory firm.  A copy of my CV is provided herewith as Exhibit 1.

**Professional Background**

   7.  I graduated from Columbia University in 1975 with a bachelor's degree in comparative literature and linguistics.  I later returned to Columbia and obtained my master's degree in these subjects.  As part of this coursework I was required to read works written my many of the authors cited in support of the opinions I present in this case.  During my time at Columbia I also took several graduate studio courses in urban design where I was responsible for working with a team of students on a specific urban design/planning project in the City.

   8.  I first started working for City Planning in 1983.  While at City Planning, I worked as a planner and urban designer, ultimately responsible for the design approval of numerous large-scale projects, including the Columbus Circle area developments, the Lower Manhattan Plan, Hudson Yards, Hunters Point in Queens and MetroTech in Brooklyn.  Each of these projects included significant streetscape planning issues.

   9.  While at City Planning I also co-authored the Neighborhood Character and Urban Design sections of the 1993 revisions to the City Environmental Quality Review ("CEQR") Technical Manual, authored and co-authored numerous zoning texts (including texts that contained extensive streetscape and sidewalk circulation space rules as well as texts that contained extensive signage rules such as the Times Square and Special Midtown District regulations), and served on the Mayor's Streetscape Task Force.

   10.  The Streetscape Task Force was organized in the early 1990s with the mandate of rationalizing an increasingly chaotic street environment.  The Task Force was a consortium of officials from city agencies with an interest in, or jurisdiction over, some aspect of

the street environment. One of the goals of the Task Force was to come up with an urban design plan for how streetscape elements (such as, light poles, mailboxes, street furniture, etc.) come together on a City sidewalk, and one product of the work of the Task Force was the first ever *catalogue raisonné* of objects on the City's streets

11.    In 1990, while still at City Planning, I began to teach at the Columbia Graduate School of Architecture, Planning and Preservation, where I served as an Adjunct Professor of Urban Planning. Since that time I have taught studios and seminars on public space design on a yearly basis. In addition, I have lectured on public space and semiotics, and served on juries (i.e. panels of reviewers) for architectural and urban design studios at Princeton, Columbia, City College and the University of Pennsylvania.

12.    In 2003 I left City Planning to accept a position with Lincoln Center. In this capacity I worked as the Deputy Executive Director and Chief Administrative Officer of the Lincoln Center Development Project, the $1 billion redesign and redevelopment of the Lincoln Center campus. Among other things, the Lincoln Center Development Project required me to craft and obtain City approval for a significant mapping action involving the streetscape of 65th Street, the main "Street of the Arts" in the Lincoln Center plan. This complex and unusual demapping involved the composition of design guidelines and approvals at the City Planning Commission and the Art Commission of the City of New York (now the Public Design Commission) for signage both within the public right of way and on private property. In designing the signage, Lincoln Center maintained the clear distinction discussed herein – i.e. the design calls for signs and street furniture for public use on the sidewalk, and site-specific signage on the building façade.

13.    In 2007 I began 3Square LLC, a real estate advisory firm.  As a principal of 3Square I use my urban planning and development experience to provide real estate and development advice to developers and not-for-profit entities in New York City and New Jersey.

**The Streetscape as a Subject of Urban Design**

14.    Understanding the reasons why advertising signage on public streets differs from advertising signage on private property requires an understanding of the historical context in which the street[5] has been studied by urban designers.

15.    The identification of rights of passage on streets – as distinguished from urban private property rights – was recognized in Roman civil law as far back as Justinian (c. 520 CE).  However, it was not until the last three decades that the rigorous academic and analytical examination of the urban street environment has made great advances.  During this time period, streets have been subjected to the same level of analysis as other significant planning and urban design subjects (such as building bulk and massing, platting, and public space design), and the urban design and planning literature recognizes that the street is a distinct and significant object of planning study.

16.    The close reading of the urban streetscapes began with the work of William "Holly" Whyte.[6]  Whyte's work was based on data obtained through his pioneering Street Life Project, which was conceived while he was consulting to the New York City Planning Commission on *A Comprehensive Master Plan for New York City* (1969).  Whyte understood, in a way no one had before, that the character of the urban street is defined by the presence of

---

[5] When I refer to the word "street" I mean the entire width of the carriageway, sidewalk and entry zone between property lines on both sides.

