UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------- x

METRO FUEL, LLC,

Plaintiff,

-against-

CITY OF NEW YORK                                      07-CV-8244 (PAC)

Defendant.
------------------------------------------------------------------------- x

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

MICHAEL A. CARDOZO
Corporation Counsel of the
City of New York
Attorney for Defendant
100 Church Street
New York, New York 10007
(212) 788-1035

ROBIN BINDER,
SHERYL R. NEUFELD,
CRISTINA L. HOGGAN,
          Of Counsel.

AUGUST 25, 2008

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................................... iii

PRELIMINARY STATEMENT ................................................................................... 1

ARGUMENT

        THE PROVISIONS OF THE ZONING RESOLUTION
        GOVERNING THE PLACEMENT OF OUTDOOR SIGNS ARE
        A LAWFUL EXERCISE OF THE CITY'S LAND USE
        REGULATORY POWERS AND DO NOT VIOLATE THE
        FIRST AND FOURTEENTH AMENDMENTS TO THE UNITED
        STATES CONSTITUTION OR ARTICLE 1 § 8 OF THE NEW
        YORK STATE CONSTITUTION. .......................................................... 5

    A.    Regulations Governing The Use and Development of Land
          In the City of New York. ............................................................ 5

    B.    The Zoning Resolution Is A Lawful Exercise of The City's
          Land Use Powers. ....................................................................... 9

    C.    The Sign Regulations Do Not Violate the First
          Amendment...................................................................................... 12

          (a)    The Central Hudson Test ................................................ 12

                  (i)    The Sign Regulations Directly Advance the
                         City's Substantial Interests in Aesthetics and
                         Neighborhood Character ...................................... 14

                  (ii)    The Sign Regulations Are No More
                         Extensive Than Necessary To Serve The
                         City's Aesthetic and Neighborhood
                         Character Interests ............................................... 24

    D.    Plaintiff Unpersuasively Attempts to Divert Attention from
          the Central Hudson Test.............................................................. 28

          (a)    Traffic Safety ................................................................. 29

          (b)    Compensation from the CSFF and PPT Franchises.......................... 32

          (c)    The City's ULURP Review of the CSFF and the
               City's Decision to Award the CSFF to Cemusa ................................. 33

          (d)    New York City Marketing ................................................... 356

E.    The City Does Not Favor Its Own Speech Over
      Commercial Speech. .................................................................... 36

F.    The Sign Regulations Do Not Violate Article 1, § 8 of the
      New York State Constitution. ..................................................... 37

CONCLUSION.............................................................................................................. 39

## TABLE OF AUTHORITIES

<u>Cases</u>                                                                                                   <u>Pages</u>

<u>Ackerley Communications of the Northwest, Inc. v. Krochalis</u>,
   108 F.3d 1095 (9th Cir. 1997)..................................................................................24

<u>Action Outdoor Advertising LLC v. Town of Shalimar, Florida</u>,
   377 F. Supp. 2d 1178 (N.D. Fla. 2005)................................................................16, 25

<u>Atlantic Outdoor Advertising Inc. v. City of New York</u>,
   06 CV 8219 (PAC)..................................................................................................1

<u>Ballen v. City of Redmond</u>,
   466 F.3d 736 (9th Cir. 2006)..................................................................................27

<u>Bery v. City of New York</u>,
   97 F.2d 689 (2d Cir. 1996),
   <u>cert. denied</u>, 520 U.S. 1251 (1997) ........................................................................40

<u>Board of Trustees of State University of New York v. Fox</u>,
   492 U.S. 469 (1989)................................................................................11, 27, 28

<u>Borgognone v. Trump Plaza</u>,
   2000 U.S. Dist. LEXIS 4081 ..................................................................................30

<u>Central Hudson Gas & Electric Corp. v. Public Service Commission</u>,
   477 U.S. 557 (1980) ..................................................................4, 11, 12, 14, 17,
                                                21, 23, 25, 26, 28,
                                                29, 33, 38, 39

<u>Chemical Bank v. Haseotes</u>,
   13 F.3d 569 (2d Cir. 1994)..................................................................................40

<u>Children of Bedford, Inc. v. Petromelis</u>,
   77 N.Y.2d 713 (1991),
   <u>rev'd on other grounds</u> 79 N.Y.2d 972 (1992)........................................................38

<u>City Council v. Taxpayers for Vincent</u>,
   466 U.S. 789 (1984)................................................................................13

<u>City of Cincinnati v. Discovery Network</u>,
   507 U.S. 410..................................................................................27

**Cases**                                                                              **Pages**

City of Eastlake v. Forest City Enterprises, Inc.,
    426 U.S. 668 (1976) .................................................................................11

City of Laude v. Gilleo,
    512 U.S. 43 (1994) ..................................................................................10

City of Renton v. Playtime Theatres, Inc.,
    475 U.S. 41 (1986) ..................................................................................39

Clear Channel Outdoor, Inc. v. City of New York,
    06 CV 8193 (PAC) ...................................................................................1

Courtroom Tel. Network LLC v. State of New York,
    5 N.Y.3d 222, 232 (2005) .......................................................................38

Matter of Cromwell v. Ferrier,
    19 N.Y.2d 263 (1967) .............................................................................14

Daubert v. Merrell Dow Pharms.,
    509 U.S. 579 (1993) ...............................................................................30

Don's Porta Signs, Inc. v. City of Clearwater,
    829 F.2d 1051 (11th Cir. 1987) ...............................................................24

Edenfield v. Fane,
    505 U.S. 761 (1993) ..........................................................................16, 25

Florida Bar v. Went For It, Inc.,
    515 U.S. 618, 628 (1995) .......................................................................15

Georgia Outdoor Adver., Inc. v. City of Waynesville,
    833 F.2d 43 (4th Cir. 1987) ....................................................................13

Greater New Orleans Broadcasting Association, Inc. v. U.S.,
    527 U.S. 173 (1999) .....................................................................17, 18, 24

Hickerson et al. v. City of New York et al.,
    146 F.3d 99 (2d Cir. 1998),
    cert. denied 525 U.S. 1067 (1999) .........................................................28

Horizon Outdoor v. City of Industry,
    228 F. Supp. 2d 1113 (C.D. Ca. 2002).....................................................15

Innumo AG. v. Moor-Jankowski,
    77 N.Y.2d 235 (1991) ...................................................................................38

Islip v. Caviglia,
    73 N.Y.2d 544 (1989) ...............................................................................38, 39

Jim Gall Auctioneers, Inc. v. City of Coral Gables,
    210 F.3d 1331 (11th Cir. 2000)......................................................................24

Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.,
    2006 U.S. Dist. LEXIS 51869 (S.D.N.Y. 2006) ..........................................4

Kumho Tire Co. v. Carmichael,
    526 U.S. 137 (1999)......................................................................................30

Lorillard Tobacco Co. v. Reilly,
    533 U.S. 525 (2001) ..........................................................................14, 15, 25

McMinn v. Town of Oyster Bay,
    66 N.Y.2d 544 (1985) ...................................................................................10

In re Methyl Tertiary Butyl Ether Products Liability Litigation v. Amerada Hess Corp.,
    2008 U.S. Dist. LEXIS 37331 (S.D.N.Y. 2008) ..........................................4

Metropolitan Lights, LLC v. City of Los Angeles,
    488 F. Supp. 2d 927 (C.D. Cal. 2006)..........................................5, 14, 19, 20, 21

Metromedia, Inc. v. City of San Diego,
    453 U.S. 490 (1981) ......................................................4, 10, 11, 14, 16, 22,
                                   23, 24, 25, 26, 33, 37

Michel v. Bare,
    230 F. Supp. 2d, 1147 (D. Nevada 2002) ....................................................17

Naegele Outdoor Adver. Inc., v. City of Durham,
    844 F.2d 172 (4th Cir. 1988)........................................................................13

National Advertising Co. v. Town of Babylon,
    900 F.2d 551 (2d Cir. 1989).........................................................................16

National Advertising Co. v. Town of Niagara,
    942 F.2d 145 (1991)................................................................................16, 40

Nectow v. City of Cambridge,
    277 U.S. 183 (1928).....................................................................................11

**Cases**                                                                                  **Pages**

New Orleans v. Dukes,
    427 U.S. 297 (1976) ................................................................................................10

Nichols Media Group, LLC v. Town of Babylon,
    365 F. Supp. 2d 295 (E.D.N.Y. 2005) ....................................................................37

Ohralik v. Ohio State Bar Association,
    436 U.S. 447 (1978) ................................................................................................11

Penn. Centr. Transport Co. v. New York City,
    438 U.S. 104 (1978) ................................................................................................10

People v. Goodman,
    31 N.Y.2d 262 (1972) .............................................................................................14

Plaza Health Laboratoriess, Inc. v. Perales,
    878 F.2d 577 (2d Cir. 1989) ...................................................................................40

Raskin v. Wyatt Co.,
    125 F.3d 55 (2d Cir. 1997) .....................................................................................30

Robert E. Kurzius, Inc. v. Upper Brookville,
    51 N.Y.2d 338 (1980),
    cert. denied, 450 U.S. 1042 (1981) ........................................................................10

Rochester Poster Adv. v. Town of Brighton,
    49 A.D.2d 273 (4th Dept. 1975) .............................................................................14

Rubin v. Coors Brewing Co.,
    514  U.S. 476 (1995) ..............................................................16, 17, 18, 24, 25

Matter of Save the Pine Brush v. City of Albany,
    70 N.Y.2d 193, 200 (1987) ....................................................................................35

Sciarrino v. City of Key West,
    83 F.3d at 369 n. 7 (11th Cir. 1996) ....................................................................24

South Gwinnett Venture v. Pruitt,
    491 F.2d 5 (5th Cir.),
    cert. denied, 419 U.S. 837 (1974) ..........................................................................10

**Cases**                                                                                    **Pages**

Stringfellow's v. City of New York,
    91 N.Y.2d 382 (1998) .................................................................................28

Suffolk Outdoor Advertising Co. v. Hulse,
    43 N.Y.2d 483 (1977) .................................................................................14

Supersign of Boca Raton v. F. Lauderdale,
    766 F.2d 1528 (11th Cir. 1985)..............................................................24

Town of Huntington v. Park Shore Country Day Camp of Dix Hills, Inc.,
    47 N.Y.2d 61 (1979) ...................................................................................10

Udell v. Haas,
    21 N.Y.2d 463 (1968) .................................................................................10

Uhlfelder v. Weinshall,
    10 Misc. 3d 151, 171-3 (N.Y. Sup. Ct. N.Y.Co. 2005),
    aff'd 47 A.D.3d 169, 186 (App. Div, 1st Dept. 2007) .............................35

United States v. Edge Broadcasting Co.,
    509 U.S. 418 (1993)...................................................................................11

United States v. Locascio,
    6 F.3d 924 (2d Cir. 1993)............................................................................4

World Wide Rush, LLC v. City of Los Angeles,
    ___ F. Supp. 2d ___, 2008 WL. 2477440 (C.D. Cal. 2008) ..............5, 19, 21

Young v. American Mini Theatres, Inc.,
    427 U.S. 50 (1976).....................................................................................10

**Statutes**                                                                                 **Pages**

6 RCNY § 2-310 ..............................................................................................8

34 RCNY § 2-14(b) ..........................................................................................9

67 RCNY § 6-06(c) ..........................................................................................33

Administrative Code § 10-110 ..........................................................................8

Administrative Code § 17-306 ..........................................................................8

**Statutes**                                                                                               **Pages**

Administrative Code § 19-525 ........................................................................................9

Administrative Code § 20-452 et seq ..............................................................................8

City Charter Chapter 14 ..................................................................................................8

City Charter § 362 et seq ...............................................................................................8

City Charter § 363 ..........................................................................................................8

City Charter § 383 ..........................................................................................................8

Fed.R.Evid. 702 ........................................................................................................4, 30

NYS Gen. Bus. Law § 35-a ...........................................................................................8

New York State Constitution Article 1 § 8 ...............................................1, 5, 37, 38

PAL § 1204 (13-a) ......................................................................................................8, 9

Z.R. § 11-01 ...............................................................................................................6, 7

Z.R. § 12-10 ...............................................................................................................6, 7

Z.R. § 22-32 ....................................................................................................................2

Z.R. § 22-341 ..................................................................................................................7

Z.R. § 32-62 ....................................................................................................................2

Z.R. § 32-63 .........................................................................................................2, 6, 12

Z. R. §§ 32-651 through 32-653 .....................................................................................7

Z.R. § 42-52 ........................................................................................................2, 6, 12

Z. R. § 42-541 .................................................................................................................7

Z. R. § 42-542 .................................................................................................................7

Z. R. § 95-10 ...................................................................................................................7

Z.R., Art. 1, Ch. 4 .......................................................................................................6, 7

| **Statutes** | **Pages** |
|---|---|
| Z.R. Art. II, Ch. 2 | 7 |
| Z. R. Art. III, Ch. 2 | 7 |
| Z. R. Art. IV, Ch. 2, | 7 |
| Z. R. Art. IX, Ch. 5 | 7 |

Defendant submits this memorandum of law in support of its motion for summary judgment dismissing in its entirety the Complaint filed by plaintiff Metro Fuel LLC ("plaintiff" or "Fuel") on or about September 21, 2007, and in opposition to the motion for summary judgment filed by Fuel on July 28, 2008.[1] For the reasons set forth herein, as well as in the accompanying Declarations of Sheryl R. Neufeld, dated August 25, 2008 ("Neufeld Dec.")[2] and Douglas Woodward, dated August 25, 2008, the provisions of the City's Zoning Resolution challenged in this action do not violate plaintiff's rights under the First and Fourteenth Amendments to the United States Constitution or Article 1, Section 8 of the New York State Constitution.

