Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------- x
CLEAR CHANNEL OUTDOOR, INC.,

                                        Plaintiff,

            -against-

THE CITY OF NEW YORK and PATRICIA J.                06-CV-8193 (PAC) (DCF)
LANCASTER, in her official capacity as Commissioner of
the New York City Department of Buildings

                                        Defendants.
------------------------------------------------------------------- x

------------------------------------------------------------------- x
ATLANTIC OUTDOOR ADVERTISING, INC., SCENIC
OUTDOOR, INC., TROYSTAR CITY OUTDOOR LLC,
and WILLOW MEDIA, LLC.,

                                        Plaintiffs,

            -against-                               06-CV-8219 (PAC) (DCF)

CITY OF NEW YORK, PATRICIA J. LANCASTER, and
EDWARD FORTIER

                                        Defendants.
------------------------------------------------------------------- x


## DECLARATION OF CHRISTINA L. HOGGAN IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION


        **CHRISTINA L. HOGGAN**, declares pursuant to 28 U.S.C. §1746, under

penalty of perjury, as follows:

        1.      I am an Assistant Corporation Counsel in the office of MICHAEL A.

CARDOZO, Corporation Counsel of the City of New York, attorney for the defendants in this

action.  I make this declaration in support of defendants' motion for summary judgment and in

opposition to plaintiffs' motion for a preliminary injunction based upon my review of records maintained by the City of New York, discussions with City employees and upon the papers and proceedings heretofore had in this action. Specifically, I submit this declaration to recount the history of the City's bus stop shelters, and Streetscape Task Force which lead to the development of the Coordinated Street Furniture Franchise, detailed in the accompanying Declaration of Kerry Gould-Schmit, former Director of the Coordinated Street Furniture Franchise, dated, May 12, 2008.

**Bus Shelters**

2.      Between mid-1973 to mid-1974, the City installed 120 shelters under its own program. Subsequently, the majority of the shelters deteriorated due to poor maintenance. A copy of the City Planning Commission Report, dated February 4, 1978, is provided herewith as Exhibit EE.

3.      In 1975, privately-operated bus stop shelters were first introduced to New York City by Bustop Shelters, Inc., operating in the boroughs of Manhattan and the Bronx. As found by the City Planning Commission, the design of the shelters functioned well and the maintenance was satisfactory. Id.

4.      Thereafter, in or about 1978, several companies submitted applications to the City for franchises to construct, install and maintain bus stop shelters within the five boroughs of New York City. Under the franchises, the franchisee was to design bus stop shelters to protect bus users from the weather, "provide them with illuminated, and therefore safer, waiting areas for night," and conspicuously display the bus route. Id.

5.      The City Planning Commission adopted standards, including siting criteria, governing the bus stop shelters after consultation with numerous city agencies and other

concerned parties. The standards were designed "to govern the exact location of shelters within the bus stop sites, to encourage an equitable distribution of shelters among the various community districts, and to promote safe, flexible shelter design and proper maintenance." Id.

6.    As part of the franchises, companies who installed and maintained bus stop shelters were permitted, subject to size and positioning restrictions, to incorporate advertising into the bus stop shelter. So as to ensure that franchisees did not simply install bus stop shelters in areas with good advertising potential, 80% of the bus stop shelters installed under a franchise had to be distributed proportionally among the community districts. Specifically, each district was entitled to receive the number of bus stop shelters equal to the total mileage of local bus routes located within that district in proportion to the total mileage of bus routes in the City. These locations were selected by the Community districts. Id.

7.    Commencing in March 1985, Miller Signs Associates was granted a franchise to construct, install, maintain, operate, and sell advertising upon bus stop shelters throughout the five boroughs of the City of New York. A copy of Excepts from the Franchise and Concession Review Committee, dated December 29, 2005, is provided herewith as Exhibit FF.

8.    Miller Signs Associates was subsequently found to be in breach of contract as it did not complete construction and installation of the bus stop shelters called for in the Agreement. As such, in May 1987 the contract was cancelled. In December 1987, the surety company, having exercised their right to assume the Franchise Contract, retained New York Bus Stop Shelter Media, Inc. to construct, install, maintain, operate, and sell advertising on bus stop shelters throughout the five boroughs. Id.

