Exhibit C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x
CLEAR CHANNEL OUTDOOR, INC.,

                                                    Plaintiff,

                    -against-

THE CITY OF NEW YORK and PATRICIA J.            06-CV-8193 (PAC) (DCF)
LANCASTER, in her official capacity as Commissioner of
the New York City Department of Buildings

                                                    Defendants.
------------------------------------------------------------------ x
------------------------------------------------------------------ x
ATLANTIC OUTDOOR ADVERTISING, INC., SCENIC
OUTDOOR, INC., TROYSTAR CITY OUTDOOR LLC,
and WILLOW MEDIA, LLC.,

                                                    Plaintiffs,

                    -against-                      06-CV-8219 (PAC) (DCF)

CITY OF NEW YORK, PATRICIA J. LANCASTER, and
EDWARD FORTIER

                                                    Defendants.
------------------------------------------------------------------ x

**REPLY DECLARATI ON OF KERRY GOULD-SCHMIT IN FURTHER SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**KERRY GOULD-SCHMIT**, declares pursuant to 28 U.S.C. §1746, under

penalty of perjury, as follows:

1. I was employed by the New York City Department of Transportation

("DOT") between August 2001 and September 29, 2007. Commencing in May 2006, I was the

Assistant Commissioner for the Coordinated Street Furniture Franchise ("CSFF"). Prior to

holding that position, I was the DOT Project Manager for the CSFF, a position which I started in

October 2002.  I am fully familiar with all aspects of the street furniture program, including, but not limited to, the legislative history of Local Law 64 and the technical components in the Request for Proposals ("RFP") issued by DOT on March 26, 2004, the terms in the CSFF Agreement, which was entered into with the City of New York's ("City") franchisee Cemusa, and the installation of street furniture under the Agreement.

2.  I submit this declaration in further support of Defendants' motion for summary judgment, and in opposition to Plaintiffs' motion for summary judgment.

3.  This declaration is based on my personal knowledge, as well as my review of records maintained by, and information obtained from, DOT and other city government agencies during my time of employment with the City and from statements made to me by officers or agents of the City.

## A. Goals of Coordinated Street Furniture Franchise

4.  In their motion for summary judgment, Plaintiffs seem to suggest that DOT's main goal in initiating the CSFF was to generate revenue by allowing advertising on street furniture, and that the City is now disingenuously trying to deny this fact.  This is not the case. DOT's goals in initiating the CSFF in 2003, as further detailed in my May 12, 2008 Declaration, were to enhance the City's streetscape by providing well-maintained attractive coordinated street furniture, increasing public amenities and, at the same time, reducing clutter on City sidewalks.

5.  DOT's main goal is reflected in the relevant authorizing legislation.  In 1996 and 2004, the City Council in authorizing RFPs for the CSFF found that the "the granting of such franchises will be in the public interest by enhancing the health, welfare, convenience, and safety of the public."  See Exhibits LL and HH.

- 2 -

6.  This sentiment was also expressed by the City Planning Commission when it approved the 1997 CSFF RFP.  As I set forth in my May 12, 2008 Declaration, the City Planning Commission stated the benefits of the CSFF as follows:

> Most of the franchise structures will replace and improve the existing or previously proposed sidewalk structures.  At a minimum, the present bus stop shelters inventory will be maintained and enhanced through the addition of newly designed shelters.  The proposed RFP expresses a preference for the replacement of the existing shelter inventory with the new designs.  Existing sidewalk newsstands will be replaced at their current locations if such locations comply with the Siting Criteria.  Complying locations will be found for other newsstands.

> The goal of this proposal is to provide well maintained attractive street furniture that offers increased public amenities and reduce clutter on City sidewalks.  The proposed RFP seeks designs for the different types of structures which will be aesthetically pleasing, will be unified in a city-wide coordinated design scheme....

> ....

> [T]he Commission believes that implementation of the program will result in a significant improvement in the appearance and usability of the City's streets and will enhance the range and quality of public facilities thereon.  The functional efficiency and appearance of existing street furniture items will improve as the current aging stock is replaced.  The introduction of new amenities, most notably automatic public toilets, will bring to New Yorkers and visitors alike a much needed augmentation of the range of public amenities available to them.  Grouping several major types of street furniture together in one program with a single franchisee under the direction of a single City agency offers the potential for a more coordinated and rational distribution of these facilities, both across the City as a whole and within a district or neighborhood.

<u>See</u> Exhibit KK at pp. 6, 24.

**B. CSFF RFP Proposal**

7.  In order to generate the necessary funding for the CSFF, the City Council authorized DOT to allow the franchisee to sell limited advertising on certain street furniture structures, i.e., bus stop shelters, newsstands, and automatic public toilets, in exchange for designing, constructing, installing and operating, and maintaining the street furniture structures.

8.  In order to obtain the CSFF, companies were required to submit a proposal to DOT.  The 2004 RFP set forth explicit instructions as to the form, organization and content of the proposal to be submitted in response to the RFP.

