Exhibit E

# MAJOR REPORTS

of the

## CITY PLANNING COMMISSION

### THE CITY OF NEW YORK
F. H. La GUARDIA, Mayor

•

Adopted During

## 1940



MUNICIPAL BUILDING, NEW YORK CITY

Price One Dollar

NYC006124

84

acquired by the Board of Transportation for subway purposes in connection with the Independent Subway. The portion now proposed to be utilized for street purposes is partly occupied by a lunch wagon and the remainder is vacant and utilized for the storage of materials and for parking cars.

It is understood that the Board of Transportation is prepared to release the surface rights in the area required for street purposes to the Board of Estimate subject to its rights to maintain and operate the subway line. The enactment of a local law will then be required to effect the transfer of the property from the Board of Estimate to the President of the Borough for street purposes.

This matter was the subject of a public hearing duly held by the Commission on April 10, 1940 (Cal. No. 17). No opposition to the proposed map change developed and the hearing was closed.

The matter was considered further at a meeting of the Commission held on May 29, 1940 (Cal. No. 15), at which time it was determined that the widening of Greenwich avenue together with the realignment of the sidewalks in this vicinity is designed to provide improved facilities for the complex interchange of traffic at the intersection of Greenwich avenue, Christopher street and Sixth avenue. However, with respect to the design and location of the safety island, it is the opinion of the Commission that the following objectionable features are indicated:

1. The plan establishes an island which projects more than one-half the width of Greenwich avenue west of the prolongation of the easterly curb of that avenue, thus making necessary the introduction of curving traffic lanes through the intersection of Christopher street and Greenwich avenue. Considering the fact that there is little likelihood that heavy commercial traffic will make reverse curve tracks within the limited area suggested, it would appear that the proposal is bad from the viewpoint of traffic and street mapping.

2. Several conflicting lanes of traffic will result which can only be handled by direct police control on the site and which will, because of short reservoir space, tend to produce confusion.

3. Lack of facilities for pedestrians exist, especially at the corner formed by the intersection of Greenwich avenue and 6th avenue at a point opposite 8th street. From this point, a person cannot cross to the easterly side of this avenue with the light in his favor at any time. The pedestrian situation is difficult of solution, but merits further consideration including, perhaps, a determination to provide an overhead crossing or establish a three phase light system. The absence of islands tending to direct traffic or serve as places of temporary safety for police officers as well as pedestrians deserves thought.

The foregoing critical comments are to be understood as comments and not as reservations. It is the duty of the Borough President's office to plan these changes and of the Commission to review them. In the present case the Commission has been dissatisfied but has not been able to persuade the Borough Engineers that changes ought to be made. The alternative of rejection has seemed too drastic since no great loss will be incurred from experiencing the difficulties of the present plan and from later revision of it.

The approval of the map under consideration is recommended.

It is further recommended that after the approval of the map:

  1. Resolutions be adopted establishing a special roadway and sidewalk treatment:

    (a) at the intersection of 6th avenue, Greenwich avenue and Christopher street, and

    (b) in Greenwich avenue from Christopher street to West 10th street, in accordance with the treatment shown on the map;

  2. That the Board of Transportation be requested to surrender, subject to its rights to maintain and operate a subway line in the subsurface portion thereof, the lands required for street purposes to the Board of Estimate; and

  3. That after such surrender by the Board of Transportation, a local law be enacted authorizing the Board of Estimate to transfer the lands in question to the President of the Borough for street purposes.

Respectfully,

      R. G. TUGWELL, Chairman, City Planning Commission.

## Report on Proposed Amendments in Revision of Zoning Resolution*

Report No. 1035.    (CP-914)      May 29, 1940.

*To Secretary, Board of Estimate, from City Planning Commission:*

By resolution adopted May 3, 1939 (Cal. No. 16), the City Planning Commission initiated, pursuant to Section 200 of the New York City Charter, certain amendments to the Building Zone Resolution, fixing May 24, 1939, as the date for a public hearing. This hearing was duly held and continued to June 1st, and then to June 5th, when it was

* The amendments proposed herein were subsequently modified by the Board of Estimate and as so modified became effective June 28, 1940. The Zoning Resolution, including Charter, Excerpts, Rules, Forms, Etc., is published in a separate pamphlet (see inside front cover).

closed. After further consideration, certain modifications were developed as a result of the public hearings and briefs submitted, and on June 14, 1939 (Cal. No. 20), a resolution was adopted fixing June 28, 1939, as the date for a further public hearing. This hearing was continued to June 29, 1939, when it was closed, the Commission again inviting submission of briefs. The proposed amendments were drafted with the full cooperation of the office of the Corporation Counsel, and were discussed from time to time with the Department of Housing and Buildings, the Chairman of the Board of Standards and Appeals and other official agencies affected.

During the summer recess further consideration was given to the whole matter, and additional changes drafted. Thus revised, the proposed amendments were advertised for hearing, in conformity with a resolution adopted on November 1, 1939 (Cal. No. 40), which was duly held on November 20, 1939. Final consideration was thereafter given to the entire matter, including the briefs submitted subsequent to the hearing, and the amendments presented herein are embodied in a resolution adopted by the Commission at a regular meeting held on May 29, 1940 (Cal. No. 22), attached to this report as Appendix C.

The Building Zone Resolution of the City of New York was adopted on July 25, 1916. The first comprehensive zoning to be undertaken in this country, it has subsequently been emulated by over 1,700 municipalities throughout the United States, approximately four-fifths of the urban population of the country enjoying the protection afforded by these zoning ordinances at the present time.

Like other police power measures, zoning draws its validity from its relationship to the health, safety and general welfare of the people. It differs essentially from most such regulations in that it differentiates between various parts of the City, applying to each district regulations appropriate to it. Most common among zoning regulations are those seeking to prevent the mixture of essentially incompatible uses, to maintain the community values in areas of established character, and to create standards for building coverage and height assuring the light, air and open space requisite to good living and working conditions, and preventing excessive density of building development in the various districts within the City.

Desirable as these objectives are in themselves, they scarcely do justice to the contribution that zoning can make to the realization of a more rational, economical and satisfactory city structure. When the basic studies requisite to a logical plan of development for the City have been completed, and the centres not alone of industry and business, but of residential development of all types as well have been determined, zoning can aid greatly in the realization of the desirable pattern.

Present day cities, studded with slum and blighted areas, and suffering from all the financial and social ills resulting from the gradual abandonment of their older districts, cannot afford to neglect any practicable method for stabilizing the use of their lands in conformity with a rational pattern. The amendments now proposed in New York's Building Zone Resolution have in view not only numerous detailed refinements described herein, but a much more effective contribution on the part of zoning to the solution of the City's basic problems. Several of the regulations which may appear to be primarily aesthetic, are in reality practical necessities if the City's blighted areas are to be rehabilitated. Measures so closely identified with the economic and social well-being of the City, and of its residents and taxpayers, are assuredly within the scope of the police power under any reasonable interpretation of the general welfare.

It will be readily understood that the initial preparation of such broad-gauge regulations, varying widely in accordance with the great variety of conditions found throughout the City, was a complex technical undertaking for which adequate data were not available at the time the original Building Zone Resolution was adopted in 1916. The whole concept was also without legal precedent in this country, so that there was justification for proceeding somewhat cautiously.

In the intervening quarter-century, however, and in the course of widespread experience with zoning elsewhere throughout the United States, this new type of urban regulation has undergone constant development both technically and legally. Means have been found for embodying in zoning ordinances improved standards, better adapted to modern urban conditions than was possible in the pioneer New York City Building Zone Resolution.

There is no longer any question of the constitutionality of zoning, so long as it is reasonably applied. But it has long been recognized that the New York Resolution, which has not been fundamentally modified since its adoption, is in need of extensive revision.

A number of basic defects were pointed out in a letter addressed to the City Government by the City Club of New York in September, 1935, which was subsequently endorsed by a number of other leading organizations. As a result, a special Joint Committee was

appointed, whose studies and deliberations have been made available to the Commission, together with a considerable number of suggestions from other sources. In addition to the lack of adequate control of building bulk, pointed out by the Joint Committee, the New York Resolution has failed, among other things, to provide: for the convenient garaging and servicing of automobiles; for the establishment of manufacturing districts distinct from the present totally unrestricted districts; of local retail districts for the provision of strictly local neighborhood shopping centres free from other un- desirable structures and uses; of row and group house districts free from the encroach- ments of large apartment houses. It has failed to take advantage of such modern opportunities as: the protection of airports, under reasonable regulations, for assuring safety; the requirement of off-street loading facilities, where otherwise there will be excessive congestion; the facilitation of large scale housing projects, which otherwise may be impeded by the strict application of existing zoning regulations.

In addition to these and numerous other defects and omissions, the zoning provisions of the new City Charter rendered the wording of the present Resolution inappropriate and obsolete in numerous particulars.

The conclusion was obvious, that the initiation of extensive revisions in the City's Zoning Resolution was one of the early responsibilities of the City Planning Commission, under the terms of the new Charter. The Commission had to consider whether this revision should be as comprehensive as might be suggested by the excessively complicated and outmoded structure of the present Resolution, or be limited to the more immediate needs. After careful consideration, it appears that more fundamental revision may be indicated upon completion of a number of the basic Master Plan studies upon which the Commission and the Department of City Planning are now engaged. At the same time there would appear to be no good reason for denying to the residents of this City the advantages to be gained through such zoning provisions as are enjoyed elsewhere, are desirable in this City, and are not inconsistent with the structure of the present Resolution.

The amendments proposed in the resolution adopted by the Commission at this time therefore include both numerous routine changes in wording and such improvements and additions as can be readily adapted to the existing Resolution.

The Resolution itself, and the amendments adopted by the Commission, are so com- plex that even a full reading of the text may not render them altogether clear. More- over, the inter-relations between the various sections are often such as to be confusing if considered in sequence. Accordingly, for the purposes of this report, the several changes have been classified as to nature and subject matter under the following six general headings:

1. Technical and routine changes.
2. Amendments and additions to definitions.
3. Garages and gasoline service stations.
4. Business and advertising signs.
5. Improvements in standards and methods.
6. Entirely new districts and provisions.

