Exhibit G

# ZONING NEW YORK CITY

A PROPOSAL FOR A

ZONING RESOLUTION

for the

CITY OF NEW YORK

submitted to the

CITY PLANNING COMMISSION

by

VOORHEES WALKER SMITH & SMITH

AUGUST, 1958

## Board of Estimate of the City of New York

ROBERT F. WAGNER
Mayor

LAWRENCE E. GEROSA
Comptroller

ABE STARK
President of the Council

HULAN E. JACK
President, Borough of Manhattan

JAMES J. LYONS
President, Borough of The Bronx

JOHN CASHMORE
President, Borough of Brooklyn

JAMES J. CRISONA
President, Borough of Queens

ALBERT V. MANISCALCO
President, Borough of Richmond

## New York City Planning Commission

JAMES FELT
Chairman

FRANCIS J. BLOUSTEIN
Vice-Chairman

GOODHUE LIVINGSTON, JR.

ROBERT G. McCULLOUGH
Ex-officio

ROBERT MOSES

LAWRENCE M. ORTON

CHARLES J. STURLA

VOORHEES WALKER SMITH & SMITH

*Architects*

101 PARK AVENUE • NEW YORK 17 • NEW YORK

STEPHEN F. VOORHEES, R.A.

RALPH WALKER, R.A.

PERRY COKE SMITH, R.A.

BENJAMIN LANE SMITH, R.A.

CHARLES BAINES, R.A.

MAURICE GAUTHIER

HARRY TAYLOR OHERARDI

JOSEPH L. HAUTMAN

CHARLES L. MACCHI

FRANK J. ROORDA

VICTOR J. DE MASI

JAMES J. BUCKRIDGE

August 12, 1958

PROPOSAL FOR A ZONING RESOLUTION
CITY OF NEW YORK - 2201

Mr. James Felt, Chairman
City Planning Commission of the
    City of New York
2 Lafayette Street
New York 7, New York

Dear Mr. Felt:

The following documents, transmitted herewith, make up the
final submission of our Proposal for a Zoning Resolution,
City of New York, and are in accordance with the terms of
the Contract between Voorhees Walker Smith & Smith and the
City of New York dated September 4, 1956, Contract No.
183,365:

1.  One reproducible autopositive of each of the present
    thirty-five 600' scale City Map sheets. On these auto-
    positives are drawn the proposed district designations
    and boundaries.

2.  The Proposed Zoning Ordinance. Ahead of each section
    of the Proposed Ordinance is a descriptive report
    covering that section.

3.  Summary, Proposal for a Zoning Resolution.

Very truly yours,

VOORHEES WALKER SMITH & SMITH

Perry Coke Smith

Enclosures

## Participating Staff

VOORHEES WALKER SMITH AND SMITH
SPECIAL PLANNING STAFF, ZONING PROJECT

Jack C. Smith, Technical Director

**Senior Analysts**

Millard Humstone
Astrid A. Monson

Paul Davidoff
John Lister
Allan K. Sloan

**Technical Staff**

Newell D. Mitchell
Peter A. Stone

Leo M. Egand
Anna W. Fisher
Louis K. Loewenstein
Frances F. Piven

**Field Staff**

Robert J. Lehde
Lionel Sapinkopf

Joseph T. Ambrose
Martha M. Davis
Lawrence Press
James Rosgood

Marvin Goldstein

**Research Assistants**

Vera B. Bloch
Francis G. Haas
Jerome N. Koffler
Sam M. Waldman

CITY PLANNING COMMISSION LIAISON COMMITTEE

James Felt, Chairman

Francis J. Bloustein, Vice Chairman

Lawrence M. Orton, Commissioner

Irving F. Ashworth, Chief,
Office of Technical Controls

Richard K. Bernstein,
Assistant to the Chairman

Norman Williams, Jr., Chief,
Office of Master Planning

DEPARTMENT OF CITY PLANNING
PRIMARY PARTICIPATING STAFF

Charles L. Austin, Senior Planner
Edwin Friedman, Planner
Ernst R. Hacker, Senior Planner
Samuel Joroff, Director,
   Division of Land Use Planning

Samuel R. Mozes, Planner
Westervelt A. Taylor, Civil Engineer
Vita O. Weiss, Planner
Louis Winnick, Director, Division of
   Population and Economic Analysis

CONSULTANTS

Raymond and May Associates
Walter C. McCrone Associates
Norman M. Klein

REPORT PRODUCTION

Graphics Section,
Department of City Planning
Sol Mann, Supervisor

Howard Bauman, Consultant

Howard William Mitchell, Design of
   Flight Obstruction Maps

Martha S. LaBianca,
Editorial Assistant

# Acknowledgments

Many agencies and organizations have generously given assistance and cooperation to this project. Although responsibility for the recommendations in the report is that of the consultants alone, special recognition for data and advice is due the following:

City of New York:

      Department of Air Pollution Control

      Department of Buildings

      Fire Department, Division of Fire Prevention

      Police Department

      Department of Public Works, Division of Sewage Disposal

      Tax Department

New York City Housing Authority

Division of Industrial Hygiene,
    New York State Department of Labor

Federal Housing Administration


Atomic Industrial Forum, Inc.

Consolidated Edison Company

Market Research Department, New York Daily News

Marketing Division, New York Journal American

Metropolitan Funeral Directors' Association, Inc.

New York City Petroleum Industries Committee

New York Metropolitan Region Study

New York Telephone Company

Port of New York Authority

Regional Plan Association

## Preface — The Need for New Zoning

It is time for New York City to stop living in zoning's past. The price we pay for clinging to an obsolete zoning structure -- burdened by the weight of amendments it was never intended to support -- is already too high.

The price is too high in terms of overbuilding and congestion in some parts of the city while others are vacant and blighted.

The builder and architect pay too high a price for stereotyped designs enforced by regulations rigidly restricting the outer form but ineffectively dealing with the bulk and density they are intended to control.

The price is too high in terms of the conformity of housing types dictated by the economics of the present regulations, narrowing the choice of the home-seeker and discouraging the variety desirable and necessary for so complex and varied a population as New York's.

The price is too high in the sheer waste of scarce sites needed for employment-giving and tax-paying industry. And paradoxically it is also too high in the lack of protection to the homes which are prematurely and uneconomically permitted to pre-empt these sites.

The price is too high in terms of the jamming and blocking of streets needed for the movement of cars because no logical provision can be made for their parking.

