Exhibit L

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x

METRO FUEL, LLC,

                                        Plaintiff,

        -against-

CITY OF NEW YORK                              07-CV-8244

                                        Defendant.
------------------------------------------------------------------ x

## STIPULATIONS OF FACT

    The parties agree to the following stipulations of fact, solely for purposes of the

above-captioned actions.  Such stipulations of fact shall not be used outside the context of the

above-captioned actions and shall not constitute an admission for any other purpose.

    1.    Fuel entered the panel sign business in New York City by acquiring

substantially all of the assets of Metro Lights, LLC on or about August 14, 2006.

    2.    The panel signs in Fuel's control as of June 2008 were located at 227

different facilities.  Of those, 178 facilities (78.5%) had one or two panels, and 49 facilities

(21.5%) had more than two panels.

    3.    Most of Fuel's panel signs in the City of New York regularly display

advertising copy.

    4.    Most of Fuel's panel signs do not have permits from the New York City

Department of Buildings to display advertising copy.


Dated: New York, New York            EMERY CELLI BRINCKERHOFF & ABADY LLP
        8/15/08, 2008

                                     By:_____
                                          Richard D. Emery (RE 5181)
                                          Eric Hecker (EH 0989)

75 Rockefeller Plaza, 20th Floor
New York, N.Y. 10019
(212) 763-5000

Attorneys for Plaintiff

Dated:  New York, New York
August 13     , 2008

OFFICE OF CORPORATION COUNSEL OF THE
CITY OF NEW YORK

By: _Sheryl R. Neufeld_
Sheryl R. Neufeld (SK 2728)
Assistant Corporation Counsel

100 Church Street, Room 5-188
New York, NY 10007
(212) 788-1035

Attorneys for Defendants

# Exhibit M

CITY PLANNING COMMISSION
February 14, 1978/Calendar No. 1A      .                          N 770135 MFY

*"Standards for Bus Stop Shelters" designed to govern the exact location of shelters
within adopted bus stop sites, to encourage an equitable distribution of shelters
among the various community districts, and to promote safe, flexible shelter design
and proper maintenance. The "Standards" will apply to any applicant who obtains a
bus stop shelter franchise, reviewed pursuant to the Uniform Land Use Review Pro-
cedure, in any of the five boroughs of New York City.*

Between mid-1973 to mid-1974, the City installed 120 shelters under its

own program. Most of these City built shelters have deteriorated, due to poor

maintenance.

Privately-operated bus stop shelters were first introduced to New York

City in 1975 by Bustop Shelters, Inc., operating in the boroughs of Manhattan and

the Bronx under an experimental program which will terminate on September 26, 1978.

To date, it has been observed that the number of shelters actually erected under

that experimental program has not kept pace with scheduled goals. The program has

also been criticized because relatively few shelters have been erected in the Bronx

as opposed to Manhattan, which offers locations with maximum advertising potential.

On the other hand, the design of the shelters installed by Bustop Shelters, Inc.

appears to have functioned well and shelter maintenance has apparently been quite

satisfactory.

Currently, several companies have submitted applications for franchises

to construct, install and maintain bus stop shelters at bus stops within the five

boroughs of New York City. To ensure the efficient implementation of a sound bus

stop shelter program, the Planning Commission has initiated the matters described

below, which are respectively covered in Reports N 770642 MFY and N 770135 MFY

(the instant report) .

To satisfy the requirements of the bus stop shelter program it is neces-

sary that actual sites be submitted for review. However, none of the applicants

whose applications for bus stop shelter franchises have been received to date for

review under ULURP has submitted any proposed sites.

In order to solve this problem, the Commission requested the various

community boards to submit lists of bus stop sites where they would like to have

shelters installed. These lists, when formally adopted will provide approved sites

for the installation of shelters by any applicant who obtains a bus stop shelter

franchise reviewed pursuant to ULURP.

NYC019218

The lists appear in City Planning Report N 770642 MFY, dated February 14, 1978, which was submitted to the Board of Estimate on the same date as this report. A copy of the lists is on file in the Offices of the Bureau of Franchises and the Mapping Division, Department of City Planning.

The subject of the instant report is a set of standards for bus stop shelters which are designed to facilitate the efficient implementation of a bus stop shelter program which will involve a large number of shelters and most of the community districts in the City. These standards were developed after consultation with many city agencies and other concerned parties and were forwarded to all community boards for their comments and suggestions. They were designed to govern the exact location of shelters within the bus stop sites, to encourage an equitable distribution of shelters among the various community districts, and to promote safe, flexible shelter design and proper maintenance. The standards which appear on the following pages numbered S 1 through S 9 will apply to any shelters installed under a bus stop shelter franchise reviewed pursuant to ULURP:

N 770135 MFY

NYC019219

The proposed bus stop shelter program will provide a large number of shelters throughout the City, designed to protect bus users from rain, sun and wind and to provide them with illuminated, and therefore safer, waiting areas for night-time use. In addition, the shelters will enable information about the bus route to be conspicuously displayed. Furthermore, the program will not only provide the above noted benefits but will also generate appreciable franchise revenues for the City.

The Planning Commission deems that the requirement that all shelters shall be installed in conformance with the above stated "Location" and "Physical and Maintenance Standards" for bus stop shelters will promote installations that are safe and have minimum adverse impact on pedestrian traffic movement. The "Standards" permit shelter design modifications that enable installations on sidewalks as narrow as 10 feet wide.

Shortly before submitting this report to the Board of Estimate, the Crime Prevention Section of the New York City Police Department advised the Department of City Planning that it believed that the high opaque, advertising panel generally incorporated in the designs submitted by applicants for bus stop shelter franchises undesireably reduces the visibility of the shelter interior from the outside. To help overcome this problem, the provision of Item A. 3 was added to the proposed "Physical and Maintenance Standards," prohibiting the display of advertising matter higher than 58 inches above the sidewalk.

The "Distribution Requirements" were developed with the double objectives of (a) ensuring that all community districts would receive a reasonable share of shelters, including those containing few bus stop locations with good advertising potential; and (b) providing the franchisee with a fair degree of latitude for selecting sites which have the maximum advertising potential. The communities' interests are protected, firstly, by the policy of approving under ULURP lists of bus stop sites which were prepared and submitted by the community boards. Secondly, the "Distribution Requirements" specify that 80% of the installed shelters shall be distributed among all community boards within a franchise territory, in proportion to the local bus route mileage which the board contains. The franchisee's interests are protected by the specification that 20% of the installed shelters plus any shelters not distributable to any community board under the above noted 80% provision (because all of their adopted bus stop sites have been used) shall be installed at adopted sites selected by the franchisee.

3                                                        N 770135 MFY

NYC019220

However, the Commission strongly believes that the success of the program will also depend upon the implementation of orderly procedures for approving the exact locations of the shelters within the approved bus stop areas and for monitoring the program for compliance with the aforesaid "Standard For Bus Stop Shelters." Franchisees should submit plans showing proposed exact locations of shelters at bus-stops to the Department of Transportation, which will review the locations for conformance with the Standards, make any necessary modifications of such plans, issue the necessary construction permits and subsequently inspect the installed shelters for conformance with the approved plans. These plans will not require further review by community boards, borough boards, the Planning Commission or the Board of Estimate.

It is recommended that the Department of Transportation also regularly inspect the installations to determine whether the shelters and adjacent areas are maintained in a clean, attractive and sanitary condition and it is further recommended that the Department of Transportation submit annual reports concerning the franchisee's performance to the Bureau of Franchises. The Bureau will use these reports on a basis for determining whether or not any bus stop shelter franchises should be either revoked or not renewed, because contractual obligations have not been fully met.

In the interest of developing an efficiently operated program, the Planning Commission recommends that the Board of Estimate adopt the following policies:

1. To grant bus stop shelter franchises for the shortest practicable time period - say up to 5 years. This policy is designed to encourage franchisees to perform well, in order to be granted contract renewals.

2. To grant each franchisee an exclusive territory, comprising several entire community districts or an entire borough.

3. To require Bustop Shelters, Inc. to conform to the same standards, constraints and policies that shall apply to applicants whose applications have been processed under ULURP, in the event that the former company is granted a "grandfathered" franchise.

THEREFORE, the City Planning Commission, deeming the "Standards for Bus Stop Shelters" incorporated in this report to be an appropriate control for locating shelters within bus stop sites, for encouraging an equitable distribution of shelters among the various community districts and for promoting safe, flexible shelter design and proper maintenance, hereby adopts the following resolution and recommends that the Board of Estimate adopt a similar resolution:

N 770135 MFY

NYC019221

RESOLVED by the City Planning Commission that the "Standards for Bus Stop Shelters," comprising "Physical and Maintenance Standards," "Distribution Requirements" and "Location Standards," incorporated in this report (N 770135 MFY) be and hereby is approved and that the aforesaid "Standards for Bus Stop Shelters" shall apply to all bus stop shelters installed under a franchise approved pursuant to the Uniform Land Use Review Procedure.

The above resolutions duly adopted by the City Planning Commission on February 14, 1978 (Cal. No. 1A) are herewith filed with the Secretary of the Board of Estimate, ~~pursuant to Section 197-c of the New York City~~ Charter.

