software vendor or the Software Escrow Agent as they relate to the deposit of Software in escrow. The agreement with the Software Escrow Agent shall provide that the City shall have the opportunity to cure any default of the Company, at the sole cost and expense of the Company, that jeopardizes the ability of the City to access the escrowed source code as provided for under this Agreement.

The escrow agreement provisions set forth in this Section 2.4.2(e) shall apply with equal force to any software licensed to the City (excluding "off-the-shelf" software) by a subcontractor of the Company.

2.4.3. <u>Warranties of Title</u>. The Company represents and warrants that the Plans and Specifications and Software: (a) are original to the Company or validly licensed or sublicensed to the Company; (b) to the knowledge of the Company after reasonable inquiry, do not infringe, dilute, misappropriate, or improperly disclose any intellectual property or proprietary rights of any third party, or otherwise violate any law, rule, or regulation; and (c) do not constitute defamation or invasion of the right of privacy. The Company further represents and warrants that it has not granted any license(s), permit(s), interest(s), or right(s), exclusive or nonexclusive, to any party other than the City with respect to the Plans and Specifications and will not grant any such licenses unless such grants are necessary to perform the Company's obligations under this Agreement.

2.4.4. <u>Permits, Authorizations, Approvals, Consents and Licenses</u>.

(a)    Before installing any Coordinated Franchise Structure, the Company shall obtain at its sole cost and expense, any necessary permits, authorizations, approvals, consents, licenses, and certifications required for each Coordinated Franchise Structure, including, but not limited to: (i) pursuant to all City laws, rules and codes related to materials and construction and all applicable sections of the building, plumbing and electrical codes of the City; (ii) all permits, authorizations, approvals, consents, licenses and certifications required by DOT, Landmarks and the Art Commission, and any other agency of the City with jurisdiction over the property on which the Coordinated Franchise Structure is to be located; (iii) any necessary permits, authorizations, approvals, consents, licenses, and certifications required pursuant to any applicable state and federal laws, rules, regulations and policies, writs, decrees and judgments; and (iv) any necessary permits, authorizations, approvals, consents, licenses and certifications from Persons to use a building or other private property, easements, poles, and conduits.

(b)    The Company agrees that fees paid to obtain any permits, consents, licenses, or any other forms of approval or authorization shall not be considered in any manner to be in the nature of a tax, or to be compensation for this franchise in lieu of the compensation described in Section 9 hereof.

2.4.5. <u>Design of Coordinated Franchise Structures</u>.    The design of all Coordinated Franchise Structures installed pursuant to this Agreement (other than Existing Bus Shelters) shall be in compliance with all applicable laws, rules and regulations of the City and shall be subject to approval of the Art Commission and, to the extent required by law, Landmarks. Company shall make good faith efforts to obtain approval of the Art Commission

and to the extent required by law, Landmarks. The Company shall submit an application signed by DOT (which application DOT agrees to sign in a form reasonably acceptable to DOT), to the Art Commission and, to the extent required by law, Landmarks, for review and approval of the Preliminary Plans and Specifications. In the event that changes to the Preliminary Plans and Specifications are required by the Art Commission or Landmarks for their approvals, the Company at its sole cost and expense shall make such changes as are required to obtain such approval. Following such approval, the Preliminary Plans and Specifications as approved shall be the Plans and Specifications referred to in this Agreement and shall be the Plans and Specifications used to manufacture the Coordinated Franchise Structures. It is anticipated that street or sidewalk conditions at certain locations will require modifications of the size of individual Coordinated Franchise Structures (as distinct from modifications to the design of the Coordinated Franchise Structures overall). Such modifications to individual Coordinated Franchise Structures shall be made at the Company's sole cost and expense upon a determination by the City that such modifications are necessary or appropriate based on street or sidewalk conditions at such specified locations. Additionally,

(a)    The Company shall design PSSs such that the public service provided is immediately apparent and shall not be obscured physically or visually by advertising;

(b)    In consultation with DOT the Company shall prepare as part of the Plans and Specifications size variations of the Newsstands which all meet the dimensional requirements set forth in the RFP and shall comply with the Americans with Disability Act as further set forth in Section 3.7 hereof. Such variations must be approved by DOT in its reasonable discretion and must meet the following specifications: there must be Newsstand lengths of 8', 10' and 12' which must be able to be used interchangeably with Newsstand widths of 4', 5' and 6'. All Newsstands must be a standard height of 9'. Additionally, the Company shall make reasonable efforts to customize the interior of the Newsstand by permitting all Newsstand Operators to select customization options from a standardized group of customization alternatives offered by the Company;

(c)    The Company shall design New Bus Shelters in a variety of sizes such that every Existing Bus Shelter may be replaced in accordance with the terms of this Agreement. New Bus Shelter designs shall provide for bus route maps, street maps, bus stop name identification, Guide-a-Ride canisters and other information. The New Bus Shelter designs shall also contemplate some form of passenger seating, such as a bench, that may or may not be required to be installed in every New Bus Shelter. Once during the Term at any time during such Term, the City may require the Company, and the Company shall at its sole cost and expense, install or remove such seating from each New Bus Shelter (this provision is not intended to limit the Company's obligation to maintain, including replacement where and when necessary, seating that has been installed and has become worn or damaged, in accordance with the maintenance obligations imposed upon the Company by this Agreement);

(d)    As the City has determined that only one configuration (in lieu of standard and landmark) is appropriate, the Company shall only be required to design and install one configuration of New Bus Shelters, APTs and Newsstands during the Term, subject to the requirements on size variations set forth in this Agreement;

satisfaction of the Commissioner within the periods set forth above, the Commissioner may (i) order the Company in writing to take appropriate action to investigate such complaint and/or cure the problem, as the case may be and (ii) if the Company fails to take appropriate action accordingly, investigate and cure the underlying problem at the Company's sole cost and expense.

3.6.    <u>Complaint Record Keeping</u>.  The Company shall maintain written, accurate and complete records of all complaints that shall be available to DOT through EIMIS or, at DOT's reasonable advance request, in written form.   Such records shall indicate: (i) the specific Coordinated Franchise Structure, including its identifying number and its exact location, for which the complaint was made; (ii) the type of complaint; (iii) the date and time of complaint; (iv) if the complaint is in written form, the name, address, and telephone number of the Person filing the complaint; (v) the Company's action to address the complaint; and (vi) to the extent applicable the date of resolution of the complaint.  All such records shall be retained by the Company throughout the Term.  The EIMIS shall provide DOT a means by which it can search for complaints by location and/or time period, and shall produce statistical reports, at DOT's request, by type of complaint, location of complaint, type of structure, and time period.

3.7.    <u>Americans with Disabilities Act</u>.  In connection with its obligations under this Agreement the Company, at its sole cost and expense, agrees to comply with the applicable provisions of the Americans With Disabilities Act of 1990, 42 U.S.C. 12132 ("ADA"), the Architectural and Transportation Barriers Compliance Board Guidelines, and any additional applicable federal, state and local laws relating to accessibility for persons with disabilities and any rules or regulations promulgated thereunder, as such laws, rules or regulations may from time to time be amended.

