Request for Proposals for a Coordinated Street Furniture Franchise

**2.4     Financial Statements**        Each firm that is a party to the Proposal must submit audited financial statements for its two most recent completed fiscal years.  Supporting documentation shall be submitted as requested by the Department.

3.    **Technical Proposal**

**3.1     Narrative**        Each Proposal must include a detailed narrative description of how the Proposer plans to fulfill and, if applicable, exceed the terms and conditions of the Franchise as described in the Scope of Services section (Section II) of this RFP, as well as any commitments to improve design, technology, and/or services during the term of the Franchise Contract.  The narrative must describe in detail the Proposer's plans pertaining to design, manufacture, installation, maintenance, and operation of each of the types of Franchise Structures, including proposed time limits for the construction, replacement and relocation of Newsstands.  In addition, the narrative must describe the Proposer's plans for administering and marketing the Franchise Structures and the advertising thereon.  The narrative must also describe the proposed computerized inventory and information-sharing system, including the operating system, type of computer, data to be entered, and reports to be made available to the Department.  The narrative must include a staffing plan for all aspects of the Franchise.  Reduced copies of the drawings described in Section 3.2 below may also be included in the narrative.

If the Proposer intends to manufacture and assemble the Franchise Structures in the United States or in the City of New York, the Proposer shall so state in the narrative.  Proposers that manufacture and assemble their Franchise Structures in the United States or in the City of New York shall be granted a preference.  Any Proposer seeking either preference will state the value of the labor and materials involved in the manufacture and assembly of the Franchise Structures, both in absolute dollars and as a percentage of the overall cost of manufacture and assembly, which the Proposer certifies will be done in the relevant jurisdiction.  If the value of labor and materials involved in the manufacture and assembly in the subject locale equals less than eighty percent (80%) of the overall costs, then the Proposer does not qualify for the USA preference.  If the value of labor and materials involved in the manufacture and assembly in the subject locale equals less than fifty percent (50%) of the overall costs, then the Proposer does not qualify for the New York City preference.  The failure of a Proposer to qualify for either of the above preferences will not preclude further review and evaluation of such Proposer or the award of a Franchise to such Proposer.

**3.2     Drawings**        Each Proposal must include color renderings and drawings of each basic design for each Franchise Structure, as described in the Scope of Services section of this RFP, and for each type of pillar structure, if proposed.  The drawings shall show all proposed amenities, all necessary utility and telecommunications connections and all special features unique to that type of structure.  Methods by which each basic design can be varied to suit specific contexts shall be indicated by means of notes and/or additional graphic representations.

The drawings required pursuant to this section shall include the following, drawn to a scale of 1 inch to 1 foot (1:12):  plan; roof plan; front, side and rear elevations; and transverse and longitudinal sections.  In addition, the following detail drawings are required, drawn to scale as appropriate:  construction, including the method of mounting the structure to the sidewalk; structural; mechanical; electrical; water and sewer; and telecommunications.

- 19 -

NYC-OTR007057

Maximum drawing size shall be 30 inches by 42 inches. Proposers shall submit two complete sets of drawings mounted on foam-core boards. All dimensions shall be included on the drawings indicating in detail methods of construction and the specific types of materials and finishes to be used, including colors and textures as applicable. Notes shall also confirm that the designs meet applicable code requirements. All drawings shall bear the seal of a Professional Engineer or Registered Architect licensed by the State of New York. Proposers may be required to submit additional items including perspective drawings, model photographs, and samples of materials, as well as additional sets of drawings (including reproducibles).

    **3.3     Scale Models** Each Proposal must include an accurate, realistic model of each of the two basic designs for each type of Franchise Structure, constructed at a scale of 1 inch equals 1 foot (1:12). Each model must show the colors and textures of all proposed materials and finishes as realistically as possible.

**4.     Cash Flow Analysis** Proposers must submit a detailed cash flow analysis itemizing the revenues and expenses anticipated over the term of the Franchise. A form for the cash flow analysis is provided as Appendix 5. Proposers mush complete and submit the form provided in Appendix 5. Additional cash flow analyses may also be provided.

**5.     Compensation Proposal**     The compensation to be paid to the City each year for the rights granted under the Franchise Contract with respect to Bus Stop Shelters, APTs, and Newsstands shall be a guaranteed minimum annual amount, or a percentage of any gross revenues derived by the Franchisee as a result of the installation of the Bus Stop Shelters, APTs, and Newsstands and the display of advertising thereon, whichever is greater. In the event that the City directs the Franchisee to install PSSs, the compensation shall be increased or reduced by a fixed amount for each PSS installed. The amount of this increase or decrease will likely vary depending on the type of PSS.

The suggested minimum annual compensation for the proposed guaranteed minimum annual amount of compensation for each year is fifteen million dollars ($15,000,000).

The guaranteed minimum annual amount offered by a proposer may be in the form of all cash or a proposer may offer compensation in the form of approximately eighty percent (80%) cash plus an alternative form of compensation with a value equal to approximately twenty percent (20%) of such guaranteed minimum annual amount.

The preferred alternative form of compensation the City would consider includes, but is not limited to, commercial media outlets such as out-of-home signage (e.g., billboards, stadium signage, transit terminals, street furniture), promotional time on television, promotional time on radio, and web-based advertising. If proposing alternative compensation to cash, the proposal must include the percentage of the compensation, the effective cash value of the alternative(s) offered and an analysis of the valuation in sufficient detail for the committee to determine the value.

The alternative form of compensation offered must have at least the same dollar value at the end of the contract as at the beginning of the contract or the Franchisee will be responsible to make up any shortfall.

NYC-OTR007058

Request for Proposals for a Coordinated Street Furniture Franchise

"Gross revenues" shall consist of the sum of any and all user fees and any and all revenues obligated to be paid to the Franchisee, its subsidiaries, affiliates, or third parties as a result of the installation of the Franchise Structures, irrespective of the Franchisee's ability to collect the revenues. Gross revenues shall be calculated on the basis of the total amounts contracted for by advertisers, telephone service providers, and the like, and shall include any amount received in the form of materials, services or other benefits, tangible or intangible, or in the nature of barter. Gross revenues shall not be subject to any deductions for commissions, brokerage, labor charges, or other expenses.

Proposers must propose all of the following: (a) a guaranteed minimum annual amount of compensation; (b) a percentage of gross revenues to be paid each contract year during the term of the Franchise should the percentage exceed the guaranteed minimum annual amount; and (c) an amount by which the annual compensation will be increased or reduced for each of the three types of PSSs (trash receptacle, multi-rack newsrack, or information/computer kiosk), per unit installed.

A percentage of net receipts will not be acceptable. A preference shall be granted to proposals that provide a greater compensation to the City in the initial period of the agreement provided that the total proposed compensation over the term of the franchise is determined to be in the best financial interest of the City.

The compensation proposal shall be submitted in a separate, sealed envelope clearly labeled "Compensation Proposal."

Such compensation shall not be considered in any manner in the nature of a tax, but such payments shall be made in addition to any and all taxes of whatever kind or description that are now or at any time hereafter may be required to be paid pursuant to any local, state, or federal law.

The proposed compensation shall be based on an assumption that the City will require the installation of 20 APTs.

6.    **Required City Documents**    The following documents shall be completed by each firm that is a party to the Proposal or that will provide services associated with this Franchise, *e.g.*, two firms submitting one Proposal as a joint venture or one firm submitting a Proposal that will require subcontracting on a long-term basis to one or more firms:

      **6.1    VENDEX Questionnaires**    Questionnaires required under the City's Vendor Information System (VENDEX) must be completed by an officer of each business entity that is a party to the Proposal, each principal of every such business entity, and any subcontractors.

      **6.2    Affirmation**    The Proposer shall complete and submit the Affirmation attached as Appendix 6 as part of the Proposal Package.

      **6.3    MacBride Principles**    The MacBride Principles attached as Appendix 9 must be signed and submitted as part of the Proposal Package and will be included in any Franchise Contract entered into by the Department pursuant to this RFP.

NYC-OTR007059

    **6.4**    **Proposer's Affidavit**  The Proposer's Affidavit attached as Appendix 11 must be signed and submitted as part of the Proposal Package.

**7.**    <u>**Acknowledgment of Addenda**</u>    The Proposer shall complete and submit the Acknowledgment of Addenda form, attached as Appendix 7, as part of the Proposal Package. This form serves as the Proposer's acknowledgment of the receipt of Addenda that may have been distributed by the Department prior to the Proposal Due Date and Time.

**B.**    **PROPOSAL PACKAGE SUBMISSION REQUIREMENTS**

**1.**    <u>**Delivery**</u>

Proposal Packages must be received by the Department's Contracts Division, 40 Worth Street, Room 824A, on or before **June 30, 2004 at 2:00 p.m..** Proposals received after the Proposal Due Date and Time are late and shall not be considered. Instructions for delivery of scale models will be distributed at the Preproposal Conference.

**2.**    <u>**Copies and Format**</u>

Proposers shall hand deliver one signed original and twenty (20) copies of the Proposal Package, except that Proposers need provide only two complete sets of the drawings mounted on foam-core boards described in Section 3.2, only one of each of the scale models described in Section 3.3, and only one original and two copies of the "Required City Documents" described in Section 6.

A proposal may include information on CD-ROM or comparable media; however, such submissions may only be submitted as supplements to the material required by this RFP, which must be provided on paper and in the form of models. Any submission in alternative media must include instructions on how to run the program.

**3.**    <u>**Length of Proposal**</u>

Proposers are advised that while there is no page limitation for Proposals, discretion should be used.

**4.**    <u>**Labeling**</u>

The outer envelope enclosing any materials submitted in response to this RFP shall be addressed as follows:

|  |  |
|---|---|
| From: | Proposer Name/Address |
| To: | New York City Department of Transportation |
|  | Contracts Division |
|  | 40 Worth Street, Room 824A |
|  | New York, NY 10013 |
| RFP Title: | Request for Proposals for a Franchise to install, operate, and maintain Bus Stop Shelters, Self-Cleaning Automatic Public Toilets, and Public Service |

NYC-OTR007060

Structures and to install and maintain Newsstands in the boroughs of the
Bronx, Brooklyn, Manhattan, Queens, and Staten Island

PIN:        **84104MBAD689**

Proposal Due Date and Time:        **June 30, 2004 at 2:00 p.m.**

## 5.   **Delivery Services**

Proposers shall be responsible for informing any commercial delivery service, if used, of all delivery requirements and for ensuring that the information required in item 4, above, appears on the outer envelope used by such service.

