Exhibit FF

*The City of New York*

**DEPARTMENT OF INFORMATION TECHNOLOGY AND TELECOMMUNICATIONS**
**DoITT**

NYC Technology Center
11 MetroTech Center
Brooklyn, NY 11201
(718) 403-8500
Fax: (718) 403-8504

**RALPH A. BALZANO**
*Commissioner*
*NYC Chief Information Officer*

May 3, 1996

David E. Bronston
*General Counsel*

Annette M. Barbaccia, Director
Mayor's Office of Environmental Coordination
One Centre Street
New York, NY 10007

Re:    Submission of Environmental Assessment Statement EAS and
        Declaration of Negative Impact for CEQR No. 96 DoITT 001Y

Dear Ms. Barbaccia:

       Attached is a completed EAS and Negative Declaration for CEQR No. 96
DoITT 001Y.

       Questions concerning these documents may be directed to:

                William L. Evers, Esq.
                Assistant Counsel, DoITT
                11 MetroTech Center
                Brooklyn, NY 11201
                (718) 403-8414

                                Sincerely yours,

                                William L. Evers

Enclosures

**Quality Service Through Technology**

NYC019353

**ENVIRONMENTAL ASSESSMENT STATEMENT**

**PART I**

**APPLICANT INFORMATION & ACTION SUMMARY**

**A.  LEAD AGENCY**

Agency:  Department of Information Technology and Telecommunications

Contact:  Martin Cintron, Asst. Commissioner-Telecommunications Services

Address:  11 MetroTech Center-3rd floor

Brooklyn, New York  11201

_____

Phone:  (718)403-8202

FAX:  (718)403-8240/41

**B.  PRIVATE OR NON-LEAD AGENCY APPLICANT**

Applicant:  N/A

Contact:  _____

Address:  _____

_____

_____

Phone:  _____

FAX:  _____

**C.  APPLICATION IDENTIFICATION**

Franchising and Regulating Private Pay Telephones on, under and over
Project name: the inalienable property of the City of New York.

CEQR # (agency initials followed by year and number):  96 DoITT 001Y

BSA #:  _____

-5-

NYC019355

ULURP #: _____
LEGISLATIVE INTRO #: _____
CAPA #: _____

### D. ACTION DESCRIPTION

1.  Provide a Sanborn or other land use map showing the boundaries of the
    directly affected area.            CityWide

2   Describe the location of the directly affected area as follows:

Borough _____All_____

Community District(s) ____All_____

Tax block(s) and lot(s) ___All_____

Street address, vanity address and nearest cross streets (minimum of two)

to property:

The directly affected area consists of the project site and the area subject
to any change in regulatory controls that the action includes.

-6-

RECEIVED BY MAIL
COMMUNICATIONS SECTION
LAW DEPT.

NYC019356

If the action would apply to the entire City or to areas that are so extensive that site-specific description is not appropriate or practicable, describe the area likely to be affected by the action: DoITT believes that there are more than 35,000 public pay telephones currently installed and operational on, over and under the inalienable property of the City of New York. Approximately 9,500 of these telephones are owned by NYNEX and licensed by the Department of Transportation, the rest are unlicensed and totally unregulated at present by the City or the NYS Public Service Commission. Both categories of public pay telephones can be found in each of the five boroughs of New York City.

3.    **Describe the action for which environmental review is being performed and, briefly, what consequences would result from or be generated by the action:**

DoITT has been authorized by Resolution No. 439-A and Local Law No. 68 of 1995 to regulate the installation, operatoin and maintenance of all public pay telephones found on, over and under the inalienable property of the City (i.e., exterior sidewalk locations).

The regulatory authority will manifest itself in the following fashion:

a) The promulgation of rules based on Local Law #68 of 1995.

b) The issuance of an RFP for nonexclusive franchises for public pay telephones pursuant to authorizing Resolution 439-A.

c) The creation of data base identifying and locating existing public pay telephones.

d) The issuance of franchises to owners and permits for approved public pay telephones by DoITT.

e) Enforcement of regulation of new public pay telephones.

f) The issuing of permits for new and existing public pay telephones.

NYC019357

4. Physical dimensions and scale of project (fill in dimensions as appropriate):

Citywide

Total contiguous square feet owned or controlled by project sponsor:

_____N/A_____ square feet.

Project square feet to be developed: _____N/A_____ square feet.

Gross floor area of project, in square feet: _____N/A_____

If the action is an expansion, indicate percent or expansion proposed in the number of units, square feet or other appropriate measure:

_____N/A_____ % of _____N/A_____.

Dimensions (in feet) or largest proposed structure: _____N/A_____ height; _____N/A_____ width; _____N/A_____ length.

Linear feet of frontage along a public thoroughfare _____N/A_____

5. Construction:

Will the action result in demolition of or significant physical alteration to any improvement?          No

-8-

NYC019358

Will the action involve either above ground construction resulting in any ground disturbance or in-ground construction?

Above ground installation of new public pay telephones may require permits from NYC Department of Transportaion

If single phase project:  Anticipated period of construction ___N/A___ months (including demolition)

If multi-phased:
Total number of phases anticipated ___N/A___ (number)
     Describe phases and construction schedule:

Anticipated date of commencement of phase 1 ___N/A___ month ___N/A___ year (including demolition)
Approximate completion date of final phase ___N/A___ month ___N/A___ year

-9-

NYC019359

**E.  APPROVALS**

1.  Will the action be reviewed pursuant to the Uniform Land Use Review Procedure (ULURP) set forth in section 197-c of the Charter?

>  No

2.  Identify below and describe as appropriate all City approvals required for the action, regardless of whether environmental review is required for any individual approval.

