7

materials, services or other benefits, tangible or intangible. All agreements made by the Company or its agent or designee in connection with the display of advertising material on telephone booths shall provide that the Comptroller of The City of New York and/or the City, subject to signing a non-disclosure agreement, shall have access to the books of account and records of all parties to such agreements for the purpose of ascertaining the correctness of gross advertising revenues.

SECTION 3.3. Compensation shall be paid to the Department of Finance of the City quarterly, within thirty (30) days after the expiration of each quarter, except in the case of the last payment when the compensation shall be paid within thirty (30) days after the termination, cancellation or expiration of this consent. Each payment shall be based on the gross receipts for the quarter immediately preceding the date of payment.

In the event any payment is not made on or before the date such payment is due, interest on such payment shall apply from the date such payment is due at the rate of twenty percent (20%) per year.

SECTION 3.4. Payments of compensation made by the Company or its agent or designee to the City pursuant to the provisions of this franchise shall not be considered in any manner to be in the nature of a tax, but shall be in addition to all taxes of whatsoever kind or description which are now or which may hereafter be required to be paid by any ordinance or local law of the City, or any law of the State of New York or any law of the federal government of the United States.

SECTION 3.5. In the event the Company continues advertising displays on telephone booths after and despite the termination, cancellation or expiration of this franchise, the Company agrees to pay to the City the compensation at the rate and in the manner set forth herein, together with all taxes the Company would have been required to pay had its continuation been duly authorized and to comply with all other obligations under this franchise, provided that such payments and compliance shall not constitute an extension of this franchise.

NYC019326

8

# ARTICLE IV

### MAINTENANCE OF ADVERTISING DISPLAYS

SECTION 4.1. The Company shall maintain the advertising panels and displays on the telephone booths in a clean and attractive condition and shall be responsible for the cost of electricity consumed. As further consideration for the grant of this franchise, the Company shall also be responsible for the cost of electricity consumed on its telephone booths on which no advertising is displayed.

SECTION 4.2 The Company shall provide each community board in the City with two (2) display panels at locations to be mutually agreed upon by the community board and the Company, for public service or community announcements. The installation, maintenance and removal of such announcements shall be the sole responsibility of the Company and shall be performed in accordance with the same standards and utilize the same materials and methods as are used by the Company for commercial displays.

SECTION 4.3 The frame of each advertising panel shall be no larger than 27 inches by 57 inches. The Company may request a waiver of this requirement by written request, accompanied by appropriate documentation supporting the need to increase the size of the panel, to the Director of the Bureau of Franchises and the President of the Borough in which the booth(s) for which waiver(s) is (are) requested is (are) located. the written consent of both the Director of the Bureau of Franchises and such Borough president shall be required for each such waiver.

SECTION 4.4 The Company shall, within the first year of the contract modify or redesign its telephone booths and, if feasible, the display panels affixed thereto with a view toward providing the caller with optimum visibility to the outside of the booth. New and replacement booths erected by the Company shall incorporate the new design.

SECTION 4.5 All agreements made by the Company in connection with the display of advertising material on telephone booths shall

NYC019327

9

provide that such agreements shall terminate upon the termination of this franchise.

SECTION 4.6 The Company shall comply with all applicable laws, rules and regulations now in force, or which may hereafter be adopted.

## ARTICLE V

### BOOKS, RECORDS AND REPORTS

SECTION 5.1. The Company or its agent or designee shall, at all times, keep complete and accurate books of account and records of the operations under and in connection with this contract and the exercise of the franchise hereby granted. Such books of account and records shall be kept in accordance with generally accepted accounting practices and principles.

SECTION 5.2. Within forty-five (45) days after the expiration of each calendar quarter during the term of this contract and within forty-five (45) days after the termination of this contract and at such other times as the City shall designate, the Company shall furnish and deliver to the City reports of its operations hereunder in such form and in such detail as the City may prescribe. The City or its representatives, subject to signing a non-disclosure agreement, shall have access to, and the right to audit, such books of account and records of the Company for the purpose of ascertaining the correctness of any and all such reports, and may examine the officers and employees of the Company under oath with respect thereto. Access to and the right to audit such books of account and records of the Company by the City shall survive the expiration or termination of this contract.

SECTION 5.3. In addition to the reports to be submitted by the Company pursuant to the preceding paragraph, the Company shall, within fifteen (15) days after the expiration of each calendar quarter, submit to the City a report setting forth, as of the end of said calendar quarter, by Borough, (i) the total number of telephone booths with

NYC019328

10

advertising panels and (ii) the total number of telephone booths on which advertising was displayed.

Section 5.4. All reports furnished by the Company or its agent or designee in accordance with this Section shall be certified by an officer of the Company to be correct and in accordance with the books of account and records of the Company or its agent or designee. Any false entry in the books of account of the Company or false statement in the reports submitted to the City as to a material fact, knowingly made by the Company, shall constitute a default hereunder.

Section 5.5. At all times during the term of this contract, and for six (6) years thereafter, the Company or its agent or designee shall maintain and keep such books and records as are required by this contract. Said books and records shall be available for inspection and audit by the City at such times as the City in its discretion may deem proper.

## ARTICLE VI

### Liability for Damages

Section 6.1. The Company shall be liable for, and shall indemnify and hold the City, its officers, agents, servants or employees harmless from any and all damages to persons and property arising out of or related to this contract, whether or not such damages are due to the negligence or otherwise of the City, its officers, agents, servants or employees; and it is a condition of this contract that the City assumes no liability for damages to either persons or property on account of the same.

Section 6.2. The Company shall, within twenty (20) days after the commencement date of this contract, file and maintain on file with the Comptroller of the City throughout the term of this contract, a liability insurance policy, issued by a company duly authorized to do business in this State, insuring the Company and the City for any injury or damage caused by the display of advertising on telephone booths, in the minimum amounts of (i) Two Million Dollars ($2,000,-

NYC019329

11

000) for bodily injury, including death, and (ii) One Hundred Thousand Dollars ($100,000) for property damage.

The insurance policy shall contain a provision stating that it cannot be cancelled, terminated or modified by the insurance company unless sixty (60) days' prior written notice thereof is sent by registered or certified mail to the Company and the City. The policy shall not be cancelled, terminated or modified by the Company without the prior written consent of the City and shall contain an endorsement to that effect.

SECTION 6.3. In the event this contract is cancelled for cause, prior to the expiration date hereof, the Company agrees to maintain the liability coverage described in Section 6.2. in effect until the advertising display panels are removed from the telephone booths.

SECTION 6.4. The Company agrees to reimburse the City for any and all judgments, claims, attorneys' fees, and court costs that the City incurs as a result of defending any claim or action arising out of this contract.

## ARTICLE VII

### SECURITY

SECTION 7.1. The Company shall, within twenty (20) days after the commencement date of this contract, deposit with the Comptroller of the City the sum of Fifty Thousand Dollars ($50,000) in money or securities to be approved by said Comptroller, which fund shall be security for the faithful performance of the terms and conditions of this contract.

