# Exhibit OO

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------x

METRO FUEL, LLC,                    ORIGINAL

                                        Case No.

              Plaintiff,            07-CV-8244

       - against -

CITY OF NEW YORK,

              Defendant.

------------------------------------x

                        May 15, 2008

                        10:22 a.m.

                        75 Rockefeller Plaza

                        New York, New York 10019


        DEPOSITION of EDWARD FORTIER, testifying

on behalf of THE CITY OF NEW YORK, the Defendant

in the above entitled matter, taken pursuant to

Consent, before a Notary Public of the State of

New York.


RAYVID REPORTING SERVICE, INC.    (212) 599-3642

EDWARD FORTIER

1

2      Q      I am hoping you can help me

3   understand the difference between a directly

4   illuminated sign and a sign with indirect

5   illumination.

6           Let me cut to the chase by asking

7   you whether you believe that my client's signs,

8   which are internally illuminated light boxes, if

9   you will, would be considered to be directly

10  illuminated or signs with indirect illumination?

11     A      Those would be directly illuminated.

12     Q      Why would they not qualify as signs

13  with direct illumination?

14     A      Because the definition of

15  "illuminated signs" would say that it gives forth

16  artificial light; whereas, indirect would tell us

17  that it is derived from an external source, so

18  that the signs are illuminated from a light

19  fixture away from the sign itself.

20     Q      Let me break it down in parts,

21  because there are a couple of different things

22  that confuse me.

23          First, let's talk about artificial

24  light or an artificial source.  What kinds of

25  illumination of signage would there be, other than

1                    EDWARD FORTIER

2    artificial?

3                    Isn't all sign illumination

4    artificial?

5          A       Well, sunlight would be natural.

6          Q       And all signs --

7          A       Otherwise, everything, correct.

8          Q       You agree with me that all signage

9    is naturally lit, to the extent that the sun is

10   out, and not naturally lit to the extent that it's

11   dark?

12         A       Correct.

13         Q       So, given that, what significance

14   does the word "artificial" have in Zoning

15   Resolution's definition of an illuminated sign?

16         A       I couldn't speak to why they use the

17   term "artificial light."  I would suppose just to

18   distinguish it from a sign that's otherwise

19   viewable during the day.

20         Q       The other piece that confuses me is

21   the word "external."

22                  What does it mean to say that a

23   light source is, quote, unquote, external with

24   respect to a sign?

25         A       I think the distinction here is

1                        EDWARD FORTIER

2    external as opposed to internal, a sign that's lit

3    from within; so that the light projects forward as

4    opposed to a light fixture that stands apart from

5    a sign.

6                    So, indirectly, by reflecting a

7    light off of a sign illuminates it.

8          Q       When we speak of "signs," we're

9    generally referring to pictorial representations,

10   right?

11         A       It could be text or pictorial.

12         Q       When we talk about a "sign

13   structure," we're talking about the structure that

14   supports and facilitates the displaying of a

15   textorial or pictorial representation?

16         A       Correct.

17         Q       I think I understand how

18   illumination could be internal or external

19   relative to a sign structure.

20                  I'm not sure I understand how

21   illumination can be internal or external with

22   respect to a sign, and I'm hoping that you can

23   help me understand that.

24         A       Well, it doesn't -- the definition

25   says "a sign with indirect illumination," so that

1                    EDWARD FORTIER

2   the illumination is actually a separate element.

3               As you described, there is the

4   structure, there is the sign itself.  Here, the

5   light comes from within -- I'm not sure the best

6   way to describe it.  It seems, to me, fairly

7   straightforward within the definition.

8        Q      Let me try to come at this a

9   different way.

10              Can you give me an example of the

11  kind of sign that would be a sign with indirect

12  illumination?

13       A      Most of the arterial signage that we

14  see is indirect, in that there are large fixtures

15  attached to the structure that project light onto

16  the sign, and you then see the sign as

17  illuminated.

18              Many of the advertising signs

19  throughout the City are indirectly illuminated.

20  To contrast, if you look in areas such as Times

21  Square where the signs give forth light

22  internally, there is no external fixture

23  reflecting light upon them.  Those would be

24  illuminated signs.

25       Q      You're generally familiar, aren't

1                      EDWARD FORTIER

2    you, with the fact that my client's signs are

3    boxes that contain posters with light bulbs behind

4    the posters?

