# EXHIBIT RR

# ORIGINAL

1

1

2   UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

3   Civil Action No. 06 Civ. 8193(PAC)(DF)
----------------------------------------x

4   CLEAR CHANNEL OUTDOOR, INC.,

             Plaintiff,

5        - against -

THE CITY OF NEW YORK and PATRICIA J.

6   LANCASTER, in her official capacity as
Commissioner of the New York City

7   Department of Buildings,

                                    Defendants.

8   ----------------------------------------x

Civil Action No. 06 Civ. 8219(PAC)(DF)

9   ----------------------------------------x

ATLANTIC OUTDOOR ADVERTISING, INC., SCENIC

10  OUTDOOR, INC., TROYSTAR CORPORATION and
WILLOW MEDIA, L.L.C,

11
                                    Plaintiffs,

12            -against-

CITY OF NEW YORK, PATRICIA J. LANCASTER,
and EDWARD FORTIER,

13
                                    Defendants.

14  ----------------------------------------x

                March 11, 2008
15              1:50 p.m.

16              Deposition of DANIEL DOCTOROFF,

17  pursuant to Notice, held at the offices of

18  Davis Wright Tremaine LLP, 1633 Broadway,

19  New York, New York, before Jineen Pavesi,

20  a Registered Professional Reporter,

21  Registered Merit Reporter, Certified

22  Realtime Reporter and Notary Public of the

23  State of New York.

24

25

```
1                                                                    2
2      A P P E A R A N C E S :
3      DAVIS WRIGHT TREMAINE LLP
       1633 Broadway
4      New York, New York 10019-6708
                    Attorneys for Plaintiff
5                   Clear Channel Outdoor, Inc.
       BY:
6            VICTOR KOVNER, ESQ.
             victorkovner@dwt.com
7            KEVAN CHOSET, ESQ.
             kevanchoset@dwt.com
8      EMERY CELLI BRINCKERHOFF & ABADY LLP
       75 Rockefeller Plaza
9      New York, New York 10019
10                  Attorneys for Atlantic
                    Outdoor Advertising, Inc.,
11                  Scenic Outdoor, Inc.,
                    Troystar Corporation, and
                    Willow Media L.L.C.
12     BY:
             ERIC HECKER, ESQ.
13           ehecker@ecbalaw.com
             DEBBIE GREENBERGER, ESQ.
             dgreenberger@ecbalaw.com
14
15     NEW YORK CITY LAW DEPARTMENT
       100 Church Street
16     New York, New York 10007
17                  Attorneys for City of New
                    York
       BY:
18           SHERYL NEUFELD, ESQ.,
             Assistant Corporation
             Counsel
19
20           JASMINE GEORGES, ESQ.
21
22
23
24
25
```

75

DOCTOROFF

1

2      Q.      What did he talk about?

3      A.      I don't remember.

4      Q.      Did he talk about billboards?

5      A.      I don't remember.

6      Q.      Did he talk about street

7  furnishings?

8      A.      I don't remember.

9          It probably would have been one

10 of 60 meetings I would have had that week.

11     Q.      I would like to show you a

12 document previously marked as Clear

13 Channel Exhibit 30.

14         (Witness perusing document.)

15     Q.      I know many of those pictures

16 are not very legible, but does this appear

17 to be the presentation and PowerPoint that

18 was presented and distributed at the

19 meeting?

20     A.      I don't recall, other than the

21 fact on appendix D it says PowerPoint

22 presentation made by Van Wagner

23 communications to Deputy Mayor Doctoroff

24 and staff.

25         I don't remember the

76

DOCTOROFF

1

2  presentation, but I assume this was the

3  presentation given the label.

4       Q.        Was the PowerPoint projected on

5  a screen?

6       A.        Yes.

7       Q.        Let's go to page Bates numbered

8  1501, which reads, "The problem; New

9  York's arterial highways and streets are

10 cluttered with illegal advertising

11 signage."

12           Does that heading refresh your

13 recollection as to whether that was one of

14 the subjects of the presentation discussed

15 at the meeting?

16      A.        It does not refresh my

17 recollection as much as the e-mail that

18 you showed me before which said that was

19 one of the topics that was going to be

20 discussed.

