J. WACHTEL

1   A.    No, the driver is looking straight ahead.

2   Q.    Not at the curb?

3   A.    Not at the curb.  The driver is looking straight

4   ahead.  But if I draw an imaginary line from the driver's

5   eye straightforward, straight ahead, let's say it's in the

6   middle of the car, it really isn't because the driver sits

7   on the left.  Let's say the driver is in the middle of the

8   street, let's say the street is 60 feet wide so we know

9   from curb to curb --

10  Q.    Okay.

11  A.    -- so from the driver's eye, if he is in the

12  middle, this is 30 feet from the driver's eye to this curb.

13  Because the other 30 feet is on this side of the driver.

14  Q.    Okay.

15  A.    All right.  So let's say this is 30 feet, let's

16  say we know that we've placed our piece of street furniture

17  30 feet off the curb.

18  Q.    Okay.

19  A.    We know it's really much less than that, but to

20  make this look good, all right.  So now we know we've got

21  30 feet from the driver's straight ahead view to the curb

22  and 30 more feet from the edge of the curb to the edge of

23  the street furniture, so we know that this is 60 feet.  All

24  right.  This distance we can measure, we take our tape

25  measure, we put it at the driver's eye and run it down the

J. WACHTEL

1    street until we get to this imaginary line that we've maybe

2    drawn with a piece of chalk across the street.  So we know

3    what this is.  Let's say, hypothetically, it's 100 feet.

4         Q.     100 feet straight ahead?

5         A.     Right.  Now we can do a calculation, because in

6    trigonometry, we can find, this line is called the

7    hypotenuse.  So in trigonometry, I don't know if you've

8    learned socatowa (phonetic).

9         Q.     If I did, it was a long time ago.

10        A.     Socatowa, I think.  So socatowa means, socatowa

11   means the sign, you have the sign and the cosign and the

12   tangent.  So the sign you calculate by the opposite over

13   the hypotenuse.  The cosign you calculate by the adjacent

14   over the hypotenuse, and the tangent you calculate by the

15   opposite over the adjacent.

16             MR. HECKER:  Can I just say -- I don't mean

17             to take over your examination -- you can ask him

18             whatever questions you want about this, but I

19             think I understood what your question was and I

20             think all he is saying is that if you know the

21             distance from the car to where the middle of the

22             street is near the street furniture and you know

23             how far it is from that point to the street

24             furniture, you can then use trigonometry to

25             calculate the angle.  I think that's all he is

J. WACHTEL

1          saying.  I don't know if that's helpful to you,

2          but continue whatever way you think is

3          appropriate.

4     A.    If you know two things, you can calculate the

5   third.  So if you want to know whether this object is

6   within the cone of vision, as long as you know two of the

7   angles, you can calculate for the third angle and you can

8   calculate for this distance.

9     Q.    Okay.

10    A.    And that will tell you, yes, it falls within the

11  cone of vision or, no, it doesn't.

12    Q.    Did you during your two days in New York or at

13  any time after do this sort of a calculation with regard to

14  what you saw during your site visits?

15    A.    No.

16    Q.    So I assume that when you were in New York City

17  you saw examples of street furniture that you concluded

18  would have been within a driver's cone of vision?

19    A.    Yes.

20    Q.    Did you come to any conclusions about how on an

21  average New York City block how long, say, a bus shelter

22  remains in a driver's cone of vision if the driver is

23  moving at the speed limit which I believe is 30 miles an

24  hour?

25    A.    You'd also need to include in that the width of

J. WACHTEL

1    the street as we discussed with this exhibit and which side

2    of the street, if you have a wider street and the driver is

3    looking at an object on the left, it may be out of the cone

4    of vision where an object on the right at the same

5    location, the same distance might be within the cone of

6    vision.  So the simple answer to your question is, I did

7    not try to do that.

8        Q.    Why does the left or the right matter?

9        A.    Because this angle, if we go back to Exhibit D,

10   the angle expands.  The angle is the same, but as you're

11   looking farther down the road, that same angle covers more

12   objects.  So if I'm looking right here very close to the

13   car to be within the cone of vision, an object would have

14   to be almost straight ahead.  But it's called, we call it

15   the focus of expansion, and it's the expansion of the

16   angle.  So the farther away you are from something, that

17   same 12 degree plus or minus 12 degree cone of vision gets

18   wider and wider and wider.  So if I'm 100 feet away like

19   here, an object may be able to be 60 feet to the side of me

20   and still be within the cone of vision.

21       Q.    Do drivers tend to look at objects within their

22   cone of vision that are closer in proximity to them or

23   further away in proximity to them?

24       A.    I'm not aware that there's any general answer to

25   that.

J. WACHTEL

1      Q.      In analyzing what you call the city-sanction

2    signs and their potential for driver distraction, did you

3    look at any accident data?

4      A.      No, I did not.

5      Q.      Did you study any sort of driver-eye movements?

6      A.      I did not.

7      Q.      Do you study situation awareness?

8      A.      I did not.

9      Q.      What is situation awareness?

10     A.      It's almost self explanatory.  Situation

11   awareness is a principal that tries to measure how aware an

12   individual is of his or her surroundings at any given

13   moment in time.  It's almost like saying, it's almost like

14   asking whether somebody has the big picture or not or

15   seeing the forest for the trees.

16     Q.      Did you study reaction time?

17     A.      I did not.

18     Q.      And did you study the number of near misses?

19     A.      I did not.

20     Q.      What did you do to come up with your conclusions?

21              MR. HECKER:  Objection.

22     Q.      How did you arrive at your conclusion that fuel

23   signs almost without exception cause you less concern about

24   the potential for driver distraction than city-sanction

25   signs?

