# EXHIBIT XX

1

```
 1
 2   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 3   Civi Action No. 06 Civ. 8193(PAC)(DF)
     ------------------------------------x
 4   CLEAR CHANNEL OUTDOOR, INC.,
                    Plaintiff,
 5        - against -
     THE CITY OF NEW YORK and PATRICIA J.
 6   LANCASTER, in her official capacity as
     Commissioner of the New York City
 7   Department of Buildings,
                                Defendants.
 8   ------------------------------------x
     Civil Action No. 06 Civ. 8219(PAC)(DF)
 9   ------------------------------------x
     ATLANTIC OUTDOOR ADVERTISING, INC., SCENIC
10   OUTDOOR, INC., TROYSTAR CORPORATION and
     WILLOW MEDIA, L.L.C,
11                              Plaintiffs,
               -against-
12   CITY OF NEW YORK, PATRICIA J. LANCASTER,
     and EDWARD FORTIER,
13                              Defendants.
     ------------------------------------x
14            March 19, 2008
              10:10 a.m.
15
16            Deposition of KERRY
17   GOULD-SCHMIT, pursuant to Notice, held at
18   the offices of Davis Wright Tremaine LLP,
19   1633 Broadway, New York, New York, before
20   Jineen Pavesi, a Registered Professional
21   Reporter, Registered Merit Reporter,
22   Certified Realtime Reporter and Notary
23   Public of the State of New York.
24
25
```

## Page 250

```
1       GOULD-SCHMIT
2   general policy discussions about it, is it
3   something worth moving forward on and what
4   type of framework would you use.
5          I was there more to sort of go
6   through what is involved with obtaining a
7   franchise and going through the council
8   and getting the authorizing resolution,
9   talking about that aspect.
10         But I have been involved in
11  conversations on the sidewalk shed
12  advertising.
13    Q.    Let's take them from the
14  beginning.
15         Tell me the first time this
16  came up.
17    A.    It was after the Bloomberg
18  administration --
19    Q.    You said this came up during
20  the Giuliani administration?
21    A.    My understanding is it was
22  discussed under Giuliani, I didn't have
23  any knowledge of it until I got asked to
24  go to a meeting once Mayor Bloomberg took
25  over.
```

## Page 251

```
1        GOULD-SCHMIT
2          As for dates, I don't recall, I
3   don't even really remember why it was
4   brought up, but I know I went to a meeting
5   about it with people from Buildings.
6     Q.   Who was at the meeting?
7     A.   Marc Ricks, maybe Gabe Taussig.
8          I don't know if Phyllis was
9   there --
10    Q.   That would be Phyllis Arnold?
11    A.   Yes, and I believe somebody
12  named Steven Kramer from DOB.
13         There were other people, I
14  don't recall their names.
15    Q.   Anyone from any other agencies
16  other than DOB, DOT, and Marc Ricks from
17  the Deputy Mayor's Office, Deputy Mayor
18  Doctoroff and Gabe Taussig of the Law
19  Department.
20         Any other departments
21  represented at the meeting?
22    A.   Not that I recall, but there
23  could have been people from other
24  departments.
25    Q.   This is during the Bloomberg
```

## Page 252

```
1        GOULD-SCHMIT
2   administration?
3     A.   Yes.
4     Q.   What --
5     A.   My recollection is post street
6   furniture franchise, because I was there
7   to walk through what was involved in doing
8   a franchise.
9     Q.   When you say post street
10  furniture franchise, do you mean post the
11  RFP or post the CEMUSA agreement?
12    A.   I would say at least obviously
13  getting the authorizing resolution and
14  getting the RFP out; I don't recall if the
15  contract had been negotiated yet, but I
16  had been through the process of getting an
17  authorizing resolution and going down that
18  road.
19    Q.   So it is probably 2004 or
20  later?
21    A.   That's probably a safe guess,
22  2003, somewhere in there, it would be late
23  '03, I guess.
24    Q.   Tell me slowly what was
25  discussed at this meeting.
```

## Page 253

```
1        GOULD-SCHMIT
2     A.   How you could actually set up a
3   franchise or a concession to sell
4   advertising space on sidewalk sheds.
5     Q.   Tell me more about what was
6   discussed.
7     A.   I think we discussed a lot of
8   the policy concerns about it, what are the
9   implications on the sidewalk sheds and
10  having them out on the sidewalk for
11  extended periods of time because it is an
12  incentive, if you're selling advertising
13  on them, you know, does it encourage
14  people to leave the sidewalk sheds out
15  there longer than they need to be and how
16  you would enforce against that.
17         That I know was a big
18  discussion point.
19    Q.   What were considered the pros
20  in favor of a concession on the sidewalk
21  sheds?
22    A.   I think part of it was they
23  would look better, you could have higher
24  standards as to lighting and things like
25  that, because if people were selling
```

**Page 254**

GOULD-SCHMIT

advertising on them, they would be generating revenue and some of that revenue should go back to making it a more pleasant environment, because it is fairly unpleasant underneath the sidewalk sheds.

So we did discuss in London the construction and sidewalk sheds are nicer, we were just talking anecdotally about what we experienced.

It certainly came up about its impact, that we had the street furniture franchise on the street and it was moving forward and would this even be attractive to people, because there is just more and more advertising out there and at some point does it lose its value, so we sort of talked about that at a very high level of detail, no great analysis, just sort of what our feelings were about that.

That's what I remember most about it.

Q. Was there discussion that this could bring in revenue for the city?
A. Sure.

**Page 255**

GOULD-SCHMIT

Q. Was there discussion about how much revenue it could bring in?
A. No; the bigger concern was are we hurting ourselves by having too much advertising.

It wasn't an analysis of I think it is worth this much; maybe that type of analysis has gone on, but I was not involved in that.

Q. So there was concern that there would be an oversaturation of the market and you might decrease the value of the ads on the street furniture structures if you also had ads on the sidewalk sheds?
A. Sure, street furniture, phones, whatever is out there, yes; the idea was could you have too much out there.

And also, you need to attract people to come in and do it.

There was just a conversation about, well, maybe the industry wouldn't even be interested in this because there is so much out there.

Q. Was there an attempt to

**Page 256**

GOULD-SCHMIT

determine whether the industry was interested?
A. I don't know that.
Q. Would that have been DOB that would have done that?
A. I assume it would be DOB because they regulate the sidewalk sheds, so I assume it is over there for them to decide because sheds are under their jurisdiction.
Q. So you were there in part because of your expertise in the street furniture franchise?
A. Yes, sort of in how to advance franchise, what's the regulatory process, and also just in general discussions about advertisement.
Q. What was the result of this initial meeting that you have described?
A. I do think there was a memo circulated, whether it went from Phyllis to our general counsel, I do think there is a memo out there basically stating the city's feelings about moving forward with

**Page 257**

GOULD-SCHMIT

this.

I don't know if I have that or it has been produced, but there is a memo out there.
Q. What was the gist of that memo?
A. I think it is very complicated.
MS. NEUFELD: I think it is a privileged memo.
Q. Other than a memo, do you know what the result of the meeting was about a possible concession on sidewalk sheds?
A. It hasn't gone anywhere, but I was not that involved, so it could be going somewhere and I just don't know about it or didn't know about it.
Q. Your involvement was limited to this one meeting?
A. I have had people follow up with phone calls.
Q. Who did you have followup telephones calls with?
A. Liz Weinstein.
Q. Who is she?
A. She works at the Mayor's Office