[6] Whyte's work was summarized in *The Social Life of Small Urban Spaces*, 1980, and in a short documentary film of the same name.

people and the possibility – the inevitability – of interaction. Whyte's ideal city sidewalk is a vital place of "100% conversations" – a place of serendipitous encounter where people duck out of the flow of pedestrian traffic to pause and catch up, completely engrossed in conversation.

17.    More technical, academic studies built on the foundation Whyte established. These studies included, among others: 1) works on queuing theory, crowd dynamics, and pedestrian behavior by Boris Pushkarev and Jeffrey Zupan, (*Urban Space for Pedestrians, 1975*) and John Fruin (*Pedestrian Planning and Design, 1971)*; and 2) works on the spatial and structural analysis of the street as an architectural construct – i.e., a distinct built environment as worthy of urban design attention as building forms. See *On Streets* (1971), a wide-ranging and highly influential compilation of essays by distinguished architects, academics, and critics (including Anthony Vidler, Kenneth Frampton, Joseph Rykwert, Diana Agrest and Peter Eisenman), edited by Stanford Anderson for the Institute for Architecture and Urban Studies.

18.    While these studies did not specifically address the appropriateness or inappropriateness of advertising signage in the public or private realm, they are nonetheless vital to an understanding of my determination that urban design theory clearly supports allowing advertising signage in public areas where it is prohibited on adjoining private property, as discussed below.

19.    One concept that emerged clearly from this work was of the street as a unitary and unifying network linking the neighborhoods of the city. The standardization and coordination of materials for sidewalks (concrete) and streets (asphalt) and of the design of street furniture, enhances the look and feel of the streetscape environment as a unitary network.

20.    These theoretical studies had clear and beneficial practical applications. The work of Holly Whyte paved the way for the type and organization of special sidewalk amenities (such as newsboxes, benches, and information kiosks) installed today by the City's 59 business improvement districts, including the Alliance for Downtown New York, the Times Square Alliance, the 34th Street Business Improvement District and the Grand Central Partnership, and throughout the City by City agencies.  Whyte's simple, logical principles also led to the reduction of clutter on the street, and the encouragement of sidewalk widenings in the dense areas of the central business districts.

21.    The work of Pushkarev, Zupan and Fruin supplied a much-needed scientific basis for the study of pedestrian patterns drawn from classical queuing theory and fluid dynamics.    The implementation of modified versions of their recommended circulation allowances on sidewalks led to a significant improvement in pedestrian safety and free flow in the world's densest and fastest-moving streetscape environments in Midtown Manhattan.

22.    The practical application of all of the theories developed in these works also found a powerful outlet in the complex zoning regulations of the Special Midtown District, Z.R. §§ 81-00, et. seq., and particularly in the refinement for zoning purposes of Pushkarev and Zupan's recommended space allotments by Patrick Ping-Tze Too, the urban designer at the Department of City Planning in New York City responsible for defining the circulation space requirements of the Special Midtown District zoning.

23.    One of the goals of the renewed interest in the street and street life was in elaborating a definition of the boundaries of public and private in order to organize the appropriate architectural and urban design treatments for streets and public spaces.  The subject of the spatial representation of the public and private spheres has been the focus of a number of

long-term theoretical projects, including Jürgen Habermas' *The Structural Transformation of the Public Sphere* (1962) and the work of Henri Lefebvre, particularly *The Production of Space* (1974). Utilizing these theoretical investigations and work on urban semiotics – the study of sign systems in the city -- by Roland Barthes and others as groundwork, architects and urban designers began to recognize and understand how the street functions as a space of communication with respect to wayfinding, orientation, access to transportation and other public amenities that is bounded by the private sphere – and to reinforce these critical functions in their designs.