## PRELIMINARY STATEMENT

In 1940, the New York City Planning Commission recognized that "[b]illboards and signs not only dominate our business streets . . . but they take advantage of every opportunity to crowd in upon public places, established and maintained by public funds, including civic centers, parks, and especially express highways and bridge approaches." See Neufeld Dec., ¶ 3, citing, Exhibit E, 1940 Major Report of City Planning Commission, at 90.[3] As a result, in 1940, the City enacted a series of regulations to control the placement of advertising signs throughout the City. Included among those regulations were restrictions on placing advertising signs in retail and

---

[1] In an order dated July 15, 2008, this Court granted plaintiff and the City permission to file memoranda of law up to 40 pages in length (Docket Sheet Entry No. 13).

[2] The following additional declarations, which were filed with the court in support of the City's motion for summary judgment in the Clear Channel Outdoor, Inc. v. City of New York, 06 CV 8193 (PAC) and Atlantic Outdoor Advertising Inc. v. City of New York, 06 CV 8219 (PAC) consolidated actions, are attached to the Neufeld Declaration and also relied upon by the City in support of its instant motion for summary judgment: the May 12, 2008 Declaration of Christina L. Hoggan, ("Hoggan Dec.") [Exhibit A]; the May 12, 2008 Declaration of Kerry Gould-Schmit, ("Gould-Schmit Dec.") [Exhibit B]; the July 28, 2008 Reply Declaration of Kerry Gould-Schmit ("Gould-Schmit Reply Dec.") [Exhibit C]; and the May 9, 2008 Declaration of Stanley Shor, ("Shor Dec.") [Exhibit D].

[3] Unless otherwise specified, all exhibits are referenced in, and provided with, the Neufeld Dec.

residential districts.[4]  See Neufeld Dec., ¶ 5.  These regulations, which have remained in place in substantially similar form since 1940 [Neufeld Dec., ¶¶ 6-9], remain an integral component of the zoning framework designed to preserve neighborhood character and an aesthetically pleasing landscape and protect the public health, safety and welfare.[5]  Specifically, advertising signs are prohibited in residential and low-density commercial zoning districts, and permitted, subject to certain size, placement and lighting restrictions, in high-density commercial (i.e. C6-5, C6-7, C7 and C8) and manufacturing (i.e. M1, M2 and M3) zoning districts.  See Z.R. §§ 22-32, 32-62, 32-63 and 42-52 (hereinafter "outdoor sign regulations").

Plaintiff entered the outdoor advertising market in New York City in 2006, long after the enactment of the outdoor sign regulations.  See Neufeld Dec., Exhibit L, ¶ 1.  While Fuel purports to operate many different types of signs in the City of New York, Fuel's challenge in this lawsuit centers around what it describes as its "panel sign business."  See Complaint, ¶ 2.  Panel signs, as defined by Fuel, are internally-illuminated light boxes measuring approximately 24 square feet.  See Complaint, ¶ 3; July 28, 2008 Declaration of Michael A. Freedman ("Freedman Dec."), ¶ 2.  Panel signs are displayed in a variety of ways, including affixed to the facades of buildings and on free-standing poles.  See Freedman Dec., ¶ 3.  The panel signs in Fuel's control as of June 2008

---

[4] However, signs which were accessory to and drew attention to a business conducted on the same zoning lot (known today as accessory signs) were not prohibited in these areas because the City recognized that these signs serve an important purpose – i.e., ensuring that businesses are able to advise customers and suppliers of the location of their establishment.  See Neufeld Dec., ¶¶ 4-5.

[5] While the Zoning Resolution also generally regulates the placement of signs to address issues of traffic safety, this case focuses solely on the City's neighborhood character and aesthetic interests because the City has not asserted that it regulates Fuel's panel signs to address traffic safety concerns.  See City Response to Interrogatories No. 15 and 16, attached to the July 28, 2008 Declaration of Eric Hecker ("Hecker Dec.") as Exhibit 26.

were located at 227 different facilities.  Of those, 178 facilities (78.5%) had one or two panels, and 49 facilities (21.5%) had more than two panels.  See Neufeld Dec., Exhibit L, ¶ 2.

Fuel's website encourages its clients to "saturate a neighborhood with [their] message or 'road block' key areas to reach commuters twice daily."  See Neufeld Dec., Exhibit MM.  At the time it filed its Complaint in September 2007, Fuel stated that it operated approximately 360 panel signs in New York City.  See Complaint, ¶ 3.  As of June 2008, Fuel operates approximately 440 panel signs in New York City.[6]  See Freedman Dec., ¶ 2.  Most of these panel signs display advertising copy, yet most of these signs do not have permits from the New York City Department of Buildings for the display of such copy.[7]  See Neufeld Dec., Exhibit L, ¶¶ 3, 4.  In the instant lawsuit, plaintiff essentially complains that the City's long-established zoning provisions regulating the placement of outdoor advertising signs violate its free speech rights under the Federal and State constitutions because the City has entered into franchise agreements that allow limited advertising on elements of street furniture on the City's sidewalks.  See Memorandum of Law in Support of Fuel's SJ Motion ("Fuel Mem.") at 1-2.

Contrary to plaintiff's assertions, however, the City's outdoor sign regulations are a permissible regulation of commercial speech under the framework established by the Supreme

---

[6] Of these, Fuel claims that 7% are situated in zoning districts where internally illuminated advertising signs are allowed.  See Freedman Dec., ¶ 7.

[7] By way of a letter agreement dated September 19, 2007 [Neufeld Dec., Exhibit NN], the City agreed that it would not commence or proceed with any zoning or code enforcement proceedings relating to any of the 360 then-existing Fuel panel signs until ten days after a decision by the District Court in this matter.  Upon information and belief, shortly prior to the commencement of this lawsuit, the Department of Buildings issued violations to a few of Fuel's panel signs for having been erected without a permit and failing to comply with the provisions of the Zoning Resolution.  It is not clear, however, what plaintiff means when it asserts in its memorandum of law that the City is "so anxious" to enforce the provisions of the Zoning Resolution against Fuel.  Fuel Mem. at 2.

Court in <u>Central Hudson Gas & Electric Corp. v. Public Service Commission</u>, 477 U.S. 557 (1980)

and <u>Metromedia, Inc. v. City of San Diego</u>, 453 U.S. 490, 502 (1981).  The City's outdoor sign

regulations directly advance the City's neighborhood character and aesthetic interests and are no

more extensive than necessary to advance those interests.  Most importantly, the fact that the City

has allowed a limited amount of advertising on elements of street furniture on the City's sidewalks

does not undermine the City's interests in preserving neighborhood character and an aesthetically

pleasing Cityscape.  As detailed in the accompanying Declaration of Douglas Woodward,[8] an urban

designer and city planner with over twenty-five years of experience, the street is a distinct planning

environment separate and apart from the adjoining property, and may appropriately be used and

regulated differently from the adjoining property.  Thus, the zoning provisions at issue herein

continue to advance the City's interests in preserving neighborhood character and an aesthetically

---

[8] Plaintiff's insinuation that Mr. Woodward is not an "expert" in the field of urban design and city planning because he "has never taken an academic course in urban design or architecture, let alone received a degree, let alone written in the area" [Fuel Mem. at 37, fn. 14] is both misleading and not worthy of serious consideration.  First, as detailed in paragraphs 7 through 13 of the Woodward declaration, Mr. Woodward does have significant academic experience in the field of urban design.  Second, it is well-settled that a person does not have to be an academic in order to have expertise in a given field.  Rather, experts are routinely qualified based upon their practical experience and knowledge.  As stated by the Court in <u>In re Methyl Tertiary Butyl Ether Prods. Liability Litigation v. Amerada Hess Corp.</u>, 2008 U.S. Dist. LEXIS 37331, *18-19 (S.D.N.Y. 2008), "[a]n expert can be qualified by 'knowledge, skill, experience, training, or education' to offer opinions that will assist the trier of fact.  Courts within the Second Circuit have 'liberally construed expert qualification requirements.'  Further, Rule 702 'specifically contemplates the admission of testimony by experts whose knowledge is based on experience' rather than formal education." (internal citations omitted).  <u>See also</u>, <u>United States v. Locascio</u>, 6 F.3d 924, 937 (2d Cir. 1993) (finding an FBI agent of seventeen years, with five years spent in the FBI's Organized Crime Program and two of those years spent as a supervisor, qualified to testify as an expert on organized crime) and <u>Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.</u>, 2006 U.S. Dist. LEXIS *15-16 (S.D.N.Y. 2006) ("one may be an expert solely based on one's practical experience notwithstanding a lack of professional education") (internal citations omitted).  Mr. Woodward worked for the New York City Department of City Planning for over twenty years and, among other things, authored numerous zoning text provisions involving streetscape and signage issues.  <u>See</u> Woodward Dec., ¶¶ 8-11.  He has both extensive academic and practical experience that will be useful to the Court in understanding the urban design principles relevant to the City's regulation of outdoor advertising, and is qualified as an expert under the standards set forth above.

pleasing Cityscape notwithstanding the fact that advertising may be placed on items of street furniture on the City's sidewalks. <u>See</u> Woodward Dec., ¶¶ 26-49.

In support of its argument that it is unconstitutional for the City to allow advertising on sidewalks but prohibit it on adjoining zoning lots, plaintiff relies upon two decisions rendered by the United States District Court for the Central District of California – <u>Metro Lights, LLC v. City of Los Angeles</u>, 488 F.Supp.2d 927 (C.D. Cal. 2006) and <u>World Wide Rush, LLC v. City of Los Angeles</u>, __ F.Supp.2d __, 2008 WL 2477440 (C.D. Cal. 2008). However, as detailed herein, the Courts in those cases were not presented with the opportunity to consider the important urban design and planning distinction between the public street and adjoining property, and are clearly distinguishable from the instant matter. Indeed, the Courts appear to have assumed that the city regulations at issue therein did not advance LA's interests. Here, however, there is no question that New York City's outdoor sign regulations advance the City's substantial interests in preserving neighborhood character and an aesthetically pleasing landscape, and that those interests are not undermined by advertising placed on items of street furniture on the City's sidewalks.

## ARGUMENT

### THE PROVISIONS OF THE ZONING RESOLUTION GOVERNING THE PLACEMENT OF OUTDOOR SIGNS ARE A LAWFUL EXERCISE OF THE CITY'S LAND USE REGULATORY POWERS AND DO NOT VIOLATE THE FIRST AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION OR ARTICLE 1 § 8 OF THE NEW YORK STATE CONSTITUTION.

**A.      Regulations Governing The Use and Development of Land In the City of New York.**

The use and development of land in the City of New York is regulated in different ways depending on the type of land in question. The Zoning Resolution (and other local laws) regulates the use and development of tracts of land known as zoning lots (e.g., most private

property upon which buildings are constructed).  In order to protect the "public health, safety and general welfare" [see Preamble to the Z.R.], the Zoning Resolution addresses, *inter alia,* the height and bulk of buildings and other structures; the area of yards, courts and other open spaces; the density of population; and the location of trades, industries and buildings designed for specific uses within the City and, to further these goals, divides the City into districts.  Z.R. § 11-01.