9.    Thereafter, the Franchise Contract was extended to New York Bus Stop Shelter Media, Inc. and its successors, including Viacom Outdoor. Id.

**Task Force**

10.    In the early to mid-1990's, an interagency Streetscape task force was created to study the structures and objects on the City's sidewalks, and develop a master plan to reduce the congestion of sidewalk obstructions and improve the appearance of the streetscape of New York City.    The interagency task force was chaired by the former Deputy Mayor for Planning and Community Relations.  See Request for Proposals For a Franchise to Install, Operate and Maintain Bus Stop Shelters, Self-Cleaning Automatic Public Toilets and Public Service Structures and to Install and Maintain Newsstands in the Boroughs of the Bronx, Brooklyn, Manhattan, Queens and Staten Island as issued on January 17, 1997 a copy of which is provided herewith as Exhibit GG.

11.    Based upon their study, the Streetscape Task Force proposed a plan under which DOT would offer a single franchise for the design, construction, installation, and maintenance of a variety of street furniture, including newsstands, bus stop shelters, self-cleaning automatic pay toilets, and other public service structures.[1]  Id.

12.    Thereafter, as detailed in the Gould-Schmit Declaration, in 1995, the DOT was designated as the agency responsible for the granting of franchises for bus stop shelters, self-cleaning automatic public toilets, newsstand structures, and any combination therof, and given a mandate to develop siting, design and evaluation criteria to, among other things, assure reasonable pedestrian flow, appropriate clearances, a coordinated design scheme, and address

---

[1] The public service structures included trash receptacles and information/computer kiosks that provide access to government or commercial activity.

visual impacts on vehicular traffic and impacts on designated landmarks and historic districts. This resulted in the development of the 1997 Coordinated Street Furniture Franchise ("CSFF") Request for Proposals, which while not yielding a contract in 1997, was thereafter revived by DOT in 2003, resulting in the 2004 Cemusa CSFF Agreement.

Dated:        New York, New York
              May 12, 2008

                                              _____
                                              Christina L. Hoggan

Exhibit B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- x
CLEAR CHANNEL OUTDOOR, INC.,

                                            Plaintiff,

                -against-

THE CITY OF NEW YORK and PATRICIA J.                06-CV-8193 (PAC) (DCF)
LANCASTER, in her official capacity as Commissioner of
the New York City Department of Buildings

                                            Defendants.
-------------------------------------------------------------------- x

-------------------------------------------------------------------- x
ATLANTIC OUTDOOR ADVERTISING, INC., SCENIC
OUTDOOR, INC., TROYSTAR CITY OUTDOOR LLC,
and WILLOW MEDIA, LLC.,

                                            Plaintiffs,

                -against-                            06-CV-8219 (PAC) (DCF)

CITY OF NEW YORK, PATRICIA J. LANCASTER, and
EDWARD FORTIER

                                            Defendants.
-------------------------------------------------------------------- x


## DECLARATION OF KERRY GOULD-SCHMIT IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

        KERRY GOULD-SCHMIT, declares pursuant to 28 U.S.C. §1746, under

penalty of perjury, as follows:

        1. I was employed by the New York City Department of Transportation

("DOT") between August 2001 and September 29, 2007. Commencing in May 2006, I was the

Assistant Commissioner for the Coordinated Street Furniture Franchise ("CSFF"). Prior to

holding that position, I was the DOT Project Manager for the CSFF, a position which I started in

October 2002. I am fully familiar with all aspects of the street furniture program, including, but not limited to, the legislative history of Local Law 64 and the technical components in the Request for Proposals ("RFP") issued by DOT on March 26, 2004, the terms in the CSFF Agreement, which was entered into with the City of New York's ("City") franchisee Cemusa, and the installation of street furniture under the Agreement.

2. I submit this declaration in support of defendants' motion for summary judgment and in opposition to plaintiffs' motion for a preliminary injunction.

3. This declaration is based on my personal knowledge, as well as my review of records maintained by, and information obtained from, DOT and other city government agencies and from statements made to me by officers or agents of the City.