9.  In addition to business entity and principal questionnaires, (i.e., VENDEX), and other required documents that were annexed as addenda to the RFP, the proposal contained several parts for the proposers to complete.  One part of the proposal consisted of a statement of the proposer's qualifications including a narrative of relevant experience, references from clients, organizational chart listing the members of the project "team," and the proposer's audited financial statements. Another part of the proposal consisted of a "technical proposal" describing the design, construction, maintenance and operation of each street furniture structure.  In addition, to satisfy this requirement, proposers had to submit drawings of the basic designs as well as scale models.  Proposals also were required to contain a cash flow analysis itemizing the revenues and expenses anticipated over the term of the franchise.  Additionally, as part of the proposal , proposers were required to submit a "compensation proposal" which consisted of both a guaranteed minimum annual amount paid to the City and  a percentage of any gross revenues derived by the franchisee that would be shared.  The RFP stipulated the City was entitled to whichever was greater. <u>See</u> Exhibit JJ, Section III.

10. While DOT has never been opposed to generating revenue, the market proved more favorable than DOT expected, and it was pleasantly surprised by the compensation proposals received during the RFP process as they far exceeded the anticipated income.

11. Once it became apparent that companies were willing to pay a significant amount for the right to advertise on CSFF structures, DOT naturally sought to properly manage its resources and generate the maximum revenue possible. This was not done however, at the expense of DOT's goal for initiating the CSFF. Indeed, as its goal in initiating the CSFF was improving the City's Streetscape, DOT would have pursued the CSFF regardless of how much revenue was generated.

## C. Cemusa's Compensation Proposal

12. Clear Channel also seems to suggest that Cemusa's compensation proposal was the only reason it was awarded the CSFF. Cemusa was not awarded the CSFF solely based upon its compensation proposal. Rather, Cemusa was awarded the CSFF based on the strength of its proposal as a whole.

13. In accordance with the RFP, the Evaluation Committee[1] conducted an initial review of the five submitted proposals and a Best and Final Offer ("BAFO") review of the top three ranked proposals.

14. The Evaluation Committee evaluated the initial and BAFO proposals through a four phase process. The first phase was reviewed on a pass/fail basis, and the other phases

---

[1] The Evaluation Committee consisted of seven members from the following City agencies and entities: two from DOT, and one each from the Departments of Consumer Affairs, City Planning, Design and Construction, Parks and Recreation and the New York City Economic Development Corporation. In accordance with the provisions of the RFP, DOT submitted all of the proposals to the Evaluation Committee for assessment. As contemplated by the RFP, the Evaluation Committee was assisted in its review of proposals by various Technical Advisors, which included a Design Advisory Committee, and a Compensation Advisory Committee.

were reviewed on a point scale which provided for a maximum point total of 145 per committee member, with points assigned as follows:

| Phase I – Responsiveness Determination | Pass/Fail |
|---|---|
| Phase II – Assessment of Proposer's Ability to Provide Required Services | 25 |
| Phase III – Assessment of Technical Proposals | 60 |
| Phase IV – Assessment of the Compensation Proposal | 55 |
| Preference Points | 5 |

See Exhibit JJ, Section III.[2]

15. During the initial review, before a proposer could advance to Phases III and IV in the scoring process, they had to receive a minimum number of points during Phase II. As such, if a proposer failed to receive the requisite number of points in Phase II, its technical and compensation proposals, regardless of its strength, would not have been reviewed. Cemusa, which ultimately was awarded the CSFF, met the requisite criteria during Phase II. In doing so, Cemusa demonstrated its ability to provide the required services. Having satisfied this step, Cemusa's technical and compensation proposals became eligible for review.

---

[2] Under Phase III, a total of 4 Preference Points were to be awarded to those meeting certain additional criteria pertaining to domestic manufacture and assembly of Street Furniture. Two preference points were to be awarded for proposals under which 80% or more of the money for labor and materials in manufacturing and assembling the Franchise Structures will be spent in the United States. Two additional preference points were to be awarded for proposals under which 50% or more of the money for labor and materials in manufacturing and assembling the Franchise Structures will be spent within the City of New York. In Phase IV, 1 Preference Point was awarded for proposals that provided a greater compensation to the City in the initial period of the agreement (provided that the total proposed compensation over the term of the franchise is determined to be in the best financial interest of the City).

16. Moreover, as evidenced by both the initial and BAFO point totals, Cemusa was awarded the CSFF based on its overall BAFO score, not just its compensation proposal. In fact, had Cemusa not scored sufficiently in all the required phases of the RFP process, or if Cemusa had received fewer preference points, its compensation proposal alone would not have been sufficient to result in it being awarded the CSFF.

17. The following chart shows the final scores achieved by the three BAFO participants:

| Company | BAFO Phase II<br><br>Proposer's Ability to Provide Required Services<br><br>maximum points 175 | BAFO Phase III<br><br>Technical Proposals<br><br>maximum points 420 | BAFO Phase IV<br><br>Compensation Proposal<br><br>maximum points 385 | BAFO Preference points<br><br>maximum points 35 | BAFO Overall<br><br>maximum points 1015 |
|---|---|---|---|---|---|
| Cemusa | 154.25 | 336.5 | 384 | 35 | 909.75 |
| NBCDecaux | 168 | 384 | 303.5 | 35 | 890.5 |
| Van Wagner | 129 | 379 | 258.5 | 28 | 795.5 |

A copy of the DOT CSFF FCRC Application Recommendation for Award of Franchise is provided as Exhibit VVV.  As reflected by the chart, if Cemusa had scored a total of 20 points lower in Phases II, III or received fewer preference points, it would not have been awarded the CSFF regardless of its compensation proposal.