Appendix A to this report lists in sequence every section affected by the proposed changes, with a brief explanation. Where more ample explanation is required, reference is made to the body of this report.

1. *Technical and routine changes.* Under the new City Charter the procedure for handling zoning matters differs substantially from that under the former Charter. It was to be expected, therefore, that the language of the Building Zone Resolution would be at variance with the newly established procedure in numerous particulars, and a con- siderable proportion of the proposed amendments seek to remedy these discrepancies. Grouped with these changes there are a number of amendments, growing out of technical considerations, that are essentially merely changes of wording rather than of substance. The changes proposed in the following sections, paragraphs and sub-paragraphs are of these two types: Title; 1(a), (1); 2; 3, (1), (4); 4(a)(4), (25), (29), (31), (33); (39), (46); 4(c); 4-A; 6(b)(old); 8; 10; 15(c); 16(d); 16-B(b), (c), (d), (e); 17(a); 18(b)(1), (2), (3) and (4); 19(g); 20; 21; 22; 23; 24; 25; 26; Appendix.

2. *Amendments and Additions to Definitions.* In this group there are included a number of changes and additions to Section 1 (definitions), growing out of experience in operating under the existing Resolution and the requirements of new provisions intro- duced elsewhere in the Resolution. The amendments of this description include the following sub-paragraphs of Section 1: (o), (p), (q), (r), (s), (t), (u), (v), (w), (x), (y) and (z).

3. *Garages and Gasoline Service Stations.* Among the least satisfactory provisions in the original Building Zone Resolution were those relating to garages and the parking and servicing of automobiles. This is not unnatural, since the automobile was then

NYC006127

87

relatively new, classed more as a luxury than a necessity, and assumed to be a considerable fire hazard. With the perfection and much more general use of the automobile there has come increased appreciation of the need for convenience in its storage and servicing, and there has been widespread support for amendments to zoning and building regulations directed to that end. At the present time neither garages, parking lots nor gasoline stations can locate, as a matter of right, in any use district except unrestricted districts. Elsewhere, they must obtain a permit from the Board of Standards and Appeals. In addition, under Section 21, they are forbidden to locate within 200 feet of a school, and are subject to certain other restrictions which, under court decisions, are not variable by the Board under any circumstances. Moreover, it has been impossible, until recently, to store or park cars within business buildings or apartment houses where the need for such service is acute. The amount and disposition of unrestricted districts within the City are such as to leave very extensive areas unserved, except by special action of the Board, whose powers are at present inadequate to meet legitimate needs in many instances.

There is need for greater freedom. At the same time the reasonable protection afforded by appropriate regulations must not be unduly relaxed. Garages, parking lots and service stations all have attributes peculiar to themselves, and requiring special attention. All these facilities must be convenient to their users; hence they must be numerous and widespread. At the same time, according to the manner in which they are constructed and managed, they may definitely benefit or harm the vicinity in which they are located. Here is a case in which, in the opinion of the Commission, the regulatory function of government is peculiarly needed. In connection with zoning, the Board of Standards and Appeals, with its authority, sanctioned by the courts, not only to exercise wide discretion, but to grant exceptions subject to conditions calculated to protect the safety and the economic well-being of the community, is the appropriate regulatory body.

The methods elected by the Commission for dealing with this situation include the following, as more specifically explained under their respective section headings (below): specific approval of group garage space in connection with group housing developments; also within and adjacent to business buildings; continued prohibition against garages and service stations locating as a matter of right in business and all more restrictive use districts, with authority in the Board to deal with these situations without the restrictive 80 per cent. consent clause; extension of the Board's jurisdiction to the area within 200 feet of a school and other situations covered by the new Section 21-A; also to existing garages affected by 21-A, but no other existing garages, and to all non-conforming gasoline stations, so that appropriate tests and conditions may be attached to the continuance of such existing non-conforming uses, as in the case of new applicants.

These proposals have been the subject of extensive discussion at the hearings held by the Commission, with special attention directed to the delegation of power to the Board, and to the establishment of some degree of control over existing uses not in conformity with the regulations of the use district in which they are located. These are fundamental matters discussed to some extent in connection with the several sections in which they are involved, but also referred to more generally in a closing section of this report. It will suffice to point out here that this is peculiarly an instance in which one "cannot have his cake and eat it too." Either that modern necessity the automobile is to be better served, or it is not; either the greater freedom of location is to be surrounded with adequate safeguards, or the communities involved are to suffer. The Commission is of the opinion that greater freedom, under suitable administrative procedures, is called for in these instances, and has framed its proposals with this in view. It is also of the opinion that the time has come to recognize some community interest as opposed to the monopolistic private interest enjoyed by these non-conforming uses. Discussion of general rules for the guidance of the administrative body exercising these powers will be reserved for the final section of this report. The several amendments affecting garages and gasoline stations are as follows:

*Section 3(9)(a).* In accordance with the Commission's decision to state explicitly certain of the commoner uses which are to be regarded as accessory uses permissible in residence districts, this paragraph (drawn from the formerly unnumbered paragraph now eliminated) provides for private garages for not more than three motor vehicles accessory to single and two-family dwellings. In doing so it now explicitly excludes non-passenger vehicles from such garages.

*Section 3(9)(b).* At present, the regulations (in the unnumbered paragraph referred to above) prevent the provision of group garages in connection with group housing developments despite the fact that the changes in the Multiple Dwelling Law necessary for this purpose were adopted at the 1939 session of the legislature. Such developments,

NYC006128

usually operated on a rental basis, have elsewhere proven themselves especially desirable from the points of view of economy and the many advantages to be derived from good design, including use of open space and neighborhood amenities generally.

The Commission has accordingly introduced this new section, to permit the provision of adequate garage facilities as an integral part of any such project. The only objection made to this proposal at the hearings was based upon the possibility that such projects might not all continue under one ownership, and the suggestion was made that they should be required to continue so. It is of course impossible to prevent the alienation of property through sale; moreover the fact that each such project must originate under a single ownership is the best possible guarantee that the several units will be so handled as to cause a minimum of disadvantage to each other. It is believed that ample safeguards are provided.

*Section 4(a)(15).* The inability of the designers and operators of business buildings to make any provision for the parking of the cars of tenants and customers has contributed largely not only to the congestion in central business districts but in some instances to the difficulty of doing business at all in such areas. The amendment to this paragraph makes it possible to provide such facilities, again under safeguards that are believed to be adequate. Its adoption is an important step in any program for adapting the city to the needs of the motor age.

*Section 6(a).* The lack of adequate garages, parking lots and gasoline stations is not the only defect in the present zoning affecting these facilities. As has already been pointed out, these service adjuncts to the motor car may be located, constructed and operated in such manner as to have little, if any, unfavorable effect upon the neighboring properties. At the same time, the constant flow of cars, the arrangement of the facilities, and the upkeep and maintenance, or lack thereof, may seriously injure the neighbors and serve as a focal spot for community decay. In the face of these potentialities, perhaps not fully understood at the time, the Building Zone Resolution as originally adopted in 1916 provided that these, as well as all other non-conforming uses, might continue in perpetuity. The belief was expressed that they would probably die out in course of time, and be supplanted by conforming uses.

It was apparently not appreciated that this *exclusive* right to conduct these non-conforming activities gave them something in the nature of a *perpetual monopoly* unaffected by any power of the Board to surround their activities with reasonable conditions and safeguards designed to protect the neighborhood. In any event, they have persisted, and without any of the ameliorating safeguards or periodic reviews to which new facilities of the sort are subject.

In the opinion of the Commission the time has come to take cognizance of this situation, not only from the point of view of the general public and the immediate neighborhoods affected, but in fairness to the more recent entrants into this field of business activity, themselves subject to what is deemed reasonable regulation. The Commission is supported in this view by a review of similar policies that have been successfully pursued in certain instances in other parts of the country.

The changes in this paragraph (6-a) are for the dual purpose of clarifying the status of non-conforming uses, both those existing in 1916 and those created by use district changes since 1916, and of referring to certain exceptions to the general rule of unqualified continuance for such uses.

*Section 6(e).* One exception applies to gasoline stations, and requires that, if non-conforming, they shall be required to apply to the Board within five years for the right to continue thereafter. This right of continuance, to be granted as a stated term of years, may be accompanied by such reasonable safeguards and conditions as the Board may deem desirable, thus bringing these stations, after this further lapse of time, into the same regulatory framework as are all newly established stations in such areas. The question of the guiding principles under which the Board shall administer these and other provisions of the Resolution are discussed elsewhere in this report. Suffice it to state here that they are intended to provide continuance during the period which may be presumed to be necessary and reasonable for the amortization of the investment.

*Section 6(f).* The reasons for introducing this paragraph, affecting garages, are the same as for Section 6(e), above. The provision differs, however, in that only garages within 200 feet of schools, hospitals and parks or otherwise conflicting with the provisions of Section 21-A are to be required to apply to the Board, and a period of ten years is allowed for the purpose. These differences are due, among other things, to the greater permanence of the structures involved, and the lesser need and opportunity for attaching useful conditions to the continued operation of garages than gasoline stations. It reflects the Commission's belief, however, that at least in the vicinity of schools and other public structures, and of parks and playgrounds, where safety is a vital factor, the public

NYC006129

89

authority should not be without power to deal with problems growing out of the use of nearby lands for garaging and service to motor vehicles.

No items in the projected amendments were more actively discussed at the hearings than these, though it must be said that most of the discussion indicated so complete a misunderstanding not only of the Commission's whole approach to the problem but of the actual effect of the provisions under discussion as to render much of the discussion beside the point. Some of this misinterpretation is comprehensible in view of the essentially complex nature of the subject-matter. The concern of individual owners for their properties is also entirely understandable, and the Commission has had their legitimate interests fully in mind in considering the administrative aspects of the proposed changes. It is less understandable why more groups concerned with the overall welfare of the city did not recognize the points at issue and represent more adequately the public point of view. Their failure to do so cannot be construed by the Commission as a valid reason for failure to act on a matter it believes to be of great public importance. These provisions for bringing non-conforming gasoline stations and garages within the same regulatory framework as are new facilities are believed to be in the public interest and surrounded by adequate safeguards for the protection of the private interests concerned.