Gross overzoning of shallow commercial strips exacts too high a price in excessive waste of land and in scattered and economically unrelated store development.

In these and in many other ways the existing zoning structure imposes an exorbitant price. The total pattern of land development it charts bears no meaningful relationship to the New York City that is or that will be. The city that our present zoning would permit is a nightmare of 55 million residents and 250 million workers. Obviously the crowded New York of today in which some eight million people live and four million work is not going to be transformed into such inconceivable size. A pattern which would permit such a transformation is not capable of rationally controlling land development. Gross distortion and waste are inevitable.

Time and experience have helped us to discover the fundamental principles of good zoning based on effective land-use planning. Like many other basic principles, once grasped they seem so simple and logical as to be self-evident. The sum of the regulations applied to all the individual segments of land within the city is of necessity the city's total pattern of permissible land development. A reasonable concept of the total city pattern should therefore be the starting point and framework of a good zoning resolution -- not its accidental by-product. Within this framework, good zoning requires the logical development and application of the minimum number of different zoning districts necessary to reflect fundamentally different conditions which exist or are desired. The larger and more complex a city, the more different kinds of districts it needs. Zoning controls that apply to these districts should be as direct and as simple as possible, concerned with three basic elements: 1) the kind of use permitted; 2) the bulk or intensity of development; and 3) in deference to the role of the automobile, the amount of off-street parking and loading space required.

Our existing zoning, being deficient in concept and structure, is likewise deficient in the control of these three basic elements of land regulation.

The present Use Districts do not really provide for the logical grouping of compatible uses, as witness business districts that permit manufacturing, warehousing and other inappropriate uses; various retail districts, none of which really provide what their names imply or what is called for; manufacturing districts which are essentially business classifications slightly less curtailed as to processing; and unrestricted districts in which anything goes despite the fact that they are often mapped in close proximity to residential zones.

Direct control of bulk is provided in only a fraction of our zoning districts; others have indirect controls which tend to be too restrictive and stultifying. And a number of districts have no real bulk controls at all.

The attempt to establish reasonable nonresidential parking requirements failed because there was no logical district structure to which they could be attached. The existing structure gave rise to such contradictions as uniform parking standards for the almost rural Prince's Bay section in Staten Island and Manhattan's Lower East Side.

These basic failings in our existing zoning do not discredit those who had the vision and courage to give New York the country's first zoning resolution over four decades ago; rather they discredit us for having failed to move ahead with comparable vision and courage in maintaining this zoning leadership. Instead, we temporized and tinkered, piled resolution and map amendments one on top of another -- more than 2,500 to date -- and developed the implausible total of more than

1,000 possible combinations of use, height, and area districts as a result of our three-map system.

Finally, we came to the realization that this wouldn't do. We were like a homeowner trying to run a houseful of modern electrical appliances on the basic wiring circuit installed in 1916 to supply a few incandescent bulbs. Whenever a new appliance was plugged in, another would malfunction or a fuse would blow. It was a hopeless task unless the house was rewired from top to bottom. So, too, New York required rezoning from top to bottom.

Two years ago the Board of Estimate authorized the City Planning Commission to enter into a contract with outside consultants for the purpose of studying and recommending the comprehensive revision of New York City's zoning. The resolution presented by Voorhees, Walker, Smith and Smith in this report is the product of that study. It is the work of an expert staff guided by the practical knowledge and experience of one of New York's most eminent architectural firms. The accumulated data, studies, and detailed knowledge of the staff of the Department of City Planning were freely made available and drawn upon by the consultants. The development and mapping of districts were based on first hand examination on the ground, from the air, and from the surrounding waters of virtually every foot of land -- developed and undeveloped -- within the borders of New York City.

The proposed zoning is realistically based on a concept of a city that can grow to a population of some 11,000,000 persons. This includes ample reserve margins for the accommodation of housing, commerce and industry. It is based on a single-map system, with direct controls on permitted use, maximum bulk and density of development, and amount of parking required in each district. The compensating variables used for bulk and density control give the builder a wide latitude of choice in the matter of types and design of structures, and the system of incentives encourages design in the public interest. At the same time, because controls are aimed at substance, not form, residential population densities are predictable and offer the opportunity for sensible planning of public facilities and services.

The proposed zoning recognizes the fact and economics of large-scale projects, and provides logically for their accommodation. It provides protection of sites for both residence and industry, not just the one-sided protection that has so frequently worked to the detriment of both. It further recommends that within the respective industrial districts, location will be governed by actual performance in respect to control of nuisance factors. Performance standards, now used in a number of large cities, encourage desirable industrial development by giving high-performance industry a wider choice of sites while offering surrounding development

measurable protection.

The proposed zoning accepts the existence of the automobile. It requires that off-street parking be provided in all residential districts, and in all commercial and manufacturing districts except for the most congested downtown areas where mandatory off-street parking would be uneconomic and impractical.

In short, as the above paragraphs may suggest, the zoning resolution proposed by Voorhees, Walker, Smith and Smith is based on the principles of good zoning -- applied with ingenuity, intelligence, and discretion. It is not and cannot be a simple resolution, because it must regulate the largest and most complex city in the world. But it is logical and consistent, and has been deliberately drawn to provide maximum simplicity to the user. Provisions that apply to various districts or to various types of uses are repeated in all the appropriate sections, so that all regulations governing a particular district or a particular use may be found in one place.

The Voorhees, Walker, Smith and Smith zoning proposals have been published so that while they are being studied in detail by the City Planning Commission, they will be available for examination and study by interested citizens -- and by professional, business and civic organizations. We will want to draw upon your views, advice and suggestions in making the necessary modifications and adjustments that are bound to be required, prior to holding formal public hearings on the adoption of a new zoning resolution.

New zoning will meet opposition -- from those who resist change in general, from those who feel that they have a vested interest in the present resolution or who can exploit its weaknesses, and from those who honestly believe that continued piecemeal amendment is the best way to accomplish our ends.

New zoning will not work an overnight miracle for New York City. Too much that has already been done will be with us for a long time. But there are still undeveloped and underdeveloped areas in New York. And even where it is most congested and built up, New York is a city that continually and restlessly rebuilds itself. The accelerating tempo of renewal and redevelopment efforts -- private and public -- will bring about profound changes in its older sections during the next twenty-five years.

Only a modern resolution, based on sound zoning principles and a realistic concept of our city, can productively guide this building and rebuilding. We now have the basis for such a zoning resolution. I am sure that the citizens of New York will insist on nothing less.