ROBERT F. WAGNER, JR., Chairman
MARTIN GALLENT, Vice Chairman
ALEXANDER COOPER, SYLVIA DEUTSCH,
HOWARD B. HORNSTEIN, THEODORE E. TEAH, Commissioners

SL/ef

5                                                                N 770135 MFY

NYC019222

Exhibit N

√8

# FRANCHISE AND CONCESSION REVIEW COMMITTEE

## DECEMBER 29, 2005

### (Cal. No. 1)

**WHEREAS**, Miller Signs Associates, by Franchise Contract dated March 20, 1985, was granted a franchise to construct, install, maintain, operate, and sell advertising upon bus stop shelters throughout the five boroughs of the City of New York; and

**WHEREAS**, By resolution dated March 26, 1987 (Cal. No. 113), the Board of Estimate found Miller Signs Associates to be in default under the Franchise Contract and directed the surety companies to complete construction and installation of the bus stop shelters; and

**WHEREAS**, By resolution dated May 21, 1987, the Board of Estimate terminated and canceled the Franchise Contract unless the surety companies would assume it by June 17, 1987; and

**WHEREAS**, By letter dated June 17, 1987, the surety companies advised the Board of Estimate that they wished to exercise their right to assume the Franchise Contract; and

**WHEREAS**, By resolution dated December 9, 1987 (Cal. No. 56), the Board of Estimate approved the surety companies' request to retain New York Bus Stop Shelter Media, Inc. ("NY Bus Stop Shelter") to construct, install, maintain, operate, and sell advertising on bus stop shelters throughout the five boroughs; and

**WHEREAS**, By resolution dated June 23, 1988 (Cal. No. 148), the Board of Estimate approved the acquisition by Gannett Co., Inc., of all the outstanding stock of NY Bus Stop Shelter; and

**WHEREAS**, On January 11, 1993, New York Subways Advertising Co., Inc. ("NYSA"), a corporation wholly owned by Gannett Co., Inc., incorporated in 1982 in the state of Arizona and qualified to do business in the State of New York, became the successor-by-merger to NY Bus Stop Shelter; and

**WHEREAS**, By resolution dated April 12, 1995 (Cal. No. 3-A), the Franchise and Concession Review Committee ( the "FCRC") approved the assignment of the Franchise Contract from the surety companies to NYSA and authorized the Department of Transportation (the "Department"), acting by and through its Commissioner, to sign any documents necessary to effectuate such assignment in accordance with the provisions of said resolution; and

**WHEREAS**, On April 12, 1995, an Assignment and Assumption agreement was entered into between NYSA, the surety companies, and the Department; and

NYC018723

**WHEREAS**, Local Law 25 of 1995 authorized the Department, with the approval the FCRC, to extend the expiration date of the Franchise to a date not later than December 31, 1997; and

**WHEREAS**, On April 12, 1995 (Cal. No. 3-B), the FCRC adopted a resolution approving the extension of the Franchise Contract until December 31, 1997, and prohibiting the advertisement of tobacco products on or in the bus stop shelters; and

**WHEREAS**, On August 22, 1996, Gannett Co., Inc., sold all of the issued and outstanding shares of NYSA to Outdoor Systems, Inc. ("Outdoor Systems"); and

**WHEREAS**, Outdoor Systems, as the owner of NYSA, agreed to be bound by all of the conditions, provisions, requirements, and limitations of the Franchise Contract, including the prohibition against the placement of any advertising for tobacco products, and to honor all outstanding obligations and commitments related to the franchise; and

**WHEREAS**, On February 11, 1997 (Cal. No. 2), the FCRC adopted a resolution approving the acquisition of NYSA by Outdoor Systems subject to certain conditions, including an increase in the required security deposit to five million dollars ($5,000,000); and

**WHEREAS**, On September 3, 1997, the Franchise Contract was amended pursuant to the resolution adopted by the FCRC; and

**WHEREAS**, Local Law 47 of 1998 authorized the Department, with the approval of the FCRC, to extend the expiration date of the Franchise to a date not later than December 31, 1999; and

**WHEREAS**, On September 15, 1999 (Cal. No. 3), the FCRC adopted a resolution approving the extension of the Franchise Contract to December 31, 1999, subject to certain additional requirements including schedules for the removal, replacement and repair of shelters, financial security and liquidated damages, the sharing of contracted for revenue after the franchisee ceases operations, the installation of seating and/or solar power in certain shelters, Year 2000 compliance and the right of the City to take title to the shelters without payment; and

**WHEREAS**, On December 7, 1999, Infinity Broadcasting Corp. ("Infinity"), of which CBS Corporation ("CBS") was then the majority shareholder, purchased all issued and outstanding shares of Outdoor Systems, subject to a United States Department of Justice ("USDOJ") Final Judgment, Consent Decree and related documents filed December 6, 1999 in the U.S. District Court for the District of Columbia ("Court"), requiring CBS, Infinity and Outdoor Systems (the "Affiliates") to divest certain out-of-home advertising display assets they control or operate in New York City ("Assets") within certain timeframes established therein to settle alleged violations of the Clayton Act (the "Consent Decree"); and

**WHEREAS**, On December 8, 1999 (Cal. No. 5), the FCRC adopted a resolution consenting to the above-described change in control of the franchise, resulting in

NYC018724

NYSA becoming a wholly owned subsidiary of Infinity, subject to clearance from USDOJ; and

WHEREAS, On December 9, 1999, the Franchise Contract was amended pursuant to the resolution adopted by the FCRC on September 15, 1999; and

WHEREAS, Local Law 8 of 2000 authorized the Department, with the approval of the FCRC, to extend the expiration date of the Franchise to a date not later than December 31, 2002; and

WHEREAS, On March 7, 2000, Outdoor Systems registered a new corporate name with the New York Secretary of State and began doing business as Infinity Outdoor, Inc. ("Infinity Outdoor"); and

WHEREAS, On April 12, 2000, the FCRC adopted a resolution approving the extension of the Franchise Contract until December 31, 2000, with the possibility of two additional one-year extension periods, subject to certain conditions and requirements including: twelve million dollars ($12,000,000) liquidated damages payable in the event of a divestiture of the Assets that are the subject of this Franchise Contract ("Contract Assets") pursuant to the Consent Decree; increased compensation; clarification of the required number of bus stop shelters; a requirement to provide a limited number of special-sized shelters at the direction of the Department; and revisions to the schedule of liquidated damages; and

WHEREAS, On June 21, 2000, Infinity executed a Guaranty agreeing to the complete and prompt observance, fulfillment and performance by NYSA of each and every provision and obligation contained in the Franchise Contract to be extended and amended pursuant to the resolution adopted by the FCRC on April 12, 2000; and

WHEREAS, On July 6, 2000, the Franchise Contract was amended pursuant to the resolution adopted by the FCRC on April 12, 2000; and

WHEREAS, On September 14, 2000, Infinity Outdoor informed the Department of changes in control that would result in Infinity becoming a wholly owned subsidiary of Viacom Inc. ("Viacom"); and

WHEREAS, On December 20, 2001, Infinity Outdoor registered a new corporate name with the New York Secretary of State and began doing business as Viacom Outdoor; and

WHEREAS, Local Law 79 of 2001 authorized the Department, with the approval of the FCRC, to extend the expiration date of the Franchise to a date not later than December 31, 2003; and

WHEREAS, On October 9, 2002, (Cal. No. 2) the FCRC adopted a resolution approving the above-described changes of control resulting in Infinity becoming a wholly owned subsidiary of Viacom, subject to clearance from the USDOJ; and

WHEREAS, On October 9, 2002 (Cal. No. 3), the FCRC adopted a resolution approving the extension of the Franchise Contract until December 31, 2003, subject to certain additional conditions and requirements, including: increased

NYC018725

compensation, changes in the payment schedule, and clarification of the requirements for public service advertising and solar powered shelters; and

**WHEREAS,** On January 7, 2003, the Franchise Contract was amended pursuant to the resolution adopted by the FCRC on October 9, 2002; and

**WHEREAS,** Local Law 57 of 2003 authorized the Department, with the approval of the FCRC, to extend the expiration date of the Franchise to a date not later than December 31, 2004; and

**WHEREAS,** On December 8, 2004 (Cal. No. 5) the FCRC adopted a resolution approving the extension of the Franchise Contract until December 31, 2004, subject to certain additional conditions and requirements, including: increased compensation; the set aside of certain bus stop shelter advertising panels by NYSA for use by the New York City Marketing Development Corporation ("MDC"); and the set aside of outdoor adverting media controlled by NYSA for use by MDC.; and

**WHEREAS,** On January 25, 2005, the Franchise Contract was amended pursuant to the resolution adopted by the FCRC on December 8, 2004; and

**WHEREAS,** Local Law 3 of 2005 authorized the Department, with the approval of the FCRC, to extend the expiration date of the franchise to a date not later than December 31, 2005; and

**WHEREAS,** The Department, pursuant to such Local Law, has adopted a resolution, subject to the approval of the FCRC, extending the franchise with NYSA from January 1, 2005 to December 31, 2005, subject to Section 3.1 of the Franchise Contract, as amended; and

**WHEREAS,** On December 21, 2005, a Local Law was passed by the City Council amending Section 378 of the New York City Charter, authorizing the Department, with the approval of the FCRC, to extend the expiration date of the franchise to a date not later than December 31, 2006; and

**WHEREAS,** The Department, pursuant to such Local Law, and subject to the signing by the Mayor of such Local Law, has adopted a resolution, subject to the approval of the FCRC, extending the franchise with NYSA from January 1, 2006 to December 31, 2006, subject to Section 3.1 of the Franchise Contract, as amended;


**NOW THEREFORE BE IT RESOLVED,**

In accordance with the provisions of the resolution adopted by the Department, the FCRC hereby approves the extension of the franchise with NYSA from January 1, 2005 to December 31, 2005, subject to Section 3.1 of the Franchise Contract, as amended, and authorizes the Department acting by and through its Commissioner to sign any documents necessary to effectuate such extension;

NYC018726

**AND BE IT FURTHER RESOLVED,**

In accordance with the provisions of the resolution adopted by the Department, the FCRC , subject to the signing by the Mayor of the Local Law passed by the City Council  on December 21, 2005, amending Section 378 of the New York City Charter, hereby approves the extension of the franchise with NYSA  from January 1, 2006 to December 31, 2006 , subject to Section 3.1 of the Franchise Contract, as amended, and authorizes the Department acting by and through its Commissioner to sign any documents necessary to effectuate such extension.