3.8.    <u>No Discrimination</u>.  The Company shall not discriminate in the provision of Services on the basis of race, creed, color, national origin, sex, age, handicap, marital status, or real or perceived sexual orientation.

3.9.    <u>Continuity of Service</u>.  In the event the Company, with the consent of the City as required and in accordance with the provisions of Section 11 hereof, sells or otherwise transfers the System, or any part thereof, or Control thereof to any Person, or to the City or the City's assignee, or in the event the franchise terminates, the Company shall transfer the System, or such relevant part, in an orderly manner in order to maintain continuity of Service.

SECTION 4

<u>ADVERTISING</u>

4.1.    <u>Introduction</u>.

(a)    In consideration of the Company's performance of the Services,  and payment by the Company of the Franchise Fees, the City hereby grants to the Company the exclusive right throughout the Term to sell and place advertising on the Coordinated Franchise Structures that are the subject of this Agreement and subject to the specifications, terms,

- 30 -

NYC-OTR006934

reservations and restrictions of this Agreement, and to collect revenues generated by such advertising.

(b)     The Company expressly acknowledges that it is receiving a non-exclusive franchise and that the City, either itself or through third parties, may design, construct, install, operate and maintain street furniture, including, but not limited to, bus stop shelters, automatic public toilets, trash receptacles, multi-rack news racks, information/computer kiosks, and newsstands, that contain advertising on them from which the Company would not be entitled to collect revenue.

4.2.    <u>Defined Terms</u>.  For the purposes of this Section 4, the following terms, phrases, words and their derivations shall have the meaning set forth herein, unless the context clearly indicates that another meaning is intended.  When not inconsistent with the context, words used in the present tense include the future tense, words used in the plural number include the singular number, and words used in the singular number include the plural number.  All capitalized terms used in the definition of any other term shall have their meaning as otherwise defined in Section 1.

(a)     "advertising" shall mean any printed matter including, but not limited to, words, pictures, photographs, symbols, graphics or visual images of any kind, or any combination thereof, promoting or soliciting the sale or the use of a product or service or providing other forms of textual or visual message or information, but in no event shall include the textual information that is required to be posted on a Coordinated Franchise Structure by federal, state and local law, rule or regulation, or this Agreement.

(b)     "alcohol advertising" shall mean advertising, the purpose or effect of which is to identify a brand of an alcohol product, a trademark of an alcohol product or a trade name associated exclusively with an alcohol product, or to promote the use or sale of an alcohol product.

(c)     "NYCMDC Advertising" shall mean advertising reasonably determined by NYCMDC to be within its corporate purpose including, but not limited to, commercial advertisements, advertising promoting New York City, and public service advertisements, but NYCMDC Advertising shall not include "spot market advertising".

(d)     "tobacco advertising" shall mean advertising, which bears a health warning required by federal statute, the purpose or effect of which is to identify a brand of a tobacco product (any substance which contains tobacco, including, but not limited to, cigarettes, cigars, pipe tobacco and chewing tobacco), a trademark of a tobacco product or a trade name associated exclusively with a tobacco product, or to promote the use or sale of a tobacco product.

(e)     "Olympic Period" shall mean the period starting four weeks prior to the commencement of the Olympics and ending two weeks after the end of the Olympics.

(f)     "prohibited advertising" shall mean advertising that is false and/or misleading, which promotes unlawful conduct or illegal goods, services or activities, or that is otherwise unlawful or obscene as determined by DOT, including but not limited to advertising that constitutes public display of offensive sexual material in violation of Penal Law 245.11.

- 31 -

NYC-OTR006935

(g)    "Public Service Advertising" shall mean advertising the purpose or effect of which is to communicate information pertaining to the public health, safety, and welfare of the citizens of the City, as determined by DOT in its sole discretion.

(h)    "spot market advertising" shall mean advertising sold by NYCMDC to commercial advertisers (whether for cash, trade or barter) in a manner unrelated to any broader sponsorship or partnership arrangement between such advertiser and NYCMDC or the City and unrelated to any event, sponsorship or support efforts, or intergovernmental agreements of NYCMDC or the City.  For the purposes of this definition of "spot market advertising", intergovernmental agreements shall mean agreements between the City and/or NYCMDC and other governmental or quasi-governmental entities.

4.3.    Advertising Specifications.

4.3.1.  Generally.  Advertising shall be permitted on the Coordinated Franchise Structures except that advertising shall not be permitted on the interior of Newsstands or APTs, or as otherwise prohibited herein.  Advertising is not permitted on PSSs except that the name or logo of a sponsoring entity shall be permitted on the exterior of trash receptacles and information/computer kiosks.  No advertising shall be permitted on APTs in parks, except that advertising shall be permitted on APTs located on sidewalks adjacent to parks.  The design, dimensions, and location of advertising on all Coordinated Franchise Structures shall be in accordance with the terms of this Agreement including Appendix D.  The Company shall be entitled to utilize the full amount of advertising space set forth on Appendix D (notwithstanding that the dimension specifications on Appendix D are expressed as "maximum advertising").

4.3.2.  Dimensions/Specifications.  All advertising, or the name or logo of a sponsoring entity, shall contain the features and conform to the basic dimensions set forth in Appendix D attached hereto, and made part hereof, provided, however, that modifications to advertising dimensions may be necessitated by location specific modifications to individual Coordinated Franchise Structures as set forth in Section 2.4.5 herein.  Notwithstanding any provision of this Agreement to the contrary, except for the modifications at individual locations contemplated in the proviso to the immediately preceding sentence, the Company shall not be required to modify the basic dimensions set forth on Appendix D attached hereto.

4.4.    Restrictions.

4.4.1.  Prohibitions.   Tobacco advertising and prohibited advertising is not permitted.  Alcohol advertising within 250 feet of any school, day care center, or house of worship is not permitted.

4.4.2.  Other Media.  Electronic media will be permitted on a case by case basis and, except for backlighting of printed posters (the Company shall be permitted to use backlighting of advertising on Coordinated Franchise Structures except where prohibited by rules or regulations of Landmarks), will be subject (except as may otherwise be permitted by the City) to the applicable zoning regulations for property adjacent to the site, and shall be subject to all applicable approvals by City agencies.  Audio advertising will not be permitted, provided, however, an audio component used in connection with an information/computer kiosk may be

- 32 -

NYC-OTR006936

permitted in the sole discretion of DOT. The Company shall be permitted to install 250 Scrollers on Coordinated Franchise Structures when and where the Company deems most advantageous in its sole discretion. Any other multimedia, or other non traditional form or type of advertising, including additional Scrollers, shall be permitted only on a case by case basis, as determined by the Commissioner and shall be subject to any applicable approvals by City agencies.

        4.4.3.  <u>Viacom Outdoor Agreement</u>.  The Company acknowledges receipt from the City of the Viacom Outdoor Agreement and agrees that it shall take such actions as are reasonably necessary to comply with the revenue sharing obligations set forth in Section 4.10 therein.