## 6.   **Proposal Package Checklist**

Appendix 8, Proposal Package Checklist, which itemizes each component/document that is to be submitted as part of the Proposal Package, has been attached for the Proposer's convenience.

## C.   **PROPOSAL EVALUATION PROCEDURES**

**1.   Evaluation Committee**      1.1      Proposals shall be evaluated by an Evaluation Committee that shall be comprised of a minimum of three (3) persons qualified to evaluate the components of this solicitation.  Members of the Committee will likely include representatives of the Departments of Transportation, Design and Construction, and City Planning.  The Evaluation Committee also will have technical advisors who may include representatives of other public entities such as the Art Commission, the Mayor's Office for People with Disabilities, the Landmarks Preservation Commission, the Department of Parks and Recreation, the Department of Environmental Protection, the Department of Buildings, the Department of Information Technology and Telecommunications, the Department of Homeless Services, the Police Department, the Fire Department, the MTA New York City Transit, the Community Assistance Unit and the Office of Management and Budget.

1.2      In addition, the City will present some or all of the design proposals received pursuant to this RFP to a Design Advisory Committee that may include representatives of civic organizations with expertise in architecture and urban design, the real estate industry, the Newsstand industries, and the Business Improvement Districts.  Any recommendations made by this Design Advisory Committee will be reviewed and may be considered by members of the Evaluation Committee.

1.3      Rating sheets or other written evaluation forms shall be used to evaluate Proposals and shall be signed and dated by all members of the Evaluation Committee reviewing the Proposal.  Initial ratings may be amended, and the amended ratings shall be recorded on amended rating sheets.  Copies of all initial and amended rating sheets or evaluation forms shall be maintained as part of the Department's files.

## 2.   **Evaluation Procedures**

NYC-OTR007061

Proposals received in response to this RFP will be reviewed and evaluated in four phases, three phases on a point scale providing for a maximum point total of 145, with points assigned as follows:

| Phase I | Pass/Fail |
|---|---|
| Phase II | 25 |
| Phase III | 60 |
| Phase IV | 55 |
| Preference Points | 5 |

If interviews, presentations, and/or demonstrations are conducted in accordance with Section IV, L, of this RFP, the Evaluation Committee may use any information from those interviews, presentations, and/or demonstrations in evaluating a Proposal.

### 2.1    Phase 1:  Responsiveness Determination

The Department's Auditor General will review each Proposal to ensure that it includes and addresses each item or document required by this RFP.  Failure to provide a complete responsive submission may result in the Proposal receiving no further review.

### 2.2    Phase 2:  Assessment of Proposer's Ability to Provide Required Services

Each Proposal that is deemed responsive by the Auditor General will be forwarded to the Evaluation Committee for its review. The Committee will examine and evaluate each Proposer's business organization, financial fitness and experience with street furniture and the sale and maintenance of outdoor advertising in urban environments. Each Proposer will receive a numerical score after this Phase.  The Committee will recommend the three Proposers receiving the highest scores, plus any Proposer whose score is within 5% of the lowest of these three scores, for further review and consideration by the Evaluation Committee.  All Proposals with scores lower than those satisfying the criteria above will receive no further review.

### 2.3    Phase 3:  Assessment of the Technical Proposals

The Committee will examine and evaluate the technical proposals of each of the Proposers selected in accordance with Phase 2 of the Evaluation Procedures.  The factors to be considered by the Committee in Phase 3 include but are not limited to: the Proposer's plans to fulfill and, if applicable, exceed the terms and conditions of the Franchise as described in Section II of this RFP; any commitments to improve design, technology and/or services during the term of the Franchise Contract; the Proposer's plans pertaining to design, manufacture, installation, maintenance and operation of each of the types of Franchise Structures, including the Proposer's plan for the replacement of existing Newsstands; the Proposer's plans for administering the Franchise, including the Proposer's computerized inventory and information sharing system; and the Proposer's plans for marketing the Franchise Structures and the advertising thereon.  Each Proposer will receive a numerical score after this Phase.

### 2.4    Phase 4:  Assessment of the Compensation Package

NYC-OTR007062

The Committee will review and evaluate the compensation to be paid to the City proposed by each Proposer. Each Proposer will receive a numerical score after this Phase.

### 2.5    Final Selection

The Committee will total all scores derived from Phases 2, 3 and 4, apply any applicable bonus points, and recommend one or more Proposers who may be invited to enter into negotiations with the City for Best and Final Offers for the Franchise.

**3.    Evaluation Criteria**    The Evaluation Committee will review and evaluate Proposals according to the following criteria, which are listed in relative weight order for each phase:

### 3.1    Phase 1: Responsiveness Determination

Proposers will either pass or fail this Phase, based on whether or not their Proposals are responsive to the RFP.

### 3.2    Phase 2: Assessment of Proposer's Ability to Provide Required Services

The following evaluation criteria will be applied:

a) The Proposer's business integrity and financial soundness, including without limitation adequate access to sources of capital and operating funds and the demonstrated ability to maintain books and records adequately.

b) The Proposer's experience and demonstrated ability in the design, installation, operation, and maintenance of Franchise Structures in an urban environment.

c) The Proposer's experience in the sale and maintenance of outdoor advertisements in an urban environment.

d) The skill and capabilities of the Proposer's management, technical staff, and field personnel.

### 3.3    Phase 3: Assessment of the Technical Proposals

The following evaluation criteria will be applied:

a) The designs of the Franchise Structures, including functional efficiency, aesthetics, security, durability, adaptability for various built environments around the City and accommodation for people with disabilities.

b) The Proposer's plans for installing, maintaining, and operating the Franchise Structures, including proposed time limits for construction, replacement and relocation of Newsstands.

c) The Proposer's plan for marketing the Franchise Structures and the advertising thereon, including without limitation attention to borough and neighborhood needs and the consideration of both local and national advertisers.

d) The Proposer's plans for administering the Franchise, including the allocation of resources (*i.e.*, staff, materials, equipment, administrative overhead, etc.) for providing each element of the Scope of Services described in Section II of the RFP.

NYC-OTR007063

Request for Proposals for a Coordinated Street Furniture Franchise

e) The Proposer's operational plan to meet or exceed the build-out schedule specified in the RFP.
f) The adequacy of the Proposer's computerized information sharing system.
g) The Proposer's ability to maintain the property of the City in good condition throughout the term of the Franchise.
h) The Proposer's commitments to improve design, technology, and/or services during the term of the Franchise Contract.

In addition, a preference shall be granted to any Proposal which commits to manufacture and assemble the Franchise Structures in the City of New York in accordance with Section III, A, 3.1 of this RFP; to any Proposal which commits to manufacture and assemble the Franchise Structures in the United States of America in accordance with Section III, A, 3.1 of this RFP. These preferences will be granted in the form of bonus points to be applied to each qualifying Proposer's numerical score from this Phase.

### 3.4    Phase 4:  Assessment of the Compensation Package

The following evaluation criterion will be applied:

The adequacy of the proposed compensation to be paid to the City.   A preference shall be granted to proposals that provide a greater compensation to the City in the initial period of the agreement provided that the total proposed compensation over the term of the franchise is determined to be in the best financial interest of the City.

### 4.    Prototype Structures

Proposers should be aware that prior to awarding the Franchise Contract, the Department will require the selected Proposer to provide and install prototypes of each Franchise Structure proposed at a location within the City of New York which will be designated by the Department. Failure to provide prototype structures that meet with the approval of the Department shall be grounds for the Department to select another Proposer.

NYC-OTR007064

**APPENDIX 2**
**Summary Chart: Dimensions and Clearances**
**(For Informational Purposes Only)**

| | | | Maximum Size | | | | Maximum Advertising | |
|---|---|---|---|---|---|---|---|---|
| | Clear Path | Curb setback | Area | Length | Width | Height | Area | Height |
| Shelter | 7 ft | 3 ft | 150 sq ft | 30 ft | 5 ft | 9 ft | 55 sq ft | 7 ft |
| APT | 8 ft | 1.5 ft | 78 sq ft | 12.5 ft | 8 ft | 12 ft | 82.5 sq ft | 9 ft |
| Pillar | 8 ft | 1.5 ft | | 8 ft | 8 ft | 14 ft | 82.5 sq ft | 12 ft |
| Newsstand | 9.5 ft | 1.5 ft | 72 sq ft | 14 ft | 6.5 ft | 9 ft | 82.5 sq ft | 9 ft |
| Information/computer kiosks | 9.5 ft | 1.5 ft | 16 sq ft | 4 ft | 4 ft | 9 ft | None* | None* |
| Trash receptacle | 9.5 ft | 1.5 ft | 6.25 sq ft | 2.5 ft | 2.5 ft | 4 ft | None* | None* |
| Multi-rack Newsrack | 8 ft | 1.5 ft to 2 ft | 22.5 sq ft | 3 ft | 7.5 ft | 5 ft | None** | None** |

\* The name or logo of a sponsoring entity, covering an area not to exceed 2 square feet, shall be permitted.

\*\* The name or logo of a sponsoring entity shall not be permitted.

NYC-OTR007079

Request for Proposals for a Coordinated Street Furniture Franchise

**APPENDIX 3**
**Siting Criteria**

The general provisions contained in the first section of these criteria apply to all Franchise Structures, except Newsstands, trash receptacles, and multi-rack newsracks. Newsstands shall be sited in accordance with the criteria in section 20-231 of the Administrative Code and any rules promulgated by the Department of Consumer Affairs pursuant thereto. Trash receptacles shall be sited in accordance with relevant Department of Sanitation regulations and guidelines. Copies of the referenced documents may be requested from the Department contact. Multi-rack newsracks shall be sited in accordance with section 19-128.1 of the New York City Administrative Code and section 2-08 of Chapter 2 of Title 34 of the Rules of the City of New York, attached as Appendix 13. Additional requirements applying to particular types of structures are stated in the sections that follow. These additional requirements are designed to accommodate differences in the structures' function, appearance, and use and to ensure appropriate and consistent locational opportunities.