LAND USE APPROVALS SOUGHT (for BSA approvals, see following section):

Zoning text amendment ____No____

Zoning map amendment ____No____

City map change _____NO__

    *Street map change:

    *Park map change:

Special permit ___No_____

    *Specify type _____N/A_____

    *Specify section of Zoning Resolution ___N/A_____

    *New or renewal? _N/A_____

    *Expiration date _N/A_____

Site selection for facility __No_____

Acquisition of real property by the City ___Ro_____

    *Public easement: __N/A____

Franchise ___Yes_____

    *Type of franchise _Non-Exclu__

    *New or renewal? ___New____

-10-

NYC019360

*Expiration date 15 years from date of award

Urban renewal area designation or alteration  No

Urban renewal plan  No

    *New or amended? N/A

Concession  No

Sanitary or waterfront landfill  No

Revocable consent  No

    *New, modified or renewal? N/A

    *Expiration date  N/A

City Planning authorization  No

Charter §197-a plan  See B-1, page 10

Disposition of City property  No

Other (specify)  N/A

BOARD OF STANDARDS AND APPEALS APPROVALS SOUGHT:

Special permit  N/A

    *Type of special permit  N/A

    *Specify section of Zoning Resolution  N/A

    *New or renewal?  N/A

    *Expiration date  N/A

Variance  N/A

    *Type of variance, if known (use or bulk)  N/A

Other (specify)  N/A

OTHER CITY APPROVALS SOUGHT:

Legislation  No

-11-

NYC019361

Rulemaking ___Yes___

  *Specify agency _____DoITT_____

Construction of public facilities ___No_____

  *Specify

Funding of construction ___No_____

  *Specify

Funding of programs ___No_____

  *Specify

Policy or plan ___No_____

Landmarks Preservation Commission approvals (exempt from CEQR) See attachment one

Department of Buildings approvals (exempt from CEQR) ___See attachment one

Other (specify) ___N/A_____


2.  Specify all state and federal approvals, actions or funding required for the action, regardless of whether environmental review is required for any individual action.  N/A

NYC019362

**F.  ACTION TYPE**

Is the action Type I action or an unlisted action?  Consult the Type I list in 6 NYCRR §617.12(b) and the City list at §6-15(a) of Executive Order No. 91 or 1977.  (See attachments 3 and 4).  Type I actions have been determined to be more likely to require preparation of an environmental impact statement than other actions.  Prior to finalizing the EAS, it may be appropriate to reconsider the answer to this question in light of other parts of the EAS or supporting materials.  Check below as appropriate:


        Unlisted <u>Yes</u>


        Type I <u>N/A</u>
             *Specify Type I category or categories <u>N/A</u>


<u>After completing or receiving Part I, the lead agency must send a copy of it,</u> <u>with any other information it deems necessary, to the Office of Environmental</u> <u>Coordination - 52 Chambers Street, Room 315, New York, New York, 10007.</u>  In addition, if an action includes discretionary actions/approvals by City agencies other than the lead agency, the lead agency should provide those involved agencies with notice of its lead agency status and send them Part I of the EAS.


-13-

NYC019363

## PART II

## SITE AND ACTION DESCRIPTION

This Part provides a detailed description of the proposed action and addresses the physical and socioeconomic context of the proposed action. Materials prepared for other purposes may be used to satisfy this Part where appropriate. Where appropriate, the action description should include the cumulative effects of related actions. This Part also requires applicants to submit analyses for all applicable categories of environmental impacts.

### A.  CATEGORIZING YOUR ACTION

(1)  LOCALIZED ACTIONS include:  a)  site specific actions which would result in a specific or known development at particular locations; and b) actions involving changes in regulatory controls that affect one or more sites in a well defined localized geographic area and are not associated with specific or known development on each of those sites.  Localized geographic area and are not associated with specific or known development on each of those sites. Localized actions may be a mix of (a) and (b).

(2)  AREAWIDE/PROGRAMMATIC ACTIONS include those actions that would apply to the entire City, or to areas that are so extensive that site-specific description and/or analysis would not be appropriate or practicable.

Check the category of action that is reflective of the actions proposed:

Category 1: (a) ___N/A___ and/or (b) ___N/A___

Category 2: ___Yes___

-14-

NYC019364

<u>For more information on categorizing your action, consult the introduction</u>
<u>to the EAS Guidebook, at pages 8-9.</u>

Subparts B, D, E and F of this Part should be completed for all localized actions.  Subpart C, entitled "Project Description," is generally completed only for site specific actions which would result in a specific or know development at particular locations.

If your action is localized and involves changes in regulatory controls that affect one or more sites not associated with a specific development, then it is generally appropriate to include in subpart E one or more reasonable development scenarios for such sites and, to the extent possible, to provide information about such scenario(s) similar to that requested in subpart C.

If your action is areawide/programmatic, then you may generally skip subparts B through E of this Part (pages 16-25 of this form), unless completion of those subparts is helpful in describing your action, and proceed directly to subpart F on page 25.  If you skip subpart B through E, be sure to attach texts and/or maps that will serve as the action description in lieu of completion of those subparts.

-15-

NYC019365

**B.  SITE DESCRIPTION**

Except where otherwise indicated, answer the following questions with regard to the directly affected area. (The directly affected area, also called the area directly affected by the action, consists of the project site and the area subject to any change in regulatory controls that the action includes.) Indicate N.A. if not applicable.

1.    MAPS:

In addition to the Sanborn or other land use map requested in Part I, provide a tax map and zoning map showing the boundaries of the directly affected area.