SECTION 7.2. If the Company shall fail to pay the City any compensation herein required within the time herein fixed, or shall fail, after ten (10) days' written notice by the Comptroller, to repay to the City any damage or expense which the City shall be compelled to pay by reason of any act or default of the Company, the Comptroller may immediately and without further notice withdraw the amount of

NYC019330

12

such compensation or payments from the security fund. In case any withdrawal is so made from the security fund, the Company shall upon fifteen (15) days' notice in writing pay to the Comptroller a sum of money sufficient to restore the said fund to the original amount of Fifty Thousand Dollars ($50,000).

SECTION 7.3. The rights reserved to the City with respect to the security fund are in addition to all other rights reserved by the City pursuant to this contract or by law, and no action, proceeding or right with respect to such security fund shall affect any other legal rights, remedies or causes of action belonging to the City.

SECTION 7.4. The Company shall be entitled to the return of the money or securities on deposit, which remain on deposit with the Comptroller at the expiration of the term of this contract, provided that there is then no outstanding default or obligation on the part of the Company.

## ARTICLE VIII

### EMPLOYMENT REGULATIONS

SECTION 8.1. The Company agrees to recognize the right of its employees to bargain collectively through representatives of their own choosing, and at all times to recognize and deal with the representatives duly designated or selected by the majority of its employees, for the purpose of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment, and not to dominate, interfere with or participate in the management or control of or give financial support to any union or association of its employees.

SECTION 8.2. The Company agrees that it will not refuse to hire or employ nor bar or discharge from employment nor discriminate against any person in compensation or in terms, conditions or privileges of employment because of age, race, creed, color, national origin, disability, marital status, sex, sexual orientation or affectional preference.

NYC019331

13

SECTION 8.3. The Company agrees that it will comply with the provisions of the Mayor's Executive Order No. 50, as now in effect or as may be amended or modified during the term of this contract.

## ARTICLE IX

### RESTRICTIONS AGAINST ASSIGNMENT, TRANSFER, ETC.

SECTION 9.1. This franchise shall not be assigned, or transferred either in whole or in part or leased, sublet or mortgaged in any manner, nor shall title thereto, either legal or equitable or any right, interest or property therein, pass to or vest in any other person or corporation whatsoever, either by the act of the Company or by operation of law whether under the provisions of statutes relating to consolidation or merger of corporations or otherwise, without the consent of the City acting by the Board, evidenced by an instrument in writing, anything herein contained to the contrary notwithstanding. The granting, giving or waiving of any one or more of such consents shall not render unnecessary any subsequent consent or consents.

The provisions of this Section shall, however, be inapplicable to an assignment, transfer, lease, sublease or mortgage of this franchise to NYNEX Corp., provided that NYNEX Corp. files an agreement, in a form to be approved by the Corporation Counsel of the City, wherein NYNEX Corp. agrees to assume and be bound by all the conditions, provisions, requirements and limitations of this contract.

SECTION 9.2. No assignment, transfer, lease, sublease, or mortgage of this franchise, or any part thereof, shall be valid or effectual for any purpose unless such assignment, transfer, lease, sublease or mortgage shall specifically provide and shall contain a covenant on the part of the assignee, transferee, lessee, sublessee or mortgagee that such assignment, transfer, lease, sublease, or mortgage is subject to all of the conditions, provisions, requirements and limitations of this contract, and that any such assignee, transferee, lessee, sublessee or mortgagee assumes and will be bound by all of the said conditions, provisions, requirements and limitations, notwithstanding anything in any statute or in the charter of such assignee, transferee, lessee,

NYC019332

14

sublessee or mortgagee to the contrary, and that such assignee, transferee, lessee, sublessee or mortgagee shall specifically waive any more favorable conditions, provisions, requirements and limitations created by any such statute or charter and shall covenant that it will not claim by reason thereof or otherwise, exemption from liability to comply with each and all of the conditions, provisions, requirements and limitations of this contract.

SECTION 9.3. The Company, its directors, officers and agents expressly covenant and agree that in the event any change in the control of the Company is about to be effected in any manner, including but not limited to, a change in such control by or through the sale, transfer, pledge or other disposition of stock, bonds or other securities of the Company or of any other corporation, or entity owning or controlling the Company, they shall forthwith notify and file with the Board or its representative all necessary information and other data affecting such change. The failure of the Company or its directors, officers, and agents to comply with the provisions of this paragraph shall be deemed a default under the provisions of this contract.

Unless the Board shall set a date for a public hearing on such change within sixty (60) days after receipt of said notice of change, the said change may be effected. Prior to the holding of such public hearing, the Board or its representative shall make an inquiry and investigation as to the experience, capability, qualifications and financial ability, character and reputation of the parties effecting the foregoing changes so as to insure the proper performance of all the terms and conditions of this franchise contract. The Company shall cooperate with the Board or its representative in facilitating the Board's inquiry or investigation.

If the Board holds such hearing and upon such hearing determines in its sole discretion that the said proposed change is not consistent with the public interest, the Board may terminate this contract upon thirty (30) days' notice to the Company and in the event the Board serves such notice of termination upon the Company, the consent of the City to the exercise of the franchise contract and all rights and privileges of the Company thereunder shall cease and determine thirty (30) days after the service of such notice. However, the Board

NYC019333

15

may rescind such notice of termination of the franchise contract if the Board receives notification from the Company prior to the aforesaid thirty (30) days that the proposed change has been annulled or rescinded provided the Board determines that the proposed change has in fact been annulled or rescinded.

## ARTICLE X

### RECEIVERSHIP

SECTION 10.1. The franchise herein granted to the Company shall, at the option of the Board, cease and determine one hundred and twenty (120) days after the appointment of a receiver or receivers or trustee or trustees to take over and conduct the business of the Company, whether in a receivership, reorganization, bankruptcy or other action or proceeding unless such receivership or trusteeship shall have been vacated prior to the expiration of said one hundred and twenty (120) days or unless

(1) such receivers or trustees shall have within one hundred and twenty (120) days, after their election or appointment, fully complied with all the terms and provisions of the franchise herein granted, and the receivers or trustees within said one hundred and twenty (120) days shall have remedied all defaults under this contract, and

(2) such receivers or trustees shall within said one hundred and twenty (120) days, execute an agreement duly approved by the Court having jurisdiction in the premises, whereby such receivers or trustees assume and agree to be bound by each and every term, provision and limitation of the franchise herein granted.

SECTION 10.2. In the case of a foreclosure or other judicial sale of the plant, property and equipment of the Company including or excluding this contract, the Board may serve notice of termination upon the Company and the successful bidder at such sale, in which event the consent of the City to the exercise of the franchise herein

NYC019334

16

granted and all rights and privileges of the Company hereunder shall cease and determine thirty (30) days after service of such notice, unless (a) the Board shall have consented to the transfer of the franchise, as and in the manner in this contract provided and (b) unless such successful bidder shall have covenanted and agreed with the City to assume and be bound by all the terms and conditions of this contract.

## ARTICLE XI

### TERMINATION AND CANCELLATION

SECTION 11.1. In the event the Company shall fail to comply with any provision herein contained, such non-compliance shall be deemed a default hereunder and the Board, in addition to any other rights reserved to itself under this contract or by law, and not in substitution thereof, shall have the right to terminate and cancel this contract. Such termination and cancellation shall be by resolution of the Board, duly adopted after not less than ten (10) days' written notice to the Company. In the event such termination or cancellation depends upon a finding of fact, such finding of fact by the Board shall be conclusive.