5              A      Yes.

6              Q      If the same boxes had light bulbs in

7    front of the posters rather than behind them,

8    would they then constitute signs with indirect

9    illumination?

10             A      Correct.

11             Q      You would agree with me, wouldn't

12   you, that all else equal, the same light box with

13   the same posters and the same light bulbs would be

14   at least as bright and at least as visible if the

15   light bulbs were in front of the poster than if

16   the light bulbs were behind the poster?

17             A      No.

18             Q      Why is that?

19             A      Because, as the definition it says,

20   it gives forth light, projects light forward,

21   which, in my perception, results in a more

22   brightly illuminated sign in the immediate area as

23   well is illuminated by the sign; whereas, again,

24   in my experience, it seems the indirectly

25   illuminated signs illuminate only the sign, not

1              EDWARD FORTIER

2    the area beyond it.

3        Q      You would agree with me that,

4    generally speaking, the Zoning Resolution is more

5    tolerant to signs with indirect illumination than

6    it is with directly illuminated signs, all else

7    equal?

8        A      Yes.

9        Q      And the reason for that difference

10   in tolerance is that the City has a specific

11   concern about light rays interfering with people's

12   enjoyment of the City?

13       A      Yes.

14       Q      You would agree with me that the

15   light rays emanating from the light bulbs in my

16   client's sign would be more intrusive from that

17   perspective if the light bulbs were located in

18   front of the sign rather than behind the sign?

19       A      No.

20       Q      I know you're not a physicist nor am

21   I a physicist.

22              As a matter of common sense,

23   wouldn't you agree with me that the light

24   emanating from my client's signs is, at least to

25   some minimal degree, dimmed by the poster?

EDWARD FORTIER

1

2      A    It would seem, as opposed to no

3  poster in place, yes.

4      Q    And so, why is it that you can't

5  also agree with me that if the light bulbs were

6  located in front of the poster rather than behind

7  them, they would be brighter from the vantage

8  point of the street?

9      A    Because the light is directed, in

10  the case of direct illumination, toward the

11  street.  Indirect illumination is aimed towards

12  the sign, is directed to the sign, so that the

13  sign is illuminated maybe, at most, a portion of

14  the wall on which it's located, but the light is

15  not projected forward towards the street.

16      Q    You would agree with me, generally,

17  that some direct illumination is directed towards

18  the street and some direct illumination is not

19  directed towards the street, it depends on the

20  circumstances, right?

21      A    If it's located at street level, I

22  don't see how it's avoidable.  If the sign is

23  targeting street level, the light must be

24  projected towards the street.  I don't see how it

25  could be otherwise.

EDWARD FORTIER

1

2      Q      Let's focus specifically on my

3   client's panel signs.

4             My client's panel signs, as they

5   actually exist on the streets, have light bulbs

6   behind the posters, correct?

7      A      Correct.

8      Q      Those light rays only reach the

9   street after passing through the poster

10  advertisement, right?

11     A      Correct.

12     Q      The way you're using these terms, do

13  you understand that to be light that's directed

14  towards the street?

15     A      Correct.

16     Q      Viewed that way, isn't all

17  illumination, whether it's considered direct or

18  indirect under the Zoning Resolution, directed

19  towards the street, because light rays can always

20  reach the street?

21            MS. NEUFELD:  Objection.

22     A      The light -- as I've said, if the

23  light is directed towards the sign, the rays are

24  not towards the street.

25            You can direct a light in one

**EDWARD FORTIER**

1

2  direction or the other.  Either it emanates from

3  the sign towards the street or emanates towards

4  the sign on the wall.

5       Q       There are certain kinds of light

6  rays that are directed by human beings, such as a

7  flashlight, that you might point in one direction

8  or another, right?

9       A       Correct.

10      Q       And there are certain kinds of light

11  rays that are not directed in any particular

12  direction, such as the proverbial light bulb

13  hanging naked in a prisoner interrogation room,

14  right?

15      A       Correct.

16      Q       There are times when an advertising

17  sign illumination is directed in the sense that

18  the illumination emanates from a flashlight type

19  lighting, that is purposely oriented towards the

20  sign?