21      Q.        In the first paragraph, the

22 final two sentences read, "More than $50

23 million was spent on the legal New York

24 City outdoor media in 2005.  If New York

25 City laws had been enforced, a significant

1                              DOCTOROFF                    77

2     portion of that money could have been

3     spent on forms of outdoor advertising that

4     provide revenue for the city such as the

5     street furniture program."

6                  Do you see that?

7         A.       I do.

8         Q.       Do you recall that point being

9     made?

10        A.       I do recall the point being

11    made and I also recall that to me that

12    point was irrelevant, that I was never

13    motivated at any time in my thinking about

14    billboards and policies related to illegal

15    billboards or arterial highway signs by

16    considerations of money, it was only by

17    considerations of aesthetics.

18                 There was never a confluence --

19    there never was expressed, certainly not

20    in my presence, a connection between

21    reducing any form of signage in order to

22    increase the value of the street furniture

23    franchise.

24        Q.       When that point was made, did

25    you disabuse Mr. Schaps or the other Van

78

DOCTOROFF

Wagner representatives of their thinking?

A.        I don't think so, but that wouldn't be unusual, they were in to make a point and I felt little need I'm sure to rebut it.

Q.        Assuming that your testimony is accurate, and I don't begin to suggest the contrary, that it was simply not a factor in your thinking or the city's policies, namely the increase of revenue, was it nonetheless accurate to say that if hundreds of outdoor billboards came down it would somewhat increase the value of other advertising?

A.        I don't believe that is the case for the reasons that I expressed earlier.

I have always viewed the billboard market and the street furniture market for advertisers, whether it is right or wrong I don't know, but to be different markets, one for motorists and their passengers and one for pedestrians.

So I don't ever even remember

79

DOCTOROFF

thinking about the connection between the two.

Q.    But you do remember that he made the point?

A.    Yes.

Q.    You also -- perhaps I am wrong, I don't want to mischaracterize your testimony -- I thought you did testify that as you looked at outdoor advertising generally, that you would agree that there were many advertisers that chose to advertise both on billboards and on shelters --

A.    But that's not relevant in my view.

The fact that an advertiser might choose to advertise on a billboard and on street furniture doesn't mean that if you didn't advertise on one you would spend more on another because you're trying to reach different people with different media.

Just like you would say, well, you know, if I don't advertise on TV I'm

DOCTOROFF                                    80

1

2    going to spend more.

3              They serve very different

4    purposes in my mind, so I don't

5    acknowledge that he even for companies

6    that would advertise on both, that a

7    decline in one would result in an increase

8    in another.

9        Q.       Let's take some sample

10   advertisers, for example.

11             Soon-to-be-released motion

12   pictures, automobiles, beer --

13       A.       No, I acknowledge that there

14   are some advertisers that would advertise

15   on both, that also advertise on TV and

16   advertise on the radio and advertise in

17   magazines and newspapers and on the

18   Internet.

19             What I don't acknowledge is

20   that a reduction in spending on one leads

21   to an increase in spending on the rest for

22   any specific form of advertising.

23       Q.       Let's change increase in

24   spending in your sentence to increase in

25   demand.

81

DOCTOROFF

A.        I don't think that's the case,
because they serve different purposes.

Q.        What are the differences in
those purposes?

A.        Different sets of people,
different targets, different demographics,
different experiences.

The experience of walking by
something is a very different experience
than what you experience driving by
something and I just don't believe they
think of them as substitutable.

Q.        But for the advertiser who
wants to promote the motion picture or the
beer or the new automobile, what's the
different purpose that is achieved --

A.        It is not the different
purpose, it is the different audience and
different experience of seeing the
advertisement.

Q.        Did you understand that Van
Wagner's billboards were largely legal tap
meeting?

A.        As I reflect on the meeting, I

DOCTOROFF

2  believe Richard Schaps made that point.

3    Q.     Did you understand that Van

4  Wagner could profit substantially by

5  stricter enforcement?

6    A.     I had absolutely no doubt what

7  their motivation was.

8           However, it was not

9  inconsistent with my perspective on

10  illegal outdoor advertising, but I came at

11  it from a very different perspective.

12           I recognized they could care

13  less about the aesthetics, we did; but

14  where there is a confluence of interest, I

15  would certainly be willing to listen.

16    Q.     How was the meeting left at its

17  conclusion?

18    A.     I think it was we'll think

19  about it and get back to them.

20    Q.     Did you do anything or write to

21  anyone after the meeting?

22    A.     I don't believe so, but I could

23  be wrong.