J. WACHTEL

1    A.    Well, I came up with that conclusion based upon a

2    number of things that I did during the two days of site

3    visits as well as some of the basic science behind some of

4    which you were just quoting.  And I would say the primary

5    observation I made that led me to that conclusion was that

6    the city-sanction signs, I can't say always, but certainly

7    the majority of the time were within the driver's cone of

8    vision, at least during some of the time and distance that

9    a driver would approach them.  And conversely, the fuel

10   signs with only one or two exceptions were never within the

11   driver's cone of vision.  And not only were the fuel signs

12   well outside the driver's cone of vision, meaning instead

13   of plus or minus 12 degrees, they might have sometimes been

14   plus or minus 30 or 40 degrees.  But in many cases, the

15   locations of the fuel signs were such that they were

16   difficult if not impossible to see, even if a driver was

17   actually looking for them as opposed to being able to see

18   even when you're not looking for them.  And the reason for

19   that is that many of them were located high up, they were

20   on pillars or posts at parking lots or gas stations or

21   something like that.  So they were above the driver's

22   normal horizontal scanning pattern.  Many of them were

23   located inside the entrances to parking garages and a

24   driver driving along a street approaching and passing the

25   entrance to the parking garage would only have a fleeting

J. WACHTEL

1  glimpse of that sign because of its location inside the

2  garage.  And on many of those occasions, the sign was

3  physically blocked from view by a car or a truck or an SUV

4  that was parked in the entrance to the parking garage

5  thereby totally blocking the view of the sign on the wall.

6  So again, I'm not saying 100 percent, but it was my

7  experience that the overwhelming majority of the fuel signs

8  were outside the cone of vision and the overwhelming

9  majority of what I call city-sanction signs were within the

10  cone of vision.

11      Q.    How many fuel signs did you look at?

12      A.    I don't know.  There's a count in the report.  I

13  don't recall off hand.

14      Q.    So whatever it says in the report is what you

15  looked at and there were no others?

16      A.    Everything I looked at is counted in the report.

17      Q.    What did you do to conclude that the majority of

18  city-sanction signs are within a driver's cone of vision?

19      A.    Well, I did not do my trigonometry when I was out

20  on the road.  So I didn't actually measure what was within

21  12 degrees and what was not.  But I've been doing this kind

22  of work for 30 years and I'm reasonably good at identifying

23  what is within that cone and what is not.  And in addition

24  to that -- I know it is a requirement in many

25  jurisdictions.  I don't know if it's a requirement in New

J. WACHTEL



1    important for me to place my head precisely where one

2    particular driver's head would be.

3        Q.    Did you look at the videos after you took them?

4        A.    Yes.

5        Q.    Do you think that you can see on the video every

6    sign that you narrated?

7        A.    No.

8        Q.    Why is that?

9        A.    Well, in part, the resolution of the video camera

10   wasn't necessarily good enough.  This wasn't a

11   professional, quality video camera.  Number two, the video

12   camera often picked up reflections in the windshield and I

13   might have been able to move my head to get rid of those

14   reflections; number three, the position of the video

15   camera, sometimes it got the rear view mirror in its image,

16   and I knew because I was looking at a site that particular

17   sign or banner or piece of street furniture came into view

18   for a fraction of a section and then got hidden by the

19   mirror.  So the video camera just might not have picked it

20   up.

21       Q.    Do you think that you saw more signs than a

22   driver would have seen because you weren't focused on the

23   driving task?

24       A.    I think I saw more signs than the average driver

25   would see for that reason and because I was looking for



J. WACHTEL

1    signs.  I was specifically, I had tasked myself to look for

2    every sign, every sign and every piece of street furniture

3    that I could.  And that's what we call a directed search or

4    directed visual search.  So chances are, I'm going to see

5    many more than someone who is driving and not directing

6    their search toward the objects.

7        Q.    Do you recall what hours you were out in the

8    field on the first day?

9        A.    All day.  (Laughter) We started, I think we met

10   at 9:00 or 9:30 and we continued until well after dark.  I

11   think we went until 9:00 p.m. or maybe 8:30 p.m.

12       Q.    And there's about an hour's worth of video on a

13   DVD I think you taped?

14       A.    That's right.

15       Q.    What did you do in the down time?

16       A.    Well, it was no down time for us.

17       Q.    What were you doing during the time you weren't

18   videoing?

19       A.    In order to save tape, when we were not actually

20   progressing through an area that I had said, okay, we're

21   going to drive on Sixth Avenue through Herald Square, we're

22   going to start on 28th street and continue to 36th Street.

23   So we -- Mr. Taggart, would be driving along and we'd be on

24   Sixth Avenue at 19th Street, 20th Street, 21st Street and

25   when we got to the start of what I had identified as the

J. WACHTEL

1    items of street furniture along these roads so it doesn't

2    pay to do them.  And I put "lack of," just not knowing

3    whether there might have been some that he didn't know

4    about, et cetera.

5        Q.    On page 13 in the second paragraph, you state

6    that "Because of their size, internal illumination and

7    visual prominence in your intersection, bus shelter signs

8    are potential distractors."

9        A.    Yes.

10       Q.    What did you do to arrive at that conclusion?

11             MR. HECKER:  Objection.

12       Q.    How did you arrive at that conclusion?

13       A.    Largely, the same way that I arrived at others, a

14   combination of my observation and my experience just

15   putting those things together.

16       Q.    Did you try and figure out whether the bus

17   shelter signs are actually distracting to drivers?

18       A.    No, there was no way I could do that.  And given

19   that I was just doing this myself, not a research study in

20   which I had lots of drivers to study.  And as I mentioned a

21   minute ago, regarding that one video sign, the very same

22   sign and the very same location might be a distractor under

23   certain circumstances and not under other circumstances

24   which is why I tend to use the word potential.