24.    The delineation of the boundaries of the public and private spheres has a critical function in the life of the City: it marks the separation of private and family life from the larger civic space of the City. This recognition of the boundary between public and private is not merely incidental to the urban pattern; it is a necessary part of navigating and making the City legible (i.e., rational and comprehensible to its users).[7]  In his essay, *"Buildings, and Streets: Notes on Configuration and Use,"* (reproduced in *On Streets*) the architect and critic Thomas Schumacher identifies the key functions of the legibility of the street as boundary:

---

[7] In context of urban design and urban semiotics, legibility relates to how a pedestrian is able to understand and "read" his or her environment, and defines orientation in a complex urban space. This is not to say that without the delineation of the boundary between public and private space people would be completely confused and unable to decipher whether a particular space was open and available to him or her. Rather, the delineation of boundaries serves a more subtle purpose – when uses of property are consistent, people are more likely to have an intuitive (perhaps not easily articulatable) sense of place. For example, In Times Square, a *sui generis* area of the City, the neighborhood character is a blend of public and private. The oversized signs on the façades of the buildings blur the distinction between public and private and contribute to the feeling of what many commentators have referred to as an outdoor room. In contrast, on upper Broadway, part of the character is high street walls and a clear distinction between what happens on private property and what happens in the street. The streets in that neighborhood are characterized by Broadway malls and pedestrian activity, and the private realm is sharply delineated.

The capability of the user to perceive immediately the street as a figure not only promotes a sense of enclosure and orientation but also delimits the territory of the public realm.

25.     In short, the street is a public realm distinct from the private sphere, an area that contains unique and dynamic activities, and a place for people to orient themselves and become a part of the life of the city.

**Reading the Components of the Street**

26.     Critics and commentators on urban life have sought in different ways to describe the function of the street.  One descriptive graphic method is to create a kind of heat gradient map of the different types of activities peculiar to the different zones that can be identified within the cross-section of the street.

27.     In his essay, "Ecological Model of the Urban Environment," Stanford Anderson used MIT Urban Ecology Program data to design a graphic representation of the publicly accessible space of the city that he called the "space of public claim."  That ecological analysis of the Street divided its space into three basic zones:  Free Access; Constrained Access; and No Access.

28.     As noted above, the street can be best conceived as a network rather than a specific place.  Its function is to link the neighborhoods of the City with an interconnected system of highways, wide, heavily trafficked avenues and local streets.  In order to more clearly illustrate the delineation of where the rights of public passage begin and end, I have mapped Stanford Anderson's three public accessibility categories as physical spaces along the street.  A copy of my illustration, which divides the street into five areas (private property, entry zone, pedestrian zone, amenity zone and vehicular zone), is provided herewith as Exhibit 2.

29.     The first area (in red) is the vehicular zone or carriageway – a public area of transportation that stretches curb line to curb line.

30.    The next zone is the amenity strip (indicated in orange), the first sidewalk zone, which contains the basic vertical infrastructure of street-life, including lights, hydrants, mailboxes, bus shelters, kiosks, clocks, newsstands, newsboxes, street signs, telephones and the miscellaneous other items identifiable in a street audit of curbside amenities. This, too, is a public zone, though not one of circulation – rather one of interface with the street pedestrian zone and its activities (boarding a bus, consulting a map, buying a paper from a newsstand, parking a bicycle, or making a phone call).

31.    The pedestrian travel zone (indicated in yellow), is the main public area of pedestrian movement. This zone is always kept unobstructed, and the City's various categories of rules for placement of amenities (e.g. the rules for revocable consents and sidewalk cafes) require a clear, unobstructed width for pedestrian passage in this zone.

32.    The entry zone (indicated in green), is the area where public and private meet, and where the unrestricted right of public access ceases. The entry zone is the area in which pedestrians stop and start to move into the transition between public and private property. For buildings that are built to the front lot line, the entry zone starts at the property line. For properties that have a setback, the entry zone straddles between the sidewalk and the private property. This is a critical zone in the cross-section of the sidewalk and street as this is the location of the beginning of private space. One of the most significant ways this public/private interface is defined is through signage.

33.    City regulations generally require signage on private property to be related to the use on the property. This serves several important purposes: it denotes an area of privacy and safety, beyond which (especially in a residential setting) admission is by invitation only; it helps create a sense of place by marking a use with a site-specific sign, which in turn contributes

-11-

to neighborhood character; and it also establishes what Thomas Schumacher described as a sense of "orientation and enclosure" in his essay "Buildings and Streets: Notes on Configuration and Use" – it is what makes the City comprehensible for its inhabitants.