      The outdoor sign regulations permit or prohibit particular categories of signs and regulate their size, height, projection and illumination, depending on the zoning district in which the sign is to be erected.  As stated above, advertising signs are permitted in all manufacturing zoning districts and in certain high-density commercial zoning districts.[9]  Z.R. §§ 32-63, 42-52.

---

[9] As indicated above, within these districts, the Zoning Resolution places certain restrictions on the size, height and illumination of advertising signs.  With respect to illumination, the Zoning Resolution permits signs with indirect illumination (i.e. illumination derived from an external artificial source, such as the external spotlights that shine onto highway billboards) in all areas where advertising signs are allowed, but limits advertising signs with direct illumination (i.e. illumination designed to give forth artificial light, such as the back lit panel signs operated by Fuel) to C6-5, C6-7 and C7 commercial zoning districts.  See Z.R. §§ 12-10 (definitions of "sign, illuminated" and "sign with indirect illumination"); 32-63, 32-644, 32-645, 42-533.  See also, May 15, 2008 Deposition Transcript of Edward Fortier, Director of the Department of Buildings' Sign and Padlock Enforcement Unit [Neufeld Dec., Exhibit OO] at p. 45, lns. 2- 19, p. 48, lns. 10-24.  Contrary to Fuel's assertions, these illumination regulations do not "make no sense."  Fuel Mem. at 5, fn. 1.  Rather, as the City responded in answering an Interrogatory on this subject: "internally illuminated advertising signs are permitted in C6-5, C6-7 and C7 districts, but not in other areas of the City because those districts are mapped in limited areas of the City where directly (internally) illuminated signage supports a distinctive neighborhood character" (such as Times Square and Coney Island).  In contrast, "[d]irectly illuminated advertising signs are not permitted in C8, M1, M2 and M3 districts because, in contrast to C6-5, C6-7 and C7 districts, these districts are located in areas throughout the City, often in close proximity to residential districts.  In addition, directly illuminated signs may have negative effects on nearby []commercial/manufacturing uses within these districts."  See City Response to Interrogatory No. 17, Eric Hecker Dec., Exhibit 26.  At his May 9, 2008 Deposition, Tom Wargo, head of the Department of City Planning's Zoning Division, explained that the Zoning Resolution restricts directly illuminated advertising signs in C8, M1, M2 and M3 districts because directly illuminated signs are of a greater intensity than indirectly illuminated signs, which creates a concern that directly illuminated signs could be visible to closely adjacent residential districts.  See Wargo Deposition Transcript, [Neufeld Dec., Exhibit PP] at p. 116, ln. 16 – p. 119, ln. 11, p. 119, ln. 24- p. 120, ln. 24, p. 126, ln. 21- p. 127, ln. 5.  See also, Fortier Dep. Tr. at p. 49, ln. 11 – p. 55, ln. 15 (internally illuminated signs project light forward and result in a more brightly illuminated sign).  In addition, Mr. Wargo testified that directly illuminated advertising signs may have negative effects on commercial and manufacturing uses within C8, M1, M2 and M3 districts because

As defined in Section 12-10 of the Zoning Resolution, zoning lots are tracts of land separate and apart from other tracts of land such as streets and waterfront area (both of which are also defined in section 12-10).  The provisions of the Zoning Resolution regulate the use and development of zoning lots but do not, unless specifically enumerated, govern the use or development of the City's streets and sidewalks.[10]

---

the intensity of the light from the advertising sign makes the advertising sign more visible and can have a negative effect on neighborhood character and aesthetics.  Wargo Dep. Tr. at p. 132, ln. 5 – p. 136, ln. 17. Fuel's assertion that signs with indirect illumination are "plainly less innocuous" than signs with direct illumination [Fuel Mem. at 5, fn. 1] is purely speculative, not supported by a citation to admissible evidence and directly contradicted by the forgoing testimony.  Moreover, if Fuel changed the lighting of its panel signs to indirect lighting its panel signs would be allowed in C8, M1, M2 and M3 districts.  Fortier Dep. Tr. at p. 47-48, 55-56.  Documents produced in January 2008 by Fuel in response to the City's discovery requests indicate that, at that time, Fuel operated approximately 419 panel signs, of which, approximately 118 were located in manufacturing zoning districts.  See Neufeld Dec., Exhibit QQ.  Arguably, these signs would be lawful if the illumination were converted from direct to indirect and plaintiff obtained permits from the Department of Buildings.

[10] The only activities taking place on the City's streets and sidewalks that are regulated by the Zoning Resolution are those that are directly related to the use and development of the adjoining zoning lot.  The principal instances of sidewalk regulation contained in the Zoning Resolution relate to: 1) the siting of sidewalk cafes (see Z.R., Art. 1, Ch. 4); 2) the planting of trees on the sidewalk in conjunction with development on zoning lots in Special Transportation Districts (see Z.R., Art. IX, Ch. 5, § 95-10); and 3) the projection of signs across street lines (see, e.g., Z.R. Art. II, Ch. 2, § 22-341; Art. III, Ch. 2, §§ 32-651 through 32-653; and Art. IV, Ch. 2, §§ 42-541 and 42-542).  Plaintiff's repeated suggestion that the City has "exempted" advertising signs on street furniture from the restrictions set forth in the Zoning Resolution [see, e.g., Fuel Mem at 21-22], is incorrect and misleading.  As a matter of law, the provisions of the Zoning Resolution simply do not govern the use and development of street furniture on the City's sidewalks.  Thus, the Declaration of Richard Bass, which purports that many of the advertising signs on street furniture do not comply with "the Zoning Resolution restrictions that apply in the districts in which the shelters are located" [Fuel Mem. at 22], is simply of no moment.  While the Zoning Resolution restrictions do not govern the placement of signs on street furniture, and the City does not accept that the actual calculations set forth in the Bass Declaration are correct, the City does accept Mr. Bass's calculations for the purposes of this motion because it does not dispute that many of the advertising signs on its street furniture are located in areas where the zoning restrictions applicable to the adjoining zoning lots do not allow advertising on those lots. Plaintiff's suggestion that the City could have chosen to subject advertising on street furniture to the zoning provisions that govern advertising on the adjoining zoning lots [Fuel Mem. at 21-22], is also not worthy of serious consideration.  As fully explained in the Woodward Declaration, advertising on street furniture does not have the same effect on neighborhood character and aesthetics as advertising on zoning lots.  Woodward Dec., ¶¶ 40-49.  In addition, it is in no way clear that the City would have been able to benefit from the free replacement of old street furniture without allowing advertising to be placed on the structures.  See, e.g., Gould-Schmit Dec., ¶¶ 22, 23, fn. 3.

For the most part, the public may not use (other than for transportation purposes) or develop the City's streets and sidewalks without obtaining prior permission from the City. The use of the City's streets and sidewalks for activities such as street fairs, vending and parades is controlled through a network of regulatory laws designed to balance the needs of these groups with those using the streets for transportation.[11]    In addition, the City can grant permission to private entities to occupy space on, over or under the City's streets and sidewalks on a more permanent basis, through franchises, concessions and revocable consents.[12]    See City Charter Chapter 14, §§ 362, et. seq. and § 383.    Public amenities on the City's streets such as bus shelters, newsstands and public pay telephones (and any advertising on those structures) are regulated pursuant to the terms of Franchise Agreements entered into by the Department of Transportation ("DOT") and the Department of Information, Technology and Telecommunications ("DoITT") pursuant to Authorizing Resolutions adopted by the City Council in accordance with City Charter § 363.    See Gould-Schmit Dec., ¶ 24 (Coordinated Street Furniture Franchise ("CSFF")) and Shor Dec., ¶ 15 (Public Pay Telephone ("PPT") Franchise).[13]    Public announcements on street pole banners on the

---

[11]  See, e.g., Administrative Code § 17-306 et seq. and § 20-452 et seq., RCNY Title 6, § 2-310, et seq., and New York State General Business Law § 35-a for regulations pertaining to street vendors, and Administrative Code § 10-110 and the Rules promulgated thereunder in RCNY Title 38, Chapter 19 for regulations pertaining to parades.

[12]  Franchises are grants of the right to occupy or use the City's inalienable property, such as streets or parks, to provide a public service.    Concessions are grants for the use of City-owned property to conduct private business, such as food courts on public plazas and food vendors in City parks.    Revocable consents may be granted to permit the use of public space for private purposes, such as access ramps adjacent to private property.    See City Charter § 362.

[13]  Subway entrances fall under the jurisdiction of the New York City Transit Authority.    Pursuant to New York State Public Authorities Law § 1204(13-a), advertising signs on subway entrances (referred to by plaintiff as "urban panels") are permitted to be displayed on Transit Authority property.    Specifically, that section provides "[n]otwithstanding the provisions of section fourteen hundred twenty-three of the penal law or the provisions of any general, special or local law, code, ordinance, rule or regulation to the contrary the

City's sidewalks are regulated pursuant to rules established by DOT. See 34 RCNY § 2-14(b). In addition, advertising on taxicabs is regulated pursuant to controls established by the Taxi and Limousine Commission ("TLC"). Pursuant to those controls advertising is prohibited on all TLC-licensed vehicles, except on displays on the top of the rooftops of taxicabs that have been approved by TLC. See Administrative Code § 19-525; Stipulations of Fact, ¶ 109 [Hecker Dec., Exhibit 1].

**B.     The Zoning Resolution Is A Lawful Exercise of The City's Land Use Powers.**

The sign regulations contained in the Zoning Resolution are narrowly tailored land-use regulations consistent with the general purpose of the Zoning Resolution to promote and protect the "public health, safety and general welfare." Preamble to the Z.R. The Supreme Court has recognized, in a number of settings, the propriety of localities imposing such "land-use restrictions or controls to enhance the quality of life by preserving the character and desirable aesthetic features

---

authority may erect signs or other printed, painted or advertising matter on any property, including elevated structures, leased or operated by it or otherwise under its jurisdiction and control and may rent, lease or otherwise sell the right to do so to any person, private or public." Plaintiff's suggestion that a "Senior City official advised DOT" that PAL Section 1204(13-a) may not permit the Transit Authority to place advertising signs on subway entrances [Fuel Mem. at 14], is simply incorrect. In support of this assertion, plaintiff relies on a misinterpretation of an email sent by DoITT Assistant Commissioner Stanley Shor [Hecker Dec., Exhibit 27]. A complete reading of the document relied upon by plaintiff reveals that Mr. Shor appears to have looked at a provision of the PAL which discusses the MTA raising revenue from concessions and privileges – not PAL § 1204(13-a) which, as quoted above, clearly allows the MTA to place advertising on subway entrances. Additionally, plaintiff places more significance than is warranted on the fact that in 1959 then Mayor Robert F. Wagner responded to a request from then Governor Nelson A. Rockefeller to provide the City's opinion on a proposal to allow the Transit Authority to place advertising on property under its jurisdiction by stating that the City recommended approval of the bill. Fuel Mem. at 14; Hecker Dec., Exhibit 28. As the cited correspondence demonstrates, the bill was sponsored on the recommendation of the Transit Authority, not the City. There is nothing in the record that suggests that the City actually had any control over whether the State would ultimately adopt the legislation that had been requested by the Transit Authority, or that the legislation would not have been enacted even if the City objected. Likewise, plaintiff's suggestion that the City could "exert its considerable influence over the MTA" to seek the MTA's compliance with zoning regulations [Fuel Mem. at 15], is not persuasive. First, the zoning regulations do not govern the placement of advertising on subway entrances on the City's sidewalks. Second, the placement of advertising is authorized by the PAL. Thus, it is entirely illogical to presume that given those facts the City should nonetheless seek to compel the Transit Authority to act in a way that it is not legally required to act.

of a city." <u>Penn. Centr. Transp. Co. v. New York City</u>, 438 U.S. 104, 129 (1978), <u>citing</u>, <u>inter alia</u>, <u>New Orleans v. Dukes</u>, 427 U.S. 297 (1976), <u>Young v. American Mini Theatres, Inc.</u>, 427 U.S. 50 (1976)). " [T]he city's interest in attempting to preserve the quality of urban life is one that must be accorded high respect." <u>Young</u>, 427 U.S. at 71.