4. Pursuant to Executive Order No. 25, dated August 23, 1995, the Mayor designated DOT as the agency responsible for the granting of franchises for bus stop shelters, self-cleaning automatic public toilets ("APTs"), newsstand structures, and any combination therof (generally referred to herein as "street furniture"). See City Council Resolution No. 1004, a copy of which is provided herewith as Exhibit HH. Additionally, under New York City Charter § 2903(a), DOT is given broad authority to regulate, among other things, the conduct of pedestrian traffic and City streets.

5. In overseeing street furniture, DOT has adopted criteria to ensure that street furniture placed on the City's sidewalks will not significantly impede pedestrian movement, visibility or public safety. These criteria include, among other things, minimum distances between bus stop shelters, newsstands, APTs, subway entrances, fire hydrants, curbs, driveways, traffic signal poles and building entrances, and a set number of feet of clear path for pedestrians to walk on the sidewalk. See excepts from Cemusa Agreement, at Section 5.1, dated May 19,

-2-

2006, a copy of which is provided herewith as Exhibit II, and Request for Proposals For a Franchise to Install, Operate and Maintain Bus Stop Shelters, Self-Cleaning Automatic Public Toilets and Public Service Structures and to Install and Maintain Newsstands in the Boroughs of the Bronx, Brooklyn, Manhattan, Queens and Staten Island as issued on March 26, 2004, at Appendix 3, a copy of which is provided herewith as Exhibit JJ. See also New York City Administrative Code ("Admin. Code") §20-228 et seq., and Title 6 of the Rules of the City of New York ("RCNY") §2-68.

**A. Goals of Coordinated Street Furniture Franchise**

6. The City's Streetscape is an issue that affects the quality of life of all New Yorkers. The lack of coordination and maintenance of street furniture detracts from our City's beauty and negatively impacts the sidewalk experience.

7. The CSFF seeks to augment and significantly improve the appearance and quality of the largest items of furniture on City streets and sidewalks, i.e. bus stop shelters, APTs, newsstands, trash receptacles, multi-rack news racks and computer information kiosks. The goals of the CSFF are to enhance the City's streetscape by providing well-maintained attractive street furniture, increase public amenities and, at the same time, reduce clutter on City sidewalks.

8. The CSFF allows the City to transform the look and feel of its streets by creating an aesthetically pleasing streetscape without the burden of public investment. Cemusa, a private company, has assumed the burdens of the substantial capital investment needed to both build the street furniture structures and fund their ongoing maintenance in exchange for the right to sell advertising on certain street furniture structures, i.e., bus stop shelters, newsstands, and automatic public toilets. As part of its franchise obligations, Cemusa will replace approximately

3,650 structures throughout New York City.[1]  In addition to this private investment, the City will receive an annual payment from the franchisee in the form of a franchise fee, which is the higher of a guaranteed minimum or a percentage of gross advertising revenues.

9.  In pursuing such a program, the City of New York joined a long list of municipalities that have already implemented, or are in the process of implementing, similar measures.  These municipalities include, but are not limited to: Chicago, Boston, Saint Louis, Los Angeles, as well as international centers like Paris, London, Milan and Sydney.

**B. Relevant Background Of Coordinated Street Furniture Franchise**

10. Over time various types of street furniture have appeared on New York City sidewalks. These street furniture elements have been constructed, installed and maintained in differing manners with varying levels of coordination and consistency.  See Cit y Planning Commission Report, October 9, 1996, a copy of which is provided herewith as Exhibit KK.

11. The newsstands on City streets, which were built prior to the Cemusa Agreement, were constructed and installed over many years on an ad hoc basis by various operators, and thus were not coordinated or consistent with each other.  This difference was further exacerbated by the fact that operators employed various levels of maintenance.  Id

12. As set forth in the accompanying Declaration of Christina L. Hoggan, after a failed attempt by the City to install and maintain bus stop shelters, the City entered into a serious of Agreements under which private companies assumed control of the City's bus stop shelters.

---

[1] The CSFF is primarily a replacement program.  Under the CSFF, approximately 90% of the structures built will replace already existing structures.