**D. The Design Advisory Committee**

18. In support of its allegation that Cemusa was awarded the CSFF solely because of its compensation proposal, Plaintiffs further argue that the Design Advisory Committee did not approve of Cemusa's design, thus proving that DOT was concerned more with compensation than aesthetics. Plaintiffs are incorrect.

19. The Design Advisory Committee's role was to review the design proposals received as part of the RFP submissions and issue a recommendation to the Evaluation Committee during the initial review of the proposals.[3] The recommendation was advisory and was not binding on the Evaluation Committee. See Exhibit JJ, Section III.

20. The Design Advisory Committee met several times as a group, and at least two of the committee's representatives attended the five proposers' design presentations along with the members of the Evaluation Committee.

21. At the design presentation for Cemusa, Cemusa presented multiple design options from multiple designers, and stated that it would build as many of the designs as DOT desired.

22.

Redacted pursuant to the April 5, 2007 Order

of the Honorable Paul A. Crotty

---

[3]The Design Advisory Committee was comprised of architects, and landscape architects from outside city service, an industrial designer representing the Business Improvement Districts and representatives from the Art Commission, Landmarks Preservation Commission and Municipal Arts Society. Exhibit WWW.

the designs were unappealing. Indeed, the Design Advisory Committee informed DOT that it liked the Grimshaw Architect ("Grimshaw") designs. A copy of the Design Advisory Committee's final recommendation is provided as Exhibit WWW.

23. Taking the Design Advisory Committee's non-binding recommendation into consideration, the Evaluation Committee asked Cemusa to only submit designs from Grimshaw with its BAFO proposal. A copy of the June 6, 2005 DOT Best and Final Offer letter to Cemusa is provided as Exhibit XXX. Cemusa did so. Thereafter, DOT awarded Cemusa the CSFF selecting one of the proposed Grimshaw design lines. Cemusa, in connection with DOT, refined the design line and submitted it to the Art Commission, pursuant to the RFP, which further refined the Grimshaw design line. Copies of the Art Commission approvals for the street furniture structures are provided as Exhibit YYY.

24. Notably, the Art Commission awarded Grimshaw the prestigious Excellence in Design Award for the design of the street furniture in 2007.[4]

25. Thus, Plaintiffs are incorrect that DOT sacrificed aesthetics for revenue in awarding Cemusa the CSFF. Moreover, the Cemusa street furniture designs are unquestionably a marked improvement over the old structures.

**E. Electronic Media**

26. Contrary to Plaintiffs' assertions, DOT's treatment and approval of electronic media on street furniture did not stem from a desire to generate income. As set forth in my May 12, 2008 Declaration, as early as September 2006, Cemusa sought DOT approval to install electronic media on bus stop shelters. Despite Cemusa's claims that the proposed electronic

---

[4] Commencing in 1982, the Art Commission has recognized outstanding public projects with an Excellence in Design Award. The winning projects are selected by the Art Commission from hundreds of submissions and exemplify the highest design standards.

media would increase revenue to the City, DOT denied Cemusa's request to install electronic media because DOT's primary concern was to continue the replacement of the outdated street furniture, thereby improving the City's streetscape. Thereafter, Cemusa, continuing to cite increased revenues, made several informal requests to DOT to install electronic media on bus stop shelters, and these requests were also denied.

27. In March 2007, DOT approved a request from Cemusa to place LCD screens and Bluetooth casting[5] technology for one year as DOT was interested in the potential benefit of the electronic media, such as the broadcasting of (1) public announcements, and (2) information to the public in times of emergencies. DOT's approval of the electronic media pilot program was not motivated solely by a desire to increase revenue. Despite the increased revenue cited by Cemusa, DOT, not only limited the pilot to ten bus stop shelters, but also limited the Bluetooth radius to a fifteen-foot radius around the shelters, as its primary concern was ascertaining the effects of the electronic media, not generating revenue.

28. In order to evaluate the program, DOT determined that upon completion of the pilot, it would compare pre- and post-installation traffic accident reports, and conduct public opinion surveys. It is my understanding from conversations with DOT that Cemusa has stopped the use of Bluetooth, and that the LCD portion of the pilot has been extended through the end of 2008. Exhibit DDD. It is also my understanding that as part of the pilot program a before-and-after study of traffic accidents was conducted and the results are provided as Exhibit CCC.

29. Further, DOT did not permit the installation of scrollers purely for monetary gain if so DOT would not have limited their installation to 7% of the shelter inventory. As part of the CSFF Agreement, of the 3,500 bus stop shelters to be installed, DOT permitted Cemusa to

---

[5] Bluetooth enables devices to communicate with each other when they are in range of each other.

install 250 scrollers. DOT considered the installation of scrollers during the BAFO phase of the RFP process as all of the BAFO proposers included scrollers in their BAFO proposals. In reviewing scrollers, DOT first considered whether scrollers would have any negative impacts on the City's Streetscape, not whether they would generate additional income. In its review, DOT determined that the scrollers, which it understood to be an industry standard, did not pose any negative impacts, and should be permitted.