The contention that these provisions are in contravention of Section 646(g) of the New York City Charter has been carefully considered by the Commission. It is the opinion of the majority that no conflict with this section is involved in any of the present amendments.

*Section 7(f).* This section is the necessary counterpart to Section 6(e) and (f), just discussed, and to other sections of the Resolution limiting the location of garages and gasoline stations, in that it gives the Board authority to grant exceptions for such uses in areas where they may not go as a matter of right. As with all the other paragraphs under Section 7, it must be read in conjunction with the general limiting language at the head of the section, and with the further indication of intent herewith recommended by the Commission for consideration by the Board of Estimate. Opinion at the hearing differed as to the elimination or modification of the "80 per cent consent" requirement. Its elimination is in line with the Commission's belief that the placement of these service facilities needs to be greatly facilitated, if the motor car is to be of maximum service, and that the government agency entrusted with the administration of the law should not be hampered by arbitrary limitations. Ample provision for the expression of local opinion exists in the public hearings required to be held by the Board on all questions coming before it for consideration under this section. In conformity with the same principle the language of this paragraph extends the jurisdiction of the Board to areas affected by new Section 21-A, a power at present denied by the courts, because of the way in which old Section 21 is worded.

*Section 7(g).* The changes in this paragraph, which relates to the granting of temporary permits for parking lots, formerly designated as section 7(h), are wholly verbal, except that such permits are explicitly forbidden to encroach upon required open spaces about buildings.

*Section 7(h).* This paragraph is introduced to give the Board separate authorization for dealing with motor vehicle repair shops. Since there may be need for such facilities in any use district, the Board is, again, granted full discretion, within its general limitations which provide assurance that any permits issued for repair facilities in the more restrictive districts would be surrounded by adequate conditions and safeguards.

*Section 21-A.* Former paragraphs 2 and 3 of Section 21 are here consolidated and revised. The Commission is of the opinion that the protection of the vicinity of school buildings from motor vehicle service facilities is sound, and should be extended to such other public facilities as hospitals, libraries, museums, parks and playgrounds. However, as already indicated, the Commission believes that the jurisdiction of the Board should be extended to include these cases, and has so worded the text.

An alternative proposal, that the continuance of garages and gasoline stations so located, be permitted unless and until the Board shall elect to proceed against them, was studied but abandoned on the advice of the Corporation Counsel, who held that such a procedure might be successfully attacked as capricious and inequitable. The procedure proposed by the Commission gives each of those affected equal right to present his case for determination on its merits by a suitable administrative agency, whose procedure must include a duly advertised public hearing.

The Board's power here, as elsewhere, is to be limited by considerations such as a reasonable time for the amortization of the investment in the improvement.

NYC006130

90

4. *Business and Advertising Signs.* A great deal of attention has been given in recent years to the subject of outdoor advertising, both in urban and rural areas. It has been generally agreed that whereas special legislation may be required in rural areas, where zoning is for the most part non-existent, cities may be expected to handle this problem through their zoning regulations.

The most casual inspection of the City of New York is enough to convince any impartial observer that zoning has thus far failed to solve the problem, so far as this city is concerned. Billboards and signs not only dominate our business streets, except the few for which special local laws have been enacted, but they take advantage of every opportunity to crowd in upon public places, established and maintained by public funds, including civic centers, parks, and especially express highways and bridge approaches. It is true that new advertising signs are excluded from districts zoned for residence use, but here again the non-conforming use tends to persist in perpetuity. Moreover the outdoor sign or billboard is to be differentiated from any other use controlled by zoning in that it derives its value not from the use of the property on which it is located, as do other uses, but from its exploitation of the view from other more or less distant properties. For this reason signs located in business areas often exert a deteriorating influence over very extensive residential areas.

Early in its deliberations the Commission came to the conclusion that here again, as in the case of garages and gasoline stations, there was a problem requiring attention, and presumably special measures for its solution.

The Commission also early reached the conclusion that far from being a purely aesthetic matter, as was claimed by many at the hearings, this problem is primarily economic and hence of fundamental concern both to private individuals and to the city itself. What power has a city to attract or even retain residents, if its home areas are rendered unattractive by reason of excessive outdoor advertising displays? Or what right has it to permit the chance owners of properties adjoining costly public improvements to benefit by their exploitation, when the funds for these purposes come through taxes from all the people?

In analyzing the problem the Commission found certain conclusions inescapable. It is apparent, for example, that there are certain areas where signs, far from being a draw-back, are among the City's principal and traditional attractions. Such, for example, is the "Times Square" area, and there are others of which this is true in lesser degree. It was clear, therefore, that whatever remedies might be recommended, they should not interfere with these features of the city.

It is also apparent that the sign erected and maintained to identify a business conducted on the premises is wholly different from the sign erected for the purpose of advertising goods or services obtainable elsewhere. The one is merely an accessory to another legitimate use; the other is a distinct business use in itself, but a use which, as already pointed out, is more nearly a use of adjoining and nearby property than of the property upon which it happens to be located.

For these reasons it has seemed logical to consider quite different regulations for these two distinct types of outdoor display. For the business sign, only the regulations which may reasonably be imposed upon it as an accessory to other business uses have been inserted. For the advertising sign regulations appropriate to this unique business use are proposed.

In general, these ends would be accomplished by: establishing a clear distinction between business and advertising signs; redefining the signs permissible as accessory uses in residential and business districts; prohibiting advertising signs from locating, as a matter of right, in business and hence retail, restricted retail and local retail districts; making their erection or continuance in such districts subject to review by the Board of Standards and Appeals; and finally by establishing areas within the vicinity of parks, parkways and express highways from which advertising signs would be excluded, except by special action of the Board. The several sections giving effect to these regulations are as follows:

*Section 1(q).* By means of a new definition inserted for the purpose, a clear distinction is made between business signs drawing attention to a business conducted on the same premises, and advertising signs publicizing activities or commodities offered elsewhere. The latter is clearly recognized as being in itself a distinctive type of business activity; the former merely an accessory to another business use.

*Section 3(9)(c) and (d).* Pursuant to the Commission's belief that certain of the accessory uses permissible in residence districts should be defined, these two paragraphs establish standards governing the use of business signs in connection with business permissible as accessory uses in residence districts, including signs indicating property as "for sale" or "for rent."

NYC006131

91

*Section 4(a)(49).*  The intent and effect of this amendment is to establish adequate administrative control over signs, primarily advertising signs, through the Board of Standards and Appeals, by preventing their erection in business, retail, restricted retail and local retail districts, except after review and favorable action by the Board in cases where they are forbidden from locating as a matter of right.  The general run of business signs are exempted from this prohibition; only those exceeding five hundred square feet in size, or extending more than eighteen inches beyond the street line being sent to the Board for approval.  Exceptions are made in the case of awnings and marquees, for which special provision is made in the Building Code, and for projecting signs on certain buildings of an essentially public nature.

*Section 6(b), (c) and (d).*  The unlimited continuance of a non-conforming use is especially indefensible when that use is by its very nature an exploitation of its surroundings, and when there is a relatively minor capital investment involved, as in the case of signs.  For these reasons, there have been included in this section provisions for a two year limitation upon existing non-conforming business and advertising signs, this limitation being subject, as in the case of gasoline stations, to review and extension for a stated term of years by the Board of Standards and Appeals.

*Section 7(k) and (1).*  Explicit authorization for action by the Board to permit non-conforming business and advertising signs in business and retail districts, and business signs in restricted and local retail districts, for stated terms of years is contained in this section.  Coupled with the previous sections, there are hereby provided adequate procedures for bringing signs in this City within the control of a suitable regulatory body.  As noted in the case of garages and gasoline stations, the question of the standards under which the Board is to act, is discussed later in this report.

*Section 7(m).*  Of a similar nature is this clause granting to the Board authority to review cases in which application is made for the erection or continuance of signs within two hundred feet of certain public improvements, more explicitly defined in Section 21-B.

*Section 21-B.*  In order to grant positive protection in the immediate vicinity of those improvements upon which large amounts of public funds have been expended, there is here inserted a provision excluding advertising signs within view from and within a distance of two hundred feet from parks, parkways and express highways.  This provision is similar in principle to the exclusion of garages and service stations from the vicinity of schools and other public buildings.  As in that case, instances of special hardship may be reviewed and afforded relief by action of the Board of Standards and Appeals, under Section 7(m).

*Section 4-D and 4-E.*  There are certain areas in the City, the most notable being the Times Square theatre district, in which these controls of either business or advertising signs are probably neither desirable nor practicable.  At the same time the special conditions obtaining in such limited areas should not be permitted to stand in the way of adequate regulation elsewhere.  There are therefore established two new use districts to be known as Business-1 and Retail-1 Districts, respectively, in which the provisions of Section 4(a)(49) shall not apply.

At the hearings, repeated requests were made that the Commission lay out such districts for incorporation in the use district map coincidentally with the adoption of the new regulations.  It is of course impracticable to take such steps prior to the time the new districts are in legal effect.  Ample time is provided, in the two-year interval following their adoption, for the consideration of requests for such use district amendments by the Commission and the Board of Estimate.

Reference was made at the hearings to the income derived by the city from the licensing of signs.  Investigation reveals that this is approximately $300,000 annually.  Such income need not be lost to the city.  The elimination of signs in inappropriate places, and requirements that they conform to reasonable standards and regulations will not eliminate outdoor advertising, however much it may shift and modify it.  There will still be a contribution to the city from the proceeds of sign licenses.  It may be pointed out, in this connection, that some cities collect much larger sums, proportionately, from such sources—a matter which the fiscal officers of the city may care to take under advisement.