James Felt

# Summary

This proposal contains the text and maps of the proposed new zoning resolution, with an accompanying explanatory report. The first section of the report explains the wide range of studies of land use, population, and economic activities leading up to the determination of the land needs of the primary types of uses in the City. The second section contains an explanation of the organization and form of the proposed resolution. With the exception of the discussion of the procedures for drawing the new zoning maps, the remaining sections of the report deal with the principal zoning regulations proposed and are inserted before the appropriate Article or Chapter of the proposed resolution. For example, an explanation of the residential use regulations precedes the chapter containing the residential use regulations.

Developing the proposed zoning resolution involved three basic steps: 1) Analyzing the land needs of the City's principal users of land; 2) Devising the proposed zoning controls and regulations; and 3) Drawing the new zoning maps. The primary results of these processes may be summarized as follows:

## Organization and Form of the Resolution

The proposed resolution has been designed primarily for the convenience of the potential developer who wants to find out what he can do on a particular plot of land, or where he can locate a particular use, rather than the rare person who will read the entire document. An allied objective was the organization of the regulations to give a clear, coherent, and logical picture to the user. These objectives have been accomplished by putting all the regulations applying to a particular category of use in one Article, by reducing cross-references to a minimum, by indicating the regulations applying to each district by means of charts, by putting numerous regulations in tabular form, by the use of explanatory drawings, diagrams, and summary tables, by supplying an index of all uses, and by employing a one-map system. The last feature, the one-map system, facilitates easy use of the proposed resolution by replacing the present cumbersome three sets of zoning maps bound separately from the resolution with a single set of maps bound with the proposed resolution.

## Proposed Zoning Districts -- Use Distinctions

The proposed zoning districts constitute the minimum number required to guide the extreme range of land use, building types, and concentrations of development in New York City. The three broad categories of use districts -- Residence, Commercial, and Manufacturing -- have been further subdivided to provide for all the present and anticipated uses to be found in a large modern city. A total of

thirteen different types of districts are proposed on the basis of use distinctions: two residential; eight commercial; and three manufacturing. To establish clearly what uses are permitted in each district, all present and anticipated uses in the City have been classified into 18 categories or "Use Groups" on the basis of similarity of function as well as compatibility with one another and with adjacent districts. Each use district designated on the zoning maps permits one or more Use Groups. For example, the Commercial Local Service District (C2) permits television repair and the other home maintenance and repair services listed in Use Group 8, but not automobile repair and other heavy service uses listed in Use Group 16. The proposed use districts may be summarized as follows:

### 1) Residence Districts

Two major categories of Residence Districts are proposed: 1) Single-family Districts (R1 and R2) designed for and restricted to single-family detached houses, and 2) General Residence Districts (R3 to R9), permitting all dwelling types subject to regulations which establish adequate standards of density and bulk for each district. The density, open space, and other proposed bulk regulations will provide protection for the various types of dwellings in the lower density districts. In addition, the residential developer and home buyer or renter is permitted to exercise the greatest possible choice in determining or finding an appropriate structural type for any area in which he wishes to build or to live.

### 2) Commercial Districts

Eight Commercial Districts are tailor-made to fit the extraordinary diversity of commercial activity in the City, ranging from purely local shopping areas, to heavy service areas, to prime central shopping districts. The eight districts are of four primary types: 1) Local Retail and Service Districts (C1 and C2), designed to service local area needs; 2) General Commercial Districts (C4), designed for primary and secondary outlying shopping centers serving extensive service areas; 3) Central Commercial Districts (C5 and C6), designed for the central business areas of Manhattan and downtown Brooklyn and catering to the retail and commercial needs of the entire City and metropolitan region; and, 4) Three special purpose districts (C3, C7, and C8) designed to accommodate waterfront recreational uses (C3), large outdoor commercial amusement uses (C7), and heavy service uses (C8).

### 3) Manufacturing Districts

Three Manufacturing Districts incorporate regulations based both on lists of permitted uses and on "performance standards" with established limits on noise, air pollution, and other types of industrial nuisances. The M1 District is designed for industries with

high performance standards and is used as a buffer to protect Residence or Commercial Districts from the heavy industrial district, M3, permitting industries which may create appreciable noise, air pollution, or other nuisances. The M2 District is designed for uses which are not as free of nuisances as those permitted in the M1 District but not as objectionable as in M3. Residential development is excluded from all Manufacturing Districts.

## The Total Zoning District Structure

To fit the broad range of situations prevalent in New York, the Residence Commercial, and Manufacturing Districts described above are combined with various levels of building bulk and parking and loading requirements. Each of the 47 districts resulting from this combination of regulations incorporates integrated controls over use, bulk, and parking and loading. Direct and meaningful relations are thus established between permitted uses, building bulk, and required levels of off-street parking and loading facilities. The 47 districts are designated on a single set of zoning maps in contrast with the 286 district combinations actually found on the three sets of zoning maps under the existing zoning regulations.

## Drawing the New Zoning Maps

The overriding importance of devising appropriate districts and applying them consistently throughout the City has been the guiding principle in this rezoning operation. The application of the proposed district regulations by means of the new zoning maps was a process involving two primary steps: 1) Analysis of the future land needs of the principal users of land in the City; and 2) The drawing of the new zoning maps. In preparing the estimates of future land needs, the staff assembled all available data bearing on land demand, conducted a number of new surveys to fill in gaps in the data, and, by interviews and conferences, drew upon the experience of dozens of specialists and real estate practitioners. In drawing the new zoning maps, every block of land in New York was carefully re-evaluated by first-hand field examination and analysis.

## Industrial Performance Standards

Industrial performance standards are proposed to supplement the listing of permitted industrial uses in order to provide a more

effective and equitable method of guiding industrial location through zoning. Thus, the large number of nuisance-free industries would be given greater freedom in choosing sites, while adjacent residential and commercial areas are given better protection from industrial nuisances.