A TRUE COPY OF RESOLUTION ADOPTED BY

THE FRANCHISE AND CONCESSION REVIEW COMMITTEE ON

*December 29, 2005* (CAL. NO. 1)

CLERK

# DEPARTMENT OF TRANSPORTATION
## RESOLUTION

**WHEREAS**, Miller Signs Associates, by Franchise Contract dated March 20, 1985, was granted a franchise to construct, install, maintain, operate, and sell advertising upon bus stop shelters throughout the five boroughs of the City of New York; and

**WHEREAS**, By resolution dated March 26, 1987 (Cal. No. 113), the Board of Estimate found Miller Signs Associates to be in default under the Franchise Contract and directed the surety companies to complete construction and installation of the bus stop shelters; and

**WHEREAS**, By resolution dated May 21, 1987, the Board of Estimate terminated and canceled the Franchise Contract unless the surety companies would assume it by June 17, 1987; and

**WHEREAS**, By letter dated June 17, 1987, the surety companies advised the Board of Estimate that they wished to exercise their right to assume the Franchise Contract; and

**WHEREAS**, By resolution dated December 9, 1987 (Cal. No. 56), the Board of Estimate approved the surety companies' request to retain New York Bus Stop Shelter Media, Inc. ("NY Bus Stop Shelter") to construct, install, maintain, operate, and sell advertising on bus stop shelters throughout the five boroughs; and

**WHEREAS**, By resolution dated June 23, 1988 (Cal. No. 148), the Board of Estimate approved the acquisition by Gannett Co., Inc., of all the outstanding stock of NY Bus Stop Shelter; and

**WHEREAS**, On January 11, 1993, New York Subways Advertising Co., Inc. ("NYSA"), a corporation wholly owned by Gannett Co., Inc., incorporated in 1982 in the state of Arizona and qualified to do business in the State of New York, became the successor-by-merger to NY Bus Stop Shelter; and

**WHEREAS**, By resolution dated April 12, 1995 (Cal. No. 3-A), the Franchise and Concession Review Committee (the "FCRC") approved the assignment of the Franchise Contract from the surety companies to NYSA and authorized the Department of Transportation (the "Department"), acting by and through its Commissioner, to sign any documents necessary to effectuate such assignment in accordance with the provisions of said resolution; and

**WHEREAS**, On April 12, 1995, an Assignment and Assumption agreement was entered into between NYSA, the surety companies, and the Department; and

**WHEREAS**, Local Law 25 of 1995 authorized the Department, with the approval of the FCRC, to extend the expiration date of the franchise to a date not later than December 31, 1997; and

1

NYC018728

**WHEREAS**, On April 12, 1995 (Cal. No. 3-B), the FCRC adopted a resolution approving the extension of the Franchise Contract until December 31, 1997, and prohibiting the advertisement of tobacco products on or in the bus stop shelters; and

**WHEREAS**, On August 22, 1996, Gannett Co., Inc., sold all of the issued and outstanding shares of NYSA to Outdoor Systems, Inc. ("Outdoor Systems"); and

**WHEREAS**, Outdoor Systems, as the owner of NYSA, agreed to be bound by all of the conditions, provisions, requirements, and limitations of the Franchise Contract, including the prohibition against the placement of any advertising for tobacco products, and to honor all outstanding obligations and commitments related to the franchise; and

**WHEREAS**, On February 11, 1997 (Cal. No. 2), the FCRC adopted a resolution approving the acquisition of NYSA by Outdoor Systems subject to certain conditions, including an increase in the required security deposit to five million dollars ($5,000,000); and

**WHEREAS**, On September 3, 1997, the Franchise Contract was amended pursuant to the resolution adopted by the FCRC; and

**WHEREAS**, Local Law 47 of 1998 authorized the Department, with the approval of the FCRC, to extend the expiration date of the franchise to a date not later than December 31, 1999; and

**WHEREAS**, On September 15, 1999 (Cal. No. 3), the FCRC adopted a resolution approving the extension of the Franchise Contract to December 31, 1999, subject to certain additional requirements including schedules for the removal, replacement and repair of shelters, financial security and liquidated damages, the sharing of contracted for revenue after the franchisee ceases operations, the installation of seating and/or solar power in certain shelters, Year 2000 compliance and the right of the City to take title to the shelters without payment; and

**WHEREAS**, On December 7, 1999, Infinity Broadcasting Corp. ("Infinity"), of which CBS Corporation ("CBS") was then the majority shareholder, purchased all issued and outstanding shares of Outdoor Systems, subject to a United States Department of Justice ("USDOJ") Final Judgment, Consent Decree and related documents filed December 6, 1999 in the U.S. District Court for the District of Columbia ("Court"), requiring CBS, Infinity and Outdoor Systems (the "Affiliates") to divest out-of-home advertising display assets they control or operate in New York City ("Assets") within certain timeframes established therein to settle alleged violations of the Clayton Act (the "Consent Decree"); and

**WHEREAS**, On December 8, 1999 (Cal. No. 5), the FCRC adopted a resolution consenting to the above-described change in control of the franchise, resulting in NYSA becoming a wholly owned subsidiary of Infinity, subject to clearance from USDOJ; and

**WHEREAS**, On December 9, 1999, the Franchise Contract was amended pursuant to the resolution adopted by the FCRC on September 15, 1999; and

NYC018729

**WHEREAS**, Local Law 8 of 2000 authorized the Department, with the approval of the FCRC, to extend the expiration date of the franchise to a date not later than December 31, 2002; and

**WHEREAS**, On March 7, 2000, Outdoor Systems registered a new corporate name with the New York Secretary of State and began doing business as Infinity Outdoor, Inc. ("Infinity Outdoor"); and

**WHEREAS**, On April 12, 2000, the FCRC adopted a resolution approving the extension of the Franchise Contract until December 31, 2000, with the possibility of two additional one-year extension periods, subject to certain conditions and requirements including: twelve million dollars ($12,000,000) liquidated damages payable in the event of a divestiture of the Assets that are the subject of this Franchise Contract ("Contract Assets") pursuant to the Consent Decree; increased compensation; clarification of the required number of bus stop shelters; a requirement to provide a limited number of special-sized shelters at the direction of the Department; and revisions to the schedule of liquidated damages; and

**WHEREAS**, On June 21, 2000, Infinity executed a Guaranty agreeing to the complete and prompt observance, fulfillment and performance by NYSA of each and every provision and obligation contained in the Franchise Contract to be extended and amended pursuant to the resolution adopted by the FCRC on April 12, 2000; and

**WHEREAS**, On July 6, 2000, the Franchise Contract was amended pursuant to the resolution adopted by the FCRC on April 12, 2000; and

**WHEREAS**, On September 14, 2000, Infinity Outdoor informed the Department of changes in control that would result in Infinity becoming a wholly owned subsidiary of Viacom Inc. ("Viacom"); and

**WHEREAS**, On December 20, 2001, Infinity Outdoor registered a new corporate name with the New York Secretary of State and began doing business as Viacom Outdoor; and

**WHEREAS**, Local Law 79 of 2001 authorized the Department, with the approval of the FCRC, to extend the expiration date of the franchise to a date not later than December 31, 2003; and

**WHEREAS**, On October 9, 2002, (Cal. No. 2) the FCRC adopted a resolution approving the above-described changes of control resulting in Infinity becoming a wholly owned subsidiary of Viacom, subject to clearance from the USDOJ; and

**WHEREAS**, On October 9, 2002 (Cal. No. 3), the FCRC adopted a resolution approving the extension of the Franchise Contract until December 31, 2003, subject to certain additional conditions and requirements, including: increased compensation, changes in the payment schedule, and clarification of the requirements for public service advertising and solar powered shelters; and

**WHEREAS**, On January 7, 2003, the Franchise Contract was amended pursuant to the resolution adopted by the FCRC on October 9, 2002; and

3

NYC018730

**WHEREAS,** Local Law 57 of 2003 authorized the Department, with the approval of the FCRC, to extend the expiration date of the franchise to a date not later than December 31, 2004;  and

**WHEREAS,** On December 8, 2004 (Cal. No. 5) the FCRC adopted a resolution approving the extension of the Franchise Contract until December 31, 2004, subject to certain additional conditions and requirements, including: increased compensation; the set aside of certain bus stop shelter advertising panels by NYSA for use by the New York City Marketing Development Corporation ("MDC"); and the set aside of outdoor adverting media controlled by NYSA for use by MDC.; and

**WHEREAS,** On January 25, 2005, the Franchise Contract was amended pursuant to the resolution adopted by the FCRC on December 8, 2004; and

**WHEREAS,** Local Law 3 of 2005 authorized the Department, with the approval of the FCRC, to extend the expiration date of the franchise to a date not later than December 31, 2005; and

**WHEREAS,** The Department, on March 26, 2004, as part of a comprehensive streetscape initiative, after authorization from the City Council, issued a request for proposals for a new franchise for the installation, operation and maintenance of bus stop shelters, self-cleaning automatic public toilets and public service structures and the installation and maintenance of newsstands; and

**WHEREAS,** The Department is diligently proceeding with the solicitation and is hopeful that a franchise will be awarded in 2006; and

**WHEREAS,** To insure that the bus stop shelters are maintained and that the City continues to collect revenue from the placement of advertisements on the shelters, the Department intends for NYSA to continue to perform its obligations pursuant to Section 4.8 of the Franchise.Contract, as amended, until the new franchise is awarded; and

**WHEREAS** on  December 21, 2005, a Local Law was passed by the City Council amending Section 378 of the New York City Charter, authorizing the Department, with the approval of the FCRC, to extend the expiration date of the franchise to a date not later than December 31, 2006;


**NOW THEREFORE BE IT RESOLVED,**

That the Department, subject to the approval of the FCRC, hereby extends the franchise with NYSA from January 1, 2005, to December 31, 2005, subject to Section 3.1 of the Franchise Contract, as amended;

**And be it further RESOLVED,**

That the Department, subject to signing by the Mayor of the Local Law passed by the City Council on December 21, 2005, amending Section 378 of the New York City Charter, and subject to the approval of the FCRC, hereby extends

4

NYC018731

the franchise with NYSA from January 1, 2006 to December 31, 2006, subject to
Section 3.1 of the Franchise Contract, as amended;

**And be it further RESOLVED,**

    That the Department, subject to the approval of the FCRC, is hereby
authorized acting by and through its Commissioner to sign any documents
necessary to effectuate such extensions in accordance with the provisions of this
resolution and the FCRC resolution.