        4.4.4.  <u>Public Service Advertising</u>.  In each year of the Term, the Company shall provide 2.5% of the total number of panels then available to the Company, to be evenly distributed among the various Coordinated Franchise Structures and evenly distributed throughout the City, at no cost to the City or NYCMDC for Public Service Advertising. The first panel locations for Public Service Advertising shall be as set forth in Exhibit H attached hereto which Exhibit shall be amended as necessary to reflect changes and additional panel locations to be provided for Public Service Advertising during the Term in accordance with this Section 4.4. The Company shall assist DOT and/or NYCMDC in its efforts to inform City agencies of the availability of such Public Service Advertising and in the coordination of requests by such agencies for the use of such space. NYCMDC will coordinate with City agencies for use of the Public Service Advertising panels. The City agrees to consider, in good faith, any proposal made by the Company to postpone the use of the Public Service Advertising space provided for in this Section, or to return that space to the Company, during times of full occupancy for other advertising campaigns in order to maximize revenue generation opportunities; <u>provided</u> that nothing in this sentence shall be interpreted to require the City to forego its rights to receive the Public Service Advertising space that it is entitled to pursuant to this Section.

        4.4.5.  <u>NYCMDC Advertising</u>.  In each year of the Term, in addition to the advertising inventory provided for Public Service Advertising pursuant to Section 4.4.4 herein, the Company shall provide advertising space to NYCMDC for NYCMDC Advertising at no cost to the City or NYCMDC consisting of 20% of the total number of panels then available to the Company under this Agreement. Such space shall be distributed fairly throughout the City and shall represent a corresponding percentage of the value of the advertising space available to the Company under this Agreement as set forth in Exhibit H attached hereto, which Exhibit shall be amended as necessary to reflect changes and additional panel locations to be provided to NYCMDC during the Term in accordance with this Section 4.4.

        4.4.6.  <u>New Structures, Return, Other</u>.

        (a)  No later than 90 days prior to the expiration of each year of the Term, additional panels that have become available to the Company in the preceding 12 months shall be allocated by mutual agreement between the Company and NYCMDC as follows for the following year of the Term:

NYC-OTR006937

(i)    2.5% of such new panels shall be allocated to Public Service Advertising to be evenly distributed as to value and geography among the newly available panels; and

(ii)    20% of such new panels shall be allocated to NYCMDC Advertising to be evenly distributed as to value and geography among the newly available panels.

(b)    If the City opts with respect to any year to return some but not all of the Public Service Advertising or the NYCMDC Advertising pursuant to Section 4.4.6(f) hereof, the specific locations of the panels shall reflect an even geographical distribution throughout the City unless otherwise agreed between the Company and NYCMDC.

(c)    The Company agrees to consider, in good faith, any proposal made by DOT or NYCMDC to exchange locations of the NYCMDC Advertising inventory previously agreed upon. Notwithstanding the preceding, the City shall have a yearly option, to be exercised on or before the 90th day prior to the expiration of each year of the Term (subject to the Company's reasonable approval as to locations, based on availability), to exchange with the Company no more than 5% of the locations (provided that no more than 1% may be exchanged per borough in any given year and all such exchanges shall be within the same borough) of the NYCMDC Advertising inventory previously agreed upon on a comparable value basis, effective the following year of the Term.

(d)    The administration of NYCMDC Advertising and Public Service Advertising, including but not limited to posting, planning, installation, maintenance, removal and reporting shall be performed by the Company at no cost to the City or NYCMDC (except that the advertising posters shall be provided to or at the direction of the Company at no expense to the Company), shall be implemented in accordance with the same standards and best practices and utilization of the same materials and methods as used by the Company for displays of its paying commercial clients, which shall include, at a minimum: sufficient lead time for planning, a copy change every four weeks, location lists with spotted maps provided to NYCMDC and DOT two weeks prior to the posting date of any campaign, a completion report including at least six quality photographs of distinct panels for every campaign and an affidavit certifying the date that materials were received and posted provided to NYCMDC and DOT within 6 weeks of the posting completion.    In programming the NYCMDC Advertising and Public Service Advertising, NYCMDC shall provide the Company with a monthly inventory of the NYCMDC Advertising and Public Service Advertising locations and the advertising campaign requested at each location.

(e)    For the purposes of this Section 4.4.6 an exclusive advertising campaign shall be any campaign whereby the Company agrees to limit its rights to enter into advertising agreements with entities that compete with a particular advertiser. If the Company wishes to enter into an exclusive advertising campaign that would limit not just the Company's rights but also NYCMDC's rights under this Agreement to use panels for NYCMDC Advertising, then provided the Company has given NYCMDC the notice described below in this paragraph NYCMDC agrees to cooperate in good faith to address any potential issues that may arise out of an accommodation by NYCMDC of such exclusivity arrangement, including, for

- 34 -

NYC-OTR006938

example, consideration of an in-kind exchange of panel locations on a one for one basis to accommodate a specified geographic exclusivity. NYCMDC has no obligation beyond such good faith cooperation to accommodate any such exclusivity commitment sought by the Company. The notice to NYCMDC described in this paragraph shall contain information as to the schedule, duration, geographic reach and number of panels involved in the proposed exclusive advertising campaign.

(f)     Additionally, the City shall have a yearly option, to be exercised no later than the 90th day prior to the expiration of each year of the Term, to return to the Company any or all of the advertising space reserved for Public Service Advertising and NYCMDC Advertising effective the following year of the Term. DOT will be compensated for this returned advertising space in accordance with Section 9.6.2 hereof.

4.4.7.   Alternative Compensation.  In addition to the advertising panels provided for Public Service Advertising and NYCMDC Advertising, the Company shall be required to provide to NYCMDC certain advertising space pursuant to Section 9.4 hereof.

4.4.8.   Olympics.  Should any Olympics be awarded to the City during the Term:

(a)     the City, at its sole discretion, may require the Company to cease to sell and place advertising on all or some of the Coordinated Franchise Structures during the Olympic Period;

(b)     the City, at its sole discretion, may impose restrictions on the parties who may advertise on the Coordinated Franchise Structures and/or the nature of the advertising during the Olympic Period;

(c)     the City or its designated representative may assume control of advertising sales and placement during the Olympic Period;

(d)     the Company shall continue to comply with all other terms of this Agreement, except as expressly set forth herein.

4.4.9.   Removal.  Any material displayed or placed in violation of Section 4 shall be removed by the Company within 48 hours of notice from DOT and any material displayed or placed in violation of Section 4.4.1 shall be removed by the Company within 24 hours of notice from DOT. If the Company fails to do so, the City shall have the right to remove such material without any liability to the Company and the Company shall pay to the City the costs incurred in connection with such removal and for any other costs or damages incurred by the City in connection with such removal including, but not limited to repair and restoration costs, arising out of the performance of such work.

4.5.   Maintenance of Advertising.

(a)     The Company shall maintain the advertising on Coordinated Franchise Structures in a clean and attractive condition at all times and be responsible for the cost of any power consumption used, electrical or otherwise, including the cost of any power consumption used in connection with NYCMDC Advertising and Public Service Advertising.