**A.    General Provisions**

1.    <u>Clear Path</u>. All Franchise Structures shall be installed so as to allow a straight unobstructed path ("clear path") for pedestrian circulation on the sidewalk. The dimensions of the clear path for each type of structure are specified in the subsequent sections. No grates or cellar doors shall be included as a part of the clear path directly in front of or behind a Franchise Structure.

2.    <u>Sight Lines</u>. The placement of the Franchise Structures shall not interfere with pedestrian or motorist sight lines necessary for traffic safety.

3.    <u>Minimum Distance Requirements</u>. Unless otherwise stated, distances shall be measured between the nearest points, viewed in plan, of the Franchise Structure and the specified object or element. Where a distance is required to be measured parallel to the curb line, the measurement shall be taken between the two lines perpendicular to the curb line, one touching the Franchise Structure and the other touching the specified object or element, that are closest to each other.

   a)    The following minimum distances shall be required between the Franchise Structure and the specified element or object:

      i)    Fifteen feet, measured parallel to the curb line, from Bus Stop Shelters; Automatic Public Toilets; Newsstands; information/computer kiosks; enclosed or unenclosed sidewalk cafes; subway entrances or exits.
      ii)    Ten feet from: Fire hydrants; standpipes; Siamese connections; driveways (which distances must also meet the Department's safety and operational requirements); building lines extended at the intersection of two streets, in accordance with Executive Order No. 22 of 1995 (see Figure 1).
      iii)    Five feet from: The trunk of any tree; canopies; information kiosks.
      iv)    Three feet from: Streetlights and traffic signal poles.

NYC-OTR007080

Request for Proposals for a Coordinated Street Furniture Franchise

    v)      Two feet from: Ventilation or other grills; manholes; access plates; street signs; parking meters; fixed litter baskets; tree pits; valve boxes; telephones; cellar doors; mailboxes.

    vi)    One and one-half feet from the curb of any street, except for Bus Stop Shelters (see below).

  b)    In addition to the above distance requirements, for any Franchise Structure where access for the public is provided from a side of the structure other than that adjacent to the clear path, the following minimum distances shall be required between each such side of the Franchise Structure and the specified element or object:

    i)      Five feet from any above-ground structure (*e.g.*, street lights, traffic signal poles, street signs, parking meters, fixed litter baskets, telephones, mail boxes)

    ii)    Three feet from any element or object that is flush with the sidewalk (*e.g.*, ventilation or other grills, manholes, access plates, tree pits, valve boxes)

  c)    No Franchise Structure may be installed directly in front of a building entrance or exit without written permission from the abutting property owner. No Franchise Structure shall be installed within 5 feet (measured parallel to the curb line) of a building entrance except where the Department determines that this requirement cannot be reasonably met.

  d)    No Franchise Structure may be installed within 3 feet of the property line of a residential or commercial structure without written permission from the abutting property owner.

  e)    No Franchise Structure may be located under a fire escape.

  f)    Except for Bus Stop Shelters, no Franchise Structure may be located within a bus stop zone or a taxi stand.

4.    <u>Vaults</u>. Where a vault is present, the Franchisee shall submit certification from an engineer that the installation of the Franchise Structure will in no way damage the vault.

5.    <u>Electrical Sources</u>. Franchise Structures should be as close as possible, subject to all other distance requirements, to the source of electricity, if required for the operation of the Franchise Structure. Such Franchise structures may not be sited farther than 150 feet from the nearest available electric power source, unless otherwise directed by the City. The Franchisee is prohibited from using a traffic signal or Con Edison type #12 post, or any power source across a major or protected roadway, unless authorized to do so by the Department.

6.    <u>Landmarks and Historic Districts</u>. The placement of the Franchise Structures will be subject to the review and approval of the Landmarks Preservation Commission to the extent required by law.

- 43 -

NYC-OTR007081

Request for Proposals for a Coordinated Street Furniture Franchise



Figure 1. Clear Corner Policy (Executive Order No. 22 of 1995)

**B.    Bus Stop Shelters**

1.    <u>Clear Path</u>.  In general, Bus Stop Shelters shall be installed to allow a minimum clear path of 7 feet in width.  However, a reduced clear path may be permitted by the Department if necessary to allow the installation of a Bus Stop Shelter.  In no case shall such clear path be less than 5 feet in width.  The clear path for a Bus Stop Shelter may include the area covered by the Bus Stop Shelter's roof overhang, provided such overhang is a minimum of 7 and 1/2 feet high.

2.    <u>Clearance from Curb</u>.  All Bus Stop Shelters shall be installed to allow a straight unobstructed path a minimum of 3 feet in width between the Shelter and the curb.  Viewed in plan, the roof of a Bus Stop Shelter including any overhang shall be set back from the curb line a minimum distance of 2 feet.

3.    <u>Relation to the Bus Stop</u>

a)    All Bus Stop Shelters shall be located as close as possible to the head of the bus stop, but no less than 10 feet from the head of the bus stop at locations where parking is permitted immediately adjacent to the head of the bus stop.

b)    If a Bus Stop Shelter has only one enclosed end, it should be situated toward the head of the bus stop.

**C.    Automatic Public Toilets, Public Service Structures**

1.    <u>Clear Path</u>

a)    All APTs shall be installed to allow a minimum clear path of 8 feet in width.

NYC-OTR007082

Request for Proposals for a Coordinated Street Furniture Franchise

b)      All information/computer kiosks shall be installed to allow a minimum clear path of 9 and 1/2 feet in width.

c)      The clear path for an information/computer kiosk may include an area up to 3 feet in width covered by the structure's roof overhang, provided such overhang is at a minimum height of 7.5 feet above the sidewalk.

d)      The clear path shall extend 15 feet to each side of the Franchise Structure.

e)      Franchise Structures on sidewalks shall be located either within 2 and 1/2 feet of the curb line or within 1 foot of the building line.

2.      <u>Minimum Distance Requirements</u>.  A minimum 15-foot distance, measured parallel to the curb, is required upon installation between the Franchise Structure and:

a)      Entrances to houses of worship.

b)      Any entrance to the elevator lobby of a building having non-residential uses above the street-level floor and having 16 floors in height or more with a frontage of at least 100 feet on narrow streets or 140 feet on wide streets (as defined in Section 12-10 of the New York City Zoning Resolution).

c)      Any entrance to the lobby of a hotel.

d)      Any entrance to a bank from the street that serves the public, including ATM entrances.

e)      Entrances to theaters and box offices.

**D.**      **Additional Requirements for Automatic Public Toilets**

1.      <u>Permissible Locations</u>.  APTs shall be located only:

a)      On wide streets, as defined in Section 12-10 of the New York City Zoning Resolution, only in commercial, manufacturing or mixed use districts.

b)      On sidewalks or plazas adjacent to property owned or leased by a government agency or public authority or under the jurisdiction of the Economic Development Corporation.

c)      On traffic islands or public places bounded on all sides by mapped streets under the jurisdiction of the Department.

d)      On or adjacent to parks property or playgrounds, subject to the approval of the Department of Parks and Recreation.

2.      <u>Utilities</u>.  The siting of APTs shall be subject to consideration of the economic feasibility of making necessary utility connections.  All APT sites are subject to the additional approval of the Department of Environmental Protection.

**E.**      **Special Circumstances**

The Commissioner may waive or modify the above criteria in specific cases, except where prohibited by law, if, in his or her opinion, such waiver or modification is consistent with the public health, safety and general welfare.  No such waiver or modification shall be granted without prior consultation with the affected Council Member, Borough President, and Community Board.  Similarly, the Department may refrain from siting a Franchise Structure at a

NYC-OTR007083

particular location that in the opinion of the Commissioner would result in an over-concentration of Franchise Structures.

Notwithstanding anything contained herein, the siting of Franchise Structures shall be subject to any applicable requirements of the New York City Administrative Code. Notwithstanding anything contained herein, trash receptacles may be replaced at their existing locations in accordance with the Department of Sanitation's Operation Order for the placement of litter baskets and the Mayor's Clear Corner Policy (Exec. Order No. 22 of 1995).

A newsstand required by the provisions of paragraph five of subdivision k of section 20-231 of the New York City Administrative Code to be relocated at any time shall be eligible to be relocated to a site within a radius of five hundred feet from its licensed location, the "catchment area", provided such site is identified by the licensee and meets the siting criteria applicable to the renewal of licenses in subparagraph a of paragraph two of subdivision d of section 20-231.

If the department of transportation determines that there is no site within such catchment area to which a newsstand may be relocated in accordance with subparagraph (a) of paragraph five of subdivision k of section 20-231, the licensee of such newsstand may apply for a license for a new newsstand in accordance with the applicable provisions of law.

A newsstand shall not be eligible for a renewal if the area of the sidewalk occupied by it exceeds seventy-two square feet or such newsstand exceeds nine feet in height or the department of transportation determines that the newsstand poses an obstruction to the free use of sidewalks by pedestrians at the time of review.

(a) A newsstand that was first licensed on or after the first day of August, nineteen hundred ninety-one shall not pose an obstruction to the free use of the sidewalks by pedestrians if the location of such newsstand does not

(i) reduce the area maintained on the sidewalk for pedestrian movement below a width of nine and one-half feet.

(ii) place the proposed newsstand within five feet of a fire hydrant.

(iii) create a level of service at the proposed location for the peak fifteen minutes of the peak hour of a pedestrian flow rate equal to or greater than eleven people per minute per linear foot of clear path, as determined by the department of transportation.

(iv) place the proposed newsstand within fifteen feet of an entrance to or exit from a subway.

(v) extend into the area encompassed by the extension of the property lines from the buildings to the curb at the intersection of two streets and the area ten feet on either side of such lines.

(vi) extend into a bus stop.

(vii) otherwise create a hazardous condition. For purposes of this subparagraph, a hazardous condition shall include, but not be limited to, the location of a newsstand less than one foot, six inches from the curb, under a fire escape, within ten feet of a driveway or parking lot or within two feet from underground access points, such as utility access openings, ventilation grills, or cellar doors.

NYC-OTR007084

(b) A newsstand that was first licensed prior to the first day of August, nineteen hundred ninety-one shall not pose an obstruction to the free use of the sidewalks by pedestrians if the location of such newsstand does not

(i) reduce the area maintained on the sidewalk for pedestrian movement below a width of nine and one-half feet.