2.    PHYSICAL SETTING (both developed and undeveloped areas):

Total square feet of directly affected area:  ____N/A____ square feet
Current general breakdown of area:

Water surface area:  ____N/A____ square feet
Roads, building and other paved surfaces:  ____N/A____ square feet
Other:  ____N/A____ square feet

3.    PRESENT LAND USE:

Residential
Total no. of dwelling units  ____N/A____
Number of low-to-moderate income units  ____N/A____
Gross floor area  ____N/A____ sq. ft.
Number of stories  ____N/A____
Describe type of residential structures:

Commercial
Retail  ____N/A____  Number of buildings and gross floor area of each building

* Low-to-moderate income units are units with monthly carrying costs of not more than 30% of the median area monthly income.  The Department of Housing Preservation and Development may be contacted for assistance in applying this definition

-16-

NYC019366

(sq. ft.):

Office __N/A____    Number of buildings and gross floor area of each building
   (sq. ft.):

Other __N/A____    Number of buildings and gross floor area of each building
   (sq. ft.):

Specify type(s):    N/A

Number of stories and height of each building: N/A

**Manufacturing/Industrial**
Type of use(s):
                N/A

Number of buildings and gross floor area of each building (sq. ft.): N/A

Number of stories and height of each building: N/A

Open storage area ___N/A_____ sq. ft.

If any unenclosed activities, specify:  N/A

**Community facility**
Number of buildings and gross floor area of each building (sq. ft.):  N/A

-17-

NYC019367

Number of stories and height of each building:    N/A

Type of community facility:    N/A

**Vacant land**
If there any vacant land in the directly affected area:  Describe briefly.

         N/A

**Publicly accessible open space**
Is there any existing publicly accessible open space in the directly affected area?  Describe briefly.

              See attachment one

Does the directly affected area include any mapped City, State or Federal parkland or any mapped or otherwise known wetland?

              See attachment one

**Other land use**
Gross floor area  N/A        sq. ft.
Number of stories    N/A
Type of use:  N/A

4.    EXISTING PARKING:
       **Garages**
       Number of spaces accessible to public:   N/A
       Number of spaces not accessible to public:   N/A
       Attended or non-attended?   N/A
       Operating hours  N/A
       Self-park
       Non-self-park (please specify)

       **Lots**
       Number of spaces accessible to public:   N/A
       Number of spaces not accessible to public   N/A

NYC019368

Attended or non-attended?  N/A
Operating hours _____N/A_____
Self-park  N/A
Non-self-park (please specify) N/A

Other (including street parking) - please specify and provide same data as for lots and garages, as appropriate.

        N/A

5.    STORAGE TANKS:

    Gas or service stations  N/A
    Oil storage facility ____N/A____
    Other, specify:  N/A

    Size tanks:    N/A
    Last NYFD inspection date:  N/A
    Location and depth of tanks: N/A

6.    CURRENT USERS:

    Number of residents:   See attachment one
    Number and type of businesses:
      N/A

    Number and type of workers by businesses:

        N/A

    Number and type of non-residents who are not workers:

        N/A

7.    HISTORIC AND ARCHAEOLOGICAL RESOURCES:

    Answer the following two questions with regard to the directly affected area, lots abutting that area, lots along the same blockfront or directly across the street from the same blockfront, and, where the directly affected area includes a corner lot, lots which front on the same street intersection.  (See Section F of the EAS Guidebook.)

-19-

NYC019369

Do any of the areas listed above contain improvement, interior landscape feature, aggregate of landscape features, or archaeological resource that:

(a)  has been designated (or is calendared for consideration as) a New York City Landmark, Interior Landmark or Scenic Landmark;

(b)  is within a designated New York City Historic District;

(c)  has been listed on, or determined eligible for, the New York State or National Register of Historic Places;

(d)  is within a New York State or National Register Historic District; or

(e)  has been recommended by the New York State Board for listing on the New York State or National Register of Historic Places?

Identify any resource.

    See attachment one

Do any of the areas listed in the introductory paragraph to 7 on page 19 contain any historic or archaeological resource, other than those listed in response to the previous question? Identify any resource.

        N/A

8.  WATERFRONT:

    Is any part of the directly affected area within the City's Waterfront Revitalization Program boundaries? (A map of the boundaries can be obtained at the Department of City Planning bookstore.) If yes, append a map showing the directly affected area as it relates to such boundaries. A map requested in other parts of this form may be used. (See Section K of the EAS Guidebook.)

        See attachment one

C.  PROJECT DESCRIPTION

        This subpart should generally be completed only if your action includes a specific or known development at particular locations.

1.  PROPOSED USES:

    Residential
    Total no. of dwelling units _____N/A_____
    Number of low-to-moderate income units _____N/A_____
    Gross floor area _____N/A_____ sq. ft.

                    -20-

NYC019370

Number of stories  N/A
Describe type(s) of residential structures:

**Commercial**
Retail  N/A          Number of buildings and gross floor area of each building
   (sq. ft.):

Office  N/A          Number of buildings and gross floor area of each building
   (sq. ft.):

Other  N/A           Number of buildings and gross floor area of each building
   (sq. ft.):

Specify type(s):    N/A

Number of stories and height of each building:    N/A

**Manufacturing/Industrial**
Type of use(s):

        N/A

Number of buildings and gross floor area of each building (sq. ft.):

        N/A

Number of stories and height of each building:

        N/A

-21-

NYC019371

Open storage area __N/A__ sq. ft.