SECTION 11.2. The Company shall not be deemed nor declared to be in default under any of the conditions, provisions, requirements or limitations of this contract in any case in which the performance of any such condition, provision, requirement or limitation is prevented by reason of strikes, injunctions or other causes beyond the control of the Company provided that the Company shall not have instigated such strike, or shall not have been responsible for suits or injunctions or other causes of delay.

## ARTICLE XII

### SUNDRY PROVISIONS

SECTION 12.1. If at any time the powers of the City, the Board, or any other board, body, authority, official or officer herein mentioned or intended to be mentioned shall be transferred by law to any other

NYC019335

17

board, body, authority, official or officer, then and in such cases such other board, body, authority, official or officer shall have all the powers, rights and duties reserved to or prescribed for the City, the Board, or other board, body, authority, official or officer herein mentioned or intended to be mentioned.

SECTION 12.2. The City hereby reserves to itself and the Company hereby grants to the City, the right to intervene in any suit, action or proceeding by any person or persons, firm or corporation seeking to enjoin, restrain or in any manner interfere with the Company in the performance or observance by it of any of the terms or conditions of this contract, or any notice or direction of the Board in such connection, or which involves or might involve the constitutionality, validity or enforcement of any section, subdivision, clause or sentence of this contract, and the City may move for dissolution of any such injunction or restraining order or take any other appropriate step, in any such suit, action or proceeding which it may deem necessary or advisable to protect its interests.

SECTION 12.3. The Company promises, covenants and agrees to conform to and abide by and perform all the conditions, provisions, requirements and limitations in this contract fixed and contained, and the Company will not at any future time set up as against the City or the Board the claim that the provisions of this contract reserving to the City the right to cancel this contract and terminate the franchise hereby granted are unreasonable and void nor will the Company set up or maintain as against the City, the Board, the Comptroller or any other official or officer of the City, that any other provisions of this contract are unreasonable or void.

SECTION 12.4. All the conditions, provisions, requirements and limitations of this contract shall be binding upon the Company, its successors or assigns.

SECTION 12.5. The rights, powers, privileges and remedies reserved to the City by this contract are cumulative and shall be in addition to and not in derogation of any other rights or remedies which the City may have at law or in equity with respect to the sub-

NYC019336

18

ject matter of this contract, and a waiver thereof at any time or in any instance shall not affect any other time or instance.

SECTION 12.6. In the event the City receives notice that any part of this contract has been held invalid, the City shall have the option to cancel this franchise. If the City does not exercise this option within six months from the date of receipt of such notice, the remainder of this franchise contract shall continue in full force and effect.

SECTION 12.7. Neither the Mayor, the Board, the Director of Franchises of the Board, nor any officer, employee, agent or representative of the City shall be personally liable to the Company under or by reason of this contract or any of its covenants, articles, or provisions.

SECTION 12.8. No action shall lie or be maintained against the City by the Company upon any claims based upon this contract unless such action shall be commenced against the City (a) within six (6) months after the termination, cancellation or conclusion of this contract or (b) within six (6) months after the accrual of the cause of action, whichever is earliest. If the provisions of the Civil Practice Laws and Rules shall provide for a shorter period of time to commence an action against the City than the foregoing, said shorter period of time shall be deemed applicable.

SECTION 12.9. (a) The Company agrees to cooperate fully and faithfully with any investigation, audit or inquiry conducted by a State of New York (State) or City of New York (City) governmental agency or authority that is empowered directly or by designation to compel the attendance of witnesses and to examine witnesses under oath, or conducted by the Inspector General of a governmental agency that is a party in interest to the transaction, submitted bid, submitted proposal, contract, lease, permit, or license that is the subject of the investigation, audit or inquiry.

(b)(i) If any person who has been advised that his or her statement, and any information from such statement, will not be used against him or her in any subsequent criminal proceeding refuses to

NYC019337

19

testify before a grand jury or other governmental agency or authority empowered directly or by designation to compel the attendance of witnesses and to examine witnesses under oath concerning the award of or performance under any transaction, agreement, lease, permit, contract, or license entered into with the City, the State, or any political sub-division or public authority thereof, or the Port Authority of New York and New Jersey, or any local development corporation within the City, or any public benefit corporation organized under the laws of the State of New York, or;

(b)(ii)  If any person refuses to testify for a reason other than the assertion of his or her privilege against self-incrimination in an investigation, audit or inquiry conducted by a City or State governmental agency or authority empowered directly or by designation to compel the attendance of witnesses and to take testimony under oath, or by the Inspector General of the governmental agency that is a party in interest in, and is seeking testimony concerning the award of, or performance under, any transaction, agreement, lease, permit, contract, or license entered into with the City, the State, or any political subdivision thereof or any local development corporation within the City, then:

(c)(i)  The Commissioner or agency head whose agency is a party in interest to the transaction, submitted bid, submitted proposal, contract, lease, permit, or license shall convene a hearing, upon not less than five (5) days written notice to the parties involved to determine if any penalties should attach for the failure of a person to testify.

(c)(ii)  If any non-governmental party to the hearing requests an adjournment, the commissioner or agency head who convened the hearing may, upon granting the adjournment, suspend any contract, lease, permit, or license pending the final determination pursuant to subsection (e) below without the City incurring any penalty or damages for delay or otherwise.

(d)  The penalties which may attach after a final determination by the commissioner or agency head may include but shall not exceed:

NYC019338

20

(i) The disqualification for a period not to exceed five (5) years from the date of an adverse determination for any person, or any entity of which such person was a member at the time the testimony was sought, from submitting bids for, or transacting business with, or entering into or obtaining any contract, lease, permit or license with or from the City; and/or

(ii) The cancellation or termination of any and all such existing City contracts, leases, permits or licenses that the refusal to testify concerns and that have not been assigned as permitted under this agreement, nor the proceeds of which pledged, to an unaffiliated and unrelated institutional lender for fair value prior to the issuance of the notice scheduling the hearing, without the City incurring any penalty or damages on account of such cancellation or termination; monies lawfully due for goods delivered, work done, rentals, or fees accrued prior to the cancellation or termination shall be paid by the City.

(e) The commissioner or agency head shall consider and address in reaching his or her determination and in assessing an appropriate penalty the factors in subdivision (i) and (ii) below. He or she may also consider, if relevant and appropriate, the criteria established in subdivisions (iii) and (iv) below in addition to any other information which may be relevant and appropriate:

(i) The party's good faith endeavors or lack thereof to cooperate fully and faithfully with any governmental investigation or audit, including but not limited to the discipline, discharge, or disassociation of any person failing to testify, the production of accurate and complete books and records, and the forthcoming testimony of all other members, agents, assignees or fiduciaries whose testimony is sought.

(ii) The relationship of the person who refused to testify to any entity that is a party to the hearing, including, but not limited to, whether the person whose testimony is sought has an ownership interest in the entity and/or the degree of authority and responsibility the person has within the entity.

NYC019339

21

(iii) The nexus of the testimony sought to the subject entity and its contracts, leases, permits or licenses with the city.

(iv) The effect a penalty may have on an unaffiliated and unrelated party or entity that has a significant interest in an entity subject to penalties under (d) above, provided that the party or entity has given actual notice to the commissioner or agency head upon the acquisition of the interest, or at the hearing called for in (c)(i) above gives notice and proves that such interest was previously acquired. Under either circumstance the party or entity must present evidence at the hearing demonstrating the potential adverse impact a penalty will have on such person or entity.