21      A       Correct.

22      Q       And, in theory, a sign could be

23  illuminated by the type of naked light bulb that

24  happens to emanate light towards the sign, but

25  also emanates light equally in all directions.

1                    EDWARD FORTIER

2          A       Okay.

3          Q       You are aware, aren't you, that my

4    client's panel signs are illuminated by

5    fluorescent light bulbs that aren't directed at

6    any particular direction, right?

7          A       They are directed to exit the box,

8    which they are located towards the sign.

9          Q       You would agree with me that the

10   only way in which they are directed, as you

11   describe, is in the sense that the back of the

12   sign and the sides of the sign are opaque?

13         A       Correct.

14         Q       The direction that you're describing

15   is the result of the fact that the backs and the

16   sides are opaque and the front are not, and not

17   from the fact that the light bulbs are oriented in

18   any particular direction?

19         A       I couldn't speak as to the

20   orientation of the light bulbs.

21                 I can speak as to the result, that

22   all light projects from that box, which is

23   contained forward towards the street.

24         Q       So, you would agree with me, in

25   order to determine whether an illumination source

EDWARD FORTIER

1

2  is directed to the street, you look to whether or

3  not rays of light reach the street as an effect,

4  rather than whether rays of light were

5  purposefully directed towards the street?

6          A       There is no -- there was no

7  subjective standard.  We simply looked to whether

8  the lighting is internal, to be projected forward

9  or set off from the sign and directed towards the

10  sign.

11          As to rays or degree of illumination

12  or the ultimate effect, we don't look to that.  We

13  look to where the fixtures are located, behind the

14  sign, projecting forward or in front of the sign

15  projecting light onto it.

16          Q       You would agree with me that

17  advertising signs are permitted in C8 and in

18  manufacturing districts subject to certain

19  restrictions?

20          A       Yes.

21          Q       You would agree with me that in none

22  of those districts are directly illuminated signs

23  permitted?

24          A       I don't believe so.

25          Q       Is it your testimony that to the

                         EDWARD FORTIER

1    you're aware of, looked into this question?

2                    MS. NEUFELD:  Objection.

3         A    As it relates to particularly signs

4    on subway stairs, no, I'm not aware.

5         Q    Is there any other way in which you

6    think this might have been looked into?

7         A    We have more recently with the Law

8    Department in conjunction with counsel --

9                    MS. NEUFELD:  Are you aware of

10                   privilege when you're answering the

11                   question?

12                   THE WITNESS:  Yeah.

13        A    We have considered the issue of MTA

14   signage as it relates to arterial signs.

15        Q    To your knowledge, nobody at the

16   City has considered the issue relating to the

17   MTA's urban panels?

18        A    No.

19                   MR. HECKER:  Let's mark it as 19.

20                   (The above described document was

21                   marked Plaintiff's Exhibit 19 for

22                   identification, as of this date.)

23        A    Mr. Fortier, Exhibit 19 is a

24   two-page document that's not Bates stamped.  At

# Exhibit PP

THOMAS WARGO

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------x

METRO FUEL, LLC,

                                  Case No.

               Plaintiff,        07-CV-8244

     - against -

CITY OF NEW YORK,

               Defendant.

-------------------------------------------x

                  May 9, 2008

                  10:13 a.m.

                  75 Rockefeller Plaza

                  New York, New York 10019

        DEPOSITION of THOMAS WARGO, testifying

on behalf of THE CITY OF NEW YORK, the Defendant

in the above entitled matter, taken pursuant to

Consent, before a Notary Public of the State of

New York.

RAYVID REPORTING SERVICE, INC.    (212) 599-3642

THOMAS WARGO

<pre>
 1                    THOMAS WARGO
 2    Division?
 3         A       No.
 4         Q       What does the Urban Design Division
 5    do?
 6         A       They do urban design work.  For
 7    instance, now their big job is the Moynihan
 8    station, the new Moynihan rail station.
 9         Q       Is Jeff Sugarman part of the Urban
10    Design Division?
11         A       Yes.
12         Q       Is Jeff Sugarman the head of the
13    Urban Design Division?
14         A       No.
15         Q       Who is the head?
16         A       Alexandros Washburn.
17         Q       Is the Urban Design Division the
18    division within DCP that has primary
19    responsibility for street furniture?
20         A       Yes.  The two divisions used to be
21    linked several years ago and they were split apart
22    two years ago.
23         Q       When did you become the head of the
24    Zoning Division?
25         A       In November of 2006.
</pre>

THOMAS WARGO

THOMAS WARGO

2    the Penn Center sub district, notwithstanding its

3    general neighborhood character and aesthetic

4    concerns about advertising signs?