24    Q.     Did you receive any letters

25  regarding the meeting?

83

DOCTOROFF

1

2    A.        I vaguely recall this coming

3    afterwards, but I may also be wrong about

4    that.

5    Q.        So you have no recollection one

6    way or the other about receiving letters?

7    A.        No, I don't.

8    Q.        I would like to show the

9    witness an exhibit previously marked as

10   No. 31.

11                 (Witness perusing document.)

12   Q.        Have you seen Exhibit 31

13   previously?

14   A.        I think I did.

15   Q.        Is Mr. Schaps accurate that you

16   quickly understood how important it was to

17   properly introduce and enforce the new

18   regulations?

19   A.        I think that's accurate.

20   Q.        Did you have any problem with

21   his reaching out to Commissioner Lancaster

22   and having his counsel contact Mona Sehgal

23   and --

24   A.        No, it was always a concern

25   about illegal billboards, so I wouldn't

84

DOCTOROFF

have had any problem with him reaching

out.

      If there are good ideas that

achieve our objectives, regardless of the

motives of the proposer, we'll certainly

consider them.

   Q.    The first sentence of the

second paragraph appears to reiterate a

point with which you disagreed previously

when it reads; "Dan, I know you have

always appreciated how valuable a resource

street furniture, telephone kiosks and

other outdoor advertising assets can be to

New York City," which followed the

importance of prompt enforcement.

   A.    He is entitled to say whatever

he wants; I think it is an overly

inclusive overstatement of my view.

      I didn't respond to him saying

I definitely have always appreciated how

valuable a resource street furniture,

telephone kiosks and other outdoor

advertising assets can be; in fact, as I

have testified, while I do believe in the

85

DOCTOROFF

1

2  importance of street furniture, with

3  respect to telephone kiosks, I believe

4  they ought to be cut down dramatically and

5  I have a very serious concern about many

6  forms of outdoor advertising.

7         So I don't think this is an

8  accurate reflection of my position.

9     Q.       Then it goes on to say at the

10 conclusion of the third paragraph, "Not

11 only will you help clean up New York City,

12 but you will be able to generate greater

13 revenue for the city from its outdoor

14 advertising assets."

15        Do you see that?

16    A.       Again, an assertion on his

17 part, that's nice, he is entitled to his

18 point of view, but that is not an accurate

19 reflection of my thinking on the subject.

20        Because, as I have said, I

21 never confused the two, I never related

22 cleaning up outdoor advertising with

23 generating more revenue from our street

24 furniture franchise or other assets.

25    Q.       You notice, do you not, that on

86

DOCTOROFF

the second page he sent ccs of this letter
to the Commissioner of Buildings and two
of its senior employees responsible for
sign enforcement, Mona Sehgal and Edward
Fortier, did you not?

A.        I just noticed that.

Q.        Having granted a meeting to
him where he made his presentation with
which you disagreed in part and then he
follows with a letter to you --

A.        When you say I disagree, let me
just interrupt.

I am not saying I disagreed in
the meeting, I didn't say I disagreed with
the intent.

He and I may have had different
motives, I do disagree with some of the
assertions that he made about my motives,
but not necessarily about my intent.

Q.        Let's go back just to clarify
that, go back to Exhibit 30 and if you
would go to page 11501.

(Witness complying.)

Q.        The last sentence of the first

DOCTOROFF                                    87

2  paragraph, "If New York City laws had been

3  enforced, a significant portion of that

4  money could have been spent on forms of

5  outdoor advertising that provide revenue

6  for the city such as the street furniture

7  program."

8          Is it your testimony that that

9  statement is accurate but did not reflect

10 your view?

11     A.      No, I hadn't even conceded that

12 it is accurate.

13          What I think I have tried to

14 say a couple of times is that I believe

15 outdoor advertising, billboards, and

16 street furniture and other related city

17 assets are not related, that revenues from

18 one, shifting of revenues from one, does

19 not -- decrease in revenues from one does

20 not translate an increase in revenues from

21 the other.

22     Q.      So it is true you disagree at

23 least in part with statements that he made

24 during his presentation?

25     A.      No, I didn't say --  I didn't

88

DOCTOROFF

1

2  say anything at the meeting.

3      Q.      I am not saying you said

4  anything, but I thought you testified you

5  listened and disagreed, albeit privately,

6  with this point?