25       Q.    So before I go through and ask a whole bunch of

J. WACHTEL

1    questions, maybe we can cut to the chase with one question.

2    (Laughter) So would it be fair to say that for all of the

3    city-sanction signs, your determinations were about whether

4    they are potentially distracting and not whether they are

5    actually distracting?

6    A.    I made no effort to measure actual distraction.

7    So all of my, all of my comments and my conclusions would

8    relate to their being potential distractors.

9    Q.    Actually, let me ask you this question.  I asked

10   you about how you came to your conclusion that bus shelter

11   signs are potential distractors and you gave an answer

12   about how you came to that conclusion.

13         Is it fair to say that your conclusion that all

14   of the other types of city-sanction signs are or are not

15   potential distractors was made in the same way?

16   A.    Yes.  And I would add one thing to that, I think

17   in answer to your previous question, I said, my

18   observations, my experience, I would add to that the

19   research, published research and largely as a result of the

20   published research, I would say that some city-sanction

21   signs have a higher potential to be distractors than

22   others.

23   Q.    Which city-sanction signs do you believe have a

24   higher potential to be distractors?

25   A.    I would say that any city-sanction signs that

J. WACHTEL

1    display motion, whether it be video or digital signs that

2    change, or scrolling signs or eye-share signs, all of those

3    four, and I think those are only four categories, display

4    motion or what we would call apparent motion.  The bigger

5    they are, the more likely they are to distract or the

6    higher potential for distraction.  And at night, the

7    brighter they are, the higher the potential for

8    distraction.

9        Q.     Is it true for all signs whether or not they

10   display motion that the bigger they are, the higher

11   potential there is for distraction?

12       A.     I think it is generally true.

13       Q.     And you said that this last part of your

14   conclusion was based upon research?

15       A.     Well, I, my answer to your previous question

16   about the bus shelter signs being distracting was based

17   upon, I said, my experience and my observations during this

18   site visit.  I should have added research to that as well

19   as a third basis for reaching that conclusion.

20       Q.     By research, do you mean the items listed in the

21   bibliography?

22       A.     Yes.  There's more research than just that, but

23   these are the, the ones in this list of references are the

24   ones that I thought were most perhaps directly related to

25   the issues here.

J. WACHTEL

1    Q.    Do you agree with the conclusions that were

2   reached in all of the things that you list in appendix one?

3                MR. HECKER:  Objection.

4    Q.    Let me just ask you this, actually.

5         In reaching this conclusion about these four

6   categories of signs that you think had more potential for

7   distraction, the motion, digital scrolling eye-share signs,

8   did you rely on what's listed as number 16?

9    A.    Did I rely on it?  I wouldn't say I relied on it.

10  It probably contributed to, to my overall opinion, but if

11  you look at reference number eight, that's a report that I

12  wrote almost 30 years ago long before most of this other

13  research was published and I had the same conclusions in

14  that report that I'm presenting to you now and that was

15  based upon my own research.

16   Q.    Would you disagree with and critique what they

17  said in number 16 --

18   A.    Yes.  I thought I was citing an earlier one.  I

19  have a very serious problems with what they did in number

20  16, yes.

21   Q.    Your report in number eight is cited by the

22  authors of number 16, right, if you remember?

23   A.    I don't remember.  But it would not surprise me.

24   Q.    Do you have a pretty good memory of what you said

25  in your report that's listed as number eight?

J. WACHTEL

1     A.     In number eight, sure, my 30-year old memory is

2     perfect.

3     Q.     I mean, have you looked at it recently?

4     (Laughter)

5     A.     No, I have not.

6     Q.     Do you agree that laboratory research techniques

7     are capable of gathering more precise data than just a

8     visual inspection?

9     A.     Yes.

10     Q.     Do you agree that laboratory research techniques

11     are more capable of yielding reliable data than visual

12     inspection?

13          MR. HECKER:  I'm just going to object.  I

14          don't know what you mean by "laboratory

15          techniques."

16     Q.     Do you know what I mean by "laboratory

17     techniques?"  (Laughter)

18     A.     Well, I assumed what you meant by "laboratory

19     techniques."

20     Q.     Have you ever used the word "laboratory

21     techniques" in any of your reports?

22     A.     Most probably.

23     Q.     What have you used the word to mean?

24     A.     Well, I would use the term probably "laboratory

25     studies."

J. WACHTEL

1    Q.    Okay.

2    A.    And in my field of human factors, it basically

3    means conducting research in a, not on the road and not in

4    the field but in the controlled environment of a research

5    facility.

6    Q.    Using a simulator or something else?

7    A.    Both.  Sometimes using simulator, sometimes using

8    other techniques, sometimes using both.

9    Q.    Such as, other techniques?

10   A.    There are lots of techniques.  For example, if

11   I'm interested in observing signs, I can project a video on

12   the wall and have people respond to that, a video that

13   perhaps I shot in a real car, I'd bring it into the

14   laboratory, project it and I have the subject or the

15   participant sit in front of a little console and press

16   buttons or operate controls based upon what they see in the

17   video.  There are the techniques we call Tachistopic,

18   T-A-C-H-I-S-T-O-P-I-C and all that really means is that's a

19   device that allows you to flash a picture on the wall for a

20   very, very tiny little period of time, fractions of a

21   second, but very precise.  And you can measure how visible

22   something is or how, we would call it, conspicuous

23   something is.  And you find that certain signs can be read

24   and interpreted with a very, very short presentation and

25   other signs take a much longer presentation and that's how

J. WACHTEL

1    you know not so much when you're looking at advertising

2    signs but when you're looking at official highway signs,

3    you want them to be seen as quickly as you can because you

4    don't want the driver distracted by the official highway

5    sign.  So we use Tachistopic techniques to flash different

6    styles, colors, contrasts, et cetera, and see which work

7    the best.