34.    Advertising signs unrelated to site-specific uses create a fuzzy atmosphere of what Melvin Weber has called the "non-place realm" – and contribute to a bland, generic streetscape that does not promote a particular sense of place or neighborhood character. New York City is a vital city of diverse, identifiable neighborhoods. Each of the City's 59 community boards contains at least ten neighborhood units – a total of over 600 true neighborhoods citywide, varying in size from a few blocks to much larger areas. Signage is the most important visual indicator of the uses in a particular area, of ethnic diversity – illustrated in the language on the façades, and of the pride of the place that the neighborhoods display along their streets.

35.    Historically, there have been a few places in New York City where the signscape has been viewed in a unique way, as in Times Square, where a large part of the defining character of the area is expressed through its signage. Manufacturing zones, too, have a different sign environment, though for the opposite reason. Whereas, in Times Square, the proliferation of signs celebrates the unique character of the space, in manufacturing zones, historically, little care was given to the aesthetics of the streetscape as these were considered industrial landscapes in no need of much aesthetic intervention or the provision of amenities.[8]

36.    The final zone (indicated in blue) is private property, the ground to the figure of the street. The dynamism of the street and its activities operates continuously alongside the abutting buildings and properties. The structure of the City – especially of a city like New

York, which is platted in a rigorously ordered fashion – is only truly perceptible in the tension between the permanence of the building walls and the movement of the street.

37.     The legible distinction on City streets between public and private creates an organization, a hierarchy of spaces that defines the division between the places of assembly, sociability and interaction essential to City life, and the private spaces of safety and quiet enjoyment, and private activities like commerce, where access is by invitation.  The successful maintenance of this tension is a salient characteristic of the livable city because it accommodates both public and private use.

38.     In his essay "The Spatial Structure of Streets" (reproduced in *On Streets)*, William C. Ellis describes the benefits of the public street as an organizing element in the potentially chaotic randomness of large, mature cities:

> [S]treets are special parts of the physical structure of their cities . . .
> This structural function tends to increase a sense of place in the
> organization of cities in that it helps to structure them into wholes;
> it tends to reduce the likelihood of random, limitless organization.

39.     In summary, the street can be seen to have an underlying coherence and organization – perhaps hidden until looked for – that it imparts to the city as a whole and that is distinct from the abutting private sphere.

**Advertising on the Street vs. Advertising on Private Property**

40.     The use of the public street as a location for amenities affecting health and safety (lights, hydrants, public toilets); information (maps, street clocks, street signs); access to

---

[8]  As manufacturing uses have been leaving the city and manufacturing areas have been converting to commercial and residential use, the attention paid to the signage in these areas should continue to be brought into line with the changing uses.

transportation (bus stops, taxi stands); and convenience (newsstands, newsboxes, phones); is a centuries-old feature of urban life in large cities.

      41.    For example, photographic excerpts from the book Atget/Paris, compiled over forty years in the late nineteenth and early twentieth centuries by Eugene Atget, clearly illustrate the precursor forms to our modern street furniture, including, in the public sphere on the sidewalk, street furniture prominently featuring advertising.  See Exhibit 3.  As these photographs indicate, the means of communication within the street has changed very little over time, except in terms of the technological sophistication of the delivery systems.  A 19th Century Parisian *flâneur* would recognize the typology of the structures on the City streets today as versions of the familiar elements of his own streetscape:  the advertising kiosk, the *pissoir*, and the newsstand.[9]

      42.    Likewise, photographs from New York in the 30s and 40s depict advertising on subway entrances and other street elements.  While bus stop shelters and public pay telephones are not historical types of street furniture *per se* (although they have existed with advertising in New York City since the mid-1970s), the strong historical precedent for advertising on other types of streetscape elements translates naturally to advertising on modern streetscape elements.

---

[9] Of course, I am not saying that a limitless amount of advertising on street furniture would be appropriate today on streets in New York City.  However, my observations of the present streetscape did not reveal an inappropriate amount of advertising.  It addition, it is my understanding that street furniture and payphone franchise contracts and rules contain controls to ensure that advertising is not limitless.  I should also note that based on the experience I gained during the two years that I spent in the field working with lighting designers on the Times Square zoning regulations, now codified in the zoning law, it is my professional opinion that the current levels of illumination on the City's bus stop shelters are perfectly appropriate.