Because they are "designed to stand out and apart from [their] surroundings, billboard[s] create[] a unique set of problems for land-use planning and development." <u>Metromedia</u>, 453 U.S. at 502. "While signs are a form of free expression protected by the *Free Speech Clause*, they pose distinctive problems that are subject to municipalities' police powers. Unlike oral speech, signs take up space and may obstruct views, distract motorists, displace alternative uses for land, and pose other problems that legitimately call for regulation." <u>City of Laude v. Gilleo</u>, 512 U.S. 43, 48 (1994). The Zoning Resolution's carefully calibrated restrictions on signs on zoning lots address these problems in a rational and carefully balanced manner.

The general principles that guide judicial review of zoning enactments are well-settled. Municipalities are vested with broad discretion to address their land use problems through the adoption of zoning ordinances and such regulations are clothed with a strong presumption of validity. <u>South Gwinnett Venture v. Pruitt</u>, 491 F.2d 5, 7 (5th Cir.), <u>cert. denied</u>, 419 U.S. 837 (1974); <u>McMinn v. Town of Oyster Bay</u>, 66 N.Y.2d 544, 548 (1985); <u>Robert E. Kurzius, Inc. v. Upper Brookville</u>, 51 N.Y.2d 338 (1980), <u>cert. denied</u>, 450 U.S. 1042 (1981); <u>Town of Huntington v. Park Shore Country Day Camp of Dix Hills, Inc.</u>, 47 N.Y.2d 61 (1979). "Underlying the entire concept of zoning is the assumption that zoning can be a vital tool for maintaining a civilized form of existence only if we employ the insights and the learning of the philosopher, the city planner, the economist, the sociologist, the public health expert and all the other professions concerned with urban problems." <u>Udell v. Haas</u>, 21 N.Y.2d 463 (1968). Thus, as an exercise of the municipal

police power, a zoning regulation will withstand judicial scrutiny so long as it is found to bear a reasonable relationship to the health, safety or welfare of the public. City of Eastlake v. Forest City Enterprises, Inc., 426 U.S. 668 (1976); Nectow v. City of Cambridge, 277 U.S. 183 (1928).

The City's sign regulations are a rational use of the City's land use power and do not violate the First Amendment. To the contrary, the sign regulations are completely consistent with the plurality decision in Metromedia and meet the test set forth in Central Hudson. The Zoning Resolution imposes no total ban on advertising signs. Rather, the zoning provisions at issue merely establish a limited land use restriction with respect to the placement of such signs.

Historically, "purely commercial advertising was not considered to implicate the constitutional protection of the First Amendment[;]" however, in the mid-1970's the Supreme Court extended some protection to such speech. United States v. Edge Broadcasting Co., 509 U.S. 418, 426 (1993). Since the 1970's, the Supreme Court has repeatedly reaffirmed that the protection afforded commercial speech is less extensive than that granted to non-commercial speech, noting that commercial speech warrants only "a limited measure of [such] protection, commensurate with its subordinate position in the scale of First Amendment values." Board of Trustees of State University of New York v. Fox, 492 U.S. 469, 477 (1989), quoting, Ohralik v. Ohio State Bar Assn., 436 U.S. 447, 456 (1978). In light of that distinction, in Metromedia, the Court held that commercial speech may be "forbidden and regulated" in situations where non-commercial speech could not be. 453 U.S. at 512-513, 522 fn 26 ("Since our judgment is based essentially on the inclusion of noncommercial speech within the prohibitions of the ordinance, the California courts may sustain the ordinance by limiting its reach to commercial speech...").

**C.      The Sign Regulations Do Not Violate the First Amendment.**

Plaintiff claims that the sign regulations are unconstitutional because they are "pierced with exceptions" [i.e. advertising on items of street furniture on the City's sidewalks] that undermine the City's stated aesthetic and neighborhood character interests. Fuel Mem. at 29. The issue to be reviewed by this Court is, therefore, whether the sign regulations advance the City's interests in aesthetics and neighborhood character, notwithstanding the fact that the City allows limited advertising on street furniture placed on the City's sidewalks. The answer to this question is incontrovertibly yes.

**(a) The Central Hudson Test**

As detailed by the Court in Central Hudson, restrictions on commercial speech are evaluated using the following framework:

> At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

Central Hudson, 477 U.S. at 566.

There is no dispute that outdoor advertising signs are lawful. Indeed, they are permitted in all manufacturing zoning districts and in certain high-density commercial zoning districts. Z.R. §§ 32-63, 42-52. Thus, there is no question that the advertising signs regulated by the City are protected by the First Amendment. However, simply because outdoor advertising signs are protected by the First Amendment, does not mean that they are exempt from all

regulation. Similarly, there is no dispute that the City has a substantial interest in preserving neighborhood character and an attractive Cityscape.[14] See Fuel Mem. at 29.

Moreover, aesthetics and neighborhood character are sufficiently substantial justifications for the regulation of commercial speech, notwithstanding plaintiff's insinuation that such interests are only substantial if considered in conjunction with the City's interest in protecting traffic safety. See Fuel Mem. at 36. As stated by the Supreme Court in City Council v. Taxpayers for Vincent, 466 U.S. 789, 807 (1984) in upholding a Los Angeles ordinance prohibiting the posting of signs on public property, "[t]he problem addressed by this ordinance – the visual assault on the citizens of Los Angeles presented by an accumulation of signs posted on public property – constitutes a significant substantive evil within the City's power to prohibit." See also, Georgia Outdoor Adver., Inc. v. City of Waynesville, 833 F.2d 43, 46 (4th Cir. 1987) ("It requires neither elaboration nor citation to say that an ordinance regulating billboards is likely to advance the objective of enhancing the beauty of a city, and that no less intrusive method would adequately protect the city's interest."); Naegele Outdoor Adver. Inc., v. City of Durham, 844 F.2d 172, 173-74 (4th Cir. 1988) ("While the evidence regarding traffic safety offered by Durham is far from conclusive, we noted in Waynesville that 'aesthetics alone is a sufficient justification' for this type of police power regulation.").

Likewise, in 1977, the New York State Court of Appeals recognized that "the regulation of outdoor advertising for aesthetic purposes alone constitutes a valid exercise of the

---

[14] There is also no dispute that the City has a substantial interest in protecting traffic safety, as plaintiff acknowledges. See Fuel Mem at. 29. However, as explained above, the City has not asserted that its traffic safety concerns motivate the regulation of the placement of panel signs. Rather, panel signs are prohibited on zoning lots in certain areas of the City in order to advance the City's interests in preserving neighborhood character and an aesthetically pleasing Cityscape.

police power." Suffolk Outdoor Advertising Co. v. Hulse, 43 N.Y.2d 483, 371 (1977) (upholding ordinance prohibiting erection of all non-accessory billboards), citing, among others, Matter of Cromwell v. Ferrier, 19 N.Y.2d 263 (1967); People v. Goodman, 31 N.Y.2d 262 (1972); Rochester Poster Adv. v. Town of Brighton, 49 A.D.2d 273 (4th Dept. 1975).[15] As a result, the first two prongs of the Central Hudson test are clearly satisfied.

### (i) The Sign Regulations Directly Advance the City's Substantial Interests in Aesthetics and Neighborhood Character

The third prong of the Central Hudson test is satisfied so long as the legislative judgment in question is not "manifestly unreasonable." Metromedia, 453 U.S. at 509. The sign regulations easily pass the third prong of the Central Hudson test. In Lorillard Tobacco Co. v. Reilly, 533 U.S. 525 (2001), the Supreme Court reaffirmed that, contrary to plaintiff's suggestion [Fuel Mem. at 33], the third prong of the Central Hudson analysis does not require the City to produce scientific studies to demonstrate that the sign regulations advance an appropriate governmental interest. In describing City's burden under the third prong of the Central Hudson test, the Court stated:

> We do not, however, require that "empirical data come ... accompanied by a surfeit of background information...We have permitted litigants to justify speech restrictions by reference to studies and anecdotes pertaining to different locales altogether, or even, in a case applying strict scrutiny, to justify restrictions based solely on history, consensus, and 'simple common sense.'"

---

[15] But see, Metro Lights, 488 F.Supp.2d at 947 n. 10 noting that because the Supreme Court in Vincent did not engage in an analysis under Central Hudson, whether aesthetics alone is a substantial interest for the purposes of Central Hudson remains an open issue. However, in light of the fact that in Vincent the Supreme Court was analyzing the constitutionality of a regulation that prohibited pure political speech and, in light of the Fourth Circuit decisions cited above, defendant asserts that there is no question that aesthetics alone is a substantial interest for the purposes of Central Hudson.

Lorillard Tobacco, 533 U.S. at 554, quoting, Florida Bar v. Went For It, Inc., 515 U.S. 618, 628 (1995) (citations and internal quotation marks omitted).

The City's sign regulations advance the City's substantial interests in reducing the aesthetic harm caused by the proliferation of outdoor advertising signs and preserving neighborhood character.[16]   See Neufeld Dec., ¶¶ 3-5, 9-10 and Exhibits referenced therein. Contrary to Fuel's assertions, the City has not "manufactured a pretextual regulatory justification . . . to mask its actual, impermissible purpose (maximizing revenue at the expense of protected speech)." Fuel Mem. at 33.  In fact, Fuel's assertion is quite perplexing in light of the indisputable fact that the regulations Fuel complains about have existed in substantially the same form for almost seventy years.[17]  Neufeld Dec., ¶¶ 5-9.

---

[16] Plaintiff's reliance upon Horizon Outdoor v. City of Industry, 228 F.Supp.2d 1113 (C.D. Ca. 2002) is misplaced. Fuel Mem. at 33.  Unlike the detailed legislative history supporting the New York City zoning regulations, the City of Industry proffered no legislative history in support of its regulations.  Rather, the City of Industry simply submitted a declaration from its City Planning Director asserting that the sign ordinance was adopted for traffic safety and aesthetic reasons.

[17] Plaintiff's insinuation of a connection between maximization of revenue and enforcement efforts against advertising signs on private property appears to be based upon its assumption about Deputy Mayor Doctoroff's silence in response to a suggestion made by Van Wagner (an outdoor advertising company) during a meeting in July 2006. During that meeting, Van Wagner suggested that if New York City enforced its regulations a significant portion of the money spent by advertisers on the signs that do not comply with City laws could have been spent on outdoor advertising media that provide revenue for the City.  Fuel Mem. at 18-19.  Plaintiff's speculation is clearly and unambiguously refuted by Deputy Mayor Doctoroff's deposition testimony.  In this regard, when questioned regarding the July 2006 meeting with Van Wagner, Deputy Mayor Doctoroff testified in no uncertain terms that, to him, the point made by Van Wagner was "irrelevant;" and that he was "never motivated at any time in [his] thinking about billboards and policies related to illegal billboards or arterial highway signs by considerations of money," rather, "it was only by considerations of aesthetics." See Doctoroff Dep. Tr. [Neufeld Dec., Exhibit RR] at p. 77, ln. 8 – p. 78, ln. 6.  Plaintiff proffers absolutely no evidence to suggest that Deputy Mayor Doctoroff's deposition testimony was anything other than truthful.  Deputy Mayor Doctoroff also explained that he felt no need to tell Van Wagner that he disagreed with their point.  See Doctoroff Dep. Tr. at p. 84, ln. 8 – p. 85. ln. 24 and p. 86-93. As a result, plaintiff's unsupported argument that the City is Fuel's biggest competitor in the marketplace [Fuel Mem. at 4], even if true, is nothing more than a red herring.  The City simply does not regulate the placement of advertising signs on private property in order to maximize its revenue from advertising on public property.

As stated by the Supreme Court in Metromedia, "[i]t is not speculative to recognize that billboards by their very nature, wherever located and however constructed, can be perceived as an 'esthetic harm.'" Metromedia, 453 U.S. at 510. The view expressed in the plurality decision in Metromedia (i.e. that legislators may rely on their commonsense judgments in determining that billboards by their very nature can be perceived as an aesthetic harm), has been adopted by the Second Circuit. See National Advertising Co. v. Town of Niagara, 942 F.2d 145, 147 (1991), citing, National Advertising Co. v. Town of Babylon, 900 F.2d 551, 556-7 (2d Cir. 1989). "In no commercial speech case following Metromedia has the Court cast doubt on the appropriateness of accepting the commonsense judgment of local lawmakers." Action Outdoor Advertising LLC v. Town of Shalimar, Florida, 377 F.Supp.2d 1178, 1191, n.13 (N.D. Fla. 2005) ("consistent with Metromedia, it is not unreasonable for those lawmakers to conclude that offsite signs in themselves constitute an esthetic harm wherever they are located or placed."). Plaintiff's reliance upon Edenfield v. Fane, 505 U.S. 761, 770-71 (1993), for the proposition that the City's sign regulations are unconstitutional because the City has not performed any studies about the impact of advertising signage on the cityscape is, therefore, misplaced.[18] Fuel Mem. at 33-5.