**1) 1997 Franchise Proposal**

13. In 1995, DOT was given a mandate to develop siting, design and evaluation criteria to, among other things, assure reasonable pedestrian flow, appropriate clearances, a coordinated design scheme, and address visual impacts on vehicular traffic and impacts on designated landmarks and historic districts. See Exhibit LL.

14. In 1996, the City Planning Commission and City Council, approved through the Uniform Land Use Review Procedure ("ULURP") [ULURP procedures are codified in New York City Charter § 197-c], DOT's application for the approval of a Request For Proposals ("RFP") for a franchise for the installation, maintenance and operation of bus stop shelters, APTs, newsstands, and public service structures.[2]  See Exhibit KK, and Council of the City of New York Resolution No. 2096, a copy of which is provided herewith as Exhibit LL.

15. In approving the RFP, the City Planning Commission stated the benefits of the CSFF as follows:

> Most of the franchise structures will replace and improve the existing or previously proposed sidewalk structures. At a minimum, the present bus stop shelters inventory will be maintained and enhanced through the addition of newly designed shelters. The proposed RFP expresses a preference for the replacement of the existing shelter inventory with the new designs. Existing sidewalk newsstands will be replaced at their current locations if such locations comply with the Siting Criteria. Complying locations will be found for other newsstands.
>
> The goal of this proposal is to provide well maintained attractive street furniture that offers increased public amenities and reduce clutter on City sidewalks. The proposed RFP seeks designs

---

[2] The public service structures listed in the RFP included trash receptacles, multi-rack newsracks and information/computer kiosks that provide access to government or commercial activity.

for the different types of structures which will be aesthetically pleasing, will be unified in a city-wide coordinated design scheme....

....

[T]he Commission believes that implementation of the program will result in a significant improvement in the appearance and usability of the City's streets and will enhance the range and quality of public facilities thereon. The functional efficiency and appearance of existing street furniture items will improve as the current aging stock is replaced. The introduction of new amenities, most notably automatic public toilets, will bring to New Yorkers and visitors alike a much needed augmentation of the range of public amenities available to them. Grouping several major types of street furniture together in one program with a single franchisee under the direction of a single City agency offers the potential for a more coordinated and rational distribution of these facilities, both across the City as a whole and within a district or neighborhood.

Exhibit KK at pp. 6, 24.

16. Additionally, the Commission, in response to concerns about advertising on street furniture structures, among other things, reduced the maximum square footage of advertising permitted, and limited advertising on Public Service Structures to litter or recycling bins. Id at 28. Due to these changes, among others, the Commission found that it had "significantly reduced the total amount of advertising on Franchise Structures." Id at 36. However, the Commission acknowledged that in order to succeed, "the franchise requires a substantial capital investment necessitating a sufficiently longer term to ensure an adequate financial return to the Franchisee. This is particularly the case, if the franchise is to yield durable street furniture of high design quality." Id at 37.

17. Pursuant to the resulting RFP, the City of New York was to enter into a twenty-year contract with a single company to rebuild 3,300 to 3500 bus stop shelters, 430 to

500 newsstands, as well as to construct 30 to 100 automatic public toilets. The company would create new designs for the structurescompliant with the Americans with Disabilities Act ("ADA"), pay to construct them, perform routine maintenance, and in return, be allowed to sell advertising space on the structures. The RFP contemplated that the City would receive a share of the gross revenue generated by such advertising. See Exhibit GG.

18. Under the 1997 RFP, the proposed street furniture had to comply with over thirty general siting criteria. Among other things, street furniture was to be installed so as to allow a straight unobstructed path for pedestrians on the sidewalk, and "not to interfere with pedestrian or motorist sight-lines necessary for traffic safety." Exhibit GG. Additionally, the street furniture could not be installed within,

> i)  Fifteen feet..., from: bus stop shelters; automatic public toilets; newsstands; computer information kiosks; enclosed or unenclosed sidewalk cafes; subway entrances or exits.
>
> ii)  Ten feet from: Fire hydrants; standpipes; Siamese connections; driveways...; building lines extended at the intersection of two streets...
>
> iii)  Five feet from: The trunk of any tree; canopies; information kiosks
>
> iv)  Three feet from: Street lights and traffic sign poles.
>
> v)  Two feet from: Ventilation or other grills; manholes; access plates; street signs; parking meters; fixed litter baskets; tree pits; valve boxes; telephones; cellar doors; mailboxes.
>
> vi)  One and one-half feet from the curb of any street, except for Bus Stop Shelters.