**F. Aesthetic and Traffic Considerations**

30. Plaintiffs also suggest that DOT failed to take into consideration aesthetics or traffic issues in entering into the CSFF. This allegation is in direct contradiction with the history of the CSFF. See May 12, 2008 Kerry Gould-Schmit Declaration at ¶¶ 10-44.

31. Among other things, the CSFF 1) was adopted to improve the City's Streetscape, 2) underwent ULURP review,[6] 3) is subject to over 30 siting criteria which were designed to, among other things, avoid visual clutter, allow unobstructed paths for pedestrians, and to not interfere with pedestrian or motor sight-lines necessary for traffic safety, and 4) resulted in the adoption of siting criteria tailored to each of the specific street furniture types.

32. Additionally, pursuant to the CSFF Agreement, the placement and size of the advertising is limited. Under the Agreement, advertising on bus stop shelters is limited to the two end panels, and to the exterior of newsstands and public toilets. The advertisements are further limited by area and height. The maximum advertising area is limited to: 55 square feet

---

[6] The ULURP review was conducted in 1996. Since the Department of City Planning determined that the new CSFF "would not present any new land use impacts on implications" a new ULURP review was not conducted. See Exhibit OO. This determination by City Planning was upheld in Uhlfelder v. Weinshall 47 A.D.3d 169 (1st Dep't 2007).

on bus stop shelters which is only 8 square feet more than what was previously allowed[7]; and 82.5 square feet on newsstands and APTs. The maximum height for advertising is: seven feet on bus stop shelters; nine feet on newsstands, and nine feet on APTs.[8]  See Exhibit II at Section 4.3.1, and Appendix D. Further, not only does the CSFF impose limitations on, among other things, the placement and size of the street furniture and advertisements, but the advertisements are integrated into the street furniture design.

## G. Plaintiffs CSFF photographs

33. The street furniture photographs submitted by Plaintiffs are so skewed that they do not accurately compare the old and new bus shelters. The photographs of the new bus shelter appears to have been taken from such a close proximity so as to make it appear larger, while the photograph of the old bus shelter appears to have been taken from a greater distance so as to make it appear smaller. Consequently, the photographs d not allow the viewer to make an accurate comparison of the old and new bus shelters.

Dated:       New York, New York
             July 28, 2008

                                        _Kerry Gould-Schmit_
                                        KERRY GOULD-SCHMIT

---

[7] The Cemusa Agreement permits a limited number of extra-large bus shelters which can be installed at heavily used bus stops.

[8] As set forth in my May 12, 2008 Declaration, advertising was permitted on newsstands in order to fund the replacement of the newsstands. See Exhibit KK. DOT anticipated the placement of advertisements would generate the necessary revenue to pay for the cost of newsstand replacement and the associated maintenance. DOT further determined that the overall aesthetic benefit of the new newsstand would outweigh any possible negative effect posed by the advertising, which would represent less than a nine percent increase in advertising on City streets. Plaintiffs allege that the advertising on newsstands are targeted to drivers since they cannot be seen by pedestrians since they are too close to the curb. Kovner Declaration at ¶ 62. Plaintiffs arc incorrect. These advertisements can be seen by pedestrians on the other side of the street, especially those waiting at the corner to cross the street.

Exhibit D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

CLEAR CHANNEL OUTDOOR, INC.,

                                        Plaintiff,

            -against-

THE CITY OF NEW YORK and PATRICIA J.                    06-CV-8193 (PAC) (DCF)
LANCASTER, in her official capacity as Commissioner of
the New York City Department of Buildings

                                        Defendants.
------------------------------------------------------------------------ x
------------------------------------------------------------------------ x
ATLANTIC OUTDOOR ADVERTISING, INC., SCENIC
OUTDOOR, INC., TROYSTAR CITY OUTDOOR LLC,
and WILLOW MEDIA, LLC.,

                                        Plaintiffs,

            -against-                                   06-CV-8219 (PAC) (DCF)

CITY OF NEW YORK, PATRICIA J. LANCASTER, and
EDWARD FORTIER

                                        Defendants.
------------------------------------------------------------------------ x


**DECLARATION OF STANLEY SHOR IN SUPPORT OF DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION
FOR A PRELIMINARY INJUNCTION**

            **STANLEY SHOR**, declares pursuant to 28 U.S.C. §1746, under penalty of

perjury, as follows:

            1.      I am the Assistant Commissioner for Franchise Administration of the

Department of Information Technology and Telecommunications of the City of New York

("DoITT").    Among other things, I am the official designated and authorized by the

Commissioner of DoITT to manage and oversee the administration of public pay telephone

("PPT") franchises and the payphone/advertising kiosks operated on and over the inalienable property of the City of New York ("City Sidewalks").

2.     I submit this declaration in support of defendants' motion for summary judgment and in opposition to plaintiffs' motion for a preliminary injunction.

3.     This declaration is based on my personal knowledge, as well as my review of records maintained by, and information obtained from, DoITT and other city government agencies and from statements made to me by officers or agents of the City of New York.