5.  *Improvements in Standards and Methods.*  A considerable group of amendments are proposed for the purpose of effecting improvements in the standards and methods employed in the existing Building Zone Resolution for the control of uses and building development in this City.  These include a few changes in use provisions, including clarification of the status of non-conforming uses in residential districts, a number of amendments for the purpose of facilitating the construction of multiple dwellings in E and F Area Districts more nearly in conformity with the natural topography of the

NYC006132

92

land, and certain other miscellaneous items considered hereunder in the order in which they appear in the Resolution. The changes deemed desirable in E, and F area districts require certain amendments to the following definitions, Section 1(d), (f), (h) and (k):

*Section 1(d) and (f)*—Definitions covering curb level and height of buildings. The provisions as to "curb level" and "height of buildings" in the original Building Zone Resolution assumed that multiple dwellings would be erected adjacent or near to the street line, and on ground either approximately at street level or to be graded to such level. In actual practice, many multiple dwellings have been erected in recent years in locations where such buildings have adequate set backs from front, side and rear lot lines have often had to be built in ways that are neither economic nor attractive, in order to comply with the provisions of the Building Zone Resolution. It would be preferable in of rolling terrain are to be found. In such cases, if multiple dwellings are erected, they to permit, or rather to require, that the height of the building and the treatment of the surrounding land be related to the natural topography. For these reasons, the definitions cited above are amended so that in the absence of an established curb elevation, or in cases where a building is set back twenty-five feet or more from the street line, the average level of the plot immediately adjacent to the building shall be considered the curb level, from which the height of the building shall be measured.

*Section 1(h) and (k)*—Definitions of rear yards and courts. Comparable in intent are the amendments to the definitions of rear yards and courts. At the present time, both the rear yards and courts of multiple dwellings must be excavated to the same curb level from which the height of the building is calculated. At the same time the definitions of rear yards and courts are such as to require such excavation to extend to the rear and side lot lines of the plot on which the multiple dwelling is erected, even if the rear yards and courts thus provided are greatly in excess of the requirements of the Resolution. Assuming that such yards and courts as are actually required are excavated to grade, there would seem to be no good reason for requiring excess space in either direction to be so excavated. In fact, every aesthetic and economic consideration would suggest that the building be permitted to leave the ground undisturbed. For these reasons, the definitions cited above are amended to introduce "excess" rear yards and courts, whose level is governed by amendments to other sections of the Resolution, namely Section 17(b) and 18(d).

*Section 4(a)(11)*—Excluded business uses. Dry cleaning establishments have, until now, been included among the uses prohibited in business districts. When this provision was originally introduced, such work was done in large establishments using inflammable liquids as cleaning agents. In recent years, modern methods have been developed by which dry cleaning can be conducted as an incidental to tailoring and other establishments utilizing non-inflammable fluids for the purpose. There would seem to be no reason for the exclusion of such local service agencies from business districts, and the present amendment is proposed to legalize them.

*Section 4-B(a) to (k), inclusive*—Restricted Retail Districts. As previously established, certain uses have been excluded from restricted retail districts on the ground that they were incompatible with the purposes for which such districts were established. The Commission has received a number of requests for clarification and extension of these excluded uses, and for this purpose has substituted the new provisions (a) to (k), inclusive, for those previously in effect.

*Section 6(a)*—Non-conforming Uses. Upon its adoption on July 25, 1916, the Building Zone Resolution exempted from its use district provisions all the uses not then in conformity with such provisions and with the use district maps as then adopted. No provision was made, however, for defining the status of uses subsequently to become non-conforming by reason of amendments to the use district maps. With the exception of the two groups of uses covered by Section 6(b) to (f), inclusive, previously referred to in this report, the legal status of all such non-conforming uses will be clearly defined hereafter by the present amendment.

*Section 7(c)*—Adjustment of uses at use district boundaries. In view of the fact that use district boundaries are normally drawn within blocks and do not always correspond with property lines, the Board is called upon to make suitable adjustments from time to time. A rewording of this paragraph is necessary to enable the Board to deal with these cases more satisfactorily. Considerable concern was expressed at the hearings, that this section, if worded as advertised, would permit the Board to allow undesirable use variances. It is recommended that the Board of Estimate revise the wording so as to eliminate any such possibility. (See Appendix B.)

*Section 7(e)*—Temporary and conditional permits for non-conforming uses. Up to the present time, Section 7(f) (old) has empowered the Board of Standards and Appeals

NYC006133

to grant temporary and conditional permits for not more than two years for non-conforming uses in undeveloped sections of the city. The limitation involved in the clause "in undeveloped sections of the city" is hereby eliminated both because there is no acceptable definition as to such sections, and because it is deemed desirable that the jurisdiction of the Board be extended throughout the City on this temporary and conditional basis. As formerly, the new provision limits such permits to two years, but allows for renewals. The time limitation provides sufficient assurance against the establishment of permanent non-conforming uses under this clause—a possibility viewed with alarm by some who appeared at the hearings.

*Section 9(b)*—Corner influence. At the present time, the height of a building fronting on a wide street may equal the height permissible on the wide street for a distance of 150 feet in depth along the side street on which it also abuts. In view of the general agreement that existing height regulations permit excessive building bulk, and in view of the desirability of preserving light and air in the narrower side streets, there would appear to be no good reason for permitting the influence of the wider street to extend for a depth greater than 100 feet. This section is, therefore, amended accordingly.

*Sections 15(a), (b), (d) and (e) and Sections 16(a), (b), (c) and (d)*—Improved standards in E and F Area Districts. The E and F area districts, affected by these changes, were originally expected to develop as two-family and single-family house districts. But in recent years there has been considerable apartment house construction in these districts, and the apartments erected have frequently exceeded the densities desirable in such areas, especially in combination with individual homes. Furthermore, the detailed provisions of the Building Zone Resolution have been such as to hamper the utilization of the terrain to best advantage, especially where there are large plots of uneven grade.

To effect desirable improvements, the court and yard requirements are slightly increased in E and F area districts; the front, side and rear yard requirements for multiple dwellings are given minimum dimensions, to be increased on a percentage basis, up to a given maximum, with increased size of plot. Finally, there is introduced an entirely new principle of bulk limitation, designed to keep the bulk of buildings in these districts within reasonable limits, at the same time affording a maximum of leeway for individuality of design and arrangement. This bulk limitation is expressed in terms of permissible area of floor space in the building in proportion to the area of the plot. For example, the 1.6 ratio permitted in F area districts is such as to permit the usual six-story apartment, but if the height were increased, it would be necessary to decrease the coverage proportionately. This provision must be read in conjunction with the new definition, Section 1(u), which gives a precise definition of "floor area". The regulation is framed in terms of floor area, rather than cubic contents of building, because the latter would put a premium on low ceilings.

*Section 17(b) and 18(d)*—Excess rear yards and courts permitted at grade. As previously stated, in referring to amendments to definitions, the purpose of giving a distinctive status to yards and courts in excess of those actually required by the Resolution is to permit them to remain at the natural level of the land. These sections, as amended, make this possible.

*Section 19(a)*—Encroachment by roofed porches. Some uncertainty has existed in the past as to the extent to which porches might encroach upon required yards and courts. This amendment prohibits such encroachment when the porches are roofed.

6. *Entirely New Districts and Provisions.* In addition to the several routine and technical changes, the comprehensive treatment of the garage, filling station, business and advertising sign problems, and changes in existing standards and methods employed in the Building Zone Resolution, a number of entirely new provisions are introduced. Several of these are required to deal with urban problems which were practically non-existent at the time of the adoption of the original Resolution, such as trailer camps, bus stations and airports. There are also a number of additional districts designed to foster and protect types of development until now inadequately protected in the City of New York, including low density garden apartments, row and group houses, and strictly local shopping centers. These and other entirely new provisions, taken in the order of their appearance in the text of the Resolution, may be summarized as follows:

*Section 3(9)(e)*—Removal of sod, gravel, etc. In order to protect established residential districts, some limitation needs to be placed upon the extent to which owners of vacant land may engage in the business of selling the excavated materials below the established levels. Lacking such limitation, the conduct of sand and gravel businesses in residential districts may create conditions hazardous and otherwise detrimental to the community. The present amendment recognizes the legality of such excavation and sale of material as may be necessary and justified in connection with the construction of a building or preparing the site therefor, including grading to the legal street level. In

NYC006134

94

defining and explicitly listing such operations as a permissible use in residential districts, the present amendment provides a basis for preventing excessive operations of this sort.

*Section 4(a)(47)*—Bus stations. As has been amply demonstrated in this city, the operation of bus terminals is liable to create conditions of special street hazard and congestion. It is therefore deemed necessary to exclude such terminals from locating, as a matter of right, in business and more restrictive use districts, in order that they may be made subject to special consideration and approval by the Board of Standards and Appeals, and to the special conditions and safeguards that may be imposed by the Board. For this purpose there is introduced a further section, 7(i), specifically authorizing the Board to grant such permits.

*Section 4(a)(48)*—Auto trailers and tourist camps. At the time of the adoption of the Building Zone Resolution in 1916, automobile trailers were unheard of. In recent years they have become so common that many communities have established public parking places and camps for their accommodation. Until now there has been no explicit provision in the New York Building Zone Resolution covering such facilities, and their status has, therefore, been highly anomalous. As in the case of bus stations, this is a business use which is subject to abuse unless carefully regulated in the public interest. Amendments are therefore introduced for the purpose of excluding trailer camps from business, retail, restricted retail and local retail districts, as a matter of right, at the same time authorizing the Board to issue permits for such purposes, subject to suitable conditions and safeguards. The latter provision is contained in Section 7(j).

*Section 4(a)(50) and (51)*—Auto wrecking and steam laundries. Experience has indicated that both auto wrecking yards and steam laundries may be highly objectionable and should, therefore, be excluded from business districts, a justifiable exception being made in the case of hotel and hospital laundries.

*Section 4-C*—Local retail districts. The original use classifications embodied in the Building Zone Resolution at its adoption in 1916 were limited to three: unrestricted, business and residence districts. It subsequently became apparent that the business districts were too little restrictive to meet the needs of retail shopping centers, and *retail* and *restricted retail* districts were successively introduced into the Resolution. There is still lacking any use district permitting the stores and services appropriate to purely local neighborhood shopping, but excluding those uses and structures not needed in such districts and incompatible with the immediately adjacent residences. There is therefore introduced this local retail district, in which the uses permitted in the restricted retail district are further limited to the ground floor. Such limitation is entirely consistent with the practice in this city of providing stores in the first floor of apartment buildings, and should permit the conversion of many existing relatively unprotected business areas into genuinely local retail districts.