## Regulations Governing the Intensity of Residential Development

The principal and most important influence of zoning on future residential development is its control over such important factors as building volume, density, and open space. Four interrelated controls are proposed to regulate the intensity of residential development: 1) The Floor Area Ratio, which limits the amount of floor area which may be developed on a lot; 2) Lot area per dwelling unit regulations, which control population density by limiting the number of dwelling units permitted on a lot; 3) The Open Space Ratio, which regulates the amount of open space on a lot; and 4) Minimum lot area and lot width regulations, which affect the density of development. The Floor Area Ratio device is already in use in several of the area districts of the present zoning resolution and has the merit of being a simple, direct, flexible, and enforceable control over the bulk of buildings. The Floor Area Ratio is supplemented by lot area per dwelling unit requirements which constitute a direct, effective control over population density -- both new residential development and the conversion of existing dwelling units. An effective balance can thereby be maintained between the permitted concentration of population and the capacity of street and transit facilities, as well as schools and other community facilities, to serve the needs of the population. The Open Space Ratio expresses the relationship between the open space on the lot and the floor area of the building or buildings on it, and supplements the Floor Area Ratio and the density regulations to insure the long-term desirability of residential areas by maintaining adequate standards of open space. The proposed controls over the intensity of residential land use have been carefully related so that it is possible to permit the developer a far wider choice as to his type of development while maintaining adequate standards of residential density and coverage. In addition, the interrelated application of the three controls makes it possible to induce better standards of open space by granting a bonus of a moderate increase in Floor Area Ratio or density when more than the required amount of open space is provided.

## Regulations to Insure Access of Light and Air

To insure adequate light and air to buildings

and to streets, three flexible alternatives are proposed which permit a high degree of design freedom in achieving economic, efficient, and attractive buildings. The first establishes an envelope characterized by a vertical front or street wall of a stated maximum height and a required setback above which a building can continue to rise beneath a limiting angle (the sky exposure plane). An alternative regulation permits the street walls of buildings to rise to greater heights, provided the buildings are set back a specified distance at street level. A third, which can be used alone or in combination with either of the others, concerns towers and permits a building or portion of a building to cover 40 percent of the lot without any required setbacks or limitation by angles (the sky exposure planes ) as long as the Floor Area Ratio is not exceeded. In order to bring more light and air into streets surrounded by tall buildings, as well as to create more usable open space, a bonus device has been established to encourage the setting back of buildings from the street line. When such a plaza or open space is provided, three feet of additional floor area are permitted for each square foot of open space or plaza provided.

Large-Scale Residential Developments

In recognition of the opportunities inherent in large-scale developments, a series of regulations is proposed which permit flexibility in site planning while insuring adequate protection of the residents of large-scale developments as well as of adjacent areas. In addition, because some of the more important regulations are applicable to both large- and small-scale projects, most projects can proceed as a matter of right without complicated administrative review. The principal regulations deal with bulk controls and convenience shopping facilities. A minimum building spacing formula is proposed, which makes the required spacing between various buildings dependent on the degree of their impact upon each other as determined by their height and length. A limited amount of controlled convenience shopping facilities is permitted in large-scale residential developments (and considered as an accessory use) if the City Planning Commission finds that such facilities are needed and are properly located. Opportunity is provided the City to arrange for the reservation of sites needed for schools or other public facilities the need for which will be created by the proposed development.

Off-Street Parking Regulations

Parking regulations are proposed to cope with the complex parking problems in this huge metropolis in an era when the automobile has become one of the most important influences on the character of residential neighborhoods and the efficiency and stability of commercial and industrial areas. Since 1947 the tidal wave of a half million more automobiles owned by residents of the City has swept New York into the unenviable position of having traffic problems comparable with Detroit and other "automobile cities." The problem of parking the automobile at the dwelling unit as well as at the end of the journey to work, shopping, or recreation is dramatized by the fact that 900,000 persons -- about half of the people who are employed outside Manhattan's Central Business District -- now drive to work. In Residence Districts appreciably higher parking requirements are proposed than in the present resolution, in recognition of the clear-cut trends in both automobile ownership and the voluntary provision of off-street parking spaces by most post-World War II residential developers. In Commercial Districts the proposed regulations are designed to recognize the wide variation in automobile use in different parts of the City and the great differences in the traffic-generating characteristics of commercial uses as exemplified by such divergent uses as supermarkets, electrical contractors, and taxidermists. The flexibility required to obtain adequate parking facilities where needed without penalizing the areas and uses with low parking needs is obtained by establishing parking levels which vary by district depending on location and by the traffic-generating characteristics of the various types of uses. In Manufacturing Districts the same requirements for parking apply to all types of Manufacturing Districts outside the Central Business Districts of Manhattan and Brooklyn because, with the exception of these two areas, there are no important differences in the patterns of journey to work by automobile. Parking requirements are based on both employment and floor area per establishment and vary for the two primary categories of industrial uses: 1) Manufacturing and related industrial uses, and 2) Storage and warehousing uses. Commercial and Manufacturing Districts in the Central Business Districts of both Manhattan and Brooklyn are exempted from parking requirements to avoid attracting more automobiles and compounding the present intolerable traffic congestion.

Non-Conforming Uses

To provide tools for dealing with the problem of non-conforming uses, the following two primary types of regulations are proposed: 1) Regulations designed to prevent the expansion or further entrenchment of non-conforming uses, including regulations on change of use, discontinuance, and enlargement; and 2) Regulations designed to make a start on a long-run program of unscrambling the worst types of non-conforming uses by requiring the gradual improvement of their performance in non-residential districts, and their gradual elimination in Residence Districts after a reasonable amortization period. Manufacturing and related uses in Residence Districts are given an amortization period extending 25 years from the effective date of the proposed resolution or 40 years from the issuance of the building permit, whichever is longer. Such uses occupying buildings designed for residential use, and therefore easily capable of reverting to residential use upon termination, are given shorter amortization periods, as are non-conforming

open uses and signs, which represent small investments. Non-conforming manufacturing and related uses in Commercial and Manufacturing Districts are permitted to continue but are required to upgrade their operations to a reasonable level of performance within 15 years. Buildings non-complying as to bulk are permitted to continue in use. Normal maintenance, repairs, and structural alterations are permitted, and enlargements are allowed under certain conditions.

## Regulation of Height Around Airports

In order to avoid obstructions to air navigation and to persons and property in adjacent areas, regulations are proposed to limit the height of tall buildings and structures in the vicinity of major airports. The regulations closely approximate the criteria established by the Federal Civil Aeronautics Administration and limit heights only to the extent necessary. A flight obstruction area is established for each of the three major airports, within which height is limited by one set of controls in those areas over which airplanes pass in approaching and taking off from runways and by a second set of controls in those areas over which airplanes pass when circling the airport.