Iris Weinshall
Commissioner, Department of Transportation

12/27/05
Date

5

NYC018732

This agreement, executed in triplicate, as of the 25<u>th</u> day of January, 2004 by and between the City of New York ("City"), acting by and through its Department of Transportation ("Department"), having an office located at 40 Worth Street, New York, NY 10013, and New York Subways Advertising Co., Inc. ("NYSA" or the "Company"), a corporation having an office located at 275 Madison Avenue, New York, NY 10016.

# WITNESSETH

**WHEREAS**, Miller Signs Associates, by Franchise Contract dated March 20, 1985, was granted a franchise to construct, install, maintain, operate, and sell advertising upon bus stop shelters throughout the five boroughs of the City of New York; and

**WHEREAS**, By resolution dated March 26, 1987 (Cal. No. 113), the Board of Estimate found Miller Signs Associates to be in default under the Franchise Contract and directed the surety companies to complete construction and installation of the bus stop shelters; and

**WHEREAS**, By resolution dated May 21, 1987, the Board of Estimate terminated and canceled the Franchise Contract unless the surety companies would assume it by June 17, 1987; and

**WHEREAS**, By letter dated June 17, 1987, the surety companies advised the Board of Estimate that they wished to exercise their right to assume the Franchise Contract; and

**WHEREAS**, By resolution dated December 9, 1987 (Cal. No. 56), the Board of Estimate approved the surety companies' request to retain New York Bus Stop Shelter Media, Inc. ("NY Bus Stop Shelter") to construct, install, maintain, operate, and sell advertising on bus stop shelters throughout the five boroughs; and

**WHEREAS**, By resolution dated June 23, 1988 (Cal. No. 148), the Board of Estimate approved the acquisition by Gannett Co., Inc., of all the outstanding stock of NY Bus Stop Shelter; and

**WHEREAS**, On January 11, 1993, NYSA, a corporation wholly owned by Gannett Co., Inc., incorporated in 1982 in the state of Arizona and qualified to do business in the State of New York, became the successor- by-merger to NY Bus Stop Shelter; and

**WHEREAS**, The surety companies petitioned the Department in 1995 for assignment of the Franchise Contract to NYSA; and

**WHEREAS**, By resolution dated April 12, 1995 (Cal. No. 3-A), the Franchise and Concession Review Committee ("FCRC") approved the assignment of the Franchise Contract from the surety companies to NYSA and authorized the Department, acting by and through its Commissioner, to sign any documents necessary to effectuate such assignment in accordance with the provisions of said resolution; and

NYC018733

**WHEREAS,** On April 12, 1995, an Assignment and Assumption agreement was entered into between NYSA, the surety companies, and the Department; and

**WHEREAS,** Local Law 25 of 1995 authorized the Department, with the approval of the FCRC, to extend the expiration date of the Franchise Contract to a date not later than December 31, 1997; and

**WHEREAS,** On April 12, 1995 (Cal. No. 3-B), the FCRC adopted a resolution approving the extension of the Franchise Contract until December 31, 1997, and prohibiting the advertisement of tobacco products on or in the bus stop shelters; and

**WHEREAS,** On August 22, 1996, Gannett Co., Inc., sold all of the issued and outstanding shares of NYSA to Outdoor Systems, Inc. ("Outdoor Systems"); and

**WHEREAS,** Outdoor Systems, as the owner of NYSA, agreed to be bound by all of the conditions, provisions, requirements, and limitations of the Franchise Contract, including the prohibition against the placement of any advertising for tobacco products, and to honor all outstanding obligations and commitments related to the franchise; and

**WHEREAS,** On February 11, 1997 (Cal. No. 2) the FCRC adopted a resolution approving the acquisition of NYSA by Outdoor Systems subject to certain conditions, including an increase in the required security deposit to five million dollars ($5,000,000); and

**WHEREAS,** On September 3, 1997, the Franchise Contract was amended pursuant to the resolution adopted by the FCRC; and

**WHEREAS,** Local Law 47 of 1998 authorized the Department, with the approval of the FCRC, to extend the expiration date of the Franchise Contract to a date not later than December 31, 1999; and

**WHEREAS,** On September 15, 1999 (Cal. No. 3), the FCRC adopted a resolution approving the extension of the Franchise Contract to December 31, 1999, subject to certain additional requirements including schedules for the removal, replacement and repair of shelters, financial security and liquidated damages, the sharing of contracted for revenue after the franchisee ceases operations, the installation of seating and/or solar power in certain shelters, Year 2000 compliance and the right of the City to take title to the shelters without payment; and

**WHEREAS,** On December 7, 1999, Infinity Broadcasting Corp. ("Infinity"), of which CBS Corporation ("CBS") was then the majority shareholder, purchased all issued and outstanding shares of Outdoor Systems, subject to a United States Department of Justice ("USDOJ") Final Judgment, Consent Decree and related documents filed December 6, 1999 in the U.S. District Court for the District of Columbia ("Court"), requiring CBS, Infinity and Outdoor Systems (the "Affiliates") to divest certain out-of-home advertising display assets they control or operate in New York City ("Assets") within certain timeframes established therein to settle alleged violations of the Clayton Act (the "Consent Decree"); and

2

NYC018734

**WHEREAS,** On December 8, 1999 (Cal. No. 5), the FCRC adopted a resolution consenting to the above-described change in control of the franchise, resulting in NYSA becoming a wholly owned subsidiary of Infinity, subject to clearance from USDOJ; and

**WHEREAS,** On December 9, 1999, the Franchise Contract was amended pursuant to the resolution adopted by the FCRC on September 15, 1999; and

**WHEREAS,** Local Law 8 of 2000 authorized the Department, with the approval of the FCRC, to extend the expiration date of the Franchise Contract to a date not later than December 31, 2002; and

**WHEREAS,** On March 7, 2000, Outdoor Systems registered a new corporate name with the New York Secretary of State and began doing business as Infinity Outdoor, Inc. ("Infinity Outdoor"); and

**WHEREAS,** On April 12, 2000, the FCRC adopted a resolution approving the extension of the Franchise Contract until December 31, 2000, with the possibility of two additional one-year extension periods, subject to certain conditions and requirements including: twelve million dollars ($12,000,000) liquidated damages payable in the event of a divestiture of the Assets that are the subject of this Franchise Contract ("Contract Assets") pursuant to the Consent Decree; increased compensation; clarification of the required number of bus stop shelters; a requirement to provide a limited number of special-sized shelters at the direction of the Department; and revisions to the schedule of liquidated damages; and

**WHEREAS,** On June 21, 2000, Infinity executed a Guaranty agreeing to the complete and prompt observance, fulfillment and performance by NYSA of each and every provision and obligation contained in the Franchise Contract to be extended and amended pursuant to the resolution adopted by the FCRC on April 12, 2000; and

**WHEREAS,** On July 6, 2000, the Franchise Contract was amended pursuant to the resolution adopted by the FCRC on April 12, 2000; and

**WHEREAS,** On September 14, 2000, Infinity Outdoor informed the Department of changes in control that would result in Infinity becoming a wholly owned subsidiary of Viacom Inc. ("Viacom"); and

**WHEREAS,** On December 20, 2001, Infinity Outdoor registered a new corporate name with the New York Secretary of State and began doing business as Viacom Outdoor; and

**WHEREAS,** Local Law 79 of 2001 authorized the Department, with the approval of the FCRC, to extend the expiration date of the Franchise Contract to a date not later than December 31, 2003; and

**WHEREAS,** On October 9, 2002 (Cal. No. 2), the FCRC adopted a resolution approving the above-described changes of control resulting in Infinity becoming a wholly owned subsidiary of Viacom, subject to clearance from the USDOJ; and

3

NYC018735

**WHEREAS,** On October 9, 2002 (Cal. No. 3), the FCRC adopted a resolution approving the extension of the Franchise Contract until December 31, 2003, subject to certain additional conditions and requirements, including: increased compensation, changes in the payment schedule, and clarification of the requirements for public service advertising and solar powered shelters; and

**WHEREAS,** On January 7, 2003, the Franchise Contract was amended pursuant to the resolution adopted by the FCRC on October 9, 2002; and

**WHEREAS,** Local Law 57 of 2003 authorized the Department, with the approval of the FCRC, to extend the expiration date of the Franchise Contract to a date not later than December 31, 2004; and

**WHEREAS,** On December 6, 2004 (Cal. No. 1), the FCRC and the Department held a joint public hearing on the extension of the Franchise Contract to December 31, 2004, and certain proposed amendments thereto, and the hearing was closed; and

**WHEREAS,** On December 8, 2004 (Cal. No. 5), the FCRC adopted a resolution approving the extension of the Franchise Contract until December 31, 2004, subject to certain additional conditions and requirements set forth below; and

**WHEREAS,** The parties hereto have agreed to extend the Franchise Contract, as amended, (the "Franchise Contract" or the "contract") with the following amendments;

**NOW THEREFORE,** the parties hereto agree as follows:

**FIRST:**      Article III, Section 3.1 of the Franchise Contract is hereby amended to read as follows:

The term of this contract and the franchise granted hereunder shall be extended to December 31, 2004, unless lawfully terminated prior to that date pursuant to the terms of the contract.   When used herein, the phrase "Commencement Date" shall mean March 20, 1985.