NYC-OTR006939

(b)    All advertising display panels must be safe, secure and sturdy, and shall be maintained as such throughout the Term. In the event the Commissioner deems a display panel or any part thereof to be unsafe, insecure or not sturdy, or to otherwise pose a threat to public safety, the Company shall remove such panel without delay upon receipt of notice from DOT. If the Company fails to do so, the City shall have the right to remove such panel without any liability to the Company and the Company shall pay to the City the costs incurred in connection with such removal and for any other costs or damages incurred by the City in connection with such removal including, but not limited to repair and restoration costs, arising out of the performance of such work. In the event any panel is removed in accordance with this Section 4.5, the Company shall take all steps necessary to maintain the full function of the structure. A replacement panel may be installed, at the Company's sole cost and expense, only with the express, prior written approval of the Commissioner, which approval shall not be unreasonably withheld, conditioned or delayed.

4.6.    <u>Future Compliance</u>. The Company shall comply with all applicable laws, rules and regulations in force as of the Effective Date and which may hereafter be adopted with respect to advertising.

4.7.    <u>Change in Local Law</u>. If there is a change in local New York City law, rule or regulation restricting alcohol advertising (a "Local Alcohol Advertising Restriction") such that the Company can demonstrate to the City a loss in revenue, then:

(a)    If the Company can show that its Gross Revenues have declined in any or all of the eight quarters beginning in the quarter in which the restriction imposed by the Local Alcohol Advertising Restriction took effect (the "Restriction Effective Date") (as compared with the Company's Gross Revenues during the corresponding quarter of the 12 month period prior to the Restriction Effective Date), then the Cash Component applicable to any such quarters shall be reduced by the product of (i) .5 and (ii) the decline in the Company's Gross Revenues attributable to the Local Alcohol Advertising Restriction during such applicable quarter. If the reduction contemplated by the preceding sentence is greater than the Cash Component applicable to such quarter pursuant to Section 9.5 hereof (after all other adjustments pursuant to Section 9 hereof), then all subsequent payments of the cash portion of the Franchise Fee shall be reduced until the full amount of the adjustment calculated in accordance with this Section 4.7(a) has been deducted, provided, however, that in no event shall any reductions be rolled over for more than seven quarters.

(b)    The adjustments set forth in Section 4.7(a) shall be in the nature of a deferral, not an offset. Accordingly, the Company shall repay to the City all amounts (without interest) deducted in accordance with Section 4.7(a) in 12 equal quarterly payments beginning on the date of the first regularly scheduled payment under Section 9.5 occurring after the last deferral allowed in Section 4.7(a) hereof.

(c)    Notwithstanding the foregoing, this Section 4.7 shall have no force or effect if there is a Local Alcohol Advertising Restriction after the 17th year of the Term. If any of the payments to be made to the City pursuant to Section 4.7(b) above would, by its terms, be payable after the expiration of this Agreement, then the balance of such amount deferred shall be paid no later than 30 days after start of the last quarter of the last year of the Term. In the event

NYC-OTR006940

that this Agreement is terminated in accordance with its terms, Company shall pay back any amounts deferred within 30 days of such termination.

For the avoidance of doubt, an example of the calculation of the adjustments to the Franchise Fee contemplated by this Section 4.7 is set forth on Schedule 4.7 to this Agreement.

(d)    Any adjustment to the Cash Component made pursuant to this Section 4.7 shall not be taken into consideration for purposes of comparing the Cash Component to 50% of Gross Revenues in accordance with Sections 9.2, 9.3 and 9.5.

## SECTION 5

## CONSTRUCTION AND TECHNICAL REQUIREMENTS

5.1.    General Requirements.    The Company agrees to construct and install the Coordinated Franchise Structures in accordance with the Plans and Specifications and each of the terms set forth in this Agreement governing construction and installation of the Coordinated Franchise Structures, the siting criteria in the RFP, the Proposal and BAFO.

5.2.    Identification of Coordinated Franchise Structure.    The Company shall have displayed on each Coordinated Franchise Structure a unique identifying number (which shall be tracked via EIMIS) and a visible sign that shall comply with Section 3.5 (b) herein.

5.3.    Quality.    The Company agrees to comply with all applicable sections of the building, plumbing and electrical codes of the City and the National Electrical Safety Code and where the nature of any work to be done in connection with the installation, operation and maintenance or deactivation of the System requires that such work be done by an electrician and/or plumber, the Company agrees to employ and utilize only licensed electricians and plumbers. All such work shall be performed using quality workmanship and construction methods in a safe, thorough and reliable manner using state of the art building materials of good and durable quality and all such work shall be done in accordance with all applicable law, rules and regulations. If, at any time, it is determined by the City or any other agency or authority of competent jurisdiction that any part of the System, is harmful to the public health or safety, then the Company shall, at its sole cost and expense, promptly correct all such conditions, provided, however, that to the extent the harmful condition was caused by the City's gross negligence or intentional misconduct, the Company shall correct such harmful condition at the City's sole cost and expense.

5.4.    Structures.    In connection with the installation, operation, and maintenance of any and all Coordinated Franchise Structures, the Company shall, at its own cost and expense, take commercially reasonable measures to protect any and all structures belonging to the City and all designated landmarks, and all other structures within any Historic District from damage that may be caused to such structures and landmarks as a result of the installation, operation or maintenance performed thereon by, or on behalf of the Company. The Company agrees that it shall be liable, at its own cost and expense, to replace or repair and restore to its prior condition in a manner as may be reasonably specified by the City, any municipal structure, designated

- 37 -

NYC-OTR006941

landmarks, structures in an Historic District or any part of the Inalienable Property of the City that may become disturbed or damaged as a result of any work thereon by or on behalf of the Company pursuant to this Agreement.

5.5.    No Obstruction.  In connection with the installation, operation, and maintenance of the Coordinated Franchise Structures, the Company shall use commercially reasonable efforts to minimize the extent to which the use of the streets or other Inalienable Property of the City is disrupted, and shall use commercially reasonable efforts not to obstruct the use of such streets and/or Inalienable Property of the City, including, but not limited to, pedestrian travel.  Sidewalk clearance must be maintained at all times so as to insure a free pedestrian passage in accordance with Appendix 3 of the RFP and any applicable laws, rules and regulations unless prior consent has been obtained from the Commissioner in his/her sole discretion.

5.6.    Safety Precautions.  The Company shall, at its own cost and expense, undertake appropriate efforts and any other actions as otherwise directed by DOT to prevent accidents at its work sites, including the placing and maintenance of proper guards, fences, barricades, security personnel and bollards at the Curb, and suitable and sufficient lighting.

5.7.    Power Outages.  In the event that any type of power outage occurs, to the extent the source of such outage is under the direct and exclusive control of the Company, the Company shall restore service within 24 hours at all Coordinated Franchise Structure locations so affected. If the source of a power outage is not under the direct and exclusive control of the Company, the Company shall undertake commercially reasonable efforts to restore service at all affected Coordinated Franchise Structure locations and shall notify the responsible party and the Commissioner within 24 hours.