(ii) place the proposed newsstand within five feet of a fire hydrant.

(iii) create a level of service at the proposed location for the peak fifteen minutes of the peak hour of a pedestrian flow rate equal to or greater than eleven people per minute per linear foot of clear path, as determined by the department of transportation.

(iv) violate the restrictions on the location of newsstands in subdivision f of this section, if such newsstand is located at the rear or side of a subway entrance or exit kiosk.

(v) extend into the area encompassed by the extension of the property lines from the buildings to the curb at the intersection of two streets.

(vi) otherwise create a hazardous condition. For purposes of this subparagraph, a hazardous condition shall include, but not be limited to, the location of a newsstand less than one foot, six inches from the curb, under a fire escape, within ten feet of a driveway or parking lot or within two feet from underground access points, such as utility access openings, ventilation grills, or cellar doors.

NYC-OTR007085

**Appendix 12**
**Newsstand Interior Design Criteria**

The following Newsstand criteria must be incorporated into proposed Newsstand designs. Proposers are encouraged to consultant with members of the Newsstand industry to gain further input and understanding of operational and functional needs of Newsstand operators.

1.  Modular shelving, storage and display cases that can be adjusted by individual Newsstand operators to address business needs. Shelving, storage and display cases must reflect the range and variety of items operators are permitted to sell at Newsstands, including but not limited to newspapers, magazines, prepackaged food, cigarettes, film, batteries and beverages. Display cases must have appropriate options for self service and operator controlled product sales.

2.  Space for standard cash box in a secure accessible location when Newsstand operator is conducting business.

3.  Internal lighting that is operated by a wall switch.

4.  Optional space to accommodate a commercial glass door refrigerator with a minimum width of 21" (unit provided by Newsstand operator).

5.  A vent to allow circulation.

6.  Optional space to accommodate a thru-wall 5,000 BTU air conditioner (unit provided by Newsstand operator).

7.  Sufficient electrical outlets and amps to support appliances, including but not limited to lottery machine, refrigerator, air conditioner, and heater.

8.  Sufficient counter and service hookups to accommodate Lotto machine if desired by operator.

- 67 -

NYC-OTR007105

Request for Proposals for a Coordinated Street Furniture Franchise

**Appendix 13**
**Newsrack Criteria**

§19-128.1 Newsracks. a. Definitions. For purposes of this section, the following terms shall have the following meanings:
1. "Newsrack" shall mean any self-service or coin-operated box, container or other dispenser installed, used or maintained for the display, sale or distribution of newspapers or other written matter to the general public.
2. "Person" shall mean a natural person, partnership, corporation, limited liability company or other association.
3. "Sidewalk" shall mean that portion of a street between the curb lines or the lateral lines of a roadway and the adjacent property lines, but not including the curb, intended for the use of pedestrians.
4. "Crosswalk" shall mean that part of a roadway, whether marked or unmarked, which is included within the extension of the sidewalk lines between opposite sides of the roadway at an intersection.
5. "Crosswalk area" shall mean that area of the sidewalk bounded by the extension of the lines of a crosswalk onto the sidewalk up to the building or property line.
6. "Corner area" shall mean that area of a sidewalk encompassed by the extension of the building lines to the curb on each corner.
7. "Board" shall mean the environmental control board of the city of New York.
8. "Close proximity" shall mean a distance adjacent to an area designed to facilitate safe ingress or egress that will reasonably permit and protect such safe ingress or egress.

b. Requirements. It shall be a violation for any person to place, install or maintain a newsrack on any sidewalk unless such newsrack is in compliance with the provisions of this section.
1. The maximum height of any newsrack containing a single publication shall be fifty inches. The maximum width of any such newsrack shall be twenty-four inches. The maximum depth of any such newsrack shall be twenty-four inches.
2. No newsrack shall be used for advertising or promotional purposes, other than announcing the name and/or website of the newspaper or other written matter offered for distribution in such newsrack.
3. Each newsrack used to sell newspapers or other written matter shall be equipped with a coin return mechanism in good working order so as to permit a person to secure a refund in the event that the newsrack malfunctions.
4. The owner or person in control of each newsrack shall affix his or her name, address, telephone number, and email address, if any, on the newsrack in a readily visible location. In no event shall a post office box be considered an acceptable address for purposes of this paragraph.
5. Subject to the limitations set forth in this section, newsracks shall be placed near a curb.
6. A newsrack shall not be placed, installed or maintained: (a) within fifteen feet of any fire hydrant; (b) in any driveway or within close proximity of any driveway; (c) in any curb cut designed to facilitate street access by disabled persons or within two feet of any such curb cut; (d) within close proximity of the entrance or exit of any railway station or subway station; (e) within any bus stop; (f) within a crosswalk area; (g) within a corner area or within five feet of any corner area; (h) on any surface where such installation or maintenance will cause damage to or will interfere with the use of any pipes, vault areas, telephone or electrical cables or other similar locations; (i) on any cellar door, grating, utility maintenance cover or other similar locations; (j) on, in or over any part of the roadway of any public street; (k) unless eight feet of

- 68 -

NYC-OTR007106

sidewalk width is preserved for unobstructed pedestrian passage; (l) in any park or on any sidewalk immediately contiguous to a park where such sidewalk is an integral part of the park design, such as the sidewalks surrounding Central Park or Prospect Park; (m) on any area of lawn, flowers, shrubs, trees or other landscaping or in such a manner that use of the newsrack would cause damage to such landscaping; or (n) where such placement, installation or maintenance endangers the safety of persons or property. Any limitation on the placement or installation of newsracks pursuant to this paragraph shall be no more restrictive than necessary to ensure the safe and unobstructed flow of pedestrian and vehicular traffic, and otherwise to assure the safety of persons and property.

7. Every newsrack shall be placed or installed in a manner that will ensure that such newsrack cannot be tipped over.

c. Notification to city of location of newsrack. 1. Where a newsrack has been placed or installed on a sidewalk before the effective date of this section, the owner or person in control of such newsrack shall, within sixty days after such effective date, submit to the commissioner a form identifying: (i) the address of such newsrack; (ii) the name of the newspaper(s) or written matter to be offered for distribution in such newsrack; and (iii) the name, address, telephone number, and email address of the owner or person in control of such newsracks; and representing that such newsracks comply with the provisions of this section.

2. Subsequent to the initial notification requirements set forth in paragraph 1 of this subdivision, the owner or person in control of any newsrack shall submit the information set forth in paragraph one of this subdivision four times a year to the commissioner in accordance with a quarterly notification schedule to be established by the commissioner.

3. Notification to the city, as required by paragraphs 1 and 2 of this subdivision, may be submitted to the department electronically.

d. Indemnification and insurance. 1. Each person who owns or controls a newsrack placed or installed on any sidewalk shall indemnify and hold the city harmless from any and all losses, costs, damages, expenses, claims, judgments or liabilities that the city may incur by reason of the placement, installation or maintenance of such newsrack, except to the extent such damage results from the negligence or intentional act of the city.

2. Each person who owns or controls a newsrack on any sidewalk shall maintain a general liability insurance policy naming the city of New York, and its departments, boards, officers, employees and agents as additional insureds for the specific purpose of indemnifying and holding harmless those additional insureds from and against any and all losses, costs, damages, expenses, claims, judgments or liabilities that result from or arise out of the placement, installation and/or the maintenance of any newsrack. The minimum limits of such insurance coverage shall be no less than three hundred thousand dollars combined single limit for bodily injury, including death, and property damage, except that any person who maintains an average of one hundred or more newsracks at any one time shall maintain such minimum insurance coverage of one million dollars. An insurance certificate demonstrating compliance with the requirements of this subdivision shall be submitted annually by December 31st to the commissioner by the person who owns or controls such insured newsracks. Should said policy be called upon to satisfy any liability for damages covered by said policy, the policy must be of such a nature that the original amount of coverage is restored after any payment of damages under the policy. Failure to maintain a satisfactory insurance policy pursuant to this subdivision, or failure to submit an annual insurance certificate to the commissioner pursuant to this subdivision, shall be deemed a violation of this section subject to subdivision f of this section.

NYC-OTR007107

e. Maintenance, continuous use, repair and removal. 1. Each newsrack shall be maintained in a clean and neat condition and shall be kept in good repair. Any person who owns or is in control of a newsrack shall be required to monitor each newsrack so that it is kept clean and free of graffiti and other unauthorized writing, painting, drawing, or other markings or inscriptions and is kept in good repair. Such person shall also use best efforts to ensure that each newsrack under his or her ownership or control is not used as a depository for the placement of refuse and shall be required to remove any refuse placed within such newsrack within twenty-four hours of being made aware of such condition.

2. In no event shall the owner or person in control of a newsrack fail to keep such newsrack supplied with written matter for a period of more than seven consecutive days without securing the door so as to prevent the deposit of refuse therein. In no event shall such newsrack remain empty for a period of more than twenty-one consecutive days.

3. Any newsrack that has been damaged or vandalized shall be repaired, replaced or removed by the owner or person in control of such newsrack within ten days of receipt of notice of such damage or vandalism. If such newsrack has been damaged or vandalized so as to constitute a danger to persons or property, it shall be made safe within a reasonable time following notice of such condition.

4. Any damage to city property resulting from the placement, installation, maintenance or removal of a newsrack shall be repaired promptly by the owner or person in control of such newsrack. If a newsrack is removed from its location on a sidewalk, the owner or person in control of such newsrack shall be responsible for restoring the sidewalk and any other affected city property to the condition existing prior to installation of that newsrack.

f. Enforcement. 1. (a) Whenever any newsrack is found to be in violation of this section, the commissioner shall issue a notice of correction by affixing it to such newsrack specifying the date and nature of the violation and shall send written notification, by regular mail, to the owner or person in control of the newsrack. Such person shall within seven business days from the date of receipt of notification via regular mail cause the violation to be corrected.