If any unenclosed activities, specify:

      N/A

**Community facility**
Number of buildings and gross floor area of each building (sq. ft.):

      N/A

Number of stories and height of each building:

      N/A

Type of community facility:

      N/A

**Vacant land**
Is there any vacant land in the directly affected area?  Describe briefly?

      N/A

**Publicly accessible open space**
Any existing publicly accessible open space to be removed or altered?
If yes, describe:

      N/A

Any publicly accessible open space to be added?  If yes, describe:

      N/A

**Other land use**
Gross floor area __N/A__ sq. ft.
Number of stories __N/A__
Type of use: N/A

2.  **PROPOSED PARKING:**
    **Garages:**
    Number of spaces accessible to public: __N/A__

-22-

NYC019372

Number of spaces not accessible to public:    N/A
Attended or non-attended?    N/A
Operating hours    N/A
Self-park    N/A
Non-self-park (please specify) N/A


Lots:
Number of spaces accessible to public:    N/A
Number of spaces not accessible to public:    N/A
Attended or non-attended?    N/A
Operating hours    N/A
Self-park    N/A
Non-self-park (please specify)    N/A

Other (including street parking) - please specify and provide same data as for lots and garages, as appropriate.


Number of location of proposed curb cuts:


3.    PROPOSED STORAGE TANKS:

      Gas or service stations    N/A
      Oil storage facility    N/A
      Other, specify: N/A


      Size of tanks:    N/A
      Location and depth of tanks:    N/A


4.    PROPOSED USERS:

      Number of residents:    N/A
      Number and type of businesses:


      Number and type of workers for each business:

            N/A

      Number and type of non-residents who are not workers:

            N/A

5.    HISTORIC AND ARCHAEOLOGICAL RESOURCES:

            N/A

NYC019373

Will the action affect any historic or archaeological resource identified in response to either of the two questions at number 7 on pages 19 and 20. Describe briefly.

See attachment one

6.    DISPLACEMENT:

Will the action directly displace specific business or affordable and/or low income residential units?  Describe briefly.  (See Section C of the EAS Guidebook.)

N/A

7.    CHANGES TO EXISTING COMMUNITY FACILITIES:

Will the action directly eliminate, displace or alter pubic or publicly funded community facilities such as educational facilities, libraries, hospitals and other health care facilities, libraries, hospitals and other health care facilities, day care centers, police stations, or fire stations?  (See Section D of the EAS Guidebook.)

N/A

D.    ZONING INFORMATION

What is the zoning classification(s) of the directly affected area?

N/A
What is the maximum amount of floor area that can be developed in the directly affected area under the present zoning?  Describe in terms of bulk for each use.

N/A

What is the proposed zoning of the directly affected area?

N/A

-24-

NYC019374

What is the maximum amount of floor area that could be developed in the directly affected area under the proposed zoning?  Describe in terms of bulk for each use.

   N/A


What are the predominant land uses and zoning classifications within a 1/4 mile radius of the proposed action?

   N/A


  **E.**  **ADDITIONAL INFORMATION**

   Attach any additional information as may be needed to describe the action.  If your action involves changes in regulatory controls that affect one or more sites not associated with a specific development, it is generally appropriate to include here one or more reasonable development scenarios for such sites and, to the extent possible, to provide information about such scenario(s) similar to that requested in subpart C on pages 20-24 above.

      See Attachment one
  **F.**  **ANALYSES**

   Attach analyses for each of the impact categories listed below (or indicate where an impact category is not applicable).  For localized actions, sections B through N of the EAS Guidebook set forth methodologies developed by the City to be used in analyses prepared for the listed categories.  Other methodologies developed or approved by the lead agency may also be utilized.  If a different methodology is contemplated, it may be advisable to consult with OEC.  For areawide/programmatic actions, consult section A of the guidebook.  You should also attach any other necessary analyses or information relevant to the determination whether the action may have a significant effect on the

-25-

NYC019375

environment, including, where appropriate, information on combined or cumulative impacts, as might occur, for example, where actions are interdependent or occur within a discrete geographical area or time frame.

If you believe that a positive declaration is appropriate because the action may have a significant effect on the environment, you may indicate that here and explain briefly.  In that case, the analyses otherwise required by this subpart do not have to be submitted (unless the lead agency specifically requests them).

Neighborhood character – Section B of the EAS Guidebook

Socioeconomic analysis/placement – Section C of the EAS Guidebook

Community facilities – Section D of the EAS Guidebook

Open space – Section E of the EAS Guidebook

Historic and archaeological resources – Section F of the EAS Guidebook

Transportation – Section G of the EAS Guidebook

Air quality – Section H of the EAS Guidebook

Infrastructure* and energy impacts – Section I of the EAS Guidebook

Natural resources – Section J of the EAS Guidebook

Noise – Section M of the EAS Guidebook

Solid waste – Section N of the EAS Guidebook

---

* For purposes of this form, infrastructure refers only to the means by which wastewater is discharged and drinking water supplied.

NYC019376

## G.  APPLICANT CERTIFICATION

Preparer's name:  Larry L. Allison
Preparer's signature:
Date:  May, 1996


Principal: Department of Information Technology and Telecommunications
Name of principal representative:  Martin Cintron
Title of principal representative: Asst. Commissioner, Telecommunications Services
Signature of principal representative:
Date:  May, 1996


NOTE:  Any person who knowingly makes a false statement or who knowingly
falsifies any statement on this form or allows any such statement to be falsified
shall be guilty of an offense punishable by fine or imprisonment or both,
pursuant to section 10-154 of the New York City Administrative Code, and may be
liable under other applicable laws.