(f)(i) The term ''license'' or ''permit'' as used herein shall be defined as a license, permit, franchise or concession not granted as a matter of right.

(ii) The term ''person'' as used herein shall be defined as any natural person doing business alone or associated with another person or entity as a partner, director, officer, principal or employee.

(iii) The term ''entity'' as used herein shall be defined as any firm, partnership, corporation, association, or person that receives monies, benefits, licenses, leases, or permits from or through the City or otherwise transacts business with the City.

(iv) The term ''member'' as used herein shall be defined as any person associated with another person or entity as a partner, director, officer, principal or employee.

(g) In addition to and notwithstanding any other provision of this contract the City may in its sole discretion terminate this contract upon not less than three (3) days written notice in the event the Company fails to promptly report in writing to the Commissioner of Investigation of the City of New York any solicitation of money, goods, requests for future employment or other benefit or thing of value, by or on behalf of any employee of the City or other person, firm, corporation or entity for any purpose which may be related to the pro-

NYC019340

22

curement or obtaining of this franchise by the Company, or affecting the performance of this contract.

SECTION 12.10  I.A.  In accordance with §6-115 of the Administrative Code of the City of New York, the Company hereby covenants and represents:

(1) that the Company and its substantially owned subsidiaries shall not during the term of this contract sell or agree to sell goods or services, other than food or medical supplies, directly to the following agencies of the South African government or directly to a corporation owned or controlled by such government and established expressly for the purposes of procuring such goods and services for such specific agencies:

(a) the police,

(b) the military,

(c) the prison system,

(d) the ministry of home affairs and national education,

(e) the ministry of education and development aid, including the development boards and the rural development boards,

(f) the ministry of justice,

(g) the ministry of constitutional development and planning,

(h) the ministry of law and order,

(i) the bureau for information,

(j) the ministry of manpower,

(k) the Armaments Development and Production Corporation (ARMSCOR), and its subsidiaries Nimrod, Atlas Aircraft Corporation, Eloptro (Pty) Ltd., Kentson (Pty) Ltd., Infoplan Ltd., Lyttleton Engineering Works (Pty) Ltd., Naschem (Pty) Ltd., Pretoria Metal Pressing (Pty) Ltd., Somchem (Pty) Ltd., Swartklip Products (Pty) Ltd., Telacast (Pty) Ltd., and Musgrave Manufacturers and Distributors,

NYC019341

23

(l) the national intelligence services,

(m) the council for scientific and industrial research,

(n) the electricity supply commission (ESCOM),

(o) the South African Coal, Oil and Gas Corporation (Sasol Limited or Sasol 1, 2 or 3),

(p) the Atomic Energy Corporation (Ltd.), or

(q) the Southern Oil Exploration Corporation (Soekor).

(2) in the case of a contract to supply goods, that none of the goods to be supplied to the City originated in the Republic of South Africa or Namibia.

(3) This stipulation does not apply to the sale of goods or services to an agency of the South African government covered in subsections a through c of section one when such sale is provided for by the terms of a contract entered into prior to July 13, 1985 (the effective date of Local Law 19), but it does apply to any increase in the amount of goods or services supplied to such a covered agency pursuant to any amendment, modification or extension of such a contract if the amendment, modification or extension was agreed to on or after July 13, 1985.

(4) This stipulation does not apply to the sale of goods or services to an agency of the South African government covered in subsections d through q of section one when such sale is provided for by the terms of a contract entered into prior to February 28, 1987 (the effective date of Local Law 81, which amends Local Law 19), but it does apply to any increase in the amount of goods or services supplied to such a covered agency pursuant to any amendment, modification or extension of such a contract if the amendment, modification or extension was agreed to on or after February 28, 1987.

B. The Company agrees that the covenants and representations in sub-section A, above, are material conditions of this contract. In the event the City receives information that the Company is in violation of sub-section A, the City shall review such information and give

NYC019342

24

the Company an opportunity to respond. If the City finds that a violation has occurred, the City shall have the right to terminate this contract and procure the supplies, services or work from another source in any manner the City deems proper. In the event of such termination, the Company shall pay to the City, or the City in its sole discretion may withhold from any amounts otherwise payable to the Company, the difference between the contract price for the uncompleted portion of this contract and the cost to the City of completing performance of this contract either itself or by engaging another contractor or contractors. In the case of a requirements contract, the Company shall be liable for such difference in price for the entire amount of supplies required by the City for the term of this contract. In the case of a construction contract, the City shall also have the right to hold the Company in partial or total default in accordance with the default provisions of this contract. The rights and remedies of the City hereunder shall be in addition to, and not in lieu of, any rights and remedies the City has pursuant to this contract or by operation of law.

II. The Company hereby covenants and represents that it and its substantially owned subsidiaries have not within the twelve months prior to the award of such contract violated, and shall not during the period of this contract violate, the provisions of the Comprehensive Anti-Apartheid Act of 1986, the Export Administration Act of 1979 as amended (50 U.S.C. §2401, *et seq.*) or the Arms Export Control Act of 1976 as amended (22 U.S.C. §2778) respecting business activity in the Republic of South Africa or Namibia. Upon a final determination by the United States Department of Commerce or any other agency of the United States or a court that the Company or its substantially owned subsidiary has violated any provision of the Comprehensive Anti-Apartheid Act, the Export Administration Act or the Arms Export Control Act respecting business activity in the Republic of South Africa or Namibia, the City shall have the right to terminate this contract and procure the supplies, services or work from another source in any manner the City deems proper. In the event of such termination, the Company shall pay to the City, or the City in its sole discretion may withhold from any amounts otherwise payable to the

NYC019343

25

Company, the difference between the contract price for the uncompleted portion of this contract and the cost to the City of completing performance of this contract either itself or by engaging another contractor or contractors. In the case of a requirements contract, the Company shall be liable for the difference in price for the entire amount of supplies required by the City for the uncompleted term of this contract. In the case of a construction contract, the City shall also have the right to hold the Company in partial or total default in accordance with the default provisions of this contract. The rights and remedies of the City hereunder shall be in addition to, and not in lieu of, any rights and remedies the City has pursuant to this contract or by operation of law

SECTION 12.11. This written agreement contains all the terms and conditions agreed upon by the parties hereto, and no other agreement, oral or otherwise, regarding the subject matter of this agreement shall be deemed to exist or to bind any of the parties hereto, or to vary any of the terms contained herein.

SECTION 12.12. This contract shall be deemed to be executed in the City of New York, State of New York, regardless of the domicile of the Company, and shall be governed by and construed in accordance with the laws of the State of New York.