5            A       Yeah, yes.

6            MR. HECKER:  It's 1:00.  Do you mind

7        pressing on for a few more minutes before

8        we take a break?

9                THE WITNESS:  Not at all.

10           MR. HECKER:  Mark this as Exhibit 6.

11           (The above described document was

12       marked Plaintiff's Exhibit 6 for

13       identification, as of this date.)

14           Q       Mr. Wargo, Exhibit 6 is an excerpt

15   from the Zoning Resolution Section 12-10, which

16   contains the definitions of certain terms, and I

17   excerpted the sections on defining advertising

18   sign, flashing sign, illuminated sign and a sign

19   with an indirect illumination.

20               Can you take a look at the

21   definition of "Illuminated Sign," which is labeled

22   at the bottom of the first page and begins at the

23   top of the second page; and also take a look at

24   the definition of a "Sign with indirect

25   illumination."

THOMAS WARGO

1                    **THOMAS WARGO**

2              My question is, what is a "sign with

3    indirect illumination," because I don't understand

4    the definition.  I'm wondering if you do.

5         A       Well, I don't deal with sign

6    regulations on a day-to-day basis.  So, I used to

7    direct all these answers to someone else in the

8    office who was our sign expert, but he's retired;

9    but, to me, a sign with indirect illumination is

10   a, say, for instance a billboard that has a

11   spotlight shown on it.

12        Q       I see.  And so, you're generally

13   familiar with the bus shelter panel signs,

14   correct?

15        A       Yes.

16        Q       You're generally familiar that those

17   signs are boxes with a poster inside and internal

18   illumination in the boxes?

19        A       Yes.

20        Q       Would you consider those signs to be

21   signs with indirect illumination or would those be

22   directly illuminated signs?

23        A       They would be directly illuminated.

24        Q       What is it about a box with a bulb

25   in it that is different from a billboard with a

THOMAS WARGO

1                    **THOMAS WARGO**

2    spotlight on it?

3         A    Well, again, I'm not a sign expert

4    and I'm not a lighting expert, and I don't begin

5    to say that I know anything about lighting

6    science, but I would think that a sign with --

7    that is lit from behind, lit from within, is going

8    to appear to be brighter, more intense.   I

9    don't -- I can't say that I know that for a fact.

10        Q    I know you are not a sign expert.

11             Do you know for a fact that those

12   signs are considered to be directly illuminated

13   signs or is that a guess?

14        A    It's a guess.

15        Q    Who would be the person at DCP with

16   the most knowledge about this issue who is not

17   retired?

18        A    We're running out of people.  I

19   guess, by default it would have to be me; but I

20   would consult with the Department of Buildings, if

21   I were asked a technical question like this.  I

22   would consult with the Department of Buildings.

23        Q    Do you know who Ed Fortier is?

24        A    Yes.

25        Q    Is he who you would consult with?

THOMAS WARGO

1                    THOMAS WARGO

2         A      Yes.

3         Q      If he gave you an answer that you

4    thought made sense, would you be inclined to make

5    that answer the policy of DCP?

6         A      Well, we don't really enforce zoning

7    regulations at the Department of Planning,

8    Department of Buildings does.  They not only

9    enforce the rules, they interpret the rules.  At

10   Planning we can only give guidance.

11        Q      Fair enough.

12               Let's go back to that interrogatory

13   response that we've been looking at from Exhibit

14   number 1 on Page 13.

15               The first full paragraph on Page 13

16   says, "Directly illuminated advertising signs are

17        not permitted in C8, M1, M2 and M3

18        districts because in contrast to C6-5, C6-7

19        and C-7 districts, these districts are

20        located in areas throughout the City, often

21        in close proximity to residential

22        districts."