7      A.      I don't know if I did or

8  didn't, but I never believed there was a

9  connection between the two.

10          So I never conceded that as a

11 matter of fact an elimination of

12 advertising on illegal outdoor signs would

13 result in an increase in advertising

14 revenue from the street furniture program.

15     Q.      To that extent at least you

16 disagreed with Mr. Schaps' presentation?

17     A.      I do disagree; I can't tell you

18 I disagreed to him.

19     Q.      I am not saying that you said

20 it, but you disagreed at the time you

21 heard it?

22     A.      I would have disagreed at that

23 time.

24          But I will also say that it was

25 never a consideration in our development

89

DOCTOROFF

of a policy with respect to outdoor
advertising.

Q.    Now let me go back to Exhibit
31, which is now a couple of days later
when you receive it following the meeting.

Isn't he making the same point
in the last sentence with which you
disagreed at the time?

A.    Yes, but I just said I probably
didn't say anything about it at the
meeting.

Q.    I understand that.

My question is, now you
learned, did you not, that he was sending
a copy of this letter confirming his
understanding, as he saw it, to your
senior officials responsible in this area.

A.    He probably would have said the
same thing in the same meeting assuming
they were there, so it certainly couldn't
have been any surprise to them.

Q.    Did you express your
disagreement on this subject to either
Commissioner Lancaster, Mona Sehgal,

90

DOCTOROFF

1
2  Edward Fortier, or anyone else at the
3  Buildings Department?
4        A.        I don't believe I did.
5        Q.        To anyone else in the city
6  government?
7        A.        I don't recall.
8        Q.        I would like to show the
9  witness Exhibit 32 previously marked.
10             (Witness perusing document.)
11       Q.        This is two e-mails in later
12  July and neither of which are to you.
13       A.        Yes.
14       Q.        The lower and earlier one is
15  from Mr. Schaps to Commissioner Lancaster;
16  can you read that lower one.
17       A.        Yes.
18             (Witness perusing document.)
19       Q.        Is it true that Edward Fortier
20  or Mona Sehgal, or responsible officials
21  at the Buildings Department, were present
22  at the meeting at your invitation?
23       A.        I don't know.
24       Q.        In the top e-mail, at the top
25  of the page, Mona Sehgal says to

91

DOCTOROFF

Commissioner Lancaster, "Ed," meaning

Fortier and "Phyllis," meaning Arnold,

"have had numerous discussions and

meetings with Van Wagner since 2001."

          Did you know that in 2006?

   A.      I don't know.

   Q.      I would like to show the

witness Exhibit No. 15 previously marked.

          This is a letter from

Mr. Pretsfelder, counsel to Van Wagner, to

Mr. Fortier dated July 27, 2006, showing

you as a copy.

          Have you seen Exhibit 15

before?

          (Witness perusing document.)

   A.      Yes.

   Q.      Did you review it at the time

you received it?

   A.      I skimmed it.

   Q.      In the third paragraph

Mr. Pretsfelder says to Mr. Fortier, "To

help you in this process and pursuant to

your request, we have enclosed a list of

the top media-buying agencies and contacts

92

DOCTOROFF

at those agencies to whom we think the
city's initial educational efforts should
be directed."

Were you aware that Mr. Fortier
had requested of Van Wagner a list of the
media-buying agencies with a view to
having the city contact them?

A.      No, but if I had been, I would
have applauded it.

Q.      You would have applauded it?

A.      Sure, we were very interested
in insuring that we eliminate the illegal
signs.

And, as I said before, the mere
fact that we and Van Wagner saw the
purpose of enforcement to be different
doesn't mean that we were not in agreement
with the goal of eliminating illegal signs
and were prepared to look at ways of doing
that.

Q.      And so their proposal that the
city write directly to the media ad
agencies had your approval?

A.      I can't say it had my approval,

93

DOCTOROFF

1

2    I don't remember weighing in specifically,

3    I would have left that to Buildings to

4    determine whether it was appropriate,

5    legal, or whatever.

6              But if they determined that it

7    was going to be effective in achieving our

8    objective, then I would have generally

9    applauded it.

10        Q.        Did you read the draft letter

11    to ad agencies that was attached to this

12    letter?

13        A.        No.

14        Q.        I would like the witness to

15    have an opportunity to review Exhibit 140.

16              (Witness perusing document.)