8         Q.    Would it be possible to use those techniques or

9    any of those techniques that you just described to analyze

10   the potential for driving distraction from city-sanction

11   signs in New York City?

12        A.    To some extent I would say yes.  I wouldn't say

13   in all cases.

14        Q.    Why not?

15        A.    Well, for example, one of the issues that I'm

16   concerned about is the brightness of signs at night.  We do

17   not have any laboratory techniques or capabilities yet to

18   replicate in an artificial setting the brightness of a

19   sign, whether that's a simulator or projector, whatever.

20   So we can never in a laboratory do a valid or reliable

21   study of how the brightness of the sign might effect or

22   might distract the driver.  That's --

23        Q.    Leaving aside that exception.

24        A.    I'll give you another example.  We talked at the

25   very beginning about simulators and how sophisticated

J. WACHTEL



1    they've become.  But the visual presentation of even the

2    best simulators are such that they cannot replicate the

3    visual acuity of the human eye when it comes to looking at

4    signs so if you create a laboratory environment with a

5    driving simulator and put in this environment all of the

6    vehicles and the road markings and the buildings and the

7    signs and all of that, and study how a driver might be

8    responding to signs or being distracted by signs, you find

9    that the signs that the simulator can reproduce are simply

10   not as visible from as great a distance as a sign in the

11   real world.  So in a simulator, what we tend to do is

12   artificially inflate the size of the sign, we make it

13   physically bigger in proportion to everything else than it

14   would be in the real world so that the driver can respond

15   to it in the same distance or the same time as he would in

16   the real world.

17         So that leads me to conclude that when you're

18   trying to study distraction from signs or responses to

19   signs in a simulator, you have problems that don't exist

20   when you try to do them in the real world.

21   Q.    When you say "in the real world," in the real

22   world how?

23   A.    On a road, on a highway, on the street.

24   Q.    But on a road, highway, street, just using the

25   same sort of method that you used in New York City or



J. WACHTEL

1    something else?

2         A.    No, I didn't do a research study in New York

3    City.  I wasn't asked to, and these guys couldn't afford me

4    if I did.  All I did was an observational study.  If I was

5    doing a research study, I could do it in any one of several

6    ways, one of which might be outfitting a particular vehicle

7    with instruments to measure the driver's foot on the gas

8    pedal, the brake pedal, the steering wheel, an eye-movement

9    camera to study where the driver is looking and so on.  And

10   then I might find by putting ads in the paper or notices on

11   the bulletin boards, I would try to get 30 or 50 or 100

12   volunteers to participate and to drive that car through the

13   streets that I've previously decided I want them to drive

14   them.  I wouldn't tell them the purpose of the study.  I

15   kind of make something up, you know, we just want to see

16   how drivers drive in New York City and that typically

17   satisfies them and then I'd measure all of these things.

18   And then I would do a statistical analysis to find out

19   whether drivers looked more often at one type of sign than

20   another or looked for longer periods of time than another

21   or looked at the brighter signs longer or the bigger signs

22   longer so that would be kind of a research study that I

23   would do on the road.  But it's very expensive to do that

24   and it's very time consuming to do that.  There are other

25   methods, but that's a typical.

J. WACHTEL

1     Q.     Well, you don't have first-hand knowledge of that

2     other than what you read in the article, right?

3     A.     Correct.

4     Q.     On page 18 you talk about in subheading B, the

5     fuel signs that are elevated above grade -- I take that

6     back.  You say there was only one intersection where you

7     observed where the fuel signs were at grade level?

8     A.     That's my recollection, yes.

9     Q.     If I'm reading the chart on appendix three

10    correctly, it looks to me like you looked at 11 fuel signs

11    on day one and ten fuel signs on day two.

12    A.     Yes.  That's what I wrote.

13    Q.     Do you know how many fuel signs there are in

14    Manhattan south of 97th Street?

15    A.     I think I was given that information in a chart,

16    but I don't remember the number.

17    Q.     Did the chart include information about whether

18    the sign was placed above or below grade level?

19    A.     I don't remember.

20    Q.     Who chose the fuel signs that you would view?

21    A.     Well, in essence, Mr. Taggart identified the fuel

22    signs to review, because I didn't know where they were

23    located.  And he did that based upon the criteria that I

24    had provided, you know, that we wanted two-way streets,

25    one-way streets, divided streets, cross streets, et cetera.

J. WACHTEL

1    Q.    Did you ask them to provide or did you ask any

2    questions about the siting of the fuel signs and

3    determining which ones you wanted to go to?

4    A.    What I remember asking him was, I had been given

5    information in advance that fuel signs were either on

6    building walls at grade level or on building walls higher

7    up or inside garage entrances or on posts above grade at

8    parking lots and gas stations.  It might have been one or

9    two other categories.  And I said to him, I want to get a

10   sampling of each of those types of locations.

11   Q.    Did you ever ask to see all the fuel signs that

12   were at grade level?

13   A.    No.

14   Q.    Did you ask to see all examples of fuel signs

15   that could potentially be within a driver's line of sight?

16   A.    No.  I just, I just asked him to choose fuel

17   signs that represented each category.

18         MS. NEUFELD:  I'm quickly approaching the

19         end.

20   Q.    A quick question for you about appendix four.

21   A.    Okay.

22   Q.    What unit of measurement is represented in these

23   -- values?

24   A.    These are, I don't know the exact, I don't know

25   the exact definition of them, but they are, they are

J. WACHTEL

1    readings from the exposure meter, the photometer that I

2    used that translate directly into a value that is called

3    ISO, I-S-O, which stands for international standards.  I

4    don't know what the O is.  But it's meant for photography

5    use and the ISO setting basically tells you how sensitive

6    the camera or the lens or the film is to a brightness

7    setting, how bright is the light that the camera can record

8    basically.