43.    The street is a medium for public communication  - that is, a space that contains publicly sponsored messages and private advertising because its function is to link the City from neighborhood to neighborhood through a continuous channel connecting and serving all uses within the city: commercial, manufacturing and residential.  By contrast the façade and streetwall of the buildings on private property, even in retail areas, generally carry messages that identify uses within the buildings or on the properties themselves.  The link between on-site use and identification and signage specific to that use strengthens the reading of the property as private, as the location of a particular use.  The street, which is part of a continuous network, requires no site-specific reinforcement because it does not contain a particular associated use within a specific boundary.

44.    Mere physical adjacency to advertising signs within the public areas of the street does not argue for the appropriateness of advertising on private property.  Quite the reverse:  the nature of the use of the space is what generates the appropriateness of the sign type. The expectation of what messages are displayed within the places of public passage in the street, as opposed to those displayed on the facades of buildings on private property, is completely different even within close physical proximity.  There is a general expectation of privacy and quiet enjoyment on private property that is not present in the public right-of-way.

45.    The City's interest in establishing different standards for appropriate signage within the public street environment and on private property derives from a desire to promote the organization of an orderly, well-designed and comprehensible cityscape.  OOH advertising signs in the private realm make the buildings serve as billboards, which blurs the distinction between public and private, and makes the City more chaotic, less readily

-15-

understandable, and erodes the sense of place.[10]  By contrast, OOH advertising signs are appropriate to public structures in the public street by nature.

46.    Street furniture contributes to the character of the street, and its aesthetic order is a significant organizing element in the streetscape.  Not only does OOH advertising do no harm to the design of the street, but it is appropriate on street furniture based on both historical precedent and the function of the street.  The street is not a static geographical place, and advertising-bearing street furniture partakes of that dynamic component as well and contributes to wayfinding and orientation.  Indeed, street furniture advertising signs are an important visual element of the amenity zone and help contribute to wayfinding and orientation. Because they are fully-integrated into the street actual street furniture structures, the advertising signs on street furniture are good indicators of the amenities that are available to the public, and they help signify where a person can get onto public transportation or where a person can purchase a newspaper.

47.    A recent review of the New York City Coordinated Street Furniture Franchise street furniture by the *New Yorker* critic Thomas de Monchaux in the architectural journal *Log*, speaks of the "ads in their glassy lightboxes – the real *raison d'etre* and occasional aesthetic redemption of most contemporary street furniture," pointing out a significant contribution that the displays make to the visual intensity of the life of the street.

---

[10] Advertising signage in the private realm also often impinges on the good design of the adjacent sidewalk public space in the pedestrian zone.  Many of these signs protrude into the public right-of-way and at heights that do not relate to the scale of the other elements of the street.  Times Square, of course, is a special place where the scale of the signage, and their projection in to the public space at vertiginous angles, contribute to the character of the neighborhood.  The great majority of city space, however, should not be Times Square, and the display of advertising signage of whatever type should become a part of the whole design of the

## Conclusion

48.     Allowing outdoor commercial advertising signage on public streets, while at the same time prohibiting outdoor commercial advertising signage on adjoining private property, does not undermine the City's interest in prohibiting advertising signage on the adjoining private property because signs on street furniture play a very different function from signs located even a few feet away on private property.  Indeed, the following factors all contribute to the appropriateness of allowing advertising signs on street furniture 1) the strong historical precedent for advertising on street furniture; 2) the function of the street as a continuous built form linking neighborhoods; 3) the fact that it provides an important visual element of the amenity zone; and 4) the fact that it is enlivening aesthetically to the streetscape environment.

49.     The provision of similar signs on zoning lots on private property adjacent to the street is generally not appropriate because it: 1) blurs the distinction between the public and private realms; 2) is not site-specific to the use at the location and thus detracts from orientation, the identification of private uses and sense of place; and 3) can be inconsistent with the organization of the street into public and private zones and thus interferes with the legibility of the street environment.

Dated: New York, New York
     August 25, 2008

_____
Douglas Woodward

---

street, not an accretion layered on top of a recognizable and coherent balanced design of public street and private realm.