Plaintiff's assertion that the sign regulations are unconstitutional because "exceptions" to the prohibition of placing advertising signs in certain areas of the City undercut the City's asserted aesthetic and neighborhood character issues, is also misplaced. In support of this argument, plaintiff relies upon the Supreme Court's decisions in Rubin v. Coors Brewing Co., 514

---

[18] Unlike the situation presented here, at issue in Edenfield was a "blanket prohibition on solicitation" by Certified Public Accountants ("CPA") imposed by a Florida regulatory Board without any evidence that such solicitations subjected consumers to greater likelihood of fraud or overreaching, nor that they interfered with the independence of CPAs.

16

U.S. 476 (1995) and <u>Greater New Orleans Broadcasting Ass'n, Inc. v. U.S.</u>, 527 U.S. 173 (1999). Fuel Mem. at 29-31. The "exceptions" plaintiff complains about are essentially programs advanced by the City for a public purpose that allow advertising in accordance with careful controls (such as the CSFF and PPT franchises which are designed to provide well-maintained attractive street furniture and ensure reliable and accessible PPT service) on the City's streets. <u>See generally</u>, Gould-Schmit Dec.; Shor Dec. Unlike the situations presented in <u>Rubin</u> and <u>Greater New Orleans</u>, the "exceptions" identified by plaintiff are related to legitimate government interests (or permitted by State law), contain their own controls to address aesthetics issues, apply in locations which are distinct from an urban design perspective from those regulated by the zoning sign restrictions, and do not render those sign regulations meaningless.[19]

A careful reading of <u>Rubin</u> and <u>Greater New Orleans</u> makes clear that the Court in those cases did not alter the analysis required under <u>Central Hudson</u>, as plaintiffs suggests. Fuel Mem. at 39. Rather, the Court in those cases simply found that the ordinances at issue did not satisfy the third prong of the <u>Central Hudson</u> test. This fact was acknowledged by the Court in <u>Michel v. Bare</u>, 230 F.Supp.2d, 1147, 1157-58 (D. Nevada 2002), when it stated that <u>Rubin</u> and <u>Greater New Orleans</u> "amount[] to a straight-forward application of the Central Hudson test."

In this regard, in <u>Rubin</u>, the Court concluded, among other things, that prohibiting brewers from displaying alcohol content on beer bottles, while at the same time allowing them to disclose alcohol content in beer advertisements, would not in any way advance the government's interest in preventing brewers from competing solely on the basis of the alcohol content of their

---

[19] Moreover, contrary to plaintiff's assertions the CSFF in and of itself addresses and advances the City's aesthetic and neighborhood character concerns. Gould-Schmit Reply Dec., ¶ 4-6.

product. <u>Id.,</u> 514 U.S. at 488. Logically, if consumers could find out a beer's alcohol content from an advertisement, there would be no reason to prevent the same information from being displayed on the beer bottle itself. Similarly, in <u>Greater New Orleans</u>, the Court concluded that banning the advertisement of privately operated commercial casino gambling while permitting the advertisement of tribal casino gambling would not advance the government's goal of alleviating the deleterious effects of gambling because preventing the advertising would not reduce the likelihood that people would gamble. Rather, allowing the additional advertising would simply channel gamblers to one casino rather than another. <u>Id.,</u> 527 U.S. at 189.

Thus, in <u>Rubin</u> and <u>Greater New Orleans</u> the ordinances at issue were found to be unconstitutional because the government's interests were such that they were patently incapable of being served by the challenged regulations. Here, in contrast, as detailed extensively in the Woodward Declaration, advertising on street furniture does not undermine the effectiveness of the challenged regulations because the street is, from an urban design perspective, a public realm distinct from the adjoining property. Woodward Dec., ¶¶ 14-49. Specifically, the street is a space that contains publicly sponsored messages and private advertising because its function is to link the City from neighborhood to neighborhood through a continuous channel connecting and serving all uses within the city. By contrast the façade and streetwall of the buildings on private property, even in retail areas, generally carry messages that identify uses within the buildings or on the properties themselves. The link between on-site use and identification and signage specific to that use strengthens the reading of the property as private, as the location of a particular use, and strengthens the sense of place. The street, which is part of a continuous network, requires no site-specific reinforcement because it does not contain a particular associated use within a specific boundary. Woodward Dec., ¶ 43.

Mere physical adjacency to advertising signs within the public areas of the street does not argue for the appropriateness of advertising on private property. Quite the reverse: the nature of the use of the space is what generates the appropriateness of the sign type. The expectation of what messages are displayed within the places of public passage in the street, as opposed to those displayed on the facades of buildings on private property is completely different even within close physical proximity. There is a general expectation of privacy and quiet enjoyment on private property that is not present in the public right-of-way. Woodward Dec., ¶ 44. The City's interest in establishing different standards for appropriate signage within the public street environment and on private property derives from a desire to promote the organization of an orderly, well-designed and comprehensible cityscape. Woodward Dec., ¶ 45. Allowing advertising signs on the public streets, while at the same time prohibiting advertising signs on adjoining private property, does not undermine the City's interest in prohibiting advertising signs on the adjoining private property because signs on street furniture play a very different function from signs located even a few feet away on private property. The provision of similar signs on zoning lots on private property adjacent to the street is generally not appropriate because it: 1) blurs the distinction between the public and private realms; 2) is not site-specific to the use at the location and thus detracts from orientation, the identification of private uses and sense of place; and 3) can be inconsistent with the organization of the street into public and private zones and thus interferes with the legibility of the street environment. Woodward Dec., ¶¶ 48-49.

Likewise, plaintiff's reliance upon <u>Metro Lights</u>, <u>supra</u> and <u>World Wide Rush</u>, <u>supra</u>, are also misplaced. Fuel Mem. at 31-32. We turn first to <u>Metro Lights</u>. The Metro Lights decision is distinguishable in many ways. First, in <u>Metro Lights</u>, the Court did not consider the distinction between the street and adjoining property for the purposes of urban design and city

19

planning.[20] As extensively detailed in the Woodward declaration, and contrary to Fuel's assertions [Fuel Mem. at 34], the fact that the City allows advertising on street furniture on the City's sidewalks does not indicate that the City is not serious about addressing its aesthetic and neighborhood character concerns. Woodward Dec., ¶¶ 40-49. In short, as Woodward explains, advertising on street furniture does not have the same negative impact on its surroundings as advertising on buildings on private property and is, in fact, an important visual element of the amenity zoning within the public sidewalk. Woodward Dec. ¶ 46.

Second, the Los Angeles ordinance at issue imposed a total ban on commercial off-site advertising by anyone other than the City's street furniture franchisee. Metro Lights, 488 F.Supp.2d at 930, 933. Here, as discussed above, there are many areas of the City available for off-site commercial advertising. Indeed, Fuel admits that a small percentage of its panel signs are lawful. Moreover, if Fuel were to change its method of illuminating its signs, an even greater percentage would comply with the provisions of the Zoning Resolution.

Third, the ordinance at issue in Metro Lights was enacted after Los Angeles entered into its Street Furniture Franchise. See Metro Lights 488 F.Supp.2d at 930-1, 933. Here, as detailed above, and in the Neufeld Declaration, off-site commercial advertising has been prohibited in residential and most commercial zoning districts since the 1940s. See Neufeld Dec., ¶¶ 5-9. Moreover, as explained above, there is absolutely no connection between the City's sign

---

[20] The Court in Metro Lights court appears to have concluded, without undertaking an urban design analysis, that the LA agreement with Viacom for installation of street furniture negated the benefits that the LA sign ordinances were designed to promote. 488 F.Supp.2d at 931-32.

regulations and a desire to raise additional money from advertising on street furniture under the CSFF and PPT Franchise.[21]

Finally, the scope of the CSFF is much narrower than the franchise awarded by the City of Los Angeles, which appears to have authorized off-site commercial advertising on at least 18,500 transit shelters or benches, as well as additional kiosks installed where no bus stop is located. Metro Lights, 488 F.Supp.2d at 935, 949. The New York City CSFF provides for approximately 80% fewer structures. As detailed in the Gould-Schmit Declaration, here, during the 20-year term of the Cemusa contract there will be no more than 3500 bus stop shelters and 20 APTs with advertising throughout the five boroughs. In addition, while the CSFF allows for 330 newsstands with advertising, today there are only approximately 270 newsstands in the City. Gould-Schmit Dec., ¶¶ 28, 31.

World Wide Rush is also easily distinguishable. First, the World Wide Rush decision was reached on a preliminary injunction motion where the Court simply concluded that plaintiffs demonstrated a likelihood of success on their Central Hudson challenge to a Los Angeles ordinance which prohibits off-site commercial advertising within 2000 feet of a freeway, and has absolutely no binding precedent here. Second, and more importantly, in World Wide Rush, the Court did not consider the distinction between the street and adjoining property for the purposes of urban design and city planning. The Judge also failed to appreciate that (as discussed below) under

---

[21] Fuel's suggestion that the City's regulatory scheme is more problematic than the Los Angeles scheme at issue in Metro Lights because in LA "the ban at issue was only prospective, grandfathering thousands of signs that were allowed to remain in place in perpetuity," is extremely puzzling. Fuel Mem. at 32. As explained above, unlike the situation in Metro Lights, the City's restrictions on advertising in residential and low-density commercial zoning districts has existed for almost 70 years. Plaintiff entered the advertising market in 2006 long after the enactment of the challenged zoning regulations. It is, thus, unclear exactly what plaintiff purports should have been "grandfathered" by the City of New York.

Metromedia it is entirely proper for a City to find that there are some circumstances where allowing some advertising will have benefits that outweigh way any harm to be caused by that advertising. Indeed, New York City's regulations satisfy Central Hudson and Metromedia because they directly advance the City's goals notwithstanding the fact that advertising is allowed on street furniture on the City's sidewalks.

Finally, even if the Court countenances plaintiff's argument that advertising on street furniture has some negative impact on the attractiveness of the Cityscape, the outdoor sign provisions of the Zoning Resolution are nonetheless constitutional. First, in Metromedia, the Court recognized that a City may distinguish between the relative value of different categories of commercial speech and may have legitimate reasons for allowing some commercial advertising and prohibiting others. In this regard, the Court explained:

> San Diego has obviously chosen to value one kind of commercial speech – onsite advertising – more than another kind of commercial speech – offsite advertising. The ordinance reflects a decision by the city that the former interest, but not the latter, is stronger than the city's interest in traffic safety and esthetics. The city has decided that in a limited instance – onsite commercial advertising – its interests should yield. We do not reject that judgment. As we see it, the city could reasonably conclude that a commercial enterprise – as well as the interested public – has a stronger interest in identifying its place of business and advertising the products or services available there than it has in using or leasing its available space for the purpose of advertising commercial enterprises located elsewhere. It does not follow from the fact that the city has concluded that some commercial interests outweigh its municipal interest in this context that it must give similar weight to all other commercial advertising.

Metromedia, 453 U.S. at 511-12.[22]   Here, as detailed above, even if one could argue that advertising on street furniture negatively impacts the aesthetics of the streetscape – which it does not - the City has legitimate reasons for concluding that being able to provide street furniture amenities at no cost to the public outweighs its other interests.   While the Metromedia Court specifically discussed San Diego's legitimate differing interests in on-site and off-site advertising, its more general recognition that a municipality may have a legitimate interest in valuing one kind of commercial speech more than another supports the City's determination to allow limited amounts of advertising signage on public street furniture while continuing to prohibit outdoor commercial advertising signage on adjoining private property.   See id.  In addition, notwithstanding the fact that the City's actions have resulted in a minimal amount of controlled advertising being permitted on City sidewalks, such as on street furniture and PPTs, the City has, in fact, taken steps to ensure that the advertising it allows does not become omnipresent.  See Exhibit S (CPC October 1996 Report); Gould-Schmit Dec., detailing the limits on advertising on street furniture and Shor Dec., detailing the limits on advertising on PPTs.