See Exhibit GG at Appendix 3.

19. Additional siting criteria were also established according to the type of street furniture. Id.

20. Further, advertising panels were to be located so not to obstruct the visibility of adjacent buildings or the interior of bus stop shelters. Additionally, advertising panels had to be placed so as "not to interfere with pedestrian or motorist sight-lines necessary for traffic safety." See Exhibit GG at 11. The RFP also provided maximum size and height requirements for advertising on street furniture. See Id at Appendix 2.

21. Thereafter, due to the City's decision not to proceed with the awarding of a contract, the CSFF was not completed.

### 2) 2004 CSFF RFP

22. In 2003, DOT, still interested in improving the aesthetics of the City's streetscape, elected to revive the CSFF proposal. DOT realized that budgetary constraints, especially after the events of September 11, would not permit the Department to undertake a large streetscape initiative with public finds. As such, DOT considered methods under which it could utilize the DOT's available assets to effectuate the program, and to ensure that the street furniture would be properly maintained in the future.

23. DOT determined that the installation and maintenance of street furniture could be realized by following the framework set out in the 1997 CSFF RFP. By allowing a private company to generate revenue by selling a limited amount of advertising space on the structures DOT could fund a citywide streetscape program.[3]

---

[3] DOT decided to follow the approach towards newsstands set forth in the 1997 RFP, which proposed to permit advertising on newsstands for the first time in order to fund the replacement of the newsstands. See Exhibit KK. DOT believed the placement of advertisements would generate the necessary revenue to pay for the cost of newsstand replacement and maintenance. The newsstands on the City streets were built over many years on an ad hoc basis by various

24. On August 19, 2003, the City Council issued a resolution authorizing DOT to grant a non-exclusive franchise to install, operate and maintain bus stop shelters, newsstands, APTs, and public service structures. See Exhibit HH.

25. The Resolution provided that the franchisee would own these structures during the term of the contract and be allowed to sell a limited amount of advertising space on the structures, the revenues from which would be shared with the City of New York.

26. In developing an RFP for the revived proposal, DOT was mandated by the Council's Resolution to develop and set forth siting criteria for the CSFF to address the following:

   1.    adequate sidewalk clearance to assure reasonable pedestrian flow;

   2.    proximity to other street furniture, sidewalk obstructions, and franchise structures;

   3.    permitted uses on adjacent zoning lots;

   4.    visual impact on vehicular traffic;

   5.    impact on designated landmarks and historic districts;

   6.    proximity to required water, sewer, and electrical connections; and

---

operators, and had fallen into various states of disrepair either due to operators' inability or unwillingness to maintain them. As it costs approximately $25,000 to build and install a newsstand, in addition to any design and maintenance costs, and DOT did not believe newsstand operators could afford such, nor be required to finance renovation and upkeep, DOT decided to recommend allowing limited advertising on the newsstands to effectuate their replacement. See Exhibit II at Appendix B. DOT believed that the overall aesthetic benefit of the new newsstand would outweigh any possible negative effect posed by the advertising, which would represent less than a nine percent increase in advertising on City streets. As set forth in the 1996 ULURP, the City Planning Commission approved DOT's recommendation with slight modifications. See Exhibit KK. Thereafter, as part of Local Law 64, the City Council amended Administrative Code 20-231(i) to read "No advertising shall be placed on any newsstand other than exterior advertising placed by a franchisee."

7.  relative locations of curb cuts.

See Exhibit HH.

27. DOT was also mandated to develop design criteria for the franchise structures to be included in the RFP to address, among other things, "the maximum number and area of the advertising panels on each type of franchise structure." Id.

28. Pursuant to that mandate, DOT generated a proposed CSFF RFP. Under the proposed RFP, the City of New York was to enter into a twenty-year contract with a single company to rebuild 3,300 to 3,500 bus stop shelters, 330 newsstand,[4] as well as to construct 20 APTs. The proposed RFP largely incorporated provisions previously approved through ULURP in 1996, and the siting and clearance criteria met the requirements set forth by the City Council. See October 3, 2003 and March 19, 2004 Memorandums from then DOT General Counsel Philip Damashek, copies of which are provided herewith as Exhibits MM and NN.