4.     DoITT is the agency of the City of New York (the "City") responsible for, among other things, the administration of telecommunications franchises in the City.  My responsibilities at DoITT include the administration of the PPT and mobile telecommunications franchises. As one of the managers of the City's sidewalks, DoITT is charged with allocating the location of PPTs in a manner that serves the best interests of the City by ensuring effective PPT service as one of the amenities offered to sidewalk pedestrians.

5.     As discussed in detail below, since the inception of advertisements on PPT enclosures, DoITT, and its predecessors, have addressed the aesthetic and traffic safety concerns associated with PPT advertisements by regulating, among other things, the siting of PPTs.

**A. PPTs prior to Advertising**

6.     In 1959, Local Law 78 of 1959 was enacted.  Local Law 78, formerly Section 19-128 of the New York City Administrative Code ("Admin. Code"), made it unlawful to install or maintain a "public telephone booth" on City Sidewalks without a license.  Licenses were initially issued by the borough presidents.  Later, that function was transferred to the City agency later known as the New York City Department of Transportation ("DOT").  See DoITT Report on Amendments to Department Rules, Title 67 of the Rules of the City of New York,

- 2 -

Section 6-06, Section 6-32 and Section 6-38, dated October 5, 2004, a copy of which is provided herewith as Exhibit QQ.

7.      As of 1984, the New York Telephone Company ("NYT"), then part of the AT&T Bell System, was the exclusive PPT operator in the City.  In or about 1984, the AT&T Bell System was broken up into several constituents.  Id.

8.      Thereafter, a number of companies began installing Customer-Owned Coin Operated Telephones ("COCOTs") in the City without obtaining licenses.  Many of the COCOTs were "poorly maintained, unsafe, unclean, and covered with graffiti."  See excepts from EAS and Negative Declaration for CEQR No. 96 DoITT 001Y, dated May 3, 1996 at Attachment 1 at p. 6., a copy of which is provided herewith as Exhibit RR.

**B. NYC and NYT Advertising Panel Franchise Agreements**

9.      In the mid-1980's, NYT began placing advertisements on its PPT enclosures.  The City, recognizing the need for PPTs, but concerned with the potential affects of such advertisements if unregulated, permitted NYT to place advertisements pursuant to an Advertising Panel Franchise Agreement.  See Advertising Panel Franchise Agreement, dated March 3, 1988, a copy of which is provided herewith as Exhibit SS.

10.     The Agreement, dated March 3, 1988, provided size and siting criteria for PPT advertisements.  Pursuant to the Agreement, advertisements could not be larger than 27" x 57" (i.e., approximately 10 ½ square feet) and could not be placed in residential zones, or in historic districts which were not located in areas zoned for commercial use unless the Bureau of Franchises, in consultation with the Landmarks Preservation Commission, gave its approval. Additionally, within Manhattan, advertisements could not be placed on PPT enclosures which were on the same side of an Avenue block where a bus stop shelter was located.  In all other

areas of Manhattan, as well as in Brooklyn, Bronx, Queens and Staten Island, advertisements could not be placed on PPT enclosures within 150 feet of a bus stop shelter. In the event a bus stop shelter was placed within an impermissible distance of an existing PPT enclosure bearing advertising, the advertisement on the PPT enclosure had to be removed. The Agreement also provided maintenance requirements for the advertising displays, including that they had to be maintained in a clean and attractive condition. See Exhibit SS at Sections 1.1, 1.2, 1.3, 4.1, 4.3.

11.    Additionally, under the Agreement, NYT was obligated to effectuate a program for the installation of additional PPTs in the City with an emphasis on "economically deprived areas." Id at Section 1.4.

12.    On July 1, 1993, the Department of Telecommunications and Energy ("DTE")[1] extended the Franchise Agreement with NYT. The 1993 Agreement, as with the 1988 Agreement, provided size and siting criteria for advertisements. Pursuant to the Agreement, advertisements could not be larger than 27" x 57", except in installations of more than two PPTs the width could be up to 120", and could not be placed in residential zones, or in historic districts which were not located in areas zoned for commercial use unless the DTE, in consultation with the Landmarks Preservation Commission, gave its approval. Additionally, within Manhattan, advertisements could not be placed on PPT enclosures which were on the same side of an Avenue block on which a bus stop shelter was located, unless the PPT enclosure was located around the corner or across the street from the shelter. In all other areas of Manhattan, as well as in Brooklyn, Bronx, Queens and Staten Island, advertisements could not be placed within 150

---

[1] By Executive Order 44, dated December 3, 1992, the mayor designated the DTE as the responsible agency for the granting of telecommunications franchises.

feet of a bus stop shelter.[2]  In the event a bus stop shelter was placed within an impermissible distance of an existing PPT enclosure bearing advertising, the advertisement on the PPT enclosure had to be removed.  The Agreement also provided maintenance requirements for the advertising displays, including that they had to be maintained in a clean and attractive condition.[3] See Advertising Panel Franchise Agreement, dated July 1, 1993, at Sections 2.1, 2.2, 2.3, 2.4, 5.1, 5.3, a copy of which is provided herewith as Exhibit TT.