*Section 4-F*—Manufacturing Districts. In the original Building Zone Resolution no provision was made for any use district especially adaptable for manufacturing and light industry. Such districts are found in zoning ordinances generally, and there has been considerable demand for their establishment in this city.

As advertised and heard by the Commission, this section would provide for a manufacturing district in which the permitted uses would be the same as in business districts, but the amount of floor space in which manufacturing would be allowed is fixed at 75 percent instead of the 25 percent permissible in business districts.

In view of the fact that garages and gasoline stations are numerous in many areas where these new manufacturing districts would be most appropriate, and since they will as a rule be insulated from residence districts by business streets, so that the effects of advertising signs will be minimized, it is believed that such uses may safely be permitted as a matter of right in the manufacturing districts, and this report has been written on the assumption that this may be done. However, a number of minor changes in wording will be necessary for this purpose, as indicated in Appendix B.

*Section 5-A(a) and (b)*—Airports. The omission of special consideration for airports in the original zoning of the City is readily understood, in view of the state of aviation's development at that time. The intimate relationship between the provision of conveniently located modern air terminals and the prosperity of the city, together with the rigid safety requirements attendant upon modern air travel, all point to the necessity for adequate protection for these essential public facilities. The structure of the Resolution, with its height districts lacking any explicit maximum height limits, renders it impossible to grant adequate protection through the mere amendment of the existing height district maps. It is therefore necessary to modify the right to construct buildings or other structures in excess of the basic height district dimensions, in the vicinity of airports, except with the explicit permission of the Board. This procedure has been adopted as clearly within the basic framework of the Resolution. It merely withholds

NYC006135

95

ntial districts,
of this sort.

this city, the
tard and con-
n locating, as
hat they may
standards and
by the Board,
uthorizing the

the adoption
of.  In recent
l public park-
en no explicit
ies, and their
ons, this is a
ublic interest.
· camps from
t, at the same
suitable con-

xperience has
objectionable
ception being

bodied in the
unrestricted,
business dis-
rs, and *retail*
on.  There is
te to purely
eded in such
· is therefore
tricted retail
ly consistent
ent buildings,
usiness areas

Resolution no
ng and light
ere has been

ovide for a
in business
wed is fixed

many areas
ce they will
ne effects of
be permitted
n written on
es in word-

eration for
the state of
provision of
gether with
he necessity
the Resolu-
renders it
the existing
truct build-
the vicinity
re has been
withholds

the application of certain height district exceptions, when this would be dangerous to air travel. The Commission rejected the alternative method, used in several other cities, of setting up a separate system of height regulations in areas adjoining airports.

In order to give the Board power to vary these regulations in appropriate cases, there should be inserted a paragraph to be known as Section 9-A(b), reading as follows:

(b)  The Board may, in appropriate cases, after public notice and hearing, and subject to appropriate conditions and safeguards, determine and vary the application of this section in harmony with its general purpose and intent.

This paragraph was included in the Resolution as advertised for hearing on June 28, 1939, and subsequently omitted.  It is believed that its restoration should be effected by the Board of Estimate.

*Section 14-A(a) to (e) inclusive*—Row and group houses.  New York's zoning to date has been altogether unsuited to the development of the row house, despite the fact that such houses are popular and are regarded by many authorities as perhaps the most economical and satisfactory type of medium income housing.  In the relatively restrictive E and F districts, rows of houses are prevented by the requirement of a side yard on one or both sides of each building, respectively (each unit between party walls being defined as a separate building under the Administrative Code).  In the D and other less restrictive area districts row houses are permitted, but are subject to being intermingled with high density apartments such as are common in these districts Indeed, the usual practice is to construct unbroken rows of houses along the side streets, reserving the avenue frontage for apartments.  The row houses are then sold off while the district retains a degree of openness, but the owners soon find themselves over-shadowed by the bulky apartments permissible in D area districts.  For these reasons the Commission has sought to provide a new district, to be designated as D-1, in which row houses may be encouraged to develop along desirable lines, and with adequate protection from other more dense forms of development.

The worst feature in existing row house development, aside from the intrusion of apartments, is their construction in solid, unbroken rows, extending frequently over the whole frontage of a block.  In the new D-1 district there is no explicit limitation on the number of units which can be built together, but a graduated side yard requirement will tend to limit the number of units to desirable proportions.  In rental housing projects where continuing maintenance can be afforded, this side yard can be in effect a com-munity playground; where the individual row houses are sold, the house next to the side yard will command a higher price, in addition to affording a desirable open space. It may be recalled here also that the amendments to Section 3(9)(b) in defining certain accessory uses permissible in residential districts, specifically permit groups of garages for the service of such row house developments.  This eliminates one of the principal obstacles existing at the present time to satisfactory row housing.

At the hearings some opposition was expressed to the side yard requirement, with a preference for a fixed dimension, if any.  In the case of a six-unit development, the combined side yard requirement would be 30 feet, or 15 feet at each end if evenly divided.  This is not excessive.  It is only in case a great many units are constructed as one that the side yards would be large, and the prevention of unbroken row construc-tion is one of the purposes of this amendment.  The Commission is of the opinion that flexible requirements of this sort, leaving a good deal to the judgment and good busi-ness sense of the owner and his designer, are preferable to more arbitrary restrictions and hence adheres to the flexible provision of the text as presented.

*Section 15-A(a) to (d)*—Less restrictive single-family district.  As first adopted, the Building Zone Resolution made no provision for single-family house districts.  As has been indicated, the E and F districts were expected to develop with two-family and single-family houses respectively, but it became apparent that both of these districts were in fact open to apartment houses, many relatively dense apartments having been built in them in recent years.  To remedy this situation the Commission initiated, and in July, 1938, there went into effect, the new G area district, a number of which have subsequently been adopted as area map changes on petition of property owners in four of the five boroughs.

Experience has indicated, however, that there are numerous areas in which residents and property owners desire protection against the erection of apartments, but are not prepared to comply with all the requirements of the G district.  For this reason the Commission has initiated this new E-1 area district, for single-family houses, somewhat less restrictive than the G district.  It is believed that units of two such houses having a common party wall are not incompatible with such developments and they are there-fore also permitted.

*Section 16-A(a) and (b)*—Garden apartments.  In recent years there has been a pronounced tendency toward the development of multiple dwellings popularly character-

NYC006136

96

ized as "garden apartments." Commercially, the term has been applied to any building of relatively moderate coverage, with some greenery for a setting. Such has been the type of apartments erected in E and F districts. Elsewhere there have been built garden apartment communities enjoying much greater open space. It is felt that the time has come for New York to provide protection for genuinely open garden apartment districts. This is accomplished in the projected F-1 district, by superimposing upon the normal provisions of the F area district, a requirement that the floor area be limited to 0.75 times the area of the lot. This provides a district that is comparatively restrictive as to bulk of building, but in which the builder is allowed wide latitude as to the design of the building to be erected. Its effect is to permit a three-story building to cover 25 percent of the lot, but to limit a six-story building to about 12 percent coverage, with other combinations in proportion. Such low densities are appropriate in many outlying sections. Upon the adoption of the F-1 district as a part of the Resolution, owners in many areas may petition for a change in the Area-district map, to place them in an F-1 district, and thus obtain protection against the more densely built type of apartment.

*Section 19(h)*—Protection against business use on side streets. This section is designed to remedy a condition about which there has been legitimate complaint. Business and retail districts customarily extend along the frontage of so-called "business streets," on which the great majority of the stores front. Such districts extend as a rule 100 feet deep, thus providing business frontage on the residential streets leading into the business street. The corner stores tend to exploit this frontage as well, for advertising, display, and sometimes entrances, to the great detriment of the adjoining residences on the side street. The proposed amendment would restrict the business activities of such corner buildings to the frontage of the recognized business street, and to a depth of 25 feet on the side street.

*Section 19-A(a) to (d), inclusive*—Loading space. One of the recognized purposes of zoning is the relief of street traffic. A leading contributing cause of street congestion is the parking of vehicles at the curb for purposes of loading and unloading. Many modern buildings have, in their own interest, provided off-street loading facilities, in order to eliminate this type of congestion. The proposed amendment would require the provision of such facilities in all new or substantially altered buildings used for purposes involving considerable trucking, in proportion to the floor area of the building. The amendment differs only in detail from similar amendments proposed and actively supported during the past decade by the Merchants Association and other organizations.

*Section 21-C*—Large scale housing projects. The provisions of the original Building Zone Resolution contemplated the erection of buildings on individual lots. A great many of the provisions in the Resolution are directly related to the individual building plot, as such.

More recently there have been notable instances of large scale residential building operations, both public and private, in which groups of buildings have been planned and constructed as a unit, in which case the original lot lines lose all meaning in relation to the structures being erected. These building groups, probably without exception, embody standards of light, air and coverage far in advance of the requirements of the zoning resolution. In fact it would appear that in some instances the need for technical agreement with the Building Zone Resolution, including the use of arbitrary lot lines for the purpose, stands in the way of the realization of the best potential results of unified design.

In several instances it has been necessary to make minor and apparently irrational changes in the zoning maps to permit such projects to proceed. In order to provide a means for furthering desirable projects of this sort, with a minimum of delay and difficulty, this new section is introduced. It is believed to contain ample safeguards.

*Section 22-A*—Lapse of permit. Variances from many provisions of the Building Zone Resolution are granted by the Board of Standards and Appeals. These variances are made in view of special justifying circumstances, and are usually accompanied by stipulations also devised in the light of the special circumstances obtaining in the particular case. Heretofore there has been no limitation on the length of time such variances are valid. The fact that such variances and exceptions, and the conditions accompanying them, are made in the light of special circumstances obtaining at the time of the application, but not necessarily continuing indefinitely, warrants a time limitation on such privileges. The limit here provided is one year, within which time some substantial construction in conformity with the special permit must have taken place, if the permit is not to lapse.

As indicated previously, something remains to be said about the delegation of authority to the Board of Standards and Appeals contemplated in several of the proposed amendments.