## Administrative Regulations

Some revisions in the methods of zoning administration become necessary as the technology of zoning and land use planning advances. In the interest of more effective administration, two kinds of modifications of the administrative procedures of the present resolution are proposed: 1) Changes that are included in the text of the proposed resolution; and 2) Changes that involve amendments to the City Charter or other existing laws and administrative rules. Among the proposed changes in administration are: 1) The addition of a small but technically capable staff to the Department of Buildings, to be headed by a Zoning Administrator who would be an additional deputy to the Commissioner within the Department; 2) A series of specific findings or conditions which must be satisfied before a variance from either the proposed use or bulk regulations can be granted; and 3) Special standards or conditions for a limited number of uses with unique characteristics which cannot be controlled adequately by the general regulations. Two agencies are empowered to grant special permits for such uses, the Board of Standards and Appeals and the City Planning Commission. The latter agency is empowered to grant permits for those uses whose location has city- or community-wide impact and whose characteristics require special planning study.

room dwelling units per acre, kitchens excluded, is particularly appropriate for three-story buildings. Eighty-five percent of the dwelling units must be provided with off-street parking spaces.



*Apartment development typical of proposed R5 District. Electchester, Queens.*

### R6 District

The bulk regulations for R6 Districts -- a Floor Area Ratio of 2.00, a density of approximately 88 three-room dwelling units per acre, and an Open Space Ratio of 20 -- are considered to be the maximum desirable in the City, except for areas located centrally or very close to cultural, commercial, and recreational facilities. Approximately one-quarter to one-third of the City's potential maximum population could reside in the R6 Districts as proposed on the zoning maps. This district can accommodate six-story buildings covering between 40 and 35 percent of a lot, or higher buildings providing greater amounts of open space. Typical areas are Ridgewood in Queens, Parkchester in the Bronx, and the Bedford-Stuyvesant area in Brooklyn. Seventy percent of the dwelling units must be provided with off-street parking spaces.



*Desirable high-rise apartment development conforming to proposed R6 District. Queensview, Queens.*

### R7 Districts

R7 Districts are proposed in many of the most congested older parts of the City which are scheduled for future redevelopment and in some others, such as Riverdale, Jackson Heights, and Rego Park, where recent construction has permitted densities to rise to high levels. Although this district permits bulk and densities higher than desirable, they are considered tolerable levels in special situations where the desirable standards cannot be met. The controlling bulk levels for this district are a Floor Area Ratio of 3.00, an Open Space Ratio of 20, and a density of about 113 three-room dwelling units per acre, kitchens excluded. This district will accommodate low-coverage

buildings of eight, ten, or more stories, as well as six-story buildings of about 45 percent coverage. The ratio of required off-street parking spaces to dwelling units is set at 60 percent.



*High rise apartment development typical of proposed R7 District. Park City, Queens.*

### R8 Districts

R8 Districts, with a Floor Area Ratio of 45%, an Open Space Ratio of 10, and a density of about 210 two-room dwelling units per acre, are designed for centrally located areas relatively near cultural, commercial, and recreational facilities. This district has been designated on the zoning maps along the Grand Concourse in the Bronx and in many parts of Manhattan, as well as in a few central areas of Brooklyn. It is suitable primarily for buildings of ten or more stories. Fifty percent of the dwelling units must be provided with off-street parking spaces.

### R9 Districts

R9 Districts have been zoned sparingly, and are found in the luxury apartment areas of Manhattan. The high densities permitted in this district are partially off-set by the typically large size of individual dwelling units in luxury buildings. The permitted Floor Area Ratio for this district is 6.00. There is no required minimum Open Space Ratio, but the 20 foot required rear yard limits lot coverage. The permitted density in this district is about 365 two-room dwelling units per acre, kitchens excluded. Forty percent of the dwelling units in a building must be provided with off-street parking spaces.

### Supplementary Use Regulations

#### Uses Permitted by Special Permit (Section 11-40)

A small number of uses not permitted in Residence Districts by right are proposed to be permitted by special permit of the Board of Standards and Appeals or the City Planning Commission. These uses include day camps, electric and gas substations, fire and police stations, telephone exchanges, water and sewage pumping stations, and railroad passenger stations. All of these uses have unique characteristics which cannot be controlled adequately by the general regulations and therefore require special controls. Standards which insure compatibility with their surroundings are set forth in Article VII.

#### Sign Regulations (Section 11-50)

Advertising signs and billboards are completely inappropriate in Residential Districts. The only types of signs that are proposed to be permitted in Residential Districts are those identifying a residence, a family, a home occupation (such as a doctor's office), a parking entrance or exit, a community facility, or a dwelling unit for sale or for rent. Community facilities are permitted bulletin boards of limited size on which notices may be posted. In addition, signs are limited in size, and illuminated or flashing signs are prohibited.

RESIDENCE DISTRICTS

| | Parking Require-ment Category | DISTRICTS | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | R1 | R2 | R3 | R4 | R5 | R6 | R7 | R8 | R9 |

**22-20  USES PERMITTED BY SPECIAL PERMIT**

**22-21  By the Board of Standards and Appeals**

In all districts, as indicated, the following uses are permitted by special permit of the Board of Standards and Appeals, in accordance with standards set forth in Chapter 3 of Article VII.

| | | R1 | R2 | R3 | R4 | R5 | R6 | R7 | R8 | R9 |
|---|---|---|---|---|---|---|---|---|---|---|

  Day camps

  Public utility or public service facilities
    Electric or gas substations serving a distribution area — C
    Fire stations — C
    Police stations — C
    Telephone exchanges — C
    Water or sewage pumping stations — C

  Radio or television towers

  Sand, gravel, or clay pits

**22-22  By the City Planning Commission**

In all districts, as indicated, the following uses are permitted by special permit of the City Planning Commission, in accordance with standards set forth in Chapter 4 of Article VII.

| | | R1 | R2 | R3 | R4 | R5 | R6 | R7 | R8 | R9 |
|---|---|---|---|---|---|---|---|---|---|---|

  Railroad passenger stations

**22-30    SIGN REGULATIONS**

**22-31    Definitions (repeated from Section 12-10)**

**Sign**

A "sign" is any structure or part thereof, or any device attached to, painted on, or represented on a building or other structure, upon which is displayed or included any letter, word, model, banner, flag, insignia, decoration, device, or representation used as, or which is in the nature of, an announcement, direction, advertisement, or other attention-directing device. A sign shall not include a similar structure or device located within a building except for illuminated signs within show windows.