In addition to all other termination rights contained herein, the Company agrees that the City may terminate the contract upon at least thirty (30) days written notice at any time after December 31, 2000, for the purpose of awarding a contract for the operation of the shelters to a successor vendor selected pursuant to a competitive solicitation.

**SECOND:**    Article IV, section 4.1 of the Franchise Contract is hereby amended to read as follows:

The Company shall pay as compensation to the City, without set-off, deduction, reduction, abatement or counterclaim, except as expressly provided herein ("Compensation"):

4

NYC018736

Thirteen Million and Five Hundred Thousand Dollars ($13,500,000) per calendar year (hereinafter the "Guaranteed Minimum Annual Payment") and Sixty Percent (60%) of all gross advertising revenues, as defined in Section 4.2, in excess of Thirty Five Million Dollars ($35,000,000) per calendar year (hereinafter the "Percentage Payment").

**Third:**        Article IV, section 4.5 of the Franchise Contract is hereby amended to read as follows

The Guaranteed Minimum Annual Payment shall be paid to the City in quarterly payments of Three Million and Three Hundred Seventy Five Thousand Dollars ($3,375,000) due within thirty (30) days after the expiration of each quarter. Each quarterly Guaranteed Minimum Annual Payment shall be accompanied by a sales report stating for the relevant quarter:  (1) the sales price for all bus stop shelter advertising sales; (2) a report of gross receipts received by the Company from all sources during the preceding quarter; (3) the identity of each buyer; (4) the location of all shelters for which each advertising sale was consummated; (5) the percentage of advertising space that went unsold during the quarter; (6) the locations of all public service advertising provided in accordance with Section 4.9; and (7) the locations of all advertising panels set aside for the New York City Marketing Development Corporation exclusive use in accordance with Section 4.9.1.

The Company shall also provide to the City an Independent Public Audit Report (Attestation) stating that the report of gross receipts included in the quarterly sales report referenced above is free of material misstatements and reflects the actual balances in the books and records of the Company.  Said Account Report shall be provided on a quarterly basis and shall be submitted simultaneously with the issuance of the sales report.

The Guaranteed Minimum Annual Payment and the Percentage Payment referenced in Section 4.1 shall be effective as of January 1, 2004.  No later than 30 days following the execution of the extension of this contract through December 31, 2004, the Company shall pay the difference between the Guaranteed Minimum Annual Payment due under this contract and any payments previously made to the City for calendar year 2004.

In the event that the Percentage Payment becomes due and owed pursuant to Section 4.1, the Company shall pay the Percentage Payment for that calendar year within thirty (30) days after the end of the calendar year.  The Company shall pay the Percentage Payment, if any, for calendar year 2004 by January 31, 2005, or thirty (30) days after execution of the extension of this contract through December 31, 2004, whichever is later.

5

NYC018737

Gross annual advertising revenues for any calendar year shall be calculated from January 1 through December 31 of that year for the purpose of determining the Percentage Payment that is due and owing pursuant to Section 4.1 of this contract.

**FOURTH:**    Article IV, section 4.9 of the Franchise Contract is hereby amended to add new section 4.9.1 to read as follows

a)    The Company shall make available to the New York City Marketing Development Corporation ("MDC"), the City's official marketing agent, the following percentage of the total number of advertising panels free of charge according to the following schedule:

July and August         20%

All remaining months    15%

The advertising panels set aside for MDC's exclusive use pursuant to this Section shall be distributed in each of the five (5) boroughs of the City by applying the above referenced percentages against the number of adverting panels located in each borough for the applicable month.

b)    Of the panels selected for MDC's exclusive use pursuant to this section, 10 percent of the total number of panels citywide shall be located below 96th Street in the borough of Manhattan. For illustrative purposes, if, for the month of July, there are a total of 5,800 advertising panels in all five boroughs of the City, MDC, under this section, would be entitled to the exclusive use of 1,160 panels (5,800 x 20%) and 116 panels would be attached to bus stop shelters located below 96th Street in the borough of Manhattan.

c)    Subject to the limitations set forth in paragraphs (a) and (b) of this section, the Company shall be permitted to determine the location of advertising panels required hereunder.

d)    The advertising panels made available to MDC pursuant to this section shall be in addition to those panels made available to the City pursuant to Section 4.9 of this contract.

e)    The content of the advertising panels set aside for MDC's exclusive use pursuant to this section shall be entirely within the discretion of MDC for use within its corporate purpose (including, but not limited to, commercial advertisements and public service advertisements),

6

NYC018738

provided, however, that MDC shall not sell such space for commercial purposes.

f)    MDC shall bear no costs for installation, maintenance, utilities and removal in connection with those advertising panels set aside for MDC's exclusive use under this section.

g)    MDC shall be entitled to change the advertisements placed pursuant to this section at a maximum frequency of once every four (4) weeks.

h)    MDC shall provide the Company with advertising posters produced in accordance with the specifications required by the Company of other advertisers and in accordance with the same schedule required by the Company for other advertisers.

i)    The installation, maintenance and removal of all advertising provided by MDC shall be performed in accordance with the same standards and utilize the same materials and methods as are used by the Company for other advertisers.

**FIFTH:**    Article IV, section 4.9 of the Franchise Contract is hereby amended to add a new section 4.9.2 to read as follows:

a)    In addition to the advertising panels made available to the City pursuant to Section 4.9 of this contract and the advertising panels made available to MDC pursuant to Section 4.9.1 of this contract, the Company shall set aside advertising media, other than that affixed to bus stop shelters, for MDC's exclusive use free of charge during the term of this Agreement. Said media must be outdoors and may be located within the City of New York or any other location where the company maintains outdoor advertising media. The market value of the spaces to be made available to MDC shall be Seven Hundred and Fifty Thousand Dollars ($750,000). The media under this section shall be distributed as space permits, but in prominent locations nonetheless. If there is a dispute concerning the total value of the advertising space made available to MDC pursuant to this subsection, the matter will be referred to the American Arbitration Association whose determination will be binding on both parties to this contract.

b)    MDC shall provide the Company with advertising posters produced in accordance with the specifications and required of other advertisers and in accordance with the same schedule required by the Company of other advertisers.

7

NYC018739

c) The installation, maintenance and removal of all advertising provided by MDC shall performed in accordance with the same standards and utilize the same materials and methods as are used by the Company for other advertisers.

d) MDC shall bear no costs for installation, maintenance, utilities and removal in connection with those advertising spaces set aside for MDC's exclusive use under this section.

e) The content of the advertising space set aside for MDC's exclusive use pursuant to this section shall be entirely within the discretion of MDC for use within its corporate purpose (including, but not limited to, commercial advertisements and public service advertisements), provided, however, that MDC shall not sell such space for commercial purposes.

f) MDC shall be entitled to change advertisements placed within advertising spaces pursuant to this section at a maximum frequency of once every four (4) weeks.

g) The Company shall provide to MDC an annual report no later than 30 days after December 31 of each year beyond 2003 that this agreement is in effect detailing the location of each media space utilized under this section.

**SIXTH:**    This amendment and the terms and conditions herein shall be effective as of January 1, 2004.

8

NYC018740

**IN WITNESS WHEREOF,** the parties hereto have caused this agreement to be executed the day and year first written above.

### New York City Department of Transportation

By: _I. Weinshall_

Iris Weinshall
Commissioner

Date: _1 6 05_

### The City of New York

By: _____
Deputy Mayor

Date: _1 10 05_

### NEW YORK SUBWAYS ADVERTISING CO., INC., A WHOLLY OWNED SUBSIDIARY OF VIACOM OUTDOOR, INC.

By: _____

Name: _Raymond Nowak_

Title: _EVP-CFO+CAO_

Date: _12 20 04_

**APPROVED AS TO FORM AND CERTIFIED AS TO LEGAL AUTHORITY**

By: _Sharon Cantor_
Acting Corporation Counsel

Date: _DEC 13 2004_

9

NYC018741

## ACKNOWLEDGMENT BY NEW YORK CITY DEPARTMENT OF TRANSPORTATION

State of New York          )
                           ) ss:
County of New York         )

On the 6 day of January in the year 2005 before me, the undersigned, personally appeared    Iris Weinshall
personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the Instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
**Notary Public or Commissioner of Deeds**

ROXANNE GAIR
Commissioner of Deeds
City of New York No. 2-10225
Commission Expires

NYC018742

## ACKNOWLEDGMENT BY NEW YORK SUBWAYS ADVERTISING

State of New York           )
                            ) ss:
County of _____   )

On the 5 day of Jan in the year 2005 before me, the undersigned, personally appeared _Ray Nunez_ personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
Notary Public or Commissioner of Deeds

11

Exhibit O

# THE CITY OF NEW YORK
## DEPARTMENT OF TRANSPORTATION
## DIVISION OF FRANCHISES, CONCESSIONS AND CONSENTS

## REQUEST FOR PROPOSALS FOR A FRANCHISE TO INSTALL, OPERATE AND MAINTAIN BUS STOP SHELTERS, SELF-CLEANING AUTOMATIC PUBLIC TOILETS AND PUBLIC SERVICE STRUCTURES AND TO INSTALL AND MAINTAIN NEWSSTANDS IN THE BOROUGHS OF THE BRONX, BROOKLYN, MANHATTAN, QUEENS AND STATEN ISLAND

### DATE OF ISSUE:  JANUARY 17, 1997
### PIN #84197MB039AD

---

**AUTHORIZED DEPARTMENT CONTACTS**

Proposers are advised that the Department's authorized contact people for all matters concerning this Request for Proposals ("RFP") are:

**Anne Koenig, Director of Franchises**
**and**
**Katie Schwab, Special Counsel**

Department of Transportation
Division of Franchises, Concessions and Consents
40 Worth Street, 9th Floor South
New York, NY  10013
Phone:  (212) 442-8040    Fax:  (212) 442-8070

---

The New York City Comptroller is charged with the audit of contracts in New York City.  Anyone who believes that there has been unfairness, favoritism or impropriety in the proposal process should inform the Comptroller of the City of New York, Office of Contract Administration, One Centre Street, Room 835, New York, NY  10007 (212) 669-3000.