## SECTION 6

## SECURITY FUND

6.1.    General Requirement.  The Company shall, in accordance with Section 2.2 herein, deposit with DOT a security deposit (the "Security Fund") in the amount of $5,000,000.00, which may consist of a certified check, bank check or wire transfer payable to the "City of New York," or other cash equivalent acceptable to DOT.  Interest shall accrue in an interest bearing bank account for the benefit of the Company and shall be paid annually to the Company on each anniversary of the Effective Date.

DOT shall be entitled, as authorized by law, to charge and collect from the Company for any reasonable administrative expenses, custodial charges, or other similar expenses, as may result from the operation of this Security Fund.

The Company shall maintain $5,000,000 in the Security Fund at all times during the Term plus one year after the end of the Term (provided that such one year period shall not start until the end of any holdover period), unless within such one year period DOT notifies the Company that the Security Fund shall remain in full force and effect during the pendency of any litigation or the assertion of any claim which has not been settled or brought to final judgment and for which the Security Fund provides security; provided that only such portion of the

NYC-OTR006942

that this Agreement is terminated in accordance with its terms, Company shall pay back any amounts deferred within 30 days of such termination.

For the avoidance of doubt, an example of the calculation of the adjustments to the Franchise Fee contemplated by this Section 4.7 is set forth on Schedule 4.7 to this Agreement.

(d)    Any adjustment to the Cash Component made pursuant to this Section 4.7 shall not be taken into consideration for purposes of comparing the Cash Component to 50% of Gross Revenues in accordance with Sections 9.2, 9.3 and 9.5.

SECTION 5

CONSTRUCTION AND TECHNICAL REQUIREMENTS

5.1.    General Requirements.    The Company agrees to construct and install the Coordinated Franchise Structures in accordance with the Plans and Specifications and each of the terms set forth in this Agreement governing construction and installation of the Coordinated Franchise Structures, the siting criteria in the RFP, the Proposal and BAFO.

5.2.    Identification of Coordinated Franchise Structure.    The Company shall have displayed on each Coordinated Franchise Structure a unique identifying number (which shall be tracked via EIMIS) and a visible sign that shall comply with Section 3.5 (b) herein.

5.3.    Quality.    The Company agrees to comply with all applicable sections of the building, plumbing and electrical codes of the City and the National Electrical Safety Code and where the nature of any work to be done in connection with the installation, operation and maintenance or deactivation of the System requires that such work be done by an electrician and/or plumber, the Company agrees to employ and utilize only licensed electricians and plumbers. All such work shall be performed using quality workmanship and construction methods in a safe, thorough and reliable manner using state of the art building materials of good and durable quality and all such work shall be done in accordance with all applicable law, rules and regulations. If, at any time, it is determined by the City or any other agency or authority of competent jurisdiction that any part of the System, is harmful to the public health or safety, then the Company shall, at its sole cost and expense, promptly correct all such conditions, provided, however, that to the extent the harmful condition was caused by the City's gross negligence or intentional misconduct, the Company shall correct such harmful condition at the City's sole cost and expense.

5.4.    Structures.    In connection with the installation, operation, and maintenance of any and all Coordinated Franchise Structures, the Company shall, at its own cost and expense, take commercially reasonable measures to protect any and all structures belonging to the City and all designated landmarks, and all other structures within any Historic District from damage that may be caused to such structures and landmarks as a result of the installation, operation or maintenance performed thereon by, or on behalf of the Company. The Company agrees that it shall be liable, at its own cost and expense, to replace or repair and restore to its prior condition in a manner as may be reasonably specified by the City, any municipal structure, designated

- 37 -

NYC-OTR006941

landmarks, structures in an Historic District or any part of the Inalienable Property of the City that may become disturbed or damaged as a result of any work thereon by or on behalf of the Company pursuant to this Agreement.

    5.5.   <u>No Obstruction</u>.  In connection with the installation, operation, and maintenance of the Coordinated Franchise Structures, the Company shall use commercially reasonable efforts to minimize the extent to which the use of the streets or other Inalienable Property of the City is disrupted, and shall use commercially reasonable efforts not to obstruct the use of such streets and/or Inalienable Property of the City, including, but not limited to, pedestrian travel.  Sidewalk clearance must be maintained at all times so as to insure a free pedestrian passage in accordance with Appendix 3 of the RFP and any applicable laws, rules and regulations unless prior consent has been obtained from the Commissioner in his/her sole discretion.

    5.6.   <u>Safety Precautions</u>.  The Company shall, at its own cost and expense, undertake appropriate efforts and any other actions as otherwise directed by DOT to prevent accidents at its work sites, including the placing and maintenance of proper guards, fences, barricades, security personnel and bollards at the Curb, and suitable and sufficient lighting.

    5.7.   <u>Power Outages</u>.  In the event that any type of power outage occurs, to the extent the source of such outage is under the direct and exclusive control of the Company, the Company shall restore service within 24 hours at all Coordinated Franchise Structure locations so affected. If the source of a power outage is not under the direct and exclusive control of the Company, the Company shall undertake commercially reasonable efforts to restore service at all affected Coordinated Franchise Structure locations and shall notify the responsible party and the Commissioner within 24 hours.

SECTION 6

<u>SECURITY FUND</u>

    6.1.   <u>General Requirement</u>.  The Company shall, in accordance with Section 2.2 herein, deposit with DOT a security deposit (the "Security Fund") in the amount of $5,000,000.00, which may consist of a certified check, bank check or wire transfer payable to the "City of New York," or other cash equivalent acceptable to DOT.  Interest shall accrue in an interest bearing bank account for the benefit of the Company and shall be paid annually to the Company on each anniversary of the Effective Date.

    DOT shall be entitled, as authorized by law, to charge and collect from the Company for any reasonable administrative expenses, custodial charges, or other similar expenses, as may result from the operation of this Security Fund.

    The Company shall maintain $5,000,000 in the Security Fund at all times during the Term plus one year after the end of the Term (provided that such one year period shall not start until the end of any holdover period), unless within such one year period DOT notifies the Company that the Security Fund shall remain in full force and effect during the pendency of any litigation or the assertion of any claim which has not been settled or brought to final judgment and for which the Security Fund provides security; provided that only such portion of the

- 38 -

NYC-OTR006942

(e)    The Company shall not have any obligations under Section 12.1.1, or Section 12.1.6 except as expressly set forth therein, to any Indemnitee for any Damages relating to the matters contemplated pursuant to this Section 2.6.

(f)    The Company agrees that it will not agree to any amendment to Sections 4.2, 4.4, 5.1, 5.2, 7.4, the last two sentences of Section 10.1, and 12.13 of the Grimshaw Agreement, or to the defined terms used in those sections, that adversely affects the City's rights under any of those sections without the City's prior written consent.