(b) If an owner or other person in control of a newsrack fails to comply with a notice of correction issued pursuant to subparagraph a of this subdivision or an order by the commissioner to remove served pursuant to paragraph three of this subdivision, a notice of violation returnable to the board shall be served on such owner or person in control of such newsrack. If the return date of the notice of violation is more than five business days after the service of such notice, the board shall, upon the request of the respondent, in person at the office of the board, provide a hearing on such violation prior to such return date and no later than five business days after the date of such request. At the time set for such hearing, or at the date to which such hearing is continued, the board shall receive all evidence relevant to the occurrence or non-occurrence of the specified violation(s), the compliance or noncompliance with any of the provisions of this section, and any other relevant information. Such hearing need not be conducted according to technical rules relating to evidence and witnesses. Oral evidence shall be taken only on oath or affirmation. Within five business days after the conclusion of the hearing, the board shall render a decision, based upon the facts adduced at said hearing, whether the newsrack violates this section. The decision shall be in writing and shall contain findings of fact and a determination of the issues presented. The board shall send to the owner or person in control of the newsrack by regular mail, a copy of its decision and order.

2. If the board renders a decision upholding the finding of a violation against the respondent upon default or after a hearing held pursuant to paragraph one of this subdivision, and the violation is not remedied within seven days of receipt of the decision of the board, the commissioner or his or her designee is authorized to provide for the removal of such newsrack

NYC-OTR007108

and any contents thereof to a place of safety. If such newsrack and any contents thereof are not claimed within thirty days after their removal by a person entitled to their return, they shall be deemed to be abandoned and may be either sold at a public auction after having been advertised in the City Record, the proceeds thereof being paid into the general fund, used or converted for use by the department or another city agency, or otherwise disposed of, and the owner or person in control shall be liable to the City for the costs of removal and storage and shall be subject to a civil penalty pursuant to paragraph five of subdivision f of this section. Newsracks and the contents thereof that are removed pursuant to this subparagraph shall be released to the owner or other person lawfully entitled to possession upon payment of the costs for removal and storage and any civil penalty or, if an action or proceeding concerning the violation is pending, upon the posting of a bond or other form of security acceptable to the department in an amount that will secure the payment of such costs and any penalty that may be imposed hereunder.

3. The commissioner may, upon notice, serve an order upon the owner or other person in control of a newsrack requiring such person to remove or cause to be removed such newsrack within seven business days of the issuance of such order where such removal is required because the site or location at which such newsrack is placed is used or is to be used for public utility purposes, public transportation, or public safety purposes, or when such newsrack unreasonably interferes with construction activities in nearby or adjacent buildings, or if removal is required in connection with a street widening or other capital project or improvement. If such person does not remove such newsrack within seven business days of the issuance of such order, the provisions contained in subparagraph b of paragraph one of this subdivision and paragraph two of this subdivision regarding issuance of a notice of violation and alternatives for removal, storage, abandonment, disposal, and release, shall apply.

4. Notwithstanding any other provision of law to the contrary, if a newsrack has been deemed to have been abandoned in accordance with this paragraph, the commissioner, his or her designee, an authorized officer or employee of any city agency or a police officer is authorized to provide for the removal of such newsrack and may either be sold at public auction after having been advertised in the City Record, the proceeds thereof being paid into the general fund, used or converted for use by the department or another city agency, or otherwise disposed of.

A newsrack shall be deemed to have been abandoned for purposes of this paragraph if the name, address or other identifying material of the owner or other person in control of such newsrack is not affixed to such newsrack as required by paragraph four of subdivision b of this section.

5. (a) Where emergency circumstances exist and the commissioner or his or her designee gives notice to the owner or other person in control of a newsrack to remove such newsrack, such person shall comply with such notice. For the purposes of this paragraph, emergency circumstances shall mean circumstances which present an imminent threat to public health or safety.

(b) If any owner or other person in control of a newsrack does not remove such newsrack when directed to do so pursuant to the provisions of subparagraph a of paragraph five of this subdivision, or if circumstances are such that public safety requires the immediate removal of a newsrack and it is not reasonable to give the owner or other person in control of such newsrack notice prior to removal, the commissioner or his or her designee may provide for the removal of such newsrack to a place of safety. Unless an administrative proceeding brought pursuant to subparagraph c of paragraph five of this subdivision has terminated in favor of such owner or other person in control of such newsrack, such owner or other person in control of such newsrack may be charged with the reasonable costs of removal and storage payable prior to the release of such newsrack and the contents thereof.

NYC-OTR007109

Request for Proposals for a Coordinated Street Furniture Franchise

(c) If an owner or other person in control of a newsrack fails to comply with a notice issued pursuant to subparagraph a of this paragraph to remove such newsrack, a notice of violation returnable to the board shall be served on such owner or person in control of such newsrack. If the newsrack has been removed by the city pursuant to subparagraph b of this paragraph, such notice of violation shall be served immediately after removal, and, if the return date of the notice of violation is more than five business days after the service of such notice, the board shall, upon the request of the respondent, in person at the office of the board, provide a hearing on such violation prior to such return date and no later than five business days after the date of such request. The hearing shall take place under the provisions set forth in subparagraph b of paragraph one of this subdivision and a decision shall be rendered by the board within five business days after the conclusion of the hearing. If a decision is rendered at such hearing that emergency circumstances did not exist, such newsrack shall be returned within ten days to the location from which it was removed by the commissioner or his or her designee. If a decision is rendered against the respondent upon default or after a hearing that such emergency circumstances existed, such newsrack and the contents thereof shall be released to the owner or other person lawfully entitled to possession. If, after a board decision that removal was proper, such newsrack and any contents thereof are not claimed within thirty days after the date of removal by a person entitled to their return, such newsrack and any contents thereof shall be deemed abandoned and may be either sold at a public auction after having been advertised in the City Record, the proceeds thereof being paid into the general fund, used or converted for use by the department or another city agency, or otherwise disposed of.

6. Any owner or person in control of a newsrack found to be in violation of any provision of this section shall, after a board decision has been issued upon default or after a hearing, be subject to a civil penalty in the amount of no less than one hundred dollars and no more than five hundred dollars for each violation.

7. The commissioner, shall remove or cause to be removed from any sidewalk for a period of three consecutive months, every newsrack and the contents thereof under the ownership or control of any person who repeatedly violates any provision or provisions of this subdivision. For purposes of this paragraph, a person shall be deemed to have repeatedly violated this section if such person has been determined by the board, upon default or after a hearing, to have violated the provisions of this section ten or more times within any-six month period and that person has failed to pay three or more civil penalties imposed during that same time period. The department shall maintain a record of all persons who repeatedly violate any provision or provisions of this subdivision. In the event that the commissioner removes or causes to be removed all newsracks and the contents thereof under the ownership or control of any person based upon this paragraph, such person shall be permitted to replace all such newsracks at the locations from which they were removed upon payment in full of all outstanding civil penalties imposed for violations of this section and the reasonable costs of removal and storage, provided that such newsracks meet the requirements of this section. If any newsracks or contents thereof removed pursuant to this paragraph are not claimed within thirty days after the expiration of the three-month removal period, such newsracks or the contents thereof shall be deemed abandoned and may be either sold at public auction after having been advertised in the City Record, the proceeds thereof being paid into the general fund, used or converted for use by the department or another city agency or otherwise disposed of.

8. In giving any notice of correction or serving any commissioners order required under this section, except as otherwise provided by law, the commissioner may rely on the validity of any address (a) posted on the newsrack pursuant to paragraph four of subdivision b of this section as the address of the owner or person in control of the newsrack, or (b) submitted to the department

NYC-OTR007110

pursuant to subdivision c of this section, and shall provide such notice by regular mail. If the owner of a newsrack or person in control of a newsrack shall have failed to comply with paragraph four of subdivision b or with subdivision c of this section, the commissioner shall make reasonable efforts to ascertain the identity and address of the owner or person in control of such newsrack for the purpose of giving any required notice, and having done so, may take action as if any required notice had been given.

9. Nothing in this section shall preclude the immediate removal of a newsrack when otherwise authorized by law.

g. Severability. If any subdivision, paragraph, subparagraph, sentence or clause of this section is for any reason held to be invalid or unconstitutional by the decision of any court of competent jurisdiction, such decision shall not affect the validity of the remaining portions of this section.

## Section 2-08
## Newsracks

**(a)** **Definitions.** For purposes of this section, the following terms shall have the following meanings:

> **(1)** **Newsrack.** "Newsrack" shall mean any self-service or coin-operated box, container or other dispenser installed, used or maintained for the display, sale or distribution of newspapers or other written matter to the general public.

> **(2)** **Person.** "Person" shall mean a natural person, partnership, corporation, limited liability company or other association.

> **(3)** **Sidewalk.** "Sidewalk" shall mean that portion of a street between the curb lines or the lateral lines of a roadway and the adjacent property lines, but not including the curb, intended for the use of pedestrians.

> **(4)** **Crosswalk.** "Crosswalk" shall mean that part of a roadway, whether marked or unmarked, which is included within the extension of the sidewalk lines between opposite sides of the roadway at an intersection.

> **(5)** **Crosswalk area.** "Crosswalk area" shall mean that area of the sidewalk bounded by the extension of the lines of a crosswalk onto the sidewalk up to the building or property line.

> **(6)** **Corner area.** "Corner area" shall mean that area of a sidewalk encompassed by the extension of the building lines to the curb on each corner.

> **(7)** **Board.** "Board" shall mean the environmental control board of the city of New York.

> **(8)** **Multiple-vending newsrack.** A newsrack designed to hold two or more different publications.

**(b)** **Placement.**

- 73 -

**(1)     Manner.**

(i)     Newsracks shall be weighted down on all sidewalks in such a way as to insure that the newsrack cannot be tipped over.

(ii)     Newsracks shall not be bolted to the sidewalk, except that multiple-vending newsracks may be bolted pursuant to a permit from the Department, except as provided in paragraph 2 of this subdivision b.

(iii)     A newsrack may not be chained to property owned or maintained by the city, except that newsracks may be chained to lampposts (except for decorative lampposts).  A newsrack so chained must not be in an unlawful location as specified in subdivision (c) of this section.  To the extent an owner or other person in control of a newsrack seeks to chain such newsrack to property not owned or maintained by the city, the consent of the owner of or person responsible for such property is required.  In all cases where the use of chains to secure newsracks is permitted, such chains shall be made of galvanized steel with a plastic or rubber protective coating, at least 0.14 inches thick, and shall allow a distance of no more than eight (8) inches between the newsrack and the street furniture to which it is chained.