–27–

NYC019377

## PART III
## ENVIRONMENTAL ASSESSMENT AND DETERMINATION

The lead agency should complete this Part after Parts I and II have been completed. In completing this Part, the lead agency should consult 6 NYCRR §617.11 (attached) which contains the State Department of Environmental Conservation's criteria for determining significance.

The lead agency should ensure the creation of a record sufficient to support the determinations in this Part. The record may be based upon analyses submitted by the applicant with Part II of the EAS. The EAS Guidebook sets forth methodologies developed by the City to be used in analyses prepared for the listed categories. Alternative or additional methodologies may be utilized by the lead agency.

1.    For each of the impact categories below, consider whether the action may have a significant effect on the environment with respect to that impact category. If it may, answer yes.

Neighborhood character    No

Socioeconomic impacts/displacement    No

Community facilities    No

Open space    No

Historic and archaeological resources    No

Transportation    No

Air quality    No

Infrastructure and energy    No

Natural resources    No

-28-

NYC019378

3.    If the lead agency has determined in its answers to questions 1 and 2 of this Part that the action will have no significant effect on the environment, a negative declaration is appropriate.  The lead agency may, in its discretion, further elaborate here upon the reasons for issuance of a negative declaration.

4.    If the lead agency has determined in its answers to questions 1 and 2 of this part that the action may have a significant effect on the environment, a conditional negative declaration (CND) may be appropriate if there is a private applicant for the action and the action is not Type I. A CND is only appropriate where the mitigation measures identified will modify the proposed action so that no significant adverse environmental impacts will result.   If a CND is appropriate, the lead agency should describe here the conditions to the action that will be undertaken and how they will mitigate potential significant impacts.

NYC019379

5.   If the lead agency has determined that the action may have a significant effect on the environment, and if a conditional negative declaration is not appropriate, then the lead agency should issue a positive declaration.  Where appropriate, the lead agency may, in its discretion, further elaborate here upon the reasons for issuance of a positive declaration.  In particular, if supporting materials do not make clear the basis for a positive declaration, the lead agency should describe briefly the impacts it has identified that may have a significant effect on the environment.

LEAD AGENCY CERTIFICATION

Preparer's name:  Larry Allison

Preparer's signature:

Date:   5/17/96

Name of lead agency representative:  Martin Cintron

Title of lead agency representative:  Asst. Commissioner, Telecommunications

Signature of lead agency representative:

Date:  5/17/96

-30-

NYC019380

ATTACHMENT 1

ENVIRONMENTAL ASSESSMENT STATEMENT

FRANCHISING AND REGULATING PRIVATE PAY TELEPHONES ON, UNDER
AND OVER THE INALIENABLE PROPERTY OF THE CITY OF NEW YORK

**Description of the Proposed Action**

The New York City Department of Information, Technology, and Telecommunications (DoITT) has been authorized by Resolution No. 439-A and Local Law No. 68 of 1995 to regulate the installation, operation, and maintenance of all public pay telephones found on, over, and under the inalienable property (i.e., exterior sidewalk locations) of the City. The regulatory authority would result in the following:

- The promulgation of rules based on Local Law #68 of 1995 (see Attachment 2)

- The issuance of an RFP for nonexclusive franchises for public pay telephones pursuant to authorizing Resolution 439-A.

- The creation of a data base identifying and locating existing public pay telephones

- The issuance of franchises to owners and permits for approved public pay telephones by DoITT

- Enforcement of regulations for new public pay telephones

- The issuing of permits for new and existing public pay telephones

NYC019381

In August 1995, the City Council passed Resolution 439-A which authorized DoITT, pursuant to Section 363 of the City Charter, to grant franchises for the installation of public pay telephones and associated equipment on, over, and under the inalienable property of the City. This was followed by the signing of Local Law 68 of 1995 by the Mayor on September 1, 1995. Local Law 68--1995 amended the Charter and the Administrative Code of the City in relation to the issuance of permits for the installation, operation, and maintenance of public pay telephones upon the streets and other inalienable property of the City and in relation to protecting such public pay telephones against graffiti and other illegal postings. Local Law 68--1995 also required that rules be promulgated regarding the interim registry that each potential franchise must submit; the permitting process before and subsequent to the awarding of a franchise; and the location and distance requirements applicable to either existing or new public pay telephone installations.

The first step in regulating this industry would be the requirement for all existing Customer-Owned Coin Operated Telephone (COCOT) owners to file detailed locational and identifying information for each public pay telephone they currently have in operation. This information (the interim registry) would be correlated against a baseline data base DoITT is compiling via a service contract, to identify and map every COCOT in the City. All COCOTs which are included in the inventory data base and not registered may then be removed by DoITT. This geo-data base would become the foundation for all future regulatory and enforcement efforts.

2

NYC019382

During the interim period between the submission of the registries and the award or denial of franchises, existing or new owners may apply for interim permits to install and operate public pay telephones on City streets. Subsequent to the award of a franchise, existing public pay telephones and new public pay telephones would also have to be permitted before such phones can be considered legal. These permits would have terms and conditions which must be adhered to by the owner. Violations of these terms and conditions or of the statute or the rules governing permits or other aspects of the statute may be forwarded to the Environmental Control Board, civil court, or in some instances, criminal court for adjudication. Permit applications may be reviewed by community planning boards and city council members.

Location and distance requirements approximate to those which would be promulgated under streetscape are critical to the regulation of this industry. Location and distance elements which affect public safety, public health, and landmark preservation would apply to all public pay telephones existing or new. Other distance, size, and configuration requirements would apply only to new installations after March 12, 1996. A copy of subchapters 1 through 4 of these rules is provided in Attachment 2.