SECTION 12.13. The Company and the City agree that any and all claims asserted by or against the City arising under this contract or related thereto shall be heard and determined either in a court of the United States located in New York City ("Federal Court") or in a court of the State of New York located in the City and County of New York ("New York State Court"). To effect this agreement and intent, the Company agrees that:

(a) If the City initiates any action against the Company in Federal Court or in New York State Court, service of process may be made on the Company either in person or by registered mail addressed to the Company at its office located at 1095 Avenue of the Americas, New York, N.Y. 10036, or to such other address as the Company may provide to the City in writing;

NYC019344

26

(b) With respect to any action between the City and the Company in New York State Court, the Company hereby expressly waives and relinquishes any rights it might otherwise have (i) to move or dismiss on grounds of forum non coveniens, (ii) to remove to Federal Court, and (iii) to move for a change of venue to a New York State Court outside New York County;

(c) With respect to any action between the City and the Company in Federal Court, the Company expressly waives and relinquishes any right it might otherwise have to move to transfer the action to a United States Court outside the City of New York; and

(d) If the Company commences any action against the City in a court located other than in the City and State of New York, upon request of the City, the Company shall either consent to a transfer of the action to a court of competent jurisdiction located in the City and State of New York or, if the court where the action is initially brought will not or cannot transfer the action, the Company shall consent to dismiss such action without prejudice and may thereafter reinstitute the action in a court of competent jurisdiction in New York City.

In Witness Whereof, The party of the first part, by its Mayor, thereunto duly authorized by the Board of Estimate of said City, has caused the corporate name of said City to be hereunto signed and the corporate seal of said City to be hereunto affixed and the party of the second part, by its officers thereunto duly authorized, has caused its

NYC019345

27

corporate name to be hereunto signed and its corporate seal to be hereunder affixed as of the date and year first above written.

THE CITY OF NEW YORK

By: EDWARD I. KOCH,
Mayor.

(Corporate Seal)

Attest:

RAYMOND C. TEATUM,
Acting City Clerk

NEW YORK TELEPHONE COMPANY

By: ROY G. DOLLARD,
Vice President.

(Seal)

Attest:

JOHN M. CLARKE,
Secretary

NYC019346

28

State of New York
City of New York        } ss.:
County of New York

On the 3rd day of March, 1988, before me personally came
EDWARD I. KOCH, to me known who, being by me duly sworn, did
depose and say: that he resides at The Mayor's House, City of New
York; that he is the Mayor of the City of New York, the municipal
corporation described in and which executed the foregoing instru-
ment; that he knew the corporate seal of The City of New York;
that the seal affixed to said instrument was said corporate seal; that
it was so affixed under and by virtue of the authority conferred on
deponent by the Board of Estimate of The City of New York; and
that he signed his name thereto by virtue of like authority.

MAXINE M. BERMAN

MAXINE M. BERMAN
Notary Public, State of New York
No. 24-4505454
Qualified in Kings County
Commission Expires August 31, 1989

NYC019347

29

State of New York   ⎫
City of New York   ⎬ ss.:
County of New York ⎭

On the 7th day of March, 1988, before me personally came
RAYMOND C. TEATUM, to me known, who, being by me duly sworn,
did depose and say; that he resides at 40 Prospect Pk. W., Brooklyn,
N.Y. 11215; that he is the Acting City Clerk of The City of New York,
the municipal corporation described in and which executed the fore-
going instrument; that he knew the corporate seal of The City of
New York; that the seal affixed to said instrument was said corporate
seal; that it was so affixed under and by virtue of the authority con-
ferred on him by the Board of Estimate of the said City of New
York; and that he signed his name thereto by virtue of like authority.

NORMA LOPEZ

NORMA LOPEZ
Commissioner of Deeds
City of New York—No. 3-2101
Certificate filed in New York County
Commission Expires February 1, 1989

NYC019348

31

State of New York  }
City of New York    } ss.:
County of New York }

On the 21st day of September, 1987, before me personally came JOHN M. CLARKE, to me known, who, being by me duly sworn, did depose and say: that he resides at Holly Lane, Rye, N.Y. 10580; that he is Secretary of the NEW YORK TELEPHONE COMPANY, the corporation described in and which executed the foregoing instrument; that he knew the seal of said corporation; that the seal affixed to said instrument was said corporate seal; that it was so affixed by the authority of the Board of Directors of said corporation; and that he signed his name thereto by like authority.

KAREN T. EVANS

KAREN T. EVANS
Notary Public, State of New York
No. 01EV4657310
Qualified in Nassau County
Commission Expires August 31, 1989

Approved as to form:

IRA C. BLANCKSTEIN,
    Corporation Counsel (Acting)
September 29, 1987

I hereby certify that the within and foregoing contract and resolution have been compared with the originals on file in the Bureau of Franchises and that they are correct transcripts therefrom and of the whole of said originals.

Secretary
Board of Estimate.

30

State of New York  }
City of New York   }  ss.:
County of New York }

On the 21st day of September, 1987, before me personally came ROY G. DOLLARD, to me known, who, being by me duly sworn, did depose and say: that he resides at 356 Hardscrabble Road, Briarcliff Manor, N.Y. 10510; that he is Vice President of the NEW YORK TELEPHONE COMPANY, the corporation described in and which executed the foregoing instrument; that he knew the seal of said corporation; that the seal affixed to said instrument was said corporate seal; that it was so affixed by the authority of the Board of Directors of said corporation; and that he signed his name thereto by like authority.

KAREN T. EVANS

KAREN T. EVANS
Notary Public, State of New York
No. 01EV4657310
Qualified in Nassau County
Commission Expires August 31, 1989

NYC019350

307    BAR PRESS, Inc., 13-17 Leight St., New York, N.Y. 10013 — (212) 966-3906

(3898—10)

NYC019351

# Exhibit HH

CONFIDENTIAL

NEW YORK CITY
NEW YORK TELEPHONE COMPANY
ADVERTISING PANEL
FRANCHISE AGREEMENT
DATED JULY 1, 1993

NYC019286

**CONFIDENTIAL**

THIS CONTRACT, made and executed as of the 1st day of July, 1993 by and between The City of New York (hereinafter referred to as the "City"), by the Mayor of the City of (hereinafter referred to as the "Mayor"), acting for and in the name of the City, under and in pursuance of the authority of the Department of Telecommunications and Energy (hereinafter referred to as "DTE"), party of the first part; and the New York Telephone Company (hereinafter referred to as the "Company"), party of the second part.

WITNESSETH:

WHEREAS, the Company was granted a franchise by the City of New York to place advertising on telephone booths located on City sidewalks in the Boroughs of Manhattan, Brooklyn, The Bronx, Queens and Staten Island, pursuant to a contract dated March 3, 1988; and

WHEREAS, by Executive Order 44, dated December 3, 1992, the Mayor has designated the Department of Telecommunications and Energy ("DTE") as the responsible agency for the granting of telecommunications franchises; and

WHEREAS, the Commissioner of the Department of Telecommunications and Energy, in accordance with Section 2.1 of the March 3, 1988 agreement, has determined to renew the agreement to place advertising on telephone booths located on City sidewalks in the Boroughs of Manhattan, Brooklyn, The Bronx, Queens and Staten Island; and

WHEREAS, on May 17, 1993, the Franchise Concession and Review Committee ("FCRC") held a public hearing on the proposed contract which was a full public proceeding affording due process in compliance with Chapter 14 of the Charter; and

1

NYC019287

CONFIDENTIAL

WHEREAS, at said hearing the FCRC reviewed the Company's financial, legal and technical ability to carry out its obligations pursuant to this contract; and reviewed the money value of the proposed renewal and the adequacy of compensation proposed to be paid therefor; and determined that this contract granting the Company the right to continue its franchise to place advertising on telephone booths located on City sidewalks complies with all applicable laws and regulations; and

WHEREAS, the City intends to exercise the full scope of its municipal powers to promote the public interest, to protect the health, safety and welfare of its citizens;

NOW, THEREFORE, in consideration of the promises and covenants and agreements herein contained, the parties hereto do hereby mutually covenant and agree as follows:

## ARTICLE I

### Definitions

SECTION 1.1  For the purposes of this contract, the following terms, phrases, words and their derivations shall have the meanings set forth in this Section, unless the context clearly indicates that another meaning is intended.  When not inconsistent with the context, words used in the present tense include the future tense, words used in the plural number include the singular number, and words used in the singular number include the plural number.  All capitalized terms used in the definition of any other term shall have their meaning as otherwise defined in Section 1.1.