23               Do you see that?

24        A      Yes.

25        Q      There is another reason in the next

THOMAS WARGO

THOMAS WARGO

1
2    sentence that we'll talk about in a minute, but I
3    want to talk about them separately.
4              My question is, do you agree that
5    the fact that "C8, M1, M2 and M3 districts are
6    located in areas throughout the City, often in
7    close proximity to residential districts" is one
8    of the reasons why directly illuminated
9    advertising signs are not permitted in those
10   districts?
11        A    Yes.
12        Q    Do you also agree that the fact that
13   directly illuminated signs may have negative
14   effects on nearby non commercial manufacturing
15   uses within C8, M1, M2 and M3 districts is another
16   reason why illuminated advertising signs are not
17   allowed in those districts?
18        A    By "non commercial manufacturing
19   uses," it's not clear what they are referring to.
20        Q    Let's come back to that one.
21              Let's focus on the first sentence,
22   which you agreed with, correct?
23        A    Yes.
24        Q    What is it about the fact that C8,
25   M1, M2 and M3 districts often are in close

THOMAS WARGO

**THOMAS WARGO**

1

2  proximity to residential districts that makes

3  directly illuminated advertising signs

4  inappropriate in those districts?

5      A      Well, if the directly illuminated

6  signs are, as I expect, brighter, they would be

7  more visible from further away.

8      Q      So, the concern is that directly

9  illuminated advertising signs in C8, M1, M2 and M3

10  districts could be visible to adjacent residential

11  districts, whereas non illuminated advertising

12  signs in those districts wouldn't be visible to

13  adjacent residential districts?

14      A      It also, I think, has to do with the

15  intensity of the visibility.

16      Q      So, the mere fact that advertising

17  signs in C8, M1, M2 and M3 districts may be

18  visible to adjacent residential districts is not

19  the problem; the problem is the intensity of that

20  visibility?

21      A      Yes.  There are rules that restrict

22  the sizes and the heights; and so, if that's

23  equal, the only difference then would be the

24  intensity of the illumination.

25      Q      You would agree with me that it

THOMAS WARGO

```
 1              THOMAS WARGO

 2    would not be appropriate to restrict directly

 3    illuminated advertising signs in those portions of

 4    C8, M1, M2 and M3 districts that are not visible

 5    from adjacent residential districts?

 6         A       If they are not visible?

 7         Q       Correct.

 8         A       Well, how would you know?

 9         Q       Well, let me ask you that question.

10               How do you know there are any

11    portions of C8, M1, M2 or M3 districts that have

12    advertising signs that would be visible to

13    adjacent residential districts, if the signs were

14    directly illuminated?

15         A       Well, I think whether it's directly

16    illuminated or indirectly illuminated doesn't

17    affect whether you would be able to see it.

18         Q       Let me back up then.

19               The concern we're talking about is

20    that advertising signs will be visible and perhaps

21    visible with a certain intensity in residential

22    districts?

23         A       From residential districts.

24         Q       In other words, the reason that

25    we're discussing restricting the illumination
```

THOMAS WARGO

1              **THOMAS WARGO**

2    level of advertising signs in C8, M1, M2 and M3

3    districts is because of the concern that you will

4    be able to see those advertising signs from

5    adjacent residential districts?

6              A       Yes.

7              Q       How do you know that there are any

8    areas of the City in which you could sit in a

9    residential district and see a directly

10   illuminated advertising sign or even an indirectly

11   illuminated advertising sign from an adjacent C8,

12   M1, M2, and M3 district?

13                    Has anyone looked at that?

14             A       Yes, these are widely mapped

15   throughout the City, and widely mapped to

16   residence districts.

17             Q       You certainly know that there are

18   large portions of C8, M1, M2 and M3 districts with

19   advertising signs that would not be visible to any

20   portions of any adjacent residential districts,

21   even if they were directly illuminated?

22             A       There is certainly going to be some

23   M districts where a sign is not going to be

24   visible from a residence district.  I concede

25   that.

THOMAS WARGO

1               **THOMAS WARGO**

2        **Q**      The City hasn't tried to identify

3    those portions of C8 or M districts where this

4    would be a problem versus those portions of C8 or

5    M districts which this would not be a problem?

6        **A**      To my knowledge, it has never done

7    that study.

8        **Q**      If you were attempting to allow the

9    highest degree of advertising signs that did not

10   interfere with the City's concerns, wouldn't it

11   make more sense to impose location or spacing

12   requirements on directly illuminated advertising

13   signs in C8, M1, M2 and M3 districts rather than

14   completely banning direct illumination in those

15   districts?