17        Q.        This is an e-mail in October

18    '06 relating to a meeting with Mike

19    McKeehan and Van Wagner and it says that

20    "the required attendees are Elizabeth

21    Weinstein and Edward Fortier."

22              Who was Elizabeth Weinstein?

23        A.        She was a senior policy advisor

24    who worked for me in the Mayor's Office of

25    Operations and was responsible for me for

110

DOCTOROFF

1
2  paid toilets.

3          So I don't remember whether

4  under the contract with CEMUSA we had the

5  option to have more.

6          We may have negotiated for that

7  option if the legislation ever changed.

8      Q.      Is it your testimony Council

9  limited you to have no more than 20 pay

10 toilets?

11     A.      Yes.

12         MR. KOVNER:  I have no further

13 questions.

14         (Time noted:  4:26 p.m.)

15

16

17  _____

18     DANIEL DOCTOROFF

19

20 Subscribed and sworn to before me

21 this        day of                , 2008.

22

23

24

25

# EXHIBIT SS

```
 1     UNITED STATES DISTRICT COURT
       SOUTHERN DISTRICT OF NEW YORK
 2     -------------------------------------------X
       METRO FUEL, LLC,
 3
                                    PLAINTIFF,
 4

 5         -against-              Case No:
                                  07-CV-8244
 6

 7     CITY OF NEW YORK,

 8                                 DEFENDANT.
       -------------------------------------------X
 9

10                      DATE: June 26, 2008

11                      TIME: 10:30 a.m.

12

13

14                EXAMINATION BEFORE TRIAL of the Plaintiff,

15     METRO FUEL, LLC, by a witness, Jerry Wachtel, taken by the

16     Defendant, pursuant to a court order and to the Federal

17     Rules of Civil Procedure, held at the offices of the New

18     York City Law Department, 100 Church Street, New York, New

19     York 10007, before Shanasia Ilgner, a Notary Public of the

20     State of New York.

21

22

23

24

25
```

1   A P P E A R A N C E S :

2


3   EMERY, CELLI, BRINCKERHOFF, & ABADY, LLP
                Attorneys for Plaintiff
4        METRO FUEL, LLC
         75 Rockefeller Plaza
5        New York, New York 10019
         BY: ERIC HECKER, ESQ.

6


7
    MICHAEL CARDOZO, ESQ.
8   NEW YORK CITY LAW DEPARTMENT
    OFFICE OF THE CORPORATION COUNSEL
9                Attorneys for Defendant
             CITY OF NEW YORK
10       100 Church Street
         New York, New York 10007
11       BY: SHERYL R. NEUFELD, ESQ.
                   -and-
12       BY: CHRISTINA HOGGAN, ESQ.
         File #: 2007-029854
13       Control #: III02334

14

15

16

17

18            *         *         *

19

20

21

22

23

24

25

J. WACHTEL

1    it is safe for them to drive and if so, under what

2    conditions.

3        Q.    Is the lab up and running?

4        A.    It's not up and running yet.  It will be after

5    Saturday of this week, (laughter) if my flight gets me home

6    in time.

7            MS. NEUFELD:  Off the record.

8            (Discussion off the record.)

9        Q.    What do the simulators that you're going to be

10   using simulate?

11       A.    They simulate a driving environment, they are

12   capable of visually reproducing with very high degree of

13   realism, the driving experience all of the roads, the

14   signs, the signals, the environment, the buildings and

15   things, other vehicles and the traffic stream, et cetera,

16   so that we can program the simulator computer in essence to

17   create a kind of a driving challenge that we want the

18   participant or the subject to experience.

19       Q.    And then does the simulator measure what the

20   driver does in that situation?

21       A.    The simulator measures with great precision

22   everything that the driver does, can measure where the

23   driver is looking, how the driver controls the steering

24   wheel, the gas pedal, the brake pedal, their reaction time

25   to events that occur such as a child running out in the

J. WACHTEL

1    road between two parked cars or a car stopping short in

2    front of them or situations like that.

3        Q.    If I use the term "street furniture," what do you

4    understand that to mean?

5        A.    I think of street furniture as pieces of

6    furniture placed by public entities, typically, on

7    sidewalks.  They may be benches or information kiosks or

8    trash cans or shelters, bus shelters, et cetera.

9        Q.    So it would include bus shelters?

10       A.    It has the capability to create by writing

11   software code, it has the capability to create the

12   appearance of pretty much any object including street

13   furniture.