9        Q.    Have you ever had occasion to measure the

10   brightness of, say, streetlights?

11       A.    I have not, no.

12       Q.    Is there any way to compare this ISO measurement

13   to either foot candles or --

14       A.    There's not.  I think I said in the text, not in

15   the appendix, that I didn't have the proper equipment which

16   is call the photometer to measure luminance values and so

17   this was a substitute and I hoped that I was careful to say

18   that this measurement doesn't represent actual measured

19   values of luminance, but is only, does a relative

20   comparison of the brightness of the different signs.

21       Q.    So just, for example, under urban panel, you say

22   the brightness value is 14.5 to 15.5.  What does that mean

23   in laymen's terms?

24       A.    Essentially, it doesn't mean anything except that

25   14.5, if you look at the LCD video one, the 14.5 shows that

J. WACHTEL

1    the urban panel is brighter than the LCD video panel at its

2    darkest setting and they were the equivalent brightness at

3    the highest setting.  But it doesn't enable you to convert

4    that measurement into luminance or foot candles.

5        Q.    So if I understand correctly, this chart doesn't

6    actually tell you how bright something is, it only compares

7    how bright something is as compared to something else

8    that's also brightened?

9        A.    That's correct.

10       Q.    So if I just went through and rank these in order

11   of number, it will just tell me which of the things you

12   looked at, at the least bright and which of the things you

13   looked at is the most bright?

14       A.    That's right.

15       Q.    Then I think your conclusion on page 20 and

16   spilling over to the top of 21 is that of all the things

17   you've looked at in your personal opinion, two things

18   appear too bright to you.

19       A.    Yes.

20       Q.    Well, I'm correct, that that's just based upon

21   your view as you are Mr. Wachtel looking at and not based

22   on your professional experience?

23       A.    I don't know how to divide that.  I would say

24   they're based on my looking at it and on the measurement

25   with the light meter and when I look at something that

J. WACHTEL



1    relates to human factors and traffic, it's hard for me to

2    separate out whether I'm looking at it as a lay man or I'm

3    looking at it because of my professional experience in the

4    field.

5         Q.    Have there been other times when in your

6    professional capacity you've analyzed the brightness of

7    signs?

8         A.    I have analyzed the brightness of quite a few

9    traffic control devices, which include signs.  I don't

10   recall specific cases of analyzing the brightness of a

11   sign, per se.  But I have probably done that at some point

12   over the years.

13        Q.    When you analyzed the brightness of those traffic

14   control devices, did you use the same method that you used

15   here?

16        A.    No.  When I do my work as an expert witness or

17   when I am participating in a research study, it is

18   important to measure the brightness of things or the

19   contrast of things with great precision.  And so we use

20   specialized equipment like a photometer, which I did not

21   have access to for this visit.

22        Q.    The new bus shelter at the south east corner of

23   Park Avenue South and East 23rd Street --

24        A.    Where are you reading from?

25        Q.    Oh, I'm sorry.  The top of page 21.



J. WACHTEL

1                    C E R T I F I C A T E

2

3    STATE OF NEW YORK        )
                                        :  SS.:
4    COUNTY OF NEW YORK       )

5

6

7              I, SHANASIA ILGNER, a Notary Public for and

8    within the State of New York, do hereby certify:

9              That the witness whose examination is

10   hereinbefore set forth was duly sworn and that such

11   examination is a true record of the testimony given by that

12   witness.

13             I further certify that I am not related to any

14   of the parties to this action by blood or by marriage and

15   that I am in no way interested in the outcome of this

16   matter.

17             IN WITNESS WHEREOF, I have hereunto set my hand

18   this ___14th___ day of ___July___, 2008.

19

20

21                    _____
                       SHANASIA ILGNER
22

23

24

25

# EXHIBIT TT

# ORIGINAL

1

1

2  UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
3  Civil Action No. 06 Civ. 8193(PAC)(DF)
------------------------------------x
4  CLEAR CHANNEL OUTDOOR, INC.,

Plaintiff,
5      - against -
THE CITY OF NEW YORK and PATRICIA J.
6  LANCASTER, in her official capacity as
Commissioner of the New York City
7  Department of Buildings,

Defendants.
8  ------------------------------------x
Civil Action No. 06 Civ. 8219(PAC)(DF)
9  ------------------------------------x
ATLANTIC OUTDOOR ADVERTISING, INC., SCENIC
10 OUTDOOR, INC., TROYSTAR CORPORATION, and
WILLOW MEDIA, L.L.C.,
11                     Plaintiffs,
             -against-
12 CITY OF NEW YORK, PATRICIA J. LANCASTER,
and EDWARD FORTIER,
13                     Defendants.
------------------------------------x
14              January 22, 2008
               10:00 a.m.
15
16              Deposition of JOSEPH PERELLO,
pursuant to Notice, held at the offices of
17 Davis Wright Tremaine LLP, 1633 Broadway,
New York, New York, before Jineen Pavesi,
18 a Registered Professional Reporter,
Registered Merit Reporter, Certified
19 Realtime Reporter and Notary Public of the
State of New York.
20
21
22
23
24
25

59

PERELLO

1
2  advertising essentially, we only sought to
3  use the advertising that we had the best
4  way we knew how for the city.
5      Q.      A little earlier in this report
6  you took credit for increasing the
7  advertising space to the city in extending
8  the Viacom.
9      A.      Yes.
10     Q.      And didn't the CEMUSA deal,
11 which you helped negotiate, provide for a
12 somewhat broader number of shelters which
13 would contain advertising?
14     A.      That's a good question.
15             We sought to -- we did not
16 seek to increase advertising panels for
17 the sake of increasing advertising panels.
18             The DOT wanted more bus
19 shelters, so we did not say build more bus
20 stop shelters because it will be more
21 advertising panels.
22             We sought to maximize
23 advertising where advertising existed, so
24 it is accurate to say that we increased
25 advertising space on the existing

60

PERELLO

1    advertising panels.