Second, the Court in Metromedia confirmed that underinclusive ordinances satisfy the Central Hudson test.  "Whether onsite advertising is permitted or not, the prohibition of offsite advertising is directly related to the stated objectives of traffic safety and esthetics.  This is not

----

[22] The ordinance at issue in Metromedia prohibited "off premise outdoor advertising display signs." Exempted from this regulation were on-site signs (i.e. accessory signs) and signs falling within twelve specific categories. "The specific categories exempted from the prohibition include: government signs; signs located at public bus stops; signs manufactured, transported, or stored within the city, if not used for advertising purposes; commemorative historical plaques; religious symbols; signs within shopping malls; for sale and for lease signs; signs on public and commercial vehicles; signs depicting time, temperature and news; approved temporary, off-premises, subdivision directional signs and '[temporary] political campaign signs.'" Metromedia, 453 U.S. at 494-96.

altered by the fact that the ordinance is underinclusive because it permits onsite advertising." 453 U.S. at 511.   Following Metromedia, underinclusive ordinances restricting the placement of outdoor advertising have been upheld across the country.  See, e.g., Jim Gall Auctioneers, Inc. v. City of Coral Gables, 210 F.3d 1331, 1333 (11th Cir. 2000), (upholding an ordinance that prohibits advertising the sale of non-homeowner goods in residential neighborhoods, while allowing the advertising of garage sales and open houses), citing, Sciarrino v. City of Key West, 83 F.3d at 369, n. 7 (11th Cir. 1996) ("The Supreme Court has conclusively indicated that a regulation may 'directly advance' its asserted ends, though it strikes at less than the entire problem") and Don's Porta Signs, Inc. v. City of Clearwater, 829 F.2d 1051, 1053 (11th Cir. 1987) ("The Constitution does not require the City to choose between curing all of its aesthetic problems or curing none at all.").  See also, Supersign of Boca Raton v. F. Lauderdale, 766 F.2d 1528, 1531 (11th Cir. 1985) ("[I]t does not follow to say that as a result of its incomplete coverage the ordinance does not address the problems of traffic safety or aesthetic improvement.  By prohibiting the operation of some advertisement vehicles, the City solves some of its traffic problem and reduces the total number of unsightly advertisements.").

It is well-settled that Metromedia controls the law of sign regulation.  "Each method of communicating ideas is a 'law unto itself' and that law must reflect the 'differing natures, values, abuses and dangers' of each method.  We deal here with the law of billboards."  Metromedia 453 U.S. at 501.   Thus, to the extent that either Rubin or Greater New Orleans is inconsistent with Metromedia, the Court must disregard those cases and use Metromedia to guide its determination. See, e.g., Ackerley Communications of the Northwest, Inc. v. Krochalis, 108 F.3d 1095, 1097-98 (9th Cir. 1997) (upholding Seattle billboard regulations as constitutional under Metromedia over plaintiff's argument that Metromedia should not guide the court's decision because, inter alia,

since Metromedia the Supreme Court has imposed a greater evidentiary burden on a municipality trying to justify a restriction on commercial speech in cases such as Rubin and Edenfield); Action Outdoor Advertising LLC v. Town of Shalimar, Florida, 377 F.Supp.2d 1178, 1190, n. 12 (N.D. Fla. 2005) (rejecting plaintiff's suggestion that cases such as Edenfield and Rubin should guide the court's analysis rather than Metromedia).  As detailed above, the City's sign regulations satisfy the third prong of the Central Hudson test because the City's neighborhood character and aesthetic interests are directly advanced by the sign regulations.

### (ii) The Sign Regulations Are No More Extensive Than Necessary To Serve The City's Aesthetic and Neighborhood Character Interests

The City's sign regulations also satisfy the fourth prong of the Central Hudson test. "The last step of the Central Hudson analysis 'complements' the third step, 'asking whether the speech restriction is not more extensive than necessary to serve the interests that support it.'" Lorillard, 533 U.S. at 556 (internal citations omitted).  The Supreme Court has made clear that "'the least restrictive means' is not the standard; instead, the case law requires a reasonable ''fit between the legislature's ends and the means chosen to accomplish those ends . . . a means narrowly tailored to achieve the desired objective.'" Id.

The sign regulations, which prohibit advertising in those areas of the City deemed to be incompatible with the use of property for advertising purposes [Neufeld Dec., ¶¶ 3-10], are no more extensive than necessary to serve the City's goals.[23]  In concluding that the City of San Diego ordinance at issue in Metromedia satisfied the fourth prong of Central Hudson, the Court stated:

---

[23] Fuel's assertion that the sign regulations are unconstitutional because they "ban considerably more speech than is necessary" because the City's regulation of panel signs does not further the City's traffic safety interests, is nothing more than a red herring and should not be considered by this Court.  Fuel Mem. at 34, 36.  The provisions of the Zoning Resolution that regulate outdoor signage regulate signs of all shapes and

> If the city has a sufficient basis for believing that billboards are traffic
> hazards and are unattractive, then obviously the most direct and
> perhaps the only effective approach to solving the problems they
> create is to prohibit them. The city has gone no further than
> necessary in seeking to meet its ends. Indeed, it has stopped short of
> fully accomplishing its ends: It has not prohibited all billboards, but
> allows onsite advertising and some specifically exempted signs.

Metromedia 453 U.S. at 508. Here, as set forth above, the City has a sufficient basis for believing

advertising signs are unattractive and inconsistent with residential and low-density commercial use,

and has taken steps to prohibit them on zoning lots in certain areas through the sign regulations.

Similarly, the City has taken steps to manage any issues posed by advertising on the streets and

sidewalks through controls detailed in franchise agreements and the City's local laws. See Gould-

Schmit and Shor Declarations.

Plaintiff errs in contending that the City's failure to subject the CSFF to the sign

restrictions contained in the Zoning Resolution requires a finding that the challenged ZR provisions

do not meet the fourth prong of the Central Hudson test. Fuel Mem. at 36-39. As Woodward

explains, because the public street and adjoining property serve different functions, it is not

necessary for the City to restrict advertising on street furniture in the way that it restricts advertising

on zoning lots in order to satisfy its interests in neighborhood character and aesthetics.[24]

---

sizes. This litigation, however, is limited solely to the City's regulation of 24-square foot internally
illuminated advertising signs. While the outdoor signage regulations are generally aimed towards advancing
the City's interests in traffic safety, aesthetics and neighborhood character, the City has not asserted that it
regulates Fuel's panel signs in order to advance its traffic safety interests. Thus, whether Fuel's panel signs
cause traffic safety issues is irrelevant to the Court's consideration of plaintiff's claims. Moreover, contrary
to plaintiff's assertions, the outdoor sign regulations do not "ban considerably more speech than is
necessary" because, as detailed above, they are necessary in their entirety to advance the City's
neighborhood character and aesthetic interests.

[24] Plaintiff's subjective assertions that "there is simply no way that anyone could rationally conclude that
Fuel's panel signs have any greater impact on aesthetics or neighborhood character than [advertising on
street furniture]," and that the use of electronic advertising is "obviously more offensive" than Fuels signs

Woodward Dec., ¶¶ 40-49. Thus, plaintiff's assumption that that the City should have "scaled back" advertising on street furniture in order to "prioritize" its neighborhood character and aesthetic concerns [Fuel Mem. at 38] is also plainly false.[25] For the same reasons, plaintiff's suggestion that the City could have imposed the same requirements on street furniture advertising that are imposed on advertising on zoning lots [Fuel Mem. at 3, 38], is not worthy of serious consideration. Interestingly, if the City were to have subjected street furniture to the zoning requirements applicable on the adjoining zoning lots (as the provisions of the Zoning Resolution do not in and of themselves regulate the use of the City's streets and sidewalks), Fuel would not be able to lawfully erect any more advertising signs than it is presently allowed to erect. In any event, the fact that plaintiff can conceive of some methods of regulation that it deems less onerous does not mean that the City is required to adopt the suggested alternatives. Fox, 492 U.S. at 480.

---

are not worthy of serious consideration. Fuel Mem. at 37. First, as Woodward explains, from an urban design perspective, advertising on street furniture and advertising on adjoining zoning lots have different impacts on aesthetics and neighborhood character. More fundamentally, unlike the advertising on street furniture which is well-integrated into the structures themselves, advertising signs on zoning lots can impinge on the good design of the adjacent sidewalk when they protrude into the public right-of-way and are placed at heights that do not relate to the scale of the other elements of the street. Woodward Dec., ¶ 45, fn. 10. Likewise, contrary to plaintiff's assertions [Fuel Mem. at 7], the level of illumination of the advertising signs on the City's street furniture is appropriate. Woodward Dec., ¶ 41, fn. 9. See also, City Response to Paragraph 25 of Plaintiff's Rule 56.1 Statement. Thus, plaintiff's reliance on City of Cincinnati v. Discovery Network, 507 U.S. 410. 418-19 (1993) and Ballen v. City of Redmond, 466 F.3d 736, 743 (9th Cir. 2006) is misplaced because the municipalities in those cases did not proffer any rationale for distinguishing between the aesthetic impact of that which was allowed and that which was prohibited.

[25] Fuel's suggestion that at the end of the prior bus shelter franchise the City could have contracted for the ongoing maintenance of the bus shelters and discontinued or "dramatically scaled back the advertising program by allowing just enough advertising to cover the cost of ongoing maintenance" [Fuel Mem. at 28], is also not worthy of consideration. As detailed in the Gould-Schmit Declarations, the CSFF is intended to enhance and improve existing sidewalk structures, including both bus stop shelters and newsstands. Gould-Schmit Dec., ¶¶ 6-8, 10, 15, 23 fn. 3.

Indeed, the City's sign regulations satisfy the fourth prong of the <u>Central Hudson</u> test because there is a "fit" between the City's ends and the regulations:

> that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is "in proportion to the interest served," [citation omitted] that employs not necessarily the least restrictive means but .. a means narrowly tailored to achieve the desired objective.

<u>Fox</u>, 492 U.S. at 480. To the extent that the zoning regulations do restrict the display of plaintiff's advertisements, the restrictions are <u>de</u> <u>minimus</u> place and manner restrictions. The facts presented here are similar to those before the Second Circuit in <u>Hickerson et al. v. City of New York et al.</u>, 146 F.3d 99 (2d Cir. 1998), <u>cert. denied</u> 525 U.S. 1067 (1999), when it considered the City's Adult Use Zoning provisions. In <u>Hickerson</u>, the Court gave full faith and credit to a New York Court of Appeals finding that adult use zoning restrictions, which the <u>Hickerson</u> plaintiffs asserted left only 4 percent of the total land area of the City open to adult establishments, provide adequate alternative avenues of communication.[26] Likewise, the sign regulations are narrowly-tailored restrictions on the place and manner in which advertising is displayed, and do not violate the plaintiff's First Amendment rights. Just as with the City's Adult Use Zoning, the sign regulations are not directed at suppressing speech but rather at regulating the place and manner in which it is displayed. As with Adult Use Zoning, there are sufficient alternative areas of the City available for advertising. <u>See</u> <u>Hickerson</u>, <u>supra</u>, and <u>Stringfellow's v. City of New York</u>, 91 N.Y.2d 382 (1998).

---

[26] In fact, in <u>Hickerson</u>, unlike this matter, the challenged provisions restrict the location of businesses, which involve expression of protected *non-commercial* speech and ideas.

**D.    Plaintiff Unpersuasively Attempts to Divert Attention from the <u>Central Hudson</u> Test.**

In an attempt to divert the Court's attention from the straightforward task of determining whether the outdoor sign regulations advance the City's interests in aesthetics and neighborhood character notwithstanding the fact that advertising that is allowed on elements of street furniture on the City's sidewalks, Fuel spends a great deal of time in its moving papers discussing issues that are irrelevant to the Court's review of the issue presented.  Included among these issues are: 1) traffic safety; 2) the compensation the City receives from the CSFF and PPT franchises; 3) the City's review of the CSFF through the Uniform Land Use Review Procedure ("ULURP") and the City's decision to award the CSFF to Cemusa; and 4) the formation of New York City Marketing.[27]

**(a) Traffic Safety**

Throughout its moving papers, Fuel reiterates that the outdoor sign regulations do not advance the City's traffic safety goals because advertising on street furniture is more likely to distract drivers than Fuel's panel signs.  See, e.g., Fuel Mem. at 22-33.  In support of this assertion, Fuel relies upon the testimony of Jerry Wachtel, a supposed traffic safety expert.  Mr. Wachtel's opinion, however, is utterly irrelevant to the Court's consideration of the issues presented herein because the City has not asserted that it regulates Fuel's panel signs in order to advance its traffic safety interests.[28]  It is well-settled that "[e]vidence contained in an expert's report must... be

---

[27] Fuel's discussion of the supposed 11 large-format billboards located on City property is also misleading, incorrect and completely irrelevant given the fact that this lawsuit centers solely around signs that are approximately 24-square feet in size.  See City Response to paragraph 143 of Plaintiff's Rule 56.1 Statement.