29. The 1997 RFP provisions, utilized by DOT in formulating the 2004 RFP, contained siting and clearance criteria which, among other things, (1) ensured adequate sidewalk clearance so as to assure reasonable pedestrian flow, (2) provided extensive minimum distances between street furniture, sidewalk obstructions, and other franchise structures, (3) permitted uses on adjacent zoning lots, (4) limited the visual impact street furniture structures on vehicular traffic, (5) took into account the placement of street furniture structures near landmarks, in historic districts, and relative to curb cut locations, and (6) provided ample placement criteria for the placement of street furniture structures in relation to water, sewer, and electrical connections. As the siting and clearance criteria in the 1997 RFP satisfied all of the requirements set forth by

---

[4] In order to address First Amendment concerns, DOT retained the sole discretion to install additional newsstand which were to be installed in the event an individual applied for, and was granted, a newsstand license at any time during the twenty-year life of the franchise term.

the City Council in the 1995 Resolution, and were carefully developed and vetted, the DOT determined that adopting new siting and clearance criteria would serve no purpose.   Any new criteria did not differ substantially from those set forth in the 1997 RFP, and undertaking the development of a new set of criteria would unnecessarily delay implementing the CSFF, and thus the improvement of the Streetscape, from which all New Yorkers would benefit.

  30. On March 19, 2004, the Department of City Planning determined that a new ULURP was not mandated for the 2004 RFP since the new CSFF "would not present any new land use impacts or implications."[5]   See October 8, 2003 and March 19, 2004 DCP letters from David Karnovsky, copies of which is provided herewith as Exhibit OO.  Indeed, the differences, as far as the land use impacts between the 1997 and 2004 CSFF RFPs are minimal.  This is largely because the siting and clearance criteria in the 2004 RFP are largely identical to those which were reviewed pursuant to ULURP in 1996 and embodied in the 1997 RFP.

  31. The number of street furniture structures to be installed under the new RFP decreased from the 1997 RFP.  Specifically, while the number of bus stop shelters remained consistent, the number of newsstands to be installed decreased from 430 to 330,[6] and the number of APTs decreased from a maximum of 100 to 20.[7]  Further, the design standards and the maximum size and height of the street furniture remained the same in the 2004 RFP as they were

---

[5] While City Planning determined a ULURP review was not necessary, DOT made efforts to speak to Community Boards, community leaders, and borough representatives in order to inform them of and obtain their input about the proposed CSFF.

[6] The 330 figure reflected the number of existing stands at time of the RFP, and thus maintained the status quo.  As of January 2008, the number of newsstands had decreased to 270.  Thus, only 270 newsstands were to be installed under the CSFF.  See January 2008 Newsstand List, a copy of which is provided herewith as Exhibit PP.

[7] During the same period PPTs had decreased from approximately 35,000 PPTs in 1996 to approximately 29,000 PPTs in 2004.  See Shor Dec. at ¶ 37.

in the 1997 RFP, with the exception that pillar newsstands, which could be taller than regular newsstands and bear advertising, were eliminated and newsracks, which could not bear advertising, were added to the 2004 RFP. See Exhibits GG and JJ. RFPs

32. The extensive siting criteria, which imposed over 30 minimum distance requirements for street furniture structures, also remained the same, with the exception of newsstand siting criteria which were altered due to an amendment of the Admin. Code in relation to the installation and maintenance of newsstands. See Exhibit JJ at Appendix 3. Newsstands were required to comply with siting criteria set forth under Admin. Code § 20-228 et seq., and 6 RCNY § 2-68. The new siting criteria are as restrictive as those reviewed under the 1997 ULURP, and in some cases, are more restrictive. See Exhibits MM and NN.