**C. Regulation of PPTs**

13.    On August 17, 1995, based on the need for reliable and accessible PPT service on the streets for the City,[4] the City Council adopted Resolution No. 439-A authorizing DoITT to solicit proposals for PPT franchises.[5]  As part of the RFP process, DoITT was required to adopt siting and clearance criteria to be utilized by DoITT in approving the placement of PPTs.  In formulating the siting and clearance criteria, DoITT took into consideration, among other things, (1) visual impacts, if any, on vehicular traffic, (2) proximity to other existing structures, including, bus stop shelters, fire hydrants, traffic lights, traffic signs, newsstands, and curb cuts, (3) the proximity of PPTs to each other, (4) adequate sidewalk clearance to assure reasonable pedestrian flow, and (5) impacts, if any, on designated landmark sites or designated

---

[2] In Brooklyn, Bronx, Queens and Staten Island, NYT was permitted to place public service messages on PPT enclosures if it did not charge a fee for the placement.  See Exhibit TT.

[3] DoITT has interpreted Avenues to include streets that actually contain the designation Avenue, e.g., 1st Avenue, Park Avenue.  Avenues have not been interpreted to include streets such as Broadway.

[4] A November 1993 DTE study showed that more than 200,000 City residents did not have telephone service in their homes.  See Exhibit RR at Attachment 1, p. 7.

[5] Resolution No. 439-A was subsequently amended on March 25, 1997 by Resolution, No. 2248. The only thing that changed in the new Resolution was the term of the proposed Agreement.

historic districts. See Resolution No. 439-A, a copy of which is provided herewith as Exhibit UU, and Resolution, No. 2248, a copy of which is provided herewith as Exhibit VV.

14.    Concurrently, the City Council adopted Local Law 68 of 1995 ("Local Law 68"), which provided COCOT operators an opportunity to legalize COCOTs[6] so as to ensure reliable and accessible telephone service to City residents while "address[ing] the issues of public health and safety, street congestion, unsightly and illegal advertising, graffiti, and public nuisance issued surrounding COCOTs." See Exhibit RR at Attachment 1, p. 7. See also Exhibit UU, and Local Law 68 of 1995, a copy of which is provided herewith as Exhibit WW.

15.    Local Law 68, which amended the City Charter and Admin. Code, authorized DoITT[7] to manage PPTs and related enclosures that were installed, operated or maintained on City Streets, in the best interests of the City, by requiring a permit, and a franchise with the City that met certain conditions.[8]  To this end, Local Law 68 required DoITT to promulgate rules imposing siting and clearance requirements for PPTs. See Exhibit WW.

16.    In early 1996, pursuant to authority granted by Local Law 68 and Resolution 439-A, DoITT promulgated rules to administer and regulate PPT franchises, existing PPTs, and applications for new PPT locations. See Admin. Code 23-403(b).  These Rules were set forth in Title 67, Chapter 6 of the RCNY.[9]

---

[6] At the time Local Law 68 of 1995 was enacted, the City estimated that there were approximately 35,000 payphones installed and operating on City Sidewalks.  Approximately 25,000 of the COCOTs were installed without licenses. See Exhibit RR at Attachment 1, pp. 5-6.

[7] By Local Law 24 of 1994, DoITT succeeded the DTE.

[8] Issuance of such a permit did not authorize companies to place advertising on a PPT enclosure.

[9] The rules took effect on April 8, 1996.

17.    The requirements regarding siting and clearance requirements were set forth at 67 RCNY § 6-41. In an effort to ensure that PPTs did not interfere with pedestrian or vehicular traffic, and did not become over saturated, thus creating visual clutter, in addition to reserving discretion for the Commissioner to manage PPT locations, DoITT adopted more than 25 siting and clearance requirements for PPTs. See 67 RCNY § 6-41. As set forth below in section E. Additional Rulemaking, DoITT has since amended the RCNY to include additional siting and clearance requirements.

18.    Title 67 RCNY § 6-41 set forth the specific siting and clearance requirements for PPTs in relation to other street furniture. For example a PPT cannot be located within 3 feet of a traffic sign, sign pole, subway grate, manhole, news rack, edge of a tree pit or planter located at the curb line, 4 feet of a traffic light, parking meter, or mailbox located at the curb line, 5 feet of an interior subway entrance, tree, or bench located at the curb line, or 15 feet of a bus stop zone, newsstand, public pay toilet, fire hydrant, or an outdoor or elevated subway entrance. [10]  67 RCNY § 6-41(e).

19.    The rules also provided siting regulations as to the distance PPTs had to be from each other. Pursuant to the rules, a pedestal or other structure holding a PPT had to be located at least 50 feet from any other pedestal or structure on any one-block front. 67 RCNY § 6-41(f). Further, no more than three (3) PPTs were permitted to be installed on a single pedestal, or in an in-line configuration. 67 RCNY § 6-41(i). The rules also provided siting requirements as to the distance PPTs had to be from curbs and corners. 67 RCNY § 6-41(g).

---

[10] A PPT can be installed if it is attached to the bus stop shelter, newsstand, or public pay toilet, or installed at building line adjacent to an outdoor or elevated subway entrance, bus stop shelter, newsstand, or public pay toilet, if the PPT does not obstruct pedestrian passage on the sidewalk. 67 RCNY § 6-41(e).