NYC006137

The Commission's reasons for believing such delegation desirable and necessary have been quite fully indicated in several sections of this report. It seems clear that these problems can best be handled, can indeed only be handled, by an administrative body, such as the Board of Standards and Appeals in this city.

At the hearings the suggestion was made that certain of these responsibilities might better be retained by the City Planning Commission. But the Commission is quite unable to function as does the Board in such matters. The Commission can, to be sure, initiate changes in the zoning maps, such as would permit the more general distribution of garages and gasoline stations. But it could not limit the uses in such spot zones to garages and gasoline stations, nor could it attach such conditions and requirements as would safeguard the neighboring community. The Board can do these things.

The Commission has attempted to surround the action of the Board with adequate safeguards in each instance, and would point out again that all actions of the Board are governed as much by the general provisions of Section 7 and Section 21 as by the paragraphs giving it specific jurisdiction over particular matters.

The Commission has also given consideration to the desirability of adding a further section, 7-A, for the governance of the Board, particularly with respect to the new responsibilities that would be entrusted to it. If the Board of Estimate believes that such a section is desirable, the Commission suggests the following wording:

*§7-A. Variances for continued use of non-conforming signs, gasoline service or oil selling stations, parking or storage of more than five motor vehicles or garages for more than five motor vehicles. The Board of Standards and Appeals in appropriate cases, after public notice and hearing and subject to appropriate conditions and safeguards as to construction, continued operation and maintenance, may determine and vary the application of §6 (b), (c), (d), (e), (f), for a stated term of years in harmony with the general purpose and intent of this resolution. In making such determinations the Board shall take into account, to the extent in its judgment practicable, the present and prospective character of the area or community affected, as evidenced by available data relating to existing conditions, present and anticipated trends of development, and the Master Plan of the city in so far as adopted; it shall also take into account the investment involved, the extent to which it shall have been amortized, and the additional time required for its substantial amortization; and it is empowered to establish general rules and regulations covering these matters, to the end that the public health, safety and general welfare may be secured and substantial justice done. In cases where uses are hereafter made non-conforming under section 21-A, by action of the city in establishing any of the public uses enumerated therein, special consideration shall be given to such circumstance by the Board, and additional time may be granted for the amortization and elimination of the non-conforming use.*

Attention is directed finally to the fact that the Commission, in its consideration of the whole matter, far from desiring to subject any person or group to unreasonable or arbitrary regulation, has made every effort to devise and suggest provisions embodying the greatest possible flexibility and freedom of action consistent with the primary objective of a balanced and planned city, in which established land uses of suitable character will be given the maximum degree of protection from unwise and improper use of properties, and every encouragement afforded for the rehabilitation of the city's run-down and blighted districts.

Further measures may have to be devised for these purposes, both within and without the framework of the Zoning Resolution. The majority of the Commission believes it has made clear the special circumstances surrounding the advertising sign, gasoline station and garage businesses which, in its judgment, require the procedures herein proposed. It is equally confident that the designation of a suitable regulatory agency with broad general powers to administer these provisions, subject to the requirement of individual consideration, including a public hearing in each instance, rather than any attempt to embody numerous detailed regulations in the Resolution itself, is the preferable procedure.

The following resolution, attached to this report as Appendix C, giving effect to the proposed amendments was adopted by the Commission on May 29, 1940 (Cal. No. 22), and it is herewith filed with the Secretary of the Board of Estimate, pursuant to section 200 of the New York City Charter.

R. G. TUGWELL, Chairman,
LAWRENCE M. ORTON,
CLEVELAND RODGERS,
EDWIN A. SALMON,
Commissioners.

NYC006138



# ZONING RESOLUTION

of

## THE CITY OF NEW YORK

As Amended by the City Planning Commission
and Modified by the Board of Estimate

F. H. La Guardia, Mayor

DOCKET COPY

Including Charter Excerpts, Rules, Forms, Etc.

Effective
June 28, 1940

Price Twenty-five Cents

155

NYC006139

3

# CITY PLANNING COMMISSION

## 2700 Municipal Building, New York City

R. G. TUGWELL, Chairman,
JOSEPH D. McGOLDRICK, Chief Engineer, Board of Estimate, ex officio,
LAWRENCE M. ORTON,
CLEVELAND RODGERS,
EDWIN A. SALMON,
ARTHUR V. SHERIDAN, Commissioners.

PHILIP B. THURSTON, Secretary.

Communications and petitions should be submitted pursuant to the rules of the Commission (see page 24).

Regular public meetings are held in Room 16, City Hall, Manhattan, Wednesdays at 2:30 P. M. Minutes of Wednesday meetings are published in THE CITY RECORD on the following Tuesday.

## INDEX

| | |
|---|---|
| Zoning Resolution | 3 |
| Zoning Excerpts from Charter | 22 |
| Zoning Excerpts from Administrative Code | 23 |
| Excerpts from Rules of Commission | 24 |
| Suggestions for Preparation of Zoning Petition | 26 |
| Diagram Illustrating Affected, Adjacent and Opposite Property | 28 |
| Form of Petition | 28 |
| Forms of Acknowledgments | 28 |
| Form of Notice to be Served on Owners of Property Affected | 29 |
| Form of Proof of Service | 30 |
| Form of Proof of Service | 30 |
| Form of Notice to be Posted | 30 |

## DEPARTMENT OF CITY PLANNING

### Price List of Maps, Publications and Services

(August 1, 1940)

**Zoning Maps and Forms**

| | |
|---|---|
| Use District Maps, 35 Sheets with Index Map, Book Form | $4.50 |
| Height District Maps, 35 Sheets with Index Map, Book Form | 4.50 |
| Area District Maps, 35 Sheets with Index Map, Book Form | 4.50 |
| Unmounted, in sets, in Sections | 5.00 |
| Subdivision Zoning Sheets, each | .03 |
| Form—Notice of Filing Zoning Petition, Foster Giving Notice of Filing Zoning Petition, each | .25 |
| Zoning Resolution (Effective June 28, 1940) | .25 |

**Map of the City of New York**

| | |
|---|---|
| Wall Map—Dated May 15, 1931, Scale 2,000 feet=1 inch (Approx. 8x4 feet) | $11.00 |
| Mounted on Cloth, Developed for Hanging | 3.00 |
| Sectional Map—Dated January 2, 1940 (35 Sections with an Index Map) | |
| Complete Set—1,000 feet=1 inch, each section | 3.00 |
| Blue Print—Scale 600 feet=1 inch, each section | 1.50 |
| White Print—Scale 600 feet=1 inch, each section | 2.00 |
| MCD Section—Dated March 1, 1935, Scale 4,000 feet=1 inch | |
| Base Work Maps | .50 |
| Existing Streets | .50 |
| 1933 Emergency Inventory Maps, in "Color," as follows: | |
| Predominant Rental Per Family Quarter | |
| Day Population } each | 5.00 |
| Population | |
| Predominant Residential Type | |
| Predominant Residential Use | |
| Predominant Residential Age | |

**Other Publications and Services**

| | |
|---|---|
| First Annual Report (1938) 94 pages | (out of print) |
| Second Annual Report (1939) 147 pages | .50 |
| Major Reports, 1938, 54 pages, with Index | .50 |
| Major Reports, 1939, 147 pages, with Index | .10 to .25 |
| Report on City Plan, as adopted, depending on length, each | |
| Proposed Capital Budget for 1940 and Capital Program (1941-1945), including Report, 67 pages | 1.00 |
| Pamphlet Minutes of meetings, issued monthly and mailed for one year | 6.00 |
| Mailing Calendars for current year, issued one year's service | 3.00 |
| Bound and Unbound (these maps, publications and services should be addressed to: The Administrator, Department of City Planning. | 8.00 |

Inquiries regarding these maps, publications and services should be addressed to:

The Administrator, Department of City Planning, Municipal Building, Room 2700. Sold only at Department of City Planning, Room 2700, Municipal Building, payable to The City of New York. Remittance should be made payable to The City of New York. Postage stamps cannot be accepted.

---

## ZONING RESOLUTION OF THE CITY OF NEW YORK

(Effective June 28, 1940)

A Resolution Regulating and Limiting the Height and Bulk of Buildings Hereafter Erected and Regulating and Determining the Area of Yards, Courts and Other Open Spaces, and Regulating and Restricting the Location of Trades and Industries and the Location of Buildings Designed for Specified Uses and Establishing the Boundaries of Districts for the Said Purposes.

Be it Resolved by the City Planning Commission as modified by the Board of Estimate of The City of New York:

### ARTICLE I—DEFINITIONS

§1. **Definitions.** Certain words in this resolution are defined for the purposes thereof as follows:

(a) Words used in the present tense include the future; the singular number includes the plural and the plural the singular.

(b) The "street line" is the dividing line between the street and the lot.

(c) The "width of the street" is the mean of the distances between the sides thereof within a block. Where a street borders a public place, public park or navigable body of water the width of the street is the mean width of such street plus the width, measured at right angles to the street line, of such public place, public park or body of water.

(d) The "curb level" for the purpose of measuring the height of any portion of a building, is the mean level of the curb in front of such portion of the building. But where a building wall is more than 100 feet in length, then the mean level of the curb on the street of greatest width, for the purposes of this resolution. If such greatest width occurs on more than one street the curb level is the mean level of the curb on that street of greatest width which has the highest curb elevation. The "curb level" for the purpose of regulating and determining the area of yards, courts and open spaces is the mean level of the curb at that front of the building where there is the highest curb elevation. Where no curb elevation has been established or where a front yard setback of 25 feet or more is provided, the average level of the land immediately adjacent to the building prior to any excavation or fill shall be considered the curb level.

(e) A "street wall" of a building, at any level, is the wall or part of the building nearest the street line.

(f) The "height" of a building, is the vertical distance measured in the case of flat roofs from the curb level to the level of the highest point of the roof beams adjacent to the street wall, and in the case of pitched roofs from the curb level to the mean height level of the gable. Where no roof beams exist or there are structures wholly or partly above the roof the height shall be measured from the curb level to the level of the highest point of the building. Where a building is a multiple dwelling, as defined in the Multiple Dwelling Law the height of the building shall be measured as prescribed in said law for the measurement of the height of a multiple dwelling, and such measurement shall be from the curb level as that term is used in said law, except that where no curb elevation has been established or where a front yard setback of 25 feet or more is provided, then in no case shall the grade from which the measurements are to be made exceed the average level of the land immediately adjacent to the building prior to any excavation or fill.