A sign includes any billboard, but does not include the flag, pennant, or insignia of any nation or association of nations, or of any state, city, or other political unit, or of any political, charitable, educational, philanthropic, civic, professional religious, or like campaign, drive, movement, or event.

**Sign, business**

A "business sign" is an accessory sign which directs attention to a profession, business, commodity, service, or entertainment conducted, sold, or offered upon the same zoning lot. A "for sale" or "for rent" sign relating to the zoning lot on which it is displayed shall be deemed a business sign.

| DISTRICTS | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| R1 | R2 | R3 | R4 | R5 | R6 | R7 | R8 | R9 |

**22-32    Permitted Accessory Signs**

In all districts, as indicated, non-illuminated accessory business signs are permitted as set forth in this Section, subject to the provisions of Section 22-33 (Additional Regulations).

| R1 | R2 | R3 | R4 | R5 | R6 | R7 | R8 | R9 |
|---|---|---|---|---|---|---|---|---|

Underlined words in text are defined in Section 12-10.

| | DISTRICTS | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | R1 | R2 | R3 | R4 | R5 | R6 | R7 | Rc | |

#### 22-321    Nameplates and identification signs

R1 | R2 | R3 | R4 | R5 | R6 | R7 | R8 |

(a)  For residential buildings other than multiple dwellings, one nameplate, with an area not exceeding one square foot and indicating only the name or address of the occupant or a permitted occupation, is permitted for each dwelling unit or rooming unit.

(b)  For multiple dwellings, including apartment hotels, and for permitted non-residential buildings or other structures, one idenfification sign, with an area not exceeding 12 square feet and indicating only the name or address of the building or the name of the management thereof, is permitted.  The height of letters on any side of awnings or canopies shall not exceed one foot.  For community facility uses, a bulletin board, with an area not exceeding 16 square feet, is also permitted.

#### 22-322    "For sale" or "for rent" signs

"For sale" or "for rent" signs, with an area not exceeding 12 square feet, are permitted.  If located on vacant land, such a sign shall not be within 15 feet of the street line, nor within six feet of any other lot line.

#### 22-323    Signs for parking areas

One sign, with an area not exceeding two square feet, designating each entrance to or exit from an off-street parking area, open or enclosed, is permitted.  No such sign shall be higher than seven feet above curb level.

### 22-33    Additional Regulations

R1 | R2 | R3 | R4 | R5 | R6 | R7 | R8 |

In all districts, as indicated, any sign permitted under the provisions of Section 22-32 (Permitted Accessory Signs) shall conform to the regulations set forth in this Section.

#### 22-331    Projecting signs

No sign shall project across a street line more than 12 inches.

#### 22-332    Height of signs

No sign shall extend above the ground floor, or more than 20 feet above curb level, whichever is less.

#### 22-333    Number of signs

Not more than one sign is permitted for each use, building, or dwelling unit, and not more than two signs for each professional office, except as otherwise provided in Section 22-32 (Permitted Accessory Signs).  On a corner lot, one sign (or for professional offices, two signs) are permitted on each street.

Underlined words in text are defined in Section 12-10.

to residents and business establishments and are needed in proximity to the areas they serve. Their service areas on the average are roughly comparable to those of small secondary centers.

Among the permitted uses typically locating in these districts are: automobile dealers, repair garages, gasoline service stations, auto laundries, contractors' shops with storage of materials and equipment, small welding and machine shops, and minor open amusement uses such as golf driving ranges, miniature golf, and small kiddie parks. From the standpoint of adjacent residential areas, these uses are frequently more objectionable than typical light manufacturing establishments. However, they provide services which are needed in areas where manufacturing uses are neither needed nor appropriate, and for this reason they cannot be restricted to Manufacturing Districts. By permitting them in a district designed especially for them, it has been possible to designate limited areas in which they may locate most appropriately and where manufacturing establishments should not be allowed to usurp the space they need.

C8 Districts are typically located along major traffic arteries where concentrations of automotive uses have developed, and also at the edges of large secondary and major centers, where they can conveniently serve both residents and business establishments.



*Uses typically found in proposed C8 District. Residences obviously do not combine well with these uses. Bronx.*

The objectionable features typically associated with C8 Districts will be controlled to some extent by application of the performance standards for M1 Districts, as set forth in Section 42-20 of the proposed resolution, to all uses of a semi-industrial nature in Use Groups 11 and 16 which involve production, processing, or repairs (See Supplementary Use Regulations, Section 32-43). Notwithstanding these controls, the activities permitted in these districts necessarily create an environment unfavorable to residential uses, which are therefore excluded.

### Uses Permitted by Special Permit (Section 32-30)

A number of uses not permitted in Commercial Districts by right, are permitted by special permit if applicable standards controlling the issuance of permits are met. The types of uses subject to these regulations are comparatively few in number and, with the exception of gasoline service stations and parking lots and garages, the number of establishments of each type will also be small. The common characteristic differentiating them from other uses is the fact that they may or may not be appropriate in a particular

district depending on conditions in the surrounding areas and upon their situation, design, site layout, and operation as these relate to the district in which they seek to locate.

The special use regulations as they apply to Commercial Districts govern several large traffic-generating uses such as arenas, stadiums, and children's amusement parks, as well as parking lots and garages in excess of the maximum capacity established for these uses in the various Use Groups. These uses involve planning problems affecting a wide area and are therefore made subject to the administrative control of the City Planning Commission. Other uses, such as gasoline service stations, involving potentially troublesome local effects, are appropriately controlled by the Board of Standards and Appeals.

### Supplementary Use Regulations (Section 32-40)

The supplementary use regulations contain important restrictions which apply to all uses in the districts specified. Included are provisions relating to the enclosure of uses within buildings; limitations upon the location of commercial uses within buildings, particularly within buildings partly occupied by dwelling units; performance standards for the general service and light manufacturing uses permitted in the C8 District; and controls on the location of gasoline service stations near schools, parks and playgrounds. These regulations are basically qualifications governing the permissibility of uses in the various districts. Some of them, particularly those controlling location within buildings, are so widely applicable and of such major importance that they significantly affect the character of the districts, as was evident in the earlier description of the districts.

### Special Provisions Applying Along District Boundaries (Section 32-50)

These regulations place restrictions on commercial development near the boundaries of Residence Districts. Since Residence District boundaries traverse the vast majority of blocks in which Commercial Districts are designated, these regulations are widely applicable. The location of business entrances, show windows, and signs is the primary focus of these regulations. Along principal commercial frontages the restrictions apply within 20 feet, and on the side streets within 75 feet, of the Residence District boundary. In both situations, the purpose is to protect residential development at the district boundary.