---

Rudolph W. Giuliani
Mayor

Christopher R. Lynn
Commissioner

NYC-OTR005091

# REQUEST FOR PROPOSALS FOR A COORDINATED STREET FURNITURE FRANCHISE

## TABLE OF CONTENTS

**SECTION I**        **SUMMARY**                                    1

**SECTION II**       **SCOPE OF SERVICES**

   A. GENERAL INFORMATION                          3
   B. BUS STOP SHELTERS                            9
   C. AUTOMATIC PUBLIC TOILETS                     11
   D. NEWSSTANDS                                   13
   E. PUBLIC SERVICE STRUCTURES                    14
   F. REVENUE OPPORTUNITIES                        16
   G. SITE SELECTION AND CONSULTATION              17
   H. RESPONSE TO COMPLAINTS                       18

**SECTION III**      **PROPOSAL PROCEDURES AND REQUIREMENTS**

   A. PROPOSAL PACKAGE                             19
   B. PROPOSAL PACKAGE SUBMISSION REQUIREMENTS     23
   C. PROPOSAL EVALUATION PROCEDURES
25

**SECTION IV**       **GENERAL INFORMATION**

   A. STATUS OF INFORMATION                        29
   B. COMMUNICATION WITH THE DEPARTMENT            29
   C. PROPOSER INQUIRIES                           29
   D. ADDENDA TO THE RFP                           29
   E. PREPROPOSAL CONFERENCE                       30
   F. LOCATION LISTING                             30
   G. MODIFIED PROPOSALS                           30
   H. WITHDRAWAL OF PROPOSALS                      31
   I. LATE PROPOSALS AND MODIFICATIONS
31
   J. CONFIDENTIAL AND/OR PROPRIETARY INFORMATION  31
   K. COSTS INCURRED BY PROPOSERS                  32
   L. SUPPLEMENTAL INFORMATION, PRESENTATIONS AND  32
      DEMONSTRATIONS

NYC-OTR005092

# TABLE OF CONTENTS

M.  NEGOTIATIONS, BEST AND FINAL OFFERS                          32
N.  PROPOSER ACCEPTANCE OF RFP AND FRANCHISE
    32              PROVISIONS
O.  FRANCHISE CONTRACT AWARD                                     32
P.  DETERMINATION OF PROPOSER RESPONSIBILITY                     33
Q.  RFP POSTPONEMENT/CANCELLATION                                34

**APPENDICES**

Appendix 1:  Authorizing Resolution                             35
Appendix 2:  Summary Chart                                       45
Appendix 3:  Siting Criteria                                     47
Appendix 4:  Proposal Cover Sheet                                53
Appendix 5:  Cash Flow Analysis                                  55
Appendix 6:  Affirmation                                         65
Appendix 7:  Acknowledgment of Addenda                          67
Appendix 8:  Proposal Package Check List                        69
Appendix 9:  MacBride Principles                                71
Appendix 10: Investigation Clause                               75

NYC-OTR005093

## SECTION I -- SUMMARY

The City of New York, acting through its Department of Transportation ("Department"), invites all qualified firms to submit Proposals for a twenty (20) year Franchise Contract for the installation, maintenance and operation of Bus Stop Shelters ("Shelters"), self-cleaning Automatic Public Toilets ("APTs") and Public Service Structures ("PSSs") and the installation and maintenance of Newsstands (collectively "Franchise Structures") and the display of advertising thereon. The City seeks Proposals to install, maintain and operate Franchise Structures that are clean, safe and attractive, in convenient locations to serve the needs of residents and visitors.

This Request for Proposals is made pursuant to a City Council Authorizing Resolution (Appendix 1) authorizing the grant of non-exclusive franchises to install, operate and maintain Bus Stop Shelters, Newsstands, APTs and PSSs. Pursuant to this authority, the Department is seeking Proposals for a Franchise that will provide for the following:

- The installation and maintenance of a minimum of 3,300 Bus Stop Shelters, with amenities for the public in the form of street identification signage, seating and public service information. This will require the creation of new designs, and preferably will include the replacement of the existing shelter inventory.
- The installation, operation and maintenance of a minimum of 30 APTs. The Franchisee will be permitted to collect a minimal fee from the public for the use of the APTs.
- The installation and maintenance of a minimum of 430 Newsstands. The Franchisee will be required to cooperate with the operator of the Newsstand regarding maintenance and repair of the Newsstand structure.

In addition, Proposers are encouraged to provide for the installation, operation and maintenance of PSSs, specifically limited to Litter and/or Recycling Bins and Computer Information Terminals that provide access to government or commercial activity. The public service provided shall be immediately apparent to the passerby and shall not be obscured physically or visually by the name or logo of any sponsoring entity.

The Franchisee will also be responsible for maintaining six existing City-owned pedestrian information kiosks.

The design and placement of the Franchise Structures shall reflect the following goals:

- In order to minimize impacts on pedestrian circulation and the visual character of the streetscape, the footprint and height of the Franchise

Structures shall be kept as small as possible consistent with their function and other requirements.

- In order to reduce physical and visual clutter on sidewalks, Proposers are encouraged to incorporate elements such as telephones, computer information terminals, litter and/or recycling bins and newsracks within or on the Franchise Structures.
- In order to maximize pedestrian circulation and clear paths, Franchise Structures shall be aligned with adjacent existing elements on the sidewalks to the extent possible.

The Franchisee will be permitted to display advertising on the Franchise Structures subject to specific criteria and limitations as more fully described below.

The Proposal must indicate the amount of compensation the Proposer is willing to offer for the rights granted under the Franchise, which must be stated as both a percentage of gross revenues derived by the Franchisee as a result of the installation of the Franchise Structures and the display of advertising thereon and a fixed guaranteed minimum annual amount, whichever is greater. Such proposed fixed guaranteed minimum annual amount shall be no less than five million dollars ($5,000,000).

By submitting a Proposal, Proposers understand and accept that at a minimum the terms and conditions in Resolution No. 1548 adopted by the New York City Council on March 6, 1996, will become part of any Franchise granted.

During the week of February 10, 1997, the Department will conduct a Preproposal Conference to provide an opportunity for interested parties to ask questions regarding the RFP. Proposers are advised to request scheduling details from a Department Contact.

Proposals are due on March 21, 1997, at 2:00 p.m., and must be submitted in accordance with the Proposal Package Submission Requirements contained herein.

2

NYC-OTR005095

## SECTION II -- SCOPE OF SERVICES

### A.    GENERAL INFORMATION

### 1.    <u>Design</u>

The Coordinated Street Furniture Franchise is an important new initiative for the
City of New York. Its primary goals are to augment and significantly improve the
appearance and quality of the largest items of furniture in our streets.

Designs must achieve aesthetic excellence. They must be compatible with a
wide variety of built contexts and must conform to a citywide coordinated design
scheme. Designs for the different types of Franchise Structures must be
coordinated so that within any one area there is a harmonious relationship
between the various items of street furniture.

Designs will be evaluated on the basis of functional efficiency, aesthetics,
security, durability, adaptability for various built environments around the City
and accommodation of people with disabilities. All designs are subject to the
approval of the Department.

For each type of standard Franchise Structure (Bus Stop Shelter, Newsstand,
Automatic Public Toilet and Public Service Structure meeting non-pillar
dimensional criteria), Proposers must submit two basic designs. The first design
shall be suitable for deployment, in the case of Bus Stop Shelters, throughout
the City and, in the case of other Franchise Structures, in medium and high
density mixed-use environments. Proposers are required to show how each of
these basic designs can be varied to suit specific contexts. This might be
achieved, for example, through alternative shapes or forms for component parts,
alternate materials and/or varying the color of applied finishes. The second
design for each type of standard Franchise Structure shall be appropriate for use
within districts which are designated historic districts or in front of individual
buildings which are designated New York City Landmarks. These designs may
also be deployed on a limited basis in other locations. Some degree of variation
in these basic designs is also required. Any designs for pillar structures shall be
additional to the basic designs specified above.

Bus Stop Shelters and Newsstands must be available in several sizes and
configurations to meet the constraints imposed by various street conditions and
users' needs as specified below. The maximum dimensions of each of the
Franchise Structures is described below and summarized in Appendix 2.