SECTION 3

SERVICE

3.1.    Operations.

3.1.1.    Bus Shelters.  As more fully set forth in the RFP, Proposal, BAFO, and Appendix C attached hereto, commencing on the Effective Date and thereafter throughout the Term the Company shall be responsible for the following cleaning and maintenance requirements:

(a)    All maintenance of the Bus Shelters, including, but not limited to, preventative maintenance, cleaning and removing graffiti, dirt, stickers and refuse from the Bus Shelters, must occur on at least two nonconsecutive days each week; promptly clearing and removing debris, snow and ice from the ground in and around the Bus Shelters up to three feet on each side of the Bus Shelter and to the Curb on the Curb-side of the Bus Shelter (including clearing a three-foot access path for wheelchairs in the case of snow and ice and spreading salt or ice remover).  The Company shall comply with the regulations for snow removal set forth in section 16-123 of the New York City Administrative Code as may be amended or modified from time to time.  A copy of section 16-123 is attached hereto as Exhibit E.

(b)    Inspections on at least two nonconsecutive days each week for damage, debris and unsafe conditions.

(c)    Inspections of electrical wiring and connections including service and post connections and testing for stray voltage (such inspections and testing may be part of regularly scheduled general inspections or otherwise) shall take place at least once each year during the Term.  The Company shall record in EIMIS the date(s) of such inspections and testing.

3.1.2.    APTs.  As more fully set forth in the RFP, Proposal, BAFO, and Appendix C attached hereto, commencing on the installation of an APT and thereafter throughout the Term the Company shall make the APTs available for use to the public at a nominal amount of $0.25 per use between the hours of eight a.m. to eight p.m. daily, unless longer hours are otherwise directed by DOT in its reasonable discretion.  Additionally, every APT must provide an emergency alarm system that allows for two-way communication for activation by the user and transmission to an operations center and the police and fire department.  A smoke and fire alarm system with an automatic door opening device must be provided.  An emergency access portal, in addition to the user door, must be provided to allow access to the interior by police or other

- 23 -

NYC-OTR006927

emergency services. All APTs must contain a self-activating system that communicates contemporaneously all significant maintenance and operations problems to an operations center. The Company shall be responsible for the following cleaning and maintenance requirements:

(a)    All maintenance of the APTs including, but not limited to, preventative maintenance, cleaning, removing graffiti, dirt, stickers and refuse, and restocking dispensers on a daily basis, promptly clearing and removing debris, snow and ice from the ground in and around the APTs up to three feet on each side of the APT and to the Curb on the Curb-side of the APT (including clearing a three-foot access path for wheelchairs in the case of snow and ice and spreading salt or ice remover), prompt response to self activating maintenance and operating warning systems, and ensuring comfortable interior temperature, ventilation and illumination between the hours of eight a.m. and eight p.m. daily unless longer hours are otherwise directed by DOT in its reasonable discretion. The Company shall comply with the regulations for snow removal set forth in section 16-123 of the New York City Administrative Code as may be amended or modified from time to time.

(b)    Daily inspections of the APTs for damage, debris, and unsafe conditions.

(c)    Inspections of electrical wiring and connections including service and post connections and testing for stray voltage (such inspections and testing may be part of regularly scheduled general inspections or otherwise) shall take place at least once each year during the Term. The Company shall record in EIMIS the date(s) of such inspections and testing.

3.1.3.    <u>PSSs</u>.  As more fully set forth in the RFP, Proposal, BAFO, and Appendix C attached hereto, commencing on the installation of a PSS and thereafter throughout the Term the Company shall be responsible for:

(a)    All maintenance of the PSSs, including, but not limited to, preventative maintenance, cleaning, and removing graffiti, dirt, stickers and refuse (provided, however, that the Company shall not be responsible for the removal of refuse from free standing trash receptacles) on at least two nonconsecutive days of the week. Company shall remove snow as necessary to ensure continued access to the PSSs.

(b)    Two inspections weekly on non-consecutive days of the PSSs for damage, debris, and unsafe conditions and for information kiosks, proper functioning of the information systems including any hardware and software.

(c)    Inspections of electrical wiring and connections including service and post connections and testing for stray voltage (such inspections and testing may be part of regularly scheduled general inspections or otherwise) shall take place at least once each year during the Term. The Company shall record in EIMIS the date(s) of such inspections and testing.

3.1.4.    <u>Newsstands</u>.  As more fully set forth in the RFP, Proposal, BAFO, and Appendix C attached hereto, commencing on the installation of a Newsstand and thereafter throughout the Term:

NYC-OTR006928

(a)     the Company shall be responsible for all maintenance of the exterior of the Replacement and New Newsstands, in cooperation with the Newsstand Operators including, but not limited to, preventative maintenance, cleaning and removing graffiti, dirt, stickers and refuse on the exterior of the Newsstand on at least two nonconsecutive days each week, promptly clearing and removing debris, snow and ice from the ground in and around the Newsstands up to three feet on each side of the Newsstand and to the Curb on the Curb-side of the Newsstand (including clearing a three-foot access path for wheelchairs in the case of snow and ice and spreading salt or ice remover) and daily inspections of the Newsstands for damage, debris, and unsafe conditions. The Company shall comply with the regulations for snow removal set forth in section 16-123 of the New York City Administrative Code as may be amended or modified from time to time. The Company shall also be responsible for inspections of electrical wiring and connections including service and post connections and testing for stray voltage (such inspections and testing may be part of regularly scheduled general inspections or otherwise) at least once each year during the Term. The Company shall record in EIMIS the date(s) of such inspections and testing; provided, however,

(b)     the Company shall not be responsible for (i) operating the Newsstand as a newsstand, (ii) cleaning Newsstand interiors, (iii) any condition on the exterior of the Newsstand that can be reasonably demonstrated to the satisfaction of DOT by the Company to have been caused solely by the Newsstand Operator provided, however, the City may require the Company to address any such condition at the City's sole cost and expense; (iv) the cost of any telephone, other communication, or electricity usage by a Newsstand Operator; or (v) any other utility cost that is not necessary to the franchise; and

(c)     The Company is prohibited from deriving revenue from the operation of the Newsstand as a newsstand.

3.1.5.  Other. The Company shall

(a)     promptly and diligently, and in all cases within the minimum standards and timeframes set forth on Appendix C attached hereto, maintain, replace or repair any parts or components of the Coordinated Franchise Structures which are broken, deteriorated or damaged, regardless of the nature, cause or frequency of such conditions using materials and methods for such maintenance, repair and replacement that comply with all applicable federal, state and local laws, rules and regulations; and

(b)     collect refuse or recyclables from any trash receptacles incorporated within or on Coordinated Franchise Structures, provided, however, that the Company shall not be responsible for the collection of refuse or recyclables from free standing trash receptacles installed as PSSs; and

(c)     maintain and repair the sidewalk immediately under and three feet on each side of the Coordinated Franchise Structure in its proper condition, or, if necessary restored thereto at the Company's sole cost and expense. On the side of the Coordinated Franchise Structure nearest the Curb, Company's responsibility of maintenance and repair shall extend to, and include, the Curb. Notwithstanding the foregoing, the Company shall not be

NYC-OTR006929

responsible for the creation of new pedestrian curbs within the area for which it is responsible for maintenance and repair; and