**(2)     Distinctive sidewalks.**  Multiple-vending newsracks may be bolted to sidewalks comprised of distinctive material, including, but not limited to, granite, terrazzo or bluestone, pursuant to a permit from the Department and provided that the written permission of the property owner or other entity that installed the distinctive sidewalk is obtained in advance of such bolting.

**(3)     Sidewalk repair and restoration.**  An owner or other person in control of a newsrack shall be responsible for any damage caused or repairs necessitated by the installation, presence or maintenance of such newsrack.  Such owner or other person also shall be responsible for any damage caused or repairs necessitated by the removal of a newsrack by either such owner or other person or by an authorized officer or employee of the Department or of any city agency who is designated by the Commissioner, or by a police officer.  Such repairs shall be made promptly and in accordance with the Department's specifications.

**(4)     Notification to the Department of location of newsracks.**  Where a newsrack has been placed or installed on a sidewalk before the effective date of section 19-128.1 of the New York City Administrative Code, the owner or other person in control of a newsrack shall, within sixty (60) days after the effective date of section 19-128.1 of the New York City Administrative Code, notify the Department by facsimile, electronically or by other means as directed by the Commissioner and on a form approved or provided by the Commissioner, of

(i)     the location of such newsrack;

NYC-OTR007112

Request for Proposals for a Coordinated Street Furniture Franchise

(ii)    the name of the newspaper(s) or written matter to be offered for distribution in such newsrack; and

(iii)   the name, address, telephone number, and email address of the owner or person in control of such newsracks;

and shall represent that such newsracks comply with the provisions of this section and section 19-128.1 of the New York City Administrative Code. Subsequent to the initial notification, the owner or person in control of a newsrack shall submit the above information to the Department on March 30, June 30, September 30 and December 30 of each year. An owner or other person in control of a newsrack placed or installed on a sidewalk after the effective date of section 19-128.1 of the New York City Administrative Code shall, within sixty (60) days after the effective date of section 19-128.1 of the New York City Administrative Code or within ten (10) days of the installation of any such newsrack, whichever is later, provide to the Department the information required above and the indemnification notification and insurance certification required pursuant to subdivision f of this section. Subsequent notification shall be made on a quarterly basis as provided above.

(c)    **Unlawful locations.** No owner or person in control of a newsrack shall install, use or maintain any newsrack in any of the following locations:

(1)    within fifteen (15) feet of any fire hydrant;

(2)    in any driveway or within five (5) feet of any driveway;

(3)    in any curb cut designed to facilitate street access by disabled persons or within two feet of any such curb cut;

(4)    within fifteen (15) feet of the entrance or exit of any railway station or subway station, except that a newsrack that otherwise complies with this subdivision may be placed against the rear of the station entrance or exit, but not against the sides;

(5)    within any bus stop;

(6)    within a crosswalk area;

(7)    within a corner area or within five (5) feet of any corner area;

(8)    on any surface where such installation or maintenance will cause damage to or interference with the use of any pipes, vault areas, telephone or electrical cables or other similar locations;

(9)    on any cellar door, grating, utility maintenance cover or other similar locations;

(10)   on, in or over any part of the roadway of any public street;

(11)   unless eight (8) feet of sidewalk width is preserved for unobstructed pedestrian passage;

(12)   in any park or on any sidewalk immediately contiguous to a park where such sidewalk is an integral part of the park design;

(13)   on any area of lawn, flowers, shrubs, trees or other landscaping or in such a manner that use of the newsrack would cause damage to such landscaping;

(14)   where such placement, installation or maintenance endangers the safety of persons or property;

(15)   at any distance less than eighteen (18) inches or more than twenty-four (24) inches from the face of the curb, measured to the side of the newsrack closest to the curb (This paragraph shall not apply to a newsrack placed against the rear of the entrance or exit of a subway or railway as provided in paragraph 4, above.);

NYC-OTR007113

Request for Proposals for a Coordinated Street Furniture Franchise

**(16)**    within five (5) feet of a canopy; and

**(17)**    within fifteen (15) feet of a sidewalk newsstand.

**(d)    Size, shape and appearance.**

**(1)    Dimensions.**  No newsrack may be higher than fifty (50) inches, wider than twenty-four (24) inches or deeper than twenty-four (24) inches.  Notwithstanding the above, no multiple-vending newsrack shall be higher than sixty (60) inches, wider than ninety (90) inches or deeper than thirty-six (36) inches.

**(2)    Identifying information required.**  The owner or person in control of each newsrack shall affix his, her or its name, address, telephone number and email address, if any, on the newsrack in a readily visible location.  In no event shall a post office box be considered an acceptable address for purposes of this paragraph.

**(3)    Advertisements prohibited.**  The surfaces of the newsrack shall not include any advertisement, whether painted, posted, or otherwise affixed thereto, or be used for promotional purposes, except for announcing the name and/or website of the newspaper or other written matter offered for distribution in such newsrack.

**(4)    Electricity.**  No electricity shall be run into a newsrack nor shall any connection for electrical purposes be installed in or on a newsrack.

**(e)    Maintenance.**  The owner or person in control of a newsrack shall be responsible for the following:

**(1)    Cleaning.**  All newsracks shall be maintained in a clean and neat condition and shall be kept in good repair.

**(2)    Painting.**  All painted newsracks shall be repainted as needed.

**(3)    Graffiti.**  All surfaces of newsracks shall be maintained free of graffiti and other unauthorized writing, painting, drawing or other markings or inscriptions, including, but not limited to, stickers and flyers.

**(4)    Refuse.**  No refuse shall accumulate in a newsrack nor shall any newsrack deteriorate into an unsanitary condition.  The owner or person in control of a newsrack shall remove refuse within twenty-four (24) hours of being made aware of the condition.

**(5)    Damage.**  A damaged or vandalized newsrack shall be repaired, replaced or removed within ten (10) days of receipt of notice of the damage or vandalism, except that if such damaged newsrack poses a danger to persons or property, it shall be made safe within twenty-four (24) hours following notice.

**(6)    Continuous use.**  In no event shall the owner or person in control of a newsrack fail to keep such newsrack supplied with written matter for a period of more than seven (7) consecutive days without securing the door so as to prevent the deposit of refuse

NYC-OTR007114

Request for Proposals for a Coordinated Street Furniture Franchise

therein. Notwithstanding the securing of the door, in no event shall such newsrack remain empty for a total period of more than twenty-one (21) consecutive days. Any newsrack empty for longer than such period shall be deemed abandoned.

(f)    **Indemnification and insurance.**

(1)    **Indemnification.** The owner or person in control of a newsrack placed or installed on any sidewalk shall indemnify and hold the City harmless from any and all losses, costs, damages, expenses, claims, judgments or liabilities that the City may incur by reason of the placement, installation or maintenance of such newsrack, except to the extent such damage results from the negligence or intentional act of the city. In addition to the insurance certificate submitted pursuant to paragraph 3 of this subdivision f, the owner or person in control of a newsrack shall submit by regular mail an indemnification notification on a form provided by the Commissioner.

(2)    **Insurance.** The owner or person in control of a newsrack shall procure and maintain, for as long as the newsrack remains on City property, a commercial general liability insurance policy from an insurer licensed to do business in the State of New York in his or her or its name, which names the City of New York, its departments, boards, officers, employees and agents as additional insureds for the specific purpose of indemnifying and holding harmless those additional insureds from and against any and losses, costs, damages, expenses, claims, judgments or liabilities that result from or arise out of the placement, installation and/or maintenance of such newsrack. The minimum limits of such insurance coverage shall be no less than $300,000 combined single limit for bodily injury, including death, and property damage, dedicated exclusively to the liabilities relating to such newsracks, except that any person who maintains an average of 100 or more newsracks at any one time shall maintain a minimum insurance coverage of $1 million dedicated exclusively to such liabilities. All insurance policies shall be endorsed to provide that (a) the City shall have no obligation whatever to provide notice to the insurance company of any occurrence or claim, and that the City's notice to the insurance company of the commencement of a lawsuit against the City, if required, shall be deemed timely if received within 180 days thereof; and (b) notice by any other insured of the commencement of any lawsuit against such insured shall constitute notice on behalf of the City as well.

(3)    **Insurance certificate.** An insurance certificate shall be submitted to the Commissioner by the owner or person in control of a newsrack within sixty (60) days after the effective date of section 19-128.1 of the New York City Administrative Code, and, thereafter, by December 31 of each year or by the expiration date of the policy, whichever is earlier, certifying that the insurance required by paragraph 2 of this subdivision f is in place for all newsracks owned by such person. When a newsrack that is not covered by such insurance is placed or installed on a sidewalk after the effective date of such section 19-128.1, the owner or person in control of such newsrack shall, within sixty (60) days after the effective date of section 19-128.1 of the New York City Administrative Code or within ten (10) days of the installation of such newsrack, whichever is later, provide to the Department the insurance certification required pursuant to this subdivision f. Acceptance by the Commissioner of any insurance certificate, whether or not conforming to the requirements of paragraph 2 of this

- 77 -

NYC-OTR007115

Request for Proposals for a Coordinated Street Furniture Franchise

subdivision f, shall not relieve the owner or person in control of a newsrack of his, her or its obligation to actually provide such insurance. The certificate shall provide that no cancellation, termination or alteration shall be made without thirty (30) days' advance written notice to the Department.

**(g)    Violations and removal.**

Violations of the provisions of section 19-128.1 of the Administrative Code or these rules shall be enforced and the newsracks shall be removed by the Commissioner pursuant to provisions of subdivision f of such section 19-128.1 and any other applicable provisions of law. The City shall charge the owner or person in control of a newsrack for the cost of removal and storage. The charge for removal shall be $50 per newsrack. The storage charge shall be $1.40 per newsrack per day.

**(h)    Notices.**    All notices required to be served on the owner or person in control of a newsrack pursuant to these rules or section 19-128.1 of the Administrative Code shall be served upon the address provided pursuant to the registration provisions in these rules. In the absence of the required registration information, service shall be made on the entity identified on the newsrack or in the publication found in the newsrack.

NYC-OTR007116

# EXHIBIT S

CITY PLANNING COMMISSION

October 9, 1996/Calendar No 34.

C960543(A)GFY

IN THE MATTER OF a modified application submitted by the Department of Transportation pursuant to Sections 197-a and 363e(2) of the New York City Charter for a franchise for installing, operating and maintaining bus stop shelters, automatic public toilets, newsstands and public service structures to be located in all five boroughs, and proposed for modification on August 19, 1996 pursuant to Section 7.030 of the Uniform Land Use Review Procedure.