After the end of the interim registry submission period (March 15 - March 31, 1996), an RFP for non-exclusive franchises regarding the installation, operation, and maintenance of public pay telephones on, over, and under the inalienable property of the City would be developed. The RFP would stipulate specific information required in order to make an initial

3

NYC019383

judgement as to whether or not to recommend a franchise to the Franchise and Concession Review Committee (FCRC). The elements which would be taken under consideration would include:

- experience of the owner in operating public pay telephones
- financial capabilities
- plan for maintenance and repair
- plan for cleaning and graffiti removal
- plan for complaint handling
- plan for inspection
- advertising plan (location, size of panels, and subject)
- commission agreement with NYC
- relationship to business improvement districts and special assessment districts
- relationship to City Landmark, historic districts, and historic pavements
- willingness to locate public pay telephones in underserved communities and areas where they may be necessary for emergencies (i.e., bridges, tunnels, highways, parks, etc.)

Advertising on public pay telephone side panels (27" x 57") would not be permitted in areas zoned to permit dwelling units and not for commercial uses and within historic districts not located in areas zoned for commercial use, unless approval for the placing of advertising has been given by DoITT in consultation with the Landmarks Preservation Commission

4

NYC019384

(LPC).  In addition, in the Borough of Manhattan, commercial advertising would not be allowed on avenue blocks on which a bus stop shelter has been located and in all other areas at locations which are within one-hundred-fifty (150) feet of a bus stop shelter except that advertising would be permitted around the corner or across the street from such shelter.  In the boroughs of Brooklyn, Queens, the Bronx, and Staten Island, no advertising, except public service messages, may be placed in locations within one-hundred (100) feet from a bus stop shelter.  When such advertising has been placed on a public pay telephone and as a result of the installation of a bus stop shelter, such public pay telephone becomes located in a restricted location, the owner would have to remove the existing advertising.

The advertising of tobacco and tobacco products as well as possibly other items would be prohibited.  Each franchisee placing commercial advertising would also have to reserve two display panels for each community board at locations mutually agreed upon by the community board and the franchisee for the purpose of public service or community announcements.

**Effects of the Proposed Action**

The proposed rules and regulations that would be imposed upon this industry in tandem with the new rules on COCOTs about to be issued by the NYS Public Service Commission, would for the first time regulate the unlicensed COCOTs in the City.  DoITT estimates that of the more than 35,000 COCOTs currently installed and operation on, over,

5

NYC019385

and under the inalienable property of the City, approximately 9,500 of these are owned by NYNEX and licensed by the City DOT. The rest are unlicensed and totally unregulated at present by the City of the NYS Public Service Commission.

In 1987, subsequent to divestiture of AT&T, a new entrepreneurial market place opened up for public pay telephones in the City and elsewhere. Independent owners and operators began installing COCOTs on the streets of the City. These telephones, which often resemble NYNEX phones, often charged rates and tariffs which were in excess of the what permitted pay telephones charged. In addition, COCOTs routinely did not identify the name and address of the owner of the COCOT or list a complaint number where complaints could be registered as well as other service omissions. Many COCOTs were and are poorly maintained, unsafe, unclean, and covered with graffiti.

Prior to 1989, the New York City Energy and Telecommunications Office (ENERTEL) funded a study of payphones in the City. Subsequent to that study, the predecessor to DoITT (DTE) performed several inspections of the COCOTs in the City inventory established via ENERTEL. Since 1992, 7,711 COCOTs (or approximately 30 percent of all estimated COCOTs in the City today) were inspected. In Manhattan, 2,214 COCOTs were inspected and 1,819 or 82.2 percent were found to be in violation of either New York State Public Service Commission (NYSPSC) or FCC rules and regulations. In the Bronx, 2,210 COCOTs were inspected and 1,095 or 49.5 percent were in violation of existing rules and regulations. In Brooklyn, where as of 1992, approximately half of all known COCOTs in the borough or

6

NYC019386

3,287 phones were inspected, 1,736 or 52.8 percent were found to be in violation. In addition, there exists a clear necessity for reliable and accessible public pay telephones on the streets of the City. A study done in November 1993 by DTE estimated that more than 200,000 City residents did not have telephone service in their homes.

The proposed action would for the first time address the issues of public health and safety, street congestion, unsightly and illegal advertising, graffiti, and public nuisance issues surrounding COCOTs. The proposed regulations would improve neighborhood character and would become a reliable "lifeline" for safety in sections of the City with low private and public telephone penetration. Further franchising and regulation would prevent violation of the Landmarks Preservation law and would protect the consumer from defective or unsafe equipment as well as unfair or illegal practices. The franchise agreements to be negotiate and awarded would bring new revenues to the City and would be a growing and reliable source of income.

**Summary of Analysis**

The analysis that follows indicates the proposed action is not likely to have any significant adverse impact on the environment. The fundamental nature of the action is to imposition of regulatory controls on the more than 25,000 COCOTs that are presently unregulated in the City. Since the proposed action could be undertaken in sections of the City that are located within historic districts or within the boundaries of the City's Waterfront

7

NYC019387

Revitalization Program, an assessment of the full-range of environmental issues have been considered as they relate to this action.

The purpose of Resolution No. 439-A and Local Law No. 68 of 1995 is to authorize DoITT to regulate the installation, operation, and maintenance of all public pay telephones found on, over, and under the inalienable property (i.e., exterior sidewalk locations) of the City. As discussed above, this would result in the legalization of all COCOTs throughout the City thereby resulting in better service to City residents, improvements to neighborhood character, public health and safety, street congestion, public nuisance issues, and increased revenue.