(a)  "Advertising" shall mean any printed matter including, but not limited to, words, pictures, photographs, symbols, graphics or visual images

2

NYC019288

CONFIDENTIAL

of any kind, or any combination thereof in connection to the solicitation of business.

(b)    "Bus stop shelter" shall mean a structure open at one or more sides constructed upon the sidewalk of the City of New York used to provide shelter to natural persons waiting to use buses authorized to operate throughout the City of New York and which contains advertising display panels.

(b)    "Commercial" shall mean that which is related to business and commerce, and which is made, done, or operated primarily for profit.

(c)    "Company" shall mean the New York Telephone Company or its designated agents.

(d)    "Commissioner" shall mean the Commissioner of the Department of Telecommunications and Energy of the City of New York, his or her designee or any successor thereto.

(e)    "Department" shall mean the Department of Telecommunications and Energy of the City of New York ("DTE"), and any successor thereto.

(f)    "Entity" shall mean any firm, partnership, corporation, association, or person that receives monies, benefits, licenses, leases, or permits from or through the City or otherwise transacts business with the City.

(g)    "FCRC" shall mean the Franchise Concession and Review Committee of the City of New York, and any successor thereto.

(h)    "License" or "Permit" as used herein shall be defined as a license, permit, franchise or concession not granted as a matter of right.

3

NYC019289

**CONFIDENTIAL**

(i)   "Member" shall mean any person associated with another person or entity as a partner, director, officer, principal or employee.

(j)   "Net commission advertising revenues" shall mean the total revenues derived by the Company, or any subsidiary, affiliate, agent, assignee, contractor, licensee, transferee or lessee of the Company, from the display of advertising material on phone booths pursuant to this contract, whether actually received by the Company, an account receivable or otherwise, less any standard advertising agency commission paid or deducted from such amount and calculated as set forth in §4.2.

(k)   "Person" shall mean any natural person doing business alone or associated with another person or entity as a partner, director, officer, principal or employee.

(l)   "Public service message" shall mean words, pictures, photographs, symbols, graphics or visual images of any kind, or any combination thereof, the primary purpose of which is to communicate information pertaining to public health, safety and welfare of the citizens of the City of New York and cultural and educational activities of significant municipal interest.

(m)   "Residential" shall mean those portions of the City of New York which have been zoned to permit dwelling units and which have not been zoned for commercial uses.

(n)   "Tobacco advertisement" shall mean words, pictures, photographs, symbols, graphics or visual images of any kind, or any combination thereof, which bear a health warning required by federal statute, the purpose or effect of which is to identify a brand of a tobacco product, a trademark of a tobacco product or a trade name associated exclusively with a tobacco product, or to promote the use or sale of a tobacco product.

4

NYC019290

CONFIDENTIAL

(o)   "Tobacco product" as used herein shall be defined as any substance which contains tobacco, including but not limited to cigarettes, cigars, pipe tobacco and chewing tobacco.

## ARTICLE II

### Grant

**SECTION 2.1**  The City hereby grants the Company, subject to the terms and conditions of this contract, the franchise, right and consent to place advertising on its telephone booths located on City sidewalks in the Boroughs of Manhattan, The Bronx, Brooklyn, Queens and Staten Island.

**SECTION 2.2**  The Company shall not place advertising on the phone booths located:

    (a)   within districts zoned for residential use; or

    (b)   within historic districts not located in areas zoned for commercial use, unless approval for the placing of advertising has been given by DTE in consultation with the Landmarks Preservation Commission.

**SECTION 2.3**   The Company shall not place commercial advertising in display panels located:

(a) in the Borough of Manhattan: (i) on Avenue blocks, on the same side of an Avenue block on which a bus stop shelter is located; or (ii) in all other areas, at locations which are within one hundred fifty (150) feet of a bus stop shelter; provided, however, that in clarification of the foregoing, commercial advertising is permitted around the corner or across the street from a bus stop shelter located on an Avenue block; and

(b) in the Boroughs of Brooklyn, The Bronx, Queens and Staten Island: at

5

CONFIDENTIAL

locations which are within one hundred fifty (150) feet of a bus stop shelter. The Company may place public service messages in such restricted display panels pursuant to §5.7.

SECTION 2.4  In the event advertising has been placed on a telephone booth, and as a result of the installation of a bus stop shelter such telephone booth becomes located in a restricted location, as set forth in §2.3, the Company shall remove the advertising from such telephone booth within thirty (30) days after written notice from the City.

## ARTICLE III

## Term of the Grant

SECTION 3.1  This contract, and the franchise granted hereunder, shall commence on the date of the execution thereof by the Mayor and shall continue for a period of five (5) years unless sooner terminated as herein provided.

SECTION 3.2  This franchise is not a grant or acknowledgement of any right or authority of the Company to install or maintain telephone booths on City sidewalks, and is subject to any limitation or revocation of such right. In the event the Company's right to install and maintain telephone booths ceases with respect to any area or areas of the City, this franchise shall simultaneously terminate with respect to such area or areas.  In addition, in the event the City grants to the Company (or an affiliate or subsidiary of the Company) a franchise, pursuant to an appropriate authorizing resolution, to provide public pay telephone service on City property during the term of this contract, then this contract shall terminate and the terms and conditions governing advertising on public pay telephones shall be mutually agreed to by the Company and the City at such time and incorporated into the new franchise agreement.

NYC019292

CONFIDENTIAL

## ARTICLE IV

## Compensation

**SECTION  4.1**  The Company or its agent or designee shall pay to the City as compensation of the franchise, right and consent hereby granted twenty-six percent (26%) of its net commission advertising revenues, as defined in §1.1(j) and as calculated in § 4.2; provided, however, that on an annual, four quarter basis, the following compensation schedule shall apply:

| Compensation Rate | Annual Net Commission Advertising Revenues |
|---|---|
| 26% | >$10,000,000 |
| 25% | $9,500,000-10,000,000 |
| 23% | $8,700,000-9,499,999 |
| 21% | $8,100,000-8,699,999 |
| 19% | <$8,100,000 |

**SECTION 4.2**  The net commission advertising revenues shall be calculated on the basis of (a) the total amounts contracted for by the advertisers for the display of advertising materials on the telephone booths, whether paid directly to the Company, another NYNEX subsidiary or affiliate of the Company, or to a third party, including any amount the equivalent of which such entity may have received from the advertiser in the form of materials, services or other benefits, tangible or intangible, LESS (b) the standard advertising agency commission, whether actually paid by the Company or whether deducted from the amount of revenues ultimately received by the Company; provided, however, that in no event shall such commission be greater than 15%.  All agreements made by the Company or its agent or designee in connection with the display of advertising material on telephone booths shall provide that the Comptroller of The City of New York and/or the City, subject to signing a non-disclosure agreement, shall have access to the books of account and records of all parties to such agreements for the purpose of ascertaining the correctness of net commission advertising revenues.