16       **A**      Well, it would be very difficult to

17   write a zoning rule that would lift the ban on

18   illuminated signs in manufacturing districts, if

19   they were not visible from a residence district.

20   That would be a very difficult rule to apply, a

21   very difficult rule to enforce.

22       **Q**      It wouldn't be difficult, would it,

23   to study how far signs generally have to be when

24   directly illuminated for someone to see them?

25       **A**      Well, it could be miles.

THOMAS WARGO

```
 1                  THOMAS WARGO

 2        Q       How could it be miles?

 3        A       If you're at a high point, I can

 4   look across -- I can look across New Jersey and

 5   see illuminated signs.

 6        Q       Fair enough.  Let me ask you a

 7   different question.

 8                Given the restrictions that exist

 9   for advertising signs in C8, M1, M2 and M3

10   districts, such as size and height restrictions,

11   it wouldn't be hard to study, would it, how far

12   one has to be away from signs that are subject to

13   those restrictions for the sign to be seen if

14   directly illuminated?

15        A       But it still could be miles.

16        Q       How could it be miles to see a sign

17   that's subject to M1 restrictions?

18        A       Even if it's no higher than forty or

19   fifty-eight feet, you can have a vista that's

20   unimpeded for miles.

21        Q       Are you aware of any such vistas in

22   the City of New York?

23        A       Look across New Jersey and you'll

24   see signs that are quite low.

25        Q       Is the City of New York interested
```

THOMAS WARGO

1                    **THOMAS WARGO**

2       in protecting New Jersey residents --

3              A      No, but --

4              Q      Let me finish the question.

5                     Is the City of New York interested

6       in protecting New Jersey residents from aesthetic

7       impacts of New York City signs on New Jersey?

8              A      No.

9              Q      What actual examples can you think

10      of that would implicate actual concerns of

11      New York City of advertising signs in New York

12      City that are visible from miles away?

13             A      I could be in Manhattan looking at

14      Long Island City.

15             Q      And you're familiar, generally, with

16      the restrictions on arterial advertising signs in

17      New York City, right?

18             A      Yes.

19             Q      You understand that those

20      restrictions generally limit or prohibit

21      advertising signage that is both within a given

22      proximity to and visible from an arterial highway?

23             A      Yes.

24             Q      And there are similar restrictions

25      with respect to public parks, right?

THOMAS WARGO

THOMAS WARGO

1

2      A      Yes.

3      Q      With respect to some public parks,

4  there are restrictions or prohibitions on placing

5  advertising signs within a given distance of those

6  parks, but only if they are in view of those

7  parks?

8      A      Yes.

9      Q      Why couldn't the City allow directly

10  illuminated advertising signs in those portions of

11  C8, M1, M2 and M3 districts that are not visible

12  from adjacent residential districts?

13      A      It could have adopted a similar

14  rule, but for whatever reason it decided not to.

15  I was not part of the study.

16      Q      There is no reason why the City

17  couldn't adopt that rule today?

18      A      If it was sensible.

19      Q      Would it be sensible?

20      A      I don't know.  I haven't studied it.

21      Q      You told me one of the reasons why

22  directly illuminated advertising signs are not

23  permitted in C8, M1, M2, and M3 districts is

24  because of the concern that those directly

25  illuminated signs could be visible to closely

THOMAS WARGO

```
 1                    THOMAS WARGO
 2    approximate adjacent residential districts, right?
 3         A      I also said that they were of
 4    greater -- I believe them to be a greater
 5    intensity than the other signage.
 6         Q      Would you agree with me that if the
 7    City allowed directly illuminated advertising
 8    signs in those portions of C8, M1, M2 and M3
 9    districts that were not visible from adjacent
10    residential districts, but didn't allow directly
11    illuminated advertising signs in C8, M1, M2 and M3
12    districts that are visible from adjacent
13    residential districts, that that would alleviate
14    the concern?
15         A      It could, yes.
16         Q      It could or it would?
17         A      Again, I'm not sure how you would
18    make the determination about being visible.
19         Q      How do you make the determination
20    about being visible from a public park or arterial
21    highway?
22         A      That's a question I would direct to
23    Ed Fortier.
24         Q      Would you agree with me that Ed
25    Fortier has a team of inspectors that go out and
```

THOMAS WARGO

THOMAS WARGO

2  make judgments, right?