14       Q.    That actually wasn't my question, but you

15   anticipated what my question was.

16            So in the simulator, you could, in theory,

17   recreate a New York City street exactly as it looks?

18       A.    I wouldn't use the word "exactly."  No simulators

19   are yet capable of -- you will always know that it's not

20   real, that it's always a simulator, but they are getting

21   better and better.  New York City would be on the high end

22   of difficulty because there is so much visual complexity to

23   the scene.  The more the visual complexity, the more

24   demanding it is on the computer to create those graphics.

25   So I can't, I can't say off hand how close this could come

J. WACHTEL

1    to creating a New York City street scene.

2        Q.    Do you know if there are other companies out

3    there using driving simulators or is driving lab a pioneer?

4        A.    No, we are not by any means a pioneer.  Driving

5    simulators have been around for 60 or 80 years.  The

6    current state of the art has been around for the last five

7    or ten years and there are probably dozens, maybe hundreds

8    of them in use around the world.

9        Q.    Are you aware of any experiments or projects that

10   you use simulators to monitor what drivers look at in terms

11   of outdoor advertising?

12       A.    Yes.  Not so much -- we think of the simulator as

13   a tool to be used by someone with some degree of expertise.

14   So I am aware of studies, research studies that have been

15   conducted using simulators to study how drivers react or

16   respond to outdoor advertising.

17       Q.    Aside from the present case, have there been any

18   other cases that you were retained in as an expert whether

19   or not you actually ended up testifying that required you

20   to do any sort of analysis of outdoor advertising on street

21   furniture?

22       A.    I can't think of any that fit that description.

23       Q.    When you mentioned a minute ago studies that were

24   conducted using simulators to look at how drivers react to

25   outdoor advertising, were those studies about large format

J. WACHTEL

1    billboards on your highways or advertising on street

2    furniture?

3        A.    None of them, as far as I know, dealt with

4    advertising on street furniture.  Some of them dealt with

5    large-scale billboards, some of them dealt with

6    smaller-scale posters, what we call posters, that might

7    have been on building facades or on posts, you know, like

8    posts, et cetera.  And when you do simulation, sometimes

9    you try, you intentionally try not to make the visual scene

10   as realistic as you might.  You try to recreate the

11   perceptual and cognitive or thought challenges without

12   making it realistic.  It's a little difficult to describe.

13   The psychologists do that all the time.  They're considered

14   surrogates.  So when we want, for example, to simulate a

15   distraction that might be from a billboard or it might be

16   from something else on the side of the road, a particular

17   study may say what we're going to do is flash green light

18   on the right side or red light on the left side and see

19   whether or not the driver can see it and respond to it.

20       Q.    So it would be a green light or a red light

21   instead of an actual something that looked like a sign?

22       A.    That's right.  But what they're really trying to

23   do is, find out whether something that's off in the side

24   view that is not part of the driving task can serve to

25   capture the driver's attention and/or distract the driver.

J. WACHTEL

1    Q.    But would everything else in the environment be

2    the same?

3    A.    Not necessarily.  In fact, in many cases, a lot

4    of this is done in basic science where we're trying to

5    understand the driver's thinking, process and so on and not

6    necessarily solving a particular real-world problem.  So

7    they may strip everything away other than the bear minimum.

8    So instead of having a road with all of the detail of

9    sidewalks and crosswalks and things, they may have simply

10   two white lines on the road with a yellow line in the

11   middle and the driver's task may be, drive the simulator

12   meaning use the gas pedal and the brake pedal and use the

13   steering wheel and follow the road.  And then they may have

14   these things I was talking about like a flashing light on

15   the side of the road to see whether the flashing light

16   captures the driver's attention; and if it does, whether

17   the driver's performance in following the road suffers.

18   Q.    Am I wrong to assume that whether the driver is

19   likely to look at the flashing light in that case, would

20   depend in some degree as to what else is going on, that the

21   driver has to focus on?

22   A.    You're not wrong, but it depends on the

23   particular purpose for a particular study.  In some cases,

24   a study, the intent of a study is just to see how easily

25   distracted a driver may be.  In other cases, it may be, it

J. WACHTEL

1    may be that the point of the study is to say, is it more

2    likely to distract the driver or less likely to distract

3    the driver if these targets, these stimuli are in a complex

4    environment versus a simple environment.