2              So with respect to the 17-1/2

3    percent, we were able to use space on

4    existing advertising panels, this did not

5    require Viacom to build new bus stop

6    shelters.

7              However, the city needs more

8    bus stop shelters, the DOT wants more bus

9    stop shelters because they are useful, but

10   that did not play in our evaluation; if

11   DOT wanted to build less bus stop

12   shelters, that's their business, not ours.

13       Q.      So on whatever number of

14   shelters, though, you did seek to increase

15   the amount of advertising space the city

16   could control?

17       A.      Whatever --  only --  we did

18   not seek to damage what worked.

19              So the bus stop shelter model

20   worked, we did not seek to say give us

21   more.

22              We only sought a number that

23   was fair and that everyone could operate

24   as they would.

61

PERELLO

1    Q.        But to the extent that you

2

3    increased the proportion of

4    city-controlled advertising on those

5    shelters, you took credit for it, did you

6    not?

7    A.        Yes.

8    Q.        And you said, although you

9    didn't do any studies on safety or

10   aesthetics, you consulted with others on

11   the law.

12   A.        Yes.

13   Q.        With whom else did you consult

14   in determining what city-controlled

15   advertising space might be appropriate.

16   A.        The Law Department, but I want

17   to clarify something; we did not have the

18   authority to raise or lower advertising

19   panels in the city, I want to make sure

20   that's clear, our role was, for instance,

21   very well explained in our role with the

22   DOT, as an advisor, someone with unique

23   knowledge in the industry.

24            So if we said we want more

25   advertising panels in the city, we could

62

PERELLO

1

2      not magically increase the number of

3      advertising panels in the city, so it

4      really didn't play a large role in what we

5      thought was acceptable or not.

6          Q.      With whom at the Law Department

7      did you consult on the question of what

8      constraints there might be in terms of --

9      what might be appropriate --  in terms of

10     city-owned or city-controlled advertising

11     space?

12         A.      I can't remember.

13              I'm even just speculating that

14     we consulted with folks, but I know that

15     when we were considering, these are the

16     things that we considered.

17         Q.      Is it possible you consulted

18     with no one?

19         A.      I guess.

20         Q.      In the second sentence of your

21     quote you use the phrase "but without so

22     much ambient advertising," do you see

23     that?

24         A.      Yes.

25         Q.      What did you mean by "ambient

63

PERELLO

1    advertising"?

2

3      A.        Ad panels everywhere, I guess,

4    an abundant of advertising.

5      Q.        You began that sentence with

6    "we would prefer to get a good deal for

7    our space."

8              What did you mean when you said

9    "we would prefer to get a good deal for

10   our space but without so much ambient

11   advertising"?

12     A.        I think there would be two ways

13   to increase revenue, there would be two

14   ways to help the bus stop shelter

15   franchise run better; you could put up

16   more ads or you could think a little bit

17   harder and be more strategic and be

18   smarter about it.

19             So I guess what I was saying

20   there was we didn't think there was a need

21   to increase the number of advertising

22   panels in general and that was not our

23   approach.

24             And I believe this was a

25   response to the media's assumption that a

64

PERELLO

1

2  chief marketing officer's job was to put

3  up ads everywhere, we were responding to

4  that.

5      Q.      Did the phrase "ambient

6  advertising" refer to advertising on

7  private property and not city-owned

8  property?

9      A.      I am not sure.

10      Q.      And then you finish the

11  sentence, "or, for that matter, illegal

12  advertising."

13          What were you referring to when

14  you used the phrase "illegal advertising"?

15      A.      I think I was referring to

16  advertising that's illegal.

17      Q.       Illegal in what respect?

18      A.      I will give you an example of

19  illegal advertising; I think stickers that

20  go on the ground, on the sidewalk, or

21  someone writes chalk on the sidewalk,

22  currently there is no permit in place for

23  that, that would be illegal advertising.

24      Q.      Did the phrase "illegal

25  advertising" apply, as you used it in that

# EXHIBIT UU

# ORIGINAL

1

2 UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

3 Civil Action No. 06 Civ. 8193(PAC)(DF)
------------------------------------------x

4 CLEAR CHANNEL OUTDOOR, INC.,
                    Plaintiff,

5       - against -
THE CITY OF NEW YORK and PATRICIA J.

6 LANCASTER, in her official capacity as
Commissioner of the New York City

7 Department of Buildings,
                    Defendants.

8 ------------------------------------------x
Civil Action No. 06 Civ. 8219(PAC)(DF)

9 ------------------------------------------x
ATLANTIC OUTDOOR ADVERTISING, INC., SCENIC

10 OUTDOOR, INC., TROYSTAR CORPORATION and
WILLOW MEDIA, L.L.C,

11                  Plaintiffs,
                     -against-

12 CITY OF NEW YORK, PATRICIA J. LANCASTER,
and EDWARD FORTIER,

13                  Defendants.
------------------------------------------x

14                    February 14, 2008
                      9:45 a.m.

15

16          Deposition of STANLEY SHOR,

17 pursuant to Notice, held at the offices of

18 Davis Wright Tremaine LLP, 1633 Broadway,

19 New York, New York, before Jineen Pavesi,

20 a Registered Professional Reporter,

21 Registered Merit Reporter, Certified

22 Realtime Reporter and Notary Public of the

23 State of New York.

24

25

65

1                          SHOR

2   respond to certain when receiving

3   violations on certain locations and not on

4   others.

5          Q.       How many PPTs currently have

6   advertising on them?