[28] Contrary to plaintiff's assertions, the City has not stated that Fuel's signs "do not actually implicate traffic safety concerns."  Fuel Mem. at 22, 34.  See City Response to Interrogatories No. 15 and 16 [Hecker Dec., Exhibit 26].  Rather, the City simply asserts that it does not regulate panel signs to address traffic safety

evaluated under Fed.R.Evid. 702 before it is considered in a ruling on the merits of a summary judgment motion." Borgognone v. Trump Plaza, 2000 U.S. Dist. LEXIS 4081, *6. See also, Raskin v. Wyatt Co., 125 F.3d 55, 66-67 (2d Cir. 1997). "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."[29] Daubert v. Merrell Dow Pharms., 509 U.S. 579 , 591 (1993), citing 3 Weinstein & Berger P702[02], pp. 702-18. As a result, Mr. Wachtel's July 27, 2008 Declaration should be excluded since his opinions have no relevance to the issue before the Court – i.e., whether the sign regulations directly advance the City's aesthetic and neighborhood character interests and are not more extensive than necessary to serve those interests.

Moreover, even if the Court were to consider Mr. Wachtel's opinions, they are of no moment because Watchel reaches no real conclusions regarding panels or signs on street furniture. Rather, without first determining whether either Fuel signs or "City sanctioned signs" [i.e., bus shelter advertising panels, newsstand advertising panels, banners, PPT advertising panels] are actually distracting to drivers, Wachtel concludes that the "Fuels signs, almost without exception, cause [him] less concern about the potential for driver distraction than City sanctioned signs. . . ."[30] Wachtel Dec., ¶ 66;  Wachtel Dep. Tr., Exhibit SS, p. 58, ln. 16-24, p. 59, ln. 2-8, p. 66.

---

issues.  Indeed, as discussed above, plaintiff's traffic safety expert has reached no definitive conclusions regarding whether panel signs cause driver distraction.  Moreover, plaintiff's expert plainly concedes that the larger a sign is, the more potential it has to be distracting.  Wachtel Dep. Tr., p. 60, ln. 9-12.

[29] While the Supreme Court in Daubert limited its findings to scientific expert testimony, it later expanded them to include all expert testimony. Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999).

[30] Notably, in reaching his conclusions, Watchel did not observe signs as a typically driver would.  Rather, Watchel admits that he "saw more signs than the average driver would see [because he wasn't focused on driving] and because [he] was looking for signs."  Wachtel Dep. Tr., p. 47, ln. 21-25, p. 48, ln. 1. Additionally, Fuel's Vice President, James Taggart selected the Fuel signs that Mr. Watchel based his findings on.  In selecting the signs, the only parameters Mr. Watchel gave Mr. Taggart was to select a sampling of the different type of Fuel signs on various streets, e.g. "two-way streets, one way streets,

Further, in reaching his conclusions, Mr. Wachtel did not use reliable scientific methodology. Rather, "all [Wachtel] did was an observational study." Wachtel Dep. Tr., p. 66, ln. 4. In the course of his "study," Wachtel made observations in an attempt to determine what signs appeared within a driver's "cone of vision" (i.e. signs a driver can see and potentially be distracted by). However, the methodology he employed in doing so was un-scientific. According to Wachtel, to determine what falls within a driver's cone of vision, one generally "performs basic trigonometry" using measurements related to the driver and the location of the signs in question.[31] Wachtel Dep. Tr., p. 22, ln. 7-25, p. 23, ln 1-11, p. 26, ln. 3-9. p. 28, ln. 18-23, p. 29, ln. 24, p. 30, ln. 1-15, p. 31, ln. 4-11. Wachtel, however, did not engage in any trigonometric analysis in determining which signs in New York City fall within a driver's cone of vision. Wachtel Dep. Tr., p. 31, ln. 12-15, p. 35, ln. 19-21. Rather, Wachtel, who was a passenger in the back seat of a car, used his visual observations to determine what was within a driver's cone of vision. Wachtel Dep. Tr., p. 45, ln. 5-6, p. 36, ln. 12-16. Consequently, his findings are questionable.

Moreover, Wachtel ignored more precise research techniques. Indeed, Wachtel could have utilized laboratory research techniques, including simulators and video techniques which "have been around for 60 or 80 years" and "measure[] with great precision everything the driver does, … where the driver is looking, how the driver controls the steering wheel, the gas pedal, the break pedal, reaction time to events" and "driver distraction." Wachtel Dep. Tr., p. 8, ln 4-5, p. 6, ln. 21-25, p. 10, ln. 23-25, p. 11, ln. 1-9, p. 63, ln. 10-25, p. 64, ln. 1-13. As Wachtel

divided streets, cross streets." Wachtel Dep. Tr., p. 85, ln. 21-25, p. 86, ln. 9-10. As such, Mr. Wachtel's findings rely upon information provided by an interested party.

[31] This measurement would be based on the vehicle being still. However, as testified to by Watchel, the cone of vision constantly changes as the driver moves. p. 25, ln. 9-15.

testified, "laboratory research techniques are capable of gathering more precise data than just a visual inspection." Wachtel Dep, Tr., p. 62, ln. 6-9. Wachtel also did not utilize a research study, which measures actual driver reactions and is "typical" methodology utilized by traffic safety experts. Wachtel Dep. Tr., p. 66, ln. 2-25. Under a research study, a vehicle is outfitted with special equipment, including an "eye-movement camera to study where the driver is looking," while volunteers, unaware of the purpose of the study, drive the vehicle through the City. Wachtel Dep. Tr., p. 66, ln. 2-25. Consequently, since Wachtel failed to follow reliable methodologies for the study he chose to conduct, and did not explore other more precise research techniques, his conclusions are at best suspect.

### (b) Compensation from the CSFF and PPT Franchises

Fuel also devotes a great deal of attention to the compensation the City receives under the CSFF and PPT franchises. See, e.g., Fuel Mem. at 15-17. The monetary compensation that the City receives under these franchises, however, is not relevant to the issues before the Court. The only issue relevant to this constitutional analysis is whether, as plaintiff claims, the mere presence of advertising on street furniture (which is subject to separate regulations)[32] affects the constitutionality of the sign regulations, or whether, as the City asserts, the presence of advertising on street furniture (and other amenities such as phone kiosks and street pole banners) has no impact

---

[32] It is important to reiterate that advertising on street furniture is not a new event. Advertisements have been permitted on bus shelters since the 1970s, and the advertising on bus shelters allowed under the Cemusa franchise is not significantly different than what was allowed in the past. See generally, Hoggan Dec., Gould-Schmit Dec. Plaintiff's characterization of a drastic increase in bus shelter advertising [Fuel Mem., at 7] is belied by the facts. As plaintiff acknowledges, there may only be an additional 8 square feet of advertising on bus shelters under the Cemusa franchise. Stipulations of Fact [Hecker Dec., Exhibit 1], at ¶ 64. Similarly, Cemusa is only allowed to install up to an additional 400 bus shelters city-wide. Stipulations of Fact, ¶ 63. While the Cemusa franchise is the first time that the City has allowed advertising on newsstands and APTs, the number of newsstands and APTs that may be installed citywide are minimal (330 newsstands and 20 APTs). Gould-Schmit Dec., ¶ 28.

on the ability of the sign regulations to satisfy the test set forth by the Supreme Court in Central Hudson and Metromedia. The fact that the City benefits financially from the street furniture franchise plays absolutely no role in this analysis.[33]

      Likewise, plaintiff attempts to muddy the waters with discussions about the revenue the City receives from advertising on phone kiosks under its PPT franchise agreements and alleged lack of control over what is placed on the City's streets. Fuel Mem. at 11-12, 17 and Hecker Dec., ¶¶ 65-69. Indeed, the City does not blindly allow advertising on PPTs in order to make a profit. As detailed in the Shor Declaration, the PPT franchise agreements allow the City to have significantly more control over PPTs on the City's streets than it had in the past. Shor Dec., ¶¶ 13-21, 26-27. Moreover, since the execution of the franchise agreements, the City has also continued to tighten the restrictions placed upon PPT advertising. Shor Dec., ¶¶ 31-37. In doing so, DoITT has, among other things, banned the placement of new PPT enclosures, and thus advertising, in Manhattan Community Districts 1 through 8.[34] Id at ¶ 34.

---

[33] It should also be noted that, contrary to plaintiff's allegations [Fuel Mem. at 1], it is simply not true that the City has "blanketed" the streetscape with advertising signs in order to "generate revenue." See Gould-Schmit Dec., ¶¶ 6-12, 42-46, 52; Gould-Schmit Reply Dec., ¶¶ 4-6; Shor Dec., ¶¶ 6-9, 13-21, 34. Moreover, the City did not choose to allow scrollers on street furniture or entertain the electronic advertising pilot program for the sole purpose of generating additional revenue. Gould-Schmit Reply Dec., ¶¶ 26-27, 29. Additionally, any discussion of the use of Bluetooth technology on City street furniture should be disregarded because 1) the use of Bluetooth technology has been discontinued [Hecker Dec., Exhibit 16 at ¶ 5]; and 2) the Z.R. does not prohibit plaintiff from using Bluetooth technology.

[34] Fuel completely misrepresents a statement included in DoITTs report on amendments to 67 RCNY 6-06(c) [Exhibit EE] regarding advertising revenue. Hecker Dec., ¶ 69. A complete and accurate reading of DoITT's report in no way suggests that the City decided to amend Section 6-06(c) only after concluding that advertising revenue from additional PPTs would be small or non-existent. In fact, DoITT specifically stated: "DoITT's decision to adopt Section 6-06(c) is based on its concerns regarding high levels of visual clutter from advertising on PPT enclosures in the areas covered by Section 6-06(c) and is unrelated to revenue issues." Exhibit EE at p. 26, n.30.

### (c)  The City's ULURP Review of the CSFF and the City's Decision to Award the CSFF to Cemusa

Plaintiff also attempts to argue that the City's ULURP review of the CSFF and the City's decision to award the CSFF to Cemusa demonstrate that the City does not have a significant interest in neighborhood character and aesthetics.  Fuel Mem. at 19-21, 23-26.  Fuel's assertions in this regard are misguided.  We turn first to plaintiff's allegations about the City's ULURP review of the CSFF.  As detailed in the Gould-Schmit Declaration, in 1996, the City Planning Commission and the City Council approved through ULURP, DOT's application for the approval to publish a Request for Proposals for the CSFF.  Gould-Schmit Dec., ¶ 14 and Exhibits S (City Planning Commission Report) and T (City Council Resolution No. 2096).  As a precursor to its ULURP application, DOT first conducted an environmental review pursuant to the State Environmental Quality Review Act ("SEQRA") and the City Environmental Quality Review ("CEQR").  See Exhibit S at p. 12.  This review considered the environmental impact of the proposed CSFF and, having determined that there would be no significant impact, resulted in the issuance of a Negative Declaration.  See id. and Hecker Dec., Exhibit 51 (CSFF Environmental Assessment Statement).  In its memorandum of law, Fuel suggests that in completing its environmental review DOT did not adequately consider the impact on neighborhood character of advertising on street furniture.  Fuel Mem. at 24-26.  Fuel's argument is flawed for several reasons.  First, Fuel fails to account for the fact that street furniture with advertising had been a part of the streetscape since the mid-1970s [Hoggan Dec., ¶¶ 2-6].   Second, Fuel erroneously assumes that a neighborhood character assessment conducted for purposes of environmental review is the equivalent of an evaluation of neighborhood character and aesthetics from a land use, planning and urban design perspective.  Thus, even assuming that Fuel is correct that the "preliminary thresholds" for a neighborhood

34

character assessment enumerated in the City's CEQR Technical Manual were triggered, this is of no moment since the City Planning Commission clearly considered the impact of street furniture with advertising on aesthetics and neighborhood character.[35]  See Exhibit S.