33. Advertising requirements remained the same in the 2004 RFP as under the 1997 RFP. Under the 2004 RFP, as with the 1997 RFP, advertising panels were to be located so as to minimize their impact on the visibility of adjacent buildings, and so as "not to interfere with pedestrian or motorist sight-lines necessary for traffic safety." See Exhibit GG at p. 8, and Exhibit JJ at p. 9. Additionally, the maximum size and height of advertising on street furniture remained the same in the 2004 RFP as they were in the 1997 RFP, with the exception that pillar newsstands which could bear advertising were eliminated and multi-rack news racks, which would not bear advertising, were added.[8] See Exhibits GG and JJ at Appendix 2.

34. On March 26, 2004, DOT issued the 2004 RFP.

_____

[8] With regard to the placement of advertising, the maximum advertising area is: 55 square feet on bus stop shelters; and 82.5 square feet on newsstands and APTs. The maximum height for advertising is: 7 feet on bus stop shelters; 12 feet on newsstands; 9 feet on APTs; and 12 feet on automatic public toilet pillars. The maximum height of newsstands was decreased to 9 feet during the contract negotiations. See Exhibit JJ at Appendix 2.

35. Under the RFP, all applicants provided detailed plans pertaining to design, manufacture, installation, maintenance, and operation of each type of street furniture structure. During the evaluation process, the City carefully considered the aesthetics, functionality, and adaptability of the proposed street furniture to various environments in the City of New York. See Exhibit JJ.

36. In September 2005, the City invited Cemusa to negotiate a franchise agreement.

## C. Cemusa Agreement

37. On or about May 19, 2006, the City entered into a 20-year contract with Cemusa by which it is the franchisee for the CSFF.[9]  Under the agreement, Cemusa has undertaken the design, construction, installation, and maintenance of street furniture, including newsstands, bus stop shelters, self-cleaning APTs, and other public service structures.   The Agreement incorporated the terms set forth in the 2004 RFP.

### 1) Siting Requirements

38. Under the Agreement, Cemusa will replace existing bus stop shelters and newsstands.  Existing bus stop shelters that do not comply with the extensive siting criteria set forth in the RFP will be relocated, as will newsstands that do not comply with the applicable regulations set forth in Admin. Code §20-228 et seq., and 6 RCNY § 2-68.  The overall street furniture design and placement of new  structures is subject to review and approval by the Art Commission. See Exhibit JJ and exhibit II at 2.44, 2.45.

---

[9] The Borough Presidents' Offices and FCRC unanimously approved the Agreement.  The FCRC is comprised of six members - two appointees representing the Mayor, one representing the Law Department, one representing the Office of Management and Budget (OMB), one representing the Comptroller, and one representative from each of the five Borough Presidents, who as a group cast one vote in accord with the location of the franchise or concession at issue.

39. Additionally, pursuant to the Agreement, Cemusa will construct up to 20 APTs, as well as up to 400 additional bus stop shelters. These structures will be installed in compliance with the extensive siting criteria set forth in the RFP. The APTs will be located at sites selected by DOT, and approved by the Mayor and the Speaker of the Council.[10] The new bus stop shelters will be placed at locations determined by DOT.[11]

40. The size of the street furniture will be determined based on the site location. In accordance with the Agreement, bus stop shelters will be available in four sizes: regular, narrow, short and double, and newsstands will be available in nine sizes, including widths of four, five, and six feet and lengths of eight, ten, and twelve feet.

41. In order to ensure Cemusa complies with the siting criteria, DOT reviews Cemusa's site plans and inspects the site location prior to the installation of street furniture structures.

**2) Advertising**

42. In consideration for Cemusa's placement of street furniture and payment of Franchise fees, DOT granted Cemusa the right to sell and place advertising on the street furniture, subject to restrictions. DOT believed that if the City did not grant the right to sell and place advertising on the street furniture, private companies would not have taken on the task of designing, installing, and maintaining the new street furniture.

43. Under the Agreement, advertising is permitted on bus stop shelters, newsstands, and APTs outside of parks. Advertising is not permitted on public service structures

---

[10] In choosing new locations, DOT has solicited proposals from Council Members, Borough Presidents, Community Boards, Business Improvement Districts, and private citizens.