- 7 -

20.     While the requirements set forth in 6 RCNY § 6-41 did not apply to PPTs previously licensed under former Admin. Code §§ 19-131 or 19-128, or PPTs which were installed prior to March 1, 1996,[11] DoITT could require the removal of these PPTs due to, among other things, a finding that the PPT interfered with the use of the street by the public or an abutting property. 67 RCNY § 6-25. Additionally, DoITT could deny the PPT operator a permit if the operator failed to maintain the PPT free of graffiti or in a safe and clean condition during the interim period. See 67 RCNY §§ 6-25, 6-31.

21.     In an Environmental Assessment Statement, dated May 17, 1996, which concluded that no adverse impacts would result from DoITT's PPT rulemaking since it was primarily regulating existing structures, DoITT reiterated that the goals of the regulations were to improve neighborhood character, and provide a reliable "lifeline" of telephone service to the citizens of the City. See Exhibit RR at Attachment 1, p. 7.

**D. Franchise Process**

22.     In response to City Council Resolution No. 439-A, DoITT released a RFP on November 21, 1996. Thereafter, an amended RFP was released on or about June 9, 1997 as Resolution 439-A was amended by Resolution No. 2248. See Exhibit VV.

23.     Under Resolution No. 2248, DoITT was authorized to adopt provisions allowing franchisees to sell or lease advertising space on PPTs in commercial and/or manufacturing zoning districts, and in zoning districts where commercial and/or manufacturing uses were permitted as of right. It was also required to adopt criteria regarding the placement of such advertisements. Id.

---

[11] Subchapters 1 and 2 of Title 67, Chapter 6 of the RCNY, established an interim registry for PPTs.

24.    Upon receiving responses to the RFP, DoITT evaluated proposals based upon the requirements of the authorizing Resolution and the best interest of the City. Id.

25.    Upon the completion of the RFP process, DoITT formulated a contract, which, among other things, set forth restrictions on the placement of advertisements. The advertising restrictions applied to all PPTs regardless of when they were permitted, and were separate and distinct from the siting requirements set forth in the RCNY.

26.    Pursuant to the Agreement, which is still in effect, PPT advertisements can not be placed (1) on sidewalks located in residential zones,[12] (2) on non-curb line PPTs, i.e., building line PPTs, (3) within Historic Districts unless such comply with the Landmarks Preservation Commission's rules and regulations, or (4) on the interior of PPTs. Additionally, within Manhattan, advertising can not be placed "on the same side of an avenue block on which advertising on a bus stop shelter, newsstand or computer terminal which provides access to government or commercial activity, or public pay toilet, is located, except that as to newsstands, computer terminals and public pay toilets," a PPT may post advertising on the same side of an avenue block if the PPT was installed "prior to any grant by the City of a street furniture franchise or similar franchise(s) that encompass(es) newsstands, computer terminals or public pay toilets, and grants the right to advertise on [them]."[13] In all other areas, advertising is not permitted on PPT enclosures within one-hundred fifty feet of a bus stop shelter, newsstand, or public pay toilets bearing advertisement, unless (1) the bus stop shelter, newsstand, or public pay toilet bearing the advertisement is around the corner or across the street from the PPT, or (2) if the PPT enclosure was installed prior to a street furniture franchise for newsstands, computer

[12] Advertising is permitted in some commercial districts and in manufacturing zoning districts.

[13] As such, regardless of when a street furniture franchise was granted, a PPT may not bear advertising on the same side of an Avenue as a bus stop shelter with advertising.

terminals and public pay toilets bearing advertising.[14]  See Excerpts from Sample PPT Franchise Agreement, a copy of which is provided herewith as Exhibit XX.

27.    Additionally, the Agreement limited the size of the PPT advertisements. Pursuant to the Agreement, advertising side panels cannot be larger than 27" x 57" (i.e., approximately 10 ½ square feet).  Advertising on rear panels can not be larger than 27" x 57" in vertical format for a single PPT pedestal, 57" x 27" in horizontal format for two PPT pedestals, 54" x 57"(i.e. approximately 21 square feet) in vertical format for two PPT pedestals, or 36" x 81" (i.e. approximately 17 ½ square feet) in horizontal format on a two or three PPT pedestal. See Exhibit XX.

28.    The Agreement also provides maintenance requirements for the advertising displays, including that they have to be maintained in a clean and attractive condition. Id.

29.    Under the Agreement, PPT operators are not permitted to manage the advertising on PPT enclosures. Id. Rather, PPT operators must contract with a designated media representative. Id. There are currently four companies that maintain contracts with the PPT companies: Prime Point Media, Titan Outdoor, LLC, Van Wagner, and Vector Media. In order to become a media representative, an outdoor advertising company ("OAC") contacts DoITT who in turn sends it a standard RFP. Upon receiving the completed proposal, DoITT reviews the submission to ensure the OAC has demonstrated that it has sufficient resources and experience to carry out the media representative function. Presently, DoITT is accepting submissions from

---

[14] As such, regardless of when a street furniture franchise was granted, a PPT may not bear advertising within 150 feet of a bus stop shelter with advertising on it if the structures are on the same side of the street.