(g) The "depth of a lot" is the mean distance from the street line of the lot to its rear line measured in the general direction of the side lines of the lot.

(h) The "rear of a lot" is the portion of a lot directly opposite the front. A "rear yard" is an open unoccupied space on the same lot with a building between the rear line of the building and the rear line of the lot. An "excess rear yard" is that part of a rear yard lying outside the limits of a rear yard of required dimensions.

(i) The "depth of a rear yard" is the mean distance between the rear line of the building and the rear line of the lot.

(j) Lots or portions of lots shall be deemed "back to back" when they are on opposite sides of the same rear of a rear line common to both and the opposite street lines in which the lots front are parallel with each other or make an angle with each other of not over 45 degrees.

NYC006140

4

(k) A "court" is an open unoccupied space other than a rear yard, on the same lot with a building. A court not extending to the street or to a rear yard is an "inner court." A court extending to the street or a rear yard is an "outer court." A court on the lot line extending through from the street to a rear yard or another street is a "side yard." "Excess court space" is that part of a court lying outside the limits of a court of required dimensions.

(l) The "height" of a yard or court at any given level shall be measured from the lowest level of such yard or court as actually constructed or from the curb level, if higher, to such level. The highest level of any given wall bounding a court or yard shall be deemed to be the mean height of such wall. Where a building is a multiple dwelling, as defined in the Multiple Dwelling Law, the height of a yard or a court shall be measured as prescribed in such law.

(m) The "least dimension" of a yard or court at any level is the least of the horizontal dimensions of such yard or court at such level. If two opposite sides of a yard or court are not parallel the horizontal dimensions between them shall be deemed to be the mean distance between them.

(n) The "length of an outer court" at any given point shall be measured in the general direction of the side lines of such court from the end opposite the end opening on a street or a rear yard to such point.

(o) A "family" is one or more persons occupying a dwelling and maintaining a common household.

(p) An "accessory use or building" is a use or building customarily incident to the principal use or building and located on the same lot with such principal use or building.

(q) A "sign" is any structure or part thereof or device attached thereto or painted or represented thereon, which shall display or include any letter, word, model, banner, flag, pennant, insignia, device or representation used as, or which is in the nature of an announcement, direction or advertisement. For the purpose of this resolution the word "sign" does not include the flag, pennant or insignia of any nation, state, city or other political unit, or of any political, educational, charitable, philanthropic, civic, professional, religious or like campaign, drive, movement or event.

A "business sign" is a sign which directs attention to a business or profession conducted upon the premises. An "advertising sign" is a sign which directs attention to a business, commodity, service or entertainment conducted, sold or offered elsewhere than upon the premises. A "for sale" or "to let" sign relating to the property on which it is displayed shall be deemed a business sign.

(r) "Board" shall mean the Board of Standards and Appeals created by Chapter 503 (1) (Laws of 1916 and Chapter 27 of the New York City Charter.

(s) The word "building" shall be deemed to include a structure as defined in the Administrative Code.

(t) A "dwelling" is any building or any portion thereof which is occupied as the home or residence of one or more persons.

a. A "multiple dwelling" shall be as defined in the Multiple Dwelling Law.

b. A "single-family dwelling" is a building designed for and occupied exclusively by not more than one family.

c. A "two-family dwelling" is a building designed for and occupied exclusively by not more than two families.

(u) For the purpose of determining the ratio of the floor area of a building to the area of the lot, the "floor area" of a building is the sum of the gross horizontal areas of the several floors of a building, including interior balconies and mezzanines but excluding garage areas and basement and cellar floor areas not devoted to residence use. All horizontal dimensions are to be made between the exterior faces of walls, including the walls of roofed porches. The floor area of a building shall include the floor area of accessory buildings, except garages, on the same lot, which shall be measured in the same way.

(v) A "lot" is a parcel or plot of ground which is or may be occupied by a building, and accessory buildings including the open spaces required by this resolution.

(w) A "non-conforming building or use" is one that does not conform with the regulations of the use district in which it is located.

(x) The word "premises" shall include a lot with or without a building thereon.

(y) A "trailer camp" shall mean and include any premises where two or more vehicles are parked, which are designed, intended, arranged or used for living or sleeping

---

5

purposes, or any premises used or held out for the purpose of supplying to the public or parking space for two or more such vehicles, whether such vehicles stand on wheels or rigid supports.

(f) For the purpose of this resolution, a public park shall be deemed to be that publicly owned ground, playground, parkway or roadway within the jurisdiction and control of the Commissioner of Parks, other than parked strips or malls in a public street, the roadways of which are not within his jurisdiction and control.

## ARTICLE II—USE DISTRICTS

§2. Use Districts. For the purpose of regulating and restricting the location of trades and industries and the location of buildings designed for specified uses the City of New York is hereby divided into nine classes of districts: (1) residence districts, (2) local retail districts, (3) restricted retail districts, (4) retail districts, (5) retail-1 districts, (6) business districts, (7) business-1 districts, (8) manufacturing districts, (9) unrestricted districts; as shown on the use district map, consisting of thirty-five sheets and an index sheet each dated March 31, 1937, and signed by the Chief Engineer of the Board of Estimate and Apportionment. The use district designated on said map, as amended, or as may be hereafter amended from time to time, are hereby continued and declared to be part hereof. The use district map designations and map designation rules which accompany said use district map are hereby declared to be part thereof. No building or premises shall be used and no building or premises erected other than a purpose permitted in the use district in which such building or premises is located.

§3. Residence Districts. In a residence district no building shall be erected other than a building arranged, intended or designed exclusively for one or more of the following specified uses:

(1) Dwellings, which except as hereinafter provided in §§14-A, 15-A and 16-B, shall include dwellings for one or more families and boarding houses and also hotels which have thirty or more sleeping rooms.

(2) Clubs, excepting clubs the chief activity of which is a service customarily carried on as a business.

(3) Churches.

(4) Schools, libraries, public museums, court houses, fire houses, and police stations.

(5) Philanthropic or eleemosynary uses or institutions, other than correctional institutions.

(6) Hospitals and sanitariums.

(7) Railroad passenger stations.

(8) Farming, truck gardening, nurseries, or green houses.

(9) Accessory uses customarily incident thereto, not including a business or any building or use not located on the same lot with the building or use to which it is accessory. The term accessory use or building shall include only uses which serve exclusively the convenience of occupants of the building to which they are accessory. Such accessory uses may include, inter alia:

(a) A private garage for not more than three motor vehicles as an appurtenance to a single family or two-family dwelling; such private garage shall be exclusively for passenger vehicles, and space for one passenger motor vehicle may be rented.

(b) A private garage or group of private garages, with a capacity not exceeding one vehicle for each family, as an appurtenance to a group of single family or two-family dwellings erected under one ownership, or as an appurtenance to one or more multi-family dwellings erected under one ownership; such garage or group of private garages shall be exclusively for passenger vehicles, including buses, which are used in the service of said dwellings. No space shall be rented or sublet to non-occupants.

(c) The practice of a profession within the premises in which the practitioner resides. Dressmaking, millinery and similar home occupations not conducted as a regular business and employing no help other than members of the immediate family living on the premises and having no business signs on the premises other than one sign not exceeding one square foot in area.

(d) The following non-flashing non-illuminated business signs: a nameplate indicating the occupant; a sign not exceeding one square foot in area indicating practice on the premises of the profession of the occupant; a sign not exceeding 12

NYC006141

6

square feet in area advertising the premises as "for sale" or "for rent" with pertinent information, which, if on vacant property shall not be within 15 feet of the street line nor within six feet of any adjoining property line. No sign shall project more than 12 inches beyond the street line. Not more than one sign shall be permitted for each use, profession, or person coming within the provisions of this section.

(e) Removal for sale of sod, loam, clay, sand, gravel or stone in connection with the construction of a building on the lot, or in connection with the regrading of a lot but in the latter case not below the legal street grade.

**14. Business Districts.** (a) In a business district no building or premises shall be used, and no building shall be erected which is arranged, intended or designed to be used, for any of the following specified trades, industries or uses:

(1) Ammonia, chlorine or bleaching powder manufacture.
(2) Asphalt manufacture or refining.
(3) Assaying (other than gold or silver).
(4) Blacksmithing or horseshoeing or welding.
(5) Boiler making.
(6) Brewing or distilling of liquors.
(7) Carpet cleaning.
(8) Celluloid manufacture.
(9) Crematory.
(10) Distillation of coal, wood or bones.
(11) Dyeing or dry cleaning establishments other than establishments where dry cleaning is accessory to the principal use.
(12) Electric central station power plant.
(13) Fat rendering.
(14) Fertilizer manufacture.
(15) Storage or parking of more than five motor vehicles or garage for more than five motor vehicles, including garage units or parking or storage on contiguous lots for a less number which in the aggregate accommodate more than five motor vehicles in the same ownership, management or control and not including in indoor salesroom where motor vehicles are kept for sale or for display purposes only; provided, however, that the provisions of §21-A apply, there may be conducted as provided therein by tenants or their employees, customers or patrons, outdoor parking or indoor garage space adjoining or within a business building but not within required open spaces provided no fee is charged and no gasoline or oil selling, or servicing or repair facilities are included.
(16) Gas (illuminating or heating) manufacture or storage.
(17) Glue, size and gelatine manufacture.
(18) Incineration or reduction of garbage, offal, dead animals or refuse.
(19) Iron, steel, brass or copper works.
(20) Junk, scrap paper or rag storage or baling.
(21) Lamp black manufacture.
(22) Lime, cement or plaster of paris manufacture.
(23) Milk bottling and distributing station.
(24) Oil cloth or linoleum manufacture.
(25) Paint, oil, varnish, pigment or turpentine manufacture.
(26) Petroleum refining or storage.
(27) Printing ink manufacture.
(28) Raw hides or skins—storage, curing or tanning.
(29) Repair shop for motor vehicles other than facilities for minor adjustments with hand tools in a legally permitted garage for more than five motor vehicles.
(30) Rubber manufacture from the crude material.
(31) Saw or planing mill or lumber yard.
(32) Shoddy manufacture or wool scouring.