### Sign Regulations (Section 32-60)

The regulations proposed in this section are patterned in their basic concept on those already in effect in the present resolution, but contain considerably more variation as applied in different districts. In general, the permitted size of signs is greater in the General Commercial and General Service Districts (C4, C6, and C8) than in Local Retail and Service Districts (C1 and C2), where the protection of adjacent residential areas is important and large attention-getting business signs are neither necessary nor appropriate. C5 (Restricted Central Commercial) Districts are subject to the same size restrictions as the C1 and C2 Districts, with an outright ban on illuminated signs. In Commercial Amusement Districts (C7) and in C6-7 Districts, which are confined to the vicinity of Times Square, business and advertising signs are not restricted, in keeping with the well-established character of these districts. Present regulations forbidding signs within 200 feet of, and visible from, a public park or arterial highway are incorporated in the proposed resolution.

| | DISTRICTS | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | C1 | C2 | C3 | C4 | C5 | C6 | C7 | C8 |

**32-62   Permitted Accessory Business Signs**

In the districts indicated, underline{accessory business signs} are permitted as set forth in this Section, except as otherwise provided in Section 32-66 (Special Provisions Applying Along District Boundaries), and subject to the provisions of Section 32-63 (Additional Regulations for Accessory Business Signs).

| C1 | C2 | C3 | C4 | C5 | C6 | C7 | C8 |

**32-621   Non-illuminated signs**

In the districts indicated, non-illuminated signs with areas not exceeding those shown in the following table are permitted:

Maximum Area
(in square feet)

| | C1 | C2 | C3 | C4 | C5 | C6 | C7 | C8 |
|---|---|---|---|---|---|---|---|---|
| 50 | | | C3 | | | | | |
| 150, or three times the street frontage of the zoning lot (in feet), whichever is greater | C1 | C2 | | | C5 | | | |
| 500, or five times the street frontage of the zoning lot, whichever is greater | | | | C4 | | C6-1 C6-2 | | C8 |
| No restrictions as to size | | | | | | C6-3 | C7 | |

**32-622   Illuminated non-flashing signs**

In the districts indicated, illuminated non-flashing signs with an area not exceeding 50 square feet are permitted.

| C1 | C2 | | | | | | |

**32-623   Illuminated or flashing signs**

In the districts indicated, illuminated or flashing signs with areas not exceeding those shown in the following table are permitted:

Maximum Area
(in square feet)

| | C1 | C2 | C3 | C4 | C5 | C6 | C7 | C8 |
|---|---|---|---|---|---|---|---|---|
| 300 | | | | C4 | | C6-1 C6-2 | | C8 |
| No restrictions as to size | | | | | | C6-3 | C7 | |

**32-63   Additional Regulations for Accessory Business Signs**

In all districts, as indicated, permitted accessory business signs are subject to the regulations of this Section.

| C1 | C2 | C3 | C4 | C5 | C6 | C7 | C8 |

**32-631   Projecting signs**

In all districts, as indicated, no permitted sign shall project across a street line more than 12 inches except the following:

| C1 | C2 | C3 | C4 | C5 | C6 | C7 | C8 |

(a) Non-illuminated signs on awnings or canopies permitted by Section C 26-219.0 of the Administrative Code, with an area not exceeding 12 square feet and with the height of letters not exceeding 12 inches, provided that such signs shall be limited to identification of the name or address of the building or an establishment contained therein.

Underlined words in text are defined in Section 12-10.

| | DISTRICTS | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | C1 | C2 | C3 | C4 | C5 | C6 | C7 | C8 |

**32-631     Projecting signs, continued**

(b) Signs on marquees permitted by Section C 26-219.0 of the Administrative Code, provided that no such sign shall extend beyond the limits of the marquee on which it is located, except that individual free-standing letters may project to a height of 24 inches above said marquee.

| C1 | C2 | C3 | C4 | C5 | C6 | C7 | C8 |

**32-632     Height of signs**

In the districts indicated, no permitted sign shall extend above curb level at a height greater than the following:

| C1 | C2 | C3 | C4 | C5 | C6 | | C8 |

Maximum Height
(in feet)

20

| C1 | C2 | C3 | C4 | C5 | | | |

30

| | | | | | C6-1 C6-2 | | C8 |

**32-64     Permitted Advertising Signs**

In the districts indicated, except as otherwise provided in Section 32-66 (Special Provisions Applying Along District Boundaries), advertising signs are permitted with no restrictions on size, illumination, or otherwise.

| | | | | | C6-3 | C7 | |

**32-65     Additional Regulations for Advertising Signs**

In the districts indicated, no advertising sign shall be located, nor shall an existing advertising sign be structurally altered, within 200 feet of an arterial highway or of a public park with an area of one-half acre or more, if such advertising sign is within view of such arterial highway or public park. For the purposes of this Section, arterial highways shall include all highways which are shown on the Master Plan of Arterial Highways and Major Streets as "principal routes", "parkways", or "toll crossings" and which have been designated by the City Planning Commission as an arterial highway to which the provisions of this Section shall apply. However, beyond 200 feet from such arterial highway or public park, an advertising sign shall be located at a distance of at least as many linear feet therefrom as there are square feet of area on the face of such sign.

| | | | | | C6-3 | C7 | |

**32-66     Special Provisions Applying along District Boundaries**

In all districts, as indicated, and within 250 feet of the boundary of a Residence District, no sign shall be larger (in square feet) than its linear distance (in feet) from the Residence District boundary.

| C1 | C2 | C3 | C4 | C5 | C6 | C7 | C8 |

Underlined words in text are defined in Section 12-10.

...ufacturing and Residence Districts. These regula-
...ns are concerned with two primary problems: 1) the
...closure or screening of industrial processing as
...l as storage, and 2) the location of business en-
...ances, show windows, and signs.

...ere an M1 District abuts a Residence District, no
...h storage of materials or products is permitted for
...e first 200 feet of depth of the M1 District. Simi-
...rly, when an M2 or M3 District abuts a Residence
...strict, all processing within 200 feet of the dis-
...ct boundary must be enclosed. In addition, within
... feet of such district boundary, the storage of
...aterials or products must be effectively screened by
... ...lid wall or fence. Additional regulations govern
... location of business entrances, show windows, and
...ns as related to Residence District boundaries. In

order to lessen their impact on adjoining residential
areas.