All components of the Franchise Structures must be fabricated of high quality,
durable and vandal-resistant materials. To the maximum extent feasible, all
surfaces of the Franchise Structures that are accessible to the public must be
graffiti-resistant. Adequate illumination of the Franchise Structures and adjacent

3

NYC-OTR005096

sidewalks must be provided. Proposals shall include consideration of the use of independent power sources, such as solar energy, as an alternative to connecting by underground conduit to the local utility. Proposals which commit to using such sources shall be eligible to receive bonus points.

Plans must also allow for the possibility of inclusion of public pay telephones in or on all the Franchise Structures except PSSs. (Additional franchise authority from the Department of Information Technology and Telecommunications will be required to provide public pay telephone service at such telephones.)

The design and placement of the Franchise Structures will be subject to the review and approval of the Landmarks Preservation Commission and the Art Commission, to the extent required by law. All Franchise Structures must be accessible to people with disabilities, and the Franchisee will be required to comply with the Americans with Disabilities Act and any additional federal, state, and local laws relating to accessibility for people with disabilities as applicable. The Franchisee will be required to comply with all New York City laws, rules and codes related to materials and construction.

2.    **Build-out**

The Franchise Structures shall be installed in such locations as directed by the Department in accordance with the consultative process and the siting criteria specified below in Section G and in Appendix 3, respectively.

The Franchisee shall comply with all applicable sections of the building, plumbing and electrical codes of the City of New York, obtain any required permits from the appropriate City agency and pay any required fees. Where the work to be done in connection with the installation, operation, maintenance, repair, removal or deactivation of the Franchise Structures requires that such work be performed by a plumber or electrician, the Franchisee shall employ and utilize only licensed plumbers and/or electricians. Quality workmanship shall be employed at all times. State-of-the-art construction methods and building materials must be integrated into the Franchise Structures as they become available. After the installation or removal of any Franchise Structure, the sidewalk immediately under or adjacent thereto shall be restored to its proper condition by the Franchisee at the Franchisee's sole expense.

The design and placement of the Franchise Structures shall not result in an installation which causes the destruction or damage of any part of a Distinctive Sidewalk or Historic Pavement. This shall not preclude the Franchisee from installing a Franchise Structure, including appurtenant utility connections, on a Distinctive Sidewalk or Historic Pavement by any means necessary. Prior to any such installation the Franchisee shall be required to:
   a) post a performance bond adequate to protect the adjacent property owner against any loss related to the condition of the Distinctive

4

NYC-OTR005097

Sidewalk or Historic Pavement that may be occasioned by the installation, operation, maintenance or removal of a Franchise Structure; and

b) make a good faith effort to procure sufficient quantities of those materials of which the Distinctive Sidewalk or Historic Pavement is comprised to repair, replace or restore it to its original condition.

In the event that the placement of any Franchise Structure results in damage to the Distinctive Sidewalk or Historic Pavement, such sidewalk or pavement shall be restored to its original condition at the sole expense of the Franchisee, using in-kind materials.

The Franchisee will be required, at a minimum, to adhere to the following build-out schedule:

|  | Shelters | APTs | Newsstands |
|---|---|---|---|
| Year 1 | 550 | 15 | 144 |
| Year 2 | 550 | 15 | 143 |
| Year 3 | 550 | *** | 143 |
| Year 4 | 550 | *** | *** |
| Year 5 | 550 | *** | *** |
| Year 6 | 550 | *** | *** |
| Years 7-20 | *** | *** | *** |

*** Additional structures as directed by the Department.

Proposals must at a minimum reflect the above build-out schedule. Proposers are encouraged to provide a more ambitious schedule for any or all aspects of the build-out.

During the term of the Franchise, the Department may direct the Franchisee to remove, replace, and relocate structures as necessary to accommodate changing needs or to address security concerns. The Franchisee, at the request of the City, shall be required to remove Franchise Structures which interfere with the construction, maintenance or repairs of public utilities, public works or public improvements, or which the City otherwise deems to be inappropriate at a particular location. At the request of the City, Franchise Structures so removed shall be reinstalled when construction, maintenance or repairs are completed or relocated to sites approved by the City. All such removals, replacements and/or relocations shall be accomplished at the sole expense of the Franchisee.

Failure to adhere to the build-out schedule as directed by the Department will be grounds for cancellation of all or any portion of the Franchise Contract.

3.    **Maintenance and Operation**

5

NYC-OTR005098

Maintenance of the Franchise Structures by the Franchisee shall include inspecting, cleaning and removing graffiti from the structures on at least two nonconsecutive days each week (or more frequently, as specified below), timely removal of debris, snow and ice in and around the structures, preventive maintenance and prompt repairs. Snow and ice removal shall include clearing a three-foot access path for wheelchairs and spreading salt, or preferably, a noncorrosive de-icer. The sidewalk immediately under or adjacent to the Franchise Structures shall be maintained in its proper condition or, if necessary, restored thereto at the Franchisee's sole expense. Repairs that are necessary to ensure public safety, as determined by the Department, shall be performed within 24 hours of notification by the Department. The Franchisee shall also be responsible for collecting refuse or recyclables from any litter and/or recycling bins incorporated within or on Franchise Structures each time the structures are cleaned, or more often as needed.

The Franchise Contract will provide for liquidated damages related to the Franchisee's failure to perform such maintenance to the satisfaction of the Department. A schedule of liquidated damages will appear in the Franchise Contract; liquidated damages will likely range from $50 to $500 per day per breach, based on the severity of the breach. Repeated failure to perform such maintenance to the satisfaction of the Department may be deemed a default in performance by the Franchisee and grounds for cancellation of all or any portion of the Franchise Contract. The City will have the right to inspect the Franchise Structures and to order compliance with installation, maintenance, operational and repair requirements.

The Franchisee shall also be responsible for acquiring and installing, at its sole expense, hardware and software for a computerized inventory system of the Franchise Structures and sites. This system shall have database, mapping, and graphic capabilities for recording the location, type, design, and features of all installed Franchise Structures and the location, features, and status of proposed sites for Franchise Structures, including sites that have been rejected. The system shall also have the capacity for contemporaneous two-way information sharing between the Department and the Franchisee regarding the installation, operation, and maintenance of the Franchise Structures. The Franchisee shall be responsible for maintaining said system and incorporating state-of-the-art technologies throughout the term of the Franchise. Proposers are encouraged to develop PC-based systems that use or are compatible with standard, commercially available programs. Such system shall be installed and operational at the commencement of the Franchise. On the expiration or sooner termination of the Franchise Contract, the computer system and data shall become the property of the City without compensation to the Franchisee.

4.    **Ownership of the Structures**

6

NYC-OTR005099

The Franchise Structures will remain the property of the Franchisee during the term of the Franchise Contract. On expiration of the Franchise Contract, the Franchise Structures shall become the property of the City without compensation to the Franchisee. Alternatively, the City may elect to have the Franchisee remove any or all of the Franchise Structures and restore their sites to their proper condition, which removal and restoration shall be at the Franchisee's sole expense.

In the event the Franchise Contract is canceled by the Department in whole or in part prior to the expiration date for any reason other than by reason of default of the Franchisee, the City shall have the option to purchase from the Franchisee the then-existing Franchise Structures. In the event of termination prior to the end of the tenth year of the Franchise term, the purchase price shall be determined by calculating 100% of the cost of fabricating and installing the structures, less depreciation on a straight line basis using an annual depreciation rate of 10%. In the event the Franchise Contract is terminated any time after the end of the tenth year and prior to the expiration of the Franchise term, the purchase price shall be determined by calculating 50% of the cost of fabricating and installing the structures, less depreciation on a straight-line basis using an annual depreciation rate of 10%. Alternatively, the Department may direct the Franchisee to remove any or all of the Franchise Structures and restore their sites to their proper condition, which removal and restoration shall be at the Franchisee's sole expense.

In the event of termination in whole or in part due to the default of the Franchisee, the Franchise Structures shall become the property of the City without any compensation to the Franchisee. Alternatively, the City may direct the Franchisee to remove any or all of the Franchise Structures and restore their sites to their proper condition, which removal and restoration shall be at the Franchisee's sole expense.

## 5.   Security Fund

Prior to the execution of the Franchise Contract, the Franchisee will be required to deposit with the New York City Comptroller the sum of five million dollars ($5,000,000), in cash or securities of equal value approved by the Comptroller, as a Security Fund to ensure the faithful performance by the Franchisee of all conditions, provisions, and requirements of the Franchise Contract. The Department will be authorized to make withdrawals from the Security Fund should the Franchisee fail to pay the required compensation or taxes. The Department also will be authorized, in the event the Franchisee fails to cure a breach of the Franchise Contract after notice from the Department, to cause the necessary work to be done and collect the cost thereof from the Security Fund. The Department also will be authorized to assess and collect liquidated damages from the Security Fund.

NYC-OTR005100

6.    **Performance Bond**

Prior to the execution of the Franchise Contract, the Franchisee will be required
to deposit with the New York City Comptroller a surety performance bond in an
amount to be determined by the City sufficient to ensure the installation of the
Franchise Structures and the faithful performance of all of the terms and
conditions of the Franchise Contract.  This performance bond shall also
expressly provide for the in-kind replacement and repair of Distinctive Sidewalks
and Historic Pavement.

A portion of this performance bond may be in the form of cash, and the
remainder shall be in the form of a bond, legally executed by a surety company
or companies approved by the City of New York and authorized to do business in
the State of New York.  A portion of the performance bond will be reduced or
returned, as the case may be, to the Franchisee upon the successful installation
of the Franchise Structures, in accordance with a schedule to be determined in
the Franchise Contract.  The remaining portion will remain on deposit throughout
the term of the Franchise.