(d)    provide and maintain adequate illumination for all Coordinated Franchise Structures, except trash receptacles and multi-rack newsracks, between dusk and daylight, or whenever artificial lighting is required for the protection, safety and welfare of the public (provided that where there is no existing electrical connection to a Bus Shelter location and where adding an electrical connection would be impractical because the necessary utility connections are unusually inaccessible, then the phrase "adequate illumination" shall mean courtesy lighting powered by solar panel); and

(e)    remove broken glass, such that the structure is made safe, within 24 hours after the Company becomes aware of the problem, (the glass shall be replaced when practicable within 24 hours of the Company becoming aware of the problem but in no event later than 48 hours after becoming aware of the problem); and

(f)    (i)    complete repairs, replacement of parts, or removal of the structure or components thereof as necessary to ensure public safety of the Coordinated Franchise Structure, within 24 hours (subject to the time frames for the replacement of glass set forth in Section 3.1.5(e)) of the time the Company becomes aware of the problem, including without limitation by oral or written notice from DOT that repair, replacement or removal is necessary to ensure public safety. Should a permit be required, the period for completion of such repair, replacement or removal shall be extended to within 24 hours of receipt of permit, provided that the Company submits a complete application for such permit without delay. The Company shall make the structure safe while permits are pending; and

(ii)    complete repairs, replacement of parts or removals not covered by the preceding clause (i), within 5 days of the time the Company becomes aware of the problem, unless a permit is required. Should a permit be required, the period for completion of such repair, replacement or removal shall be extended to within 5 days of receipt of permit, provided that the Company submits a complete application for such permit without delay; and

(g)    If the Company removes a Coordinated Franchise Structure pursuant to Section 3.1.5 (f) and such Coordinated Franchise Structure is to be replaced at the same location, such replacement will take place within the time frames set forth in Appendix G. If a permit is required, the time period shall be measured from the date of receipt of permit, provided that the Company submits a complete application for such permit without delay.

(h)    If the Company fails to make replacement, complete repairs, or effectuate removals, as required herein, then DOT may, in addition to any other rights and remedies set forth in this Agreement, and without any further notice, make replacement and repairs, or effectuate removals, at the sole cost and expense of the Company.

3.2.    Automatic Vehicle Location and Control System. The Company shall cooperate with DOT, MTA New York City Transit, or any other agencies to make the Bus Shelters available for the installation of wiring and equipment and the ongoing maintenance of AVLC's as such systems are developed. The Company is not responsible for the acquisition, installation,

NYC-OTR006930

or maintenance of AVLC equipment or for associated costs and will have no ownership interest in, or responsibility for, the AVLC. However, the Company shall cooperate in its design, installation and maintenance and shall provide access to the Bus Stop Shelters to permit AVLC installation and maintenance, and ensuring (assuming adequate instruction from all applicable governmental and quasi-governmental entities) that routine maintenance of the Bus Stop Shelters does not interfere with the AVLC.

3.3.    Electronic Inventory and Management Information System and Recordkeeping.

(a)    Within 20 days of the Effective Date and thereafter throughout the Term, the Company shall at its sole cost and expense, and as more fully set forth in the RFP and Proposal, install and maintain an Electronic Inventory and Management Information System for the Coordinated Franchise Structures incorporating state-of-the-art technology. If at any time during the Term DOT determines in its reasonable discretion that EIMIS is failing to meet the requirements of the preceding sentence or is inadequate for its purposes then DOT may direct the Company to make such necessary modifications to EIMIS as it deems necessary, and such modifications shall be promptly implemented by the Company at its sole cost and expense.

(i)    to the extent necessary the EIMIS, any part thereof, or any software necessary for its operation shall be installed and maintained by the Company on DOT provided personal computers providing for access by authorized DOT users. DOT shall make appropriate information technology personnel available to coordinate the installation of the EIMIS on its equipment and/or network as appropriate.

(ii)    the EIMIS shall not run primarily on the DOT's equipment or network and DOT shall not be responsible for management, maintenance or assuring access to the system. All such requirements shall be the responsibility of the Company.

(iii)    within 20 days of the Effective Date, the Company shall provide full access to the EIMIS (and training thereon reasonably satisfactory to DOT) to no less than ten authorized personnel of the City through the Internet using any standard Internet browser providing access to the World Wide Web pursuant to the license agreement between the Company and The Siroky Group Inc. attached hereto as Exhibit K. Such access shall be provided through standard Internet security protocols through a secure server. In addition, the City shall have access, through the same means, for a reasonable number of additional users to allow read-only access to conduct searches of the EIMIS and to allow 311 operators (or operators under a successor system) to enter and review the status of complaints received.

(iv)    the EIMIS shall provide at minimum: two-way information sharing between the City and the Company for the recording and processing of complaints from the public and the City, plotting street furniture structures on city maps, graphic navigation, color coding of structures, incident recording and reports, financial information regarding costs, revenues, advertising value by location and structure type, advertising panels displaying Public Service Advertising and NYCMDC Advertising, back-up maintenance and data protection protocols, and a help-menu function for assisting with system operation. The City shall make appropriate 311 personnel available to coordinate the creation of an interface between EIMIS and the 311 system.

- 27 -

NYC-OTR006931

(v)    the EIMIS shall be available to authorized users 24 hours per day, seven days a week. In the event of lost access, it shall be restored within six hours of notification by the City.

(b)    Commencing on the Effective Date and thereafter throughout the Term, the Company shall maintain records, in a form satisfactory to the Commissioner and which shall be in a format which is downloadable to commercially available software, demonstrating compliance with the maintenance and operating requirements set forth in Section 3.1 herein, Appendix C attached hereto and the RFP, Proposal and BAFO. Such records shall be available for inspection by the City at all times upon reasonable written advance notice and copies thereof, whether in paper, electronic or other form, shall be provided to DOT promptly upon request. Not later than 30 calendar days after the Effective Date, the Company shall submit to DOT a detailed description of all proposed recordkeeping procedures that will document compliance with the minimum service operating procedures set forth in Section 3.1 herein and Appendix C attached hereto. If DOT determines in its reasonable discretion that such proposed recordkeeping procedures are insufficiently detailed or otherwise unlikely to adequately document compliance with the minimum service operating procedures set forth in Section 3.1 herein and Appendix C attached hereto, DOT may direct the Company to adopt such modifications to the proposed recordkeeping procedures as it deems reasonably necessary, and such modifications shall be promptly implemented by the Company at its sole cost and expense.

(c)    The Company shall be permitted, at any time during the Term, to replace the software and related components then constituting the EIMIS with alternative software and related components (which may be proprietary to the Company or an Affiliate of the Company), at its sole cost and expense, provided that the features of the replacement EIMIS are substantially equivalent or superior to the EIMIS being replaced. In such event, the Company shall grant to the City all necessary licenses and sublicenses as contemplated by Section 2.4.2(b), and shall escrow or cause to be escrowed the source code as required by Section 2.4.2(e). In addition, if such software is proprietary to the Company or an Affiliate of the Company, the Company shall grant to the City all necessary licenses to operate the EIMIS as contemplated by this Agreement following the Term, on a perpetual, royalty-free basis. Furthermore, all right, title, and interest in all data collected by the EIMIS and all other information necessary for the City to maintain and operate the Coordinated Franchise Structures will become the sole and exclusive property of the City without any compensation to the Company after the termination or expiration of this Agreement and the Company and its software vendor shall return any and all such data to the City in a format accessible and usable by the City without the use of the Company's and/or software vendor's software; provided, however, that the Company may retain and use for its own business purposes a copy of such data, and the City shall grant to the Company any necessary license in this regard.