The application (C960543 GFY) for approval of an RFP for a franchise for the installation, maintenance and operation of bus stop shelters, self-cleaning automatic public toilets and public service structures and the installation and maintenance of newsstands in all five boroughs of the city (the Coordinated Street Furniture Franchise) was filed by the Department of Transportation on May 1, 1996. On August 19, 1996, The Department of Transportation recommended, and the City Planning Commission proposed, pursuant to Section 7.030 of the Uniform Land Use Review Procedure (ULURP), a modification (C960543 (A) GFY) to the original application. The modified application revised the original RFP to indicate the location and nature of business terms to be included in the final RFP and added text relating to the protection of distinctive sidewalks or historic pavements and requiring the Franchisee to cooperate with DOT in responding to complaints and is the subject of this report.

1

NYC019051

BACKGROUND

The village in growing any match elements of street furniture under a coordinated franchise arrangement is new for the City of New York. To date the regulation, construction, installation and maintenance of various types of street furniture has occurred in differing ways with greater or lesser degrees of coordination and consistency.

The bus stop shelters currently in use throughout the city have their genesis in two February 14, 1978 reports of the City Planning Commission, (N770135MFY and N770642MFY), which set out locations and size and clearance standards for shelters citywide.  All current shelters are provided by a private entity which utilizes two standard designs throughout the City dating from the early 1980's.  The company operates under a City franchise which permits advertising on the shelters and which is administered by the Department of Transportation.  On April 25, 1995, the Franchise and Concession Review Committee approved the extension of the franchise contract to December 31, 1997.

The inventory of newsstands which currently exist on City streets has accrued over a period of many years on an ad hoc basis. Individual operators have constructed and installed newsstands pursuant to licenses issued by the Department of Consumer Affairs. On January 18, 1992, the City promulgated revised "Newsstand Guidelines" pursuant to the New York City Administrative Code.

C960543(A)  GPY

NYC019052

These guidelines include size limitations for newsstand structures and siting and clearance criteria and specify review and approval procedures involving several City entities. Newsstands in existence prior to August 1991 were allowed to remain in place, subject to less stringent standards than those constructed after this date.

Efforts to bring automatic public toilets to city streets began in the summer of 1992 with a pilot program under which toilets were installed temporarily at three locations in Manhattan. On March 16, 1994 an application by DOT (C940054 (A) GFY) for a Request for Proposals for a franchise involving the construction, operation and maintenance of automatic public toilets and public service kiosks was approved by the City Council (Res. #214). The RFP called for a maximum inventory of 200 toilets and 400 kiosks and included dimensional, siting and clearance criteria comparable to those in the "Newsstand Guidelines". The franchisee would be permitted to place advertising on both the toilets and the kiosks. As required by the Council's resolution, on May 26, 1994, the Department of Transportation issued a Request for Qualifications for participation in a one-year pilot program for Automatic Self-cleaning Public Toilets. A lack of meaningful response to the RFQ resulted in a decision not to proceed with the Request for Proposals.

At present there are a small number of City-owned pedestrian

---

3                                                            **C960543(A)  GFY**

NYC019053

informational kiosks located on City streets solely within Manhattan. They are free standing structures containing posters and maps.

The proposal currently being advanced seeks to replace and coordinate all of the items of street furniture discussed above under a unified program. On March 6, 1996 the City Council adopted Resolution Number 1548 authorizing the Department of Transportation to grant franchises for bus stop shelters, newsstands, automatic public toilets and public service structures. The Request for Proposals which is the subject of this report is the mechanism by which a franchisee will be selected to implement the coordinated street furniture program.

## THE PROPOSAL

The land use aspects of the proposed RFP were certified by the Planning Commission for referral to Community Boards on May 20, 1996. The proposed Request for Proposals is for a non-exclusive 20-year franchise to install, maintain and operate bus stop shelters (BSSs), self-cleaning automatic public toilets (APTs) and public service structures (PSSs) and to install and maintain newsstands in the five boroughs of the City. The RFP calls for proposals to construct, maintain and operate such facilities, collectively referred to as "Franchise Structures", that are clean, safe and attractive, in convenient locations to serve the needs of residents and visitors. As permitted by the Authorizing

4                                              C960543(A) GFY

NYC019054

[text illegible] of RFP also allows for the placement of advertising on Franchise Structures, subject to special criteria and limitations as more fully described below.

The proposed RFP requires that proposals provide for the following:

o    The installation and maintenance of a minimum of 3,300 and a
     maximum of 3,500 bus stop shelters, with amenities for the
     public in the form of street identification signage, seating
     (where directed by the Department of Transportation) and
     public service information;

o    The installation, operation and maintenance of a minimum of 30
     and a maximum of 100 self-cleaning APTs, for the use of which
     the franchisee will be permitted to collect a minimal fee from
     the public; and

o    The installation and maintenance of a minimum of 430 and a
     maximum of 500 newsstands.  The Franchisee will not operate
     the newsstands, but will be responsible for their maintenance
     and repair.

In addition, proposers are encouraged to provide for the installation, operation and maintenance of public service structures, incorporating such elements as newspaper and periodical dispensers, recycling or litter bins, computer terminals that

5                                        C960543(A)  GFY

NYC019055

provide access to government or commercial a ivitie, bicycle racks and public pay telephones.

Most of the Franchise Structures will replace and improve on existing or previously proposed sidewalk structures.  At a minimum, the present bus stop shelter inventory will be maintained and enhanced through the addition of newly designed shelters.   The proposed RFP expresses a preference for the replacement of the existing shelter inventory with the new designs.  Existing sidewalk newsstands will be replaced at their current locations if such locations comply with the Siting Criteria.   Complying locations will be found for other newsstands.

The goal of this proposal is to provide well-maintained attractive street furniture that offers increased public amenities and to reduce clutter on City sidewalks.  The proposed RFP seeks designs for the different types of structures which will be aesthetically pleasing, will be unified in a city-wide coordinated design scheme and will take into account compatibility with special contexts, such as historic districts, through both the basic designs and the incorporation of site-specific design components.

The design and placement of the Franchise Structures will be subject to the review and approval of the Landmarks Preservation Commission and the Art Commission.  The Franchisee will be required to comply with the Americans with Disabilities Act and any federal,

6                                                    C960543(A) GFY

NYC019056

state and local laws relating to accessibility for people with
disabilities.

The maximum permissible dimensions for each of the Franchise
Structures are as follows:

|                   | Area        | Height | Width    | Length    |
|-------------------|-------------|--------|----------|-----------|
| Bus Stop Shelter  | 150 sq. ft. | 9 ft.  | 5 ft.    | 30 ft.    |
| Newsstand         | 72 sq. ft.  | 9 ft.  | 6.5 ft.  | 14 ft.    |
| APT               | 78 sq. ft.  | 12 ft. | 8 ft.    | 12.5 ft.  |
| PSS               | 36 sq. ft.  | 9 ft.  | 6 ft.    | 6 ft.     |

Proposers will also have the option to propose cylindrical, pillar-
type structures for newsstands, APTs and PSSs.  Such structures,
which occupy less sidewalk area than permitted in the table above,
will have a maximum height of 16 feet, but will not be permitted to
exceed the maximum widths stated above.


Sites for street furniture constructed under the Franchise will be
selected by the Department of Transportation in accordance with
comprehensive Siting Criteria.  These criteria generally mirror the
existing or approved criteria for Bus Stop Shelters, Newsstands and
APTs.   Minor adjustments have been made to provide greater
consistency and coordination, but the criteria continue to
recognize the unique nature of each type of structure.

C960543(A) GFY

NYC019057

The Siting Criteria require that all Franchise Structures be located so that a completely unobstructed clear path parallel to the curb is maintained at the following minimum widths.

|                    | Clear Path |
|--------------------|------------|
| Bus Stop Shelter   | 7 ft.      |
| APT                | 8 ft.      |
| Newsstand          | 9.5 ft.    |
| PSS                | 9.5 ft.    |

For Bus Stop Shelters only, on narrow sidewalks the Department of Transportation may permit a narrower clear path, but not less than 5 feet. An additional requirement that all Franchise Structures be located in proximity to either the curb line or the building line guarantees that on wide sidewalks the clear path will exceed the above minimums.

The Siting Criteria specify minimum clearances between a Franchise Structure and other elements or objects on or in the surface of the sidewalk. A Franchise Structure may not be located in front of a building entrance unless the owner so permits. For a specified list of building types, APTs, Newsstands and PSSs must be located at least 15 feet from entrances.

The Siting Criteria further restrict the location of APTs, most notably to wide streets, as defined in the Zoning Resolution, in

8

C960543(A)  GFY

NYC019058

commercial, manufacturing or mixed-use districts.

The proposed RFP specifies in the following language a procedure for locating the Franchise Structures under which the Department of Transportation will engage in an extensive consultative process with Community Boards, elected officials and others:

> The Department will adhere to the following consultative process in designating new sites:
>
> 1. The Department will request recommendations for new sites from Council Members, Borough Presidents, Community Boards, Business Improvement Districts (BIDs), the New York City Transit Authority (for bus stop shelters only), and newspaper publishers and licensed newsstand operators (for newsstands only).
>
> 2. The Department will review these recommendations and any other suggested sites for compliance with the siting criteria (Appendix 3) and additionally consider the following factors:
>
>    Bus Stop Shelters: Ridership figures, transfer points, location of existing shelters, geographic distribution, sidewalk activity, presence of other Franchise Structures on the sidewalk
>
>    Newsstands: Economic viability, replacement of existing structures, geographic distribution, sidewalk activity, presence of other Franchise Structures on the sidewalk
>
>    APTs: Availability of water and sewer service, public convenience, enhancement of commercial and tourist areas, sites recommended by the Department of Parks and Recreation, geographic distribution, sidewalk activity, presence of other Franchise Structures on the sidewalk
>
>    Public Service Structures: Sidewalk activity, geographic distribution, presence of other Franchise Structures on the sidewalk.
>
> 3. The Department will distribute lists of proposed sites determined by the Department to be desirable for a 60-day comment period to Council Members, Borough Presidents,

C960543(A)  GFY

NYC019059

Community Boards, other appropriate City agencies, BIDs, the New York City Transit Authority (for bus stop shelters only), newspaper publishers (for newsstands only), adjacent property owners (for newsstands and APTs only) and any other interested party, including Proposers, if they so request.