The illegal COCOTs currently in use throughout the City are poorly maintained, unsafe, unclean, and are covered with graffiti. The proposed action's new regulations would result in cleaner and better maintained pay telephones since the names and addresses of the owners (permitees) would now be known and any fines or complaints could be sent to them. The permittee would be responsible for all repairs, including the removal of graffiti. The revocation of permits and the removal of pay telephones would follow if the permittee does not adhere to the regulations. Owners would be more inclined to follow the new regulations since they could be fined or have their telephones removed from the street.

Pedestrian access would be improved since the new regulations of the proposed action would reduce street congestion by requiring that new public pay phones shall not be installed

8

NYC019388

within 15 feet of a subway entrance, 10 feet of a corner, 15 feet of a sidewalk cage, 15 feet of a bus stop shelter zone, and 15 feet of a newsstand. Several other distances in which a pay telephone could locate adjacent to fire hydrants, standpipes, mailboxes, parking meters, etc. are listed in Subchapter 4 of the new Chapter 6 of Title 67 of the Official Compilation of Rules of the City of New York (Attachment 2).

Since it has been estimated that more than 200,000 City residents do not have telephones, it is important that pay telephones are properly maintained in the event of an emergency. The proposed action's new regulations would require owners to fix broken phones expeditiously or risk fines and the removal of the phone. Therefore, the new regulations would benefit the health and safety of the public.

The new regulations of the proposed action would be a benefit to historic landmarks and historic districts. The proposed regulations state that no pay telephone shall be attached to a building or other improvement in an historic district or to any part of an individual landmark. No pay telephone shall be installed within the lot line or within three feet of an individual landmark of a building or other improvement in an historic district.

As a result, it is on this basis that it may be concluded that this action would not have any foreseeable significant adverse impact on the environment.

9

NYC019389

## Land Use/Zoning/Neighborhood Character

The proposed action would not result in any land use, zoning, or neighborhood character impacts. As previously discussed, the neighborhood character would be improved by the proposed action since the new regulations impose limits on advertising and require permitees to remove graffiti and make prompt repairs.

## Historic Resources

The proposed action would not result in any adverse impacts to historic resources or historic districts. The new regulations would actually improve conditions in historic districts since the proposed regulations would require that no pay telephones would be allowed to be attached to a building or other improvement in an historic district or to any part of an individual landmark. Also, as previously stated, no public pay telephone shall be installed within the lot line or within three feet of an individual landmark or a building or other improvement in an historic district.

## Transportation

The proposed action would not result in any transportation impacts. The new regulations required for pay telephone distances from subway entrances, corners, sidewalk cages, bus stop shelter zones, and newstands would actually improve pedestrian movement on City sidewalks

10

NYC019390

by allowing for more sidewalk space.

## Coastal Zone Management

The City's coastal zones are subject to the Local Waterfront Revitalization Program (LWRP).

The program consists of 44 State-wide policies for protection and improvement of the

waterfront and 12 policies specifically applicable to the City of New York. These policies

establish a framework for managing waterfront resources in the public interest. The proposed

action was reviewed with respect to its consistency with the LWRP by applying and

considering the associated checklist included in the *CEQR Technical Manual*. Since the

proposed action would not result in the construction of any structures, new developments or

changes in land use, it would have no effect on State policies 1 through 44 and City policies

A through L. Therefore, the proposed action would not result in any coastal zone impacts.

## Other Impact Issues

The proposed action would not result in any significant impacts to any other environmental

issues such as air quality, hazardous materials, natural resources, etc.

11

NYC019391

# Exhibit GG

No. 652

# THE CITY OF NEW YORK

## and the

# NEW YORK TELEPHONE COMPANY

Granting said Company a franchise to place advertising on its telephone booths located on City sidewalks in the Boroughs of Manhattan, Brooklyn, The Bronx, Queens and Staten Island.

## CONTRACT

Dated March 3, 1988

## and

Resolution authorizing the execution of same.

NYC019319

Approved Resolution No. 1

## BOARD OF ESTIMATE
### City of New York

———————————

WHEREAS, By resolution adopted April 30, 1987 (Cal. No. 130), the Board of Estimate entered on it minutes an authorizing resolution and accompanying proposed contract and did set June 16, 1987 as the date for a public hearing on this resolution and accompanying proposed contract; and

WHEREAS, Said hearing was continued to June 30, 1987 and July 16, 1987, and was closed on the latter date; now, therefore, be it

RESOLVED, That the Board of Estimate of The City of New York hereby grants to the New York Telephone Company the franchise and right to place advertising on its telephone booths located on City sidewalks in the Boroughs of Manhattan, Brooklyn, The Bronx, Queens and Staten Island, upon and subject to all the terms and conditions contained in the accompanying proposed form of contract, and that this resolution shall be duly certified and presented to the Mayor for his approval, and, upon such approval, the Mayor of The City of New York be and he hereby is authorized to execute and deliver the accompanying contract in the name and on behalf of The City of New York, and that this resolution shall be null and void if the New York Telephone Company shall fail on its behalf to properly execute said contract in duplicate and deliver the same to this Board within forty-

NYC019320

2

five (45) days after the approval of this resolution by the Mayor or within such further time as the Board may grant by resolution.

————————

(Here follows contract as on following pages)

————————

A true copy of resolution adopted by the Board of Estimate July 16, 1987.

THEODORE H. MEEKINS,
Secretary.

————————

The foregoing resolution is hereby approved.

EDWARD I. KOCH,
Mayor.

By: STANLEY BREZENOFF,
Deputy Mayor.

Dated: New York, N.Y., August 7, 1987.