NYC019293

CONFIDENTIAL

**SECTION 4.3**  Compensation shall be paid to the Department of Finance of the City quarterly, within thirty (30) days after the expiration of each quarter, except in the case of the last payment when the compensation shall be paid within thirty (30) days after the termination, cancellation or expiration of this contract.  Each payment shall be based on the quarter immediately preceding the date of payment.  Notwithstanding the foregoing, the Company or its agent shall submit to the City within thirty days after the end of each four quarters following the date of this contract, a reconciliation and, if necessary, an adjustment or request for payment, as the case may be, in accordance with Section 4.1. In the event any payment by the Company is not made on or before the date such payment is due, interest on such payment shall apply from the date such payment is due at the rate of eighteen percent (18%) per year.

**SECTION 4.4**  Payments of compensation made by the Company or its agent or designee to the City pursuant to the provisions of this franchise shall not be considered in any manner to be in the nature of a tax, but shall be in addition to all taxes of whatsoever kind or description which are now or which may hereafter be required to be paid by any ordinance or local law of the City, or any law of the State of New York or any law of the federal government of the United States.

**SECTION 4.5**  In the event the Company continues advertising displays on telephone booths after and despite the termination, cancellation or expiration of this franchise, the Company agrees to pay to the City the compensation at the rate and in the manner set forth herein, together with all taxes the Company would have been required to pay had its continuation been duly authorized and to comply with all other obligations under this franchise, provided that such payments and compliance shall not constitute an extension of this franchise.

8

NYC019294

CONFIDENTIAL

ARTICLE V

Maintenance of Advertising Displays

SECTION 5.1  The Company shall maintain the advertising panels and
displays on the telephone booths in a clean and attractive condition and shall
be responsible for the cost of electricity consumed.  As further consideration
for the grant of this franchise, the Company shall also be responsible for the
cost of electricity consumed on its telephone booths on which no advertising
is displayed.

SECTION 5.2  In addition to the best efforts obligations set forth in
§5.7, the Company shall provide each community board in the City with two (2)
display panels at locations to be mutually agreed upon by the community board
and the Company, for public service or community announcements.  The
installation, maintenance and removal of such announcements shall be the sole
responsibility of the Company and shall be performed in accordance with the
same standards and utilize the same materials and methods as are used by the
Company for commercial displays.  The Company shall make available to the
community board a comparable location for the relocation of such announcements
as mutually agreed upon by the community board and the Company simultaneously
with any removal or relocation of said announcements.

SECTION 5.3  The frame of each advertising panel shall be no larger
than 27 inches by 57 inches except in installations of more than two
telephones where the width may be extended up to 120 inches.  The Company may
request a wavier of this requirement by written request, accompanied by
appropriate documentation supporting the need to increase the size of the
panel, to the Commissioner and the President of the Borough in which the
booth(s) for which wavier(s) is (are) requested is (are) located.  The written
consent of both the Commissioner and such Borough President shall be required

9

NYC019295

CONFIDENTIAL

for each such wavier.

SECTION 5.4  The Company shall make certain where feasible that the display panels affixed thereto provide the caller with optimum visibility to the outside of the booth.  New and replacement booths erected by the Company shall incorporate this design.

SECTION 5.5  All agreements made by the Company in connection with the display of advertising material on telephone booths shall provide that such agreements shall terminate upon the termination of this franchise.

SECTION 5.6  Commencing September 1, 1993, the Company shall not install in its display panels on any telephone booth or enclosure any tobacco advertisement or advertising for tobacco products.

SECTION 5.7  The Company shall use its best efforts to make available at a minimum five percent (5%) of the total number of advertising display panels for public service messages without charge.

SECTION 5.8  The Company shall comply with all applicable laws, rules and regulations now in force, or which may hereafter be adopted.

ARTICLE VI

Books, Records and Reports

SECTION 6.1  The Company or its agent or designee shall at all times keep complete and accurate books of account and records of the operations under and in connection with this contract and the exercise of the franchise hereby granted.  Such books of account and records shall be kept in accordance with generally accepted accounting practices and principles("GAAP").

10

NYC019296

CONFIDENTIAL

SECTION 6.2  Within forty-five (45) days after the expiration of each calendar quarter during the term of this contract and within forty-five (45) days after the termination of this contract and at such other times as the City shall designate, the Company shall furnish and deliver to DTE reports of its operations hereunder is such form and in such detail as DTE may prescribe. The City or its representatives, subject to signing a non-disclosure agreement, shall have access to, and the right to audit such books of account and records of the Company for the purpose of ascertaining the correctness of any and all such reports, and may examine the officers and employees of the Company under oath with respect thereto.  Access to and the right to audit such books of account and records of the Company by the City shall survive the expiration or termination of this contract.

SECTION 6.3  In addition to the reports to be submitted by the Company pursuant to the preceding paragraph, the Company shall, within fifteen (15) days after the expiration of each calendar quarter, submit to the City a report setting forth, as of the end of said calendar quarter, by Borough (i) the total number of telephone booths with advertising panels and (ii) the total number of telephone booths on which advertising was displayed.

SECTION 6.4  All reports furnished by the Company or its agent or designee in accordance with this Section shall be certified by an officer of the Company to be correct and in accordance with the books of account and records of the Company or its agent or designee.  Any false entry in the books of account of the Company or false statement in the reports submitted to the City as to a material fact, intentionally made by the Company, shall constitute a default hereunder.

SECTION 6.5  At all times during the term of this contract, and for six (6) years thereafter, the Company or its agent or designee shall maintain and keep such books and records as are required by this contract.  Said books and

11

NYC019297



records shall be available for inspection and audit by the City at such times as the City in its discretion may deem proper.

## ARTICLE VII

### Liability for Damages

SECTION 7.1  The Company shall be liable for, and shall indemnify and hold the City, its officers, agents, servants or employees harmless from any and all damages to persons and property arising out of or related to this contract; provided however that such damages are not due to the sole negligence or willful misconduct of the City, its officers, agents, servants or employees. It is a condition of this contract that the City assumes no lability for damages to either persons or property in accordance with the foregoing.

SECTION 7.2  The Company shall, within twenty (20) days after the commencement date of this contract, file and maintain on file with the Comptroller of the City throughout the term of this contract, a certificate of insurance regarding a liability insurance policy, issued by a company duly authorized to do business in this State, insuring the Company and the City for any injury or damage caused by the display of advertising on telephone booths, in the minimum amounts of (i) Two Million Dollars ($2,000,000) for bodily injury including death and (ii) One Hundred Thousand  Dollars ($100,000) for property damage.  The insurance policy shall contain a provision stating that it cannot be cancelled, terminated or modified by the insurance company unless sixty (60) days prior written notice thereof is sent by registered or certified mail to the Company and the City.  The policy shall not be cancelled, terminated or modified by the Company without the prior written consent of the City and shall contain an endorsement to that effect.