3       A       They deal with assigned regulations

4  on a general basis.

5       Q       They issue tickets to signs located

6  in view of arterial highways and public parks

7  based on judgments about whether or not those

8  signs are, in fact -- whether those signs are

9  located in view of arterial highways and public

10  parks?

11       A       Right.

12            MS. NEUFELD:  Objection to form.

13       Q       If there is some basis to disagree

14  with the judgment that those signs are within view

15  of public parks or arterial highways, the

16  landowner or outdoor advertising company is free

17  to contest the violation, right?

18       A       Yes.

19       Q       Is there any reason why that system

20  wouldn't work for directly illuminated signs in

21  C8, M1, M2, M3 vistas?

22       A       There is no reason for me to

23  believe, in theory, it cannot work.

24       Q       I'll take that.

25            You testified that you are generally

THOMAS WARGO

THOMAS WARGO

1                    THOMAS WARGO

2  familiar with the 4x4 poster advertisements that

3  are on bus shelters?

4         A     Yes.

5         Q     And I doubt that you've measured the

6  illumination level with a light meter, but would

7  you say you're generally familiar within a

8  colloquial way with the light generated when

9  you're walking down the street, as a citizen?

10       A     Yes.

11       Q     Are those the kind of signs that the

12  City is concerned about in terms of projecting

13  light in adjacent residential districts?

14       A     I believe so.

15       Q     You testified before that the

16  intensity of the lighting matters?

17       A     Yes.

18       Q     You testified before that the size

19  matters?

20       A     Yes.

21       Q     You also testified that the vista

22  matters?

23       A     Yes.

24       Q     I'm asking you whether you think a

25  4x6 box that's illuminated in approximately the

THOMAS WARGO

```
1                    THOMAS WARGO
2   manner that the bus shelter advertisements are
3   illuminated would realistically be able to cause
4   concerns in terms of being visible from adjacent
5   residential districts?
6                MS. NEUFELD:  Objection to form.
7                MR. HECKER:  I'll rephrase it.
8        Q      We're talking about C8, M1, M2 and
9   M3 districts, right?
10       A      Yes.
11       Q      We're talking about the difference
12  between illuminated and non illuminated signs in
13  those districts?
14       A      Yes.
15       Q      We're talking about the concern that
16  illuminated signs might be visible to adjacent
17  residential districts in a way that non
18  illuminated signs might not be, right?
19       A      Yes.
20       Q      I'm asking you, does that concern
21  apply to the City's bus shelter ads that are
22  located in C8, M1, M2 and M3 districts?
23       A      No.
24       Q      Why not?
25       A      Because it's a different realm in
```

THOMAS WARGO

1

2  the City streets.

3      Q    I understand your testimony that a

4  street is different.

5            I'm wondering if those signs were

6  visible from adjacent residential districts, that

7  wouldn't bother you, because they are on the

8  streets?

9      A    Correct.

10     Q    Do you have any reason to believe

11  that those signs tend to be visible from adjacent

12  residential districts?

13     A    Do I have concerns?

14     Q    Do you have any factual basis to

15  believe that bus shelter signs located in C8, M1,

16  M2 or M3 districts would be visible from adjacent

17  residential districts, given their size and --

18     A    They could be visible from adjacent

19  residential districts.

20     Q    You are talking about residential

21  districts that are across the street?

22     A    Across the street, yes.

23     Q    Excluding those signs that are

24  located on the borders of residential districts

25  M1, M2, M3 or C8 districts, is it fair to say that

THOMAS WARGO

```
 1                    THOMAS WARGO
 2    the bus shelter signs located in those districts
 3    are not visible from adjacent districts?
 4         A     Yes.
 5         Q     The second sentence in the
 6    interrogatory says, "In addition, directly
 7              illuminated signs may have negative effects
 8              on nearby non commercial manufacturing
 9              uses within these districts."
10              I want to know if you agree with
11    that, and I think you said before there might be
12    some reason that you don't?
13         A     Could you repeat that.
14         Q     If you could read the second
15    sentence of the first full paragraph on Page 13,
16    of Exhibit 1, which begins, "In addition," and
17    tell me whether you agree with that.
18              I thought you might have said
19    earlier that there is something about the word
20    "non commercial" that you disagreed with.
21              MR. HECKER:  Off the record.
22              (Discussion off the record.)
23              MR. HECKER:  Back on the record.
24         Q     I have a new question.
25              Having discussed this with
```

1                    **THOMAS WARGO**

2    Ms. Neufeld, it is possible that the word "non" in

3    that sentence is a typo.