5        Q.    But if you wanted to actually see whether

6    something in a particular environment was likely to

7    distract, you would want it to replicate as close as

8    possible the actual environment?

9        A.    I think that's a fair statement.

10       Q.    Now, not cases where you have been retained as an

11   expert but in any other situation, have you, aside from

12   this, been asked to conduct studies related to advertising

13   on street furniture?

14       A.    No.  I don't believe so.  I'm sorry.  There's one

15   exception that I can recall.  I've done some work for the

16   City of Seattle where they are installing a new light-rail

17   system and they are contemplating outdoor advertising on

18   these platforms of these stations so they are adjacent to

19   the roadside.  So I've done some work with the city for the

20   city to help them plan for those.

21       Q.    Are those platforms similarly situated to street

22   furniture in New York City?

23            MR. HECKER:  Objection.

24       A.    It's hard to say they are similar.  They're

25   similar in that they are fairly close to the side of the

J. WACHTEL

1    straight ahead to be the center line of their vision.  The

2    cone of vision is sort of in the shape of a triangle where

3    the point where the two sides of the triangle come together

4    is at the driver's eye -- can I draw it?

5             MS. NEUFELD:  Sure.  We'll have to mark it

6             as an exhibit, but go right ahead.

7    A.      Art is not my forte.  Let's say we have a driver,

8    here's our stick figure driver and he's or she's in a car

9    and they are driving in this direction so the driver wants

10   mostly to be looking straight ahead, that's where the

11   traffic is, that's where the signs are, et cetera.  Of

12   course we want them to be turning their head from side to

13   side to look at rear view mirrors, side view mirror, other

14   traffic, but mostly they are looking straight ahead.  So

15   the cone of vision, they call it a cone because it's

16   three-dimensional.  But if we draw it flat like this, it's

17   two-dimensional, it's like that.  So this is the angle, all

18   right.  So when --

19   Q.      This being the arc like --

20   A.      This little arc like thing.  So this line

21   represents straight ahead.

22   Q.      The line through the middle?

23   A.      The two lines to the side represent what we

24   consider to be the edges, if you will, of the cone of

25   vision.  When we say plus or minus 10 or 12 degrees, some

J. WACHTEL

1    people think of it as 15 degrees.  It's not a rigid number.

2    So let's say this would be 12 degrees and this would be 12

3    degrees on either side.

4        Q.    So the lines you already have are the 12 degree?

5        A.    Right.  So the cone of vision would be everything

6    within this area, that's basically within 24 degrees of

7    straight ahead.

8        Q.    Okay.

9        A.    So anything that's out here or out here is not

10   within the cone of vision and anything that's in here is

11   within the cone of vision.

12       Q.    When you say "out here," you mean outside --

13       A.    Beyond.

14       Q.    The two lines that you've drawn that look like a

15   V, and when you say inside you mean in that 24 degree --

16       A.    Are you a baseball fan?

17       Q.    Not so much.

18       A.    This is foul territory.

19       Q.    I mean, that I get.

20            MR. HECKER:  Have you ever had a dog have

21            surgery?

22            MS. NEUFELD:  Oh, the cone.  Yeah.

23            THE WITNESS:  That's not the cone of vision

24            though.  (Laughter)

25       Q.    Okay.  Very good.

J. WACHTEL

1               (Defendant's Exhibit C, drawing, marked for

2               identification.)

3    Q.     With Exhibit C that you've so nicely drawn for us

4   in front of you, on a typical New York City street, where

5   does street furniture fall in your drawing?

6               MR. HECKER:  Objection.

7               MS. NEUFELD:  What's the basis of the

8               objection?

9               MR. HECKER:  I object to the form.  I find

10              the question ambiguous and confusing, but I'll

11              let Mr. Wachtel answer the question anyway he

12              can.

13              MS. NEUFELD:  Well, I want --

14    Q.     Is it possible to represent on this drawing a bus

15   stop shelter that you encounter while you were here in New

16   York City?

17               MR. HECKER:  Again, I'll just object.

18    A.     I need to explain one other thing about the

19   drawing and then maybe my answer will be a little clearer.

20   The way this is drawn now shows this driver in this car

21   with this cone of vision as if the driver stopped.  Right.