7          A.       I don't have a number for that.

8          Q.       Do you have a general idea?

9          A.       We have approximately 21,000

10  pay phones in total; of that total, 58

11  percent are at the curb and 42 percent are

12  at the building line and this continuously

13  changes over time.

14                 There is a significant number

15  of phones removed every year, there is

16  also some phones that are new that come

17  into the system.

18                 Of that 58 percent, there is a

19  percentage that have advertising on them,

20  but it is not 100 percent.

21                 As far as the actual number of

22  ad panels, we do have records at the

23  office for what the companies provide to

24  us, the locations of the ad panels that

25  they put up, but I don't have an actual

66

SHOR

1
2  number related to the phones, partially

3  because there are difficulties in relating

4  the advertising panels to the phones

5  because there can be one phone, there can

6  be two phones, there could be three phones

7  related to the same advertising panels.

8      Q.      When you said there are 21,000

9  public PPTs, you could have --

10     A.      You could even have four.

11     Q.      You could have multiple PPTs in

12  one enclosure, correct?

13     A.      Yes.

14     Q.      So there would be three

15  advertising panels surrounding four PPTs?

16     A.      Yes, usually, or there could be

17  no advertising panels depending on what

18  choices the company made and what the

19  zoning is at the location.

20             Usually if there is four phones

21  it is a commercial location and usually

22  they would have three advertising panels,

23  but not always.

24     Q.      You said that the breakdown was

25  58 percent at the curb, 42 percent at the

163

SHOR

2  considered approving anything that was

3  going to create a distraction, even if it

4  was going to bring us twice the amount of

5  money.

6      Q.     In deciding whether the

7  advertising would create a distraction,

8  how would you make that determination?

9      A.     I made the determination based

10  on -- as you can see in my letter of

11  approval, saying that the illumination

12  would be no brighter than the rest of the

13  panel.

14         Basically it was to not create

15  a significant change in the look of the

16  pay phone for this type of advertising.

17      Q.     In deciding whether an

18  advertisement would constitute a

19  distraction, did you give weight to what

20  sort of advertising was on bus shelters,

21  for example?

22      A.     No.

23      Q.     Did you give weight to what

24  sort of advertising was on MTA signs, for

25  example?

227

1                           SHOR

2        Q.        What was the answer that you

3    received?

4        A.        I never received an answer on

5    this.

6                  I don't know if the

7    commissioner took this any further.

8        Q.        Do you know how many such

9    advertisements the MTA has over transit

10   facilities?

11       A.        No.

12                 MS. SCHNEIER:  I will just mark

13   one more document, Exhibit 113, and then

14   if I can take a five-minute break to

15   confer, I think I will wrap it up.

16                 This is a document Bates

17   stamped NYC 10702 through 10710.

18                 (Clear Channel Exhibit 113,

19   Bates stamped NYC 10702 through 10710, was

20   marked for identification, as of this

21   date.)

22                 (Witness perusing document.)

23       Q.        Earlier in the deposition,

24   Mr. Shor, I believe you testified that

25   DOITT does not track whether any of the

# EXHIBIT VV



**DEPARTMENT OF INFORMATION TECHNOLOGY AND TELECOMMUNICATIONS**

75 Park Place, 9th Floor
New York, NY 10007
(212) 788-6550
Fax (212) 788-8938

**GINO P. MENCHINI**
*Commissioner*
*Chief Information Officer*

**STANLEY SHOR**
*Assistant Commissioner*
*PPT Franchises*

January 10, 2005

Paul G. Whitby, Esq.
General Counsel
Van Wagner Communications, LLC
800 Third Avenue
New York, NY  10022-7604

Re:  Use of LED Displays

Dear Mr. Whitby:

Commissioner Menchini has reviewed your request for authorization to maintain 49 light emitting diode (LED) displays on public pay telephone kiosks.  Please be advised that your request is rejected.  Therefore, these installations must be removed forthwith.

Please be advised that failure to remove these displays within thirty (30) days will result in additional enforcement proceedings.  Your cooperation will be appreciated.

Sincerely,

Stanley Shor

C:  Commissioner Gino Menchini
    Deputy Commissioner Agostino Cangemi

**DIAL 311** Government Information and Services for NYC

# EXHIBIT WW

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------x

METRO FUEL, LLC,

                                                  Case No.

                          Plaintiff,             07-CV-8244

        - against -

CITY OF NEW YORK,

                          Defendant.

-------------------------------------------x

# ORIGINAL

                              June 10, 2008

                              12:30 p.m.

                              75 Rockefeller Plaza

                              New York, New York 10019


              DEPOSITION of KERRY GOULD-SCHMIT,

testifying on behalf of THE CITY OF NEW YORK,

the Defendant in the above entitled matter,

taken pursuant to Consent, before a Notary

Public of the State of New York.


RAYVID REPORTING SERVICE, INC.    (212) 599-3642

1              **KERRY GOULD-SCHMIT**

2

3    **A P P E A R A N C E S :**

4

5         **EMERY CELLI BRINCKERHOFF & ABADY, LLP**

6              **Attorneys for Plaintiff**

7              **75 Rockefeller Plaza**

8              **New York, New York 10019**

9

10      **BY:    ERIC HECKER, ESQ.**

11

12      **MICHAEL A. CARDOZO, ESQ.**

13              **Corporation Counsel**

14              **New York City Law Department**

15              **Attorneys for Defendants and Witness**

16              **100 Church Street**

17              **New York, New York  10007-2601**

18

19      **BY:    SHERYL R. NEUFELD, ESQ.**

20              **Assistant Corporation Counsel**

21

22                  **- and -**

23

24      **BY:    CHRISTINA HOGGAN, ESQ.**

25              **Assistant Corporation Counsel**

1                      KERRY GOULD-SCHMIT

2    disagree.