When DOT sought to revive the CSFF proposal in 2003, the Department of City Planning determined that a new ULURP review was not required because the CSFF proposed in 2003 was substantially similar to that which had already been approved.  Gould-Schmit Dec., ¶ 30 and Exhibit W.  Fuel's insinuation that the City should have performed a new ULURP review in 2003 [Fuel Mem. at 24] was already raised and rejected by the New York State Supreme Court Appellate Division, First Department in Uhlfelder v. Weinshall, 10 Misc. 3d 151, 171-3 (N.Y. Sup. Ct. N.Y.Co. 2005), aff'd 47 A.D.3d 169, 186 (App. Div, 1st Dept. 2007).[36]

Fuel's insinuation that the City sacrificed its aesthetic interests in awarding the street furniture franchise to Cemusa is also incorrect.  Fuel Mem. at 19-21.  No one disputes that Cemusa offered the City the most lucrative financial package, however, had Cemusa not also established its ability to provide the required services, it would not have found itself in the position as the highest

---

[35] It should be noted that the statue of limitations for challenging the propriety of the environmental review of the CSFF has long passed.  See Uhlfelder, 10 Misc. 3d 151 at 174 (N.Y. Sup. Ct. N.Y.Co. 2005), aff'd 47 A.D.3d 169, 186 (App. Div, 1st Dept. 2007), citing Matter of Save the Pine Brush v. City of Albany, 70 N.Y.2d 193, 200 (1987) (a four-month statute of limitations applies to challenges to SEQRA and CEQR claims).

[36] Fuel also erroneously places significance on the fact that the certain community boards and the Manhattan Borough President and Borough Board expressed concerns during the 1996 ULURP process about excessive advertising and clutter on the streets.  Fuel Mem. at 25.  Indeed, Fuel ignores the fact that these concerns were expressed prior to the completion of the City Planning Commission's ULURP review, and that, in ultimately approving the CSFF RFP that had been proposed by DOT, the City Planning Commission took these concerns (as well as others) into account in making its final determination.  Significantly, the CSFF RFP approved by the City Planning Commission allowed for less advertising than that which was initially proposed by DOT.  See Exhibit S and Stipulations of Fact [Hecker Dec., Exhibit 1], ¶ 92.  In addition, the CSFF contract between the City and Cemusa was unanimously approved by the FCRC, on which the current Manhattan Borough President sat.  See Gould-Schmit Dec., fn. 9.

ranked bidder.  See Gould-Schmit Reply Dec., ¶¶ 12-17.  Moreover, Fuel completely mischaracterizes the substance of the recommendation made to the CSFF Evaluation Committee by the Design Advisory Committee.  Gould-Schmit Reply Dec., ¶¶ 18-23; City Response to Fuel 56.1 Statement, ¶¶ 108-09.  Finally, it is indisputable that Cemusa's street furniture is a marked improvement over what was previously on the City's streets and, in fact, was given a design award by the Art Commission.  See Gould-Schmit Reply Dec., ¶¶ 24-25.

### (d) New York City Marketing

Plaintiff's discussion of the formation of New York City Marketing and Joseph Perello's role in negotiating the Cemusa contract [Fuel Mem. at 17-18] is also both irrelevant and an attempt to distract the Court from the issue at hand.  The fact that Perello saw street furniture as beneficial to the City's overall marketing strategy, does not mean that the City entered into the Street Furniture Franchise in order to plaster the City with advertisements, as plaintiff suggests.  Indeed, as Perello testified at his deposition "we did not seek to increase advertising panels for the sake of increasing advertising panels.  The DOT wanted more bus shelters, so we did not say build more bus stop shelters because it will be more advertising panels.  We sought to maximize [the City's access to] advertising where advertising existed, so it is accurate to say that we increased advertising space [available for use by the City] on the existing advertising shelters."  Perello Dep. Tr. [Exhibit TT] at p. 59, ln. 14- p. 60, ln. 2.  See also, p. 60, lns. 8-13 ("However, the city needs more bus stop shelters, the DOT wants more bus stop shelters because they are useful, but that did not play into our evaluation; if DOT wanted to build less bus stop shelters, that's their business, not ours.");  p. 61, lns. 2-7 (clarifying that Perello solely sought to increase the proportion of City controlled advertising on existing shelters); and p. 63, ln. 5 – p. 64, ln. 5 (illustrating that job of Chief Marketing Officer was not to plaster the City with advertising).

**E.      The City Does Not Favor Its Own Speech Over Commercial Speech.**

Contrary to plaintiff's assertions [Fuel Mem. at 40], the City does not favor its own speech over the speech of others.  In support of its argument, plaintiff relies upon <u>Nichols Media Group, LLC v. Town of Babylon</u>, 365 F.Supp.2d 295 (E.D.N.Y. 2005).  That case involved a challenge to a Town of Babylon ordinance that expressly exempted signs posted by the government from the application of the ordinance.  Here, there is no similar exception for signs posted by the City under the challenged regulations.  Rather, the City is subject to the same restrictions on speech placed upon others.

To the extent there are any "exceptions" to the zoning provisions that benefit the City (e.g., CSFF, PPTs), the "exceptions" are for speech on City-owned property.  However, anyone who wants to do so can arrange to advertise on the City's property.  Thus, the market is available to all speakers.  As recognized by the <u>Nichols</u> court:

> <u>Metromedia</u>, while not deciding the precise issue here, noted that the San Diego ordinance at issue contained a provision allowing for various non-commercial signs, including 'signs erected in discharge of any governmental function.'   When commenting on these exemptions to San Diego's ban on off-site advertising, the Court noted that the government was not free to pick and choose among the non-commercial messages that can be disseminated through billboard advertising.

<u>Nichols</u>, 365 F.Supp. 2d at 316-17.  Thus, unlike the situation in <u>Nichols</u>, here the City cannot "communicate ideas to the public in ways that other speakers may not." <u>Id.</u> at 317.

**F.      The Sign Regulations Do Not Violate Article 1, § 8 of the New York State Constitution.**

Likewise, the sign regulations do not violate the free speech provisions of the New York State Constitution.  While it is true that the New York Court of Appeals has, at times, held

that Article 1, § 8 is more protective of speech than the First Amendment,[37] this case does not present a situation where the protections afforded by the State Constitution are, or should be, anything other than that which is afforded by the Federal Constitution.  Indeed, the City knows of no New York State case that has concluded that zoning restrictions on commercial speech are to be evaluated more strictly than under the test set forth by the Supreme Court in <u>Central Hudson</u>.

Moreover, even if the State Constitution can be found to be more protective of commercial speech than the Federal Constitution, the <u>Central Hudson</u> test is more than sufficient for analyzing restrictions on commercial speech under the State Constitution.  This conclusion flows naturally from an analysis of the Court of Appeals' treatment of Adult Use Zoning ordinances under the State Constitution.  In that context, the Court of Appeals has concluded that expressive matter of an adult nature is to be afforded greater protection under the State Constitution.  See <u>Islip v. Caviglia</u>, 73 N.Y.2d 544.  Nonetheless, the test articulated by the Court of Appeals to assess the constitutionality of Adult Use Zoning ordinances under the State Constitution is substantially similar to the test articulated by the Supreme Court for assessing the constitutionality of those ordinances under the Federal Constitution.  See <u>id.</u>

The standards for assessing the facial constitutionality of an Adult Use Zoning ordinance under the First Amendment were established by the United States Supreme Court in <u>City</u>

---

[37] As stated by the Court of Appeals, Article 1, § 8 "contains language that is more expansive than its Federal counterpart and we have at times interpreted it in a manner that is more protective of free <u>expression</u> than the First Amendment to the Federal Constitution."  <u>Children of Bedford, Inc. v. Petromelis</u>, 77 N.Y.2d 713, 731 (1991), <u>rev'd on other grounds</u> 79 N.Y.2d 972 (1992).  For example, the Court of Appeals has applied a more liberal analysis in cases such as <u>Immuno AG. v. Moor-Jankowski</u>, 77 N.Y.2d 235, 249 (1991) (applying a broader analysis in the context of a libel suit to determine whether a letter to the editor was protected under the freedom of press guarantee) and <u>Islip v. Caviglia</u>, 73 N.Y.2d 544, 559 (1989) (content-neutral adult use zoning regulations) and declined to apply a more liberal analysis in cases such as <u>Courtroom Tel. Network LLC v. State of New York</u>, 5 N.Y.3d 222, 232 (2005) (no right to televise a trial).

of Renton v. Playtime Theatres, Inc., 475 U.S. 41 (1986). In that case, the Court applied the traditional two-prong test for determining the constitutional validity of content-neutral time, place and manner regulations -- that is, whether the regulation was "designed to serve a substantial governmental interest, and whether it allows for reasonable alternative avenues of communication." Renton 475 U.S. at 50. In Islip, the Court of Appeals addressed claims regarding the constitutionality of Islip's Adult Use Zoning ordinance brought under both the First Amendment and Article I, § 8 of the New York State Constitution. As to the First Amendment claim, the Court of Appeals applied the test set forth in Renton. Islip, 73 N.Y.2d at 554-55. As to the State constitutional claim, the Court of Appeals noted that the applicable test was similar to that set forth in Renton: a content-neutral regulation will be upheld if it is "designed to carry out legitimate and important governmental objectives" and is "no broader than necessary to achieve its purposes."[38] Id. at 556-57, 559. Significantly, the test articulated by the Court of Appeals in Islip for evaluating a zoning restriction applicable to elements of pure speech, is almost identical to that articulated by the Supreme Court for evaluating restrictions on commercial speech in Central Hudson (i.e., whether the regulation in question directly advances a substantial governmental interest and is not more extensive than necessary to serve that interest, 477 U.S. at 566). Thus, the constitutionality of the sign regulations under both the Federal and State Constitutions should be evaluated under Central Hudson. As set forth above, the sign regulations satisfy the Central Hudson test.

---

[38] The Islip court found that the Adult Use Zoning ordinance was constitutional under both the Federal and State Constitutions. Applying the State test, the Court concluded that the Islip use regulations were content-neutral, designed to further important government interests, and were no broader than necessary to achieve its goals, insofar it was "less restrictive than banning adult uses altogether," did not represent a total ban on adult uses, but left open ample channels for dissemination of adult material. Id.

## CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment should be granted in its entirety. However, if the court does not grant defendant's motion, defendant submits 1) that plaintiff's application for a preliminary injunction [Fuel Mem. at 27, fn. 11] should be denied and; 2) to the extent the Court finds that any provisions of the laws challenged herein are unconstitutional, defendant should be given the opportunity to be heard regarding whether those provisions can be severed from the regulations as a whole.

Regarding plaintiff's application for a preliminary injunction, where, as here, "the moving party seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme," the injunction should be granted only if the moving party establishes that (1) that they will be irreparably injured if the relief sought is not granted, and (2) that they are likely to succeed on the merits of their claim. Plaza Health Labs., Inc. v. Perales, 878 F.2d 577, 580 (2d Cir. 1989); see also, Chemical Bank v. Haseotes, 13 F.3d 569, 572-73 (2d Cir. 1994). While it is settled law that for purposes of a motion for preliminary injunction, the deprivation of a First Amendment right constitutes irreparable injury [see e.g., Bery v. City of New York, 97 F.2d 689, 693 (2d Cir. 1996), cert. denied, 520 U.S. 1251 (1997)], as demonstrated above, plaintiff is not likely to succeed on the merits of its claim as to the unconstitutionality of the sign regulations, and the temporary stay of enforcement agreed to by the parties should be lifted.

Regarding defendant's application to be heard as to severability, it is well-settled that as a general rule, where only a portion of a statute is objectionable, the court should refrain from invalidating the entire statute. See, e.g., National Advertising v. Town of Niagara, supra, 942 F.2d at 148. Thus, should defendant's motion be denied, defendant requests the opportunity to brief the question of severability.

Dated:          New York, New York
                August 25, 2008

                                    Respectfully Submitted

                          By: _____
                                    Sheryl R. Neufeld (SK-2728)
                                    Christina L. Hoggan (CH 6877)
                                    Assistant Corporation Counsels

                                    MICHAEL A. CARDOZO
                                    Corporation Counsel of the
                                      City of New York
                                    Attorney for Defendants
                                    100 Church Street
                                    New York, New York 10007
                                    (212) 788-1035

41