[11] In choosing new locations, DOT has solicited proposals from Council Members, Borough Presidents, Community Boards, Business Improvement Districts, the MTA (for bus stop shelters only), and private citizens.

except that the name or logo of a sponsoring entity is permitted on the exterior of trash receptacles and information/computer kiosks. See Exhibit II at Section 4.3.1.

44. Pursuant to the Agreement, advertising on bus stop shelters is limited to the two end panels, and to the exterior of newsstands and public toilets. The advertisements are further limited by area and height. The maximum advertising area is limited to: 55 square feet on bus stop shelters; 82.5 square feet on newsstands and APTs. The maximum height for advertising is: seven feet on bus stop shelters; nine feet on newsstands, and nine feet on APTs. See Exhibit II at Section 4.3.1, and Appendix D

45. In preparing presentations for, among others, Community Boards, I estimated that the CSFF would result in only a nine percent increase in advertisements on City Streets. This figure took into account a placement of all 330 newsstands called for under the Agreement. As the number of newsstands has decreased to approximately 270, the percentage of advertising increase has decreased to approximately 8%.

46. As recognized by the 1996 ULURP, the improvement in aesthetics resulting from the new street furniture structures outweighs any potential increase in visual clutter arising from the advertisements. Thereby, resulting in a net improvement to the City Streetscape.

**a. Electronic Media**

47. Pursuant to the Agreement, electronic media is permitted on a case-by-case basis, except for (1) backlighting of printed posters which is permitted unless barred by Landmarks regulations, and (2) placement of up to 250 scrollers on street furniture structures. See Exhibit II at 4.4.2.

48. As early as September 2006, Cemusa sought DOT approval to install electronic media on bus stop shelters. Specifically, on September 1, 2006, Cemusa, citing that

electronic media would increase revenue to the City, requested permission to install interactive advertisements with SMS Technology. As DOT's primary concern under CSFF was ensuring the replacement of the outdated street furniture, thus improving the City Streetscape, DOT denied Cemusa's request.

49. Thereafter, Cemusa made several informal requests to DOT to install electronic media on bus stop shelters, but these requests were denied.

50. On March 12, 2007, DOT, approved a request from Cemusa to place LCD screens and Bluetooth casting[12] technology for one year. DOT approved the program as it was interested in the potential benefit of the electronic media, such as broadcasting (1) public announcements, and (2) information to the public in times of emergencies. As DOT was less concerned with the revenue increase suggested by Cemusa as a basis for approving the request, it limited the test to ten bus stop shelters. DOT also limited the Bluetooth radius to a fifteen-foot radius around the shelters.[13]    Additionally, in order to evaluate the program, DOT determined that upon completion of the pilot, it would compare pre- and post-installation traffic accident reports, and conduct public opinion surveys.

**b. City Advertising**

51. A minimum of 2.5% of the total advertising panels on franchise structures is set aside for public service advertisements, at no cost to the City of New York. In addition, 20% of the advertising space on all of the franchise structures is reserved for use by the City of New York and its marketing partners, at no cost to the City of New York or its marketing partners.

---

[12] Bluetooth enables devices to communicate with each other when they are in range of each other.

[13] After the electronic media was installed, DOT inspected the sites to ensure compliance. DOT limited the bluetooth radius to fifteen feet as it wanted to test the effects of the technology before allowing it to go beyond the immediate radius of bus stop shelters.

05/12/2008 13:20 FAX 914 478 2225          THE OFFICE INK          ☒002

See Exhibit II at Sections 4.4.4, 4.4.5.  Additionally, Cemusa is posting advertisements for the City on Cemusa Structures internationally at no cost to the City.

52. The benefits to the City under the CSFF are numerous: (1) the City will benefit from extensive private investment to upgrade the existing street furniture inventory, which presently consists of approximately 3,400 structures; (2) City residents and visitors will enjoy enhanced and distinctive structures including new amenities such as APTs; and (3) the street furniture structures are cleaned and maintained by Cemusa at its expense for the life of the Agreement.  In addition, while it was not the goal of initiating the CSFF, the City will receive guaranteed revenue as a result of the CSFF, and significant opportunities to advertise and promote the City and its interests in New York and around the world.

Dated:          New York, New York
                May 12, 2008

                                        _____
                                        KERRY GOULD-SCHMIT