OACs seeking to become new media representatives. Upon becoming an approved media representative, the OAC can contract with PPT operators to place advertisements on PPTs.

30.    Additionally, pursuant to the Agreement, the design and appearance of all PPTs, regardless of when they were installed, are subject to the approval of the Art Commission. Exhibit XX at 3.4.

**E. Additional Rulemaking**

31.    Since the promulgation of its initial rules in March 1996, DoITT has amended its rules several times based on its evolving knowledge and experience regulating the PPT industry.

32.    In 1998, due to, among other things, DoITT's ongoing concern regarding the saturation of PPTs, DoITT amended 67 RCNY § 6-41(j)(2), effective September 16, 1998, so as to reduce the number of PPTs located on a sidewalk based on the length of the street. Title 67 RCNY § 6-41(j)(2) provides,

> (2) There shall be no more than the following number of public pay telephones on any sidewalk between two street corners in the City;
>
> (i) on any such sidewalk that is one hundred (100) feet or less, a maximum of: one public pay telephone installation that includes no more than one public pay telephone;
>
> (ii) on any such sidewalk that is more than one hundred (100) feet and less than three hundred (300) feet, a maximum of: two public pay telephone installations that contain in the aggregate no more than four public pay telephones;
>
> (iii) on any such sidewalk that is at least three hundred (300) feet but less than six hundred (600) feet, a maximum of: two public pay telephone installations that contain in the aggregate no more than six public pay telephones;

(iv) on any such sidewalk that is six hundred (600) feet or more, a maximum of: three public pay telephone installations that contain in the aggregate no more than nine public pay telephones.

33.    During the same period, additional regulations regarding the location of PPTs in relation to street furniture or street conditions were added. See 67 RCNY § 6-41(h). Pursuant to the new regulation, a PPT can not be installed where (1) the City has issued a permit for a location-specific street vending installation, (2) a revocable consent has previously been issued that would be inconsistent with installation of a PPT or PPT pedestal, or (3) other street furniture that has been previously authorized is to be located at the site, except that a permitted PPT may be affixed to such pursuant to an agreement between the PPT service provider, the City,[15] and the owner of the street furniture. See 67 RCNY § 6-41(h).

34.    On October 5, 2004, due to a concern that a high concentration of advertising panels were being placed on PPT enclosures in Manhattan, DoITT adopted 67 RCNY §6-06(c). Title 67 RCNY §6-06(c) prohibits the placement of advertisements on new PPT enclosures in Manhattan Community Districts 1 through 8.[16] See Exhibit QQ.

35.    Additionally, effective March 18, 2006, DoITT added new siting requirements to 67 RCNY § 6-41. Pursuant to the new additions, PPTs cannot be located within 8 feet of a bicycle rack, or 4 feet of any sidewalk encumbrance not enumerated in 67 RCNY § 6-41.

---

[15] Specifically, the agreement has to be entered into by the Department of the City with jurisdiction over the relevant piece of street furniture.

[16] Manhattan Community Districts 1 though 8 encompass all of Manhattan below 96th Street, in addition to West 96th Street to West 110th Street between the Hudson River and Central Park West.

36.     Due to amendments to 67 RCNY § 6-40 and 6-41, all PPTs are subject to some level of siting requirements based on when they were installed.

37.     PPTs which were (1) licensed under former Admin. Code §§ 19-131 or 19-128, or (2) installed prior to March 1, 1996 and listed on interim registry, are subject to over 15 siting and clearance requirements.[17]  67 RCNY § 6-41.  All other PPTs are subject to over 45 siting and clearance requirements.[18]

**F.  Number of PPTs**

38.     Since the inception of DoITTs codification of PPT regulations in 1996, the number of PPTs on City sidewalks has decreased by 40%.  Specifically, the number of PPTs on City sidewalks has decreased from approximately 35,000 PPTs in 1996 to approximately 21,000 PPTs on City sidewalks today.   In 2004, there were approximately 29,000 PPTs.

Dated: New York, New York
      May _9_, 2008

                                        **STANLEY SHOR**

---

[17] Among other things, these PPTs must be installed so that they ensure a minimum sidewalk clearance, and so as not to interfere in any manner with curb cuts, crosswalks, fire escapes, building egress, or cellar doors, and so as not to obstruct pedestrian passage or vehicular traffic lines of sight.  Moreover, PPTs cannot be within (1) 4 feet of a "Pedestal Structure" or any sidewalk encumbrance not specifically enumerated in 67 RCNY § 41, (2) 5 feet of an entrance or exit to a wheelchair lift or ramp's end, (3) 8 feet from a bicycle rack, and (4) 15 feet of a fire hydrant, an entrance way of an outdoor or elevated subway entrance, or bus stop zone, unless the PPT is attached thereto, or to the building immediately adjacent to the PPT and a clear pedestrian passage is maintained.

[18] PPTs installed prior to June 26, 1998 are not subject to the siting criteria set forth in 67 RCNY § 6-41(j)(2), i.e., regulations regarding the number of PPTs located on a sidewalk based on the length of the street.