7

(33) Slaughtering of animals or fowl.
(34) Smelting.
(35) Soap manufacture.
(36) Stable for more than five horses.
(37) Starch, glucose or dextrine manufacture.
(38) Stock yard.
(39) Stone or monumental works, or the manufacture of cement blocks.
(40) Sugar refining.
(41) Sulphurous, sulphuric, nitric or hydrochloric acid manufacture.
(42) Tallow, grease or lard manufacture or refining.
(43) Tar distillation or manufacture.
(44) Tar roofing or tar waterproofing manufacture.
(45) Refrigerating plants, coal yards and coal pockets.
(46) Gasoline service or oil selling station.
(47) Bus station.
(48) Trailer camp.
(49) Business and advertising signs, except:

(a) Non-flashing business signs, each of which does not exceed 500 square feet in area and which does not project more than eighteen inches beyond the street line provided that such business signs may in no case exceed an aggregate of 15 per cent of the area of the wall surface, including window and door areas, on which they are displayed.

(b) Business signs on awnings or marquees permitted by the Administrative Code.

(c) Projecting signs attached to a theatre, hotel, a large department store or a similar structure of an essentially public nature, which advertise or indicate the principal business transacted on such premises.

(50) Automobile wrecking yard.

(51) Steam or wet wash laundry other than in a hotel or hospital.

(b) In a business district no building or premises shall be used, and no building shall be erected, which is arranged, intended or designed to be used for any trade, industry or use, which is noxious or offensive by reason of the emission of odor, dust, smoke, gas or noise; but car barns or places of amusement shall not be excluded.

(c) In a business district no building or premises shall be used, and no building shall be erected, which is arranged, intended or designed to be used for any kind of manufacturing, except that any kind of manufacturing not included within the prohibitions of paragraphs a and b of this section may be carried on provided not more than 25 per cent of the total floor space of the building is so used, but space equal to the area of the lot may be so used in any case, although in excess of said 25 per cent. The printing of a newspaper shall not be deemed manufacturing.

**§4-A. Retail Districts.** In a retail district the same regulations and restrictions shall apply as are provided for business districts except that no manufacturing or treatment of products shall be carried on other than such as are incidental to the conduct of a retail business conducted on the premises, or such other manufacturing as is now permitted in a business district, provided that in such other manufacturing not more than five per cent (5%) of the total floor space of the building is so used.

**§4-B. Restricted Retail Districts.** In a restricted retail district, the same regulations and restrictions shall apply as are provided for retail districts except that in a restricted retail district no building or premises shall be used and no building shall be erected which is arranged, intended or designed to be used for any of the following purposes:

(a) Amusement centre for the playing of games and for the operation of bagatelle boards and other similar devices.
(b) Billiard parlor, pool parlor or bowling alley other than in a hotel.
(c) Cabaret other than in a hotel.
(d) Freak show or wax museum.
(e) Theatre or motion picture theatre.

NYC006142

16

17

§21. **Rules and Regulations; Modification of Provisions.** The Board of Standards and Appeals shall adopt from time to time such rules and regulations as they may deem necessary to carry into effect the provisions of this resolution. Where there are practical difficulties or unnecessary hardship in the way of carrying out the strict letter of the provisions of this resolution the Board of Standards and Appeals shall have power in a specific case to vary any such provision in harmony with its general purpose and intent, so that the public health, safety and general welfare may be secured and substantial justice done. Where the street layout actually on the ground varies from the street layout as shown on the use, height or area district map, the designation shown on the mapped areas shall be applied by the Board of Standards and Appeals to the unmapped streets in such a way as to carry out the intent and purpose of the plan for the particular section in question. Before taking any action authorized in this section the Board of Standards and Appeals shall give public notice and hearing.

§21-A. **Restrictions on Location of Garages, Storage or Parking of Motor Vehicles, Gasoline Service Stations.** Except as provided in §6 and §7(g), no premises may be used as a gasoline service station or oil selling station, or as a garage for more than... motor vehicles, or for the storage or parking of more than five motor vehicles, and no building may have its... or building is situated on either side of any portion of a street between two intersecting streets, on which portion there exists an exit from or an entrance to a public school, a public park or public playground of one half acre or more in area, a hospital maintained as a charitable institution, a public library, a public museum, or a duly organized school licensed by the Board of Regents for children under 16 years of age; and in no case except... by the Board of Regents... feet... use of... travel. However, this prohibition shall not apply when the... 100 feet measured along the line of travel... line. Where certificates of occupancy have been issued and where all other requirements of law, rule and regulation have been complied with, the existing use of such premises may be continued unless such use shall have been determined, after a public hearing by the Board of Standards and Appeals, to be a hazard to life, health, or the general welfare. Any public agency, department head, or public institution may petition the Board of Standards and Appeals... considering the termination of an existing use, the Board shall give due consideration to the general welfare and to the investment involved. The board may continue or terminate the said use, subject to such conditions as it may prescribe.

§21-B. **Restrictions on Location of Advertising Signs.** No advertising sign shall hereafter be erected or structurally altered in any use district within 200 feet of a highway designated by the City Planning Commission as an express highway to which the provisions of this section shall apply, or within 200 feet of a public park of one-half acre or more in area, if within view of such highway or park.

§21-C. **Site Plans for Large Residential Developments.** Upon presentation to the Board of Standards and Appeals of a site plan showing the extent of dwellings... spaces on an area not less than 75,000 square feet in extent, the Board, after public notice and hearing, upon report from the City Planning Commission, may grant a variance from the use, height or area provisions of this resolution; provided that the ratio of the floor area of the building or buildings to the area of the lot does not exceed that permitted by this resolution; and further provided that the special circumstances of the particular case and at least equivalent to the requirements of this resolution; and further provided that the minimum distance between any two buildings is not less than 6 inches per foot of height and in no case less than 20 feet.

§22. **Unlawful Use; Certificate of Occupancy.** It shall be unlawful to use or permit the use of any building or premises or part thereof hereafter created, erected, changed or converted wholly or partly in its use, until a certificate of occupancy shall have been... that the building or premises or the part thereof so created, erected, changed or converted and the proposed use thereof conform to the provisions of this resolution shall have been issued by the Department of Housing and Buildings. In the case of such buildings or premises it shall be the duty of the department of housing and buildings to issue a certificate of occupancy within ten days after a request for the same... building is in fact in... by any owner of a building or premises affected by this resolution, provided it is entitled thereto; and the part thereof so created, erected, changed or converted and the proposed use thereof conform to all the requirements herein set forth. Under rules and regulations of the Board of Standards and Appeals a temporary



(b) An open or lattice enclosed iron fire escape, fireproof outside stairway or d-floored balcony to a fire tower may project not more than 4 feet into a rear yard an inner court, except that an open or lattice enclosed iron fire escape may project more than 8 feet into a rear yard or into an inner court when it does not occupy re than 20 per cent of the area of such inner court.

(c) A corner of a court or court may be cut off between walls of the same building vided that the length of the wall of such cut-off does not exceed 7 feet.

(d) An offset to a court or yard may be considered as a part of such court or d provided that it is no deeper in any part than it is wide on the open side and t such open side be in no case less than 6 feet wide.

(e) If a building is erected on the same lot with another building the several ldings shall, for the purpose of this article, be considered as a single building, ess otherwise herein specifically provided for. Any structure, whether independent of attached to a building, shall for the purpose of this article be deemed a building or a t of a building.

(f) If an additional story or stories are added to a building existing at the time passage of this resolution, the courts and yards of which do not conform to the uirements of this article, the least dimensions of yards and courts shall be increased the top of the existing yard or court walls as though they were of the prescribed enths and widths and the carrying up of existing elevator and stair enclosures ll be exempted from the provisions of this article.

(g) On a corner lot the owner may elect either street line as the front of the lot, ent as provided in paragraph (h) of this article.

(h) In cases where there is more than 100 feet of frontage on a street in an estricted... a business, a business-1, a retail, retail-1, a restricted il or a local retail district, to a depth not exceeding 100 feet, and the abutting property the rear is in a residence district, buildings within 100 feet of a corner, hereafter ngel, intended or designed to be used for... business use, shall have their ances fronting on such street, and show windows and business signs facing on or jecting over any intersecting street shall not extend more than 25 feet from the er.

§19. **Loading Space.** (a) Every building or part thereof hereafter erected, ch is arranged, intended or designed to be used for manufacture, storage, or goods lay, or for a department store, hotel or hospital, shall be provided with one truck lay or unloading berth of a minimum size of 25 feet by 10 feet for each 25,000 square... anged, intended thereof exceeding 5,000 square feet of aggregate gross floor area and provided that no building... The minimum clear height of such space, ... access to it from the street... 12 feet. Such requirements shall not apply ny such building having less than 25,000 square feet of aggregate gross floor area anged, intended or designed for such use;

(b) No building or part thereof heretofore erected, which is arranged, intended or gned for any of the purposes specified above shall hereafter be altered, extended or rged so as to provide aggregate floor space in excess of 25,000 square feet, unless k loading or unloading berths are provided as required for buildings hereafter erected;

(c) No building that is not arranged, intended or designed for use for the purposes ified above shall be hereafter used for such purposes unless truck loading or unloading ds as herein prescribed are provided.

(d) Where such loading space does not adjoin the street, convenient and adequate ss, at least 12 feet in width, to such space shall be provided.

## ARTICLE V—GENERAL AND ADMINISTRATIVE

§20. **Interpretation; Purpose.** In interpreting and applying the provisions of resolution, they shall be held to be the minimum requirements for the promotion of public health, safety and general welfare. It is not intended to... the... annul nances, rules, regulations or permits previously adopted or issued, or which shall be ted or issued pursuant to law relating to the use of buildings or land except as rwise provided in this resolution. Where this resolution imposes greater restriction the use of a building or land or upon the height and bulk of a building, or pre-

scribes larger open spaces than are required by such ordinances, rules, regulations or permits, this resolution shall control.

NYC006143