Sign Regulations (section H-5)

In Manufacturing Districts, signs are permitted with-
out restriction except in the following special situ-
ations along Manufacturing District boundaries. Limit
are placed on the size of signs within 200 feet of a
boundary of a Residence District and on the size and
height of illuminated signs within 1,000 feet of a
Residence, Local Retail, or Local Service District.
In addition, present regulations prohibiting signs
within 500 feet of and visible from a public park or
arterial highway are incorporated in the proposed
resolution.

MANUFACTURING DISTRICTS

| | DISTRICTS | | |
|---|---|---|---|
| | M1 | M2 | M3 |

42-50    SPECIAL PROVISIONS APPLYING ALONG DISTRICT BOUNDARIES

### 42-51    Open Storage of Materials or Products

In the district indicated, and within 200 feet of a Residence District bound-
ary, no open storage of materials or products is permitted.

M1

### 42-52    Activities Restricted to Completely Enclosed Buildings

In the districts indicated, and within 300 feet of a Residence District bound-
ary, all commercial and manufacturing activities, except storage of materials
or products, shall take place within completely enclosed buildings, except as
otherwise specifically stated in the Use Groups permitted in the district, and
except for accessory off-street loading or parking.

M2   M3

### 42-53    Screening

In the districts indicated, and within 200 feet of a Residence District bound-
ary, open storage of materials or products shall be permitted only if effec-
tively screened by a solid wall or fence (including solid entrance and exit
gates) at least eight feet in height.

M2   M3

### 42-54    Interior Lots

In all districts, as indicated, when the side lot line of any interior or
through lot in any Manufacturing District adjoins any zoning lot in any Resi-
dence District, no primary business entrance, show window or sign shall be
located in the Manufacturing District within 20 feet of the Residence District
boundary.  However, where the zoning lot in the Manufacturing District adjoin-
ing the Residence District boundary is less than 30 feet wide, such required
distance from the Residence District boundary shall be reduced to 10 feet.

M1   M2   M3

### 42-55    Corner Lots

In all districts, as indicated, where frontage on a corner lot in any Manu-
facturing District adjoins frontage on an interior lot in any Residence
District, no primary business entrance, show window, or sign shall be lo-
cated within 75 feet of the Residence District boundary.  However, if such
a corner lot in the Manufacturing District adjoins zoning lots in Residence
Districts on both frontages, the requirements of this Section shall apply
to only one frontage of the corner lot in the Manufacturing District, and
the requirements of Section 42-54 (Interior Lots) shall apply to the other
frontage.  The provisions of this Section shall not apply to service en-
trances less than three feet six inches in width, windows other than show
windows, or ventilators, fire escapes, or other appurtenances required by
law.

M1   M2   M3

### 42-56    Subdivision of Lots

In all districts, as indicated, for all zoning lots existing at the
effective date of this resolution, the provisions of Section 42-54
(Interior Lots) or Section 42-55 (Corner Lots) shall apply regardless
of any subsequent subdivision.

M1   M2   M3

### 42-57    Performance Standards

In all districts, as indicated, special provisions applying along district
boundaries for performance standards shall apply as set forth in Section 42-21
to Section 42-28, inclusive.

M1   M2   M3

42-60    SIGN REGULATIONS

### 42-61    Definitions (repeated from Section 12-10)

#### Sign

A "sign" is any structure or part thereof, or any device attached to, painted on,
or represented on a building or other structure, upon which is displayed or in-
cluded any letter, word, model, banner, flag, insignia, decoration, device, or

Underlined words in text are defined in Section 12-10.

MANUFACTURING DISTRICTS

**42-61    Definitions** (repeated from Section 12-10), continued

representation used as, or which is in the nature of, an announcement, direction, advertisement, or other attention-directing device. A sign shall not include a similar structure or device located within a building except for illuminated signs within show windows.

A sign includes any billboard, but does not include the flag, pennant, or insignia of any nation or association of nations, or of any state, city, or other political unit, or of any political, charitable, educational, philanthropic, civic, professional, religious, or like campaign, drive, movement, or event.

**Sign, advertising**

An "advertising sign" is a sign which directs attention to a business, commodity, service, or entertainment conducted, sold, or offered elsewhere than upon the same zoning lot.

**Sign, business**

A "business sign" is an accessory sign which directs attention to a profession, business, commodity, service, or entertainment conducted, sold, or offered upon the same zoning lot. A "for sale" or "for rent" sign relating to the zoning lot on which it is displayed shall be deemed a business sign.

| | DISTRICTS | | |
|---|---|---|---|
| | M1 | M2 | M3 |
| **42-62    Permitted Accessory Business Signs or Advertising Signs**<br><br>In all districts, as indicated, accessory business signs or advertising signs are permitted with no restrictions on size, illumination, or otherwise, except as otherwise provided in Section 42-64 (Special Provisions Applying along District Boundaries) and subject to the provisions of Sections 42-63 (Additional Regulations for Advertising Signs). | M1 | M2 | M3 |
| **42-63    Additional Regulations for Advertising Signs**<br><br>In all districts, as indicated, no advertising sign shall be located, nor shall an existing advertising sign be structurally altered, within 200 feet of an arterial highway or of a public park with an area of one-half acre or more, if such advertising sign is within view of such arterial highway or public park. For the purposes of this Section, arterial highways shall include all highways which are shown on the Master Plan of Arterial Highways and Major Streets as "principal routes", "parkways", or "toll crossings", and which have been designated by the City Planning Commission as an arterial highway to which the provisions of this Section shall apply. However, beyond 200 feet from such arterial highway or public park, an advertising sign shall be located at a distance of at least as many linear feet therefrom as there are square feet of area on the face of such sign. | M1 | M2 | M3 |
| **42-64    Special Provisions Applying along District Boundaries** | | | |
| **42-641    Restriction on size of signs**<br><br>In all districts, as indicated, and within 250 feet of the boundary of a Residence District, no sign shall be larger (in square feet) than its linear distance (in feet) from the Residence District boundary. | M1 | M2 | M3 |
| **42-642    Restriction on height above curb level**<br><br>In all districts, as indicated, and within 1,000 feet of the boundary of a Residence District, or a C1 or C2 district, no illuminated sign with an area exceeding 25 square feet shall extend more than 50 feet above curb level, unless all illuminated portions thereof face at an angle of at least 90 degrees from such boundary line. | M1 | M2 | M3 |

Underlined words in text are defined in Section 12-10.

197