7.    **Liability and Insurance**

The Franchisee will be liable for, and shall indemnify, defend and hold the City,
its officers, agents and employees harmless from, any and all claims or damages
to persons or property by reason of the installation, operation or maintenance of
the Franchise Structures.  The Franchisee will be required to procure and
maintain, at its sole cost and expense, the following types of insurance from an
insurance company acceptable to the City:

   a) Commercial General Liability Insurance in the amount of ten million
      dollars ($10,000,000)  in the Company's name, and naming the City,
      its officers, agents and employees as an additional insured thereunder,
      and endorsed to cover the liability assumed by the Company.
   b) Workers' Compensation Insurance in accordance with applicable law.
   c) Employers' Liability Insurance in accordance with applicable law.
   d) Automobile Liability Insurance in the amount of two million dollars
      ($2,000,000) and naming the City, its officers, agents and employees
      as an additional insured.

B.    **BUS STOP SHELTERS**

1.    **Design**

Bus Stop Shelters must first and foremost provide meaningful protection from
precipitation, wind and sun, and the number and placement of side enclosures
shall be sufficient to accomplish this purpose.  At the same time, ease of access
for both functional and security reasons must be maintained.

8

NYC-OTR005101

The Department strongly encourages innovation and flexibility in Bus Stop Shelter design. The Franchisee will be required to construct Shelters in a variety of shapes and sizes to accommodate different street conditions and service needs, including extra-large Shelters for heavily used bus stops and Shelters with shorter and narrower footprints for sidewalks where space is limited in length or in width.

All designs must provide at least the following amenities:

- Adequate illumination of the interior and the adjacent sidewalk.
- Passenger seating which by design precludes reclining and may or may not be installed in every Shelter, but which the City may at any time require to be installed or removed.
- An area or areas on the structure for bus route maps, street maps, bus stop name and street identification, Guide-A-Ride canisters and other information. Bus stop name and street identification shall be back-lit or otherwise illuminated and shall be designed in such a manner to maximize the ability of bus passengers to see such name and identification from the bus as the bus approaches the bus stop.

Proposers are encouraged to propose additional public amenities.

Materials used for the walls of the Shelters must be transparent. The dimensions of structural frames and supports shall be kept at a minimum. In the event that glass is the material proposed for the Shelter walls, an alternative unbreakable and, to the maximum extent feasible, scratch-resistant material must also be proposed for Shelters at locations where there is a high incidence of vandalism.

Advertising panels, maps and signs shall be located so as to minimize their impact on the visibility of adjacent buildings and the interior of the Bus Stop Shelter. They shall not interfere with pedestrian or motorist sight-lines necessary for traffic safety.

The maximum area of the largest Bus Stop Shelter shall be 150 square feet. The maximum length shall be 30 feet; the maximum width, excluding the roof, shall be 5 feet; and the maximum height shall be 9 feet.

## 2.    **Build-out**

The City seeks a Proposal for a minimum of 3300 Bus Stop Shelters by the end of the sixth year of the Franchise term with an option to direct the installation of additional Bus Stop Shelters, to be exercised, if at all, at the sole discretion of the City, but in no event later than the eighteenth year of the twenty-year Franchise. The total number of Bus Stop Shelters will not exceed 3500.

9

At the commencement of the Franchise term, the Franchisee will be required to purchase the existing shelters.  The existing shelter inventory is owned by the Current Franchisee, New York Subways Advertising Co., Inc., a corporation wholly owned by Outdoor Systems, Inc., with the exception of 418 shelters, which are owned by the Department. The payment for the entire inventory of existing shelters will be equal to the depreciated value of the shelters owned by the Current Franchisee, as calculated pursuant to Section 14.5 of the current Bus Stop Shelter Franchise Contract.  This amount is estimated by the Current Franchisee at approximately $4 million, but is subject to verification and audit by the Department and the City Comptroller.  The Department's preliminary estimates indicate this amount may be significantly less.  (The Bus Stop Shelter Franchise Contract may be obtained by calling a Department Contact.)

By no later than the end of the sixth year, the entire inventory must conform to the new designs and amenities, preferably through the construction of new Shelters, although proposals to accomplish this through retrofitting of existing shelters of the current design will also be considered.  The Franchisee will be required to construct or retrofit at least 550 Shelters per year, as directed by the Department, during the first six years of the term.  Said construction and/or retrofitting shall be done in accordance with an annual schedule to be furnished by the Department to the Franchisee.  Said schedule shall be designed to afford a fair distribution of new and/or retrofitted Shelters throughout the five boroughs of the City and shall be based upon ridership and boarding data from the MTA New York City Transit and from authorized private carriers.

Shelters will be purchased, retrofitted or constructed by the Franchisee at its sole expense. The Franchisee will be responsible for all installation costs, including providing the Shelters with electric power.

The Shelters will be located at bus stops where demand for their use is greatest, as determined by the Department following the consultation process described below.

During the term of the Franchise, the Department may direct the Franchisee to remove, replace and/or relocate Shelters as necessary to accommodate changing needs and concerns. Such removals, replacements and relocations shall be accomplished at the sole expense of the Franchisee.

3.    **Maintenance and Operation**

Immediately on the commencement of the Franchise and throughout the. Franchise term, the Franchisee will be responsible for the complete maintenance of the entire inventory of Bus Stop Shelters.  The maintenance shall include, but shall not be limited to, cleaning, inspecting and removing graffiti from the Shelters on at least two nonconsecutive days each week, promptly clearing and

10

NYC-OTR005103

removing debris, snow and ice from the ground in and around the Shelters, repairing or replacing damaged parts within 24 hours of notification by the Department, and preventive maintenance. Snow and ice removal shall include clearing a three-foot access path for wheelchairs and spreading salt or ice remover.

4.    **Intelligent Transportation Systems**

The successful Proposer will be required to cooperate with the MTA New York City Transit or other agencies to make the structures available for the installation of wiring and equipment and the ongoing maintenance of Intelligent Transportation Systems (ITS), as such systems are developed.

Proposers should be aware that the Department has entered into an agreement to participate in an operational test of an ITS for Real-Time Bus Travel Information, which will communicate to the public the expected arrival times of buses. The operational test will involve the installation of 15 video monitors and 15 electronic variable message signs at select Bus Stop Shelters beginning in 1998. A copy of the agreement may be obtained from a Department Contact.

The Franchisee will not be responsible for the costs associated with the acquisition, installation and maintenance of such systems. However, if the test is successful, the program may be implemented citywide, and Proposers should consider this possibility in designing the Bus Stop Shelters.


C.    **AUTOMATIC PUBLIC TOILETS**

1.    **Design**

Each unit must be accessible to persons with disabilities and must contain a commode; a hand-washing station that provides warm soapy water followed by warm rinse water; toilet tissue and seat cover dispensers; and a paper-towel dispenser or air-drier. Heating, ventilation and lighting systems, including emergency lighting, must be provided. The unit must be designed with the ability to fully and automatically self-clean and disinfect the floor, seat and bowl after every use. All APT units must contain a self-activating warning system that communicates contemporaneously all significant maintenance and operations problems to an operations center. All APT units must provide external indicators informing potential users of whether the unit is available for use.

In addition, every APT unit must provide an emergency alarm system that allows for two-way communication for activation by the user and transmission to an operations center and the Police and/or Fire Department. A smoke and fire alarm system with an automatic door-opening device must be provided. An

11

NYC-OTR005104

**42-57**
**Additional Sign Regulations for Adult Establishments**

M1 M2 M3

In all districts, as indicated, all permitted #signs#, other than
#advertising signs#, for #adult establishments# shall conform
with the provisions of this Chapter, except that the maximum
#surface area# of all #signs#, other than #advertising signs#,
for #adult establishments# shall not exceed, in the aggregate,
three times the #street# frontage of the #zoning lot#, but in no
event more than 150 square feet per establishment, of which no
more than 50 square feet may be #illuminated# and no portion
thereof may be #flashing#.

No #signs# for #adult establishments# shall be permitted on the
roof of any #building#, nor shall such #signs# extend above #curb
level# at a height greater than 25 feet.


2/27/01

**42-58**
**Signs Erected Prior to December 13, 2000**

M1 M2 M3

In all districts, as indicated, a #sign# erected prior to
December 13, 2000, shall have #non-conforming use# status
pursuant to Sections 52-82 (Non-Conforming Signs Other Than
Advertising Signs) or 52-83 (Non-Conforming Advertising Signs)
with respect to the extent of the degree of #non-conformity# of
such #sign# as of such date with the provisions of Sections
42-52, 42-53 and 42-54, where such #sign# shall have been issued
a permit by the Department of Buildings on or before such date.
In all such districts, as indicated, a #sign# other than an
#advertising sign# erected prior to December 13, 2000, shall also
have #non-conforming use# status pursuant to Section 52-82 with
respect to the degree of #non-conformity# of such #sign# as of
such date with the provisions of Section 42-55, paragraphs (a)(1)
and (b), where such #sign# shall have been issued a permit by the
Department of Buildings on or before such date. Nothing herein
shall be construed to confer #non-conforming use# status upon any
#advertising sign# located within 200 feet of an arterial highway
or of a #public park# with an area of one-half acre or more, and
within view of such arterial highway or #public park#, or where
such #advertising sign# is located at a distance from an arterial
highway or #public park# with an area of one-half acre or more
which is greater in linear feet than there are square feet of

#surface area# on the face of such #sign#, contrary to the
requirements of Section 42-55, paragraph (b). The #non-conforming
use# status of signs subject to Section 42-55, paragraphs (c)(1),
(c)(2) and (d), shall remain unaffected by this provision.

For the purposes of this Section, arterial highways shall include
all highways that are shown on the Master Plan of Arterial
Highways and Major Streets as "principal routes," "parkways" or
"toll crossings," and that have been designated by the City
Planning Commission as arterial highways to which the provisions
of this Section shall apply.