3.4.    <u>Performance Standards and Corrective Actions</u>.

(a)    If the Company has failed to comply with the maintenance and operating requirements set forth in Section 3.1 herein and Appendix C attached hereto, then the Company shall pay liquidated damages as set forth on Appendix A attached hereto.

- 28 -

NYC-OTR006932

(b)    If notwithstanding compliance with the maintenance and operating requirements set forth in Section 3.1 herein and Appendix C attached hereto, complaints that the Coordinated Franchise Structures are unsafe or unclean or in disrepair increase by 20% or more during any six month period as compared to the previous six month period, the Commissioner may require the Company, at its sole cost and expense, to adopt and implement such modifications to its inspection, maintenance, repair or cleaning procedures as he or she deems appropriate to ensure that the Coordinated Franchise Structures are maintained in a clean and safe condition and in good repair.

(c)    In addition to any other term, condition or requirement of this Agreement, except and to the extent caused by relocation requirements imposed by the City, the Company shall not have more than ten percent of any one type of its Coordinated Franchise Structures out of service at any given time; provided that the foregoing requirement with respect to APTs shall be twenty percent and shall not be in effect until at least five APTs have been installed by the Company.  Failure to comply with this Section 3.4(c) shall result in the assessment of liquidated damages as set forth in Appendix A attached hereto.

3.5.    Complaint Handling Procedures.

(a)    Within 30 days after the Effective Date of this Agreement, subject to the reasonable approval of DOT, the Company shall establish and maintain prompt and efficient complaint handling procedures for handling complaints received directly from the public and for handling complaints forwarded to the Company by the City, which procedures shall be consistent with all applicable laws, rules and regulations and the provisions of this Section 3.5.  Such procedures shall be set forth in writing and copies thereof shall be maintained at the Company's office and shall be available to the public and the Commissioner upon request.

(b)    All Coordinated Franchise Structures shall have on them a conspicuously posted notice advising the public that they may direct complaints and comments to 311.

(c)    The Company shall have a telephone line for receiving complaints forwarded from DOT, the 311 system or other designated City agencies.  The line shall be answered in person from 9:00 a.m. to 5:00 p.m. Monday through Friday, and at other times shall be answered via recorded message.  Notwithstanding the above, the Company shall have a contact person available to DOT by phone 24 hours a day, seven days a week.

(d)    The Company shall record all complaints received on the telephone line, through EIMIS, or from any other source in the manner set forth in Section 3.6 hereof and shall diligently and promptly investigate each complaint.  If such complaint is reasonably determined to be accurate, the condition shall be cured within the timeframes set forth in Appendix C attached hereto.

(e)    The Company shall provide to DOT a reasonable and adequate explanation describing corrective steps taken by the Company in response to any complaint or reasons why no corrective steps were taken.

(f)    In the event that a complaint has not been diligently and promptly investigated and/or the underlying problem has not been cured by the Company to the

- 29 -

NYC-OTR006933

NYC-OTR007117

satisfaction of the Commissioner within the periods set forth above, the Commissioner may (i) order the Company in writing to take appropriate action to investigate such complaint and/or cure the problem, as the case may be and (ii) if the Company fails to take appropriate action accordingly, investigate and cure the underlying problem at the Company's sole cost and expense.

       3.6.   <u>Complaint Record Keeping</u>.  The Company shall maintain written, accurate and complete records of all complaints that shall be available to DOT through EIMIS or, at DOT's reasonable advance request, in written form.   Such records shall indicate: (i) the specific Coordinated Franchise Structure, including its identifying number and its exact location, for which the complaint was made; (ii) the type of complaint; (iii) the date and time of complaint; (iv) if the complaint is in written form, the name, address, and telephone number of the Person filing the complaint; (v) the Company's action to address the complaint; and (vi) to the extent applicable the date of resolution of the complaint.  All such records shall be retained by the Company throughout the Term.  The EIMIS shall provide DOT a means by which it can search for complaints by location and/or time period, and shall produce statistical reports, at DOT's request, by type of complaint, location of complaint, type of structure, and time period.

       3.7.   <u>Americans with Disabilities Act</u>.  In connection with its obligations under this Agreement the Company, at its sole cost and expense, agrees to comply with the applicable provisions of the Americans With Disabilities Act of 1990, 42 U.S.C. 12132 ("ADA"), the Architectural and Transportation Barriers Compliance Board Guidelines, and any additional applicable federal, state and local laws relating to accessibility for persons with disabilities and any rules or regulations promulgated thereunder, as such laws, rules or regulations may from time to time be amended.

       3.8.   <u>No Discrimination</u>.  The Company shall not discriminate in the provision of Services on the basis of race, creed, color, national origin, sex, age, handicap, marital status, or real or perceived sexual orientation.

       3.9.   <u>Continuity of Service</u>.  In the event the Company, with the consent of the City as required and in accordance with the provisions of Section 11 hereof, sells or otherwise transfers the System, or any part thereof, or Control thereof to any Person, or to the City or the City's assignee, or in the event the franchise terminates, the Company shall transfer the System, or such relevant part, in an orderly manner in order to maintain continuity of Service.

SECTION 4

<u>ADVERTISING</u>

    4.1.   <u>Introduction</u>.

       (a)    In consideration of the Company's performance of the Services,   and payment by the Company of the Franchise Fees, the City hereby grants to the Company the exclusive right throughout the Term to sell and place advertising on the Coordinated Franchise Structures that are the subject of this Agreement and subject to the specifications, terms,

- 30 -

NYC-OTR006934

**Appendix D: Advertising Dimensions/Specifications**

| Franchise Structure Type | Maximum advertising or sponsoring entity name or logo | | |
|---|---|---|---|
| | Area | Maximum Height | Location of advertising panels |
| Bus Stop Shelter | 55 sq. ft. | 7 ft. | Limited to two shelter end panels |
| APT* | 82.5 sq. ft. | 9 ft. | Exterior |
| Newsstand | 82.5 sq. ft. | 9 ft. | Exterior |
| Information/Computer Kiosks | 2 sq. ft** | 2 ft. | NA |
| Trash Receptacle | 2 sq. ft** | 2 ft. | NA |
| Multi-rack Newsrack | None*** | None | NA |

*No advertising permitted on APTs in parks, but advertising may be placed on APTs on sidewalks adjacent to parks.

**No advertising except for the name or logo of a sponsoring entity shall be permitted on the exterior.

*** No advertising or name or logo of a sponsoring entity shall be permitted.

NYC-OTR007011