4.  After consideration of the comments and selection of a Franchisee the Department will choose final sites and notify Council Members, Borough Presidents, Community Boards, other appropriate City agencies, the Franchisee, and any other person who commented on the proposed sites.

At least once each year, the Department will request from all Community Boards, BIDs, Council Members, Borough Presidents, the Franchisee and (for purposes of siting newsstand structures) publishers of major daily New York City newspapers a prioritized list of locations for the placement or removal of Franchise Structures.

The Department may direct the Franchisee to replace bus stop shelters, newsstands and PSSs at existing sites, independent of the above consultative process.

The Franchisee will be required, at a minimum, to adhere to the following build-out schedule:

| | BSSs | APTs | Newsstands |
|---|---|---|---|
| Year 1 | 550 | 15 | 144 |
| Year 2 | 550 | 15 | 143 |
| Year 3 | 550 | *** | 143 |
| Year 4 | 550 | *** | *** |
| Year 5 | 550 | *** | *** |
| Year 6 | 550 | *** | *** |
| Years 7-20 | *** | *** | *** |

*** Additional structures as directed by DOT

10

NYC019060

The printed RFP permits a maximum of 2 advertising panels on any
Franchise Structure.     The maximum permissible amounts of
advertising are as follows:

|            | Area        | Height |
|------------|-------------|--------|
| Bus Stop Shelter | 70 sq. ft. | 7 ft. |
| Newsstand | 108 sq. ft. | 9 ft. |
| APT | 108 sq. ft. | 9 ft. |
| PSS | 42 sq.ft. | 7 ft. |

The maximum permitted height of advertising on pillar structures is
14 feet.

For no more than 10% of the total number of Franchise Structures
citywide and for no more than 20% of the total number of Franchise
Structures in any one community district, the RFP allows increases
in the maximum advertising areas and numbers of panels of up to 35
square feet and 1 additional panel.

The placement of advertising panels shall not obstruct the
visibility of adjacent buildings or the interior of a Bus Stop
Shelter, nor may it interfere with pedestrian or motorist sight-
lines necessary for traffic safety.  Advertising on PSSs may not
physically or visually obscure the public service they provide.

Backlit printed media are allowed in all locations.  The intent of

11

C960543(A)  GFY

NYC019061

the proposed RFP is to ensure that electrically animated media
such as "zipper" signs) are permitted only on a case by case basis
and only in zoning districts where the Zoning Resolution allows
them. Audio advertising will not be permitted. Advertising of
tobacco products is prohibited.

## ENVIRONMENTAL REVIEW

The original application (C960543GFY) was reviewed pursuant to the
New York State Environmental Quality Review Act (SEQRA), and the
SEQR regulations set forth in Volume 6 of the New York Code of
Rules and Regulations, Section 617.00 *et seq.*, and the New York
City Environmental Quality Review (CEQR) procedures set forth in
Executive Order 91 of 1977. The designated CEQR number is
96DOT010Y. The Lead Agency is the Department of Transportation.

After a study of the potential environmental impacts of the
proposed action, a Negative Declaration was issued on May 3, 1996.

After review of the modified application (C960543(A)GFY), it was
determined that the modifications constitute a minor modification
of the proposed RFP and that the Negative Declaration issued on May
3, 1996 remains valid.

## UNIFORM LAND USE REVIEW

The original application (C960543GFY) was certified as complete by
the Department of City Planning on May 20, 1991, and was duly

---

12

C960543(A) GFY

NYC019062

referred to the community boards, the Borough Boards and the Borough Presidents in accordance with Article 3 of the Uniform Land Use Review Procedure (ULURP) rules. The modified application (C960543(A) GFY) was referred to the community boards, Borough Boards and Borough Presidents on August 15, 1996, pursuant to Section 7.030 of the ULURP Rules.


**Community Board Review**

The Commission received recommendations from the following 41 community boards. A copy of each board's full recommendation is attached to this report.


The Bronx Community Boards:   2, 3, 4, 7, 9, 10, 11, 12
Brooklyn Community Boards:   1, 2, 5, 6, 7, 9, 10, 12, 13, 15, 18
Manhattan Community Boards:   1, 2, 3, 4, 5, 6, 7, 8, 9
Queens Community Boards:   1, 3, 4, 6, 7, 8, 9, 10, 11, 12
Staten Island Community Boards: 1, 2, 3


Four community boards voted in favor of the proposal; seventeen boards voted in favor of the proposal with modifications; nineteen voted against the proposal and one board voted no recommendation.


Many resolutions, including several of the disapprovals, supported the general concept of a comprehensive, coordinated, city-wide approach to the provision of major elements of street furniture. A range of issues, concerns and proposed modifications relating to

13                                                C960543(A) GFY

NYC019063

specific aspects of the RFP were raised.  Those most frequently
cited in the Community Board resolutions were as follows.

Many resolutions call for a greater role for Community Boards,
Business Improvement Districts and/or elected officials in the
siting process, such as final siting approval or the ability to
appeal DOT's decisions.  Some request a limit on the number of
structures in some Community Districts and a guaranteed minimum
number in others.  Some concerns are also expressed about the
minimum clear paths contained in the siting criteria.

Many resolutions express concern about the amount of advertising
and call for the maximum permitted size or number of panels to be
reduced.  Several resolutions seek a higher percentage of the total
amount of advertising for public service information.  Control over
the content of advertising is also sought.

Several resolutions suggest a shorter franchise term, possibly with
a renewal provision subject to performance review.

A number of resolutions express concern about contextual "fit" and
seek to have the design of structures subject to the review or
approval of the affected Community Board, BID, council member
and/or Borough President.

There is concern over the City's ability to ensure adequate

C960543(A) GFY

NYC019064

franchises' performance in terms of maintenance and removal of
damaged structures. Several resolutions suggest defined monetary
penalties or contract revocation for failure to perform and
specific timetables for these actions.

Objections to the 16 foot maximum height for pillar structures are
raised in several resolutions.

Two Manhattan Community Boards seek greater number of APTs and
longer required operating hours for them.

**Borough President Review**

The President of the Borough of Brooklyn, on July 29, 1996
recommended approval of the application with modifications, as
follows:

> The siting of street furniture shall be in consultation with,
> and the approval of, the affected community board, City
> Council member and borough president, and such requirement
> shall be included in the franchise agreement;
>
> The affected community board, City Council member and borough
> president shall be consulted with regard to the design and
> composition of the street furniture and they shall approve
> which design and composition will be placed at a particular
> site, and such requirements shall be included in the franchise
> agreement;
>
> The height of pillar-type newsstands, PSSs and APTs shall be
> kept as low as possible and that pillar-type street furniture
> shall not be sired in low-rise building areas; and
>
> The advertising of alcoholic beverages and offensive materials
> shall be prohibited; and

---

15

C960543(A) GFY

NYC019065

The design of the street furniture to be sited in downtown Brooklyn, to the extent possible, shall conform to the "Downtown Brooklyn Streetscape Design Guidelines"

The President of the Borough of Manhattan, on August 23, 1996, recommended disapproval of the application.    She raised the following issues:

The Borough President proposes that site selection for Franchise Structures be preceded by extensive surveys of existing street furniture so that Community Districts which have too many or too few of these structures can be better served in the future, and poorly sited structures can be relocated.    A comprehensive boroughwide street furniture masterplan should be completed with the intent to set limits on the number of Franchise Structures per block face and per intersection.    Additionally, the DOT proposal should outline a specific plan to ensure wide geographical distribution of Franchise Structures.    To ensure equitable distribution throughout Manhattan, a specific strategy should be devised that will guarantee each Community District a minimum number of each type of Franchise Structure.    Districts in Northern Manhattan will receive a fair share of all types of Franchise Structures.    One concrete provision to ensure geographic distribution of bus stop shelters, especially in Northern Manhattan, would be to site the first year build-out of 550 bus stop shelters in new locations, rather than replacing existing structures.

The design of street furniture should contribute to the reduction of street clutter.    In order to achieve this goal, new designs for all Franchise Structures should be combined with public service structures, such as litter and recycling bins, newspaper dispensers and public pay telephones.    The Borough President strongly agrees with the Borough Board that it is absolutely essential to include ample provisions for newsbox dispensers in DOT's final RFP.

It is important to regulate the amount of advertising permitted within any given area.    This is necessary both to prevent visual inundation by too many advertisements, which has been found to reduce visual impact if too closely sited, and to protect the economic viability of the advertisements. One possible way to achieve this would be to specify a minimum allowable distance between structures containing advertisements, or set a maximum square footage of advertising per block face.    The most objectionable aspects of the proposed advertising are described below:

16                                                  C960543(A)  GFY

NYC019066

The additional third advertising panel proposed for 11 percent of bus stop shelters and newsstands (bus shelters currently have 1 or 2 panels). The proposed advertising footage, without the addition of a 25 foot square panel, is already excessive, and elevates the target of potential revenues above the quality, design and maintenance of the City's public space.

o  The proposed 16-foot high pillar style structures. The negative land use impacts from locating 16-foot high pillars to be used for newsstands, public toilets and public service structures outweigh any potential benefit related to a decreased sidewalk footprint.

o  The low amount (minimum of 2.5 percent) of public service advertising. The amount of public service information and advertising should be increased to a minimum of 25 percent of all available advertising space to be distributed equally among each community district. The surface space likely to be available on APTs should be used for public information such as maps and guides.

The Borough President concurs with the Borough Board that the long length of the twenty-year contract term dictates that five or ten-year contract renewal periods should be set based on stringent performance reviews. Performance evaluations should include comments from all interested elected officials and community members who are involved in the siting process. Penalties and liquidated damages should be incurred by the franchisee for non-compliance with maintenance and contract requirements. A complaint system should be set up so that problems can be resolved quickly.


The President of the Borough of Staten Island, on August 6, 1996, recommended approval of the application.


A copy of each Borough President recommendation is attached.


**Borough Board Review**

The Manhattan Borough Board, on August 15, 1996, voted to disapprove the application. The Board's resolution raised a series

17