NYC019321

THIS CONTRACT, made and executed in duplicate this 3rd day of March, 1988 by and between The City of New York (hereinafter referred to as the "City"), by the Mayor of the City (hereinafter referred to as the "Mayor"), acting for and in the name of the City, under and in pursuance of the authority of the Board of Estimate of the City (hereinafter referred to as the "Board"), party of the first part; and the New York Telephone Company (hereinafter referred to as the "Company"), party of the second part.

### WITNESSETH:

WHEREAS, The Company, by a petition dated January 22, 1985, applied to the Board for the grant of a franchise to place advertising on telephone booths located on City sidewalks in the Boroughs of Manhattan, Brooklyn, The Bronx, Queens and Staten Island, as more particularly described in said petition; and

WHEREAS, Said Board adopted a resolution on January 9, 1986 (Cal. No. 69) setting February 6, 1986 as the date for a public hearing on said petition, and said petition and notice of public hearing thereon were duly published; and

WHEREAS, Said public hearing was continued to February 20, 1986 and was duly held and closed on said date; and

WHEREAS, Said Board has made inquiry as to the money value of the proposed franchise and the adequacy of the compensation proposed to be paid therefor; and

WHEREAS, Said Board did embody the results of such inquiry in this contract and caused this contract to be spread upon the minutes of the Board on April 30, 1987, together with the proposed resolution

[3]

NYC019322

4

authorizing the same, and did set the 16th day of June, 1987 for a public hearing thereon, at which citizens are entitled to appear and be heard; and

WHEREAS, Prior to said hearing, notice thereof and the proposed contract and proposed resolution anthorizing this contract were published in full for at least fifteen (15) days immediately prior thereto in The City Record and notice of such hearing, together with the place where copies of the proposed contract and proposed resolution authorizing such contract might be obtained by all those interested therein, was published at least twice, at the expense of the Company, in the two newspapers in which the petition and notice of hearing thereon were published, and said hearing was duly held and closed on said date;

Now, THEREFORE, In consideration of the premises and covenants and agreements herein contained, the parties hereto do hereby mutually covenant and agree as follows:

## ARTICLE I

### GRANT

SECTION 1.1. The City hereby grants the Company, subject to the terms and conditions of this contract, the franchise, right and consent to place advertising on its telephone booths located on City sidewalks in the Boroughs of Manhattan, The Bronx, Brooklyn, Queens and Staten Island.

SECTION 1.2 The Company shall not place advertising on telephone booths located

(a) within districts zoned for residential use

(b) within historic districts not located in areas zoned for commercial use, unless approval for the placing of advertising has been given by the Bureau of Franchises in consultation with the Landmarks Preservation Commission.

NYC019323

5

(c) in the following restricted locations:

   (A) in the Borough of Manhattan—

      (i) on the same side of an Avenue block on which a bus stop shelter is located

      (ii) in all other areas, at locations which are within one hundred fifty (150) feet of a bus stop shelter.

   (B) in the Boroughs of Brooklyn, The Bronx, Queens and Staten Island—at locations which are within one hundred fifty (150) feet of a bus stop shelter.

SECTION 1.3. In the event advertising has been placed on a telephone booth, and as a result of the installation of a bus stop shelter such telephone booth becomes located in a restricted location, as set forth in Section 1.2., subdivision (c), the Company shall remove the advertising from such telephone booth within thirty (30) days' written notice from the City.

SECTION 1.4 Within one year from the date on which the Board approves this contract, the Company shall prepare and submit for the approval of the Board, after considering recommendations of the Bureau of Franchises, the City Planning Commission and the appropriate Borough President, a program for the installation of additional public telephone booths in the City with particular emphasis on economically deprived areas, and shall implement such program, consistent with applicable law, rules and regulations, within one year from the date of its approval. For the purpose of this section, economically deprived areas shall be defined as Community Development eligible census tracts.

## ARTICLE II

### TERM OF THE GRANT

SECTION 2.1. This contract, and the franchise granted hereunder, shall commence on the date of the execution thereof by the Mayor and shall continue for a period of five (5) years, unless sooner terminated

NYC019324

6

as herein provided. This franchise may be renewed for an additional term of five (5) years subject to the approval of the Board. In the event of such renewal, the Board shall have the right to increase the compensation payable to the City.

SECTION 2.2  This franchise is not a grant or acknowledgement of any right or authority of the Company to install or maintain telephone booths on City sidewalks, and is subject to any limitation or revocation of such right.

In the event the Company's right to install and maintain telephone booths ceases with respect to any area or areas of the City, this franchise shall simultaneously terminate with respect to such area or areas.

## ARTICLE III

### COMPENSATION

SECTION 3.1.  The Company or its agent or designee shall pay to the City as compensation for the franchise, right and consent hereby granted twenty-two and two-tenths percent (22.2%) of its gross advertising revenues, as defined in Section 3.2.

SECTION 3.2.  Gross advertising revenues shall be the gross revenues derived by the Company, or any subsidiary, affiliate, agent, assignee, contractor, licensee, transferee or lessee of the Company from the display of advertising material on telephone booths, whether actually received by the Company, an account receivable or otherwise. The gross revenues shall be calculated on the basis of the total amounts contracted for by the advertisers for the display of advertising materials on the telephone booths, whether paid directly to the Company, to a subsidiary or affiliate of the Company, or to a third party. Agency fees or any other fees, whether actually paid by the Company or whether deducted from the amount of revenue received by the Company, shall not be deducted from gross advertising revenues. The gross revenues shall include any amount, the equivalent of which the Company, a subsidiary or affiliate of the Company, or a third party may have received from the advertiser in the form of

NYC019325