12

NYC019298

SECTION 7.3  In the event this contract is cancelled for cause, prior to the expiration date hereof, the Company agrees to maintain the liability coverage described in §7.2 in effect until the advertising display panels are removed from the telephone booths.

SECTION 7.4  The Company agrees to reimburse the City for any and all judgements, claims, attorneys' fees, and court costs that the City incurs as a result of defending any claim or action arising out of this contract, except for claims due to the sole negligence or willful misconduct of the City, its officers, agents, servants or employees.

ARTICLE VIII

Security

SECTION 8.1  The Company represents that it has, in connection with the original agreement, deposited with the Comptroller of the City the sum of Fifty Thousand Dollars ($50,000) in cash as the original security fund.  In order to augment such original security fund and in order to secure the faithful performance of the terms and conditions of this contract, the Company shall, simultaneously with the execution and delivery of this contract, arrange for, and maintain throughout the terms of this contract, a payment bond solely for the protection of the City with corporate surety and trust companies acceptable to the Comptroller, in a face amount of not less than Four Hundred and Fifty Thousand Dollars ($450,000).

SECTION 8.2  If the Company shall fail to pay the City any compensation herein required within the time herein fixed, or shall fail, after ten (10) days' written notice by the Comptroller, to repay to the City any damages or expense which the City shall be compelled to pay by reason of any act or default of the Company, the Comptroller may immediately and without further

13

NYC019299

CONFIDENTIAL

notice (i) withdraw the amount of such compensation or payments from the cash portion of the security fund and/or (ii) seek recourse against the payment bond.  In case withdrawal is so made from the cash portion of the security fund and/or recourse is sought against the payment bond portion of the security fund, the Company shall upon fifteen (15) days' notice in writing pay to the Comptroller a sum of money sufficient to restore the cash portion of the fund to the original amount of Fifty Thousand Dollars ($50,000) and/or restore or replace the payment bond portion of the security fund.

SECTION 8.3  The rights reserved to the City with respect to the security fund are in addition to all other rights reserved by the City pursuant to this contract or by law, and no action, proceeding or right with respect to such security fund shall affect any other legal rights, remedies or causes of action belonging to the City.

SECTION 8.4  The Company shall be entitled to the cancellation of the payment bond and the return of the money or securities on deposit, which remain on deposit with the Comptroller at the expiration of this contract, provided that there is then no outstanding default or obligation on the part of the Company.

## ARTICLE IX

### Employment Regulations

SECTION 9.1  The Company agrees to recognize the right of its employees to bargain collectively through representatives of their own choosing and all times to recognize and deal with the representatives duly designated or selected by the majority or its employees, for the purpose of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment, and not to dominate, interfere with or participate

14

NYC019300

CONFIDENTIAL

in the management or control of or give financial support to any union or association of its employees.

SECTION 9.2  The Company agrees that it will not refuse to hire or employ nor bar or discharge from employment nor discriminate against any person in compensation or in terms, conditions or privileges of employment because of age, race, creed, color, national origin, disability, marital status, sex, sexual orientation or affectional preference.

SECTION 9.3  The Company agrees that it will comply with the provisions of the Mayor's Executive Order No. 50 (Equal Employment Opportunity) as now in effect or as may be amended or modified during the term of this contract.

### ARTICLE X

### Restrictions Against Assignment, Transfer, Etc.

SECTION 10.1  This franchise shall not be assigned, or transferred either in whole or in part or leased, sublet or mortgaged in any manner, nor shall title thereto, either legal or equitable, nor any right, interest or property therein, pass to or vest in any other person or corporation whatsoever, either by the act of the Company or by operation of law whether under the provisions of statutes relating to consolidation or merger of corporations or otherwise, without the consent of the City acting through DTE, evidenced by an instrument in writing, anything herein contained to the contrary notwithstanding.  The granting, giving or waiving of any one or more of such consents shall not render unnecessary any subsequent consent or consents.

The provisions of this Section shall, however, be inapplicable to an assignment, transfer, lease, sublease or mortgage of this franchise to NYNEX Corp. or any subsidiary or affiliate of NYNEX Corp., provided that NYNEX Corp.

15

NYC019301

CONFIDENTIAL

files an agreement, in a form to be approved by the Corporation Counsel of the City, wherein NYNEX Corp. agrees to assume and be bound by all the conditions, provisions, requirements and limitations of this contract.

**SECTION 10.2**  No assignment, transfer, lease, sublease or mortgage of this franchise, or any part thereof, shall be valid or effective for any purpose unless such assignment, transfer, lease, sublease or mortgage shall specifically provide and shall contain a covenant on the part of the assignee, transferee, lessee, sublessee or mortgagee that such assignment, transfer, lease, sublease, or mortgage is subject to all of the conditions, provisions, requirements and limitations of this contract, and that any such assignee, transferee, lessee, sublessee or mortgagee assumes and will be bound by all of the said conditions, provisions, requirements and limitations, notwithstanding anything in any statute or in the charter of such assignee, transferee, lessee, sublessee or mortgagee to the contrary and that such assignee, transferee, lessee, sublessee or mortgagee shall specifically waive any more favorable conditions, provisions, requirements and limitations created by any such statute or charter and shall covenant that it will not claim by reason thereof or otherwise, exemption from liability to comply with each and all of the conditions, provisions, requirements and limitations of this contract.

**SECTION 10.3**  The Company, its directors, officers and agents expressly covenant and agree that in the event any change in the control of the Company is about to be effected in any manner, including but not limited to a change in such control by or through the sale, transfer, pledge or other disposition of stock, bonds or other securities of the Company or of any other corporation, or entity owning or controlling the Company, they shall forthwith notify and file with DTE or its representatives all necessary information and other data affecting such change.  The failure of the Company or its directors, officers, and agents to comply with the provisions of this paragraph shall be deemed a default under the provisions of this contract.

16

NYC019302

CONFIDENTIAL

Unless DTE shall set a date for a public hearing on such change within sixty (60) days after receipt of said notice of change, the said change may be effected.  Prior to the holding of such public hearing, DTE or its representatives shall make an inquiry and investigation as to the experience, capability, qualifications and financial ability, character and reputation of the parties effecting the foregoing changes so as to insure the proper performance of all the terms and conditions of this franchise contract.  The Company shall cooperate with DTE or its representative in facilitating DTE's inquiry or investigation.  If DTE holds such hearing and upon such hearing determines in its sole discretion that the said proposed change is not consistent with the public interest, DTE may terminate this contract upon thirty (30) days' notice to the Company and in the event DTE serves such notice of termination upon the Company, the consent of the City to the exercise of the franchise contract and all rights and privileges of the Company thereunder shall cease and determine thirty (30) days after the service of such notice.  However, DTE may rescind such notice of termination of the franchise contract if DTE receives notification from the Company prior to the aforesaid thirty (30) days that the proposed change has been annulled or rescinded provided DTE determines that the proposed change has in fact been annulled or rescinded.

## ARTICLE XI

### Receivership

SECTION 11.1  The franchise herein granted to the Company shall, at the option of DTE, cease and determine one hundred and twenty (120) days after the appointment of a receiver or receivers or trustee or trustees to take over and conduct the business of the Company, whether in a receivership, reorganization, bankruptcy or other action or proceeding unless such receivership or trusteeship shall have been vacated prior to the expiration of

17

NYC019303