4                    Let's assume for the sake of

5    argument that that word "non" is a typo and it

6    shouldn't be there, and Ms. Neufeld is not

7    committing to that position.

8                    My question is, do you agree, in

9    addition to the concerns we discussed, directly

10   illuminated signs may have negative effects on

11   nearby commercial/manufacturing uses within C8,

12   M1, M2 and M3 districts?

13        A     Yes.

14        Q     And what kind of negative effects

15   are we talking about?

16        A     Again, it's a matter of context.  A

17   lot of these manufacturing districts having

18   evolved into more retailer business districts; so,

19   it's appropriate then that the advertising signage

20   be regulated.

21        Q     What exactly are the negative

22   effects that you say flow from the illumination of

23   advertising signs in C8, M1, M2 and M3 districts?

24        A     The intensity of light.

25        Q     And how does the intensity of the

THOMAS WARGO

THOMAS WARGO

1

2    light affect, in a negative way, commercial or

3    manufacturing uses in these kinds of districts?

4        A    It's the public perception in terms

5    of the -- you have the aesthetics issue, you also

6    have the neighborhood context issue.  The

7    advertising -- the intensity of the advertising

8    sign lends a whole different character to the

9    street.

10        Q    You testified that you don't believe

11    that bus shelter advertising in these districts is

12    problematic, even though those ads are directly

13    illuminated, correct?

14        A    Correct.

15        Q    That belief flows from the fact that

16    these bus shelter ads are on the streets and the

17    sidewalks rather than on private property?

18        A    Correct.

19        Q    If those bus shelter signs were on a

20    parking lot rather than on the streets and they

21    were not illuminated, they would be permissible

22    and appropriate in these districts, correct?

23        A    Yes.

24        Q    And if those bus shelter signs were

25    on a parking lot and they were illuminated, as

THOMAS WARGO

1                    **THOMAS WARGO**

2    they are, when they are in bus stations, they

3    would not be appropriate in those districts?

4         A     Yes.

5         Q     What is it about the illumination of

6    bus district signs that would make them

7    permissible and appropriate on parking lots if not

8    illuminated but impermissible and inappropriate in

9    parking lots if they are illuminated in the manner

10   that they are if they are in bus shelters?

11        A     They could be illuminated on private

12   property, just not directly illuminated.

13               Again, it gets to the issues of

14   signage on buildings, the signage on private

15   property, which is distinct from the signage on

16   the public street.

17        Q     I'm trying to take that out of the

18   equation, by putting them on a parking lot.  So,

19   forget about the street for a second.

20               The same bus shelter signs, same

21   size, same illumination, put them in a parking lot

22   in an M1 district.  We have a choice between

23   turning the light bulb on or off.  I think we will

24   agree they would be legal if the light bulb was

25   off and illegal if the light bulb was on?

THOMAS WARGO

1           THOMAS WARGO

2       A       If the light bulb was illuminating

3   from the panel sign itself.

4       Q       Which is the case for bus shelters?

5       A       Yes.

6       Q       Which is my question.

7       A       Yes.

8       Q       I'm asking does that make sense?

9       A       Yes.

10      Q       Why would it make sense to say that

11  internally illuminated bus shelter ads placed on a

12  parking lot would be legal in an M1 district if

13  the light happened to be out but illegal if the

14  light were turned on?  Why is that?

15      A       It's the visibility again, the

16  intensity of the light is making the signage more

17  visible.

18      Q       C8 districts don't allow any

19  residential use, correct?

20      A       Correct.

21      Q       According to the Zoning Handbook

22  that you helped author, C8 districts are

23  incompatible with residential and retail uses,

24  correct?

25      A       They are compatible with retail, a

# EXHIBIT QQ

FILED UNDER SEAL PURSUANT TO THE MARCH 27, 2008
ORDER OF THE HONORABLE PAUL A. CROTTY