22   So this 24 degrees goes out from my eyes, out there, but

23   when we talk about moving traffic, the driver is only

24   stopped at traffic lights or stop signs or at traffic

25   stops, otherwise, the driver is moving.  As the driver

J. WACHTEL

1  moves, the cone of vision, because based on his head, on

2  his eye, the cone of vision moves with him.  So as a driver

3  is driving -- I'll make another exhibit so we don't confuse

4  them.  So as the driver is driving down the street, let's

5  say here's the street and the car is here, my cone of

6  vision may be like that.

7      Q.    So are you saying that your cone of vision

8  changes depending on where you are on the street?

9      A.    Yes.  It changes constantly as I go.  So the more

10  I move this way, same car, same cone of vision, right; now

11  it extends out at the same angle.  So let's say there is a

12  street furniture, a bus shelter, newsstand, whatever,

13  public telephone and it's here, when I'm here, it's in my

14  cone of vision.  When I get closer to it, it may go out of

15  my cone of vision.

16          Does that answer your question?

17      Q.    It does.  Exhibit D.

18          (Defendant's Exhibit D, drawing, marked for

19          identification.)

20      Q.    I'm just curious -- if you know, you know; you

21  don't, you don't -- do you know how many feet a typical New

22  York City street block is?  Not an avenue block, but a

23  street block, like say from East 23rd Street to East 24th

24  Street.

25      A.    I don't.

J. WACHTEL

1    Q.    Let's assume it's about 100 feet.

2    A.    Okay.

3    Q.    Is there a way to figure out based on how many

4    feet a block is, how far a driver can see or what would be

5    in the cone of vision?  Is there any correlation between

6    that?

7    A.    There is a way to figure that out, yes.

8    Q.    How do you figure that out?

9    A.    You perform basic trigonometry, so.

10    Q.    Words lawyers do not like to hear.

11    A.    Just so -- shall I draw on this or start a new

12    exhibit?

13    Q.    Whatever you prefer.

14         MR. HECKER:  Let the record reflect that Mr.

15         Wachtel is making further drawings on Exhibit D.

16    A.    Okay.  So let's use this example.

17    Q.    The one closest to the top of the page?

18    A.    Correct.  So what I would do, I take my straight

19    line, all right, so let's say I want to determine if a

20    particular item of street furniture is or is not within the

21    cone of vision at a particular location.  So let's say here

22    is my piece of street furniture.

23    Q.    You've marked a box with an X in it or what you

24    are looking at as your left hand side of the page.

25         MR. HECKER:  I believe the right.

J. WACHTEL

1    Q.    My left hand side of the page.

2    A.    So here's my driver, here is the line that's

3    straight ahead.

4    Q.    So you've made a dot in the first --

5    A.    I've made a little circle for the driver's eye,

6    I've drawn a more heavy line for the straight view and now

7    I'm going to draw a heavier line for the right hand edge of

8    the cone of vision.

9    Q.    Okay.

10   A.    And now, I'm going to connect this triangle at

11   the top.

12   Q.    You've made a line, a horizontal line right under

13   the box with the X?

14   A.    Yes.

15   Q.    To make this example easier, I'm going to erase

16   this box and put it right here at the end of the cone of

17   vision?

18   A.    Right.  So now I know what my angle is because

19   the cone of vision is 12 degrees.

20   Q.    Okay.

21   A.    So this angle right in here is 12 degrees.

22   Q.    Okay.

23   A.    This is what we call a right triangle.

24   Q.    Yes.

25   A.    So, therefore, this is 90 degrees.  We know that

J. WACHTEL

1    from our basic trigonometry.  The angle between the

2    straight ahead view where it meets an imaginary line that

3    goes from the straight ahead to the object that we're

4    interested in, to the bus shelter.

5        Q.    Okay.

6        A.    So this is 90 degrees.

7        Q.    Correct.

8        A.    This is --

9        Q.    Well, 90 degrees to the piece of street

10   furniture?

11       A.    No.  90 degrees, it doesn't measure distance, it

12   only measures the angle between these two lines.  The

13   distance we will come to in a minute.

14       Q.    Okay.

15       A.    So we have 90 degrees, we have 12 degrees here,

16   we don't yet know what this angle is.

17       Q.    Okay.

18       A.    Now, we can measure this because we know if

19   here's the end of the street, right, we know how far the

20   driver's eye is from the curb, we can measure it, right.

21   If I put my tape measure at your eye in your car and I

22   measure the distance to the curb, I know what that distance

23   is.

24       Q.    Wait a second.  So you're assuming that the

25   driver is looking --