3              The amount of money that Cemusa

4    thinks it's going to make on this contract is way,

5    way more than it's going to cost them to build out

6    the newsstands and maintain them for twenty years.

7              Would you agree with that?

8              MS. NEUFELD:  Objection.

9         A    Yes.

10        Q    The difference between being able to

11   place advertising signs on the newsstands and not

12   being able to place advertising signs on the

13   newsstands is not the difference between this deal

14   being profitable for Cemusa or not profitable for

15   Cemusa, right?

16             MS. NEUFELD:  Objection.

17        A    Could you just repeat that?

18             MR. HECKER:  Read it back.

19             (The question requested was read

20        back by the reporter.)

21        A    I agree, the deal would be

22   profitable for Cemusa, less profitable, but still

23   profitable.

24        Q    I know we don't have a crystal ball,

25   but based on your practical experience, would this

**KERRY GOULD-SCHMIT**

1
2    process generally, and would this bidder in

3    specific -- isn't it a fair presumption that if

4    the City had decided to require the proposers to

5    build out and maintain all the newsstands, but not

6    allow them to put advertising on, then, A, the

7    bidders still would have bid and still would have

8    been willing to play ball; but B, would have

9    simply offered the City less compensation?

10                Isn't that fair to assume?

11                MS. NEUFELD:  Objection.

12        A       I think it's fair to assume, with a

13   certain caveat.

14                The newsstands are a very difficult

15   replacement for any proposer.  There are

16   individuals who operate them.  This is not -- it's

17   not a fun thing for them to do.

18                I mean, this is extremely

19   complicated.  It's become very expensive with the

20   electrical hookups.  I mean, I think you needed to

21   incentivize it somehow.

22                I agree with you, I think it would

23   still be profitable for them, but I think some --

24   it's a huge headache for them.  So, I think --

25        Q       It's a huge headache for them

**KERRY GOULD-SCHMIT**

1

2 regardless of whether they are putting advertising

3 signs on them?

4         A       The advertising incentivizes it for

5 them.  We wanted a relationship between them and

6 the newsstand operators.  This -- I've been

7 involved with the newsstand operators a long time.

8               It makes it a bit easier for the

9 company to swallow.  It also, I hope, makes the

10 relationship better.  It makes the company more

11 attentive to the newsstand operator.

12               I think there are all these outside

13 goods that come from the fact that there is

14 advertising on that newsstand.

15         Q       I want to focus on the aspect that

16 you focused on in your Declaration, which is the

17 money.

18               My reading of Footnote 3 is that

19 you're suggesting that the City needed the carrot

20 of newsstand advertising revenue to induce the

21 prospective bidders to be willing to build

22 newsstands.  That's what you're suggesting in this

23 footnote, right?

24         A       Yes; and maybe not -- yes, I am

25 suggesting that.  I think we needed the money as a

**KERRY GOULD-SCHMIT**

1

2    carrot.

3        Q       I'm not in any way suggesting this

4    is perjury.  I'm just asking you to reconsider in

5    more detail whether this is the best way of

6    reflecting your view, and I'm asking you to

7    consider whether it isn't really more accurate to

8    say that you needed some carrot, that's for sure,

9    but that the overall carrot of allowing the

10   bidders to put advertising on bus shelters, which

11   is far more lucrative than advertising on the much

12   smaller number of newsstands would have been

13   enough of a carrot to induce people to build out

14   the newsstands, albeit, with less money promised

15   to the City.  Isn't that fair?

16               MS. NEUFELD:  Objection.

17       A       I think we needed the carrot, and

18   the only reason I say this to you, when we have a

19   newsstand litigation, I will tell you we

20   anecdotally heard a lot of people saying sever

21   them off.

22       Q       My firm represented the Plaintiffs

23   in that case, so I'm familiar with that.

24       A       I'm talking about the anecdotal

25   things we heard from the business community, I'll

**KERRY GOULD-SCHMIT**

1
2    say; and their point was, we'd rather do it

3    without them, we would rather do the bus stop

4    shelters.

5          If we are going to take on the

6    headache of these newsstands, they would have to

7    have advertising, because there is no way they

8    wanted to do it just to do it, and we did hear

9    that, just in conversation with people.

10   Q     From prospective bidders or from

11   newsstand operators?

12   A     I just know it was sort of talked

13   about, like at the City Council hearings and

14   things like that, about they knew the litigation

15   was pending.  It could have been an issue of

16   people didn't want to get involved in -- I don't

17   know what.

18         I just know that there are 296

19   stands and about 260 of them are below 96th Street

20   in Manhattan.  Extremely difficult construction.

21   It's a lot of pain to deal with the newsstands

22   just because you're constantly inundated with

23   requests from people and I think we needed to have

24   advertising to act as an incentive to move

25   forward.

**KERRY GOULD-SCHMIT**

1

2 Q Your belief is that if the City had

3 said you can have two panels on each of 3,300 bus

4 shelters, but you can't have any panels on

5 newsstands and we expect your revenue offers to

6 reflect that, your belief is that the bidders

7 would not have been willing to bid on the street

8 furniture at all?

9  If that's what you're saying, so be

10 it.

11 A I really have no idea what they

12 would do.  I really don't.  I don't know their

13 business models or what they are thinking.  I

14 don't know.

15  I can't answer that question.  I

16 know what we felt, and I still believe this, we

17 needed to incentivize the newsstands somehow.

18 Q And you didn't think that 6,600 ad

19 panels on 3,300 shelters was enough?

20 A I know -- like I said, I have no

21 idea.  I'm not a bidder.

22 Q Let me ask you this question.

23  Did the City ever consider, to your

24 knowledge, whether it would have been such an

25 incentive to get these newsstands built, to limit